# EXHIBIT A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| STEWARD HEALTH CARE | § | Case No. 24-90123 (CML) |
| SYSTEM LLC, *et al.*,[1] | § | |
| | § | (Jointly Administered) |
| Debtors and Appellees. | § | |

| | | |
|---|---|---|
| THE COMMONWEALTH OF | § | Lead Civil Action No. |
| MASSACHUSETTS, TRACO | § | 4:25-cv-02825 |
| INTERNATIONAL GROUP S. DE | § | |
| R.L., AND DR. MANISHA | § | Consolidated with: |
| PUROHIT, *et al.*, | § | 4:25-cv-02829 |
| | § | 4:25-cv-02901 |
| Appellant. | § | |

| | | |
|---|---|---|
| THE COMMONWEALTH OF | § | |
| MASSACHUSETTS, | § | Civil Action No. 4:25-cv-03754 |
| | § | |
| Appellant. | § | |

| | | |
|---|---|---|
| KEVIN M. EPSTEIN, THE UNITED | § | |
| STATES TRUSTEE FOR REGION 7 | § | Civil Action No. 4:25-cv-03755 |
| | § | |
| Appellant. | § | |

---

[1] A complete list of the 167 debtors in the underlying chapter 11 cases (the "<u>Debtors</u>" and "<u>Appellees</u>") may be obtained at https://restructuring.ra.kroll.com/Steward.

| TRACO INTERNATIONAL GROUP S. DE R.L., | § § § § | Civil Action No. 4:25-cv-03757 |
|---|---|---|
| Appellant. | | |

| DR. MANISHA PUROHIT, *et al.*, | § § § | Civil Action No. 4:25-cv-03830 |
|---|---|---|
| Appellants. | | |

**THE COMMONWEALTH, TRACO, AND PARTICIPANTS' JOINT (I) UNOPPOSED MOTION TO CONSOLIDATE APPEALS OF THE SETTLEMENT ORDER, SOLICITATION ORDER, DISMISSAL ORDER, AND CONFIRMATION ORDER; AND (II) OPPOSED MOTION TO <u>CERTIFY FOR DIRECT APPEAL</u>**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................3

JURISDICTION AND VENUE ........................................................7

PROCEDURAL BACKGROUND........................................................8

   A. The FILO Settlement and Solicitation of the Plan ............................8

   B. Confirmation of the Plan ..............................................10

   C. Prior Consolidation and Abatement of the Settlement Appeal ...................10

ARGUMENT AND AUTHORITIES........................................................11

   A. Consolidation of Interrelated Appeals Promotes Judicial Efficiency ...........11

   B. The Proposed Consolidated Appeals Satisfy Each Potential Basis for Certification – Though a Single Basis Would Suffice ...................12

     1. Criteria for Certification........................................12
     2. No Controlling Law and Conflicting Decision ......................14
     3. Public Importance................................................16
     4. Materially Advance Progress ......................................17

CONCLUSION........................................................19

# TABLE OF AUTHORITIES

## Cases

*In re Adkins*,
    517 B.R. 698 (Bankr. N.D. Tex. 2014) ............................................................... 13

*In re Braniff Airways, Inc.*,
    700 F.2d 935 (5th Cir. 1983) ................................................................................. 9

*In re Bruce*,
    No. 21-CV-7455 (CS), 2021 WL 6111925 (S.D.N.Y. Dec. 27, 2021) .............. 14

*FERC v. Extraction Oil & Gas Extraction Oil & Gas*,
    Inc., No. 20-cv-1412, 2021 WL 3722229, at *6 (D. Del. Aug. 23, 2021) ......... 17

*Harrington v. Purdue Pharma L.P.*,
    603 U.S. 204 (2024) ............................................................................................ 12

*In re LAJET, Inc.*,
    163 B.R. 81, 83 (E.D. La. 1993) ......................................................................... 11

*Medlin v. Palmer*,
    874 F.2d 1085, 1088 (5th Cir. 1989) .................................................................. 11

*In re Millennium Lab Holdings II, LLC*,
    543 B.R. 703 (Bankr. D. Del. 2016) ................................................................... 14

*In re MPF Holding U.S. LLC*,
    444 B.R. 719 (Bankr. S.D. Tex. 2011) ............................................................... 18

*Nortel Networks Inc. v. Ernest & Young Inc. (In re Nortel Networks, Inc.)*,
    Nos. 15-196, 15-197, 2016 WL 2899225 (D. Del. May 17, 2016) .................... 17

*In re Pac. Lumber Co.*,
    584 F.3d 229 (5th Cir. 2009) ........................................................................ 13, 18

*In re Qimonda AG*,
    470 B.R. 374 (E.D. Va. 2012) ............................................................................ 17

*In re Springfield Hosp., Inc.*,
    618 B.R. 109 (Bankr. D. Vt. 2020) ..................................................................... 14

iv

*Weber v. United States*,
    484 F.3d 154 (2d Cir. 2007) .......................................................17, 18

## Statutes and Codes

United States Code
    Title 11, Section 105(a) ...................................................................12
    Title 11, Section 1112(b) .................................................................12
    Title 11, Section 1122(a) .................................................................12
    Title 11, Section 1123(a) .................................................................12
    Title 11, Section 1129(a) .................................................5, 6, 12, 16
    Title 28, Section 157(b) .....................................................................7
    Title 28, Section 158(c) ...................................................................11
    Title 28, Section 158(d) ...................................3, 6, 7, 13, 17, 18
    Title 28, Section 1408 .......................................................................7
    Title 28, Section 1409 .......................................................................7
    Title 28, Section 1746 .......................................................................1

## Rules and Regulations

Federal Rules of Appellate Procedure
    Rule 3(b) ....................................................................................2, 11
    Rule 6 ................................................................................................2
    Rule 27(d) .......................................................................................22
    Rule 32(a).......................................................................................22
    Rule 32(f).......................................................................................22

Federal Rules of Bankruptcy Procedure
    Rule 8006(f).....................................................................................3

## Other Authorities

H.R. Rep. No. 109-31 (2005), reprinted in 2005 U.S.C.C.A.N. 88.........................13

TO THE HON. GEORGE C. HANKS, JR., UNITED STATES DISTRICT JUDGE:

The Commonwealth of Massachusetts ("Massachusetts" or the "Commonwealth"), TRACO International Group S. de R.L. ("TRACO"), and Drs. Manisha Purohit, Diane Paggioli, James Thomas, Thomas Ross, Michael Regan, Peter Lydon, Sridhar Ganda, A. Ana Beesen, Benoy Zachariah, Barry Arkin, Bruce Kriegel, Gary Miller, Jennifer Skolnick, Stephen McElroy, Robert Dart, Robert Lowenstein, and Irina Kogan for themselves and other participants in and beneficiaries of certain of the Debtors' deferred compensation plans (collectively, the "Participants" and, together with the Commonwealth and TRACO, the "Appellants"), by and through undersigned counsel, submit this *Joint (I) Unopposed Motion to Consolidate Appeals of the Settlement Order,* [2] *Solicitation Order,* [3]

---

[2] The Commonwealth, TRACO, and the Participants each appealed the *Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* [Bankr. ECF No. 5035] (the "Settlement Order"), attached to the McDonald Decl. as **Exhibit 2**, entered by the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), commencing Civil Action Nos. 4:25-cv-02825, 4:25-cv-02829, and 4:25-cv-02901. This Court consolidated the appeals of the Settlement Order under Lead Civil Action No. 4:25-cv-02825 (collectively, the "Settlement Appeal").

[3] The U.S. Trustee appealed, among other orders, the Bankruptcy Court's *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation Of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and*

( . . . footnote continued on next page . . . )

*Dismissal Order,*[4] *and Confirmation Order;*[5] *and (II) Opposed Motion to Certify for Direct Appeal* (the "Motion").

Appellants request consolidation of the Proposed Consolidated Appeals, pursuant to Rule 8003(b)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 3(b)(2) and 6 of the Federal Rules of Appellate Procedure (the "Appellate Rules"), Rule 7.6 of the Local Rules of the United States District Court for the Southern District of Texas (the "Local Rules"), and this Court's Procedures. This relief is unopposed. The Declaration of Hugh M. McDonald in Support of the Motion (the "McDonald Decl.") is attached as **Exhibit A**. A table summarizing the Proposed Consolidated Appeals and interrelated issues on appeal is attached to the McDonald Decl. as **Exhibit 1**.

Appellants also request certification of the Proposed Consolidated Appeals for direct appeal to the United States Court of Appeals for the Fifth Circuit (the

---

*Unexpired Leases; and (VII) Granting Related Relief* [Bankr. ECF No. 5036] (the "Solicitation Order"), attached to the McDonald Decl. as **Exhibit 3**, commencing Civil Action No. 4:25-cv-03755 (the "Solicitation Appeal").

[4] The U.S. Trustee and the Participants each appealed the Bankruptcy Court's *Order Denying Motions to Convert or Dismiss Chapter 11 Cases* [Bankr. ECF No. 5772] (the "Dismissal Order"), attached to the McDonald Decl. as **Exhibit 4**, commencing Civil Action Nos. 4:25-cv-03755 and 4:25-cv-03824 (collectively, the "Dismissal Appeal").

[5] Each of the Appellants appealed the Bankruptcy Court's *Findings of Fact, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* [Bankr. ECF No. 5774] (the "Confirmation Order"), attached to the McDonald Decl. as **Exhibit 5**, commencing Civil Action Nos. 4:25-cv-03754, 4:25-cv-03755, 4:25-cv-03757, and 4:25-cv-03830 (collectively, the "Confirmation Appeal," and together with the Settlement Appeal, Solicitation Appeal, and Dismissal Appeal, the "Proposed Consolidated Appeals").

2

"Fifth Circuit") pursuant to 28 U.S.C. § 158(d) and Bankruptcy Rule 8006(f). This relief is opposed by the Appellees.

Kevin M. Epstein, the United States Trustee for Region 7 (the "U.S. Trustee") supports the motion for consolidation of the Proposed Consolidated Appeals and takes no position currently on the motion for certification of the Proposed Consolidated Appeals for direct review.

This Motion is made in the first-filed Confirmation Appeal. Notice of this Motion will be filed contemporaneously in each of the appeals subject to the request for consolidation.

## PRELIMINARY STATEMENT

Creditors that provide goods and services to a debtor necessary to maintain its business post-petition are called administrative expense creditors and are essential to a properly functioning bankruptcy system. The Bankruptcy Code[6] contains provisions designed to ensure that, upon the filing of a chapter 11 petition, a debtor can maintain business operations during its chapter 11 case in furtherance of the goals of the Bankruptcy Code. To encourage administrative expense creditors to extend post-petition unsecured credit to debtors on "normal" credit terms, administrative expense claims receive priority treatment ahead of other unsecured creditors and must be paid in full for a chapter 11 plan to be confirmed. The

---

[6] 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

requirement that administrative expenses be paid in full pressures chapter 11 debtors to avoid incurring excessive administrative expenses or risk losing the benefits of a chapter 11 plan. Cases in which a debtor cannot pay administrative expenses, and therefore cannot confirm a chapter 11 plan, are subject to either conversion to chapter 7 liquidation or dismissal.

In the *Steward* bankruptcy cases, after the Debtors liquidated all their operational assets, the estates were and remain administratively insolvent. The only valuable assets that remain in the Debtors' estates are litigation claims of speculative value. Rather than seek conversion and permit a chapter 7 trustee to liquidate the estates litigation claims, the administratively insolvent Debtors expended significant estate resources to develop and propose (1) the FILO Settlement[7] (to obtain funding for, transfer claims to, and establish a litigation trust and distribution waterfall – all outside of the plan confirmation process) and (2) a chapter 11 Plan[8] (which accomplishes little else). The Plan contains no anticipated effective date, but the Debtors project that recoveries from the litigation claims would be sufficient to pay allowed administrative expense and priority claims in full by June 2027 (based on

---

[7] The "<u>FILO Settlement</u>" means terms and conditions between the Debtors, FILO Secured Parties, and Creditors' Committee as set forth in the Settlement Term Sheet attached to Settlement Order as Exhibit 1. *See* Settlement Order, attached to the McDonald Decl. as **<u>Exhibit 2</u>**, at 38-140 of 140.

[8] *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, dated July 11, 2025 [Bankr. ECF No. 5492] (as supplemented and amended, the "<u>Plan</u>"), attached to the McDonald Decl. as **<u>Exhibit 6</u>**.

the Debtors' separate projection that billions of these claims will be disallowed, expunged, or reclassified as general unsecured claims).[9] Only then can the Plan, if confirmed, go effective.[10]

Numerous creditors objected to the FILO Settlement and moved to convert or dismiss the cases. In May 2025, the Bankruptcy Court approved the FILO Settlement, conditionally approved the Disclosure Statement, and set a confirmation hearing, carrying the motions to convert or dismiss. Numerous creditors objected to the Plan and moved to convert or dismiss the cases. In July 2025, the Bankruptcy Court approved the Disclosure Statement on a final basis, denied the motions to convert or dismiss the cases, and confirmed the Debtors' Plan (with modifications). The Appellants timely filed notices of appeal.[11]

Among the issues raised in the Bankruptcy Court was whether an effective date for the possible payment in full of administrative expense and priority claims that is projected to occur two years after confirmation based on speculative litigation

---

[9] The Debtors asserted attorney-client privilege and work product protection when objecting creditors cross-examined the Debtors' Chief Restructuring Officer on the amount and timing of projected recoveries. The Appellants maintain that the Debtors' projections are woefully optimistic.

[10] As a condition to confirmation of a proposed chapter 11 plan, section 1129(a) of the Bankruptcy Code requires payment in full of administrative expense and priority claims on the plan's effective date.

[11] The Commonwealth appealed the Settlement Order and Confirmation Order. The U.S. Trustee appealed the Solicitation Order, Dismissal Order, and Confirmation Order. TRACO appealed the Settlement Order and Confirmation Order. The Participants appealed the Settlement Order, Dismissal Order, and Confirmation Order.

recoveries and reductions in administrative and priority claims satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code (the "Effective Date Issue").  The Bankruptcy Court shared many of the concerns advanced by the objectors and noted that it was a difficult decision to reach.  The Bankruptcy Court also noted the lack of controlling Fifth Circuit precedent as well as the conflicting decisions within the circuit.  As the Commonwealth stated during the confirmation hearing, the Bankruptcy Court's decision on the Effective Date Issue will impact future chapter 11 cases and likely reduce the availability of post-petition unsecured credit to future chapter 11 debtors.  This critical question of law is the type of question for which Congress intended direct certification, and this Court should grant direct certification under the mandatory provisions of 28 U.S.C. § 158(d)(2).

Four distinct bases are to be considered but only one basis is required for the Court to grant direct certification under 28 U.S.C. § 158(d)(2).  The Effective Date Issue, standing alone, satisfies all four potential bases.  *First*, there is no controlling authority by the Fifth Circuit or the Supreme Court addressing the Effective Date Issue (and other issues).  *Second*, the issues are a matter of public importance because the outcome will undoubtedly affect creditors' willingness to extend unsecured post-petition credit to future chapter 11 debtors on "normal" trade terms and because the issue is likely to recur in other bankruptcy cases.  *Third*, conflicting decisions as to whether an extended effective date is permissible exist within courts

6

in the Fifth Circuit. And *fourth*, a direct appeal would materially advance the progress of this case because the parties are likely to appeal to the Fifth Circuit whether this Court affirms or reverses.

Other issues in the Proposed Consolidated Appeals also satisfy the certification criteria and, for judicial efficiency, should be considered and resolved alongside the Effective Date Issue. Accordingly, Appellants respectfully request the Court consolidate and certify the Proposed Consolidated Appeals for direct review by the Fifth Circuit.

## JURISDICTION AND VENUE

The Court has jurisdiction to consider this matter under 28 U.S.C. § 158(d)(2)(A). This is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL BACKGROUND

### A.  The FILO Settlement and Solicitation of the Plan

On April 28, 2025, the Debtors filed the Disclosure Statement, [12] Plan, Solicitation Motion, [13] and Settlement Motion. [14]

Under the proposed, pre-confirmation FILO Settlement (1) the Debtors would transfer their remaining assets to a litigation trust, (2) the FILO Secured Parties [15] would provide $125 million to the litigation trust to fund litigation (not in the form of new money, but by permitting the Debtors to use the proceeds of their alleged

---

[12]  *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* [Bankr. ECF No. 5028] (the "Disclosure Statement"), attached to the McDonald Decl. as **Exhibit 7**.

[13]  *Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* [Bankr. ECF No. 4745] (the "Solicitation Motion"), attached to the McDonald Decl. as **Exhibit 8**.

[14]  *Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO Dip Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* [Bankr. ECF No. 4746] (the "Settlement Motion"), attached to the McDonald Decl. as **Exhibit 9**.

[15]  The "FILO Secured Parties" are the FILO Lenders, FILO Bridge Secured Parties (each as defined in that certain Amended and Restated Intercreditor Agreement dated February 21, 2024), and the FILO DIP Secured Parties (as defined in the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* [Bankr. ECF No. 1538]).

collateral – accounts receivable and litigation proceeds – as and if collected), (3) the FILO Secured Parties would authorize the Debtors to use $21.5 million, in part, to fund solicitation and confirmation of a chapter 11 plan of liquidation, (4) the FILO Secured Parties would be repaid in full (with interest, fees, and a percentage of the litigation recoveries) and any excess recovery by the litigation trust would be distributed to the Debtors' estates in accordance with the waterfall provided in the FILO Settlement, and (5) the fees of the Debtors' professionals would be paid but no mechanism to ensure payment of other administrative expense creditors was provided. Numerous parties filed objections to the Settlement Motion and Solicitation Motion, including that the FILO Settlement constituted an impermissible *sub rosa* plan under Fifth Circuit precedent.[16]

On May 29, 2025, the Court held a hearing on the Solicitation Motion and Settlement Motion. On May 30, 2025, the Court read its decision into the record, overruling all objections, granting conditional approval of the Disclosure Statement, approving the Settlement Motion, and setting a confirmation hearing. On June 2, 2025, the Court entered its Settlement Order. The Commonwealth, TRACO, and the Participants appealed the Settlement Order.

---

[16] *See In re Braniff Airways, Inc*., 700 F.2d 935, 940 (5th Cir. 1983). Objections to the Settlement Motion and Solicitation Motion are listed in the *Agenda of Matters Set for Hybrid Hearing on May 29, 2025 at 10:30 A.M. (Central Time)* [Bankr. ECF No. 4991], attached to the McDonald Decl. as **Exhibit 10**.

### B. Confirmation of the Plan

Approximately 50 parties objected to the adequacy of the Disclosure Statement and/or confirmation of the Plan. On July 14 and 15, 2025, the Court held a hearing on final approval of the Disclosure Statement and Plan Confirmation. On July 16, 2025, the Court read its decision into the record, confirming the Plan with modifications, setting status conferences every six months to assess progress reaching the effective date of the Plan by June 2027, and denying the U.S. Trustee and the Participants' motions to convert or dismiss the cases.

On July 25, 2025, the Court entered the Confirmation Order and Dismissal Order. Each of the Appellants appealed the Confirmation Order. The U.S. Trustee appealed the Solicitation Order. The U.S. Trustee and Participants appealed the Dismissal Order.

### C. Prior Consolidation and Abatement of the Settlement Appeal

On June 30, 2025, the Commonwealth, TRACO, and the Participants filed a *Joint Motion to Consolidate [the Settlement] Appeals*,[17] which this Court granted on August 4, 2025.[18]

On August 19, 2025, the Commonwealth, TRACO, and the Participants filed an *Expedited Unopposed Motion to Abate Briefing Deadlines* in the Settlement

---

[17] Civil Action No. 4:25-cv-02825, ECF No. 5.

[18] Civil Action No. 4:25-cv-02825, ECF No. 11.

Appeal pending resolution of this request for further consolidation of appeals and certification for direct appeal to the Fifth Circuit.[19]  This Court abated briefing deadlines in the Settlement Appeal the same day.[20]

## **ARGUMENT AND AUTHORITIES**

### A.    **Consolidation of Interrelated Appeals Promotes Judicial Efficiency**

Bankruptcy appeals "shall be taken in the same manner as appeals in civil proceedings generally are taken to the court of appeals from the district courts . . . ." 28 U.S.C. § 158(c)(2).  "Consolidation is discretionary and appropriate when the various legal issues presented by the . . . separate appeals arise from the same set of operative facts . . . ."  *In re LAJET, Inc.*, 163 B.R. 81, 83 (E.D. La. 1993) (consolidating appeals taken from the same adversary proceeding and quoting FED. R. APP. P. 3(b) and *Medlin v. Palmer*, 874 F.2d 1085, 1088 (5th Cir. 1989)) (internal quotations omitted).

As shown in **Exhibit 1** to the McDonald Decl., the Proposed Consolidated Appeals raise similar and overlapping issues and arise from the same operative facts. Indeed, the Bankruptcy Court noted in its ruling on the Settlement Motion that the

---

[19]  Civil Action No. 4:25-cv-02825, ECF No. 16.

[20]  Civil Action No. 4:25-cv-02825, ECF No. 19.

FILO Settlement and Plan "complement one another."[21]  Thus, any appellate court reviewing the Settlement Appeal must also be familiar with the facts of the Confirmation Appeal and *vice versa*.  The same is true with respect to the Solicitation Appeal and Dismissal Appeal.  Appellees do not dispute the interrelatedness of the multiple appeals or the efficiencies that will be promoted in resolving them together.

It would waste judicial resources for an appellate court to wade into the facts here and resolve some but not all of the issues presented in the Proposed Consolidated Appeals.  Consolidation is, therefore, warranted here.

**B.  The Proposed Consolidated Appeals Satisfy Each Potential Basis for Certification – Though a Single Basis Would Suffice**

**1.  *Criteria for Certification***

The Court must certify a decision for direct appeal to the Fifth Circuit if it determines that *any one* of the following criteria are met:

(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

(ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

---

[21]  *See* Transcript of July 16, 2025 Hearing at 27:9-14, attached to the McDonald Decl. as **Exhibit 11** ("Here we actually have a plan.  Could there be a hypothetical settlement that dictated all the terms of the plan?  I don't know.  But we don't have that here.  But that's a hypothetical because there is actually a plan here.  Do they complement one another?  Yes, sure.  But that doesn't mean it dictates the terms of the plan.").

(iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken[.]

28 U.S.C. § 158(d)(2)(A).

Congress determined that certification directly to the court of appeals would address "time and cost factors attendant to the present appellate system" and the concern that "decisions rendered by a district court . . . are generally not binding and lack stare decisis value." H.R. Rep. No. 109-31, at 148 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 206. "The twin purposes of [28 U.S.C. § 158(d)(2)] were to expedite appeals in significant cases and to generate binding appellate precedent in bankruptcy, whose caselaw has been plagued by indeterminacy." *In re Pac. Lumber Co.*, 584 F.3d 229, 241-42 (5th Cir. 2009) (citing H.R. Rep. No. 109-31).

The four criteria[22] are disjunctive and relief is not discretionary. 28 U.S.C. § 158(d)(2)(B) ("if the bankruptcy court [or] the district court . . . determines that a circumstance specified in clause (i), (ii), or (iii) . . . exists . . . then the . . . court . . . shall make the certification[.]"). If any one of the four criteria is satisfied, the court must certify an order for direct review, regardless of whether the three other criteria are satisfied. COLLIER ON BANKRUPTCY ¶ 5.06[3] (Richard Levin & Henry J.

---

[22] Although there are only three subsections in 28 U.S.C. § 158(d)(2)(A), the first contains two separate criteria; questions of law and questions of public importance. *See, e.g., In re Adkins*, 517 B.R. 698, 699 (Bankr. N.D. Tex. 2014) ("If any of the four conditions precedent are met, the bankruptcy court shall make the certification.").

Sommer eds., 16th ed.) ("court must [certify] on request of one or more of the parties if it determines that [at] least one of the conditions specified in section 158(d)(2)(A)(i), (ii) or (iii) exists").

### 2. *No Controlling Law and Conflicting Decision*

To date, neither the Fifth Circuit nor the Supreme Court has addressed the Effective Date Issue. "Controlling law for the purposes of section 158(d)(2)(A)(i) is that which admits of no ambiguity in resolving the issue." *In re Springfield Hosp., Inc.*, 618 B.R. 109, 116 (Bankr. D. Vt. 2020) (quoting *In re Millennium Lab Holdings II, LLC*, 543 B.R. 703, 711 (Bankr. D. Del. 2016)). The relevant inquiry for purposes of section 158(d)(2)(A)(ii) is whether conflicting decisions exist within the Fifth Circuit. *See* COLLIER ON BANKRUPTCY ¶ 5.06[4][c] (Richard Levin & Henry J. Sommer eds., 16th ed.).

The Court can determine whether there is controlling authority for purposes of certification under section 158(d)(2)(A)(i). *See In re Bruce*, No. 21-CV-7455 (CS), 2021 WL 6111925, at *5 (S.D.N.Y. Dec. 27, 2021) (certifying appeal where "it is clear from this Court's own review of the relevant case law . . . that there is no controlling . . . authority on the question"). Here, the Bankruptcy Court already

14

acknowledged the lack of controlling Fifth Circuit precedent and that the Effective Date Issue "can go both ways."[23]

In addition, there is conflicting case law on the Effective Date Issue supporting certification under section 158(d)(2)(A)(ii). In their confirmation brief, the Debtors cited thirteen cases with effective dates occurring months and years after confirmation and attempted to distinguish cases cited by objecting parties that did not permit a significantly extended effective date on similar facts (including conflicting decisions within the Fifth Circuit).[24] The Court also cited *Sears* and *American Airlines* as cases with indeterminate effective dates in ruling on the Effective Date Issue.[25]

Because the case law on the Effective Date Issue is not free from ambiguity, there are conflicting cases with the Fifth Circuit on this issue, and there is no controlling authority, the Court should certify the Proposed Consolidated Appeals to the Fifth Circuit.

---

[23] *See* Transcript of May 30, 2025 Hearing at 35:9-20, attached to the McDonald Decl. as **Exhibit 12**.

[24] *See Debtors' Memorandum of Law in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of the Debtors' Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* [Bankr. ECF No. 5439 at 108-19 of 196], attached to the McDonald Decl. as **Exhibit 13**.

[25] *See* Transcript of July 16, 2025 Hearing at 32:17-19, attached to the McDonald Decl. as **Exhibit 11**.

### 3. *Public Importance*

Certification should be granted because the impact of significantly extended effective dates on future chapter 11 debtors and the costs of their cases is a matter of public importance.

> A "matter of public importance" should transcend the litigants and involve a legal question the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case. Such things as the constitutionality of a provision of title 11, the applicability of nonbankruptcy law to matters arising in a bankruptcy case, the ability to change the venue of a title 11 case to an improper venue or any one of the important provisions governing consumer bankruptcies come immediately to mind as matters that might be considered as being of public importance. Alternatively, a court might find a matter to be of public importance if it could impact a large number of jobs or other vital interest in a community.

COLLIER ON BANKRUPTCY ¶ 5.06[4][b] (Richard Levin & Henry J. Sommer eds., 16th ed.) (footnote citations omitted).

The number of jobs at stake in future chapter 11 cases is notionally quite large, and the payment of administrative expense claims is a vital interest in the similarly large community of administrative expense claimants. If a plan that cannot pay administrative expense and priority claims in full until an estate successfully litigates and collects on speculative litigation claims can be confirmed, then future administrative expense creditors, who previously found comfort in section 1129(a)(9) of the Bankruptcy Code, will undoubtedly reconsider their

16

position.[26]  A natural economic response by administrative expense creditors will be to require advance payment terms or simply refuse to extend unsecured credit for post-petition goods and services.   The impact of this kind of response by the community of administrative creditors on the success or failure of future chapter 11 cases cannot be understated.

### 4.  *Materially Advance Progress*

Federal courts throughout the country have noted that 28 U.S.C. § 158(d)(2)(A) is satisfied if it speeds up the litigation or otherwise makes it less burdensome on the parties and the courts.  *See, e.g., Weber v. United States*, 484 F.3d 154, 158 (2d Cir. 2007) (certification is proper "where a prompt, determinative ruling might avoid needless litigation"); *In re Qimonda AG*, 470 B.R. 374, 389 (E.D. Va. 2012) ("[o]ne of the primary goals of § 158(d)(2) is to provide a quicker and less costly route to resolve issues that will likely end up in the court of appeals, and this matter is surely destined for the Fourth Circuit"); *FERC v. Extraction Oil & Gas Extraction Oil & Gas*, Inc., No. 20-cv-1412, 2021 WL 3722229, at *6 (D. Del. Aug. 23, 2021) (any ruling made would "almost certainly" be appealed to the circuit court); *Nortel Networks Inc. v. Ernest & Young Inc. (In re Nortel Networks, Inc.)*, Nos. 15-196, 15-197, 2016 WL 2899225, at *5 (D. Del. May 17, 2016) ( "appellate

---

[26] This concern already extends beyond the *Steward* bankruptcy case.  *See* Becky Yerak, *Suppliers Get Burned in Expensive Bankruptcy Cases*, WALL ST. J. (Aug. 22, 2025, 5:30 a.m. ET), https://www.wsj.com/articles/suppliers-get-burned-in-expensive-bankruptcy-cases-fe94aab8.

review by the [circuit court] is inevitable . . . having such review sooner rather than later may well result in materially advancing the progress of these cases"); *In re MPF Holding U.S. LLC*, 444 B.R. 719, 727 (Bankr. S.D. Tex. 2011) (certification proper because "any decision by the District Court in this matter is very likely to be appealed to the Fifth Circuit").

Certification here would materially advance the progress of this case. This is not an issue where "percolation through the district court would cast more light on the issue and facilitate a wise and well-informed decision." *See Weber*, 484 F.3d at 161. Instead, the Effective Date Issue is a legal question, ripe for resolution, that would quickly resolve the dispute over confirmation, regardless of outcome. *See In re Pac. Lumber Co.*, 584 F.3d at 241-42.

Regardless of how this Court would rule on the merits, the losing party is virtually certain to appeal to the Fifth Circuit. If the Court expends judicial resources to study the record and the law, any opinion it issues will amount to an advisory opinion that does not advance this appeal's ultimate resolution but rather delays it. Thus, direct review by the Fifth Circuit is warranted under 28 U.S.C. § 158(d)(2)(A)(iii).

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should consolidate and certify the Proposed Consolidated Appeals for direct appeal to the Fifth Circuit.  A proposed form of order is attached as **<u>Exhibit B</u>** for the Court's use and consideration.

Dated: September 5, 2025                Respectfully submitted,

**_THE COMMONWEALTH OF
MASSACHUSETTS_**

By its attorney,

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

By: _/s/ Hugh M. McDonald_
Hugh M. McDonald (Bar No. NY2420974)
Special Assistant Attorney General
Andrew M. Troop (Bar No. MA547179)
Special Assistant Attorney General

PILLSBURY WINTHROP SHAW PITTMAN
LLP

Andrew V. Alfano (Bar No. NY5525241)
31 West 52nd Street
New York, NY 10019
Tel: 212-858-1000
Fax: 212-858-1500

William D. Wood (Bar No. 21916500)
L. James Dickinson (Bar No. 24105805)
609 Main Street, Suite 2000
Houston, TX 77002
Tel: 713-276-7600
Fax: 713-276-7673

19

**TRACO INTERNATIONAL GROUP S. DE R.L.**

STEPTOE LLP

By: _/s/ Timothy Walsh_
Timothy Walsh
Michele Jacobson
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 957-3085
Email: twwalsh@steptoe.com
       mjacobson@steptoe.com

20

*DR. MANISHA PUROHIT, ET AL.*

VERRILL DANA LLP

By: */s/ Robert J. Keach*
Robert J. Keach
Lindsay K. Milne
Letson D. Boots
One Portland Square, 10th Floor
Portland, ME 04101
Telephone: (207) 774-4000
Email: rkeach@verrill-law.com
     lmilne@verrill-law.com
     lboots@verrill-law.com

- and -

DIAMOND MCCARTHY, LLP

Allan B. Diamond, Esq.
Christopher D. Johnson, Esq.
909 Fannin Street, 37th Floor
Houston, TX 77010
Telephone: (713) 333-5100
Email: allan.diamond@diamondmccarthy.com
     chris.johnson@diamondmccarthy.com

## CERTIFICATE OF COMPLIANCE

I certify that this Motion complies with the type-volume limitation of FED. R. APP. P. 27(d)(2)(A) because it contains 4,526 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

I certify that this Motion also complies with the typeface and style requirements of FED. R. APP. P. 27(d)(1)(E) and 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.

*/s/ Hugh M. McDonald*
Hugh M. McDonald

## CERTIFICATE OF CONFERENCE

I certify that I conferred with counsel for the Debtors regarding the Motion and confirmed that the Debtors do not oppose consolidation but oppose certification.

*/s/ Hugh M. McDonald*
Hugh M. McDonald

## CERTIFICATE OF SERVICE

I certify that on September 5, 2025, I caused a copy of the foregoing Motion to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Hugh M. McDonald*
Hugh M. McDonald

22

# EXHIBIT A

*McDonald Decl.*

## DECLARATION OF HUGH M. MCDONALD IN SUPPORT OF APPELLANTS' JOINT (I) UNOPPOSED MOTION FOR CONSOLIDATION OF SETTLEMENT, SOLICITATION, DISMISSAL, AND CONFIRMATION APPEALS AND (II) OPPOSED MOTION FOR CERTIFICATION OF DIRECT APPEAL TO THE FIFTH CIRCUIT

I, Hugh M. McDonald, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I submit this declaration in support of *Appellants' Joint (I) Unopposed Motion for Consolidation of Settlement, Solicitation, Dismissal, and Confirmation Appeals and (II) Opposed Motion for Certification of Direct Appeal to the Fifth Circuit* (the "Motion").[1]

2.     I am a Special Assistant Attorney General to the Commonwealth of Massachusetts ("Massachusetts" or the "Commonwealth") and a partner at Pillsbury Winthrop Shaw Pittman LLP, counsel to the Commonwealth.

3.     Attached as **Exhibit 1** is a table summarizing the Proposed Consolidated Appeals and issues presented therein.

4.     Attached as **Exhibit 2** is a true and correct copy of the *Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and*

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Motion.

*Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* [Bankr. ECF No. 5035] (the "<u>Settlement Order</u>").

5.      Attached as **Exhibit 3** is a true and correct copy of the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation Of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* [Bankr. ECF No. 5036] (the "<u>Solicitation Order</u>").

6.      Attached as **Exhibit 4** is a true and correct copy of the *Order Denying Motions to Convert or Dismiss Chapter 11 Cases* [Bankr. ECF No. 5772] (the "<u>Dismissal Order</u>").

7.      Attached as **Exhibit 5** is a true and correct copy of the *Findings of Fact, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* [Bankr. ECF No. 5774] (the "<u>Confirmation Order</u>").

2

8.     Attached as **Exhibit 6** is a true and correct copy of the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, dated July 11, 2025 [Bankr. ECF No. 5492] (as supplemented and amended, the "Plan").

9.     Attached as **Exhibit 7** is a true and correct copy of the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* [Bankr. ECF No. 5028] (the "Disclosure Statement").

10.     Attached as **Exhibit 8** is a true and correct copy of the *Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* [Bankr. ECF No. 4745] (the "Solicitation Motion").

11.     Attached as **Exhibit 9** is a true and correct copy of the *Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III)*

3

*Authorizing Amendment to FILO Dip Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* [Bankr. ECF No. 4746] (the "Settlement Motion").

12.    Attached as **Exhibit 10** is a true and correct copy of the *Agenda of Matters Set for Hybrid Hearing on May 29, 2025 at 10:30 A.M. (Central Time)* [Bankr. ECF No. 4991].

13.    Attached as **Exhibit 11** is a true and correct copy of the transcript of the hearing held by the Bankruptcy Court on July 16, 2025.

14.    Attached as **Exhibit 12** is a true and correct copy of the transcript of the hearing held by the Bankruptcy Court on May 30, 2025.

15.    Attached as **Exhibit 13** is a true and correct copy of the *Debtors' Memorandum of Law in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of the Debtors' Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* [Bankr. ECF No. 5439].

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Signed:   September 5, 2025          */s/ Hugh M. McDonald*
          New York, New York          Hugh M. McDonald

4

**EXHIBIT 1**

*Table Summarizing Proposed Consolidated Appeals*

| Order on Appeal | Appellant – Notice of Appeal | Civil Action No. | Statement of Issues on Appeal |
|---|---|---|---|
| Settlement Order | Massachusetts [Bankr. ECF Nos. 5123, 5130] | 4:25-cv-02825 | 1.  Whether the Bankruptcy Court erred in concluding that the settlement agreement approved by the Settlement Order was not an impermissible *sub rosa* plan, notwithstanding that the agreement effectively dictates the terms of any future plan by, inter alia: (a) providing for the transfer of substantially all of the Debtors' assets out of their estates to a Litigation Trust prior to and independent of confirmation; (b) establishing the Litigation Trust; (c) establishing the governance structure of the Litigation Trust; (d) providing for the issuance of beneficial interests to creditor groups; (e) altering creditor priorities, including by paying professional fees in full ahead of other administrative claimants who may not recover in full; (f) granting releases to certain parties; (g) approving the funding for the trust and the litigations; and (h) establishing a distribution waterfall and treatment of creditor claims that must be included in any plan, all without the safeguards provided by the confirmation process and, importantly, without a meaningful right of creditors to vote.<br><br>2.  Whether the Bankruptcy Court erred in ruling that the mere filing of a proposed chapter 11 plan predicated on the settlement that may never be confirmed shields the settlement from being deemed a *sub rosa* plan.<br><br>3.  Whether the Bankruptcy Court's determination that, absent approval of the settlement, the FILO lenders would be entitled to seek stay relief and foreclose on all of the Debtors' remaining assets without restriction, was legally and factually correct and provided a proper basis for approving a settlement that dictates the terms of any future plan, including by transferring |

| Order on Appeal | Appellant – Notice of Appeal | Civil Action No. | Statement of Issues on Appeal |
|---|---|---|---|
| | | | all of the Debtors' assets and providing for the administration and distribution of those assets outside of a plan confirmation process.<br><br>4. Whether the Bankruptcy Court's belief that the settlement presented the best option to reach a confirmation hearing is a legally relevant basis for approving a settlement notwithstanding the infirmities addressed above. |
| Settlement Order | TRACO [Bankr. ECF No. 5128] | 4:25-cv-02829 (previously consolidated with 4:25-cv-2825) | The same 4 issues stated by the Commonwealth and the Participants. |
| Settlement Order | Participants [Bankr. ECF No. 5161] | 4:25-cv-02901 (previously consolidated with 4:25-cv-2825) | The same 4 issues stated by the Commonwealth and TRACO. |
| Confirmation Order | Massachusetts [Bankr. ECF No. 5852] | 4:25-cv-03754 | 1. Whether the Bankruptcy Court erred when it found that the Joint Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors [Docket No. 5492] (the "Plan") satisfied the requirements of section 1129(a)(9) of the Bankruptcy Code where the timing of possible payments in full of administrative expense and priority claims and, thus, the Plan's effective date, is uncertain and is targeted to occur, if at all, two years after entry of the Confirmation Order.<br><br>2. Whether the Bankruptcy Court erred in concluding that the Plan satisfied the requirements of sections 1129(a)(11) and 1123(a) of the Bankruptcy Code and was feasible where the only source of recoveries for secured, |

| Order on Appeal | Appellant – Notice of Appeal | Civil Action No. | Statement of Issues on Appeal |
|---|---|---|---|
| | | | administrative, and priority creditors is recoveries from litigations of indeterminate value and duration.<br><br>3.  Whether the Bankruptcy Court erred in confirming the Plan where the Debtors are administratively insolvent and their ability to pay administrative expense and priority claims in full is contingent on both: (i) the disallowance of nearly $3 billion in administrative expense claims and more than $11 billion in priority claims; and (ii) the recovery and collection of hundreds of millions of dollars in settlements or judgments in litigations brought or potentially to be brought 2  References to the Bankruptcy Code are to 11 U.S.C. §§ 101 et seq. on behalf of the Debtors, and where the bases for the estimated reduction in claim amounts and recoveries have no foundation other than the Debtors' unsupported assertions.<br><br>4.  Whether the Bankruptcy Court erred in assessing the likelihood of the Debtors' success in reducing administrative and priority claims when, among other things, the evidence presented demonstrated that for post-petition medical malpractice claims, the Debtors were relying on an October 2024 actuarial analysis and no independent assessment of asserted, or known but not yet reported, malpractice claims had been undertaken.<br><br>5.  Whether the Bankruptcy Court erred in concluding that the Debtors were likely to achieve litigation recoveries sufficient to pay all administrative expense and priority claims at some point by (i) reference to the amount of damages claimed (or to be claimed) by the Debtors in those litigations and (ii) the fact that the Debtors only need to recover a fraction of the claimed damage amounts if they are successful in reducing asserted administrative expense and priority claims by approximately $14 billion in the aggregate.<br><br>6.  Whether the Bankruptcy Court's finding that the Plan is feasible should be disregarded based on its own additional controls imposed on the Debtors |

| Order on Appeal | Appellant – Notice of Appeal | Civil Action No. | Statement of Issues on Appeal |
|---|---|---|---|
| | | | requiring semi-annual status conferences to assess progress on litigation recoveries and claim reductions coupled with its admonition that it will convert the cases (and the Plan will never go effective) if sufficient progress is not being made on both efforts and if payment in full of administrative and priority claims is not fully funded by June 2027.<br><br>7.  Whether the Bankruptcy Court erred when it allowed the Debtors to introduce evidence of their anticipated litigation recoveries and timings based on the advice of the Debtors' various counsel, where the Debtors refused to disclose that advice and the Bankruptcy Court refused to compel disclosure based on the Debtors' assertion of attorney-client privilege and work product protection.<br><br>8.  Whether the Bankruptcy Court erred when it found that the Plan complied with sections 1122(a) and 1129(a)(8) of the Bankruptcy Code even though two classes of accepting claims consisting of general unsecured claims were separately classified, impaired by agreement, and manufactured to facilitate confirmation.<br><br>9.  Whether the Bankruptcy Court erred when it ordered without any legal or jurisdictional basis that "if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated, reconsidered, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification, reconsideration, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or Lien incurred or undertaken by the Debtors or the applicable Estate Representative, or any other Entity authorized or required to take action to implement the Plan, as applicable, prior to the effective date of such reversal, stay, modification, reconsideration, or vacatur. Notwithstanding any such reversal, stay, modification, reconsideration, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in reliance |

| Order on Appeal | Appellant – Notice of Appeal | Civil Action No. | Statement of Issues on Appeal |
|---|---|---|---|
| | | | on, this Confirmation Order prior to the effective date of such reversal, stay, modification, reconsideration, or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, the Plan Documents, or any amendments or modifications to the foregoing." <br><br> 10.  Whether the Bankruptcy Court erred when it concluded that the Plan complied with sections 1129(a)(3), (a)(9), and (b)(1) of the Bankruptcy Code, where the Plan ensures immediate payment to professional fee administrative claimants but defers payments to other unpaid administrative expense claimants unless and until sufficient litigation recoveries are achieved. <br><br> 11.  Whether the Bankruptcy Court erred when it approved the substantive consolidation of the Debtors pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code for all purposes except voting tabulation. |
| Solicitation Order, Dismissal Order, and Confirmation Order | U.S. Trustee [Bankr. ECF No. 5854] | 4:25-cv-03755 | 1.  Did the bankruptcy court err by failing to dismiss or convert to chapter 7 the Debtors' chapter 11 cases under 11 U.S.C. § 1112(b). <br><br> 2.  Did the bankruptcy court err by approving the Debtors' disclosure statement. <br><br> 3. Did the bankruptcy court err by confirming the Debtors' chapter 11 plan. <br><br> 4.  Did the bankruptcy court err by entering the confirmation order because the plan will pay only 50% of administrative expense claims to holders of such claims who did not return a form opting out of that treatment, violating the statutory requirement that to be confirmed a plan must pay administrative claimants in full "[e]xcept to the extent that" they have "agreed to a different treatment," 11 U.S.C. § 1129(a)(9)(A). |

| Order on Appeal | Appellant – Notice of Appeal | Civil Action No. | Statement of Issues on Appeal |
|---|---|---|---|
| | | | 5.  Did the bankruptcy court err by entering the confirmation order because the plan did not meet the requirement of 11 U.S.C. § 1129(a)(11) that it is not likely to be followed by the liquidation of the debtor other than a liquidation proposed in the plan.<br><br>6.  Did the bankruptcy court err by entering the confirmation order because the plan imposes releases of claims against non-debtor third parties that belong to holders of claims against the debtors and holders of interests in the debtors unless those holders of claims and interests complied with the plan's requirements to opt out of the third-party releases.<br><br>7.  Did the bankruptcy court err by entering the confirmation order because the plan includes an injunction barring anyone from commencing or continuing any proceeding on a released claim.<br><br>8.  Did the bankruptcy court err by entering the confirmation order because the plan includes an injunction requiring bankruptcy court authorization before anyone can commence or pursue a released or exculpated claim.<br><br>9.  Is the confirmation order's approval of a chapter 11 plan with these third-party release and injunction provisions impermissible under *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 209, 227 (2024)—which held bankruptcy courts cannot confirm a chapter 11 plan that imposes nonconsensual releases of, or injunctions barring, claims between non-debtors— because the failure to opt out does not make them consensual.<br><br>10.  Did the bankruptcy court err by entering the confirmation order because the plan includes an overly broad exculpation provision under Fifth Circuit precedent. |

| Order on Appeal | Appellant – Notice of Appeal | Civil Action No. | Statement of Issues on Appeal |
|---|---|---|---|
| Confirmation Order | TRACO [Bankr. ECF No. 5858] | 4:25-cv-03757 | The same 11 issues stated by the Commonwealth and the Participants. |
| Dismissal Order | Participants [Bankr. ECF No. 5874] | 4:25-cv-03824 | 1.  Whether the Bankruptcy Court erred in denying the motions to convert notwithstanding the record being clear that the Debtors (i) suffered unquestioned substantial postpetition losses and continued accumulation of debt pre- and post-confirmation and (ii) have disposed of and proposed to liquidate any residual assets, primarily causes of action, resulting in the Debtors no longer having any prospects of rehabilitation or for restoration of their prepetition businesses, necessitating mandatory conversion to a case under chapter 7 under sections 1112(b)(1) and  1112(b)(4)(A) of the Bankruptcy Code. <br><br> 2.  Whether the Bankruptcy Court erred in failing to convert the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code and instead confirming the Debtors' liquidating chapter 11 plan when section 1112(b)(2)(B) expressly bars the option of confirming a plan when the grounds for conversion are those enumerated in section 1112(b)(4)(A), to wit: substantial postpetition losses and an absence of a reasonable likelihood of rehabilitation. |
| Confirmation Order | Participants [Bankr. ECF No. 5875] | 4:25-cv-03830 | The same 11 issues stated by the Commonwealth and TRACO plus a twelfth issue: <br><br> 12.  Whether the Bankruptcy Court erred in confirming the Plan notwithstanding the record being clear that the Debtors (i) suffered unquestioned substantial post-petition losses and continued accumulation of debt pre- and post-confirmation and (ii) have disposed of and proposed to liquidate any residual assets, primarily causes of action, resulting in the Debtors no longer having any prospects of rehabilitation or for restoration of their prepetition businesses, necessitating mandatory conversion to a case under chapter 7 under section 1112(b)(4)(A) of the Bankruptcy Code. |

| Order on Appeal | Appellant – Notice of Appeal | Civil Action No. | Statement of Issues on Appeal |
|---|---|---|---|
|  |  |  |  |

# EXHIBIT 2

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 02, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|   |   |   |
|---|---|---|
| In re: | § | **Chapter 11** |
|  | § |  |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC**, *et al.*, | § |  |
|  | § | **(Jointly Administered)** |
| Debtors.[1] | § | Re: Docket No. 4746 |
|  | § |  |

## ORDER (I) APPROVING SETTLEMENT WITH FILO SECURED PARTIES; (II) AUTHORIZING AND DIRECTING TRANSFER OF ASSETS IN CONNECTION THEREWITH; (III) AUTHORIZING AMENDMENT TO FILO DIP CREDIT AGREEMENT AND CONTINUED USE OF CASH COLLATERAL; (IV) GRANTING ADEQUATE PROTECTION; (V) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES AND FORM AND MANNER OF NOTICE OF ASSUMPTION AND ASSIGNMENT; AND (VI) GRANTING RELATED RELIEF

Upon the motion, dated April 28, 2025 (the "**Motion**"),[2] of Steward Health Care

System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**"), for entry of an order pursuant to sections 362, 363,

and 105 of the Bankruptcy Code and Bankruptcy Rules 4001, 6004, and 9019, (i) approving the

terms and conditions of the settlement with the FILO Secured Parties and the Creditors' Committee

as set forth in the Settlement Term Sheet (the "**Settlement**"); (ii) authorizing and directing the

transfer by the Debtors of the Litigation Trust Assets to the Litigation Trust; (iii) authorizing the

DIP Amendment and use of cash collateral; (iv) granting adequate protection to the Prepetition

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims
       and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11
       cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
       Motion, the FILO DIP Order, or the *Settlement and Stay Relief Term Sheet* annexed to this Order as <u>Exhibit 1</u>
       (the "**Settlement Term Sheet**"), as applicable.

Bridge Agent, the FILO Bridge Lenders, and the FILO DIP Secured Parties (collectively, the "**FILO Secured Parties**"); (v) authorizing and approving the Assumption and Assignment Procedures set forth in paragraphs 29 through 41 of this Order; and (vi) granting related relief; all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion and the hearing thereof having been provided; and such notice having been adequate and appropriate under the circumstances and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon the hearing held on the Motion; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their respective estates, creditors, and all parties in interest; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor, and the Debtors having demonstrated good, sufficient and sound business justification for the relief granted herein, it is **HEREBY FOUND AND DETERMINED THAT:**[3]

      A.    **Findings and Conclusions.**  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the

---

[3]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Rule 7052 of the Bankruptcy Rules.

following findings of fact constitute conclusions of law, they are adopted as such. To the extent

any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     **Jurisdiction.**  This Court has jurisdiction to hear and determine the Motion

and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334. This is a core

proceeding within the meaning of 28 U.S.C. § 157(b), and as such, this Court has the authority to

enter a final order and authority to grant the relief contained herein.

C.     **Venue.**  Venue of these chapter 11 cases and the Motion in this district is

proper under 28 U.S.C. §§ 1408 and 1409.

D.     **Statutory Predicates.**  The statutory and legal predicates for the relief

requested in the Motion are sections 105, 361, 362, and 363 of the Bankruptcy Code and

Bankruptcy Rules 4001, 6004, and 9019.

E.     **Business Justification; Fiduciary Duties.**  The Debtors have demonstrated

that entry into and consummation of the Settlement constitute the exercise by the Debtors of sound

business judgment, and such acts are in the best interests of the Debtors, their estates, and creditors,

and all parties in interest. The Court finds that the Debtors have articulated good and sufficient

business reasons justifying the entry into and consummation of the Settlement. The Debtors'

decision to enter into and consummate the Settlement constitutes a proper exercise of the fiduciary

duties of the Debtors and their respective directors, managers, and officers.

F.     **Corporate Authority.**  The Debtors (i) have the corporate or other

organizational power and authority necessary to fully perform under the Settlement and execute,

deliver, implement and fully perform any and all obligations, instruments, documents, and papers,

and take any and all actions, in each case contemplated thereby, (ii) have all of the power and

authority necessary to consummate the Settlement, and (iii) have taken or are deemed to have taken

3

all corporate or other organizational action necessary to authorize and approve the Settlement and any actions required to be performed by the Debtors to consummate such transactions. Upon the entry of this Order, no further consents or approvals of the Debtors are required for the Debtors or their estates to consummate the Settlement.

G. **Arms'-Length and Good Faith.** The Settlement was negotiated and is undertaken by the Debtors, the FILO Secured Parties, and the Creditors' Committee (collectively, the "**Parties**") at arms'-length, without collusion or fraud, and in good faith.

H. **Insider Status.** The Litigation Trust shall not become, as a result of its obligations under the Settlement or otherwise, an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

I. **No Fraudulent Transfer.** The consideration provided pursuant to the Settlement Term Sheet and the Settlement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law. The Settlement Term Sheet was not entered into, and the Settlement is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. None of the Debtors, the FILO Secured Parties, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective current or former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors, or assigns have engaged in any conduct that would cause or permit the Settlement or the consummation of the transactions

contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code and no party is entitled to damages or recovery in connection therewith under section 363(n) of the Bankruptcy Code.

J.      **No Avoidance.**  The Settlement cannot be avoided.  None of the Parties or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective current or former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors or assigns have engaged in any conduct that would cause or permit the consummation of the Settlement to be avoided, or costs or damages to be imposed.

K.      **No Successor Liability.**  Neither the Litigation Trust nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates except to the extent explicitly provided in the Settlement Term Sheet and this Order.  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the Settlement Term Sheet, neither the Litigation Trust nor any of its affiliates shall (a) be liable for any claims that may be asserted against the Debtors, the Debtors' estates or any of their predecessors or affiliates, or (b) be subject to successor liability or similar liability (including, without limitation, to the United States, any state thereof or otherwise) for any claims, or causes of action of any kind or character against the Debtors, the Debtors' estates or otherwise, whether known or unknown, and neither the Litigation Trust nor any of its affiliates shall have any successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer liability, labor law, de facto merger, mere continuation, or substantial continuation, whether known or unknown, whether now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or

equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, claims or defenses (including rights of recoupment) that may be asserted against the Debtors, the Debtors' estates or otherwise. Neither the Litigation Trust nor any of its affiliates is, and the consummation of the Settlement will not render such parties, a mere continuation, and neither the Litigation Trust nor any of its affiliates is holding itself out as a mere continuation, of any of the Debtors or their respective estates, enterprise, or operations, and there is no continuity or common identity between the Litigation Trust or any of its affiliates, on the one hand, and any of the Debtors or their estates, on the other hand. Accordingly, the Settlement does not amount to a consolidation, merger, or de facto merger of the Litigation Trust or any of their affiliates with or into any of the Debtors or their estates, and neither the Litigation Trust nor any of its affiliates is, or shall be deemed to be, a successor to any of the Debtors or their estates as a result of the consummation of Settlement; *provided*, however, that, notwithstanding anything in this Order to the contrary, the Litigation Trust shall receive, retain, and may enforce all rights to commence, pursue, litigate, compromise, abandon, or settle, in each case in accordance with the Litigation Trust Agreement, any and all estate claims or causes of action constituting Litigation Trust Assets and nothing contained in this Order shall prohibit or impair the Litigation Trust from taking all necessary or desirable actions to liquidate the Litigation Trust Assets.

      L. **No Sub Rosa Plan.** The Settlement Term Sheet and the Settlement contemplated thereby do not constitute a *sub rosa* chapter 11 plan. The Settlement Term Sheet and the Settlement do not impermissibly restructure the rights of the Debtors' creditors nor do they impermissibly dictate a chapter 11 plan for the Debtors.

M. **Releases.** This Court has jurisdiction under 28 U.S.C. §§ 1334(a) and 1334(b) to approve the release provisions set forth in Exhibit A to the Settlement Term Sheet (the "**Releases**"). Section 105(a) of the Bankruptcy Code permits approval of the releases set forth in the Settlement and this Order. Based upon the record in these chapter 11 cases, the Releases (i) were consensual; (ii) were an integral part of the Settlement, and are essential to the formulation and implementation of the Settlement; (iii) were negotiated at arms' length and in good faith between the Debtors, the Creditors' Committee, and the FILO Secured Parties; and (iv) are fair, equitable, and reasonable. Additionally, such releases have been given in exchange for and are supported by fair consideration provided by each and all of the parties providing such releases. Accordingly, based upon the record of these chapter 11 cases, this Court finds that the Releases are consistent with the Bankruptcy Code and applicable law. The Releases are appropriately tailored to the circumstances of these chapter 11 cases and reasonable in scope.

N. The Debtors' decision to enter into the Settlement and consummate the transactions therein constitutes a proper exercise of the fiduciary duties of the Debtors and their directors, managers, and officers. Because the entry into and consummation of the Settlement constitute the exercise by the Debtors of sound business judgment, the Debtors, and their respective current members, managers, officers, directors, employees, advisors, professionals or agents (in each case, solely in their capacity as such), shall have or incur no liability to the estates or any holder of a Claim against or Interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of Settlement or the consummation of the transactions contemplated thereunder, other than liability arising out of or relating to any breach of the terms of the Settlement or willful misconduct or fraud, in each case as determined by a court

of competent jurisdiction; *provided*, however, that nothing in this paragraph shall amend, modify or supersede the releases set forth in the Settlement.

O.     **Assumption and Assignment Procedures.**  The Debtors have articulated good and sufficient business reasons for the Court to approve the Assumption and Assignment Procedures.  The Assumption and Assignment Procedures, including the form Cure Notice attached hereto as **Exhibit 3**, are fair, reasonable, and appropriate.  The Assumption and Assignment Procedures provide an adequate opportunity for all Contract Counterparties to raise any objections to the proposed assumption and assignment or to the proposed Cure Costs.  The Assumption and Assignment Procedures comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

P.     **Cure Notice.**  The Cure Notice, the form of which is attached hereto as **Exhibit 3**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures, as well as any and all objection deadlines related thereto, and no other or further notice shall be required for the Motion and the procedures described therein, except as expressly required herein.

Q.     **Notice.**  Notice of the hearing on the Motion and the opportunity for any party in interest to object was adequate and sufficient under the circumstances as to all parties affected by the Settlement.  The Debtors provided due, adequate, and sufficient notice to creditors and parties in interest, and no other or further notice need be provided.

R.     **Time is of the Essence.**  Time is of the essence in consummating the Settlement.  In order to maximize the value of the Debtors' assets, it is essential that the Settlement occur within the time constraints set forth herein and in the Settlement Term Sheet.  Good and sufficient reasons for approval of the Settlement Term Sheet and the Settlement have been

articulated by the Debtors.  The Parties may consummate the Settlement any time after entry of this Order and subject to the terms and conditions set forth herein and in the Settlement Term Sheet.

S.  **Final Order; Immediate Effect.**  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein.

## ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1.  The Motion is granted.

2.  **Approval of Settlement**.  The Settlement is approved pursuant to sections 362, 363 and 105 of the Bankruptcy Code and Bankruptcy Rules 4001, 6004, and 9019.  Each of the Parties, as well as their directors, managers, officers, employees, and agents, is authorized, and the Parties are directed (a) to fully perform under the Settlement Term Sheet, annexed hereto as **Exhibit 1**, and the Definitive Documents (as defined below) and (b) to execute, deliver, implement and fully perform any and all other obligations, instruments, documents, and papers, including the Definitive Documents, and to take any and all actions, in each case under clause (b), reasonably necessary or appropriate to consummate the Settlement.  This Order and the Settlement are enforceable and binding on the Debtors, the Debtors' estates, the FILO Secured Parties, the Creditors' Committee and all other parties in interest, including, without limitation, any subsequently appointed chapter 11 or chapter 7 trustee, any other estate representative, and all

9

recording officers each in accordance with the terms thereof. For the avoidance of doubt, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Litigation Trust Assets to the Litigation Trust in accordance with this Order and the Settlement.

3. **Approval of Settlement Term Sheet and Definitive Documents.** The Settlement Term Sheet, the Litigation Trust Agreement, the TSA, the Trustee Engagement Letter, the Commitment Letter, and the DIP Amendment (collectively, the "**Definitive Documents**"), and the terms and provisions included therein are approved in their entirety. The failure to describe specifically or include any particular provision of the Settlement Term Sheet, any of the Definitive Documents, or related documents in the Motion or this Order shall not diminish or impair the effectiveness of such provision or related documents, it being the intent of this Court that the Settlement Term Sheet, all other Definitive Documents, and the transactions and related documents contemplated therein be approved in their entirety.

4. **Automatic Stay Modification.** The automatic stay provisions of section 362 are hereby modified to the extent necessary to allow the Parties to take action in accordance with the Settlement Term Sheet and with respect to transactions approved under this Order. Before the Litigation Trust Establishment Date or, solely with respect to the Retained FILO Claim, before the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, the FILO Secured Parties shall not be allowed to move (or direct or support any party to move) to convert the cases to chapter 7, or for relief from the automatic stay unless either the Debtors or the Creditors' Committee materially breach the terms of the Settlement, including the terms of the Settlement Term Sheet, the Plan Term Sheet, or any Definitive Document, and such breach has not been cured within three (3) business days following

written notice from the FILO Secured Parties to the Debtors and the Creditors' Committee of such breach. On and after the Litigation Trust Establishment Date or, solely with respect to the Retained FILO Claim, on and after the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, the FILO Secured Parties shall not be allowed to move (or direct or support any party to move) to convert the cases to chapter 7, or for relief from the automatic stay under any circumstance (without prejudice to the FILO Secured Parties' rights to seek to enforce the Settlement, including the Settlement Term Sheet, the Plan Term Sheet, and the Definitive Documents).

5.      **Establishment of the Litigation Trust.** On the earlier of (i) July 14, 2025 and (ii) one (1) business day after entry of an order confirming the Plan (the "**Litigation Trust Establishment Date**"), the Litigation Trust shall be established in accordance with the Settlement Term Sheet and the Litigation Trust Agreement, which shall be consistent with the Settlement Term Sheet and otherwise mutually agreeable to the Parties, with approval not to be unreasonably withheld, conditioned or delayed. The powers, authority, responsibilities, and duties of the Litigation Trust and the Litigation Trustee (as defined below) are set forth in, and shall be governed by, the Litigation Trust Agreement.

6.      **Transfer of Litigation Trust Assets.** Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, on the Litigation Trust Establishment Date, the Debtors shall automatically, with no further action of any party, be deemed to have transferred the Litigation Trust Assets, including all interests, rights, and privileges relating thereto, to the Litigation Trust and shall execute all documentation necessary to effectuate such transfer, and the Litigation Trust shall have and take title to and possession of the Litigation Trust Assets free and clear of all liens, claims, charges, encumbrances, contractually imposed restrictions, interests, and constructive

trusts ("**Claims**"), and, to the fullest extent of the law, shall have no obligation with respect to Claims, of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liabilities, de facto merger, continuation or continuity, setoff or recoupment rights, or any similar theories under applicable state or federal law or otherwise. This Order: (a) is and shall be effective as a determination that upon the Litigation Trust Establishment Date in accordance with the Settlement, all Claims of any kind or nature whatsoever existing as to Litigation Trust Assets, and any tax liability, prior to the applicable closing have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected; and (b) is and shall be binding upon and shall authorize all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, report or insure any title or state of title, or otherwise record or release any documents or instruments necessary or appropriate to effectuate, implement, or consummate the Settlement. Upon the transfer of the Litigation Trust Assets to the Litigation Trust, in no event shall any part of the Litigation Trust Assets revert to the Estate (other than any distributions made on account of the Class B interests in accordance with the Litigation Trust Agreement). For the avoidance of doubt, the transfer of the rights of the Debtors and the Estate to recover insurance proceeds from the Debtors' directors and officers liability insurance policies (the "**D&O Policies**") shall not hinder the ability of any beneficiaries of such D&O Policies to submit claims and otherwise pursue and obtain coverage under the D&O Policies, subject to the terms of the *Order Authorizing the Use of Proceeds of Directors and Officers Liability Insurance*

*Policies for Defense Costs of Individual Insurers* (Docket No. 3887) (the "**D&O Insurance Order**") and provided that the D&O Insurance Order is in full force and effect. For the avoidance of doubt, the Litigation Trust Assets to be transferred to the Litigation Trust includes Claims and Causes of Action asserted or assertable by the Debtors or the Estate against all government payors (whether federal or state, including, without limitation, the Commonwealth of Massachusetts).

7.     **Privileges.** All attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection and all other privileges, immunities or protections from disclosure (the "**Privileges**") held by any of (1) any one or more of the Debtors or (2) any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors (together the "**Privilege Transfer Parties**") related in any way to the Trust Assets or the analysis or prosecution of any Trust Assets (the "**Transferred Privileged Information**") are hereby transferred and assigned to, and vested in, the Litigation Trust and its authorized representatives. The Transferred Privileged Information shall include documents and information of all manner, whether oral, written or digital, and whether or not previously disclosed or discussed. For the avoidance of doubt, the Privileges shall include any right or obligation to preserve or enforce or waive a privilege that arises from any joint defense, common interest or similar agreement involving any of the Privilege Transfer Parties.

8.     The foregoing transfer and assignment shall vest the Privileges concerning the Transferred Privileged Information in the Litigation Trust, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Litigation Trust and the Litigation Trust beneficiaries; *provided*, *however*, that to the extent that any such Privileges or Transferred Privileged Information relates to both the Trust Assets on one hand and any matter

in which the Estate has an interest on the other, such Privileges and Transferred Privileged Information shall vest jointly in the Estate (or its designee) and the Litigation Trust. As relates to any Privileges or Transferred Privileged Information held jointly with the Estate (or its designee), (i) with respect to litigations or proceedings concerning matters in which the Estate has an interest as a potential defendant, the Estate shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information, upon receiving prior written consent from the Litigation Trust, and (ii) with respect to litigations or proceedings concerning the Trust Assets where the Estate has an interest as a potential defendant, the Litigation Trust shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the Estate. The Litigation Trust and Estate agree that they do not intend to provide a general waiver of all Privileges and that each such party will take commercially reasonable steps to avoid a general waiver of the Privileges.

9.      Pursuant to, *inter alia*, Federal Rule of Evidence 502(d), no Privileges shall be waived by the transfer and assignment of the Privileges or the production of any Transferred Privileged Information to the Litigation Trust or any of its respective employees, professionals or representatives, or by disclosure of such Transferred Privileged Information between the Privilege Transfer Parties, on the one hand, and the Litigation Trust, on the other hand, or any of their respective employees, professionals or representatives.

10.      If a Privilege Transfer Party, the Litigation Trust, any of their respective employees, professionals or representatives or any other person inadvertently produces or

discloses Transferred Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Transferred Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Trust of the production and shall demand of all recipients of the inadvertently disclosed Transferred Privileged Information that they return or confirm the destruction of such materials.

    11.  **Litigation Trustee**. As of the Litigation Trust Establishment Date, Mark Kronfeld of Province Fiduciary Services, LLC shall serve as the person responsible for the governance and administration of the Litigation Trust, pursuant to the terms of the Settlement and the Definitive Documents (the "**Litigation Trustee**"). The Litigation Trustee shall be a fiduciary and owe fiduciary duties to all beneficiaries of the Litigation Trust, collectively, and, without limitation, shall act as a 'trustee' with respect to the Litigation Trust Assets for purposes of rights granted under 11 U.S.C. § 108, with the authority of a debtor-in-possession or trustee to assert such rights under said statute, whether in judicial, administrative or arbitration proceedings, whether during or after the pendency of these cases. In the event that the Litigation Trustee resigns, is removed for cause in accordance with the Litigation Trust Agreement, or is otherwise unable to serve in such capacity, the Litigation Trustee will be replaced by the terms of the Settlement and Definitive Documents, as applicable. The powers, authority, responsibilities, and duties of the Litigation Trust and the Litigation Trustee are set forth in, and shall be governed by, the Litigation Trust Agreement. Upon the Litigation Trust Establishment Date, the Litigation Trust and the Litigation Trustee shall be empowered to act or refrain from acting in accordance with the Litigation Trust Agreement, in each case, without the need for Bankruptcy Court approval and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Local Rules.

12. **Distribution of Litigation Trust Interests**.  Upon the Litigation Trust Establishment Date, the Litigation Trustee shall distribute the interests in the Litigation Trust to the beneficiaries of the Litigation Trust in accordance with the terms of the Litigation Trust Agreement, which shall be consistent with the Settlement Term Sheet and otherwise mutually agreeable to the Parties, with approval not to be unreasonably withheld, conditioned or delayed.

13. **Class B Representative**.  The Transformation Committee shall serve as the initial Class B Representative.  The Class B Representative shall have the responsibilities set forth in the Settlement Term Sheet and the Litigation Trust Agreement.

14. **Coordination.**  The Estate will coordinate its efforts with the Litigation Trustee with respect to issues involving overlapping concerns among the Estate and the Litigation Trust with respect to third parties.  If the Estate and the Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a mediation conference with Judge Isgur, in his capacity as mediator (or in the event that Judge Isgur is not available, such other entity or individual reasonably acceptable to the Litigation Trustee and the Estate) in connection with the subject matter of this Order; and (ii) failing a successful mediation, obtain resolution by this Court. With respect to any such disputes presented to this Court:

    a. If the FILO Balance is in an Underpayment State on the date of any hearing before this Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate; *provided*, *however*, that the Litigation Trustee's business judgment shall not be considered by this Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estate (other than with respect to claims under section 502(h) of the Bankruptcy Code).

    b. If the FILO Balance is not in an Underpayment State on the date of any hearing before this Court, the Estate's business judgment shall be applied to the dispute, subject to challenge by the Litigation Trustee; *provided*, *however*, that the Estate's business judgement shall not be considered by this Court with respect to a matter (or a

portion thereof) as to which such business judgment would allow or increase the liabilities of the Litigation Trust.

15.     Notwithstanding the foregoing, with respect to any constructive trust claims asserted by any third parties with respect to any Litigation Trust Assets or Retained Collateral, as well as any government investigations, the Litigation Trust and the Estate will coordinate efforts to dispute or settle such claims, or to address such investigations, including with respect to funding arrangements for the defense of any such claims or addressing any such investigations.

16.     **Litigation Funding.** The Litigation Funding terms set forth in the Commitment Letter, which shall be consistent with the Settlement Term Sheet and otherwise mutually agreeable to the Parties, with approval not to be unreasonably withheld, conditioned or delayed, are hereby approved. Upon execution of the Commitment Letter, the Commitment Letter shall constitute legal, valid, and binding obligations of the Litigation Trust and Funding Parties (as defined in the Commitment Letter) and be enforceable in accordance with its terms and such obligations shall not be enjoined (temporarily, preliminarily or permanently) or subject to any contest, attack, rejection, defense, counterclaim, disallowance, reduction, discharge, impairment, release, avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or any applicable law or regulation, and the Litigation Trust shall be authorized to incur the obligations under the Commitment Letter and use the proceeds of such Commitment Letter, in each case, in accordance with the Litigation Trust Agreement without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any person. The terms and conditions of the Commitment Letter shall bind the Litigation Trust, each other entity that enters into such agreement, and all beneficiaries of the Litigation Trust. The Funding Parties are approved and directed to provide

litigation funding on the terms outlined in the Commitment Letter and the Settlement Term Sheet, as applicable.

17.     **Transition Services Agreement.**  On the Litigation Trust Establishment Date, the Debtors and the Litigation Trust shall enter into the TSA.  Payments made by the Litigation Trust to the Estate for any services under the TSA prior to the Estate paying for the budgeted costs of providing such services shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such costs.

18.     **Releases.**  The Releases are: (a) consensual; (b) supported by adequate consideration; (c) a necessary and integral part of the settlement embodied in the Settlement Term Sheet; (d) a good-faith settlement and compromise; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties (as defined in Exhibit A to the Settlement Term Sheet) asserting any claim or cause of action released thereby.  Additionally, the Releases are fair and equitable and in the best interests of the Debtors, their estates, creditors, and all parties in interest considering (x) the probability of success in litigation; (y) the complexity and likely duration and expense of litigating; and (z) the arms'-length negotiations which produced the settlement embodied in the Settlement Term Sheet.

19.     As of the Litigation Trust Establishment Date, the release provisions embodied in the Settlement, including those set forth in Exhibit A to the Settlement Term Sheet, are hereby approved and shall be effective and binding on all Persons and Entities, without further order or action by this Court.

20.     **FILO DIP Facility and Cash Collateral.**  For the avoidance of doubt, the DIP Amendment, attached hereto as **Exhibit 2**, is authorized in its entirety.  The Debtors are authorized, subject to the terms and conditions of the Settlement Term Sheet and the DIP

Amendment, to continue to use the FILO Secured Parties' cash collateral through the Litigation Trust Establishment Date. For the avoidance of doubt, notwithstanding anything to the contrary in the DIP Orders, no amounts on account of any Deferred Fees or Unestimated Fees (each as defined in the Plan Term Sheet) shall be deposited into the Professional Fees Escrow Account, and such amounts shall instead be paid in accordance with paragraph 3 of the Plan Term Sheet.

21. **FILO Secured Parties' Claims.** Upon entry of this Order, the FILO DIP Obligations in the principal amount of $206,197,079 and the Prepetition Bridge Obligations held by the FILO Secured Parties in the principal amount of $30,394,856, in each case calculated as of April 28, 2025, plus any and all accrued but unpaid or uncapitalized interest, fees, costs, expenses, charges, advances, claims, debts, and other obligations that have accrued to the FILO Secured Parties as of April 28, 2025 or accrue at any time thereafter, including to the extent capitalized into additional principal thereafter (excluding any amounts on account of the MOIC Amount (as defined in the Prepetition Bridge Credit Agreement)), shall constitute allowed claims secured by valid and perfected liens on the FILO DIP Collateral and Prepetition Bridge Collateral, respectively, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in these cases and any Successor Cases; *provided* that nothing in this Order allows the MOIC Amount (other than, upon the Litigation Trust Establishment Date, the MOIC Payment), *provided* further that, upon the Litigation Trust Establishment Date, the MOIC Payment will be allowed on the terms set forth in paragraph 11 of the Settlement Term Sheet.

22.     **Binding Effect of Order**.  This Order and the Settlement are binding in all respects on the Debtors, the Debtors' estates, the FILO Secured Parties, the Creditors' Committee and all other parties in interest, including, without limitation, all creditors of, and holders of equity interests in, the Debtors, any subsequently appointed chapter 11 or chapter 7 trustee, any other estate representative, all recording officers and all successors and assigns to any of the foregoing, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons," or other fiduciaries in these chapter 11 cases or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the Settlement Term Sheet and the obligations thereunder shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Order, including the rights granted to and obligations of the FILO Secured Parties hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on the Debtors and all parties in interest.  Upon entry of this Order, the Settlement authorized herein shall be of full force and effect regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business.  To the extent of any conflict between the express terms of this Order and the Settlement Term Sheet, the terms of this Order shall control.  To the extent of any conflict between this Order and the Settlement Term Sheet, on the one hand, and any previous order of the Court, this Order and the Settlement Term Sheet shall control.

23.     The reversal or modification on appeal of this Order shall not affect the validity of the transfer of the Litigation Trust Assets to the Litigation Trust, unless the authorization

to effectuate such transfer and such transfer are duly stayed pending such appeal. The Litigation Trust is entitled to all protections afforded by section 363(m) of the Bankruptcy Code.

24. On the Litigation Trust Establishment Date (which is subject to the issuance of the Litigation Funding, the Class A-1 interests, Class A-2 interests, and the Class B interests in the Litigation Trust in accordance with the Settlement), without the need for any further organizational action or approval of any board of directors, board of managers, member, manager, management, or security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued with respect to the FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims), and any rights of any holder in respect thereof, including any "claims" against the Debtors (as such term is defined in the Bankruptcy Code) shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

25. After the Litigation Trust Establishment Date (which is subject to the issuance of the Litigation Funding, the Class A-1 interests, Class A-2 interests, and the Class B interests in the Litigation Trust in accordance with the Settlement), the Debtors or the Transformation Committee may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, liens, pledges, and other security interests with respect to the FILO DIP Obligations and the Prepetition Bridge Obligations held by the FILO Secured Parties (excluding the Retained FILO Claim, which, for the avoidance of doubt, shall, until the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, remain secured by the Retained Cash and any other assets of the Debtors' estates or any successor(s) thereto (provided that the negative pledge provisions and other rights and entitlements of the Litigation Trust with

respect to the Retained Collateral shall survive and remain unaffected notwithstanding such timely satisfaction of the Confirmation Milestone or satisfaction of the Retained FILO Claim)), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, liens, pledges, and other security interests held by the FILO Secured Parties (excluding with respect to the Retained FILO Claim prior to the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash), including, without limitation, UCC-3 termination statements.

26.     From and after the Litigation Trust Establishment Date, the Retained Collateral (which includes, for the avoidance of doubt, all proceeds derived therefrom) shall be held in trust exclusively for the benefit of the Litigation Trust and shall be subject to a negative pledge by the Estate and not made available (pursuant to subsequent order of the Court or otherwise) other than for distribution in accordance with the Litigation Trust's distribution waterfall as contemplated by the Litigation Trust Agreement.

27.     The Estate shall, at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost), (a) use commercially reasonable efforts to monetize the Non-Transferrable A/R, Excluded Interests, and ERTCs in coordination, and in a manner reasonably agreed upon, with the Litigation Trust, and (b) promptly turn over any cash or other value realized on account of the Non-Transferrable A/R, Excluded Interests, or ERTCs to the Litigation Trust.

28.     All rights, claims, causes of action, rights of setoff or recoupment, and legal or equitable defenses that any of the Debtors or their respective estates had with respect to the Litigation Trust Assets immediately prior to the Litigation Trust Establishment Date, including, without limitation, any extension of time available under section 108 of the Bankruptcy Code, shall be available to the Litigation Trust as if the Litigation Trust were the Debtors.  For the

avoidance of doubt, the Litigation Trust shall be entitled to conduct examinations pursuant to Bankruptcy Rule 2004.

29.     **Assumption and Assignment Procedures.**  The following Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all Contract Counterparties, comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and are approved.

30.     The Cure Notice, substantially in the form attached hereto as **Exhibit 3**, is reasonable, fair, and appropriate, contains the type of information required under Bankruptcy Rule 2002, and complies in all respects with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules, and is hereby approved.

31.     The Cure Notice, including any Supplemental Cure Notice (as defined below), is reasonably calculated to provide sufficient notice to the Contract Counterparties of the Debtors' proposed assumption and assignment of the Assigned Contracts and constitutes adequate notice thereof, and no other or further notice of the Debtors' proposed Cure Costs or the proposed assumption and assignment of the Assigned Contracts shall be required if the Debtors file and serve such notice in accordance with the Assumption and Assignment Procedures and this Order**.**

32.     Within five (5) Business Days after entry of this Order, the Debtors shall file the Cure Notice with the Court and serve the Cure Notice on the Contract Counterparties. Service of the Cure Notice in accordance with this Order on all Contract Counterparties is hereby deemed to be good and sufficient notice of the proposed Cure Costs for, and the proposed assumption and assignment of, the Assigned Contracts.  As soon as reasonably practicable after filing the Cure Notice, the Debtors shall post a copy of the Cure Notice on the website maintained

by Kroll Restructuring Administration, LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://restructuring.ra.kroll.com/Steward (the "**Kroll Website**").

33.     The Debtors shall use commercially reasonable efforts to provide or cause to be provided to all Contract Counterparties to a proposed Assigned Contract a notice that sets forth a list of proposed Assigned Contracts that may be assumed by the Debtors.

34.     Objections, if any, to any proposed Cure Costs (each, a "**Cure Objection**") must:  (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and, to the extent applicable, provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Rules and the Local Rules; and (v) be filed with the Court and served on the Debtors, the Creditors' Committee, and the FILO Secured Parties within ten (10) days after receipt of Cure Notice (the "**Cure Objection Deadline**").

35.     If a Cure Objection cannot otherwise be resolved by the parties, the Debtors may, after consultation with the Creditors' Committee and subject to the consent of the FILO Secured Parties, assume and assign the Contract(s) to the Litigation Trust pending resolution of the Cure Objection.

36.     If a Contract Counterparty to any Assigned Contract files a Cure Objection to the assumption and assignment of such Assigned Contract to the Litigation Trust, then such contract shall be deemed a "**Disputed Contract**."  The Debtors, in consultation with the Creditors' Committee, shall be authorized to resolve or settle any Cure Objection to the assumption and assignment of Disputed Contracts in accordance with the terms of the Settlement and this Order, including with respect to Cure Costs without need for any further order or action from this Court.

Once any objection to a Disputed Contract is resolved, the Disputed Contract shall be subject to the terms of this Order, including without limitations paragraphs 29-41, in all respects.

37.     Any Disputed Contract that is the subject of an unresolved Cure Objection may be assumed and assigned prior to the resolution of such Cure Objection, so long as the Litigation Trust (i) pays any undisputed Cure Costs on or before the Litigation Trust Establishment Date and (ii) appropriately reserves funding for the disputed portion of the Cure Costs pending resolution of the dispute.

38.     If (a) the Debtors, in consultation with the Creditors' Committee and the FILO Secured Parties, identify (i) additional contracts or leases to be assumed and assigned to the Litigation Trust or (ii) modifications that need to be made to a proposed Cure Cost previously stated in the Cure Notice, or (b) the Litigation Trust designates any additional contracts or leases not previously included on the Cure Notice for assumption and assignment, the Debtors may, after consultation with the Creditors' Committee and subject to the consent of the FILO Secured Parties, at any time before the Litigation Trust Establishment Date, file with the Court and serve by first class mail on the applicable Contract Counterparty a supplemental Cure Notice (each, a "**Supplemental Cure Notice**," the form of which shall be substantially similar to the form of Cure Notice attached hereto as **Exhibit 3**).   As soon as reasonably practicable after filing a Supplemental Cure Notice, the Debtors shall post a copy of the Supplemental Cure Notice on the Kroll Website.  Any Cure Objection with respect to Cure Costs set forth in a Supplemental Cure Notice must be filed within seven (7) days of the filing of such Supplemental Cure Notice.

39.     The Litigation Trust shall be responsible for paying all Cure Costs and all reasonable and documented costs of the Estate associated with assuming and assigning any contracts or leases to the Litigation Trust, including any related advisor or personnel costs incurred

by the Estate, to the extent that the Litigation Trustee (or, prior to the Litigation Trust Establishment Date, the FILO DIP Agent) has consented to the Estate's incurrence of such costs, such consent not to be unreasonably withheld, conditioned, or delayed. Notwithstanding anything to the contrary in this Order, the assumption by the Debtors and assignment of any contracts or leases to the Litigation Trust shall be subject to the consent of the FILO Secured Parties.

40. If no Cure Objection is timely received with respect to an Assigned Contract: (i) the Contract Counterparty to such Assigned Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Litigation Trust of the Assigned Contract, and be forever barred from asserting any objection with regard to such assumption and assignment; (ii) any and all defaults under the Assigned Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and upon payment of the Cure Costs set forth in the Cure Notice for such Assigned Contract; and (iii) the Contract Counterparty shall be forever barred from asserting any other claims related to such Assigned Contract against the Debtors and their estates or the Litigation Trust, or the property of any of them, that existed prior to the assignment of such Assigned Contract to the Litigation Trust.

41. The inclusion of a contract, lease, or other agreement on the Cure Notice or any Supplemental Cure Notice shall not constitute or be deemed a determination or admission by the Debtors or any other party in interest that such contract or other document is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that the stated Cure Cost is due (all rights with respect thereto being expressly reserved). The Debtors and the applicable counterparties reserve all of their rights, claims, defenses, and causes of action with

respect to each contract or other document listed on the Cure Notice or any Supplemental Cure Notice.

42.    **Provider Agreements.** Pursuant to section 363(b) of the Bankruptcy Code, the Debtors' rights under any provider, payor, or similar agreement (including any such agreement with the Centers for Medicare and Medicaid Services or in connection with any state Medicaid program) (collectively, the "**Provider Agreements**"), including, but not limited to, (i) the right to payments of accounts receivable, and (ii) the rights retained by the Debtors with respect to any Provider Agreement that was transferred to any purchaser of the Debtors' assets (each, a "**Purchaser**"), in each case, are hereby assigned to the Litigation Trust and shall constitute Litigation Trust Assets upon the Litigation Trust Establishment Date as permitted under 42 C.F.R. § 424.73(b)(2); provided that, to the extent the Debtors are required to pay any accounts receivable that become due and owing under a Provider Agreement to a Purchaser pursuant to court order or any asset purchase agreement, bill of sale, or provider-leaseback arrangement entered into after the Petition Date and prior to the date of this Order (each, a "**Sale Document**"), the Litigation Trust shall, to the extent it receives any proceeds of such accounts receivable, pay such accounts receivable proceeds to the applicable Purchaser in accordance with the applicable court order or Sale Document.

43.    **Litigation Trust Tax Requirements.** The Litigation Trust shall be subject to, and the Litigation Trustee shall comply with, the Litigation Trust Tax and Other Matters provisions set forth in **Exhibit 4**. Such provisions shall be included in the Litigation Trust Agreement. The Litigation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating

purpose of the Litigation Trust and reasonably necessary to conserve and protect the assets transferred to the Litigation Trust and provide for the orderly liquidation thereof. The funding provided pursuant to the Commitment Letter is necessary and incidental to the liquidating purpose of the Litigation Trust. In accordance therewith, the Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes, with the holders of allowed FILO DIP Claims and allowed FILO Bridge Claims, in respect of their Class A-1 and Class A-2 interests in the Litigation Trust, and the respective FILO Secured Parties providing Litigation Funding, in respect of their Class A-1 interests in the Litigation Trust, being as grantors. Subject to definitive guidance from the Internal Revenue Service (the "**IRS**") or a court of competent jurisdiction to the contrary, all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust beneficiaries) shall report consistent therewith for U.S. federal income tax purposes and, to the extent permitted by applicable law, for state and local income tax purposes.

44.     In no event shall the Litigation Trust be dissolved later than five (5) years from the Litigation Trust Establishment Date unless this Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of this Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for U.S. federal income tax purposes) is

necessary to facilitate or complete the recovery on, and liquidation of, the assets of the Litigation Trust.

45. **Objections Overruled.** Any objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled are hereby overruled on the merits and denied with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein, including, without limitation, the Releases.

46. **Retention of Causes of Action/Reservation of Rights.** Except as otherwise provided in this Order, nothing contained in this Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, or other legal or equitable defenses that any of the Debtors and their estates had immediately prior to the Litigation Trust Establishment Date in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, any affirmative causes of action against parties with a relationship with the Debtors. Subject to the terms of the Settlement, including the Releases, the Debtors and their estates shall have, retain, reserve, and be entitled to assert all claims, causes of action, rights of setoff or recoupment, and other legal or equitable defenses that do not constitute Litigation Trust Assets transferred to the Litigation Trust on the Litigation Trust Establishment Date.

47. Notwithstanding anything to the contrary in this Order, to the extent that any Litigation Trust Assets are transferred to the Litigation Trust, those assets are subject to setoff rights or recoupment rights (if any) which are otherwise preserved with respect to any Litigation Trust Assets. The Class A-1 and Class A-2 interests shall have the same priority in relation to

such setoff rights that the FILO DIP Liens have in relation to such setoff rights as of immediately prior to the Litigation Trust Establishment Date.

48. **Payor Agreements.** Notwithstanding anything in this Order to the contrary, any rights, claims and causes of action of the Debtors under any provider agreements, facility agreements, or similar in-network contracts (the "**Payor Agreements**") with (i) UnitedHealthcare Insurance Company; (ii) Cigna Health and Life Insurance Company; (iii) Aetna, Inc.; (iv) Health Care Service Corporation, a Mutual Legal Reserve Company and its division Blue Cross and Blue Shield of Texas; (v) Humana Insurance Company, Humana Health Plan, Inc., Humana Government Business, Inc., CarePlus Health Plans of Florida, Inc., CarePlus Health Plans, Inc.; (vi) the Elevance Health Companies, Inc. and its affiliates; (vii) Medshape, Inc., DJO, LLC, Trilliant Surgical, LLC, Novastep, Inc., Encore Medical, L.P. (d/b/a DJO Surgical) and SURGI-CARE, Inc.; and (viii) Blue Cross and Blue Shield of Massachusetts, Inc. and Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc., and their respective parents, subsidiaries, and affiliates (collectively, the "**Specified Payors**") transferred pursuant to this Order shall be subject to (a) all available defenses of the Specified Payors, including, without limitation, recoupment and setoff, and (b) all rights of the Specified Payors under the Payor Agreements other than their rights of affirmative recoveries, which rights of affirmative recovery shall be preserved against the Debtors. For the avoidance of doubt, nothing in the foregoing sentence shall be construed as an admission that any Specified Payor has or will have any such rights or valid defenses, including recoupment or setoff, to any claim or cause of action against such Specified Payor.

49. **Chubb Companies.** Notwithstanding anything to the contrary in the Motion, this Order, the Term Sheet, or any other document related to any of the foregoing nothing, alters or modifies the terms and conditions of any insurance policies or related agreements issued

30

by ACE American Insurance Company, and/or any of its U.S.-based affiliates and/or any predecessors (collectively, and solely in their capacities as insurers under the foregoing policies, the "**Chubb Companies**") issued to or pursuant to which coverage is provided to, any of the Debtors (or their affiliates or predecessors) at any time and all agreements, documents or instruments relating to such insurance policies (collectively, the "**Chubb Insurance Program**") and nothing shall permit or otherwise effect a sale, assignment, or any other transfer of the Chubb Insurance Program and/or any rights, proceeds, benefits, claims, rights to payments, or recoveries under or relating thereto without the prior express written consent of the Chubb Companies or pursuant to a further order of this Court; provided, however, to the extent any claim that may be covered by the Chubb Insurance Program (including any D&O Policies) results in any insurance proceeds that are payable to the Debtors such proceeds may be turned over to the Litigation Trust, if provided for pursuant to the terms of the Term Sheet (each, a "**Proceed Turnover**"); provided, however, further, that the Chubb Companies shall not have any duty to the Litigation Trust to effectuate a Proceed Turnover or liability to the Litigation Trust related to a Proceed Turnover.

50. **Hartford**. Notwithstanding anything to the contrary in this Order, the Motion or the Settlement: (i) no insurance policy/policies or agreement(s) relating to any and all such policy/policies of insurance issued by Hartford Fire Insurance Company or any of its affiliated insurance companies ("**Hartford**") to any of the Debtors and/or any of their non-debtor affiliate(s) ("**Policy**" or "**Policies**") shall be in any manner transferred to any other entity pursuant to the Order, Motion, or Settlement without the express written consent of Hartford or pursuant to a further order of this Court; (ii) to the extent that there is a transfer of any rights of the Debtors under any policy (including but not limited to Accounts Receivables, Claims, and Causes of Action (and the proceeds, products, offspring or profits thereof)), such transfer shall not be free and clear

of any of Hartford's defenses, including setoff and recoupment rights; (iii) nothing herein or otherwise shall be deemed a determination that any past, present or future proceeds of letter of credit Hartford is holding or will be holding is property of the estate; and (iv) nothing herein or otherwise shall impact Hartford's ability to raise its contention that the aforementioned proceeds of letters of credit are not property of the estate.

51.     **Tenet.**  Debtors Steward Health Care System LLC, Steward Medical Group, Inc., Steward PGH, Inc., Steward NSMC, Inc., Steward CGH, Inc., and Steward HH, Inc. are party, as plaintiffs, to that certain case styled *Steward Health Care System v. Tenet Business Services Corporation*, C.A. No. 2022-0289-SG, pending before the Court of Chancery of the State of Delaware (the "**Steward-Tenet Chancery Case**"), to which Tenet Business Services Corporation, Tenet Healthcare Corporation, CGH Hospital, Ltd., Coral Gables Hospital, Inc., Hialeah Hospital, Inc., Hialeah Real Properties, Inc., Lifemark Hospitals of Florida, Inc., Lifemark Hospitals, Inc., North Shore Medical Center, Inc., Sunrise Medical Group I, LLC, Tenet Florida Physician Services, LLC, TFPS IV, LLC (collectively, the "**Tenet Defendants**"), and Sharilee Smith are party as defendants.

52.     Debtor Steward Health Care System LLC is party, as respondent, to that certain arbitration proceeding captioned *Conifer Revenue Cycle Solutions, LLC vs. Steward Health Care System LLC*, Case No. 01-22-0002-5628, pending before the American Arbitration Association (Dallas, Texas) (the "**Conifer-Steward Arbitration**"), to which Conifer Revenue Cycle Solutions, LLC ("**Conifer**") is party as claimant.

53.     Notwithstanding anything to the contrary in this Order, the Settlement, the Settlement Term Sheet, the Litigation Trust Agreement, any other Definitive Document, any Cure Notice, or any other document approved pursuant hereto or entered into in connection herewith,

(a) any of the Debtors' rights in respect of the Steward-Tenet Chancery Case or the Conifer-Steward Arbitration that are transferred to the Litigation Trust, including any rights to the funds escrowed with the Court in the Steward-Tenet Chancery Court (the "**Chancery Escrow**"), shall remain subject to any valid affirmative defenses (including setoff and recoupment) held by the Tenet Defendants and Conifer and (b) any rights of the Tenet Defendants to the funds in the Chancery Escrow shall not be impaired.

54. Nothing in this Order prejudices the right of any Tenet Defendant or Conifer to assert, prior to the Litigation Trust Establishment Date, that any funds held by the Debtors are held in trust (including constructive trust) for any Tenet Defendant or Conifer or otherwise are not property of the Debtors' estate; provided, however, that all parties' rights to object to the priority, validity, amount and extent of any alleged trust are fully preserved.

55. **TRACO.** Reference is hereby made to that certain adversary proceeding styled *TRACO International Group S. De R.L. v. Steward Health Care System LLC and All Affiliated Debtors*, Adversary Case No. 24-03261 (the "**TRACO Adversary Proceeding**") filed on December 6, 2024. Notwithstanding anything to the contrary in this Order, to the extent that any funds transferred to the Litigation Trust by the Debtors on the Litigation Trust Establishment Date are either found by a final, non-appealable order of this Court, or mutual agreement by the Debtors, the FILO Secured Parties (or, after the Litigation Trust Establishment Date, the Class A-2 Representative), and TRACO International Group S. De R.L. ("**TRACO**"), to be held in trust for TRACO (the "**Disputed Funds**"), this Order shall not be deemed to impair any claims asserted in the TRACO Adversary Proceeding with respect to such funds or judgments related thereto; provided, that nothing contained herein shall be deemed to abrogate any requirements under the Bankruptcy Code or Bankruptcy Rules to obtain approvals of settlements. The Debtors, TRACO,

and all other parties reserve all of their rights, remedies, claims, and defenses with respect to the Disputed Funds under the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules, all applicable contracts, and applicable state and Federal laws, including, but not limited to, their rights to file any objections, motions, or other filings as may be appropriate.

56.     **CommonSpirit.**  Reference is hereby made to that certain adversary proceeding styled *Catholic Health Initiatives Colorado, et al. v. Steward Health Care System, LLC, et al.*, Adversary Case No. 25-03001 (the "**CommonSpirit Constructive Trust Action**") filed on January 3, 2025.  Notwithstanding anything to the contrary in this Order, to the extent that any funds transferred to the Litigation Trust are either found by a final, non-appealable order of this Court, or mutual agreement by the Debtors, the FILO Secured Parties (or, after the Litigation Trust Establishment Date, the Class A-2 Representative), and Catholic Health Initiatives Colorado ("**CHIC**"), CommonSpirit Health ("**CSH**"), and/or CommonSpirit Mountain Region f/k/a Centura Health Corporation ("**CSMR**", together with CSH and CHIC, "**CommonSpirit**"), to be held in trust for CommonSpirit (the "**Disputed Funds**"), this Order shall not be deemed to impair any claims asserted in the CommonSpirit Constructive Trust Action or judgments related thereto; provided, that nothing contained herein shall be deemed to abrogate any requirements under the Bankruptcy Code or Bankruptcy Rules to obtain approvals of settlements.  The Debtors, CommonSpirit, and all other parties reserve all of their rights, remedies, claims, and defenses with respect to the Disputed Funds under the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules, all applicable contracts, and applicable state and Federal laws, including, but not limited to, their rights to file any objections, motions, or other filings as may be appropriate.

57.     **HSA**.  The Debtors acknowledge that (1) they and Healthcare Systems of America and its affiliates (collectively, "**HSA**") are party to that certain *Stipulation and Agreed*

*Order Between Debtors and Healthcare Systems of America Adjourning Hearing on Emergency Motion of Healthcare Systems of America to Enforce the Global Settlement Order and Compel The Debtors To Comply With Its Obligations Thereunder* (Docket No. 4828) (the "**HSA Stipulated Order**"), pursuant to which certain disputed funds (the "**Disputed LIP and DPP Funds**") have been or will be deposited into the Medicaid Funds Segregated Account (as defined in the HSA Stipulated Order) and (2) the Disputed LIP and DPP Funds are subject to an ongoing ownership dispute currently pending before this Court. Notwithstanding any other provision in this Order (including, without limitation, paragraph 6), the Settlement Term Sheet, or the occurrence of the Litigation Trust Establishment Date, (a) no Disputed LIP and DPP Funds subject to the HSA Stipulated Order shall be transferred to the Litigation Trust unless and until the HSA Stipulated Order requires the release of such funds to the Debtors and (b) to the extent that the Debtors or the Litigation Trust are, or become, in possession of any Disputed LIP or DPP Funds that are required to be, but have not been, deposited into the Medicaid Funds Segregated Account, the right to such funds shall not transfer to the Litigation Trust unless and until the HSA Stipulated Order would have otherwise required the release of such funds to the Debtors, which release shall be governed by the terms of the HSA Stipulated Order. For the avoidance of doubt, nothing in this Order shall be deemed to transfer any Disputed LIP and DPP Funds to which HSA is found or deemed to have an ownership interest—whether by court order or a settlement acceptable to the Debtors and the FILO Parties—free and clear of HSA's ownership rights, including any Claims to enforce such rights. Notwithstanding the occurrence of the Litigation Trust Establishment Date, the HSA Stipulated Order, and the rights and obligations of HSA and the Debtors under the HSA Stipulated Order, including, without limitation, any Claims that accrued prior to the Litigation Trust Establishment Date, shall remain in full force and effect against HSA and the Debtors, as

applicable.  If any Disputed DIP or LPP Funds are released to HSA, the Debtors or the Litigation

Trust from the Medicaid Funds Segregated Account following entry of a final order from the Court

that has not been stayed (or such Disputed DIP or LPP Funds are transferred from the Debtors to

the Litigation Trust following entry of such unstayed final order), and, following an appeal, a court

of competent jurisdiction enters a final order reversing, modifying or remanding the lower court's

decision as to ownership of the Disputed DIP or LPP Funds, HSA, the Debtors or the Litigation

Trust, as applicable, shall have the right to seek recovery of such Disputed DIP or LPP Funds from

the party in possession of such funds.

58.     Notwithstanding anything to the contrary in this Order or the Settlement

Term Sheet, Ann-Marie Driscoll and Patrick Lombardo are not Individual Released Parties and

shall be deemed excluded from the list of individuals identified on Schedule 1 annexed to the

Settlement Term Sheet.

59.     Notice of the Motion is adequate under Bankruptcy Rule 6004(a).

60.     Notwithstanding the provisions of Bankruptcy Rule 6004(h) or 6006(d), this

Order shall be immediately effective and enforceable upon its entry.

61.     The Debtors are authorized to take all actions necessary or appropriate to

carry out the relief granted in this Order.

62.     This Court shall retain jurisdiction to hear and determine all matters arising

from or related to the implementation, interpretation, or enforcement of this Order and the

Settlement Term Sheet; *provided*, *however*, that any mediation requirements in the Definitive

Documents shall be given full force and effect.

Signed:  June 02, 2025

Christopher Lopez
United States Bankruptcy Judge

# Exhibit 1

## Settlement Term Sheet

# SETTLEMENT AND STAY RELIEF TERM SHEET

## April 28, 2025

This Term Sheet sets forth the material substantive terms pursuant to which the Debtors, the FILO DIP/Bridge Agent and Lenders (the "FILO Parties"), and the Unsecured Creditors Committee ("UCC") will support entry of an order resolving requests for relief from the stay by the FILO Parties.

1. This Term Sheet must be approved by an order of the Bankruptcy Court, pursuant to sections 361, 362, 363 and 105 of the Bankruptcy Code and Bankruptcy Rules 4001(d)(iii), 6004, and 9019 (the "Approval Order"), entered not later than May 28, 2025 (the "Approval Milestone"). In addition, the Debtors shall file a motion seeking the Bankruptcy Court's approval of the Approval Order (the "Approval Motion") by no later than April 28, 2025 (the "Motion Milestone"). If the Debtors do not satisfy either the Motion Milestone or the Approval Milestone, this agreement will be of no further force or effect.[1]

2. All of the Estate (as defined below) assets identified on **Schedule 1** hereto (the "Litigation Trust Assets") will be transferred free and clear (to the fullest extent permissible by applicable law) to the "Litigation Trust," a trust to be created. The Estate assets that are not Litigation Trust Assets shall be retained by the Estate (the "Retained Assets").[2] The terms of the

---

[1] The milestones and other dates and deadlines contained herein may be extended by e-mail agreement amongst counsel to the Debtors, FILO Parties, and UCC.

[2] The Retained Assets shall include, without limitation, (i) the Estate's reversionary interests (if any) in the Professional Fees Escrow Account, the Physician Insurance Account (each as defined in the FILO DIP Order (Docket No. 1538)), the Expense Escrow Account (as defined in the MPT Settlement Order (Docket No. 2610)), and in each case, the amounts deposited therein, and (ii) any equity interests in any Debtor. To the extent that the Estate realizes cash or other value on account of any Retained Assets that comprise, would have comprised or are derived from FILO DIP collateral ("Retained Collateral") (which shall exclude, for the avoidance of doubt, the Class B interests, any proceeds thereof, and any proceeds funded to, advanced to, or authorized to be used by the Estate in accordance with this Term Sheet) the Estate shall promptly turn over such cash or other value to the Litigation Trust for distribution in accordance with the Litigation Trust's distribution waterfall. To the extent that any Retained Collateral is identified that could be monetized for value, the Estate shall use commercially reasonable efforts to monetize such Retained Collateral in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee at the Litigation Trust's sole expense and paid in advance pursuant to the TSA (for the avoidance of doubt, any reasonable and documented costs incurred by the Estate in connection with such agreed upon monetization process shall be charged to the Litigation Trust at the Estate's cost). The Approval Order shall provide that from and after the Trust Establishment Date (as defined below), the Retained Collateral (which includes, for the avoidance of doubt, all proceeds derived therefrom) shall be held in trust exclusively for the benefit of

Litigation Trust will be governed by a trust agreement consistent with this Term Sheet and otherwise mutually agreeable to the parties, with approval not to be unreasonably withheld, conditioned or delayed (the "<u>Litigation Trust Agreement</u>").

3. The Approval Order will provide that the Litigation Trust Assets will be transferred to the Litigation Trust on the earlier of (i) July 8, 2025; and (ii) one (1) business day after the confirmation date of any confirmed plan (the actual date of transfer of the assets is the "<u>Trust Establishment Date</u>"). The Debtors and FILO DIP Lenders will enter into an amendment to the FILO DIP credit agreement providing for an extension of the FILO DIP maturity date through (i) in the first instance, the Motion Milestone, (ii) if the Debtors satisfy the Motion Milestone, the Approval Milestone, and (iii) if the Debtors satisfy the Approval Milestone, through the date by which the Litigation Trust Assets are required to have been transferred to the Litigation Trust pursuant to the immediately preceding sentence. It shall be an Event of Default under the FILO DIP Credit Agreement if the Debtors or UCC materially breach their respective obligations to the FILO Parties under this Term Sheet or the Plan Support Agreement Term Sheet, and such breach is not cured within three business days of the FILO Parties providing written notice of such breach to Debtors' and UCC's counsel.

4. On the Trust Establishment Date, the releases set forth in **<u>Exhibit A</u>** shall go into full force and effect; provided that, for the avoidance of doubt, the release will not include (i) $10 million of principal claims outstanding under the FILO Bridge facility (the "<u>Retained FILO Claim</u>"), which shall, until the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, remain secured by the Retained Cash and any other assets of the Debtors' estates or any successor(s) thereto (collectively, the "<u>Estate</u>") (provided that the negative pledge provisions and other rights and entitlements of the Litigation Trust with respect to the Retained Collateral shall survive and remain unaffected notwithstanding such timely occurrence of the Confirmation Milestone or satisfaction of the Retained FILO Claim); or (ii) the rights or entitlements of the FILO Parties or the Litigation Trust contemplated by this Term Sheet or the Plan Support Agreement Term Sheet (or any further documentation memorializing the same), including, without limitation, the FILO Parties' rights to receive Retained Cash as a paydown on the Class A-

---

the Litigation Trust and shall be subject to a negative pledge by the Estate and not made available (pursuant to subsequent order of the court or otherwise) other than for distribution in accordance with the Litigation Trust's distribution waterfall as contemplated by this footnote 2.

2 Preference pursuant to paragraph 6 of this Term Sheet and the Litigation Trust's rights under the TSA.

5. As a condition precedent to the effectiveness of this Term Sheet, (i) the Debtors shall have made a prepayment of the FILO DIP Loans by April 28, 2025, in the amount of no less than $30.3 million (the "Required Prepayment"), and (ii) the Debtors and the FILO Parties shall have executed an amendment to the FILO DIP Credit Agreement (the "DIP Amendment") approving the budget annexed to the DIP Amendment (the "DIP Budget").

6. The Debtors will hold $15 million (the "Retained Cash") in a third-party escrow account subject to the lien of the Retained FILO Claim. If the Retained Cash is not authorized to be utilized by the Debtors pursuant to an order confirming a chapter 11 plan consistent with the terms of Section 1 of the Plan Support Agreement Term Sheet ("Plan"), which order is entered on or prior to August 1, 2025 (the "Confirmation Milestone"), the Retained Cash will be paid to the FILO Parties as a paydown on the Retained FILO Claim until paid in full in cash and the remainder as a paydown on the Class A-2 Preference. If an order confirming the Plan is entered prior to the Confirmation Milestone, the Debtors may use the Retained Cash for any purposes authorized under the Plan.

7. The Litigation Trust will be governed pursuant to the Litigation Trust Agreement creating and governing the Litigation Trust:

   a. The Litigation Trust will have three beneficiary classes:

      i. Class A-1 interests, which shall (i) represent the rights and entitlements of the parties that from time to time extend or are deemed to have extended funding under the Litigation Funding (the "Litigation Funders") and their representative (the "Litigation Funding Agent") and (ii) have a distribution and liquidation preference as set forth in this Term Sheet.

      ii. Class A-2 interests will be held by the FILO Parties and their successors, which interests shall have a distribution and liquidation preference as set forth in this Term Sheet (together with the Class A-1 interests, the "Class A interests").

      The definitive documentation will provide that the Class A interests will only be transferrable (i) pursuant to an available exemption under the Securities Act of 1933, as amended (the "Securities Act"), or a registration of such Class A

3

interests under the Securities Act, and (ii) so long as any proposed transfer would not result in a requirement that the Class A interests be registered under the Securities Act. Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class A interests would be effectuated, and shall entitle the Litigation Trustee (as defined below) to, in its reasonable discretion at any time the Class A interests are not registered, and other than with respect to a transfer by operation of law, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

The definitive documentation shall also contain customary representations and warranties of each initial holder of the Class A interests to the effect that it is an accredited investor and a qualified institutional buyer, possesses appropriate investment experience, and is acquiring the interests for its own account and not with a view toward distribution. To the extent such representations cannot be made by each FILO Party on the date of issuance, then at any time the Class A interests are not registered, all such Class A interests shall be non-transferable (other than by will, intestate, or operation of law).

The FILO Agent or its designee, acting at the direction of FILO Parties holding Class A-2 interests entitled to a majority in amount of the outstanding Class A-2 Preference, shall be the representative of the Class A-2 interests (the "Class A-2 Representative").

iii. Class B interests will be held by Steward Health Care Holdings LLC, on behalf of the Estate, or by any successor entity that may be established under a confirmed plan (each, a "Successor Entity").

The definitive documentation will provide that the Class B interests will only be transferrable (i) to any liquidating trust

4

or other similar vehicle formed under and following a confirmed plan or otherwise formed pursuant to applicable law or (ii) (A) pursuant to an available exemption under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") and so long as any proposed transfer would not result in a requirement that the Class B interests be registered under the Securities Act, or a registration of such Class B interests under the Securities Act, and (B) if such transfer is to occur prior to the effective date of any confirmed plan, with the consent of the Litigation Trustee (not to be unreasonably withheld, conditioned or delayed) if the purpose of the transfer is to obtain proceeds to pay costs and expenses of the Successor Entity, including taxes. Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class B interests would be effectuated, and other than with respect to a transfer by operation of law or pursuant to bankruptcy court order or confirmed plan, shall entitle the Litigation Trustee to, in its reasonable discretion at any time the Class B interests are not registered, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

There shall be a single representative of the Class B interests at any given time (the "<u>Class B Representative</u>"), which shall initially be the Transformation Committee, on behalf of the Estate. If a plan is confirmed, the terms of the Plan and the Confirmation Order will determine the successor Class B Representative on or before the Effective Date of the Plan. If the Chapter 11 Cases are converted to Chapter 7 cases, the Chapter 7 Trustee (or its designee) will be the Class B Representative.

iv. Any right to receive Litigation Trust interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Litigation Trust interests constitute "securities," the exemption provisions of section 4(a)(2) of the Securities Act will be satisfied and the offer and sale of such interests will be exempt from registration under the Securities Act.

5

b. The identity of the trustee of the Litigation Trust (the "<u>Litigation Trustee</u>") shall be a party to be identified. The terms of the Litigation Trustee's engagement shall be acceptable to the Debtors, FILO Parties, and the UCC. The Debtors and the UCC will have the right to consent to the selection of any successor Litigation Trustee (including the terms of such successor Litigation Trustee's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

c. The Litigation Trustee will be a fiduciary and owe fiduciary duties to all Litigation Trust beneficiaries, collectively.

d. Except as specifically set forth in the following subparagraphs, the Litigation Trustee will have exclusive governance authority over the Litigation Trust.

e. With respect to the Litigation Trust Assets set forth on the schedule agreed to contemporaneously herewith among the Debtors, the FILO Parties, and the UCC (the "<u>Threshold Schedule</u>"), the following consents shall be required:

    i. For a settlement proposal or monetization opportunity (each, a "<u>Proposal</u>") for which the Specified Value (as defined below) meets or exceeds the applicable Minimum Thresholds set forth on the Threshold Schedule but that does not meet or exceed the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee may decide, without obtaining the consent of any other party, whether to accept or reject such settlement in its sole judgement consistent with its fiduciary duties, in each case, subject to clauses (iii) – (v) of this paragraph 7.e., including, without limitation, the Minimum Threshold adjustments set forth in such clauses.

    ii. For a Proposal for which the Specified Value exceeds the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee shall accept and implement such Proposal unless the Litigation Trustee reasonably determines based on the advice of outside counsel that accepting and implementing such Proposal is inconsistent with its fiduciary duties.

iii.  If the FILO Balance is in an Underpayment State, (a) each Minimum Threshold shall be deemed to be equal to 80% of its stated value set forth in the Threshold Schedule unless and until the FILO Balance is no longer in an Underpayment State and (b) the Litigation Trustee shall be authorized to accept a Proposal that does not meet or exceed the applicable Minimum Thresholds as then in effect without obtaining the consent of any other party if the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal and (ii) provides five (5) business days' written notice (the "Notice Period") to the Class A-2 Representative and the Class B Representative (the "Notice Parties") of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an objection in writing to the Litigation Trustee and the other Notice Party (which objection shall specify in reasonable detail the grounds for the objection) (an "Objection"), and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator.  If a successful resolution is not achieved within three (3) business days of the commencement of such mediation (which period may be extended by the Litigation Trustee in its sole discretion in writing) (the "Mediation Period"), the parties may seek resolution by the Bankruptcy Court on an emergency basis.

iv.  If the FILO Balance is not in an Underpayment State, the Litigation Trustee will not accept any Proposal unless (a) the Class A-2 Representative and Class B Representative have authorized such acceptance; (b) the Proposal exceeds the applicable Minimum Thresholds by 20% or more, in which case the consent of no other party shall be required; or (c) the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal, in which case the consent of no other party shall be required, and (ii) provides five (5) business days' written notice to the Notice Parties of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an Objection to the Litigation Trustee and the other Notice Party, and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator.  If a

7

successful resolution is not achieved within the Mediation Period, the parties may seek resolution by the Bankruptcy Court on an emergency basis.

v. At the FILO Parties' election, the FILO Parties may, on one or more occasions, increase the deemed value of a Specified Value with the effect that it is treated as meeting the applicable Minimum Thresholds by contributing Class A-2 interests having a Class A-2 Preference equal to the difference between the Net Offered Specified Value and the highest applicable Net Minimum Specified Value (each as defined below).

vi. "Specified Value" shall be equal to the gross cash and cash equivalent proceeds of a Proposal.

vii. "Net Minimum Specified Value" is equal to the Minimum Threshold set forth in the Threshold Schedule less the pro forma contingency fee that would be payable in connection with a Proposal equal to such Minimum Threshold.

viii. "Net Offered Specified Value" is equal to the Specified Value less any contingency fee payable to the Trust's counsel, in each case, with respect to the applicable Proposal.

f. With respect to the disposition of Litigation Trust Assets not set forth on the Threshold Schedule, the disposition shall be carried out by the Litigation Trustee, exercising its reasonable business judgment.

g. The Litigation Trustee shall not agree to a contingency fee in excess of 20% of the gross proceeds of a litigation without the written consent of the Class A-2 Representative and the Class B Representative, other than any existing contingency fee arrangements approved by the Bankruptcy Court as of the Trust Establishment Date.

h. The Estate or Class B Representative, as applicable, shall have the right to pay in full or any portion of the FILO Balance, in cash, without any prepayment penalty at any time. Once the FILO Balance has been reduced to $0, (i) the rights granted to the Class A-2 Representative hereunder shall inure to the Class B Representative and the rights of the Class B Representative hereunder shall inure to the Litigation Funding Agent for the benefit of the holders of the Variable Component and (ii) the Class B Representative may replace the Litigation Trustee subject to the

terms of the Litigation Trustee's agreement with the Litigation Trust (which agreement shall be consistent with this Term Sheet and otherwise reasonably acceptable to the Debtors, the FILO Parties, and the UCC).

i. Distributions from the Litigation Trust shall be subject to the following priorities:

    i. Fees of the Litigation Funding Agent and the Class A-2 Representative (which shall be $50,000 per month for each position), and indemnification and reasonable and documented expenses of (A) the Litigation Trust (including payments owing under the TSA, which shall be paid to the Estate), and (B) the Litigation Funding Agent, the Litigation Funders, the Class A-2 Representative, and the FILO Parties (solely with respect to this clause (B), subject to an aggregate cap not to exceed: (i) $500,000 per month for the initial three-month period commencing on the Trust Establishment Date, (ii) $350,000 per month for the nine-month period following such initial three-month period, and (iii) $220,000 per month[3] thereafter; provided that such cap shall not apply to the FILO Parties before the Trust Establishment Date; provided further that, (i) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) are less than the amount of such monthly cap, the amount of such variance will roll forward and increase such monthly cap in the following months until such variance is used and (ii) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) exceed the amount of such monthly cap, the amount of such variance can be carried forward and satisfied in future months to the extent there is availability under the applicable monthly cap in any such future month).

    ii. Class A-1 interests until the Class A-1 Preference, the Upfront Premium, and, subject to paragraph 13 of this Term Sheet, the Variable Component (as defined below) (which survives repayment of the Class A-1 Preference and the FILO Balance) are repaid in full in cash.

---

[3] Monthly invoices of the professionals for such parties shall be provided to the Estate with reasonable summaries of activities, which may be redacted for privilege and shall not require time entries to be provided.

     iii. Class A-2 interests until the Class A-2 Preference is repaid in full in cash and the FILO Balance is $0.

     iv. Class B interests.

     v. Notwithstanding anything to the contrary in the immediately preceding clauses (ii) - (iv):

          1. If the FILO Balance is not in an Underpayment State, 25% of any amount otherwise payable to (i) the holders of the Class A-2 interests, and (ii) on or after December 1, 2025, the Class A-1 interests, shall be used to pay unpaid Deferred Fees and Unestimated Fees (each, as defined in the Plan Support Agreement Term Sheet) on a pro rata basis.

          2. If the FILO Balance is less than $25 million, any unpaid Unestimated Fees or Deferred Fees will be paid on a pro rata basis from any available proceeds that would otherwise be payable to the holders of Class A-1 interests as Variable Component (provided that such Variable Component shall be payable with the next proceeds received following repayment in full of such unpaid Unestimated Fees and Deferred Fees).

8. The Estate will coordinate its efforts with the Litigation Trustee with respect to issues involving overlapping concerns among the Estate and the Litigation Trust with respect to third parties. For example, if the same third party is involved in disputes with both the Estate and the Litigation Trust, the effort will be coordinated between the Estate and the Litigation Trustee. If the Estate and the Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a conference with Judge Isgur, in his capacity as mediator in connection with the subject matter of this Term Sheet; and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.

    a. With respect to any such dispute presented to the Bankruptcy Court:

      i. If the FILO Balance is in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate; *provided*, *however*, that the Litigation Trustee's business judgment will not be considered

by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estate (other than with respect to §502(h) claims).

    ii. If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate's business judgment will be applied to the dispute, subject to challenge by the Litigation Trustee; *provided*, *however*, that the Estate's business judgment will not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Litigation Trust.

    b. Notwithstanding the foregoing, with respect to any constructive trust claims asserted by any third parties with respect to any Litigation Trust Assets or Retained Collateral, as well as any government investigations, the Litigation Trust and the Estate will coordinate efforts to dispute or settle such claims, or to address such investigations, including with respect to funding arrangements for the defense of any such claims or addressing any such investigations.

9. FILO Parties to agree to use of cash collateral from April 1, 2025, through the Trust Establishment Date in an amount up to $61 million through June 27, 2025 and with additional amounts available for use thereafter, in each case, in accordance with the DIP Budget and the Pre-TED Professional Fee Estimates (as defined in the Plan Support Agreement Term Sheet). The aggregate amount of cash collateral used from April 1, 2025, through the Trust Establishment Date, together with interest thereon at the Applicable Rate, shall be the "Secured Interim Advances." On the Trust Establishment Date, the Debtors shall repay the FILO DIP Loans with Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of such Secured Interim Advances, and on account of such repayment, the amount of FILO DIP Loans outstanding shall be reduced by the amount of such Secured Interim Advances.

10. Funding.

    a. The FILO Parties shall commit, subject to the terms and conditions to be set forth in a commitment letter consistent with this Term Sheet and otherwise acceptable to the FILO Parties and the Debtors (the "Commitment Letter") (which shall be executed within 10 business days after execution of this Term Sheet), to, commencing on

the Trust Establishment Date, extend funds (solely from the proceeds of FILO DIP/Bridge Claim[4] repayments received after the FILO DIP Agent's receipt of the Required Prepayment, or Class A interests distributions) to the Litigation Trust (the "Litigation Funding") on a delayed draw basis in an aggregate amount of up to $125 million (the "Initial Commitment Amount") (which is inclusive of (x) a budgeted amount of $61 million through June 27, 2025, together with any additional amounts budgeted thereafter under the DIP Budget, which, in each case, may only be incurred in the form of Secured Interim Advances, and (y) the $6.5 million of Estate Funding), which funded amounts shall be available to pay litigation costs of the Litigation Trust, costs of administration of the Litigation Trust and monetization of the Litigation Trust Assets, in each case, subject to (i) budgets delivered from time to time to, and which must be reasonably acceptable to, the Litigation Funding Agent (the "Litigation Funding Budget") and (ii) the satisfaction of any conditions to funding under the Commitment Letter and absence of any uncured material breaches of the Litigation Trustee's obligations under the Litigation Trust Agreement.[5] Requests for funding under the Litigation Funding shall be made solely (a) in compliance with the foregoing terms and (b) by the Litigation Trustee upon at least five business days' written notice to the Litigation Funding Agent, it being understood and agreed that not more than one such funding request shall be made during any 30-day period. Litigation Funding to include an uncommitted accordion of 25% of the Initial Commitment Amount, on the same terms as the initial tranche (to the extent the accordion becomes committed in the sole and absolute discretion of the FILO Parties, the amount of such commitment together with the Initial Commitment Amount, shall be the "Total Commitment Amount"). The commitments under the Commitment Letter shall automatically terminate upon the earlier to occur of (i) the funding of the then applicable commitment amount (whether the Initial Commitment Amount or the Total Commitment Amount, as the case may be) and (ii) the repayment of the FILO Balance.

b. Further financing to be subject to written consent of (x) the Litigation Trustee; (y) the Class B Representative; and (z) unless the further

---

[4] "FILO DIP/Bridge Claim" refers to the claims outstanding under the FILO DIP/Bridge facilities immediately prior to the Trust Establishment Date.

[5] To the extent that the initial Litigation Funding Budget contemplates disbursements to legal counsel on a current basis and the projected amount of such disbursements is subsequently reduced through contingency fee, success fee, or similar arrangements (the aggregate amount of such reduction as agreed by the Litigation Trustee, the "Contingency Fee Savings"), the Total Commitment Amount shall be reduced by the Contingency Fee Savings.

financing is junior to amounts due or to be due to the FILO Parties and under the Litigation Funding, the Class A-2 interests holders and the Litigation Funding Agent. For the avoidance of doubt, the Litigation Trust shall not incur any debt, obligation for borrowed money or other obligation with payment priority senior to or *pari passu* with the Class A interests or secure any obligation with liens on any Litigation Trust Assets or Retained Collateral, in each case, without the prior written consent of the Class A-2 Representative and Class B Representative and the Litigation Funding Agent.

c. Upon the occurrence of the Trust Establishment Date, the Litigation Trust shall provide $6.5 million to the Estate (or any successor liquidating vehicle) (the "Estate Funding") to fund costs and expenses of the Estate and the Estate's professionals incurred after the Trust Establishment Date and of any successor liquidating vehicle (or representative thereof) established to hold the Class B interests and/or any remaining assets of the Debtors.

d. In respect of the Estate Funding, the FILO Parties indirectly providing such funding shall receive Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of the Estate Funding. The Estate Funding shall not be required to be repaid by the Estate.

11. MOIC Payment: The "MOIC Payment" refers to a payment to which the FILO Bridge lenders are entitled (subject to the occurrence of the Trust Establishment Date) in accordance with the terms set forth below. On the Trust Establishment Date, the MOIC Payment will be allowed on the following terms:

a. The Litigation Trust's MOIC obligation will be $11.25 million through March 31, 2026, increasing by:

   i. $1.0 million on April 1, 2026,
   ii. An additional $1.5 million on May 1, 2026,
   iii. An additional $2.0 million on June 1, 2026,
   iv. An additional $2.5 million on July 1, 2026,
   v. An additional $3.0 million on August 1, 2026, and
   vi. An additional $3.75 million on September 1, 2026 and on the first day of each month thereafter until the FILO Balance is paid in full in cash.

b. The total MOIC Payments will not exceed 85% of $75 million *minus* any interest paid or accreted on account of the claims outstanding

13

under the FILO Bridge facility (the "FILO Bridge Claims") (including any interest paid or accreted on account of the Class A-2 Preference that is allocable to FILO Bridge Claims).

12. Class A-2 interests shall, as of the applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the sum of (i) all principal and accrued interest, fees, expenses,[6] and other amounts outstanding under the FILO DIP/Bridge facilities[7] immediately prior to the Trust Establishment Date (for the avoidance of doubt, excluding the Retained FILO Claim), (ii) all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), (iii) the MOIC Payment, and (iv) the "Exit Premium" under the FILO DIP Loans (which shall be calculated as if the FILO DIP Loans were being fully repaid), in each case, as of such date, *less* (y) the (A) aggregate amount, if any, of cash distributions paid on the Class A-2 interests from the Litigation Trust and (B) aggregate amount, if any, of Class A-2 interests otherwise contributed or waived by the FILO Parties, in each case, as of such date (the "Class A-2 Preference"). Prongs (i) and (ii) of the definition of Class A-2 Preference shall accrete at (a) from the Trust Establishment Date through September 30, 2025, a rate equal to 10% per annum, (b) from October 1, 2025 through December 31, 2025, a rate equal to 10.5% per annum, (c) from January 1, 2026 through March 31, 2026, a rate equal to 11% per annum, and (d) a rate equal to 11.25% per annum commencing on April 1, 2026, and increasing by an additional 25bps at the beginning of each quarter thereafter, subject to a maximum of 12% per annum (the immediately preceding clauses (a)-(d), the "Applicable Rate," which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-2 Preference on a monthly basis); provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

---

[6] Milbank to defer (i) 10% of its fees incurred between April 1, 2025, and the Trust Establishment Date, and (ii) any of its fees incurred in excess of the Pre-TED Professional Fee Estimates. All outstanding Milbank invoices and Houlihan's March 18, 2025 invoice shall be paid as a condition precedent to the effectiveness of this Term Sheet, and thereafter all Milbank and Houlihan fees and expenses that are not subject to deferral shall be paid current in accordance with the FILO DIP Order and Approval Order, as applicable.

[7] FILO DIP/Bridge facilities to be allowed in full pursuant to the Approval Order, subject to the MOIC Payment settlement set forth in this Term Sheet.

13. Litigation Funding will be made available to the Litigation Trust by the FILO Parties on these terms:

    a. The Class A-1 interests shall, as of each applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the aggregate amount of funding extended or deemed to have been extended under the Litigation Funding plus all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), in each case, as of such date, *less* (y) the aggregate amount, if any, of cash distributions paid on the Class A-1 interests from the Litigation Trust as of such date (the "Class A-1 Preference"). The Class A-1 Preference shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-1 Preference on a monthly basis; provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

    b. The Litigation Funding will, in addition to payment of the Class A-1 Preference and the agency fee of the Litigation Funding Agent, as well as indemnification and reimbursement of all reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), be entitled to:

        i. an upfront premium (the "Upfront Premium"), payable in kind, in an amount equal to $4.25 million; provided that if the Litigation Funding accordion is exercised with the consent of the Litigation Trustee, then the Upfront Premium shall be increased by the same percentage that the commitments under the Litigation Funding are increased.

        ii. 20% of gross litigation proceeds (the "Variable Component"), of which (a) 15% (the "Upfront Percentage") is paid in cash at the time of receipt of such litigation proceeds and (b) 5% is deferred, with the applicable deferred cash being held in escrow (the "Deferred Portion"); provided that if the litigation proceeds result from a litigation financed with a contingency fee structure or third-party litigation funding, the total Variable Component shall be limited to the lesser of (A) the

15

applicable Variable Component noted above (subject to clause 13.d below), and (B) the greater of (i) 30% of such gross litigation proceeds minus the amount of contingency fee, success fee, or third-party litigation funding cost related to such litigation and (ii) 10% of such gross litigation proceeds (the "Reduced Variable Component").

In the event the Reduced Variable Component is equal to or less than 15% of such gross litigation proceeds, then all of such Reduced Variable Component shall be treated as the Upfront Percentage. In the event the Reduced Variable Component is greater than 15% of such gross litigation proceeds, then 15% of such gross litigation proceeds shall be treated as the Upfront Percentage and the remaining portion shall be treated as the Deferred Portion.

c.  If the FILO Balance is repaid in full in cash on or before October 1, 2026, the escrow holding the Deferred Portion shall be paid to the Estate. On October 2, 2026, if the FILO Balance has not been paid in full in cash by October 1, 2026, the escrow holding the Deferred Portion shall be disbursed in full to the Litigation Funding Agent. Following such time and until repayment of the FILO Balance in full in cash, the Variable Component shall be paid in cash at the time of receipt of litigation proceeds in accordance with the terms of clause 13.b. with no amounts deferred.

d.  After repayment of the FILO Balance, the Variable Component shall continue to be entitled to a percentage of the gross litigation proceeds (i) at the Upfront Percentage only (i.e., 15%) if the FILO Balance is repaid in full in cash on or before October 1, 2026, or (ii) at 20% if the FILO Balance is not repaid in full in cash on or before October 1, 2026, in each case, subject to the Reduced Variable Component adjustment described above (the "Post-FILO Repayment Variable Component"); provided that (x) to the extent a Plan is confirmed, the Post-FILO Repayment Variable Component shall be paid in two installments, with the first installment being paid in cash upon receipt of the applicable litigation proceeds in an amount equal to 62.5% of the Post-FILO Repayment Variable Component, and the payment of the remaining balance of the Post-FILO Repayment Variable Component being deferred until (and subject to) the satisfaction of allowed administrative and other priority claims pursuant to the Plan, and (y) if a Plan has not been confirmed, the Post-FILO Repayment Variable Component shall be paid in full in cash upon receipt of the applicable litigation proceeds.

14. "<u>FILO Balance</u>" equals on any applicable date of determination: the sum of (a) the outstanding Class A-2 Preference (including all accreted amounts accrued thereon) and fees and expenses of the Class A-2 Representative to the extent payable under this Term Sheet, (b) the outstanding Class A-1 Preference, the Upfront Premium, the agency fee of the Litigation Funding Agent, and outstanding indemnification claims and reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), and (c) any unpaid Variable Component that has been earned (for the avoidance of doubt, (i) other than before October 2, 2026, any Deferred Portion held in escrow and (ii) subject to adjustment, if applicable, in connection with any Post-FILO Repayment Variable Component).

15. The FILO Balance will be in an "<u>Underpayment State</u>" if the aggregate FILO Balance is equal to or greater than

    a. $275 million as of the Trust Establishment Date.
    b. Solely for purposes of paragraph 7.i.v.1., $220 million as of December 1, 2025.
    c. For all purposes other than paragraph 7.i.v.1., $220 million as of December 31, 2025.
    d. $160 million as of April 1, 2026.
    e. $110 million as of July 1, 2026.
    f. $60 million as of September 1, 2026.
    g. $10 million as of December 31, 2026.

16. The Debtors, FILO Parties and UCC to negotiate in good faith and agree prior to entry of the Approval Order on the terms of a transition services agreement pursuant to which the Estate will provide TSA services to the Litigation Trust, including agreement on the scope of services to be provided and pricing at cost (the "<u>TSA</u>"). In advance of each calendar month, the TSA shall provide for the Litigation Trust to advance the Estate's estimated monthly operating expenses, including for payroll and vendors, subject to (i) the initial TSA budget annexed hereto as **Exhibit B**, which may be updated from time to time if approved in writing by the Litigation Trustee and the Class A-2 Representative, and (ii) a reconciliation process with respect to amounts funded in prior months. Payments made by the Litigation Trust to the Estate for any services under the TSA prior to the Estate paying for the budgeted costs of providing such services shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such costs. In addition, the Litigation Trust shall provide, when and to the extent due as evidenced by reasonably detailed evidence thereof delivered by the Estate to the Litigation Trust (the "<u>Tax Package</u>"), up to $4 million in funding to

17

the Estate for the sole purpose of the Estate paying income taxes for the Debtors' current 2024/2025 income tax year. Payments made by the Litigation Trust to the Estate for such taxes shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such taxes reflected in the Tax Package on a dollar-for-dollar basis. The Estate and its related parties (including employees and advisors) shall be defended, held harmless and indemnified by the Litigation Trust against any and all liabilities or losses that may be incurred in connection with the rendering of services under the TSA to the Litigation Trust or Litigation Trustee, subject to customary carve outs for fraud, willful misconduct, and gross negligence. All other expenses of the Estate incurred on or after the Trust Establishment Date, including cost of administration of the Estate, must be budgeted and paid from the Retained Cash, Estate Funding, or other Estate (not Litigation Trust) resources.

17. Reporting and Information Sharing.

   a. <u>Regular Conference Calls</u>: Litigation Trustee to host conference calls on a bi-weekly basis (or more frequently in the Litigation Trustee's discretion) regarding the Litigation Trust Asset monetization process, which calls shall be accessible to the Litigation Funding Agent, the Class A-1 interest holders, the Class A-2 Representative, the Class A-2 interest holders, and the Class B Representative.

   b. <u>Ad Hoc Conference Calls</u>: In addition to the foregoing, the Litigation Trustee shall make itself reasonably available for conference calls to discuss specific topics reasonably requested in writing by the Litigation Funding Agent, the Class A-2 Representative, or the Class B Representative.

   c. <u>Financial Reporting</u>: Litigation Trustee shall deliver a written report to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representative on a monthly basis providing, as of the date of the report:

      i. the amount of cash received by the Litigation Trust through the Litigation Trust Asset monetization process (broken down by source), and the application thereof pursuant to paragraph 7(i) hereof;

      ii. the amount of expenses paid by the Litigation Trust (broken down by category and professional firm);

      iii. the FILO Balance;

   iv. the amount of the accrued Variable Component and the Deferred Portion then held in escrow; and

   v. a reasonably detailed summary of the asset monetization activity undertaken in the immediately preceding month.

  d. <u>Preference Actions</u>: Togut shall deliver to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representatives reporting with respect to preference actions, which shall be consistent (with respect to both frequency and format) with the reporting currently required to be delivered to the FILO and UCC counsel under paragraph 5 of the Togut retention order [ECF No. 3886].

  e. <u>Confidentiality/Preservation of Privileges</u>: Access to reporting shall be subject to entry into (i) a confidentiality agreement and (ii) a common interest agreement and other protocols to the extent necessary to protect applicable privileges, as reasonably determined by the Litigation Trustee.

18. Each FILO Party agrees that prior to the Trust Establishment Date, it shall not transfer, directly or indirectly, in whole or in part, any FILO DIP/Bridge Claims, option thereon, or right or interest therein, and any purported such transfer shall be void and without effect, in each case, unless the transferee thereof: (a) is a signatory to this Term Sheet as of the date of such transfer; or (b) has signed a joinder to this Term Sheet and the Plan Support Agreement Term Sheet acceding to the obligations of a holder of FILO DIP/Bridge Claims hereunder and thereunder (each, a "<u>Permitted Transferee</u>"). Any transfer of FILO DIP/Bridge Claims occurring prior to the Trust Establishment Date shall require the transferee to assume the transferor's obligations under the Commitment Letter in proportion to the amount of FILO DIP/Bridge Claims so transferred relative to the aggregate amount of all FILO DIP/Bridge Claims outstanding as of the date of such transfer (the "<u>Stapling Requirement</u>"). Notwithstanding anything to the contrary herein, a FILO Party may transfer FILO DIP/Bridge Claims to an entity that is acting in its capacity as a Qualified Marketmaker[8] without the requirement that the Qualified Marketmaker be a signatory to this Term Sheet or execute a joinder; *provided* that any such Qualified

---

[8] "<u>Qualified Marketmaker</u>" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers FILO DIP/Bridge Claims, or enter with customers into long or short positions in FILO DIP/Bridge Claims, in its capacity as a dealer or market maker in such FILO DIP/Bridge Claims and (ii) is in fact regularly in the business of making a market in claims, interests, or securities of issuers or borrowers.

Marketmaker (i) may only subsequently transfer the FILO DIP/Bridge Claims to a transferee that is or becomes a Permitted Transferee at the time of such transfer and to the extent such subsequent transfer complies with the Stapling Requirement and (ii) shall be required to, by the earlier of (x) ten (10) business days after its acquisition of any transferred FILO DIP/Bridge Claims and (y) the Required Joinder Date,[9] either sign a joinder to this Term Sheet or transfer all FILO DIP/Bridge Claims held by such Qualified Marketmaker to one or more Permitted Transferees, in each case, in compliance with the Stapling Requirement.

19. The parties shall negotiate promptly and in good faith to agree on definitive documentation, which shall include the Litigation Trust Agreement (including the funding mechanics with respect to the Class A-1 interests), the Litigation Trustee's engagement letter, the Commitment Letter, the TSA, and the DIP Amendment. Counsel to the Debtors, the UCC, and the FILO Parties to agree on allocation of drafting responsibility and a detailed work plan and fee estimates.

20. All transactions contemplated herein shall be implemented in a tax-efficient manner and are subject to review by tax professionals.

---

[9] "<u>Required Joinder Date</u>" means the third business day before the expiration of the chapter 11 plan voting deadline, if any, applicable to the FILO Bridge Claims.

Docusign Envelope ID: 6AA59DE7-3E72-4364-85C3-10EE83D76509

 

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

 

> **STEWARD HEALTH CARE SYSTEM LLC,**
> **on Behalf of Itself and its Debtor Affiliates**
>
> By: _____
> Name:  John Castellano
> Title:  Chief Restructuring Officer

 

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

For and on behalf of **OneIM Fund I LP, as DIP Lender,** acting by its General Partner, OneIM GP LLC, acting by its Manager, GCT Capital LLC

By: _____

Name: Munish Varma

Title: Authorized Signatory

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**BRIGADE AGENCY SERVICES LLC,** as FILO Agent

By: BRIGADE CAPITAL MANAGEMENT, LP, Its Managing Manager

By: _____

Name: Patrick Criscillo

Title: Authorized Signer

**BIG RIVER GROUP FUND SPC LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE BADGER FUND, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE DIVERSIFIED CREDIT CIT**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE CREDIT FUND II LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Settlement and Stay Relief Term Sheet*

**BRIGADE HIGH YIELD FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LOAN FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE OPPORTUNISTIC CREDIT LBG
FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Settlement and Stay Relief Term Sheet*

**BRIGADE-SIERRABRAVO FUND LP**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**CITY OF PHOENIX EMPLOYEES'
RETIREMENT PLAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FEDEX CORPORATION EMPLOYEES'
PENSION TRUST**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FUTURE DIRECTIONS CREDIT
OPPORTUNITIES FUND**,
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**JPMORGAN CHASE RETIREMENT PLAN BRIGADE BANK LOAN**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**SC CREDIT OPPORTUNITIES MANDATE, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**MIDOCEAN CREDIT FUND MANAGEMENT, LP**

By: _____
Name: Damion Brown
Title: Managing Director

**MidOcean Tactical Credit Fund III LP**
By: Tactical Credit Fund III GP, LP
By: Ultramar Credit Holdings Ltd., its General Partner

By: _____
Name: Damion Brown
Title: Managing Director

**MidOcean Multi Asset Credit Fund, LP**
By: MidOcean Multi Asset Credit Fund GP, LLC its General Partner

By: _____
Name: Damion Brown
Title: Managing Director

**Abbott Abbvie Multiple Employer Pension Plan Trust**

By: _____
MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

**Abbott Laboratories Annuity Retirement Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

*Signature Page to Settlement and Stay Relief Term Sheet*

Case 1:24-cv-00224 Document 1-1 Filed on 09/26/01 in TXSD Page 109 of 1832

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**OWL CREEK INVESTMENTS I, LLC**

By: OWL CREEK ASSET MANAGEMENT, LP
as Investment Manager

By: _____
Name: Kevin Dibble
Title:  General Counsel

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**WHITEHAWK FINANCE LLC**
By: WHITEHAWK CAPITAL PARTNERS, LP, as Investment Manager


By: _____
Name: Robert Louzan
Title: Managing Partner

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**The Official Committee of Unsecured Creditors**, solely in its representative capacity, and not on behalf of any individual member thereof

By: */s/ Brad M. Kahn*
Name:  Brad M. Kahn
Title:  Partner

Akin Gump Strauss Hauer & Feld LLP, in its capacity as counsel to, and authorized signatory for, the Official Committee of Unsecured Creditors of Steward Health Care System, LLC, *et al*.

*Signature Page to Settlement and Stay Relief Term Sheet*

# Schedule 1

## Litigation Trust Assets

1. All cash and cash equivalents, excluding only (a) the Retained Cash[1], (b) all cash held or received on behalf of buyers of the Debtors' hospital and Stewardship operations pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet ("Buyers"), (c) all cash received from Buyers or other third parties for purposes of paying cure costs, (d) cash to fund checks issued in accordance with the DIP Budget and which remain outstanding immediately prior to the Trust Establishment Date, (e) all cash held for subtenant security deposits or rent collected on behalf of Buyers, subtenants, or overlandlords, (f) all cash held in the Professional Fee Escrow Account, the Physician Insurance Account, the Utility Deposit Account, or the Expense Escrow Account, and (g) any funds of the Debtors in the Vendor Fund Escrow Account pursuant to the Vendor Fund Escrow Agreement, entered into as of March 11, 2025, by and among Golden Sun TSA Services, LLC, a Delaware limited liability company; Steward Health Care System LLC, a Delaware limited liability company; MPT Development Services, Inc., a Delaware corporation; Lifespan of Massachusetts, Inc., a Massachusetts nonprofit corporation; BMC Community Hospital Corporation and BMC Community Hospital Corporation II, Massachusetts nonprofit corporations; Orlando Health, Inc., a Florida corporation; and Kroll Restructuring Administration LLC, a Delaware limited liability company.

2. All accounts receivable, excluding only (a) accounts receivable that the Debtors sold to Buyers pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet and (b) any accounts receivable that cannot be transferred to the Litigation Trust or a subsidiary thereof pursuant to applicable law (such accounts receivables described in this clause (b), the "Non-Transferrable A/R"). With respect to any Non-Transferrable A/R, the Estate shall, at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost), (i) use commercially reasonable efforts to collect or otherwise monetize such Non-Transferrable A/R in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (ii) promptly turn over any cash or other value realized on account of such Non-Transferrable A/R to the Litigation Trust.

3. The equity interests in Steward A/R Co, LLC. Promptly upon transfer of the equity interests in Steward A/R Co, LLC to the Litigation Trust, the current

---

[1] Each capitalized term that is used but not defined herein has the meaning ascribed to it in (a) the Term Sheet to which this **Schedule 1** is attached or (b) the mutual releases set forth in **Exhibit A** to the Term Sheet.

manager of Steward A/R Co, LLC, John Castellano, shall submit his resignation as manager and the Litigation Trustee and Steward A/R Co, LLC shall grant Mr. Castellano a release of claims against Mr. Castellano in connection with his services as manager, in form and substance reasonably acceptable to Mr. Castellano, and the Litigation Trust shall appoint his replacement.

4. All Claims[2] and Causes of Action[3] of the Debtors and the Estate, including, without limitation, in each case, to the extent not released pursuant to the mutual releases set forth in **Exhibit A** to the Term Sheet, the following Claims and Causes of Action:

   a. all Claims and Causes of Action asserted by the Debtors in the *Second Amended Complaint and Jury Demand* filed by Steward Health Care System LLC at Docket No. 61 in Civil Action No. 21-cv-11902-PBS in the United States District Court for the District of Massachusetts (the "Norwood Complaint") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the Norwood Complaint;

   b. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against healthcare payors, including, without limitation, the commercial payors identified in **Schedule 1-A** hereto;

   c. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Non-Released Parties, including, without limitation, arising from or relating to the 2016 Distribution, the 2020 Transactions, the 2021 Distribution, the 2022 Distribution, or any Plane

---

[2] "Claim" means a "claim," as defined in section 101(5) of the Bankruptcy Code.

[3] "Cause of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license or franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whenever arising, whether in law or equity, whether sounding in tort or contract, whether asserted in arbitration, a court or regulatory proceeding, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including under any state or federal securities laws. Causes of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) Avoidance Actions, and (iii) any claim or defense, including fraud, mistake, duress, or usury and any other defenses set forth in section 558 of the Bankruptcy Code.

Sale,[4] or otherwise arising from or relating to the payment of unlawful dividends, the avoidance of prepetition dividend payments or other distributions, or one or more breaches of fiduciary or other duties;

d. all Avoidance Actions[5] asserted or assertable by the Debtors or the Estate against the transferees identified in **Schedule 1-B** hereto or any other prepetition vendors of the Debtors;

e. all Claims and Causes of Action against Blue Cross Blue Shield Association ("BCBS") or any of its independent Affiliates, including, without limitation, arising from or relating to the Claims and Causes of Action asserted in the class action lawsuits against BCBS and its various licensees consolidated in *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (MDL No. 2406) (N.D. Ala. 2013) (the "BCBS Antitrust Litigation") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the BCBS Antitrust Litigation;

f. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Commonwealth of Massachusetts, including, without limitation, any Claims or counterclaims of the Debtors or the Estate in connection with *The Commonwealth of Massachusetts' Motion for Relief from the Automatic Stay to Allow for the Setoff of Mutual Obligations if and to the Extent that Recoupment is Not Available* (Docket No. 3393) and the adversary proceeding filed by the Debtors against the Commonwealth of Massachusetts (Docket No. 3983) (Adv. Pro. No. 25-03053);

g. all Claims and Causes of Action with respect to the escrow account holding the Adjustment Escrow Amount (as defined in the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) the Asset Purchase Agreement with Brady Health Buyer, LLC (B) the Sale of Stewardship Health Assets Free and Clear of Liens and Liabilities and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (Docket No. 2135)) and the funds deposited therein; and

---

[4] "Plane Sales" means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

[5] "Avoidance Actions" means all Claims and Causes of Action under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, any other avoidance actions under the Bankruptcy Code, and any state law fraudulent transfer claims.

h. all Claims and Causes of Action with respect to the right of certain Debtors to receive reimbursement from Golden Sun TSA Services, LLC in connection with the renewal of that certain Software Licensing Agreement, dated September 9, 2009, by and between IASIS Healthcare LLC and Microsoft Corporation, as amended, under Section 9.7 of the asset purchase agreement attached as <u>Exhibit 1</u> to the *Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4192).

5. All rights of the Debtors and the Estate to recover insurance proceeds from the D&O Policies (as defined in the *Motion of Debtors for Order Authorizing the Use of Proceeds of Directors and Officers Liability Insurance Policies for Insureds Defense Costs* (Docket No. 2540)) in connection with any Claim or Cause of Action that is not released pursuant to the mutual releases set forth in **<u>Exhibit A</u>** to the Term Sheet. For the avoidance of doubt, the transfer of the rights of the Debtors and the Estate to recover insurance proceeds from the D&O Insurance shall not hinder the ability of any beneficiaries or insureds of such D&O Insurance to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

6. All of the Debtors' remaining interests in joint ventures and the Meadows Hospital Promissory Note, in each case, unless otherwise directed by the FILO Parties, which shall be transferred to one or more corporate subsidiaries of the Litigation Trust; provided that in the event any transfer of interests in joint ventures triggers any put, call, ROFO or ROFR, or other similar rights of third parties, such interests shall be excluded (the "<u>Excluded Interests</u>") and only the proceeds of sale of such interests will be transferred to the Litigation Trust. The Estate shall, at Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize the Excluded Interests in coordination, and in a manner reasonably agreed upon, with the Litigation Trust, and (b) promptly turn over any cash or other value realized on account of such Excluded Interests to the Litigation Trust.

7. All proceeds, products, offspring, or profits of any employee retention tax credits ("<u>ERTCs</u>") owned by any Debtors, net of any reasonable and documented out-of-pocket expenses of any broker or consultant retained in connection with a sale of such ERTCs (to the extent not paid in advance by the Litigation Trust in accordance with the succeeding sentence). The Estate shall at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize such ERTCs

in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (b) promptly turn over any cash or other value realized on account of such ERTCs to the Litigation Trust.

8. All proceeds, products, offspring, or profits of any of the foregoing assets and property.

## Schedule 1-A

### **Payors**

| Column1 |
| --- |
| Aetna Better Health of Florida |
| Aetna Health Management, LLC |
| Aetna Health, Inc. |
| Aetna Network Services LLC |
| Aetna U.S. Healthcare Inc. |
| AmeriGroup Texas, Inc. |
| Arizona Physicians IPA, Inc. |
| AvMed, Inc. |
| BHP of Ohio, Inc. |
| Blue Cross and Blue Shield of Florida, Inc. |
| Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. |
| Blue Cross and Blue Shield of Massachusetts, Inc. |
| Blue Cross and Blue Shield of Texas |
| Boston Medical Center Health Plan, Inc. |
| Caritas Christi |
| Cenpatico Behavioral Health LP |
| Cigna Behavioral health of Texas |
| Cigna Health and Life Insurance Company |
| Cigna HealthCare of Florida, Inc. |
| Cigna HealthCare of Massachusetts, Inc. |
| CIGNA Healthcare of Texas, Inc |
| Community Insurance Company |
| Connecticut General Life Insurance Company |
| Employers Health Insurance Company |
| Evercare of Texas, LLC |
| First Health Group Corp. |
| GHS Property and Casualty Insurance Company |
| Harvard Pilgrim Health Care, Inc. |
| Health Options, Inc. |
| Health Value Management, Inc. |
| Healthease of Florida |
| HealthSpring Life & Health Insurance Company, Inc. |
| Highmark Blue Cross Blue Shield |
| Humana Health Insurance Company of Florida |
| Humana Health Plan of Florida |
| Humana Health Plan of Texas, Inc. |
| Humana Insurance Company |
| Humana Medical Plan, Inc. |
| Leon Health, Inc. |
| Massachusetts Benefit Administrators LLC |
| MetraHealth Inruance Company |
| Metropolitan Life Insurance Company |
| Neighborhood Health Plan of Rhode Island |

| |
|---|
| NovaSys Health, Inc. |
| Oscar Insurance Company of Florida |
| PacifiCare of Arizona, Inc. |
| PacifiCare of Texas, Inc. |
| SelectCare of Texas, LLC |
| Senior Whole Health LLC |
| Simply Healthcare Plans, Inc. |
| Steward Health Care System, LLC |
| Sunshine State Health Plan, Inc. |
| Superior HealthPlan, Inc. |
| Texas HealthSpring, LLC |
| Total Health Plan, Inc, |
| Travelers Insurance Company |
| Tufts Associated Health Maintenance Organization, Inc. |
| Tufts Associated Health Plans, Inc. |
| Tufts Benefit Administrators |
| Tufts Health Plan, Inc. |
| Tufts Insurance Company |
| Tufts Public Plans, Inc. |
| U.S. Behavioral Health Plan, California |
| United Behavioral Health, Inc. |
| United Benefits of Texas, Inc. |
| United Community Plans of Texas, L.L.C. |
| United Health and Life Insurance Company |
| United Healthcare |
| United Healthcare Insurance Company |
| United Healthcare of Arizona, Inc. |
| United Healthcare of New England Inc. |
| United HealthCare of Ohio, Inc. |
| United Healthcare of Texas, Inc. |
| UnitedHealthcare Community Plan of Ohio, Inc. |
| UnitedHealthcare Insurance Company |
| UnitedHealthcare of Arizona, Inc. |
| UnitedHealthcare of Florida, Inc. |
| UnitedHealthcare of New England, Inc. |
| UnitedHealthcare of Ohio, Inc. |
| Universal American Corp. |
| US Behavioral Health |
| Warren Ohio Rehab Hospital Company |
| WellCare of Florida, Inc. |
| WellCare of Texas, Inc. |

**Schedule 1-B**

**Preference Defendants**

m o r n r

NORTHWIN  PHARMACEUTICALS LLC
 EFOREST  OSCELNI  & BERAR  INELLI
TOTAL ORTHOPAE  IC CARE
PROVI  ENCE ME  ICAL TECHNOLOG  INC
ACUME   LLC
THE PAR  ER  VMC TRUST
ALL PRO CLEANING S  STEMS
SPINEOLOG  INC
AEROSEAL LLC
MO  ULAR  EVICES
GALLOWA  OFFICE SUPPLIES INC
BLEN  EN ROTH LAW FIRM PLLC
ME  ICAL CONSULTANTS NETWOR  INC
COLE SCOTT &  ISSANE PA
ENVIRONMENTAL S  STEMS INC
SI-BONE, INC
 -CENTRI  LLC
TOTAL SCOPE INC
TREACE ME  ICAL CONCEPTS INC
 ESIGN B  NATURE CORP
FIRETROL PROTECTION S  STEMS INC
IMMUCOR INC
LSI SOLUTIONS
INNOVATIVE ME  ICAL PRO  UCTS INC
HERSHE  CREAMER  COMPAN
HEALTHCARE FINANCIAL INC
LANMOR SERVICES INC
SIGNET ELECTRONIC S  STEMS INC
TERUMO ME  ICAL CORPORATION
FINTHRIVE INC
CARCO GROUP, INC.
ME  ISOLV INC
BLOOMBERG IN  USTR  GROUP INC
WHELAN PROPERT  MANAGEMENT
AMERICAN COLLEGE OF RA  IOLOG
SMITH & NEPHEW INC
LABORATOR  CORPORATION OF AMERICA
 IMMER US INC
RICE MCVANE
MIST  HA

WILSON ELSER MOS OWIT E ELMAN
COMPLIANT HEALTHCARE
FU IFILM HEALTHCARE AMERICAS
THE FILTER MAN
BRIGHTER HEALTH NETWOR LLC
NETWOR PROVI ERS INC
CHARTER COMMUNICATIONS
VIRTUAL RA IOLOG PROFESSIONALS OF N
  ext Capital LLC
  EVETS IN USTRIES INC
PFEIFFER & SON LT
PROLACTA BIOSCIENCE INC
STR ER ORTHOPAE ICS
AGILITI HEALTH INC
STR ER SALES CORP
OL MPUS AMERICA INC.
ENVIRONMENTAL HEALTH & ENGINEERING
STR ER EN OSCOP
STR ER SUSTAINABILIT SOLUTIONS
HEALOGICS WOUN CARE &
ME TRONIC USA INC
GENCON SERVICE INC
PRORENATA LABS LLC
MA O SURGICAL CORP
ELEVATE PATIENT FINANCIAL
CONVERGE TECHNOLOG SOLUTIONS
  O SURGICAL
LPS ENTERPRISES LLC
INARI ME ICAL INC
Global Healthcare Exchange
BRISTOL LAW PLLC AN CLINICAL
BOSTON SCIENTIFIC CORPORATION
ARC IAL SIS SOUTH FLORI A
BROC TON HOSPITAL INC
GASTROENTEROLOG AFFILIATES OF
IMAGEFIRST OF NEVA A LLC
LIFENET HEALTH
FAVORITE HEALTHCARE STAFFING INC
STR ER NEUROVASCULAR
NUVASIVE INC
R AN LLC

SIEMENS HEALTHCARE   IAGNOSTICS
STR   ER SPINE
CHEM-A   UA INC
HEMOSTASIS LLC
STR   ER CRANIOMA   ILLOFACIAL
IRON MOUNTAIN
SMART SOURCE LLC
UTAH HEALTH INFORMATION NETWOR
ALLSTON BRIGHTON COMMUNIT
CATAL   ST ORTHOSCIENCE LLC
CUBE   STU   IO LLC
TAP   RI   E TRANSPORTSATION INC
AIRGAS USA LLC
CORC   M INC
MARSH USA INC
AFSCME OHIO COUNCIL
BCM CONTROLS CORPORATION
CHG COMPANIES INC
BEC   EL CONTROLS INC
HOLLAN   & HART LLP
BROC   TON NEIGHBORHOO   HEALTH CENTER
E       MARTINE   PLUMBING SERVICE INC
FLORI   A BIRTH RELATE   NEUROLOGICAL
  &   HEALTH CARE S  STEMS INC
UMASS CHAN ME   ICAL SCHOOL
PENUMBRA INC
NE   TME   PLAIN STATES LLC
  UIC   BASE INC
AARON BARLOW PI   E
REME   I   LLC
LUME      CORPORATION
LUME      CORPORATION
TRANSLOGIC CORPORATION
HILL BARTH &   ING LLC
EPSTEIN BEC   ER & GREEN PC
PENRA   TECHNOLOGIES INC
TRI-M MAINTENANCE INC
VMG HEALTH
WELLS PHARMA OF HOUSTON LLC
THOMAS   OUNG ASSOCIATES INC
  AMES W FLETT CO INC

THE ME  ICUS FIRM INC
NORTH COAST FIRE PROTECTION INC
HAMILTON ME  ICAL INC
  UENCH USA INC
CO  E RE   CONSULTANTS LLC
EC  S  STEMS LLC
ME  TO   LABORATORIES INC
A ME  E  O LOC  SMITH SECURIT
  FA   AIR  BRAN  S - GARELIC  FARMS
CS ME   ICAL LLC
ER
PC INSTITUTE FOR ME  ICAL E  UCATION
TENNANT SALES AN   SERVICE COMPAN
VICTOR  MECHANICAL HOL  ING LLC
G    USA INC
GREGOR   WATTS
NATIONAL FIRE ALARM PROTECTION
EARL  BIR   POWER LLC
WA  LAN   MULLI  IN
SOUTHFIEL   ME  ICAL CARE LLC
MICROSURGICAL TECHNOLOG
NEW ENGLAN   REVENUE C  CLE
  RS TUMOR REGISTER   SERVICES
NOVO HEALTH SERVICES FLORI  A LLC
ALLIE   UNIVERSAL TECHNOLOG  SERVICE
ALLIE    OOR AN  HAR  WARE CO INC
CINTAS
SHEA  LE  UNISERVICE INC
RICHAR   CELLER LEGAL PA
SOUTHERN LITHO  I LLC
ORTHALIGN INC
GENSET FIRE & SECURIT   LLC
BOGGS FIRE E  UIPMENT INC
CROWN HEALTH CARE LAUN  R
TAN  EM THEOR
IN  USTRIAL BURNER S  STEMS INC
CLAU CLEANING CORPORATION
FE  E  FREIGHT INC
IMAGING PH  SICS LLC
REGIONAL MANAGEMENT ASSOCIATES
PARAGON   INC

COMMTAN
  ILAGOS PLUMBING SERVICES INC
PROIECTUS SERVICES LLC
EAST EN   ME  ICAL I LLC
PITNE   BOWES GLOBAL FINANCIAL
COMMUNIT  BAN   OF TE  AS
SONE   HEALTH INC
THE  OINT COMMISSION
HERMAN M EPSTEIN M
A   VANTECH INC
CENTER POINTE SLEEP ASSOCIATES LLC
PHARMAC   ONESOURCE
PITNE   BOWES INC
SMART CARE E   UIPMENT SOLUTIONS
BIOREFERENCE LABORATORIES INC
M  M TRANSPORTATION CONSULTANTS INC
APO PUMPS & COMPRESSORS LLC
TE  AS   EPT OF STATE HEALTH
E  WAR     ON & COMPAN
CENTRAL COMMUNICATIONS AN
REMOTE ICU LLC
ME   ISTIM USA INC
PLANT PROFESSIONALS INC
CITI PROGRAM
ME  IPRO
Edwards Lifesciences LLC
THE PITNE   BOWES RESERVE ACCOUNT
ALSCO INC
     REAALT   TRUST
MICHAEL  ISER
ME   AIR INC
RE   RIVER PHARMAC   SVCS
ROSE BROS SEPTIC &   RAINAGE INC
COMPASS CR  OGENICS INC
ALL ME  ICAL PERSONNEL LLC
MELISSA ALWORTH    O PA
CAL  ERA ME  ICAL INC
FARI   GHEBLEH M  PC
C &  LEASING CORPORATION
MUNIR SHAH M
GREENTEAM PLUMBING LLLC

SIEMENS ME ICAL SOLUTIONS USA
CENTRAL A MI TURE PHARMAC
MG CLEANING SOLUTION LLC
HANNA CAMPBELL & POWELL LLP
CROWN UNIFORM & LINEN SERVICE
E PERT ME ICAL NAVIGATION
A VANCE AIR AN HEAT CO INC
 & LABORATOR LLC
VERATHON INC
OHNSON OCONNOR FERON &
WB MASON CO INC
MATHESON TRI GAS INC
TLC ENGINEERING SOLUTIONS INC
TIERPOINT LLC
US POSTAL SERVICE
ME TRONIC SOFAMOR ANE USA INC
Globus Medical North America
FRESHPOINT SOUTH FLORI A INC
GLE CONSULTING INC
 UEST IAGNOSTICS INCORPORATE
HACHE URBANOS I LLC
UNITE TE TILE RENTAL SERVICES
COTTON COMMERCIAL USA
GLOBAL ET CAPITAL LLC
MILESTONE HEALTHCARE LLC
 UGGAN MECHANICAL SERVICES INC
REPUBLIC SERVICES INC
BAM BAM ENTERPRISES LLC
HUNTON SERVICES
SOUTHEAST TE AS INPATIENT PH SICIAN
BIO RA LABORATORIES
OCEANS BEHAVIORAL HOSPITAL
PALOI A VISORS LLC
BLUS RESTORATION CONTRACTORS LLC
FA I NA OUR M
PREMIER IAGNOSTIC SERVICES INC
CUTT EN ELL & OLSON ATTORNE
TRAILRUNNER INTERNATIONAL LLC
WINSTON & STRAWN LLP
BOW ITCH & EWE LLP
LIFESHARE BLOO CENTERS

ANGELICA URENA AN   LAW OFFICE
NEOGENOMICS LABORATORIES
MERCHANT SERVICE
SAPPHIRE ELEVATOR LLC
CONCUR TECHNOLOGIES INC
NEIGHBORWOR  S HOUSING SOLUTIONS
AM SURGICAL
CT CORPORATION S  STEM
CCMMA T  PLLC
SERPE AN  REWS PLLC
OHIO VALLE  PERFUSION ASSOCIATES
ASAHI INTECC USA INC
VIRTUAL RA  IOLOGIC CORPORATION
ROLLS-RO  CE PLC
ECRI
LUBIN & ME  ER AS ATTORNE  FOR THE
PA  FIEL  AN   STOUT LLP TRUST
TE  AS HEALTHCARE LINEN LLC
MI  A  E LLC
BAL  WIN GROUP  BA ROGERS GRA
OMRAM LLC
PE  IATRIC PROFESSIONAL ASSOC PC
ACCESS TELECARE PLLC
BRIAN T. CART
SALT  MICHELSON ARCHITECTS
PUEBLO MECHANICAL AN  CONTROLS LLC
TELERA  IOLOG  SOLUTIONS
ALLHEART ELECTRIC COMPAN
ME  ICAL BUSINESS ASSOCIATES INC
GOR  ON & PARTNERS TRUST ACCT
SOUTHWEST ME  ICAL IMAGING PA
HOLI  A  CVS LLC
METTEL
STREAMLINE VERIF  LLC
 UALIT  HEALTHCARE PARTNERS
CHARLIE WILLIAMS PAINTING
 CB ORTHO LLC
NORTHWIN  STRATEGIES LLC
E  ECUTIVE ME  ICAL PH  SICS ASSOC
EASTSI  E ENTERPRISES INC
BOILER SPECIALISTS INC

TO S ENVIROSCAPES LLC
MN & COMPAN MEIA MANAGEMENT INC
HARR WONIAS M LLC
ACOB COHEN M
IMPERATIVE CARE INC
BB ELIVER LLC
MORTON HOSPITAL
MEIALAB INC
BOWIE COUNT TEAS LOCAL PROVIER PARTIC
MARICE GUMAN PLLC FBO ELL
 TANT MEICAL INC
CC ANESTHESIA SOLUTIONS LLC
HOART TREE EPERTS INC
 A MAANS M
ELEVATOR REPAIR SERVICE INC
STUART BREISCH M
MILAN PLASTIC SURGER CENTER
TSNE MISSION WORS
TEN HEALTH LLC
PRIESTAR EMS INC
ARHC NCOST LLC
PACIFIC PREMIER TRUST COMPAN
UMS MR FUSION SVC OF NE LLC
ALLAN MORGE M PA
POPP HUTCHESON PLLC
MERGE HEALTHCARE SOLUTIONS INC
TTG ISOTOPES LLC
ENTECH SALES & SERVICE LLC
 ONSULT INC
TAN WIARS INC
WEST TEAS UROLOG PA
 OHN ORMAN
BASIN NEUROSURGICAL & SPINE
UMS URS LITHOTRIPS SERVICES
S R EME M PA
AMERICAN ARBITRATION ASSOCIATION
CARIOVASCULAR IAGNOSTIC CENTER
VIRAM PATEL M PA
VOGEL ANG LAW PC
PURCHASING POWER LLC
FUSION ORTHOPEICS USA LLC

GREATER HAMPSTEA  FAMIL  ME  ICINE
UMS LITHO SERVICE OF BRISTOL COUNT
AVASURE LLC
VSI SURGICAL
  MILLER CONSULTING LLC
PINE ISLAN   ASSOCIATES LLC
ARIOL LABRA  A M  PA
A  VANCE  CAR  IOVASCULAR
ACCRE  ITATION COUNCIL FOR GRA  UATE
MASS PAR  INC
GIANT PEACH CONSTRUCTION LLC
STEINER-ATLANTIC LLC
M  E VERA LAN  SCAPING LLC
WINTER ST PARTNERS NEW BE  FOR  LLC
SATCOM  IRECT INC
B  RNES MECHANICAL CONTRACTORS INC
SAN ANTONIO MERCHANT SHIPPERS LLC
VTR PAPAGO ME  ICAL PAR  LLC
ENVELOPE SUPERSTORE
RAMON HECHAVARRIA M
SOUTH FLORI  A ME  ICAL IMAGING PA
UNITE   RENTALS NORTH AMERICA INC
G  RC TECHNOLOGIES LLC
SOUTH MI   LESE  OPPORTUNIT  COUNCIL
Associates in Medical Imaging LLC
PRECISION PH  SICS SERVICES LLC
MP
FW WEBB COMPAN
FU  IFILM SONOSITE INC
 AMES M POTTS M
MBA ME  ICAL INC
EVE  IAS HEALTH SOLUTIONS LLC
  CM  HOL  INGS LLC
S  STEM  OF BOSTON
PERMIAN BASIN ANESTHESIA PLLC
 ASON R MURPH
GEROW E  UIPMENT COMPAN
CR HALL COMPAN  LT
MELTWATER NEWS US INC
BER  SHIRE BAN
GEN   IGITAL INC.

AEP SOUTHWESTERN ES
SAMBASIVA R SU HAVASI M PA
FARRU H URESHI
MILLERS RIVER EVELOPMENT LLC
WA LE REGIONAL ME ICAL CENTER
MRUNAL PATEL
REIS LAN SCAPING & GAR ENING LLC
SLIPPER ROC COMMERCIAL ROOFING
 BA ER LAW GROUP PC
THE PICAR GROUP LLC
COWBO S STA IUM LP
MERRITT ME ICAL CENTER II
AL O H MARTINE FLEITES M PA
THE SUFFOL GROUP LLC
A VI E TECHNOLOGIES LLC
GRANGER ME ICAL INC
WORL FUEL SERVICES EUROPE LT AVIATION
ANANIA PLUMBING & HEATING INC
HEALTHCARE FINANCIAL GROUP INC
INNERFACE ARCHITECTURAL SIGNAGE INC
 ONSTANT N S WA UN
SENSO SCIENTIFIC
 AVI HEN ERSON M
EPREWAR INC
 OCTORS PAR II CON O ASSOCIATION
CHRISTOPHER TROIANO M
SPAR LIGHT BILL PA
T ONCOLOG PA
 ARL STOR EN OSCOP
GREER LABORATORIES
MOUNTAIN ME ICAL PH SICIAN
SMARTRISE HEALTH LLC
PE IATRIC ECHOCAR IOGRAPH SERVICES
LIN BIO CORP
CHARLES CROFT M PA
THE ELTA PATHOLOG GROUP LLC
HA STAC I LLC
EN OLOGI LLC
ACCESS CORP
INTEGRIT HEALTHCARE LOCUMS LLC
TA LOR COMMUNICATIONS

AGILITI SURGICAL INC
INSPIRE ME ICAL S STEMS INC
AGILITI SURGICAL E UIPMENT REPAIR
 ONNELLE FINANCIAL LLC
WM CORPORATE SERVICES INC
FLORI A EPARTMENT OF CHIL REN
SERVPRO OF CENTRAL BREVAR
IMAGEFIRST
 IGISONICS INC
FRESH PROVISIONS INC
S SCO SOUTH FLORI A INC
ISMAEL MONTANE M PA
RM ARI ONA HOL INGS INC
VO CE INC
RE LABEL SERVICES
CORIN USA LIMITE
AMERICAN RE CROSS
NATIONAL GOVERNMENT SERVICES
SERVICEMASTER B GILIMORE
HELGESEN HOUT & ONES PC
ENGIE RESOURCES
SPECTRUM
IMAGEFIRST OF NEW ENGLAN
UNIVERSAL ELECTRICAL SERVICES INC
TECO PEOPLES GAS
 AIME E CAMPOS M PA
TRICARE Management
GREAT-WEST LIFE
GCB IN USTRIES LLC
NITEEN AN AL AR
HUNTON TRANE
TLC ANITORIAL INC
BEACONME AES LLC
PROLIN HEALTHCARE
ABBOTT LABORATORIES INC.
ABBOTT RAPI IAGNOSTICS
ABBOTT VASCULAR INC
ACCRE ITATION PARTNERS LLC
AMERICAN ACA EM HOL INGS LLC
AMN HEALTHCARE LANGUAGE SERVICES
A UIT SOLUTIONS LLC

BECTON  IC  INSON AN   COMPAN
BIOMERIEU
BIOMERIEU  VITE   INC
BLUEVO  ANT LLC
CAREFUSION SOLUTIONS LLC
CHANGE HEALTHCARE SOLUTIONS LLC
COLLEGE OF AMERICAN PATHOLOGISTS
  OCTORS BILLING INC
  RFIRST.COM
ELE  TA INC
E  PERIAN HEALTH INC
FORWAR   A   VANTAGE INC
GE HEALTHCARE IITS USA
GETINGE USA SALES LLC
GUI  EPOINT SECURIT   LLC
HOLOGIC SALES AN   SERVICES LLC
IMALOGI   LLC
INSITEONE LLC
INTELLIGENT ME  ICAL OB ECTS INC
  ORCHE   TECHNOLOGIES LLC
LAN  AUER INC
ME  ASOURCE
MERATIVE US LP
MICROSOFT CORP
NET HEALTH S  STEMS INC
Philips Medical Capital
PHILIPS NORTH AMERICA LLC
PRESS GANE   ASSOCIATES LLC
PROVATION SOFTWARE INC
RA  IOMETER AMERICA INC
RL  ATI  NORTH AMERICA INC
ROCHE   IAGNOSTICS CORPORATION
SAGILIT  OPERATIONS INC F  A HGS
SECURITAS HEALTHCARE LLC
SHARECARE HEALTH   ATA
SOURCEHOV HEALTHCARE INC
SPO  , INC.
STERIC  CLE INC
TRINIS  S LLC
TWIAGE SOLUTIONS INC
VARIAN ME  ICAL S  STEMS INC

VI  IENT INC
WERFEN USA LLC
  C   GENERAL CONTRACTORS
ME  LINE MO  ART HOL  ING
SO  E  O INC & AFFILIATES
  TEST CORP
A MURPH   INC
AB   OMINAL SURGEONS LT
ABIOME   INC
ACA  IAN AMBULANCE SERVICES INC
ACCESS CIG LLC
ACCLARENT INC
ACUTANE INC STAMPS CONCENTRATION
A    ISON GROUP
A  VANCE   STERILI  ATION PRO  UCTS
AESCULAP INSTRUMENTS
ALGORE   HEALTH TECHNOLOGIES INC
ALTER    INC
AMERICAN COLLEGE OF SURGEONS
AMERICAN HEART ASSOCIATION INC.
AMERICAN ME  ICAL RESPONSE OF
AMERICAN PORTABLE
ANGIO    NAMICS INC
AR CATAL   O CORPORATION
ARI  ONA GASTRO CARE PLLC
ARM ELECTRICAL SERVICES LLC
ARTHRE   INC
ARTHROSURFACE INC
ASSURGENT ME  ICAL STAFFING
ATI RESTORATION LLC
ATRICURE
BA  STATE INTERPRETERS INC
BEC  MAN COULTER INC
BIO-RA   LABORATORIES INC
BIOTE ME  ICAL LLC
BREA  AWA   COURIER BOSTON INC
BREWSTER AMBULANCE SERVICE
CAR  IOVASCULAR S  STEMS INC
CARRIER CORPORATION
CARRIER RENTAL S  STEMS
CERAPE   ICS INC

COLLECTIVE ME ICAL TECHNOLOGIES INC
CONCOR ME ICAL GROUP OF TE AS
CONCOR ME ICAL GROUP PLLC
COR IS US CORP
CORE IAL SIS SERIES LLC
COVI IEN SALES LLC
CRA INTERNATIONAL INC
CTL Amedica
C RACOM LLC
  ASSAULT FALCON ET CO
  HHS - UNIFIE STATE LABORATORIES
  IGIRA IMAGING SOLUTIONS INC
  OVER FLOORS INC
  RUC ER ME IA INC
    INC
ELIOT COMMUNIT HUMAN
ELL A LLC
EMERGENCHEALTH LLC
EMPOWER ANNUIT INS CO OF AMERICA,
ENCORE FIRE PROTECTION
ERBE USA INC
EVO UA WATER TECHNOLOGIES LLC
FAGRON STERILE SERVICES LLC
FLE CARE LLC
FLORI A PEST CONTROL
FONAR CORPORATION
F MASSE ASSOCIATES INC
F SHOUL ER USA INC
GASTON ELECTRICAL CO INC
GLENSTONE CAPITAL LLC
GOR ON FOO SERVICE INC
GULF COAST REGIONAL BLOO CENTER
HARBINGER COMMUNICATIONS INC
HATCH LLC
HEALTHPRO HERITAGE
HIGH ESERT MECHANICAL CORP
HUB INTERNATIONAL NEW ENGLAN LLC PREMI
INO THERAPEUTICS LLC
INSIGHT IMAGING
INTEGRA LIFESCIENCES CORP
Intuitive Surgical Inc.

AC  SON LLO     SELECT RIS
AMES CARROLL AS AGENT LABORIE
ANI-  ING OF RHO  E ISLAN
ENSEN HUGHES INC
 FRAN  LAN  SCAPING INC
UST PRESS PLA
 CI USA INC
 IC    RUM TECHNOLOG  GROUP LLC
  NOWTION HEALTH
LAB LOGISTICS LLC
LANTHEUS ME  ICAL IMAGING INC.
LEMAITRE VASCULAR INC
LIFE SPINE INC
LIGHTNING BOLT SOLUTIONS
LIMBACH COMPAN   LLC
LINCOLN HARRIS CSG
LIVANOVA USA INC
MCT E  PRESS INC
ME  ACTA USA INC
MERIT ME  ICAL S  STEMS INC
MESSAGE MANAGEMENT CENTER LLC
MESSER LLC
MICRO-TECH EN  OSCOP  USA INC
MI  LAN  PATHOLOGIST P A
MS  SONLINE INC
NEOGENOMICS LABORATORIES INC
NMS LABS
ONEBLOO  INC
ORTHO CLINICAL  IAGNOSTICS
OSSIO INC
OSTEOME
PARIS HEALTHCARE
PARTNERSOURCE
PENNS  LVANNIA STATESHENANGO
PEPSI COLA COMPAN
PHREESIA INC
PREPM   PROFESSIONALS LLC
PRO HEALTH ME  ICAL STAFFING LLC
PROFESSIONAL PIPING INC
PROFICIO SURGICAL ASSISTANTS LLC
PULMONAR   CONSULTANTS PC

REAU   MORGAN &   UINN LLP TRUST
RENTO  IL NORTH AMERICA
REPUBLIC SPINE LLC
RESOURCES GLOBAL PROFESSIONALS
RESTORI  HEALTH
RE  NOL  S  EWALT
RICHAR   WOLF ME  ICAL
RICHAR  S BRAN  T MILLER NELSON
RICOH USA INC
RI  E MOBILE TRANSPORTATION INC
ROOFS INC
SCA PHARMACEUTICALS LLC
SCHIN  LER ELEVATOR CORPORATION
SEMPERIS INC
SERVICEHUB CORPORATION
SHOC  WAVE ME  ICAL INC
SHRE  IT
SIGNATURE AVIATION USA LLC
SIL   ROA  ME  ICAL INC
S  ELETAL    NAMICS LLC
SOUTH TE  AS BOILER IN  USTRIES
SOUTHWORTH-MILTON INC
SPECIALT  CARE CAR  IOVASCULAR
SPINEART USA INC
STAT BIO ME  ICAL SALES & SERVICE
STEVEN A CALLAHAN ELECTRICAL
STEWART & STEVENSON
SUNBELT RENTALS
S  SCO ARI  ONA INC
S  SCO BOSTON LLC
S  SCO CENTRAL FLORI  A INC
S  SCO EAST TE  AS
S  SCO HOUSTON INC
S  SCO  AC  SON LLC
S  SCO WEST TE  AS
S  SME   AMERICA INC
TAC ME   INC
THE FACTOR INC
THE ROMANS GROUP
THERAPEUTIC RESEARCH CENTER
TMHP

TORNIER INC
TOWNE PAR  LLC
TRANE US INC
UNUM LIFE INSURANCE COMPAN  OF
UROLOGIC SURGEONS OF ARI  ONA PLC
US FOO  S INC
US ME  E  UIP LLC
WASTE CONNECTIONS OF FLORI  A
WEST TECHS CHILL WATER SPECIALIST
WESTPORT LINEN SERVICES INC
WHITMAN PARTNERS INC
WIC  ER SMITH O HARA MCCO  & FOR
WLG WL GORE&ASSOC MP
WOLF & COMPAN  PC
WRIGHT ME  ICAL TECHNOLOG  INC
 M HEALTH INFORMATION S  STEMS
ACCLARA SOLUTIONS LLC
CLOU  ME
COGNI  ANT TECHNOLOG  SOLUTIONS
CONSENSUS CLOU  SOLUTIONS
  ELL FINANCIAL SERVICES
ERGONOMIC GROUP
HEWLETT PAC  AR  FINANCIAL SERVICES
HP INC
INOVALON PROVI  ER INC
INTERLACE HEALTH LLC
IO  INE SOFTWARE LLC
 AMS INC
LOGI  HEALTH INC
MRO CORPORATION
PRESI  IO NETWOR  E
REVSPRING INC
TEGRIA RCM GROUP US INC.
BREA  EALE SACHSE & WILSON LLP
BRUCE &  ELLE  PC
CAPPLIS CONNORS CARROLL & ENNIS
  RAFFIN & TUC  ER LLP
FAL  WAAS HERNAN  E  ET AL
FOSTER & EL  RI  GE LLP
HALL PRANGLE & SCHOONVEL  LLC
HAMEL MARCIN  UNN REAR  ON & SHEA PC

ULIE SMITH
IPP AN  CHRISTIAN PC
MARSHALL  ENNEHE  WARNER
UINTAIROS PRIETO WOO  & BO  ER PA
RESNIC  & LOUIS PC
SNOW CHRISTENSEN & MARTINEAU
THE CHEC  ETT LAW FIRM PLLC
THOMPSON BOWIE & HATCH LLC
WILLIS TOWERS WATSON US LLC
WIPFLI LLP
AU  ERE INTERNATIONAL LIMITE
E  CELA RECEIVABLES    LLC
H RAMOS FARMS

## Exhibit A[1]

**Mutual Releases.**  Except as otherwise expressly set forth below, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Trust Establishment Date, each of (A) the Debtors, (B) the Estates, (C) the Litigation Trust, (D) the Litigation Trustee, (E) the FILO Parties, (F) the Creditors' Committee and each of its members (solely in their official capacity), and (G) each Related Party of each Person or Entity described in any of the immediately preceding clauses (A) through (F) to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law (each, a "**Releasing Party**" and, collectively, the "**Releasing Parties**"), in each case on behalf of themselves and their respective successors, assigns, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through such Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of such Releasing Party), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Trust Establishment Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the FILO Settlement Term Sheet or any other contract, instrument, release, or document created or entered into in connection with the FILO Settlement or any of the other definitive documents related thereto; any other debt or security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors; the subject matter of, or the transactions or events giving rise to, any Claim or Interest; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the Approval Order and the transactions contemplated thereby; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Trust Establishment Date.  Notwithstanding anything to the contrary in the foregoing, these releases (i)  shall not be construed as releasing (a)  any Released Party from Claims or Causes of Action arising from a material misrepresentation or an act or omission constituting actual fraud, willful misconduct, criminal misconduct, or gross negligence of or by such Released Party, in each case as judicially determined by a Final Order, (b) any Claims or Causes of Action arising after the transfer of the Litigation Trust Assets to the Litigation Trust, (c) the Debtors or the Estates from

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Settlement and Stay Relief Term Sheet*, to which this exhibit is attached (the "**FILO Settlement Term Sheet**"), or **Annex 1** attached hereto, as applicable.

the Retained FILO Claim (including, without limitation, any liens securing the Retained FILO Claim), (d) any rights or obligations of any party or Entity under the Approval Order, the FILO Settlement Term Sheet, the Plan Support Agreement Term Sheet, any definitive document related to the FILO Settlement or the Plan Support Agreement Term Sheet, or any other document, instrument, or agreement executed to implement the Plan or the transactions contemplated by the FILO Settlement, or (e) any Intercompany Claims; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. For the avoidance of doubt, no Person or Entity not (i) expressly identified on the list of Individual Released Parties, or (ii) defined as a Released Party, shall be deemed to be granted a release hereunder, regardless of whether such Person or Entity is specifically identified on Schedule 2 hereof.

## Annex 1

## Defined Terms

*2016 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in October 2016 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2020 Transactions* means, individually and/or collectively, (a) the transactions that were entered into and/or occurred in or about May 2020 pursuant to which: (i) Manolete Health, LLC purchased Steward Healthcare International Holdings Ltd. from Steward Health Care System LLC, (ii) Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**") contributed real properties to MPT of Utah-Steward, LLC (together with its subsidiaries, the "**Utah JV**") for common equity interests in the Utah JV and subsequent cash distributions from the Utah JV, and the Utah JV leased such real properties back to Jordan Valley and Davis, and (iii) Cerberus Operations and Advisory Company exchanged its equity in Steward Healthcare Investors LLC for a $350 million convertible note, and (b) all other transactions related thereto, including any transactions in what was referred to at the time as Project Easter.

*2021 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in January 2021 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2022 Transaction* means the transaction or transactions entered into on or about May 31, 2022 (and certain other dates in 2022) by and among, among others, Sparta Merger Sub I Inc., Sparta Merger Sub II Inc., Sparta Merger Sub III Inc., Sparta Merger Sub I LLC, Sparta Merger Sub II LLC, Sparta Merger Sub III LLC, Sparta Sub Inc., SNCN Holdco Inc., SICN Holdco Inc., Steward Integrated Care Network, Inc., Steward Accountable Care Network, Inc., Steward Health Care Network Inc., Sparta Holding Co. LLC, Steward Health Care System LLC and CareMax, Inc. pursuant to which certain value-based care assets were transferred to Sparta Holding Co. LLC and acquired by CareMax, Inc., and all other transactions related thereto or included therein (including any dividends, distributions, and/or allocations paid, made, and/or issued in 2022 in connection with and/or following such transaction(s), and any subsequent transfer of the proceeds thereof or arising therefrom).

*Affiliate* means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

*Cause of Action* means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or

Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any Avoidance Actions.

*Chapter 11 Case* means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

*Chief Restructuring Officer* means John R. Castellano, in his capacity as Chief Restructuring Officer of each of the Debtors.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code.

*Creditors' Committee* means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

*Debtor Related Parties* means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*FILO DIP Order* means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

*FILO Parties* means, collectively, the Prepetition Bridge Agent, the FILO Bridge Lenders, the FILO DIP Secured Parties, the Prepetition FILO Agent, and the FILO Lenders (each as defined in the FILO DIP Order), in each case in their capacities as such, and the Litigation Funding Agent and the providers of the Litigation Funding in their capacities as such.

**FILO Settlement** means the settlement embodied in the FILO Settlement Term Sheet.

**Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

**Hospital Debtors** means all Debtors, other than, for the avoidance of doubt, Steward Health Care Holdings LLC and Steward Health Care System LLC, that held or owned a license to operate a hospital at any time during the Chapter 11 Cases.

**Identified Non-Released Parties** means (i) the Persons and Entities listed on **Schedule 2** annexed hereto, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

**Individual Released Parties** means the individuals listed on the **Schedule 1** annexed hereto, each in their capacity as a current or former director, officer, manager, employee, advisor, or consultant of one or more of the Debtors.

**Interest** means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and whether fully vested or vesting in the future, including

any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor.

**Intercompany Claim** means any pre- or postpetition Claim against a Debtor held by another Debtor.

**Investigation Subcommittee** means the subcommittee of the Transformation Committee, consisting of Alan J. Carr and William Transier.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Person** means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

**Petition Date** means May 6, 2024.

**Plan Administrator Committee** means a committee comprised of Monica Blacker, Alan J. Carr, and William Transier.

**Plan Support Agreement Term Sheet** means the Plan Support Agreement Term Sheet referred to in the FILO Settlement Term Sheet and executed in connection therewith.

**Plane Sales** means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

**Prepetition Transactions** means the (i) 2016 Distribution, (ii) 2020 Transactions, (iii) 2021 Distribution, (iv) 2022 Transaction, and (v) the Plane Sales.

**Related Parties** means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, and (b) the Litigation Trust and the Litigation Trustee; (iii) each of the following, solely in their capacities as such, (a) the Creditors' Committee and each of its members, and (b) the FILO Parties; and (iv) with respect to each of the foregoing Entities identified in the immediately preceding clauses (ii) or (iii), such Entities' Related Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Released Party.

**Representative** means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

**Transformation Committee** means the special committee of the board of managers of Steward Health Care Holdings LLC comprised of Alan J. Carr, John R. Castellano, and William Transier.

## Schedule 1

**Individual Released Parties**

- Alan Carr
- Ann-Marie Driscoll
- Carlos Hernandez
- David Barnhardt
- Eugene (Jay) Sullivan
- Gail Schlesinger
- General H.R. McMaster
- Henry (Nick) Nickells
- Jeffrey Morales
- Jennifer Hunt
- John Boehner
- John Castellano
- Joseph Weinstein
- Katchena Potter
- Mary Beth Taylor
- Nathalie Hibble
- Octavio Diaz
- Patrick Lombardo
- Rich Iannessa
- Sr. Vimala Vadakumpadan
- Susan Brown
- William Transier

**<u>Schedule 2</u>**

**Identified Non-Released Parties**

- Alessandra Pace
- Armin Ernst
- Brian Carty
- Christopher Dunleavy
- Craig Jesiolowski
- David Chicoine
- David Friend
- David Morales
- Herbert Holtz
- James Karam
- James Lenehan
- Jill Moretto
- John Polanowicz
- Joseph Ciccolo
- Joseph Maher
- Joshua Putter
- Mark Girard
- Mark Rich
- Michael Callum
- Miroslav Boyanov
- Nadine Delicata
- Ralph de la Torre
- Robert Guyon
- Ruben King-Shaw Jr.
- Sanjay Shetty

- 5326 Old Buena Vista Road LLC
- Ad Astra Per Aspera LLC
- CareMax, Inc.
- Cayman TRS Holdings
- Cerberus Capital Management, L.P.
- Cerberus International II Master Fund LP
- Cerberus Partners II LP
- Cerberus Series Four Holdings LLC
- de la Torre Foundation
- de la Torre Family Foundation
- Management Health Services Colombia S.A.S.
- Management Health Services LLC
- Manolete Health Investors LLC
- Manolete Health LLC
- Medical Properties Trust, Inc.
- MPT Sycamore Opco LLC
- Ralph de la Torre Revocable Trust
- RDLT – SHCI Investor LLC
- RDLT – SHCI Manager LLC
- Sagamore Capital Management, LLC
- Santa Clara Holdings LLC
- Sparta Holding Co. LLC
- Steward Health Care International
- Steward Health Care International (Malta) Ltd
- Steward Health Care International Colombia S.A.S.
- Steward Health Care Investors LLC
- Steward Health Care International Investors LLC
- Steward Health Care International Kingdom of Saudi Arabia, S.L.
- Steward Health Care International Ltd
- Steward Health Care International S.L
- Steward Malta Assets Ltd
- Steward Malta Ltd
- Steward Malta Management Ltd
- Steward Malta Personnel Limited
- Steward Management Holdings LLC
- Tenet Healthcare Corporation
- TRACO International Group S. DE R.L.

**Exhibit B**

**TSA Budget**



# Post-TED TSA Forecast

**($ in thousands)**

| Month Ending | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Forecast |
| **Illus. Estate Expenses (Covered by TSA with Litigation Trust)** | | | | | | | | | | | | | | | | | | | |
| Payroll & Payroll Related | $ (481) | $ (350) | $ (350) | $ (250) | $ (250) | $ (250) | $ (100) | $ (100) | $ (100) | $ (100) | $ (100) | $ (100) | $ (50) | $ (50) | $ (50) | $ (50) | $ (50) | $ (50) | $ (2,831) |
| Suppliers & Trade Vendors | (850) | (750) | (650) | (550) | (400) | (350) | (150) | (150) | (150) | - | - | - | - | - | - | - | - | - | (4,000) |
| Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Operating Disbursements | (75) | (75) | (75) | (75) | (75) | (50) | (25) | (25) | (25) | - | - | - | - | - | - | - | - | - | (500) |
| Medical Records | (3,500) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (3,500) |
| U.S. Trustee Fees | (875) | - | - | (129) | - | - | (81) | - | - | (80) | - | - | (60) | - | - | (56) | - | - | (1,281) |
| **Total Illus. TSA Covered Expenses** | **$ (5,781)** | **$ (1,175)** | **$ (1,075)** | **$ (1,004)** | **$ (725)** | **$ (650)** | **$ (356)** | **$ (275)** | **$ (275)** | **$ (180)** | **$ (100)** | **$ (100)** | **$ (110)** | **$ (50)** | **$ (50)** | **$ (106)** | **$ (50)** | **$ (50)** | **$ (12,113)** |

**Exhibit 2**

**DIP Amendment**

Execution Version

# AMENDMENT NO. 6
## TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **AMENDMENT NO. 6 TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT** is entered into as of April 28, 2025 (this "Amendment"), by and among Steward Health Care System LLC, a Delaware limited liability company (the "Borrower"), Holdings, the other Loan Parties, the Lenders party hereto and Brigade Agency Services LLC, as administrative agent for the Lenders (in such capacity, the "Administrative Agent").

## RECITALS

**WHEREAS**, reference is made to that certain Debtor-In-Possession Credit Agreement, dated as of July 10, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the date hereof, the "Existing Credit Agreement"; the Existing Credit Agreement after giving effect to this Amendment, the "Credit Agreement"), by and among the Borrower, the other Loan Parties party thereto, the Lenders party thereto, the Administrative Agent and the Collateral Agent;

**WHEREAS**, the Loan Parties have requested to amend the Existing Credit Agreement to, among other things, extend the maturity date under the Existing Credit Agreement through (i) in the first instance, April 28, 2025 (the "Motion Milestone"), (ii) if the Debtors have filed a motion seeking the Bankruptcy Court's approval of an order (the "Approval Order"), pursuant to sections 361, 362, 363 and 105 of the Bankruptcy Code and Bankruptcy Rules 4001(d)(iii), 6004, and 9019, approving the Settlement and Stay Relief Term Sheet executed by (x) the Debtors, (y) the FILO DIP Secured Parties, the Prepetition Bridge Agent, and the FILO Bridge Lenders (collectively, the "FILO Parties"), and (z) the Creditors' Committee (together with the Debtors and the FILO Parties, the "Settlement Parties") (the "Settlement Term Sheet") by the Motion Milestone, May 28, 2025 (the "Approval Milestone"), and (iii) if the Approval Order is entered by the Approval Milestone, the date that is the earlier of (x) July 8, 2025 and (y) one business day after the confirmation date of any confirmed plan; and

**WHEREAS**, subject to the terms and conditions set forth herein, the Administrative Agent and the Lenders party hereto, constituting all of the Lenders under the Existing Credit Agreement immediately prior to the effectiveness of this Amendment on the Amendment Effective Date (as defined below), are willing to extend the maturity under the Existing Credit Agreement as detailed herein, only on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto hereby agree as follows:

1.     <u>Defined Terms</u>. Capitalized terms used (including in the preamble and recitals hereto) but not defined herein shall have the meanings ascribed to them in the Credit Agreement or, if not defined in the Credit Agreement, the order entered by the Bankruptcy Court at Docket No. 1538 in the Chapter 11 Cases (the "FILO DIP Order").

2.     <u>Maturity Extension</u>. In accordance with Section 9.02(c) of the Existing Credit Agreement, the Administrative Agent and the Lenders party hereto, constituting all of the Lenders under the Existing Credit Agreement as in effect immediately prior to the effectiveness of this

Amendment, hereby agree to amend the Existing Credit Agreement, and the Existing Credit Agreement is hereby amended to amend and restate clause (a) in the definition of "Maturity Date" in Section 1.01 of the Existing Credit Agreement to read as follows: "(a) April 28, 2025,"; *provided*, that if the Debtors have filed a motion seeking the Bankruptcy Court's approval of the Approval Order by the Motion Milestone, the Existing Credit Agreement shall be automatically and without any further actions deemed amended to amend and restate clause (a) in the definition of "Maturity Date" in Section 1.01 of the Existing Credit Agreement to read as follows: "(a) May 28, 2025,"; *provided*, *further*, that if the Approval Order is entered by the Approval Milestone, the Existing Credit Agreement shall be automatically and without any further actions deemed amended to amend and restate clause (a) in the definition of "Maturity Date" in Section 1.01 of the Existing Credit Agreement to read as follows: "(a) the date that is the earlier of (x) July 8, 2025 and (y) one business day after the confirmation date of any confirmed plan,".

3.      <u>Amendments and Waivers</u>.  In accordance with Section 9.02(b) of the Existing Credit Agreement, the Borrower, the Administrative Agent and the Lenders party hereto, constituting all of the Lenders under the Existing Credit Agreement as in effect immediately prior to the effectiveness of this Amendment, hereby agree:

a.      to amend the Existing Credit Agreement, and the Existing Credit Agreement is hereby amended, to amend and restate Section 5.17(a) of the Existing Credit Agreement to read as follows:

"(i) host a bi-weekly conference call on a day that is a Business Day among the Chief Restructuring Officer, the advisors to the Loan Parties and the Lender Advisors, at a time to be mutually agreed upon and (ii) host a bi-weekly conference call on a day that is a Business Day among one or more members of the Transformation Committee of the Board of Managers of Steward Health Care Systems LLC, one or more representatives of the Lenders, including the Administrative Agent, and at the option of the Lenders, the Lender Advisors, at a time to be mutually agreed upon, each of which conference calls shall be used to discuss, among other things, the Debtors' asset monetization process, preparation for strategic processes and/or any issues related to the financial affairs, finances, business, assets, operations or condition (financial or otherwise) of the Loan Parties and their Subsidiaries, including such matters as may be requested by the Lenders or Lender Advisors; <u>provided</u>, that the Lenders and Lender Advisors shall confine attendance to those parties reasonably necessary to participate and such conference calls will be subject to reasonable time limits; and";

b.      that it shall be an Event of Default under the Credit Agreement if the Debtors or the Creditors' Committee materially breach their respective obligations to the FILO Parties under the Settlement Term Sheet or the Plan Support Agreement Term Sheet entered into by the Settlement Parties on or about the date hereof, and such breach is not cured within three business days of the FILO Parties providing written notice of such breach to the Debtors' and the Creditors' Committee's counsel; and

c.      to waive any Default or Event of Default (including any Event of Default under Section VII(b) of the Existing Credit Agreement and/or arising as a failure to give notice thereof) existing as of the Amendment Effective Date relating to the Borrower's

failure to pay interest with respect to $237,304,853.71 of Term SOFR Loans with an Interest Period ending March 31, 2025 on the date due.

4. <u>Covenants of the Borrower</u>. In consideration of the maturity extension set forth above, each of the Loan Parties hereby agrees that:

a. The covenants of the Loan Parties set forth in Sections 4(e), (f), and (g) of the Limited Waiver No. 2 and Amendment to Debtor-in-Possession Credit Agreement, entered into as of December 31, 2024, by and among the Borrower, Holdings, the other Loan Parties, the Lenders party thereto, and the Administrative Agent, and Sections 3(f), (g), and (h) of the Amendment No. 5 to Debtor-in-Possession Credit Agreement, entered into as of December 31, 2024, by and among the Borrower, Holdings, the other Loan Parties, the Lenders party thereto, and the Administrative Agent, are incorporated herein by reference.

b. The Loan Parties delivered a budget annexed hereto as <u>Annex A</u> for the weeks ending May 2, 2025 through July 11, 2025, which has been approved by the Lenders and which constitutes the Approved Budget for all purposes of the Credit Agreement as of the Amendment Effective Date.

c. The Loan Parties and their Subsidiaries shall not make any payments to any vendors during the period set forth in the Approved Budget delivered pursuant to clause 4(b) above other than as set forth in such applicable Approved Budget.

5. <u>Representations and Warranties</u>. In order to induce the Administrative Agent and the Lenders to enter into this Amendment and the agreements contemplated hereby regarding the Existing Credit Agreement in the manner provided herein, Holdings, the Borrower and the other Loan Parties hereby represent and warrant on and as of the Amendment Effective Date that:

a. this Amendment has been duly executed and delivered by each Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms;

b. at the time of and immediately after giving effect to this Amendment, the representations and warranties of the Loan Parties contained in Article III of the Credit Agreement are true and correct in all material respects (except, with respect to the representation contained in Section 3.06 of the Credit Agreement, to the extent otherwise disclosed by the Borrower (or its counsel) to the Lenders (or their counsel)) on and as of the Amendment Effective Date (it being understood that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects after giving effect to any such qualification therein) with the same effect as though made on and as of the Amendment Effective Date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date); and

c. at the time of and immediately after giving effect to this Amendment, no Default or Event of Default has occurred or is continuing.

6.     <u>Conditions to Effectiveness to Amendment</u>.  The effectiveness of this Amendment is subject to the satisfaction or waiver of the following conditions (the time at which all such conditions are so satisfied or waived is referred to herein as the "<u>Amendment Effective Date</u>"):

a.     Each of the parties hereto shall have received a counterpart signature page of this Amendment, duly executed by each of the Borrower, Holdings, the other Loan Parties, the Administrative Agent and the Lenders (constituting all of the Lenders under the Credit Agreement immediately prior to the effectiveness of this Amendment);

b.     To the extent required by the FILO DIP Order, either the Creditors' Committee shall have consented in writing to this Amendment or the Bankruptcy Court shall have entered an order in the Chapter 11 Cases approving the Debtors' entry into this Amendment in accordance with paragraph 2(c)(ii) of the FILO DIP Order; and

c.     The Settlement Term Sheet has been executed by all parties thereto and shall have become effective in accordance with the terms and conditions thereof.

7.     <u>No Modification</u>.  Nothing contained herein shall be deemed to constitute a waiver of compliance with any term or condition contained in the Existing Credit Agreement, the Credit Agreement or any of the other Loan Documents or constitute a course of conduct or dealing among the parties except as explicitly set forth herein.  The parties hereto hereby reserve all rights, privileges and remedies under the Loan Documents.  Except as explicitly set forth herein, the Existing Credit Agreement remains unmodified and in full force and effect.  All references in the Loan Documents to the Existing Credit Agreement shall be deemed to be references to the Existing Credit Agreement after giving effect hereto.

8.     <u>Governing Law; Jurisdiction; Consent to Service of Process; WAIVER OF JURY TRIAL</u>.  Section 9.09 and Section 9.10 of the Existing Credit Agreement are hereby incorporated by reference, *mutatis mutandis*.  The parties hereto hereby agree to cooperate with one another in having any dispute as to the validity, enforceability, or interpretation of this Amendment heard by the Bankruptcy Court on an expedited basis.

9.     <u>Severability of Provisions</u>.     Any provision of this Amendment which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.   All rights, remedies and powers provided in this Amendment may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of law, and all the provisions of this Amendment are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Amendment invalid or unenforceable.

10.     <u>Integration</u>.  The Existing Credit Agreement, after giving effect to this Amendment, and the other Loan Documents constitute the entire understanding of the parties hereto and thereto with respect to the subject matter thereof and thereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby and thereby.

11.     Execution in Counterparts.  This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which shall together constitute one and the same instrument.  Delivery of an executed counterpart hereof by facsimile or electronic transmission shall be as effective as delivery of any original executed counterpart hereof. By its signature hereto, each Person signing this Amendment on behalf of a party represents and warrants to the other parties that it is duly authorized to execute and deliver this Amendment.  The words "execution," "signed," "signature," and words of like import in this Amendment shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

12.     Headings. The headings of the several sections and subsections of this Amendment are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Amendment.

13.     Loan Document. The parties hereto hereby agree that this Amendment is a Loan Document.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to be executed and delivered by their duly authorized officers as of the date first above written.

> **BRIGADE AGENCY SERVICES LLC,** as FILO Agent
>
> By: BRIGADE CAPITAL MANAGEMENT, LP, Its Managing Manager
>
> By: _____
> Name: Patrick Criscillo
> Title: Authorized Signer

**LENDERS:**

**BIG RIVER GROUP FUND SPC LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE BADGER FUND, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE DIVERSIFIED CREDIT CIT**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE CREDIT FUND II LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**LENDERS:**

**BRIGADE HIGH YIELD FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LOAN FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE OPPORTUNISTIC CREDIT LBG
FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**LENDERS:**

**BRIGADE-SIERRABRAVO FUND LP**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**CITY OF PHOENIX EMPLOYEES'**
**RETIREMENT PLAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FEDEX CORPORATION EMPLOYEES'**
**PENSION TRUST**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FUTURE DIRECTIONS CREDIT**
**OPPORTUNITIES FUND**,
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

**LENDERS:**

**JPMORGAN CHASE RETIREMENT PLAN
BRIGADE BANK LOAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**LOS ANGELES COUNTY EMPLOYEES
RETIREMENT ASSOCIATION**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**SC CREDIT OPPORTUNITIES MANDATE,
LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**LENDERS:**

**MIDOCEAN CREDIT FUND MANAGEMENT, LP**

By: _____

Name: ~~Damion Brown~~

Title: Managing Director

**MidOcean Tactical Credit Fund III LP**
By: Tactical Credit Fund III GP, LP
By: Ultramar Credit Holdings Ltd., its General Partner

By: _____

Name: ~~Damion~~ Brown
Title: Managing Director

**MidOcean Multi Asset Credit Fund, LP**
By: MidOcean Multi Asset Credit Fund GP, LLC its General Partner

By: _____

Name: ~~Damion~~ Brown
Title: Managing Director

**Abbott Abbvie Multiple Employer Pension Plan Trust**

By: _____

~~MidOcean Credit~~ Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

**LENDERS:**

**Abbott Laboratories Annuity Retirement Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

**LENDER:**

For and on behalf of **OneIM Fund I LP, as DIP Lender,** acting by its General Partner, OneIM GP LLC, acting by its Manager, GCT Capital LLC

By: _____
Name: Munish Varma
Title: Authorized Signatory

**LENDER:**

**OWL CREEK INVESTMENTS I, LLC**

By: OWL CREEK ASSET MANAGEMENT, LP
as Investment Manager

By: _____
Name: Kevin Dibble
Title:  General Counsel

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

**LENDER:**

**WHITEHAWK FINANCE LLC**
By: WHITEHAWK CAPITAL PARTNERS, LP, as
Investment Manager


By: _____
Name: Robert Louzan
Title: Managing Partner

**BORROWER:**

**STEWARD HEALTH CARE SYSTEM LLC**

By:

Name: John Castellano

Title: Chief Restructuring Officer

**LOAN GUARANTORS:**

**ARIZONA DIAGNOSTIC & SURGICAL CENTER, INC.**
**BEAUMONT HOSPITAL HOLDINGS, INC.**
**BILTMORE SURGERY CENTER HOLDINGS, INC.**
**BILTMORE SURGERY CENTER, INC.**
**BRIM HEALTHCARE OF TEXAS, LLC**
**BRIM HOLDING COMPANY, INC.**
**CHOICE CARE CLINIC I, INC.**
**CHOICE CARE CLINIC II, INC.**
**CHOICE CARE CLINIC III, INC.**
**CHOICE CARE CLINIC OF LOUISIANA, INC.**
**CHOICE CARE CLINIC OF UTAH, INC.**
**DAVIS HOSPITAL HOLDINGS, INC.**
**DAVIS SURGICAL CENTER HOLDINGS, INC.**
**GLENWOOD SPECIALTY IMAGING, LLC**
**HERITAGE TECHNOLOGIES, L.L.C.**
**IASIS CAPITAL CORPORATION**
**IASIS FINANCE II LLC**
**IASIS FINANCE III LLC**
**IASIS FINANCE TEXAS HOLDINGS, LLC**
**IASIS FINANCE, INC.**
**IASIS GLENWOOD REGIONAL MEDICAL CENTER, LP**
**IASIS HEALTHCARE CORPORATION**
**IASIS HEALTHCARE HOLDINGS, INC.**
**IASIS HEALTHCARE LLC**
**IASIS MANAGEMENT COMPANY**
**IASIS TRANSCO, INC.**
**INDIGENT CARE SERVICES OF NORTHEAST LOUISIANA, INC.**
**JORDAN VALLEY HOSPITAL HOLDINGS, INC.**
**MESA GENERAL HOSPITAL, LP**
**MORTON HOSPITAL, A STEWARD FAMILY HOSPITAL, INC.**
**MOUNTAIN POINT HOLDINGS, LLC**
**MOUNTAIN VISTA MEDICAL CENTER, LP**
**MT TRANSITION LP**

By:
Name: John Castellano
Title:  Chief Restructuring Officer

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

NASHOBA VALLEY MEDICAL CENTER, A
STEWARD FAMILY HOSPITAL, INC.
NEW ENGLAND SINAI HOSPITAL, A STEWARD
FAMILY HOSPITAL, INC.
ODESSA FERTILITY LAB, INC.
ODESSA REGIONAL HOSPITAL, LP
PERMIAN BASIN CLINICAL SERVICES, INC.
PERMIAN PREMIER HEALTH SERVICES, INC.
PHYSICIAN GROUP OF ARIZONA, INC.
PHYSICIAN GROUP OF ARKANSAS, INC.
PHYSICIAN GROUP OF FLORIDA, INC.
PHYSICIAN GROUP OF LOUISIANA, INC.
PODIATRIC PHYSICIANS MANAGEMENT OF
ARIZONA, INC.
PP TRANSITION LP
PP TRANSITION, INC.
QUINCY MEDICAL CENTER, A STEWARD
FAMILY HOSPITAL, INC.
RIVERWOODS ASC HOLDCO LLC
SEABOARD DEVELOPMENT PORT ARTHUR LLC
SHC YOUNGSTOWN OHIO LABORATORY
SERVICES COMPANY LLC
SHC YOUNGSTOWN OHIO OUTPATIENT
SERVICES LLC
SHC YOUNGSTOWN OHIO PSC LLC
SJ MEDICAL CENTER, LLC
ST. LUKE'S BEHAVIORAL HOSPITAL, LP
ST. LUKE'S MEDICAL CENTER, LP
STEWARD CARNEY HOSPITAL, INC.
STEWARD CGH, INC.
STEWARD EMERGENCY PHYSICIANS, INC.
STEWARD FALL RIVER MANAGEMENT CARE
SERVICES LLC
STEWARD FLORIDA ALF LLC
STEWARD FLORIDA HOLDINGS LLC
STEWARD GOOD SAMARITAN MEDICAL
CENTER, INC.
STEWARD GOOD SAMARITAN OCCUPATIONAL
HEALTH SERVICES, INC.
STEWARD GOOD SAMARITAN RADIATION
ONCOLOGY CENTER, INC.
STEWARD HEALTH CARE HOLDINGS LLC
STEWARD HEALTH CARE NETWORK, INC.
STEWARD HH, INC.

By:

Name: John Castellano
Title:   Chief Restructuring Officer

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

STEWARD HILLSIDE REHABILITATION HOSPITAL, INC.
STEWARD HOLY FAMILY HOSPITAL, INC.
STEWARD HOSPITAL HOLDINGS LLC
STEWARD IMAGING & RADIOLOGY HOLDINGS LLC
STEWARD MEDICAID CARE NETWORK, INC.
STEWARD MEDICAL GROUP, INC.
STEWARD MEDICAL HOLDINGS LLC
STEWARD MELBOURNE HOSPITAL, INC.
STEWARD NEW ENGLAND INITIATIVES, INC.
STEWARD NORWOOD HOSPITAL, INC.
STEWARD NSMC, INC.
STEWARD OHIO HOLDINGS LLC
STEWARD OPERATIONS HOLDINGS LLC
STEWARD PENNSYLVANIA HOLDINGS LLC
STEWARD PGH, INC.
STEWARD PHYSICIAN CONTRACTING, INC.
STEWARD ROCKLEDGE HOSPITAL, INC.
STEWARD SEBASTIAN RIVER MEDICAL CENTER, INC.
STEWARD SHARON REGIONAL HEALTH SYSTEM, INC.
STEWARD ST. ANNE'S HOSPITAL CORPORATION
STEWARD ST. ELIZABETH'S MEDICAL CENTER OF BOSTON, INC.
STEWARD ST. ELIZABETH'S REALTY CORP.
STEWARD TEXAS HOSPITAL HOLDINGS LLC
STEWARD TRUMBULL MEMORIAL HOSPITAL, INC.
STEWARD VALLEY REGIONAL VENTURES, INC.
THE MEDICAL CENTER OF SOUTHEAST TEXAS, LP
TNC TRANSITION LP
UTAH TRANSCRIPTION SERVICES, INC.
STEWARDSHIP HEALTH, INC.
STEWARDSHIP HEALTH MEDICAL GROUP, INC.
STEWARDSHIP SERVICES INC.
SEABOARD DEVELOPMENT LLC
SOUTHWEST GENERAL HOSPITAL, LP
STEWARD FLORIDA ASC LLC
BREVARD SHC HOLDINGS LLC


By: _____
Name: John Castellano
Title: Chief Restructuring Officer


*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

STEWARD MEDICAL GROUP EXPRESS CARE, INC.
STEWARD HEALTH CARE NETWORK ACO TEXAS, INC.
STEWARD HEALTHCARE MANAGEMENT SERVICES LLC
STEWARD EASTON HOSPITAL, INC.
SALT LAKE REGIONAL MEDICAL CENTER, LP
JORDAN VALLEY MEDICAL CENTER, LP
STEWARD PET IMAGING, LLC
STEWARD ANESTHESIOLOGY PHYSICIANS OF FLORIDA, INC.
STEWARD EMERGENCY PHYSICIANS OHIO, INC.
STEWARD EMERGENCY PHYSICIANS OF PENNSYLVANIA, INC.
STEWARD RADIOLOGY PHYSICIANS OF FLORIDA, INC.
STEWARD EMERGENCY PHYSICIANS OF FLORIDA, INC.
ONSITE CARE, INC.
STEWARD ANESTHESIOLOGY PHYSICIANS OF PENNSYLVANIA, INC.
BOSTON SPORTS MEDICINE AND RESEARCH INSTITUTE, LLC
STEWARD RADIOLOGY PHYSICIANS OF MASSACHUSETTS, INC.
STEWARD PATHOLOGY PHYSICIANS OF MASSACHUSETTS, INC.
STEWARD EMERGENCY PHYSICIANS OF ARIZONA, INC.
STEWARD RADIOLOGY PHYSICIANS OF ARIZONA, INC.
STEWARD ANESTHESIOLOGY PHYSICIANS OF MASSACHUSETTS, INC.
STEWARD MEDICAL GROUP PENNSYLVANIA ENDOSCOPY LLC
STEWARD RADIOLOGY PHYSICIANS OF PENNSYLVANIA, INC.
PHYSICIAN GROUP OF UTAH, INC.
SALT LAKE REGIONAL PHYSICIANS, INC.

By: _____
Name: John Castellano
Title: Chief Restructuring Officer

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

DAVIS HOSPITAL & MEDICAL CENTER, LP
SOUTHRIDGE PLAZA HOLDINGS, INC.
STEWARD FMC, INC.
HC ESSENTIAL CO.
HEALTH CHOICE FLORIDA, INC.
HEALTH CHOICE LOUISIANA, INC.
HEALTH CHOICE MANAGED CARE SOLUTIONS
LLC
HEALTH CHOICE PREFERRED LOUISIANA ACO
LLC
HEALTH CHOICE PREFERRED LOUISIANA
PHYSICIAN ASSOCIATION LLC
HEALTH CHOICE PREFERRED TEXAS ACO –
ALAMO REGION LLC
HEALTH CHOICE PREFERRED TEXAS ACO –
GULF COAST REGION LLC
HEALTH CHOICE PREFERRED TEXAS
PHYSICIAN ASSOCIATION – ALAMO REGION
LLC
HEALTH CHOICE PREFERRED TEXAS
PHYSICIAN ASSOCIATION – GULF COAST
REGION LLC
STEWARD HOSPITAL HOLDINGS SUBSIDIARY
ONE, INC.
STEWARD HEALTH CARE OZ FUND, INC.
STEWARD HEALTH CHOICE, INC.
STEWARD HEALTH CARE INTERNATIONAL
LLC
STEWARD EMPLOYER SOLUTIONS LLC
STEWARD MEDICAL VENTURES, INC.
BOSTON ORTHOPEDIC CENTER, LLC
HEALTH CHOICE NORTHERN ARIZONA LLC
STEWARD SPECIAL PROJECTS LLC
STEWARD ACCOUNTABLE CARE
ORGANIZATION, INC.
BLACKSTONE MEDICAL CENTER, INC.
BLACKSTONE REHABILITATION HOSPITAL,
INC.
HEALTHUTAH HOLDCO LLC
STEWARD ASC HOLDINGS LLC
STEWARD TSC INVESTMENTS LLC
STEWARD SA FSED HOLDINGS, INC.
STEWARD WEST VENTURES CO.


By: _____

Name: John Castellano
Title:   Chief Restructuring Officer


*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

**HEALTH CHOICE UTAH ACCOUNTABLE CARE LLC**
**HEALTH CHOICE PREFERRED ACCOUNTABLE CARE LLC**
**CONVERSE MEDICAL CENTER LLC**
**DE ZAVALA MEDICAL CENTER LLC**
**LEGACY TRAILS MEDICAL CENTER LLC**
**BRIM PHYSICIANS GROUP OF COLORADO, LLC**
**BRIM HEALTHCARE OF COLORADO, LLC**
**ONSITE CARE MSO, LLC**
**TRACO INVESTMENT MANAGEMENT LLC**
**DOWNTOWN HOUSTON PHYSICIAN HOSPITAL ORGANIZATION**

By: _____

Name: John Castellano

Title:  Chief Restructuring Officer

## ANNEX A

### Budget

[See attached.]



# DIP Budget

($ in millions)

| Week # | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 2-May | 9-May | 16-May | 23-May | 30-May | 6-Jun | 13-Jun | 20-Jun | 27-Jun | 4-Jul | 11-Jul | |
| Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Forecast |
| Hospital Receipts | $ 0.8 | $ 0.8 | $ 0.8 | $ 0.8 | $ 0.8 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.3 | $ 0.3 | $ 6.9 |
| Supplemental Programs | 21.6 | - | - | - | - | 4.5 | - | - | - | - | - | 26.1 |
| Other Operating Receipts | - | - | - | - | - | - | - | - | 1.9 | - | - | 1.9 |
| **Total Operating Receipts** | **$ 22.4** | **$ 0.8** | **$ 0.8** | **$ 0.8** | **$ 0.8** | **$ 5.1** | **$ 0.6** | **$ 0.6** | **$ 2.5** | **$ 0.3** | **$ 0.3** | **$ 34.9** |
| **Operating Disbursements** | | | | | | | | | | | | |
| Payroll & Payroll Related | (0.1) | (0.4) | (0.2) | (0.4) | (0.2) | (0.2) | (0.1) | (0.2) | (0.1) | (0.2) | (0.0) | (2.2) |
| Suppliers & Trade Vendors | (0.4) | (0.3) | (0.3) | (0.3) | (0.5) | (0.3) | (0.3) | (0.3) | (0.3) | (0.2) | (0.2) | (3.3) |
| Other Operating Disbursements | (0.2) | (0.1) | (1.1) | (0.1) | (0.1) | (0.1) | - | - | (0.1) | - | - | (1.5) |
| **Total Operating Disbursements** | **$ (0.6)** | **$ (0.8)** | **$ (1.6)** | **$ (0.8)** | **$ (0.8)** | **$ (0.6)** | **$ (0.4)** | **$ (0.5)** | **$ (0.4)** | **$ (0.3)** | **$ (0.2)** | **$ (7.0)** |
| **Net Cash Flow From Operations** | **$ 21.8** | **$ 0.0** | **$ (0.8)** | **$ 0.0** | **$ 0.0** | **$ 4.5** | **$ 0.2** | **$ 0.1** | **$ 2.1** | **$ (0.1)** | **$ 0.1** | **$ 27.9** |
| **Non-Operating Disbursements** | | | | | | | | | | | | |
| Debt Service | (2.8) | - | - | - | (2.6) | - | - | - | - | (2.5) | - | (7.8) |
| Restructuring Professional Fees, Net of Deferral | (2.0) | (2.4) | (3.6) | (2.3) | (2.3) | (2.0) | (2.2) | (2.0) | (2.0) | (1.9) | (2.3) | (25.1) |
| Litigation Professional Fees | (1.0) | (0.3) | (0.3) | (0.3) | (0.7) | (0.3) | (0.3) | (0.6) | (0.3) | (0.1) | (0.1) | (4.0) |
| Lender Professional Fees, Net of Deferral | (0.1) | - | - | (2.5) | (0.1) | (2.5) | - | - | (0.2) | (1.9) | - | (7.3) |
| U.S. Trustee Fees | (0.7) | - | - | - | - | - | - | - | - | - | - | (0.7) |
| **Total Non-Operating Disbursements** | **$ (6.6)** | **$ (2.7)** | **$ (3.9)** | **$ (5.0)** | **$ (5.6)** | **$ (4.8)** | **$ (2.5)** | **$ (2.6)** | **$ (2.5)** | **$ (6.3)** | **$ (2.4)** | **$ (44.8)** |
| **Net Cash Flow** | **$ 15.2** | **$ (2.6)** | **$ (4.7)** | **$ (5.0)** | **$ (5.6)** | **$ (0.3)** | **$ (2.3)** | **$ (2.6)** | **$ (0.4)** | **$ (6.4)** | **$ (2.3)** | **$ (16.9)** |
| **Beg. Cash Balance** | **$ 6.9** | **$ 24.4** | **$ 22.7** | **$ 20.8** | **$ 16.8** | **$ 12.2** | **$ 12.4** | **$ 17.4** | **$ 21.9** | **$ 23.4** | **$ 17.0** | **$ 6.9** |
| ( + / - ) Net Cash Flow | 15.2 | (2.6) | (4.7) | (5.0) | (5.6) | (0.3) | (2.3) | (2.6) | (0.4) | (6.4) | (2.3) | (16.9) |
| ( + ) Transaction & Litigation Proceeds | 2.4 | 1.0 | 2.8 | 1.0 | 1.0 | 0.4 | 7.3 | 7.0 | 1.9 | - | - | 24.8 |
| **End. Book Cash Balance** | **$ 24.4** | **$ 22.7** | **$ 20.8** | **$ 16.8** | **$ 12.2** | **$ 12.4** | **$ 17.4** | **$ 21.9** | **$ 23.4** | **$ 17.0** | **$ 14.8** | **$ 14.8** |
| *Est. Secured Interim Advance* | **$ (25.7)** | **$ (29.1)** | **$ (34.5)** | **$ (40.3)** | **$ (46.7)** | **$ (52.0)** | **$ (54.9)** | **$ (58.1)** | **$ (61.0)** | **$ (67.7)** | **$ (70.2)** | **$ (70.2)** |

**Exhibit 3**

**Cure Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| STEWARD HEALTH CARE SYSTEM | § | Case No. 24-90213 (CML) |
| LLC, *et al.*, | § |  |
|  | § | (Jointly Administered) |
| Debtors.[1] | § |  |
|  | § |  |

## NOTICE OF CURE COSTS AND POTENTIAL
## ASSUMPTION AND ASSIGNMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH SETTLEMENT

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On April 28, 2025, Steward Health Care System LLC and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") a motion (Docket No. 4746) (the "**Motion**") seeking, among other things, entry of an order:

    a) approving a settlement (the "**Settlement**") with the FILO Secured Parties and the Creditors' Committee;

    b) authorizing and directing the transfer by the Debtors of the Litigation Trust Assets "free and clear" (to the fullest extent permitted by law) to the Litigation Trust under section 363(f) of the Bankruptcy Code;

    c) authorizing the DIP Amendment (as defined therein and attached thereto as **Exhibit 2**) and use of cash collateral in accordance with the Settlement;

    d) granting adequate protection to the FILO Secured Parties;

    e) authorizing and approving notice to each non-Debtor counterparty (each, a "**Contract Counterparty**") to an executory contract or unexpired lease of non-residential real property of the Debtors (each, a "**Contract**") regarding the potential assumption and assignment of such Contracts and the Debtors' calculations of the amount necessary to cure any monetary defaults under such Contracts (the "**Cure**

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

Costs"), substantially in the form attached thereto as **Exhibit 3** (the "**Cure Notice**");

    f)   authorizing and approving procedures for the assumption and assignment of certain Contracts in connection with the Settlement, as applicable (collectively, the "**Assigned Contracts**") and determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and

    g)   granting related relief.

On [●], 2025, the Bankruptcy Court entered the *Order (I) Approving Settlement With FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* (Docket No. [●]) (the "**Settlement Order**").[2]

## Cure Costs

In accordance with the Assumption and Assignment Procedures and the Settlement Order, the Debtors shall, in connection with the Settlement, assume and assign to the Litigation Trust (or its designated assignee, as applicable) certain contracts and leases of the Debtors, subject to the consent of the FILO Secured Parties.

Each of the contracts and leases that may potentially be assumed and assigned in connection with the Settlement and the Debtors' agreement of the Cure Costs with respect thereto are set forth on **Exhibit A** annexed hereto.

The inclusion of any contract or lease on **Exhibit A** does not constitute an admission that a particular contract or lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such contract or lease ultimately will be assumed or assigned. All rights of the Debtors and the counterparties with respect thereto are reserved.

Notwithstanding the inclusion of any lease or contract on **Exhibit A**, the Litigation Trust is not bound to accept assignment of such Contract, and may amend the schedule of Assigned Contracts to remove any contract or lease in its sole discretion.

If: (a) the Debtor, subject to the consent of the FILO Secured Parties, identifies (i) additional contracts or leases to be assumed and assigned to the Litigation Trust, or (ii) modifications that need to be made to a proposed Cure Cost previously stated in the Assignment and Cure Notice; or (b) the Litigation Trust designates any additional contracts or leases not previously included on this Assignment and Cure Notice for assumption and assignment,

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Order.

the Debtor shall file with the Court and serve by first class mail on the applicable Contract Counterparty a supplemental Assignment and Cure Notice (a "**Supplemental Cure Notice**").

### Cure Objections

Objections, if any, to any proposed Cure Costs (each, a "**Cure Objection**") with respect to the Contracts identified on **Exhibit A** must: (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and, to the extent applicable, provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Rules and the Local Rules; and (v) be filed with the Court and served on the Debtors, the Creditors' Committee, and the FILO Secured Parties within ten (10) days after receipt of Cure Notice:

Any Cure Objection with respect to Cure Costs set forth in a Supplemental Cure Notice must be filed within seven (7) days of filing of that Supplemental Cure Notice.

**IF NO TIMELY CURE OBJECTION IS FILED WITH RESPECT TO AN ASSIGNED CONTRACT: (I) THE CONTRACT COUNTERPARTY TO SUCH PROPOSED ASSIGNED CONTRACT SHALL BE DEEMED TO HAVE CONSENTED TO THE ASSUMPTION BY THE DEBTOR AND ASSIGNMENT TO THE LITIGATION TRUST, AS APPLICABLE, OF THE ASSIGNED CONTRACT, AND BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO SUCH ASSUMPTION AND ASSIGNMENT; (II) ANY AND ALL DEFAULTS UNDER THE ASSIGNED CONTRACT AND ANY AND ALL PECUNIARY LOSSES RELATED THERETO SHALL BE DEEMED CURED AND COMPENSATED PURSUANT TO BANKRUPTCY CODE SECTION 365(B)(1)(A) AND UPON PAYMENT OF THE CURE COSTS SET FORTH IN THE CURE NOTICE FOR SUCH ASSIGNED CONTRACT; AND (III) THE CONTRACT COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OTHER CLAIMS RELATED TO SUCH ASSIGNED CONTRACT AGAINST THE DEBTOR AND ITS ESTATE OR THE LITIGATION TRUST OR ITS PROPERTY THAT EXISTED PRIOR TO THE ASSIGNMENT OF SUCH CONTRACT TO THE LITIGATION TRUST.**

### Additional Information

Copies of the Motion, the Settlement Order, and the Assumption and Assignment Procedures may be obtained free of charge at the website dedicated to the Debtor's chapter 11 case maintained by the Debtor's claims and noticing agent, Kroll Restructuring Administration, LLC, located at https://cases.ra.kroll.com/Steward.

*[Remainder of page intentionally left blank.]*

Dated:      [●], 2025
            Houston, Texas

_/s/ Draft_____

| WEIL, GOTSHAL & MANGES LLP | LATHAM & WATKINS LLP |
|---|---|

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
            Clifford.Carlson@weil.com
            Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Jeffrey D. Saferstein (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Jeffrey.Saferstein@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:   DavidJ.Cohen@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

LATHAM & WATKINS LLP
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864
Email:   Ray.Schrock@lw.com
            Candace.Arthur@lw.com

*Attorneys for Debtors*
*and Debtors in Possession*

4

**Exhibit 4**

**Litigation Trust Tax and Other Matters**

# Litigation Trust Tax and Other Matters

1. **Tax Treatment.** The Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes, with the holders of allowed FILO DIP Claims and allowed FILO Bridge Claims, in respect of their Class A-1 and Class A-2 interests in the Litigation Trust, and respective FILO Secured Parties providing Litigation Funding, in respect of their Class A-1 interests in the Litigation Trust, being treated as grantors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust beneficiaries) shall treat for U.S. federal income tax purposes the transfer of assets by the Debtors to the Litigation Trust as (a) the transfer of the portion of the assets to which the Class A-1 and Class A-2 interests in the Litigation Trust relate (in the case of Class A-1 interests, to the extent of the Secured Interim Advances and the Estate Funding) directly to the holders of allowed FILO DIP Claims, the holders of allowed FILO Bridge Claims, and the FILO Secured Parties that provided the Estate Funding (subject to any liabilities and obligations relating to those assets) in satisfaction of and in exchange for their claims and the Estate Funding, followed by (b) the transfer of such assets by such persons, and of the remaining Litigation Trust assets by the Debtors, to the Litigation Trust in exchange for beneficial interests in the Litigation Trust; provided that, if concurrent with the establishment of the Litigation Trust the Debtors have or will transfer their rights and obligations with respect to the Litigation Trust to a successor liquidating vehicle pursuant to a confirmed chapter 11 plan, the parties shall abide by the provisions of the chapter 11 plan relating thereto. Accordingly, absent definitive guidance to the contrary, the holders of the Class A-1 and Class A-2 interests in the Litigation Trust and the Debtors, as the holders of the Class B interests in the Litigation Trust, shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the assets of the Litigation Trust, subject to any chapter 11 plan provisions relating to the foregoing.

2. **Liquidation Purpose of the Litigation Trust; No Successor in Interest.** The Litigation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust and reasonably necessary to conserve and protect the assets transferred to the Litigation Trust and provide for the orderly liquidation thereof. Accordingly, the Litigation Trustee shall, in an expeditious but orderly manner, liquidate and convert to cash the Litigation Trust assets, make timely distributions to the beneficiaries of the Litigation Trust, as applicable, and not unduly prolong their duration. The Litigation Trustee shall distribute at least annually to the Litigation Trust beneficiaries any cash on hand (including any amounts invested pending distribution) of the Litigation Trust, net of any amounts reserved in respect of disputed claims and any reserves established in the good faith discretion of the Litigation Trustee to provide for payment of any obligations or liabilities of the Litigation Trust, including any claims assumed by the Litigation Trust pursuant to any

chapter 11 plan and any costs or expenses of the Litigation Trust or Litigation Trustee and any taxes, or to maintain the value of any assets of the Litigation Trust. Notwithstanding anything herein or in the Litigation Trust Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth herein.

3. **Cash Investments.** The right and power of the Litigation Trustee to invest the assets of the Litigation Trust, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, and to the investment guidelines of section 345 of the Bankruptcy Code.

4. **Tax Reporting and Tax Payments.**

   (a) The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 4.

   (b) As soon as practicable after the Litigation Trust Establishment Date, the Debtors (or its designee), in consultation with the Litigation Trustee, shall make a good faith determination of the fair market value of the Litigation Trust assets, as of Litigation Trust Establishment Date. The Debtors (or its designee) shall inform all parties of such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

   (c) The Litigation Trust shall be responsible for payment, out of Litigation Trust assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets.

   (d) The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

   (e) The Litigation Trustee and the Debtors (and any successor liquidating vehicle) shall each cooperate with the other in connection with the preparation and filing of any tax returns, the provision of any required tax forms, and any other matter with respect to taxes, and shall make available to the other, as reasonably requested, any information or records relevant to the preparation or filing of any tax returns or forms or the defense of any audit or other tax proceeding.

   (f) The treatment provided in this Exhibit, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

# EXHIBIT 3

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 02, 2025

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM LLC,** *et al.*, | § | Case No. 24-90213 (CML) |
| | § | |
| Debtors. [1] | § | (Jointly Administered) |
| | § | |

**ORDER (I) SCHEDULING COMBINED HEARING ON
(A) ADEQUACY OF DISCLOSURE STATEMENT AND
(B) CONFIRMATION OF PLAN; (II) CONDITIONALLY
APPROVING DISCLOSURE STATEMENT AND FORM
AND MANNER OF NOTICE OF CONDITIONAL DISCLOSURE
STATEMENT HEARING; (III) ESTABLISHING SOLICITATION
AND VOTING PROCEDURES; (IV) ESTABLISHING ADMINISTRATIVE
EXPENSE CLAIMS CONSENT PROGRAM NOTICE AND OPT-OUT
PROCEDURES; (V) ESTABLISHING NOTICE AND OBJECTION
PROCEDURES FOR CONFIRMATION OF PROPOSED PLAN; (VI) APPROVING
NOTICE PROCEDURES FOR ASSUMPTION OR REJECTION OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (VII) GRANTING RELATED RELIEF**

Upon the motion, dated April 28, 2025 (the "**Motion**"), Steward Health Care System LLC, and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), for entry of an order pursuant to sections 105, 365, 1124, 1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3001, 3016, 3017, 3018, 3020, 6004, and 9006, Bankruptcy Local Rules 2002-1 and 3016-1, and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (effective as of September 18, 2024, the "**Complex Case Procedures**"), the Debtors request entry of an order (this "**Order**"), granting the following relief:

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Voting Agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

## Plan, Disclosure Statement & Related Procedures, Dates/Deadlines and Materials

i.  scheduling a combined hearing ("**Combined Hearing**") to approve the Disclosure Statement (as defined below) on a final basis and consider confirmation of the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. 5021) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Plan**");

ii.  conditionally[2] approving the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. 5023) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Disclosure Statement**")[3] as containing adequate information pursuant to section 1125 of the Bankruptcy Code;

iii.  approving the form and manner of notice of the hearing to conditionally consider the proposed Disclosure Statement;

iv.  approving the form and manner of the notice (the "**Combined Hearing Notice**") of the Combined Hearing, substantially in the form attached herein as **Exhibit 1**;

v.  establishing July 2, 2025 at 5:00 p.m. (Central Time) as the deadline to object to the adequacy of the Disclosure Statement and/or confirmation of the Plan (the "**Combined Objection Deadline**");

vi.  approving the procedures for assumption, assumption and assignment, or rejection of the Debtors' executory contracts and unexpired leases;

### Solicitation and Voting

vii.  establishing May 21, 2025 as the record date for the purpose of determining which holders of Claims are entitled to vote on the Plan and receive the applicable notice(s) relating to solicitation and confirmation (the "**Voting Record Date**");

viii.  approving procedures for (a) soliciting, receiving, and tabulating votes to accept or reject the Plan and (b) voting to accept or reject the Plan (the "**Solicitation and Voting Procedures**"), substantially in the form attached herein as **Exhibit 2**;

ix.  approving the ballots (the "**Ballots**") that the Debtors will send to holders of Claims entitled to vote to accept or reject the Plan, substantially in the forms attached herein as **Exhibits 3-5**;

---

[2]  The Debtors reserve the right to seek final approval of the Disclosure Statement prior to the Combined Hearing to the extent the hearing to consider approval of the Disclosure Statement is moved to a date after the 28-day objection deadline under Bankruptcy Rule 2002(b).

[3]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement or the Plan, as applicable.

x.    finding that the solicitation materials and documents included in the solicitation packages to be sent to holders of Claims entitled to vote to accept or reject the Plan as described in paragraph 8 herein (the "**Solicitation Packages**") are in compliance with Bankruptcy Rules 2002(b) and 3017(d);

xi.    approving the form of notice the Debtors will send to holders of Claims and Interests of the Non-Voting Classes (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests)) that are, pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, conclusively presumed to accept or deemed to reject the Plan, as applicable (the "**Notice of Non-Voting Status**"), substantially in the form attached herein as **Exhibit 6**;

xii.    approving (a) the form to opt out of the Third-Party Releases (the "**Release Opt-Out Form**"), substantially in the form attached herein as **Exhibit 7**, which the Debtors will send to holders of Claims and Interests of the Non-Voting Classes (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests)) that are, pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, conclusively presumed to accept or reject the Plan, as applicable, and (b) July 2, 2025 at 5:00 p.m. (Central Time) as the deadline by which holders of Claims and Interests of the Non-Voting Classes (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests)) must submit the Release Opt-Out Form (the "**Release Opt-Out Deadline**");

xiii.    establishing July 2, 2025 at 5:00 p.m. (Central Time) as the deadline by which holders of Claims entitled to vote may vote to accept or reject the Plan (the "**Voting Deadline**");

## Administrative Expense Claims Consent Program

xiv.    approving the form of opt-out the Debtors will send to holders of Administrative Expense Claims (other than as otherwise provided herein) for the Administrative Expense Claims Consent Program (the "**Consent Program Opt-Out Form**"), substantially in the form attached herein as **Exhibit 8**;

xv.    establishing May 21, 2025 as the record date for determining which holders of Administrative Expense Claims are entitled to participate in the Administrative Expense Claims Consent Program and receive the Consent Program Opt-Out Form (the "**Administrative Claims Record Date**");

xvi.    approving the materials and documents to be sent to eligible holders of Administrative Expense Claims (as provided in paragraph 30 herein) (the "**Consent Program Materials**");

xvii.    approving (a) the Consent Program Opt-Out Procedures (as defined herein) and (b) July 2, 2025 at 5:00 p.m. (Central Time) as the deadline by which holders of Administrative Expense Claims must submit the Consent Program Opt-Out Form (the "**Consent Program Opt-Out Deadline**"); and

xviii.    granting related relief;

all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion

and the relief requested therein pursuant to 28 U.S.C. § 1334; and this Court having found that this

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of

this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409;

and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing

on the Motion were appropriate and no other notice need be provided; and this Court having

reviewed the Motion; and this Court having held a hearing to consider the relief requested in the

Motion (the "**Conditional Disclosure Statement Hearing**"); and all objections, if any, to the

Motion having been withdrawn, resolved, or overruled; and this Court having determined that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and

it appearing that the relief requested in the Motion is in the best interests of the Debtors and their

respective estates and creditors; and upon all of the proceedings had before this Court and after

due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

**Conditional Approval of Disclosure Statement.**

1.    The Disclosure Statement is hereby conditionally approved as providing

holders of Claims entitled to vote on the Plan with adequate information to make an informed

decision as to whether to vote to accept or reject the Plan within the meaning of section 1125 of

the Bankruptcy Code and complies with Bankruptcy Rule 3016(c) and is subject to final approval

of the Court at the Combined Hearing.    No further or additional information is necessary or

required.

2.    The Disclosure Statement (including all applicable exhibits thereto)

provides holders of Claims and other parties in interest with sufficient notice of the proposed

releases, injunctions, and exculpation provisions contained in Article XII of the Plan, in accordance with Bankruptcy Rule 3016(c).

3.     The procedures pursuant to which the Debtors provided notice to the parties entitled to notice of the time, date, and place of the Conditional Disclosure Statement Hearing provided due, proper, and adequate notice, comport with due process, and comply with all applicable Bankruptcy Rules and Bankruptcy Local Rules.  No further notice is required or necessary.

**Approval of Solicitation and Voting Procedures and Materials and Timeline for Soliciting Votes for Confirming Plan.**

    **a.**    **Solicitation and Voting Procedures.**

4.     The Solicitation and Voting Procedures, attached hereto as **<u>Exhibit 2</u>**, provide for a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018 and are hereby approved in their entirety.

5.     The Debtors are hereby authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation and Voting Procedures.   The solicitation period during which the Debtors will solicit votes to accept or reject the Plan is a reasonable and sufficient period of time for holders of Claims in the Voting Classes to make an informed decision regarding whether to accept or reject the Plan and timely return Ballots evidencing such decision.

    **b.**    **Solicitation and Confirmation Timeline.**

6.     The following dates and deadlines are hereby established (subject to modification as necessary by the Debtors in consultation with the Creditors' Committee) with respect to the solicitation of the Plan, voting on the Plan, and confirmation of the Plan, as well as filing objections to confirmation of the Plan and approving the Disclosure Statement on a final basis:

| SOLICITATION AND CONFIRMATION TIMETABLE | |
|---|---|
| Voting Record Date and Administrative Claims Record Date | **May 21, 2025** |
| Mailing Deadline for Combined Hearing Notice, Solicitation Packages, and Election Packages | **No later than three (3) business days after entry of this Order, or as soon as reasonably practicable thereafter** |
| Supplemental Publication Deadline | **As soon as reasonably practicable after entry of this Order** |
| Deadline for Debtors to File Claims Objections for Voting Purposes or to Request Claim Estimation for Voting Purposes | **June 18, 2025 at 5:00 p.m. (Central Time)** |
| Mailing Deadline for Cure Amounts and Filing of Cure Notice | **June 21, 2025** |
| Plan Supplement Filing Deadline | **June 25, 2025** |
| Rule 3018(a) Motion Deadline | **June 25, 2025 at 5:00 p.m. (Central Time)** |
| Voting Deadline, Consent Program Opt-Out Deadline, and Release Opt-Out Deadline | **July 2, 2025 at 5:00 p.m. (Central Time)** |
| Deadline to Object to Disclosure Statement and Plan | **July 2, 2025 at 5:00 p.m. (Central Time)** |
| Assumption and Cure Objection Deadline | **July 3, 2025** |
| Deadline to File Confirmation Brief and Reply to Plan Objection(s) | **July 9, 2025** |
| Ballot Certification Deadline | **July 9, 2025** |
| Combined Hearing | **July 11, 2025 at 9:00 a.m. (Central Time)** |

###### c.    Solicitation Packages.

7.    The Solicitation Packages, and each of the documents contained therein (substantially in the form attached hereto), including, but not limited to the Ballots, are APPROVED.

8.    The Debtors shall mail, or cause to be mailed, the Solicitation Packages on or before the Mailing Deadline to holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date, as required by Bankruptcy Rule 3017(d).   The Debtors shall also provide complete Solicitation Packages (excluding Ballots, as applicable) to the U.S. Trustee and all parties required to be notified under Bankruptcy Rule 2002 and Local Rule 2002-11 (except to the extent that such party is entitled to receive an Election Package).   Solicitation Packages shall contain copies of:

    (a)    this Order, as entered by this Court and without attachments;

    (b)    the conditionally approved Disclosure Statement with all exhibits thereto, including the Plan;

    (c)    the Combined Hearing Notice;

    (d)    the Solicitation and Voting Procedures;

    (e)    the applicable Ballot customized (where possible and appropriate) for such holder and conforming to Official Bankruptcy Form No. B 314, in the form described below;[4]

    (f)    for holders of claims in Class 4, the letter from the Creditors' Committee to holders of unsecured claims setting forth, among other things, the Creditors' Committee's recommendation that holders of General Unsecured Claims vote to accept the Plan (substantially in the form attached herein as **Exhibit 9**) (the "**Creditors' Committee Position Letter**"); and

    (g)    a postage-prepaid return envelope.

---

[4]    Official Bankruptcy Form No. B 314 can be found at http://www.uscourts.gov/forms/bankruptcy-forms, the official website for the United States Bankruptcy Courts.

9. The Debtors are authorized to serve the Plan, the Disclosure Statement, and this Order in electronic format (on a QR code included in the Combined Hearing Notice), such that only the Ballots and the Combined Hearing Notice shall be served in paper format, except as otherwise provided in this Order, the Solicitation and Voting Procedures, or the Consent Program Opt-Out Procedures. Any creditor or equity holder for which service by QR code imposes a hardship may request an additional copy of the Plan, the Disclosure Statement (and attachments), and this Order (without attachments except the Solicitation and Voting Procedures) in paper format or via USB flash drive by contacting Kroll by (a) calling (646) 893-5546 (international) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Upon receipt of an email, telephonic, or written request, in a timely manner, the Debtors shall provide such creditor with a paper copy, or a USB flash drive, of the Plan and the Disclosure Statement at no cost to the creditor.

10. The Voting Agent is authorized to assist the Debtors in (i) distributing the Solicitation Packages and, as applicable, the Consent Program Materials, Notice of Non-Voting Status, or the Release Opt-Out Forms (collectively referred to as the "**Election Packages**") (ii) receiving, tabulating, and reporting on Consent Program Opt-Out Forms cast to opt out of the Administrative Expense Claims Consent Program by holders of Allowed Administrative Expense Claims, (iii) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims, (iv) receiving, tabulating, and reporting on Release Opt-Out Forms cast to opt out of the Third-Party Releases by Non-Voting Classes, (v) responding to inquiries from holders

8

of Claims or Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the Administrative Expense Claims Consent Program by the Consent Program Materials, or the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, or the procedures and requirements to opt out of the Third-Party Releases by the Release Opt-Out Form or the Third-Party Release Opt-Out Election, (vi) soliciting votes on the Plan, and (vii) if necessary or appropriate, contacting creditors and equity holders regarding the Plan, the Ballots, the Solicitation Packages, the Election Packages, and all other related documents and matters related thereto. To the extent a holder is entitled to receive both a Solicitation Package and one of the Election Packages, the Voting Agent is authorized to consolidate such packages to limit costs to the estate.

11.     Holders of transferred Claims entitled to vote on the Plan shall receive a Solicitation Package only if: (i) all actions necessary to transfer such Claim are completed by the Voting Record Date or (ii) the transferee files, by the Voting Record Date, (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer. In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote on the Plan made by the holder of such Claim as of the Voting Record Date.

12.     The Voting Agent is authorized to accept the Ballots on or before the Voting Record Date: (i) by first-class mail in the return envelope provided with each Ballot, (ii) by overnight courier; (iii) by hand delivery; or (iv) via Kroll's online balloting portal (each such electronically submitted Ballot, an "**E-Ballot**") at the Online Portal. The encrypted E-Ballot data and audit trail created by electronic submission via Kroll's Online Portal shall become part of the

record of any Ballot submitted in this manner and the creditor's electronic signature shall be deemed to be immediately legally valid and effective. Alternatively, in lieu of submitting an E-Ballot, holders of Claims may return their Ballots in the return envelope provided, or otherwise via first class mail, overnight courier, or hand delivery, so long as the Ballots are actually received on or before the Voting Deadline. Holders of Claims mailing their Ballots to the Voting Agent shall mail them to the following address:

> Steward Health Care System LLC Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

13. The Debtors are authorized, but not required, to (i) waive any defects or irregularities as to any Ballot at any time, either before or after the Voting Deadline, or (ii) extend the Voting Deadline (in consultation with the Creditors' Committee).

14. At any time during which Bankruptcy Court or other approval would otherwise be required to change or withdraw any ballots submitted or votes cast in connection with the Plan, if the Debtors or the Creditors' Committee have materially breached their respective obligations to the FILO Parties under the FILO Settlement Term Sheet, the Plan Support Agreement Term Sheet, or the FILO Settlement Order, and such breach is not cured by the earlier of (x) three business days after the FILO Parties have provided written notice of such breach to the Debtors' and Creditors' Committee's counsel or (y) the date that is two business days before the Confirmation Hearing, any holder of FILO Bridge Claims may modify or withdraw any ballots or votes previously submitted or cast by such holder and such ballots or votes may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need for further order or consent from the Debtors or any other party allowing such change or resubmission); *provided* that, upon any such modification or withdrawal of any accepting ballots

or votes of any such holder or change or resubmission of such votes, all parties shall be released from any obligations under the FILO Settlement Term Sheet, the Plan Support Agreement Term Sheet, or the FILO Settlement Order, which obligations shall be deemed terminated, other than with respect to any breach occurring prior to such termination.

15.　　The Debtors are not required to mail Solicitation Packages or Notices of Non-Voting Status to holders (i) that have Claims that have already been paid in full during these chapter 11 cases, (ii) whose prior mailings in these chapter 11 cases were returned as undeliverable and that have not provided a forwarding address by the Voting Record Date,[5] and (iii) that have Claims and Interests, as applicable, in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests).　In the event that the United States Postal Service returns some Solicitation Packages, Election Packages, or Notices of Non-Voting Status as undeliverable, the Debtors shall be excused from re-mailing such Solicitation Packages, Election Packages, or Notices of Non-Voting Status.　The failure to mail such Solicitation Packages, Election Packages, Notices of Non-Voting Status, or any other materials related to voting or confirmation of the Plan to such entities will not constitute inadequate notice of the Combined Hearing or the Voting Deadline and shall not constitute a violation of Bankruptcy Rule 3017.

**Notice of Non-Voting Status.**

16.　　The Notice of Non-Voting Status is APPROVED.

17.　　The proposed form and manner of service of the Notice of Non-Voting Status provide due, proper, and adequate notice, comport with due process, and comply

---

[5]　For purposes of serving the Solicitation Packages, the Debtors are authorized to rely on the address information for (i) known holders of Administrative Expense Claims (other than Professional Fee Claims and FILO DIP Claims) and (ii) holders of the Voting and Non-Voting Classes as compiled, updated, and maintained by the Voting Agent as of the Voting Record Date, and the Debtors and the Voting Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitations Packages (including the Ballots).

with all applicable Bankruptcy Rules and Bankruptcy Local Rules. No further notice is required or necessary.

18. Except to the extent that the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to holders of Claims and Interests in the Non-Voting Classes, as such holders are not entitled to vote on the Plan. Instead, on or before the Mailing Deadline, the Voting Agent shall mail a Notice of Non-Voting Status, substantially in the form attached hereto as **Exhibit 6**, a Combined Hearing Notice, substantially in the form attached hereto as **Exhibit 1**, and a Release Opt-Out Form, substantially in the form attached hereto as **Exhibit 7** to the holders of Claims and Interests in the Non-Voting Classes in lieu of a Solicitation Package.

19. The Notice of Non-Voting Status provides (i) notice of the Court's conditional approval of the Disclosure Statement, (ii) notice of filing the Plan, (iii) notice of the holder's non-voting status, (iv) notice of the Third-Party Releases Election (as described herein), and (iv) information about how to obtain copies of the Disclosure Statement and the Plan. In addition, the Notice of Non-Voting Status contains the full text of the release, exculpation, and injunction provisions set forth in Article XII of the Plan and advises such holders of Claims in Non-Voting Classes that they will be bound by the Third-Party Releases in section 12.6(c) of the Plan unless they timely, properly, and affirmatively opt out. Holders of Claims in the Non-Voting Classes that choose to opt out of the Third-Party Releases may do so by submitting their Release Opt-Out Form in the return envelope provided, or otherwise: (i) by first-class mail, (ii) by overnight courier, (iii) by hand delivery, or (iv) via the Online Portal, so that (in each instance) their opt-out election is actually received by the Voting Agent no later than the Release Opt-Out Deadline.

20.     The requirement to serve a Notice of Non-Voting Status, Release Opt-Out Form, Combined Hearing Notice, or any other type of notice in connection with solicitation of the Plan to Holders of Claims in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) is hereby waived.

**Release Opt-Out Form.**

21.     The Release Opt-Out Form is APPROVED.

22.     The Release Opt-Out Form complies with the Bankruptcy Code, applicable Bankruptcy Rules, and the applicable Bankruptcy Local Rules and Complex Case Procedures and, together with the Combined Hearing Notice and, as applicable, the Notice of Non-Voting Status, provides adequate notice to holders of Claims and Interests in the Non-Voting Classes.   No further notice is required or necessary.

23.     The Release Opt-Out Deadline shall be **July 2, 2025 at 5:00 p.m. (Central Time)**.

24.     All Release Opt-Out Forms must be properly completed and returned either by (i) delivering the Release Opt-Out Form to the Voting Agent or (ii) submitting the Release Opt-Out Form by electronic, online transmission through the Online Portal, each in accordance with the instructions included on the Release Opt-Out Form.  The Voting Agent is authorized to assist the Debtors in (i) receiving, tabulating, and reporting on Release Opt-Out Forms and (ii) responding to inquiries from holders of Claims or Interests and other parties in interest relating to the procedures and requirements to opt out of the Third Party Releases by the Release Opt-Out Form.

25.     A holder that timely, properly, and affirmatively elects to opt out of the Third-Party Releases by the Release Opt-Out Deadline will not be deemed a Releasing Party under the Plan (or, by extension, a Releasing Party).

**Approval of Consent Program Opt-Out Procedures and Materials and Timeline for Providing Consent Program Materials to Holders of Administrative Expense Claims.**

### a.    Consent Program Opt-Out Procedures

26.    The Consent Program Opt-Out Procedures (including the Consent Program

Opt-Out Deadline) are APPROVED.

| | |
|---|---|
| **Administrative Claims Record Date** | • May 21, 2025. |
| **Consent Program Opt-Out Deadline** | • All Consent Program Opt-Out Forms must be timely and properly completed and returned so as to be **actually received** by the Voting Agent by **July 2, 2025 at 5:00 p.m. (Central Time)** either by (i) delivering the Consent Program Opt-Out Form to the Voting Agent in the return envelope provided or otherwise by first-class mail, hand delivery, or overnight courier or (ii) submitting the Consent Program Opt-Out Form by electronic, online transmission through the Online Portal (as defined herein), each in accordance with the instructions included on the Consent Program Opt-Out Form. |
| **Tabulation** | • Whenever a holder of an Administrative Expense Claim submits a Consent Program Opt-Out Form that does not properly check the box to affirmatively indicate such holder's decision to opt out of the Administrative Expense Claims Consent Program, such Form will not be counted, and such creditor shall be deemed not to have opted out of the Administrative Expense Claims Consent Program.<br>• A holder that timely and properly submits a Consent Program Opt-Out Form shall be deemed to have opted out of the Administrative Expense Claims Consent Program.<br>• A holder of Administrative Expense Claims against more than one Debtor that timely and properly submits a Consent Program Opt-Out Form shall have its election to affirmatively opt out counted with respect to each of such Debtors.<br>• The Debtors, in consultation with the Creditors' Committee, may waive any defects or irregularities as to any particular irregular Consent Program Opt-Out Form at any time, either before or after the Consent Program Opt-Out Deadline.<br>• Failure to properly follow the instructions on, and timely submit, the Consent Program Opt-Out Form may result in the Consent Program Opt-Out Form not being counted.<br>• The Debtors and/or their Voting Agent, as applicable, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Consent Program Opt-Out Forms, which |

|  | determination will be final and binding on all parties. |
|  | • The Debtors are further authorized, in consultation with the Creditors' Committee, to waive any defects or irregularities or conditions of delivery as to any particular Consent Program Opt-Out Form by any holders of Administrative Expense Claims. |
|  | • Unless otherwise agreed to by the Debtors and the applicable holder, all holders of known and identified Administrative Expense Claims are eligible to participate and will receive a Consent Program Opt-Out Form other than holders of: (i) Professional Fee Claims; (ii) FILO DIP Claims; or (iii) asserted Administrative Expense Claims that are entirely contingent, unliquidated and/or disputed by the Debtors. |
|  | • The Internal Revenue Service is excluded from participation in the Administrative Expense Claims Consent Program and will be considered to opt-out of the Administrative Expense Claims Consent Program. |

27. The Debtors are authorized to adjust any Administrative Expense Claim on the Claims Register (i) if a holder declines to opt out of the Administrative Expense Claims Consent Program, in accordance with the Settled Administrative Expense Claim listed on such holders Consent Program Opt-Out Form, or (ii) upon agreement between the parties in interest (in consultation with the Creditors' Committee), in each case, without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

28. The Consent Program Materials and the Consent Program Opt-Out Procedures (including the Consent Program Opt-Out Deadline) are adequate to solicit opt-out elections from eligible holders of Administrative Expense Claims with respect to the Administrative Expense Claims Consent Program and to otherwise inform holders of Administrative Expense Claims regarding their rights and available choices with respect to such program. Those parties who do not timely, properly, and affirmatively opt out of the Administrative Expense Claims Consent Program in accordance with the Consent Program Opt-Out Procedures by the Consent Program Opt-Out Deadline shall be deemed to have consented to the settlement of their Administrative Expense Claims in the amount of the Settled Administrative

Expense Claim listed on the Consent Program Opt-Out Form and treatment set forth in the Administrative Expense Claims Consent Program for such parties. To the extent an eligible holder of an Allowed Administrative Expense Claim does not timely, properly, and affirmatively opt out of the Administrative Expense Claims Consent Program, upon entry of the Confirmation Order, such holder's acceptance of and consent to the Administrative Expense Claims Consent Program will be deemed consent to the Plan and acceptance of the treatment under the Plan in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Administrative Expense Claim as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code. No further notice is required or necessary.

### b. Consent Program Materials

29. The Consent Program Materials, and each of the documents contained therein (substantially in the form attached hereto), including, but not limited to the Consent Program Opt-Out Form, are APPROVED.

30. The Debtors are hereby authorized to take all actions necessary to implement the terms of the Consent Program Opt-Out Procedures, including mailing the Consent Program Materials to holders of Administrative Expense Claims in accordance with this Order and the Consent Program Opt-Out Procedures. Consent Program Materials shall contain copies of:

(a)    this Order, as entered by the Court and without attachments;

(b)    the conditionally approved Disclosure Statement with all exhibits thereto, including the Plan;

(c)    the Combined Hearing Notice;

(d)    the Consent Program Opt-Out Form customized (where possible and appropriate) for such holder; and

(e)    a postage-prepaid return envelope.

31.     The Debtors are authorized to serve the Disclosure Statement, the Plan, and this Order in electronic format (on a QR code included in the Combined Hearing Notice) instead of printed hard copies.  Only the Consent Program Opt-Out Form and the Combined Hearing Notice will be provided in paper format.  Moreover, the Plan and the Disclosure Statement will be available at no charge via the Internet at the Online Portal.  If service by QR code imposes a hardship for any party entitled to receive a copy of the Plan and the Disclosure Statement (*e.g.*, the party does not own or have access to a smartphone), such party may request a paper copy of, or a USB flash drive that includes the Plan, Disclosure Statement, and this Order (without attachments, except the Solicitation and Voting Procedures as annexed as **Exhibit 2** hereto) by contacting Kroll by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line.  Upon receipt of an email, telephonic, or written request, in a timely manner, the Debtors shall provide such administrative creditor with a paper copy of, or a USB flash drive containing, the Plan and the Disclosure Statement at no cost to such creditor.

32.     The Voting Agent is Authorized to assist the Debtors in (i) receiving and reporting on Consent Program Opt-Out Forms cast to opt out of the Administrative Expense Claims Consent Program and (ii) responding to inquiries from holders of Administrative Expense Claims relating to the Consent Program Materials, including the Consent Program Opt-Out Form, and all other related documents and matters related thereto, including the Consent Program Opt-Out Procedures.

33.     Holders of transferred Administrative Expense Claims are entitled to opt out of the Administrative Expense Claims Consent Program only if: (i) all actions necessary to transfer such Claim are completed by the Administrative Claims Record Date or (ii) by the Administrative Claims Record Date, the transferee files (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer.   In the event an Administrative Expense Claim is transferred after the Administrative Claims Record Date, the transferee of such Administrative Expense Claim shall be bound by any election on the Consent Program Opt-Out Form made by the holder of such Claim as of the Administrative Claims Record Date pursuant to the Consent Program Opt-Out Procedures.

34.     The Voting Agent is authorized to accept the Consent Program Opt-Out Forms on or before the Consent Program Opt-Out Deadline: (i) by first-class mail in the return envelope provided with each Consent Program Opt-Out Form; (ii) by overnight courier; (iii) by hand delivery; or (iv) by electronic, online transmission at https://restructuring.ra.kroll.com/Steward/ (the "**Online Portal**").   The encrypted Consent Program Opt-Out Form data and audit trail created by electronic submission via Kroll's Online Portal shall become part of the record of any Consent Program Opt-Out Form submitted in this manner and the creditor's electronic signature shall be deemed to be immediately legally valid and effective.

35.     The Debtors are authorized, but not required, to (i) waive any defects or irregularities as to any Consent Program Opt-Out Form at any time, either before or after the Consent Program Opt-Out Deadline, or (ii) extend (in consultation with the Creditors' Committee) the Consent Program Opt-Out Deadline.

36.     In the event that the United States Postal Service returns the Consent Program Materials as undeliverable, the Debtors shall be excused from re-mailing such Consent Program Materials.

**Combined Hearing Notice.**

37.     The Combined Hearing Notice is APPROVED.

38.     The form and proposed manner of service of the Combined Hearing Notice provide due, proper, and adequate notice, comport with due process, and comply with all applicable Bankruptcy Rules and Bankruptcy Local Rules.  No further notice is required or necessary.

39.     The Debtors are authorized to give supplemental publication notice of the Combined Hearing in one or more of any of the following publications *Boston Globe, Houston Chronicle, New York Times National Edition, Arizona Republic, Florida Today, Indian River Press Journal, Miami Herald, Midland Reporter-Telegram, South Florida Sun Sentinel, Texarkana Gazette, Youngstown Vindicator, Monroe News-Star*, as well as other publications, as the Debtors deem appropriate.

**Combined Hearing.**

40.     The Combined Hearing will begin on **July 11, 2025 at 9:00 a.m. (Central Time)**; *provided*, *however*, that the Combined Hearing may be adjourned or continued from time to time by the Court or the Debtors (in consultation with the Creditors' Committee) without further notice other than adjournments announced in open Court or as indicated in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Court.

**Combined Objection Procedures.**

41.     The deadline to file an objection to the adequacy of the Disclosure Statement and/or confirmation of the Plan shall be **July 2, 2025 at 5:00 p.m. (Central Time)** (the "**Combined Objection Deadline**").

42.     Objections and responses, if any, to confirmation of the Plan, must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules, and any order of the Court; (iii) set forth the name of the objecting party, the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' estates or property; and (iv) provide the basis for the objection and the specific grounds therefor, and, if practicable, a proposed modification to the Plan that would resolve such objection.   Registered users of this Court's case filing system must electronically file their objections and responses on or before the Combined Objection Deadline.   All other parties in interest must file their objections and responses in writing, together with proof of service thereof, with the United States Bankruptcy Court Clerk's Office, United States Courthouse, 515 Rusk Avenue, Courtroom 401, 4th Floor, Houston, Texas 77002, on or before the Combined Objection Deadline.

43.     Pursuant to Bankruptcy Rule 3020(b), if no objection is timely filed, this Court may determine that the Plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues.

44.     Objections to confirmation of the Plan that are not timely filed, served, and actually received in the manner set forth above shall not be considered and shall be deemed overruled.

45.     The Debtors and any parties in interest are authorized to file and serve replies or an omnibus reply to any such objections along with a brief in support of confirmation of the

Plan (the "**Confirmation Brief**") either separately or in a single, consolidated document on or before **July 9, 2025**.

**Approval of Notices to Executory Contract and Unexpired Lease Counterparties.**

46. The procedures set forth in the Motion regarding notice to all parties of the assumption, assumption and assignment, or rejection of the applicable Debtors' Executory Contracts and Unexpired Leases, provide due, proper, and adequate notice, comport with due process and comply with Bankruptcy Rules 2002, 3017 and 3020, and are hereby approved. No further or additional notice is required or necessary.

**Plan Supplement Filing Deadline.**

47. The Debtors are authorized to file the Plan Supplement with the Court on or before **June 25, 2025** (the "**Plan Supplement Filing Deadline**").

**General.**

48. The Debtors, in consultation with the Creditors' Committee, are authorized to make non-substantive changes to the Disclosure Statement, the Plan, the Ballots, the Consent Program Opt-Out Forms, the Consent Program Opt-Out Procedures, the Solicitation and Voting Procedures, the Combined Hearing Notice, the Notice of Non-Voting Status, the Release Opt-Out Form, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages or Election Packages prior to mailing.

49. Nothing contained in the Motion or this Order or any payment made pursuant to the authority granted by this Order is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any

claim, (iii) a waiver of the Debtors' or any party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any Claims, (vi) a waiver of any Claims or causes of action which may exist against any creditor or interest holder, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.

50.     Notwithstanding anything in this Order to the contrary, Catholic Health Initiatives Colorado, CommonSpirit Health, and/or CommonSpirit Mountain Region f/k/a Centura Health Corporation reserve the right to object to final approval of the Disclosure Statement and confirmation of the Plan.

51.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

52.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

53.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice.

54.     The Debtors are authorized to take all steps necessary or appropriate to carry out the relief granted in this Order.

55.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Signed:  June 02, 2025

_____   .
Christopher Lopez
United States Bankruptcy Judge

**<u>Exhibit 1</u>**

**Form of Combined Hearing Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC**, *et al.*, | § |  |
|  | § | (Jointly Administered) |
| Debtors.[1] | § |  |

## NOTICE OF (I) CONDITIONAL APPROVAL OF DISCLOSURE STATEMENT; (II) APPROVAL OF (A) SOLICITATION AND VOTING PROCEDURES, (B) ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM NOTICE AND OPT-OUT PROCEDURES; AND (C) NOTICE PROCEDURES FOR THE ASSUMPTION OR REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (III) COMBINED HEARING TO CONSIDER FINAL APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN; AND (IV) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR FINAL APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN

### TO ALL PARTIES IN INTEREST IN THE CHAPTER 11 CASES OF:

| Name of Debtors | Case Numbers | Name of Debtors | Case Numbers |
|---|---|---|---|
| SJ Medical Center, LLC | 24-90210 (CML) | Choice Care Clinic III, Inc. | 24-90287 (CML) |
| Downtown Houston Physician Hospital Organization | 24-90211 (CML) | Choice Care Clinic of Louisiana, Inc. | 24-90291 (CML) |
|  |  | Choice Care Clinic of Utah, Inc. | 24-90299 (CML) |
| Steward Health Care Holdings LLC | 24-90212 (CML) | Converse Medical Center LLC | 24-90306 (CML) |
| Steward Health Care System LLC | 24-90213 (CML) | Davis Hospital & Medical Center, LP | 24-90315 (CML) |
| Arizona Diagnostic & Surgical Center, Inc. | 24-90214 (CML) | Davis Hospital Holdings, Inc. | 24-90318 (CML) |
| Beaumont Hospital Holdings, Inc. | 24-90215 (CML) | Davis Surgical Center Holdings, Inc. | 24-90324 (CML) |
| Biltmore Surgery Center Holdings, Inc. | 24-90216 (CML) | De Zavala Medical Center LLC | 24-90340 (CML) |
| Biltmore Surgery Center, Inc. | 24-90217 (CML) | Glenwood Specialty Imaging, LLC | 24-90344 (CML) |
| Blackstone Medical Center, Inc. | 24-90219 (CML) | HC Essential Co. | 24-90347 (CML) |
| Blackstone Rehabilitation Hospital, Inc. | 24-90223 (CML) | Health Choice Florida, Inc. | 24-90350 (CML) |
| Boston Orthopedic Center, LLC | 24-90225 (CML) | Health Choice Louisiana, Inc. | 24-90218 (CML) |
| Boston Sports Medicine and Research Institute, LLC | 24-90230 (CML) | Health Choice Managed Care Solutions LLC | 24-90224 (CML) |
|  |  | Health Choice Northern Arizona LLC | 24-90227 (CML) |
| Brevard SHC Holdings LLC | 24-90236 (CML) | Health Choice Preferred Accountable Care LLC | 24-90229 (CML) |
| Brim Healthcare of Colorado, LLC | 24-90242 (CML) | Health Choice Preferred Louisiana ACO LLC | 24-90234 (CML) |
| Brim Healthcare of Texas, LLC | 24-90248 (CML) | Health Choice Preferred Louisiana Physician Association LLC | 24-90237 (CML) |
| Brim Holding Company, Inc. | 24-90261 (CML) |  |  |
| Brim Physicians Group of Colorado, LLC | 24-90266 (CML) | Health Choice Preferred Texas ACO – Alamo Region LLC | 24-90239 (CML) |
| Choice Care Clinic I, Inc. | 24-90278 (CML) |  |  |
| Choice Care Clinic II, Inc. | 24-90283 (CML) | Health Choice Preferred Texas ACO – Gulf Coast | 24-90244 (CML) |

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

| Name of Debtors | Case Numbers |
|---|---|
| Region LLC | |
| Health Choice Preferred Texas Physician Association – Alamo Region LLC | 24-90250 (CML) |
| Health Choice Preferred Texas Physician Association – Gulf Coast Region LLC | 24-90253 (CML) |
| Health Choice Utah Accountable Care LLC | 24-90257 (CML) |
| HealthUtah Holdco LLC | 24-90262 (CML) |
| Heritage Technologies, LLC | 24-90273 (CML) |
| IASIS Capital Corporation | 24-90276 (CML) |
| IASIS Finance II LLC | 24-90281 (CML) |
| IASIS Finance III LLC | 24-90285 (CML) |
| IASIS Finance, Inc. | 24-90290 (CML) |
| IASIS Finance Texas Holdings, LLC | 24-90295 (CML) |
| IASIS Glenwood Regional Medical Center, LP | 24-90301 (CML) |
| IASIS Healthcare Corporation | 24-90311 (CML) |
| IASIS Healthcare Holdings, Inc. | 24-90317 (CML) |
| IASIS Healthcare LLC | 24-90319 (CML) |
| IASIS Management Company | 24-90322 (CML) |
| IASIS Transco, Inc. | 24-90325 (CML) |
| Indigent Care Services of Northeast Louisiana, Inc. | 24-90247 (CML) |
| Jordan Valley Hospital Holdings, Inc. | 24-90252 (CML) |
| Jordan Valley Medical Center, LP | 24-90263 (CML) |
| Legacy Trails Medical Center LLC | 24-90269 (CML) |
| Mesa General Hospital, LP | 24-90277 (CML) |
| Morton Hospital, A Steward Family Hospital, Inc. | 24-90282 (CML) |
| Mountain Point Holdings, LLC | 24-90289 (CML) |
| Mountain Vista Medical Center, LP | 24-90297 (CML) |
| MT Transition LP | 24-90303 (CML) |
| Nashoba Valley Medical Center, A Steward Family Hospita, Inc. | 24-90313 (CML) |
| New England Sinai Hospital, A Steward Family Hospital, Inc. | 24-90329 (CML) |
| Odessa Fertility Lab, Inc. | 24-90334 (CML) |
| Odessa Regional Hospital, LP | 24-90348 (CML) |
| OnSite Care, Inc. | 24-90352 (CML) |
| OnSite Care MSO, LLC | 24-90358 (CML) |
| Permian Basin Clinical Services, Inc. | 24-90365 (CML) |
| Permian Premier Health Services, Inc. | 24-90371 (CML) |
| Physician Group of Arizona, Inc. | 24-90373 (CML) |
| Physician Group of Arkansas, Inc. | 24-90374 (CML) |
| Physician Group of Florida, Inc. | 24-90375 (CML) |
| Physician Group of Louisiana, Inc. | 24-90376 (CML) |
| Physician Group of Utah, Inc. | 24-90220 (CML) |
| Podiatric Physicians Management of Arizona, Inc. | 24-90226 (CML) |
| PP Transition, Inc. | 24-90228 (CML) |
| PP Transition LP | 24-90231 (CML) |
| Quincy Medical Center, A Steward Family Hospital, Inc. | 24-90235 (CML) |
| Riverwoods ASC Holdco LLC | 24-90241 (CML) |
| Salt Lake Regional Medical Center, LP | 24-90245 (CML) |
| Salt Lake Regional Physicians, Inc. | 24-90251 (CML) |
| Seaboard Development LLC | 24-90256 (CML) |
| Seaboard Development Port Arthur LLC | 24-90258 (CML) |
| SHC Youngstown Ohio Laboratory Services Company LLC | 24-90267 (CML) |
| SHC Youngstown Ohio Outpatient Services LLC | 24-90270 (CML) |
| SHC Youngstown Ohio PSC LLC | 24-90274 (CML) |
| Southridge Plaza Holdings, Inc. | 24-90275 (CML) |
| Southwest General Hospital, LP | 24-90280 (CML) |
| St. Luke's Behavioral Hospital, LP | 24-90284 (CML) |
| St. Luke's Medical Center, LP | 24-90294 (CML) |
| Steward Accountable Care Organization, Inc. | 24-90302 (CML) |
| Steward Anesthesiology Physicians of Florida, Inc. | 24-90307 (CML) |
| Steward Anesthesiology Physicians of Massachusetts, Inc. | 24-90310 (CML) |
| Steward Anesthesiology Physicians of Pennsylvania, Inc. | 24-90328 (CML) |
| Steward ASC Holdings LLC | 24-90332 (CML) |
| Steward Carney Hospital, Inc. | 24-90336 (CML) |
| Steward CGH, Inc. | 24-90339 (CML) |
| Steward Easton Hospital, Inc. | 24-90341 (CML) |
| Steward Emergency Physicians, Inc. | 24-90343 (CML) |
| Steward Emergency Physicians of Arizona, Inc. | 24-90346 (CML) |

| Name of Debtors | Case Numbers |
|---|---|
| Steward Emergency Physicians of Florida, Inc. | 24-90349 (CML) |
| Steward Emergency Physicians of Pennsylvania, Inc. | 24-90351 (CML) |
| Steward Emergency Physicians Ohio, Inc. | 24-90353 (CML) |
| Steward Employer Solutions LLC | 24-90355 (CML) |
| Steward Fall River Management Care Services LLC | 24-90356 (CML) |
| Steward Florida ALF LLC | 24-90359 (CML) |
| Steward Florida ASC LLC | 24-90361 (CML) |
| Steward Florida Holdings LLC | 24-90222 (CML) |
| Steward FMC, Inc. | 24-90233 (CML) |
| Steward Good Samaritan Medical Center, Inc. | 24-90240 (CML) |
| Steward Good Samaritan Occupational Health Services, Inc. | 24-90246 (CML) |
| Steward Good Samaritan Radiation Oncology Center, Inc. | 24-90255 (CML) |
| Steward Health Care International LLC | 24-90260 (CML) |
| Steward Health Care Network ACO Texas, Inc. | 24-90265 (CML) |
| Steward Health Care Network, Inc. | 24-90271 (CML) |
| Steward Health Care OZ Fund, Inc. | 24-90279 (CML) |
| Steward Health Choice, Inc. | 24-90286 (CML) |
| Steward Healthcare Management Services LLC | 24-90293 (CML) |
| Steward HH, Inc. | 24-90298 (CML) |
| Steward Hillside Rehabilitation Hospital, Inc. | 24-90304 (CML) |
| Steward Holy Family Hospital, Inc. | 24-90309 (CML) |
| Steward Hospital Holdings LLC | 24-90314 (CML) |
| Steward Hospital Holdings Subsidiary One, Inc. | 24-90320 (CML) |
| Steward Imaging & Radiology Holdings LLC | 24-90326 (CML) |
| Steward Medicaid Care Network, Inc. | 24-90331 (CML) |
| Steward Medical Group Express Care, Inc. | 24-90337 (CML) |
| Steward Medical Group, Inc. | 24-90362 (CML) |
| Steward Medical Group Pennsylvania Endoscopy LLC | 24-90354 (CML) |
| Steward Medical Holdings LLC | 24-90357 (CML) |
| Steward Medical Ventures, Inc. | 24-90360 (CML) |
| Steward Melbourne Hospital, Inc. | 24-90363 (CML) |
| Steward New England Initiatives, Inc. | 24-90364 (CML) |
| Steward Norwood Hospital, Inc. | 24-90366 (CML) |
| Steward NSMC, Inc. | 24-90367 (CML) |
| Steward Ohio Holdings LLC | 24-90368 (CML) |
| Steward Operations Holdings LLC | 24-90369 (CML) |
| Steward Pathology Physicians of Massachusetts, Inc. | 24-90370 (CML) |
| Steward Pennsylvania Holdings LLC | 24-90372 (CML) |
| Steward PET Imaging, LLC | 24-90221 (CML) |
| Steward PGH, Inc. | 24-90232 (CML) |
| Steward Physician Contracting, Inc. | 24-90238 (CML) |
| Steward Radiology Physicians of Arizona, Inc. | 24-90243 (CML) |
| Steward Radiology Physicians of Florida, Inc. | 24-90249 (CML) |
| Steward Radiology Physicians of Massachusetts, Inc. | 24-90254 (CML) |
| Steward Radiology Physicians of Pennsylvania, Inc. | 24-90259 (CML) |
| Steward Rockledge Hospital, Inc. | 24-90264 (CML) |
| Steward SA FSED Holdings, Inc. | 24-90268 (CML) |
| Steward Sebastian River Medical Center, Inc. | 24-90272 (CML) |
| Steward Sharon Regional Health System, Inc. | 24-90288 (CML) |
| Steward Special Projects LLC | 24-90292 (CML) |
| Steward St. Anne's Hospital Corporation | 24-90296 (CML) |
| Steward St. Elizabeth's Medical Center of Boston, Inc. | 24-90300 (CML) |
| Steward St. Elizabeth's Realty Corp. | 24-90305 (CML) |
| Steward Texas Hospital Holdings LLC | 24-90308 (CML) |
| Steward Trumbull Memorial Hospital, Inc. | 24-90312 (CML) |
| Steward TSC Investments LLC | 24-90316 (CML) |
| Steward Valley Regional Ventures, Inc. | 24-90321 (CML) |
| Steward West Ventures Co. | 24-90323 (CML) |
| Stewardship Health, Inc. | 24-90327 (CML) |
| Stewardship Health Medical Group, Inc. | 24-90330 (CML) |
| Stewardship Services Inc. | 24-90333 (CML) |
| The Medical Center of Southeast Texas, LP | 24-90335 (CML) |
| TNC Transition LP | 24-90338 (CML) |
| TRACO Investment Management LLC | 24-90342 (CML) |
| Utah Transcription Services, Inc. | 24-90345 (CML) |

## PLEASE TAKE NOTICE OF THE FOLLOWING:

1.     ***Conditional Approval of Disclosure Statement***.  On May 29, 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") held a hearing (the "**Conditional Disclosure Statement Hearing**") at which it conditionally approved the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Disclosure Statement**") of Steward Health Care System LLC and its affiliated debtors in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), and thereafter entered an order (the "**Disclosure Statement Order**") with respect thereto. The Disclosure Statement Order, among other things, authorizes the Debtors to solicit votes to accept the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Plan**").[2]

2.     ***Combined Hearing***.  A hearing to consider confirmation of the Plan and final approval of the Disclosure Statement (the "**Combined Hearing**") has been scheduled for **July 11, 2025 at 9:00 a.m. (Central Time)** before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, in the Bankruptcy Court.  The Combined Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by a Bankruptcy Court announcement providing for such adjournment or continuation on its agenda. The Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing.

3.     ***Voting Record Date***.  Holders of Claims in Class 3 (FILO Bridge Claims) Class 4 (General Unsecured Claims), and Class 5 (PBGC Claims) who are otherwise eligible to vote shall be entitled to vote to accept or reject the Plan as of **May 21, 2025** (the "**Voting Record Date**").

4.     ***Voting Deadline***.  If you received a Solicitation Package, including a Ballot, and intend to vote on the Plan, you must: (i) follow the instructions carefully; (ii) complete all of the required information on the Ballot; and (iii) execute and return your completed Ballot according to and as set forth in detail in the voting instructions on your Ballot so that it is actually received by the Debtors' solicitation and voting agent, Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**") on or before **July 2, 2025 at 5:00 p.m. (Central Time)** (the "**Voting Deadline**"). **ANY FAILURE TO FOLLOW THE VOTING INSTRUCTIONS INCLUDED WITH YOUR BALLOT MAY DISQUALIFY YOUR BALLOT AND YOUR VOTE.**

5.     ***Parties in Interest Not Entitled to Vote***.  Holders of Claims or Interests in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 6 (Intercompany Claims), Class 7 (Subordinated Securities Claims), Class 8 (Intercompany Interests), Class 9 (Non-Debtor Owned Subsidiary Interests), and Class 10 (Parent Interests) are not entitled to vote on the Plan and will not receive a Ballot.  If any creditor seeks to challenge the Allowed amount of its Claim for voting purposes, such creditor must file with the Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes in a different amount (a "**Rule 3018(a) Motion**"). Any Rule 3018(a) Motion must be filed with the Court not later than **June 25, 2025 at 5:00 p.m. (Central Time)**. Upon the filing of any such Rule 3018(a) Motion, such creditor's Ballot shall be counted in accordance with the guidelines provided in the Solicitation and Voting Procedures attached as **Exhibit 2** to the Disclosure Statement Order, unless temporarily Allowed in a different amount by an order of the Court entered prior to or concurrent with entry of an order confirming the Plan.

6.     ***Consent Program Opt-Out Deadline***.  If you received a Consent Program Opt-Out Form and intend to opt out of the Administrative Expense Claims Consent Program, you must:  (i) follow the instructions carefully; (ii) complete all of the required information on the Consent Program Opt-Out Form; and (iii) timely execute and return your completed Consent Program Opt-Out Form according to and as set forth in detail in the voting instructions on your Consent Program Opt-Out Form so that it is actually received by Kroll on or before **July 2, 2025 at 5:00 p.m. (Central Time)** (the "**Consent Program Opt-Out Deadline**").  To the extent a holder of an Allowed Administrative Claim does not timely, properly, and affirmatively, opt out of the Administrative Claims Consent Program, such holder shall be deemed to have agreed (i) to be bound by the terms of the Administrative Claims Consent Program, and (ii)

---

[2]     All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, attached as Exhibit A to the Disclosure Statement.

3

upon entry of the Confirmation Order, that such holder's acceptance of and consent to the Administrative Claims Consent Program will be deemed consent to the Plan and acceptance of the treatment under the Plan in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Administrative Claim (other than Professional Fee Claims and FILO DIP Claims) as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code. **ANY FAILURE TO FOLLOW THE VOTING INSTRUCTIONS INCLUDED WITH YOUR CONSENT PROGRAM OPT-OUT FORM MAY DISQUALIFY YOUR ELECTION.**

7.     ***Objections to Confirmation***.  The deadline to object or respond to confirmation of the Plan or final approval of the Disclosure Statement is **July 2, 2025 at 5:00 p.m. (Central Time)** (the "**Combined Objection Deadline**").  The *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* (Docket No. [●]) has been entered and the Confirmation Date does not alter the terms of such order.

8.     ***Form and Manner of Objections to Confirmation***.  Objections and responses, if any, to confirmation of the Plan or final approval of the Disclosure Statement, must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules, and any order of the Court; (iii) set forth the name of the objecting party and the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' estates or property; (iv) provide the basis for the objection and the specific grounds therefor, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed with the Bankruptcy Court (with proof of service) via ECF or by mailing to the Bankruptcy Court at United States Bankruptcy Court Clerk's Office, United States Courthouse, 515 Rusk Avenue, Courtroom 401, 4th Floor, Houston, Texas 77002, so as to be actually received no later than the Combined Objection Deadline.

9.     **IF AN OBJECTION TO CONFIRMATION OF THE PLAN OR FINAL APPROVAL OF THE DISCLOSURE STATEMENT IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THEN THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO CONFIRMATION OF THE PLAN OR FINAL APPROVAL OF THE DISCLOSURE STATEMENT OR THE ADEQUACY THEREOF AND MAY NOT BE HEARD AT THE COMBINED HEARING.**

10.     ***Additional Information***.  Any party in interest wishing to obtain information about the solicitation procedures or copies of the Disclosure Statement, the Plan, or other solicitation materials should contact Kroll by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line.  Interested parties may also review and download the Disclosure Statement and the Plan free of charge at https://restructuring.ra.kroll.com/Steward.  In addition, the Disclosure Statement and Plan are on file with the Bankruptcy Court and may be reviewed for a fee by accessing the Bankruptcy Court's website: https://www.txs.uscourts.gov/page.  Note that a PACER password and login are needed to access documents on the Bankruptcy Court's website.  A PACER password can be obtained at: https://pacer.uscourts.gov/.

11.     You may also access electronic copies of the Plan, Disclosure Statement, and any other solicitation materials via the QR Code below.  Please be advised that Kroll cannot provide legal advice.



**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED. UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS COMBINED HEARING NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### Notice of Assumption and Rejection of Executory
### <u>Contracts and Unexpired Leases of Debtors and Related Procedures</u>

1.      Article X of the Plan provides that, all executory contracts and unexpired leases to which any of the Debtors are a party shall be deemed rejected except for an executory contract or unexpired lease that: (i) is specifically and expressly designated as a contract or lease to be assumed pursuant to the Plan, including as set forth in the Schedule of Assumed Contracts or Confirmation Order; (ii) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate assumption or rejection motion filed by the Estate Representative on or before the Effective Date; (v) is the subject of a pending Cure Dispute; (vi) is a contract, lease, or other agreement or document entered into in connection with the Plan; or (vii) is a D&O Policy or other insurance policy to which any Debtor or Estate Representative is a beneficiary or an insured.  For the avoidance of doubt, the Estate Representative may seek to assume, assume and assign, or reject an executory contract or unexpired lease at any time prior to the Effective Date, whether or not such executory contract or unexpired leases is listed on the Schedule of Assumed Contracts.

2.      Pursuant to section 10.3 of the Plan, at least fourteen (14) days before the Combined Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to potentially be assumed or assumed and assigned to the Plan Trust, reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with the Plan and, where applicable, setting forth the proposed Cure Amount (if any).  Additionally, section 10.3 of the Plan provides that **any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i)  prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or its Estate, as applicable.  Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed

executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in Section Error! Reference source not found. of the Plan, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

3.       Section 10.3 of the Plan also provides that, if there is a Cure Dispute (as defined in the Plan) pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided* that the Estate Representative may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Court To the extent a Cure Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Cure Dispute; *provided* that the Debtors or the Plan Trustee reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to the extent such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtors and the Plan Trustee).  The Debtors or the Plan Trustee may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

4.       Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired leases.

5.       Section 10.4 of the Plan provides that unless an earlier date is otherwise provided for by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' executory contracts or unexpired leases pursuant to this Plan, must be filed with Bankruptcy Court and served on the Claims and Noticing Agent no later than twenty-one (21) days after the Effective Date.  Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, or (ii) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, the Plan Trust, the Plan Trustee, or the property for any of the foregoing without the need for any objection by the Plan Trustee or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims, except as otherwise provided by Final Order of the Bankruptcy Court.

## QUESTIONS:

If you have questions about this Combined Hearing Notice, please contact Kroll by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line, or (d) visiting https://restructuring.ra.kroll.com/Steward/.

Dated:  **[●]**, 2025
      Houston, Texas

  /s/  DRAFT

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
          Clifford.Carlson@weil.com
          Stephanie.Morrison@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Jeffrey.Saferstein@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:   DavidJ.Cohen@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:   Ray.Schrock@lw.com
          Candace.Arthur@lw.com

*Attorneys for Debtors*
*and Debtors in Possession*

**Exhibit 2**

**Form of Solicitation and Voting Procedures**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC, *et al.*,** | § |  |
|  | § | **(Jointly Administered)** |
| Debtors.[1] | § |  |
|  | § |  |

## SOLICITATION AND VOTING PROCEDURES

       **PLEASE TAKE NOTICE** that on May 6, 2024, Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") each filed a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On May 16, 2024, the U.S. Trustee appointed an official committee of unsecured creditors. No trustee or examiner has been appointed in these chapter 11 cases. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

       **PLEASE TAKE FURTHER NOTICE** that on [●], 2025, the Court entered the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* (Docket No. [●]) (the "**Disclosure Statement Order**"), which, among other things, (i) authorized the Debtors to solicit votes on the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and its Affiliated Debtors]* (Docket No. [●]) (the "**Plan**") and (ii) conditionally approved the *Disclosure Statement for Joint Plan of Liquidation of Steward Healthcare System LLC and Its Affiliated Debtors* (Docket No. [●]) (the "**Disclosure Statement**").[2]

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Voting Agent (as defined below) at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2]    Capitalized terms not otherwise defined herein have the same meaning as set forth in the Disclosure Statement Order, Plan, or Disclosure Statement, as applicable.

## A.    Parties Entitled to Vote.

Holders of Claims in Class 3 (FILO Bridge Claims), Class 4 (General Unsecured Claims), and Class 5 (PBGC Claims) are Impaired and entitled to receive distributions under the Plan and, thus, may vote to accept or reject the Plan, subject to certain exceptions discussed below (each, a "**Voting Class**," and collectively, the "**Voting Classes**").

A holder of a Claim in a Voting Class is nonetheless not entitled to vote to the extent that:

(a)    as of the Voting Record Date (as defined below), the outstanding amount of such creditor's Claim is zero ($0.00);

(b)    as of the Voting Record Date, such holders' Claim has been disallowed, expunged, disqualified or suspended;

(c)    such creditor has not timely filed a Proof of Claim in accordance with the *Order (I) Establishing Deadlines and Procedures for Filing Proofs of Claim; (II) Approving Form and Manner of Notice Thereof; and (III) Granting Related Relief* (Docket No. 1564) (the "**Bar Date Order**") as of the General Bar Date or the Government Bar Date, as applicable, and the Debtors have not scheduled such creditor's Claim or have scheduled such creditor's Claim in an undetermined amount or as contingent, unliquidated, or disputed or such creditor is not required to file a Proof of Claim pursuant to the Bar Date Order; *provided*, that to the extent that such creditor's deadline to file a Claim arising from any rejection of an Executory Contract or Unexpired Lease to which such creditor is party has not yet occurred, such creditor will be entitled to vote in the amount of $1.00 on account of such Claim; or

(d)    such creditor's Claim is subject to an objection, a request for estimation, or an adversary proceeding as of **June 18, 2025 at 5:00 p.m. (Central Time)**, subject to the procedures set forth below; *provided* that, any such holder shall receive a Ballot and may submit such Ballot on a provisional basis and may elect to opt out of the Third-Party Releases contained in the Plan. To the extent such holder does not file a Rule 3018 Motion in accordance with the instructions set forth below, the Ballot will not be counted for voting purposes; however, any opt-out election made by such holder on its Ballot with respect to the Third-Party Releases contained in the Plan shall be valid so long as such Ballot is submitted in accordance with the procedures set forth herein. To the extent such holder files a Rule 3018 Motion in accordance with the instructions set forth below, the extent to which such Ballot shall be counted for voting purposes will be determined by the Court or as otherwise agreed by the Debtors and the holder.

With respect to transfers of Claims required to be filed pursuant to Bankruptcy Rule 3001(e), the transferee shall be entitled to receive a Solicitation Package (as defined below) and,

if the holder of such Claim is otherwise entitled to vote with respect to the Plan, cast a Ballot (defined below) on account of such Claim only if: (i) all actions necessary to transfer such Claim are completed by the Voting Record Date; or (ii) the transferee files with the Court, by the Voting Record Date, (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer. In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote or election on the Plan made by the holder of such Claim as of the Voting Record Date.

Where any portion of a single Claim has been transferred to a transferee and notice of such transfer is required to be filed pursuant to Bankruptcy Rule 3001(e), all holders of any portion of such single Claim may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code, and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan. In the event that: (a) a Ballot; (b) a group of Ballots within a Voting Class received from a single creditor; or (c) a group of Ballots received from the various holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion.

## B.  Parties Not Entitled to Vote.

Holders of Claims in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) will: (i) receive full recovery of their Allowed Claims under the Plan; or (ii) otherwise receive treatment as to render such holder's Claim Unimpaired (collectively, the "**Unimpaired Classes**"). Pursuant to section 1126(f) of the Bankruptcy Code, the holders of such Claims in these Unimpaired Classes are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote on the Plan.

Holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) are either plan proponents or controlled by plan proponents (the "**Plan Proponent Classes**"). Therefore, they are conclusively presumed to accept the plan and will not be solicited.

Holders of Claims and Interests in Class 7 (Subordinated Securities Claims), Class 9 (Non-Debtor Owned Subsidiary Interests), and Class 10 (Parent Interests) are Impaired and such holders are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, accordingly, are not entitled to vote on the Plan (together with the Unimpaired Classes and the Plan Proponent Classes, the "**Non-Voting Classes**").

## C.  Voting Record Date.

The Court has established **May 21, 2025** as the record date for purposes of determining (i) which holders of Claims in the Voting Classes are entitled to vote on the Plan, and (ii) which holders of Claims and Interests are entitled to receive a Notice of Non-Voting Status (as defined below) (the "**Voting Record Date**").

**D.** **Establishing Claim Amounts for Voting Purposes.**

**FILO Bridge Claims (Class 3)**.  The amount of each FILO Bridge Claim, for voting purposes only, will be established by reference to the list of FILO Bridge Lenders to the Bridge Credit Agreement and those FILO Bridge Lenders' corresponding FILO Bridge Claim amounts as of the Voting Record Date, as reflected on the loan register maintained by the FILO Bridge Agent, which shall be provided by the FILO Bridge Agent to the Debtors and the Voting Agent no later than one (1) Business Day following the Voting Record Date.

**General Unsecured Claims (Class 4)**.  Except as otherwise provided herein and solely to the extent a holder is entitled to vote under these procedures, the amount of each General Unsecured Claim in Class 4, for voting purposes only, shall be established pursuant to the following hierarchy:

(a)  if a Claim has been estimated or otherwise Allowed for voting purposes by order of the Court, such Claim is temporarily Allowed in the amount so estimated or Allowed by this Court;

(b)  if (a) does not apply, but the Claim has been estimated or otherwise Allowed for voting purposes pursuant to a stipulation, settlement, or other agreement in writing reached between the applicable Debtor(s) and the holder of the Claim (whether such stipulation, settlement, or agreement is filed or not), such Claim is temporarily Allowed against such Debtor(s) in the amount set forth in the stipulation, settlement, or other agreement;

(c)  if neither (a) nor (b) applies, then in the liquidated, non-contingent, and undisputed amount set forth on a Proof of Claim timely filed in accordance with the Bar Date Order as of the Voting Record Date; *provided that*, if the amount set forth on a timely-submitted Proof of Claim is wholly unliquidated, contingent, and/or disputed (as determined on the face of the Claim or based on reasonable review by the Debtors and/or the Voting Agent), then the Claim shall be temporarily Allowed for voting purposes in the amount of $1.00;

(d)  if neither (a), (b), nor (c) applies, then in the liquidated, non-contingent, and undisputed amount set forth on the Debtors' Schedules; *provided that*, if the Claim appearing on the Debtors' Schedules is either contingent, unliquidated, and/or disputed, or in a $0.00 amount, then the Claim shall be disallowed for voting purposes, except to the extent that such creditor's deadline to file a Claim arising from any rejection of an Executory Contract or Unexpired Lease to which such creditor is party has not yet occurred; *provided*, that, to the extent such creditor's deadline to file a Claim has not yet occurred, such creditor will be entitled to vote in the amount of $1.00 on account of such Claim;

(e)  notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class may

be provided with only one Solicitation Package and one Ballot for voting on a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and

(f)     if a Proof of Claim has been amended by a later Proof of Claim that is filed on or prior to the Bar Date, the later filed amended Proof of Claim shall be entitled to vote in a manner consistent with these tabulation rules, and the earlier filed Proof of Claim shall be disallowed for voting purposes, regardless of whether the Debtors have objected to such amended claim. Except as otherwise ordered by the Court, any amendments to Proofs of Claim after the Bar Date shall not be considered for purposes of these tabulation rules.

**PBGC Claims (Class 5)**.  The amount of PBGC Claims, for voting purposes only, will be $8,750,000.

**General**.

If the Debtors have filed an objection to, a request for estimation of, or an adversary proceeding relating to a Claim, on or before **June 18, 2025 at 5:00 p.m. (Central Time)**, such Claim shall be temporarily disallowed for voting purposes, except as ordered by the Court before the Voting Deadline; *provided*, *however*, that, if the Debtors' objection seeks only to reclassify or reduce the Allowed amount of such Claim, then such Claim is temporarily Allowed for voting purposes in the reduced amount and/or as reclassified (as applicable), except as may be ordered by the Court before or concurrent with, entry of an order confirming the Plan; *provided*, *further*, that if the Debtors' objection seeks only to disallow a Proof of Claim purportedly filed on behalf of a class of claimants, then such Claim is temporarily Allowed for voting purposes only as to the individual that filed such Proof of Claim and not as to the class of claimants on behalf of which such Proof of Claim was filed.

If any holder seeks to challenge the Allowed amount of its Claim for voting purposes, such creditor must file with the Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes in a different amount (a "**Rule 3018(a) Motion**").  Any Rule 3018(a) Motion must be filed with the Court so as to be actually received not later than **June 25, 2025, at  5:00 p.m. (Central Time)**.

Upon the filing of any such Rule 3018(a) Motion, such holder's Provisional Ballot shall be counted in accordance with the above-designated guidelines, unless temporarily Allowed in a different amount by an order of the Court entered prior to or concurrent with entry of an order confirming the Plan.

For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims against one Debtor held by a single holder in a particular Class shall be aggregated as if such holder held one Claim in such Debtor in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan.

### E.    Form, Content, and Manner of Notices.

#### Voting Agent

The Debtors have retained Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**") as their claims, noticing, and solicitation agent pursuant to the *Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* (Docket No. 29).  Pursuant to the Disclosure Statement Order, Kroll is authorized to assist the Debtors in (i) distributing the Solicitation Packages and, as applicable, the Consent Program Materials, the Notice of Non-Voting Status, or the Release Opt-Out Forms (collectively referred to as the "**Election Packages**"), (ii) receiving, tabulating, and reporting on Consent Program Opt-Out Forms cast to opt out of the Administrative Expense Claims Consent Program by holders of Allowed Administrative Expense Claims, (iii) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims, (iv) receiving, tabulating, and reporting on Release Opt-Out Forms cast to opt out of the Third-Party Releases by Non-Voting Classes, (v) responding to inquiries from holders of Claims or Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the Administrative Expense Claims Consent Program by the Consent Program Materials, or the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, or the procedures and requirements to opt out of the Third-Party Releases by the Release Opt-Out Form or the Third-Party Release Opt-Out Election, (vi) soliciting votes on the Plan, and (vii) if necessary or appropriate, contacting creditors and equity holders regarding the Plan, the Ballots, the Solicitation Packages, the Election Packages, and all other related documents and matters related thereto.

#### The Solicitation Package

The following materials shall constitute the Solicitation Package:

(a)    the Disclosure Statement Order, as entered by the Court and without attachments;

(b)    the conditionally approved Disclosure Statement with all exhibits thereto, including the Plan;

(c)    the Combined Hearing Notice;

(d)    these Solicitation and Voting Procedures;

(e)    the applicable Ballot customized (where possible and appropriate) for such holder and conforming to Official Bankruptcy Form No. B 314, in the form described below;[3]

---

[3]    Official Bankruptcy Form No. B 314 can be found at http://www.uscourts.gov/forms/bankruptcy-forms, the official website for the United States Bankruptcy Courts.

(f)     for holders of Claims in Class 4, the letter from the Creditors' Committee to holders of unsecured claims setting forth, among other things, the Creditors' Committee's recommendation that holders of General Unsecured Claims vote to accept the Plan (the "**Creditors' Committee Position Letter**"); and

(g)     a postage-prepaid return envelope.

Holders of Claims or Interests in a Non-Voting Class (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) shall only receive the Combined Hearing Notice, the Notice of Non-Voting Status (as defined and described below), and the Release Opt-Out Form (as defined and described below).

### Distribution of the Solicitation Package

The Solicitation Package shall provide the Disclosure Statement, the Plan, and the Disclosure Statement Order in electronic format (on a QR code included in the Combined Hearing Notice) instead of printed hard copies. Only the Ballots and the Combined Hearing Notice will be provided in paper format. Moreover, the Plan and the Disclosure Statement will be available at no charge via the internet at the Online Portal. If service by QR code imposes a hardship for any party entitled to receive a copy of the Plan and the Disclosure Statement (*e.g.*, the party does not own or have access to a smartphone), such party may request a paper copy or a USB flash drive that includes copies of the Plan, Disclosure Statement, and Disclosure Statement Order (without attachments, except the Solicitation and Voting Procedures as annexed as <u>Exhibit 2</u> thereto) by contacting Kroll by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Upon receipt of such request, in a timely manner, the Debtors will provide such party with a paper copy, or USB flash drive containing, of the Plan and the Disclosure Statement at no cost to the party.

The Debtors shall mail to holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date the Solicitation Packages on or before the date that is three (3) Business Days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter (the "**Solicitation Mailing Deadline**"). The Debtors will also provide complete Solicitation Packages (excluding Ballots) to the U.S. Trustee and all parties in interest required to be notified under Bankruptcy Rule 2002 and Local Rule 2002-1.

The Debtors shall request that the FILO Bridge Agent post to its electronic datasite (i) a non-customized Solicitation Package (not including Ballots) and (ii) information to request customized Ballots from Kroll for FILO Bridge Lenders' as of the Voting Record Date as reflected on the loan register maintained by the FILO Bridge Agent. Such postings to the electronic datasite shall occur within five (5) calendar days of the mailing of the Solicitation Packages.

The Debtors are not required to mail Solicitation Packages to creditors or interest holders (i) who have Claims or Interests that have already been paid in full during the Chapter 11 Cases, (ii) whose prior mailings in these chapter 11 cases were returned as undeliverable and who have not provided a forwarding address by the Voting Record Date, (iii) who hold Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 6 (Intercompany Claims), Class 7 (Subordinated Securities Claims), Class 8 (Intercompany Interests) and Class 9 (Non-Debtor Owned Subsidiary Interests), and/or (iv) who are not otherwise entitled to vote to accept or reject the Plan in accordance with the terms and provisions of these Solicitation and Voting Procedures.

In the event that the United States Postal Service returns any mailings as undeliverable, the Debtors are excused from mailing Solicitation Packages or Notices of Non-Voting Status to addresses from which the Debtors received mailings returned as undeliverable. For purposes of serving the Solicitation Packages and Notices of Non-Voting Status, the Debtors may rely on the address information for the holders of Claims and Interests as compiled, updated, and maintained by the Voting Agent as of the Voting Record Date. The Debtors and the Voting Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitation Packages (including Ballots) and will not be required to resend Solicitation Packages or other materials, including Notices of Non-Voting Status, that are returned as undeliverable unless the Debtors are provided with accurate addresses for such parties prior to the Voting Record Date.

To avoid duplication and reduce expenses, the Debtors will use commercially reasonable efforts to ensure that each holder of a Claim receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against the Debtors.

### Forms of Ballots

Holders of Claims in the Voting Classes that are eligible to vote (as set forth herein) shall receive ballots substantially in the forms attached to the Disclosure Statement Order as **Exhibits 3-5** (the "**Ballots**"), as applicable.[4] All holders of Claims in the Voting Classes will receive a Ballot that includes an election to opt out of the third party releases in section 12.6(b) of the Plan (the "**Third-Party Releases**"). Holders of Claims in the Voting Classes that properly and timely elect to opt out of the Third-Party Releases will not be a Releasing Party or Released Party under the Plan.

### Notice of Non-Voting Status and Release Opt-Out Forms

Holders of Claims and Interests in the Non-Voting Classes in lieu of a Solicitation Package, will receive (i) the Combined Hearing Notice, (ii) a Notice of Non-Voting Status substantially in the form attached to the Disclosure Statement Order as **Exhibit 6** (the "**Notice of Non-Voting Status**"), and (iii) a Release Opt-Out Form (as defined below); *provided* that, the

---

[4] Kroll is required to retain all paper copies of Ballots and all solicitation-related correspondence for one (1) year following the Effective Date, whereupon Kroll is authorized to destroy and/or otherwise dispose of all paper copies of Ballots; printed solicitation materials including unused copies of the Solicitation Package; and all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Court in writing within such one (1) year period.

Debtors are not required to serve holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) copies of the Combined Hearing Notice, Notice of Non-Voting Status, Release Opt-Out Form, or any other type of notice in connection with solicitation of the Plan because such Claims and Interests are held by the Debtors or the Debtors' affiliates.

The Notice of Non-Voting Status provides (i) notice of the Court's conditional approval of the Disclosure Statement, (ii) notice of the filing of the Plan and Disclosure Statement, (iii) notice of the holders' non-voting status, and (iv) information about how to obtain copies of the Disclosure Statement and the Plan. In addition, the Notice of Non-Voting Status contains the full text of the release, exculpation, and injunction provisions set forth in Article XII of the Plan and advises such holders in Non-Voting Classes that they will be bound by the Third-Party Releases unless they timely, properly, and affirmatively opt out.

The Debtors shall cause to be mailed a release opt-out form, substantially in the form attached to the Disclosure Statement Order as **Exhibit 7** (the "**Release Opt-Out Form**"), to holders of Claims and Interests in the Non-Voting Classes. For holders of Claims in the Voting Classes, the opt out option shall be on such holder's Ballot.

A holder that properly, timely, and affirmatively elects on the Release Opt-Out Form to opt out of the Third-Party Releases will not be a Releasing Party or Released Party under the Plan. An encrypted opt-out data and audit trail will be created through the electronic submission process and become part of the record of any opt-out election submitted in this manner. Additionally, any holder's electronic signature will be deemed to be legally valid and effective immediately. For the avoidance of doubt, the Voting Agent's online portal at https://restructuring.ra.kroll.com/steward/(the "**Online Portal**") is the sole method for holders of Claims and Interests in the Non-Voting Classes to transmit the Release Opt-Out Form electronically. All Release Opt-Out Forms must be properly completed and returned so as to be **actually received** by the Voting Agent by **July 2, 2025 at 5:00 p.m. (Central Time)** (the "**Release Opt-Out Deadline**") either by (i) delivering the Release Opt-Out Form to the Voting Agent by first-class mail, hand delivery, or overnight courier or (ii) submitting the Release Opt-Out Form by electronic, online transmission through the Online Portal, each in accordance with the instructions included on the Release Opt-Out Form.

**F.      Voting Deadline.**

The Court has established **July 2, 2025 (Central Time)** as the deadline to submit votes to accept or reject the Plan (the "**Voting Deadline**"). The Debtors may extend the Voting Deadline, in their discretion (in consultation with the Creditors' Committee), without further order of the Court. To be counted as a vote to accept or reject the Plan, each Ballot must be properly executed, completed, and timely delivered to the Voting Agent: (i) by first-class mail in the return envelope provided with each Ballot; (ii) by overnight mail; (iii) by hand delivery, or (iv) via E-Ballot through the Online Portal, so that (in each instance) it is **actually received** by the Voting Agent no later than the Voting Deadline.

The Voting Agent is authorized to accept Ballots through the Online Portal. The encrypted Ballot data and audit trail created by such electronic submission will become part of the

record of any Ballot submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

Holders of Claims submitting their Ballots in hard copy to the Voting Agent shall mail or deliver them to the following address:

> Steward Health Care System LLC Ballot Processing
> c/o Kroll Restructuring Administration LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

In all instances, holders should consult their Ballot for specific instructions regarding submission of their votes and any elections. The manner of Ballot submission is at the election and risk of the holders of Claims in the Voting Classes who vote on the Plan. Regardless of the manner of submission, to be counted, Ballots must be **actually, timely, and properly received** by the Voting Agent by the Voting Deadline. The Debtors strongly recommend submitting electronic Ballots through the Online Portal.

## G.     Tabulation Procedures.

### General Rules

The following voting procedures and standard assumptions shall be used in tabulating the Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of the Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Local Rules:

(a)     Whenever a holder of Claims casts more than one Ballot voting the same Claims before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline shall be deemed to reflect such creditor's intent, and thus supersede any previously received Ballot. Following the Voting Deadline, no Ballot may be changed or revoked, absent further order of the Court or as directed by the Debtors.

(b)     Whenever a holder of Claims casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but does not indicate either an acceptance or rejection of the Plan, such Ballot will not be counted.

(c)     Whenever a holder of a Claim casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but indicates both an acceptance and a rejection of the Plan, the Ballot will not be counted.

(d)     A holder shall be deemed to have voted the full amount of its Claim in each Class and shall not be entitled to split its vote within a particular Class or between more than one Debtor. Any such holder's Ballot that partially

accepts and partially rejects the Plan, between the same or multiple Debtors, will not be counted.

(e)    A Person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims should indicate such capacity when signing, and if so requested by the Debtors or the Voting Agent, must submit proper evidence satisfactory to the Debtors of its authority to so act.

(f)    A holder of Claims against more than one Debtor that casts a single Ballot shall have its votes counted separately with respect to each such Debtor.

(g)    A holder of Claims in more than one Class must use separate Ballots for each Class of Claims.

(h)    The Debtors (in consultation with the Creditors' Committee), unless subject to contrary order of the Court, may waive any defects or irregularities as to any particular irregular Ballot at any time, either before or after the Voting Deadline.

(i)    The following Ballots shall not be counted:

    i.    any Ballot received after the Voting Deadline unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot or waived the late submission;

    ii.    any Ballot that is illegible or contains insufficient information to permit the identification of the voting party;

    iii.    any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

    iv.    any Ballot cast by a Person or Entity that is not entitled to vote, even if such individual or Entity holds a Claim in a Voting Class;

    v.    any unsigned Ballot, provided that E-Ballots submitted on the Online Portal will be deemed to contain a legal, valid signature;

    vi.    any Ballot containing a vote that the Court determines, after notice and a hearing, was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code; or

    vii.    any Ballot transmitted to the Voting Agent by e-mail, facsimile, or other means not specifically approved herein.

### Miscellaneous Rules

Each holder of Claims that votes to accept or reject the Plan is deemed to have voted the full amount of its Claim therefor.

The Voting Agent may, but is not required to, contact parties who submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies, provided that, neither the Debtors nor Voting Agent is required to contact such parties to provide notification of defects or irregularities with respect to completion or delivery of Ballots, nor will any of them incur any liability for failure to provide such notification. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors, in consultation with the Creditors' Committee, (or the Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived prior to the Voting Deadline) will be invalidated.

The Debtors and/or their Voting Agent, as applicable, in consultation with the Creditors' Committee, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots or Release Opt-Out Forms, which determination will be final and binding on all parties.

The Debtors are authorized to reject any and all Ballots submitted by any holders of Claims not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, in consultation with the Creditors' Committee, be unlawful.

The Debtors (in consultation with the Creditors' Committee) are further authorized to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any holders of Claims. The interpretation (including the Ballot and the respective instructions thereto) by the Debtors in accordance with the foregoing sentence will be final and binding on all parties.

The Debtors or their Voting Agent shall file the Voting Report on or before **July 9, 2025**.

### H.      Combined Hearing Notice.

Within three (3) Business Days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Notice Parties and holders of Claims and Interests in the Non-Voting Classes via e-mail or first-class mail a copy of the Combined Hearing Notice, which sets forth (i) the Voting Deadline, (ii) the Combined Objection Deadline and procedures for filing objections and responses to confirmation of the Plan, (iii) the time, date, and place for the Combined Hearing, and (iv) information about the Plan's release and injunction provisions in compliance with Bankruptcy Rule 2002(c)(3). The Debtors will separately serve holders of Claims in the Voting Classes with the Combined Hearing Notice as part of their Solicitation Packages.

The Debtors may, in their discretion, give supplemental publication notice of the Combined Hearing, no later than twenty-eight (28) days prior to the Combined Hearing, in one or more local or foreign newspapers, trade journals, or similar publications as the Debtors deem appropriate.

**The Debtors (in consultation with the Creditors' Committee) reserve the right and are authorized to make non-substantive or immaterial changes to the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Ballots, the Solicitation and Voting Procedures, the Combined Hearing Notice, the Release Opt-Out Form, and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages before their distribution.**

## Exhibit 3

**Form of Ballot for FILO Bridge  Claims (Class 3)**

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE DISCLOSURE STATEMENT AND OTHER MATERIALS ACCOMPANYING THIS BALLOT.[1]

PLEASE NOTE THAT, EVEN IF YOU INTEND TO VOTE TO REJECT THE PLAN, YOU MUST STILL READ, COMPLETE, AND EXECUTE THIS ENTIRE BALLOT.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| **STEWARD HEALTH CARE SYSTEM LLC,** *et al.*, | § | Case No. 24-90213 (CML) |
|  | § |  |
|  | § | (Jointly Administered) |
| Debtors.[2] | § |  |

BALLOT FOR VOTING TO ACCEPT OR REJECT
THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS
CLASS 3 (FILO BRIDGE CLAIMS)

IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE JULY 2, 2025 AT 5:00 P.M. (CENTRAL TIME) (THE "VOTING DEADLINE"), UNLESS EXTENDED BY THE DEBTORS IN CONSULTATION WITH THE CREDITORS' COMMITTEE.

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") are soliciting votes with respect to the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be modified, amended, or supplemented, the "**Plan**"). The Plan is attached as **Exhibit A** to the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and schedules thereto, and as may be modified, amended, or supplemented, the "**Disclosure Statement**").

---

[1]  All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to them in the Plan, attached as Exhibit A to the Disclosure Statement.

[2]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is: 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

You are receiving this ballot (the "**Ballot**") because records indicate that you are the holder (a "**Holder**") of a FILO Bridge Claim as of May 21**,** 2025 (the "**Voting Record Date**"). Your receipt of this Ballot does not indicate that your Claim(s) has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of, or distribution on account of, Class 3 FILO Bridge Claims.

The Disclosure Statement provides information to assist you in deciding whether to accept or reject the Plan. If you do not have the Disclosure Statement, you may obtain a copy from Kroll Restructuring Administration LLC (the "**Voting Agent**" or "**Kroll**") at no charge by accessing the Debtors' restructuring website at https://restructuring.ra.kroll.com/Steward/.

If you have any questions on how to properly complete this Ballot, please contact the Voting Agent by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Please be advised that the Voting Agent cannot provide legal advice. You may wish to seek legal advice concerning the Plan and the classification and treatment of your Class 3 FILO Bridge Claim under the Plan.

---

**IMPORTANT NOTICE REGARDING TREATMENT FOR FILO BRIDGE CLAIMS IN CLASS 3**

As described in more detail in the Disclosure Statement, if the Plan is confirmed and the Effective Date occurs, except to the extent released pursuant to the FILO Settlement Order, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO Bridge Claims, on the Litigation Trust Establishment Date, each such holder shall (i) receive their Pro Rata Share of the Class A-2 Litigation Trust Interests on account of their Allowed Remaining FILO Bridge Claim (unless previously received), and (ii) retain their Pro Rata Share of their Retained FILO Claims, which shall entitle such holders to their Pro Rata Share of the FILO Plan Trust Interests on the Plan Trust Establishment Date to the extent not repaid prior thereto.

**PLEASE READ THE DISCLOSURE STATEMENT AND PLAN FOR MORE DETAILS.**

---

The Plan can be confirmed by the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") and thereby made binding on you if it is accepted by the Holders of (i) at least two-thirds in amount of the Allowed Claims voted in each Impaired Class, and (ii) if the Impaired Class is a Class of Claims, more than one-half in number of the Allowed Claims voted in each Impaired Class, and if the Plan otherwise satisfies the applicable requirements of section 1129(a) under the Bankruptcy Code. If the requisite acceptances are not obtained, the Bankruptcy Court may nonetheless confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes rejecting the Plan, and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or if you vote to reject the Plan. To have your vote counted, you must complete, sign, and return this Ballot to the Voting Agent by the Voting Deadline. You must

provide all of the information requested by this Ballot. Failure to do so may result in the disqualification of your vote.

**NOTICE REGARDING CERTAIN RELEASE,
EXCULPATION, AND INJUNCTION PROVISIONS IN PLAN**

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan. Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:**

**SECTION 12.5     PLAN INJUNCTION.**

**(a)     Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under Section 1.1(a) or Section 1.1(b) of the Plan, or (ii) subject to exculpation pursuant to Section Error! Reference source not found. of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section Error! Reference source not found. of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:  (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;  (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;  (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action;  (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors**

or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to Section 1.1(a) or Section 1.1(b) of the Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b)     Subject in all respects to Section Error! Reference source not found. of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in Section Error! Reference source not found. of the Plan, shall have

jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)     By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in **Section** Error! Reference source not found. **of** the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

(d)     The injunctions in **Section** Error! Reference source not found. **of** the Plan shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

**SECTION 12.6          RELEASES.**

(a)     **Releases by the Debtors and their Estates.** Except as otherwise expressly set forth below in **Section** Error! Reference source not found. **of** the Plan, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the

negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable.  Notwithstanding anything to the contrary in the foregoing, the releases contained in <u>Section 1.1(a)</u> of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with <u>Section</u> Error! Reference source not found. of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party.  Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on <u>Exhibit B</u> of the Plan or the Schedule of Identified Non-Released Parties.

(b)     **Third-Party Releases.  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action**

asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in <u>Section 1.1(b)</u> of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by or against the FILO Parties arising from a material misrepresentation, or (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)     Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing,

discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

## SECTION 12.7        EXCULPATION.

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in <u>Section Error! Reference source not found.</u> of the Plan shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

## SECTION 12.15       RELEASE OF LIENS

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date,

all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Plan Trust.

### SECTION 5.12 Cancellation of Existing Securities, Agreements, and Liens.

(a)     Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)     On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)     After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)     Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### Relevant Definitions Related to Release and Exculpation Provisions:

***Exculpated Parties*** means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

**Related Parties** means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in the Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

**Releasing Parties** means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

**Individual Released Parties** means the individuals listed on **Exhibit A** of the Plan, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

**Debtor Related Parties** means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's (a) attorneys, accountants, investment bankers, consultants, professional advisors, and independent auditors, (b) employed and affiliated physicians and other medical personnel (solely with respect to Medical Liability Claims asserted against such individuals and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), and (c) Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee) and Chief Restructuring Officer, as applicable, in each case of the immediately preceding clauses (a) – (c), solely in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i),

such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

***Identified Non-Released Parties*** means (i) the Persons and Entities listed on **Exhibit B** of the Plan, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

***Schedule of Identified Non-Released Parties*** means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

> **PLEASE COMPLETE ITEMS 1, 2, 3, AND 4. IF THIS BALLOT HAS NOT BEEN PROPERLY SIGNED IN THE SPACE PROVIDED, YOUR VOTE MAY NOT BE VALID OR COUNTED AS HAVING BEEN CAST.**

**Item 1.** **Amount of Claim**. The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder (or authorized signatory of such a Holder) of a FILO Bridge Claim in the aggregate unpaid principal amount under the Bridge Credit Agreement set forth below.

> $ _____

**Item 2.** **Votes on the Plan**. Please vote either to accept or to reject the Plan with respect to your Claims below. Any Ballot not marked either to accept or reject the Plan, or marked both to accept and reject the Plan, shall not be counted in determining acceptance or rejection of the Plan.

> **Prior to voting on the Plan, please note the following:**
>
> **If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan. Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:**
>
> **The Disclosure Statement and the Plan must be referenced for a complete description of the release, injunction, and exculpation provisions.**

The undersigned Holder of a Class 3 FILO Bridge Claim votes to (check <u>one</u> box):

☐ **Accept** the Plan ☐ **Reject** the Plan.

**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

**Item 3.** **Optional Opt-Out Release Election**. Check the box below if you elect not to grant the releases contained in Section 12.6(b) of the Plan. Election to withhold consent is at your option. If you submit an accepting or a rejecting Ballot, or if you submit a Ballot in which you abstain from voting, and in each case, you do not check the box below, you will be deemed to consent to

the releases contained in Section 12.6(b) of the Plan to the fullest extent permitted by applicable law. The Holder of the Class 3 FILO Bridge Claim set forth in <u>Item 1</u> elects to:

☐ **OPT OUT** of the releases contained only in Section 12.6(b) of the Plan.

**Item 4.** **Acknowledgements**. By signing this Ballot, the Holder (or authorized signatory of such Holder) acknowledges review and receipt of the Plan, the Disclosure Statement, and the other applicable solicitation materials, and certifies that (i) it has the power and authority to vote to accept or reject the Plan, (ii) it was the Holder (or is entitled to vote on behalf of such Holder) of the FILO Bridge Claims described in <u>Item 1</u> as of the Voting Record Date, and (iii) all authority conferred, or agreed to be conferred, pursuant to this Ballot, and every obligation of the undersigned hereunder, shall be binding on the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy, and legal representatives of the undersigned, and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

Name of Holder: _____

*(print or type)*

Signature: _____

Name of Signatory: _____

*(if other than Holder, include name and title)*

Title: _____

Address: _____

_____

_____

_____

E-mail Address: _____

Date Completed: _____

## VOTING INFORMATION AND INSTRUCTIONS FOR COMPLETING THE BALLOT

1.  Ballots received after the Voting Deadline (if the Voting Deadline has not been extended) may not, at the Debtors' discretion, be counted.  **The Voting Agent will tabulate all properly completed, valid Ballots received on or before the Voting Deadline.**

2.  Complete the Ballot by providing all the information requested, signing, dating, and returning the Ballot to the Voting Agent.  Any Ballot that is illegible, contains insufficient information to identify the Holder, or is unsigned[3] will not be counted.  Ballots may not be submitted to the Voting Agent by facsimile or electronic mail.  If neither the "**accept**" nor "**reject**" box is checked in Item 2, both boxes are checked in Item 2, or the Ballot is otherwise not properly completed, executed, or timely returned, then the Ballot shall not be counted in determining acceptance or rejection of the Plan.

3.  You must vote all your Claims within a single Class under the Plan either to accept or reject the Plan. Accordingly, if you return more than one Ballot voting different or inconsistent Claims within a single Class under the Plan, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan likewise will not be counted.

4.  The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of Claims.

5.  The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.

6.  If you cast more than one Ballot voting the same Claims prior to the Voting Deadline, the latest received, valid Ballot submitted to the Voting Agent will supersede any prior Ballot.

7.  If (i) the Debtors revoke or withdraw the Plan, or (ii) the Confirmation Order is not entered or consummation of the Plan does not occur, this Ballot shall automatically be null and void and deemed withdrawn without any requirement of affirmative action by or notice to you.

8.  There may be changes made to the Plan that do not cause material adverse effects on an accepting Class.  If such non-material changes are made to the Plan, the Debtors will not resolicit votes for acceptance or rejection of the Plan.

9.  NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT, ANY SUPPLEMENTAL INFORMATION PROVIDED BY THE DEBTORS, OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT.

---

3   E-Ballots submitted on the Online Portal will be deemed to contain a legal, valid signature.

10.     PLEASE RETURN YOUR BALLOT PROMPTLY.

11.     IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR
        BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR
        THE VOTING PROCEDURES, PLEASE CONTACT THE VOTING AGENT BY
        (I) CALLING (646) 893-5546 (INTERNATIONAL, TOLL) OR (888) 505-1257
        (U.S./CANADA, TOLL FREE); (II) WRITING TO STEWARD HEALTH CARE
        SYSTEM LLC BALLOT PROCESSING, C/O KROLL RESTRUCTURING
        ADMINISTRATION LLC, 850 3RD AVENUE, SUITE 412, BROOKLYN, NY 11232
        (IF BY FIRST CLASS MAIL, HAND DELIVERY OR OVERNIGHT MAIL); OR
        (III) EMAILING STEWARDINFO@RA.KROLL.COM WITH "STEWARD HEALTH
        SOLICITATION INQUIRY" IN THE SUBJECT LINE. PLEASE DO NOT DIRECT
        ANY INQUIRIES TO THE BANKRUPTCY COURT.

12.     THE VOTING AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE
        LEGAL ADVICE.

**PLEASE SUBMIT YOUR BALLOT BY ONLY <u>ONE</u> OF THE FOLLOWING METHODS:**

---

**By electronic, online submission:**

To submit your Ballot via the Voting Agent's online portal (the "**Online Portal**"), visit
https://restructuring.ra.kroll.com/steward/. Click on the "Submit E-Ballot" section of the website
and follow the instructions to submit your Ballot.

Ballots submitted by facsimile, email, or other means of electronic transmission will not be
counted. If voting online, to have your vote counted, you must electronically complete, sign, and
submit the electronic Ballot by utilizing the Online Portal.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your
customized electronic Ballot:**

**Unique E-Ballot ID#:**

_____

The Online Portal is the sole manner in which Ballots will be accepted via electronic or online
transmission. Ballots submitted by facsimile, email, or other means of electronic transmission
will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your
electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you
receive, as applicable.

**Holders are strongly encouraged to submit their ballots via the Online Portal.   Holders
who cast a Ballot using the Voting Agent's Online Portal should NOT also submit a paper
Ballot.**

---

> **By First Class Mail, Hand Delivery, or Overnight Mail to:**
>
> **Steward Health Care System LLC Ballot Processing**
> **c/o Kroll Restructuring Administration LLC**
> **850 3rd Avenue, Suite 412**
> **Brooklyn, NY 11232**
>
> To arrange hand delivery of your Ballot, please email the Voting Agent at
> StewardBallots@ra.kroll.com (with "Steward Release Ballot Delivery" in the subject line) at
> least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date
> and time of delivery.

**ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS SO THAT THE BALLOTS ARE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS JULY 2, 2025 AT 5:00 P.M. (CENTRAL TIME).**

## <u>Exhibit 4</u>

**Form of Ballot for General Unsecured  Claims (Class 4)**

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE DISCLOSURE STATEMENT, THE CREDITORS' COMMITTEE POSITION LETTER AND OTHER MATERIALS ACCOMPANYING THIS BALLOT.[1]**

**PLEASE NOTE THAT, EVEN IF YOU INTEND TO VOTE TO REJECT THE PLAN, YOU MUST STILL READ, COMPLETE, AND PROPERLY EXECUTE THIS ENTIRE BALLOT.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[2] | § | |

**BALLOT FOR VOTING TO ACCEPT OR REJECT
THE JOINT CHAPTER 11 PLAN OF LIQUIDATION
STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS
CLASS 4 (GENERAL UNSECURED CLAIMS)**

> **IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS BALLOT MUST BE PROPERLY COMPLETED, FULLY EXECUTED, AND TIMELY RETURNED SO THAT IT IS <u>ACTUALLY RECEIVED</u> BY THE VOTING AGENT ON OR BEFORE JULY 2, 2025 AT 5:00 P.M. (CENTRAL TIME) (THE "<u>VOTING DEADLINE</u>"), UNLESS EXTENDED BY THE DEBTORS IN CONSULTATION WITH THE CREDITORS' COMMITTEE.**

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") are soliciting votes with respect to the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be modified, amended, or supplemented, the "**Plan**"). The Plan is attached as **<u>Exhibit A</u>** to the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and

---

[1]  All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to them in the Plan, attached as <u>Exhibit A</u> to the Disclosure Statement.

[2]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Voting Agent (as defined below) at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is: 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

schedules thereto, and as may be modified, amended, or supplemented, the "**Disclosure Statement**").

You are receiving this ballot (the "**Ballot**") because records indicate that you are the holder (a "**Holder**") of a General Unsecured Claim as of May 21**, **2025 (the "**Voting Record Date**"). Your receipt of this Ballot does not indicate that your Claim(s) has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of, or distribution on account of, Class 4 General Unsecured Claims.

The Disclosure Statement provides information to assist you in deciding whether to accept or reject the Plan. If you do not have the Disclosure Statement, you may obtain a copy from Kroll Restructuring Administration LLC (the "**Voting Agent**" or "**Kroll**") at no charge by accessing the Debtors' restructuring website at https://restructuring.ra.kroll.com/Steward/.

> **If you hold a Medical Liability Claim against the Debtors and do not elect to opt-out of the third-party releases contained in Section 12.6(b) of the Plan by timely and properly completing <u>Item 3</u> of this Ballot, then you are electing to release claims against the "Released Parties," including any claims against the Debtors' employed physicians and affiliated physicians related to Medical Liability**

If you have any questions on how to properly complete this Ballot, please contact the Voting Agent by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free); (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail); or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Please be advised that the Voting Agent cannot provide legal advice. You may wish to seek legal advice concerning the Plan and the classification and treatment of your Class 4 General Unsecured Claim under the Plan.

> **IMPORTANT NOTICE REGARDING TREATMENT FOR GENERAL UNSECURED CLAIMS IN CLASS 4**
>
> As described in more detail in the Disclosure Statement, if the Plan is confirmed and the Effective Date occurs, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed General Unsecured Claim, on or prior to the Effective Date, each such holder shall receive its Pro Rata Share of the GUC Plan Trust Interests.
>
> **PLEASE READ THE DISCLOSURE STATEMENT AND PLAN FOR MORE DETAILS.**

The Plan can be confirmed by the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") and thereby made binding on you if it is accepted by the Holders of (i) at least two-thirds in amount of the Allowed Claims voted in each Impaired Class, and (ii) if the Impaired Class is a Class of Claims, more than one-half in number of the Allowed Claims voted in each Impaired Class, and if the Plan otherwise satisfies the applicable requirements of section 1129(a) under the Bankruptcy Code. If the requisite acceptances are not

obtained, the Bankruptcy Court may nonetheless confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes rejecting the Plan, and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or if you vote to reject the Plan. To have your vote counted, you must properly complete, sign, and timely return this Ballot to the Voting Agent by the Voting Deadline. You must provide all of the information requested by this Ballot. Failure to do so may result in the disqualification of your vote.

### NOTICE REGARDING CERTAIN RELEASE, <u>EXCULPATION, AND INJUNCTION PROVISIONS IN PLAN</u>

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, <u>you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan.</u> Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:**

**SECTION 12.5          <u>PLAN INJUNCTION</u>.**

(a)          **Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under <u>Section 1.1(a)</u> or <u>Section 1.1(b)</u> of the Plan, or (ii) subject to exculpation pursuant to <u>Section</u> Error! Reference source not found. of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to <u>Section</u> Error! Reference source not found. of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action: (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or**

against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to <u>Section 1.1(a)</u> or <u>Section 1.1(b)</u> of the Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b)     Subject in all respects to <u>Section</u> Error! Reference source not found. of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released

under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in Section Error! Reference source not found. of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)     By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section Error! Reference source not found. of the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

(d)     The injunctions in Section Error! Reference source not found. of the Plan shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

**SECTION 12.6     RELEASES.**

(a)     **Releases by the Debtors and their Estates.** Except as otherwise expressly set forth below in Section Error! Reference source not found. of the Plan, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or

before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in <u>Section 1.1(a)</u> of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with <u>Section</u> Error! Reference source not found. of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified

as a Identified Non-Released Party on <u>Exhibit B</u> of the Plan or the Schedule of Identified Non-Released Parties.

(b) **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in <u>Section 1.1(b)</u> of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by or against the FILO Parties arising from a material misrepresentation, or (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of

Action against any Identified Non-Released Party. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)  Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

## SECTION 12.7     EXCULPATION.

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in Section Error! Reference source not found. of the Plan shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any

post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

## SECTION 12.15      RELEASE OF LIENS

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Plan Trust.

## SECTION 5.12 Cancellation of Existing Securities, Agreements, and Liens.

(a)      Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)      On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)      After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)      Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

**Relevant Definitions Related to Release and Exculpation Provisions**:

*Exculpated Parties* means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

*Related Parties* means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

*Released Parties* means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in the Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

*Releasing Parties* means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

*Individual Released Parties* means the individuals listed on **Exhibit A** of the Plan, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

*Debtor Related Parties* means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's (a) attorneys, accountants, investment bankers, consultants, professional

advisors, and independent auditors, (b) employed and affiliated physicians and other medical personnel (solely with respect to Medical Liability Claims asserted against such individuals and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), and (c) Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee) and Chief Restructuring Officer, as applicable, in each case of the immediately preceding clauses (a) – (c), solely in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

**Identified Non-Released Parties** means (i) the Persons and Entities listed on **Exhibit B** of the Plan, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

**Schedule of Identified Non-Released Parties** means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

---

**PLEASE COMPLETE ITEMS 1, 2, 3, AND 4.  IF THIS BALLOT HAS NOT BEEN PROPERLY SIGNED IN THE SPACE PROVIDED, YOUR VOTE MAY NOT BE VALID OR COUNTED AS HAVING BEEN CAST.**

---

**Item 1.        Amount of Claim**.  The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder (or authorized signatory of such a Holder) of a General Unsecured Claim in the aggregate unpaid amount set forth below.

> $ _____

> **Debtor:** _____

**Item 2.        Votes on the Plan**.  Please vote either to accept or to reject the Plan with respect to your Claims below.  Any Ballot not marked either to accept or reject the Plan, or marked both to accept and reject the Plan, shall not be counted in determining acceptance or rejection of the Plan.

---

**Prior to voting on the Plan, please note the following:**

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan.  Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:**

**The Disclosure Statement and the Plan must be referenced for a complete description of the release, injunction, and exculpation provisions.**

---

The undersigned Holder of a Class 4 General Unsecured Claim votes to (check <u>one</u> box):

☐ **Accept** the Plan          ☐ **Reject** the Plan.

**Item 3.        Third-Party Release Opt-Out Election.**  Check the box below if you elect not to grant the Third-Party Releases contained in Section 12.6(b) of the Plan.  Election to withhold consent is at your option and must be affirmatively exercised.  If you submit an accepting or a rejecting Ballot, or if you submit a Ballot in which you abstain from voting, and in each case, you do not check the box below, you will be deemed to consent to, and grant, the Third-Party Releases

contained in Section 12.6(b) of the Plan to the fullest extent permitted by applicable law. **If you hold a Medical Liability Claim against the Debtors and do not elect to opt-out of the releases contained in Section 12.6(b) of the Plan, then you are electing to release claims against the Debtors' employed physicians and affiliated physicians related to Medical Liability Claims.**

The Holder of the Class 4 General Unsecured Claim set forth in Item 1 elects to:

☐ **OPT OUT** of the Third-Party Releases contained only in Section 12.6(b) of the Plan.

**Item 4.** **Acknowledgements**. By signing this Ballot, the Holder (or authorized signatory of such Holder) acknowledges review and receipt of the Plan, the Disclosure Statement, and the other applicable solicitation materials, and certifies that (i) it has the power and authority to vote to accept or reject the Plan, (ii) it was the Holder (or is entitled to vote on behalf of such Holder) of the General Unsecured Claims described in <u>Item 1</u> as of the Voting Record Date, and (iii) all authority conferred, or agreed to be conferred, pursuant to this Ballot, and every obligation of the undersigned hereunder, shall be binding on the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy, and legal representatives of the undersigned, and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

Name of Holder: _____
                *(print or type)*

Signature: _____

Name of Signatory: _____
                *(if other than Holder, include name and title)*

Title: _____

Address: _____

_____

_____

_____

E-mail Address: _____

Date Completed: _____

## VOTING INFORMATION AND INSTRUCTIONS FOR COMPLETING THE BALLOT

1.      Ballots received after the Voting Deadline (if the Voting Deadline has not been extended) may not, at the Debtors' discretion, be counted.  **The Voting Agent will tabulate all properly completed, valid Ballots received on or before the Voting Deadline.**

2.      Complete the Ballot by providing all the information requested, signing, dating, and returning the Ballot to the Voting Agent.  Any Ballot that is illegible, contains insufficient information to identify the Holder, or is unsigned[3] will not be counted.  Ballots may not be submitted to the Voting Agent by facsimile or electronic mail.  If neither the "**accept**" nor "**reject**" box is checked in Item 2, or both boxes are checked in Item 2, or the Ballot is otherwise not properly completed, executed, or timely returned, then the Ballot shall not be counted in determining acceptance or rejection of the Plan.

3.      You must vote all your Claims within a single Class under the Plan either to accept or reject the Plan.  Accordingly, if you return more than one Ballot voting different or inconsistent Claims within a single Class under the Plan, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan likewise will not be counted.

4.      The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of Claims.

5.      The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.

6.      If you cast more than one Ballot voting the same Claims prior to the Voting Deadline, the latest received, valid Ballot submitted to the Voting Agent will supersede any prior Ballot.

7.      If (i) the Debtors revoke or withdraw the Plan, or (ii) the Confirmation Order is not entered or consummation of the Plan does not occur, this Ballot shall automatically be null and void and deemed withdrawn without any requirement of affirmative action by or notice to you.

8.      There may be changes made to the Plan that do not cause material adverse effects on an accepting Class.  If such non-material changes are made to the Plan, the Debtors will not resolicit votes for acceptance or rejection of the Plan.

9.      NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT, ANY SUPPLEMENTAL INFORMATION PROVIDED BY THE DEBTORS, THE

---

[3]     Ballots submitted on the Online Portal ("**E-Ballots**") will be deemed to contain a legal, valid signature.

CREDITORS' COMMITTEE POSITION LETTER, OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT.

10.    PLEASE PROPERLY COMPLETE AND PROMPTLY RETURN YOUR BALLOT TO THE VOTING AGENT.

11.    IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE VOTING AGENT BY (I) CALLING (646) 893-5546 (INTERNATIONAL, TOLL) OR (888) 505-1257 (U.S./CANADA, TOLL FREE); (II) WRITING TO STEWARD HEALTH CARE SYSTEM LLC BALLOT PROCESSING, C/O KROLL RESTRUCTURING ADMINISTRATION LLC, 850 3RD AVENUE, SUITE 412, BROOKLYN, NY 11232 (IF BY FIRST CLASS MAIL, HAND DELIVERY OR OVERNIGHT MAIL); OR (III) EMAILING STEWARDINFO@RA.KROLL.COM WITH "STEWARD HEALTH SOLICITATION INQUIRY" IN THE SUBJECT LINE.  PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT.

12.    THE VOTING AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

**PLEASE SUBMIT YOUR BALLOT BY ONLY <u>ONE</u> OF THE FOLLOWING METHODS**

---

**By electronic, online submission:**

To submit your Ballot via the Voting Agent's online portal (the "**Online Portal**"), visit https://restructuring.ra.kroll.com/steward/. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.

Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted. If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the Online Portal.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:**

_____

The Online Portal is the sole manner in which E-Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

---

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

**Holders are strongly encouraged to submit their ballots via the Online Portal. Holders who cast a Ballot using the Voting Agent's Online Portal should NOT also submit a paper Ballot.**

**By First Class Mail, Hand Delivery, or Overnight Mail to:**

**Steward Health Care System LLC Ballot Processing**
**c/o Kroll Restructuring Administration LLC**
**850 3rd Avenue, Suite 412**
**Brooklyn, NY 11232**

To arrange hand delivery of your Ballot, please email the Voting Agent at StewardBallots@ra.kroll.com (with "Steward Release Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

**ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS SO THAT THE BALLOTS ARE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS JULY 2, 2025 AT 5:00 P.M. (CENTRAL TIME).**

**Exhibit 5**

**Form of Ballot for PBGC  Claims (Class 5)**

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE DISCLOSURE STATEMENT AND OTHER MATERIALS ACCOMPANYING THIS BALLOT.[1]**

**PLEASE NOTE THAT, EVEN IF YOU INTEND TO VOTE TO REJECT THE PLAN, YOU MUST STILL READ, COMPLETE, AND EXECUTE THIS ENTIRE BALLOT.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[2] | § | |

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF**
**STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS**
**CLASS 5 (PBGC CLAIMS)**

---

**IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE JULY 2, 2025 AT 5:00 P.M. (CENTRAL TIME) (THE "VOTING DEADLINE"), UNLESS EXTENDED BY THE DEBTORS WITH IN CONSULTATION WITH THE CREDITORS' COMMITTEE.**

---

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") are soliciting votes with respect to the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be modified, amended, or supplemented, the "**Plan**"). The Plan is attached as **Exhibit A** to the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and schedules thereto, and as may be modified, amended, or supplemented, the "**Disclosure Statement**").

---

[1]  All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to them in the Plan, attached as Exhibit A to the Disclosure Statement.

[2]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Voting Agent (as defined below) at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is: 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

You are receiving this ballot (the "**Ballot**") because records indicate that you are the holder (a "**Holder**") of a PBGC Claim as of May 21**,** 2025 (the "**Voting Record Date**"). Your receipt of this Ballot does not indicate that your Claim(s) has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of, or distribution on account of, Class 5 PBGC Claims.

The Disclosure Statement provides information to assist you in deciding whether to accept or reject the Plan. If you do not have the Disclosure Statement, you may obtain a copy from Kroll Restructuring Administration LLC (the "**Voting Agent**" or "**Kroll**") at no charge by accessing the Debtors' restructuring website at https://restructuring.ra.kroll.com/Steward/.

If you have any questions on how to properly complete this Ballot, please contact the Voting Agent by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Please be advised that the Voting Agent cannot provide legal advice. You may wish to seek legal advice concerning the Plan and the classification and treatment of your Class 5 PBGC Claim under the Plan.

---

**IMPORTANT NOTICE REGARDING TREATMENT FOR PBGC CLAIMS IN CLASS 5**

As described in more detail in the Disclosure Statement, if the Plan is confirmed and the Effective Date occurs, in accordance with the PBGC Settlement, in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Claims, on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests. For the avoidance of doubt, the PBGC Claims shall be the only Claims on which the PBGC shall be entitled to any Distribution in connection with the Debtors or this Plan.

**PLEASE READ THE DISCLOSURE STATEMENT AND PLAN FOR MORE DETAILS.**

---

The Plan can be confirmed by the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") and thereby made binding on you if it is accepted by the Holders of (i) at least two-thirds in amount of the Allowed Claims voted in each Impaired Class, and (ii) if the Impaired Class is a Class of Claims, more than one-half in number of the Allowed Claims voted in each Impaired Class, and if the Plan otherwise satisfies the applicable requirements of section 1129(a) under the Bankruptcy Code. If the requisite acceptances are not obtained, the Bankruptcy Court may nonetheless confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes rejecting the Plan, and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or if you vote to reject the Plan. To have your vote counted, you must complete, sign, and return this Ballot to the Voting Agent by the Voting Deadline. You must provide all of the information requested by this Ballot. Failure to do so may result in the disqualification of your vote.

## NOTICE REGARDING CERTAIN RELEASE,
## EXCULPATION, AND INJUNCTION PROVISIONS IN PLAN

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, <u>you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan.</u> Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:**

**SECTION 12.5      <u>PLAN INJUNCTION</u>.**

**(a)      Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under <u>Section 1.1(a)</u> or <u>Section 1.1(b)</u> of the Plan, or (ii) subject to exculpation pursuant to <u>Section</u> Error! Reference source not found. of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to <u>Section</u> Error! Reference source not found. of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:  (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan**

and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to **Section 1.1(a)** or **Section 1.1(b)** of the Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b) Subject in all respects to **Section Error! Reference source not found.** of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in **Section Error! Reference source not found.** of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.  For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)     **By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section Error! Reference source not found. of the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.**

(d)     **The injunctions in Section Error! Reference source not found. of the Plan shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.**

**SECTION 12.6      RELEASES.**

(a)     **Releases by the Debtors and their Estates.   Except as otherwise expressly set forth below in Section Error! Reference source not found. of the Plan, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates) whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the**

Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in <u>Section 1.1(a)</u> of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with <u>Section</u> Error! Reference source not found. of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on <u>Exhibit B</u> of the Plan or the Schedule of Identified Non-Released Parties.

(b)     **Third-Party Releases. Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise**

based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in Section 1.1(b) of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by or against the FILO Parties arising from a material misrepresentation, or (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)     Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties

or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

**SECTION 12.7      EXCULPATION.**

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in <u>Section</u> Error! Reference source not found. of the Plan shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**SECTION 12.15      RELEASE OF LIENS**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Plan Trust.

## SECTION 5.12 Cancellation of Existing Securities, Agreements, and Liens.

(a)     Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)     On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)     After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)     Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

## Relevant Definitions Related to Release and Exculpation Provisions:

*Exculpated Parties* means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

*Related Parties* means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed

accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in the Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

**Releasing Parties** means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

**Individual Released Parties** means the individuals listed on **Exhibit A** of the Plan, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

**Debtor Related Parties** means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's (a) attorneys, accountants, investment bankers, consultants, professional advisors, and independent auditors, (b) employed and affiliated physicians and other medical personnel (solely with respect to Medical Liability Claims asserted against such individuals and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), and (c) Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee) and Chief Restructuring Officer, as applicable, in each case of the immediately preceding clauses (a) – (c), solely in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in

their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

*Identified Non-Released Parties* means (i) the Persons and Entities listed on **Exhibit B** of the Plan, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

*Schedule of Identified Non-Released Parties* means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

---

**PLEASE COMPLETE ITEMS 1, 2, 3, AND 4. IF THIS BALLOT HAS NOT BEEN PROPERLY SIGNED IN THE SPACE PROVIDED, YOUR VOTE MAY NOT BE VALID OR COUNTED AS HAVING BEEN CAST.**

---

**Item 1.** **Principal Amount of Claim**. The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder (or authorized signatory of such a Holder) of a PBGC Claim in the aggregate unpaid principal amount set forth below.

$ _____

**Item 2.** **Votes on the Plan**. Please vote either to accept or to reject the Plan with respect to your Claims below. Any Ballot not marked either to accept or reject the Plan, or marked both to accept and reject the Plan, shall not be counted in determining acceptance or rejection of the Plan.

---

**Prior to voting on the Plan, please note the following:**

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan. Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). s The releases as presented in the Plan are provided below:**

**The Disclosure Statement and the Plan must be referenced for a complete description of the release, injunction, and exculpation provisions.**

---

The undersigned Holder of a Class 5 PBGC Claim votes to (check <u>one</u> box):

☐ **Accept** the Plan          ☐ **Reject** the Plan.

> **Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

**Item 3.** **Optional Opt-Out Release Election**. Check the box below if you elect not to grant the releases contained in Section 12.6(b) of the Plan. Election to withhold consent is at your option. If you submit an accepting or a rejecting Ballot, or if you submit a Ballot in which you abstain from voting, and in each case, you do not check the box below, you will be deemed to consent to the releases contained in Section 12.6(b) of the Plan to the fullest extent permitted by applicable law. The Holder of the Class 5 PBGC Claim set forth in <u>Item 1</u> elects to:

☐ **OPT OUT** of the releases contained only in Section 12.6(b) of the Plan.

**Item 4.** **Acknowledgements**. By signing this Ballot, the Holder (or authorized signatory of such Holder) acknowledges review and receipt of the Plan, the Disclosure Statement, and the other applicable solicitation materials, and certifies that (i) it has the power and authority to vote to accept or reject the Plan, (ii) it was the Holder (or is entitled to vote on behalf of such Holder) of the PBGC Claims described in <u>Item 1</u> as of the Voting Record Date, and (iii) all authority conferred, or agreed to be conferred, pursuant to this Ballot, and every obligation of the undersigned hereunder, shall be binding on the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy, and legal representatives of the undersigned, and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

Name of Holder: _____

(*print or type*)

Signature: _____

Name of Signatory: _____

(*if other than Holder, include name and title*)

Title: _____

Address: _____

_____

_____

_____

E-mail Address: _____

Date Completed: _____

## VOTING INFORMATION AND INSTRUCTIONS FOR COMPLETING THE BALLOT

1. Ballots received after the Voting Deadline (if the Voting Deadline has not been extended) may not, at the Debtors' discretion, be counted. **The Voting Agent will tabulate all properly completed, valid Ballots received on or before the Voting Deadline.**

2. Complete the Ballot by providing all the information requested, signing, dating, and returning the Ballot to the Voting Agent. Any Ballot that is illegible, contains insufficient information to identify the Holder, or is unsigned[3] will not be counted. Ballots may not be submitted to the Voting Agent by facsimile or electronic mail. If neither the "**accept**" nor "**reject**" box is checked in Item 2, both boxes are checked in Item 2, or the Ballot is otherwise not properly completed, executed, or timely returned, then the Ballot shall not be counted in determining acceptance or rejection of the Plan.

3. You must vote all your Claims within a single Class under the Plan either to accept or reject the Plan. Accordingly, if you return more than one Ballot voting different or inconsistent Claims within a single Class under the Plan, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan likewise will not be counted.

4. The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of Claims.

5. The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.

6. If you cast more than one Ballot voting the same Claims prior to the Voting Deadline, the latest received, valid Ballot submitted to the Voting Agent will supersede any prior Ballot.

7. If (i) the Debtors revoke or withdraw the Plan, or (ii) the Confirmation Order is not entered or consummation of the Plan does not occur, this Ballot shall automatically be null and void and deemed withdrawn without any requirement of affirmative action by or notice to you.

8. There may be changes made to the Plan that do not cause material adverse effects on an accepting Class. If such non-material changes are made to the Plan, the Debtors will not resolicit votes for acceptance or rejection of the Plan.

9. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT, ANY SUPPLEMENTAL INFORMATION PROVIDED BY THE DEBTORS, OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT.

---

[3] E-Ballots submitted on the Online Portal will be deemed to contain a legal, valid signature.

10. PLEASE RETURN YOUR BALLOT PROMPTLY.

11. IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE VOTING AGENT BY (I) CALLING (646) 893-5546 (INTERNATIONAL, TOLL) OR (888) 505-1257 (U.S./CANADA, TOLL FREE); (II) WRITING TO STEWARD HEALTH CARE SYSTEM LLC BALLOT PROCESSING, C/O KROLL RESTRUCTURING ADMINISTRATION LLC, 850 3RD AVENUE, SUITE 412, BROOKLYN, NY 11232 (IF BY FIRST CLASS MAIL, HAND DELIVERY OR OVERNIGHT MAIL); OR (III) EMAILING STEWARDINFO@RA.KROLL.COM WITH "STEWARD HEALTH SOLICITATION INQUIRY" IN THE SUBJECT LINE. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT.

12. THE VOTING AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

**PLEASE SUBMIT YOUR BALLOT BY ONLY <u>ONE</u> OF THE FOLLOWING METHODS:**

---

**By electronic, online submission:**

To submit your Ballot via the Voting Agent's online portal (the "<u>Online Portal</u>"), visit <u>https://restructuring.ra.kroll.com/steward/</u>. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.

Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted. If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the Online Portal.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:**

_____

The Online Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

---

Holders are strongly encouraged to submit their ballots via the Online Portal. Holders who cast a Ballot using the Voting Agent's Online Portal should NOT also submit a paper Ballot.

By First Class Mail, Hand Delivery, or Overnight Mail to:

Steward Health Care System LLC Ballot Processing
c/o Kroll Restructuring Administration LLC
 850 3rd Avenue, Suite 412
Brooklyn, NY 11232

To arrange hand delivery of your Ballot, please email the Voting Agent at StewardBallots@ra.kroll.com (with "Steward Release Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS SO THAT THE BALLOTS ARE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS JULY 2, 2025 AT 5:00 P.M. (CENTRAL TIME).

## <u>Exhibit 6</u>

## **Notice of Non-Voting Status**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM LLC,** *et al.*, | § | Case No. 24-90213 (CML) |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |

## NOTICE OF NON-VOTING STATUS

On May 6, 2024 (the "**Petition Date**"), Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), each commenced a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

On [●], 2025, the Bankruptcy Court held a hearing at which it conditionally approved the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (the "**Disclosure Statement**"), and thereafter entered an order (the "**Disclosure Statement Order**") with respect thereto. The Disclosure Statement Order, among other things, authorizes the Debtors to solicit votes to accept the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and schedules thereto, and as may be modified, amended, or supplemented, the "**Plan**").[2]

If you have any questions about the status of your Claim or Interest or if you wish to obtain paper copies of the Plan and the Disclosure Statement, you may contact the Debtors' voting agent, Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**"), by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Copies of the Plan and Disclosure Statement can also be accessed online at https://restructuring.ra.kroll.com/Steward/. Please be advised that Kroll cannot provide legal advice.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is: 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement or the Plan, as applicable.

You are receiving this notice (this "Notice of Non-Voting Status") because, according to the Debtors' books and records, as of May 21, 2025, you are a holder of:

i.    **Class 1 Other Priority Claims** under the Plan, which provides that your Claim(s) against the Debtors is unimpaired and therefore, pursuant to section 1126(f) of the Bankruptcy Code, you are presumed to have accepted the Plan and are not entitled to vote on the Plan;

ii.    **Class 2 Other Secured Claims** under the Plan, which provides that your Claim(s) against the Debtors is unimpaired and therefore, pursuant to section 1126(f) of the Bankruptcy Code, you are presumed to have accepted the Plan and are not entitled to vote on the Plan;

iii.    **Class 7 Subordinated Securities Claims** under the Plan, which provides that your Claim(s) against the Debtors is not entitled to a recovery and therefore, pursuant to section 1126(g) of the Bankruptcy Code, you are deemed to have rejected the Plan and are not entitled to vote on the Plan;

iv.    **Class 9 Non-Debtor Owned Subsidiary Interests** under the Plan, which provides that your Interest(s) in the Debtors is not entitled to a recovery and therefore, pursuant to section 1126(g) of the Bankruptcy Code, you are deemed to have rejected the Plan and are not entitled to vote on the Plan; and/or

v.    **Class 10 Parent Interests** under the Plan, which provides that your Interest(s) in the Debtors is not entitled to a recovery and therefore, pursuant to section 1126(g) of the Bankruptcy Code, you are deemed to have rejected the Plan and are not entitled to vote on the Plan.

**UNDER THE TERMS OF THE PLAN, YOUR NON-VOTING STATUS DOES NOT PRECLUDE YOU FROM OPTING OUT OF THE RELEASES CONTAINED IN SECTION 12.6(B) OF THE PLAN. OPTING OUT OF SUCH RELEASES IS AT YOUR OPTION AND MUST BE AFFIRMATIVELY EXERCISED ON THE RELEASE OPT-OUT FORM PROVIDED AND TIMELY RETURNED TO THE VOTING AGENT. <u>FAILURE TO ELECT TO OPT OUT OF THE THIRD-PARTY RELEASES WILL DEEM YOU TO CONSENT TO THE THIRD-PARTY RELEASES CONTAINED IN SECTION 12.6(B) OF THE PLAN</u>.**

The deadline for filing objections to confirmation of the Plan or final approval of the Disclosure Statement is **July 2, 2025 at 5:00 p.m. (Central Time) (the "Combined Objection Deadline")**. Any objections to the confirmation of the Plan or final approval of the Disclosure Statement must: (i) be in writing; (ii) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any order of the Bankruptcy Court; (iii) set forth the name of the objecting party and the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' estates or property; and (iv) provide the basis for the objection, and the specific grounds therefor, and, if practicable, a proposed modification to the Plan that would resolve such objection. Registered

users of the Bankruptcy Court's case filing system must electronically file their objections and responses on or before the Combined Objection Deadline. All other parties in interest must file their objections and responses in writing with the United States Bankruptcy Court Clerk's Office, Rosario Saldana, United States Courthouse, 515 Rusk Avenue, Courtroom 401, 4th Floor, Houston, Texas 77002, on or before the Combined Objection Deadline.

---

If you have questions about this Notice of Non-Voting Status, please contact Kroll at:

**Telephone**: (888) 505-1257 (U.S./Canada, toll free) or (646) 893-5546 (international, toll)

**Email**: stewardinfo@ra.kroll.com

**Website**: https://restructuring.ra.kroll.com/Steward/

---

## NOTICE REGARDING CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS IN PLAN

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, <u>you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan.</u> Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:**

**SECTION 12.5      <u>PLAN INJUNCTION</u>.**

**(a)      Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under <u>Section 1.1(a)</u> or <u>Section 1.1(b)</u> of the Plan, or (ii) subject to exculpation pursuant to <u>Section</u> Error! Reference source not found. of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to <u>Section</u> Error! Reference source not found. of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action: (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any**

manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to **Section 1.1(a)** or **Section 1.1(b)** of the Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b) Subject in all respects to **Section Error! Reference source not found.** of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission,

transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in <u>Section</u> Error! Reference source not found. of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)    By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in <u>Section</u> Error! Reference source not found. of the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

(d)    The injunctions in <u>Section</u> Error! Reference source not found. of the Plan shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

**SECTION 12.6    <u>RELEASES</u>.**

(a)    **Releases by the Debtors and their Estates. Except as otherwise expressly set forth below in <u>Section</u> Error! Reference source not found. of the Plan, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or**

the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in Section 1.1(a) of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with Section Error! Reference source not found. of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the

Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on **Exhibit B** of the Plan or the Schedule of Identified Non-Released Parties.

(b) **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in Section 1.1(b) of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by or against the FILO Parties arising from a material misrepresentation, or (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order,

any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c) Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

## SECTION 12.7 EXCULPATION.

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in Section Error! Reference source not found. of the Plan shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the

scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**SECTION 12.15    RELEASE OF LIENS**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Plan Trust.

**SECTION 5.12 Cancellation of Existing Securities, Agreements, and Liens.**

(a)     Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)     On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)     After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)     Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests

with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

**Relevant Definitions Related to Release and Exculpation Provisions**:

        *Exculpated Parties* means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

        *Related Parties* means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

        *Released Parties* means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in the Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

        *Releasing Parties* means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

*Individual Released Parties* means the individuals listed on **Exhibit A** of the Plan, each in their capacity as a current or former director, officer, manager, employee, advisor, or consultant of one or more of the Debtors.

*Debtor Related Parties* means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's (a) attorneys, accountants, investment bankers, consultants, professional advisors, and independent auditors, (b) employed and affiliated physicians and other medical personnel (solely with respect to Medical Liability Claims asserted against such individuals and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), and (c) Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee) and Chief Restructuring Officer, as applicable, in each case of the immediately preceding clauses (a) – (c), solely in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

*Identified Non-Released Parties* means (i) the Persons and Entities listed on **Exhibit B** of the Plan, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

*Schedule of Identified Non-Released Parties* means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

Dated: [•], 2025
       Houston, Texas


   _/s/ DRAFT_               

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: Gabriel.Morgan@weil.com
       Clifford.Carlson@weil.com
       Stephanie.Morrison@weil.com


-and-


**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted _pro hac vice_)
Jason H. George (admitted _pro hac vice_)767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: Jeffrey.Saferstein@weil.com
       Jason.George@weil.com


-and-


**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted pro hac vice)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159
Email: DavidJ.Cohen@weil.com

_Attorneys for Debtors and_
_Debtors in Possession_

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted _pro hac vice_)
Candace M. Arthur (admitted _pro hac vice_)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: Ray.Schrock@lw.com
       Candace.Arthur@lw.com

_Attorneys for Debtors_
_and Debtors in Possession_

**Exhibit 7**

**Form of Release Opt-Out**

**OPTIONAL:**     **RELEASE OPT-OUT FORM**

      You are receiving this opt-out form (the "**Release Opt-Out Form**") because you are or may be a holder (a "**Holder**") of a Claim against or Interest in Steward Health Care System LLC and its debtor affiliates (collectively, the "**Debtors**") that is not entitled to vote on the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be modified, amended, or supplemented, the "**Plan**").[1] A holder of Claims or Interests is deemed to grant the third-party releases set forth below unless such holder affirmatively opts out on or before July 2, 2025 at 5:00 P.M. (Central Time) (the "**Opt-Out Deadline**").

      If you believe you are a holder of a Claim or Interest with respect to the Debtors or Released Parties (as defined below) and choose to opt out of the third-party releases set forth in Section 12.6(b) of the Plan, please submit your election to opt out through one of the following methods: (i) completing, signing, dating, and returning this Release Opt-Out Form promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to the Debtors' voting agent, Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**"), at the address set forth below, so that it is actually received by the Voting Agent prior to the Opt-Out Deadline, or (ii) by completing and signing the Release Opt-Out Form via the Online Portal located at https://restructuring.ra.kroll.com/Steward/ (the "**Online Portal**").

**<u>To ensure that your Release Opt-Out Form is counted, you must complete, clearly sign, and timely return your Release Opt-Out Form so that it is actually received by the Voting Agent by the Opt-Out Deadline by *ONLY ONE* of the following methods:</u>**

**<u>Hard Copy Submission</u>**

| **If by First Class Mail, Hand Delivery, or Overnight Mail:** |
|---|
| Steward Health Care System LLC Ballot Processing<br>c/o Kroll Restructuring Administration LLC<br>850 3rd Avenue, Suite 412<br>Brooklyn, NY 11232<br><br>To arrange hand delivery of your Release Opt-Out Form, please email the Voting Agent at StewardBallots@ra.kroll.com (with "Steward Release Opt-Out Form Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery. |

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**"), as applicable.

**Electronic Online Submission**

| If by Online Portal |
|---|
| To submit your Release Opt-Out Form via the Voting Agent's Online Portal, visit https://restructuring.ra.kroll.com/steward/. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Release Opt-Out Form.<br><br>Release Opt-Out Forms submitted by facsimile, email, or other means of electronic transmission will not be counted. If submitting online, to have your Opt-Out election counted, you must electronically complete, sign, and submit your electronic Release Opt-Out Form by utilizing the Online Portal.<br><br>**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Opt-Out Form:**<br><br>**Unique E-Opt-Out ID#: _____**<br><br>The Online Portal is the sole manner in which Release Opt-Out Forms will be accepted via electronic or online transmission.  Release Opt-Out Forms submitted by facsimile, email, or other means of electronic transmission will not be counted.<br><br>**Holders are strongly encouraged to submit their Release Opt-Out Forms via the Online Portal.  Parties who submit a Release Opt-Out Form using the Voting Agent's Online Portal should NOT also submit a hard copy Opt-Out Form.** |

**THIS RELEASE OPT-OUT FORM MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BY THE OPT-OUT DEADLINE.  IF THE RELEASE OPT-OUT FORM IS RECEIVED AFTER THE OPT-OUT DEADLINE, IT WILL NOT BE COUNTED.**

**Item 1.** **Amount of Claim**. The undersigned hereby certifies that, as of May 21, 2025, the undersigned was the Holder (or authorized signatory of such a Holder) of Claims or Interests in the amount set forth below.

| | |
|---|---|
| **Class 1 Other Priority Claims** | Amount:  $_____ |
| **Class 2 Other Secured Claims** | Amount:  $_____ |
| **Class 7 Subordinated Securities Claims** | Amount:  $_____ |

2

| Class 9 Non-Debtor Owned Subsidiary Interests | Amount: $_____ |
|---|---|
| Class 10 Parental Interests | Amount: $_____ |

### NOTICE REGARDING CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS IN PLAN

If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan. Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:

**SECTION 12.5      PLAN INJUNCTION.**

(a)      Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under Section 1.1(a) or Section 1.1(a) of the Plan, or (ii) subject to exculpation pursuant to Section Error! Reference source not found. of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section Error! Reference source not found. of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action: (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted

such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to **Section 1.1(a)** or **Section 1.1(a)** of the Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b)     Subject in all respects to **Section** Error! Reference source not found. of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any

such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in Section Error! Reference source not found. of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.  For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)     By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section Error! Reference source not found. of the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

(d)     The injunctions in Section Error! Reference source not found. of the Plan shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

## SECTION 12.6     RELEASES.

(a)     Releases by the Debtors and their Estates.   Except as otherwise expressly set forth below in Section Error! Reference source not found. of the Plan, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part,

the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in Section 1.1(a) of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with Section Error! Reference source not found. of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on Exhibit B of the Plan or the Schedule of Identified Non-Released Parties.

      **(b)**     **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in <u>Section 1.1(a)</u> of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by or against the FILO Parties arising from a material misrepresentation, or (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the

Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)    Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

**SECTION 12.7      EXCULPATION.**

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in Section Error! Reference source not found. of the Plan shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation

Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

## SECTION 12.15    RELEASE OF LIENS

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Plan Trust.

## SECTION 5.12 Cancellation of Existing Securities, Agreements, and Liens.

(a)    Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)    On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)    After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)    Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

**Relevant Definitions Related to Release and Exculpation Provisions**:

*Exculpated Parties* means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

*Related Parties* means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

*Released Parties* means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in the Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

*Releasing Parties* means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

*Individual Released Parties* means the individuals listed on **Exhibit A** of the Plan, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

*Debtor Related Parties* means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's (a) attorneys, accountants, investment bankers, consultants, professional

advisors, and independent auditors, (b) employed and affiliated physicians and other medical personnel (solely with respect to Medical Liability Claims asserted against such individuals and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), and (c) Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee) and Chief Restructuring Officer, as applicable, in each case of the immediately preceding clauses (a) – (c), solely in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

    ***Identified Non-Released Parties*** means (i) the Persons and Entities listed on **Exhibit B** of the Plan, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions  or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

    ***Schedule of Identified Non-Released Parties*** means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PURSUANT TO THE PLAN, IF YOU, AS A HOLDER OF A CLAIM(S) WHO HAS BEEN GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH IN SECTION 12.6(b) OF THE PLAN BUT DO NOT OPT OUT, YOU ARE AUTOMATICALLY DEEMED TO HAVE CONSENTED TO THE RELEASE PROVISIONS IN SECTION 12.6(b) OF THE PLAN.**

**By checking the box below, the undersigned Holder of a Claim not entitled to vote identified in Item 1 above, having received notice of the opportunity to opt out of granting the releases contained in Section 12.6(b) of the Plan:**

☐ **Elects to <u>OPT OUT</u> of the releases contained in Section 12.6(b) of the Plan.**

**Item 3.** **Certifications**. By signing this Release Opt-Out Form, the undersigned certifies that:

a. as of the Voting Record Date, either: (i) the Holder is the Holder of the Claims or Interests set forth in Item 1; or (ii) the Holder is an authorized signatory for an entity that is the Holder of the Claims or Interests set forth in Item 1;

b. the undersigned has received a copy of the Notice of Non-Voting Status and the Release Opt-Out Form and that the Release Opt-Out Form is made pursuant to the terms and conditions set forth therein;

c. if applicable, the undersigned has submitted the same election concerning the releases with respect to all Claims or Interests held by the undersigned; and

d. no other Release Opt-Out Forms have been submitted with respect to the Holder's Claims or Interests, or, if any other Release Opt-Out Forms have been submitted with respect to such Claims or Interests, then any such earlier Release Opt-Out Forms are hereby revoked.

Name of Holder: _____

*(print or type)*

Signature: _____

Name of Signatory: _____

*(if other than Holder, include name and title)*

Title: _____

Address: _____

_____

_____

_____

E-mail Address: _____

Date Completed: _____

**IF YOU WISH TO OPT OUT, PLEASE COMPLETE, SIGN, AND DATE THIS RELEASE OPT-OUT FORM AND RETURN IT TO THE VOTING AGENT BY *JUST ONE* OF THE PREVIOUSLY OUTLINED METHODS: FIRST CLASS OR OVERNIGHT MAIL, HAND DELIVERY, OR BY ONLINE TRANSMISSION VIA THE ONLINE PORTAL.**

---

**THIS OPT-OUT FORM MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE THE OPT-OUT DEADLINE OF JULY 2, 2025 at 5:00 P.M. (CENTRAL TIME).**

---

**Exhibit 8**

**Consent Program Opt-Out Form**

**OPTIONAL:**              **CONSENT PROGRAM OPT-OUT FORM**

You are receiving this opt-out form (the "**Consent Program Opt-Out Form**") because you are a holder (a "**Holder**") of an Administrative Expense Claim against Steward Health Care System LLC and its debtor affiliates (collectively, the "**Debtors**") that is entitled to participate in the Administrative Expense Claims Consent Program in connection with the *Joint Chapter 11 Plan of Liquidation of Steward Health Care Systems LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be modified, amended, or supplemented, the "**Plan**").[1] A Holder of Administrative Expense Claims is deemed to have elected to participate in the Administrative Expense Claims Consent Program set forth below **unless such Holder affirmatively opts out by completing <u>Item 2</u> and <u>Item 3</u> of this Consent Program Opt-Out Form and submitting such completed Consent Program Opt-Out Form in accordance with the procedures set forth below so that it is <u>actually received</u> by Kroll Restructuring Administration ("Kroll" or the "Voting Agent") on or before 5:00 P.M. (Central Time) on July 2, 2025 (the "Consent Program Opt-Out Deadline")**.

If you are a Holder of an Administrative Expense Claim against the Debtors and choose to opt out of the Administrative Expense Claims Consent Program, please submit your election to opt out through one of the following methods: (i) completing, signing, dating, and returning this Consent Program Opt-Out Form promptly in the enclosed reply envelope provided, or otherwise via first class mail, overnight courier, or hand delivery to the Voting Agent at the address set forth below, so that it is received by the Voting Agent prior to the Consent Program Opt-Out Deadline, or (ii) by completing and signing the electronic version of your Consent Program Opt-Out Form and submitting it via the Online Portal located at https://restructuring.ra.kroll.com/Steward/. Instructions for submitting this Consent Program Opt-Out Form via either of the specified, valid methods are outlined later in this document.

**If you received this Consent Program Opt-Out Form, but do not timely, properly, and affirmatively opt out, you shall be deemed to have consented to the Administrative Expense Claims Consent Program, and your Administrative Expense Claim will be deemed Allowed in the amount listed in <u>Item 1</u> below next to "Settled Administrative Expense Claim," which is equal to 50% of the Reconciled Amount (as defined below)**.

If you have any questions about the status of your Claim or if you wish to obtain paper copies of the Plan and the Disclosure Statement, you may contact the Voting Agent, by : (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Please be advised that Kroll cannot provide legal advice.

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**"), as applicable.

Copies of the Plan and Disclosure Statement can also be accessed, free of charge, online at https://restructuring.ra.kroll.com/Steward/. You may also access electronic copies of the Plan, Disclosure Statement, and any other solicitation materials via the QR Code below.



**To ensure that your hard copy Consent Program Opt-Out Form is counted, clearly sign and timely return your properly completed Consent Program Opt-Out Form in the enclosed prepaid pre-addressed business reply envelope, or via first-class mail, overnight courier, or hand delivery to:**

**Paper Copy Consent Program Opt-Out Form Submission**

> Steward Health Care System LLC Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

**THIS CONSENT PROGRAM OPT-OUT FORM MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BY THE CONSENT PROGRAM OPT-OUT DEADLINE. IF THE CONSENT PROGRAM OPT-OUT FORM IS RECEIVED AFTER THE CONSENT PROGRAM OPT-OUT DEADLINE, IT WILL NOT BE COUNTED AND YOU WILL BE DEEMED TO HAVE CONSENTED TO THE FINAL SETTLEMENT AND COMPROMISE OF YOUR ADMINISTRATIVE EXPENSE CLAIM(S) IN THE AMOUNT LISTED IN ITEM 1 BELOW NEXT TO "SETTLED ADMINISTRATIVE EXPENSE CLAIM" IN EXCHANGE FOR THE TREATMENT PROVIDED IN THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM SET FORTH BELOW.**

**Item 1.** **Amount of Administrative Expense Claim.** As of May 21, 2025, (the "**Administrative Claims Record Date**") the Debtors' books and records show that you held unpaid Administrative Expense Claims in the aggregate amount listed in the table below as the "**Reconciled Amount**." If you do not opt out of the Administrative Expense Claims Consent Program, your Administrative Expense Claim will be deemed allowed in an amount equal to **50%** of the Reconciled Amount (the "**Settled Administrative Expense Claim**") and you will receive

an accelerated payment on account of and toward your Settled Administrative Expense Claim in accordance with the Administrative Expense Claims Consent Program (as set forth below).

| Reconciled Amount | $ _____ |
|---|---|
| Settled Administrative Expense Claim | $ _____ |

If you disagree with the amount listed as the Reconciled Amount but still wish to participate in the Administrative Expense Claims Consent Program, you are encouraged to contact the Debtors' advisors **as soon as possible** upon receipt of this form at stewardvendorteam@weil.com and stewardclaims@alixpartners.com.

**Item 2.          Administrative Expense Claims Consent Program.**

**CRITICAL INFORMATION REGARDING ADMINISTATIVE EXPENSE CLAIMS AND PROCEDURES FOR AGREEING TO DIFFERENT TREATMENT**

Generally, holders of administrative expense claims that have become allowed by the Bankruptcy Court are entitled to be paid the allowed amount of such administrative expense claims in full as a condition to the effectiveness of a chapter 11 plan.  However, holders of administrative expense claims can agree to "different treatment" for such claim and such agreement can enable a debtor to confirm and consummate a chapter 11 plan.

In light of the amount of secured, administrative, and priority claims against the Debtors' estates, as well as the forecasted timeline for the Debtors to monetize and collect on their remaining assets (including significant litigation claims), the Debtors anticipate that there will be a significant executory period between the Confirmation Date of the Plan and the Effective Date of the Plan. Accordingly, to accelerate (i) cash payments to consenting Holders of Allowed Administrative Expense Claims reasonably promptly after the Confirmation Date of the Plan, and (ii) the consummation of the Plan, the Plan provides for the Administrative Expense Claims Consent Program.

**Pursuant to the Plan, each holder of an Administrative Expense Claim that is entitled to participate in the Administrative Expense Claims Consent Program and does not timely, properly, and affirmatively opt-out will**:

i.       have its Administrative Expense Claim deemed allowed in the amount listed as the Settled Administrative Expense Claim in **Item 1** above, which is equal to 50% of the amount set forth in the Debtors' books and records (*i.e.*, the Reconciled Amount in **Item 1** above); and

ii.      receive an accelerated payment following the Confirmation Date on account of and toward their Settled Administrative Expense Claim, which shall consist of a pro rata portion up to the Settled Administrative Expense Claim of a distribution equal to $12.5 million (the "**Settled Administrative Expense Claims Cash Pool**") following the Confirmation

Date.

If your distribution under the Settled Administrative Expense Claims Cash Pool is less than your Settled Administrative Expense Claim as listed in <u>Item 1</u>, the remainder of your Settled Administrative Expense Claim will be paid on the Effective Date in accordance with Section 2.1 of the Plan.

Regardless of your election herein, any Administrative Expense Claims accrued after the Administrative Claims Record Date will be treated in accordance with Section 2.1 of the Plan.

**If you choose to opt-out of the Administrative Expense Claims Consent Program**, your Administrative Expense Claim will be treated in accordance with Section 2.1(a) of the Plan and, to the extent such Administrative Expense Claim becomes Allowed by the Bankruptcy Court (through settlement or adjudication), such Allowed Administrative Expense Claim will be paid in full on the later of (a) the Effective Date, (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (c) the next Plan Distribution Date (as defined in the Plan) after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

The timing of the Effective Date and distributions to Holders of Allowed Administrative Expense Claims are indeterminate and may depend in part on the level of participation in the Administrative Expense Claims Consent Program. The Debtors anticipate that the more Holders that choose to opt-out of the Administrative Expense Claims Consent Program, the longer it will take for the Debtors to have sufficient cash to satisfy all Allowed Administrative Expense Claims, thus ultimately delaying or even potentially contributing risking the occurrence of the Effective Date. In addition, the Administrative Expense Claims Consent Program and any and all distributions contemplated thereby are contingent upon confirmation of the Plan. The Holders of Allowed Administrative Expense Claims will not have the option to receive expedited payment in exchange for a reduction of such Holders' Allowed Administrative Expense Claims in the event that the Plan is not confirmed. The Debtors believe they will be able to satisfy all Allowed Administrative Expense Claims in full as of the Effective Date regardless of participation in the Administrative Expense Claims Consent Program.

**The implementation of the Administrative Expense Claims Consent Program is conditioned upon sufficient participation in the Administrative Expense Claims Consent Program**. Specifically, at least 75% (in dollar amount) of the Debtors' estimated Allowed Administrative Expense Claims must participate in the Administrative Expense Claims Consent Program (the "**Minimum Participation Threshold**"). If Holders of more than 25% (in dollar amount) of the Debtors' estimated Allowed Administrative Expense Claims opt-out of the Administrative Expense Claims Consent Program, and unless such condition is waived by the Debtors and the Creditors' Committee, the Administrative Expense Claims Consent Program will not be consummated. If the Minimum Participation Threshold is not satisfied or waived by the Debtors and the Creditors' Committee, the Debtors' estates shall retain the Settled Administrative Expense Claims Cash Pool equal to $12.5 million.

Please take notice that regardless of whether you participate in the Administrative Expense Claims Consent Program, the Debtors rights of setoff, recoupment, and any and all potential Claims (as

4

that term is defined in section 101(5) of the Bankruptcy Code) and causes of action of the Debtors and/or the Creditors' Committee, including under chapter 5 of the Bankruptcy Code or applicable law, are expressly preserved.

All Holders of Administrative Expense Claims **that do not timely, properly, and affirmatively opt-out** of the Administrative Expense Claims Consent Program by the Consent Program Opt-Out Deadline by completing and submitting a Consent Program Opt-Out Form in accordance with the procedures set forth herein will be deemed to have agreed to be bound by the terms of the Administrative Expense Claims Consent Program, including the settlement and compromise of your Administrative Expense Claim.

The Debtors will seek approval of the Administrative Expense Claims Consent Program by the Bankruptcy Court at the hearing to consider confirmation of the Plan scheduled to be held on July 11, 2025 at 9:00 a.m. (Central Time), before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of Texas Courtroom 401, 4th floor, 515 Rusk Avenue, Houston, TX 77002.

Procedures for the submission and tabulation of the Consent Program Opt-Out Forms (*i.e.*, the Consent Program Opt-Out Procedures) are located in paragraphs 26-28 of the Disclosure Statement Order.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE DISCLOSURE STAEMENT AND THE PLAN, INCLUDING THE ADMINISTRATIVE EXPENSE CLAIM AND ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM PROVISIONS THEREIN, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PURSUANT TO THE PLAN, IF YOU, AS A HOLDER OF CLAIMS WHO HAS BEEN GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM BUT DO NOT TIMELY, PROPERLY, AND AFFIRMATIVELY OPT OUT, YOU ARE AUTOMATICALLY DEEMED TO HAVE CONSENTED TO RECEIVE A PRO RATA DISTRIBUTION OF THE SETTLED ADMINISTRATIVE EXPENSE CLAIMS CASH POOL UP TO THE AMOUNT OF YOUR SETTLED ADMINISTRATIVE EXPENSE CLAIM.**

**By checking the box below, the undersigned Holder of Administrative Expense Claim(s), having received notice of the opportunity to opt out of the Administrative Expense Claims Consent Program:**

☐ **Elects to OPT OUT of the Administrative Expense Claims Consent Program.**

Item 3.    **Certifications**. By signing this Consent Program Opt-Out Form, the undersigned certifies that:

a.    as of the Administrative Claims Record Date, either: (i) the Holder is the Holder of Administrative Expense Claims; or (ii) the Holder is an

authorized signatory for an entity that is the Holder of Administrative Expense Claims;

b.    the undersigned has received a copy of this Consent Program Opt-Out Form; and

c.    no other Consent Program Opt-Out Form has been submitted with respect to the Holder's Administrative Expense Claims, or if any other Consent Program Opt-Out Forms have been submitted with respect to such Claims, then any such earlier Consent Program Opt-Out Forms are hereby revoked.

Name of Holder: _____

(*print or type*)

Signature: _____

Name of Signatory: _____

(*if other than Holder, include name and title*)

Title: _____

Address: _____

_____

_____

_____

E-mail Address: _____

Date Completed: _____

**IF YOU WISH TO OPT OUT OF THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM, PLEASE COMPLETE, SIGN, AND DATE THIS CONSENT PROGRAM OPT-OUT FORM AND RETURN IT TO THE VOTING AGENT VIA *JUST ONE* OF THE FOLLOWING METHODS SO THAT IT IS *ACTUALLY RECEIVED* BY THE VOTING AGENT ON OR BEFORE THE CONSENT PROGRAM OPT-OUT DEADLINE:**

| **To Submit Your Consent Program Opt-Out Form Via Online Portal** |
| --- |
| To submit your Consent Program Opt-Out Form via the Voting Agent's Online Portal, visit https://restructuring.ra.kroll.com/Steward/. Click on the "**Submit E-Ballot**" section of the website and follow the instructions to submit your Consent Program Opt-Out Form.<br><br>IMPORTANT NOTE: You will need the following information to retrieve and submit your electronic Consent Program Opt-Out Form: |

**Unique E-Opt-Out ID#:** _____

The Online Portal is the sole manner in which your Consent Program Opt-Out Form will be accepted via electronic or online transmission. Consent Program Opt-Out Forms submitted by facsimile, email or other means of electronic transmission will not be valid. Any Consent Program Opt-Out Form submitted through the Online Portal will be deemed to contain an electronic Holder signature that is immediately legally valid and effective.

Please complete and submit an electronic Consent Program Opt-Out Form for each Unique E-Opt-Out ID# you receive, as applicable. Holders who cast a Consent Program Opt-Out Form using the Online Portal should NOT also submit a paper copy of their Consent Program Opt-Out Form.

**To Submit Your Consent Program Opt-Out Form Via Paper Copy**

To submit your opt-out election via a paper Consent Program Opt-Out Form, review Item 1 and complete Items 2 and 3 above and submit your paper Consent Program Opt-Out Form in the pre-addressed, pre-paid return envelope provided, or otherwise, by first-class mail, hand delivery, or overnight courier to:

Steward Health Care System LLC Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

To arrange hand delivery of your Consent Program Opt-Out Form, please email the Voting Agent at StewardBallots@ra.kroll.com (with "Steward Consent Program Opt-Out Form Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

# Exhibit 9

**Creditors' Committee Position Letter**

### THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
### OF STEWARD HEALTH CARE SYSTEM LLC AND ITS DEBTOR AFFILIATES

### Chapter 11 Case No. 24-90213 (Bankr. S.D. Tex.) (CML)

c/o Akin Gump Strauss Hauer & Feld LLP

May 28, 2025

**To: Holders of Class 4 General Unsecured Claims**

The Official Committee of Unsecured Creditors (the "Creditors' Committee") was appointed by the United States Trustee to represent the interests of all unsecured creditors of Steward Health Care System, LLC and its affiliated debtors (collectively, "Steward" or the "Debtors") in the above referenced chapter 11 cases (the "Chapter 11 Cases") filed in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").[1] Akin Gump Strauss Hauer & Feld LLP is counsel to the Creditors' Committee. We write to advise you of the Creditors' Committee's position regarding the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* [Docket No. 4743] (the "Plan"). The Plan is described in further detail in, and attached as an exhibit to, the accompanying *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* [Docket No. 4744] (the "Disclosure Statement").[2]

The Creditors' Committee believes that the Plan provides the only potential path to a meaningful recovery for the Debtors' unsecured creditors and is in the best interests of unsecured creditors. **Therefore, the Creditors' Committee recommends that each unsecured creditor vote to accept the Plan** and **not "opt out" of the Third-Party Releases.**

Additionally, the Creditors' Committee recommends that each holder of an Allowed Administrative Expense Claim **not "opt out" of the Administrative Expense Claims Consent Program**.[3]

\*\*\*

From the outset of the Chapter 11 Cases, the Creditors' Committee has played an active and critical role in representing the interests of all unsecured creditors. As a result of the Global Settlement[4] reached earlier in the Chapter 11 Cases, the Debtors sold or transferred 28 hospitals to new operators and sold Stewardship Health, the physician network group, to a third-party purchaser. This allowed the Debtors to avoid hospital closures, ensure continuity of patient care, and maximize value for stakeholders by reducing losses from their operations. The Global

---

[1] *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 290].

[2] Capitalized terms used in this letter (the "Creditors' Committee Position Letter") but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable.

[3] This letter sets forth the position of the Creditors' Committee and not the views of any member of the Creditors' Committee in its individual capacity.

[4] *Final Order Approving (I) Global Settlement with Medical Properties Trust, Prepetition ABL/FILO Secured Parties, FILO Secured Parties, and Creditors' Committee, (II) Interim Management Procedures, and (III) Granting Related Relief* [Docket No. 2610].

Settlement also resulted in the release or waiver of a substantial amount of allegedly secured claims, senior in priority to unsecured creditors.

Following the transfer of the Debtors' hospitals and sale of the physician network business, the Debtors' remaining assets consisted primarily of valuable litigation claims and causes of action against third parties that require liquidation to provide recoveries to stakeholders. However, the estates had little liquidity and were approaching the deadline to repay their postpetition financing. If this deadline were reached, the lenders would likely take actions that would allow them to take all of the value from this litigation. This made it far from certain that any chapter 11 plan could be negotiated or that general unsecured creditors would have any chance of a recovery on their claims. Recognizing that the only path to maximizing the value of the Debtors' remaining assets was to engage in negotiations with the Debtors and certain of their prepetition secured lenders (the "FILO Lenders"), the Creditors' Committee and the Debtors entered into a plan mediation with the FILO Lenders, overseen by the Honorable Judge Marvin Isgur.

After months-long, hard-fought negotiations, during which the Creditors' Committee advocated for a Plan structure that would allow general unsecured creditors to receive recoveries, the parties reached the FILO Settlement[5] and agreement on the terms of a chapter 11 plan, as now reflected in the Plan. The Plan aims to monetize the Debtors' valuable litigation claims and allow for an orderly liquidation of the Debtors' remaining assets.

**FILO Settlement and the Plan.** The FILO Settlement combined with the Plan provides sufficient funding to allows for the Debtors' remaining assets to be monetized.

The FILO Settlement will provide the Debtors with: (i) resources to pursue confirmation of the Plan; (ii) up to $125 million of funding to the Litigation Trust to monetize substantial claims and causes of action; and (iii) cash to provide near-term payments to holders of Allowed Administrative Expense Claims, and funds to administer and wind down the Debtors' estates. Moreover, the FILO Settlement and the Plan provide for the compromise of certain claims asserted by the FILO Lenders, as well as an agreement by the FILO Lenders to subordinate a portion of their claims to payment of administrative expense claims.

Absent consummation of the FILO Settlement, the Creditors' Committee anticipates that the FILO Lenders will seek to foreclose on substantially all of the Debtors' assets, which will likely result in the conversion of the Chapter 11 Cases to chapter 7, and no distribution to general unsecured creditors.

The monetization of the Debtors' remaining assets is likely to take significant time. As noted above, the Debtors' remaining assets are primarily litigation claims against third parties. However, the Creditors' Committee believes that the FILO Settlement and confirmation of the Plan, including the substantial amount of funding being provided by the FILO Lenders to fund the

---

[5] The FILO Settlement is reflected in the *Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* [Docket No. 4746].

monetization of the Debtors' assets and the administration and wind-down of the Debtors' estates, provides the greatest likelihood for meaningful recoveries to unsecured creditors.

**Administrative Expense Claims Consent Program.** Although the Debtors have paid approximately 97% of Administrative Expense Claims incurred in the chapter 11 cases, a significant amount of outstanding Administrative Expense Claims remain unpaid, which must be satisfied before general unsecured claims may be paid. The Administrative Expense Claims Consent Program provides a mechanism to accelerate the repayment of a portion of the Debtors' Administrative Expense Claims and reduce the outstanding amount. Holders of Allowed Administrative Expense Claims that do not opt out of the Administrative Expense Claims Consent Program by the deadline will: (i) receive an accelerated, pro-rated distribution equal to 50% of their applicable claims (as compared to waiting for the liquidation of the Debtors' assets and repayment of the claims of the FILO Lenders) from a $12.5 million cash pool; and (ii) such claims will be deemed satisfied in full. If an applicable holder's distribution from the Administrative Expense Claims Cash Pool is less than 50% of the applicable claim, the remainder will be paid in accordance with Section 2.1 of the Plan. Implementation of the Administrative Expense Claims Consent Program is conditioned on the participation of at least 75% of the dollar amount of the estimated Allowed Administrative Expense Claims. While the Creditors' Committee and Debtors may waive the condition, the Creditors' Committee believes that it is beneficial to all stakeholders for holders of Allowed Administrative Expense Claims to participate. Importantly, as noted above, participation in the Administrative Expense Claims Consent Program provides holders of Allowed Administrative Expense Claims an opportunity to obtain an accelerated recovery on their claims in consideration for a waiver of a portion of the applicable claims.

**Medical Liability Claim Procedures.** The Plan sets forth Medical Liability Claim Procedures to secure the just, speedy, and cost-efficient determination of allowance of every Debtor Medical Liability Claim. These procedures will provide substantially similar treatment to all holders of Debtor Medical Liability Claims. For purposes of distribution under the Plan, any Debtor Medical Liability Claim that arose prior to the Petition Date and is for an amount of $350,000.00 or less in a timely filed proof of claim supported by reasonable documentation (subject to determination by the Estate Representative or their designee) will automatically be deemed Allowed. If a medical malpractice claimant, timely submitted a proof of claim, (a) but sufficient documentation, (b) the claim was submitted in an unliquidated or (c) the amount was greater than $350,000, the holders will be notified that they have 180 days to provide additional information to substantiate their claims, otherwise the applicable claims will be deemed disallowed and expunged. After the expiration of 180 day information gathering period, the Estate Representative will communicate with holders of medical malpractice claims regarding the further liquidation of such claims, which may include settlement, mediation, arbitration or litigation of such claims.

**Expected Treatment of General Unsecured Claims.** The Plan provides for an orderly distribution of recoveries in accordance with the Bankruptcy Code. Allowed Administrative Expense Claims must be satisfied before holders of General Unsecured Claims may receive distributions. The estimated amount of Allowed General Unsecured Claims is between $1,390,000,000.00 and $2,320,000,000.00. According to the Disclosure Statement, depending on the success of the Litigation Trust in monetizing the Debtors' litigation claims and repaying the

FILO Lenders in a timely fashion, among other things, the Debtors estimate that general unsecured creditors will receive between 3.9% and 21.6% recovery on their Allowed Claims.

For the reasons described above, the Creditors' Committee supports the Plan and believes it is in the best interests of the Debtors' general unsecured creditors as a whole under the circumstances. **Accordingly, the Creditors' Committee recommends that all unsecured creditors vote to accept the Plan and not opt out of the Third-Party Releases, and that all holders of Allowed Administrative Expense Claims not opt out of the Administrative Expense Claims Consent Program.**

The Debtors have provided you with a Ballot with which to vote to accept or reject the Plan, as well as forms to opt out of the Third-Party Releases (the "Release Opt-Out Form") and to opt out of the Administrative Expense Claims Consent Program (the "Consent Program Opt-Out Form"). To have your vote counted, you **MUST timely and properly complete and return the Ballot** in accordance with the procedures set forth therein and in the accompanying Disclosure Statement Order. In order to opt out of the Third-Party Releases or the Administrative Expense Claims Program, you must complete and return the appropriate form in accordance with the procedures set forth therein and in the accompanying Disclosure Statement Order. **PLEASE READ THE DIRECTIONS ON THE BALLOT CAREFULLY AND COMPLETE IT IN ITS ENTIRETY BEFORE RETURNING IT TO THE DEBTORS' SOLICITATION AGENT.**

The foregoing description is not intended as a substitute for the Plan or Disclosure Statement. You should carefully read the Plan and the Disclosure Statement in their entirety. Please note that the Creditors' Committee represents the interests of unsecured creditors as a whole and does not represent the individual interests of any unsecured creditor. You must make your own independent determination as to whether the Plan is acceptable to you and may wish to consult with your own legal and/or financial advisor in connection therewith.

The Creditors' Committee Position Letter is not offered as legal advice as to any specific claim or treatment under the Plan. It is for informational purposes only. The Creditors' Committee Position Letter shall not be relied upon for any purpose other than the Creditors' Committee's view on how to vote on the Plan. The Creditors' Committee **does not guarantee any particular result** in the Debtors' Chapter 11 Cases. The Creditors' Committee Position Letter does not constitute and shall not be construed as a solicitation by the Creditors' Committee or by any individual member of the Creditors' Committee. The Bankruptcy Court's approval of the Creditors' Committee Position Letter to be included as part of the Solicitation Packages does not constitute an endorsement by the Bankruptcy Court of the merits of the Plan or the accuracy or completeness of the information contained herein.

Should you have any questions about this letter, the Plan, the Disclosure Statement, the Administrative Claims Consent Program, the Solicitation Packages, or the Debtors' Chapter 11 Cases, we would be pleased to discuss them with you. Please direct any such questions to counsel for the Creditors' Committee at StewardCreditorInfo@akingump.com.

Very Truly Yours,

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF STEWARD HEALTH CARE SYSTEM, LLC AND ITS DEBTOR AFFILIATES, *ET AL.*

# EXHIBIT 4

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 25, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | Re: Docket Nos. 4912 and 4964 |

### ORDER DENYING MOTIONS TO CONVERT OR DISMISS CHAPTER 11 CASES

Upon the motions to convert or dismiss the chapter 11 cases of Steward Health Care System

LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter

11 cases (collectively, the "**Debtors**"), filed by Dr. Manisha Purohit, Dr. Diane Paggioli, Dr. James

Thomas, Dr. Thomas Ross, Dr. Michael Regan, Dr. Peter Lyndon, Dr. Sridhar Ganda, and Dr. A.

Ana Beesen (Docket No. 4912) and the United States Trustee for the Southern District of Texas

(Docket No. 4964) (collectively, the "**Motions**"); [2] and upon the joinders to the Motions filed by

TRACO International Group S. De R.L. (Docket Nos. 5001 and 5003) and NorthStar Anesthesia,

P.A. (Docket No. 4931) (collectively, the "**Joinders**"); and upon the objections to the Motions

filed by the Debtors (Docket No. 5117) and the Official Committee of Unsecured Creditors

(Docket No. 5120) (collectively, the "**Objections**"); and this Court having jurisdiction to consider

the Motions and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of

the Motions and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and

it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

this Court having reviewed the Motions, the Joinders, and the Objections; and a hearing having been held by the Court on July 14 and 15, 2025 (the "**Hearing**") to consider, among other things, the relief requested in the Motions; and an oral ruling having been provided by the Court on July 16, 2025 (the "**Oral Ruling**"); and upon the record of the Hearing; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motions are denied.

2.      The findings and conclusions set forth herein and orally on the record of the Hearing and in the Oral Ruling constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure. All findings of fact and conclusions of law announced by this Court at the Hearing and in the Oral Ruling in relation to the Motions are hereby incorporated into this Order and are essential, inextricable, and nonseverable components and terms of this Order.

3.      This Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Signed:  July 25, 2025

_____
Christopher Lopez
United States Bankruptcy Judge

# EXHIBIT 5



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC, *et al.*,** | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER
### (I) APPROVING DISCLOSURE STATEMENT ON A FINAL BASIS
### AND (II) CONFIRMING JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
### <u>STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS</u>

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") having:

a. commenced, on May 6, 2024 (the "**Petition Date**"), these Chapter 11 Cases by filing voluntary petitions in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**" or the "**Bankruptcy Court**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**");

b. on May 6, 2024, obtained entry of the *Order Directing Joint Administration of Chapter 11 Cases* (Docket No. 24);

c. proposed and filed the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, dated July 11, 2025 (Docket No. 5492) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented from time to time, the "**Plan**"),[2] and filed the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, dated June 1, 2025 (Docket No. 5028) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented from time to time, the "**Disclosure Statement**");

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan. The rules of interpretation set forth in <u>Article I</u> of the Plan and the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Confirmation Order.

d.  on June 2, 2025, obtained, after notice and hearing, entry of the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* (Docket No. 5036) (the "**Disclosure Statement Order**"), which, among other things, (i) conditionally approved the Disclosure Statement; (ii) approved solicitation procedures related to the Plan; (iii) approved notice and opt-out procedures related to the Administrative Expense Claims Consent Program; (iv) set the deadline for filing objections to confirmation of the Plan and final approval of the Disclosure Statement for July 2, 2025 at 5:00 p.m. (Central Time); and (v) scheduled a hearing to approve the Disclosure Statement on a final basis and consider confirmation of the Plan for July 11, 2025 at 9:00 a.m. (Central Time) (the "**Combined Hearing**");

e.  caused to be served, through their claims, noticing, and solicitation agent, Kroll Restructuring Administration LLC ("**Kroll**"), the Disclosure Statement, the Plan, and related solicitation materials, including the ballots (the "**Ballots**"), notice of non-voting status ("**Notice of Non-Voting Status**"), release opt-out forms ("**Release Opt-Out Forms**"), and notice of the Combined Hearing (collectively, the "**Solicitation Materials**") to holders of Claims and Interests and other parties in interest in accordance with the Disclosure Statement Order, as described in the affidavit filed at Docket No. 5380 and the supplemental affidavit filed at Docket No. 5425 (together, the "**Solicitation Affidavits**") and the *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the (I) Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors and (II) Solicitation of Administrative Expense Claims Opt-Out Forms and Reporting of Opt-Out Forms Received for Administrative Expense Claims Consent Program* (Docket No. 5436), filed on July 10, 2025 (the "**Solicitation Declaration**");

f.  caused to be served, through Kroll, the Administrative Expense Claims Consent Program Opt-Out Form and related materials (the "**Consent Program Materials**") to eligible holders of Administrative Expense Claims in accordance with the Disclosure Statement Order, as described in the Solicitation Affidavits and the Solicitation Declaration;

g.  caused to be served, through Kroll, the Medical Liability Claims Procedures attached as <u>Exhibit D</u> to the Plan, as described in the Solicitation Affidavits and Solicitation Declaration;

h.  caused to be published in the *New York Times*, *Houston Chronicle*, *Boston Globe*, *Midland Reporter-Telegram*, *Miami Herald*, *South Florida Sun Sentinel*, *Texarkana Gazette*, *The Tribune Chronicle & The Vindicator*, *Arizona Republic*, *Florida Today*, *Indian River Press Journal/St Lucie News Tribune/Stuart News*, and *The News-Star* the

2

notice of the Combined Hearing as set forth in the *Certificate of Publication*, filed by Kroll on July 7, 2025 (Docket No. 5393) (the "**Certificate of Publication**");

i. caused to be served, through Kroll, (i) the *Notice of Cure Amounts and Potential Assumption of Executory Contracts and Unexpired Leases in Connection with Confirmation of Plan* (Docket No. 5402) on July 8, 2025 and (ii) the *Second Notice of Cure Amounts and Potential Assumption of Executory Contracts and Unexpired Leases in Connection With Confirmation of Plan* (Docket No. 5507) (collectively, as may be further amended or supplemented from time to time, the "**Cure Notice**") setting forth the applicable Cure Amounts on the counterparties to such Executory Contracts and Unexpired Leases, as applicable, as set forth in the *Affidavit of Service*, filed on July 9, 2025 (Docket No. 5419) and the *Affidavit of Service*, filed on July 15, 2025 (Docket No. 5559);

j. filed (i) on June 25, 2025, the *Notice of Filing of Plan Supplement in Connection with Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. 5207) and (ii) on July 13, 2025, the *Notice of Filing of Amended Plan Supplement in Connection With Joint Chapter 11 Plan of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. 5504) (together, and as may be further amended or supplemented from time to time, the "**Plan Supplement**"); and

k. filed, on June 27, 2025 and July 10, 2025 the (i) *Initial Declaration of John R. Castellano in Support of Confirmation of Chapter 11 Plan* (Docket No. 5219) (the "**Initial Castellano Declaration**"); (ii) the *Declaration of Alan J. Carr in Support of Confirmation of Chapter 11 Plan* (Docket No. 5220) (the "**Carr Declaration**"); (iii) the *Declaration of Marc J. Brown in Support of (I) Confirmation of Debtors' Joint Chapter 11 Plan of Liquidation and (II) The Debtors' Omnibus Objection to the Chapter 7 Conversion Motions* (Docket No. 5221) (the "**Brown Declaration**"); and (iv) the *Supplemental Declaration of John R. Castellano in Support of Confirmation of Debtors' Joint Chapter 11 Plan of Liquidation* (Docket No. 5440) (the "**Castellano Declaration**") (collectively with the Solicitation Declaration, the "**Supporting Declarations**");

l. filed, on July 10, 2025, *Debtors' Memorandum of Law in Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of the Debtors' Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. 5439);

This Court having:

a. approved in the Disclosure Statement Order July 2, 2025 at 5:00 p.m. (Central Time) as the deadline for voting on the Plan;

b. set in the Disclosure Statement Order July 2, 2025, at 5:00 p.m. (Central Time) as the deadline by which objections to Confirmation of the Plan and final approval of the Disclosure Statement must be filed (the "**Objection Deadline**");

3

c. set in the Disclosure Statement Order July 11, 2025 at 9:00 a.m. (Central Time) as the date and time for the Combined Hearing pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

d. reviewed the Disclosure Statement, the Plan, the Confirmation Brief, the Plan Supplement, the Voting Certification, the Supporting Declarations, exhibits, statements, responses, and comments regarding Confirmation, including any and all objections, statements, and reservations of rights filed by parties in interest on the docket of the Chapter 11 Cases;

e. pursuant to the *Order Adjourning Combined Hearing* (Docket No. 5175), adjourned the Confirmation Hearing from July 11, 2025 to July 14, 2025 at 1:00 p.m. (Central Time);

f. held the Combined Hearing from July 14 to July 16, 2025;

g. heard the arguments and considered the evidence presented, proffered, and adduced at the Combined Hearing;

h. considered the entire record of the Combined Hearing;

i. taken judicial notice of the entire record of these Chapter 11 Cases; and

j. overruled all objections to the Plan, Confirmation, final approval of the Disclosure Statement, and all statements and reservations of rights not consensually resolved or withdrawn, except as expressly provided herein.

NOW, THEREFORE, based on the foregoing, and after due deliberation and sufficient cause appearing therefor, this Court hereby FINDS, DETERMINES, and CONCLUDES as follows:

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

a. <u>Findings of Fact and Conclusions of Law</u>.  The findings and conclusions set forth herein and orally on the record of the Combined Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  All findings of fact and conclusions of law announced by this Court at the Combined Hearing in relation to Confirmation of the Plan and final approval of the Disclosure Statement are hereby incorporated into this Confirmation Order and are essential,

inextricable, and nonseverable components and terms of this Confirmation Order and the treatment and distributions provided under the Plan. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

b. <u>Jurisdiction, Venue, Core Proceeding</u>. This Court has jurisdiction over these Chapter 11 Cases pursuant to 28 U.S.C. § 1334. Confirmation of the Plan and final approval of the Disclosure Statement are core proceedings pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order with respect thereto. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. To the extent necessary, the parties have impliedly consented to the entry of a final order by this Court with respect to Confirmation of the Plan and final approval of the Disclosure Statement. The Debtors are eligible debtors under section 109 of the Bankruptcy Code and are proper plan proponents under section 1121(a) of the Bankruptcy Code.

c. <u>Chapter 11 Petitions</u>. On the Petition Date, the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules, and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"). Since the Petition Date, the Debtors have operated their business and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

d. <u>Appointment of Creditors' Committee</u>. On May 16, 2024, the U.S. Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**") in these Chapter 11 Cases pursuant to section 1102 of the

Bankruptcy Code (Docket No. 290).  No trustee or examiner has been appointed in these Chapter 11 Cases pursuant to section 1104 of the Bankruptcy Code.

e.      Judicial Notice.  This Court takes judicial notice of the docket of these Chapter 11 Cases maintained by the Clerk of this Court, including all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before this Court during the pendency of the Chapter 11 Cases.  Any resolution of objections to Confirmation of the Plan or final approval of the Disclosure Statement explained on the record at the Combined Hearing is hereby incorporated by reference.  All unresolved objections, statements, informal objections, and reservations of rights, if any, related to the Plan, the Disclosure Statement, Confirmation of the Plan, or final approval of the Disclosure Statement are overruled on the merits and denied in their entirety.

f.      Burden of Proof.  Based on the record of the Chapter 11 Cases, each of the Debtors has met the burden of proving by a preponderance of the evidence each applicable element of sections 1129(a) and (b) of the Bankruptcy Code, including all other sections of the Bankruptcy Code referenced therein or implicated thereby.

g.      Claims Bar Date.  As evidenced by (i) the affidavits filed at Docket Nos. 1867, 2255, 2344, 2623, 2689, 3005, 3215, 3343, 3428, 3832, and 3860, holders of Claims and Interests were given notice and the opportunity to file Proofs of Claim against the Debtors in accordance with the procedures and deadlines set forth in the *Order (I) Establishing Deadlines and Procedures for Filing Proofs of Claim; (II) Approving Form and Manner of Notice Thereof; and (III) Granting Related Relief* (Docket No. 1564) (the "**Bar Date Order**"); and (ii) the affidavits filed at Docket Nos. 3369, 3838, 3996, 3997, 4748, and 4749, holders of Claims and Interests were given notice and the opportunity to file Proofs of Administrative Claim (as defined in the Administrative

6

Expense Claims Bar Date Order) against the Debtors in accordance with the procedures and deadlines set forth in the *Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claims Bar Date, and (V) Granting Related Relief* (Docket No. 3217) (the "**Administrative Expense Claims Bar Date Order**").

      h.    <u>Principal Purpose</u>. No Governmental Unit has requested that this Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act. As evidenced by its terms, the principal purpose of the Plan is not such avoidance. Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

      i.    <u>Adequacy of Disclosure Statement</u>. The Disclosure Statement contains adequate and extensive information regarding the circumstances of these Chapter 11 Cases and the Plan (and the transactions contemplated therein) so that the parties entitled to vote on the Plan were able to make informed decisions regarding whether to vote to accept or reject the Plan. Additionally, the Disclosure Statement contains "adequate information," as such term is defined in section 1125(a)(1) of the Bankruptcy Code, with respect to the Debtors, the Plan, and the transactions contemplated therein and the Disclosure Statement complies with all other applicable requirements of the Bankruptcy Code.

      j.    <u>Solicitation</u>. As described in and evidenced by the Solicitation Affidavits and the Solicitation Declaration, transmittal and service of the Solicitation Materials and the Consent Program Materials (collectively, the "**Solicitation**") were timely, adequate, appropriate, and sufficient under the circumstances of these Chapter 11 Cases. The Solicitation (i) was conducted

7

in good faith, (ii) complied with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Disclosure Statement Order, and all other applicable non-bankruptcy rules, laws, and regulations applicable to the Solicitation, (iii) was open, transparent, and inclusive, and (iv) was appropriate and satisfactory based upon the circumstances of these Chapter 11 Cases. The Released Parties and the Exculpated Parties acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including with respect to (1) the solicitation of acceptance or rejection of the Plan and (2) the participation in the offer, issuance, sale, or purchase of a security offered or sold under the Plan, and are entitled to the protections of section 1125(e) of the Bankruptcy Code and all other applicable protections and rights provided in the Plan and this Confirmation Order.

k.      <u>Notice</u>.  As evidenced by the Solicitation Affidavits, the Certificate of Publication, and the Solicitation Declaration, all parties required to be given notice of the Combined Hearing (including the deadline for filing and serving objections to Confirmation of the Plan and final approval of the Disclosure Statement) have been given due, proper, adequate, timely, and sufficient notice of the Combined Hearing in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules (including Bankruptcy Rule 3017(d)), the Bankruptcy Local Rules, and all other applicable non-bankruptcy rules, laws, and regulations, and such parties had an opportunity to appear and be heard with respect thereto.  No other or further notice is required with respect thereto.

l.      <u>Voting Record Date</u>.  The Solicitation Materials and the Plan were distributed to holders in the Voting Classes that held a Claim or Interest as of May 21, 2025 (the "**Voting Record Date**").  The establishment and notice of the Voting Record Date were reasonable and sufficient.

m.    <u>Tabulation</u>.  As described in the Solicitation Declaration, (i) the holders of Claims in Class 5 (PBGC Claims) are Impaired under the Plan and voted to accept the Plan in the numbers and amounts required by section 1126 of the Bankruptcy Code at each Debtor entity; (ii) the holders of Claims in Class 3 (FILO Bridge Claims) are Impaired under the Plan voted to accept the Plan in the numbers and amounts required by section 1126 of the Bankruptcy Code; and (iii) the holders of Claims in Class 4 (General Unsecured Claims) are Impaired under the Plan and voted to accept the Plan in the numbers and amounts required by section 1126 of the Bankruptcy Code at 105 Debtor entities.  At the 62 Debtor entities for which the Class 4 (General Unsecured Claims) voted to reject the Plan, either (i) Class 3 (FILO Bridge Claims) voted to accept the Plan, (ii) Class 5 (PBGC Claims) voted to accept the Plan, or (iii) both Class 3 (FILO Bridge Claims) and Class 5 (PBGC Claims) voted to accept the Plan.  All procedures used to tabulate the Ballots were fair, reasonable, and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (effective as of September 18, 2024), the Disclosure Statement Order, and all other applicable non-bankruptcy rules, laws, and regulations. Pursuant to the Disclosure Statement Order, the other Classes of Claims against or Interests in the Debtors are either deemed to reject or presumed to accept the Plan.

n.    <u>Cram Down Requirements</u>.  With respect to each Class that has voted or is deemed to reject the Plan, the requirements of section 1129(b) of the Bankruptcy Code have been satisfied and the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code.  The Plan does not unfairly discriminate between such Class and similarly situated Classes of Claims. Furthermore, the Plan is fair and equitable with respect to the Class of Claims that rejected the Plan, as the Plan provides that no holder of any Claim or Interest that is junior to the Claims or

Interests of such Classes will receive or retain any property under the Plan on account of such junior Claim or Interests.

o.      <u>Bankruptcy Rule 3016</u>.  In accordance with Bankruptcy Rule 3016(a), the Plan and all modifications thereto are dated and identify the Debtors as proponents of the Plan.  The Debtors appropriately filed the Disclosure Statement and the Plan with this Court, thereby satisfying Bankruptcy Rule 3016(b).  The discharge, release, injunction, and exculpation provisions in the Disclosure Statement and the Plan were set forth in bold and with specific and conspicuous language, thereby complying with Bankruptcy Rule 3016(c).

p.      <u>Only One Plan</u>.  The Plan (including previous versions thereof) is the only chapter 11 plan filed in each of these Chapter 11 Cases and, accordingly, satisfies section 1129(c) of the Bankruptcy Code.

q.      <u>Not Small Business Cases</u>.  These Chapter 11 Cases are not small business cases, and accordingly, section 1129(e) of the Bankruptcy Code does not apply to these Chapter 11 Cases.

r.      <u>Executory Contracts and Unexpired Leases</u>.   The Debtors have exercised reasonable business judgment in determining whether to assume or reject Executory Contracts and Unexpired Leases pursuant to <u>Article X</u> of the Plan.  Each assumption of an Executory Contract or Unexpired Lease pursuant to <u>Article X</u> of the Plan shall be legal, valid, and binding upon the applicable Estate Representative and their successors and assigns and all non-Debtor parties and their successors and assigns to such Executory Contract or Unexpired Lease.

s.      <u>Plan Supplement</u>.  The documents contained in the Plan Supplement comply and are consistent with the Bankruptcy Code and the terms of the Plan, and the filing and notice of such documents were good and proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Disclosure Statement Order, and the facts and

circumstances of these Chapter 11 Cases.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan.  Subject to the terms of the Plan, the Debtors reserve the right to alter, amend, update, or modify the Plan Supplement at any time before the Effective Date in accordance with Section 14.6 of the Plan, provided that the Plan Supplement may be amended, supplemented, or otherwise modified by the Debtors with the consent of the Creditors' Committee, which consent shall not be unreasonably withheld, conditioned, or delayed in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; *provided* that, subject to Section 14.6(b) of the Plan, any amendment, supplement, or modification that adversely affects the Litigation Trust shall also require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent) (such consent, not to be unreasonably withheld, conditioned, or delayed).

t. <u>Retention of Causes of Action and Reservation of Rights</u>.  The Debtors filed with this Court the Schedule of Retained Causes of Action as Exhibit 2 to the Plan Supplement. Therefore, in accordance with and as provided by section 1123(b) of the Bankruptcy Code and Section 12.11 of the Plan, except as otherwise provided in the Plan, including Sections 12.6(a), 12.6(b), 12.6(c), 12.7, and 12.8, any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Confirmation Date or Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, but not limited to, any actions specifically enumerated herein, and such rights to commence, pursue, prosecute, and/or settle such Claims or Causes of Action (including, without limitation, any

avoidance action, preference, or other Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, including, without limitation, sections 502(d), 544, 545, 547, 548, 549, 550, 551, 553(b) of the Bankruptcy Code) (collectively, the "**Retained Causes of Action**") shall be preserved, including for the benefit of the Debtors, the Litigation Trust and the Plan Trust, as applicable, notwithstanding the occurrence of the Confirmation Date and the Effective Date. As provided by Section 3.3 and Section 12.11 of the Plan and the Confirmation Order, except as otherwise provided in the Plan, including Sections 12.6(a), 12.6(b), 12.6(c), 12.7, and 12.8, the Debtors, the Plan Trust, and the Litigation Trust, as applicable, shall have, retain, reserve, and be entitled to assert all such Retained Causes of Action as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights and defenses in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced, and shall be entitled to all extension of time and/or tolling provisions provided under section 108 of the Bankruptcy Code, in each case, subject to and as further detailed in paragraph 56 of this Confirmation Order. In accordance with section 1123(b)(3) of the Bankruptcy Code and Section 10.1 of the Plan, except as otherwise provided in the Plan, the Schedule of Retained Causes of Action, or herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Debtors, the Plan Trust, or the Litigation Trust, as applicable. The Debtors, the Plan Trust, and the Litigation Trust, as applicable, shall retain and may enforce any and all such Causes of Action. The Debtors, the Plan Trust, and the Litigation Trust, as applicable, shall have the right, authority, and discretion to determine, initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or

approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

u. <u>Cure of Defaults</u>. In accordance with <u>Article X</u> of the Plan, counterparties to the Debtors' Executory Contracts and Unexpired Leases proposed for potential assumption or assumption and assignment were each served with the Schedule of Assumed Contracts and the applicable Cure Notice, which included the proposed Cure Amounts for each contract or lease listed thereon. The time given to parties in interest to object to the assumption, assumption and assignment, and rejection of their Executory Contracts and Unexpired Leases, and the proposed Cure Amounts, was good and sufficient and no other or further notice is required. The Estate Representative has paid or will pay valid Cure Amounts in the ordinary course, except as otherwise agreed with the relevant counterparty, in accordance with the procedures outlined in <u>Section 10.3</u> of the Plan.

v. <u>Best Interest of Creditors</u>. The liquidation analysis attached to the Disclosure Statement as <u>Exhibit C</u>, and the other evidence presented, proffered, or adduced at the Combined Hearing, including, but not limited to, the Brown Declaration, the Initial Castellano Declaration, the Castellano Declaration, and the Plan Supplement (i) are persuasive and credible, (ii) have not been controverted by any evidence, and (iii) establish that each holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

w. <u>Feasibility</u>. The information contained in the Disclosure Statement, and the other evidence presented, proffered, or adduced at the Combined Hearing, including the Initial

Castellano Declaration and the Castellano Declaration, (i) are persuasive and credible, (ii) have not been controverted by any evidence, and (iii) establishes that the Plan is feasible and provides adequate and appropriate means for its implementation and an orderly wind down and liquidation of the Debtors' estates, as contemplated by the Plan, thereby satisfying the requirements of section 1129(a)(11) of the Bankruptcy Code.

x.      <u>Directors</u>.  The managers, officers, and directors of the Debtors shall be relieved of any and all duties with respect to the Debtors as of the Confirmation Date of the Plan.  The identities and affiliations of the persons proposed to serve as the initial directors, managers, or officers of the Debtors, as applicable, on and after the Confirmation Date each have been fully disclosed to the extent such information is available, and the appointment to, or continuance in, such offices of such persons as described in <u>Section 5.10</u> of the Plan and in the Plan Supplement is consistent with the interests of holders of Claims against and Interests in the Debtors and with public policy.

y.      <u>Preservation of Privilege</u>.  Nothing contained in this Confirmation Order, any of the Plan Documents, the Supporting Declarations, or any and all other documents related thereto is intended to, nor constitutes, nor should be deemed to constitute a waiver by the Debtors, their Estates, or any successors in interest, including but not limited to the Litigation Trust or the Plan Trust, of any relevant privilege(s), or rules, including, but not limited to, the attorney-client privilege, the common-interest privilege and the attorney work-product rule.

z.      <u>Release, Exculpation, and Injunction Provisions</u>.  The injunction, release, and exculpation provisions contained in the Plan, as modified by this Confirmation Order, for the benefit of the Released Parties and Exculpated Parties, as applicable, are essential components of the Plan.

aa.     Good and valid justifications have been demonstrated in support of the releases, as modified by this Confirmation Order, granted by the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee (the "**Debtor Releases**"), and the Debtors have satisfied the business judgment standard with respect to the Debtor Releases.  The Debtor Releases offer protection to parties that played an integral role in the chapter 11 cases.  The Plan reflects the settlement and resolution of several complex issues, and the Debtor Releases are an integral part of the consideration to be provided in exchange for the compromises and resolutions embodied in the Plan.  Each of the Released Parties made significant concessions or contributions to the chapter 11 cases and/or otherwise cooperated constructively to enable the Debtors to maximize the value of their Estates.  Therefore, the Debtor Releases represent a valid exercise of the Debtors' business judgment.

bb.     The releases contained in Section 12.6(b) of the Plan (the "**Third-Party Releases**") are appropriate and consensual as to all relevant parties, including on the part of the Releasing Parties.  The Third-Party Releases were conspicuously disclosed in the Ballots (forms of which were attached as Schedules 3-5 to the Disclosure Statement Order), the Notice of Non-Voting Status (a form of which was attached as Exhibit 6 to the Disclosure Statement Order), the Release Opt-Out Form (a form of which was attached as Exhibit 7 to the Disclosure Statement Order), the Disclosure Statement, and the Plan.  Holders of Claims and Interests were duly informed of the Third-Party Releases, including through the Release Opt-Out Forms, and given the opportunity to opt out.  The release provisions contained in Section 12.6(b) of the Plan are consensual under applicable law because (1) all Releasing Parties were given due and adequate notice of the Third Party Releases and sufficient opportunity and instruction to elect to opt out of such releases in accordance with the Disclosure Statement Order and paragraph 40 of the Procedures for Complex

15

Cases in the Southern District of Texas, effective September 18, 2024, and (2) the releases therein are provided only by (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan was solicited but that did not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases. The Third-Party Releases are consensual and: (1) essential to the Confirmation of the Plan; (2) given in exchange for the good and valuable consideration provided by the Released Parties; (3) a good faith settlement and compromise of the Claims released by the Third-Party Releases; (4) in the best interests of the Debtors and the Debtors' Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Releases, except as otherwise expressly set forth in the Plan. The Third-Party Releases are an integral part of the Plan that is supported by the Classes entitled to vote on the Plan. Like the Debtor Releases, the Third-Party Releases facilitated participation in both the Plan and the chapter 11 process generally. The Third-Party Releases are

instrumental to the Plan and were critical in incenting the parties to support the Plan. The Third-Party Releases are appropriately tailored under the facts and circumstances of the Chapter 11 Cases. Parties-in-interest have had a full opportunity to opt out of the Third-Party Releases. As such, the Third-Party Releases appropriately offer certain protections to parties that constructively participated in the Debtors' restructuring process by, among other things, supporting the Plan.

cc. Each of the (x) Notices of Non-Voting Status, which were sent to holders of Claims and Interests in Classes not entitled to vote on the Plan (except with respect to holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests)), (y) the Ballots, which were sent to holders of Claims and Interests in Classes entitled to vote on the Plan, and (z) the Release Opt-Out Forms, which were sent as an attachment to the Notice of Non-Voting Status, expressly included, in bold font, the terms of the Third-Party Releases, as set forth in Section 12.6(b) of the Plan. The language of the Third-Party Releases was also emphasized using bold font in the Plan and the Disclosure Statement. The Notice of Non-Voting Status, the Ballots, and the Release Opt-Out Form advised careful review and consideration of the terms of the Third-Party Releases, along with the exculpation and injunction provisions. The Debtors sufficiently put the Releasing Parties on notice of the Claims being released and the opt-out procedures and provided sufficient time and instruction for such parties to elect to opt out of such releases.

dd. The process described in the Solicitation Declaration and the Solicitation Affidavits that the Debtors and Kroll followed to identify the relevant parties on which to serve the applicable Ballot, Notice of Non-Voting Status, and/or Release Opt-Out Form (i) is consistent with the industry standard and (ii) was reasonably calculated to ensure that each Holder of Claims or Interests in each Class was informed of its ability to opt out of the releases and the consequences for failing to timely do so. For the avoidance of doubt, any party that validly elected in the Release

Opt-Out Form or in the Ballot to opt out of the Third-Party Releases prior to any deadline to submit a Ballot, whether under any original or extended deadline, shall be neither a Released Party nor a Releasing Party under the Plan.

ee.    Accordingly, as has been established based upon the record in these Chapter 11 Cases, the Supporting Declarations, and the evidence presented in connection with the Combined Hearing, the release provisions contained in <u>Article XII</u> of the Plan (i) were integral to the agreements among the various parties in interest and are essential to the formulation and implementation of the Plan, as required by section 1123 of the Bankruptcy Code, (ii) are consistent with and permissible under applicable law, (iii) were given in exchange for good and valuable consideration provided by the Released Parties, (iv) are in the best interests of the Debtors, the Debtors' Estates, holders of Claims and Interests, and all other parties in interest, (v) were negotiated in good faith and at arm's length, (vi) confer substantial benefits on the Debtors, the Debtors' estate, and the Debtors' creditors, and (vii) are fair, equitable, and reasonable, and failure to implement the Debtor Releases, Third-Party Releases, injunctions, and exculpation provisions set forth in the Plan and approved in this Confirmation Order would seriously impair and jeopardize the Debtors' ability to confirm and implement the Plan, and the compromises and settlements provided therein.

ff.    The exculpation provisions contained in the Plan and this Confirmation Order are appropriately tailored to the circumstances of these Chapter 11 Cases and are appropriate under applicable law, including *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419 (5th Cir. 2022) and *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 132 F.4th 353 (5th Cir. 2025), because they are supported by proper evidence, proposed in good faith, formulated following

extensive good faith, arm's-length negotiations with key constituents, and appropriately limited in scope. The Exculpated Parties reasonably relied upon the exculpation provisions as a material inducement to engage in postpetition negotiations with the Debtors and other key stakeholders that culminated in the Plan, the Plan Settlement (including the Plan Support Agreement Term Sheet), the FILO Settlement (as defined in the Disclosure Statement), and all other settlements and compromises therein that maximize value for the Debtors' Estates. The record in these Chapter 11 Cases supports that the exculpation provisions are appropriately tailored to protect the Exculpated Parties from unnecessary litigation and contain appropriate carve outs for actions determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence.

gg.     The record in these Chapter 11 Cases further supports that the members of the Transformation Committee exhibited the highest standards of professionalism and due diligence in the performance of all of their roles as managers, directors, and officers in these cases. The members of the Transformation Committee (i) were integral to the restructuring, (ii) exercised the highest level of prudent business judgment after exhaustive diligence in their decision making; (iii) satisfied such duties fully, completely, professionally and admirably at all times and in all capacities throughout these Chapter 11 Cases.

hh.     The injunction provisions contained in the Plan are essential to the Plan, are appropriate under applicable law, including *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 132 F.4th 353 (5th Cir. 2025), and are necessary to implement the Plan and to preserve and enforce the discharge, release, and exculpation provisions of the Plan. The injunction provisions are appropriately tailored to achieve those purposes. Subject in all respects to <u>Section 13.1</u> of the Plan, no Entity may commence or

pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part, such Claims and Causes of Action as described in Section 12.5(b) of the Plan, without this Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.

ii.    The record of the Combined Hearing and the Chapter 11 Cases is sufficient to support the injunctions, releases, and exculpation provided for in Article XII of the Plan and in this Confirmation Order.  Accordingly, based upon the record of the Chapter 11 Cases, the representations of the parties, and/or the evidence proffered, adduced, and/or presented at the Combined Hearing, the injunctions, releases, and exculpation set forth in Article XII of the Plan and in this Confirmation Order are consistent with the Bankruptcy Code and applicable law and are approved.

jj.    For purposes of the *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment for Future Utility Companies; (II) Approving Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* (Docket No. 91) (the "**Utilities Order**"), each Debtor has sold all or substantially all of its assets.

kk.    Administrative Expense Claims Consent Program.  The Administrative Expense Claims Consent Program Opt-Out Form was distributed to eligible holders of Administrative Expense Claims as of May 21, 2025 (the "**Administrative Claims Record Date**").    The

establishment and notice of the Administrative Claims Record Date were reasonable and sufficient. The Administrative Expense Claims Consent Program Condition has been waived in accordance with the Plan.

ll.    Certain holders of Claims entitled to priority under section 507 of the Bankruptcy Code have entered into settlements with the Debtors (including, for the avoidance of doubt, by failing to opt out of the Administrative Expense Claims Consent Program after being duly served with an election form in accordance with the Disclosure Statement Order) whereby such holder has agreed to accept a different treatment than that provided for by sections 1129(a)(9) of the Bankruptcy Code.  For any holder that has not agreed to such an alternative treatment, Section 2.1 of the Plan provides that such holder shall receive treatment consistent with section 1129(a)(9) of the Bankruptcy Code.  As such, the Plan complies with the requirements of section 1129(a)(9) of the Bankruptcy Code.

mm.    As evidenced by the Solicitation Affidavits and the Solicitation Declaration, all parties required to be given notice of the Administrative Expense Claims Consent Program have been given due, proper, adequate, timely, and sufficient notice of the Administrative Expense Claims Consent Program in accordance with the Disclosure Statement Order, and such parties had an opportunity to appear and be heard with respect thereto.  The procedures to opt out of the Administrative Expense Claims Consent Program provide adequate procedures to solicit opt-out elections from eligible holders of Administrative Expense Claims with respect to the Administrative Expense Claims Consent Program and otherwise to inform eligible holders regarding their rights and available choices with respect to such program.  No other or further notice is required with respect thereto.

nn.     <u>Modifications to Plan</u>.  Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan made after solicitation of the Plan or in this Confirmation Order (including any modifications announced on the record of the Combined Hearing) constitute technical or clarifying changes, changes with respect to particular Claims or Interests by agreement with holders of such Claims or Interests, or such modifications do not materially and adversely affect or change the treatment of any other Claim or Interest under the Plan.  Notice of these modifications was adequate and appropriate under the facts and circumstances of these Chapter 11 Cases.  In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that holders of Claims or Interests be afforded any further opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan is properly before this Court, and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

oo.     <u>Compromises and Settlements</u>.  The Plan is deemed to constitute a motion under section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 with respect to all settlements provided for therein, including but not limited to, the PBGC Settlement, each settlement of Administrative Expense Claims under the Administrative Expense Claims Consent Program, the FILO Settlement, and the Plan Settlement (collectively, the "**Plan Settlements**"). Entry of this Confirmation Order constitutes this Court's approval of the terms of the Plan Settlements provided for under the Plan and compromises, including the releases in connection with the Plan Settlements.  For the avoidance of doubt, the FILO Settlement was approved by this Court pursuant to the *Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO*

DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 5035) (the "**FILO Settlement Order**"), and nothing in the Plan or this Confirmation Order or otherwise shall modify the FILO Settlement Order.  In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases, and other benefits provided under the Plan and with the support of the various creditors, stakeholders, and other parties in interest, including the FILO Parties and the Creditors' Committee and its members: (i) Philips North America LLC; (ii) Medline Industries LP; (iii) Cross Country Healthcare, Inc.; (iv) Cerner Corporation; (v) Sodexo, Inc.; (vi) R1 RCM, Inc.; (vii) Creditor Initials: J.D.C.; (viii) Pension Benefit Guaranty Corporation; and (ix) 1199SEIU United Healthcare Workers East (collectively, the "**Creditors' Committee Members**"), the provisions of the Plan, including the Plan Settlements, constitute a good faith compromise and settlement of all Claims, Causes of Action, disputes, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  In addition, the compromises and Plan Settlements embodied in the Plan are integral to the Plan and preserve value by enabling the Debtors to avoid extended, value-eroding litigation. Entry of this Confirmation Order constitutes this Court's approval of the Plan Settlements, and a finding by this Court that the Plan Settlements are fair, equitable, and reasonable and in the best interests of the Debtors, the Debtors' Estates, and holders of Claims and Interests because, among other things: (a) each of the Plan Settlements reflects a reasonable balance between the possible success of litigation with respect to each of the settled claims and disputes, on the one hand, and the benefits of fully and finally resolving such claims and disputes and allowing the Debtors to expeditiously exit chapter 11, on the other hand; (b) absent each of the Plan Settlements, there is a

likelihood of complex and protracted litigation with the attendant expense, inconvenience, delay and uncertainty that has a possibility to derail the Debtors' efforts to maximize value for their creditors and would jeopardize the Debtors' ability to confirm and implement the Plan, and the compromises and settlements provided therein; (c) each of the parties supporting each of the Plan Settlements, including the Debtors, the FILO Parties, the Creditors' Committee, and the PBGC, are represented by counsel that is recognized as being knowledgeable, competent, and experienced; (d) each of the Plan Settlements is the product of arm's-length bargaining and good faith negotiations between sophisticated parties; and (e) each of the Plan Settlements will maximize the value of the Debtors' Estates and distributions to holders of Allowed Claims and is essential to the successful implementation of the Plan.  Based on the foregoing, the Plan Settlements satisfy the requirements of applicable Fifth Circuit law for approval of settlements and compromises pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019, and the Plan Settlements are hereby approved.

pp.    <u>Litigation Trust</u>.  In accordance with paragraph 11 of the FILO Settlement Order, and the terms of the Plan, the Litigation Trustee shall be a fiduciary and owe fiduciary duties to all beneficiaries of the Litigation Trust, collectively, and, without limitation, shall act as a 'trustee' with respect to the Litigation Trust Assets for purposes of rights granted under 11 U.S.C. § 108, with the authority of a debtor-in-possession or trustee to assert such rights under said statute, whether in judicial, administrative or arbitration proceedings, whether during or after the pendency of these cases.  For the avoidance of doubt, the beneficiaries of the Litigation Trust include holders of Class B Interests, and accordingly, the Litigation Trustee shall be a fiduciary and owe fiduciary duties to the Estates, in their capacities as beneficiaries of the Class B Interests, collectively with the beneficiaries of the Class A Interests, with respect to the Litigation Trust Assets and the pursuit

thereof. Such fiduciary duties of the Litigation Trustee pursuant to paragraph 11 of the FILO Settlement Order shall be without limitation to any other duties or obligations expressly provided for in this Confirmation Order or the Litigation Trust Agreement.

qq.     <u>Good Faith</u>.  The Debtors have proposed the Plan and all documents necessary to effectuate the Plan, contained in the Plan, or contemplated by the Plan, including the Disclosure Statement, Plan Supplement and, for the avoidance of doubt, the Definitive Documents (collectively, the "**Plan Documents**") in good faith and not by any means forbidden by applicable law.  In so finding, this Court has considered the totality of the circumstances of these cases, the formulation and negotiation of the Plan and all modifications thereto, the Plan Settlement, the FILO Settlement, and the Administrative Expense Claims Consent Program.  The Debtors' good faith is evident from the facts and record of these Chapter 11 Cases, the Solicitation Materials, the Supporting Declarations, the record of the Combined Hearing, and other proceedings held before this Court in these Chapter 11 Cases.  The Plan Documents were negotiated at arm's length in good faith.  The Debtors, the FILO Parties, the Creditors' Committee, the Released Parties, the Exculpated Parties, and each of the foregoing Person's applicable Related Parties, including, without limitation, the Litigation Funding Agent, the Class A-2 Representative and the Class B Representative, have been and will be acting in good faith if they proceed to: (i) consummate the Plan and the agreements, settlements, transactions, distributions, and other transfers contemplated therein and in this Confirmation Order, including the funding or deemed funding (in each case, to the extent applicable), of the Litigation Funding and Estate Funding in accordance with the terms and conditions of the Commitment Letter (as defined in the FILO Settlement Order); (ii) make any distributions pursuant to the terms and conditions of the Plan, the Litigation Trust Agreement, and this Confirmation Order, as applicable; (iii) carry out any transactions contemplated by the Plan,

including, without limitation, the establishment and administration of the Litigation Trust in accordance with the FILO Settlement Order and Litigation Trust Agreement; and (iv) take any actions authorized by the Plan and this Confirmation Order.

rr.      Substantive Consolidation.  The evidence in support of the Plan that was proffered or adduced at or prior to the Combined Hearing, including the Initial Castellano Declaration, the Castellano Declaration, and all other pleadings in support of the Plan, established that the substantive consolidation of the Chapter 11 Cases of the Debtors for distribution purposes pursuant to this Confirmation Order and Section 5.3 of the Plan is (i) in the best interests of the Debtors, the Estates, and all holders of Claims, (ii) fair, equitable, and reasonable, (iii) effected after due notice and opportunity for a hearing, and (iv) appropriate under Bankruptcy Code sections 105(a) and 1123(a)(5)(C).

ss.      Satisfaction of Confirmation Requirements.  The Plan satisfies the requirements for confirmation by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation, as set forth in section 1129 of the Bankruptcy Code.

tt.      Likelihood of Satisfaction of Conditions Precedent to Effective Date.  Each of the conditions precedent to the Effective Date, as set forth in Article XI of the Plan, has been or is reasonably likely to be satisfied or waived in accordance with the Plan.

## **ORDER**

**ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:**

**A.      Findings of Fact and Conclusions of Law**

1.      The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule

9014. All findings of fact and conclusions of law announced by this Court on the record at the Combined Hearing in relation to Confirmation of the Plan and/or final approval of the Disclosure Statement are hereby incorporated into this Confirmation Order. To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and vice versa.

**B.**  **Notice of the Combined Hearing, Solicitation, and Tabulation**

2.  Notice of the Combined Hearing, the Solicitation, and the tabulation of submitted Ballots, Administrative Expense Claim Opt-Out Forms, Release Opt-Out Forms, and Medical Liability Claims Procedures complied with the Disclosure Statement Order, were appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, uncontroverted, and were in compliance with the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

**C.**  **Final Approval of Disclosure Statement**

3.  The Disclosure Statement is approved on a final basis as having adequate information as contemplated by section 1125(a)(1) of the Bankruptcy Code.

**D.**  **Confirmation of Plan**

4.  As modified by the Confirmation Order, the Plan and each of its provisions are confirmed pursuant to section 1129 of the Bankruptcy Code. The Plan Documents, including, without limitation, the Plan Supplement, are hereby authorized and approved. The terms of the Plan and the Plan Documents are incorporated herein by reference and are an integral part of this Confirmation Order. The terms of the Plan, the Plan Documents, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Confirmation Date or Effective Date, as applicable, upon the Estate Representative, the Litigation Trustee, any and all holders of Claims or Interests (irrespective of whether holders of such Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity

acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  Except as provided by this Confirmation Order, subject to the terms of the Plan, including <u>Section 14.6</u> thereof, the Estate Representative is authorized to alter, amend, update, or modify the Plan Documents on or prior to the Effective Date.  The failure to specifically include or refer to any particular article, section, or provision of the Plan or the Plan Documents in this Confirmation Order shall not diminish or impair the effectiveness or enforceability of such article, section, or provision nor constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

5.     All actions contemplated to take place upon or following the Confirmation Date pursuant to the Plan or any of the Plan Documents are hereby authorized.  The Estate Representative, the Plan Trust, the Litigation Trust, or any other party contemplated by the Plan Documents, as applicable, are authorized to take all actions required under the Plan or the Plan Documents to effectuate the Plan and the Plan Documents and the transactions contemplated therein.

**E.     Objections**

6.     Except as set forth herein, any objections (including any reservations of rights contained therein) to Confirmation of the Plan and/or final approval of the Disclosure Statement, including, but not limited to, the objections filed at Docket Nos. 5173, 5186, 5201, 5268, 5270, 5275, 5276, 5279, 5284, 5286, 5287, 5288, 5289,5290, 5291, 5293, 5294, 5295, 5296, 5297, 5298, 5301, 5305, 5306, 5307, 5309, 5311, 5313, 5314, 5316, 5318, 5320, 5328, 5329, 5332, 5331, 5334, 5335, 5336, 5337, 5339, 5340, 5341, 5342, 5344, 5346, 5315, 5350, 5352, 5355, 5366, and 5369, or other responses or reservations of rights with respect to Confirmation of the Plan and/or final approval of the Disclosure Statement that have not been withdrawn or resolved prior to entry of

this Confirmation Order shall be, and hereby are, overruled on the merits and denied. All objections to Confirmation of the Plan not filed and served prior to the Objection Deadline, if any, are deemed waived and shall not be considered by this Court.

7. *Reservations of Rights*. Notwithstanding anything to the contrary in this Confirmation Order, the reservations of rights and all other terms and provisions included on **Schedule 1** attached hereto are incorporated by reference herein.

**F.     No Action**

8. Pursuant to the appropriate provisions of any applicable state's general corporation or limited liability company laws, other applicable non-bankruptcy law, and section 1142(b) of the Bankruptcy Code, (i) no action of the respective directors, managers, members, stockholders, or other equity holders of the Debtors shall be required to authorize the Debtors or other applicable Estate Representative to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, including any Plan Document, and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including any Plan Document, and (ii) to the extent the Debtors or other applicable Estate Representative determines (a) any Entity is a necessary party to execute and deliver or join in the execution or delivery of any instrument required to effect a transfer of property dealt with by the Plan, including any Plan Document, or (b) any Entity (other than any party to the FILO Settlement Term Sheet, the Litigation Trust, or the Litigation Trustee) is a necessary party to perform any other act in furtherance of the transactions contemplated by the Plan and the transactions contemplated by the Plan or this Confirmation Order, including any Plan Document, and this Confirmation Order, and in furtherance of consummation of the Plan, and, in each case, such Entity is so informed by the Debtors or other applicable Estate Representative,

then such Entity is directed to take such steps as necessary to comply with the foregoing and section 1142(b) of the Bankruptcy Code.

### G.  Governmental Approvals Not Required

9.  Except as otherwise expressly set forth herein, or as set forth in the Plan Documents, including the Plan Supplement, this Confirmation Order constitutes all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation and consummation of the Plan and the Plan Documents and any other acts that may be necessary or appropriate for the implementation or consummation of the Plan or the Plan Documents to the fullest extent permitted by law and nothing herein to the contrary shall diminish the authority of section 1142 of the Bankruptcy Code.

### H.  Implementation

10.  The Debtors, the Plan Trust, or other applicable Estate Representative and the appropriate officers, representatives, trustees, and members of the boards of managers or boards of directors thereof (including, for the avoidance of doubt, the Plan Administrator Committee), as applicable, shall be authorized to and may issue, execute, deliver, file, or record such documents, securities, contracts, instruments, releases, and other agreements, including the Plan Documents, and take any other actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, including any and all transactions or other actions delineated in the Plan or otherwise contemplated by the Plan or the Plan Documents, including the conversion, merger, or dissolution of any Debtor, without the need for any further approvals (including, without limitation, by any stockholder, member, equity holder, board of directors, or board of managers), authorization, or consents, except for those expressly required pursuant to the Plan.  All actions contemplated by the Plan, including all actions in connection with any Plan Document, are hereby effective and authorized to be taken on, prior to, or after the Effective Date,

as applicable, without further application to, or order of this Court, or further action by the respective officers, directors, managers, members, stockholders, or equity holders of the Debtors.

11. This Confirmation Order authorizes (i) the creation and implementation of the Plan Trust in accordance with the terms of this Confirmation Order, the Plan, and the Plan Trust Agreement, and (ii) the appointment of (a) the Plan Administrator Committee in accordance with the terms of Section 5.10 of the Plan and (b) the Plan Trustee in accordance with Section 6.3 of the Plan to accomplish the purposes of the Plan Trust, as set forth in and subject to the Plan Trust Agreement and the Plan, notwithstanding any otherwise applicable non-bankruptcy law.

12. Except as otherwise provided in the Plan (including in all respects Sections 12.6(a), 12.6(b), 12.7, and 12.8 of the Plan), the Plan Documents, the Plan Supplement, the FILO Settlement Order, or this Confirmation Order, on and after the Litigation Trust Establishment Date or Plan Trust Establishment Date (as applicable), pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan or the Plan Supplement, shall vest in the Litigation Trust or the Plan Trust (as applicable) free and clear of all Claims, Liens, encumbrances, charges, constructive trusts, and other interests to the extent permitted under applicable law. The Litigation Trust shall issue (i) the Class A-1 Trust Interests to the Litigation Funders; (ii) the Class A-2 Trust Interests to the FILO Parties; and (iii) the Class B Trust Interests to Steward Health Care Holdings LLC on behalf of the Estate (each as defined in the Litigation Trust Agreement) as provided for in the Plan, FILO Settlement, and the Litigation Trust Agreement. For the avoidance of doubt, nothing in this Confirmation Order alters, supersedes, limits, or amends any releases granted by any prior order of this Court, including, but not limited to those set forth in the FILO Settlement Order.

13.     Pursuant to the terms of the Plan (in accordance with the Litigation Trust Agreement, and Plan Trust Agreement, as applicable), on and after the Plan Trust Establishment Date or Litigation Trust Establishment Date (as applicable), the Plan Administrator Committee, the Plan Trustee or Litigation Trustee (as applicable) may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Interests without supervision of or approval by the Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than, with respect to the Plan Trustee, restrictions expressly imposed by the Plan or this Confirmation Order.

I.      **Plan Administrator Committee**

14.     As set forth in <u>Section 5.10</u> of the Plan, on and after the Confirmation Date and until the Plan Trust Establishment Date, the Plan Administrator Committee shall have exclusive governance rights of the Estates and be authorized to implement the Plan and any applicable orders of the Court in accordance with the Plan Administrator Agreement, pursuant to the terms and conditions of the Plan. The Plan Administrator Committee shall initially be comprised of Monica Blacker, Alan J. Carr, and William Transier. Monica Blacker shall serve as the initial chairperson of the Plan Administrator Committee (the "**Committee Chairperson**"). Except as otherwise provided in the Plan Trust Agreement, any decision by the Plan Administrator Committee shall require the affirmative vote of at least two (2) of the three (3) members of the Plan Administrator Committee; provided that the Plan Administrator Committee shall not act without the consent of the Committee Chairperson. Upon the Plan Trust Establishment Date, the Plan Trustee shall accede to the rights and obligations of the Plan Administrator Committee. Subject to the terms of the Plan Documents, the Estate Representative may retain professionals and pay the charges that it incurs on behalf of the Estates after the Confirmation Date for professionals' fees, disbursements, expenses, or related support services without application to the Court. Notwithstanding

Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, the provisions of this paragraph shall become immediately effective and enforceable and deemed binding upon entry of this Confirmation Order.

## J.  Wind Down

15.   Pursuant to the Plan and subject to the Wind Down Budget, the Estate Representative shall implement the Wind Down.  On the Confirmation Date, the Wind Down Reserve shall be established in accordance with the Wind Down Budget and the Plan.  The Estate Representative may use the funds in the Wind Down Reserve to fund the Wind Down solely in accordance with the Wind Down Budget and the Plan.  For the avoidance of doubt, neither the FILO Parties nor the Litigation Trust shall have any obligation to fund the Wind Down Reserve, other than providing the Estate Funding in accordance with the terms of the FILO Settlement Order, and no Retained Collateral or proceeds thereof shall be used to fund the Wind Down Reserve; *provided* that for the avoidance of doubt, the foregoing shall not limit the Litigation Trusts' obligations under the Litigation Trust Agreement.

16.   In accordance with the Plan and pursuant to this Confirmation Order, confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code, because the Debtors and their Estates will be wound down in accordance with the Plan.

## K.  Plan Transactions

17.   The Debtors or the applicable Estate Representative may take all actions consistent with this Confirmation Order and the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate any transactions contemplated in the Plan, this Confirmation Order, or the Plan Documents, including, for the avoidance of doubt, the Wind Down.

18.     This Confirmation Order shall, and shall be deemed to, pursuant to sections 363, 1123, 1142, 1145, and 1146 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Wind Down, and, to the extent such actions were taken before the Confirmation Date, such actions are ratified in all respects, and, in each case, no further approvals, authorization, or consents shall be required, except those expressly required pursuant to the Plan or this Confirmation Order.  The FILO Parties, the Creditors' Committee and the Creditors' Committee Members, each of the foregoing Person's Related Parties, and any other parties necessary to effectuate, to the fullest extent permitted under section 1142 of the Bankruptcy Code, any transactions approved by, contemplated by, or necessary to effectuate the Plan, shall be deemed to consent to any such transactions.

## L.     Administrative Expense Claims Bar Date

19.     Each Entity that asserts an Administrative Expense Claim against the Debtors on account of a Claim (i) for which a proof of claim was not required to be submitted pursuant to the Bar Date Order or Administrative Expense Claims Bar Date Order, and (ii) which is not a Professional Fee Claim, must file an original written proof of administrative expense claim, substantially in the form attached hereto as **Exhibit D** (a "**Proof of Administrative Claim**").  Any such Proofs of Administrative Claim must be filed so they are actually received by Kroll by (i) the first Business Day that is twenty (20) days following the Confirmation Date with respect to Administrative Expense Claims (other than Professional Fee Claims) held by any Entity (including any Governmental Unit) arising prior to the Confirmation Date that are not subject to the Administrative Expense Claims Bar Date Order, or (ii) the first Business Day that is twenty (20) days following the Effective Date, with respect to Administrative Expense Claims (other than

Professional Fee Claims) held by any Entity (including any Governmental Unit) arising between the Confirmation Date and the Effective Date (the "**Administrative Expense Claims Bar Date**").

20.     Holders of Administrative Expense Claims that are required to file a request for payment of such Administrative Expense Claims and that do not file such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors and their successors, as applicable, and their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released without consideration as of the Effective Date. The Debtors may agree to extend the Administrative Expense Claims Bar Date or otherwise modify the requirements hereunder on behalf of a requesting claimant following consultation with the Creditors' Committee and the FILO Parties.

21.     For the avoidance of doubt, until the Effective Date of the Plan, the provisions of paragraph 16 of the Administrative Expense Claims Bar Date Order shall continue in full force and effect, and  Administrative Expense Claims that were required to have been filed pursuant to the Administrative Expense Claims Bar Date Order shall not be entitled to payment prior to the Effective Date of the Plan unless otherwise ordered by the Court. The procedures set forth in Article IX of the Plan apply to the holders of Administrative Expense Claims.

**M.     Administrative Expense Claims Consent Program**

22.     The holders of Allowed Administrative Expense Claims that received an Administrative Expense Claims Consent Program Opt-Out Form that did not timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program will receive a recovery of 50% of their applicable reconciled Administrative Expense Claim listed on the Administrative Expense Claims Consent Program Opt-Out Form (each, a "**Settled Administrative Expense Claim**"). On the first Business Day after the date that is (45) calendar

days after the Confirmation Date, or as soon thereafter as reasonably practicable, distributions to holders of Settled Administrative Expense Claims shall have commenced, and each holder of a Settled Administrative Expense Claim shall receive their Pro Rata Share of the Settled Administrative Expense Claims Cash Pool, up to their Settled Administrative Expense Claim, with the balance of the Settled Administrative Expense Claim paid in Cash in accordance with Section 2.1(a) of the Plan; *provided* that the holders of such Settled Administrative Expense Claims shall not seek payment of the remainder of their Settled Administrative Expense Claims prior to the effective date of any chapter 11 plan.

23. The terms of the Administrative Expense Claims Consent Program, including all other relevant and necessary documents related thereto, shall be effective immediately and binding on all parties in interest upon the entry of this Confirmation Order. The failure to specifically include or refer to any related document in this Confirmation Order does not diminish or impair the effectiveness or enforceability of such document, it being the intention of the Court that all such documents are approved in their entirety.

24. Unless otherwise agreed or stipulated to by the Debtors: (i) all Settled Administrative Expense Claims shall be deemed Allowed subject to and in accordance with the terms of the Administrative Expense Claims Consent Program and this Confirmation Order, (ii) all Administrative Expense Claims held or asserted by the holders that were sent an Administrative Expense Claims Consent Program Opt-Out Form and did not timely, properly, and affirmatively opt out in the Administrative Expense Claims Consent Program shall be disallowed other than the Settled Administrative Expense Claims, and (iii) all other Administrative Expense Claims shall not be treated as Settled Administrative Expense Claims. Kroll, as claims and noticing agent, is hereby authorized to update the claims register (i) for these chapter 11 cases to reflect this

paragraph 24 and with respect to the implementation of the Administrative Expense Claims Consent Program, and (ii) any other agreements set forth in this Confirmation Order. Holders of Administrative Expense Claims that did not timely, properly, and affirmatively opt out of the Administrative Expense Claims Consent Program are deemed to accept treatment under the Plan and the Administrative Expense Claims Consent Program in accordance therewith in satisfaction of section 1129(a)(9) of the Bankruptcy Code.

**N.     Specified Claims Bar Date**

25.     Notwithstanding anything in any prior order of the Bankruptcy Court to the contrary, including, but not limited to, the Bar Date Order, any Entity that (i) asserts any claim of an employee of the Debtors for unused paid time off (other than an employee of the Debtors subject to the Bar Date Order); (ii) asserts any claim that is solely against any non-Debtor affiliate(s); and/or (iii) is a non-Debtor affiliate asserting a claim against a Debtor affiliate (collectively, the "**Specified Claims**") must file a proof of claim in substantially the form attached to the Bar Date Order as Exhibit 1 thereto (the "**Proof of Claim**") so that it is actually received by Kroll on or before the first Business Day that is twenty (20) days following the Confirmation Date with respect to Specified Claims held by any such Entity arising prior to the Petition Date (the "**Specified Claims Bar Date**").

**O.     Medical Liability Claims**

26.     Following entry of the Confirmation Order, and notwithstanding anything to the contrary in a Plan Document, the automatic stay shall remain in effect with respect to all Medical Liability Claims against the Debtors and shall only be modified in accordance with the Medical Liability Claims Procedures.

**P.      Claim Allowance and Disallowance**

27.      All Claims expressly Allowed or Disallowed pursuant to the Plan and/or this Confirmation Order shall be Allowed or Disallowed, respectively, and the Claims and Noticing Agent is authorized to update the claims register maintained in the Chapter 11 Cases accordingly.

**Q.      Distributions**

28.      The Debtors or the applicable Estate Representative are authorized and directed to make all distributions under the Plan pursuant to the terms of the Plan and to pay, as applicable, any fees and expenses approved by this Confirmation Order or any other order of this Court.

**R.      Executory Contracts and Unexpired Leases**

29.      Pursuant to Article X of the Plan, as of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases to which any of the Debtors are a party shall be deemed rejected except for an Executory Contract or Unexpired Lease that: (i) is specifically and expressly designated as a contract or lease to be assumed pursuant to the Plan, including as set forth in the Schedule of Assumed Contracts or Confirmation Order; (ii) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Court or assumed and assigned pursuant to pursuant to a Final Order of the Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate pending assumption or rejection motion on or before the Effective Date; (v) is the subject of a pending Cure Dispute; (vi) is a contract, lease, or other agreement or document entered into in connection with the Plan; or (vii) is a D&O Policy or other insurance policy to which any Debtor or Estate Representative is a beneficiary or an insured.  For the avoidance of doubt, the Estate Representative may seek to assume, assume and assign, or reject an Executory Contract and Unexpired Lease at any time prior to the Effective Date, whether or not such Executory Contract or Unexpired Lease is listed on the Schedule of Assumed Contracts.

30.     Subject to (i) Section 10.3 of the Plan or resolution of any dispute with respect to the contracts or leases subject to such disputes and (ii) the occurrence of the Effective Date, entry of the Order shall constitute approval of the assumptions, assumptions and assignments, or rejections, as applicable, provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by this Court that the Debtors or applicable Estate Representative, or the assignee of such Executory Contract or Unexpired Lease (as applicable) have provided adequate assurance of future performance under such Executory Contract or Unexpired Lease.  Each Executory Contract and Unexpired Lease assumed pursuant to the Plan shall vest in and be fully enforceable in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of this Court authorizing and providing for its assumption, or applicable law.

31.     Notwithstanding anything to the contrary herein, all rights and obligations of the Debtors under or with respect to any Executory Contracts and Unexpired Leases to which any of the Debtors are a party shall vest in the Plan Trust on the Plan Trust Establishment Date, whether or not such Executory Contracts or Unexpired Leases are otherwise pending assumption, assumption and assignment, or rejection in accordance with Section 10.1(a) of the Plan, and the Plan Trust shall have all rights of the Debtors to assume, assume and assign, or reject such Executory Contracts or Unexpired Leases on or prior to the Effective Date.

32.     The Litigation Trustee's retention of a professional retained by the Debtors, the Litigation Trust, or any party in interest (including the Plan Trust) during or after these Chapter 11 Cases shall not be deemed a conflict of interest, or to the extent such conflict of interest exists, such conflict is hereby waived by the Debtors and the Litigation Trust.  Any and all contracts assumed and assigned to the Litigation Trust pursuant to the assumption and assignment

procedures set forth in paragraphs 29 through 41 of the FILO Settlement Order shall be deemed assigned as of the Litigation Trust Establishment Date, and any cure costs associated therewith shall be paid by the Litigation Trust in accordance with the terms of the FILO Settlement Order.

**S.    Compromises and Settlements**

33.    The Plan is a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim or Interest and any distribution to be made on account of such Claim or Interest.

34.    The entry of this Confirmation Order constitutes this Court's approval, of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that the Plan Settlements are in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and are fair, equitable, and reasonable.   The compromises, settlements, and releases described in the Plan shall be deemed non-severable from each other and from all other terms of the Plan.   In accordance with and subject to the provisions of the Plan (including the consent rights thereunder) and the FILO Settlement Order, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of this Court, after the Confirmation Date, the Debtors or the applicable Estate Representative may compromise and settle any Claims against, and Interests in, the Debtors and the Debtors' Estates.

35.    The provisions of the Plan Settlements constitute a good faith compromise and settlement among the Debtors and the applicable parties of all Claims, Causes of Action, Interests, and controversies among such parties, including all potential Claims, Causes of Action, Interests, and controversies between the Debtors, the FILO Parties, the Creditors' Committee and its members, the PBGC, and each of the foregoing Person's applicable Related Parties, and are in consideration of the value provided to the Estates by such parties pursuant to the Plan Settlements.

The Plan shall be deemed a motion to approve the Plan Settlements as a good faith compromise and settlement of all of the Claims, Interests, Causes of Action and controversies described in the foregoing sentence pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.  Entry of this Confirmation Order constitutes this Court's approval of the Plan Settlements, as well as a finding by this Court that the Plan Settlements are in the best interests of the Debtors, the Debtors' Estates, and holders of Claims and Interests and are fair, equitable, and reasonable.

36.     Certain Claims and Causes of Action may exist between one or more of the Debtors and one or more of their Affiliates, which Claims and Causes of Action may have been settled, and any such settlements are reflected in the treatment of the Intercompany Claims and the Claims against and Interests in each Debtor entity, provided that, for the avoidance of doubt, Claims and Causes of Action are expressly preserved as against TRACO.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of any such Intercompany Claims and Causes of Action pursuant to Bankruptcy Rule 9019.

37.     Notwithstanding anything to the contrary in the Plan, the Debtors, the Estate Representative, the Plan Trust, the Litigation Trust, the FILO Parties, the Creditors' Committee and its members, and the Related Parties for each of the foregoing shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (1) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, or (2) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of any security offered or sold under the Plan.  No Entity may commence or pursue a Claim or Cause of Action of any kind against any Debtor, the Estate

Representative, the Litigation Trust, the FILO Parties, the Creditors' Committee or its members, or the Related Parties for each of the foregoing that arose or arises from, in whole or in part, a Claim or Cause of Action subject to this decretal paragraph 37 of this Confirmation Order, without this Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim that is not otherwise inconsistent with the terms and provisions of the Plan and this Confirmation Order for actual fraud, gross negligence, or willful misconduct against any such Debtor, the Estate Representative, the Litigation Trust, the FILO Parties, the Creditors' Committee, or any of the foregoing Party's Related Parties and such party is not exculpated pursuant to this provision; and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against such Debtor, the FILO Parties, the Creditors' Committee, or any of the foregoing Person's Related Parties.

38. Upon the entry of this Confirmation Order, PBGC shall grant a full release of all claims and causes of action against all the Debtors (and any successor-in-interest thereto, including any liquidation or litigation trust), other than the PBGC Claims; *provided* that PBGC does not release non-Debtor Company controlled group members as of the Plan Termination Date.

**T. Limited Substantive Consolidation**

39. As set forth in Section 5.3(c) of the Plan, the Plan served as a motion by the Debtors seeking entry of a Court order approving the Plan Settlement, including this Court's findings that the Plan Settlement is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the Estates, and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing.

40.     Entry of this Confirmation Order shall constitute approval, pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, of the substantive consolidation of the Chapter 11 Cases of each of the Debtors for distribution purposes, as provided for in <u>Section 5.3</u> of the Plan.  Effective as of the date hereof, subject to <u>Section 5.3</u> of the Plan: (i) all assets and liabilities of the Debtors shall be treated as though they were pooled; (ii) each Claim filed or to be filed against any Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Debtors; (iii) all Intercompany Claims shall be adjusted, reinstated, or discharged in accordance with <u>Section 4.6</u> of the Plan; (iv) no Plan Distributions shall be made under the Plan on account of any Intercompany Interest or any Non-Debtor Owned Subsidiary Interest to the extent set forth in <u>Sections 4.8</u> and <u>4.9</u> of the Plan; (v) any Claims on account of a guarantee provided by a Debtor of the obligations of another Debtor shall be treated as eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof by any other Debtor shall be treated as one Claim against a single consolidated Estate; and (vi) any joint or joint and several liability of any of the Debtors shall be one obligation of the Debtors and any Claims based upon such joint or joint and several liability shall be treated as one Claim against a single consolidated Estate.

41.     In accordance with the Plan Settlement, each Class of Claims and Interests shall hereby be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The foregoing limited substantive consolidation of the Debtors under the Plan shall not result in the merger or otherwise affect the separate legal existence of each Debtor other than with respect to distribution rights under the Plan.  The Plan Settlement shall not (other than for purposes related to funding Plan Distributions under the Plan) affect (u) the legal and organizational structure of the Debtors, (v) Executory Contracts or Unexpired Leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (w) any

agreements entered into by the Plan Trust on or after the Plan Trust Establishment Date, (x) the Debtors' or the applicable Estate Representative's ability to subordinate or otherwise challenge Claims, (y) any Causes of Action or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no Plan Settlement, and (z) distributions to the Debtors, Plan Trust, or Litigation Trust from any insurance policies or the proceeds thereof.

**U.     Conditions Precedent to Effective Date**

42.     The Plan shall not become effective unless and until all conditions set forth in Section 11.1 of the Plan have been satisfied or waived pursuant to Section 11.2 of the Plan. In addition to the conditions precedent to the Effective Date set forth in Section 11.1 of the Plan, the Effective Date shall not occur unless the Estate Representative shall have (i) sufficient Cash on hand to (a) satisfy (x) all Allowed Administrative Expense Claims (unless an applicable holder consents to different treatment) in accordance with section 1129(a)(9)(A) of the Bankruptcy Code and (y) all Allowed Priority Tax Claims and Other Priority Claims (unless an applicable holder consents to different treatment) that are required to be paid on the Effective Date under the terms of the Plan (the "**Effective Date Priority Claims**"), and (b) reserve for all Disputed Administrative Expense Claims and Disputed Effective Date Priority Claims actually asserted in a timely filed proof of claim in accordance with the applicable Bar Date; *provided* that the Debtors shall not be required to reserve for Disputed Administrative Expense Claims or Disputed Effective Date Priority Claims that have been disallowed by order of the Bankruptcy Court (whether or not subject to an appeal); *provided further* that upon notice and an opportunity to object and be heard, the Debtors may seek an estimation from the Court of the appropriate amount to reserve on account of any Disputed Administrative Expense Claims and Disputed Effective Date Priority Claims, and (ii) determined in good faith that there will be enough Cash on hand to satisfy the Debtors'

obligations with respect to all other Allowed priority claims when due and payable under the Plan.  The condition precedent provided for in the previous sentence cannot be waived or modified absent further order of the Bankruptcy Court.

## V.   Release, Exculpation, and Injunction Provisions

43.    As of the Confirmation Date and the Effective Date, as applicable, except for the rights that remain in effect from and after the Confirmation Date or the Effective Date, as applicable, to enforce the Plan or any Plan Document, all injunction, release, discharge, and exculpation provisions embodied in the Plan, including those contained in <u>Article XII</u> of the Plan and in this Confirmation Order, are hereby approved and shall be effective and binding on all Persons and Entities, to the extent provided in the Plan as modified by this Confirmation Order, without further order or action by this Court.  The commencement or prosecution of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order, whether directly, derivatively, or otherwise are hereby permanently enjoined.  Further, in accordance with <u>Section 12.4</u> of the Plan, upon entry of this Confirmation Order all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date (including, for the avoidance of doubt, filing a competing chapter 11 plan); provided that the Debtors right to withdraw or revoke the Plan in accordance with <u>Section 14.7</u> of the Plan is expressly preserved.

44.    No Entity may assert a claim on any basis against any of the Debtors' current managers, directors, and officers that are Released Parties arising out of or related to their roles in

these cases without first seeking authority from this Court. Any such request shall be made in writing with notice to all affected parties and shall include a proposed complaint setting forth any alleged claims and the detailed factual basis in support of such claims. Further, any such request shall include a proposed attorney fee reserve by such requesting Entity, subject to court modification, that will be deposited to this Court's registry to indemnify the applicable current managers, directors, and officers of the Debtors that are Released Parties against costs associated with the successful defense of any claim that is allowed to proceed, unless such claim is not released under Section 12.6 of the Plan. This Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by applicable law.

## W.      Dissolution of Official Committee

45.      On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases. The Estate Representative or the Plan Trust, as applicable, shall be responsible for paying the fees or expenses incurred by the Creditors' Committee as expenses under Section 12.2 of the Plan following the Confirmation Date and concluding on the Effective Date. For the avoidance of doubt, pursuant to Section 2.3 of the Plan, the Creditors' Committee shall retain authority in all respects to file final fee applications for its professionals and the applicable Estate Representatives shall pay all amounts due thereunder upon Court approval of such final fee applications and the Creditors' Committee shall further retain the right to object to any final fee application filed pursuant to Section 2.3.

## X.      Release of Liens

46.      Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall

be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Plan Trust; *provided* that notwithstanding anything in this Confirmation Order or the Plan to the contrary, nothing in this Confirmation Order or in the Plan shall, or shall be construed to (a) release, vitiate, or otherwise impair any interest held by, or any rights of, any Professional Person(s) (as defined in the FILO DIP Order) in the Professional Fees Escrow Account or the Carve-Out (which excludes, for the avoidance of doubt, the Litigation Trust Assets and the Retained Collateral) pursuant to the terms of the DIP Orders, and all such interests and rights are hereby preserved, or (b) modify any rights of the Litigation Trust or obligations of the Estates with respect to the Retained Collateral (as defined in the FILO Settlement Order), including, without limitation, under paragraphs 26 and 27 of the FILO Settlement Order.

**Y.     Retention of Jurisdiction**

47.     Subject to <u>Article XIII</u> of the Plan, pursuant to sections 105(a) and 1142 of the Bankruptcy Code, this Court shall retain exclusive jurisdiction with respect to all matters arising from or related to these Chapter 11 Cases, the Plan, and the implementation of this Confirmation Order, including, without limitation, those matters set forth in <u>Article XIII</u> of the Plan.

**Z.     Statutory Fees**

48.     All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors or the Plan Trustee in full on the Effective Date.  As of the Plan Trust Establishment Date, the Plan Trustee shall assume responsibility for the payment of all Statutory Fees when due and payable, and shall file with this Court quarterly reports in a form reasonably acceptable to the U.S. Trustee; *provided, however*, such quarterly reports shall be made in lieu of the monthly operating reports required by 28 CFR § 58.8.  Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed,

dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of quarterly fees.

## AA. Documents, Mortgages, and Instruments

49. Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan and this Confirmation Order and directed pursuant to section 1142 of the Bankruptcy Code to take such steps with respect to the foregoing to implement the transactions necessary to consummate the Plan.

## BB. No Waiver of Privilege

50. Nothing contained in this Confirmation Order, any of the Plan Documents, the Supporting Declarations, the record of the Combined Hearing, or any and all other documents related thereto, shall constitute, or be deemed to constitute, a waiver by the Debtors or their Estates of any relevant privilege(s), including the attorney-client privilege.

## CC. Reversal/Stay/Modification/Reconsideration/Vacatur of Order

51. Except as otherwise provided in this Confirmation Order, if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated, reconsidered, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification, reconsideration, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or Lien incurred or undertaken by the Debtors or the applicable Estate Representative, or any other Entity authorized or required to take action to implement the Plan, as applicable, prior to the effective date of such reversal, stay, modification, reconsideration, or vacatur. Notwithstanding any such reversal, stay, modification, reconsideration, or vacatur of

this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the effective date of such reversal, stay, modification, reconsideration, or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, the Plan Documents, or any amendments or modifications to the foregoing. No reversal, stay, modification, reconsideration, or vacatur of this Confirmation Order shall affect the enforceability of the FILO Settlement Order.

## DD. Provisions of Plan and Confirmation Order Nonseverable and Mutually Dependent

52. This Confirmation Order shall constitute a judicial determination and provides that each term and provision of the Plan, as it may have been altered or interpreted in accordance with Section 14.14 of the Plan, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Trust (as the case may be), and (c) non-severable and mutually dependent; *provided* that, subject to Section 14.6(b) of the Plan, any amendment, supplement, or modification that adversely affects the Litigation Trust shall also require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent) (such consent, not to be unreasonably withheld, conditioned, or delayed).

## EE. Headings

53. Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

## FF. Governing Law

54. Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise with respect to such document, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles

of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).  The rights, duties, and obligations arising under the Plan Documents shall be governed by the applicable law set forth therein.

## GG.    Applicable Non-Bankruptcy Law

55.    Pursuant to sections 1123(a) and 1142 of the Bankruptcy Code, the provisions of this Confirmation Order, the Plan, the Plan Documents, and any other related documents or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

## HH.    Rights to Bring Causes of Action

56.    In pursuing any Retained Causes of Action, the Plan Trustee and Plan Trust, or the Litigation and Litigation Trustee, as applicable, shall be deemed trustees for all purposes under section 108 of the Bankruptcy Code, and for the avoidance of doubt, are entitled to all extension of time and/or tolling provisions provided under section 108 of the Bankruptcy Code in any judicial, arbitration or administrative proceeding, during or after the pendency of these cases, including all such benefits to which any of the Debtors as debtor-in-possession would have been entitled had the Litigation Trust or the Plan Trust not been established, and shall succeed to the Debtors' rights with respect to the periods in which any of the Retained Causes of Action may be brought under section 546 of the Bankruptcy Code.  Upon the Litigation Trust Establishment Date, and notwithstanding anything to the contrary in the Plan or any other Definitive Document, the Litigation Trustee shall be (i) the representative of the Estate of each of the Debtors, appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, for the purposes of pursuing the Retained Causes of Action and carrying out the Litigation Trust's duties under the Litigation Trust Agreement, the FILO Settlement Order, the Plan, this Confirmation Order, or any other Definitive Document, and (ii) a fiduciary of, and shall owe fiduciary duties to, the Estates in their capacities

as beneficiaries of the Class B Interests, collectively with the beneficiaries of the Class A Interests, solely with respect to the Litigation Trust Assets and the pursuit thereof, in each case, without modifying the fiduciary duties applicable to the Litigation Trust and the Litigation Trustee, as applicable, under the Litigation Trust Agreement.  For the avoidance of doubt, the act of transferring the Litigation Trust Assets or the Plan Trust Assets, as authorized by this Confirmation Order, the Plan, the FILO Settlement Order, and the Litigation Trust Agreement, shall not, and shall not be construed to, destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights (specifically including any extensions available to a trustee or debtor-in-possession under 11 U.S.C. § 108) may be asserted by the Litigation Trust, in any judicial, arbitration, or administrative proceeding, during or after the pendency of these Chapter 11 Cases, as if the asset or right asserted in such judicial, arbitration, or administrative proceeding were an action or other asset still held by the applicable Debtor or Debtor-in-possession.

57.     The Litigation Trustee is hereby (a) authorized to execute and perform under the Litigation Trust Agreement, to appear and be heard before the Bankruptcy Court or any other court of competent jurisdiction on all matters related to the Chapter 11 Cases and/or the Retained Causes of Action (as a representative of the Litigation Trust and/or under section 1123(b) of the Bankruptcy Code as a representative of the Debtors' estates, as applicable, without modifying the fiduciary duties applicable to the Litigation Trustee under the Litigation Trust Agreement) and to present to creditors, other courts of competent jurisdiction, and any other Entity the Litigation Trust Agreement, the Plan, and the Confirmation Order as evidence of its authority, and (b) vested with all of the powers and authority set forth in this Confirmation Order, the Plan, the Litigation Trust Agreement, and otherwise as is necessary or proper to carry out the provisions of the Plan or Litigation Trust Agreement, as applicable (including any rights of the Debtors and the Creditors'

Committee's to conduct discovery and oral examinations of any party under Bankruptcy Rule 2004 as such rights existed prior to the Litigation Trust Establishment Date).

## II.     Notice of Entry of Confirmation Order and Effective Date

*58.*     In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Confirmation Date, the Debtors shall serve notice of the entry of this Confirmation Order substantially in the form attached as **Exhibit B** hereto (the "**Confirmation Notice**") on all parties who hold a Claim or Interest in these cases, and the U.S. Trustee, and any other known parties in interest.  The Debtors shall cause a summary version of the Confirmation Notice to be published in one or more of any of the following publications: *Boston Globe*, *Houston Chronicle*, *New York Times National Edition*, *Arizona Republic*, *Florida Today*, *Indian River Press Journal*, *Miami Herald*, *Midland Reporter-Telegram*, *South Florida Sun Sentinel*, *Texarkana Gazette*, *Youngstown Vindicator*, *Monroe News-Star*, as well as other publications as the Debtors deem appropriate, as soon as reasonably practicable following the Confirmation Date. Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of the contents thereof, including the entry of this Confirmation Order, the Specified Claims Bar Date, and the Administrative Expense Claims Bar Date.

59.     As soon as reasonably practicable after the Effective Date, the Plan Trustee shall serve notice of the occurrence of the Effective Date, substantially in the form attached as **Exhibit C** hereto (the "**Consummation Notice**"), on all parties who hold a Claim or Interest in these cases, the U.S. Trustee, and any other known parties in interest.  Such Consummation Notice is hereby approved in all respects and shall be deemed good and sufficient notice of occurrence of the Effective Date.

## JJ. Final Order

60.    This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

## KK. [Reserved].

61.    [Reserved].

## LL. Inconsistency

62.    In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or this Confirmation Order).  In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.  The provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each.  If there is any inconsistency between any Plan provision and any provision of this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of this Confirmation Order shall govern and any such provision of this Confirmation Order shall be deemed a modification of the Plan.  In the event of any inconsistency between the Plan, the Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, or the Confirmation Order, on the one hand, and the FILO Settlement Order or any other instrument or document created or executed pursuant to the FILO Settlement Order, on the other hand, the Confirmation Order shall control.

## MM. Valid and Binding

63.    All documents necessary to implement the Plan and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements.

## NN.    Term of Injunctions or Stays

64.    Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays arising under or entered during these Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

## OO.    Substantial Consummation

65.    Upon the occurrence of the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

## PP.    First-Day and Other Orders

66.    Upon entry of this Confirmation Order, and notwithstanding any prior order of this Court to the contrary, the Debtors shall no longer be required and shall no longer have any obligation to comply with any notice or reporting obligations under any of the First Day and Other Orders (as defined herein), including, but not limited to: (i) paragraph 9 of the *Final Order (I) Authorizing Debtors to Pay (A) Critical Vendor Claims, (B) Lien Claims, and (C) 503(b)(9) Claims; and (II) Granting Related Relief* (Docket No. 612); (ii) paragraph 10 of the *Final Order (I) Authorizing the Debtors to (A) Continue Insurance Policies, Surety Bonds, and Letters of Credit and (B) Satisfy Obligations Related Thereto; (II) Modifying the Automatic Stay to Permit Employees to Proceed with Workers' Compensation Claims; and (III) Granting Related Relief* (Docket No. 2166); (iii) paragraph 4 of the *Final Order (I) Authorizing Debtors to (A) Maintain, Administer, Modify, and Renew Their Existing Refund Programs and Pay or Otherwise Honor Prepetition Obligations Related Thereto, and (B) Honor Prepetition Health Plan Administration Obligations; and (II) Granting Related Relief* (Docket No. 624); (iv) paragraph 6 of the *Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees, and (II) Granting Related*

*Relief* (Docket No. 114); (v) paragraph 3 of the *Order Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, Expenses, and Other Compensation, (B) Maintain Employee Benefits Programs, and (C) Continue to Pay Workforce Obligations, and (II) Granting Related Relief* (Docket No. 86); (vi) paragraph 1(a)(v) of the *Order (I) Establishing Procedures for Sales, Transfers, and Abandonment of De Minimis Assets; and (II) Granting Related Relief* (Docket No. 1665); (vii) paragraph 1(xi) of the *Order Authorizing Debtors to Employ Professionals Used in Ordinary Course of Business Effective as of Petition Date* (Docket No. 784); and (viii) paragraphs 1 and 14 of the *Final Order (I) Authorizing Debtors to (A) Continue Their Existing Cash Management System, (B) Maintain Existing Business Forms And Intercompany Arrangements, (C) Continue Intercompany Transactions, And (D) Continue Employee Credit Card Program; (II) Extending Time To Comply With Requirements Of 11 U.S.C. § 345(B); And (III) Granting Related Relief* (Docket No. 2168) (all such orders collectively with the Utilities Order, the "**First-Day and Other Orders**").

### QQ. Closure of these Chapter 11 Cases

67. The Debtors or Plan Trustee, as applicable, shall, after the full administration of these Chapter 11 Cases, file with this Court all documents required by Bankruptcy Rule 3022 and any applicable order of this Court to close these Chapter 11 Cases. After the Confirmation Date, the Debtors or Plan Trustee, as applicable, shall be authorized, but not directed, to submit one or more motions for order(s) that close and issue final decrees for any of the Chapter 11 Cases, for any Debtor, in each case in accordance with the Bankruptcy Code and the Bankruptcy Rules, and changing the caption of these Chapter 11 Cases accordingly. Matters concerning Claims may be heard and adjudicated in a Debtor's chapter 11 case that remains open regardless of whether the applicable Claim is against a Debtor in a chapter 11 case that is closed.

**RR.    Miscellaneous Provisions.**

68.    *Medical Properties Trust.*  Notwithstanding anything in the Plan, the Plan Trust Agreement, the Litigation Trust Agreement, the Plan Supplement, or any of the Definitive Documents, nothing in such documents shall impair or modify MPT's rights under the MPT Settlement Order or the TSA / EPDA Settlement Order (as defined in the Disclosure Statement) or the compromises, settlements, and releases approved thereby, and such compromises, settlements, and releases are binding on the  Plan Trust and the Litigation Trust.

69.    *SEC.*  Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan and/or the Confirmation Order, no provision of the Plan or the Confirmation Order shall (i) preclude the United States Securities and Exchange Commission ("**SEC**") from enforcing its police and regulatory powers; or, (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

70.    *United States.*  As to the United States, its agencies or any instrumentalities thereof (collectively, the "**United States**"), notwithstanding anything to the contrary contained in the Plan and any other Definitive Documents, nothing shall:

    i.    limit or be intended to or be construed to bar the United States from pursuing any police or regulatory action or any criminal action;

    ii.    discharge, release, exculpate, impair or otherwise preclude: (a) any obligation or liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (b) any Claim of the United States arising on or after the Confirmation Date; (c) any liability of the Debtors under police or regulatory statutes or regulations to the United States as the owner, lessor, lessee or operator of property that such Entity  owns, operates or leases after the Effective Date; or  (d) any liability owed to the United States, including but not limited to any liabilities arising under the federal environmental, criminal, civil or common law, by any non-Debtor, including (including any Released Parties or Exculpated Parties that are non-Debtors); provided, however, that the foregoing shall not diminish the scope of any exculpation to which any Person is entitled under section 1125(e) of the Bankruptcy Code. For

the avoidance of doubt, the United States is not a "Releasing Party" (as defined in the Plan);

    iii.    enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any obligation or liability described in the preceding clause (ii); provided, however, that the rights and defenses of all Entities (including Exculpated Parties and Released Parties) with respect to (a)–(d) in clause (ii) are likewise fully preserved;

    iv.    affect any right of setoff or recoupment of the United States against any of the Debtors, Plan Administrator Committee, or Plan Trust; *provided, however*, that the rights and defenses of the Debtors, Plan Administrator Committee, or Plan Trust with respect thereto are fully preserved;

    v.    authorize the assumption, assignment, sale or other transfer of any federal (a) grants, (b) grant funds, (c) contracts, (d) agreements, (e) awards, (f) task orders, (g) property, (h) intellectual property, (i) patents, (j) leases, (k) certifications, (l) applications, (m) registrations, (n) billing numbers, (o) national provider identifiers, (p) provider transaction access numbers, (q) licenses, (r) permits, (s) covenants, (t) inventory, (u) guarantees, (v) indemnifications, (w) data, (x) records, or (y) any other interests belonging to the United States (collectively, "**Federal Interests**") without compliance with all terms of the Federal Interests and with all applicable non-bankruptcy law;

    vi.    confer exclusive jurisdiction upon the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code);

    vii.    be interpreted to set cure amounts related to any Federal Interests or to require the United States to novate, approve or otherwise consent to the assumption, assignment, sale or other transfer of any Federal Interests;

    viii.    constitute or be deemed an approval or consent by the United States;

    ix.    waive, alter, or otherwise limit the United States' property rights;

    x.    be construed as a compromise or settlement of any liability, Claim, Cause of Action or interest of the United States;

    xi.    modify the scope of section 525 of the Bankruptcy Code;

71.    To the extent applicable, the United States shall be considered as having opted out of the Administrative Expense Claims Consent Program (as defined in the Plan).

72. *Texas Comptroller.* Notwithstanding anything else to the contrary in the Plan or Confirmation Order, these provisions will govern the treatment of the claims of the Texas Comptroller of Public Accounts (the "**Texas Comptroller**"): (1) nothing provided in the Plan or Confirmation Order shall affect or impair any existing statutory or common law setoff rights of the Texas Comptroller in accordance with 11 U.S.C. § 553; (2) nothing provided in the Plan or Confirmation Order shall affect or impair any rights of the Texas Comptroller to pursue any non-Debtor third parties (excluding the Plan Trust and Litigation Trust) for tax debts or claims; (3) nothing provided in the Plan or Confirmation Order shall be construed to preclude the payment of interest actually accrued and owing on the Texas Comptroller's administrative expense tax claims; (4) subject to filing a proof of claim in accordance with any applicable bar date, the Texas Comptroller is not required to file a motion or application for payment of administrative expense claims pursuant to 11 U.S.C. § 503(b)(1)(D); and (5) the Texas Comptroller may amend its tax claims to reflect the results of the actual assessment of tax liabilities without the consent of the Bankruptcy Court or the Plan Trustee. In connection with the foregoing, any defenses, claims, counterclaims, affirmative defenses, and other rights that exist under applicable law in favor of the Debtors, any applicable Estate Representative, or the Texas Comptroller, as applicable, are preserved. The Texas Comptroller affirmatively opts out of the Administrative Expense Claims Consent Program as well as the Third-Party Releases. The Texas Comptroller has indicated it will assert it is entitled to interest on account of any Allowed Priority Tax claims in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code; *provided*, however, that all defenses, claims, counterclaims, affirmative defenses, and other rights thereto that exist under applicable law in favor of the Debtors or the Estate Representative, as applicable, are expressly preserved. The Debtors or the applicable Estate Representative will (1) file the 2025 Texas

Franchise Tax Return no later than November 15, 2025; and (2) timely file any subsequent Texas franchise tax returns, if required, when due in the ordinary course taking into account any extensions granted.

73. *State of Texas.* Nothing in this Order, the Plan, or related documents discharges, releases, precludes, or enjoins: (i) any liability to the State of Texas and its agencies, including, but not limited to, Texas Health and Human Services Commission, Texas Commission on Environmental Quality, and the Texas Medical Board, ("**Texas**") that is not a "claim" as defined in 11 U.S.C. § 101(5); (ii) any Claim of Texas arising on or after the Confirmation Date; (iii) any liability to Texas under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the Confirmation Date; or (iv) any liability to Texas on the part of any Person other than the Debtors. All rights of Texas that are implicated by the terms of this Order, the Plan, or related documents are expressly reserved, and all rights and defenses of the Debtors, the Estate Representative, and other parties in interest are hereby preserved. Further, nothing in this Order, the Plan, or related documents authorizes the transfer or assignment of any Texas (a) license, (b) permit, (c) registration, (d) authorization, (e) agreement, or (f) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Order, the Plan, or related documents shall relieve any entity for any obligation to address or comply with information requests or inquiries from Texas. Nothing in this Confirmation Order, the Plan, or related documents shall affect any setoff or recoupment rights of Texas, or any defenses thereto. For the avoidance of doubt, Texas opts out of any and all releases provided in the Plan.

74. *Certain Commercial Payors.* Notwithstanding anything in the Plan or this Order to the contrary, any and all defenses of UnitedHealthcare Insurance Company, Change Healthcare

Technologies, LLC, National Decision Support Company, LLC, Change Healthcare Technology Enabled Services, LLC, Change Healthcare Solutions, LLC, Optum360, LLC, and all of their direct and indirect subsidiaries, affiliates, and parents (collectively, the "**UHC Entities**"), Cigna Health and Life Insurance Company and its direct and indirect subsidiaries, affiliates, and parents (collectively, the "**Cigna Entities**"), and Aetna Life Insurance Company and its direct and indirect subsidiaries, affiliates, and parents (collectively, the "**Aetna Entities**"), if any, including setoff and recoupment, are hereby preserved, and it shall not be necessary for the UHC Entities, Cigna Entities or Aetna Entities to seek any court order or other relief to be able to assert any such existing defenses in any pleading in any litigation or arbitration with the Litigation Trust, the Plan Trust, the Debtors, or any of their successors or assigns, to the extent applicable. The Class A-1 and Class A-2 interests shall have the same priority in relation to such setoff rights that the FILO DIP Liens have in relation to such setoff rights as of immediately prior to the Litigation Trust Establishment Date.  Notwithstanding anything in the Plan or Confirmation Order to the contrary, the deadline for the Debtors to object to any Administrative Expense Claims filed by any UHC Entity, Cigna Entity, and Aetna Entity that arose prior to the Confirmation Date shall be 365 days following the Confirmation Date or such later date that is approved by Order of the Bankruptcy Court.

75.     *CommonSpirit.*  Reference is hereby made to that certain (i) adversary proceeding styled *Catholic Health Initiatives Colorado, et al. v. Steward Health Care System, LLC, et al.,* Adversary Case No. 25-03001 (the "**CommonSpirit Constructive Trust Action**") filed on January 3, 2025; (ii) the FILO Settlement Order; and (iii) the Disclosure Statement Order. Notwithstanding anything to the contrary in this Order, the Plan, or the Disclosure Statement, to the extent that any funds transferred to the Litigation Trust or the Plan Trust, as applicable, are either found by a final, non-appealable order of this Court, or mutual agreement by the Debtors,

the FILO Secured Parties (or, after the Litigation Trust Establishment Date or the Plan Trust Establishment Date, the Class A-2 Representative or the Plan Trustee, as applicable), and Catholic Health Initiatives Colorado ("**CHIC**"), CommonSpirit Health ("**CSH**"), and/or CommonSpirit Mountain Region f/k/a Centura Health Corporation ("**CSMR**", together with CSH and CHIC, "**CommonSpirit**"), to be held in a trust for CommonSpirit (the "**Disputed Funds**"), this Order, the Plan, and the Disclosure Statement shall not be deemed to impair any claims asserted in the CommonSpirit Constructive Trust Action or judgments related thereto; *provided*, that nothing contained herein shall be deemed to abrogate any requirements under the Bankruptcy Code or Bankruptcy Rules to obtain approvals of settlements. The Debtors, CommonSpirit, and all other parties reserve all of their rights, remedies, claims, counterclaims, and defenses with respect to the Disputed Funds under the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules, all applicable contracts, and applicable state and Federal laws, including, but not limited to, their rights to file any objections, motions, discovery requests, or other filings as may be appropriate.

76. *Hartford Fire Insurance.* Notwithstanding anything to the contrary in this Order or the Definitive Documents: (i) no insurance policy/policies or agreement(s) relating to any and all such policy/policies of insurance issued by Hartford Fire Insurance Company or any of its affiliated insurance companies ("**Hartford**") to any of the Debtors and/or any of their non-debtor affiliate(s) ("**Policy**" or "**Policies**") shall be in any manner transferred to any other entity(ies) pursuant to the Order or the Plan without the express written consent of Hartford (which consent has not, to date, been given), or pursuant to a further order of this Court; *provided* that, for the avoidance of doubt, the Debtors' rights under the Policies may be transferred to the Litigation Trust or Plan Trust, as applicable; (ii) to the extent that there is a transfer of any rights of the Debtors under any Policy (including but not limited to accounts receivables, claims, and causes of

action (and the proceeds, products, offspring or profits thereof)), such transfer(s) shall not be free and clear of any of Hartford's defenses, including but not limited to setoff and recoupment rights; (iii) nothing herein or otherwise shall be deemed a determination that any past, present or future proceeds of any letters of credit Hartford is holding or will be holding ("**LOCs**") is property of the estate; and (iv) nothing herein or otherwise shall impact Hartford's ability to raise its contention that the aforementioned proceeds of LOCs are not property of the estate. Notwithstanding anything to the contrary in this Order or the Definitive Documents, Hartford shall be permitted to apply the proceeds of the LOCs (the "**Proceeds**") for payment of any deductibles, reasonable attorneys' fees and costs paid by Hartford (including, but not limited to, attorney fees and costs incurred in connection with the Chapter 11 Cases), and any other "Obligations" (as defined in certain Policy documents) in accordance with the Policy documents or as otherwise permitted by law. Hartford shall, upon reasonable request (not to exceed once quarterly), provide to the Estate Representative an accounting of its use of the Proceeds, subject to redaction of personal information. Notwithstanding anything to the contrary in the Definitive Documents or this Order, including Section 12.5(d) of the Plan, Hartford's defenses, including, but not limited to, recoupment and set-off rights, if any, are reserved. The last sentence of Section 9.3 of the Plan, which provides that in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such claim is estimated, shall not apply to the Hartford. Nothing in the Definitive Documents or this Order shall require Hartford to pay any amounts within any deductible or self-insured retention of any Policy issued by Hartford (or a determination that Hartford is responsible for any self-insured retention or deductible), and

to the extent Hartford makes any such payment, Hartford's right to pursue a claim against the Debtors and/or successors-in-interest on account of such payment is preserved; *provided* that the Debtors' and/or successors-in-interest rights and defenses to such a claim are fully preserved. Section 9.11 of the Plan shall not apply to any claims covered by a workers' compensation policy issued by Hartford. Notwithstanding anything to the contrary in the Definitive Documents or this Order, Hartford shall not be a Releasing Party. To the extent that it is deemed that Hartford qualified to participate in the Administrative Expense Claim Consent Program, Hartford shall be deemed to have opted out of the Administrative Expense Claims Consent Program. Nothing in this Order or the Definitive Documents shall impair the inspection or audit rights of Hartford as set forth in the Policies.

77.     *ASIC.*  Atlantic Specialty Insurance Company ("**ASIC**")[3] has issued surety bonds on behalf of one or more of the Debtors (collectively, the "**ASIC Surety Bonds**" and each individually, an "**ASIC Surety Bond**"). On May 23, 2013, the Debtors entered into a *General Indemnity Agreement* with ASIC (the "**ASIC Indemnity Agreement**"). The Debtors' obligations under the ASIC Surety Bonds and ASIC Indemnity Agreement are secured by cash collateral which is currently held by ASIC (the "**Existing ASIC Collateral**").

     i.  Nothing in this Confirmation Order or the Plan shall be deemed to be a sale, transfer, assumption or assumption and assignment of any ASIC Surety Bond or the ASIC Indemnity Agreement.

     ii.  All Existing ASIC Collateral shall remain in place to secure all payment and/or performance obligations of the Debtors under the ASIC Surety Bonds or for obligations arising under the ASIC Indemnity Agreement. Nothing in this Confirmation Order or the Plan shall be deemed to apply to the ASIC's claims or rights with respect to the Existing ASIC Collateral, nor shall these provisions be interpreted to bar, impair, prevent or otherwise limit ASIC from exercising its

---

[3]     Additional indemnitees that are affiliates of ASIC were OneBeacon Insurance Company, OneBeacon America Insurance Company, OneBeacon Specialty Insurance Company and any of their future direct or indirect affiliates or subsidiaries (collectively, "**ASIC Affiliates**"). For purposes of this Confirmation Order, each ASIC Affiliate is included in the definition of ASIC above.

valid rights, if any, under or with respect to any of the ASIC Surety Bonds, the ASIC Indemnity Agreement, or applicable law, including the common law of suretyship. For the avoidance of doubt, ASIC may continue to apply any and all of Existing ASIC Collateral for all losses and expenses through the Effective Date in accordance with the *Stipulation and Agreed Order Between the Debtors and Atlantic Specialty Insurance Company Modifying the Automatic Stay* (Docket No. 4125) ("**Agreed Order**"); *provided* that, notwithstanding anything to the contrary in the Agreed Order, following the Effective Date, ASIC may apply Existing ASIC Collateral without the Debtors' written consent; *provided further* that paragraph 5 of the Agreed Order shall continue to apply following the Effective Date. Nothing in this Order shall prevent any party from seeking further or additional relief from the requirements of this paragraph from the Court, and all parties reserve all rights with respect thereto.

iii.  Nothing herein shall be deemed to provide ASIC's consent to the involuntary substitution of any principal under any ASIC Surety Bond.

iv.  Nothing in this Confirmation Order or the Plan shall be interpreted to alter, diminish or enlarge the rights or obligations of ASIC in regard to state and federal agencies, third parties or otherwise under any surety bonds, any indemnity agreements or applicable law nor shall any of the foregoing be deemed to enjoin ASIC from asserting any rights, claims or defenses, in regard to or against any state and federal agencies, third parties including, without limitation, any of ASIC's indemnitors, insurers, or otherwise under any surety bonds, any indemnity agreements or applicable law.

v.  Upon the release of all ASIC Surety Bonds and upon full satisfaction or reimbursement of all losses and expenses to ASIC incurred or obligated under the ASIC Surety Bonds and the ASIC Indemnity Agreement, including satisfaction or reimbursement from any Existing ASIC Collateral, ASIC shall immediately return all Existing ASIC Collateral, if any, to the Debtors or the Plan Trust, as applicable.

vi.  Nothing in this Order or Plan shall impair ASIC's information rights under the ASIC Surety Bonds.

vii.  ASIC shall be deemed to have Opted Out of the Administrative Expense Claim Consent Program for all Administrative Expense Claims filed by ASIC. The parties reserve all rights with respect to the allowance, validity, and extent of any Administrative Expense Claim filed by ASIC.

viii.  ASIC shall not be a Releasing Party under the Plan.

78. *Texas Taxing Authorities*. Notwithstanding anything to the contrary in the Plan or this Order, any claim of the Texas Taxing Authorities[4] (the "**Tax Claims**") that become Allowed Secured Claims shall be treated as Class 2 – Other Secured Claims in accordance with Section 4.2 of the Plan. Any Allowed Secured Claims of the Texas Taxing Authorities shall be entitled to interest to the extent provided under sections 506(b), 1129 and/or 511 of the Bankruptcy Code. Any valid and perfected liens securing the Tax Claims, whether on real or business personal property, or on the proceeds of the sale of such property, shall be retained with the same force and effect and priority pursuant to state law until the Tax Claims are paid in full. Taxes for the 2025 tax year shall be paid in the ordinary course of business when due.

79. *Chubb.* Notwithstanding anything to the contrary in the Definitive Documents (including, without limitation and for the avoidance of doubt, Sections 6.11, 9.4, 9.11, 9.12, 10.2, 10.6, 12.3, 12.5, 12.6, and 12.9 of the Plan and any corresponding provisions of this Confirmation Order):

    a. on the Effective Date, the Debtors shall assume pursuant to sections 105 and 365 of the Bankruptcy Code all of the Chubb Insurance Policies[5] that currently provide coverage to the Debtors and the Chubb Insurance Agreements,[6] unless such insurance policies, agreements, documents or instruments were rejected pursuant to an order of this Court or subject of a rejection motion as of the Effective Date, and not by operation of the Plan or this Order; *provided*, however, for the avoidance of doubt, no part of the Chubb Insurance Program shall be rejected except pursuant to a final non-appealable order of this Court, such order not being this Order;

---

[4] "**Texas Taxing Authorities**" means Bexar County, Dallas County, Ector CAD, Fort Bend County, Jefferson County, Harris County, Fort Bend ISD, Fort Bend County Levee Improvement District #2, Mission Bend Utility District, Alief ISD, City of Houston (where represented by Perdue Brandon), Richardson ISD, Howard County Tax Office, Midland County, Midland CAD, Hardin County, and Bowie CAD.

[5] The term "**Chubb Insurance Policies**" shall mean all insurance policies issued by the Chubb Companies (as defined herein) to or that provide coverage to any of the Debtors at any time and for all lines of coverage, all extensions and/or renewals thereof.

[6] The term "**Chubb Insurance Agreements**" shall mean all agreements, documents, or instruments related to the Chubb Insurance Policies (as defined herein).

b.  subject to section (e) of this paragraph, on the Effective Date, after the foregoing assumption of the Chubb Insurance Agreements and the applicable Chubb Insurance Policies, all Chubb Insurance Policies and Chubb Insurance Agreements (collectively, the "**Chubb Insurance Program**") shall vest unaltered in the Plan Trust and continue in full force and effect thereafter in accordance with the terms and conditions thereof;

c.  except as set forth in section (e) of this paragraph, other than with respect to any insurance policy, agreement, document, or instrument that is rejected in accordance with subpart (a) hereof, nothing shall alter, modify, release, amend, impair or otherwise affect the terms and conditions of the Chubb Insurance Program and any rights and obligations thereunder, including, but not limited to the Chubb Companies'[7] interest in any collateral and/or security held by the Chubb Companies under the Chubb Insurance Program (together with the proceeds thereof and/or any credits, the "**Chubb Collateral**") pursuant to the terms of the Chubb Insurance Program and applicable non-bankruptcy law;

d.  nothing, including any of the Definitive Documents, bar date notice, claim objection, or any other order of this Court, alters or modifies the liability, obligation or duty, if any, that the Chubb Companies have to pay claims or other amounts covered by the Chubb Insurance Program subject to the terms of the Chubb Insurance Program and applicable non-bankruptcy law;

e.  after the Effective Date, the Plan Trust shall become and remain liable in full for all of its and the Debtors' liabilities or obligations in relation to the Chubb Insurance Program, regardless of whether such liabilities or obligations arise or become liquidated before, on or after the Effective Date, without the need or requirement for the Chubb Companies to file or serve any objection to a proposed cure claim or a request, application, claim, Proof of Claim and without the Chubb Companies being subject to the Bar Date, any other bar date or similar deadline governing Proofs of Claim, Cure Amounts, or provide any notice of setoff or recoupment; provided, however, notwithstanding anything to the contrary in this paragraph 79, all liabilities or obligations of the Debtors or Plan Trust in respect of the Chubb Insurance Program, regardless of the rejection of any part of the Chubb Insurance Program, if any, shall be satisfied (i) first by or through the Chubb Companies setting off (in full dollars) against the Chubb Collateral, or using or otherwise applying (in full dollars) the Chubb Collateral to or in respect of such obligations or liabilities in accordance with the terms and conditions of the Chubb Insurance Program, without the Chubb Companies being required to file or serve a Claim of any kind or take any other action in these Chapter 11 Cases, including filing or serving any objection to a proposed Cure Claim; and (ii) second to the extent the Chubb Collateral is insufficient to satisfy any of the obligations or liabilities of the Debtors or Plan Trust under the Chubb Insurance Program, the Chubb Companies

---

[7]  The term "**Chubb Companies**" shall mean ACE American Insurance Company and/or any of its U.S.-based affiliates and the predecessors and successors, collectively, and solely in their capacities as insurers of one or more of the Debtors (or any of their predecessors).

shall have a General Unsecured Claim for such amounts and such General Unsecured Claim shall be treated as provided for in the Plan.

    f.    except as set forth in this paragraph 79, nothing shall permit or otherwise effectuate a sale, assignment or other transfer of the Chubb Insurance Program, any portion thereof, and/or any rights, benefits, claims, proceeds, rights to payment, or recoveries under and/or relating to the Chubb Insurance Program without the prior express written consent of the Chubb Companies or pursuant to further order of the Court;

    g.    the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Section XII of the Plan, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit: (1) claimants with valid workers' compensation claims, claims against non-Debtors that may be entitled to coverage under the Chubb Insurance Program, or direct action claims against the Chubb Companies under applicable non-bankruptcy law to proceed with their claims; (2) the Chubb Companies to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against any of the Chubb Companies under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay and/or the injunctions set forth in Article XII of the Plan to proceed with its claim, (C) claims against non-Debtors who may be entitled to coverage under the Chubb Insurance Program, and (D) all costs in relation to each of the foregoing; (3) subject to and in accordance with the terms and conditions of the Chubb Insurance Program, the Chubb Companies to draw on or against, use or apply any or all of Chubb Collateral at any time and to hold the proceeds thereof as security for the obligations of the insureds, including the Debtors (and the Plan Trust, as applicable) and/or apply such proceeds to the obligations of the insureds, including the Debtors (and the Plan Trust, as applicable) under the Chubb Insurance Program in such order as the Chubb Companies may determine; and (4) following the Effective Date, the Chubb Companies to cancel any insurance policies under the Chubb Insurance Program and take other actions relating to the Chubb Insurance Program (including effectuating a setoff and/or asserting any recoupment or subrogation rights or claims (for the avoidance of doubt, any claims against the Debtors or the Plan Trust shall be satisfied as provided for in subpart (e) hereof) in accordance with the terms of the Chubb Insurance Program and applicable non-bankruptcy law);

    h.    to the extent it is later asserted that a Claim that is subject to the Medical Liability Claims Procedures may be covered by the Chubb Insurance Program, the Chubb Companies reserve all rights with regard to any such Claim and any findings and conclusions regarding liquidation of any Medical Liability Claim pursuant to the Medical Liability Claims Procedures shall not be binding on the Chubb Companies;

    i.    to the extent that it is deemed that the Chubb Companies qualified to participate in the Administrative Expense Claim Consent Program, the Chubb Companies shall

be deemed to have opted out of the Administrative Expense Claims Consent Program; and

j.   nothing in Section 12.5(b) of the Plan or any corresponding provision of this Order requires, precludes, and/or prohibits the Chubb Companies to or from administering, handling, defending, settling and/or paying claims covered by the Chubb Insurance Program in accordance with and subject to the terms and conditions of the Chubb Insurance Program and/or applicable non-bankruptcy law.

80.    *Executory Contracts and Unexpired Leases*. For the avoidance of doubt, notwithstanding anything in the contrary to this Order or the Plan, including Section 10.6, an Executory Contract or Unexpired Lease, including any of the Debtors' insurance policies, shall not be deemed assumed by the applicable Debtor on the Effective Date if rejected by the Debtor pursuant to a Final Order on or prior to the Effective Date or is subject of a rejection motion as of the Effective Date.

81.    *Class A-1 and Class A-2 Interests*. The Class A-1 and Class A-2 interests shall have the same priority in relation to any setoff rights preserved pursuant to the Plan or this Confirmation Order that the FILO DIP Liens have in relation to such setoff rights as of immediately prior to the Litigation Trust Establishment Date.

82.    *Certain Personal Injury Claimants*. Nothing in the Plan or this Order shall (i) subject the Medical Liability Claims of Savannah B. Gross, Joni A. Rausch and William J. Rausch, II, Sidney Brown, as personal representative of the estate of Lawanna Monette Spruill, the estate of Beverly D. Caldwell, the estate of James F. Smith, the estate of Nancy E. DeSouza, Michael Porterfield, as Administrator of the Estate of Brenda Porterfield, deceased, or Roxanne Spampinato (collectively, the "**Personal Injury Claimants**") against non-Debtor third parties, including, but not limited to, any employed or affiliated physician of a Debtor, or any other medical personnel employed by a Debtor, to the Medical Liability Claims Procedures or (ii) enjoin the Personal Injury Claimants from pursuing such claims against non-Debtor third parties, including,

but not limited to, any employed or affiliated physician of a Debtor, or any other medical personnel employed by a Debtor.

83. *The Michelsons.* Notwithstanding anything to the contrary in this Order or the Plan (including the Medical Liability Claim Procedures): (i) Linda Michelson and Michael Michelson (collectively, the "**Michelsons**") shall be entitled to seek relief from any stay of their claims against the Debtors and non-Debtor defendants and the standards for obtaining such relief shall not be altered from the existing applicable law; (ii) nothing in this Order or the Plan (including the Medical Liability Claims Procedures) shall authorize the Bankruptcy Court to estimate the Michelsons' asserted Medical Liability Claims against the Debtors for distribution purposes; (iii) the Michelsons' rights and defenses to assert that the Bankruptcy Court lacks jurisdiction or authority to (A) make any disposition on the merits of the Michelsons' asserted Medical Liability Claims against the Debtors and/or (B) disallow and expunge, in whole or in part, the Michelsons' asserted Medical Liability Claim against the Debtors after finding that the Michelsons did not (X) comply with the Medical Liability Claim Procedures (as modified for the Michelsons in clauses (i) and (iv) of this paragraph), (Y) negotiate in good faith, and/or (Z) cooperate with the Estate Representative as may be necessary to effectuate the Medical Liability Claims Procedures, are fully preserved and all parties (including, among others, the Estate Representative) shall be prohibited and estopped from arguing that the Michelsons consented to the Bankruptcy Court exercising such jurisdiction or authority, or otherwise waived, such rights, defenses, and/or arguments by not obtaining a determination at Confirmation Hearing or appealing this Order; and (iv) only the Michelsons (or their successors) shall have the authority to withdraw their respective claims.

84.     *Government Payor Claims.*  For the avoidance of doubt, the Retained Causes of Action and the Litigation Trust Assets to be transferred to the Litigation Trust includes Claims and Causes of Action asserted or assertable by the Debtors or the Estate against all government payors (whether federal or state, including, without limitation, the Commonwealth of Massachusetts).

85.     *Limitation of Debtor Releases*.  Notwithstanding anything to the contrary in the Plan or this Order, the releases granted in Section 12.6(a) of the Plan, solely with respect to Claims and Causes of Action based on acts taking place before the Petition Date, shall be limited to Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, (a) the Debtors' preparations for chapter 11; and (b) the Debtors' restructuring efforts leading up to the filing of the Chapter 11 Cases, including, for the avoidance of doubt, in the case of each of (a)-(b), all acts or omissions, obligations, transactions, transfers, agreements, events, or any other occurrences of, based on, relating to, or in any manner arising from the conduct of the Transformation Committee members and the Professionals since the appointment of the Transformation Committee members.  For the avoidance of doubt, (i) nothing in the foregoing sentence shall enhance, broaden, or enlarge the releases granted in Section 12.6(a) of the Plan or the definition of Released Parties in Section 1.1 of the Plan; and (ii) without limiting the foregoing in any way, for the avoidance of doubt, the releases granted in the Plan to each Related Party by virtue of its relationship to one or more Released Parties are solely in such Related Party's capacity

as such.  For the avoidance of doubt, notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Debtor Releases in <u>Section 12.6(a)</u> of the Plan are modified by this paragraph 85 of this Confirmation Order.

86.     *Medical Liability Claims Procedures.*  Notwithstanding anything in the Plan or the Medical Liability Claims Procedure to the contrary, if a holder of a Medical Liability Claim against a Debtor is not satisfied with its Claim Determination following completion of Phase 1 of the Medical Liability Claims Procedures, such holder shall not be required to participate in Mediation and instead may elect to proceed under either Phase 3(a) or Phase 3(b) of the Medical Liability Claims Procedures.  A holder must submit notice to the Estate Representative of its intent to appeal the Claim Determination and proceed with either Mediation, Arbitration, or liquidating its claims in the tort system without the need to obtain additional relief from the automatic stay within thirty (30) days of receipt of the Claim Determination, otherwise the holder shall be deemed to have accepted the Claim Determination and such claimant's Debtor Medical Liability Claim shall be Allowed in the amount of the Claim Determination without further action by the parties or the Bankruptcy Court.  The Medical Liability Claims Procedures shall otherwise remain in full force and effect.

87.     Notwithstanding anything else in the Plan or this Order to the contrary, nothing in this Plan or this Order shall reimpose the automatic stay to the extent it was previously lifted by an order of the Bankruptcy Court to allow a holder to liquidate its Medical Liability Claim in the tort system.

88.     *Status Conferences.*  Status conferences regarding the Debtors' progress towards satisfying the conditions to the Effective Date shall be held on the following dates and times: (i) December 15, 2025, at 1:00 p.m. (Central Time); (ii) June 15, 2026, at 1:00 p.m. (Central Time);

(iii) December 15, 2026, at 1:00 p.m. (Central Time); and (iv) June 15, 2027, at 1:00 p.m. (Central Time).

Signed: July 25, 2025

Christopher Lopez
United States Bankruptcy Judge

## Schedule 1

### Reservations of Rights

1. *Certain Directors and Officers.* Notwithstanding anything in the Plan or this Order to the contrary, Mark Rich and York21 Solutions LLC shall not be Releasing Parties, and each such parties' defenses to any claims asserted or assertable by the Litigation Trust are preserved. Notwithstanding anything in the Plan or this Order to the contrary, nothing in the Plan or this Order shall prejudice the rights of (or impair the claims or defenses of) any beneficiary or insured under a D&O Policy with respect to such D&O Policy.

2. *Zimmer U.S., Inc.* Notwithstanding anything to the contrary in the Plan or this Order, Zimmer U.S., Inc. shall not be a Releasing Party.

3. *SWARMC.* Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Definitive Documents, or this Confirmation Order, Southwest Arkansas Regional Medical Center LLC ("**SWARMC**") and the Debtors reserve all of their rights, remedies, claims, counterclaims, and defenses under the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules, all applicable contracts, and applicable state and Federal laws, including, but not limited to, their rights to file any objections, motions, discovery requests, or other filings as may be appropriate, with respect to the (i) *Motion of Debtors for Entry of an Order (I) Enforcing Sale Order, Asset Purchase Agreement, and Transition Services Agreement; and (II) Granting Related Relief* (Docket No. 4343), (ii) *Response and Objection of Southwest Arkansas Regional Medical Center ("SWARMC") to Motion of Debtors for Entry of an Order (I) To Enforce Sale Order, Asset Purchase Agreement, and Transition Services Agreement; and (II) Granting Related Relief* (Docket No. 4343) and *Counter Motion (A) To Compel Debtors to Comply with the Sale Order and Purchase Agreement, (B) For an Accounting, and (C) Granting Related Relief* (Docket No. 4687), (iii) *Debtors' Reply in Support of Motion of Debtors for Entry of an Order (I) Enforcing Sale Order, Asset Purchase Agreement, and Transition Services Agreement; and (II) Granting Related Relief* (Docket No. 4833), and (iv) *Reply in Support of Counter Motion of Southwest Arkansas Regional Medical Center ("SWARMC") (A) To Compel Debtors to Comply with the Sale Order and Purchase Agreement, (B) For an Accounting, and (C) Granting Related Relief* (Docket No. 4935) and neither the Plan, nor this Order shall be determinative of any of the issues, claims or defenses in the referenced motions of the Debtors and SWARMC.

4. *Insurance Payors.* For the avoidance of doubt, notwithstanding anything to the contrary in this Order, the Plan, or any Definitive Document, no defendant (or respondent in arbitration) to a Cause of Action described on Schedule 1 of the FILO Settlement Term Sheet, including without limitation any commercial health insurer, health plan administrator, licensee of the Blue Cross Blue Shield Association and the Blue Cross Blue Shield Association itself or any other insurance payor, shall be a Released Party.

5. *Lexington Insurance Company.* Nothing in the Plan or this Order shall (i) constitute any adjudication, judgment, trial, hearing on the merits, finding, conclusion, or other determination establishing the coverage obligation of Lexington Insurance Company or any of its affiliates (collectively "**Lexington**") under any insurance policy, nor (ii) limit the right of Lexington to assert any and all defenses at law or in equity that Lexington may have under applicable law

to provide insurance coverage or a defense or to perform any other action arising out of or related to any insurance policy issued by Lexington.

6. *Quorum Health*. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Definitive Documents, or this Confirmation Order:

    (i)    Golden Sun TSA Services, LLC, Odessa Texas Hospital Company, LLC, Big Spring Texas Hospital Company, LLC, Quorum Health Corporation, and their respective Related Parties (collectively and individually as the context requires, "**Quorum Health**") are not Releasing Parties under the Plan;

    (ii)    Quorum Health reserves any valid defenses, including setoff and recoupment, against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; *provided, however*, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved;

    (iii)    The (a) *Order (I) Authorizing and Approving (A) the Sale of Odessa Regional Medical Center and Scenic Mountain Medical Center Free and Clear of Liens, Claims, Encumbrances, and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 2887) (the "Quorum Hospital Sale Order"), (b) BSAAs and all related Transaction Documents (as those terms are defined in the Quorum Hospital Sale Order), (c) the *Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of Encumbrances to Affiliate of Quorum Health, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4192) (the "**Quorum TSA Sale Order**"), and (d) the APA (as defined in the Quorum TSA Sale Order) and all related transaction documents (all such agreements, transaction documents, and orders referenced in (a) through (d) collectively, the "**Quorum Transaction Documents**"), the Debtors' and Estates' obligations under such Quorum Transaction Documents, and any of Quorum Health's rights, defenses, remedies, Claims or Causes of Action arising from or relating to the Quorum Transaction Documents, are not impaired by the Plan, the Plan Supplement, the Definitive Documents, or this Confirmation Order;

    (iv)    Confirmation of the Plan shall not constitute a rejection, assumption, or assignment of the Debtors' unexpired leases relating to the medical office building in Big Spring, Texas (the "**Big Spring Leases**"), the Debtors' assumption and assignment of which are the subject of objections and a pending Cure Dispute (Docket. Nos. 1730, 1979, 2724, and 3172) filed by Shannon Real Estate Services, the present owner of such medical office building, the resolution of which disputes shall be resolved in accordance with the orders approving the Quorum Transaction Documents. Notwithstanding anything in the Plan or Confirmation Order to the contrary, including Paragraphs 10.4 and 10.9(d) of the Plan, any Proofs of Claim based on the rejection of any of the Debtors' Big Spring Leases must be filed with the Bankruptcy Court and served on the Claims and Noticing Agent no later than twenty-one (21) days after the date Shannon Real Estate Services receives notice of any such rejection.

7. *Boston Sports Medicine*. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Definitive Documents, or this Confirmation Order:

    (i)    Boston Sports Medicine, Inc. ("**Boston Sports Medicine**") is not a Releasing Party under the Plan;

    (ii)    Boston Sports Medicine reserves any valid defenses, including setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; *provided, however*, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved;

    (iii)    The Debtors and Boston Sports Medicine agree that, for purposes of Boston Sports Medicine's complaint (the "**Boston Sports Medicine Complaint**") in the United States District Court for the District of Massachusetts, pending as Case Number 1:21-cv-11945-DJC (the "**Boston Sports Medicine Litigation**"), the automatic stay and any injunction in the Plan do not apply to claims or causes of action against non-debtor Dr. Thomas J. Gill;

    (iv)    the Plan, the Plan Supplement, the Definitive Documents, and this Confirmation Order do not resolve the merits of Boston Sports Medicine's claims and causes of action set forth in the Boston Sports Medicine Complaint or that could otherwise be asserted in the Boston Sports Medicine Litigation, and all parties' arguments are preserved;

    (v)    Boston Sports Medicine reserves the right to seek non-monetary injunctive or similar equitable non-monetary relief against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, and the Plan Trustee, and any other successors or assigns of the Debtors or the Estates with respect to Boston Sports Medicine's claims and causes of action set forth in the Boston Sports Medicine Complaint; *provided*, *however*, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, as applicable, with respect thereto are fully preserved;

    (vi)    Boston Sports Medicine reserves the right to assert an Administrative Expense Claim for any monetary damages arising prior to the Effective Date, and all parties' defenses and objections to any such Administrative Expense Claim are preserved; *provided*, *however*, any asserted Administrative Expense Claim remains subject to the Administrative Expense Claims Bar Date (as defined in section 1.1 of the Plan);

    (vii)    Boston Sports Medicine's claims and causes of action for monetary damages arising after the Effective Date, if any, are not altered, impaired, released, stayed, enjoined, amended, rejected, discharged, or otherwise affected by the Plan, the Plan Supplement, the Definitive Documents, or this Confirmation Order; and

    (viii)    the Debtors, the Estates, the Estate Representative, the Plan Trust, or the Plan Trustee shall provide Boston Sports Medicine at least seven (7) days' prior notice and an opportunity to object prior to selling or assigning Boston Sports Medicine and Research Institute, LLC's domain name, trade name, marks, or trademarks.

8. *Highspring.* Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Definitive Documents, or this Confirmation Order:

    (i)    Highspring LLC, f/k/a Vaco LLC ("**Highspring**") is not a Releasing Party under the Plan; and

    (ii)    Highspring reserves any valid defenses, including setoff and recoupment, against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

9. *US MED-EQUIP, LLC.* Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Definitive Documents, or this Confirmation Order:

    (i)    US MED-EQUIP, LLC ("**US MED-EQUIP**") is not a Releasing Party under the Plan;

    (ii)    US MED-EQUIP reserves any valid defenses, including setoff and recoupment, against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved; and

    (iii)    US MED-EQUIP has opted out of the Administrative Expense Claims Consent Program.

10. *DJO Entities.* Medshape, Inc., DJO, LLC, Trilliant Surgical, LLC, Novastep, Inc., Encore Medical, L.P. (d/b/a DJO Surgical) and SURGI-CARE, Inc. (the "**DJO Entities**") reserves any valid defenses of setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; *provided, however*, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

11. *Blue Cross Blue Shield Texas.* Health Care Service Corporation, a Mutual Legal Reserve Company and its division Blue Cross and Blue Shield of Texas (collectively "**BCBSTX**") reserves all defenses of setoff, waiver of claims and causes of action, and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved. BCBSTX does not waive any claims or defenses as to its proofs of claims

filed against the Debtors and/or Estates as appliable, except to the extent such proofs of claim have otherwise been withdrawn with prejudice or disallowed and expunged by order of the Court.

12. *UC Health.* University of Colorado Health, a Colorado non-profit corporation ("**UCHealth**") reserves any valid defenses, including setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; *provided,* however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

13. *Cintas.* Cintas Corporation No. 2 ("**Cintas**") reserves any valid defenses, including those of setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; *provided, however,* that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

14. *Dext Capital.* Dext Capital, LLC reserves any valid defenses of setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

15. *Compass Parties.* Morrison Management Specialists, Inc., Compass Group USA, Inc. by and through its subsidiary Crothall Healthcare, Inc., and Crothall Healthcare, Inc. (collectively, the "**Compass Parties**") reserve any valid defenses of setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

16. *Stryker.* Notwithstanding anything to the contrary in the Plan or this Confirmation Order (as either or both may be modified, supplemented, or amended), all defenses (including, without limitation, setoff, subrogation, recoupment, or affirmative defenses of any kind or nature) of Stryker Corporation and any of its divisions, affiliates, subsidiaries, successors and assigns ("**Stryker**") against the Debtors, the Plan Administrator, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any successors or assigns of the Debtors or the Estates, or any entity authorized to prosecute Causes of Action under the Plan, are preserved, and are not waived, released, exculpated, relinquished, discharged, enjoined, barred, or otherwise adversely affected by the Plan, this Confirmation Order or otherwise; *provided, however,* that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the

Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are also fully preserved.

17. *Humana*.  Notwithstanding anything in the Plan or this Order to the contrary, Humana, Humana Insurance Company, Humana Health Plan, Inc., Humana Government Business, Inc., and CarePlus Health Plans, Inc. (collectively, the "**Humana Entities**") reserves any valid defenses including, but not limited to, defenses of setoff and recoupment or causes of action against any third party, the Debtors, the Estates, the Estate Representative, the Litigation Trustee, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assignees of the Debtors or the Estates; provided, however, that the rights and defenses of any third party, the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation  Trustee, the Plan Trust, or the Plan Trustee, and any other successor or assigns of the Debtors of the Estates as applicable, with respect thereto are fully preserved. Humana is not a Releasing Party under the Plan.  Notwithstanding anything to the contrary in the Plan or Confirmation Order, to the extent the Debtors or Humana discover that any executory contracts are still in effect between the Debtors and a Humana Entity prior to the Effective Date, which were not addressed on the Schedule of Assumed Contracts, then the Debtors will work with Humana in good faith within 30 days of the discovery regarding the disposition of an applicable contract.  The Debtors shall also work in good faith following the Confirmation Date regarding the disposition of the executory contracts between a Humana Entity and the Debtors identified on the Schedule of Assumed Contracts.

18. *Access*.  Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Definitive Documents or this Confirmation Order:

(i)  Access Information Management Corporation f/k/a Retrievex, Inc. ("**Access**") is not a Releasing Party under the Plan;

(ii)  Access reserves any and all valid defenses, including setoff and recoupment, against third parties, the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved;

(iii)  Promptly following entry of this Confirmation Order, the Debtors will work in good faith with Access regarding the treatment of the Debtors' medical records in Access' possession, and, subject to the terms and conditions of the Plan (including section 2.1 thereof) and this Confirmation Order (including paragraphs 19–21 hereof), Access reserves all rights to seek payment in advance and/or assert an Administrative Expense Claim for all costs associated with the further storage, destruction, transportation or other treatment of such records, and the Debtors reserve all rights and defenses in connection therewith; and

(iv)  For the avoidance of doubt, (i) nothing in the Plan or this Confirmation Order shall affect the requirements of section 365(b)(1) of the Bankruptcy Code with respect to any pending objections filed by Access regarding the assumption and assignment of Access' contract(s) pursuant to any other order(s) of the Bankruptcy Court that have not otherwise been resolved, all of which are preserved and (ii) that certain Master Agreement: Records

Storage and Management Services dated as of April 1, 2018 by and between Access and debtor Steward Health Care System LLC, as amended and supplemented, is the subject of a Cure Dispute. *See* Docket No. 1081.

19. *HHS.* Notwithstanding anything to the contrary in the Plan, any Plan documents, or the Confirmation Order, nothing therein or herein shall affect any setoff, subrogation, or recoupment rights of HHS Environmental Services, LLC, HHS Culinary and Nutrition Solutions, LLC or any of their affiliates (collectively, "HHS") against any obligation, and HHS reserves any and all valid defenses of setoff, subrogation, and recoupment against the Debtors, the Estates, the Estate Representative, the Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates, as applicable, with respect thereto are fully preserved.

20. *Getinge.* Notwithstanding anything else in the Plan or this Confirmation Order to the contrary, neither the confirmation of the Plan, the entry of this Confirmation Order nor the effectuation of any transaction contemplated thereby shall impair any defense of setoff or recoupment held by Getinge USA Sales, LLC (with its affiliates, collectively, "**Getinge**") to the extent such defense existed and was valid prior to the confirmation of the Plan, with the effect that any such defense may be asserted by and is fully preserved in favor of Getinge against the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, the Plan Administrator Committee and any other successors or assigns of the Debtors or the Estates; for the avoidance of doubt, the foregoing does not expand Getinge's rights or defenses (if any) as they exist immediately prior to the confirmation of the Plan.

21. [*Reserved.*]

22. *CHRISTUS, Orlando Health, and HSA.* Notwithstanding anything in this Confirmation Order to the contrary, each of CHRISTUS Health Ark-La-Tex ("**CHRISTUS**"), Orlando Health Medical Group, Inc. (collectively "**Orlando Health**"), Healthcare Systems of America ("**HSA**") reserve any and all defenses, including setoff and recoupment, that it may have against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved. Notwithstanding anything in this Order to the contrary, each of CHRISTUS, Orlando Health, and HSA shall not be required to obtain leave of this Court prior to asserting any defense, including setoff and recoupment, in any litigation or other proceeding filed or pending against it. Nothing in this paragraph shall be construed to create, expand, limit, impair or acknowledge any right of setoff or recoupment by the Debtors and their successors and assigns beyond those that exist independent of this paragraph.

23. *Commonwealth.* The Commonwealth of Massachusetts reserves, and nothing in the Plan or Confirmation Order affects or modifies, any valid setoff and recoupment rights against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates;

*provided, however*, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

24. *Florida Blue.*  Blue Cross and Blue Shield of Florida, Inc. ("**Florida Blue**") reserves any valid defenses, including those of setoff and recoupment, against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; *provided, however*, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

25. [*Reserved.*]

26. *Blue Cross Blue Shield MA.*  Notwithstanding any provision to the contrary in the Disclosure Statement, Plan, supporting Plan documents, and Plan Confirmation Order, any defenses of Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. and Blue Cross and Blue Shield of Massachusetts, Inc., including but not limited to, rights and defenses of setoff and recoupment, are fully preserved against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

27. *ODM.*  Ohio Department of Medicaid ("**ODM**") reserves any valid defenses of setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; *provided, however*, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

28. *Sunbelt Rentals*. Notwithstanding anything to the contrary in this Confirmation Order, the Plan, the Disclosure Statement, or any exhibit or supplement to any of the foregoing documents, all of Sunbelt Rentals, Inc.'s rights and defenses of setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, any chapter 11 trustee appointed in these cases, any chapter 7 trustee appointed upon any conversion of these cases, and any other successors or assigns of any of the foregoing are fully preserved; *provided, however*, that the rights and defenses of the Debtors, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, any chapter 11 trustee appointed in these cases, any chapter 7 trustee appointed upon any conversion of these cases, and any other successors or assigns of any of the foregoing, with respect thereto are fully preserved.

29. *Mass General Brigham.*  Mass General Brigham Incorporated, on behalf of certain of its affiliates (collectively, the "**MGB Entities**"), including Mass General Brigham Health Plan, Inc. (f/k/a AllWays Health Partners, Inc. and Neighborhood Health Plan, Incorporated) ("**MGBH**") and Mass General Brigham Health Insurance Company (f/k/a AllWays Health

Partners Insurance Company) ("**MGBHIC**," and collectively with MGBH, "**MGBHP**") reserve any valid defenses of setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

30. *Western Reserve*. Nothing in the Plan shall be an adjudication, or determination as to the classification, of the claims asserted by Western Reserve Health Education Inc. in the *Application & Motion of Western Reserve Health Education, Inc. for (1) Allowance and Payment of Administrative Expense Claim; and (2) Accounting & Turnover of Post Petition Grant Funds* (Docket No. 3537); *provided* that the Debtors' defenses to such claims are fully preserved.

31. *Sodexo*. Sodexo reserves any and all setoff and recoupment claims, rights, and defenses against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the claims, rights, and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved. For the avoidance of doubt, Sodexo opts out of any and all releases provided in the Plan and opts out of the Administrative Expense Claim Consent Program.

32. *LabCorp*. In order to effectuate that certain *Stipulation and Agreed Order Resolving Potential Avoidance Claims* (Docket No. 5596-1) (the "**Stipulation and Agreed Order**") by and among the Debtors, Laboratory Corporation of America ("**Laboratory Corporation**"), and Medtox Laboratories, Inc. ("**Medtox**," and collectively with Laboratory Corporation, "**LabCorp**"), any and all claims and causes of action of the Debtors and their successors and assigns, including, but not limited to, any and all claims, damages, actions, suits, causes of action, rights, liens, demands, obligations and/or liabilities, whether statutory or at common law, known or unknown, asserted or unasserted, in equity or otherwise, including those arising under chapter 5 of the Bankruptcy Code ("**Chapter 5 Causes of Action**"), other than liability of LabCorp, if any, that would otherwise result from any act or omission of such released party to the extent that such act or omission is determined by a final order to have constituted willful misconduct involving claims for actual fraud or intentional torts, in each case, other than Chapter 5 Causes of Action, (collectively, the "**LabCorp Causes of Action**"), shall not become Litigation Trust Causes of Action or be transferred to the Litigation Trust[8] on the Litigation Trust Establishment Date. The LabCorp Causes of Action shall only become Litigation Trust Causes of Action and be transferred to the Litigation Trust in the event that the Bankruptcy Court denies the motion seeking an order approving the Stipulation and Agreed Order and such order has become final and non-appealable. Further, unless and until the Bankruptcy Court approves the Stipulation and Agreed Order and such order has become final and non-appealable, Laboratory Corporation and Medtox and each of their affiliates

---

[8] Capitalized terms used but not otherwise defined in this language to be included in any order confirming the Debtors' Plan shall have the meanings ascribed to them in the Debtors' Plan.

(collectively, the "**LabCorp Parties**") expressly and fully reserve and preserve any and all valid defenses, including any rights of setoff, recoupment, and any and all other valid defenses of the LabCorp Parties under applicable law against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; *provided, however*, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully reserved and preserved.

33. *Dr. Kasper.* Notwithstanding anything to the contrary in the Plan or this Order, nothing in the Plan or Order shall impair the cure claim of Dr. Ekkehard Kasper ("**Dr. Kasper**") or Dr. Kasper's objection to the Debtors' proposed cure amount filed at Docket Nos. 1776 and 2813, and all of the Debtors' rights and defenses to such cure claim are preserved. Dr. Kasper reserves any valid defenses of setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved. The parties shall attempt to negotiate a resolution to the cure claim and if they fail to achieve a settlement, the Debtors, the Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust or the Plan Trustee and any other successors or assigns of the Debtors or the Estates as applicable, shall file an objection to the cure claim on or before December 31, 2025 and their failure to do so will result in the cure claim being Allowed as an administrative expense claim in the amount set forth in his cure objection at Docket No. 1776. The Debtor acknowledges receipt of and accepts Dr. Kasper's Administrative Claim Consent Program Opt-Out Form.

34. *Elevance.* The Elevance Health Companies, Inc., on behalf of itself and its affiliates (including, without limitation, Community Insurance Company, dba Anthem Blue Cross and Blue Shield, Unicare Life & Health Insurance Company, Carelon Health, Carelon Behavioral Health LLC, Beacon Health Strategies, LLC, Massachusetts Behavioral Health Partnership, HealthSun Health Plans, Inc., Simply Healthcare Plans, Inc., Freedom Health, Inc., Freedom Optimum, Apc Passe, LLC, CareMore and WellPoint, Inc. f/k/a Amerigroup Texas, Inc. d/b/a Amerigroup Community Care) (collectively, "**Elevance**") reserves any valid defenses of setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved. For the avoidance of doubt, nothing in the Plan or this Confirmation Order shall affect the requirements of section 365(b)(1) of the Bankruptcy Code with respect to any pending objections filed by Elevance regarding the assumption and assignment of Elevance's contracts pursuant to any other order(s) of the Bankruptcy Court that have not otherwise been resolved, all of which are preserved.

35. *FRS* Notwithstanding anything to the contrary in the Plan or this Confirmation Order, Financial Recovery Services, LLC ("**FRS**") reserves and shall not be deemed to waive (i) the

right to contest the Debtors' rejection of the PCIF Agreement (as defined in as defined in Docket No. 5497) on the basis that such contract is not executory, (ii) any and all rights in connection with the assignment set forth in the paragraph entitled "FRS Compensation" in the PCIF Agreement, and (iii) FRS's rights to pursue its filed administrative expense claim. The Debtors and the Plan Trustee reserve all their rights and defenses in connection with the PCIF Agreement and FRS's assertions with respect thereto.

36. *Becton, Dickinson and Company.* Notwithstanding anything in the Plan or this Order, all of Becton, Dickinson and Company's defenses, including but not limited to rights of setoff and recoupment, against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates, with respect to litigation between or among such parties, are fully preserved.

37. *Shannon Real Estate Services*. For the avoidance of doubt, nothing in the Plan or this Confirmation Order shall affect the requirements of section 365(b)(1) of the Bankruptcy Code or other applicable law with respect to any pending objections filed by Shannon Real Estate Services ("**Shannon**") regarding the assumption and assignment of Shannon's contracts pursuant to any other order(s) of the Bankruptcy Court that have not otherwise been resolved, all of which are preserved.

38. *Molina.* Notwithstanding anything to the contrary in the Plan or this Confirmation Order (as either or both may be modified, supplemented, or amended), all defenses (including, without limitation, setoff, subrogation, recoupment, or affirmative defenses of any kind or nature) of Healthcare of Idaho, Molina Healthcare of Mississippi, Inc., Senior Whole Health, LLC, Molina Healthcare of South Carolina, Inc., Molina Healthcare of Texas, Inc., Molina Healthcare of Utah, Inc., Molina Healthcare of California, Inc., Molina Healthcare of Michigan, Inc., Molina Healthcare of New Mexico, Inc., Molina Healthcare of Virginia, Inc., Molina Healthcare of Washington, Inc., Senior Whole Health of New York, a/k/a Molina Healthcare of New York and or Affinity by Molina Healthcare, Molina Healthcare of Wisconsin Inc., including their affiliates and subsidiaries that underwrite or administer health plans (collectively, "**Molina**") against third parties, the Debtors, the Plan Administrator Committee, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any successors or assigns of the Debtors or the Estates, or any entity authorized to prosecute Causes of Action under the Plan, are preserved, and are not waived, released, exculpated, relinquished, discharged, enjoined, barred, or otherwise adversely affected by the Plan, this Confirmation Order or otherwise; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are also fully preserved.

39. *Estate of Grogg.* Nothing in the Plan or this Order shall (i) subject the Medical Liability Claims of Denise Grogg, individually and as personal representative of the estate of Terence Grogg ("**Estate of Grogg**"), against non-Debtor third parties, including, but not limited to, any employed or affiliated physician of a Debtor, or any other medical personnel employed by a Debtor, to the Medical Liability Claims Procedures or (ii) enjoin the Estate of Grogg from pursuing such claims against non-Debtor third parties including, but not limited to, any employed or affiliated physician of a Debtor, or any other medical personnel employed by a Debtor. If the Estate of Grogg elects to proceed with liquidating its Medical Liability Claims

against the Debtors in the tort system, pursuant to phase 3(b) of the Medical Liability Claims Procedures, the Plan Injunction, to the extent applicable, shall be deemed modified, without further order of the Bankruptcy Court, to allow the Estate of Grogg to proceed against the Estate Representative in the tort system for the sole purpose of liquidating its Medical Liability Claims against the Debtors.

40. *Tenet Healthcare*. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Definitive Documents, or this Confirmation Order, Tenet Business Services Corporation, Conifer Revenue Cycle Solutions, LLC, and the Tenet APA Parties[9] reserves any valid defenses, including setoff and recoupment, against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved.

41. *TRACO*. TRACO International Group S. De R.L. ("**TRACO**") reserves any valid defenses of setoff and recoupment against the Debtors, the Estates, the Estate Representative, the Litigation Trust, the Litigation Trustee, the Plan Trust, the Plan Trustee, and any other successors or assigns of the Debtors or the Estates with respect to any dispute among the parties, including but not limited to TRACO's (i) Administrative Claim No. 13963; (ii) motion for payment of postpetition premiums (Docket No. 3341); and (iii) General Unsecured Claim Nos. 14808-14870; provided, however, that the rights and defenses of the Debtors, Plan Administrator Committee, the Litigation Trust, the Litigation Trustee, the Plan Trust, or the Plan Trustee, and any other successors or assigns of the Debtors or the Estates as applicable, with respect thereto are fully preserved. Reference is hereby made to that certain adversary proceeding styled *TRACO International Group S. De R.L. v. Steward Health Care System LLC and All Affiliated Debtors*, Adversary Case No. 24-03261 (the "**TRACO Adversary Proceeding**") filed on December 6, 2024. Notwithstanding anything to the contrary in this Order, to the extent that any funds transferred to the Litigation Trust by the Debtors on the Litigation Trust Establishment Date pursuant to the FILO Settlement Order (as defined in the Plan) are either found by a final, non-appealable order of this Court, or mutual agreement by the Debtors, the FILO Secured Parties (or, after the Litigation Trust Establishment Date, the Class A-2 Representative), and TRACO, to be held in trust for TRACO (the "**Disputed Funds**"), this Order shall not be deemed to impair any claims asserted in the TRACO Adversary Proceeding with respect to such funds or judgments related thereto; provided, that nothing contained herein shall be deemed to abrogate any requirements under the Bankruptcy Code or Bankruptcy Rules to obtain approvals of settlements. This Order shall not impact the reservation of TRACO's rights set forth at paragraph 55 of the FILO Settlement Order. The Debtors, TRACO, and all other parties reserve all of their rights, remedies, claims, and defenses with respect to the Disputed Funds under the Bankruptcy Code, the Bankruptcy Rules, the Federal Rules, all

---

[9]   The "**Tenet APA Parties**" are CGH Hospital, Ltd., Coral Gables Hospital, Inc., Hialeah Hospital, Inc., Hialeah Real Properties, Inc., Lifemark Hospitals of Florida, Inc., Lifemark Hospitals, Inc., North Shore Medical Center, Inc., Sunrise Medical Group I, LLC, Tenet Florida Physician Services, LLC, TFPS IV, LLC, and Sharilee Smith, as trustee, and Tenet Healthcare Corporation.

applicable contracts, and applicable state and Federal laws, including, but not limited to, their rights to file any objections, motions, or other filings as may be appropriate.

## Exhibit A

**Plan**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| **STEWARD HEALTH CARE SYSTEM LLC**, *et al.*, | § § § | Case No. 24-90213 (CML) |
| Debtors.[1] | § § § | (Jointly Administered) |

## JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
## STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Attorneys for Debtors and Debtors in Possession*

July 11, 2025
Houston, Texas

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

# Table of Contents

| | | |
|---|---|---|
| **ARTICLE I.** | **Definitions and Interpretation.** | **1** |
| 1.1 | Definitions. | 1 |
| 1.2 | Interpretation; Application of Definitions; Rules of Construction. | 20 |
| 1.3 | Reference to Monetary Figures. | 21 |
| 1.4 | Controlling Document. | 21 |

| | | |
|---|---|---|
| **ARTICLE II.** | **Administrative Expense Claims, FILO DIP Claims, Professional Fee Claims, and Priority Tax Claims.** | **21** |
| 2.1 | Administrative Expense Claims. | 21 |
| 2.2 | FILO DIP Claims. | 22 |
| 2.3 | Professional Fee Claims. | 22 |
| 2.4 | Priority Tax Claims. | 23 |

| | | |
|---|---|---|
| **ARTICLE III.** | **Classification of Claims and Interests** | **24** |
| 3.1 | Classification in General. | 24 |
| 3.2 | Summary of Classification of Claims and Interests. | 24 |
| 3.3 | Special Provision Governing Unimpaired Claims. | 25 |
| 3.4 | Elimination of Vacant Classes. | 25 |
| 3.5 | Voting Classes; Presumed Acceptance by Non-Voting Classes. | 25 |
| 3.6 | Voting; Presumptions; Solicitation. | 25 |
| 3.7 | Cramdown. | 26 |
| 3.8 | No Waiver. | 26 |

| | | |
|---|---|---|
| **ARTICLE IV.** | **Treatment of Claims and Interests.** | **26** |
| 4.1 | Class 1:  Other Priority Claims. | 26 |
| 4.2 | Class 2:  Other Secured Claims. | 26 |
| 4.3 | Class 3:  FILO Bridge Claims. | 27 |
| 4.4 | Class 4:  General Unsecured Claims. | 28 |
| 4.5 | Class 5: PBGC Claims. | 28 |
| 4.6 | Class 6:  Intercompany Claims. | 28 |
| 4.7 | Class 7:  Subordinated Securities Claims. | 28 |
| 4.8 | Class 8: Intercompany Interests. | 29 |
| 4.9 | Class 9:  Non-Debtor Owned Subsidiary Interests. | 29 |
| 4.10 | Class 10:  Parent Interests. | 29 |

| | | |
|---|---|---|
| **ARTICLE V.** | **Means for Implementation** | **30** |
| 5.1 | Joint Chapter 11 Plan. | 30 |
| 5.2 | Compromise and Settlement of Claims, Interests, and Controversies. | 30 |
| 5.3 | Plan Settlement. | 30 |
| 5.4 | Sources of Consideration for Plan Distribution. | 31 |
| 5.5 | Implementation. | 32 |
| 5.6 | Transition Services Agreement | 33 |
| 5.7 | Litigation Funding Agreement | 34 |
| 5.8 | Coordination between the Litigation Trust and the Plan Trust. | 34 |

5.9 Corporate Action. ................................................................................................ 35
5.10 Plan Administrator Committee ........................................................................... 35
5.11 Governance. ......................................................................................................... 35
5.12 Cancellation of Existing Securities, Agreements, and Liens............................... 36
5.13 Merger or Dissolution of Debtors....................................................................... 36
5.14 Preservation of Causes of Action. ....................................................................... 37
5.15 Effectuating Documents; Further Transactions. .................................................. 37
5.16 Closing of the Chapter 11 Cases. ........................................................................ 38

**ARTICLE VI.        Plan Trust. ................................................................................... 38**

6.1 Establishment of the Plan Trust. ......................................................................... 38
6.2 Funding of and Transfer of Assets into the Plan Trust. ...................................... 40
6.3 Plan Trustee. ........................................................................................................ 40
6.4 Plan Trust Agreement. ......................................................................................... 43
6.5 Fees and Expenses of the Plan Trust. .................................................................. 43
6.6 Creation and Maintenance of Trust Accounts. .................................................... 43
6.7 Limitation of Liability. ........................................................................................ 43
6.8 Indemnification. ................................................................................................... 44
6.9 Insurance. ............................................................................................................. 44
6.10 Dissolution of the Plan Trust. ............................................................................. 45
6.11 Records. ............................................................................................................... 45
6.12 Section 1145 Exemption; Non-Transferability of Plan Trust Interests. .............. 45
6.13 Plan Trust Tax and Other Matters. ...................................................................... 46

**ARTICLE VII.       Litigation Trust ............................................................................ 49**

7.1 Establishment of the Litigation Trust. ................................................................. 49
7.2 Funding of and Transfer of Assets into the Litigation Trust. .............................. 51
7.3 Litigation Trustee. ............................................................................................... 52
7.4 Litigation Trust Agreement. ................................................................................ 53
7.5 Class B Representative. ........................................................................................ 54
7.6 Fees and Expenses of the Litigation Trust. ......................................................... 54
7.7 Indemnification. ................................................................................................... 54
7.8 Dissolution of the Litigation Trust. ..................................................................... 55
7.9 Records. ............................................................................................................... 55
7.10 Transferability of Litigation Trust Interests. ...................................................... 55
7.11 Litigation Trust Tax and Other Matters............................................................... 55

**ARTICLE VIII.      Distributions. ............................................................................... 59**

8.1 Distributions Generally. ...................................................................................... 59
8.2 No Postpetition Interest on Claims...................................................................... 59
8.3 Distribution Record Date. ................................................................................... 59
8.4 Date of Distributions. .......................................................................................... 60
8.5 Reserve on Account of Disputed Claims............................................................. 60
8.6 Distributions After Effective Date. ..................................................................... 61
8.7 Plan Distributions Made by Plan Trustee. ........................................................... 61
8.8 Delivery of Distributions. ................................................................................... 61
8.9 Unclaimed Property............................................................................................. 61
8.10 Satisfaction of Claims......................................................................................... 62

8.11    Manner of Payment Under Plan. ...................................................................................... 62
8.12    Minimum Distribution. .................................................................................................... 62
8.13    No Distribution in Excess of Amount of Allowed Claim. ............................................... 62
8.14    Allocation of Distributions Between Principal and Interest. .......................................... 63
8.15    Setoffs and Recoupments. ............................................................................................... 63
8.16    Withholding and Reporting Requirements. .................................................................... 63
8.17    Securities Registration Exemption. ................................................................................. 64
8.18    Disbursing Agent. ........................................................................................................... 64

ARTICLE IX.      Procedures for Resolving Claims. ....................................................... 65

9.1    Allowance of Claims. ...................................................................................................... 65
9.2    Objections to Claims. ...................................................................................................... 65
9.3    Estimation of Claims. ...................................................................................................... 65
9.4    Claim Resolution Procedures Cumulative. ..................................................................... 66
9.5    Adjustment to Claims Register Without Objection. ........................................................ 66
9.6    No Distributions Pending Allowance. ............................................................................. 66
9.7    Distributions After Allowance. ....................................................................................... 66
9.8    Elimination of Duplicate Claims. .................................................................................... 67
9.9    Late Filed Claims. ........................................................................................................... 67
9.10    Amendments to Claims. .................................................................................................. 67
9.11    Insured Claims. ............................................................................................................... 67
9.12    Medical Liability Claims Procedures. ............................................................................. 68

ARTICLE X.      Executory Contracts and Unexpired Leases. ..................................... 68

10.1    Rejection of Executory Contracts and Unexpired Leases. .............................................. 68
10.2    Survival of Indemnification Obligations. ....................................................................... 69
10.3    Determination of Cure Disputes and Deemed Consent. .................................................. 69
10.4    Rejection Damages Claims. ............................................................................................. 70
10.5    Joint Ventures. ................................................................................................................. 71
10.6    Insurance Policies. .......................................................................................................... 71
10.7    Assignment. ..................................................................................................................... 72
10.8    Modifications, Amendments, Supplements, Restatements, or Other Agreements. .......... 72
10.9    Reservation of Rights. ..................................................................................................... 72

ARTICLE XI.      Conditions Precedent to Occurrence of Effective Date. ..................... 73

11.1    Conditions Precedent to Effective Date .......................................................................... 73
11.2    Waiver of Conditions Precedent ..................................................................................... 73
11.3    Effect of Failure of a Condition ...................................................................................... 74
11.4    Effect of Vacatur of Confirmation Order. ....................................................................... 74

ARTICLE XII.      Effect of Confirmation. ......................................................................... 74

12.1    Binding Effect. ................................................................................................................ 74
12.2    Vesting of Assets. ............................................................................................................ 74
12.3    Pre-Confirmation Injunctions and Stays. ....................................................................... 75
12.4    Injunction Against Interference with Plan. ..................................................................... 75
12.5    Plan Injunction. ............................................................................................................... 76
12.6    Releases. .......................................................................................................................... 77

12.7    Exculpation. ................................................................................................ 80
12.8    Waiver of Statutory Limitation on Releases. ............................................ 81
12.9    Injunction Related to Releases and Exculpation. ..................................... 81
12.10   Subordinated Claims. ................................................................................ 82
12.11   Retention of Causes of Action and Reservation of Rights. ..................... 82
12.12   Ipso Facto and Similar Provisions Ineffective. ....................................... 82
12.13   Solicitation of Plan. .................................................................................. 82
12.14   Corporate and Limited Liability Company Action. ................................. 83
12.15   Release of Liens. ....................................................................................... 83

**ARTICLE XIII.    Retention of Jurisdiction.** ........................................................... 83

13.1    Retention of Jurisdiction. .......................................................................... 83
13.2    Courts of Competent Jurisdiction. ........................................................... 86

**ARTICLE XIV.    Miscellaneous Provisions** ............................................................. 86

14.1    Statutory Fees. ........................................................................................... 86
14.2    Exemption from Certain Transfer Taxes. ................................................ 86
14.3    Dissolution of Creditors' Committee. ...................................................... 87
14.4    Request for Expedited Determination of Taxes of the Debtors. .............. 87
14.5    Dates of Actions to Implement Plan. ....................................................... 87
14.6    Amendments. ............................................................................................. 87
14.7    Revocation or Withdrawal of Plan. .......................................................... 88
14.8    Notice of Effective Date. .......................................................................... 88
14.9    Substantial Consummation. ...................................................................... 88
14.10   Governing Law. ......................................................................................... 88
14.11   Immediate Binding Effect. ........................................................................ 89
14.12   Successors and Assigns. ............................................................................ 89
14.13   Entire Agreement. ..................................................................................... 89
14.14   Severability of Plan Provisions. ............................................................... 89
14.15   Additional Documents. ............................................................................. 89
14.16   Deemed Acts. ............................................................................................ 90
14.17   Computing Time. ....................................................................................... 90
14.18   Exhibits to Plan. ........................................................................................ 90
14.19   Notices. ...................................................................................................... 90
14.20   Reservation of Rights. ............................................................................... 93

Each of the debtors in the above-captioned chapter 11 cases (each, a "**Debtor**" and, collectively, the "**Debtors**") proposes the following joint chapter 11 plan of liquidation pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

## ARTICLE I.    DEFINITIONS AND INTERPRETATION.

### 1.1    *Definitions.*

The following terms shall have the respective meanings specified below:

*2016 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in October 2016 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2020 Transactions* means, individually and/or collectively, (i) the transactions that were entered into and/or occurred in or about May 2020 pursuant to which: (a) Manolete Health, LLC purchased Steward Healthcare International Holdings Ltd. from Steward Health Care System LLC, (b) Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**") contributed real properties to MPT of Utah-Steward, LLC (together with its subsidiaries, the "**Utah JV**") for common equity interests in the Utah JV and subsequent cash distributions from the Utah JV, and the Utah JV leased such real properties back to Jordan Valley and Davis, and (c) Cerberus Operations and Advisory Company exchanged its equity in Steward Healthcare Investors LLC for a $350 million convertible note, and (ii) all other transactions related thereto, including any transactions in what was referred to at the time as Project Easter.

*2021 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in January 2021 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2022 Transaction* means the transaction or transactions entered into on or about May 31, 2022 (and certain other dates in 2022) by and among, among others, Sparta Merger Sub I Inc., Sparta Merger Sub II Inc., Sparta Merger Sub III Inc., Sparta Merger Sub I LLC, Sparta Merger Sub II LLC, Sparta Merger Sub III LLC, Sparta Sub Inc., SNCN Holdco Inc., SICN Holdco Inc., Steward Integrated Care Network, Inc., Steward Accountable Care Network, Inc., Steward Health Care Network Inc., Sparta Holding Co. LLC, Steward Health Care System LLC and CareMax, Inc. pursuant to which certain value-based care assets were transferred to Sparta Holding Co. LLC and acquired by CareMax, Inc., and all other transactions related thereto or included therein (including any dividends, distributions, and/or allocations paid, made, and/or issued in 2022 in connection with and/or following such transaction(s), and any subsequent transfer of the proceeds thereof or arising therefrom).

*Administrative Expense Claim* means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under sections 327, 328, 330, 365, 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and

operating the Debtors' businesses and (ii) Professional Fee Claims, but excluding FILO DIP Claims, FILO Bridge Claims, Intercompany Claims, and Priority Tax Claims.

**Administrative Expense Claims Bar Date** means (i) the date fixed by the Administrative Expense Claims Bar Date Order by which any Person (including any Governmental Unit) asserting an Administrative Expense Claim against any Debtor (subject to the exceptions contained therein) must have filed a proof of Administrative Expense Claim with the Bankruptcy Court or application for allowance of such Administrative Expense Claim (as applicable) against any such Debtor or be forever barred from asserting such Administrative Expense Claim, (ii) the first Business Day that is twenty (20) days following the Confirmation Date with respect to Administrative Expense Claims (other than Professional Fee Claims) held by any Person (including any Governmental Unit) arising prior to the Confirmation Date that are not subject to the Administrative Expense Claims Bar Date Order, or (iii) the first Business Day that is twenty (20) days following the Effective Date, with respect to Administrative Expense Claims (other than Professional Fee Claims) held by any Person (including any Governmental Unit) arising between the Confirmation Date and the Effective Date. The Confirmation Order shall provide for the Administrative Expense Claims Bar Dates set forth in clauses (ii) and (iii) of the immediately preceding sentence.

**Administrative Expense Claims Bar Date Order** means the *Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claims Bar Date, and (V) Granting Related Relief* (Docket No. 3217), entered by the Bankruptcy Court on November 14, 2024.

**Administrative Expense Claims Consent Program** means the consent program proposed to certain holders of Administrative Expense Claims with respect to the treatment of such Administrative Expense Claims as set forth in the Confirmation Order and the Plan.

**Administrative Expense Claims Consent Program Condition** means that, in accordance with the terms and conditions of the Administrative Expense Claims Consent Program, holders of more than seventy-five percent (75%) of the aggregate dollar amount of Administrative Expense Claims, in the amounts set forth in the Administrative Expense Claims Consent Program Opt-Out Form, do not opt out of participating in the Administrative Expense Claims Consent Program, which such condition may be waived by the Debtors and the Creditors' Committee.

**Administrative Expense Claims Consent Program Opt-Out Form** means the opt-out form, approved under the Disclosure Statement Order, sent to holders of Administrative Expense Claims pursuant to which holders may opt out of participating in the Administrative Expense Claims Consent Program.

**Affiliate** means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity

twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Allowed* means, with respect to any Claim against or Interest in a Debtor, (i) any Claim or Interest arising on or before the Effective Date or under section 502(h) of the Bankruptcy Code (a) as to which no objection to allowance has been interposed within the time period set forth in this Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, (iii) any Claim or Interest expressly Allowed under this Plan, or (iv) any Claim that is listed in the Debtors' Schedules as liquidated, non-contingent, and undisputed; *provided* that the Debtors, the Plan Administrator Committee, and the Plan Trustee, as applicable, will retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to this Plan, except that no such Claims shall be retained against Released Parties other than as expressly set forth in ARTICLE XII of this Plan.

*Allowed Bridge MOIC Amount* means $11,250,000 through March 31, 2026 and increasing by: (i) $1,000,000 on April 1, 2026, (ii) $1,500,000 on May 1, 2026, (iii) $2,000,000 on June 1, 2026, (iv) 2,500,000 on July 1, 2026, (v) $3,000,000 on August 1, 2026, and (vi) $3,750,000 on September 1, 2026 and on the first day of each month thereafter until the FILO Balance (as defined in the FILO Settlement Term Sheet) is paid in full in Cash; *provided* that the Allowed Bridge MOIC Amount shall not exceed 85% of $75,000,000 *minus* any interest paid or accreted on account of the FILO Bridge Claims (including any interest paid or accreted on account of the Class A-2 Preference that is allocable to FILO Bridge Claims).

*Asset* means any right, title, and interest of a Debtor in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible.

*Available Cash* means Cash on hand (including any amounts invested pending distribution) of the Plan Trust or the Litigation Trust, as applicable, as of the date of determination, net of any amounts reserved in respect of Disputed Claims and any reserves established in the good faith discretion of the Plan Trustee or the Litigation Trustee, as applicable, in consultation with the Creditors' Committee, to provide for payment of any obligations or liabilities of the Plan Trust or Litigation Trust, as applicable, including any Claims assumed by the Plan Trust or the Litigation Trust pursuant to this Plan and any costs or expenses of the Plan Trust or Plan Trustee or the Litigation Trust or Litigation Trustee and any taxes (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes of such fund or separate taxable entity), or to maintain the value of any Assets of the Plan Trust or the Litigation Trust, as applicable.

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising

under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

*Ballot* means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

*Bar Date* means the date fixed by order(s) of the Bankruptcy Court (including the Bar Date Order or otherwise in this Plan or the Confirmation Order) by which any Persons, asserting a Claim against any Debtor must have filed a Proof of Claim or application for allowance of such Claim (as applicable) with the Bankruptcy Court against any such Debtor or be forever barred from asserting such Claim.

*Bar Date Order* means the *Order (I) Establishing Deadlines and Procedures for Filing Proofs of Claim; (II) Approving Form and Manner of Notice Thereof; and (III) Granting Related Relief* (Docket No. 1564) as may be modified, supplemented, or amended from time to time.

*Bridge Credit Agreement* means that certain *Credit Agreement*, dated as of February 21, 2024, by and among Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc. and Stewardship Health Medical Group, Inc., as borrowers thereunder, and the other loan parties party thereto, the lenders party thereto and Brigade Agency Services LLC, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

*Bridge MOIC* means the obligations of certain Debtors constituting the MOIC Amount (as defined in the Bridge Credit Agreement) under the Bridge Credit Agreement.

*Business Day* means any calendar day that is not a Saturday, Sunday, or other calendar day on which banks are authorized or required to be closed in New York, New York.

*Cash* means legal tender of the United States of America.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including but not limited to any and all rights of a Debtor, Debtor-in-possession, or Estate Representative to assert rights to extend time under 11 U.S.C. § 108. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any Avoidance Actions.

**Chapter 11 Case** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

**Chief Restructuring Officer** means John R. Castellano, in his capacity as Chief Restructuring Officer of each of the Debtors.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code.

**Claims and Noticing Agent** means Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors.

**Claims Register** means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

**Class** means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

**Class A Litigation Trust Interests** means, collectively, the Class A-1 Litigation Trust Interests and the Class A-2 Litigation Trust Interests.

**Class A-1 Litigation Trust Interests** shall mean the "Class A-1 interests" as set forth in the FILO Settlement Term Sheet.

**Class A-2 Litigation Trust Interests** shall mean the "Class A-2 interests" as set forth in the FILO Settlement Term Sheet.

**Class A-2 Preference** shall have the meaning set forth in the FILO Settlement Term Sheet.

**Class B Litigation Trust Interests** shall mean the "Class B interests" as set forth in the FILO Settlement Term Sheet.

**Class B Representative** means the representative of the Class B Litigation Trust Interests in accordance with the Litigation Trust Agreement, which shall initially be the Plan Administrator Committee.

**Confirmation Date** means the date on which the Bankruptcy Court enters the Confirmation Order.

**Confirmation Hearing** means the hearing held by the Bankruptcy Court regarding approval of the Disclosure Statement and confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

**Creditors' Committee** means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

**Cure Amount** means the payment of Cash or the distribution of other property (as the applicable parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume or assume and assign such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**Cure Dispute** means an unresolved objection regarding assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including objections based on the appropriate Cure Amount or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or any other issue relating to assumption of an executory contract or unexpired lease.

**D&O Policy** means all directors and officers liability insurance policies (including any runoff policies or tail coverage) issued or providing coverage at any time to any of the Debtors, for current or formers directors', managers', and officers' liability and all agreements, documents, or instruments relating thereto.

**Debtor(s)** has the meaning set forth in the introductory paragraph of this Plan.

**Debtor Related Parties** means (i) with respect to each Debtor and each Estate, such

Debtor's or Estate's (a) attorneys, accountants, investment bankers, consultants, professional advisors, and independent auditors, (b) employed and affiliated physicians and other medical personnel (solely with respect to Medical Liability Claims asserted against such individuals and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), and (c) Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee) and Chief Restructuring Officer, as applicable, in each case of the immediately preceding clauses (a) – (c), solely in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

**Definitive Documents** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Plan, including, but not limited to: (i) the Plan; (ii) the Disclosure Statement; (iii) the motion seeking approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (iv) the Disclosure Statement Order; (v) each of the documents comprising the Plan Supplement; (vi) the Confirmation Order; (vii) the Plan Administrator Agreement; (viii) Plan Trust Agreement; and (ix) the Litigation Trust Agreement, each of which shall be in form and substance reasonably acceptable to the Creditors' Committee.

**DIP Orders** means (i) the FILO DIP Order and (i) the MPT DIP Order.

**Disbursing Agent** means the Plan Trustee or such Entity or Entities designated by the Plan Trustee to make or facilitate distributions required by the Plan.

**Disclosure Statement** means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time, and which is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3018.

**Disclosure Statement Order** means the order entered by the Bankruptcy Court (a) finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code; and (b) authorizing solicitation of the Plan.

**Disputed** means, with respect to a Claim, (i) any Claim that is disputed under ARTICLE IX of this Plan or as to which the Debtors or any party in interest have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim was not timely or properly filed, (iii) any Claim that is listed in the Schedules as unliquidated, contingent or disputed, and as to which no request for payment or proof of Claim has been filed, or (iv) any Claim that is otherwise disputed by any of the Debtors, the

Plan Administrator Committee, or the Plan Trustee or any party in interest in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Debtors or any party in interest dispute the amount of an asserted Claim, such Claim shall be deemed Allowed in the amount that is not disputed, if any, and a Disputed Claim as to the balance of such Claim.

**Disputed Claim Reserve** means any Plan Trust Assets allocable to, or held on account of, Disputed Claims, including one or more reserve accounts to be funded, in consultation with the Creditors' Committee, with Cash and/or proceeds of the Plan Trust Assets, as applicable, in accordance with the terms of the Plan, for Disputed Claims.

**Distribution Record Date** means the Effective Date.

**Effective Date** means the date that is the first Business Day on which all conditions to the effectiveness of this Plan set forth in <u>Section 11.1</u> of this Plan have been satisfied or waived in accordance with <u>Section 11.2</u> of this Plan.

**Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**Estate(s)** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**Estate Funding** means $6,500,000 of Cash paid by the Litigation Trust to the Debtors or the Plan Trust on the Litigation Trust Establishment Date to fund the administration of the Chapter 11 Cases after the Litigation Trust Establishment Date, in respect of which the FILO Parties indirectly providing such funding shall receive pursuant hereto, at the direction of the Debtors, Class A-1 Litigation Trust Interests having a liquidation preference (along with a proportionate interest in all other rights and obligations therein) equal to the amount of the Estate Funding; *provided* that, for the avoidance of doubt, the Estate Funding shall not otherwise be required to be repaid by the Debtors, the Estates, or the Plan Trust.

**Estate Representative** means either (i) the Debtors (prior to the Confirmation Date), (ii) the Plan Administrator Committee (on or after the Confirmation Date until the Plan Trust Establishment Date), or (iii) the Plan Trustee (on or after the Plan Trust Establishment Date), each as applicable.

**Exculpated Parties** means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

**Expense Escrow Account** shall have the meaning set forth in the MPT Settlement Order.

**FILO Bridge Agent** means Brigade Agency Services LLC, in its capacity as agent under the Bridge Credit Agreement.

**FILO Bridge Claims** means all Claims held by a FILO Bridge Lender under the Bridge Credit Agreement and DIP Orders, including, for the avoidance of doubt, the Remaining FILO Bridge Claims and the Retained FILO Claims.

**FILO Bridge Lenders** means all lenders that are not the MPT Bridge Lender under the Bridge Credit Agreement, each in their capacity as lender under the Bridge Credit Agreement.

**FILO DIP Agent** means the "Agent" under the FILO DIP Credit Agreement.

**FILO DIP Claim** means all Claims held by a FILO DIP Lender on account of, arising under the FILO DIP Credit Agreement and FILO DIP Order.

**FILO DIP Credit Agreement** means that certain *Debtor-in-Possession Credit Agreement*, dated as of July 10, 2024, by and among Steward Health Care System LLC, as borrower, the other Debtors jointly and severally, as guarantors, the FILO DIP Lenders, as lenders, and Brigade Agency Services LLC, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

**FILO DIP Lenders** shall have the meaning set forth in the FILO DIP Order.

**FILO DIP Order** means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

**FILO Lenders** shall have the meaning set forth in the FILO DIP Order.

**FILO Parties** means the (i) FILO DIP Lenders, (ii) FILO DIP Agent, (iii) FILO Bridge Lenders, (iv) FILO Bridge Agent, (v) Prepetition FILO Agent, (vi) FILO Lenders, and (vii) the providers of the Litigation Funding (as defined in the FILO Settlement Term Sheet).

**FILO Plan Trust Interests** means the beneficial interests in the Plan Trust granted to the holders of Allowed Retained FILO Claims, which beneficial interests shall entitle such holders to share in the FILO Plan Trust Recovery in accordance with the Plan.

**FILO Plan Trust Recovery** means 10% of the Plan Trust Recovery until Allowed Retained FILO Claims are paid in full, to be paid *pro rata* to the holders of the FILO Plan Trust Interests.

**FILO Settlement Order** means the *Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* (Docket No. 5035), entered by the Bankruptcy Court on June 2, 2025.

*FILO Settlement Term Sheet* means the term sheet approved by the FILO Settlement Order and annexed hereto as **Exhibit C**.

*Final Order* means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

*General Unsecured Claim* means (i) any unsecured Claim against any Debtor (including any prepetition Medical Liability Claim) that is not (a) an Administrative Expense Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a PBGC Claim; (e) a Retained FILO Claim; (f) an Intercompany Claim, or (g) otherwise entitled to priority under the Bankruptcy Code or any Final Order, and (ii) other than Intercompany Claims, any prepetition claim against a Debtor held by a non-Debtor that is a direct or indirect subsidiary of SHC Holdings.

*Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

*GUC Plan Trust Interests* means the beneficial interests in the Plan Trust granted to holders of Allowed General Unsecured Claims, which beneficial interests shall entitle such holders to share in the GUC Plan Trust Recovery in accordance with the Plan.

*GUC Plan Trust Recovery* means 90% of the Plan Trust Recovery until Allowed Retained FILO Claims are paid in full and 100% of the Plan Trust Recovery after Allowed Retained FILO Claims are paid in full, to be paid *pro rata* to the holders of the GUC Plan Trust Interests and PBGC Plan Trust Interests based on the aggregate amount of Allowed General Unsecured Claims and Allowed PBGC Claims.

*Hospital Debtors* means all Debtors, other than, for the avoidance of doubt, Steward Health Care Holdings LLC and Steward Health Care System LLC, that (i) held or owned a license to operate a hospital or (ii) operated a hospital located in Ohio, in each case, at any time during the Chapter 11 Cases.

*Identified Non-Released Parties* means (i) the Persons and Entities listed on **Exhibit B** annexed hereto, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the

immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Indemnification Obligations* means each of the Debtors' indemnification obligations in place immediately prior to the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors and officers that are currently employed by, or serving on the board of directors of, any of the Debtors, as of the date immediately prior to the Effective Date, and the attorneys, accountants, investment bankers, and other Professionals that are retained by any of the Debtors as of the date immediately prior to the Effective Date.

*Individual Released Parties* means the individuals listed on **Exhibit A** annexed hereto, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

*Intercompany Claim* means any pre- or postpetition Claim against a Debtor held by another Debtor or by a controlled non-Debtor direct or indirect subsidiary of SHC Holdings; *provided* that any Claim that TRACO may have against the Debtors shall not be considered an Intercompany Claim.

*Intercompany Interests* means an Interest in a Debtor held by another Debtor.

*Initial Plan Distribution* means the first Plan Distribution that the Estate Representative makes to holders of Allowed Claims**.**

*Initial Plan Distribution Date* means the date selected by the Estate Representative, which will be no later than a date that is on or as soon as reasonably practicable after the Effective Date, on which the Estate Representative will make the Initial Plan Distribution; *provided* that, prior to the Effective Date, (i) the Estate Representative may distribute the Settled Administrative Expense Claims Cash Pool to holders of Settled Administrative Expense Claims pursuant to Section 2.1 of this Plan, (ii) the Plan Trustee may distribute the Plan Trust Interests in accordance with Section 6.1 of this Plan, (iii) the Litigation Trustee may distribute the Litigation Trust Interests in accordance with Section 7.1 of this Plan, and (iv) the Plan Trustee and Liquidation Trustee may distribute any Available Cash.

**Insured Claim** means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' insurance policies.

**Interest** means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

**Interim Compensation Procedures Order** means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 783), as may be amended, modified, or supplemented from time to time.

**Investigation Subcommittee** means the subcommittee of the Transformation Committee, consisting of Alan J. Carr and William Transier.

**IRS** means the United States Internal Revenue Service.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Litigation Funding Agreement** means the commitment letter and any ancillary documents thereto pursuant to which the FILO Parties shall provide financing to the Litigation Trust to fund (i) the cost of administering the Litigation Trust and monetizing the Litigation Trust Assets, (ii) the Secured Interim Advances, and (iii) the Estate Funding, and which shall be consistent with the FILO Settlement Term Sheet and otherwise in form and substance mutually agreeable to the Debtors, the Creditors' Committee, and the FILO Parties, with approval not to be unreasonably withheld, conditioned or delayed. A substantially final form of such letter mutually agreeable to the parties was filed with the Bankruptcy Court on May 25, 2025 [Docket No. 4966], and any changes to such substantially final form will be disclosed in the Plan Supplement.

**Litigation Trust** means that certain trust to be established in accordance with ARTICLE VII of this Plan and the FILO Settlement Order to hold the Litigation Trust Assets and make distributions to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement.

**Litigation Trust Agreement** means the agreement evidencing the terms and provisions governing the Litigation Trust, dated as of the Litigation Trust Establishment Date, establishing the terms and conditions of the Litigation Trust, the rights of, and limitations on, the Litigation Trust Interests, and pursuant to which the Litigation Trustee shall manage and administer the Litigation Trust Assets, and which shall be consistent with the FILO Settlement Term Sheet and otherwise in form and substance mutually agreeable to the Debtors, the Creditors' Committee, and the FILO Parties, with approval not to be unreasonably withheld, conditioned or delayed. A substantially final form of such agreement mutually agreeable to the parties was filed with the Bankruptcy Court on May 25, 2025 [Docket No. 4966], and any changes to such substantially final form will be disclosed in the Plan Supplement.

*Litigation Trust Assets* means, as of the Litigation Trust Establishment Date, all Assets of the Estates (including the Litigation Trust Causes of Action) identified on <u>Schedule 1</u> of the FILO Settlement Term Sheet.

*Litigation Trust Beneficiaries* shall mean the holders of the Litigation Trust Interests.

*Litigation Trust Causes of Action* means all Claims and Causes of Action held by the Debtors that are not released or settled under the Plan, the FILO Settlement Order, or the Confirmation Order.

*Litigation Trust Establishment Date* means the date the Litigation Trust is established and the Litigation Trust Assets are transferred thereto in accordance with <u>Section 7.1</u> of this Plan and the FILO Settlement Order.

*Litigation Trust Expenses* means any and all reasonable fees, costs and expenses incurred by the Litigation Trust or the Litigation Trustee (or any professional or other Person retained by the Litigation Trustee) on or after the Litigation Trust Establishment Date in connection with any of their duties under the Litigation Trust Agreement, including any administrative fees, attorneys' fees and expenses, insurance fees, taxes and escrow expenses.

*Litigation Trust Interests* means, collectively, the Class A Litigation Trust Interests and the Class B Litigation Trust Interests.

*Litigation Trustee* means Mark Kronfeld of Province, LLC, as trustee for the Litigation Trust.

*Mediator* means the Honorable Marvin Isgur, or in the event the Honorable Marvin Isgur is not available, such other entity or individual reasonably acceptable to the Litigation Trustee and the Estate Representative.

*Medical Liability Claims* means any Claim against any Debtor, any employed or affiliated physician of a Debtor, or any other medical personnel employed by a Debtor arising out of or related to alleged negligence in connection with the rendering of medical care prior to the Effective Date.

*Medical Liability Claims Procedures* means the procedures pursuant to which a general process and timeline will be established for reconciling and determining the Allowed amount of Medical Liability Claims against the Debtors, which procedures are annexed to this Plan as **Exhibit D**.

*MPT Bridge Lender* means the MPT Lender (as defined in the Bridge Credit Agreement) under the Bridge Credit Agreement.

*MPT DIP Order* means the *Final Order (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain*

*Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 625), entered by the Bankruptcy Court on June 3, 2024.

***MPT Settlement Order*** means the *Final Order Approving (I) Global Settlement with Medical Properties Trust, Prepetition ABL/FILO Secured Parties, FILO Secured Parties, and Creditors' Committee, (II) Interim Management Procedures, and (III) Granting Related Relief* (Docket No. 2610), entered by the Bankruptcy Court on September 18, 2024.

***Non-Debtor Owned Subsidiary Interests*** means Interests in Debtors (other than Parent Interests) that are owned by non-Debtors.

***Other Priority Claim*** means any Claim other than an Administrative Expense Claim, a FILO DIP Claim, a FILO Bridge Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

***Other Secured Claim*** means any Secured Claim other than an Administrative Expense Claim, a Priority Tax Claim, a FILO DIP Claim, or a FILO Bridge Claim.

***Parent Interests*** means Interests in SHC Holdings.

***PBGC*** means the Pension Benefit Guaranty Corporation.

***PBGC Claims*** means the Claims of the PBGC, which shall be Allowed as prepetition unsecured claims, in the amount of $8,750,000 in accordance with <u>Section 4.5</u> herein.

***PBGC Plan Trust Interests*** means the beneficial interests in the Plan Trust granted to the PBGC, as the holder of the Allowed PBGC Claim, which beneficial interests shall entitle the PBGC to share in the GUC Plan Trust Recovery in accordance with the Plan.

***PBGC Settlement*** means the settlement between the Debtors and the PBGC, to which the Creditors' Committee has concurred, the agreed terms of which are incorporated herein (including <u>Section 4.5</u> hereof) and described in the Disclosure Statement.

***Pension Plan*** means the New England Sinai Hospital Pension Plan.

***Person*** means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

***Petition Date*** means May 6, 2024.

***Physician Insurance Account*** shall have the meaning set forth in the FILO DIP Order.

***Plan*** means this joint chapter 11 plan, including all exhibits, annexes, supplements, and schedules hereto (including the Plan Supplement), as may be amended, supplemented, or modified from time to time in accordance with the Bankruptcy Code and the terms of this Plan.

**Plan Administrator Agreement** means the agreement setting forth, among other things, the identity, the terms of compensation, and the authority of the Plan Administrator Committee, and the scope of services to be provided by the Plan Administrator Committee, which agreement shall be in form and substance reasonably acceptable to the Creditors' Committee.

**Plan Administrator Committee** means a committee comprised of Monica Blacker, Alan J. Carr, and William Transier.

**Plan Distribution** means the payment or distribution of consideration to holders of Allowed Claims under this Plan.

**Plan Distribution Date** means a date or dates, including the Initial Plan Distribution Date, as determined by the Estate Representative, in accordance with the terms of the Plan and Confirmation Order, on which the Plan Trustee makes a Plan Distribution to holders of the Plan Trust Interests on account of Allowed Claims.

**Plan Supplement** means a supplemental appendix to this Plan, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of this Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and Bankruptcy Rules, which may include: (i) the Schedule of Identified Non-Released Parties; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Schedule of Alternative Plan Debtors; (v) the Wind Down Budget; (vi) the Plan Administrator Agreement; (vii) disclosure of the identity of the Plan Trustee; (viii) the Plan Trust Agreement; (ix) disclosure of the identity of the Litigation Trustee; (x) the Litigation Trust Agreement; (xi) the Transition Services Agreement; and (xii) the Litigation Funding Agreement. Through the Effective Date, the Debtors shall have the right to amend any schedules, exhibits, or amendments to any of the documents contained in, and exhibits to, the Plan Supplement, subject to the consent rights of the Creditors' Committee and the FILO Parties herein.

**Plan Support Agreement Term Sheet** means the term sheet attached to the Disclosure Statement as Exhibit B.

**Plan Trust** means that certain trust to be established in accordance with ARTICLE VI of this Plan to hold the Plan Trust Assets and make distributions to holders of Allowed Claims pursuant to the Plan.

**Plan Trust Agreement** means the agreement evidencing the terms and provisions governing the Plan Trust, dated as of the Plan Trust Establishment Date, establishing the terms and conditions of the Plan Trust and pursuant to which the Plan Trustee shall manage and administer the Plan Trust Assets, which shall be in form and substance reasonably acceptable to the Creditors' Committee.

**Plan Trust Assets** means, on the Plan Trust Establishment Date, all Retained Assets and any property acquired by the Debtors after the establishment of the Litigation Trust (including, for the avoidance of doubt, the Class B Litigation Trust Interests), other than Intercompany Interests.

**Plan Trust Beneficiaries** means the holders of the Plan Trust Interests.

15

**Plan Trust Establishment Date** means the date the Plan Trust is established in accordance with Section 6.1 of this Plan.

**Plan Trust Interests** means, collectively, (i) the GUC Plan Trust Interests, (ii) the PBGC Plan Trust Interests, and (iii) the FILO Plan Trust Interests.

**Plan Trust Net Proceeds** means all Cash proceeds realized from the Plan Trust Assets (net of any taxes, including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes imposed on or with respect to any such fund or other separate taxable entity) after reserving in full for the Wind Down Reserve.

**Plan Trust Recovery** means one hundred percent (100%) of the Plan Trust Net Proceeds after satisfying or reserving in full for all Allowed Other Secured Claims, Administrative Expense Claims (including Professional Fee Claims), Priority Tax Claims, and Other Priority Claims, which reserves shall be determined by the Debtors in consultation with the Creditors' Committee.

**Plan Trustee** means a Person or Entity who shall serve as trustee of the Plan Trust, as contemplated by Section 6.3 of this Plan and the Plan Trust Agreement.

**Plane Sales** means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

**Prepetition FILO Agent** shall have the meaning set forth in the FILO DIP Order.

**Prepetition Transactions** means the (i) 2016 Distribution, (ii) 2020 Transactions, (iii) 2021 Distribution, (iv) 2022 Transaction, and (v) Plane Sales.

**Priority Tax Claim** means any Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Pro Rata Share** means (i) that proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interest in that Class entitled to share in the same recovery as such Class under the Plan, or (ii) that proportion that Allowed Claims in a particular Class bears to the aggregate amount of Allowed Claims in multiple Classes, as applicable.

**Professional** means any Entity retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

**Professional Fee Claim** means a Claim for fees and expenses incurred by a Professional on or after the Petition Date through and including the Effective Date under sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code.

*Professional Fees Escrow Account* shall have the meaning ascribed to such term in the DIP Orders.

*Proof of Claim* means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

*Related Parties* means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

*Released Parties* means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in this Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

*Releasing Parties* means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

*Reinstate, Reinstated, or Reinstatement* means with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

*Representative* means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors,

principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

**Remaining FILO Bridge Claims** means the FILO Bridge Claims, other than the Retained FILO Claims.

**Retained Assets** means those assets that will be retained by the Debtors following the establishment of the Litigation Trust, including (i) the Class B Litigation Trust Interests, (ii) Intercompany Interests, (iii) Intercompany Claims, (iv) the Physician Insurance Account (and the proceeds thereof), (v) the Professional Fees Escrow Account (solely to the extent of the Debtors' interest in such account), (vi) the Expense Escrow Account (and the proceeds thereof), and (vii) any other asset identified as a "Retained Asset" in the FILO Settlement Term Sheet.

**Retained Causes of Action** means the Causes of Action retained by the Debtors and transferred either to the Plan Trust on the Plan Trust Establishment Date or the Litigation Trust on the Litigation Trust Establishment Date, as listed and described in the Schedule of Retained Causes of Action.

**Retained FILO Claims** means FILO Bridge Claims in principal amount totaling $10,000,000, which shall be unsecured, accrue interest at 7.0% per annum commencing on the Effective Date (provided that such interest shall not have to be paid in cash and shall be paid in kind and capitalized and added to the balance of the Retained FILO Claims on a quarterly basis), and shall be junior in payment priority only to all Secured Claims, Priority Claims, Administrative Expense Claims, and Professional Fee Claims.

**Schedule of Alternative Plan Debtors** means the list of Debtors, if any, who will be decoupled from this Plan in accordance with Section 5.3(c), which list which shall be filed with the Plan Supplement.

**Schedule of Assumed Contracts** means a schedule to be filed as part of the Plan Supplement of executory contracts and unexpired leases to be assumed by the Debtors on the Effective Date pursuant to the Plan, which schedule shall be reasonably acceptable to the Creditors' Committee.

**Schedule of Identified Non-Released Parties** means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

**Schedule of Retained Causes of Action** means a schedule to be filed as part of the Plan Supplement of Causes of Action to be retained by the Debtors and the Plan Trust.

**Schedules** means, collectively, any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors with the Bankruptcy Court and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, supplemented, or otherwise modified from time to time.

***Secured Claim*** means a Claim (i) secured by a Lien on any Debtor's interest in property to the extent of the value of such interest as (a) set forth in this Plan, (b) agreed to by the holder of such Claim and the Debtors or the Plan Trustee, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

***Secured Interim Advances*** means the aggregate amount of cash collateral used by the Debtors from April 1, 2025 through the Litigation Trust Establishment Date together with interest thereon at the Applicable Rate (as defined in the FILO Settlement Term Sheet); on the Litigation Trust Establishment Date, the Debtors shall repay the FILO DIP Loans with Class A-1 interests having a liquidation preference (along with a proportionate interest in all other rights and obligations therein) equal to the amount of such Secured Interim Advances.

***Security*** has the meaning set forth in section 101(49) of the Bankruptcy Code.

***Settled Administrative Expense Claims*** means Administrative Expense Claims of holders who receive the Administrative Expense Claims Consent Program Opt-Out Form and do not affirmatively opt out on or before the deadline set forth in such form, and therefore, are deemed to have an Allowed Administrative Expense Claim in an amount equal to fifty percent (50%) of the reconciled amount set forth in the Administrative Expense Claims Consent Program Opt-Out Form.

***Settled Administrative Expense Claims Cash Pool*** means $12,500,000.

***SHC Holdings*** means Steward Health Care Holdings LLC.

***Statutory Fees*** means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

***Subordinated Securities Claims*** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

***TRACO*** means TRACO International Group S. DE R.L.

***Transformation Committee*** means the special committee of the board of managers of SHC Holdings comprised of Alan J. Carr, John R. Castellano, and William Transier.

***Transition Services Agreement*** means that certain agreement between the Debtors and the Litigation Trust pursuant to which the Debtors (and following the Plan Trust Establishment Date, the Plan Trust) provide certain transition services to the Litigation Trust, which shall be consistent with the FILO Settlement Term Sheet and otherwise acceptable to the Debtors, the Creditors' Committee, and the FILO Parties, and filed as part of the Plan Supplement. A substantially final form of such agreement mutually agreeable to the parties was filed with the Bankruptcy Court on May 25, 2025 [Docket No. 4966], and any changes to such substantially final form will be disclosed in the Plan Supplement.

***U.S. Trustee*** means the United States Trustee for Region 7.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

*Waived Bridge MOIC Claims* means all Claims held by the FILO Bridge Lenders under the Bridge Credit Agreement for the Bridge MOIC other than the Allowed Bridge MOIC Amount.

*Wind Down* means the process to (i) sell, abandon, wind down, dissolve, liquidate, or distribute the Retained Assets and the Plan Trust Assets, (ii) resolve, terminate, or wind down any remaining liabilities of the Estates and the Plan Trust, (iii) reconcile all Claims, and (iv) administer the Plan and make Plan Distributions, in each case in accordance with the Plan.

*Wind Down Budget* means a budget setting forth the estimate of costs and expenses necessary to effectuate the Wind Down through the Wind Down Completion Date, which budget (i) shall be prepared by the Debtors, in consultation with the Creditors' Committee, and (ii) after the Plan Trust Establishment Date, may be amended, modified, or supplemented from time to time by the Plan Trustee in its reasonable discretion.

*Wind Down Completion Date* means the date upon which the Retained Assets and the Plan Trust Assets have been sold, abandoned, dissolved, liquidated, realized, or otherwise disposed of, and all proceeds thereof have been distributed in accordance with the Plan.

*Wind Down Reserve* means a deposit account or other Cash reserve held by the Estate Representative, to be funded, including from the Estate Funding, in accordance with the Wind Down Budget with a cash reserve, which shall be available and used only to satisfy wind down costs of the Debtors, the Plan Administrator Committee, and the Plan Trust and shall not be subject to prepetition Liens or Liens or superpriority Claims granted under the DIP Orders, the Confirmation Order, or the Plan; *provided* that any funds remaining in the Wind Down Reserve on the Wind Down Completion Date shall be distributed by the Plan Trust as Plan Trust Net Proceeds pursuant to the Plan and the Plan Trust Agreement.

## 1.2    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively. The words "includes" and "including" are not limiting. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in

section 102 of the Bankruptcy Code shall apply; (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (v) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

### 1.3    *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4    *Controlling Document.*

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each. If there is any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan. In the event of any inconsistency between this Plan, the Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, or the Confirmation Order, on the one hand, and the FILO Settlement Order or any other instrument or document created or executed pursuant to the FILO Settlement Order, on the other hand, the Confirmation Order shall control; *provided* that any provision of the Confirmation Order that is inconsistent with the FILO Settlement Term Sheet shall require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent).

**ARTICLE II.        ADMINISTRATIVE EXPENSE CLAIMS, FILO DIP CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS.**

### 2.1    *Administrative Expense Claims.*

**(a)**    On, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (iii) the next Plan Distribution Date after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, distributions to holders of Allowed Administrative Expense Claims shall have commenced, with each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) to receive, in full and final satisfaction, settlement, release, and discharge of such Claim, (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**(b)** Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court, or as provided by Section 2.1 hereof, requests for payment of Administrative Expense Claims, other than requests for payment of Professional Fee Claims, must be filed and served on the Debtors no later than the applicable Administrative Expense Claims Bar Date pursuant to the procedures specified in the Administrative Expense Claims Bar Date Order, the Confirmation Order, the notice of entry of the Confirmation Order, and the notice of Effective Date.

**(c) Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Estate Representative, as applicable, and their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released without consideration as of the Effective Date.**

**(d)** The Confirmation Order shall provide that, to the extent the Administrative Expense Claims Consent Program Condition is satisfied or waived in accordance with the Plan, on the first Business Day after the date that is (45) calendar days after the Confirmation Date, or as soon thereafter is reasonably practicable, distributions to holders of Settled Administrative Expense Claims shall have commenced, with each holder of a Settled Administrative Expense Claim set to receive their Pro Rata Share of the Settled Administrative Expense Claims Cash Pool, with the balance of the Settled Administrative Expense Claim paid in Cash in accordance with Section 2.1(a) of the Plan.

## 2.2 *FILO DIP Claims.*

**(a)** Except to the extent released pursuant to the FILO Settlement Order, on the Litigation Trust Establishment Date, the FILO DIP Claims shall be deemed Allowed in the full amount outstanding under the FILO DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses provided for thereunder.

**(b)** Except to the extent that a holder of an Allowed FILO DIP Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO DIP Claim, on the Litigation Trust Establishment Date, each such holder shall receive its Pro Rata Share of the Class A-2 Litigation Trust Interests and, in respect of the Secured Interim Advances, its Pro Rata Share of the Class A-1 Litigation Trust Interests.

## 2.3 *Professional Fee Claims.*

**(a)** All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall file, on or before the date that is thirty (30) calendar days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Confirmation Date. Objections to any Professional Fee Claims must be filed and served no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

(b)     Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Professional Fee Claim is entered; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Estate Representative, (x) first out of the Professional Fees Escrow Account; and (y) if the amount available for distribution pursuant to the foregoing clause (x) is insufficient to remit all distributions required to be made to such holders pursuant to this sentence, from Cash on hand or the Plan Trust Net Proceeds.

(c)     Notwithstanding the foregoing, any Professional Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court, including the Interim Compensation Procedures Order may be paid at the times and in the amounts authorized pursuant to such orders.

(d)     Five (5) Business Days before the Confirmation Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors and the Creditors' Committee, and the Debtors or Litigation Trust shall fund such estimated amounts into the Professional Fees Escrow Account for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in such Professional Fees Escrow Account for purposes of this paragraph shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Litigation Trust without any further action or order of the Bankruptcy Court.

(e)     From and after the Confirmation Date, the Estate Representative and the Litigation Trust, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals after the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(f)     The Estate Representative is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.4     *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim at the option of the Estate Representative (in consultation with the Creditors' Committee), either: (i) Cash in an

amount equal to such Allowed Priority Tax Claim on the latest of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (c) the next Plan Distribution Date after such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (d) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (*provided* that the Estate Representative reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

## ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2    *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (i) Impaired and Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject this Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, FILO DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 3 | FILO Bridge Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | PBGC Claims | Impaired | Yes |
| 6 | Intercompany Claims | Impaired | No (Presumed to Accept) |
| 7 | Subordinated Securities Claims | Impaired | No (Deemed to Reject) |
| 8 | Intercompany Interests | Impaired | No (Presumed to Accept ) |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|:---:|:---:|:---:|:---:|
| 9 | Non-Debtor Owned Subsidiary Interests | Impaired | No (Deemed to Reject) |
| 10 | Parent Interests | Impaired | No (Deemed to Reject) |

### 3.3 *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors, the Plan Trust, and the Litigation Trust, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.4 *Elimination of Vacant Classes*.

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.5 *Voting Classes; Presumed Acceptance by Non-Voting Classes*.

With respect to each Debtor, if a Class contained Claims or Interests eligible to vote and no holder of such Claims or Interests, as applicable, votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims or Interests, as applicable, in such Class.

### 3.6 *Voting; Presumptions; Solicitation*.

(a) **Acceptance by Certain Impaired Classes.** Only holders of Claims in Classes 3, 4, and 5 are entitled to vote to accept or reject this Plan. An Impaired Class of Claims or Interests shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims or Interests actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims or Interests actually voting in such Class have voted to accept this Plan.

(b) **Presumed Acceptance by Unimpaired Classes.** Holders of Claims in Classes 1 and 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Additionally, holders of Claims and Interests in Classes 6 and 8 are presumed to accept or deemed to reject the Plan. Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(c) **Deemed Rejection by Certain Impaired Classes.** Holders of Claims and Interests in Classes 7, 9, and 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.7    *Cramdown.*

If any Class entitled to vote on this Plan does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.8    *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or other Entity's right to object on any basis to any Claim.

## ARTICLE IV.        TREATMENT OF CLAIMS AND INTERESTS.

### 4.1    *Class 1:  Other Priority Claims.*

**(a)    Treatment:**  Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, each such holder shall receive:

> (i)    payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the next Plan Distribution Date after such Other Priority Tax Claim becomes an Allowed Other Priority Claim, or as soon as practicable thereafter; or

> (ii)    such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired.

**(b)    Impairment and Voting:**  Class 1 is Unimpaired, and holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

### 4.2    *Class 2:  Other Secured Claims.*

**(a)    Treatment:**  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim, each such holder shall receive at the option of the Estate Representative:

> (i)    payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective

Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the next Plan Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as practicable thereafter;

(ii) transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or

(iii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

**(b)** **Impairment and Voting:** Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

### 4.3 *Class 3: FILO Bridge Claims.*

**(a)** **Allowance.**

(i) <u>Remaining FILO Bridge Claims</u>: As of April 28, 2025, the Remaining FILO Bridge Claims shall be deemed Allowed in the principal amount of $41,833,761.53, plus any and all interest, fees, costs, other charges, and expenses provided for under the Bridge Credit Agreement (other than with respect to the Bridge MOIC), *minus* the amount of the Allowed Retained FILO Claims, *plus* the Allowed Bridge MOIC Amount; *provided* that the Waived Bridge MOIC Claim is deemed waived without further notice to, approval of or action by any Person or Entity, and each holder of a Waived Bridge MOIC Claim shall not receive any distribution or retain any property on account of its Waived Bridge MOIC Claim.

(ii) <u>Retained FILO Claims</u>: On the Litigation Trust Establishment Date, the Retained FILO Claims are Allowed in the aggregate amount of $10,000,000.

**(b)** **Treatment**: Except to the extent released pursuant to the FILO Settlement Order, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO Bridge Claims, on the Litigation Trust Establishment Date, each such holder shall (i) receive their Pro Rata Share of the Class A-2 Litigation Trust Interests on account of their Allowed Remaining FILO Bridge Claim (unless previously received), and (ii) retain their Pro Rata Share of their Retained FILO Claims, which shall entitle such holders to their Pro Rata Share of the FILO Plan Trust Interests on the Plan Trust Establishment Date to the extent not repaid prior thereto.

(c)     **Impairment and Voting:**  Class 3 is Impaired, and, thus, holders of Allowed FILO Bridge Claims are entitled to vote to accept or reject the Plan.

### 4.4     *Class 4:  General Unsecured Claims.*

(a)     **Treatment:**  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed General Unsecured Claim, on or prior to the Effective Date, each such holder shall receive its Pro Rata Share of the GUC Plan Trust Interests.

(b)     **Impairment and Voting:**  Class 4 is Impaired, and, thus, holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.5     *Class 5: PBGC Claims*

(a)     **Allowance**:  The PBGC Claims shall be Allowed, as a prepetition unsecured claim, in the amount of $8,750,000.

(b)     **Treatment:**  In accordance with the PBGC Settlement, in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Claims, on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests.  For the avoidance of doubt, the PBGC Claims shall be the only Claims on which the PBGC shall be entitled to any Distribution in connection with the Debtors or this Plan.

(c)     **Impairment and Voting:**  Class 5 is Impaired, and, thus, holders of Allowed PBGC Claims are entitled to vote to accept or reject the Plan.

### 4.6     *Class 6:  Intercompany Claims.*

(a)     **Treatment:**  On or prior to the Effective Date or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, reinstated, or discharged (each without any Plan Distribution) to the extent reasonably determined to be appropriate by the Estate Representative.

(b)     **Impairment and Voting:**  Holders of Class 6 Intercompany Claims are either plan proponents or controlled by plan proponents and therefore are conclusively presumed to accept the Plan.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Intercompany Claims.

### 4.7     *Class 7:  Subordinated Securities Claims.*

(a)     **Treatment:**    All Subordinated Securities Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Securities Claims will not receive any distribution on account of such Allowed Subordinated Securities Claims.

**(b)      Impairment and Voting:**  Class 7 is Impaired.  Holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan.  Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Subordinated Securities Claims will not be solicited.

### 4.8      *Class 8: Intercompany Interests.*

**(a)      Treatment:**  On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Intercompany Interests shall be adjusted, reinstated, or discharged at the election of the Estate Representative; *provided* that no Plan Distributions shall be made to holders of an Intercompany Interest on account of such Intercompany Interest under the Plan.

**(b)      Impairment and Voting:**  Holders of Class 8 Intercompany Interests are plan proponents and are therefore conclusively presumed to have accepted the Plan.  Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

### 4.9      *Class 9:  Non-Debtor Owned Subsidiary Interests.*

**(a)      Treatment:**  On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Non-Debtor Owned Subsidiary Interests shall be cancelled and there shall be no distribution to holders of Non-Debtor Owned Subsidiary Interests on account of such Non-Debtor Owned Subsidiary Interests under the Plan.

**(b)      Impairment and Voting:**  Class 9 is Impaired.  Holders of Non-Debtor Owned Subsidiary Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Non-Debtor Owned Subsidiary Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Non-Debtor Owned Subsidiary Interests.

### 4.10      *Class 10:  Parent Interests.*

**(a)      Treatment:**  On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any members, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Parent Interests shall be cancelled and there shall be no distribution to holders of Parent Interests under the Plan.

**(b)      Impairment and Voting:**  Class 10 is Impaired.  Holders of Parent Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Parent Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Parent Interests.

# ARTICLE V.    MEANS FOR IMPLEMENTATION.

## 5.1    *Joint Chapter 11 Plan*.

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.

## 5.2    *Compromise and Settlement of Claims, Interests, and Controversies*.

Pursuant to section 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, and the releases contained in this Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim or Interest and any distribution to be made on account of such Claim or Interest. This Plan shall be deemed a motion to approve the compromises and settlements contained in this Plan, including the PBGC Settlement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, including the PBGC Settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of this Plan.

## 5.3    *Plan Settlement*.

(a)    As a proposed compromise and settlement of inter-Estate and inter-creditor issues, including those relating to whether the liability and assets of the Debtors should be substantively consolidated for distribution purposes under the Plan (the "**Plan Settlement**"), the following treatment shall apply if the Plan Settlement is accepted and approved:

(i)    all assets and liabilities of the Debtors shall be treated as though they were pooled;

(ii)    each Claim filed or to be filed against any Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Debtors;

(iii)    all Intercompany Claims shall be adjusted, reinstated, or discharged in accordance with Section 4.6 herein;

(iv)    no Plan Distributions shall be made under the Plan on account of any Intercompany Interest or any Non-Debtor Owned Subsidiary Interest to the extent set forth in Sections 4.8 and 4.9 herein;

(v)    any Claims on account of a guarantee provided by a Debtor of the obligations of another Debtor shall be treated as eliminated so that any Claim against any Debtor and any Claim based upon a guarantee

thereof by any other Debtor shall be treated as one Claim against a single consolidated Estate; and

(vi)     any joint or joint and several liability of any of the Debtors shall be one obligation of the Debtors and any Claims based upon such joint or joint and several liability shall be treated as one Claim against a single consolidated Estate.

(b)     The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order approving the Plan Settlement, including the Bankruptcy Court's findings that the Plan Settlement is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the Estates, and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing.  As a result of the Plan Settlement, each Class of Claims and Interests shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan shall not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan.  The Plan Settlement shall not (other than for purposes related to funding Plan Distributions under the Plan) affect (u) the legal and organizational structure of the Debtors, (v) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (w) any agreements entered into by the Plan Trust on or after the Plan Trust Establishment Date, (x) the Estate Representative's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (y) any Causes of Action or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no Plan Settlement, and (z) distributions to the Debtors or the Plan Trust from any insurance policies or the proceeds thereof.

(c)     Notwithstanding the foregoing in this <u>Section 5.3</u>, the Debtors reserve the right to examine the Claims asserted against the various Debtors and to withdraw the Plan with respect to any particular Debtor.  In the event that the Debtors elect to withdraw the Plan with respect to any Entity prior to the Confirmation Date, such Entity shall be listed on the Schedule of Alternative Plan Debtors included in the Plan Supplement and the Debtors may proceed to seek confirmation of this Plan as to the remaining Debtors in accordance with <u>Section 5.3(a)</u> above.

### 5.4     *Sources of Consideration for Plan Distribution.*

The Debtors and Plan Trustee shall fund Cash distributions under this Plan with Cash proceeds available from:  (i) Cash available on or after the Effective Date in accordance with the Plan; (ii) proceeds realized from the Class B Litigation Trust Interests; (iii) proceeds realized from the Plan Trust Assets; (iii) proceeds realized from the Retained Assets; (iv) Cash from the Professional Fees Escrow Account (*provided* that the Cash proceeds of the Professional Fees Escrow Account shall be exclusively used to pay Allowed Professional Fee Claims until paid in full in Cash and any amount remaining thereafter shall be transferred to the Litigation Trust); and (v) any additional proceeds of the Wind Down, if any.

### 5.5 *Implementation.*

(i)     On and after the Plan Trust Establishment Date, the Debtors and the Plan Trust shall use commercially reasonable efforts to liquidate and distribute the value of their respective interests in all of their Assets.

(ii)    On and after the Litigation Trust Establishment Date, the Litigation Trust shall use commercially reasonable efforts to liquidate and distribute the value of its interests in the Litigation Trust Assets, including through either prosecuting, settling, or otherwise monetizing the Litigation Trust Causes of Action, in accordance with the terms of the Litigation Trust Agreement; *provided* that notwithstanding anything else contained in this Plan or the Confirmation Order, nothing in the Plan or the Confirmation Order shall limit the Debtors' ability or authority to settle any Litigation Trust Cause of Action prior to the Litigation Trust Establishment Date.

(iii)   No later than the Effective Date, the Plan Trust (if not previously established) shall be established pursuant to the Plan and the Plan Trust Agreement.

(iv)    No later than one (1) Business Day following the Confirmation Date, the Litigation Trust (if not previously established) shall be established pursuant to the Plan and the Litigation Trust Agreement.

(v)     On the Confirmation Date, the Professional Fees Escrow Account shall be funded with an amount of Cash sufficient to pay all accrued Professional Fee Claims based upon estimates provided by the Professionals, as set forth in Section 2.3 of this Plan.

(vi)    On the Confirmation Date, the Wind Down Reserve shall be established.

(vii)   On the Litigation Trust Establishment Date, the Litigation Trust shall fund the Estate Funding.

(viii)  After the Litigation Trust Establishment Date, the Litigation Trust shall make all payments required under the Transition Services Agreement to the Estate Representative.

(ix)    On or prior to the Effective Date, the Professional Fees Escrow Account shall be funded with an amount of Cash sufficient to pay all outstanding Professional Fee Claims.

(x)     On the Plan Trust Establishment Date, the Physician Insurance Account shall vest in, and be transferred to, the Plan Trust. The Plan Trustee shall assume responsibility for administering and paying the Covered Claims and Covered Amounts (each as defined in the FILO DIP Order) in accordance with the FILO DIP Order. Upon payment in full of all

Covered Amounts, any amounts remaining in the Physician Insurance Account shall be transferred to the Litigation Trust.

(xi)    On the Plan Trust Establishment Date, the Plan Trust Assets shall transfer to the Plan Trust automatically and without further action of the Bankruptcy Court.

(xii)    On the Litigation Trust Establishment Date, the Litigation Trust Assets shall transfer to the Litigation Trust automatically and without further action of the Bankruptcy Court; *provided* that the Debtors, the FILO Parties, the Litigation Trust, and the Litigation Trustee shall execute all documentation necessary to effectuate such transfer.

(xiii)    On the Litigation Trust Establishment Date, $10,000,000 of FILO Bridge Claims shall automatically convert without any further action by any party into an equal amount of Retained FILO Claims, subject to the terms and conditions of this Plan.

(xiv)    Upon the FILO Balance (as defined in the FILO Settlement Term Sheet) being reduced to $0 such that all amounts distributable in respect of Class A Litigation Trust Interests have been distributed, the Plan Trustee may in its sole discretion (so long as the Plan Trust owns all of the Class B Litigation Trust Interests) direct the Litigation Trustee to effectuate the distribution of all remaining Litigation Trust Assets to the Plan Trust on account of the Plan Trust's Class B Litigation Trust Interests, by transfer in kind, merger or otherwise (which assets shall be distributed subject to (a) any outstanding interests in, and obligations and liabilities of, the Litigation Trust, including the right of the holders of the Class A-1 Litigation Trust Interests to receive distributions on account of the Post-FILO Repayment Variable Component (as defined in the FILO Settlement Term Sheet) and (b) any rights of the Class A-2 Representative (as defined in the FILO Settlement Term Sheet) under the FILO Settlement Term Sheet); *provided* that the Plan Trustee has obtained a favorable private letter ruling from the IRS or an opinion of the Plan Trust's tax advisor, in each case from which the Plan Trustee reasonably concludes that such transaction would not have a material adverse tax impact on the Plan Trust.

### 5.6    *Transition Services Agreement*

The Estate Representative shall provide transition services to the Litigation Trust in accordance with the Transition Services Agreement. The Estate Representative shall be defended, held harmless, and indemnified by the Litigation Trust against any and all liabilities or losses that may be incurred in connection with the rendering of services under the Transition Services Agreement to the Litigation Trust or Litigation Trustee, subject to customary carve outs for fraud, willful misconduct, or gross negligence.

### 5.7 _Litigation Funding Agreement_

On the Litigation Trust Establishment Date (to the extent not previously executed), the applicable parties shall execute and deliver the Litigation Funding Agreement to the Litigation Trust and such document shall become effective in accordance with its terms. Upon execution, the Litigation Funding Agreement shall constitute legal, valid, and binding obligations of the parties thereto and be enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order, and the Litigation Trust shall be authorized to incur the obligations under the Litigation Funding Agreement and use the proceeds of such Litigation Funding Agreement, in each case, in accordance with the terms of the Plan, the Confirmation Order, the FILO Settlement Order, and the Litigation Funding Agreement without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The terms and conditions of the Litigation Funding Agreement shall bind the Litigation Trust and each other Entity that enters into such agreement.

### 5.8 _Coordination between the Litigation Trust and the Plan Trust_.

(a) The Estate Representative shall coordinate with the Litigation Trustee with respect to issues involving overlapping concerns with respect to third parties. If the Estate Representative and Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a mediation conference with the Mediator; and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.

(b) With respect to any such disputes presented to the Bankruptcy Court:

(i) If the FILO Balance (as defined in the FILO Settlement Term Sheet) is in an Underpayment State (as defined in the FILO Settlement Term Sheet) on the date of any hearing before the Bankruptcy Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate Representative; _provided_ that the Litigation Trustee's business judgment shall not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estates or the Plan Trust (other than with respect to claims under section 502(h) of the Bankruptcy Code) without the consent of the Estate Representative.

(ii) If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate Representative's business judgment shall be applied to the dispute, subject to challenge by the Litigation Trustee; _provided_ that the Estate Representative's business judgment shall not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase

the liabilities of the Litigation Trust without the consent of the Litigation Trustee.

### 5.9 *Corporate Action.*

(a)     Following the Confirmation Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by this Plan or the Confirmation Order (including any action to be undertaken by the Plan Trustee or Litigation Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Confirmation Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the organizational structure of the Debtors, and any other action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

(b)     The authorizations and approvals contemplated by this Section 5.9 shall be effective notwithstanding any requirements under non-bankruptcy law.

(c)     The Confirmation Order shall and shall be deemed, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, to authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

### 5.10 *Plan Administrator Committee*

On and after the Confirmation Date and until the Plan Trust Establishment Date, the Plan Administrator Committee shall have exclusive governance rights of the Estates and be authorized to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Plan Administrator Agreement.  Monica Blacker shall serve as the initial chairperson of the Plan Administrator Committee (the "**Committee Chairperson**").  Any decision by the Plan Administrator Committee shall require the affirmative vote of at least two (2) of the three (3) members of the Plan Administrator Committee; *provided* that the Plan Administrator Committee shall not act without the consent of the Committee Chairperson.  Upon the Plan Trust Establishment Date, the Plan Trustee shall accede to the rights and obligations of the Plan Administrator Committee.

### 5.11 *Governance.*

(a)     On the Confirmation Date, the authority, power and incumbency of the persons then acting as directors, officers, managers, members and other authorized persons of the Debtors shall be terminated and such persons shall be deemed to have resigned.  On the Confirmation Date, the applicable Estate Representative shall serve as the initial director(s) or manager, as applicable, and sole officer of each Debtor after the Confirmation Date until such time as such Debtor goes out of existence, by merger into another Debtor, by dissolution or otherwise.

(b)     The Estate Representative, on behalf of the Debtors, may appoint a manager of any Debtor to serve after the Confirmation Date.  The Estate Representative, on behalf of the Debtors, may elect such additional manager(s) and/or officer(s) of the Debtors as the Estate

Representative deems necessary to implement this Plan and the actions contemplated herein. The Estate Representative, on behalf of the Debtors, shall, after the Confirmation Date, have the power to act by written consent to remove any manager or officer of any Debtor at any time with or without cause.

(c)     As of the Confirmation Date, the governing documents of the Debtors may be amended (and shall be deemed amended) to the extent necessary to carry out the provisions of this Plan.

### 5.12    *Cancellation of Existing Securities, Agreements, and Liens.*

(a)     Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)     On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)     After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)     Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 5.13    *Merger or Dissolution of Debtors.*

On or after the Confirmation Date, at the direction of the Estate Representative, any of the Debtors may be merged into SHC Holdings and the Estate Representative may complete the

winding up of such Debtors (including SHC Holdings) without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its members, managers, directors, management, or Security holders or any payments to be made in connection therewith, other than the filing of a certificate of dissolution and/or merger with the appropriate governmental authorities, and any such certificate of dissolution and/or merger may be filed by the Estate Representative without need for any authorization, signature or other act of any Person or Entity, including without limitation any holder of any Claim or Interest.  On or after the Confirmation Date, the Estate Representative may engage in any other transaction in furtherance of the Plan.  Any such transactions may be effective without any further action by the members, managers, directors, management, or Security holders of the Debtors.

### 5.14 *Preservation of Causes of Action.*

**Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by order of the Bankruptcy Court, the Debtors preserve and reserve any and all Causes of Action, including, for the avoidance of doubt, the Litigation Trust Causes of Action.**  For the avoidance of doubt, any Claim or Cause of Action that is settled or released prior to the Litigation Trust Establishment Date shall not be deemed a Litigation Trust Cause of Action.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order to any Cause of Action or potential Cause of Action against them as any indication that the Debtors, the Plan Administrator Committee, the Plan Trustee, the Plan Trust, the Litigation Trustee, or the Litigation Trust will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the consummation of the Plan or the occurrence of the Effective Date.   Prior to the Effective Date, (i) the Estate Representative, with respect to any Cause of Action that is not a Litigation Trust Asset, and (ii) the Litigation Trustee with respect to any Litigation Trust Cause of Action, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 5.15 *Effectuating Documents; Further Transactions.*

(a)     On and after the Confirmation Date, the Estate Representative is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

(b)     Before, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the Security holders, directors, managers, or members of the Debtors shall be deemed to have been so approved and shall be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable law and without

any requirement of further action by the Security holders, directors, managers, or members of the Debtors, or the need for any approvals, authorizations, actions or consents.

### 5.16    *Closing of the Chapter 11 Cases.*

After the Confirmation Date, the Estate Representative shall be authorized, but not directed, to submit one or more motions for order(s) that close and issue final decrees for any of the Chapter 11 Cases, for any Debtor, in each case in accordance with the Bankruptcy Code and the Bankruptcy Rules.  Furthermore, the Claims and Noticing Agent shall be authorized to destroy all paper/hardcopy records related to the Chapter 11 Cases two (2) years after the Effective Date has occurred.

## ARTICLE VI.    PLAN TRUST.

### 6.1    *Establishment of the Plan Trust.*

On or prior to the Effective Date, the Plan Trust shall be established in accordance with the Plan Trust Agreement for the purpose of being vested with and liquidating the Plan Trust Assets, reconciling Claims and making distributions to holders of Allowed Claims in accordance with the terms of this Plan and the Plan Trust Agreement.  Upon the Plan Trust Establishment Date, the Plan Trust shall assume all Claims (including, for the avoidance of doubt, all Administrative Expense Claims (including Professional Fee Claims), Other Secured Claims, Priority Tax Claims, and Other Priority Claims) against the Debtors (other than the FILO DIP Claims, FILO Bridge Claims, and Claims for which Plan Trust Interests are distributed) with the same validity and priority as such Claims had against the Debtors immediately prior to the Plan Trust Establishment Date and there shall be no further recourse against the Debtors with respect to such Claims.  For the avoidance of doubt, the Estate Representative may establish the Plan Trust after the Confirmation Date but prior to the Effective Date.  On or following the Plan Trust Establishment Date, the Plan Trustee may distribute the Plan Trust Interests to holders of Allowed Claims and establish the Disputed Claim Reserve in accordance with the Plan.  Subject to and to the extent set forth in this Plan, the Confirmation Order, the Plan Trust Agreement, or any other order of the Bankruptcy Court entered in connection therewith, the Plan Trust and the Plan Trustee shall be empowered, without the need for Bankruptcy Court approval, to:

> (i)    perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Plan Trust;

> (ii)    establish, maintain and administer trust accounts, which shall be segregated to the extent appropriate in accordance with this Plan;

> (iii)    accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle and protect, as applicable, the Plan Trust Assets in accordance with this Plan;

> (iv)    except to the extent any Claims have already been Allowed (including pursuant to the terms of this Plan), control and effectuate the Claims reconciliation process with respect to all Claims, including to object

38

to, seek to subordinate, recharacterize, compromise or settle any and all such Claims against the Debtors, including the Disputed Claims, pursuant to the procedures prescribed in this Plan;

(v)     calculate and make distributions to holders of Allowed Claims;

(vi)     administer each Debtor's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(vii)     administer the Plan Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Plan Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(viii)     retain, compensate and employ Professionals (including Estate Professionals) to represent the Plan Trust;

(ix)     direct and control the Wind Down, liquidation, sale or abandonment of the Plan Trust Assets, including the Retained Assets, and any other remaining Assets of the Debtors under the Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims;

(x)     exercise such other powers as may be vested in the Plan Trust under the Plan Trust Agreement and this Plan, or as are deemed by the Debtors or the Plan Trustee to be necessary and proper to implement the provisions of the Plan Trust Agreement and effectuate the purpose of the Plan Trust;

(xi)     dissolve the Plan Trust in accordance with the terms of the Plan Trust Agreement;

(xii)     on behalf of each of the Debtors, carry out and implement all provisions of this Plan; and

(xiii)     wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor.

The Plan Trustee shall have the same authority in respect of all taxes and tax returns of the Debtors as if the Plan Trustee were the Debtors.

Notwithstanding anything to the contrary in this <u>Section 6.1</u>, the Plan Trust's primary purpose is liquidating the Plan Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Plan Trust's liquidating purpose and reasonably necessary to conserve and protect the Plan Trust Assets and provide for the orderly liquidation thereof.

### 6.2 *Funding of and Transfer of Assets into the Plan Trust.*

Except as otherwise provided in this Plan or the Confirmation Order, upon the Plan Trust Establishment Date, the Debtors shall transfer the Plan Trust Assets, including, but not limited to the Estate Funding, to the Plan Trust, and all such assets shall vest in the Plan Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the Plan Trustee, in accordance with this Plan and the Plan Trust Agreement. The Plan Trustee shall have the authority to create additional sub-accounts in trust accounts established pursuant to <u>Section 6.6</u> and sub-trusts within the Plan Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Plan Trust. The act of transferring the Plan Trust Assets, as authorized by this Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Plan Trust as if the asset or right was still held by the applicable Debtor. Upon the transfer of the Plan Trust Assets to the Plan Trust, the Debtors shall have no interest in or with respect to the Plan Trust Assets or the Plan Trust. Upon delivery of the Plan Trust Assets to the Plan Trust, the Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Plan Trust Assets or the Plan Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Plan Trust Assets to the Plan Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Plan Trust shall vest in the Plan Trust and its representatives, and the Debtors and the Plan Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Plan Trustee shall agree to accept and hold the Plan Trust Assets in the Plan Trust for the benefit of the Plan Trust Beneficiaries, subject to the terms of the Plan and the Plan Trust Agreement.

### 6.3 *Plan Trustee.*

(a) **Appointment of Plan Trustee.** Upon the Plan Trust Establishment Date, the Plan Administrator Committee shall be appointed as the Plan Trustee. Except as otherwise provided in this Plan, the Plan Trustee (i) shall be the successor to and representative of the Estate of each of the Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code and (ii) shall be the sole representative of, and shall act for, the Debtors, and shall assume any such outstanding responsibility of the Debtors under the Plan. The powers, rights and responsibilities of the Plan Trustee shall be as specified in the Plan Trust Agreement and Plan and shall include the authority and responsibility to fulfill the items identified in this <u>Section 6.3</u> of the Plan. Other rights and duties of the Plan Trustee and the Plan Trust Beneficiaries shall be as set forth in the

Plan Trust Agreement. The FILO Parties will have the right to consent to any successor Plan Trustee that is not a chapter 7 trustee (including the terms of any such successor's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

**(b)** **Functions of the Plan Trustee.** On and after the Plan Trust Establishment Date, the Plan Trustee and/or the Plan Trust, as applicable, shall carry out the functions set forth in this <u>Section 6.3</u> and, after the Effective Date, may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the Plan Trust Agreement. Such functions shall include any and all powers and authority to:

(i) effectuate the Plan, including the prosecution and any other disposition of all litigation related to any appeals in respect to the approval and/or implementation of the Plan;

(ii) wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt, or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor;

(iii) exercise its business judgment to direct and control the Wind Down, including the liquidation, sale and/or abandonment of the Plan Trust Assets, including the Retained Assets, under this Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims;

(iv) marshal, market for sale, and wind down any of the Plan Trust Assets, including the Retained Assets;

(v) serve as the initial director or manager, as applicable, and sole officer of each Debtor after the Effective Date until such time as such Debtor is merged or dissolved, as applicable, and take any actions necessary to effectuate the terms of the Plan and the Plan Trust Agreement in such capacities;

(vi) take any actions necessary to (A) resolve all matters related to the Plan Trust Assets and (B) vest such assets in the Plan Trust;

(vii) open and maintain bank accounts on behalf of or in the name of the Plan Trust;

(viii) fund the Wind Down Reserve;

(ix) amend, modify, or supplement the Wind Down Budget;

(x) determine, from time to time, whether the amounts available in the Wind Down Reserve are in excess of the amount necessary to

satisfy the purpose for which such reserve was established and amend, modify, or supplement the Wind Down Budget accordingly. If the Plan Trustee determines that a surplus exists in the Wind Down Reserve as of the date of such determination, the Plan Trustee may transfer such surplus amount to the Plan Trust for distribution in accordance with the Plan;

(xi)     maintain the books and records and accounts of the Debtors or the Plan Trust;

(xii)    reconcile Claims and calculate and make distributions to holders of Allowed Claims in accordance with the Plan;

(xiii)   administer each Debtor's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(xiv)    administer the Plan Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Plan Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(xv)     file, prosecute, settle or dispose of any and all objections to asserted Claims;

(xvi)    enter into and consummate any transactions for the purpose of dissolving the Debtors;

(xvii)   make distributions of the Plan Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay the expenses of the Plan Trust, to holders of Allowed Claims, in accordance with the Plan;

(xviii)  purchase and carry all insurance policies reasonably necessary or advisable to pay all associated insurance premiums and costs;

(xix)    invest Cash, as available, and any income earned thereon;

(xx)     take such actions as are necessary or appropriate to close any of the Chapter 11 Cases;

(xxi)    retain, compensate and employ Professionals to represent the Plan Trust or the Plan Trustee, as applicable; and

42

(xxii) take any other actions not inconsistent with the provisions hereof that the Plan Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

### 6.4    *Plan Trust Agreement.*

Prior to the Plan Trust Establishment Date, the Debtors shall execute and deliver the Plan Trust Agreement. The Plan Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Plan Trustee. Any such indemnification shall be the sole responsibility of the Plan Trust and payable solely from the Plan Trust Assets.

### 6.5    *Fees and Expenses of the Plan Trust.*

From and after the Plan Trust Establishment Date, expenses of the Plan Trust shall be paid from the Plan Trust Assets in the ordinary course of business, in accordance with the Plan and the Plan Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Plan Trustee, on behalf of the Plan Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional (including professionals previously employed by the Debtors) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Plan Trustee, are necessary to assist the Plan Trustee in the performance of the Plan Trustee's duties under the Plan and the Plan Trust Agreement, subject to any limitations and procedures established by the Plan Trust Agreement.

### 6.6    *Creation and Maintenance of Trust Accounts.*

On and after the Plan Trust Establishment Date, appropriate trust accounts will be established and maintained in one or more federally insured domestic banks in the name of the Plan Trust. Cash deposited in the trust accounts will be invested, held and used solely as provided in the Plan Trust Agreement. The trust accounts will be funded, as applicable, by Cash proceeds obtained through the disposition of Plan Trust Assets or the proceeds of the Plan Trust or Class B Litigation Trust Interests. Upon obtaining an order of the Bankruptcy Court authorizing final distribution or closure of the Chapter 11 Cases, any funds remaining in the trust accounts shall be distributed in accordance with this Plan and the Plan Trust Agreement, and the trust accounts may be closed.

### 6.7    *Limitation of Liability.*

Neither the Plan Trustee, nor its firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, disbursing agents or agents, and any of such Person's successors and assigns, shall incur any liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with the Plan or Plan Trust Agreement, other than for specific actions or omissions resulting from its willful misconduct, gross negligence or fraud found by a Final Order of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage or expense suffered by the Plan Trust. The Plan Trustee shall enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee or any other analogous trustee. The Plan Trustee may, in connection with the performance of its functions, in the Plan Trustee's

sole and absolute discretion, consult with his, her or its attorneys, accountants, advisors and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are in writing. Notwithstanding such authority, the Plan Trustee shall be under no obligation to consult with any such attorneys, accountants, advisors or agents, and any determination not to do so shall not result in the imposition of liability on the Plan Trustee or its members unless such determination is based on willful misconduct, gross negligence or fraud. Persons dealing with the Plan Trustee shall look only to the Plan Trust Assets to satisfy any liability incurred by the Plan Trustee to such person in carrying out the terms of the Plan or the Plan Trust Agreement, and the Plan Trustee shall have no personal obligation to satisfy such liability.

### 6.8    *Indemnification*.

In addition to the indemnification provided by the Litigation Trust pursuant to Section 7.7 of this Plan and the Transition Services Agreement, the Plan Trust shall indemnify the Plan Trustee for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred without fraud, gross negligence or willful misconduct on the part of the Plan Trustee (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Plan Trustee in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or the Plan Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct. In addition to the indemnification provided by the Litigation Trust pursuant to Section 7.7 of this Plan and the Transition Services Agreement, the Plan Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Plan Trustee, from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Plan Trust or the implementation or administration of the Plan if the Plan Trustee acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Plan Trust. To the extent the Plan Trust indemnifies and holds the Plan Trustee harmless as provided above, the reasonable legal fees and related costs incurred by counsel to the Plan Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as expenses of the Plan Trust. The costs and expenses incurred in enforcing the right of indemnification in this Section 6.8 shall be paid by the Plan Trust. This provision shall survive the termination of the Plan Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Plan Trustee.

### 6.9    *Insurance*.

The Plan Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Plan Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties, and obligations of the Plan Trustee, which insurance coverage may, at the sole option of the Plan Trustee, be extended for a reasonable period after the termination of the Plan Trust Agreement.

### 6.10    *Dissolution of the Plan Trust.*

In no event shall the Plan Trust be dissolved later than five (5) years from the Plan Trust Establishment Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Plan Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Plan Trust Assets.

### 6.11    *Records.*

The Plan Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors necessary for the disposition of Plan Trust Assets and objections to Disputed Claims. Following the Plan Trust Establishment Date, the Plan Trustee is authorized, pursuant to section 554(a) of the Bankruptcy Code, without further application to the Bankruptcy Court or notice to any party, to abandon or otherwise destroy documents and records (whether in electronic or paper format), other than any medical records, that the Plan Trustee determines, in its reasonable business judgment, are no longer necessary to the administration of either the Chapter 11 Cases or the Plan, notwithstanding any federal, state, or local law or requirement requiring the retention of the applicable documents or records; *provided* that, prior to abandoning or destroying any records, the Plan Trustee shall notify the Litigation Trustee of its intent to abandon or destroy such records, which notice shall be provided at least five (5) Business Days prior to such intended abandonment or destruction, and offer to transfer such records to the Litigation Trustee, and if the Litigation Trustee elects to retain or receive such records, the Litigation Trustee shall do so at the Litigation Trustee's sole cost and expense (paid in advance), including the cost of any required continued storage until the transfer can be effectuated.

### 6.12    *Section 1145 Exemption; Non-Transferability of Plan Trust Interests.*

Any Plan Trust Interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Plan Trust Interests constitute "securities," the offer and sale of such Plan Trust Interests to the Plan Trust Beneficiaries will be exempt to the extent provided in section 1145 of the Bankruptcy Code from registration, without further action by any person, under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations requiring registration for the offer. Any such Plan Trust Interests (and the underlying Claim giving rise thereto) shall not: (i) be voluntarily or involuntarily, directly or indirectly, assigned, conveyed, hypothecated, pledged, or otherwise transferred or traded, except by will, intestate succession or as may otherwise be required by operation of law; (ii) be evidenced by a certificate or other instrument; and (iii) possess any voting rights with respect to the Plan Trust or otherwise.

### 6.13    *Plan Trust Tax and Other Matters.*

(a)    **Tax Treatment.**  The Plan Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 *et seq.* or other separate taxable entity).  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), all parties (including, without limitation, the Debtors, the Plan Trustee, and the Plan Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of Assets by the Debtors to the Plan Trust (including the Class B Litigation Trust Interests) as (i) the transfer of such Assets and, by reason of the transfer of the Class B Litigation Trust Interests, a respective portion of the underlying Assets of the Litigation Trust (in each case, subject to any liabilities and obligations relating to those Assets) by the Debtors directly to the holders of Allowed Claims entitled to receive Plan Trust Interests in satisfaction of their Claims, other than to the extent any Assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets (subject to such liabilities and obligations) by such holders to the Plan Trust in exchange for the beneficial interests in the Plan Trust.  Accordingly, absent definitive guidance to the contrary, the Plan Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respect share of Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of Litigation Trust Assets (in each case, other than to the extent any such Assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

(b)    **Liquidation Purpose of the Plan Trust; No Successor in Interest.**  The Plan Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust.  Accordingly, the Plan Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Plan Trust Assets, make timely distributions to the Plan Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Plan Trustee shall distribute at least annually to the Plan Trust Beneficiaries any Available Cash. The Plan Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in this Plan or the Plan Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Plan Trustee expressly for such purpose. Notwithstanding anything in the Plan or Plan Trust Agreement to the contrary, the Plan Trustee shall always act consistently with, and not contrary to, the purpose of the Plan Trust as set forth in the Plan.

(c)    **Cash Investments.**  The right and power of the Plan Trustee to invest the Plan Trust Assets, the proceeds thereof, or any income earned by the Plan Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the

Bankruptcy Code. The Plan Trustee may expend the Cash of the Plan Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Assets of the Plan Trust during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Plan Trust) and (iii) to satisfy other respective liabilities incurred by the Plan Trust in accordance with this Plan and the Plan Trust Agreement (including, without limitation, the payment of any taxes).

      **(d)**      **Tax Reporting and Tax Payments.**

      (i)      The Plan Trustee shall file tax returns for the Plan Trust treating the Plan Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 6.13(d). The Plan Trustee also shall annually send to each holder of a Plan Trust Interest, a separate statement regarding the receipts and expenditures of the Plan Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

      (ii)      As soon as practicable after the Plan Trust Establishment Date, the Plan Trustee shall make a good faith determination of the fair market value of the Plan Trust Assets as of the Plan Trust Establishment Date. The Plan Trustee shall inform all parties of such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

      (iii)      Allocations of Plan Trust taxable income among Plan Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Plan Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of Plan Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Plan Trust Assets. The tax book value of Plan Trust Assets for purpose of this paragraph shall equal their fair market value on the date Plan Trust Assets are transferred to the Plan Trust, adjusted in accordance

with tax accounting principles prescribed by the United States Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     The Plan Trust shall be responsible for payment, out of Plan Trust Assets, of any taxes imposed on the Plan Trust or the Plan Trust Assets. More particularly, any taxes imposed on any Disputed Claim Reserve or its assets will be paid out of the assets of the Disputed Claim Reserve (including any Plan Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims. In the event, and to the extent, any Cash in any Disputed Claim Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of the Disputed Claim Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)      The Plan Trustee may request an expedited determination of taxes of the Plan Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the Plan Trust, taxes of such fund or other separate taxable entity) and the Debtors, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Plan Trust (or any such disputed ownership fund or other separate taxable entity) or the Debtors for all taxable periods through the dissolution of the Plan Trust.

(vi)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Plan Trustee), the Plan Trustee may elect to treat any Plan Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes. If a "disputed ownership fund" election is made (or all or any portion of the Plan Trust Assets allocable to, or held on account of, Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the Plan Trustee and Plan Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii)    The Plan Trustee, the Litigation Trustee and the Debtors shall each cooperate with the other in connection with the preparation and filing of any tax returns, the provision of any required tax forms, and any other matter with respect to taxes, and shall make available to the other, as reasonably requested, any information or records relevant to the preparation or filing of any tax returns or forms or the defense of any audit or other tax proceeding.

(viii)   The treatment provided in this Section 6.13, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

## ARTICLE VII.    LITIGATION TRUST

### 7.1    *Establishment of the Litigation Trust.*

To the extent not previously established pursuant to the FILO Settlement Order, the Confirmation Order shall provide that no later than one (1) Business Days following the Confirmation Date, the Litigation Trust shall be established in accordance with the FILO Settlement Order and the Litigation Trust Agreement for the purpose of being vested with and liquidating the Litigation Trust Assets and making distributions to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement. Following the Litigation Trust Establishment Date, the Litigation Trustee shall distribute the Litigation Trust Interests to the Litigation Trust Beneficiaries. In each case, subject in all respects to the FILO Settlement Order and the Litigation Trust Agreement, the Litigation Trust and the Litigation Trustee shall be empowered, without the need for Bankruptcy Court approval, to:

(i)      perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Litigation Trust;

(ii)     establish, maintain, and administer trust accounts;

(iii)    accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the Litigation Trust Assets in accordance with the Litigation Trust Agreement;

(iv)     make distributions to holders of Litigation Trust Interests in accordance with the Litigation Trust Agreement;

(v)      administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

(vi) retain, compensate and employ professionals to represent the Litigation Trust;

(vii) direct and control the pursuit, settlement, liquidation, sale, or abandonment of the Litigation Trust Assets in accordance with the Litigation Trust Agreement and applicable law and as necessary to maximize distributions to Litigation Trust Beneficiaries;

(viii) exercise such other powers as may be vested in the Litigation Trust under the Litigation Trust Agreement, or as are deemed by the Litigation Trustee to be necessary and proper to implement the provisions of the Litigation Trust Agreement and effectuate the purpose of the Litigation Trust;

(ix) conduct investigations of the Litigation Trust Causes of Action pursuant to Bankruptcy Rule 2004;

(x) pursue, prosecute, settle, abandon, or otherwise resolve the Litigation Trust Assets (including any Litigation Trust Causes of Action transferred to the Litigation Trust and including through the commencement, participation, defense, or continuation of legal proceedings, including judicial, arbitration or administrative proceedings, in any domestic or foreign jurisdiction) in accordance with the Litigation Trust Agreement during or after the pendency of these Chapter 11 Cases;

(xi) protect and enforce the rights of the Litigation Trust in and to the Litigation Trust Assets by utilizing any foreign judicial proceedings and any applicable foreign bankruptcy, insolvency, moratorium, or similar law; and

(xii) dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement.

Notwithstanding anything to the contrary in this Section 7.1, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

For the avoidance of doubt, any Claim or Cause of Action that is settled or released prior to the Litigation Trust Establishment Date, subject to the consent rights of the FILO Parties, shall not be deemed a Litigation Trust Cause of Action, and until the Litigation Trust Establishment Date, the Estate Representative shall retain the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Claim or Cause of Action, subject to the consent rights of the FILO Parties, the Bankruptcy Code, and applicable orders of the Bankruptcy Court. Nothing in this Plan or in the Confirmation Order shall impair the ability or authority of the Estate Representative to settle any such Claim or Cause of Action, subject to the consent rights of the

FILO Parties, prior to the Litigation Trust Establishment Date.

### 7.2 *Funding of and Transfer of Assets into the Litigation Trust.*

(a)     Upon the Litigation Trust Establishment Date, the Debtors shall transfer the Litigation Trust Assets to the Litigation Trust, and all such assets shall vest in the Litigation Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise) to the fullest extent permitted by law) on such date, to be administered by the Litigation Trustee, in accordance with the Litigation Trust Agreement.  The Litigation Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the Litigation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Litigation Trust.  The act of transferring the Litigation Trust Assets, as authorized by the Confirmation Order, this Plan and the FILO Settlement Order, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights (specifically including any extensions available to a trustee or debtor-in-possession under 11 U.S.C. § 108) may be asserted by the Litigation Trust, in any judicial, arbitration, or administrative proceeding, during or after the pendency of these Chapter 11 Cases, as if the asset or right asserted in such judicial, arbitration, or administrative proceeding were an action or other asset still held by the applicable Debtor or Debtor-in-possession.  Upon the transfer of the Litigation Trust Assets to the Litigation Trust, the Estates or their successors shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust other than the Class B Litigation Trust Interests. Upon delivery of the Litigation Trust Assets to the Litigation Trust, the Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Litigation Trust Assets or the Litigation Trust (other than the Class B Litigation Trust Interests). Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. The Litigation Trustee shall agree to accept and hold the Litigation Trust Assets in the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, subject to the terms of the Litigation Trust Agreement.

(b)     All attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection and all other privileges, immunities or protections from disclosure (the "**Privileges**") held by any of (1) any one or more of the Debtors or (2) any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors (together the "**Privilege Transfer Parties**") related in any way to the Litigation Trust Assets or the analysis or prosecution of any Litigation Trust Assets (the "**Transferred Privileged Information**") shall be transferred and assigned to, and vested in, the Litigation Trust and its authorized representatives. The Transferred Privileged Information shall include documents and information of all manner, whether oral, written or digital, and whether or not previously disclosed or discussed. For the avoidance of doubt, the Privileges shall include any right or obligation to preserve or enforce or waive a privilege that arises from any joint defense, common interest or similar agreement involving any of the Privilege Transfer Parties.

**(c)** The foregoing transfer and assignment shall vest the Privileges concerning the Transferred Privileged Information in the Litigation Trust, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Litigation Trust and the Litigation Trust Beneficiaries; *provided*, however, that to the extent that any such Privileges or Transferred Privileged Information relates to both the Litigation Trust Assets on one hand and any matter in which the Debtors (or the Plan Trust) have an interest on the other, such Privileges and Transferred Privileged Information shall vest jointly in the Debtors (or, following the Plan Trust Establishment Date, the Plan Trust) (or their designee) and the Litigation Trust. As relates to any Privileges or Transferred Privileged Information held jointly with the Debtors (or, following the Plan Trust Establishment Date, the Plan Trust) (or their designee), (i) with respect to litigations or proceedings concerning matters in which the Debtors (or the Plan Trust) has an interest as a potential defendant, the Debtors shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the Litigation Trust, and (ii) with respect to litigations or proceedings concerning the Litigation Trust Assets where the Debtors (or the Plan Trust) has an interest as a potential defendant, the Litigation Trust shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the Estate Representative. The Litigation Trust and Debtors have agreed that they do not intend to provide a general waiver of all Privileges and that each such party will take commercially reasonable steps to avoid a general waiver of the Privileges.

**(d)** Pursuant to, *inter alia*, Federal Rule of Evidence 502(d), no Privileges shall be waived by the transfer and assignment of the Privileges or the production of any Transferred Privileged Information to the Litigation Trust or any of its respective employees, professionals or representatives, or by disclosure of such Transferred Privileged Information between the Privilege Transfer Parties, on the one hand, and the Litigation Trust, on the other hand, or any of their respective employees, professionals or representatives.

**(e)** If a Privilege Transfer Party, the Litigation Trust, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Transferred Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Transferred Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Trust of the production and shall demand of all recipients of the inadvertently disclosed Transferred Privileged Information that they return or confirm the destruction of such materials.

### 7.3 *Litigation Trustee*.

**(a) Appointment of Litigation Trustee.** Upon the Litigation Trust Establishment Date, the Litigation Trustee, to the extent not previously appointed pursuant to the FILO Settlement Order, shall be appointed. The Litigation Trust shall be administered by the Litigation Trustee pursuant to the Litigation Trust Agreement. The powers, rights and responsibilities of the Litigation Trustee shall be as specified in the Litigation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in this Section 7.3

of the Plan. Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

(b) **Functions of the Litigation Trustee.** On and after the Litigation Trust Establishment Date, the Litigation Trustee shall carry out the functions set forth in this Section 7.3 and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the FILO Settlement Order or the Litigation Trust Agreement. Such functions shall include any and all powers and authority to:

(i) take any actions necessary to (A) resolve all matters related to the Litigation Trust Assets and (B) vest such assets in the Litigation Trust;

(ii) open and maintain bank accounts on behalf of or in the name of the Litigation Trust;

(iii) maintain the books and records and accounts of the Litigation Trust and obtain any necessary insurance;

(iv) administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

(v) fund the Estate Funding;

(vi) make distributions of the Litigation Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay the Litigation Trust Expenses, to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement;

(vii) invest Cash, as available, and any income earned thereon;

(viii) retain, compensate and employ professionals to represent the Litigation Trust or the Litigation Trustee, as applicable; and

(ix) take any other actions not inconsistent with the provisions hereof, the FILO Settlement Order, and the Litigation Trust Agreement that the Litigation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

**7.4** *Litigation Trust Agreement.*

Prior to the Litigation Trust Establishment Date, the Debtors shall execute and deliver the Litigation Trust Agreement. The Litigation Trust Agreement may include reasonable

and customary indemnification provisions for the benefit of the Litigation Trustee. Any such indemnification shall be the sole responsibility of the Litigation Trust and payable solely from the Litigation Trust Assets.

### 7.5 *Class B Representative.*

The Litigation Trust shall be administered by the Litigation Trustee pursuant to the Litigation Trust Agreement and the Plan. On the Litigation Trust Establishment Date, the Plan Administrator Committee shall be appointed as the Class B Representative to help oversee the activities of the Litigation Trust in accordance with the Litigation Trust Agreement. Upon the Plan Trust Establishment Date, the Plan Trustee shall succeed the Plan Administrator Committee as the Class B Representative. Following the Litigation Trust Establishment Date, the Class B Representative shall be responsible for, among other things, (i) exercising its rights under the Litigation Trust Agreement, and (ii) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the above duties.

### 7.6 *Fees and Expenses of the Litigation Trust.*

(a) From and after the Litigation Trust Establishment Date, Litigation Trust Expenses shall be paid from the Litigation Trust Assets in the ordinary course of business, in accordance with the Litigation Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Litigation Trustee, on behalf of the Litigation Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional (including Professionals previously employed by the Debtors or another party-in-interest) for services rendered or expenses incurred on and after the Litigation Trust Establishment Date that, in the discretion of the Litigation Trustee, are necessary to assist the Litigation Trustee in the performance of the Litigation Trustee's duties under the Litigation Trust Agreement, subject to any limitations and procedures established by the Litigation Trust Agreement.

(b) The Litigation Trustee may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties determined by the Litigation Trustee to have qualifications necessary or desirable to assist in the investigation, prosecution and/or settlement of the Litigation Trust Causes of Action).

### 7.7 *Indemnification.*

The Litigation Trust shall indemnify the Plan Trustee and its Representatives for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred, in each case, without fraud, gross negligence, breach of fiduciary duties, or willful misconduct on the part of the Plan Trustee or its Representatives, as applicable (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Plan Trustee or its Representatives at the request of the Litigation Trustee in connection with the rendering of services to the Litigation Trust or the Litigation Trustee, including under the Transition Services Agreement. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross

negligence or willful misconduct. To the extent the Litigation Trust indemnifies and holds the Plan Trustee harmless as provided above, the reasonable legal fees and related costs incurred by counsel to the Plan Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Litigation Trust Expenses. The costs and expenses incurred in enforcing the right of indemnification in this Section 7.7 shall be paid by the Litigation Trust. This provision shall survive the termination of the Litigation Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Plan Trustee.

### 7.8 *Dissolution of the Litigation Trust.*

In no event shall the Litigation Trust be dissolved later than five (5) years from the Litigation Trust Establishment Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets.

### 7.9 *Records.*

The Litigation Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the Debtors necessary, as reasonably determined by the Litigation Trustee, for the disposition of Litigation Trust Assets, subject to the payment of any required fees, costs, or expenses under the Transition Services Agreement.

### 7.10 *Transferability of Litigation Trust Interests.*

The Litigation Trust Interests shall be transferable solely to the extent provided for, and subject to the conditions set forth, in the Litigation Trust Agreement.

### 7.11 *Litigation Trust Tax and Other Matters.*

(a) **Tax Treatment.** The Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes, with the holders of Allowed FILO DIP Claims and Allowed FILO Bridge Claims, in respect of their Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests, and the respective FILO Parties providing litigation funding, in respect of their Class A-1 Litigation Trust Interests, being treated as grantors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of Assets by the Debtors to the Litigation Trust as follows:

(i) If the transfers of Assets to the Litigation Trust and Plan Trust (and distribution of Litigation Trust Interests and Plan Trust Interests)

occur concurrently, as (A) the transfer of Assets directly to the holders of Allowed Claims entitled to receive Litigation Trust Interests, to the FILO Parties that provided the Estate Funding and, by reason of the Class B Litigation Trust Interests transferred to the Plan Trust, to holders of Allowed Claims entitled to receive Plan Trust Interests (subject to any liabilities and obligations relating to the Litigation Trust Assets), in satisfaction of, and in exchange for, their Claims and Estate Funding, other than to the extent any Assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity in respect of the Plan Trust, followed by (B) the transfer of such Assets (subject to such liabilities and obligations) by such persons to the Litigation Trust (in the case of the holders of Plan Trust Interests, first as a transfer of such assets to the Plan Trust and then from the Plan Trust to the Litigation Trust) in exchange for their Litigation Trust Interests.

(ii)     If the transfer of Assets to the Litigation Trust occurs prior to (and not concurrently with) the transfer of Assets to and distribution of beneficial interests in the Plan Trust, as (A) the transfer of the portion of the Litigation Trust Assets to which the Class A Litigation Trust Interests relate (in the case of the Class A-1 Litigation Trust Interests, to the extent of the Secured Interim Advances and the Estate Funding) directly to the holders of Allowed FILO DIP Claims, the holders of Allowed Remaining FILO Bridge Claims and the FILO Parties that provided the Estate Funding (subject to any liabilities and obligations relating to those Assets) in satisfaction of, and in exchange for, their Claims and Estate Funding, followed by (B) the transfer of such Assets by such persons, and of the remaining Litigation Trust Assets by the Debtors, to the Litigation Trust in exchange for their Litigation Trust Interests. In such event, the subsequent transfer of the Class B Litigation Trust Interests by the Debtors to the Plan Trust shall be treated as a direct transfer of the applicable portion of the assets of the Litigation Trust underlying such Class B Litigation Trust Interests to the Plan Trust Beneficiaries, followed by the transfer of such Assets by the Plan Trust Beneficiaries to the Plan Trust, as further described in Section 6.13(a) above.

Accordingly, absent definitive guidance to the contrary, (A) prior to the establishment of the Plan Trust, the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests and the Debtors, as the holders of the Class B Litigation Trust Interests, shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (B) after the establishment of the Plan Trust, (1) the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (2) the holders of the Plan Trust Interests shall be treated

for U.S. federal income tax purposes as the grantors and owners of their respective share of the Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of the Litigation Trust Assets, in each case, other than to the extent any Assets of the Plan Trust allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity.

        **(b)** **Liquidation Purpose of the Litigation Trust; No Successor in Interest.** The Litigation Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. Accordingly, the Litigation Trustees shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions to the Litigation Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Litigation Trustee shall distribute at least annually to the Litigation Trust Beneficiaries any Available Cash. The Litigation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Litigation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose. Notwithstanding anything in the Plan or the Litigation Trust Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth in the Plan.

        **(c)** **Cash Investments.** The right and power of the Litigation Trustee to invest the Litigation Trust Assets, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code. The Litigation Trustee may expend the Cash of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Assets of the Litigation Trust during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust) and (iii) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement (including, without limitation, the payment of any taxes).

        **(d)** **Tax Reporting and Tax Payments.**

                (i)      The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this <u>Section 7.11(d)</u>. The Litigation Trustee also shall annually send to each holder of a Litigation Trust Interest, a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying

beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable after the Litigation Trust Establishment Date, the Estate Representative, in consultation with the Litigation Trustee, shall make a good faith determination of the fair market value of the Litigation Trust Assets, as of Litigation Trust Establishment Date. The Estate Representative shall inform all parties of such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)    Allocations of Litigation Trust taxable income among Litigation Trust Beneficiaries (including holders of Plan Trust Interests, as grantors and deemed owners of their respective portion of the underlying Litigation Trust Assets) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value) to the holders of Litigation Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the United States Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)     The Litigation Trust shall be responsible for payment, out of Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets.

(v)      The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

(vi)     The Litigation Trustee, the Plan Trustee, and the Debtors shall each cooperate with the other in connection with the preparation and filing of any tax returns, the provision of any required tax forms, and

any other matter with respect to taxes, and shall make available to the other, as reasonably requested, any information or records relevant to the preparation or filing of any tax returns or forms or the defense of any audit or other tax proceeding.

(vii)    The treatment provided in this <u>Section 7.11</u>, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

# ARTICLE VIII.    DISTRIBUTIONS.

## 8.1    <u>*Distributions Generally*</u>.

On or after the Effective Date, the Plan Trustee (with the assistance of the Disbursing Agent as necessary) shall make all Plan Distributions to holders of Allowed Claims in accordance with the terms of this Plan; *provided* that, for the avoidance of doubt, following the Plan Trust Establishment Date and the Litigation Trust Establishment Date, the Plan Trustee and Litigation Trustee may make distributions of (i) Plan Trust Interests and Litigation Trust Interests, as applicable, and (ii) any Available Cash. The Plan Trust shall make Plan Distributions only in accordance with the terms of the Plan, the Confirmation Order and the Plan Trust Agreement to holders of Allowed Claims, and only to the extent that the Plan Trust has sufficient Plan Trust Assets (or income and/or proceeds realized from Plan Trust Assets) to make such payments in accordance with and to the extent provided for in the Plan, the Confirmation Order and the Plan Trust Agreement. The Estate Representative shall direct the Initial Plan Distribution (including the Plan Distribution of the Plan Trust Interests as set forth in <u>ARTICLE IV</u>) to holders of Allowed Claims no later than the Initial Plan Distribution Date. After the Initial Plan Distribution Date, the Estate Representative shall, from time to time, determine the subsequent Plan Distribution Dates.

## 8.2    <u>*No Postpetition Interest on Claims*</u>.

Unless otherwise provided in this Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

## 8.3    <u>*Distribution Record Date*</u>.

As of the close of business on the Distribution Record Date, the various lists of holders of Claims or Interests in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests after the Distribution Record Date; *provided* that the Plan Trustee shall file a notice on the docket of the anticipated Effective Date at least ten (10) calendar days before the anticipated Effective Date. Neither the Debtors nor the Plan Trustee shall have any obligation to recognize any transfer of a Claim (i) occurring after the close of business on the Distribution Record Date, or (ii) that does not comply with Bankruptcy Rule 3001(e) or otherwise does not comply with the Bankruptcy Code or Bankruptcy Rules. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Plan Trustee shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable

executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

### 8.4    *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 8.5    *Reserve on Account of Disputed Claims.*

**(a)**    From and after the Plan Trust Establishment Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the Allowed amount, or Allowed or disallowed by Final Order, the Plan Trust shall retain, for the benefit of each holder of a Disputed Claim, an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim has been estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as constituting and representing the maximum amount in which such Claim may ultimately become an Allowed Claim or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Estate Representative.  Cash held in the Disputed Claim Reserve (including, with respect to Cash, any earnings that have accrued on such Cash, net of any expenses, including any taxes, relating thereto) shall be retained by the Plan Trust for the benefit of holders of Disputed Claims pending determination of their entitlement thereto under the terms of the Plan. Any Cash shall be either (x) held by the Plan Trust in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States government and guaranteed by the United States government, and having (in either case) a maturity of not more than 30 days. No payments or Plan Distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

**(b)**    Subject to the other provisions of this Plan regarding timing of Plan Distributions, after a Disputed Claim becomes an Allowed Claim, the Plan Trustee shall distribute to the holder thereof the Plan Distributions, if any, to which such holder is then entitled under the Plan and any earnings related to the portion of the Disputed Claim Reserve allocable to such Allowed Claim (net of any expenses, including any taxes, relating thereto), and a Plan Trust Interest in accordance with the Plan, subject to the provisions concerning distributions from the Plan Trust, including the application of any reserves.  The balance of any Cash previously retained but not distributed to a Disputed Claim holder shall be included in future distributions to holders of Claims in the applicable Class.  Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will be paid (i) first from the Disputed Claim Reserve and (ii) if the amount available for Plan Distribution pursuant to the foregoing clause (i) is insufficient to remit Plan Distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent Distribution Date(s) from Plan Trust Assets.

**(c)**     If a Disputed Claim is disallowed, assets treated as held in the Disputed Claim Reserve on account of such Claim shall, at such time as reasonably determined by the Plan Trustee, be treated for U.S. federal income tax purposes as an additional distribution of an undivided interest in the underlying assets with respect to previously Allowed Claims.  For the avoidance of doubt, the Plan Trustee shall not be required to make any Plan Distributions as a result of any Disputed Claims that are disallowed until all Disputed Claims either become Allowed Claims or are disallowed.

**(d)**     Unless otherwise ordered by the Bankruptcy Court, the Disputed Claim Reserve shall not be used for operating expenses, costs, or any purpose other than as set forth in this Section 8.5.

### 8.6     *Distributions After Effective Date.*

Plan Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 8.7     *Plan Distributions Made by Plan Trustee.*

All Plan Distributions shall be made by the Plan Trustee on and after the Effective Date as provided herein; *provided* that, for the avoidance of doubt, following the Plan Trust Establishment Date and the Litigation Trust Establishment Date, the Plan Trustee and Litigation Trustee may make distributions of (i) Plan Trust Interests and Litigation Trust Interests, as applicable, and (ii) any Available Cash.  The Plan Trustee shall not be required to give any bond or surety or other security for the performance of its duties.  The Debtors shall use commercially reasonable efforts to provide the Plan Trustee with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' books and records.  The Debtors shall cooperate in good faith with the applicable Plan Trustee to comply with the withholding and reporting requirements outlined in Section 8.16 of this Plan.

### 8.8     *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, the Plan Trustee shall make all Plan Distributions to any holder of an Allowed Claim or its authorized designee or transferee as and when required by this Plan at (a) the address of such holder on the books and records of the Debtors or their agents, (b) at the address in any written notice of address change delivered to the Debtors or the Plan Trustee, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001, or (c) the address of the designee of such holder to the extent practicable. Subject to Section 8.9 of this Plan, in the event that any Plan Distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Plan Trustee has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

### 8.9     *Unclaimed Property.*

**(a)**     Six (6) months from the later of:  (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim or Interest is first Allowed, all Plan Distributions

payable on account of such Claim or Interest that are unclaimed pursuant to <u>Section 8.9(b)</u> shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Plan Trustee or its successor or assigns, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Plan Trustee shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

**(b)** A Plan Distribution shall be deemed unclaimed if a holder has not (i) accepted a particular distribution or, in the case of distribution made by check, by ninety (90) calendar days after issuance, negotiated such check, (ii) given notice to the Plan Trustee of an intent to accept a particular Plan Distribution, (iii) responded to the Debtors', Plan Trustee's, or Disbursing Agent's as applicable, request for information necessary to facilitate a particular Plan Distribution, or (iv) taken any other action necessary to facilitate such distribution.

### 8.10 *Satisfaction of Claims.*

Unless otherwise provided in this Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims and shall not exceed the amount of such Allowed Claims. Notwithstanding anything to the contrary in the Plan, upon the Plan Trust Establishment Date, the Plan Trust shall assume all Claims (including, for the avoidance of doubt, all Administrative Expense Claims (including Professional Fee Claims), Other Secured Claims, Priority Tax Claims, and Other Priority Claims) against the Debtors (other than the FILO DIP Claims and FILO Bridge Claims except the Retained FILO Claims) with the same validity and priority as such Claims had against the Debtors immediately prior to the Plan Trust Establishment Date and there shall be no further recourse against the Debtors with respect to such Claims.

### 8.11 *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Estate Representative, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Estate Representative. Any wire transfer fees incurred by the Estate Representative in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's Plan Distribution.

### 8.12 *Minimum Distribution.*

The Plan Trustee shall have no obligation to make a Plan Distribution that is less than $100.00 in Cash.

### 8.13 *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

### 8.14   *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in this Plan or as otherwise required by law (as determined by the Debtors or Plan Trustee), Plan Distributions with respect to an Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Allowed Claim, to any portion of such Allowed Claim for accrued but unpaid interest.

### 8.15   *Setoffs and Recoupments.*

Except as otherwise provided in this Plan, including in all respects <u>Sections 12.6(a)</u>, <u>12.6(b)</u>, <u>12.7</u>, and <u>12.8</u>, each Debtor or the Plan Trustee on behalf such Debtor, may, pursuant to applicable non-bankruptcy law, set off or recoup against any Allowed Claim and the Plan Distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that such Debtor or its successors may hold against the holder of such Allowed Claim after the Plan Trust Establishment Date. Notwithstanding the foregoing, neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Trustee, a Debtor, or an Estate or its successor of any claims, rights, or Causes of Action that the Plan Trustee, a Debtor, or an Estate or its successor or assign may possess against the holder of such Claim, except as otherwise provided in this Plan, including in all respects <u>Sections 12.6(a)</u>, <u>12.6(b)</u>, <u>12.7</u>, and <u>12.8</u>.

### 8.16   *Withholding and Reporting Requirements.*

**(a)     Withholding Rights.**  In connection with this Plan, any Entity issuing any instrument or making any distribution or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to this Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Plan Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any Entity issuing any instrument or making any Plan Distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

**(b)     Forms.**  Any party entitled to receive any property as an issuance or distribution under this Plan shall, upon reasonable request, deliver to the applicable withholding

agent or such other Entity or Estate designated by the Plan Trustee, an appropriate IRS Form W-9 or (if the payee is a foreign person) IRS Form W-8 and/or any other forms or documents, as applicable, requested by the Plan Trustee or the applicable withholding agent to reduce or eliminate any required federal, state, or local withholding. If such request is made by a withholding agent or such other Entity or Estate designated by the Plan Trustee and the party entitled to receive such property as an issuance or distribution fails to comply with any such request within ninety (90) days after the request is made, the amount of such issuance or distribution shall irrevocably revert to the Plan Trust, as applicable, and any Claim in respect of such distribution under this Plan shall be discharged and forever barred from assertion against any Debtor, Estate, the Plan Trust, and their respective property.

### 8.17 *Securities Registration Exemption.*

Any Plan Trust Interests and Litigation Trust Interests will not, and are not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Plan Trust Interests or Litigation Trust Interests constitute "securities," the offer and sale of (i) such Plan Trust Interests to the Plan Trust Beneficiaries will be exempt to the extent provided in section 1145 of the Bankruptcy Code from registration, without further action by any person, under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations requiring registration for the offer or (ii) such Litigation Trust Interests to the Litigation Trust Beneficiaries will be exempt to the extent provided in Section 4(a)(2) of the Securities Act and similar exemptions under state securities laws. Any such Plan Trust Interests and Litigation Trust Interests shall be subject to the limitations set forth in their respective trust agreements in a manner consistent with this Plan.

### 8.18 *Disbursing Agent.*

(a) The Plan Trustee shall have the authority to enter into agreements with one or more Disbursing Agents to facilitate the distributions required under the Plan, the Confirmation Order, and the Plan Trust Agreement. The Plan Trustee may pay to the Disbursing Agent all reasonable and documented fees and expenses of the Disbursing Agent without the need for other approvals, authorizations, actions or consents. For the avoidance of doubt, the reasonable and documented fees of the Disbursing Agent will be paid by the Plan Trustee and will not be deducted from distributions to be made under the Plan to holders of Allowed Claims receiving distributions from the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

(b) From and after the Confirmation Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against the Debtors, the Plan Trust Beneficiaries, and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent. No holder of a Claim, a Plan Trust Beneficiary, or other party in interest shall have or pursue any claim or Cause of

Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making Plan Distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

**(c)** The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all Plan Distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**(d)** Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Plan Trust in the ordinary course of business.

## ARTICLE IX.    PROCEDURES FOR RESOLVING CLAIMS.

### 9.1    *Allowance of Claims.*

The Estate Representative shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim.

### 9.2    *Objections to Claims.*

As of the Plan Trust Establishment Date, objections to Claims against the Debtors may be interposed and prosecuted only by the Plan Trustee. Any objections to Claims shall be served and filed (i) on or before one hundred and eighty (180) days following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court; *provided* that the Estate Representative may extend the Claim Objection Deadline for an additional one hundred and eighty (180) days in their sole discretion upon the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing

### 9.3    *Estimation of Claims.*

The Estate Representative may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to

any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Estate Representative may pursue supplementary proceedings to object to the allowance of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated.

### 9.4 *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan without further notice or Bankruptcy Court approval.  Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Plan Trust Establishment Date, the Plan Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Plan Trust may hold against any Person, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.

### 9.5 *Adjustment to Claims Register Without Objection.*

Any Claim or Interest that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Estate Representative upon agreement between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 9.6 *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.  Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or Plan Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 9.7 *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Plan Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan.  On a date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Plan Trustee in the Plan Trustee's sole discretion, the Plan Trustee shall provide to the holder of such Claim the

Plan Distribution (if any) to which such holder is entitled under this Plan, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code. For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, the Plan Trustee shall not be required to make any Plan Distributions on account of Disputed Claims that become Allowed Claims or as a result of any Disputed Claims that are disallowed until all Disputed Claims either become Allowed Claims or are disallowed. Notwithstanding anything contained herein, to the extent that a Disputed Claim becomes an Allowed Claim after the Plan Trust Establishment Date or Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Plan Trust Establishment Date or Effective Date (as applicable).

### 9.8 *Elimination of Duplicate Claims.*

Any Proof of Claim filed against one or more of the Debtors shall be deemed to be a single Claim, and all duplicate Proofs of Claim for the same Claim filed against more than one Debtor shall be deemed disallowed and expunged.

### 9.9 *Late Filed Claims.*

Except as otherwise provided herein or as agreed to by the Debtors or Plan Trustee, (i) any Proof of Claim filed after the Bar Date with respect to such Claim and (ii) any proof of Administrative Expense Claim filed after the applicable Administrative Expense Claims Bar Date with respect to such Administrative Expense Claim, shall be deemed Disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims and such Administrative Expense Claims may not receive any Plan Distributions on account of such Claims and such Administrative Expense Claims, unless such late Proof of Claim or such proof of Administrative Expense Claim, as applicable, has been deemed timely filed by a Final Order.

### 9.10 *Amendments to Claims.*

A Claim may not be filed, amended, or supplemented without the prior written authorization of the Bankruptcy Court or the Plan Trustee, and any such new, amended, or supplemented Claim filed without such written authorization shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

### 9.11 *Insured Claims.*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies, other than with respect to any policies issued by TRACO or its predecessors. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court; *provided* that, to the extent that a holder receives a Plan Distribution on account of any portion of an Allowed Claim that is an Insured Claim that is thereafter satisfied by insurance proceeds, the holder shall promptly return that portion of the Plan Distribution attributable to the portion of such Claim so satisfied.

**9.12** ***Medical Liability Claims Procedures.***

All Medical Liability Claims against the Debtors shall be reconciled in accordance with the Medical Liability Claims Procedures. Following entry of the Confirmation Order, the automatic stay shall remain in effect with respect to all Medical Liability Claims against the Debtors and shall only be modified in accordance with the Medical Liability Claims Procedures. To the extent the automatic stay was previously lifted in the Chapter 11 Cases with respect to any particular Medical Liability Claim, upon entry of the Confirmation Order, the automatic stay shall be reimposed and remain in effect unless or until modified in accordance with the Medical Liability Claims Procedures.

**ARTICLE X.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

**10.1** ***Rejection of Executory Contracts and Unexpired Leases.***

**(a)**      As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are a party shall be deemed rejected except for an executory contract or unexpired lease that: (i) is specifically and expressly designated as a contract or lease to be assumed pursuant to this Plan, including as set forth in the Schedule of Assumed Contracts or Confirmation Order; (ii) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate assumption or rejection motion filed by the Estate Representative on or before the Effective Date; (v) is the subject of a pending Cure Dispute; (vi) is a contract, lease, or other agreement or document entered into in connection with the Plan; or (vii) is a D&O Policy or other insurance policy to which any Debtor or Estate Representative is a beneficiary or an insured. For the avoidance of doubt, the Estate Representative may seek to assume, assume and assign, or reject an executory contract or unexpired lease at any time prior to the Effective Date, whether or not such executory contract or unexpired leases is listed on the Schedule of Assumed Contracts.

**(b)**      Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Debtors, the Plan Trustee, or the assignee of such executory contract or unexpired lease (as applicable) have provided adequate assurance of future performance under such executory contract or unexpired lease. Each executory contract or unexpired lease assumed pursuant to this Plan shall vest in and be fully enforceable by the applicable Debtor in accordance with its terms, except as modified by the provisions of this Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law, and shall be assigned by the Debtors to the Plan Trust pursuant to this Plan on the Effective Date. Notwithstanding anything to the contrary herein, all rights and obligations of the Debtors under or with respect to any executory contracts and unexpired leases to which any of the Debtors are a party shall vest in the Plan Trust on the Plan Trust Establishment Date, whether or not such executory contracts or unexpired leases are otherwise pending assumption, assumption and assignment, or rejection in accordance with Section 10.1(a) of this Plan, and the Plan Trust shall have all rights of the Debtors

to assume, assume and assign, or reject such executory contracts and unexpired leases on or prior to the Effective Date.

(c)     Assumption of any executory contract or unexpired lease pursuant to this Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the Effective Date.

## 10.2   *Survival of Indemnification Obligations.*

Any and all obligations of the Debtors to indemnify, defend, reimburse, or limit the liability of current and former officers, directors, members, managers, agents, or employees against any Claims or Causes of Action as provided in the Debtors' corporate charters, bylaws, other organizational documents, other agreements, or applicable law shall survive confirmation of the Plan, and shall be assumed by such Debtor solely to the extent necessary to recover and have access to insurance proceeds. Any indemnification claims arising under the foregoing documents shall be treated as General Unsecured Claims against the Debtors to the extent Allowed. Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, solely for the purposes described in the first sentence of this Section 10.2.

## 10.3   *Determination of Cure Disputes and Deemed Consent.*

Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Estate Representative may otherwise agree.

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts. At least fourteen (14) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to potentially be assumed or assumed and assigned to the Plan Trust, reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any). **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.** Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct

or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or its Estate, as applicable. Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 10.3, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

If there is a Cure Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided* that the Estate Representative may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent a Cure Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Cure Dispute; *provided* that the Debtors or the Plan Trustee reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to the extent such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtors and the Plan Trustee). The Debtors or the Plan Trustee may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired leases.

### 10.4 *Rejection Damages Claims*.

Unless an earlier date is otherwise provided for by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' executory contracts or unexpired leases pursuant to this Plan, must be filed with Bankruptcy Court and served on the Claims and Noticing Agent no later than twenty-one (21) days after the Effective Date.

Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, or (ii) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, the Plan Trust, the Plan Trustee, or the property for any of the foregoing without the need for any objection by the Plan Trustee or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims, except as otherwise provided by Final Order of the Bankruptcy Court.

### 10.5 *Joint Ventures.*

Notwithstanding anything to the contrary in this Plan, all shareholders' agreements, nominee agreements, call option agreements, and other agreements in respect of joint venture entities to which a Debtor or the Plan Trust is a party are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless otherwise specifically assumed.

### 10.6 *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments related thereto, as of the Effective Date (or on such earlier date as determined by the Estate Representative, in consultation with the Creditors' Committee), shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor and shall continue in full force and effect thereafter in accordance with their respective terms and vest in the Plan Trust. All officers, managers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Policies in effect as of, or purchased on or before, the Effective Date for the full term of such D&O Policies regardless of whether such officers, managers, directors, agents, and/or employees remain in such positions as of the Effective Date, in each case, to the extent set forth in such D&O Policies. Nothing in the Plan shall alter, supplement, change, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the Debtors' insurance policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including the conditions, limitations, and/or exclusions) of the insurance policies, and thus the rights or obligations thereof, are subject to the Bankruptcy Code and applicable law. For the avoidance of doubt, the transfer of the rights of the Debtors and the Estates to recover proceeds from D&O Policies to the Litigation Trust and the Plan Trust, as applicable, shall not hinder the ability of any beneficiaries or insureds of such D&O Policies to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

### 10.7 *Assignment.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned to the Litigation Trust (subject to the consent of the FILO Parties) or Plan Trust hereunder, if applicable, shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

### 10.8 *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

### 10.9 *Reservation of Rights.*

**(a)** Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors, the Estates, the Plan Trust, or the Plan Trustee or their respective Affiliates has any liability thereunder.

**(b)** Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors, the Estates, the Plan Trust, or the Plan Trustee under any executory or non-executory contract or unexpired or expired lease.

**(c)** Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Estates, the Plan Trust, or the Litigation Trust, as applicable, under any executory or non-executory contract or unexpired or expired lease.

**(d)** If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Estate Representative shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE XI.   CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.

### 11.1   *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

**(a)**   the Disclosure Statement Order shall have been entered;

**(b)**   the Litigation Trust Establishment Date has occurred, including the transfer of the Litigation Trust Assets to the Litigation Trust;

**(c)**   the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

**(d)**   the Confirmation Order shall have been entered by the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction, which Confirmation Order shall be in form and substance reasonably acceptable to the Creditors' Committee;

**(e)**   all actions, documents, certificates, and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

**(f)**   all authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received; and

**(g)**   the Professional Fees Escrow Account and the Wind Down Reserve (in accordance with the Wind Down Budget) shall have been fully funded as provided for in this Plan.

### 11.2   *Waiver of Conditions Precedent.*

**(a)**   Each of the conditions precedent to the occurrence of the Effective Date of the Plan set forth in this ARTICLE XI may be waived, in whole or in part, by the Debtors with the consent of the Creditors' Committee, not to be unreasonably withheld, without leave of or order of the Bankruptcy Court; *provided* that the condition precedent to the occurrence of the Effective Date of the Plan set forth in Section 11.1(b) may be waived only with the consent of the Debtors, the Creditors' Committee, and the FILO DIP Agent.

**(b)**   Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

**(c)**   The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 11.3   *Effect of Failure of a Condition.*

If the Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against any Interests in the Debtors, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other Entity; *provided* that, notwithstanding the foregoing, all actions authorized to be taken pursuant to the Confirmation Order, FILO Settlement Order, and Section 8.10 hereof, and all terms of the Confirmation Order, FILO Settlement Order, and Section 8.10 shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not revert to the Debtors or the Estates.

### 11.4   *Effect of Vacatur of Confirmation Order.*

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise; *provided* that, notwithstanding the foregoing, all actions authorized to be taken pursuant to the Confirmation Order, FILO Settlement Order, and Section 8.10 hereof, and all terms of the Confirmation Order, FILO Settlement Order, and Section 8.10 shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not revert to the Debtors or the Estates.

## ARTICLE XII.    EFFECT OF CONFIRMATION.

### 12.1   *Binding Effect.*

As of the Confirmation Date, this Plan shall bind (i) the Debtors; (ii) the Plan Administrator Committee; (iii) the Plan Trustee and the Plan Trust; (iv) the Litigation Trustee and the Litigation Trust; (v) all holders of Claims against and Interests in the Debtors and their respective successors and assigns, regardless of whether any such holders were (a) Impaired or Unimpaired under this Plan, (b) presumed to accept or deemed to reject this Plan, (c) failed to vote to accept or reject this Plan, (d) voted to reject this Plan, and/or (e) received any Plan Distribution under the Plan; (vi) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan; (vii) each Entity acquiring property under this Plan and the Confirmation Order; and (viii) any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

### 12.2   *Vesting of Assets.*

Except as otherwise provided in this Plan (including in all respects Sections 12.6(a), 12.6(b), 12.7, and 12.8), the Plan Supplement, or the Confirmation Order, on and after the

Litigation Trust Establishment Date and Plan Trust Establishment Date (as applicable), pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with this Plan or the Plan Supplement, shall vest in the Litigation Trust and the Plan Trust (as applicable) free and clear of all Claims, Liens, encumbrances, charges, constructive trusts, and other interests to the extent permitted under applicable law. Subject to the terms of this Plan and the Litigation Trust Agreement and Plan Trust Agreement, on and after the Plan Trust Establishment Date or Litigation Trust Establishment Date (as applicable), the Plan Trustee or Litigation Trustee (as applicable) may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order. Without limiting the foregoing, the Plan Trustee may pay the charges that it incurs on behalf of the Estates after the Confirmation Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court. In addition, all rights, benefits, and protections provided to the Debtors or their Estates pursuant to the Plan, the Plan Supplement, or the Confirmation Order including, but not limited to, the release, exculpation, and injunction provisions provided in Section ARTICLE XII of the Plan, shall vest in the Litigation Trust and the Plan Trust, as applicable, unless expressly provided otherwise by the Plan or the Confirmation Order.

### 12.3 *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in this Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

As set forth in Section 9.12 of this Plan, following entry of the Confirmation Order, the automatic stay shall remain in effect with respect to all Medical Liability Claims against the Debtors and shall only be modified in accordance with the Medical Liability Claims Procedures. To the extent the automatic stay was previously lifted in the Chapter 11 Cases with respect to any particular Medical Liability Claim, upon entry of the Confirmation Order, the automatic stay shall be reimposed and remain in effect unless or until modified in accordance with the Medical Liability Claims Procedures.

### 12.4 *Injunction Against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date.

**12.5** *Plan Injunction.*

(a)     Except as otherwise expressly provided in this Plan, or for distributions required to be paid or delivered pursuant to this Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under Section 12.6(a) or Section 12.6(b) of this Plan, or (ii) subject to exculpation pursuant to Section 12.7 of this Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 12.7 of this Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:  (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to this Plan, including pursuant to Section 12.6(a) or Section 12.6(b) of this Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of this Plan.

(b)     Subject in all respects to Section 13.1 of this Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure

Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under this Plan or, with respect to an Exculpated Party, been exculpated under this Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in <u>Section 13.1</u> of this Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

       **(c)** By participating in the Plan by voting or by accepting Plan Distributions pursuant to this Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to this Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in this <u>Section 12.5</u>, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

       **(d)** The injunctions in this <u>Section 12.5</u> shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

       **12.6** *<u>Releases.</u>*

       **(a) Releases by the Debtors and their Estates. Except as otherwise expressly set forth below in this <u>Section 12.6</u>, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable**

consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or the Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in this <u>Section 12.6(a)</u> (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive

Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with <u>Section 4.6</u> of this Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on <u>Exhibit B</u> of this Plan or the Schedule of Identified Non-Released Parties.

(b)      **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the

transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or the Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases contained in this **Section 12.6(b)** (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by or against the FILO Parties arising from a material misrepresentation, or (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party.  Nothing contained in this Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)	Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

### 12.7 _Exculpation._

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation,

preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in this Section 12.7 shall not release or exculpate (a) any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 12.8    *Waiver of Statutory Limitation on Releases.*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER ARTICLE XII OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 12.6 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### 12.9    *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to this Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

**12.10  _Subordinated Claims._**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right, to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**12.11  _Retention of Causes of Action and Reservation of Rights._**

Except as otherwise provided in this Plan, including in all respects <u>Sections 12.6(a)</u>, <u>12.6(b)</u>, <u>12.7</u>, and <u>12.8</u>, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  Except as otherwise provided in this Plan, including in all respects <u>Sections 12.6(a)</u>, <u>12.6(b)</u>, <u>12.7</u>, and <u>12.8</u>, the Debtors, the Plan Trust, and the Litigation Trust, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**12.12  _Ipso Facto and Similar Provisions Ineffective._**

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, or (iii) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation.

**12.13  _Solicitation of Plan._**

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer,

issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 12.14 *Corporate and Limited Liability Company Action.*

Upon the Plan Trust Establishment Date or the Effective Date, as applicable, all actions contemplated by the Plan (including any action to be undertaken by the Plan Trust) shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Plan Trust Establishment Date or the Effective Date, as applicable, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, members, managers, or officers of the Debtors, the Plan Trust, or the Plan Trustee. On or as (as applicable) before the Effective Date, the authorized officers of the Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan). The authorizations and approvals contemplated by this Section 12.14 shall be effective notwithstanding any requirements under non-bankruptcy law.

### 12.15 *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Plan Trust.

## ARTICLE XIII.    RETENTION OF JURISDICTION.

### 13.1 *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to sections 1334 and 157 of title 28 of the United States Code, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that Plan Distributions to holders of Allowed Claims and Interests are accomplished as provided in this Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under this Plan;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any administrative or priority Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of claims or interests;

(f)    to hear and determine settlements and disputes with respect to any Plan Trust Asset, including any Cause of Actions transferred to the Plan Trust;

(g)    to hear and determine settlements and disputes with respect to any Litigation Trust Asset, including any Cause of Actions transferred to the Litigation Trust;

(h)    to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motions, adversary proceeding, application, contested matter or other litigated matter brought by the Plan Trustee or the Litigation Trustee, including any disputes between the Litigation Trustee and the Estate Representative as set forth in the Litigation Trust Agreement and Section 5.8 of the Plan;

(i)    to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(j)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(k)    to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, the Confirmation Order, or any order of the Bankruptcy Court, in such a manner as may be necessary to carry out the purposes and effects thereof;

(l)    to hear and determine all Professional Fee Claims;

(m)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(n)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(o)     to hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan;

(p)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, Plan Supplement, and Confirmation Order;

(q)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(r)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(s)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(t)     to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date or Administrative Expense Claims Bar Date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(u)     to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE XII of this Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

(v)     to enforce all orders previously entered by the Bankruptcy Court

(w)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(x)     to recover all Assets of the Plan Trust, the Litigation Trust, the Debtors and property of the Estates, wherever located;

(y)     to hear and determine all disputes between the Debtors or Plan Trust, on one hand, and the Litigation Trustee, on the other; and

      **(z)**      to enter a final decree closing each of the Chapter 11 Cases;

*provided*, *however*, that (i) any mediation requirements in the FILO Settlement Term Sheet, the Litigation Trust Agreement, the Litigation Funding Agreement, the Transition Services Agreement, the Trustee Engagement Letter (as defined in the FILO Settlement Order), and the DIP Amendment (as defined in the FILO Settlement Order) shall be given full force and effect and (ii) to the extent the Bankruptcy Court lacks, or otherwise abstains from exercising, jurisdiction over any matter relating to the FILO Settlement Term Sheet, the Litigation Trust Agreement, the Litigation Funding Agreement, the Transition Services Agreement, the Trustee Engagement Letter (as defined in the FILO Settlement Order), and the DIP Amendment (as defined in the FILO Settlement Order), then the applicable jurisdictional, forum selection, and dispute resolution clauses in such documents shall govern.

### 13.2    *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.    MISCELLANEOUS PROVISIONS.

### 14.1    *Statutory Fees.*

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors or the Plan Trustee in full on the Effective Date. As of the Plan Trust Establishment Date, the Plan Trustee shall assume primary responsibility for the payment of all Statutory Fees. On and after the Plan Trust Establishment Date, the Plan Trustee shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, each Debtor or Plan Trustee, as applicable, shall remain obligated to file post-confirmation quarterly reports and to pay Statutory Fees to the U.S. Trustee until the earliest of that particular Debtor's, or Plan Trustee's (on behalf of a Debtor), as applicable, case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of Statutory Fees.

### 14.2    *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (b) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Confirmation Order), shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, document recording tax, intangibles

or similar tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 14.3 *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee, if any, shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases. The Debtors or the Plan Trust, as applicable, shall not be responsible for paying the fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

### 14.4 *Request for Expedited Determination of Taxes of the Debtors.*

The Debtors, Plan Administrator Committee, and Plan Trustee shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Debtors filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Wind Down Completion Date.

### 14.5 *Dates of Actions to Implement Plan.*

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 14.6 *Amendments.*

(a) **Plan Modifications.** This Plan may be amended, supplemented, or otherwise modified by the Debtors (with the consent of the Creditors' Committee, not to be unreasonably withheld, conditioned, or delayed) in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; *provided* that any amendment, supplement, or modification that adversely affects the Litigation Trust shall also require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent) (such consent, not to be unreasonably withheld, conditioned, or delayed). In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, supplemented, or otherwise modified.

(b) **Certain Technical Amendments.** Prior to the Effective Date, the Debtors (with the consent of the Creditors' Committee, not to be unreasonably withheld, conditioned, or

delayed) may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do not adversely affect in a material way the treatment of the holders of Claims or Interests under this Plan; *provided* that any adjustment or modification that adversely affects the Litigation Trust shall also require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent) (such consent, not to be unreasonably withheld, conditioned, or delayed).

### 14.7    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date.  If this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur on the Effective Date, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, any Debtor or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims, or (iii) constitute an admission, acknowledgement, offering, or undertaking of any sort by any Debtor or any other Entity; *provided* that notwithstanding the foregoing all actions authorized to be taken pursuant to the Confirmation Order and FILO Settlement Order and all terms of the Confirmation Order and FILO Settlement Order shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not revert to the Debtors or the Estates.

### 14.8    *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 14.9    *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 14.10    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that this Plan or the Confirmation Order provides otherwise, the rights, duties, and obligations arising under this Plan and the Confirmation Order shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 14.11 _Immediate Binding Effect._

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Confirmation Date, the terms of this Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Plan Trustee, the Litigation Trustee, the holders of Claims or Interests (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected this Plan), the Released Parties, and each of their respective successors and assigns.

### 14.12 _Successors and Assigns._

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

### 14.13 _Entire Agreement._

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### 14.14 _Severability of Plan Provisions._

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Trust (as the case may be), and (c) non-severable and mutually dependent.

### 14.15 _Additional Documents._

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Plan Trustee, the Litigation Trustee, and all holders of Claims receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 14.16 *Deemed Acts*.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 14.17 *Computing Time*.

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 14.18 *Exhibits to Plan*.

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full in this Plan.

### 14.19 *Notices*.

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

(1) If to the Debtors, to:

**Steward Health Care System LLC**
2811 McKinney Avenue, Suite 300
Dallas, Texas 75204.
Attn: John R. Castellano, Chief Restructuring Officer
Email: JCastellano@alixpartners.com

with a copy (which will not constitute notice) to:

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, New York 10153
Attn:   Jeffrey D. Saferstein
         Jason H. George
Email: jeffrey.saferstein@weil.com
         jason.george@weil.com

-and-

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Attn:   Clifford W. Carlson

90

Stephanie N. Morrison
Email: clifford.carlson@weil.com
        stephanie.morrison@weil.com

-and-

1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Attn:   David J. Cohen
Email: davidj.cohen@weil.com

-and-

**Latham & Watkins LLP**
1271 Avenue of Americas
New York, New York 10020
Attn:   Ray C. Schrock
        Candace M. Arthur
Email: ray.schrock@lw.com
        candace.arthur@lw.com

(2) If to the Creditors' Committee, to:

**Akin Gump Strauss Hauer & Feld LLP**
One Bryant Park
New York, New York 10036
Attn:   Ira S. Dizengoff
        Brad M. Kahn
        Avi E. Luft
Email: idizengoff@akingump.com
        bkahn@akingump.com
        aluft@akingump.com

-and-

2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Attn: Sarah Link Schultz
Email: sschultz@akingump.com

(3) If to the Plan Trustee to:

**Force Ten Partners, LLC**
100 Crescent Court, 7th Floor
Dallas, Texas 75201
Attn:   Monica Blacker

Email: mblacker@force10partners.com

with a copy (which will not constitute notice) to:

**McGuireWoods LLP**
Texas Tower
845 Texas Ave., Suite 2400
Houston, Texas 77002
Attn:  Demetra Liggins
Email: dliggins@mcguirewoods.com

-and-

**Weil, Gotshal & Manges LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Attn:  David J. Cohen
Email: davidj.cohen@weil.com

-and-

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Attn:  Clifford W. Carlson
      Stephanie N. Morrison
Email: clifford.carlson@weil.com
      stephanie.morrison@weil.com

(4) If to the Litigation Trustee to:

**Province Fiduciary Services, LLC**
2360 Corporate Circle, Suite 340
Henderson, Nevada 89074
Attn:  Mark Kronfeld
Email: mkronfeld@provincefirm.com

with a copy (which shall not constitute notice) to:

**Province, LLC**
2360 Corporate Circle, Suite 340
Henderson, Nevada 89074
Attn:  David W. Dachelet, Esq.
Email: ddachelet@provincefirm.com

(5) If to the FILO Parties to:

**Milbank LLP**
55 Hudson Yards
New York, New York 10001
Attn:   Mike Price
        Andrew Harmeyer
        Brian Kinney
Email: mprice@milbank.com
        aharmeyer@milbank.com
        bkinney@milbank.com

After the occurrence of the Effective Date, the Debtors and the Plan Trustee have authority to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. Notwithstanding the foregoing, the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Debtors and the Plan Trustee are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

### 14.20   *Reservation of Rights.*

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

[*Remainder of Page Intentionally Left Blank*]

Docusign Envelope ID: 309BE97B-52AF-42BF-B947-1AF68D4DE2A9

Dated: July 11, 2025
Chicago, Illinois

Respectfully submitted,

By: /s/ _____

Name: John R. Castellano
Title: Chief Restructuring Officer

*On behalf of Steward Health Care System LLC
and each of Its Debtor Affiliates*

*Signature Page to Joint Chapter 11 Plan*

## Exhibit A

### Individual Released Parties

- Alan Carr
- Carlos Hernandez
- David Barnhardt
- Eugene (Jay) Sullivan
- Gail Schlesinger
- General H.R. McMaster
- Henry (Nick) Nickells
- Jeffrey Morales
- Jennifer Hunt
- John Boehner
- John Castellano
- Joseph Weinstein
- Katchena Potter
- Mary Beth Taylor
- Nathalie Hibble
- Octavio Diaz
- Rich Iannessa
- Sr. Vimala Vadakumpadan
- Susan Brown
- William Transier

## Exhibit B

### Identified Non-Released Parties

- Alessandra Pace
- Armin Ernst
- Brian Carty
- Christopher Dunleavy
- Craig Jesiolowski
- David Chicoine
- David Friend
- David Morales
- Herbert Holtz
- James Karam
- James Lenehan
- Jill Moretto
- John Polanowicz
- Joseph Ciccolo
- Joseph Maher
- Joshua Putter
- Mark Girard
- Mark Rich
- Michael Callum
- Miroslav Boyanov
- Nadine Delicata
- Ralph de la Torre
- Robert Guyon
- Ruben King-Shaw Jr.
- Sanjay Shetty

- 5326 Old Buena Vista Road LLC
- Ad Astra Per Aspera LLC
- CareMax, Inc.
- Cayman TRS Holdings
- Cerberus Capital Management, L.P.
- Cerberus International II Master Fund LP
- Cerberus Partners II LP
- Cerberus Series Four Holdings LLC
- de la Torre Foundation
- de la Torre Family Foundation
- Management Health Services Colombia S.A.S.
- Management Health Services LLC
- Manolete Health Investors LLC
- Manolete Health LLC
- Medical Properties Trust, Inc.
- MPT Sycamore Opco LLC
- Ralph de la Torre Revocable Trust
- RDLT – SHCI Investor LLC
- RDLT – SHCI Manager LLC
- Sagamore Capital Management, LLC
- Santa Clara Holdings LLC
- Sparta Holding Co. LLC
- Steward Health Care International
- Steward Health Care International (Malta) Ltd
- Steward Health Care International Colombia S.A.S.
- Steward Health Care Investors LLC
- Steward Health Care International Investors LLC
- Steward Health Care International Kingdom of Saudi Arabia, S.L.
- Steward Health Care International Ltd
- Steward Health Care International S.L
- Steward Malta Assets Ltd
- Steward Malta Ltd
- Steward Malta Management Ltd
- Steward Malta Personnel Limited
- Steward Management Holdings LLC
- Tenet Healthcare Corporation
- TRACO International Group S. DE R.L.

**Exhibit C**

**FILO Settlement Term Sheet**

## SETTLEMENT AND STAY RELIEF TERM SHEET

### April 28, 2025

This Term Sheet sets forth the material substantive terms pursuant to which the Debtors, the FILO DIP/Bridge Agent and Lenders (the "FILO Parties"), and the Unsecured Creditors Committee ("UCC") will support entry of an order resolving requests for relief from the stay by the FILO Parties.

1. This Term Sheet must be approved by an order of the Bankruptcy Court, pursuant to sections 361, 362, 363 and 105 of the Bankruptcy Code and Bankruptcy Rules 4001(d)(iii), 6004, and 9019 (the "Approval Order"), entered not later than May 28, 2025 (the "Approval Milestone"). In addition, the Debtors shall file a motion seeking the Bankruptcy Court's approval of the Approval Order (the "Approval Motion") by no later than April 28, 2025 (the "Motion Milestone"). If the Debtors do not satisfy either the Motion Milestone or the Approval Milestone, this agreement will be of no further force or effect.[1]

2. All of the Estate (as defined below) assets identified on **Schedule 1** hereto (the "Litigation Trust Assets") will be transferred free and clear (to the fullest extent permissible by applicable law) to the "Litigation Trust," a trust to be created. The Estate assets that are not Litigation Trust Assets shall be retained by the Estate (the "Retained Assets").[2] The terms of the

---

[1] The milestones and other dates and deadlines contained herein may be extended by e-mail agreement amongst counsel to the Debtors, FILO Parties, and UCC.

[2] The Retained Assets shall include, without limitation, (i) the Estate's reversionary interests (if any) in the Professional Fees Escrow Account, the Physician Insurance Account (each as defined in the FILO DIP Order (Docket No. 1538)), the Expense Escrow Account (as defined in the MPT Settlement Order (Docket No. 2610)), and in each case, the amounts deposited therein, and (ii) any equity interests in any Debtor. To the extent that the Estate realizes cash or other value on account of any Retained Assets that comprise, would have comprised or are derived from FILO DIP collateral ("Retained Collateral") (which shall exclude, for the avoidance of doubt, the Class B interests, any proceeds thereof, and any proceeds funded to, advanced to, or authorized to be used by the Estate in accordance with this Term Sheet) the Estate shall promptly turn over such cash or other value to the Litigation Trust for distribution in accordance with the Litigation Trust's distribution waterfall. To the extent that any Retained Collateral is identified that could be monetized for value, the Estate shall use commercially reasonable efforts to monetize such Retained Collateral in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee at the Litigation Trust's sole expense and paid in advance pursuant to the TSA (for the avoidance of doubt, any reasonable and documented costs incurred by the Estate in connection with such agreed upon monetization process shall be charged to the Litigation Trust at the Estate's cost). The Approval Order shall provide that from and after the Trust Establishment Date (as defined below), the Retained Collateral (which includes, for the avoidance of doubt, all proceeds derived therefrom) shall be held in trust exclusively for the benefit of

Litigation Trust will be governed by a trust agreement consistent with this Term Sheet and otherwise mutually agreeable to the parties, with approval not to be unreasonably withheld, conditioned or delayed (the "<u>Litigation Trust Agreement</u>").

3.   The Approval Order will provide that the Litigation Trust Assets will be transferred to the Litigation Trust on the earlier of (i) July 8, 2025; and (ii) one (1) business day after the confirmation date of any confirmed plan (the actual date of transfer of the assets is the "<u>Trust Establishment Date</u>"). The Debtors and FILO DIP Lenders will enter into an amendment to the FILO DIP credit agreement providing for an extension of the FILO DIP maturity date through (i) in the first instance, the Motion Milestone, (ii) if the Debtors satisfy the Motion Milestone, the Approval Milestone, and (iii) if the Debtors satisfy the Approval Milestone, through the date by which the Litigation Trust Assets are required to have been transferred to the Litigation Trust pursuant to the immediately preceding sentence. It shall be an Event of Default under the FILO DIP Credit Agreement if the Debtors or UCC materially breach their respective obligations to the FILO Parties under this Term Sheet or the Plan Support Agreement Term Sheet, and such breach is not cured within three business days of the FILO Parties providing written notice of such breach to Debtors' and UCC's counsel.

4.   On the Trust Establishment Date, the releases set forth in **<u>Exhibit A</u>** shall go into full force and effect; provided that, for the avoidance of doubt, the release will not include (i) $10 million of principal claims outstanding under the FILO Bridge facility (the "<u>Retained FILO Claim</u>"), which shall, until the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, remain secured by the Retained Cash and any other assets of the Debtors' estates or any successor(s) thereto (collectively, the "<u>Estate</u>") (provided that the negative pledge provisions and other rights and entitlements of the Litigation Trust with respect to the Retained Collateral shall survive and remain unaffected notwithstanding such timely occurrence of the Confirmation Milestone or satisfaction of the Retained FILO Claim); or (ii) the rights or entitlements of the FILO Parties or the Litigation Trust contemplated by this Term Sheet or the Plan Support Agreement Term Sheet (or any further documentation memorializing the same), including, without limitation, the FILO Parties' rights to receive Retained Cash as a paydown on the Class A-

---

the Litigation Trust and shall be subject to a negative pledge by the Estate and not made available (pursuant to subsequent order of the court or otherwise) other than for distribution in accordance with the Litigation Trust's distribution waterfall as contemplated by this footnote 2.

2 Preference pursuant to paragraph 6 of this Term Sheet and the Litigation Trust's rights under the TSA.

5. As a condition precedent to the effectiveness of this Term Sheet, (i) the Debtors shall have made a prepayment of the FILO DIP Loans by April 28, 2025, in the amount of no less than $30.3 million (the "<u>Required Prepayment</u>"), and (ii) the Debtors and the FILO Parties shall have executed an amendment to the FILO DIP Credit Agreement (the "<u>DIP Amendment</u>") approving the budget annexed to the DIP Amendment (the "<u>DIP Budget</u>").

6. The Debtors will hold $15 million (the "<u>Retained Cash</u>") in a third-party escrow account subject to the lien of the Retained FILO Claim.  If the Retained Cash is not authorized to be utilized by the Debtors pursuant to an order confirming a chapter 11 plan consistent with the terms of Section 1 of the Plan Support Agreement Term Sheet ("<u>Plan</u>"), which order is entered on or prior to August 1, 2025 (the "<u>Confirmation Milestone</u>"), the Retained Cash will be paid to the FILO Parties as a paydown on the Retained FILO Claim until paid in full in cash and the remainder as a paydown on the Class A-2 Preference.  If an order confirming the Plan is entered prior to the Confirmation Milestone, the Debtors may use the Retained Cash for any purposes authorized under the Plan.

7. The Litigation Trust will be governed pursuant to the Litigation Trust Agreement creating and governing the Litigation Trust:

    a. The Litigation Trust will have three beneficiary classes:

        i. Class A-1 interests, which shall (i) represent the rights and entitlements of the parties that from time to time extend or are deemed to have extended funding under the Litigation Funding (the "<u>Litigation Funders</u>") and their representative (the "<u>Litigation Funding Agent</u>") and (ii) have a distribution and liquidation preference as set forth in this Term Sheet.

        ii. Class A-2 interests will be held by the FILO Parties and their successors, which interests shall have a distribution and liquidation preference as set forth in this Term Sheet (together with the Class A-1 interests, the "<u>Class A interests</u>").

        The definitive documentation will provide that the Class A interests will only be transferrable (i) pursuant to an available exemption under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or a registration of such Class A

3

interests under the Securities Act, and (ii) so long as any proposed transfer would not result in a requirement that the Class A interests be registered under the Securities Act. Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class A interests would be effectuated, and shall entitle the Litigation Trustee (as defined below) to, in its reasonable discretion at any time the Class A interests are not registered, and other than with respect to a transfer by operation of law, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

The definitive documentation shall also contain customary representations and warranties of each initial holder of the Class A interests to the effect that it is an accredited investor and a qualified institutional buyer, possesses appropriate investment experience, and is acquiring the interests for its own account and not with a view toward distribution. To the extent such representations cannot be made by each FILO Party on the date of issuance, then at any time the Class A interests are not registered, all such Class A interests shall be non-transferable (other than by will, intestate, or operation of law).

The FILO Agent or its designee, acting at the direction of FILO Parties holding Class A-2 interests entitled to a majority in amount of the outstanding Class A-2 Preference, shall be the representative of the Class A-2 interests (the "Class A-2 Representative").

iii. Class B interests will be held by Steward Health Care Holdings LLC, on behalf of the Estate, or by any successor entity that may be established under a confirmed plan (each, a "Successor Entity").

The definitive documentation will provide that the Class B interests will only be transferrable (i) to any liquidating trust

or other similar vehicle formed under and following a confirmed plan or otherwise formed pursuant to applicable law or (ii) (A) pursuant to an available exemption under the Securities Act of 1933, as amended (the "Securities Act") and so long as any proposed transfer would not result in a requirement that the Class B interests be registered under the Securities Act, or a registration of such Class B interests under the Securities Act, and (B) if such transfer is to occur prior to the effective date of any confirmed plan, with the consent of the Litigation Trustee (not to be unreasonably withheld, conditioned or delayed) if the purpose of the transfer is to obtain proceeds to pay costs and expenses of the Successor Entity, including taxes. Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class B interests would be effectuated, and other than with respect to a transfer by operation of law or pursuant to bankruptcy court order or confirmed plan, shall entitle the Litigation Trustee to, in its reasonable discretion at any time the Class B interests are not registered, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

There shall be a single representative of the Class B interests at any given time (the "Class B Representative"), which shall initially be the Transformation Committee, on behalf of the Estate. If a plan is confirmed, the terms of the Plan and the Confirmation Order will determine the successor Class B Representative on or before the Effective Date of the Plan. If the Chapter 11 Cases are converted to Chapter 7 cases, the Chapter 7 Trustee (or its designee) will be the Class B Representative.

iv. Any right to receive Litigation Trust interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Litigation Trust interests constitute "securities," the exemption provisions of section 4(a)(2) of the Securities Act will be satisfied and the offer and sale of such interests will be exempt from registration under the Securities Act.

b. The identity of the trustee of the Litigation Trust (the "Litigation Trustee") shall be a party to be identified. The terms of the Litigation Trustee's engagement shall be acceptable to the Debtors, FILO Parties, and the UCC. The Debtors and the UCC will have the right to consent to the selection of any successor Litigation Trustee (including the terms of such successor Litigation Trustee's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

c. The Litigation Trustee will be a fiduciary and owe fiduciary duties to all Litigation Trust beneficiaries, collectively.

d. Except as specifically set forth in the following subparagraphs, the Litigation Trustee will have exclusive governance authority over the Litigation Trust.

e. With respect to the Litigation Trust Assets set forth on the schedule agreed to contemporaneously herewith among the Debtors, the FILO Parties, and the UCC (the "Threshold Schedule"), the following consents shall be required:

    i. For a settlement proposal or monetization opportunity (each, a "Proposal") for which the Specified Value (as defined below) meets or exceeds the applicable Minimum Thresholds set forth on the Threshold Schedule but that does not meet or exceed the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee may decide, without obtaining the consent of any other party, whether to accept or reject such settlement in its sole judgement consistent with its fiduciary duties, in each case, subject to clauses (iii) – (v) of this paragraph 7.e., including, without limitation, the Minimum Threshold adjustments set forth in such clauses.

    ii. For a Proposal for which the Specified Value exceeds the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee shall accept and implement such Proposal unless the Litigation Trustee reasonably determines based on the advice of outside counsel that accepting and implementing such Proposal is inconsistent with its fiduciary duties.

iii. If the FILO Balance is in an Underpayment State, (a) each Minimum Threshold shall be deemed to be equal to 80% of its stated value set forth in the Threshold Schedule unless and until the FILO Balance is no longer in an Underpayment State and (b) the Litigation Trustee shall be authorized to accept a Proposal that does not meet or exceed the applicable Minimum Thresholds as then in effect without obtaining the consent of any other party if the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal and (ii) provides five (5) business days' written notice (the "Notice Period") to the Class A-2 Representative and the Class B Representative (the "Notice Parties") of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an objection in writing to the Litigation Trustee and the other Notice Party (which objection shall specify in reasonable detail the grounds for the objection) (an "Objection"), and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator. If a successful resolution is not achieved within three (3) business days of the commencement of such mediation (which period may be extended by the Litigation Trustee in its sole discretion in writing) (the "Mediation Period"), the parties may seek resolution by the Bankruptcy Court on an emergency basis.

iv. If the FILO Balance is not in an Underpayment State, the Litigation Trustee will not accept any Proposal unless (a) the Class A-2 Representative and Class B Representative have authorized such acceptance; (b) the Proposal exceeds the applicable Minimum Thresholds by 20% or more, in which case the consent of no other party shall be required; or (c) the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal, in which case the consent of no other party shall be required, and (ii) provides five (5) business days' written notice to the Notice Parties of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an Objection to the Litigation Trustee and the other Notice Party, and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator. If a

successful resolution is not achieved within the Mediation Period, the parties may seek resolution by the Bankruptcy Court on an emergency basis.

v. At the FILO Parties' election, the FILO Parties may, on one or more occasions, increase the deemed value of a Specified Value with the effect that it is treated as meeting the applicable Minimum Thresholds by contributing Class A-2 interests having a Class A-2 Preference equal to the difference between the Net Offered Specified Value and the highest applicable Net Minimum Specified Value (each as defined below).

vi. "Specified Value" shall be equal to the gross cash and cash equivalent proceeds of a Proposal.

vii. "Net Minimum Specified Value" is equal to the Minimum Threshold set forth in the Threshold Schedule less the pro forma contingency fee that would be payable in connection with a Proposal equal to such Minimum Threshold.

viii. "Net Offered Specified Value" is equal to the Specified Value less any contingency fee payable to the Trust's counsel, in each case, with respect to the applicable Proposal.

f. With respect to the disposition of Litigation Trust Assets not set forth on the Threshold Schedule, the disposition shall be carried out by the Litigation Trustee, exercising its reasonable business judgment.

g. The Litigation Trustee shall not agree to a contingency fee in excess of 20% of the gross proceeds of a litigation without the written consent of the Class A-2 Representative and the Class B Representative, other than any existing contingency fee arrangements approved by the Bankruptcy Court as of the Trust Establishment Date.

h. The Estate or Class B Representative, as applicable, shall have the right to pay in full or any portion of the FILO Balance, in cash, without any prepayment penalty at any time. Once the FILO Balance has been reduced to $0, (i) the rights granted to the Class A-2 Representative hereunder shall inure to the Class B Representative and the rights of the Class B Representative hereunder shall inure to the Litigation Funding Agent for the benefit of the holders of the Variable Component and (ii) the Class B Representative may replace the Litigation Trustee subject to the

terms of the Litigation Trustee's agreement with the Litigation Trust (which agreement shall be consistent with this Term Sheet and otherwise reasonably acceptable to the Debtors, the FILO Parties, and the UCC).

   i.   Distributions from the Litigation Trust shall be subject to the following priorities:

      i.   Fees of the Litigation Funding Agent and the Class A-2 Representative (which shall be $50,000 per month for each position), and indemnification and reasonable and documented expenses of (A) the Litigation Trust (including payments owing under the TSA, which shall be paid to the Estate), and (B) the Litigation Funding Agent, the Litigation Funders, the Class A-2 Representative, and the FILO Parties (solely with respect to this clause (B), subject to an aggregate cap not to exceed: (i) $500,000 per month for the initial three-month period commencing on the Trust Establishment Date, (ii) $350,000 per month for the nine-month period following such initial three-month period, and (iii) $220,000 per month[3] thereafter; provided that such cap shall not apply to the FILO Parties before the Trust Establishment Date; provided further that, (i) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) are less than the amount of such monthly cap, the amount of such variance will roll forward and increase such monthly cap in the following months until such variance is used and (ii) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) exceed the amount of such monthly cap, the amount of such variance can be carried forward and satisfied in future months to the extent there is availability under the applicable monthly cap in any such future month).

      ii.   Class A-1 interests until the Class A-1 Preference, the Upfront Premium, and, subject to paragraph 13 of this Term Sheet, the Variable Component (as defined below) (which survives repayment of the Class A-1 Preference and the FILO Balance) are repaid in full in cash.

---

[3] Monthly invoices of the professionals for such parties shall be provided to the Estate with reasonable summaries of activities, which may be redacted for privilege and shall not require time entries to be provided.

  iii. Class A-2 interests until the Class A-2 Preference is repaid in full in cash and the FILO Balance is $0.

  iv. Class B interests.

  v. Notwithstanding anything to the contrary in the immediately preceding clauses (ii) - (iv):

   1. If the FILO Balance is not in an Underpayment State, 25% of any amount otherwise payable to (i) the holders of the Class A-2 interests, and (ii) on or after December 1, 2025, the Class A-1 interests, shall be used to pay unpaid Deferred Fees and Unestimated Fees (each, as defined in the Plan Support Agreement Term Sheet) on a pro rata basis.

   2. If the FILO Balance is less than $25 million, any unpaid Unestimated Fees or Deferred Fees will be paid on a pro rata basis from any available proceeds that would otherwise be payable to the holders of Class A-1 interests as Variable Component (provided that such Variable Component shall be payable with the next proceeds received following repayment in full of such unpaid Unestimated Fees and Deferred Fees).

8. The Estate will coordinate its efforts with the Litigation Trustee with respect to issues involving overlapping concerns among the Estate and the Litigation Trust with respect to third parties.  For example, if the same third party is involved in disputes with both the Estate and the Litigation Trust, the effort will be coordinated between the Estate and the Litigation Trustee. If the Estate and the Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a conference with Judge Isgur, in his capacity as mediator in connection with the subject matter of this Term Sheet; and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.

  a. With respect to any such dispute presented to the Bankruptcy Court:

   i. If the FILO Balance is in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate; *provided*, *however*, that the Litigation Trustee's business judgment will not be considered

by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estate (other than with respect to §502(h) claims).

    ii. If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate's business judgment will be applied to the dispute, subject to challenge by the Litigation Trustee; *provided*, *however*, that the Estate's business judgment will not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Litigation Trust.

    b. Notwithstanding the foregoing, with respect to any constructive trust claims asserted by any third parties with respect to any Litigation Trust Assets or Retained Collateral, as well as any government investigations, the Litigation Trust and the Estate will coordinate efforts to dispute or settle such claims, or to address such investigations, including with respect to funding arrangements for the defense of any such claims or addressing any such investigations.

9. FILO Parties to agree to use of cash collateral from April 1, 2025, through the Trust Establishment Date in an amount up to $61 million through June 27, 2025 and with additional amounts available for use thereafter, in each case, in accordance with the DIP Budget and the Pre-TED Professional Fee Estimates (as defined in the Plan Support Agreement Term Sheet). The aggregate amount of cash collateral used from April 1, 2025, through the Trust Establishment Date, together with interest thereon at the Applicable Rate, shall be the "Secured Interim Advances." On the Trust Establishment Date, the Debtors shall repay the FILO DIP Loans with Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of such Secured Interim Advances, and on account of such repayment, the amount of FILO DIP Loans outstanding shall be reduced by the amount of such Secured Interim Advances.

10. Funding.

    a. The FILO Parties shall commit, subject to the terms and conditions to be set forth in a commitment letter consistent with this Term Sheet and otherwise acceptable to the FILO Parties and the Debtors (the "Commitment Letter") (which shall be executed within 10 business days after execution of this Term Sheet), to, commencing on

the Trust Establishment Date, extend funds (solely from the proceeds of FILO DIP/Bridge Claim[4] repayments received after the FILO DIP Agent's receipt of the Required Prepayment, or Class A interests distributions) to the Litigation Trust (the "<u>Litigation Funding</u>") on a delayed draw basis in an aggregate amount of up to $125 million (the "<u>Initial Commitment Amount</u>") (which is inclusive of (x) a budgeted amount of $61 million through June 27, 2025, together with any additional amounts budgeted thereafter under the DIP Budget, which, in each case, may only be incurred in the form of Secured Interim Advances, and (y) the $6.5 million of Estate Funding), which funded amounts shall be available to pay litigation costs of the Litigation Trust, costs of administration of the Litigation Trust and monetization of the Litigation Trust Assets, in each case, subject to (i) budgets delivered from time to time to, and which must be reasonably acceptable to, the Litigation Funding Agent (the "<u>Litigation Funding Budget</u>") and (ii) the satisfaction of any conditions to funding under the Commitment Letter and absence of any uncured material breaches of the Litigation Trustee's obligations under the Litigation Trust Agreement.[5]  Requests for funding under the Litigation Funding shall be made solely (a) in compliance with the foregoing terms and (b) by the Litigation Trustee upon at least five business days' written notice to the Litigation Funding Agent, it being understood and agreed that not more than one such funding request shall be made during any 30-day period.  Litigation Funding to include an uncommitted accordion of 25% of the Initial Commitment Amount, on the same terms as the initial tranche (to the extent the accordion becomes committed in the sole and absolute discretion of the FILO Parties, the amount of such commitment together with the Initial Commitment Amount, shall be the "<u>Total Commitment Amount</u>").  The commitments under the Commitment Letter shall automatically terminate upon the earlier to occur of (i) the funding of the then applicable commitment amount (whether the Initial Commitment Amount or the Total Commitment Amount, as the case may be) and (ii) the repayment of the FILO Balance.

b. Further financing to be subject to written consent of (x) the Litigation Trustee; (y) the Class B Representative; and (z) unless the further

---

[4] "<u>FILO DIP/Bridge Claim</u>" refers to the claims outstanding under the FILO DIP/Bridge facilities immediately prior to the Trust Establishment Date.

[5] To the extent that the initial Litigation Funding Budget contemplates disbursements to legal counsel on a current basis and the projected amount of such disbursements is subsequently reduced through contingency fee, success fee, or similar arrangements (the aggregate amount of such reduction as agreed by the Litigation Trustee, the "<u>Contingency Fee Savings</u>"), the Total Commitment Amount shall be reduced by the Contingency Fee Savings.

financing is junior to amounts due or to be due to the FILO Parties and under the Litigation Funding, the Class A-2 interests holders and the Litigation Funding Agent. For the avoidance of doubt, the Litigation Trust shall not incur any debt, obligation for borrowed money or other obligation with payment priority senior to or *pari passu* with the Class A interests or secure any obligation with liens on any Litigation Trust Assets or Retained Collateral, in each case, without the prior written consent of the Class A-2 Representative and Class B Representative and the Litigation Funding Agent.

c. Upon the occurrence of the Trust Establishment Date, the Litigation Trust shall provide $6.5 million to the Estate (or any successor liquidating vehicle) (the "Estate Funding") to fund costs and expenses of the Estate and the Estate's professionals incurred after the Trust Establishment Date and of any successor liquidating vehicle (or representative thereof) established to hold the Class B interests and/or any remaining assets of the Debtors.

d. In respect of the Estate Funding, the FILO Parties indirectly providing such funding shall receive Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of the Estate Funding. The Estate Funding shall not be required to be repaid by the Estate.

11. MOIC Payment: The "MOIC Payment" refers to a payment to which the FILO Bridge lenders are entitled (subject to the occurrence of the Trust Establishment Date) in accordance with the terms set forth below. On the Trust Establishment Date, the MOIC Payment will be allowed on the following terms:

a. The Litigation Trust's MOIC obligation will be $11.25 million through March 31, 2026, increasing by:

  i. $1.0 million on April 1, 2026,
  ii. An additional $1.5 million on May 1, 2026,
  iii. An additional $2.0 million on June 1, 2026,
  iv. An additional $2.5 million on July 1, 2026,
  v. An additional $3.0 million on August 1, 2026, and
  vi. An additional $3.75 million on September 1, 2026 and on the first day of each month thereafter until the FILO Balance is paid in full in cash.

b. The total MOIC Payments will not exceed 85% of $75 million *minus* any interest paid or accreted on account of the claims outstanding

under the FILO Bridge facility (the "<u>FILO Bridge Claims</u>") (including any interest paid or accreted on account of the Class A-2 Preference that is allocable to FILO Bridge Claims).

12. Class A-2 interests shall, as of the applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the sum of (i) all principal and accrued interest, fees, expenses,[6] and other amounts outstanding under the FILO DIP/Bridge facilities[7] immediately prior to the Trust Establishment Date (for the avoidance of doubt, excluding the Retained FILO Claim), (ii) all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), (iii) the MOIC Payment, and (iv) the "Exit Premium" under the FILO DIP Loans (which shall be calculated as if the FILO DIP Loans were being fully repaid), in each case, as of such date, *less* (y) the (A) aggregate amount, if any, of cash distributions paid on the Class A-2 interests from the Litigation Trust and (B) aggregate amount, if any, of Class A-2 interests otherwise contributed or waived by the FILO Parties, in each case, as of such date (the "<u>Class A-2 Preference</u>"). Prongs (i) and (ii) of the definition of Class A-2 Preference shall accrete at (a) from the Trust Establishment Date through September 30, 2025, a rate equal to 10% per annum, (b) from October 1, 2025 through December 31, 2025, a rate equal to 10.5% per annum, (c) from January 1, 2026 through March 31, 2026, a rate equal to 11% per annum, and (d) a rate equal to 11.25% per annum commencing on April 1, 2026, and increasing by an additional 25bps at the beginning of each quarter thereafter, subject to a maximum of 12% per annum (the immediately preceding clauses (a)-(d), the "<u>Applicable Rate</u>," which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-2 Preference on a monthly basis); provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

---

[6] Milbank to defer (i) 10% of its fees incurred between April 1, 2025, and the Trust Establishment Date, and (ii) any of its fees incurred in excess of the Pre-TED Professional Fee Estimates. All outstanding Milbank invoices and Houlihan's March 18, 2025 invoice shall be paid as a condition precedent to the effectiveness of this Term Sheet, and thereafter all Milbank and Houlihan fees and expenses that are not subject to deferral shall be paid current in accordance with the FILO DIP Order and Approval Order, as applicable.

[7] FILO DIP/Bridge facilities to be allowed in full pursuant to the Approval Order, subject to the MOIC Payment settlement set forth in this Term Sheet.

13. Litigation Funding will be made available to the Litigation Trust by the FILO Parties on these terms:

    a. The Class A-1 interests shall, as of each applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the aggregate amount of funding extended or deemed to have been extended under the Litigation Funding plus all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), in each case, as of such date, *less* (y) the aggregate amount, if any, of cash distributions paid on the Class A-1 interests from the Litigation Trust as of such date (the "Class A-1 Preference"). The Class A-1 Preference shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-1 Preference on a monthly basis; provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

    b. The Litigation Funding will, in addition to payment of the Class A-1 Preference and the agency fee of the Litigation Funding Agent, as well as indemnification and reimbursement of all reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), be entitled to:

        i. an upfront premium (the "Upfront Premium"), payable in kind, in an amount equal to $4.25 million; provided that if the Litigation Funding accordion is exercised with the consent of the Litigation Trustee, then the Upfront Premium shall be increased by the same percentage that the commitments under the Litigation Funding are increased.

        ii. 20% of gross litigation proceeds (the "Variable Component"), of which (a) 15% (the "Upfront Percentage") is paid in cash at the time of receipt of such litigation proceeds and (b) 5% is deferred, with the applicable deferred cash being held in escrow (the "Deferred Portion"); provided that if the litigation proceeds result from a litigation financed with a contingency fee structure or third-party litigation funding, the total Variable Component shall be limited to the lesser of (A) the

applicable Variable Component noted above (subject to clause 13.d below), and (B) the greater of (i) 30% of such gross litigation proceeds minus the amount of contingency fee, success fee, or third-party litigation funding cost related to such litigation and (ii) 10% of such gross litigation proceeds (the "<u>Reduced Variable Component</u>").

In the event the Reduced Variable Component is equal to or less than 15% of such gross litigation proceeds, then all of such Reduced Variable Component shall be treated as the Upfront Percentage. In the event the Reduced Variable Component is greater than 15% of such gross litigation proceeds, then 15% of such gross litigation proceeds shall be treated as the Upfront Percentage and the remaining portion shall be treated as the Deferred Portion.

c. If the FILO Balance is repaid in full in cash on or before October 1, 2026, the escrow holding the Deferred Portion shall be paid to the Estate. On October 2, 2026, if the FILO Balance has not been paid in full in cash by October 1, 2026, the escrow holding the Deferred Portion shall be disbursed in full to the Litigation Funding Agent. Following such time and until repayment of the FILO Balance in full in cash, the Variable Component shall be paid in cash at the time of receipt of litigation proceeds in accordance with the terms of clause 13.b. with no amounts deferred.

d. After repayment of the FILO Balance, the Variable Component shall continue to be entitled to a percentage of the gross litigation proceeds (i) at the Upfront Percentage only (i.e., 15%) if the FILO Balance is repaid in full in cash on or before October 1, 2026, or (ii) at 20% if the FILO Balance is not repaid in full in cash on or before October 1, 2026, in each case, subject to the Reduced Variable Component adjustment described above (the "<u>Post-FILO Repayment Variable Component</u>"); provided that (x) to the extent a Plan is confirmed, the Post-FILO Repayment Variable Component shall be paid in two installments, with the first installment being paid in cash upon receipt of the applicable litigation proceeds in an amount equal to 62.5% of the Post-FILO Repayment Variable Component, and the payment of the remaining balance of the Post-FILO Repayment Variable Component being deferred until (and subject to) the satisfaction of allowed administrative and other priority claims pursuant to the Plan, and (y) if a Plan has not been confirmed, the Post-FILO Repayment Variable Component shall be paid in full in cash upon receipt of the applicable litigation proceeds.

14. "<u>FILO Balance</u>" equals on any applicable date of determination: the sum of (a) the outstanding Class A-2 Preference (including all accreted amounts accrued thereon) and fees and expenses of the Class A-2 Representative to the extent payable under this Term Sheet, (b) the outstanding Class A-1 Preference, the Upfront Premium, the agency fee of the Litigation Funding Agent, and outstanding indemnification claims and reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), and (c) any unpaid Variable Component that has been earned (for the avoidance of doubt, (i) other than before October 2, 2026, any Deferred Portion held in escrow and (ii) subject to adjustment, if applicable, in connection with any Post-FILO Repayment Variable Component).

15. The FILO Balance will be in an "<u>Underpayment State</u>" if the aggregate FILO Balance is equal to or greater than

    a. $275 million as of the Trust Establishment Date.
    b. Solely for purposes of paragraph 7.i.v.1., $220 million as of December 1, 2025.
    c. For all purposes other than paragraph 7.i.v.1., $220 million as of December 31, 2025.
    d. $160 million as of April 1, 2026.
    e. $110 million as of July 1, 2026.
    f. $60 million as of September 1, 2026.
    g. $10 million as of December 31, 2026.

16. The Debtors, FILO Parties and UCC to negotiate in good faith and agree prior to entry of the Approval Order on the terms of a transition services agreement pursuant to which the Estate will provide TSA services to the Litigation Trust, including agreement on the scope of services to be provided and pricing at cost (the "<u>TSA</u>"). In advance of each calendar month, the TSA shall provide for the Litigation Trust to advance the Estate's estimated monthly operating expenses, including for payroll and vendors, subject to (i) the initial TSA budget annexed hereto as **<u>Exhibit B</u>**, which may be updated from time to time if approved in writing by the Litigation Trustee and the Class A-2 Representative, and (ii) a reconciliation process with respect to amounts funded in prior months. Payments made by the Litigation Trust to the Estate for any services under the TSA prior to the Estate paying for the budgeted costs of providing such services shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such costs. In addition, the Litigation Trust shall provide, when and to the extent due as evidenced by reasonably detailed evidence thereof delivered by the Estate to the Litigation Trust (the "<u>Tax Package</u>"), up to $4 million in funding to

the Estate for the sole purpose of the Estate paying income taxes for the Debtors' current 2024/2025 income tax year. Payments made by the Litigation Trust to the Estate for such taxes shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such taxes reflected in the Tax Package on a dollar-for-dollar basis. The Estate and its related parties (including employees and advisors) shall be defended, held harmless and indemnified by the Litigation Trust against any and all liabilities or losses that may be incurred in connection with the rendering of services under the TSA to the Litigation Trust or Litigation Trustee, subject to customary carve outs for fraud, willful misconduct, and gross negligence. All other expenses of the Estate incurred on or after the Trust Establishment Date, including cost of administration of the Estate, must be budgeted and paid from the Retained Cash, Estate Funding, or other Estate (not Litigation Trust) resources.

17. Reporting and Information Sharing.

    a. <u>Regular Conference Calls</u>: Litigation Trustee to host conference calls on a bi-weekly basis (or more frequently in the Litigation Trustee's discretion) regarding the Litigation Trust Asset monetization process, which calls shall be accessible to the Litigation Funding Agent, the Class A-1 interest holders, the Class A-2 Representative, the Class A-2 interest holders, and the Class B Representative.

    b. <u>Ad Hoc Conference Calls</u>: In addition to the foregoing, the Litigation Trustee shall make itself reasonably available for conference calls to discuss specific topics reasonably requested in writing by the Litigation Funding Agent, the Class A-2 Representative, or the Class B Representative.

    c. <u>Financial Reporting</u>: Litigation Trustee shall deliver a written report to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representative on a monthly basis providing, as of the date of the report:

        i. the amount of cash received by the Litigation Trust through the Litigation Trust Asset monetization process (broken down by source), and the application thereof pursuant to paragraph 7(i) hereof;

        ii. the amount of expenses paid by the Litigation Trust (broken down by category and professional firm);

        iii. the FILO Balance;

        iv.  the amount of the accrued Variable Component and the Deferred Portion then held in escrow; and

        v.  a reasonably detailed summary of the asset monetization activity undertaken in the immediately preceding month.

    d.  <u>Preference Actions</u>: Togut shall deliver to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representatives reporting with respect to preference actions, which shall be consistent (with respect to both frequency and format) with the reporting currently required to be delivered to the FILO and UCC counsel under paragraph 5 of the Togut retention order [ECF No. 3886].

    e.  <u>Confidentiality/Preservation of Privileges</u>: Access to reporting shall be subject to entry into (i) a confidentiality agreement and (ii) a common interest agreement and other protocols to the extent necessary to protect applicable privileges, as reasonably determined by the Litigation Trustee.

18. Each FILO Party agrees that prior to the Trust Establishment Date, it shall not transfer, directly or indirectly, in whole or in part, any FILO DIP/Bridge Claims, option thereon, or right or interest therein, and any purported such transfer shall be void and without effect, in each case, unless the transferee thereof: (a) is a signatory to this Term Sheet as of the date of such transfer; or (b) has signed a joinder to this Term Sheet and the Plan Support Agreement Term Sheet acceding to the obligations of a holder of FILO DIP/Bridge Claims hereunder and thereunder (each, a "<u>Permitted Transferee</u>"). Any transfer of FILO DIP/Bridge Claims occurring prior to the Trust Establishment Date shall require the transferee to assume the transferor's obligations under the Commitment Letter in proportion to the amount of FILO DIP/Bridge Claims so transferred relative to the aggregate amount of all FILO DIP/Bridge Claims outstanding as of the date of such transfer (the "<u>Stapling Requirement</u>"). Notwithstanding anything to the contrary herein, a FILO Party may transfer FILO DIP/Bridge Claims to an entity that is acting in its capacity as a Qualified Marketmaker[8] without the requirement that the Qualified Marketmaker be a signatory to this Term Sheet or execute a joinder; *provided* that any such Qualified

---

[8] "<u>Qualified Marketmaker</u>" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers FILO DIP/Bridge Claims, or enter with customers into long or short positions in FILO DIP/Bridge Claims, in its capacity as a dealer or market maker in such FILO DIP/Bridge Claims and (ii) is in fact regularly in the business of making a market in claims, interests, or securities of issuers or borrowers.

Marketmaker (i) may only subsequently transfer the FILO DIP/Bridge Claims to a transferee that is or becomes a Permitted Transferee at the time of such transfer and to the extent such subsequent transfer complies with the Stapling Requirement and (ii) shall be required to, by the earlier of (x) ten (10) business days after its acquisition of any transferred FILO DIP/Bridge Claims and (y) the Required Joinder Date,[9] either sign a joinder to this Term Sheet or transfer all FILO DIP/Bridge Claims held by such Qualified Marketmaker to one or more Permitted Transferees, in each case, in compliance with the Stapling Requirement.

19. The parties shall negotiate promptly and in good faith to agree on definitive documentation, which shall include the Litigation Trust Agreement (including the funding mechanics with respect to the Class A-1 interests), the Litigation Trustee's engagement letter, the Commitment Letter, the TSA, and the DIP Amendment. Counsel to the Debtors, the UCC, and the FILO Parties to agree on allocation of drafting responsibility and a detailed work plan and fee estimates.

20. All transactions contemplated herein shall be implemented in a tax-efficient manner and are subject to review by tax professionals.

---

[9] "Required Joinder Date" means the third business day before the expiration of the chapter 11 plan voting deadline, if any, applicable to the FILO Bridge Claims.

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**STEWARD HEALTH CARE SYSTEM LLC,
on Behalf of Itself and its Debtor Affiliates**

By: _____
Name:  John Castellano
Title:  Chief Restructuring Officer

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

For and on behalf of **OneIM Fund I LP, as DIP Lender,** acting by its General Partner, OneIM GP LLC, acting by its Manager, GCT Capital LLC

By: _____
Name: Munish Varma
Title: Authorized Signatory

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**BRIGADE AGENCY SERVICES LLC,** as FILO Agent

By: BRIGADE CAPITAL MANAGEMENT, LP, Its Managing Manager

By: _____

Name: Patrick Criscillo
Title: Authorized Signer

**BIG RIVER GROUP FUND SPC LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE BADGER FUND, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE DIVERSIFIED CREDIT CIT**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE CREDIT FUND II LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

*Signature Page to Settlement and Stay Relief Term Sheet*

**BRIGADE HIGH YIELD FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LOAN FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE OPPORTUNISTIC CREDIT LBG
FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE-SIERRABRAVO FUND LP**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**CITY OF PHOENIX EMPLOYEES'
RETIREMENT PLAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FEDEX CORPORATION EMPLOYEES'
PENSION TRUST**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FUTURE DIRECTIONS CREDIT
OPPORTUNITIES FUND**,
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**JPMORGAN CHASE RETIREMENT PLAN BRIGADE BANK LOAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**SC CREDIT OPPORTUNITIES MANDATE, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**MIDOCEAN CREDIT FUND MANAGEMENT, LP**

By: _____

Name: Damion Brown

Title: Managing Director

**MidOcean Tactical Credit Fund III LP**
By: Tactical Credit Fund III GP, LP
By: Ultramar Credit Holdings Ltd., its General Partner

By: _____

Name: Damion Brown
Title: Managing Director

**MidOcean Multi Asset Credit Fund, LP**
By: MidOcean Multi Asset Credit Fund GP, LLC its General Partner

By: _____

Name: Damion Brown
Title: Managing Director

**Abbott Abbvie Multiple Employer Pension Plan Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

**Abbott Laboratories Annuity Retirement Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**OWL CREEK INVESTMENTS I, LLC**

By: OWL CREEK ASSET MANAGEMENT, LP
as Investment Manager

By: _____
Name: Kevin Dibble
Title:  General Counsel

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**WHITEHAWK FINANCE LLC**
By: WHITEHAWK CAPITAL PARTNERS, LP, as
Investment Manager


By: _____
Name: Robert Louzan
Title: Managing Partner

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**The Official Committee of Unsecured Creditors**, solely in its representative capacity, and not on behalf of any individual member thereof

By: */s/ Brad M. Kahn*
Name: Brad M. Kahn
Title: Partner

Akin Gump Strauss Hauer & Feld LLP, in its capacity as counsel to, and authorized signatory for, the Official Committee of Unsecured Creditors of Steward Health Care System, LLC, *et al*.

## Schedule 1

### Litigation Trust Assets

1. All cash and cash equivalents, excluding only (a) the Retained Cash[1], (b) all cash held or received on behalf of buyers of the Debtors' hospital and Stewardship operations pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet ("Buyers"), (c) all cash received from Buyers or other third parties for purposes of paying cure costs, (d) cash to fund checks issued in accordance with the DIP Budget and which remain outstanding immediately prior to the Trust Establishment Date, (e) all cash held for subtenant security deposits or rent collected on behalf of Buyers, subtenants, or overlandlords, (f) all cash held in the Professional Fee Escrow Account, the Physician Insurance Account, the Utility Deposit Account, or the Expense Escrow Account, and (g) any funds of the Debtors in the Vendor Fund Escrow Account pursuant to the Vendor Fund Escrow Agreement, entered into as of March 11, 2025, by and among Golden Sun TSA Services, LLC, a Delaware limited liability company; Steward Health Care System LLC, a Delaware limited liability company; MPT Development Services, Inc., a Delaware corporation; Lifespan of Massachusetts, Inc., a Massachusetts nonprofit corporation; BMC Community Hospital Corporation and BMC Community Hospital Corporation II, Massachusetts nonprofit corporations; Orlando Health, Inc., a Florida corporation; and Kroll Restructuring Administration LLC, a Delaware limited liability company.

2. All accounts receivable, excluding only (a) accounts receivable that the Debtors sold to Buyers pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet and (b) any accounts receivable that cannot be transferred to the Litigation Trust or a subsidiary thereof pursuant to applicable law (such accounts receivables described in this clause (b), the "Non-Transferrable A/R"). With respect to any Non-Transferrable A/R, the Estate shall, at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost), (i) use commercially reasonable efforts to collect or otherwise monetize such Non-Transferrable A/R in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (ii) promptly turn over any cash or other value realized on account of such Non-Transferrable A/R to the Litigation Trust.

3. The equity interests in Steward A/R Co, LLC. Promptly upon transfer of the equity interests in Steward A/R Co, LLC to the Litigation Trust, the current

---

[1] Each capitalized term that is used but not defined herein has the meaning ascribed to it in (a) the Term Sheet to which this **Schedule 1** is attached or (b) the mutual releases set forth in **Exhibit A** to the Term Sheet.

manager of Steward A/R Co, LLC, John Castellano, shall submit his resignation as manager and the Litigation Trustee and Steward A/R Co, LLC shall grant Mr. Castellano a release of claims against Mr. Castellano in connection with his services as manager, in form and substance reasonably acceptable to Mr. Castellano, and the Litigation Trust shall appoint his replacement.

4. All Claims[2] and Causes of Action[3] of the Debtors and the Estate, including, without limitation, in each case, to the extent not released pursuant to the mutual releases set forth in **Exhibit A** to the Term Sheet, the following Claims and Causes of Action:

    a. all Claims and Causes of Action asserted by the Debtors in the *Second Amended Complaint and Jury Demand* filed by Steward Health Care System LLC at Docket No. 61 in Civil Action No. 21-cv-11902-PBS in the United States District Court for the District of Massachusetts (the "Norwood Complaint") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the Norwood Complaint;

    b. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against healthcare payors, including, without limitation, the commercial payors identified in **Schedule 1-A** hereto;

    c. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Non-Released Parties, including, without limitation, arising from or relating to the 2016 Distribution, the 2020 Transactions, the 2021 Distribution, the 2022 Distribution, or any Plan

---

[2] "Claim" means a "claim," as defined in section 101(5) of the Bankruptcy Code.

[3] "Cause of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license or franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whenever arising, whether in law or equity, whether sounding in tort or contract, whether asserted in arbitration, a court or regulatory proceeding, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including under any state or federal securities laws. Causes of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) Avoidance Actions, and (iii) any claim or defense, including fraud, mistake, duress, or usury and any other defenses set forth in section 558 of the Bankruptcy Code.

Sale,[4] or otherwise arising from or relating to the payment of unlawful dividends, the avoidance of prepetition dividend payments or other distributions, or one or more breaches of fiduciary or other duties;

d. all Avoidance Actions[5] asserted or assertable by the Debtors or the Estate against the transferees identified in **Schedule 1-B** hereto or any other prepetition vendors of the Debtors;

e. all Claims and Causes of Action against Blue Cross Blue Shield Association ("BCBS") or any of its independent Affiliates, including, without limitation, arising from or relating to the Claims and Causes of Action asserted in the class action lawsuits against BCBS and its various licensees consolidated in *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (MDL No. 2406) (N.D. Ala. 2013) (the "BCBS Antitrust Litigation") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the BCBS Antitrust Litigation;

f. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Commonwealth of Massachusetts, including, without limitation, any Claims or counterclaims of the Debtors or the Estate in connection with *The Commonwealth of Massachusetts' Motion for Relief from the Automatic Stay to Allow for the Setoff of Mutual Obligations if and to the Extent that Recoupment is Not Available* (Docket No. 3393) and the adversary proceeding filed by the Debtors against the Commonwealth of Massachusetts (Docket No. 3983) (Adv. Pro. No. 25-03053);

g. all Claims and Causes of Action with respect to the escrow account holding the Adjustment Escrow Amount (as defined in the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) the Asset Purchase Agreement with Brady Health Buyer, LLC (B) the Sale of Stewardship Health Assets Free and Clear of Liens and Liabilities and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (Docket No. 2135)) and the funds deposited therein; and

---

[4] "Plane Sales" means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

[5] "Avoidance Actions" means all Claims and Causes of Action under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, any other avoidance actions under the Bankruptcy Code, and any state law fraudulent transfer claims.

h. all Claims and Causes of Action with respect to the right of certain Debtors to receive reimbursement from Golden Sun TSA Services, LLC in connection with the renewal of that certain Software Licensing Agreement, dated September 9, 2009, by and between IASIS Healthcare LLC and Microsoft Corporation, as amended, under Section 9.7 of the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4192).

5. All rights of the Debtors and the Estate to recover insurance proceeds from the D&O Policies (as defined in the *Motion of Debtors for Order Authorizing the Use of Proceeds of Directors and Officers Liability Insurance Policies for Insureds Defense Costs* (Docket No. 2540)) in connection with any Claim or Cause of Action that is not released pursuant to the mutual releases set forth in **Exhibit A** to the Term Sheet. For the avoidance of doubt, the transfer of the rights of the Debtors and the Estate to recover insurance proceeds from the D&O Insurance shall not hinder the ability of any beneficiaries or insureds of such D&O Insurance to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

6. All of the Debtors' remaining interests in joint ventures and the Meadows Hospital Promissory Note, in each case, unless otherwise directed by the FILO Parties, which shall be transferred to one or more corporate subsidiaries of the Litigation Trust; provided that in the event any transfer of interests in joint ventures triggers any put, call, ROFO or ROFR, or other similar rights of third parties, such interests shall be excluded (the "Excluded Interests") and only the proceeds of sale of such interests will be transferred to the Litigation Trust. The Estate shall, at Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize the Excluded Interests in coordination, and in a manner reasonably agreed upon, with the Litigation Trust, and (b) promptly turn over any cash or other value realized on account of such Excluded Interests to the Litigation Trust.

7. All proceeds, products, offspring, or profits of any employee retention tax credits ("ERTCs") owned by any Debtors, net of any reasonable and documented out-of-pocket expenses of any broker or consultant retained in connection with a sale of such ERTCs (to the extent not paid in advance by the Litigation Trust in accordance with the succeeding sentence). The Estate shall at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize such ERTCs

in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (b) promptly turn over any cash or other value realized on account of such ERTCs to the Litigation Trust.

8. All proceeds, products, offspring, or profits of any of the foregoing assets and property.

## Schedule 1-A

## <u>Payors</u>

| Column1 |
| --- |
| Aetna Better Health of Florida |
| Aetna Health Management, LLC |
| Aetna Health, Inc. |
| Aetna Network Services LLC |
| Aetna U.S. Healthcare Inc. |
| AmeriGroup Texas, Inc. |
| Arizona Physicians IPA, Inc. |
| AvMed, Inc. |
| BHP of Ohio, Inc. |
| Blue Cross and Blue Shield of Florida, Inc. |
| Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. |
| Blue Cross and Blue Shield of Massachusetts, Inc. |
| Blue Cross and Blue Shield of Texas |
| Boston Medical Center Health Plan, Inc. |
| Caritas Christi |
| Cenpatico Behavioral Health LP |
| Cigna Behavioral health of Texas |
| Cigna Health and Life Insurance Company |
| Cigna HealthCare of Florida, Inc. |
| Cigna HealthCare of Massachusetts, Inc. |
| CIGNA Healthcare of Texas, Inc |
| Community Insurance Company |
| Connecticut General Life Insurance Company |
| Employers Health Insurance Company |
| Evercare of Texas, LLC |
| First Health Group Corp. |
| GHS Property and Casualty Insurance Company |
| Harvard Pilgrim Health Care, Inc. |
| Health Options, Inc. |
| Health Value Management, Inc. |
| Healthease of Florida |
| HealthSpring Life & Health Insurance Company, Inc. |
| Highmark Blue Cross Blue Shield |
| Humana Health Insurance Company of Florida |
| Humana Health Plan of Florida |
| Humana Health Plan of Texas, Inc. |
| Humana Insurance Company |
| Humana Medical Plan, Inc. |
| Leon Health, Inc. |
| Massachusetts Benefit Administrators LLC |
| MetraHealth Inruance Company |
| Metropolitan Life Insurance Company |
| Neighborhood Health Plan of Rhode Island |

| |
|---|
| NovaSys Health, Inc. |
| Oscar Insurance Company of Florida |
| PacifiCare of Arizona, Inc. |
| PacifiCare of Texas, Inc. |
| SelectCare of Texas, LLC |
| Senior Whole Health LLC |
| Simply Healthcare Plans, Inc. |
| Steward Health Care System, LLC |
| Sunshine State Health Plan, Inc. |
| Superior HealthPlan, Inc. |
| Texas HealthSpring, LLC |
| Total Health Plan, Inc, |
| Travelers Insurance Company |
| Tufts Associated Health Maintenance Organization, Inc. |
| Tufts Associated Health Plans, Inc. |
| Tufts Benefit Administrators |
| Tufts Health Plan, Inc. |
| Tufts Insurance Company |
| Tufts Public Plans, Inc. |
| U.S. Behavioral Health Plan, California |
| United Behavioral Health, Inc. |
| United Benefits of Texas, Inc. |
| United Community Plans of Texas, L.L.C. |
| United Health and Life Insurance Company |
| United Healthcare |
| United Healthcare Insurance Company |
| United Healthcare of Arizona, Inc. |
| United Healthcare of New England Inc. |
| United HealthCare of Ohio, Inc. |
| United Healthcare of Texas, Inc. |
| UnitedHealthcare Community Plan of Ohio, Inc. |
| UnitedHealthcare Insurance Company |
| UnitedHealthcare of Arizona, Inc. |
| UnitedHealthcare of Florida, Inc. |
| UnitedHealthcare of New England, Inc. |
| UnitedHealthcare of Ohio, Inc. |
| Universal American Corp. |
| US Behavioral Health |
| Warren Ohio Rehab Hospital Company |
| WellCare of Florida, Inc. |
| WellCare of Texas, Inc. |

**Schedule 1-B**

**<u>Preference Defendants</u>**

m o r n r

NORTHWIN   PHARMACEUTICALS LLC
 EFOREST   OSCELNI   & BERAR   INELLI
TOTAL ORTHOPAE   IC CARE
PROVI   ENCE ME   ICAL TECHNOLOG   INC
ACUME   LLC
THE PAR   ER  VMC TRUST
ALL PRO CLEANING S   STEMS
SPINEOLOG   INC
AEROSEAL LLC
MO   ULAR   EVICES
GALLOWA   OFFICE SUPPLIES INC
BLEN   EN ROTH LAW FIRM PLLC
ME   ICAL CONSULTANTS NETWOR   INC
COLE SCOTT &   ISSANE PA
ENVIRONMENTAL S   STEMS INC
SI-BONE, INC
 -CENTRI   LLC
TOTAL SCOPE INC
TREACE ME   ICAL CONCEPTS INC
 ESIGN B   NATURE CORP
FIRETROL PROTECTION S   STEMS INC
IMMUCOR INC
LSI SOLUTIONS
INNOVATIVE ME   ICAL PRO   UCTS INC
HERSHE   CREAMER   COMPAN
HEALTHCARE FINANCIAL INC
LANMOR SERVICES INC
SIGNET ELECTRONIC S   STEMS INC
TERUMO ME   ICAL CORPORATION
FINTHRIVE INC
CARCO GROUP, INC.
ME   ISOLV INC
BLOOMBERG IN   USTR   GROUP INC
WHELAN PROPERT   MANAGEMENT
AMERICAN COLLEGE OF RA   IOLOG
SMITH & NEPHEW INC
LABORATOR   CORPORATION OF AMERICA
 IMMER US INC
RICE MCVANE
MIST   HA

WILSON ELSER MOS OWIT E ELMAN

COMPLIANT HEALTHCARE

FU IFILM HEALTHCARE AMERICAS

THE FILTER MAN

BRIGHTER HEALTH NETWOR LLC

NETWOR PROVI ERS INC

CHARTER COMMUNICATIONS

VIRTUAL RA IOLOG PROFESSIONALS OF N

   ext Capital LLC

  EVETS IN USTRIES INC

PFEIFFER & SON LT

PROLACTA BIOSCIENCE INC

STR ER ORTHOPAE ICS

AGILITI HEALTH INC

STR ER SALES CORP

OL MPUS AMERICA INC.

ENVIRONMENTAL HEALTH & ENGINEERING

STR ER EN OSCOP

STR ER SUSTAINABILIT SOLUTIONS

HEALOGICS WOUN CARE &

ME TRONIC USA INC

GENCON SERVICE INC

PRORENATA LABS LLC

MA O SURGICAL CORP

ELEVATE PATIENT FINANCIAL

CONVERGE TECHNOLOG SOLUTIONS

   O SURGICAL

LPS ENTERPRISES LLC

INARI ME ICAL INC

Global Healthcare Exchange

BRISTOL LAW PLLC AN CLINICAL

BOSTON SCIENTIFIC CORPORATION

ARC IAL SIS SOUTH FLORI A

BROC TON HOSPITAL INC

GASTROENTEROLOG AFFILIATES OF

IMAGEFIRST OF NEVA A LLC

LIFENET HEALTH

FAVORITE HEALTHCARE STAFFING INC

STR ER NEUROVASCULAR

NUVASIVE INC

R AN LLC

SIEMENS HEALTHCARE    IAGNOSTICS
STR   ER SPINE
CHEM-A   UA INC
HEMOSTASIS LLC
STR   ER CRANIOMA   ILLOFACIAL
IRON MOUNTAIN
SMART SOURCE LLC
UTAH HEALTH INFORMATION NETWOR
ALLSTON BRIGHTON COMMUNIT
CATAL  ST ORTHOSCIENCE LLC
CUBE   STU  IO LLC
TAP  RI  E TRANSPORTSATION INC
AIRGAS USA LLC
CORC  M INC
MARSH USA INC
AFSCME OHIO COUNCIL
BCM CONTROLS CORPORATION
CHG COMPANIES INC
BEC  EL CONTROLS INC
HOLLAN   & HART LLP
BROC  TON NEIGHBORHOO   HEALTH CENTER
E      MARTINE   PLUMBING SERVICE INC
FLORI   A BIRTH RELATE   NEUROLOGICAL
  &  HEALTH CARE S  STEMS INC
UMASS CHAN ME  ICAL SCHOOL
PENUMBRA INC
NE  TME   PLAIN STATES LLC
  UIC  BASE INC
AARON BARLOW PI  E
REME  I  LLC
LUME     CORPORATION
LUME     CORPORATION
TRANSLOGIC CORPORATION
HILL BARTH &  ING LLC
EPSTEIN BEC  ER & GREEN PC
PENRA   TECHNOLOGIES INC
TRI-M MAINTENANCE INC
VMG HEALTH
WELLS PHARMA OF HOUSTON LLC
THOMAS   OUNG ASSOCIATES INC
 AMES W FLETT CO INC

THE ME  ICUS FIRM INC
NORTH COAST FIRE PROTECTION INC
HAMILTON ME  ICAL INC
 UENCH USA INC
CO  E RE  CONSULTANTS LLC
EC  S STEMS LLC
ME  TO  LABORATORIES INC
A ME  E  O LOC  SMITH SECURIT
 FA  AIR  BRAN  S - GARELIC  FARMS
CS ME  ICAL LLC
ER
PC INSTITUTE FOR ME  ICAL E  UCATION
TENNANT SALES AN  SERVICE COMPAN
VICTOR  MECHANICAL HOL  ING LLC
G  USA INC
GREGOR  WATTS
NATIONAL FIRE ALARM PROTECTION
EARL  BIR  POWER LLC
WA  LAN  MULLI  IN
SOUTHFIEL  ME  ICAL CARE LLC
MICROSURGICAL TECHNOLOG
NEW ENGLAN  REVENUE C  CLE
 RS TUMOR REGISTER  SERVICES
NOVO HEALTH SERVICES FLORI  A LLC
ALLIE  UNIVERSAL TECHNOLOG  SERVICE
ALLIE  OOR AN  HAR  WARE CO INC
CINTAS
SHEA  LE  UNISERVICE INC
RICHAR  CELLER LEGAL PA
SOUTHERN LITHO  I LLC
ORTHALIGN INC
GENSET FIRE & SECURIT  LLC
BOGGS FIRE E  UIPMENT INC
CROWN HEALTH CARE LAUN  R
TAN  EM THEOR
IN  USTRIAL BURNER S  STEMS INC
CLAU CLEANING CORPORATION
FE  E  FREIGHT INC
IMAGING PH  SICS LLC
REGIONAL MANAGEMENT ASSOCIATES
PARAGON  INC

COMMTAN

ILAGOS PLUMBING SERVICES INC

PROIECTUS SERVICES LLC

EAST EN   ME   ICAL I LLC

PITNE   BOWES GLOBAL FINANCIAL

COMMUNIT   BAN   OF TE   AS

SONE   HEALTH INC

THE   OINT COMMISSION

HERMAN M EPSTEIN M

A   VANTECH INC

CENTER POINTE SLEEP ASSOCIATES LLC

PHARMAC   ONESOURCE

PITNE   BOWES INC

SMART CARE E   UIPMENT SOLUTIONS

BIOREFERENCE LABORATORIES INC

M   M TRANSPORTATION CONSULTANTS INC

APO PUMPS & COMPRESSORS LLC

TE   AS   EPT OF STATE HEALTH

E   WAR   ON & COMPAN

CENTRAL COMMUNICATIONS AN

REMOTE ICU LLC

ME   ISTIM USA INC

PLANT PROFESSIONALS INC

CITI PROGRAM

ME   IPRO

Edwards Lifesciences LLC

THE PITNE   BOWES RESERVE ACCOUNT

ALSCO INC

REAALT   TRUST

MICHAEL  ISER

ME   AIR INC

RE   RIVER PHARMAC   SVCS

ROSE BROS SEPTIC &   RAINAGE INC

COMPASS CR  OGENICS INC

ALL ME   ICAL PERSONNEL LLC

MELISSA ALWORTH   O PA

CAL   ERA ME   ICAL INC

FARI   GHEBLEH M   PC

C &  LEASING CORPORATION

MUNIR SHAH M

GREENTEAM PLUMBING LLLC

SIEMENS ME ICAL SOLUTIONS USA

CENTRAL A MI TURE PHARMAC

 MG CLEANING SOLUTION LLC

HANNA CAMPBELL & POWELL LLP

CROWN UNIFORM & LINEN SERVICE

E PERT ME ICAL NAVIGATION

A VANCE AIR AN HEAT CO INC

 & LABORATOR LLC

VERATHON INC

 OHNSON OCONNOR FERON &

WB MASON CO INC

MATHESON TRI GAS INC

TLC ENGINEERING SOLUTIONS INC

TIERPOINT LLC

US POSTAL SERVICE

ME TRONIC SOFAMOR ANE USA INC

Globus Medical North America

FRESHPOINT SOUTH FLORI A INC

GLE CONSULTING INC

 UEST IAGNOSTICS INCORPORATE

HACHE URBANOS I LLC

UNITE TE TILE RENTAL SERVICES

COTTON COMMERCIAL USA

GLOBAL ET CAPITAL LLC

MILESTONE HEALTHCARE LLC

 UGGAN MECHANICAL SERVICES INC

REPUBLIC SERVICES INC

BAM BAM ENTERPRISES LLC

HUNTON SERVICES

SOUTHEAST TE AS INPATIENT PH SICIAN

BIO RA LABORATORIES

OCEANS BEHAVIORAL HOSPITAL

PALOI A VISORS LLC

BLUS RESTORATION CONTRACTORS LLC

FA I NA OUR M

PREMIER IAGNOSTIC SERVICES INC

CUTT EN ELL & OLSON ATTORNE

TRAILRUNNER INTERNATIONAL LLC

WINSTON & STRAWN LLP

BOW ITCH & EWE LLP

LIFESHARE BLOO CENTERS

ANGELICA URENA AN   LAW OFFICE
NEOGENOMICS LABORATORIES
MERCHANT SERVICE
SAPPHIRE ELEVATOR LLC
CONCUR TECHNOLOGIES INC
NEIGHBORWOR  S HOUSING SOLUTIONS
AM SURGICAL
CT CORPORATION S  STEM
CCMMA T   PLLC
SERPE AN   REWS PLLC
OHIO VALLE   PERFUSION ASSOCIATES
ASAHI INTECC USA INC
VIRTUAL RA   IOLOGIC CORPORATION
ROLLS-RO  CE PLC
ECRI
LUBIN & ME  ER AS ATTORNE   FOR THE
PA  FIEL   AN   STOUT LLP TRUST
TE  AS HEALTHCARE LINEN LLC
MI   A  E LLC
BAL   WIN GROUP   BA ROGERS GRA
OMRAM LLC
PE  IATRIC PROFESSIONAL ASSOC PC
ACCESS TELECARE PLLC
BRIAN T. CART
SALT   MICHELSON ARCHITECTS
PUEBLO MECHANICAL AN   CONTROLS LLC
TELERA  IOLOG   SOLUTIONS
ALLHEART ELECTRIC COMPAN
ME   ICAL BUSINESS ASSOCIATES INC
GOR   ON & PARTNERS TRUST ACCT
SOUTHWEST ME   ICAL IMAGING PA
HOLI   A  CVS LLC
METTEL
STREAMLINE VERIF   LLC
  UALIT   HEALTHCARE PARTNERS
CHARLIE WILLIAMS PAINTING
 CB ORTHO LLC
NORTHWIN   STRATEGIES LLC
E  ECUTIVE ME  ICAL PH  SICS ASSOC
EASTSI  E ENTERPRISES INC
BOILER SPECIALISTS INC

TO S ENVIROSCAPES LLC
MN & COMPAN ME IA MANAGEMENT INC
HARR W ONIAS M LLC
ACOB COHEN M
IMPERATIVE CARE INC
B B ELIVER LLC
MORTON HOSPITAL
ME IALAB INC
BOWIE COUNT TE AS LOCAL PROVI ER PARTIC
MARICE GU MAN PLLC FBO ELL
TANT ME ICAL INC
CC ANESTHESIA SOLUTIONS LLC
HOART TREE E PERTS INC
A MA ANS M
ELEVATOR REPAIR SERVICE INC
STUART BREISCH M
MI LAN PLASTIC SURGER CENTER
TSNE MISSION WOR S
TEN HEALTH LLC
PRI ESTAR EMS INC
ARHC NCO ST LLC
PACIFIC PREMIER TRUST COMPAN
UMS MR FUSION SVC OF NE LLC
ALLAN M ORGE M PA
POPP HUTCHESON PLLC
MERGE HEALTHCARE SOLUTIONS INC
TTG ISOTOPES LLC
ENTECH SALES & SERVICE LLC
ONSULT INC
TAN WI AR S INC
WEST TE AS UROLOG PA
OHN ORMAN
BASIN NEUROSURGICAL & SPINE
UMS URS LITHOTRIPS SERVICES
S R EME M PA
AMERICAN ARBITRATION ASSOCIATION
CAR IOVASCULAR IAGNOSTIC CENTER
VI RAM PATEL M PA
VOGEL ANG LAW PC
PURCHASING POWER LLC
FUSION ORTHOPE ICS USA LLC

GREATER HAMPSTEA   FAMIL   ME   ICINE
UMS LITHO SERVICE OF BRISTOL COUNT
AVASURE LLC
VSI SURGICAL
  MILLER CONSULTING LLC
PINE ISLAN   ASSOCIATES LLC
ARIOL LABRA   A M   PA
A  VANCE   CAR   IOVASCULAR
ACCRE   ITATION COUNCIL FOR GRA   UATE
MASS PAR   INC
GIANT PEACH CONSTRUCTION LLC
STEINER-ATLANTIC LLC
M   E VERA LAN   SCAPING LLC
WINTER ST PARTNERS NEW BE   FOR   LLC
SATCOM   IRECT INC
B  RNES MECHANICAL CONTRACTORS INC
SAN ANTONIO MERCHANT SHIPPERS LLC
VTR PAPAGO ME   ICAL PAR   LLC
ENVELOPE SUPERSTORE
RAMON HECHAVARRIA M
SOUTH FLORI   A ME   ICAL IMAGING PA
UNITE   RENTALS NORTH AMERICA INC
G   RC TECHNOLOGIES LLC
SOUTH MI    LESE   OPPORTUNIT   COUNCIL
Associates in Medical Imaging LLC
PRECISION PH  SICS SERVICES LLC
MP
FW WEBB COMPAN
FU  IFILM SONOSITE INC
 AMES M POTTS M
MBA ME   ICAL INC
EVE  IAS HEALTH SOLUTIONS LLC
  CM   HOL   INGS LLC
S  STEM   OF BOSTON
PERMIAN BASIN ANESTHESIA PLLC
 ASON R MURPH
GEROW E   UIPMENT COMPAN
CR HALL COMPAN   LT
MELTWATER NEWS US INC
BER  SHIRE BAN
GEN   IGITAL INC.

Case 4:25-cv-00237 Document 52-1 Filed on 08/05/25 in TXSD Page 563 of 1832

AEP SOUTHWESTERN   ES
SAMBASIVA R SU  HAVASI M   PA
FARRU  H   URESHI
MILLERS RIVER   EVELOPMENT LLC
WA  LE  REGIONAL ME  ICAL CENTER
MRUNAL PATEL
REIS LAN  SCAPING & GAR  ENING LLC
SLIPPER  ROC   COMMERCIAL ROOFING
  BA  ER LAW GROUP PC
THE PICAR   GROUP LLC
COWBO  S STA  IUM LP
MERRITT ME  ICAL CENTER II
AL  O H MARTINE  FLEITES M   PA
THE SUFFOL   GROUP LLC
A  VI  E  TECHNOLOGIES LLC
GRANGER ME  ICAL INC
WORL   FUEL SERVICES EUROPE LT   AVIATION
ANANIA PLUMBING & HEATING INC
HEALTHCARE FINANCIAL GROUP INC
INNERFACE ARCHITECTURAL SIGNAGE INC
  ONSTANT  N S  WA   UN
SENSO SCIENTIFIC
  AVI    HEN  ERSON M
EPREWAR   INC
  OCTORS PAR  II CON  O ASSOCIATION
CHRISTOPHER   TROIANO M
SPAR  LIGHT BILL PA
T  ONCOLOG  PA
  ARL STOR  EN  OSCOP
GREER LABORATORIES
MOUNTAIN ME  ICAL PH  SICIAN
SMARTRISE HEALTH LLC
PE  IATRIC ECHOCAR  IOGRAPH   SERVICES
LIN  BIO CORP
CHARLES CROFT M   PA
THE   ELTA PATHOLOG   GROUP LLC
HA  STAC  I   LLC
EN  OLOGI   LLC
ACCESS CORP
INTEGRIT   HEALTHCARE LOCUMS LLC
TA  LOR COMMUNICATIONS

AGILITI SURGICAL INC
INSPIRE ME ICAL S STEMS INC
AGILITI SURGICAL E UIPMENT REPAIR
 ONNELLE FINANCIAL LLC
WM CORPORATE SERVICES INC
FLORI A EPARTMENT OF CHIL REN
SERVPRO OF CENTRAL BREVAR
IMAGEFIRST
 IGISONICS INC
FRESH PROVISIONS INC
S SCO SOUTH FLORI A INC
ISMAEL MONTANE M PA
RM ARI ONA HOL INGS INC
VO CE INC
RE LABEL SERVICES
CORIN USA LIMITE
AMERICAN RE CROSS
NATIONAL GOVERNMENT SERVICES
SERVICEMASTER B GILIMORE
HELGESEN HOUT & ONES PC
ENGIE RESOURCES
SPECTRUM
IMAGEFIRST OF NEW ENGLAN
UNIVERSAL ELECTRICAL SERVICES INC
TECO PEOPLES GAS
 AIME E CAMPOS M PA
TRICARE Management
GREAT-WEST LIFE
GCB IN USTRIES LLC
NITEEN AN AL AR
HUNTON TRANE
TLC ANITORIAL INC
BEACONME AES LLC
PROLIN HEALTHCARE
ABBOTT LABORATORIES INC.
ABBOTT RAPI IAGNOSTICS
ABBOTT VASCULAR INC
ACCRE ITATION PARTNERS LLC
AMERICAN ACA EM HOL INGS LLC
AMN HEALTHCARE LANGUAGE SERVICES
A UIT SOLUTIONS LLC

BECTON IC INSON AN COMPAN
BIOMERIEU
BIOMERIEU VITE INC
BLUEVO ANT LLC
CAREFUSION SOLUTIONS LLC
CHANGE HEALTHCARE SOLUTIONS LLC
COLLEGE OF AMERICAN PATHOLOGISTS
  OCTORS BILLING INC
  RFIRST.COM
ELE TA INC
E PERIAN HEALTH INC
FORWAR A VANTAGE INC
GE HEALTHCARE IITS USA
GETINGE USA SALES LLC
GUI EPOINT SECURIT LLC
HOLOGIC SALES AN SERVICES LLC
IMALOGI LLC
INSITEONE LLC
INTELLIGENT ME ICAL OB ECTS INC
  ORCHE TECHNOLOGIES LLC
LAN AUER INC
ME ASOURCE
MERATIVE US LP
MICROSOFT CORP
NET HEALTH S STEMS INC
Philips Medical Capital
PHILIPS NORTH AMERICA LLC
PRESS GANE ASSOCIATES LLC
PROVATION SOFTWARE INC
RA IOMETER AMERICA INC
RL ATI NORTH AMERICA INC
ROCHE IAGNOSTICS CORPORATION
SAGILIT OPERATIONS INC F A HGS
SECURITAS HEALTHCARE LLC
SHARECARE HEALTH ATA
SOURCEHOV HEALTHCARE INC
SPO , INC.
STERIC CLE INC
TRINIS S LLC
TWIAGE SOLUTIONS INC
VARIAN ME ICAL S STEMS INC

VI IENT INC
WERFEN USA LLC
  C   GENERAL CONTRACTORS
ME  LINE MO ART HOL ING
SO  E  O INC & AFFILIATES
  TEST CORP
A MURPH   INC
AB   OMINAL SURGEONS LT
ABIOME   INC
ACA  IAN AMBULANCE SERVICES INC
ACCESS CIG LLC
ACCLARENT INC
ACUTANE INC STAMPS CONCENTRATION
A    ISON GROUP
A  VANCE  STERILI ATION PRO  UCTS
AESCULAP INSTRUMENTS
ALGORE  HEALTH TECHNOLOGIES INC
ALTER   INC
AMERICAN COLLEGE OF SURGEONS
AMERICAN HEART ASSOCIATION INC.
AMERICAN ME  ICAL RESPONSE OF
AMERICAN PORTABLE
ANGIO    NAMICS INC
AR CATAL   O CORPORATION
ARI  ONA GASTRO CARE PLLC
ARM ELECTRICAL SERVICES LLC
ARTHRE   INC
ARTHROSURFACE INC
ASSURGENT ME  ICAL STAFFING
ATI RESTORATION LLC
ATRICURE
BA  STATE INTERPRETERS INC
BEC  MAN COULTER INC
BIO-RA   LABORATORIES INC
BIOTE ME  ICAL LLC
BREA  AWA  COURIER BOSTON INC
BREWSTER AMBULANCE SERVICE
CAR  IOVASCULAR S  STEMS INC
CARRIER CORPORATION
CARRIER RENTAL S  STEMS
CERAPE  ICS INC

COLLECTIVE ME ICAL TECHNOLOGIES INC
CONCOR ME ICAL GROUP OF TE AS
CONCOR ME ICAL GROUP PLLC
COR IS US CORP
CORE IAL SIS SERIES LLC
COVI IEN SALES LLC
CRA INTERNATIONAL INC
CTL Amedica
C RACOM LLC
  ASSAULT FALCON ET CO
  HHS - UNIFIE STATE LABORATORIES
  IGIRA IMAGING SOLUTIONS INC
  OVER FLOORS INC
  RUC ER ME IA INC
    INC
ELIOT COMMUNIT HUMAN
ELL A LLC
EMERGENCHEALTH LLC
EMPOWER ANNUIT INS CO OF AMERICA,
ENCORE FIRE PROTECTION
ERBE USA INC
EVO UA WATER TECHNOLOGIES LLC
FAGRON STERILE SERVICES LLC
FLE CARE LLC
FLORI A PEST CONTROL
FONAR CORPORATION
F MASSE ASSOCIATES INC
F SHOUL ER USA INC
GASTON ELECTRICAL CO INC
GLENSTONE CAPITAL LLC
GOR ON FOO SERVICE INC
GULF COAST REGIONAL BLOO CENTER
HARBINGER COMMUNICATIONS INC
HATCH LLC
HEALTHPRO HERITAGE
HIGH ESERT MECHANICAL CORP
HUB INTERNATIONAL NEW ENGLAN LLC PREMI
INO THERAPEUTICS LLC
INSIGHT IMAGING
INTEGRA LIFESCIENCES CORP
Intuitive Surgical Inc.

AC  SON LLO    SELECT RIS
AMES CARROLL AS AGENT LABORIE
ANI-  ING OF RHO  E ISLAN
ENSEN HUGHES INC
 FRAN   LAN  SCAPING INC
UST PRESS PLA
 CI USA INC
 IC    RUM TECHNOLOG   GROUP LLC
  NOWTION HEALTH
LAB LOGISTICS LLC
LANTHEUS ME  ICAL IMAGING INC.
LEMAITRE VASCULAR INC
LIFE SPINE INC
LIGHTNING BOLT SOLUTIONS
LIMBACH COMPAN   LLC
LINCOLN HARRIS CSG
LIVANOVA USA INC
MCT E  PRESS INC
ME   ACTA USA INC
MERIT ME  ICAL S  STEMS INC
MESSAGE MANAGEMENT CENTER LLC
MESSER LLC
MICRO-TECH EN  OSCOP  USA INC
MI  LAN   PATHOLOGIST P A
MS  SONLINE INC
NEOGENOMICS LABORATORIES INC
NMS LABS
ONEBLOO   INC
ORTHO CLINICAL   IAGNOSTICS
OSSIO INC
OSTEOME
PARIS HEALTHCARE
PARTNERSOURCE
PENNS  LVANNIA STATESHENANGO
PEPSI COLA COMPAN
PHREESIA INC
PREPM   PROFESSIONALS LLC
PRO HEALTH ME  ICAL STAFFING LLC
PROFESSIONAL PIPING INC
PROFICIO SURGICAL ASSISTANTS LLC
PULMONAR   CONSULTANTS PC

REAU  MORGAN &  UINN LLP TRUST
RENTO  IL NORTH AMERICA
REPUBLIC SPINE LLC
RESOURCES GLOBAL PROFESSIONALS
RESTORI  HEALTH
RE  NOL  S  EWALT
RICHAR  WOLF ME  ICAL
RICHAR  S BRAN  T MILLER NELSON
RICOH USA INC
RI  E MOBILE TRANSPORTATION INC
ROOFS INC
SCA PHARMACEUTICALS LLC
SCHIN  LER ELEVATOR CORPORATION
SEMPERIS INC
SERVICEHUB CORPORATION
SHOC  WAVE ME  ICAL INC
SHRE  IT
SIGNATURE AVIATION USA LLC
SIL  ROA  ME  ICAL INC
S  ELETAL  NAMICS LLC
SOUTH TE  AS BOILER IN  USTRIES
SOUTHWORTH-MILTON INC
SPECIALT  CARE CAR  IOVASCULAR
SPINEART USA INC
STAT BIO ME  ICAL SALES & SERVICE
STEVEN A CALLAHAN ELECTRICAL
STEWART & STEVENSON
SUNBELT RENTALS
S  SCO ARI  ONA INC
S  SCO BOSTON LLC
S  SCO CENTRAL FLORI  A INC
S  SCO EAST TE  AS
S  SCO HOUSTON INC
S  SCO  AC  SON LLC
S  SCO WEST TE  AS
S  SME  AMERICA INC
TAC ME  INC
THE FACTOR INC
THE ROMANS GROUP
THERAPEUTIC RESEARCH CENTER
TMHP

TORNIER INC

TOWNE PAR   LLC

TRANE US INC

UNUM LIFE INSURANCE COMPAN   OF

UROLOGIC SURGEONS OF ARI  ONA PLC

US FOO   S INC

US ME   E  UIP LLC

WASTE CONNECTIONS OF FLORI   A

WEST TECHS CHILL WATER SPECIALIST

WESTPORT LINEN SERVICES INC

WHITMAN PARTNERS INC

WIC  ER SMITH O HARA MCCO   & FOR

WLG WL GORE&ASSOC MP

WOLF & COMPAN   PC

WRIGHT ME   ICAL TECHNOLOG   INC

   M HEALTH INFORMATION S  STEMS

ACCLARA SOLUTIONS LLC

CLOU   ME

COGNI  ANT TECHNOLOG   SOLUTIONS

CONSENSUS CLOU   SOLUTIONS

   ELL FINANCIAL SERVICES

ERGONOMIC GROUP

HEWLETT PAC  AR   FINANCIAL SERVICES

HP INC

INOVALON PROVI  ER INC

INTERLACE HEALTH LLC

IO   INE SOFTWARE LLC

   AMS INC

LOGI   HEALTH INC

MRO CORPORATION

PRESI  IO NETWOR  E

REVSPRING INC

TEGRIA RCM GROUP US INC.

BREA  EALE SACHSE & WILSON LLP

BRUCE &   ELLE   PC

CAPPLIS CONNORS CARROLL & ENNIS

   RAFFIN & TUC  ER LLP

FAL   WAAS HERNAN  E   ET AL

FOSTER & EL  RI  GE LLP

HALL PRANGLE & SCHOONVEL   LLC

HAMEL MARCIN   UNN REAR   ON & SHEA PC

ULIE SMITH

IPP AN   CHRISTIAN PC

MARSHALL   ENNEHE   WARNER

UINTAIROS PRIETO WOO   & BO   ER PA

RESNIC   & LOUIS PC

SNOW CHRISTENSEN & MARTINEAU

THE CHEC  ETT LAW FIRM PLLC

THOMPSON BOWIE & HATCH LLC

WILLIS TOWERS WATSON US LLC

WIPFLI LLP

AU   ERE INTERNATIONAL LIMITE

E  CELA RECEIVABLES   LLC

H RAMOS FARMS

## Exhibit A[1]

**Mutual Releases.**  Except as otherwise expressly set forth below, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Trust Establishment Date, each of (A) the Debtors, (B) the Estates, (C) the Litigation Trust, (D) the Litigation Trustee, (E) the FILO Parties, (F) the Creditors' Committee and each of its members (solely in their official capacity), and (G) each Related Party of each Person or Entity described in any of the immediately preceding clauses (A) through (F) to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law (each, a "**Releasing Party**" and, collectively, the "**Releasing Parties**"), in each case on behalf of themselves and their respective successors, assigns, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through such Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of such Releasing Party), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Trust Establishment Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the FILO Settlement Term Sheet or any other contract, instrument, release, or document created or entered into in connection with the FILO Settlement or any of the other definitive documents related thereto; any other debt or security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors; the subject matter of, or the transactions or events giving rise to, any Claim or Interest; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the Approval Order and the transactions contemplated thereby; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Trust Establishment Date.  Notwithstanding anything to the contrary in the foregoing, these releases (i)  shall not be construed as releasing (a)  any Released Party from Claims or Causes of Action arising from a material misrepresentation or an act or omission constituting actual fraud, willful misconduct, criminal misconduct, or gross negligence of or by such Released Party, in each case as judicially determined by a Final Order, (b) any Claims or Causes of Action arising after the transfer of the Litigation Trust Assets to the Litigation Trust, (c) the Debtors or the Estates from

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Settlement and Stay Relief Term Sheet,* to which this exhibit is attached (the "**FILO Settlement Term Sheet**"), or **Annex 1** attached hereto, as applicable.

the Retained FILO Claim (including, without limitation, any liens securing the Retained FILO Claim), (d) any rights or obligations of any party or Entity under the Approval Order, the FILO Settlement Term Sheet, the Plan Support Agreement Term Sheet, any definitive document related to the FILO Settlement or the Plan Support Agreement Term Sheet, or any other document, instrument, or agreement executed to implement the Plan or the transactions contemplated by the FILO Settlement, or (e) any Intercompany Claims; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. For the avoidance of doubt, no Person or Entity not (i) expressly identified on the list of Individual Released Parties, or (ii) defined as a Released Party, shall be deemed to be granted a release hereunder, regardless of whether such Person or Entity is specifically identified on Schedule 2 hereof.

## Annex 1

### Defined Terms

*2016 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in October 2016 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2020 Transactions* means, individually and/or collectively, (a) the transactions that were entered into and/or occurred in or about May 2020 pursuant to which: (i) Manolete Health, LLC purchased Steward Healthcare International Holdings Ltd. from Steward Health Care System LLC, (ii) Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**") contributed real properties to MPT of Utah-Steward, LLC (together with its subsidiaries, the "**Utah JV**") for common equity interests in the Utah JV and subsequent cash distributions from the Utah JV, and the Utah JV leased such real properties back to Jordan Valley and Davis, and (iii) Cerberus Operations and Advisory Company exchanged its equity in Steward Healthcare Investors LLC for a $350 million convertible note, and (b) all other transactions related thereto, including any transactions in what was referred to at the time as Project Easter.

*2021 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in January 2021 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2022 Transaction* means the transaction or transactions entered into on or about May 31, 2022 (and certain other dates in 2022) by and among, among others, Sparta Merger Sub I Inc., Sparta Merger Sub II Inc., Sparta Merger Sub III Inc., Sparta Merger Sub I LLC, Sparta Merger Sub II LLC, Sparta Merger Sub III LLC, Sparta Sub Inc., SNCN Holdco Inc., SICN Holdco Inc., Steward Integrated Care Network, Inc., Steward Accountable Care Network, Inc., Steward Health Care Network Inc., Sparta Holding Co. LLC, Steward Health Care System LLC and CareMax, Inc. pursuant to which certain value-based care assets were transferred to Sparta Holding Co. LLC and acquired by CareMax, Inc., and all other transactions related thereto or included therein (including any dividends, distributions, and/or allocations paid, made, and/or issued in 2022 in connection with and/or following such transaction(s), and any subsequent transfer of the proceeds thereof or arising therefrom).

2

*Affiliate* means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

*Cause of Action* means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or

Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any Avoidance Actions.

*Chapter 11 Case* means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

*Chief Restructuring Officer* means John R. Castellano, in his capacity as Chief Restructuring Officer of each of the Debtors.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code.

*Creditors' Committee* means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

*Debtor Related Parties* means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*FILO DIP Order* means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

*FILO Parties* means, collectively, the Prepetition Bridge Agent, the FILO Bridge Lenders, the FILO DIP Secured Parties, the Prepetition FILO Agent, and the FILO Lenders (each as defined in the FILO DIP Order), in each case in their capacities as such, and the Litigation Funding Agent and the providers of the Litigation Funding in their capacities as such.

**FILO Settlement** means the settlement embodied in the FILO Settlement Term Sheet.

**Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

**Hospital Debtors** means all Debtors, other than, for the avoidance of doubt, Steward Health Care Holdings LLC and Steward Health Care System LLC, that held or owned a license to operate a hospital at any time during the Chapter 11 Cases.

**Identified Non-Released Parties** means (i) the Persons and Entities listed on **Schedule 2** annexed hereto, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

**Individual Released Parties** means the individuals listed on the **Schedule 1** annexed hereto, each in their capacity as a current or former director, officer, manager, employee, advisor, or consultant of one or more of the Debtors.

**Interest** means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and whether fully vested or vesting in the future, including

any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor.

**Intercompany Claim** means any pre- or postpetition Claim against a Debtor held by another Debtor.

**Investigation Subcommittee** means the subcommittee of the Transformation Committee, consisting of Alan J. Carr and William Transier.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Person** means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

**Petition Date** means May 6, 2024.

**Plan Administrator Committee** means a committee comprised of Monica Blacker, Alan J. Carr, and William Transier.

**Plan Support Agreement Term Sheet** means the Plan Support Agreement Term Sheet referred to in the FILO Settlement Term Sheet and executed in connection therewith.

**Plane Sales** means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

**Prepetition Transactions** means the (i) 2016 Distribution, (ii) 2020 Transactions, (iii) 2021 Distribution, (iv) 2022 Transaction, and (v) the Plane Sales.

**Related Parties** means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, and (b) the Litigation Trust and the Litigation Trustee; (iii) each of the following, solely in their capacities as such, (a) the Creditors' Committee and each of its members, and (b) the FILO Parties; and (iv) with respect to each of the foregoing Entities identified in the immediately preceding clauses (ii) or (iii), such Entities' Related Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Released Party.

**Representative** means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

**Transformation Committee** means the special committee of the board of managers of Steward Health Care Holdings LLC comprised of Alan J. Carr, John R. Castellano, and William Transier.

## Exhibit A

### Individual Released Parties

- Alan Carr
- Ann-Marie Driscoll
- Carlos Hernandez
- David Barnhardt
- Eugene (Jay) Sullivan
- Gail Schlesinger
- General H.R. McMaster
- Henry (Nick) Nickells
- Jeffrey Morales
- Jennifer Hunt
- John Boehner
- John Castellano
- Joseph Weinstein
- Katchena Potter
- Mary Beth Taylor
- Nathalie Hibble
- Octavio Diaz
- Patrick Lombardo
- Rich Iannessa
- Sr. Vimala Vadakumpadan
- Susan Brown
- William Transier

## Schedule 2

### Identified Non-Released Parties

- Alessandra Pace
- Armin Ernst
- Brian Carty
- Christopher Dunleavy
- Craig Jesiolowski
- David Chicoine
- David Friend
- David Morales
- Herbert Holtz
- James Karam
- James Lenehan
- Jill Moretto
- John Polanowicz
- Joseph Ciccolo
- Joseph Maher
- Joshua Putter
- Mark Girard
- Mark Rich
- Michael Callum
- Miroslav Boyanov
- Nadine Delicata
- Ralph de la Torre
- Robert Guyon
- Ruben King-Shaw Jr.
- Sanjay Shetty

- 5326 Old Buena Vista Road LLC
- Ad Astra Per Aspera LLC
- CareMax, Inc.
- Cayman TRS Holdings
- Cerberus Capital Management, L.P.
- Cerberus International II Master Fund LP
- Cerberus Partners II LP
- Cerberus Series Four Holdings LLC
- de la Torre Foundation
- de la Torre Family Foundation
- Management Health Services Colombia S.A.S.
- Management Health Services LLC
- Manolete Health Investors LLC
- Manolete Health LLC
- Medical Properties Trust, Inc.
- MPT Sycamore Opco LLC
- Ralph de la Torre Revocable Trust
- RDLT – SHCI Investor LLC
- RDLT – SHCI Manager LLC
- Sagamore Capital Management, LLC
- Santa Clara Holdings LLC
- Sparta Holding Co. LLC
- Steward Health Care International
- Steward Health Care International (Malta) Ltd
- Steward Health Care International Colombia S.A.S.
- Steward Health Care Investors LLC
- Steward Health Care International Investors LLC
- Steward Health Care International Kingdom of Saudi Arabia, S.L.
- Steward Health Care International Ltd
- Steward Health Care International S.L
- Steward Malta Assets Ltd
- Steward Malta Ltd
- Steward Malta Management Ltd
- Steward Malta Personnel Limited
- Steward Management Holdings LLC
- Tenet Healthcare Corporation
- TRACO International Group S. DE R.L.

**Exhibit D**

**Medical Liability Claims Procedures**

## <u>MEDICAL LIABILITY CLAIMS PROCEDURES</u>[1]

The Estate Representative shall adopt and implement the below procedures (the "**Medical Liability Claims Procedures**") for reviewing and liquidating all unliquidated claims against the Debtors arising out of or related to alleged negligence in connection with the rendering of medical care arising prior to the Effective Date (the "**Debtor Medical Liability Claims**"). The below procedures will allow and permit the Estate Representative to make determinations as to the allowance of asserted Debtor Medical Liability Claims, including the allowed amount thereof (the "**Allowed Claim Amount**"). The Estate Representative shall administer the Medical Liability Claims Procedures with the goals of securing the just, speedy, and cost-efficient determination of allowance of every Debtor Medical Liability Claim, and providing substantially similar treatment to all holders of Debtor Medical Liability Claims.

Subject to the procedures and conditions set forth below, the Estate Representative shall have the authority to determine the allowance of any Debtor Medical Liability Claim. Pursuant to that authority, the Estate Representative may investigate any Debtor Medical Liability Claim and may request information from any holder of a Debtor Medical Liability Claim to ensure compliance with the terms outlined herein. Subject to section [6.11] of the Plan, the Estate Representative shall retain all property, rights, privileges and defenses of the Debtors with respect to all Debtor Medical Liability Claims. The Estate Representative shall have the authority to compromise, settle, withdraw, or otherwise resolve any Debtor Medical Liability Claims without approval of the Bankruptcy Court in accordance with these Medical Liability Claims Procedures. Any finding or determination by the Estate Representative with respect to a Debtor Medical Liability Claim shall not be binding or used for any other purpose other than allowance of the Debtor Medical Liability Claim for distribution purposes under the Plan.[2]

### <u>Procedures</u>

Debtor Medical Liability Claims will be classified into the following categories for consideration and determination under these Medical Liability Claims Procedures:

**Debtor Medical Liability Claims Asserted in the Amount of $350,000 or Less**: If a holder has filed a proof of claim by the applicable Bar Date asserting a Debtor Medical Liability Claim arising prior to the Petition Date in the amount of $350,000 or less, such Debtor Medical Liability Claim shall automatically be deemed Allowed for purposes of distribution under the Plan; <u>provided</u> that such holder has submitted reasonable documentation in support of such Debtor Medical Liability Claim, as determined by the Estate Representative or their designee, each in their sole discretion. The Estate Representative will provide such holder notice that their Debtor

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and its Affiliated Debtors* (Docket No. 4743) (including all exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Plan**").

[2]  In all instances, the Estate Representative will treat all individual and collective claim related information in accordance with existing HIPAA Privacy Rules and standards of care.

Medical Liability Claim has been deemed Allowed in the amount asserted in the timely filed proof of claim. For purposes of this category, the Estate Representative reserves the right to exclude any amended proofs of claim filed after the applicable Bar Date.

For holders of Debtor Medical Liability Claims asserted in the amount of $350,000 or less that have not submitted sufficient documentation in their timely filed proofs of claim, such holders will be notified by the Estate Representative that they will have one hundred and eighty (180) days to provide any additional information necessary to the Estate Representative to substantiate such claims. Absent submission of such sufficient documentation by the applicable deadline, such Debtor Medical Liability Claim shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

**Debtor Medical Liability Claims Asserted in an Amount Greater Than $350,000**: After the Confirmation Date, the Estate Representative will send a form (the "**Claim Form**") to all holders who have asserted Debtor Medical Liability Claims in an amount greater than $350,000 or in an unliquidated amount in a timely filed proof of claim. Each such holder shall complete and submit the Claim Form within one hundred and eighty (180) days of service of such form.[3] The Claim Form shall provide holders of Debtor Medical Liability Claims with two options:

> **Option 1: Claim Reduction Election**. Holders of Debtor Medical Liability Claims may agree and stipulate to an Allowed Claim Amount of $350,000 (the "**Claim Reduction Election**"); provided that such Allowed Claim Amount shall solely be for purposes of allowance of their Claim in the Chapter 11 Cases and distributions under the Plan. For the avoidance of doubt, treatment of such Debtor Medical Liability Claim and distributions on account thereof shall solely be determined by the Plan. The Claim Reduction Election shall not be available to holders who have asserted Debtor Medical Liability Claims in an unliquidated amount.

> **Option 2: Claim Determination**. Holders of Debtor Medical Liability Claims may elect to participate in a claim review process as follows:

>> **Phase 1: Initial Claim Determination Process**. If a holder of a Debtor Medical Liability Claim does not make the Claim Reduction Election, such holder must demonstrate the following in its Claim Form:

>>> a. **Claim Validity Requirements**. A holder must demonstrate:

>>>> i. The holder received negligent medical care from (a) a Debtor or (b) any individual whose negligent provision of medical care is the legal responsibility of a Debtor;

>>>> ii. Such negligent medical care was the proximate cause of the holder's alleged damages; and

>>>> iii. The holder filed a Proof of Claim on or before the applicable Bar Date.

---

[3] It shall be the responsibility of the holder of the Debtor Medical Liability Claim to provide the Estate Representative with any change of address or contact information.

b. **Claim Evidence**. A holder may demonstrate a qualifying Debtor Medical Liability Claim by submitting to the Estate Representative:

   i. Medical records substantiating the medical treatment received and alleged injuries suffered by the holder as a result of such medical treatment or services;

   ii. Medical bills and other records (e.g., paystubs, receipts, hospital records, insurance records, any applicable funeral or burial expenses) substantiating any economic damages alleged by the holder;

   iii. A sworn statement by a qualified physician establishing that (i) he or she personally examined the holder's medical records and/or the holder, and (ii) based upon that examination, he or she believes to a reasonable degree of medical certainty that the holder's alleged damages were proximately caused by the negligent provision of medical care; and

   iv. Any other credible evidence that tends to establish the existence of an alleged injury and/or economic damages, including, but not limited to, the following information:

      1. Evidence of the holder's condition at the time of the alleged injury;

      2. The nature of the holder's or decedent's alleged bodily injury;

      3. The duration of any medical, mental health, or rehabilitative treatment;

      4. The holder's or decedent's age;

      5. The holder's or decedent's employment history;

      6. The holder's or decedent's medical history;

      7. A death certificate, if the claim is presented for a deceased individual;

      8. Affidavits from holder, heirs, or others with personal knowledge, describing the timing, length and circumstances of holder's or decedent's injuries; and

      9. Whether the holder or decedent had a surviving spouse, parents, or dependents, and if so, the age of those dependents.

   v. A holder must also submit the following information, if available, to the Estate Representative:

      1. Information that might suggest the existence of another source or condition that may have caused or contributed to any injuries;

      2. The potential liability of other entities or persons for some or all of the holder's injuries or damages and any compensation

and recoveries, of any kind, received from any person or entities connected to holder's injuries; and

3. Copies of all claims, complaints, proofs of claim, notices, settlement documents, releases, recoveries, compensation received, or similar documents that holder submits or entered into in respect of claims asserted against or to be asserted against any other entity or person arising from or related to holder's or decedent's injuries that underlie the Debtor Medical Liability Claim presented to the Estate Representative; provided that, to the extent that additional such documents or evidence becomes available to the holder after his or her claim submission and before the Estate Representative determines the allowance of the Debtor Medical Liability Claim, the holder shall supplement his or her claim with such additional evidence.

vi. The holder may submit such additional information that the holder believes will assist the Estate Representative determine that the holder has satisfied the Claim Validity Requirements.

vii. The Estate Representative may request additional information as reasonably necessary in the opinion of the Estate Representative to determine the allowance of a Debtor Medical Liability Claim. The holder shall provide such additional information so that it is received by the Estate Representative within fourteen (14) days of such request.

c. **Claim Determination**. The Estate Representative or its advisors shall evaluate each submission individually and will follow the guidelines set forth above to determine, based on the information obtained, (a) whether or not a submitted Debtor Medical Liability Claim is Allowed or is disallowed and (b) to the extent Allowed, the corresponding Allowed Claim Amount (such determination, the "**Claim Determination**"). The Allowed Claim Amount shall be determined by the Estate Representative to replicate to the extent possible the amount a reasonable jury might award for the Debtor Medical Liability Claim, taking into account the relative shares of fault that may be attributed to any parties potentially responsible for the Debtor Medical Liability Claim under applicable law and applying the same standard of proof that would apply under applicable law. In no circumstances shall the Estate Representative assign any claim value for any punitive damages, exemplary damages, statutory enhanced damages, attorney's fees or costs, or claims presentation-related expenses. If the holder accepts the Allowed Claim Amount, it becomes the final determination of the claim.

d. **Appeal to Mediation**. If the Claim Determination is not satisfactory to the holder, the holder may request to proceed to mediation. A holder must submit notice to the Estate Representative of its intent to appeal the Claim Determination through mediation within thirty (30) days of receipt of the

Claim Determination, otherwise the holder shall be deemed to have accepted the Claim Determination and such claimant's Debtor Medical Liability Claim shall be Allowed in the amount of the Claim Determination without further action by the parties or the Bankruptcy Court.

**Phase 2: Mediation**. If the Initial Claim Determination Process does not result in a Claim Determination satisfactory to a holder and a notice of appeal of the Claim Determination is timely provided to the Estate Representative, the Estate Representative and the holder shall proceed to non-binding mediation ("**Mediation**") no earlier than one hundred and eighty (180) days after the Estate Representative's receipt of such holder's notice of appeal (unless the Estate Representative agrees to an earlier date). The Estate Representative shall serve a mediation referral notice on the American Arbitration Association (the "**AAA**"). The Mediation shall conclude within one hundred and twenty (120) days following appointment of a mediator (the "**Mediator**"). The Mediation will be conducted remotely via Zoom or similar platform, unless another location is mutually agreed to by the holder and the Estate Representative. In Mediation, the Mediator shall consider the same evidentiary requirements as set forth above.

    a. **Appointment of a Mediator**.

        i. Within sixty (60) days after the referral to mediation has occurred, the AAA shall prepare a list of five potential mediators from its panel. The Estate Representative and the holder shall each be permitted to strike two names from the list within five (5) days of receiving the list. The AAA shall appoint the Mediator from the remaining names and send immediate notice of such appointment and the location and time of the mediation conference to the Estate Representative and the holder. All Mediators shall be impartial and neutral. No Mediator shall have any financial or personal interest in or relation to the proceedings or, except where otherwise agreed by the parties, in any related matters.

    b. **Conduct of Mediation**.

        i. No written discovery shall be permitted unless mutually agreed to by the parties, provided that any information submitted in the Initial Claim Determination Process shall be permitted to be considered by the Mediator in the Mediation.

    c. **Fees and Costs of Mediation**.

        i. Mediation fees shall be divided evenly between the holder and the Plan Trust. Each party shall bear the expense of its own counsel and all other costs.

    d. **Mediation Report**.

        i. At the conclusion of the Mediation or the final adjournment after any continuation thereof, the parties shall sign a written report (the "**Mediation Report**") before the Mediator stating:

            1. That the holder and the Estate Representative have completed the Mediation in good faith and otherwise complied with the Mediation procedures set forth herein; and either:

                a. That the Debtor Medical Liability Claim has been settled and the terms of the settlement; or

                b. That the holder intends to either (i) subject the Debtor Medical Liability Claim to binding arbitration or (ii) proceed with liquidating the Debtor Medical Liability Claim in the tort system.

**Phase 3(a): Binding Arbitration**.  If, at the conclusion of Mediation, the claimant elects to subject the Debtor Medical Liability Claim to arbitration ("**Arbitration**"), an Arbitration hearing shall be held following appointment of an arbitrator (the "**Arbitrator**").  In Arbitration, the Arbitrator shall consider the same evidentiary requirements set forth above.

    a. **Conduct of Arbitration**.

        i. The Arbitration shall be conducted in accordance with applicable law and shall be governed by the Federal Arbitration Act, Title 9, United States Code.  Except as otherwise provided herein or as otherwise agreed by the parties, the Arbitration shall be conducted pursuant to the AAA's Commercial Arbitration Rules.  Those rules provide procedures and guidelines for, among other things, (a) the qualifications and appointment of the Arbitrator, (b) communications with the Arbitrator, (c) preliminary exchange of information, (d) the introduction of evidence, and (e) the time, form, and scope of the arbitration award.

        ii. No written discovery shall be permitted unless mutually agreed to by the parties.

        iii. Requests for documents shall be required to be made at least thirty (30) calendar days before the hearing to the Arbitrator, who shall rule on the requests within five (5) days and only grant the requests if clearly relevant and necessary.  If a request is granted, documents are required to be produced within ten (10) calendar days from the Arbitrator granting the request.

        iv. The Arbitrator shall have sole discretion as to whether depositions can be taken; provided that, to the extent the Arbitrator allows depositions, such depositions must be limited to two (2) hours and each party may only request to depose up to two witnesses.

     v.   The claimant and Estate Representative each must submit a five (5) page pre-arbitration statement at least seven (7) days prior to the Arbitration. Each party shall be granted ninety (90) minutes, including any rebuttal, within which to present its position. The Arbitration shall be conducted remotely via Zoom or similar platform, unless another location is mutually agreed to by the claimant and the Estate Representative. No post-arbitration briefs shall be permitted.

  b. **Fees and Costs of Arbitration**.

     i.   Arbitration fees shall be divided evenly between the claimant and the Plan Trust; provided that the Arbitrator may in his or her sole discretion assess the entire cost of Arbitration against any party delaying or abusing the arbitration proceedings. Each party shall bear the expense of its own counsel, experts, witnesses, prosecution, and all other costs.

  c. **Arbitration Award**.

     i.   The arbitral award must be written and shall be binding and shall be within the discretion of the Arbitrator, but in no event shall the award exceed the claimed amount of the Debtor Medical Liability Claim set forth in the claimant's Claim Form or Proof of Claim, whichever is lower. Neither party shall have the right to appeal the award except on the grounds set forth in the Federal Arbitration Act. There will be no right to a trial *de novo*.

**Phase 3(b): Tort System Alternative**. Holders, who at the conclusion of Mediation elect to proceed with liquidating their Debtor Medical Liability Claim in the tort system, retain the right to institute or continue a lawsuit in the tort system against the Estate Representative in the appropriate jurisdiction. Upon such an election, the automatic stay shall be deemed modified, without further order of the Bankruptcy Court, to allow the holder to proceed against the Estate Representative in the tort system for the sole purpose of liquidating his or her Debtor Medical Liability Claim. For the avoidance of doubt, no holder shall be granted relief from the automatic stay to commence or continue any action, suit or trial, to proceed with discovery, or to pursue its Debtor Medical Liability Claim in a non-bankruptcy forum until the holder has completed the Medical Liability Claims Procedures. Any lawsuit in the tort system must be filed by the holder in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses shall be available to both sides at trial. The final judgment obtained in the tort system shall determine the Allowed Claim Amount that is eligible for distribution from the Plan Trust in accordance with the Plan.

    **Allowed Amounts**. Any Debtor Medical Liability Claim that is Allowed, as determined pursuant to these Medical Liability Claims Procedures, shall be treated in accordance with the Plan confirmed and implemented in the Debtors' Chapter 11 Cases.

**Ability to Settle Debtor Medical Liability Claims**.  Nothing herein shall limit the ability of a holder and the Estate Representative to settle a Debtor Medical Liability Claim by mutual agreement at any time.  All such settlements shall be subject to the terms set forth herein.

**Failure to Comply with the Medical Liability Claims Procedures**.  If a holder fails to comply with the Medical Liability Claims Procedures, negotiate in good faith, or cooperate with the Estate Representative as may be necessary to effectuate the Medical Liability Claims Procedures, the Bankruptcy Court may, after notice and a hearing, find such conduct to be in violation of the Confirmation Order, an abandonment of, or failure to prosecute, the Debtor Medical Liability Claim.  Upon such findings, the Bankruptcy Court may, among other things, disallow and expunge the Debtor Medical Liability Claim, in whole or in part, or grant such other or further remedy deemed just and appropriate under the circumstances, including, without limitation, awarding attorneys' fees and other fees and costs to the Estate Representative.

## Exhibit B

## Confirmation Notice

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

## NOTICE OF ENTRY OF ORDER
## (I) CONFIRMING JOINT CHAPTER 11 PLAN OF LIQUIDATION
## OF STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED
## <u>DEBTORS AND (II) APPROVING DISCLOSURE STATEMENT ON A FINAL BASIS</u>

**PLEASE TAKE NOTICE** that on July [●], 2025, the Honorable Christopher M. Lopez, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), entered the *Findings of Fact, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. [●]) (the "**Confirmation Order**") confirming the *Confirming Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, dated July 11, 2025 (Docket No. 5492) (as supplemented and amended, the "**Plan**").[2]

**PLEASE TAKE FURTHER NOTICE** that copies of the Confirmation Order, Plan, and Disclosure Statement may be obtained free of charge by visiting the website maintained by Kroll Restructuring Administration LLC ("**Kroll**") at https://restructuring.ra.kroll.com/Steward. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://www.pacer.gov/. Please note that a PACER password and login are required to access documents via PACER.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise provided in the Plan, the deadline for filing requests for payment of Administrative Expense Claims arising between November 15, 2025 and July [●], 2025 is August [●], 2025 (the "**Administrative Expense Claims Bar Date**"). Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or the applicable Estate

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

Representative and their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released without consideration as of the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that, notwithstanding anything in the Bar Date Order to the contrary, the deadline for the holders of Specified Claims[3] to file a proof of claim is August [●], 2025.  Holders of Specified Claims must file a proof of claim in substantially the form attached to the Bar Date Order as <u>Exhibit 1</u> thereto (the "**Proof of Claim**") so that it is actually received by Kroll on or before the first Business Day that is twenty (20) days following the Confirmation Date with respect to Specified Claims held by any such Entity arising prior to the Petition Date (the "**Specified Claims Bar Date**").  Holders of Specified Claims that are required to file and serve a proof of claim and that do not file and serve such proof of claim by the Specified Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Specified Claim against the Debtors or the applicable Estate Representative and their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released without consideration as of the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the provisions thereof are binding on the Debtors and any holder of a Claim against, or Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder voted to accept the Plan.

**PLEASE TAKE FURTHER NOTICE** that you may also access electronic copies of the form of Proof of Administrative Claim and the Proof of Claim via the QR Code below.  The form of administrative proof of claim is also available on the "Submit a Claim" page at https://restructuring.ra.kroll.com/steward/.  Please be advised that Kroll cannot provide legal advice.



---

[3]  "**Specified Claims**" means any Entity that (i) asserts any claim of an employee of the Debtors for unused paid time off (other than an employee of the Debtors subject to the Bar Date Order); (ii) asserts any claim that is solely against any non-Debtor affiliate(s); and/or (iii) is a non-Debtor affiliate asserting a claim against a Debtor affiliate.

.
WEIL\100633206\11\76000.0004

Dated:  July [●], 2025
        Houston, Texas

_/s/  DRAFT_

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:    Gabriel.Morgan@weil.com
          Clifford.Carlson@weil.com
          Stephanie.Morrison@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted _pro hac vice_)
Jason H. George (admitted _pro hac vice_)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:    Jeffrey.Saferstein@weil.com
          Jason.George@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted _pro hac vice_)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:    DavidJ.Cohen@weil.com

_Attorneys for Debtors
and Debtors in Possession_

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted _pro hac vice_)
Candace M. Arthur (admitted _pro hac vice_)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:    Ray.Schrock@lw.com
          Candace.Arthur@lw.com

_Attorneys for Debtors
and Debtors in Possession_

3

**Exhibit C**

**Consummation Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC**, *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

## NOTICE OF EFFECTIVE DATE OF JOINT
## CHAPTER 11 PLAN OF LIQUIDATION OF STEWARD
## HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS

**PLEASE TAKE NOTICE** that on July [●], 2025, the Honorable Christopher M. Lopez, United States Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"), entered the *Findings of Fact, Conclusions of Law, and Order (I) Approving Disclosure Statement on a Final Basis and (II) Confirming Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. [●]) (the "**Confirmation Order**") confirming the *Confirming Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, dated July 11, 2025 (Docket No. 5492) (as supplemented and amended, the "**Plan**").[2]

**PLEASE TAKE FURTHER NOTICE** that on [●], all conditions precedent to consummation of the Plan were satisfied or waived in accordance with Article XI of the Plan. Further, no stay of the Confirmation Order is in effect. Accordingly, [●] is the Effective Date of the Plan. As of the Effective Date, the injunction set forth in Section 12.5 of the Plan is now in place.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise provided in the Plan, the deadline for filing requests for payment of Administrative Expense Claims arising between [●] and [●] is [●] (the "**Administrative Expense Claims Bar Date**"). Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or the applicable Estate Representative and their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released without consideration as of the Effective Date.

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**PLEASE TAKE FURTHER NOTICE** that in accordance with <u>Section 10.1</u> of the Plan, on the Effective Date, except as otherwise provided in the Plan, all Executory Contracts and Unexpired Leases to which any of the Debtors are parties shall be deemed rejected except for an Executory Contract or Unexpired Lease that: (i) is specifically and expressly designated as a contract or lease to be assumed pursuant to the Plan, including as set forth in the Schedule of Assumed Contracts or Confirmation Order; (ii) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate pending assumption or rejection motion on or before the Effective Date; (v) is the subject of a pending Cure Dispute; (vi) is a contract, lease, or other agreement or document entered into in connection with the Plan; or (vii) is a D&O Policy or other insurance policy to which any Debtor or Estate Representative is a beneficiary or an insured. For the avoidance of doubt, the Estate Representative may seek to assume, assume and assign, or reject any Executory Contract or Unexpired Lease at any time prior to the Effective Date, whether or not such Executory Contract or Unexpired Lease is listed on the Schedule of Assumed Contracts. As of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that copies of the Confirmation Order, Plan and Disclosure Statement may be obtained free of charge by visiting the website maintained by Kroll Restructuring Administration LLC ("**Kroll**") at <u>https://restructuring.ra.kroll.com/Steward</u>. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://www.pacer.gov/. Please note that a PACER password and login are required to access documents via PACER.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the provisions thereof (including the exhibits and schedules thereto and all documents and agreements executed pursuant thereto or in connection therewith), the Plan Documents, the Plan Supplement, and the Confirmation Order are effective and enforceable and shall bind the Debtors, the Released Parties, the Exculpated Parties, all holders of Claims and Interests (irrespective of whether such Claims or Interests are Impaired under the Plan or whether the holders of such Claims or Interests accepted or are deemed to have accepted the Plan), any other Person giving, acquiring, or receiving property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases with any of the Debtors, any other party in interest in the Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing. All settlements, compromises, releases (including, without limitation, the releases set forth in <u>Article XII</u> of the Plan), waivers, discharges, exculpations, and injunctions set forth in the Plan are effective and binding on any Entity that may have had standing to assert any settled, compromised, released, waived, discharged, exculpated, or enjoined Causes of Action.

**PLEASE TAKE FURTHER NOTICE** that you may also access electronic copies of the form of administrative proof of claim via the QR Code below. The form of administrative proof of claim is also available on the "Submit a Claim" page at https://restructuring.ra.kroll.com/steward/. Please be advised that Kroll cannot provide legal advice.



*[Remainder of Page Left Intentionally Blank.]*

Dated:  [●]
        Houston, Texas

*/s/  DRAFT*

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:    Gabriel.Morgan@weil.com
          Clifford.Carlson@weil.com
          Stephanie.Morrison@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:    Jeffrey.Saferstein@weil.com
          Jason.George@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:    DavidJ.Cohen@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:    Ray.Schrock@lw.com
          Candace.Arthur@lw.com

*Attorneys for Debtors*
*and Debtors in Possession*

**Exhibit D**

**Form of Proof of Administrative Claim**

**United States Bankruptcy Court, Southern District of Texas**

# Proof of Administrative Expense Claim

**Read the instructions before filling out this form. This form is for asserting claims entitled to administrative priority pursuant to 11 U.S.C. § 503(b) and 11 U.S.C. § 507(a)(2) against one of the below Debtors (i) arising on or after November 16, 2024 or (ii) for which a proof of claim was not required to be submitted pursuant to the Bar Date Order (Docket No. 3217) or Administrative Expense Claims Bar Date Order (Docket No. 3217). Do not use this form to assert any claims arising prior to May 6, 2024, or post-petition claims arising on or prior to November 15, 2024 that were subject to the Administrative Expense Claims Bar Date Order.**

<u>**Attach redacted copies of any documents that support the claim**</u>, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment. Claims submitted without documented support may be subject to an objection by the Debtors. If such an objection occurs, you will be notified in writing.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

| Fill in this information to identify the case (Select only one Debtor per claim form): |
|---|

| | | |
|---|---|---|
| ☐ Steward Health Care System LLC (Case No. 24-90213) | ☐ Mesa General Hospital, LP (Case No. 24-90277) | ☐ Steward Good Samaritan Radiation Oncology Center, Inc. (Case No. 24-90255) |
| ☐ Arizona Diagnostic & Surgical Center, Inc. (Case No. 24-90214) | ☐ Morton Hospital, A Steward Family Hospital, Inc. (Case No. 24-90282) | ☐ Steward Health Care Holdings LLC (Case No. 24-90212) |
| ☐ Beaumont Hospital Holdings, Inc. (Case No. 24-90215) | ☐ Mountain Point Holdings, LLC (Case No. 24-90289) | ☐ Steward Health Care International LLC (Case No. 24-90260) |
| ☐ Biltmore Surgery Center Holdings, Inc. (Case No. 24-90216) | ☐ Mountain Vista Medical Center, LP (Case No. 24-90297) | ☐ Steward Health Care Network ACO Texas, Inc. (Case No. 24-90265) |
| ☐ Biltmore Surgery Center, Inc. (Case No. 24-90217) | ☐ MT Transition LP (Case No. 24-90303) | ☐ Steward Health Care Network, Inc. (Case No. 24-90271) |
| ☐ Blackstone Medical Center, Inc. (Case No. 24-90219) | ☐ Nashoba Valley Medical Center, A Steward Family Hospital, Inc. (Case No. 24-90313) | ☐ Steward Health Care OZ Fund, Inc. (Case No. 24-90279) |
| ☐ Blackstone Rehabilitation Hospital, Inc. (Case No. 24-90223) | ☐ New England Sinai Hospital, A Steward Family Hospital, Inc. (Case No. 24-90329) | ☐ Steward Health Choice, Inc. (Case No. 24-90286) |
| ☐ Boston Orthopedic Center, LLC (Case No. 24-90225) | ☐ Odessa Fertility Lab, Inc. (Case No. 24-90334) | ☐ Steward Healthcare Management Services LLC (Case No. 24-90293) |
| ☐ Boston Sports Medicine and Research Institute, LLC (Case No. 24-90230) | ☐ Odessa Regional Hospital, LP (Case No. 24-90348) | ☐ Steward HH, Inc. (Case No. 24-90298) |
| ☐ Brevard SHC Holdings LLC (Case No. 24-90236) | ☐ OnSite Care MSO, LLC (Case No. 24-90358) | ☐ Steward Hillside Rehabilitation Hospital, Inc. (Case No. 24-90304) |
| ☐ Brim Healthcare of Colorado, LLC (Case No. 24-90242) | ☐ OnSite Care, Inc. (Case No. 24-90352) | ☐ Steward Holy Family Hospital, Inc. (Case No. 24-90309) |
| ☐ Brim Healthcare of Texas, LLC (Case No. 24-90248) | ☐ Permian Basin Clinical Services, Inc. (Case No. 24-90365) | ☐ Steward Hospital Holdings LLC (Case No. 24-90314) |
| ☐ Brim Holding Company, Inc. (Case No. 24-90261) | ☐ Permian Premier Health Services, Inc. (Case No. 24-90371) | ☐ Steward Hospital Holdings Subsidiary One, Inc. (Case No. 24-90320) |
| ☐ Brim Physicians Group of Colorado, LLC (Case No. 24-90266) | ☐ Physician Group of Arizona, Inc. (Case No. 24-90373) | ☐ Steward Imaging & Radiology Holdings LLC (Case No. 24-90326) |
| ☐ Choice Care Clinic I, Inc. (Case No. 24-90278) | ☐ Physician Group of Arkansas, Inc. (Case No. 24-90374) | ☐ Steward Medicaid Care Network, Inc. (Case No. 24-90331) |
| ☐ Choice Care Clinic II, Inc. (Case No. 24-90283) | ☐ Physician Group of Florida, Inc. (Case No. 24-90375) | ☐ Steward Medical Group Express Care, Inc. (Case No. 24-90337) |
| ☐ Choice Care Clinic III, Inc. (Case No. 24-90287) | ☐ Physician Group of Louisiana, Inc. (Case No. 24-90376) | ☐ Steward Medical Group Pennsylvania Endoscopy LLC (Case No. 24-90354) |
| ☐ Choice Care Clinic of Louisiana, Inc. (Case No. 24-90291) | ☐ Physician Group of Utah, Inc. (Case No. 24-90220) | ☐ Steward Medical Group, Inc. (Case No. 24-90362) |
| ☐ Choice Care Clinic of Utah, Inc. (Case No. 24-90299) | ☐ Podiatric Physicians Management of Arizona, Inc. (Case No. 24-90226) | ☐ Steward Medical Holdings LLC (Case No. 24-90357) |
| ☐ Converse Medical Center LLC (Case No. 24-90306) | ☐ PP Transition LP (Case No. 24-90231) | ☐ Steward Medical Ventures, Inc. (Case No. 24-90360) |
| ☐ Davis Hospital & Medical Center, LP (Case No. 24-90315) | ☐ PP Transition, Inc. (Case No. 24-90228) | ☐ Steward Melbourne Hospital, Inc. (Case No. 24-90363) |
| ☐ Davis Hospital Holdings, Inc. (Case No. 24-90318) | ☐ Quincy Medical Center, A Steward Family Hospital, Inc. (Case No. 24-90235) | ☐ Steward New England Initiatives, Inc. (Case No. 24-90364) |
| ☐ Davis Surgical Center Holdings, Inc. (Case No. 24-90324) | ☐ Riverwoods ASC Holdco LLC (Case No. 24-90241) | ☐ Steward Norwood Hospital, Inc. (Case No. 24-90366) |
| ☐ De Zavala Medical Center LLC (Case No. 24-90340) | ☐ Salt Lake Regional Medical Center, LP (Case No. 24-90245) | ☐ Steward NSMC, Inc. (Case No. 24-90367) |

## Fill in this information to identify the case (Select only one Debtor per claim form):

- ☐ Downtown Houston Physician Hospital Organization (Case No. 24-90211)
- ☐ Glenwood Specialty Imaging, LLC (Case No. 24-90344)
- ☐ HC Essential Co. (Case No. 24-90347)
- ☐ Health Choice Florida, Inc. (Case No. 24-90350)
- ☐ Health Choice Louisiana, Inc. (Case No. 24-90218)
- ☐ Health Choice Managed Care Solutions LLC (Case No. 24-90224)
- ☐ Health Choice Northern Arizona LLC (Case No. 24-90227)
- ☐ Health Choice Preferred Accountable Care LLC (Case No. 24-90229)
- ☐ Health Choice Preferred Louisiana ACO LLC (Case No. 24-90234)
- ☐ Health Choice Preferred Louisiana Physician Association LLC (Case No. 24-90237)
- ☐ Health Choice Preferred Texas ACO - Alamo Region LLC (Case No. 24-90239)
- ☐ Health Choice Preferred Texas ACO - Gulf Coast Region LLC (Case No. 24-90244)
- ☐ Health Choice Preferred Texas Physician Association - Alamo Region LLC (Case No. 24-90250)
- ☐ Health Choice Preferred Texas Physician Association - Gulf Coast Region LLC (Case No. 24-90253)
- ☐ Health Choice Utah Accountable Care LLC (Case No. 24-90257)
- ☐ HealthUtah Holdco LLC (Case No. 24-90262)
- ☐ Heritage Technologies, LLC (Case No. 24-90273)
- ☐ IASIS Capital Corporation (Case No. 24-90276)
- ☐ IASIS Finance II LLC (Case No. 24-90281)
- ☐ IASIS Finance III LLC (Case No. 24-90285)
- ☐ IASIS Finance Texas Holdings, LLC (Case No. 24-90295)
- ☐ IASIS Finance, Inc. (Case No. 24-90290)
- ☐ IASIS Glenwood Regional Medical Center, LP (Case No. 24-90301)
- ☐ IASIS Healthcare Corporation (Case No. 24-90311)
- ☐ IASIS Healthcare Holdings, Inc. (Case No. 24-90317)
- ☐ IASIS Healthcare LLC (Case No. 24-90319)
- ☐ IASIS Management Company (Case No. 24-90322)
- ☐ IASIS Transco, Inc. (Case No. 24-90325)
- ☐ Indigent Care Services of Northeast Louisiana, Inc. (Case No. 24-90247)
- ☐ Jordan Valley Hospital Holdings, Inc. (Case No. 24-90252)
- ☐ Jordan Valley Medical Center, LP (Case No. 24-90263)
- ☐ Legacy Trails Medical Center LLC (Case No. 24-90269)

- ☐ Salt Lake Regional Physicians, Inc. (Case No. 24-90251)
- ☐ Seaboard Development LLC (Case No. 24-90256)
- ☐ Seaboard Development Port Arthur LLC (Case No. 24-90258)
- ☐ SHC Youngstown Ohio Laboratory Services Company LLC (Case No. 24-90267)
- ☐ SHC Youngstown Ohio Outpatient Services LLC (Case No. 24-90270)
- ☐ SHC Youngstown Ohio PSC LLC (Case No. 24-90274)
- ☐ SJ Medical Center, LLC (Case No. 24-90210)
- ☐ Southridge Plaza Holdings, Inc. (Case No. 24-90275)
- ☐ Southwest General Hospital, LP (Case No. 24-90280)
- ☐ St. Luke's Behavioral Hospital, LP (Case No. 24-90284)
- ☐ St. Luke's Medical Center, LP (Case No. 24-90294)
- ☐ Steward Accountable Care Organization, Inc. (Case No. 24-90302)
- ☐ Steward Anesthesiology Physicians of Florida, Inc. (Case No. 24-90307)
- ☐ Steward Anesthesiology Physicians of Massachusetts, Inc. (Case No. 24-90310)
- ☐ Steward Anesthesiology Physicians of Pennsylvania, Inc. (Case No. 24-90328)
- ☐ Steward ASC Holdings LLC (Case No. 24-90332)
- ☐ Steward Carney Hospital, Inc. (Case No. 24-90336)
- ☐ Steward CGH, Inc. (Case No. 24-90339)
- ☐ Steward Easton Hospital, Inc. (Case No. 24-90341)
- ☐ Steward Emergency Physicians of Arizona, Inc. (Case No. 24-90346)
- ☐ Steward Emergency Physicians of Florida, Inc. (Case No. 24-90349)
- ☐ Steward Emergency Physicians of Pennsylvania, Inc. (Case No. 24-90351)
- ☐ Steward Emergency Physicians Ohio, Inc. (Case No. 24-90353)
- ☐ Steward Emergency Physicians, Inc. (Case No. 24-90343)
- ☐ Steward Employer Solutions LLC (Case No. 24-90355)
- ☐ Steward Fall River Management Care Services LLC (Case No. 24-90356)
- ☐ Steward Florida ALF LLC (Case No. 24-90359)
- ☐ Steward Florida ASC LLC (Case No. 24-90361)
- ☐ Steward Florida Holdings LLC (Case No. 24-90222)
- ☐ Steward FMC, Inc. (Case No. 24-90233)
- ☐ Steward Good Samaritan Medical Center, Inc. (Case No. 24-90240)
- ☐ Steward Good Samaritan Occupational Health Services, Inc. (Case No. 24-90246)

- ☐ Steward Ohio Holdings LLC (Case No. 24-90368)
- ☐ Steward Operations Holdings LLC (Case No. 24-90369)
- ☐ Steward Pathology Physicians of Massachusetts, Inc. (Case No. 24-90370)
- ☐ Steward Pennsylvania Holdings LLC (Case No. 24-90372)
- ☐ Steward PET Imaging, LLC (Case No. 24-90221)
- ☐ Steward PGH, Inc. (Case No. 24-90232)
- ☐ Steward Physician Contracting, Inc. (Case No. 24-90238)
- ☐ Steward Radiology Physicians of Arizona, Inc. (Case No. 24-90243)
- ☐ Steward Radiology Physicians of Florida, Inc. (Case No. 24-90249)
- ☐ Steward Radiology Physicians of Massachusetts, Inc. (Case No. 24-90254)
- ☐ Steward Radiology Physicians of Pennsylvania, Inc. (Case No. 24-90259)
- ☐ Steward Rockledge Hospital, Inc. (Case No. 24-90264)
- ☐ Steward SA FSED Holdings, Inc. (Case No. 24-90268)
- ☐ Steward Sebastian River Medical Center, Inc. (Case No. 24-90272)
- ☐ Steward Sharon Regional Health System, Inc. (Case No. 24-90288)
- ☐ Steward Special Projects LLC (Case No. 24-90292)
- ☐ Steward St. Anne's Hospital Corporation (Case No. 24-90296)
- ☐ Steward St. Elizabeth's Medical Center of Boston, Inc. (Case No. 24-90300)
- ☐ Steward St. Elizabeth's Realty Corp. (Case No. 24-90305)
- ☐ Steward Texas Hospital Holdings LLC (Case No. 24-90308)
- ☐ Steward Trumbull Memorial Hospital, Inc. (Case No. 24-90312)
- ☐ Steward TSC Investments LLC (Case No. 24-90316)
- ☐ Steward Valley Regional Ventures, Inc. (Case No. 24-90321)
- ☐ Steward West Ventures Co. (Case No. 24-90323)
- ☐ Stewardship Health Medical Group, Inc. (Case No. 24-90330)
- ☐ Stewardship Health, Inc. (Case No. 24-90327)
- ☐ Stewardship Services Inc. (Case No. 24-90333)
- ☐ The Medical Center of Southeast Texas, LP (Case No. 24-90335)
- ☐ TNC Transition LP (Case No. 24-90338)
- ☐ TRACO Investment Management LLC (Case No. 24-90342)
- ☐ Utah Transcription Services, Inc. (Case No. 24-90345)

## Part 1: Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor |
| 2. **Has this claim been acquired from someone else?** | ☐ No <br> ☐ Yes. From whom? |
| 3. **Where should notices and creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**    **Where should payments to the creditor be sent?** (if different) <br><br> Name     Name <br><br> Number   Street     Number   Street <br><br> City   State   Postal Code    City   State   Postal Code <br><br> Country     Country <br><br> Contact phone     Contact phone <br><br> Contact email     Contact email |
| 4. **Does this claim amend one already filed?** | ☐ No <br> ☐ Yes. Claim number on court claims registry (if known)_____    Filed on _____ MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☐ No <br> ☐ Yes. Who made the earlier filing? |

## Part 2: Give Information About the Claim

| | |
|---|---|
| 6. **Date debt was incurred?** (if known) | _____ <br> MM / DD / YYYY |
| 7. **How much is the administrative expense claim?** | $ |
| 8. **What is the basis of the claim? (for example, Goods Sold, Services Performed, Taxes, etc)** | |

**Supporting Documentation.** Each Proof of Administrative Expense Claim must include supporting documentation as contemplated by Bankruptcy Rules 3001(c) and 3001(d). If, however, such documentation is voluminous, upon prior written consent of the Debtors' counsel, such Proof of Administrative Claim may include a summary of such documentation or an explanation as to why such documentation is not available; provided that any creditor that received such written consent shall be required to transmit such writings to Debtors' counsel upon request no later than ten days from the date of such request.

Case 24-90577 Document 1721 Filed in TXSB on 07/25/25 Page 603 of 1832

| Part 3: | Sign Below |
|---------|------------|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____ (mm/dd/yyyy)

_____
Signature

**Print the name of the person who is completing and signing this claim:**

Name _____
       First name               Middle name              Last name

Title _____

Company _____
      Identify the corporate servicer as the company if the authorized agent is a servicer.

Address _____
       Number        Street

_____
City                   State      ZIP Code

Contact phone _____ Email _____

# EXHIBIT 6

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| **STEWARD HEALTH CARE SYSTEM LLC**, *et al.*, | § | Case No. 24-90213 (CML) |
|  | § |  |
| Debtors.[1] | § | (Jointly Administered) |
|  | § |  |

## JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
## STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Attorneys for Debtors and Debtors in Possession*

July 11, 2025
Houston, Texas

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

# Table of Contents

**ARTICLE I.    Definitions and Interpretation**................................................................1

1.1    Definitions. ................................................................................................1
1.2    Interpretation; Application of Definitions; Rules of Construction. ...........20
1.3    Reference to Monetary Figures. ...............................................................21
1.4    Controlling Document. .............................................................................21

**ARTICLE II.    Administrative Expense Claims, FILO DIP Claims, Professional Fee Claims, and Priority Tax Claims.** .........................................21

2.1    Administrative Expense Claims. ..............................................................21
2.2    FILO DIP Claims. ....................................................................................22
2.3    Professional Fee Claims. ..........................................................................22
2.4    Priority Tax Claims. .................................................................................23

**ARTICLE III.    Classification of Claims and Interests** .........................................24

3.1    Classification in General. ........................................................................24
3.2    Summary of Classification of Claims and Interests. ................................24
3.3    Special Provision Governing Unimpaired Claims. ...................................25
3.4    Elimination of Vacant Classes. ................................................................25
3.5    Voting Classes; Presumed Acceptance by Non-Voting Classes. ...............25
3.6    Voting; Presumptions; Solicitation. ..........................................................25
3.7    Cramdown. ...............................................................................................26
3.8    No Waiver. ...............................................................................................26

**ARTICLE IV.    Treatment of Claims and Interests.** ..............................................26

4.1    Class 1:  Other Priority Claims. ...............................................................26
4.2    Class 2:  Other Secured Claims. ...............................................................26
4.3    Class 3:  FILO Bridge Claims. .................................................................27
4.4    Class 4:  General Unsecured Claims. ........................................................28
4.5    Class 5: PBGC Claims. ............................................................................28
4.6    Class 6:  Intercompany Claims. ................................................................28
4.7    Class 7:  Subordinated Securities Claims. ................................................28
4.8    Class 8: Intercompany Interests. ...............................................................29
4.9    Class 9:  Non-Debtor Owned Subsidiary Interests. ..................................29
4.10   Class 10:  Parent Interests. .......................................................................29

**ARTICLE V.    Means for Implementation** .........................................................30

5.1    Joint Chapter 11 Plan ...............................................................................30
5.2    Compromise and Settlement of Claims, Interests, and Controversies........30
5.3    Plan Settlement. .......................................................................................30
5.4    Sources of Consideration for Plan Distribution. ......................................31
5.5    Implementation. .......................................................................................32
5.6    Transition Services Agreement .................................................................33
5.7    Litigation Funding Agreement ..................................................................34
5.8    Coordination between the Litigation Trust and the Plan Trust. .................34

| | | |
|---|---|---|
| 5.9 | Corporate Action. | 35 |
| 5.10 | Plan Administrator Committee | 35 |
| 5.11 | Governance. | 35 |
| 5.12 | Cancellation of Existing Securities, Agreements, and Liens | 36 |
| 5.13 | Merger or Dissolution of Debtors. | 36 |
| 5.14 | Preservation of Causes of Action. | 37 |
| 5.15 | Effectuating Documents; Further Transactions. | 37 |
| 5.16 | Closing of the Chapter 11 Cases. | 38 |

**ARTICLE VI.    Plan Trust.    38**

| | | |
|---|---|---|
| 6.1 | Establishment of the Plan Trust. | 38 |
| 6.2 | Funding of and Transfer of Assets into the Plan Trust. | 40 |
| 6.3 | Plan Trustee. | 40 |
| 6.4 | Plan Trust Agreement. | 43 |
| 6.5 | Fees and Expenses of the Plan Trust. | 43 |
| 6.6 | Creation and Maintenance of Trust Accounts. | 43 |
| 6.7 | Limitation of Liability. | 43 |
| 6.8 | Indemnification. | 44 |
| 6.9 | Insurance. | 44 |
| 6.10 | Dissolution of the Plan Trust. | 45 |
| 6.11 | Records. | 45 |
| 6.12 | Section 1145 Exemption; Non-Transferability of Plan Trust Interests. | 45 |
| 6.13 | Plan Trust Tax and Other Matters. | 46 |

**ARTICLE VII.    Litigation Trust    49**

| | | |
|---|---|---|
| 7.1 | Establishment of the Litigation Trust. | 49 |
| 7.2 | Funding of and Transfer of Assets into the Litigation Trust. | 51 |
| 7.3 | Litigation Trustee. | 52 |
| 7.4 | Litigation Trust Agreement. | 53 |
| 7.5 | Class B Representative. | 54 |
| 7.6 | Fees and Expenses of the Litigation Trust | 54 |
| 7.7 | Indemnification. | 54 |
| 7.8 | Dissolution of the Litigation Trust. | 55 |
| 7.9 | Records. | 55 |
| 7.10 | Transferability of Litigation Trust Interests. | 55 |
| 7.11 | Litigation Trust Tax and Other Matters. | 55 |

**ARTICLE VIII.    Distributions.    59**

| | | |
|---|---|---|
| 8.1 | Distributions Generally. | 59 |
| 8.2 | No Postpetition Interest on Claims. | 59 |
| 8.3 | Distribution Record Date. | 59 |
| 8.4 | Date of Distributions. | 60 |
| 8.5 | Reserve on Account of Disputed Claims. | 60 |
| 8.6 | Distributions After Effective Date. | 61 |
| 8.7 | Plan Distributions Made by Plan Trustee. | 61 |
| 8.8 | Delivery of Distributions. | 61 |
| 8.9 | Unclaimed Property. | 61 |
| 8.10 | Satisfaction of Claims. | 62 |

| 8.11 | Manner of Payment Under Plan. | 62 |
|------|-------------------------------|----|
| 8.12 | Minimum Distribution. | 62 |
| 8.13 | No Distribution in Excess of Amount of Allowed Claim. | 62 |
| 8.14 | Allocation of Distributions Between Principal and Interest. | 63 |
| 8.15 | Setoffs and Recoupments. | 63 |
| 8.16 | Withholding and Reporting Requirements. | 63 |
| 8.17 | Securities Registration Exemption. | 64 |
| 8.18 | Disbursing Agent. | 64 |

**ARTICLE IX.     Procedures for Resolving Claims.** ............................................. **65**

| 9.1 | Allowance of Claims. | 65 |
|-----|---------------------|----|
| 9.2 | Objections to Claims. | 65 |
| 9.3 | Estimation of Claims. | 65 |
| 9.4 | Claim Resolution Procedures Cumulative. | 66 |
| 9.5 | Adjustment to Claims Register Without Objection. | 66 |
| 9.6 | No Distributions Pending Allowance. | 66 |
| 9.7 | Distributions After Allowance. | 66 |
| 9.8 | Elimination of Duplicate Claims. | 67 |
| 9.9 | Late Filed Claims. | 67 |
| 9.10 | Amendments to Claims. | 67 |
| 9.11 | Insured Claims. | 67 |
| 9.12 | Medical Liability Claims Procedures. | 68 |

**ARTICLE X.     Executory Contracts and Unexpired Leases.** ............................... **68**

| 10.1 | Rejection of Executory Contracts and Unexpired Leases. | 68 |
|------|--------------------------------------------------------|----|
| 10.2 | Survival of Indemnification Obligations. | 69 |
| 10.3 | Determination of Cure Disputes and Deemed Consent. | 69 |
| 10.4 | Rejection Damages Claims. | 70 |
| 10.5 | Joint Ventures. | 71 |
| 10.6 | Insurance Policies. | 71 |
| 10.7 | Assignment. | 72 |
| 10.8 | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 72 |
| 10.9 | Reservation of Rights. | 72 |

**ARTICLE XI.     Conditions Precedent to Occurrence of Effective Date.** .......................... **73**

| 11.1 | Conditions Precedent to Effective Date | 73 |
|------|----------------------------------------|----|
| 11.2 | Waiver of Conditions Precedent | 73 |
| 11.3 | Effect of Failure of a Condition | 74 |
| 11.4 | Effect of Vacatur of Confirmation Order. | 74 |

**ARTICLE XII.     Effect of Confirmation.** ......................................... **74**

| 12.1 | Binding Effect. | 74 |
|------|-----------------|----|
| 12.2 | Vesting of Assets. | 74 |
| 12.3 | Pre-Confirmation Injunctions and Stays. | 75 |
| 12.4 | Injunction Against Interference with Plan. | 75 |
| 12.5 | Plan Injunction. | 76 |
| 12.6 | Releases. | 77 |

12.7  Exculpation. ............................................................................................................. 80
12.8  Waiver of Statutory Limitation on Releases. ......................................................... 81
12.9  Injunction Related to Releases and Exculpation. .................................................. 81
12.10  Subordinated Claims. ............................................................................................. 82
12.11  Retention of Causes of Action and Reservation of Rights. .................................... 82
12.12  Ipso Facto and Similar Provisions Ineffective. .................................................... 82
12.13  Solicitation of Plan. ............................................................................................... 82
12.14  Corporate and Limited Liability Company Action. ............................................... 83
12.15  Release of Liens. .................................................................................................... 83

**ARTICLE XIII.  Retention of Jurisdiction. ....................................................................... 83**

13.1  Retention of Jurisdiction. ...................................................................................... 83
13.2  Courts of Competent Jurisdiction. ......................................................................... 86

**ARTICLE XIV.  Miscellaneous Provisions. ....................................................................... 86**

14.1  Statutory Fees. ....................................................................................................... 86
14.2  Exemption from Certain Transfer Taxes. ............................................................... 86
14.3  Dissolution of Creditors' Committee. .................................................................... 87
14.4  Request for Expedited Determination of Taxes of the Debtors. ............................ 87
14.5  Dates of Actions to Implement Plan. ..................................................................... 87
14.6  Amendments. .......................................................................................................... 87
14.7  Revocation or Withdrawal of Plan. ........................................................................ 88
14.8  Notice of Effective Date. ....................................................................................... 88
14.9  Substantial Consummation. .................................................................................... 88
14.10  Governing Law. ...................................................................................................... 88
14.11  Immediate Binding Effect. ..................................................................................... 89
14.12  Successors and Assigns. ......................................................................................... 89
14.13  Entire Agreement. .................................................................................................. 89
14.14  Severability of Plan Provisions. ............................................................................ 89
14.15  Additional Documents. ........................................................................................... 89
14.16  Deemed Acts. .......................................................................................................... 90
14.17  Computing Time. .................................................................................................... 90
14.18  Exhibits to Plan. ..................................................................................................... 90
14.19  Notices. ................................................................................................................... 90
14.20  Reservation of Rights. ............................................................................................ 93

Each of the debtors in the above-captioned chapter 11 cases (each, a "**Debtor**" and, collectively, the "**Debtors**") proposes the following joint chapter 11 plan of liquidation pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in <u>Section 1.1</u> below.

## ARTICLE I.  DEFINITIONS AND INTERPRETATION.

### 1.1  *Definitions.*

The following terms shall have the respective meanings specified below:

*2016 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in October 2016 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2020 Transactions* means, individually and/or collectively, (i) the transactions that were entered into and/or occurred in and or about May 2020 pursuant to which: (a) Manolete Health, LLC purchased Steward Healthcare International Holdings Ltd. from Steward Health Care System LLC, (b) Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**") contributed real properties to MPT of Utah-Steward, LLC (together with its subsidiaries, the "**Utah JV**") for common equity interests in the Utah JV and subsequent cash distributions from the Utah JV, and the Utah JV leased such real properties back to Jordan Valley and Davis, and (c) Cerberus Operations and Advisory Company exchanged its equity in Steward Healthcare Investors LLC for a $350 million convertible note, and (ii) all other transactions related thereto, including any transactions in what was referred to at the time as Project Easter.

*2021 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in January 2021 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2022 Transaction* means the transaction or transactions entered into on or about May 31, 2022 (and certain other dates in 2022) by and among, among others, Sparta Merger Sub I Inc., Sparta Merger Sub II Inc., Sparta Merger Sub III Inc., Sparta Merger Sub I LLC, Sparta Merger Sub II LLC, Sparta Merger Sub III LLC, Sparta Sub Inc., SNCN Holdco Inc., SICN Holdco Inc., Steward Integrated Care Network, Inc., Steward Accountable Care Network, Inc., Steward Health Care Network Inc., Sparta Holding Co. LLC, Steward Health Care System LLC and CareMax, Inc. pursuant to which certain value-based care assets were transferred to Sparta Holding Co. LLC and acquired by CareMax, Inc., and all other transactions related thereto or included therein (including any dividends, distributions, and/or allocations paid, made, and/or issued in 2022 in connection with and/or following such transaction(s), and any subsequent transfer of the proceeds thereof or arising therefrom).

*Administrative Expense Claim* means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under sections 327, 328, 330, 365, 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and

operating the Debtors' businesses and (ii) Professional Fee Claims, but excluding FILO DIP Claims, FILO Bridge Claims, Intercompany Claims, and Priority Tax Claims.

**Administrative Expense Claims Bar Date** means (i) the date fixed by the Administrative Expense Claims Bar Date Order by which any Person (including any Governmental Unit) asserting an Administrative Expense Claim against any Debtor (subject to the exceptions contained therein) must have filed a proof of Administrative Expense Claim with the Bankruptcy Court or application for allowance of such Administrative Expense Claim (as applicable) against any such Debtor or be forever barred from asserting such Administrative Expense Claim, (ii) the first Business Day that is twenty (20) days following the Confirmation Date with respect to Administrative Expense Claims (other than Professional Fee Claims) held by any Person (including any Governmental Unit) arising prior to the Confirmation Date that are not subject to the Administrative Expense Claims Bar Date Order, or (iii) the first Business Day that is twenty (20) days following the Effective Date, with respect to Administrative Expense Claims (other than Professional Fee Claims) held by any Person (including any Governmental Unit) arising between the Confirmation Date and the Effective Date. The Confirmation Order shall provide for the Administrative Expense Claims Bar Dates set forth in clauses (ii) and (iii) of the immediately preceding sentence.

**Administrative Expense Claims Bar Date Order** means the *Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claims Bar Date, and (V) Granting Related Relief* (Docket No. 3217), entered by the Bankruptcy Court on November 14, 2024.

**Administrative Expense Claims Consent Program** means the consent program proposed to certain holders of Administrative Expense Claims with respect to the treatment of such Administrative Expense Claims as set forth in the Confirmation Order and the Plan.

**Administrative Expense Claims Consent Program Condition** means that, in accordance with the terms and conditions of the Administrative Expense Claims Consent Program, holders of more than seventy-five percent (75%) of the aggregate dollar amount of Administrative Expense Claims, in the amounts set forth in the Administrative Expense Claims Consent Program Opt-Out Form, do not opt out of participating in the Administrative Expense Claims Consent Program, which such condition may be waived by the Debtors and the Creditors' Committee.

**Administrative Expense Claims Consent Program Opt-Out Form** means the opt-out form, approved under the Disclosure Statement Order, sent to holders of Administrative Expense Claims pursuant to which holders may opt out of participating in the Administrative Expense Claims Consent Program.

**Affiliate** means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity

twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Allowed* means, with respect to any Claim against or Interest in a Debtor, (i) any Claim or Interest arising on or before the Effective Date or under section 502(h) of the Bankruptcy Code (a) as to which no objection to allowance has been interposed within the time period set forth in this Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, (iii) any Claim or Interest expressly Allowed under this Plan, or (iv) any Claim that is listed in the Debtors' Schedules as liquidated, non-contingent, and undisputed; *provided* that the Debtors, the Plan Administrator Committee, and the Plan Trustee, as applicable, will retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to this Plan, except that no such Claims shall be retained against Released Parties other than as expressly set forth in <u>ARTICLE XII</u> of this Plan.

*Allowed Bridge MOIC Amount* means $11,250,000 through March 31, 2026 and increasing by: (i) $1,000,000 on April 1, 2026, (ii) $1,500,000 on May 1, 2026, (iii) $2,000,000 on June 1, 2026, (iv) 2,500,000 on July 1, 2026, (v) $3,000,000 on August 1, 2026, and (vi) $3,750,000 on September 1, 2026 and on the first day of each month thereafter until the FILO Balance (as defined in the FILO Settlement Term Sheet) is paid in full in Cash; *provided* that the Allowed Bridge MOIC Amount shall not exceed 85% of $75,000,000 *minus* any interest paid or accreted on account of the FILO Bridge Claims (including any interest paid or accreted on account of the Class A-2 Preference that is allocable to FILO Bridge Claims).

*Asset* means any right, title, and interest of a Debtor in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible.

*Available Cash* means Cash on hand (including any amounts invested pending distribution) of the Plan Trust or the Litigation Trust, as applicable, as of the date of determination, net of any amounts reserved in respect of Disputed Claims and any reserves established in the good faith discretion of the Plan Trustee or the Litigation Trustee, as applicable, in consultation with the Creditors' Committee, to provide for payment of any obligations or liabilities of the Plan Trust or Litigation Trust, as applicable, including any Claims assumed by the Plan Trust or the Litigation Trust pursuant to this Plan and any costs or expenses of the Plan Trust or Plan Trustee or the Litigation Trust or Litigation Trustee and any taxes (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes of such fund or separate taxable entity), or to maintain the value of any Assets of the Plan Trust or the Litigation Trust, as applicable.

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising

under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

*Ballot* means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

*Bar Date* means the date fixed by order(s) of the Bankruptcy Court (including the Bar Date Order or otherwise in this Plan or the Confirmation Order) by which any Persons, asserting a Claim against any Debtor must have filed a Proof of Claim or application for allowance of such Claim (as applicable) with the Bankruptcy Court against any such Debtor or be forever barred from asserting such Claim.

*Bar Date Order* means the *Order (I) Establishing Deadlines and Procedures for Filing Proofs of Claim; (II) Approving Form and Manner of Notice Thereof; and (III) Granting Related Relief* (Docket No. 1564) as may be modified, supplemented, or amended from time to time.

*Bridge Credit Agreement* means that certain *Credit Agreement*, dated as of February 21, 2024, by and among Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc. and Stewardship Health Medical Group, Inc., as borrowers thereunder, and the other loan parties party thereto, the lenders party thereto and Brigade Agency Services LLC, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

*Bridge MOIC* means the obligations of certain Debtors constituting the MOIC Amount (as defined in the Bridge Credit Agreement) under the Bridge Credit Agreement.

*Business Day* means any calendar day that is not a Saturday, Sunday, or other calendar day on which banks are authorized or required to be closed in New York, New York.

*Cash* means legal tender of the United States of America.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including but not limited to any and all rights of a Debtor, Debtor-in-possession, or Estate Representative to assert rights to extend time under 11 U.S.C. § 108. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any Avoidance Actions.

**Chapter 11 Case** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

**Chief Restructuring Officer** means John R. Castellano, in his capacity as Chief Restructuring Officer of each of the Debtors.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code.

**Claims and Noticing Agent** means Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors.

**Claims Register** means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

**Class** means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

**Class A Litigation Trust Interests** means, collectively, the Class A-1 Litigation Trust Interests and the Class A-2 Litigation Trust Interests.

**Class A-1 Litigation Trust Interests** shall mean the "Class A-1 interests" as set forth in the FILO Settlement Term Sheet.

5

*Class A-2 Litigation Trust Interests* shall mean the "Class A-2 interests" as set forth in the FILO Settlement Term Sheet.

*Class A-2 Preference* shall have the meaning set forth in the FILO Settlement Term Sheet.

*Class B Litigation Trust Interests* shall mean the "Class B interests" as set forth in the FILO Settlement Term Sheet.

*Class B Representative* means the representative of the Class B Litigation Trust Interests in accordance with the Litigation Trust Agreement, which shall initially be the Plan Administrator Committee.

*Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order.

*Confirmation Hearing* means the hearing held by the Bankruptcy Court regarding approval of the Disclosure Statement and confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

*Creditors' Committee* means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

*Cure Amount* means the payment of Cash or the distribution of other property (as the applicable parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume or assume and assign such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

*Cure Dispute* means an unresolved objection regarding assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including objections based on the appropriate Cure Amount or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or any other issue relating to assumption of an executory contract or unexpired lease.

*D&O Policy* means all directors and officers liability insurance policies (including any runoff policies or tail coverage) issued or providing coverage at any time to any of the Debtors, for current or formers directors', managers', and officers' liability and all agreements, documents, or instruments relating thereto.

*Debtor(s)* has the meaning set forth in the introductory paragraph of this Plan.

*Debtor Related Parties* means (i) with respect to each Debtor and each Estate, such

Debtor's or Estate's (a) attorneys, accountants, investment bankers, consultants, professional advisors, and independent auditors, (b) employed and affiliated physicians and other medical personnel (solely with respect to Medical Liability Claims asserted against such individuals and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), and (c) Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee) and Chief Restructuring Officer, as applicable, in each case of the immediately preceding clauses (a) – (c), solely in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

**Definitive Documents** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Plan, including, but not limited to: (i) the Plan; (ii) the Disclosure Statement; (iii) the motion seeking approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (iv) the Disclosure Statement Order; (v) each of the documents comprising the Plan Supplement; (vi) the Confirmation Order; (vii) the Plan Administrator Agreement; (viii) Plan Trust Agreement; and (ix) the Litigation Trust Agreement, each of which shall be in form and substance reasonably acceptable to the Creditors' Committee.

**DIP Orders** means (i) the FILO DIP Order and (i) the MPT DIP Order.

**Disbursing Agent** means the Plan Trustee or such Entity or Entities designated by the Plan Trustee to make or facilitate distributions required by the Plan.

**Disclosure Statement** means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time, and which is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3018.

**Disclosure Statement Order** means the order entered by the Bankruptcy Court (a) finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code; and (b) authorizing solicitation of the Plan.

**Disputed** means, with respect to a Claim, (i) any Claim that is disputed under ARTICLE IX of this Plan or as to which the Debtors or any party in interest have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim was not timely or properly filed, (iii) any Claim that is listed in the Schedules as unliquidated, contingent or disputed, and as to which no request for payment or proof of Claim has been filed, or (iv) any Claim that is otherwise disputed by any of the Debtors, the

Plan Administrator Committee, or the Plan Trustee or any party in interest in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Debtors or any party in interest dispute the amount of an asserted Claim, such Claim shall be deemed Allowed in the amount that is not disputed, if any, and a Disputed Claim as to the balance of such Claim.

*Disputed Claim Reserve* means any Plan Trust Assets allocable to, or held on account of, Disputed Claims, including one or more reserve accounts to be funded, in consultation with the Creditors' Committee, with Cash and/or proceeds of the Plan Trust Assets, as applicable, in accordance with the terms of the Plan, for Disputed Claims.

*Distribution Record Date* means the Effective Date.

*Effective Date* means the date that is the first Business Day on which all conditions to the effectiveness of this Plan set forth in <u>Section 11.1</u> of this Plan have been satisfied or waived in accordance with <u>Section 11.2</u> of this Plan.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*Estate Funding* means $6,500,000 of Cash paid by the Litigation Trust to the Debtors or the Plan Trust on the Litigation Trust Establishment Date to fund the administration of the Chapter 11 Cases after the Litigation Trust Establishment Date, in respect of which the FILO Parties indirectly providing such funding shall receive pursuant hereto, at the direction of the Debtors, Class A-1 Litigation Trust Interests having a liquidation preference (along with a proportionate interest in all other rights and obligations therein) equal to the amount of the Estate Funding; *provided* that, for the avoidance of doubt, the Estate Funding shall not otherwise be required to be repaid by the Debtors, the Estates, or the Plan Trust.

*Estate Representative* means either (i) the Debtors (prior to the Confirmation Date), (ii) the Plan Administrator Committee (on or after the Confirmation Date until the Plan Trust Establishment Date), or (iii) the Plan Trustee (on or after the Plan Trust Establishment Date), each as applicable.

*Exculpated Parties* means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

*Expense Escrow Account* shall have the meaning set forth in the MPT Settlement Order.

*FILO Bridge Agent* means Brigade Agency Services LLC, in its capacity as agent under the Bridge Credit Agreement.

**FILO Bridge Claims** means all Claims held by a FILO Bridge Lender under the Bridge Credit Agreement and DIP Orders, including, for the avoidance of doubt, the Remaining FILO Bridge Claims and the Retained FILO Claims.

**FILO Bridge Lenders** means all lenders that are not the MPT Bridge Lender under the Bridge Credit Agreement, each in their capacity as lender under the Bridge Credit Agreement.

**FILO DIP Agent** means the "Agent" under the FILO DIP Credit Agreement.

**FILO DIP Claim** means all Claims held by a FILO DIP Lender on account of, arising under the FILO DIP Credit Agreement and FILO DIP Order.

**FILO DIP Credit Agreement** means that certain *Debtor-in-Possession Credit Agreement*, dated as of July 10, 2024, by and among Steward Health Care System LLC, as borrower, the other Debtors jointly and severally, as guarantors, the FILO DIP Lenders, as lenders, and Brigade Agency Services LLC, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

**FILO DIP Lenders** shall have the meaning set forth in the FILO DIP Order.

**FILO DIP Order** means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

**FILO Lenders** shall have the meaning set forth in the FILO DIP Order.

**FILO Parties** means the (i) FILO DIP Lenders, (ii) FILO DIP Agent, (iii) FILO Bridge Lenders, (iv) FILO Bridge Agent, (v) Prepetition FILO Agent, (vi) FILO Lenders, and (vii) the providers of the Litigation Funding (as defined in the FILO Settlement Term Sheet).

**FILO Plan Trust Interests** means the beneficial interests in the Plan Trust granted to the holders of Allowed Retained FILO Claims, which beneficial interests shall entitle such holders to share in the FILO Plan Trust Recovery in accordance with the Plan.

**FILO Plan Trust Recovery** means 10% of the Plan Trust Recovery until Allowed Retained FILO Claims are paid in full, to be paid *pro rata* to the holders of the FILO Plan Trust Interests.

**FILO Settlement Order** means the *Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* (Docket No. 5035), entered by the Bankruptcy Court on June 2, 2025.

**FILO Settlement Term Sheet** means the term sheet approved by the FILO Settlement Order and annexed hereto as **Exhibit C**.

**Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**General Unsecured Claim** means (i) any unsecured Claim against any Debtor (including any prepetition Medical Liability Claim) that is not (a) an Administrative Expense Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a PBGC Claim; (e) a Retained FILO Claim; (f) an Intercompany Claim, or (g) otherwise entitled to priority under the Bankruptcy Code or any Final Order, and (ii) other than Intercompany Claims, any prepetition claim against a Debtor held by a non-Debtor that is a direct or indirect subsidiary of SHC Holdings.

**Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

**GUC Plan Trust Interests** means the beneficial interests in the Plan Trust granted to holders of Allowed General Unsecured Claims, which beneficial interests shall entitle such holders to share in the GUC Plan Trust Recovery in accordance with the Plan.

**GUC Plan Trust Recovery** means 90% of the Plan Trust Recovery until Allowed Retained FILO Claims are paid in full and 100% of the Plan Trust Recovery after Allowed Retained FILO Claims are paid in full, to be paid *pro rata* to the holders of the GUC Plan Trust Interests and PBGC Plan Trust Interests based on the aggregate amount of Allowed General Unsecured Claims and Allowed PBGC Claims.

**Hospital Debtors** means all Debtors, other than, for the avoidance of doubt, Steward Health Care Holdings LLC and Steward Health Care System LLC, that (i) held or owned a license to operate a hospital or (ii) operated a hospital located in Ohio, in each case, at any time during the Chapter 11 Cases.

**Identified Non-Released Parties** means (i) the Persons and Entities listed on **Exhibit B** annexed hereto, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the

immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

**Impaired** means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

**Indemnification Obligations** means each of the Debtors' indemnification obligations in place immediately prior to the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors and officers that are currently employed by, or serving on the board of directors of, any of the Debtors, as of the date immediately prior to the Effective Date, and the attorneys, accountants, investment bankers, and other Professionals that are retained by any of the Debtors as of the date immediately prior to the Effective Date.

**Individual Released Parties** means the individuals listed on **Exhibit A** annexed hereto, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

**Intercompany Claim** means any pre- or postpetition Claim against a Debtor held by another Debtor or by a controlled non-Debtor direct or indirect subsidiary of SHC Holdings; *provided* that any Claim that TRACO may have against the Debtors shall not be considered an Intercompany Claim.

**Intercompany Interests** means an Interest in a Debtor held by another Debtor.

**Initial Plan Distribution** means the first Plan Distribution that the Estate Representative makes to holders of Allowed Claims**.**

**Initial Plan Distribution Date** means the date selected by the Estate Representative, which will be no later than a date that is on or as soon as reasonably practicable after the Effective Date, on which the Estate Representative will make the Initial Plan Distribution; *provided* that, prior to the Effective Date, (i) the Estate Representative may distribute the Settled Administrative Expense Claims Cash Pool to holders of Settled Administrative Expense Claims pursuant to Section 2.1 of this Plan, (ii) the Plan Trustee may distribute the Plan Trust Interests in accordance with Section 6.1 of this Plan, (iii) the Litigation Trustee may distribute the Litigation Trust Interests in accordance with Section 7.1 of this Plan, and (iv) the Plan Trustee and Liquidation Trustee may distribute any Available Cash.

**Insured Claim** means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' insurance policies.

**Interest** means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

**Interim Compensation Procedures Order** means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 783), as may be amended, modified, or supplemented from time to time.

**Investigation Subcommittee** means the subcommittee of the Transformation Committee, consisting of Alan J. Carr and William Transier.

**IRS** means the United States Internal Revenue Service.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Litigation Funding Agreement** means the commitment letter and any ancillary documents thereto pursuant to which the FILO Parties shall provide financing to the Litigation Trust to fund (i) the cost of administering the Litigation Trust and monetizing the Litigation Trust Assets, (ii) the Secured Interim Advances, and (iii) the Estate Funding, and which shall be consistent with the FILO Settlement Term Sheet and otherwise in form and substance mutually agreeable to the Debtors, the Creditors' Committee, and the FILO Parties, with approval not to be unreasonably withheld, conditioned or delayed. A substantially final form of such letter mutually agreeable to the parties was filed with the Bankruptcy Court on May 25, 2025 [Docket No. 4966], and any changes to such substantially final form will be disclosed in the Plan Supplement.

**Litigation Trust** means that certain trust to be established in accordance with ARTICLE VII of this Plan and the FILO Settlement Order to hold the Litigation Trust Assets and make distributions to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement.

**Litigation Trust Agreement** means the agreement evidencing the terms and provisions governing the Litigation Trust, dated as of the Litigation Trust Establishment Date, establishing the terms and conditions of the Litigation Trust, the rights of, and limitations on, the Litigation Trust Interests, and pursuant to which the Litigation Trustee shall manage and administer the Litigation Trust Assets, and which shall be consistent with the FILO Settlement Term Sheet and otherwise in form and substance mutually agreeable to the Debtors, the Creditors' Committee, and the FILO Parties, with approval not to be unreasonably withheld, conditioned or delayed. A substantially final form of such agreement mutually agreeable to the parties was filed with the Bankruptcy Court on May 25, 2025 [Docket No. 4966], and any changes to such substantially final form will be disclosed in the Plan Supplement.

**Litigation Trust Assets** means, as of the Litigation Trust Establishment Date, all Assets of the Estates (including the Litigation Trust Causes of Action) identified on Schedule 1 of the FILO Settlement Term Sheet.

**Litigation Trust Beneficiaries** shall mean the holders of the Litigation Trust Interests.

**Litigation Trust Causes of Action** means all Claims and Causes of Action held by the Debtors that are not released or settled under the Plan, the FILO Settlement Order, or the Confirmation Order.

**Litigation Trust Establishment Date** means the date the Litigation Trust is established and the Litigation Trust Assets are transferred thereto in accordance with Section 7.1 of this Plan and the FILO Settlement Order.

**Litigation Trust Expenses** means any and all reasonable fees, costs and expenses incurred by the Litigation Trust or the Litigation Trustee (or any professional or other Person retained by the Litigation Trustee) on or after the Litigation Trust Establishment Date in connection with any of their duties under the Litigation Trust Agreement, including any administrative fees, attorneys' fees and expenses, insurance fees, taxes and escrow expenses.

**Litigation Trust Interests** means, collectively, the Class A Litigation Trust Interests and the Class B Litigation Trust Interests.

**Litigation Trustee** means Mark Kronfeld of Province, LLC, as trustee for the Litigation Trust.

**Mediator** means the Honorable Marvin Isgur, or in the event the Honorable Marvin Isgur is not available, such other entity or individual reasonably acceptable to the Litigation Trustee and the Estate Representative.

**Medical Liability Claims** means any Claim against any Debtor, any employed or affiliated physician of a Debtor, or any other medical personnel employed by a Debtor arising out of or related to alleged negligence in connection with the rendering of medical care prior to the Effective Date.

**Medical Liability Claims Procedures** means the procedures pursuant to which a general process and timeline will be established for reconciling and determining the Allowed amount of Medical Liability Claims against the Debtors, which procedures are annexed to this Plan as **Exhibit D**.

**MPT Bridge Lender** means the MPT Lender (as defined in the Bridge Credit Agreement) under the Bridge Credit Agreement.

**MPT DIP Order** means the *Final Order (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain*

*Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 625), entered by the Bankruptcy Court on June 3, 2024.

**MPT Settlement Order** means the *Final Order Approving (I) Global Settlement with Medical Properties Trust, Prepetition ABL/FILO Secured Parties, FILO Secured Parties, and Creditors' Committee, (II) Interim Management Procedures, and (III) Granting Related Relief* (Docket No. 2610), entered by the Bankruptcy Court on September 18, 2024.

**Non-Debtor Owned Subsidiary Interests** means Interests in Debtors (other than Parent Interests) that are owned by non-Debtors.

**Other Priority Claim** means any Claim other than an Administrative Expense Claim, a FILO DIP Claim, a FILO Bridge Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

**Other Secured Claim** means any Secured Claim other than an Administrative Expense Claim, a Priority Tax Claim, a FILO DIP Claim, or a FILO Bridge Claim.

**Parent Interests** means Interests in SHC Holdings.

**PBGC** means the Pension Benefit Guaranty Corporation.

**PBGC Claims** means the Claims of the PBGC, which shall be Allowed as prepetition unsecured claims, in the amount of $8,750,000 in accordance with Section 4.5 herein.

**PBGC Plan Trust Interests** means the beneficial interests in the Plan Trust granted to the PBGC, as the holder of the Allowed PBGC Claim, which beneficial interests shall entitle the PBGC to share in the GUC Plan Trust Recovery in accordance with the Plan.

**PBGC Settlement** means the settlement between the Debtors and the PBGC, to which the Creditors' Committee has concurred, the agreed terms of which are incorporated herein (including Section 4.5 hereof) and described in the Disclosure Statement.

**Pension Plan** means the New England Sinai Hospital Pension Plan.

**Person** means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

**Petition Date** means May 6, 2024.

**Physician Insurance Account** shall have the meaning set forth in the FILO DIP Order.

**Plan** means this joint chapter 11 plan, including all exhibits, annexes, supplements, and schedules hereto (including the Plan Supplement), as may be amended, supplemented, or modified from time to time in accordance with the Bankruptcy Code and the terms of this Plan.

**Plan Administrator Agreement** means the agreement setting forth, among other things, the identity, the terms of compensation, and the authority of the Plan Administrator Committee, and the scope of services to be provided by the Plan Administrator Committee, which agreement shall be in form and substance reasonably acceptable to the Creditors' Committee.

**Plan Administrator Committee** means a committee comprised of Monica Blacker, Alan J. Carr, and William Transier.

**Plan Distribution** means the payment or distribution of consideration to holders of Allowed Claims under this Plan.

**Plan Distribution Date** means a date or dates, including the Initial Plan Distribution Date, as determined by the Estate Representative, in accordance with the terms of the Plan and Confirmation Order, on which the Plan Trustee makes a Plan Distribution to holders of the Plan Trust Interests on account of Allowed Claims.

**Plan Supplement** means a supplemental appendix to this Plan, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of this Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and Bankruptcy Rules, which may include: (i) the Schedule of Identified Non-Released Parties; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Schedule of Alternative Plan Debtors; (v) the Wind Down Budget; (vi) the Plan Administrator Agreement; (vii) disclosure of the identity of the Plan Trustee; (viii) the Plan Trust Agreement; (ix) disclosure of the identity of the Litigation Trustee; (x) the Litigation Trust Agreement; (xi) the Transition Services Agreement; and (xii) the Litigation Funding Agreement.  Through the Effective Date, the Debtors shall have the right to amend any schedules, exhibits, or amendments to any of the documents contained in, and exhibits to, the Plan Supplement, subject to the consent rights of the Creditors' Committee and the FILO Parties herein.

**Plan Support Agreement Term Sheet** means the term sheet attached to the Disclosure Statement as Exhibit B.

**Plan Trust** means that certain trust to be established in accordance with ARTICLE VI of this Plan to hold the Plan Trust Assets and make distributions to holders of Allowed Claims pursuant to the Plan.

**Plan Trust Agreement** means the agreement evidencing the terms and provisions governing the Plan Trust, dated as of the Plan Trust Establishment Date, establishing the terms and conditions of the Plan Trust and pursuant to which the Plan Trustee shall manage and administer the Plan Trust Assets, which shall be in form and substance reasonably acceptable to the Creditors' Committee.

**Plan Trust Assets** means, on the Plan Trust Establishment Date, all Retained Assets and any property acquired by the Debtors after the establishment of the Litigation Trust (including, for the avoidance of doubt, the Class B Litigation Trust Interests), other than Intercompany Interests.

**Plan Trust Beneficiaries** means the holders of the Plan Trust Interests.

**Plan Trust Establishment Date** means the date the Plan Trust is established in accordance with Section 6.1 of this Plan.

**Plan Trust Interests** means, collectively, (i) the GUC Plan Trust Interests, (ii) the PBGC Plan Trust Interests, and (iii) the FILO Plan Trust Interests.

**Plan Trust Net Proceeds** means all Cash proceeds realized from the Plan Trust Assets (net of any taxes, including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes imposed on or with respect to any such fund or other separate taxable entity) after reserving in full for the Wind Down Reserve.

**Plan Trust Recovery** means one hundred percent (100%) of the Plan Trust Net Proceeds after satisfying or reserving in full for all Allowed Other Secured Claims, Administrative Expense Claims (including Professional Fee Claims), Priority Tax Claims, and Other Priority Claims, which reserves shall be determined by the Debtors in consultation with the Creditors' Committee.

**Plan Trustee** means a Person or Entity who shall serve as trustee of the Plan Trust, as contemplated by Section 6.3 of this Plan and the Plan Trust Agreement.

**Plane Sales** means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

**Prepetition FILO Agent** shall have the meaning set forth in the FILO DIP Order.

**Prepetition Transactions** means the (i) 2016 Distribution, (ii) 2020 Transactions, (iii) 2021 Distribution, (iv) 2022 Transaction, and (v) Plane Sales.

**Priority Tax Claim** means any Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Pro Rata Share** means (i) that proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interest in that Class entitled to share in the same recovery as such Class under the Plan, or (ii) that proportion that Allowed Claims in a particular Class bears to the aggregate amount of Allowed Claims in multiple Classes, as applicable.

**Professional** means any Entity retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

**Professional Fee Claim** means a Claim for fees and expenses incurred by a Professional on or after the Petition Date through and including the Effective Date under sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code.

**Professional Fees Escrow Account** shall have the meaning ascribed to such term in the DIP Orders.

**Proof of Claim** means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

**Related Parties** means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in this Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

**Releasing Parties** means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

**Reinstate, Reinstated, or Reinstatement** means with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

**Representative** means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors,

17

principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

> **Remaining FILO Bridge Claims** means the FILO Bridge Claims, other than the Retained FILO Claims.

> **Retained Assets** means those assets that will be retained by the Debtors following the establishment of the Litigation Trust, including (i) the Class B Litigation Trust Interests, (ii) Intercompany Interests, (iii) Intercompany Claims, (iv) the Physician Insurance Account (and the proceeds thereof), (v) the Professional Fees Escrow Account (solely to the extent of the Debtors' interest in such account), (vi) the Expense Escrow Account (and the proceeds thereof), and (vii) any other asset identified as a "Retained Asset" in the FILO Settlement Term Sheet.

> **Retained Causes of Action** means the Causes of Action retained by the Debtors and transferred either to the Plan Trust on the Plan Trust Establishment Date or the Litigation Trust on the Litigation Trust Establishment Date, as listed and described in the Schedule of Retained Causes of Action.

> **Retained FILO Claims** means FILO Bridge Claims in principal amount totaling $10,000,000, which shall be unsecured, accrue interest at 7.0% per annum commencing on the Effective Date (provided that such interest shall not have to be paid in cash and shall be paid in kind and capitalized and added to the balance of the Retained FILO Claims on a quarterly basis), and shall be junior in payment priority only to all Secured Claims, Priority Claims, Administrative Expense Claims, and Professional Fee Claims.

> **Schedule of Alternative Plan Debtors** means the list of Debtors, if any, who will be decoupled from this Plan in accordance with Section 5.3(c), which list which shall be filed with the Plan Supplement.

> **Schedule of Assumed Contracts** means a schedule to be filed as part of the Plan Supplement of executory contracts and unexpired leases to be assumed by the Debtors on the Effective Date pursuant to the Plan, which schedule shall be reasonably acceptable to the Creditors' Committee.

> **Schedule of Identified Non-Released Parties** means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

> **Schedule of Retained Causes of Action** means a schedule to be filed as part of the Plan Supplement of Causes of Action to be retained by the Debtors and the Plan Trust.

> **Schedules** means, collectively, any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors with the Bankruptcy Court and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, supplemented, or otherwise modified from time to time.

**Secured Claim** means a Claim (i) secured by a Lien on any Debtor's interest in property to the extent of the value of such interest as (a) set forth in this Plan, (b) agreed to by the holder of such Claim and the Debtors or the Plan Trustee, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

**Secured Interim Advances** means the aggregate amount of cash collateral used by the Debtors from April 1, 2025 through the Litigation Trust Establishment Date together with interest thereon at the Applicable Rate (as defined in the FILO Settlement Term Sheet); on the Litigation Trust Establishment Date, the Debtors shall repay the FILO DIP Loans with Class A-1 interests having a liquidation preference (along with a proportionate interest in all other rights and obligations therein) equal to the amount of such Secured Interim Advances.

**Security** has the meaning set forth in section 101(49) of the Bankruptcy Code.

**Settled Administrative Expense Claims** means Administrative Expense Claims of holders who receive the Administrative Expense Claims Consent Program Opt-Out Form and do not affirmatively opt out on or before the deadline set forth in such form, and therefore, are deemed to have an Allowed Administrative Expense Claim in an amount equal to fifty percent (50%) of the reconciled amount set forth in the Administrative Expense Claims Consent Program Opt-Out Form.

**Settled Administrative Expense Claims Cash Pool** means $12,500,000.

**SHC Holdings** means Steward Health Care Holdings LLC.

**Statutory Fees** means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

**Subordinated Securities Claims** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

**TRACO** means TRACO International Group S. DE R.L.

**Transformation Committee** means the special committee of the board of managers of SHC Holdings comprised of Alan J. Carr, John R. Castellano, and William Transier.

**Transition Services Agreement** means that certain agreement between the Debtors and the Litigation Trust pursuant to which the Debtors (and following the Plan Trust Establishment Date, the Plan Trust) provide certain transition services to the Litigation Trust, which shall be consistent with FILO Settlement Term Sheet and otherwise acceptable to the Debtors, the Creditors' Committee, and the FILO Parties, and filed as part of the Plan Supplement. A substantially final form of such agreement mutually agreeable to the parties was filed with the Bankruptcy Court on May 25, 2025 [Docket No. 4966], and any changes to such substantially final form will be disclosed in the Plan Supplement.

**U.S. Trustee** means the United States Trustee for Region 7.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

*Waived Bridge MOIC Claims* means all Claims held by the FILO Bridge Lenders under the Bridge Credit Agreement for the Bridge MOIC other than the Allowed Bridge MOIC Amount.

*Wind Down* means the process to (i) sell, abandon, wind down, dissolve, liquidate, or distribute the Retained Assets and the Plan Trust Assets, (ii) resolve, terminate, or wind down any remaining liabilities of the Estates and the Plan Trust, (iii) reconcile all Claims, and (iv) administer the Plan and make Plan Distributions, in each case in accordance with the Plan.

*Wind Down Budget* means a budget setting forth the estimate of costs and expenses necessary to effectuate the Wind Down through the Wind Down Completion Date, which budget (i) shall be prepared by the Debtors, in consultation with the Creditors' Committee, and (ii) after the Plan Trust Establishment Date, may be amended, modified, or supplemented from time to time by the Plan Trustee in its reasonable discretion.

*Wind Down Completion Date* means the date upon which the Retained Assets and the Plan Trust Assets have been sold, abandoned, dissolved, liquidated, realized, or otherwise disposed of, and all proceeds thereof have been distributed in accordance with the Plan.

*Wind Down Reserve* means a deposit account or other Cash reserve held by the Estate Representative, to be funded, including from the Estate Funding, in accordance with the Wind Down Budget with a cash reserve, which shall be available and used only to satisfy wind down costs of the Debtors, the Plan Administrator Committee, and the Plan Trust and shall not be subject to prepetition Liens or Liens or superpriority Claims granted under the DIP Orders, the Confirmation Order, or the Plan; *provided* that any funds remaining in the Wind Down Reserve on the Wind Down Completion Date shall be distributed by the Plan Trust as Plan Trust Net Proceeds pursuant to the Plan and the Plan Trust Agreement.

## 1.2    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively. The words "includes" and "including" are not limiting. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in

section 102 of the Bankruptcy Code shall apply; (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (v) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

### 1.3     *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4     *Controlling Document.*

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each. If there is any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan. In the event of any inconsistency between this Plan, the Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, or the Confirmation Order, on the one hand, and the FILO Settlement Order or any other instrument or document created or executed pursuant to the FILO Settlement Order, on the other hand, the Confirmation Order shall control; *provided* that any provision of the Confirmation Order that is inconsistent with the FILO Settlement Term Sheet shall require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent).

**ARTICLE II.          ADMINISTRATIVE EXPENSE CLAIMS, FILO DIP CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS.**

### 2.1     *Administrative Expense Claims.*

**(a)**     On, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (iii) the next Plan Distribution Date after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, distributions to holders of Allowed Administrative Expense Claims shall have commenced, with each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) to receive, in full and final satisfaction, settlement, release, and discharge of such Claim, (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

(b)     Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court, or as provided by Section 2.1 hereof, requests for payment of Administrative Expense Claims, other than requests for payment of Professional Fee Claims, must be filed and served on the Debtors no later than the applicable Administrative Expense Claims Bar Date pursuant to the procedures specified in the Administrative Expense Claims Bar Date Order, the Confirmation Order, the notice of entry of the Confirmation Order, and the notice of Effective Date.

**(c)     Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Estate Representative, as applicable, and their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released without consideration as of the Effective Date.**

(d)     The Confirmation Order shall provide that, to the extent the Administrative Expense Claims Consent Program Condition is satisfied or waived in accordance with the Plan, on the first Business Day after the date that is (45) calendar days after the Confirmation Date, or as soon thereafter is reasonably practicable, distributions to holders of Settled Administrative Expense Claims shall have commenced, with each holder of a Settled Administrative Expense Claim set to receive their Pro Rata Share of the Settled Administrative Expense Claims Cash Pool, with the balance of the Settled Administrative Expense Claim paid in Cash in accordance with Section 2.1(a) of the Plan.

## 2.2     *FILO DIP Claims.*

(a)     Except to the extent released pursuant to the FILO Settlement Order, on the Litigation Trust Establishment Date, the FILO DIP Claims shall be deemed Allowed in the full amount outstanding under the FILO DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses provided for thereunder.

(b)     Except to the extent that a holder of an Allowed FILO DIP Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO DIP Claim, on the Litigation Trust Establishment Date, each such holder shall receive its Pro Rata Share of the Class A-2 Litigation Trust Interests and, in respect of the Secured Interim Advances, its Pro Rata Share of the Class A-1 Litigation Trust Interests.

## 2.3     *Professional Fee Claims.*

(a)     All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall file, on or before the date that is thirty (30) calendar days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Confirmation Date. Objections to any Professional Fee Claims must be filed and served no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

(b)     Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Professional Fee Claim is entered; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Estate Representative, (x) first out of the Professional Fees Escrow Account; and (y) if the amount available for distribution pursuant to the foregoing clause (x) is insufficient to remit all distributions required to be made to such holders pursuant to this sentence, from Cash on hand or the Plan Trust Net Proceeds.

(c)     Notwithstanding the foregoing, any Professional Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court, including the Interim Compensation Procedures Order may be paid at the times and in the amounts authorized pursuant to such orders.

(d)     Five (5) Business Days before the Confirmation Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors and the Creditors' Committee, and the Debtors or Litigation Trust shall fund such estimated amounts into the Professional Fees Escrow Account for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  If a holder of a Professional Fee Claim does not provide an estimate, the Debtors may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim.  When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in such Professional Fees Escrow Account for purposes of this paragraph shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Litigation Trust without any further action or order of the Bankruptcy Court.

(e)     From and after the Confirmation Date, the Estate Representative and the Litigation Trust, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals after the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(f)     The Estate Representative is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.4     *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim at the option of the Estate Representative (in consultation with the Creditors' Committee), either: (i) Cash in an

amount equal to such Allowed Priority Tax Claim on the latest of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (c) the next Plan Distribution Date after such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (d) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (*provided* that the Estate Representative reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

## ARTICLE III.     CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1     *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2     *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (i) Impaired and Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject this Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, FILO DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 3 | FILO Bridge Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | PBGC Claims | Impaired | Yes |
| 6 | Intercompany Claims | Impaired | No (Presumed to Accept) |
| 7 | Subordinated Securities Claims | Impaired | No (Deemed to Reject) |
| 8 | Intercompany Interests | Impaired | No (Presumed to Accept ) |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|:---:|:---:|:---:|:---:|
| 9 | Non-Debtor Owned Subsidiary Interests | Impaired | No (Deemed to Reject) |
| 10 | Parent Interests | Impaired | No (Deemed to Reject) |

### 3.3 *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors, the Plan Trust, and the Litigation Trust, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.4 *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.5 *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims or Interests eligible to vote and no holder of such Claims or Interests, as applicable, votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims or Interests, as applicable, in such Class.

### 3.6 *Voting; Presumptions; Solicitation.*

**(a)** **Acceptance by Certain Impaired Classes.** Only holders of Claims in Classes 3, 4, and 5 are entitled to vote to accept or reject this Plan. An Impaired Class of Claims or Interests shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims or Interests actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims or Interests actually voting in such Class have voted to accept this Plan.

**(b)** **Presumed Acceptance by Unimpaired Classes.** Holders of Claims in Classes 1 and 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Additionally, holders of Claims and Interests in Classes 6 and 8 are presumed to accept or deemed to reject the Plan. Accordingly, such holders are not entitled to vote to accept or reject this Plan.

**(c)** **Deemed Rejection by Certain Impaired Classes.** Holders of Claims and Interests in Classes 7, 9, and 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.7    *Cramdown.*

If any Class entitled to vote on this Plan does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.8    *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or other Entity's right to object on any basis to any Claim.

## ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS.

### 4.1    *Class 1:  Other Priority Claims.*

**(a)    Treatment:**  Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, each such holder shall receive:

> (i)    payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the next Plan Distribution Date after such Other Priority Tax Claim becomes an Allowed Other Priority Claim, or as soon as practicable thereafter; or

> (ii)    such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired.

**(b)    Impairment and Voting:**  Class 1 is Unimpaired, and holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

### 4.2    *Class 2:  Other Secured Claims.*

**(a)    Treatment:**  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim, each such holder shall receive at the option of the Estate Representative:

> (i)    payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective

Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the next Plan Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as practicable thereafter;

(ii)    transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or

(iii)    such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

**(b)**    **Impairment and Voting:** Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

### 4.3    *Class 3: FILO Bridge Claims.*

**(a)**    **Allowance.**

(i)    <u>Remaining FILO Bridge Claims</u>: As of April 28, 2025, the Remaining FILO Bridge Claims shall be deemed Allowed in the principal amount of $41,833,761.53, plus any and all interest, fees, costs, other charges, and expenses provided for under the Bridge Credit Agreement (other than with respect to the Bridge MOIC), *minus* the amount of the Allowed Retained FILO Claims, *plus* the Allowed Bridge MOIC Amount; *provided* that the Waived Bridge MOIC Claim is deemed waived without further notice to, approval of or action by any Person or Entity, and each holder of a Waived Bridge MOIC Claim shall not receive any distribution or retain any property on account of its Waived Bridge MOIC Claim.

(ii)    <u>Retained FILO Claims</u>: On the Litigation Trust Establishment Date, the Retained FILO Claims are Allowed in the aggregate amount of $10,000,000.

**(b)**    **Treatment**: Except to the extent released pursuant to the FILO Settlement Order, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO Bridge Claims, on the Litigation Trust Establishment Date, each such holder shall (i) receive their Pro Rata Share of the Class A-2 Litigation Trust Interests on account of their Allowed Remaining FILO Bridge Claim (unless previously received), and (ii) retain their Pro Rata Share of their Retained FILO Claims, which shall entitle such holders to their Pro Rata Share of the FILO Plan Trust Interests on the Plan Trust Establishment Date to the extent not repaid prior thereto.

**(c)     Impairment and Voting:** Class 3 is Impaired, and, thus, holders of Allowed FILO Bridge Claims are entitled to vote to accept or reject the Plan.

### 4.4     *Class 4:  General Unsecured Claims*.

**(a)     Treatment:** Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed General Unsecured Claim, on or prior to the Effective Date, each such holder shall receive its Pro Rata Share of the GUC Plan Trust Interests.

**(b)     Impairment and Voting:** Class 4 is Impaired, and, thus, holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.5     *Class 5: PBGC Claims*

**(a)     Allowance**: The PBGC Claims shall be Allowed, as a prepetition unsecured claim, in the amount of $8,750,000.

**(b)     Treatment:** In accordance with the PBGC Settlement, in full and final satisfaction, settlement, release, and discharge of such PBGC Claims, on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests.  For the avoidance of doubt, the PBGC Claims shall be the only Claims on which the PBGC shall be entitled to any Distribution in connection with the Debtors or this Plan.

**(c)     Impairment and Voting:** Class 5 is Impaired, and, thus, holders of Allowed PBGC Claims are entitled to vote to accept or reject the Plan.

### 4.6     *Class 6:  Intercompany Claims*.

**(a)     Treatment:** On or prior to the Effective Date or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, reinstated, or discharged (each without any Plan Distribution) to the extent reasonably determined to be appropriate by the Estate Representative.

**(b)     Impairment and Voting:** Holders of Class 6 Intercompany Claims are either plan proponents or controlled by plan proponents and therefore are conclusively presumed to accept the Plan.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Intercompany Claims.

### 4.7     *Class 7: Subordinated Securities Claims*.

**(a)     Treatment:** All Subordinated Securities Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Securities Claims will not receive any distribution on account of such Allowed Subordinated Securities Claims.

**(b)** **Impairment and Voting:** Class 7 is Impaired. Holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan. Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Subordinated Securities Claims will not be solicited.

### 4.8 *Class 8: Intercompany Interests.*

**(a)** **Treatment:** On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Intercompany Interests shall be adjusted, reinstated, or discharged at the election of the Estate Representative; *provided* that no Plan Distributions shall be made to holders of an Intercompany Interest on account of such Intercompany Interest under the Plan.

**(b)** **Impairment and Voting:** Holders of Class 8 Intercompany Interests are plan proponents and are therefore conclusively presumed to have accepted the Plan. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

### 4.9 *Class 9: Non-Debtor Owned Subsidiary Interests.*

**(a)** **Treatment:** On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Non-Debtor Owned Subsidiary Interests shall be cancelled and there shall be no distribution to holders of Non-Debtor Owned Subsidiary Interests on account of such Non-Debtor Owned Subsidiary Interests under the Plan.

**(b)** **Impairment and Voting:** Class 9 is Impaired. Holders of Non-Debtor Owned Subsidiary Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Non-Debtor Owned Subsidiary Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Non-Debtor Owned Subsidiary Interests.

### 4.10 *Class 10: Parent Interests.*

**(a)** **Treatment:** On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any members, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Parent Interests shall be cancelled and there shall be no distribution to holders of Parent Interests under the Plan.

**(b)** **Impairment and Voting:** Class 10 is Impaired. Holders of Parent Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Parent Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Parent Interests.

# ARTICLE V.        MEANS FOR IMPLEMENTATION.

### 5.1     *Joint Chapter 11 Plan.*

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.

### 5.2     *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, and the releases contained in this Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim or Interest and any distribution to be made on account of such Claim or Interest. This Plan shall be deemed a motion to approve the compromises and settlements contained in this Plan, including the PBGC Settlement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, including the PBGC Settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of this Plan.

### 5.3     *Plan Settlement.*

**(a)** As a proposed compromise and settlement of inter-Estate and inter-creditor issues, including those relating to whether the liability and assets of the Debtors should be substantively consolidated for distribution purposes under the Plan (the "**Plan Settlement**"), the following treatment shall apply if the Plan Settlement is accepted and approved:

> (i)     all assets and liabilities of the Debtors shall be treated as though they were pooled;

> (ii)    each Claim filed or to be filed against any Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Debtors;

> (iii)   all Intercompany Claims shall be adjusted, reinstated, or discharged in accordance with Section 4.6 herein;

> (iv)    no Plan Distributions shall be made under the Plan on account of any Intercompany Interest or any Non-Debtor Owned Subsidiary Interest to the extent set forth in Sections 4.8 and 4.9 herein;

> (v)     any Claims on account of a guarantee provided by a Debtor of the obligations of another Debtor shall be treated as eliminated so that any Claim against any Debtor and any Claim based upon a guarantee

thereof by any other Debtor shall be treated as one Claim against a single consolidated Estate; and

(vi)    any joint or joint and several liability of any of the Debtors shall be one obligation of the Debtors and any Claims based upon such joint or joint and several liability shall be treated as one Claim against a single consolidated Estate.

(b)    The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order approving the Plan Settlement, including the Bankruptcy Court's findings that the Plan Settlement is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the Estates, and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing.  As a result of the Plan Settlement, each Class of Claims and Interests shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan shall not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan.  The Plan Settlement shall not (other than for purposes related to funding Plan Distributions under the Plan) affect (u) the legal and organizational structure of the Debtors, (v) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (w) any agreements entered into by the Plan Trust on or after the Plan Trust Establishment Date, (x) the Estate Representative's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (y) any Causes of Action or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no Plan Settlement, and (z) distributions to the Debtors or the Plan Trust from any insurance policies or the proceeds thereof.

(c)    Notwithstanding the foregoing in this <u>Section 5.3</u>, the Debtors reserve the right to examine the Claims asserted against the various Debtors and to withdraw the Plan with respect to any particular Debtor.  In the event that the Debtors elect to withdraw the Plan with respect to any Entity prior to the Confirmation Date, such Entity shall be listed on the Schedule of Alternative Plan Debtors included in the Plan Supplement and the Debtors may proceed to seek confirmation of this Plan as to the remaining Debtors in accordance with <u>Section 5.3(a)</u> above.

### 5.4    *Sources of Consideration for Plan Distribution.*

The Debtors and Plan Trustee shall fund Cash distributions under this Plan with Cash proceeds available from:  (i) Cash available on or after the Effective Date in accordance with the Plan; (ii) proceeds realized from the Class B Litigation Trust Interests; (iii) proceeds realized from the Plan Trust Assets; (iii) proceeds realized from the Retained Assets; (iv) Cash from the Professional Fees Escrow Account (*provided* that the Cash proceeds of the Professional Fees Escrow Account shall be exclusively used to pay Allowed Professional Fee Claims until paid in full in Cash and any amount remaining thereafter shall be transferred to the Litigation Trust); and (v) any additional proceeds of the Wind Down, if any.

### 5.5 *Implementation*.

(i)     On and after the Plan Trust Establishment Date, the Debtors and the Plan Trust shall use commercially reasonable efforts to liquidate and distribute the value of their respective interests in all of their Assets.

(ii)    On and after the Litigation Trust Establishment Date, the Litigation Trust shall use commercially reasonable efforts to liquidate and distribute the value of its interests in the Litigation Trust Assets, including through either prosecuting, settling, or otherwise monetizing the Litigation Trust Causes of Action, in accordance with the terms of the Litigation Trust Agreement; *provided* that notwithstanding anything else contained in this Plan or the Confirmation Order, nothing in the Plan or the Confirmation Order shall limit the Debtors' ability or authority to settle any Litigation Trust Cause of Action prior to the Litigation Trust Establishment Date.

(iii)   No later than the Effective Date, the Plan Trust (if not previously established) shall be established pursuant to the Plan and the Plan Trust Agreement.

(iv)    No later than one (1) Business Day following the Confirmation Date, the Litigation Trust (if not previously established) shall be established pursuant to the Plan and the Litigation Trust Agreement.

(v)     On the Confirmation Date, the Professional Fees Escrow Account shall be funded with an amount of Cash sufficient to pay all accrued Professional Fee Claims based upon estimates provided by the Professionals, as set forth in Section 2.3 of this Plan.

(vi)    On the Confirmation Date, the Wind Down Reserve shall be established.

(vii)   On the Litigation Trust Establishment Date, the Litigation Trust shall fund the Estate Funding.

(viii)  After the Litigation Trust Establishment Date, the Litigation Trust shall make all payments required under the Transition Services Agreement to the Estate Representative.

(ix)    On or prior to the Effective Date, the Professional Fees Escrow Account shall be funded with an amount of Cash sufficient to pay all outstanding Professional Fee Claims.

(x)     On the Plan Trust Establishment Date, the Physician Insurance Account shall vest in, and be transferred to, the Plan Trust. The Plan Trustee shall assume responsibility for administering and paying the Covered Claims and Covered Amounts (each as defined in the FILO DIP Order) in accordance with the FILO DIP Order. Upon payment in full of all

32

Covered Amounts, any amounts remaining in the Physician Insurance Account shall be transferred to the Litigation Trust.

(xi)    On the Plan Trust Establishment Date, the Plan Trust Assets shall transfer to the Plan Trust automatically and without further action of the Bankruptcy Court.

(xii)   On the Litigation Trust Establishment Date, the Litigation Trust Assets shall transfer to the Litigation Trust automatically and without further action of the Bankruptcy Court; *provided* that the Debtors, the FILO Parties, the Litigation Trust, and the Litigation Trustee shall execute all documentation necessary to effectuate such transfer.

(xiii)  On the Litigation Trust Establishment Date, $10,000,000 of FILO Bridge Claims shall automatically convert without any further action by any party into an equal amount of Retained FILO Claims, subject to the terms and conditions of this Plan.

(xiv)   Upon the FILO Balance (as defined in the FILO Settlement Term Sheet) being reduced to $0 such that all amounts distributable in respect of Class A Litigation Trust Interests have been distributed, the Plan Trustee may in its sole discretion (so long as the Plan Trust owns all of the Class B Litigation Trust Interests) direct the Litigation Trustee to effectuate the distribution of all remaining Litigation Trust Assets to the Plan Trust on account of the Plan Trust's Class B Litigation Trust Interests, by transfer in kind, merger or otherwise (which assets shall be distributed subject to (a) any outstanding interests in, and obligations and liabilities of, the Litigation Trust, including the right of the holders of the Class A-1 Litigation Trust Interests to receive distributions on account of the Post-FILO Repayment Variable Component (as defined in the FILO Settlement Term Sheet) and (b) any rights of the Class A-2 Representative (as defined in the FILO Settlement Term Sheet) under the FILO Settlement Term Sheet); *provided* that the Plan Trustee has obtained a favorable private letter ruling from the IRS or an opinion of the Plan Trust's tax advisor, in each case from which the Plan Trustee reasonably concludes that such transaction would not have a material adverse tax impact on the Plan Trust.

**5.6    _Transition Services Agreement_**

The Estate Representative shall provide transition services to the Litigation Trust in accordance with the Transition Services Agreement. The Estate Representative shall be defended, held harmless, and indemnified by the Litigation Trust against any and all liabilities or losses that may be incurred in connection with the rendering of services under the Transition Services Agreement to the Litigation Trust or Litigation Trustee, subject to customary carve outs for fraud, willful misconduct, or gross negligence.

### 5.7 *Litigation Funding Agreement*

On the Litigation Trust Establishment Date (to the extent not previously executed), the applicable parties shall execute and deliver the Litigation Funding Agreement to the Litigation Trust and such document shall become effective in accordance with its terms. Upon execution, the Litigation Funding Agreement shall constitute legal, valid, and binding obligations of the parties thereto and be enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order, and the Litigation Trust shall be authorized to incur the obligations under the Litigation Funding Agreement and use the proceeds of such Litigation Funding Agreement, in each case, in accordance with the terms of the Plan, the Confirmation Order, the FILO Settlement Order, and the Litigation Funding Agreement without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The terms and conditions of the Litigation Funding Agreement shall bind the Litigation Trust and each other Entity that enters into such agreement.

### 5.8 *Coordination between the Litigation Trust and the Plan Trust*.

(a) The Estate Representative shall coordinate with the Litigation Trustee with respect to issues involving overlapping concerns with respect to third parties. If the Estate Representative and Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a mediation conference with the Mediator; and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.

(b) With respect to any such disputes presented to the Bankruptcy Court:

(i) If the FILO Balance (as defined in the FILO Settlement Term Sheet) is in an Underpayment State (as defined in the FILO Settlement Term Sheet) on the date of any hearing before the Bankruptcy Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate Representative; *provided* that the Litigation Trustee's business judgment shall not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estates or the Plan Trust (other than with respect to claims under section 502(h) of the Bankruptcy Code) without the consent of the Estate Representative.

(ii) If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate Representative's business judgment shall be applied to the dispute, subject to challenge by the Litigation Trustee; *provided* that the Estate Representative's business judgment shall not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase

the liabilities of the Litigation Trust without the consent of the Litigation Trustee.

### 5.9    *Corporate Action.*

(a)    Following the Confirmation Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by this Plan or the Confirmation Order (including any action to be undertaken by the Plan Trustee or Litigation Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Confirmation Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in this Plan involving the organizational structure of the Debtors, and any other action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

(b)    The authorizations and approvals contemplated by this Section 5.9 shall be effective notwithstanding any requirements under non-bankruptcy law.

(c)    The Confirmation Order shall and shall be deemed, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, to authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

### 5.10    *Plan Administrator Committee*

On and after the Confirmation Date and until the Plan Trust Establishment Date, the Plan Administrator Committee shall have exclusive governance rights of the Estates and be authorized to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Plan Administrator Agreement.  Monica Blacker shall serve as the initial chairperson of the Plan Administrator Committee (the "**Committee Chairperson**").  Any decision by the Plan Administrator Committee shall require the affirmative vote of at least two (2) of the three (3) members of the Plan Administrator Committee; *provided* that the Plan Administrator Committee shall not act without the consent of the Committee Chairperson.  Upon the Plan Trust Establishment Date, the Plan Trustee shall accede to the rights and obligations of the Plan Administrator Committee.

### 5.11    *Governance.*

(a)    On the Confirmation Date, the authority, power and incumbency of the persons then acting as directors, officers, managers, members and other authorized persons of the Debtors shall be terminated and such persons shall be deemed to have resigned.  On the Confirmation Date, the applicable Estate Representative shall serve as the initial director(s) or manager, as applicable, and sole officer of each Debtor after the Confirmation Date until such time as such Debtor goes out of existence, by merger into another Debtor, by dissolution or otherwise.

(b)    The Estate Representative, on behalf of the Debtors, may appoint a manager of any Debtor to serve after the Confirmation Date.  The Estate Representative, on behalf of the Debtors, may elect such additional manager(s) and/or officer(s) of the Debtors as the Estate

Representative deems necessary to implement this Plan and the actions contemplated herein. The Estate Representative, on behalf of the Debtors, shall, after the Confirmation Date, have the power to act by written consent to remove any manager or officer of any Debtor at any time with or without cause.

(c) As of the Confirmation Date, the governing documents of the Debtors may be amended (and shall be deemed amended) to the extent necessary to carry out the provisions of this Plan.

### 5.12 *Cancellation of Existing Securities, Agreements, and Liens.*

(a) Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b) On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c) After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d) Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 5.13 *Merger or Dissolution of Debtors.*

On or after the Confirmation Date, at the direction of the Estate Representative, any of the Debtors may be merged into SHC Holdings and the Estate Representative may complete the

winding up of such Debtors (including SHC Holdings) without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its members, managers, directors, management, or Security holders or any payments to be made in connection therewith, other than the filing of a certificate of dissolution and/or merger with the appropriate governmental authorities, and any such certificate of dissolution and/or merger may be filed by the Estate Representative without need for any authorization, signature or other act of any Person or Entity, including without limitation any holder of any Claim or Interest. On or after the Confirmation Date, the Estate Representative may engage in any other transaction in furtherance of the Plan. Any such transactions may be effective without any further action by the members, managers, directors, management, or Security holders of the Debtors.

### 5.14 *Preservation of Causes of Action.*

**Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by order of the Bankruptcy Court, the Debtors preserve and reserve any and all Causes of Action, including, for the avoidance of doubt, the Litigation Trust Causes of Action.** For the avoidance of doubt, any Claim or Cause of Action that is settled or released prior to the Litigation Trust Establishment Date shall not be deemed a Litigation Trust Cause of Action. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order to any Cause of Action or potential Cause of Action against them as any indication that the Debtors, the Plan Administrator Committee, the Plan Trustee, the Plan Trust, the Litigation Trustee, or the Litigation Trust will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the consummation of the Plan or the occurrence of the Effective Date. Prior to the Effective Date, (i) the Estate Representative, with respect to any Cause of Action that is not a Litigation Trust Asset, and (ii) the Litigation Trustee with respect to any Litigation Trust Cause of Action, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 5.15 *Effectuating Documents; Further Transactions.*

**(a)** On and after the Confirmation Date, the Estate Representative is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

**(b)** Before, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the Security holders, directors, managers, or members of the Debtors shall be deemed to have been so approved and shall be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable law and without

any requirement of further action by the Security holders, directors, managers, or members of the Debtors, or the need for any approvals, authorizations, actions or consents.

### 5.16 *Closing of the Chapter 11 Cases.*

After the Confirmation Date, the Estate Representative shall be authorized, but not directed, to submit one or more motions for order(s) that close and issue final decrees for any of the Chapter 11 Cases, for any Debtor, in each case in accordance with the Bankruptcy Code and the Bankruptcy Rules. Furthermore, the Claims and Noticing Agent shall be authorized to destroy all paper/hardcopy records related to the Chapter 11 Cases two (2) years after the Effective Date has occurred.

## ARTICLE VI.    PLAN TRUST.

### 6.1 *Establishment of the Plan Trust.*

On or prior to the Effective Date, the Plan Trust shall be established in accordance with the Plan Trust Agreement for the purpose of being vested with and liquidating the Plan Trust Assets, reconciling Claims and making distributions to holders of Allowed Claims in accordance with the terms of this Plan and the Plan Trust Agreement. Upon the Plan Trust Establishment Date, the Plan Trust shall assume all Claims (including, for the avoidance of doubt, all Administrative Expense Claims (including Professional Fee Claims), Other Secured Claims, Priority Tax Claims, and Other Priority Claims) against the Debtors (other than the FILO DIP Claims, FILO Bridge Claims, and Claims for which Plan Trust Interests are distributed) with the same validity and priority as such Claims had against the Debtors immediately prior to the Plan Trust Establishment Date and there shall be no further recourse against the Debtors with respect to such Claims. For the avoidance of doubt, the Estate Representative may establish the Plan Trust after the Confirmation Date but prior to the Effective Date. On or following the Plan Trust Establishment Date, the Plan Trustee may distribute the Plan Trust Interests to holders of Allowed Claims and establish the Disputed Claim Reserve in accordance with the Plan. Subject to and to the extent set forth in this Plan, the Confirmation Order, the Plan Trust Agreement, or any other order of the Bankruptcy Court entered in connection therewith, the Plan Trust and the Plan Trustee shall be empowered, without the need for Bankruptcy Court approval, to:

> (i)     perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Plan Trust;

> (ii)     establish, maintain and administer trust accounts, which shall be segregated to the extent appropriate in accordance with this Plan;

> (iii)     accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle and protect, as applicable, the Plan Trust Assets in accordance with this Plan;

> (iv)     except to the extent any Claims have already been Allowed (including pursuant to the terms of this Plan), control and effectuate the Claims reconciliation process with respect to all Claims, including to object

38

to, seek to subordinate, recharacterize, compromise or settle any and all such Claims against the Debtors, including the Disputed Claims, pursuant to the procedures prescribed in this Plan;

(v)     calculate and make distributions to holders of Allowed Claims;

(vi)     administer each Debtor's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(vii)     administer the Plan Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Plan Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(viii)     retain, compensate and employ Professionals (including Estate Professionals) to represent the Plan Trust;

(ix)     direct and control the Wind Down, liquidation, sale or abandonment of the Plan Trust Assets, including the Retained Assets, and any other remaining Assets of the Debtors under the Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims;

(x)     exercise such other powers as may be vested in the Plan Trust under the Plan Trust Agreement and this Plan, or as are deemed by the Debtors or the Plan Trustee to be necessary and proper to implement the provisions of the Plan Trust Agreement and effectuate the purpose of the Plan Trust;

(xi)     dissolve the Plan Trust in accordance with the terms of the Plan Trust Agreement;

(xii)     on behalf of each of the Debtors, carry out and implement all provisions of this Plan; and

(xiii)     wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor.

The Plan Trustee shall have the same authority in respect of all taxes and tax returns of the Debtors as if the Plan Trustee were the Debtors.

Notwithstanding anything to the contrary in this Section 6.1, the Plan Trust's primary purpose is liquidating the Plan Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Plan Trust's liquidating purpose and reasonably necessary to conserve and protect the Plan Trust Assets and provide for the orderly liquidation thereof.

### 6.2    *Funding of and Transfer of Assets into the Plan Trust*.

Except as otherwise provided in this Plan or the Confirmation Order, upon the Plan Trust Establishment Date, the Debtors shall transfer the Plan Trust Assets, including, but not limited to the Estate Funding, to the Plan Trust, and all such assets shall vest in the Plan Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the Plan Trustee, in accordance with this Plan and the Plan Trust Agreement.  The Plan Trustee shall have the authority to create additional sub-accounts in trust accounts established pursuant to Section 6.6 and sub-trusts within the Plan Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Plan Trust.  The act of transferring the Plan Trust Assets, as authorized by this Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Plan Trust as if the asset or right was still held by the applicable Debtor. Upon the transfer of the Plan Trust Assets to the Plan Trust, the Debtors shall have no interest in or with respect to the Plan Trust Assets or the Plan Trust. Upon delivery of the Plan Trust Assets to the Plan Trust, the Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Plan Trust Assets or the Plan Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Plan Trust Assets to the Plan Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Plan Trust shall vest in the Plan Trust and its representatives, and the Debtors and the Plan Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Plan Trustee shall agree to accept and hold the Plan Trust Assets in the Plan Trust for the benefit of the Plan Trust Beneficiaries, subject to the terms of the Plan and the Plan Trust Agreement.

### 6.3    *Plan Trustee*.

**(a)    Appointment of Plan Trustee.**  Upon the Plan Trust Establishment Date, the Plan Administrator Committee shall be appointed as the Plan Trustee.  Except as otherwise provided in this Plan, the Plan Trustee (i) shall be the successor to and representative of the Estate of each of the Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code and (ii) shall be the sole representative of, and shall act for, the Debtors, and shall assume any such outstanding responsibility of the Debtors under the Plan.  The powers, rights and responsibilities of the Plan Trustee shall be as specified in the Plan Trust Agreement and Plan and shall include the authority and responsibility to fulfill the items identified in this Section 6.3 of the Plan.  Other rights and duties of the Plan Trustee and the Plan Trust Beneficiaries shall be as set forth in the

Plan Trust Agreement. The FILO Parties will have the right to consent to any successor Plan Trustee that is not a chapter 7 trustee (including the terms of any such successor's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

**(b)** **Functions of the Plan Trustee.** On and after the Plan Trust Establishment Date, the Plan Trustee and/or the Plan Trust, as applicable, shall carry out the functions set forth in this <u>Section 6.3</u> and, after the Effective Date, may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the Plan Trust Agreement. Such functions shall include any and all powers and authority to:

(i) effectuate the Plan, including the prosecution and any other disposition of all litigation related to any appeals in respect to the approval and/or implementation of the Plan;

(ii) wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt, or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor;

(iii) exercise its business judgment to direct and control the Wind Down, including the liquidation, sale and/or abandonment of the Plan Trust Assets, including the Retained Assets, under this Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims;

(iv) marshal, market for sale, and wind down any of the Plan Trust Assets, including the Retained Assets;

(v) serve as the initial director or manager, as applicable, and sole officer of each Debtor after the Effective Date until such time as such Debtor is merged or dissolved, as applicable, and take any actions necessary to effectuate the terms of the Plan and the Plan Trust Agreement in such capacities;

(vi) take any actions necessary to (A) resolve all matters related to the Plan Trust Assets and (B) vest such assets in the Plan Trust;

(vii) open and maintain bank accounts on behalf of or in the name of the Plan Trust;

(viii) fund the Wind Down Reserve;

(ix) amend, modify, or supplement the Wind Down Budget;

(x) determine, from time to time, whether the amounts available in the Wind Down Reserve are in excess of the amount necessary to

41

satisfy the purpose for which such reserve was established and amend, modify, or supplement the Wind Down Budget accordingly. If the Plan Trustee determines that a surplus exists in the Wind Down Reserve as of the date of such determination, the Plan Trustee may transfer such surplus amount to the Plan Trust for distribution in accordance with the Plan;

(xi)    maintain the books and records and accounts of the Debtors or the Plan Trust;

(xii)    reconcile Claims and calculate and make distributions to holders of Allowed Claims in accordance with the Plan;

(xiii)    administer each Debtor's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(xiv)    administer the Plan Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Plan Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(xv)    file, prosecute, settle or dispose of any and all objections to asserted Claims;

(xvi)    enter into and consummate any transactions for the purpose of dissolving the Debtors;

(xvii)   make distributions of the Plan Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay the expenses of the Plan Trust, to holders of Allowed Claims, in accordance with the Plan;

(xviii)  purchase and carry all insurance policies reasonably necessary or advisable to pay all associated insurance premiums and costs;

(xix)    invest Cash, as available, and any income earned thereon;

(xx)    take such actions as are necessary or appropriate to close any of the Chapter 11 Cases;

(xxi)    retain, compensate and employ Professionals to represent the Plan Trust or the Plan Trustee, as applicable; and

(xxii) take any other actions not inconsistent with the provisions hereof that the Plan Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

### 6.4 *Plan Trust Agreement.*

Prior to the Plan Trust Establishment Date, the Debtors shall execute and deliver the Plan Trust Agreement. The Plan Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Plan Trustee. Any such indemnification shall be the sole responsibility of the Plan Trust and payable solely from the Plan Trust Assets.

### 6.5 *Fees and Expenses of the Plan Trust.*

From and after the Plan Trust Establishment Date, expenses of the Plan Trust shall be paid from the Plan Trust Assets in the ordinary course of business, in accordance with the Plan and the Plan Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Plan Trustee, on behalf of the Plan Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional (including professionals previously employed by the Debtors) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Plan Trustee, are necessary to assist the Plan Trustee in the performance of the Plan Trustee's duties under the Plan and the Plan Trust Agreement, subject to any limitations and procedures established by the Plan Trust Agreement.

### 6.6 *Creation and Maintenance of Trust Accounts.*

On and after the Plan Trust Establishment Date, appropriate trust accounts will be established and maintained in one or more federally insured domestic banks in the name of the Plan Trust. Cash deposited in the trust accounts will be invested, held and used solely as provided in the Plan Trust Agreement. The trust accounts will be funded, as applicable, by Cash proceeds obtained through the disposition of Plan Trust Assets or the proceeds of the Plan Trust or Class B Litigation Trust Interests. Upon obtaining an order of the Bankruptcy Court authorizing final distribution or closure of the Chapter 11 Cases, any funds remaining in the trust accounts shall be distributed in accordance with this Plan and the Plan Trust Agreement, and the trust accounts may be closed.

### 6.7 *Limitation of Liability.*

Neither the Plan Trustee, nor its firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, disbursing agents or agents, and any of such Person's successors and assigns, shall incur any liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with the Plan or Plan Trust Agreement, other than for specific actions or omissions resulting from its willful misconduct, gross negligence or fraud found by a Final Order of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage or expense suffered by the Plan Trust. The Plan Trustee shall enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee or any other analogous trustee. The Plan Trustee may, in connection with the performance of its functions, in the Plan Trustee's

sole and absolute discretion, consult with his, her or its attorneys, accountants, advisors and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are in writing. Notwithstanding such authority, the Plan Trustee shall be under no obligation to consult with any such attorneys, accountants, advisors or agents, and any determination not to do so shall not result in the imposition of liability on the Plan Trustee or its members unless such determination is based on willful misconduct, gross negligence or fraud. Persons dealing with the Plan Trustee shall look only to the Plan Trust Assets to satisfy any liability incurred by the Plan Trustee to such person in carrying out the terms of the Plan or the Plan Trust Agreement, and the Plan Trustee shall have no personal obligation to satisfy such liability.

### 6.8  *Indemnification.*

In addition to the indemnification provided by the Litigation Trust pursuant to Section 7.7 of this Plan and the Transition Services Agreement, the Plan Trust shall indemnify the Plan Trustee for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred without fraud, gross negligence or willful misconduct on the part of the Plan Trustee (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Plan Trustee in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or the Plan Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct. In addition to the indemnification provided by the Litigation Trust pursuant to Section 7.7 of this Plan and the Transition Services Agreement, the Plan Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Plan Trustee, from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Plan Trust or the implementation or administration of the Plan if the Plan Trustee acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Plan Trust. To the extent the Plan Trust indemnifies and holds the Plan Trustee harmless as provided above, the reasonable legal fees and related costs incurred by counsel to the Plan Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as expenses of the Plan Trust. The costs and expenses incurred in enforcing the right of indemnification in this Section 6.8 shall be paid by the Plan Trust. This provision shall survive the termination of the Plan Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Plan Trustee.

### 6.9  *Insurance.*

The Plan Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Plan Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties, and obligations of the Plan Trustee, which insurance coverage may, at the sole option of the Plan Trustee, be extended for a reasonable period after the termination of the Plan Trust Agreement.

### 6.10    *Dissolution of the Plan Trust.*

In no event shall the Plan Trust be dissolved later than five (5) years from the Plan Trust Establishment Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Plan Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Plan Trust Assets.

### 6.11    *Records.*

The Plan Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors necessary for the disposition of Plan Trust Assets and objections to Disputed Claims. Following the Plan Trust Establishment Date, the Plan Trustee is authorized, pursuant to section 554(a) of the Bankruptcy Code, without further application to the Bankruptcy Court or notice to any party, to abandon or otherwise destroy documents and records (whether in electronic or paper format), other than any medical records, that the Plan Trustee determines, in its reasonable business judgment, are no longer necessary to the administration of either the Chapter 11 Cases or the Plan, notwithstanding any federal, state, or local law or requirement requiring the retention of the applicable documents or records; *provided* that, prior to abandoning or destroying any records, the Plan Trustee shall notify the Litigation Trustee of its intent to abandon or destroy such records, which notice shall be provided at least five (5) Business Days prior to such intended abandonment or destruction, and offer to transfer such records to the Litigation Trustee, and if the Litigation Trustee elects to retain or receive such records, the Litigation Trustee shall do so at the Litigation Trustee's sole cost and expense (paid in advance), including the cost of any required continued storage until the transfer can be effectuated.

### 6.12    *Section 1145 Exemption; Non-Transferability of Plan Trust Interests.*

Any Plan Trust Interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Plan Trust Interests constitute "securities," the offer and sale of such Plan Trust Interests to the Plan Trust Beneficiaries will be exempt to the extent provided in section 1145 of the Bankruptcy Code from registration, without further action by any person, under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations requiring registration for the offer. Any such Plan Trust Interests (and the underlying Claim giving rise thereto) shall not: (i) be voluntarily or involuntarily, directly or indirectly, assigned, conveyed, hypothecated, pledged, or otherwise transferred or traded, except by will, intestate succession or as may otherwise be required by operation of law; (ii) be evidenced by a certificate or other instrument; and (iii) possess any voting rights with respect to the Plan Trust or otherwise.

### 6.13    *Plan Trust Tax and Other Matters.*

(a)    **Tax Treatment.**  The Plan Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 *et seq.* or other separate taxable entity).  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), all parties (including, without limitation, the Debtors, the Plan Trustee, and the Plan Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of Assets by the Debtors to the Plan Trust (including the Class B Litigation Trust Interests) as (i) the transfer of such Assets and, by reason of the transfer of the Class B Litigation Trust Interests, a respective portion of the underlying Assets of the Litigation Trust (in each case, subject to any liabilities and obligations relating to those Assets) by the Debtors directly to the holders of Allowed Claims entitled to receive Plan Trust Interests in satisfaction of their Claims, other than to the extent any Assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets (subject to such liabilities and obligations) by such holders to the Plan Trust in exchange for the beneficial interests in the Plan Trust. Accordingly, absent definitive guidance to the contrary, the Plan Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respect share of Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of Litigation Trust Assets (in each case, other than to the extent any such Assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

(b)    **Liquidation Purpose of the Plan Trust; No Successor in Interest.**  The Plan Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust. Accordingly, the Plan Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Plan Trust Assets, make timely distributions to the Plan Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Plan Trustee shall distribute at least annually to the Plan Trust Beneficiaries any Available Cash. The Plan Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in this Plan or the Plan Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Plan Trustee expressly for such purpose. Notwithstanding anything in the Plan or Plan Trust Agreement to the contrary, the Plan Trustee shall always act consistently with, and not contrary to, the purpose of the Plan Trust as set forth in the Plan.

(c)    **Cash Investments.**  The right and power of the Plan Trustee to invest the Plan Trust Assets, the proceeds thereof, or any income earned by the Plan Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the

Bankruptcy Code. The Plan Trustee may expend the Cash of the Plan Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Assets of the Plan Trust during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Plan Trust) and (iii) to satisfy other respective liabilities incurred by the Plan Trust in accordance with this Plan and the Plan Trust Agreement (including, without limitation, the payment of any taxes).

**(d)** **Tax Reporting and Tax Payments.**

(i)     The Plan Trustee shall file tax returns for the Plan Trust treating the Plan Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this <u>Section 6.13(d)</u>. The Plan Trustee also shall annually send to each holder of a Plan Trust Interest, a separate statement regarding the receipts and expenditures of the Plan Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)    As soon as practicable after the Plan Trust Establishment Date, the Plan Trustee shall make a good faith determination of the fair market value of the Plan Trust Assets as of the Plan Trust Establishment Date. The Plan Trustee shall inform all parties of such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)   Allocations of Plan Trust taxable income among Plan Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Plan Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of Plan Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Plan Trust Assets. The tax book value of Plan Trust Assets for purpose of this paragraph shall equal their fair market value on the date Plan Trust Assets are transferred to the Plan Trust, adjusted in accordance

47

with tax accounting principles prescribed by the United States Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv) The Plan Trust shall be responsible for payment, out of Plan Trust Assets, of any taxes imposed on the Plan Trust or the Plan Trust Assets. More particularly, any taxes imposed on any Disputed Claim Reserve or its assets will be paid out of the assets of the Disputed Claim Reserve (including any Plan Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims. In the event, and to the extent, any Cash in any Disputed Claim Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of the Disputed Claim Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v) The Plan Trustee may request an expedited determination of taxes of the Plan Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the Plan Trust, taxes of such fund or other separate taxable entity) and the Debtors, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Plan Trust (or any such disputed ownership fund or other separate taxable entity) or the Debtors for all taxable periods through the dissolution of the Plan Trust.

(vi) Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Plan Trustee), the Plan Trustee may elect to treat any Plan Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes. If a "disputed ownership fund" election is made (or all or any portion of the Plan Trust Assets allocable to, or held on account of, Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the Plan Trustee and Plan Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii)     The Plan Trustee, the Litigation Trustee and the Debtors shall each cooperate with the other in connection with the preparation and filing of any tax returns, the provision of any required tax forms, and any other matter with respect to taxes, and shall make available to the other, as reasonably requested, any information or records relevant to the preparation or filing of any tax returns or forms or the defense of any audit or other tax proceeding.

(viii)    The treatment provided in this <u>Section 6.13</u>, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

# ARTICLE VII.     LITIGATION TRUST

## 7.1     *<u>Establishment of the Litigation Trust</u>.*

To the extent not previously established pursuant to the FILO Settlement Order, the Confirmation Order shall provide that no later than one (1) Business Days following the Confirmation Date, the Litigation Trust shall be established in accordance with the FILO Settlement Order and the Litigation Trust Agreement for the purpose of being vested with and liquidating the Litigation Trust Assets and making distributions to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement. Following the Litigation Trust Establishment Date, the Litigation Trustee shall distribute the Litigation Trust Interests to the Litigation Trust Beneficiaries. In each case, subject in all respects to the FILO Settlement Order and the Litigation Trust Agreement, the Litigation Trust and the Litigation Trustee shall be empowered, without the need for Bankruptcy Court approval, to:

(i)     perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Litigation Trust;

(ii)    establish, maintain, and administer trust accounts;

(iii)   accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the Litigation Trust Assets in accordance with the Litigation Trust Agreement;

(iv)    make distributions to holders of Litigation Trust Interests in accordance with the Litigation Trust Agreement;

(v)     administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

(vi)    retain, compensate and employ professionals to represent the Litigation Trust;

(vii)    direct and control the pursuit, settlement, liquidation, sale, or abandonment of the Litigation Trust Assets in accordance with the Litigation Trust Agreement and applicable law and as necessary to maximize distributions to Litigation Trust Beneficiaries;

(viii)    exercise such other powers as may be vested in the Litigation Trust under the Litigation Trust Agreement, or as are deemed by the Litigation Trustee to be necessary and proper to implement the provisions of the Litigation Trust Agreement and effectuate the purpose of the Litigation Trust;

(ix)    conduct investigations of the Litigation Trust Causes of Action pursuant to Bankruptcy Rule 2004;

(x)    pursue, prosecute, settle, abandon, or otherwise resolve the Litigation Trust Assets (including any Litigation Trust Causes of Action transferred to the Litigation Trust and including through the commencement, participation, defense, or continuation of legal proceedings, including judicial, arbitration or administrative proceedings, in any domestic or foreign jurisdiction) in accordance with the Litigation Trust Agreement during or after the pendency of these Chapter 11 Cases;

(xi)    protect and enforce the rights of the Litigation Trust in and to the Litigation Trust Assets by utilizing any foreign judicial proceedings and any applicable foreign bankruptcy, insolvency, moratorium, or similar law; and

(xii)    dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement.

Notwithstanding anything to the contrary in this Section 7.1, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

For the avoidance of doubt, any Claim or Cause of Action that is settled or released prior to the Litigation Trust Establishment Date, subject to the consent rights of the FILO Parties, shall not be deemed a Litigation Trust Cause of Action, and until the Litigation Trust Establishment Date, the Estate Representative shall retain the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Claim or Cause of Action, subject to the consent rights of the FILO Parties, the Bankruptcy Code, and applicable orders of the Bankruptcy Court. Nothing in this Plan or in the Confirmation Order shall impair the ability or authority of the Estate Representative to settle any such Claim or Cause of Action, subject to the consent rights of the

FILO Parties, prior to the Litigation Trust Establishment Date.

### 7.2   *Funding of and Transfer of Assets into the Litigation Trust*.

(a)   Upon the Litigation Trust Establishment Date, the Debtors shall transfer the Litigation Trust Assets to the Litigation Trust, and all such assets shall vest in the Litigation Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise) to the fullest extent permitted by law) on such date, to be administered by the Litigation Trustee, in accordance with the Litigation Trust Agreement.  The Litigation Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the Litigation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Litigation Trust.  The act of transferring the Litigation Trust Assets, as authorized by the Confirmation Order, this Plan and the FILO Settlement Order, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights (specifically including any extensions available to a trustee or debtor-in-possession under 11 U.S.C. § 108) may be asserted by the Litigation Trust, in any judicial, arbitration, or administrative proceeding, during or after the pendency of these Chapter 11 Cases, as if the asset or right asserted in such judicial, arbitration, or administrative proceeding were an action or other asset still held by the applicable Debtor or Debtor-in-possession.  Upon the transfer of the Litigation Trust Assets to the Litigation Trust, the Estates or their successors shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust other than the Class B Litigation Trust Interests. Upon delivery of the Litigation Trust Assets to the Litigation Trust, the Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Litigation Trust Assets or the Litigation Trust (other than the Class B Litigation Trust Interests). Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. The Litigation Trustee shall agree to accept and hold the Litigation Trust Assets in the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, subject to the terms of the Litigation Trust Agreement.

(b)   All attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection and all other privileges, immunities or protections from disclosure (the "**Privileges**") held by any of (1) any one or more of the Debtors or (2) any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors (together the "**Privilege Transfer Parties**") related in any way to the Litigation Trust Assets or the analysis or prosecution of any Litigation Trust Assets (the "**Transferred Privileged Information**") shall be transferred and assigned to, and vested in, the Litigation Trust and its authorized representatives. The Transferred Privileged Information shall include documents and information of all manner, whether oral, written or digital, and whether or not previously disclosed or discussed. For the avoidance of doubt, the Privileges shall include any right or obligation to preserve or enforce or waive a privilege that arises from any joint defense, common interest or similar agreement involving any of the Privilege Transfer Parties.

**(c)**    The foregoing transfer and assignment shall vest the Privileges concerning the Transferred Privileged Information in the Litigation Trust, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Litigation Trust and the Litigation Trust Beneficiaries; *provided*, however, that to the extent that any such Privileges or Transferred Privileged Information relates to both the Litigation Trust Assets on one hand and any matter in which the Debtors (or the Plan Trust) have an interest on the other, such Privileges and Transferred Privileged Information shall vest jointly in the Debtors (or, following the Plan Trust Establishment Date, the Plan Trust) (or their designee) and the Litigation Trust. As relates to any Privileges or Transferred Privileged Information held jointly with the Debtors (or, following the Plan Trust Establishment Date, the Plan Trust) (or their designee), (i) with respect to litigations or proceedings concerning matters in which the Debtors (or the Plan Trust) has an interest as a potential defendant, the Debtors shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the Litigation Trust, and (ii) with respect to litigations or proceedings concerning the Litigation Trust Assets where the Debtors (or the Plan Trust) has an interest as a potential defendant, the Litigation Trust shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the Estate Representative. The Litigation Trust and Debtors have agreed that they do not intend to provide a general waiver of all Privileges and that each such party will take commercially reasonable steps to avoid a general waiver of the Privileges.

**(d)**    Pursuant to, *inter alia*, Federal Rule of Evidence 502(d), no Privileges shall be waived by the transfer and assignment of the Privileges or the production of any Transferred Privileged Information to the Litigation Trust or any of its respective employees, professionals or representatives, or by disclosure of such Transferred Privileged Information between the Privilege Transfer Parties, on the one hand, and the Litigation Trust, on the other hand, or any of their respective employees, professionals or representatives.

**(e)**    If a Privilege Transfer Party, the Litigation Trust, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Transferred Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Transferred Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Trust of the production and shall demand of all recipients of the inadvertently disclosed Transferred Privileged Information that they return or confirm the destruction of such materials.

### 7.3    _Litigation Trustee_.

**(a)    Appointment of Litigation Trustee.**    Upon the Litigation Trust Establishment Date, the Litigation Trustee, to the extent not previously appointed pursuant to the FILO Settlement Order, shall be appointed.  The Litigation Trust shall be administered by the Litigation Trustee pursuant to the Litigation Trust Agreement. The powers, rights and responsibilities of the Litigation Trustee shall be as specified in the Litigation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in this Section 7.3

of the Plan.  Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

(b)     **Functions of the Litigation Trustee.**  On and after the Litigation Trust Establishment Date, the Litigation Trustee shall carry out the functions set forth in this <u>Section 7.3</u> and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the FILO Settlement Order or the Litigation Trust Agreement.  Such functions shall include any and all powers and authority to:

(i)     take any actions necessary to (A) resolve all matters related to the Litigation Trust Assets and (B) vest such assets in the Litigation Trust;

(ii)     open and maintain bank accounts on behalf of or in the name of the Litigation Trust;

(iii)     maintain the books and records and accounts of the Litigation Trust and obtain any necessary insurance;

(iv)     administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

(v)     fund the Estate Funding;

(vi)     make distributions of the Litigation Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay the Litigation Trust Expenses, to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement;

(vii)     invest Cash, as available, and any income earned thereon;

(viii)     retain, compensate and employ professionals to represent the Litigation Trust or the Litigation Trustee, as applicable; and

(ix)     take any other actions not inconsistent with the provisions hereof, the FILO Settlement Order, and the Litigation Trust Agreement that the Litigation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

**7.4**     **_Litigation Trust Agreement._**

Prior to the Litigation Trust Establishment Date, the Debtors shall execute and deliver the Litigation Trust Agreement.  The Litigation Trust Agreement may include reasonable

and customary indemnification provisions for the benefit of the Litigation Trustee. Any such indemnification shall be the sole responsibility of the Litigation Trust and payable solely from the Litigation Trust Assets.

### 7.5 *Class B Representative.*

The Litigation Trust shall be administered by the Litigation Trustee pursuant to the Litigation Trust Agreement and the Plan. On the Litigation Trust Establishment Date, the Plan Administrator Committee shall be appointed as the Class B Representative to help oversee the activities of the Litigation Trust in accordance with the Litigation Trust Agreement. Upon the Plan Trust Establishment Date, the Plan Trustee shall succeed the Plan Administrator Committee as the Class B Representative. Following the Litigation Trust Establishment Date, the Class B Representative shall be responsible for, among other things, (i) exercising its rights under the Litigation Trust Agreement, and (ii) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the above duties.

### 7.6 *Fees and Expenses of the Litigation Trust.*

(a) From and after the Litigation Trust Establishment Date, Litigation Trust Expenses shall be paid from the Litigation Trust Assets in the ordinary course of business, in accordance with the Litigation Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Litigation Trustee, on behalf of the Litigation Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional (including Professionals previously employed by the Debtors or another party-in-interest) for services rendered or expenses incurred on and after the Litigation Trust Establishment Date that, in the discretion of the Litigation Trustee, are necessary to assist the Litigation Trustee in the performance of the Litigation Trustee's duties under the Litigation Trust Agreement, subject to any limitations and procedures established by the Litigation Trust Agreement.

(b) The Litigation Trustee may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties determined by the Litigation Trustee to have qualifications necessary or desirable to assist in the investigation, prosecution and/or settlement of the Litigation Trust Causes of Action).

### 7.7 *Indemnification.*

The Litigation Trust shall indemnify the Plan Trustee and its Representatives for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred, in each case, without fraud, gross negligence, breach of fiduciary duties, or willful misconduct on the part of the Plan Trustee or its Representatives, as applicable (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Plan Trustee or its Representatives at the request of the Litigation Trustee in connection with the rendering of services to the Litigation Trust or the Litigation Trustee, including under the Transition Services Agreement. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross

negligence or willful misconduct. To the extent the Litigation Trust indemnifies and holds the Plan Trustee harmless as provided above, the reasonable legal fees and related costs incurred by counsel to the Plan Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Litigation Trust Expenses. The costs and expenses incurred in enforcing the right of indemnification in this <u>Section 7.7</u> shall be paid by the Litigation Trust. This provision shall survive the termination of the Litigation Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Plan Trustee.

### 7.8 *Dissolution of the Litigation Trust.*

In no event shall the Litigation Trust be dissolved later than five (5) years from the Litigation Trust Establishment Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets.

### 7.9 *Records.*

The Litigation Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the Debtors necessary, as reasonably determined by the Litigation Trustee, for the disposition of Litigation Trust Assets, subject to the payment of any required fees, costs, or expenses under the Transition Services Agreement.

### 7.10 *Transferability of Litigation Trust Interests.*

The Litigation Trust Interests shall be transferable solely to the extent provided for, and subject to the conditions set forth, in the Litigation Trust Agreement.

### 7.11 *Litigation Trust Tax and Other Matters.*

(a) **Tax Treatment.** The Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes, with the holders of Allowed FILO DIP Claims and Allowed FILO Bridge Claims, in respect of their Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests, and the respective FILO Parties providing litigation funding, in respect of their Class A-1 Litigation Trust Interests, being treated as grantors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of Assets by the Debtors to the Litigation Trust as follows:

(i) If the transfers of Assets to the Litigation Trust and Plan Trust (and distribution of Litigation Trust Interests and Plan Trust Interests)

occur concurrently, as (A) the transfer of Assets directly to the holders of Allowed Claims entitled to receive Litigation Trust Interests, to the FILO Parties that provided the Estate Funding and, by reason of the Class B Litigation Trust Interests transferred to the Plan Trust, to holders of Allowed Claims entitled to receive Plan Trust Interests (subject to any liabilities and obligations relating to the Litigation Trust Assets), in satisfaction of, and in exchange for, their Claims and Estate Funding, other than to the extent any Assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity in respect of the Plan Trust, followed by (B) the transfer of such Assets (subject to such liabilities and obligations) by such persons to the Litigation Trust (in the case of the holders of Plan Trust Interests, first as a transfer of such assets to the Plan Trust and then from the Plan Trust to the Litigation Trust) in exchange for their Litigation Trust Interests.

(ii)    If the transfer of Assets to the Litigation Trust occurs prior to (and not concurrently with) the transfer of Assets to and distribution of beneficial interests in the Plan Trust, as (A) the transfer of the portion of the Litigation Trust Assets to which the Class A Litigation Trust Interests relate (in the case of the Class A-1 Litigation Trust Interests, to the extent of the Secured Interim Advances and the Estate Funding) directly to the holders of Allowed FILO DIP Claims, the holders of Allowed Remaining FILO Bridge Claims and the FILO Parties that provided the Estate Funding (subject to any liabilities relating to those Assets) in satisfaction of, and in exchange for, their Claims and Estate Funding, followed by (B) the transfer of such Assets by such persons, and of the remaining Litigation Trust Assets by the Debtors, to the Litigation Trust in exchange for their Litigation Trust Interests. In such event, the subsequent transfer of the Class B Litigation Trust Interests by the Debtors to the Plan Trust shall be treated as a direct transfer of the applicable portion of the assets of the Litigation Trust underlying such Class B Litigation Trust Interests to the Plan Trust Beneficiaries, followed by the transfer of such Assets by the Plan Trust Beneficiaries to the Plan Trust, as further described in Section 6.13(a) above.

Accordingly, absent definitive guidance to the contrary, (A) prior to the establishment of the Plan Trust, the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests and the Debtors, as the holders of the Class B Litigation Trust Interests, shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (B) after the establishment of the Plan Trust, (1) the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (2) the holders of the Plan Trust Interests shall be treated

for U.S. federal income tax purposes as the grantors and owners of their respective share of the Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of the Litigation Trust Assets, in each case, other than to the extent any Assets of the Plan Trust allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity.

      **(b)**     **Liquidation Purpose of the Litigation Trust; No Successor in Interest.** The Litigation Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. Accordingly, the Litigation Trustees shall, in an expeditious but orderly manner, liquidate and convert to Cash the Litigation Trust Assets, make timely distributions to the Litigation Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Litigation Trustee shall distribute at least annually to the Litigation Trust Beneficiaries any Available Cash. The Litigation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Litigation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose. Notwithstanding anything in the Plan or the Litigation Trust Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth in the Plan.

      **(c)**     **Cash Investments.** The right and power of the Litigation Trustee to invest the Litigation Trust Assets, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code. The Litigation Trustee may expend the Cash of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Assets of the Litigation Trust during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust) and (iii) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement (including, without limitation, the payment of any taxes).

      **(d)**     **Tax Reporting and Tax Payments.**

           (i)     The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this <u>Section 7.11(d)</u>. The Litigation Trustee also shall annually send to each holder of a Litigation Trust Interest, a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying

beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)    As soon as practicable after the Litigation Trust Establishment Date, the Estate Representative, in consultation with the Litigation Trustee, shall make a good faith determination of the fair market value of the Litigation Trust Assets, as of Litigation Trust Establishment Date. The Estate Representative shall inform all parties of such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)    Allocations of Litigation Trust taxable income among Litigation Trust Beneficiaries (including holders of Plan Trust Interests, as grantors and deemed owners of their respective portion of the underlying Litigation Trust Assets) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value) to the holders of Litigation Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the United States Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)    The Litigation Trust shall be responsible for payment, out of Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets.

(v)    The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

(vi)    The Litigation Trustee, the Plan Trustee, and the Debtors shall each cooperate with the other in connection with the preparation and filing of any tax returns, the provision of any required tax forms, and

58

any other matter with respect to taxes, and shall make available to the other, as reasonably requested, any information or records relevant to the preparation or filing of any tax returns or forms or the defense of any audit or other tax proceeding.

(vii)    The treatment provided in this Section 7.11, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

## ARTICLE VIII.    DISTRIBUTIONS.

### 8.1    _Distributions Generally_.

On or after the Effective Date, the Plan Trustee (with the assistance of the Disbursing Agent as necessary) shall make all Plan Distributions to holders of Allowed Claims in accordance with the terms of this Plan; _provided_ that, for the avoidance of doubt, following the Plan Trust Establishment Date and the Litigation Trust Establishment Date, the Plan Trustee and Litigation Trustee may make distributions of (i) Plan Trust Interests and Litigation Trust Interests, as applicable, and (ii) any Available Cash. The Plan Trust shall make Plan Distributions only in accordance with the terms of the Plan, the Confirmation Order and the Plan Trust Agreement to holders of Allowed Claims, and only to the extent that the Plan Trust has sufficient Plan Trust Assets (or income and/or proceeds realized from Plan Trust Assets) to make such payments in accordance with and to the extent provided for in the Plan, the Confirmation Order and the Plan Trust Agreement.  The Estate Representative shall direct the Initial Plan Distribution (including the Plan Distribution of the Plan Trust Interests as set forth in ARTICLE IV) to holders of Allowed Claims no later than the Initial Plan Distribution Date.  After the Initial Plan Distribution Date, the Estate Representative shall, from time to time, determine the subsequent Plan Distribution Dates.

### 8.2    _No Postpetition Interest on Claims_.

Unless otherwise provided in this Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### 8.3    _Distribution Record Date_.

As of the close of business on the Distribution Record Date, the various lists of holders of Claims or Interests in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests after the Distribution Record Date; _provided_ that the Plan Trustee shall file a notice on the docket of the anticipated Effective Date at least ten (10) calendar days before the anticipated Effective Date.  Neither the Debtors nor the Plan Trustee shall have any obligation to recognize any transfer of a Claim (i) occurring after the close of business on the Distribution Record Date, or (ii) that does not comply with Bankruptcy Rule 3001(e) or otherwise does not comply with the Bankruptcy Code or Bankruptcy Rules.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Plan Trustee shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable

executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

### 8.4 *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 8.5 *Reserve on Account of Disputed Claims.*

(a) From and after the Plan Trust Establishment Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the Allowed amount, or Allowed or disallowed by Final Order, the Plan Trust shall retain, for the benefit of each holder of a Disputed Claim, an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim has been estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as constituting and representing the maximum amount in which such Claim may ultimately become an Allowed Claim or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Estate Representative. Cash held in the Disputed Claim Reserve (including, with respect to Cash, any earnings that have accrued on such Cash, net of any expenses, including any taxes, relating thereto) shall be retained by the Plan Trust for the benefit of holders of Disputed Claims pending determination of their entitlement thereto under the terms of the Plan. Any Cash shall be either (x) held by the Plan Trust in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States government and guaranteed by the United States government, and having (in either case) a maturity of not more than 30 days. No payments or Plan Distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

(b) Subject to the other provisions of this Plan regarding timing of Plan Distributions, after a Disputed Claim becomes an Allowed Claim, the Plan Trustee shall distribute to the holder thereof the Plan Distributions, if any, to which such holder is then entitled under the Plan and any earnings related to the portion of the Disputed Claim Reserve allocable to such Allowed Claim (net of any expenses, including any taxes, relating thereto), and a Plan Trust Interest in accordance with the Plan, subject to the provisions concerning distributions from the Plan Trust, including the application of any reserves. The balance of any Cash previously retained but not distributed to a Disputed Claim holder shall be included in future distributions to holders of Claims in the applicable Class. Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will be paid (i) first from the Disputed Claim Reserve and (ii) if the amount available for Plan Distribution pursuant to the foregoing clause (i) is insufficient to remit Plan Distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent Distribution Date(s) from Plan Trust Assets.

**(c)**    If a Disputed Claim is disallowed, assets treated as held in the Disputed Claim Reserve on account of such Claim shall, at such time as reasonably determined by the Plan Trustee, be treated for U.S. federal income tax purposes as an additional distribution of an undivided interest in the underlying assets with respect to previously Allowed Claims.  For the avoidance of doubt, the Plan Trustee shall not be required to make any Plan Distributions as a result of any Disputed Claims that are disallowed until all Disputed Claims either become Allowed Claims or are disallowed.

**(d)**    Unless otherwise ordered by the Bankruptcy Court, the Disputed Claim Reserve shall not be used for operating expenses, costs, or any purpose other than as set forth in this Section 8.5.

### 8.6    *Distributions After Effective Date.*

Plan Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 8.7    *Plan Distributions Made by Plan Trustee.*

All Plan Distributions shall be made by the Plan Trustee on and after the Effective Date as provided herein; *provided* that, for the avoidance of doubt, following the Plan Trust Establishment Date and the Litigation Trust Establishment Date, the Plan Trustee and Litigation Trustee may make distributions of (i) Plan Trust Interests and Litigation Trust Interests, as applicable, and (ii) any Available Cash.  The Plan Trustee shall not be required to give any bond or surety or other security for the performance of its duties.  The Debtors shall use commercially reasonable efforts to provide the Plan Trustee with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' books and records.  The Debtors shall cooperate in good faith with the applicable Plan Trustee to comply with the withholding and reporting requirements outlined in Section 8.16 of this Plan.

### 8.8    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, the Plan Trustee shall make all Plan Distributions to any holder of an Allowed Claim or its authorized designee or transferee as and when required by this Plan at (a) the address of such holder on the books and records of the Debtors or their agents, (b) at the address in any written notice of address change delivered to the Debtors or the Plan Trustee, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001, or (c) the address of the designee of such holder to the extent practicable. Subject to Section 8.9 of this Plan, in the event that any Plan Distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Plan Trustee has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

### 8.9    *Unclaimed Property.*

**(a)**    Six (6) months from the later of:  (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim or Interest is first Allowed, all Plan Distributions

payable on account of such Claim or Interest that are unclaimed pursuant to <u>Section 8.9(b)</u> shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Plan Trustee or its successor or assigns, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Plan Trustee shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

**(b)** A Plan Distribution shall be deemed unclaimed if a holder has not (i) accepted a particular distribution or, in the case of distribution made by check, by ninety (90) calendar days after issuance, negotiated such check, (ii) given notice to the Plan Trustee of an intent to accept a particular Plan Distribution, (iii) responded to the Debtors', Plan Trustee's, or Disbursing Agent's as applicable, request for information necessary to facilitate a particular Plan Distribution, or (iv) taken any other action necessary to facilitate such distribution.

### 8.10    *Satisfaction of Claims.*

Unless otherwise provided in this Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims and shall not exceed the amount of such Allowed Claims. Notwithstanding anything to the contrary in the Plan, upon the Plan Trust Establishment Date, the Plan Trust shall assume all Claims (including, for the avoidance of doubt, all Administrative Expense Claims (including Professional Fee Claims), Other Secured Claims, Priority Tax Claims, and Other Priority Claims) against the Debtors (other than the FILO DIP Claims and FILO Bridge Claims except the Retained FILO Claims) with the same validity and priority as such Claims had against the Debtors immediately prior to the Plan Trust Establishment Date and there shall be no further recourse against the Debtors with respect to such Claims.

### 8.11    *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Estate Representative, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Estate Representative. Any wire transfer fees incurred by the Estate Representative in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's Plan Distribution.

### 8.12    *Minimum Distribution.*

The Plan Trustee shall have no obligation to make a Plan Distribution that is less than $100.00 in Cash.

### 8.13    *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

### 8.14    *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in this Plan or as otherwise required by law (as determined by the Debtors or Plan Trustee), Plan Distributions with respect to an Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of such Allowed Claim, to any portion of such Allowed Claim for accrued but unpaid interest.

### 8.15    *Setoffs and Recoupments.*

Except as otherwise provided in this Plan, including in all respects Sections 12.6(a), 12.6(b), 12.7, and 12.8, each Debtor or the Plan Trustee on behalf such Debtor, may, pursuant to applicable non-bankruptcy law, set off or recoup against any Allowed Claim and the Plan Distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that such Debtor or its successors may hold against the holder of such Allowed Claim after the Plan Trust Establishment Date. Notwithstanding the foregoing, neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Trustee, a Debtor, or an Estate or its successor of any claims, rights, or Causes of Action that the Plan Trustee, a Debtor, or an Estate or its successor or assign may possess against the holder of such Claim, except as otherwise provided in this Plan, including in all respects Sections 12.6(a), 12.6(b), 12.7, and 12.8.

### 8.16    *Withholding and Reporting Requirements.*

(a)    **Withholding Rights.**  In connection with this Plan, any Entity issuing any instrument or making any distribution or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to this Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Plan Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any Entity issuing any instrument or making any Plan Distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

(b)    **Forms.**  Any party entitled to receive any property as an issuance or distribution under this Plan shall, upon reasonable request, deliver to the applicable withholding

agent or such other Entity or Estate designated by the Plan Trustee, an appropriate IRS Form W-9 or (if the payee is a foreign person) IRS Form W-8 and/or any other forms or documents, as applicable, requested by the Plan Trustee or the applicable withholding agent to reduce or eliminate any required federal, state, or local withholding. If such request is made by a withholding agent or such other Entity or Estate designated by the Plan Trustee and the party entitled to receive such property as an issuance or distribution fails to comply with any such request within ninety (90) days after the request is made, the amount of such issuance or distribution shall irrevocably revert to the Plan Trust, as applicable, and any Claim in respect of such distribution under this Plan shall be discharged and forever barred from assertion against any Debtor, Estate, the Plan Trust, and their respective property.

### 8.17 *Securities Registration Exemption.*

Any Plan Trust Interests and Litigation Trust Interests will not, and are not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Plan Trust Interests or Litigation Trust Interests constitute "securities," the offer and sale of (i) such Plan Trust Interests to the Plan Trust Beneficiaries will be exempt to the extent provided in section 1145 of the Bankruptcy Code from registration, without further action by any person, under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations requiring registration for the offer or (ii) such Litigation Trust Interests to the Litigation Trust Beneficiaries will be exempt to the extent provided in Section 4(a)(2) of the Securities Act and similar exemptions under state securities laws. Any such Plan Trust Interests and Litigation Trust Interests shall be subject to the limitations set forth in their respective trust agreements in a manner consistent with this Plan.

### 8.18 *Disbursing Agent.*

(a) The Plan Trustee shall have the authority to enter into agreements with one or more Disbursing Agents to facilitate the distributions required under the Plan, the Confirmation Order, and the Plan Trust Agreement. The Plan Trustee may pay to the Disbursing Agent all reasonable and documented fees and expenses of the Disbursing Agent without the need for other approvals, authorizations, actions or consents. For the avoidance of doubt, the reasonable and documented fees of the Disbursing Agent will be paid by the Plan Trustee and will not be deducted from distributions to be made under the Plan to holders of Allowed Claims receiving distributions from the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

(b) From and after the Confirmation Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against the Debtors, the Plan Trust Beneficiaries, and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent. No holder of a Claim, a Plan Trust Beneficiary, or other party in interest shall have or pursue any claim or Cause of

Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making Plan Distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

        **(c)**     The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all Plan Distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

        **(d)**     Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Plan Trust in the ordinary course of business.

## ARTICLE IX.      PROCEDURES FOR RESOLVING CLAIMS.

### 9.1    *Allowance of Claims.*

        The Estate Representative shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim.

### 9.2    *Objections to Claims.*

        As of the Plan Trust Establishment Date, objections to Claims against the Debtors may be interposed and prosecuted only by the Plan Trustee. Any objections to Claims shall be served and filed (i) on or before one hundred and eighty (180) days following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court; *provided* that the Estate Representative may extend the Claim Objection Deadline for an additional one hundred and eighty (180) days in their sole discretion upon the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing

### 9.3    *Estimation of Claims.*

        The Estate Representative may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to

any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Estate Representative may pursue supplementary proceedings to object to the allowance of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated.

### 9.4    *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan without further notice or Bankruptcy Court approval. Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Plan Trust Establishment Date, the Plan Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Plan Trust may hold against any Person, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.

### 9.5    *Adjustment to Claims Register Without Objection.*

Any Claim or Interest that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Estate Representative upon agreement between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 9.6    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or Plan Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 9.7    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Plan Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan. On a date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Plan Trustee in the Plan Trustee's sole discretion, the Plan Trustee shall provide to the holder of such Claim the

Plan Distribution (if any) to which such holder is entitled under this Plan, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code. For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, the Plan Trustee shall not be required to make any Plan Distributions on account of Disputed Claims that become Allowed Claims or as a result of any Disputed Claims that are disallowed until all Disputed Claims either become Allowed Claims or are disallowed. Notwithstanding anything contained herein, to the extent that a Disputed Claim becomes an Allowed Claim after the Plan Trust Establishment Date or Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Plan Trust Establishment Date or Effective Date (as applicable).

### 9.8 *Elimination of Duplicate Claims.*

Any Proof of Claim filed against one or more of the Debtors shall be deemed to be a single Claim, and all duplicate Proofs of Claim for the same Claim filed against more than one Debtor shall be deemed disallowed and expunged.

### 9.9 *Late Filed Claims.*

Except as otherwise provided herein or as agreed to by the Debtors or Plan Trustee, (i) any Proof of Claim filed after the Bar Date with respect to such Claim and (ii) any proof of Administrative Expense Claim filed after the applicable Administrative Expense Claims Bar Date with respect to such Administrative Expense Claim, shall be deemed Disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims and such Administrative Expense Claims may not receive any Plan Distributions on account of such Claims and such Administrative Expense Claims, unless such late Proof of Claim or such proof of Administrative Expense Claim, as applicable, has been deemed timely filed by a Final Order.

### 9.10 *Amendments to Claims.*

A Claim may not be filed, amended, or supplemented without the prior written authorization of the Bankruptcy Court or the Plan Trustee, and any such new, amended, or supplemented Claim filed without such written authorization shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

### 9.11 *Insured Claims.*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies, other than with respect to any policies issued by TRACO or its predecessors. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court; *provided* that, to the extent that a holder receives a Plan Distribution on account of any portion of an Allowed Claim that is an Insured Claim that is thereafter satisfied by insurance proceeds, the holder shall promptly return that portion of the Plan Distribution attributable to the portion of such Claim so satisfied.

### 9.12   *Medical Liability Claims Procedures.*

All Medical Liability Claims against the Debtors shall be reconciled in accordance with the Medical Liability Claims Procedures. Following entry of the Confirmation Order, the automatic stay shall remain in effect with respect to all Medical Liability Claims against the Debtors and shall only be modified in accordance with the Medical Liability Claims Procedures. To the extent the automatic stay was previously lifted in the Chapter 11 Cases with respect to any particular Medical Liability Claim, upon entry of the Confirmation Order, the automatic stay shall be reimposed and remain in effect unless or until modified in accordance with the Medical Liability Claims Procedures.

## ARTICLE X.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 10.1   *Rejection of Executory Contracts and Unexpired Leases.*

(a)   As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are a party shall be deemed rejected except for an executory contract or unexpired lease that: (i) is specifically and expressly designated as a contract or lease to be assumed pursuant to this Plan, including as set forth in the Schedule of Assumed Contracts or Confirmation Order; (ii) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate assumption or rejection motion filed by the Estate Representative on or before the Effective Date; (v) is the subject of a pending Cure Dispute; (vi) is a contract, lease, or other agreement or document entered into in connection with the Plan; or (vii) is a D&O Policy or other insurance policy to which any Debtor or Estate Representative is a beneficiary or an insured. For the avoidance of doubt, the Estate Representative may seek to assume, assume and assign, or reject an executory contract or unexpired lease at any time prior to the Effective Date, whether or not such executory contract or unexpired leases is listed on the Schedule of Assumed Contracts.

(b)   Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Debtors, the Plan Trustee, or the assignee of such executory contract or unexpired lease (as applicable) have provided adequate assurance of future performance under such executory contract or unexpired lease. Each executory contract or unexpired lease assumed pursuant to this Plan shall vest in and be fully enforceable by the applicable Debtor in accordance with its terms, except as modified by the provisions of this Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law, and shall be assigned by the Debtors to the Plan Trust pursuant to this Plan on the Effective Date. Notwithstanding anything to the contrary herein, all rights and obligations of the Debtors under or with respect to any executory contracts and unexpired leases to which any of the Debtors are a party shall vest in the Plan Trust on the Plan Trust Establishment Date, whether or not such executory contracts or unexpired leases are otherwise pending assumption, assumption and assignment, or rejection in accordance with Section 10.1(a) of this Plan, and the Plan Trust shall have all rights of the Debtors

to assume, assume and assign, or reject such executory contracts and unexpired leases on or prior to the Effective Date.

(c)     Assumption of any executory contract or unexpired lease pursuant to this Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the Effective Date.

## 10.2    *Survival of Indemnification Obligations.*

Any and all obligations of the Debtors to indemnify, defend, reimburse, or limit the liability of current and former officers, directors, members, managers, agents, or employees against any Claims or Causes of Action as provided in the Debtors' corporate charters, bylaws, other organizational documents, other agreements, or applicable law shall survive confirmation of the Plan, and shall be assumed by such Debtor solely to the extent necessary to recover and have access to insurance proceeds. Any indemnification claims arising under the foregoing documents shall be treated as General Unsecured Claims against the Debtors to the extent Allowed. Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, solely for the purposes described in the first sentence of this Section 10.2.

## 10.3    *Determination of Cure Disputes and Deemed Consent.*

Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Estate Representative may otherwise agree.

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts. At least fourteen (14) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to potentially be assumed or assumed and assigned to the Plan Trust, reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any). **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.** Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct

or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or its Estate, as applicable. Each such provision shall be deemed to not apply to the assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 10.3, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

If there is a Cure Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided* that the Estate Representative may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent a Cure Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Cure Dispute; *provided* that the Debtors or the Plan Trustee reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to the extent such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtors and the Plan Trustee). The Debtors or the Plan Trustee may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired leases.

## 10.4 *Rejection Damages Claims*.

Unless an earlier date is otherwise provided for by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' executory contracts or unexpired leases pursuant to this Plan, must be filed with Bankruptcy Court and served on the Claims and Noticing Agent no later than twenty-one (21) days after the Effective Date.

Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, or (ii) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, the Plan Trust, the Plan Trustee, or the property for any of the foregoing without the need for any objection by the Plan Trustee or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims, except as otherwise provided by Final Order of the Bankruptcy Court.

### 10.5 *Joint Ventures.*

Notwithstanding anything to the contrary in this Plan, all shareholders' agreements, nominee agreements, call option agreements, and other agreements in respect of joint venture entities to which a Debtor or the Plan Trust is a party are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless otherwise specifically assumed.

### 10.6 *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments related thereto, as of the Effective Date (or on such earlier date as determined by the Estate Representative, in consultation with the Creditors' Committee), shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor and shall continue in full force and effect thereafter in accordance with their respective terms and vest in the Plan Trust. All officers, managers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Policies in effect as of, or purchased on or before, the Effective Date for the full term of such D&O Policies regardless of whether such officers, managers, directors, agents, and/or employees remain in such positions as of the Effective Date, in each case, to the extent set forth in such D&O Policies. Nothing in the Plan shall alter, supplement, change, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the Debtors' insurance policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including the conditions, limitations, and/or exclusions) of the insurance policies, and thus the rights or obligations thereof, are subject to the Bankruptcy Code and applicable law. For the avoidance of doubt, the transfer of the rights of the Debtors and the Estates to recover proceeds from D&O Policies to the Litigation Trust and the Plan Trust, as applicable, shall not hinder the ability of any beneficiaries or insureds of such D&O Policies to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

### 10.7    *Assignment.*

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned to the Litigation Trust (subject to the consent of the FILO Parties) or Plan Trust hereunder, if applicable, shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

### 10.8    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

### 10.9    *Reservation of Rights.*

**(a)**    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors, the Estates, the Plan Trust, or the Plan Trustee or their respective Affiliates has any liability thereunder.

**(b)**    Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors, the Estates, the Plan Trust, or the Plan Trustee under any executory or non-executory contract or unexpired or expired lease.

**(c)**    Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Estates, the Plan Trust, or the Litigation Trust, as applicable, under any executory or non-executory contract or unexpired or expired lease.

**(d)**    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Estate Representative shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

# ARTICLE XI. CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.

## 11.1 *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

(a) the Disclosure Statement Order shall have been entered;

(b) the Litigation Trust Establishment Date has occurred, including the transfer of the Litigation Trust Assets to the Litigation Trust;

(c) the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(d) the Confirmation Order shall have been entered by the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction, which Confirmation Order shall be in form and substance reasonably acceptable to the Creditors' Committee;

(e) all actions, documents, certificates, and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

(f) all authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received; and

(g) the Professional Fees Escrow Account and the Wind Down Reserve (in accordance with the Wind Down Budget) shall have been fully funded as provided for in this Plan.

## 11.2 *Waiver of Conditions Precedent.*

(a) Each of the conditions precedent to the occurrence of the Effective Date of the Plan set forth in this ARTICLE XI may be waived, in whole or in part, by the Debtors with the consent of the Creditors' Committee, not to be unreasonably withheld, without leave of or order of the Bankruptcy Court; *provided* that the condition precedent to the occurrence of the Effective Date of the Plan set forth in Section 11.1(b) may be waived only with the consent of the Debtors, the Creditors' Committee, and the FILO DIP Agent.

(b) Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(c) The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 11.3   *Effect of Failure of a Condition.*

If the Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other Entity; *provided* that, notwithstanding the foregoing, all actions authorized to be taken pursuant to the Confirmation Order, FILO Settlement Order, and Section 8.10 hereof, and all terms of the Confirmation Order, FILO Settlement Order, and Section 8.10 shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not revert to the Debtors or the Estates.

### 11.4   *Effect of Vacatur of Confirmation Order.*

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise; *provided* that, notwithstanding the foregoing, all actions authorized to be taken pursuant to the Confirmation Order, FILO Settlement Order, and Section 8.10 hereof, and all terms of the Confirmation Order, FILO Settlement Order, and Section 8.10 shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not revert to the Debtors or the Estates.

## ARTICLE XII.   EFFECT OF CONFIRMATION.

### 12.1   *Binding Effect.*

As of the Confirmation Date, this Plan shall bind (i) the Debtors; (ii) the Plan Administrator Committee; (iii) the Plan Trustee and the Plan Trust; (iv) the Litigation Trustee and the Litigation Trust; (v) all holders of Claims against and Interests in the Debtors and their respective successors and assigns, regardless of whether any such holders were (a) Impaired or Unimpaired under this Plan, (b) presumed to accept or deemed to reject this Plan, (c) failed to vote to accept or reject this Plan, (d) voted to reject this Plan, and/or (e) received any Plan Distribution under the Plan; (vi) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan; (vii) each Entity acquiring property under this Plan and the Confirmation Order; and (viii) any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

### 12.2   *Vesting of Assets.*

Except as otherwise provided in this Plan (including in all respects Sections 12.6(a), 12.6(b), 12.7, and 12.8), the Plan Supplement, or the Confirmation Order, on and after the

Litigation Trust Establishment Date and Plan Trust Establishment Date (as applicable), pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with this Plan or the Plan Supplement, shall vest in the Litigation Trust and the Plan Trust (as applicable) free and clear of all Claims, Liens, encumbrances, charges, constructive trusts, and other interests to the extent permitted under applicable law. Subject to the terms of this Plan and the Litigation Trust Agreement and Plan Trust Agreement, on and after the Plan Trust Establishment Date or Litigation Trust Establishment Date (as applicable), the Plan Trustee or Litigation Trustee (as applicable) may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order. Without limiting the foregoing, the Plan Trustee may pay the charges that it incurs on behalf of the Estates after the Confirmation Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court. In addition, all rights, benefits, and protections provided to the Debtors or their Estates pursuant to the Plan, the Plan Supplement, or the Confirmation Order including, but not limited to, the release, exculpation, and injunction provisions provided in Section ARTICLE XII of the Plan, shall vest in the Litigation Trust and the Plan Trust, as applicable, unless expressly provided otherwise by the Plan or the Confirmation Order.

### 12.3    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in this Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

As set forth in Section 9.12 of this Plan, following entry of the Confirmation Order, the automatic stay shall remain in effect with respect to all Medical Liability Claims against the Debtors and shall only be modified in accordance with the Medical Liability Claims Procedures. To the extent the automatic stay was previously lifted in the Chapter 11 Cases with respect to any particular Medical Liability Claim, upon entry of the Confirmation Order, the automatic stay shall be reimposed and remain in effect unless or until modified in accordance with the Medical Liability Claims Procedures.

### 12.4    *Injunction Against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date.

**12.5** *Plan Injunction.*

(a)    Except as otherwise expressly provided in this Plan, or for distributions required to be paid or delivered pursuant to this Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under Section 12.6(a) or Section 12.6(b) of this Plan, or (ii) subject to exculpation pursuant to Section 12.7 of this Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 12.7 of this Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:  (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to this Plan, including pursuant to Section 12.6(a) or Section 12.6(b) of this Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of this Plan.

(b)    Subject in all respects to Section 13.1 of this Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure

76

Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under this Plan or, with respect to an Exculpated Party, been exculpated under this Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in <u>Section 13.1</u> of this Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)     By participating in the Plan by voting or by accepting Plan Distributions pursuant to this Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to this Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in this <u>Section 12.5</u>, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

(d)     The injunctions in this <u>Section 12.5</u> shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

**12.6     _Releases._**

**(a)     Releases by the Debtors and their Estates. Except as otherwise expressly set forth below in this <u>Section 12.6</u>, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable**

consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or the Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 12.6(a) (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive

Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with **Section 4.6** of this Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on **Exhibit B** of this Plan or the Schedule of Identified Non-Released Parties.

(b) **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the

transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or the Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 12.6(b) (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by or against the FILO Parties arising from a material misrepresentation, or (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Nothing contained in this Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)     Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

### 12.7     *Exculpation.*

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation,

preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in this <u>Section 12.7</u> shall not release or exculpate (a) any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 12.8 *<u>Waiver of Statutory Limitation on Releases.</u>*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER <u>ARTICLE XII</u> OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN <u>SECTION 12.6</u> OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### 12.9 *<u>Injunction Related to Releases and Exculpation.</u>*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to this Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

### 12.10  *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right, to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 12.11  *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in this Plan, including in all respects <u>Sections 12.6(a)</u>, <u>12.6(b)</u>, <u>12.7</u>, and <u>12.8</u>, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  Except as otherwise provided in this Plan, including in all respects <u>Sections 12.6(a)</u>, <u>12.6(b)</u>, <u>12.7</u>, and <u>12.8</u>, the Debtors, the Plan Trust, and the Litigation Trust, as applicable, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 12.12  *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, or (iii) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation.

### 12.13  *Solicitation of Plan.*

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer,

issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 12.14 *Corporate and Limited Liability Company Action.*

Upon the Plan Trust Establishment Date or the Effective Date, as applicable, all actions contemplated by the Plan (including any action to be undertaken by the Plan Trust) shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Plan Trust Establishment Date or the Effective Date, as applicable, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, members, managers, or officers of the Debtors, the Plan Trust, or the Plan Trustee. On or (as applicable) before the Effective Date, the authorized officers of the Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan). The authorizations and approvals contemplated by this Section 12.14 shall be effective notwithstanding any requirements under non-bankruptcy law.

### 12.15 *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Plan Trust.

## ARTICLE XIII. RETENTION OF JURISDICTION.

### 13.1 *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to sections 1334 and 157 of title 28 of the United States Code, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(a) to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b) to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)     to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     to ensure that Plan Distributions to holders of Allowed Claims and Interests are accomplished as provided in this Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under this Plan;

(e)     to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any administrative or priority Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of claims or interests;

(f)     to hear and determine settlements and disputes with respect to any Plan Trust Asset, including any Cause of Actions transferred to the Plan Trust;

(g)     to hear and determine settlements and disputes with respect to any Litigation Trust Asset, including any Cause of Actions transferred to the Litigation Trust;

(h)     to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motions, adversary proceeding, application, contested matter or other litigated matter brought by the Plan Trustee or the Litigation Trustee, including any disputes between the Litigation Trustee and the Estate Representative as set forth in the Litigation Trust Agreement and Section 5.8 of the Plan;

(i)     to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(j)     to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(k)     to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, the Confirmation Order, or any order of the Bankruptcy Court, in such a manner as may be necessary to carry out the purposes and effects thereof;

(l)     to hear and determine all Professional Fee Claims;

(m)    to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(n)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(o)    to hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan;

(p)    to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, Plan Supplement, and Confirmation Order;

(q)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(r)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(s)    to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(t)    to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date or Administrative Expense Claims Bar Date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(u)    to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE XII of this Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

(v)    to enforce all orders previously entered by the Bankruptcy Court

(w)    to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(x)    to recover all Assets of the Plan Trust, the Litigation Trust, the Debtors and property of the Estates, wherever located;

(y)    to hear and determine all disputes between the Debtors or Plan Trust, on one hand, and the Litigation Trustee, on the other; and

(z)     to enter a final decree closing each of the Chapter 11 Cases;

*provided*, *however*, that (i) any mediation requirements in the FILO Settlement Term Sheet, the Litigation Trust Agreement, the Litigation Funding Agreement, the Transition Services Agreement, the Trustee Engagement Letter (as defined in the FILO Settlement Order), and the DIP Amendment (as defined in the FILO Settlement Order) shall be given full force and effect and (ii) to the extent the Bankruptcy Court lacks, or otherwise abstains from exercising, jurisdiction over any matter relating to the FILO Settlement Term Sheet, the Litigation Trust Agreement, the Litigation Funding Agreement, the Transition Services Agreement, the Trustee Engagement Letter (as defined in the FILO Settlement Order), and the DIP Amendment (as defined in the FILO Settlement Order), then the applicable jurisdictional, forum selection, and dispute resolution clauses in such documents shall govern.

### 13.2     *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.     MISCELLANEOUS PROVISIONS.

### 14.1     *Statutory Fees.*

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors or the Plan Trustee in full on the Effective Date.  As of the Plan Trust Establishment Date, the Plan Trustee shall assume primary responsibility for the payment of all Statutory Fees.  On and after the Plan Trust Establishment Date, the Plan Trustee shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.   After the Effective Date, each Debtor or Plan Trustee, as applicable, shall remain obligated to file post-confirmation quarterly reports and to pay Statutory Fees to the U.S. Trustee until the earliest of that particular Debtor's, or Plan Trustee's (on behalf of a Debtor), as applicable, case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of Statutory Fees.

### 14.2     *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (b) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Confirmation Order), shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, document recording tax, intangibles

or similar tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 14.3   *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee, if any, shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases. The Debtors or the Plan Trust, as applicable, shall not be responsible for paying the fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

### 14.4   *Request for Expedited Determination of Taxes of the Debtors.*

The Debtors, Plan Administrator Committee, and Plan Trustee shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Debtors filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Wind Down Completion Date.

### 14.5   *Dates of Actions to Implement Plan.*

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 14.6   *Amendments.*

(a)   **Plan Modifications.**   This Plan may be amended, supplemented, or otherwise modified by the Debtors (with the consent of the Creditors' Committee, not to be unreasonably withheld, conditioned, or delayed) in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; *provided* that any amendment, supplement, or modification that adversely affects the Litigation Trust shall also require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent) (such consent, not to be unreasonably withheld, conditioned, or delayed).  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, supplemented, or otherwise modified.

(b)   **Certain Technical Amendments.**  Prior to the Effective Date, the Debtors (with the consent of the Creditors' Committee, not to be unreasonably withheld, conditioned, or

delayed) may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do not adversely affect in a material way the treatment of the holders of Claims or Interests under this Plan; *provided* that any adjustment or modification that adversely affects the Litigation Trust shall also require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent) (such consent, not to be unreasonably withheld, conditioned, or delayed).

### 14.7    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date.  If this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur on the Effective Date, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, any Debtor or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims, or (iii) constitute an admission, acknowledgement, offering, or undertaking of any sort by any Debtor or any other Entity; *provided* that notwithstanding the foregoing all actions authorized to be taken pursuant to the Confirmation Order and FILO Settlement Order and all terms of the Confirmation Order and FILO Settlement Order shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not to revert to the Debtors or the Estates.

### 14.8    *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 14.9    *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 14.10    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that this Plan or the Confirmation Order provides otherwise, the rights, duties, and obligations arising under this Plan and the Confirmation Order shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 14.11  *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Confirmation Date, the terms of this Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Plan Trustee, the Litigation Trustee, the holders of Claims or Interests (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected this Plan), the Released Parties, and each of their respective successors and assigns.

### 14.12  *Successors and Assigns*.

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

### 14.13  *Entire Agreement*.

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### 14.14  *Severability of Plan Provisions*.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Trust (as the case may be), and (c) non-severable and mutually dependent.

### 14.15  *Additional Documents*.

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Plan Trustee, the Litigation Trustee, and all holders of Claims receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 14.16  *Deemed Acts*.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 14.17  *Computing Time*.

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 14.18  *Exhibits to Plan*.

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full in this Plan.

### 14.19  *Notices*.

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

(1) If to the Debtors, to:

**Steward Health Care System LLC**
2811 McKinney Avenue, Suite 300
Dallas, Texas 75204.
Attn: John R. Castellano, Chief Restructuring Officer
Email: JCastellano@alixpartners.com

with a copy (which will not constitute notice) to:

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, New York 10153
Attn:   Jeffrey D. Saferstein
        Jason H. George
Email: jeffrey.saferstein@weil.com
        jason.george@weil.com

-and-

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Attn:   Clifford W. Carlson

90

Stephanie N. Morrison
Email: clifford.carlson@weil.com
stephanie.morrison@weil.com

-and-

1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Attn:   David J. Cohen
Email: davidj.cohen@weil.com

-and-

**Latham & Watkins LLP**
1271 Avenue of Americas
New York, New York 10020
Attn:   Ray C. Schrock
        Candace M. Arthur
Email: ray.schrock@lw.com
        candace.arthur@lw.com

(2) If to the Creditors' Committee, to:

**Akin Gump Strauss Hauer & Feld LLP**
One Bryant Park
New York, New York 10036
Attn:   Ira S. Dizengoff
        Brad M. Kahn
        Avi E. Luft
Email: idizengoff@akingump.com
        bkahn@akingump.com
        aluft@akingump.com

-and-

2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Attn: Sarah Link Schultz
Email: sschultz@akingump.com

(3) If to the Plan Trustee to:

**Force Ten Partners, LLC**
100 Crescent Court, 7th Floor
Dallas, Texas 75201
Attn:   Monica Blacker

Email: mblacker@force10partners.com

with a copy (which will not constitute notice) to:

**McGuireWoods LLP**
Texas Tower
845 Texas Ave., Suite 2400
Houston, Texas 77002
Attn: Demetra Liggins
Email: dliggins@mcguirewoods.com

-and-

**Weil, Gotshal & Manges LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Attn: David J. Cohen
Email: davidj.cohen@weil.com

-and-

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Attn: Clifford W. Carlson
        Stephanie N. Morrison
Email: clifford.carlson@weil.com
        stephanie.morrison@weil.com

(4) If to the Litigation Trustee to:

**Province Fiduciary Services, LLC**
2360 Corporate Circle, Suite 340
Henderson, Nevada 89074
Attn: Mark Kronfeld
Email: mkronfeld@provincefirm.com

with a copy (which shall not constitute notice) to:

**Province, LLC**
2360 Corporate Circle, Suite 340
Henderson, Nevada 89074
Attn: David W. Dachelet, Esq.
Email: ddachelet@provincefirm.com

(5) If to the FILO Parties to:

**Milbank LLP**
55 Hudson Yards
New York, New York 10001
Attn:   Mike Price
          Andrew Harmeyer
          Brian Kinney
Email: mprice@milbank.com
          aharmeyer@milbank.com
          bkinney@milbank.com

After the occurrence of the Effective Date, the Debtors and the Plan Trustee have authority to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. Notwithstanding the foregoing, the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Debtors and the Plan Trustee are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

### 14.20 *Reservation of Rights*.

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

[*Remainder of Page Intentionally Left Blank*]

Dated: July 11, 2025
Chicago, Illinois

Respectfully submitted,

By: /s/ _____

Name: John R. Castellano
Title: Chief Restructuring Officer

*On behalf of Steward Health Care System LLC
and each of Its Debtor Affiliates*

## <u>Exhibit A</u>

### Individual Released Parties

- Alan Carr
- Carlos Hernandez
- David Barnhardt
- Eugene (Jay) Sullivan
- Gail Schlesinger
- General H.R. McMaster
- Henry (Nick) Nickells
- Jeffrey Morales
- Jennifer Hunt
- John Boehner
- John Castellano
- Joseph Weinstein
- Katchena Potter
- Mary Beth Taylor
- Nathalie Hibble
- Octavio Diaz
- Rich Iannessa
- Sr. Vimala Vadakumpadan
- Susan Brown
- William Transier

## Exhibit B

### Identified Non-Released Parties

- Alessandra Pace
- Armin Ernst
- Brian Carty
- Christopher Dunleavy
- Craig Jesiolowski
- David Chicoine
- David Friend
- David Morales
- Herbert Holtz
- James Karam
- James Lenehan
- Jill Moretto
- John Polanowicz
- Joseph Ciccolo
- Joseph Maher
- Joshua Putter
- Mark Girard
- Mark Rich
- Michael Callum
- Miroslav Boyanov
- Nadine Delicata
- Ralph de la Torre
- Robert Guyon
- Ruben King-Shaw Jr.
- Sanjay Shetty

- 5326 Old Buena Vista Road LLC
- Ad Astra Per Aspera LLC
- CareMax, Inc.
- Cayman TRS Holdings
- Cerberus Capital Management, L.P.
- Cerberus International II Master Fund LP
- Cerberus Partners II LP
- Cerberus Series Four Holdings LLC
- de la Torre Foundation
- de la Torre Family Foundation
- Management Health Services Colombia S.A.S.
- Management Health Services LLC
- Manolete Health Investors LLC
- Manolete Health LLC
- Medical Properties Trust, Inc.
- MPT Sycamore Opco LLC
- Ralph de la Torre Revocable Trust
- RDLT – SHCI Investor LLC
- RDLT – SHCI Manager LLC
- Sagamore Capital Management, LLC
- Santa Clara Holdings LLC
- Sparta Holding Co. LLC
- Steward Health Care International
- Steward Health Care International (Malta) Ltd
- Steward Health Care International Colombia S.A.S.
- Steward Health Care Investors LLC
- Steward Health Care International Investors LLC
- Steward Health Care International Kingdom of Saudi Arabia, S.L.
- Steward Health Care International Ltd
- Steward Health Care International S.L
- Steward Malta Assets Ltd
- Steward Malta Ltd
- Steward Malta Management Ltd
- Steward Malta Personnel Limited
- Steward Management Holdings LLC
- Tenet Healthcare Corporation
- TRACO International Group S. DE R.L.

**Exhibit C**

**FILO Settlement Term Sheet**

## SETTLEMENT AND STAY RELIEF TERM SHEET

### April 28, 2025

This Term Sheet sets forth the material substantive terms pursuant to which the Debtors, the FILO DIP/Bridge Agent and Lenders (the "FILO Parties"), and the Unsecured Creditors Committee ("UCC") will support entry of an order resolving requests for relief from the stay by the FILO Parties.

1. This Term Sheet must be approved by an order of the Bankruptcy Court, pursuant to sections 361, 362, 363 and 105 of the Bankruptcy Code and Bankruptcy Rules 4001(d)(iii), 6004, and 9019 (the "Approval Order"), entered not later than May 28, 2025 (the "Approval Milestone"). In addition, the Debtors shall file a motion seeking the Bankruptcy Court's approval of the Approval Order (the "Approval Motion") by no later than April 28, 2025 (the "Motion Milestone"). If the Debtors do not satisfy either the Motion Milestone or the Approval Milestone, this agreement will be of no further force or effect.[1]

2. All of the Estate (as defined below) assets identified on **Schedule 1** hereto (the "Litigation Trust Assets") will be transferred free and clear (to the fullest extent permissible by applicable law) to the "Litigation Trust," a trust to be created. The Estate assets that are not Litigation Trust Assets shall be retained by the Estate (the "Retained Assets").[2] The terms of the

---

[1] The milestones and other dates and deadlines contained herein may be extended by e-mail agreement amongst counsel to the Debtors, FILO Parties, and UCC.

[2] The Retained Assets shall include, without limitation, (i) the Estate's reversionary interests (if any) in the Professional Fees Escrow Account, the Physician Insurance Account (each as defined in the FILO DIP Order (Docket No. 1538)), the Expense Escrow Account (as defined in the MPT Settlement Order (Docket No. 2610)), and in each case, the amounts deposited therein, and (ii) any equity interests in any Debtor. To the extent that the Estate realizes cash or other value on account of any Retained Assets that comprise, would have comprised or are derived from FILO DIP collateral ("Retained Collateral") (which shall exclude, for the avoidance of doubt, the Class B interests, any proceeds thereof, and any proceeds funded to, advanced to, or authorized to be used by the Estate in accordance with this Term Sheet) the Estate shall promptly turn over such cash or other value to the Litigation Trust for distribution in accordance with the Litigation Trust's distribution waterfall. To the extent that any Retained Collateral is identified that could be monetized for value, the Estate shall use commercially reasonable efforts to monetize such Retained Collateral in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee at the Litigation Trust's sole expense and paid in advance pursuant to the TSA (for the avoidance of doubt, any reasonable and documented costs incurred by the Estate in connection with such agreed upon monetization process shall be charged to the Litigation Trust at the Estate's cost). The Approval Order shall provide that from and after the Trust Establishment Date (as defined below), the Retained Collateral (which includes, for the avoidance of doubt, all proceeds derived therefrom) shall be held in trust exclusively for the benefit of

Litigation Trust will be governed by a trust agreement consistent with this Term Sheet and otherwise mutually agreeable to the parties, with approval not to be unreasonably withheld, conditioned or delayed (the "Litigation Trust Agreement").

3. The Approval Order will provide that the Litigation Trust Assets will be transferred to the Litigation Trust on the earlier of (i) July 8, 2025; and (ii) one (1) business day after the confirmation date of any confirmed plan (the actual date of transfer of the assets is the "Trust Establishment Date"). The Debtors and FILO DIP Lenders will enter into an amendment to the FILO DIP credit agreement providing for an extension of the FILO DIP maturity date through (i) in the first instance, the Motion Milestone, (ii) if the Debtors satisfy the Motion Milestone, the Approval Milestone, and (iii) if the Debtors satisfy the Approval Milestone, through the date by which the Litigation Trust Assets are required to have been transferred to the Litigation Trust pursuant to the immediately preceding sentence. It shall be an Event of Default under the FILO DIP Credit Agreement if the Debtors or UCC materially breach their respective obligations to the FILO Parties under this Term Sheet or the Plan Support Agreement Term Sheet, and such breach is not cured within three business days of the FILO Parties providing written notice of such breach to Debtors' and UCC's counsel.

4. On the Trust Establishment Date, the releases set forth in **Exhibit A** shall go into full force and effect; provided that, for the avoidance of doubt, the release will not include (i) $10 million of principal claims outstanding under the FILO Bridge facility (the "Retained FILO Claim"), which shall, until the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, remain secured by the Retained Cash and any other assets of the Debtors' estates or any successor(s) thereto (collectively, the "Estate") (provided that the negative pledge provisions and other rights and entitlements of the Litigation Trust with respect to the Retained Collateral shall survive and remain unaffected notwithstanding such timely occurrence of the Confirmation Milestone or satisfaction of the Retained FILO Claim); or (ii) the rights or entitlements of the FILO Parties or the Litigation Trust contemplated by this Term Sheet or the Plan Support Agreement Term Sheet (or any further documentation memorializing the same), including, without limitation, the FILO Parties' rights to receive Retained Cash as a paydown on the Class A-

---

the Litigation Trust and shall be subject to a negative pledge by the Estate and not made available (pursuant to subsequent order of the court or otherwise) other than for distribution in accordance with the Litigation Trust's distribution waterfall as contemplated by this footnote 2.

2 Preference pursuant to paragraph 6 of this Term Sheet and the Litigation Trust's rights under the TSA.

5. As a condition precedent to the effectiveness of this Term Sheet, (i) the Debtors shall have made a prepayment of the FILO DIP Loans by April 28, 2025, in the amount of no less than $30.3 million (the "Required Prepayment"), and (ii) the Debtors and the FILO Parties shall have executed an amendment to the FILO DIP Credit Agreement (the "DIP Amendment") approving the budget annexed to the DIP Amendment (the "DIP Budget").

6. The Debtors will hold $15 million (the "Retained Cash") in a third-party escrow account subject to the lien of the Retained FILO Claim. If the Retained Cash is not authorized to be utilized by the Debtors pursuant to an order confirming a chapter 11 plan consistent with the terms of Section 1 of the Plan Support Agreement Term Sheet ("Plan"), which order is entered on or prior to August 1, 2025 (the "Confirmation Milestone"), the Retained Cash will be paid to the FILO Parties as a paydown on the Retained FILO Claim until paid in full in cash and the remainder as a paydown on the Class A-2 Preference. If an order confirming the Plan is entered prior to the Confirmation Milestone, the Debtors may use the Retained Cash for any purposes authorized under the Plan.

7. The Litigation Trust will be governed pursuant to the Litigation Trust Agreement creating and governing the Litigation Trust:

   a. The Litigation Trust will have three beneficiary classes:

      i. Class A-1 interests, which shall (i) represent the rights and entitlements of the parties that from time to time extend or are deemed to have extended funding under the Litigation Funding (the "Litigation Funders") and their representative (the "Litigation Funding Agent") and (ii) have a distribution and liquidation preference as set forth in this Term Sheet.

      ii. Class A-2 interests will be held by the FILO Parties and their successors, which interests shall have a distribution and liquidation preference as set forth in this Term Sheet (together with the Class A-1 interests, the "Class A interests").

      The definitive documentation will provide that the Class A interests will only be transferrable (i) pursuant to an available exemption under the Securities Act of 1933, as amended (the "Securities Act"), or a registration of such Class A

3

interests under the Securities Act, and (ii) so long as any proposed transfer would not result in a requirement that the Class A interests be registered under the Securities Act. Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class A interests would be effectuated, and shall entitle the Litigation Trustee (as defined below) to, in its reasonable discretion at any time the Class A interests are not registered, and other than with respect to a transfer by operation of law, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

The definitive documentation shall also contain customary representations and warranties of each initial holder of the Class A interests to the effect that it is an accredited investor and a qualified institutional buyer, possesses appropriate investment experience, and is acquiring the interests for its own account and not with a view toward distribution. To the extent such representations cannot be made by each FILO Party on the date of issuance, then at any time the Class A interests are not registered, all such Class A interests shall be non-transferable (other than by will, intestate, or operation of law).

The FILO Agent or its designee, acting at the direction of FILO Parties holding Class A-2 interests entitled to a majority in amount of the outstanding Class A-2 Preference, shall be the representative of the Class A-2 interests (the "Class A-2 Representative").

iii. Class B interests will be held by Steward Health Care Holdings LLC, on behalf of the Estate, or by any successor entity that may be established under a confirmed plan (each, a "Successor Entity").

The definitive documentation will provide that the Class B interests will only be transferrable (i) to any liquidating trust

or other similar vehicle formed under and following a confirmed plan or otherwise formed pursuant to applicable law or (ii) (A) pursuant to an available exemption under the Securities Act of 1933, as amended (the "Securities Act") and so long as any proposed transfer would not result in a requirement that the Class B interests be registered under the Securities Act, or a registration of such Class B interests under the Securities Act, and (B) if such transfer is to occur prior to the effective date of any confirmed plan, with the consent of the Litigation Trustee (not to be unreasonably withheld, conditioned or delayed) if the purpose of the transfer is to obtain proceeds to pay costs and expenses of the Successor Entity, including taxes.  Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class B interests would be effectuated, and other than with respect to a transfer by operation of law or pursuant to bankruptcy court order or confirmed plan,  shall entitle the Litigation Trustee to, in its reasonable discretion at any time the Class B interests are not registered, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

There shall be a single representative of the Class B interests at any given time (the "Class B Representative"), which shall initially be the Transformation Committee, on behalf of the Estate.  If a plan is confirmed, the terms of the Plan and the Confirmation Order will determine the successor Class B Representative on or before the Effective Date of the Plan.  If the Chapter 11 Cases are converted to Chapter 7 cases, the Chapter 7 Trustee (or its designee) will be the Class B Representative.

iv. Any right to receive Litigation Trust interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law.  However, if it should be determined that any such Litigation Trust interests constitute "securities," the exemption provisions of section 4(a)(2) of the Securities Act will be satisfied and the offer and sale of such interests will be exempt from registration under the Securities Act.

b. The identity of the trustee of the Litigation Trust (the "<u>Litigation Trustee</u>") shall be a party to be identified. The terms of the Litigation Trustee's engagement shall be acceptable to the Debtors, FILO Parties, and the UCC. The Debtors and the UCC will have the right to consent to the selection of any successor Litigation Trustee (including the terms of such successor Litigation Trustee's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

c. The Litigation Trustee will be a fiduciary and owe fiduciary duties to all Litigation Trust beneficiaries, collectively.

d. Except as specifically set forth in the following subparagraphs, the Litigation Trustee will have exclusive governance authority over the Litigation Trust.

e. With respect to the Litigation Trust Assets set forth on the schedule agreed to contemporaneously herewith among the Debtors, the FILO Parties, and the UCC (the "<u>Threshold Schedule</u>"), the following consents shall be required:

　　i. For a settlement proposal or monetization opportunity (each, a "<u>Proposal</u>") for which the Specified Value (as defined below) meets or exceeds the applicable Minimum Thresholds set forth on the Threshold Schedule but that does not meet or exceed the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee may decide, without obtaining the consent of any other party, whether to accept or reject such settlement in its sole judgement consistent with its fiduciary duties, in each case, subject to clauses (iii) – (v) of this paragraph 7.e., including, without limitation, the Minimum Threshold adjustments set forth in such clauses.

　　ii. For a Proposal for which the Specified Value exceeds the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee shall accept and implement such Proposal unless the Litigation Trustee reasonably determines based on the advice of outside counsel that accepting and implementing such Proposal is inconsistent with its fiduciary duties.

iii. If the FILO Balance is in an Underpayment State, (a) each Minimum Threshold shall be deemed to be equal to 80% of its stated value set forth in the Threshold Schedule unless and until the FILO Balance is no longer in an Underpayment State and (b) the Litigation Trustee shall be authorized to accept a Proposal that does not meet or exceed the applicable Minimum Thresholds as then in effect without obtaining the consent of any other party if the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal and (ii) provides five (5) business days' written notice (the "<u>Notice Period</u>") to the Class A-2 Representative and the Class B Representative (the "<u>Notice Parties</u>") of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an objection in writing to the Litigation Trustee and the other Notice Party (which objection shall specify in reasonable detail the grounds for the objection) (an "<u>Objection</u>"), and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator. If a successful resolution is not achieved within three (3) business days of the commencement of such mediation (which period may be extended by the Litigation Trustee in its sole discretion in writing) (the "<u>Mediation Period</u>"), the parties may seek resolution by the Bankruptcy Court on an emergency basis.

iv. If the FILO Balance is not in an Underpayment State, the Litigation Trustee will not accept any Proposal unless (a) the Class A-2 Representative and Class B Representative have authorized such acceptance; (b) the Proposal exceeds the applicable Minimum Thresholds by 20% or more, in which case the consent of no other party shall be required; or (c) the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal, in which case the consent of no other party shall be required, and (ii) provides five (5) business days' written notice to the Notice Parties of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an Objection to the Litigation Trustee and the other Notice Party, and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator. If a

successful resolution is not achieved within the Mediation Period, the parties may seek resolution by the Bankruptcy Court on an emergency basis.

v. At the FILO Parties' election, the FILO Parties may, on one or more occasions, increase the deemed value of a Specified Value with the effect that it is treated as meeting the applicable Minimum Thresholds by contributing Class A-2 interests having a Class A-2 Preference equal to the difference between the Net Offered Specified Value and the highest applicable Net Minimum Specified Value (each as defined below).

vi. "Specified Value" shall be equal to the gross cash and cash equivalent proceeds of a Proposal.

vii. "Net Minimum Specified Value" is equal to the Minimum Threshold set forth in the Threshold Schedule less the pro forma contingency fee that would be payable in connection with a Proposal equal to such Minimum Threshold.

viii. "Net Offered Specified Value" is equal to the Specified Value less any contingency fee payable to the Trust's counsel, in each case, with respect to the applicable Proposal.

f. With respect to the disposition of Litigation Trust Assets not set forth on the Threshold Schedule, the disposition shall be carried out by the Litigation Trustee, exercising its reasonable business judgment.

g. The Litigation Trustee shall not agree to a contingency fee in excess of 20% of the gross proceeds of a litigation without the written consent of the Class A-2 Representative and the Class B Representative, other than any existing contingency fee arrangements approved by the Bankruptcy Court as of the Trust Establishment Date.

h. The Estate or Class B Representative, as applicable, shall have the right to pay in full or any portion of the FILO Balance, in cash, without any prepayment penalty at any time. Once the FILO Balance has been reduced to $0, (i) the rights granted to the Class A-2 Representative hereunder shall inure to the Class B Representative and the rights of the Class B Representative hereunder shall inure to the Litigation Funding Agent for the benefit of the holders of the Variable Component and (ii) the Class B Representative may replace the Litigation Trustee subject to the

8

terms of the Litigation Trustee's agreement with the Litigation Trust (which agreement shall be consistent with this Term Sheet and otherwise reasonably acceptable to the Debtors, the FILO Parties, and the UCC).

    i.  Distributions from the Litigation Trust shall be subject to the following priorities:

        i.  Fees of the Litigation Funding Agent and the Class A-2 Representative (which shall be $50,000 per month for each position), and indemnification and reasonable and documented expenses of (A) the Litigation Trust (including payments owing under the TSA, which shall be paid to the Estate), and (B) the Litigation Funding Agent, the Litigation Funders, the Class A-2 Representative, and the FILO Parties (solely with respect to this clause (B), subject to an aggregate cap not to exceed: (i) $500,000 per month for the initial three-month period commencing on the Trust Establishment Date, (ii) $350,000 per month for the nine-month period following such initial three-month period, and (iii) $220,000 per month[3] thereafter; provided that such cap shall not apply to the FILO Parties before the Trust Establishment Date; provided further that, (i) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) are less than the amount of such monthly cap, the amount of such variance will roll forward and increase such monthly cap in the following months until such variance is used and (ii) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) exceed the amount of such monthly cap, the amount of such variance can be carried forward and satisfied in future months to the extent there is availability under the applicable monthly cap in any such future month).

        ii.  Class A-1 interests until the Class A-1 Preference, the Upfront Premium, and, subject to paragraph 13 of this Term Sheet, the Variable Component (as defined below) (which survives repayment of the Class A-1 Preference and the FILO Balance) are repaid in full in cash.

---

[3] Monthly invoices of the professionals for such parties shall be provided to the Estate with reasonable summaries of activities, which may be redacted for privilege and shall not require time entries to be provided.

iii. Class A-2 interests until the Class A-2 Preference is repaid in full in cash and the FILO Balance is $0.

iv. Class B interests.

v. Notwithstanding anything to the contrary in the immediately preceding clauses (ii) - (iv):

1. If the FILO Balance is not in an Underpayment State, 25% of any amount otherwise payable to (i) the holders of the Class A-2 interests, and (ii) on or after December 1, 2025, the Class A-1 interests, shall be used to pay unpaid Deferred Fees and Unestimated Fees (each, as defined in the Plan Support Agreement Term Sheet) on a pro rata basis.

2. If the FILO Balance is less than $25 million, any unpaid Unestimated Fees or Deferred Fees will be paid on a pro rata basis from any available proceeds that would otherwise be payable to the holders of Class A-1 interests as Variable Component (provided that such Variable Component shall be payable with the next proceeds received following repayment in full of such unpaid Unestimated Fees and Deferred Fees).

8. The Estate will coordinate its efforts with the Litigation Trustee with respect to issues involving overlapping concerns among the Estate and the Litigation Trust with respect to third parties. For example, if the same third party is involved in disputes with both the Estate and the Litigation Trust, the effort will be coordinated between the Estate and the Litigation Trustee. If the Estate and the Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a conference with Judge Isgur, in his capacity as mediator in connection with the subject matter of this Term Sheet; and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.

a. With respect to any such dispute presented to the Bankruptcy Court:

i. If the FILO Balance is in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate; *provided*, *however*, that the Litigation Trustee's business judgment will not be considered

by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estate (other than with respect to §502(h) claims).

ii. If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate's business judgment will be applied to the dispute, subject to challenge by the Litigation Trustee; *provided*, *however*, that the Estate's business judgment will not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Litigation Trust.

b. Notwithstanding the foregoing, with respect to any constructive trust claims asserted by any third parties with respect to any Litigation Trust Assets or Retained Collateral, as well as any government investigations, the Litigation Trust and the Estate will coordinate efforts to dispute or settle such claims, or to address such investigations, including with respect to funding arrangements for the defense of any such claims or addressing any such investigations.

9. FILO Parties to agree to use of cash collateral from April 1, 2025, through the Trust Establishment Date in an amount up to $61 million through June 27, 2025 and with additional amounts available for use thereafter, in each case, in accordance with the DIP Budget and the Pre-TED Professional Fee Estimates (as defined in the Plan Support Agreement Term Sheet). The aggregate amount of cash collateral used from April 1, 2025, through the Trust Establishment Date, together with interest thereon at the Applicable Rate, shall be the "Secured Interim Advances." On the Trust Establishment Date, the Debtors shall repay the FILO DIP Loans with Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of such Secured Interim Advances, and on account of such repayment, the amount of FILO DIP Loans outstanding shall be reduced by the amount of such Secured Interim Advances.

10. Funding.

a. The FILO Parties shall commit, subject to the terms and conditions to be set forth in a commitment letter consistent with this Term Sheet and otherwise acceptable to the FILO Parties and the Debtors (the "Commitment Letter") (which shall be executed within 10 business days after execution of this Term Sheet), to, commencing on

11

the Trust Establishment Date, extend funds (solely from the proceeds of FILO DIP/Bridge Claim[4] repayments received after the FILO DIP Agent's receipt of the Required Prepayment, or Class A interests distributions) to the Litigation Trust (the "Litigation Funding") on a delayed draw basis in an aggregate amount of up to $125 million (the "Initial Commitment Amount") (which is inclusive of (x) a budgeted amount of $61 million through June 27, 2025, together with any additional amounts budgeted thereafter under the DIP Budget, which, in each case, may only be incurred in the form of Secured Interim Advances, and (y) the $6.5 million of Estate Funding), which funded amounts shall be available to pay litigation costs of the Litigation Trust, costs of administration of the Litigation Trust and monetization of the Litigation Trust Assets, in each case, subject to (i) budgets delivered from time to time to, and which must be reasonably acceptable to, the Litigation Funding Agent (the "Litigation Funding Budget") and (ii) the satisfaction of any conditions to funding under the Commitment Letter and absence of any uncured material breaches of the Litigation Trustee's obligations under the Litigation Trust Agreement.[5] Requests for funding under the Litigation Funding shall be made solely (a) in compliance with the foregoing terms and (b) by the Litigation Trustee upon at least five business days' written notice to the Litigation Funding Agent, it being understood and agreed that not more than one such funding request shall be made during any 30-day period. Litigation Funding to include an uncommitted accordion of 25% of the Initial Commitment Amount, on the same terms as the initial tranche (to the extent the accordion becomes committed in the sole and absolute discretion of the FILO Parties, the amount of such commitment together with the Initial Commitment Amount, shall be the "Total Commitment Amount"). The commitments under the Commitment Letter shall automatically terminate upon the earlier to occur of (i) the funding of the then applicable commitment amount (whether the Initial Commitment Amount or the Total Commitment Amount, as the case may be) and (ii) the repayment of the FILO Balance.

b. Further financing to be subject to written consent of (x) the Litigation Trustee; (y) the Class B Representative; and (z) unless the further

---

[4] "FILO DIP/Bridge Claim" refers to the claims outstanding under the FILO DIP/Bridge facilities immediately prior to the Trust Establishment Date.

[5] To the extent that the initial Litigation Funding Budget contemplates disbursements to legal counsel on a current basis and the projected amount of such disbursements is subsequently reduced through contingency fee, success fee, or similar arrangements (the aggregate amount of such reduction as agreed by the Litigation Trustee, the "Contingency Fee Savings"), the Total Commitment Amount shall be reduced by the Contingency Fee Savings.

financing is junior to amounts due or to be due to the FILO Parties and under the Litigation Funding, the Class A-2 interests holders and the Litigation Funding Agent. For the avoidance of doubt, the Litigation Trust shall not incur any debt, obligation for borrowed money or other obligation with payment priority senior to or *pari passu* with the Class A interests or secure any obligation with liens on any Litigation Trust Assets or Retained Collateral, in each case, without the prior written consent of the Class A-2 Representative and Class B Representative and the Litigation Funding Agent.

c. Upon the occurrence of the Trust Establishment Date, the Litigation Trust shall provide $6.5 million to the Estate (or any successor liquidating vehicle) (the "Estate Funding") to fund costs and expenses of the Estate and the Estate's professionals incurred after the Trust Establishment Date and of any successor liquidating vehicle (or representative thereof) established to hold the Class B interests and/or any remaining assets of the Debtors.

d. In respect of the Estate Funding, the FILO Parties indirectly providing such funding shall receive Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of the Estate Funding. The Estate Funding shall not be required to be repaid by the Estate.

11. MOIC Payment: The "MOIC Payment" refers to a payment to which the FILO Bridge lenders are entitled (subject to the occurrence of the Trust Establishment Date) in accordance with the terms set forth below. On the Trust Establishment Date, the MOIC Payment will be allowed on the following terms:

a. The Litigation Trust's MOIC obligation will be $11.25 million through March 31, 2026, increasing by:

    i. $1.0 million on April 1, 2026,
    ii. An additional $1.5 million on May 1, 2026,
    iii. An additional $2.0 million on June 1, 2026,
    iv. An additional $2.5 million on July 1, 2026,
    v. An additional $3.0 million on August 1, 2026, and
    vi. An additional $3.75 million on September 1, 2026 and on the first day of each month thereafter until the FILO Balance is paid in full in cash.

b. The total MOIC Payments will not exceed 85% of $75 million *minus* any interest paid or accreted on account of the claims outstanding

under the FILO Bridge facility (the "<u>FILO Bridge Claims</u>") (including any interest paid or accreted on account of the Class A-2 Preference that is allocable to FILO Bridge Claims).

12. Class A-2 interests shall, as of the applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the sum of (i) all principal and accrued interest, fees, expenses,[6] and other amounts outstanding under the FILO DIP/Bridge facilities[7] immediately prior to the Trust Establishment Date (for the avoidance of doubt, excluding the Retained FILO Claim), (ii) all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), (iii) the MOIC Payment, and (iv) the "Exit Premium" under the FILO DIP Loans (which shall be calculated as if the FILO DIP Loans were being fully repaid), in each case, as of such date, *less* (y) the (A) aggregate amount, if any, of cash distributions paid on the Class A-2 interests from the Litigation Trust and (B) aggregate amount, if any, of Class A-2 interests otherwise contributed or waived by the FILO Parties, in each case, as of such date (the "<u>Class A-2 Preference</u>").  Prongs (i) and (ii) of the definition of Class A-2 Preference shall accrete at (a) from the Trust Establishment Date through September 30, 2025, a rate equal to 10% per annum, (b) from October 1, 2025 through December 31, 2025, a rate equal to 10.5% per annum, (c) from January 1, 2026 through March 31, 2026, a rate equal to 11% per annum, and (d) a rate equal to 11.25% per annum commencing on April 1, 2026, and increasing by an additional 25bps at the beginning of each quarter thereafter, subject to a maximum of 12% per annum (the immediately preceding clauses (a)-(d), the "<u>Applicable Rate</u>," which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-2 Preference on a monthly basis); provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

---

[6] Milbank to defer (i) 10% of its fees incurred between April 1, 2025, and the Trust Establishment Date, and (ii) any of its fees incurred in excess of the Pre-TED Professional Fee Estimates.  All outstanding Milbank invoices and Houlihan's March 18, 2025 invoice shall be paid as a condition precedent to the effectiveness of this Term Sheet, and thereafter all Milbank and Houlihan fees and expenses that are not subject to deferral shall be paid current in accordance with the FILO DIP Order and Approval Order, as applicable.

[7] FILO DIP/Bridge facilities to be allowed in full pursuant to the Approval Order, subject to the MOIC Payment settlement set forth in this Term Sheet.

13. Litigation Funding will be made available to the Litigation Trust by the FILO Parties on these terms:

    a. The Class A-1 interests shall, as of each applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the aggregate amount of funding extended or deemed to have been extended under the Litigation Funding plus all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), in each case, as of such date, *less* (y) the aggregate amount, if any, of cash distributions paid on the Class A-1 interests from the Litigation Trust as of such date (the "Class A-1 Preference"). The Class A-1 Preference shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-1 Preference on a monthly basis; provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

    b. The Litigation Funding will, in addition to payment of the Class A-1 Preference and the agency fee of the Litigation Funding Agent, as well as indemnification and reimbursement of all reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), be entitled to:

        i. an upfront premium (the "Upfront Premium"), payable in kind, in an amount equal to $4.25 million; provided that if the Litigation Funding accordion is exercised with the consent of the Litigation Trustee, then the Upfront Premium shall be increased by the same percentage that the commitments under the Litigation Funding are increased.

        ii. 20% of gross litigation proceeds (the "Variable Component"), of which (a) 15% (the "Upfront Percentage") is paid in cash at the time of receipt of such litigation proceeds and (b) 5% is deferred, with the applicable deferred cash being held in escrow (the "Deferred Portion"); provided that if the litigation proceeds result from a litigation financed with a contingency fee structure or third-party litigation funding, the total Variable Component shall be limited to the lesser of (A) the

15

applicable Variable Component noted above (subject to clause 13.d below), and (B) the greater of (i) 30% of such gross litigation proceeds minus the amount of contingency fee, success fee, or third-party litigation funding cost related to such litigation and (ii) 10% of such gross litigation proceeds (the "Reduced Variable Component").

In the event the Reduced Variable Component is equal to or less than 15% of such gross litigation proceeds, then all of such Reduced Variable Component shall be treated as the Upfront Percentage.  In the event the Reduced Variable Component is greater than 15% of such gross litigation proceeds, then 15% of such gross litigation proceeds shall be treated as the Upfront Percentage and the remaining portion shall be treated as the Deferred Portion.

c.  If the FILO Balance is repaid in full in cash on or before October 1, 2026, the escrow holding the Deferred Portion shall be paid to the Estate.  On October 2, 2026, if the FILO Balance has not been paid in full in cash by October 1, 2026, the escrow holding the Deferred Portion shall be disbursed in full to the Litigation Funding Agent. Following such time and until repayment of the FILO Balance in full in cash, the Variable Component shall be paid in cash at the time of receipt of litigation proceeds in accordance with the terms of clause 13.b. with no amounts deferred.

d.  After repayment of the FILO Balance, the Variable Component shall continue to be entitled to a percentage of the gross litigation proceeds (i) at the Upfront Percentage only (i.e., 15%) if the FILO Balance is repaid in full in cash on or before October 1, 2026, or (ii) at 20% if the FILO Balance is not repaid in full in cash on or before October 1, 2026, in each case, subject to the Reduced Variable Component adjustment described above (the "Post-FILO Repayment Variable Component"); provided that (x) to the extent a Plan is confirmed, the Post-FILO Repayment Variable Component shall be paid in two installments, with the first installment being paid in cash upon receipt of the applicable litigation proceeds in an amount equal to 62.5% of the Post-FILO Repayment Variable Component, and the payment of the remaining balance of the Post-FILO Repayment Variable Component being deferred until (and subject to) the satisfaction of allowed administrative and other priority claims pursuant to the Plan, and (y) if a Plan has not been confirmed, the Post-FILO Repayment Variable Component shall be paid in full in cash upon receipt of the applicable litigation proceeds.

14. "<u>FILO Balance</u>" equals on any applicable date of determination: the sum of (a) the outstanding Class A-2 Preference (including all accreted amounts accrued thereon) and fees and expenses of the Class A-2 Representative to the extent payable under this Term Sheet, (b) the outstanding Class A-1 Preference, the Upfront Premium, the agency fee of the Litigation Funding Agent, and outstanding indemnification claims and reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), and (c) any unpaid Variable Component that has been earned (for the avoidance of doubt, (i) other than before October 2, 2026, any Deferred Portion held in escrow and (ii) subject to adjustment, if applicable, in connection with any Post-FILO Repayment Variable Component).

15. The FILO Balance will be in an "<u>Underpayment State</u>" if the aggregate FILO Balance is equal to or greater than

   a. $275 million as of the Trust Establishment Date.
   b. Solely for purposes of paragraph 7.i.v.1., $220 million as of December 1, 2025.
   c. For all purposes other than paragraph 7.i.v.1., $220 million as of December 31, 2025.
   d. $160 million as of April 1, 2026.
   e. $110 million as of July 1, 2026.
   f. $60 million as of September 1, 2026.
   g. $10 million as of December 31, 2026.

16. The Debtors, FILO Parties and UCC to negotiate in good faith and agree prior to entry of the Approval Order on the terms of a transition services agreement pursuant to which the Estate will provide TSA services to the Litigation Trust, including agreement on the scope of services to be provided and pricing at cost (the "<u>TSA</u>"). In advance of each calendar month, the TSA shall provide for the Litigation Trust to advance the Estate's estimated monthly operating expenses, including for payroll and vendors, subject to (i) the initial TSA budget annexed hereto as **Exhibit B**, which may be updated from time to time if approved in writing by the Litigation Trustee and the Class A-2 Representative, and (ii) a reconciliation process with respect to amounts funded in prior months. Payments made by the Litigation Trust to the Estate for any services under the TSA prior to the Estate paying for the budgeted costs of providing such services shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such costs. In addition, the Litigation Trust shall provide, when and to the extent due as evidenced by reasonably detailed evidence thereof delivered by the Estate to the Litigation Trust (the "<u>Tax Package</u>"), up to $4 million in funding to

17

the Estate for the sole purpose of the Estate paying income taxes for the Debtors' current 2024/2025 income tax year. Payments made by the Litigation Trust to the Estate for such taxes shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such taxes reflected in the Tax Package on a dollar-for-dollar basis. The Estate and its related parties (including employees and advisors) shall be defended, held harmless and indemnified by the Litigation Trust against any and all liabilities or losses that may be incurred in connection with the rendering of services under the TSA to the Litigation Trust or Litigation Trustee, subject to customary carve outs for fraud, willful misconduct, and gross negligence. All other expenses of the Estate incurred on or after the Trust Establishment Date, including cost of administration of the Estate, must be budgeted and paid from the Retained Cash, Estate Funding, or other Estate (not Litigation Trust) resources.

17. Reporting and Information Sharing.

    a. <u>Regular Conference Calls</u>: Litigation Trustee to host conference calls on a bi-weekly basis (or more frequently in the Litigation Trustee's discretion) regarding the Litigation Trust Asset monetization process, which calls shall be accessible to the Litigation Funding Agent, the Class A-1 interest holders, the Class A-2 Representative, the Class A-2 interest holders, and the Class B Representative.

    b. <u>Ad Hoc Conference Calls</u>: In addition to the foregoing, the Litigation Trustee shall make itself reasonably available for conference calls to discuss specific topics reasonably requested in writing by the Litigation Funding Agent, the Class A-2 Representative, or the Class B Representative.

    c. <u>Financial Reporting</u>: Litigation Trustee shall deliver a written report to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representative on a monthly basis providing, as of the date of the report:

        i. the amount of cash received by the Litigation Trust through the Litigation Trust Asset monetization process (broken down by source), and the application thereof pursuant to paragraph 7(i) hereof;

        ii. the amount of expenses paid by the Litigation Trust (broken down by category and professional firm);

        iii. the FILO Balance;

> iv. the amount of the accrued Variable Component and the Deferred Portion then held in escrow; and
>
> v. a reasonably detailed summary of the asset monetization activity undertaken in the immediately preceding month.

d. <u>Preference Actions</u>: Togut shall deliver to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representatives reporting with respect to preference actions, which shall be consistent (with respect to both frequency and format) with the reporting currently required to be delivered to the FILO and UCC counsel under paragraph 5 of the Togut retention order [ECF No. 3886].

e. <u>Confidentiality/Preservation of Privileges</u>: Access to reporting shall be subject to entry into (i) a confidentiality agreement and (ii) a common interest agreement and other protocols to the extent necessary to protect applicable privileges, as reasonably determined by the Litigation Trustee.

18. Each FILO Party agrees that prior to the Trust Establishment Date, it shall not transfer, directly or indirectly, in whole or in part, any FILO DIP/Bridge Claims, option thereon, or right or interest therein, and any purported such transfer shall be void and without effect, in each case, unless the transferee thereof: (a) is a signatory to this Term Sheet as of the date of such transfer; or (b) has signed a joinder to this Term Sheet and the Plan Support Agreement Term Sheet acceding to the obligations of a holder of FILO DIP/Bridge Claims hereunder and thereunder (each, a "<u>Permitted Transferee</u>"). Any transfer of FILO DIP/Bridge Claims occurring prior to the Trust Establishment Date shall require the transferee to assume the transferor's obligations under the Commitment Letter in proportion to the amount of FILO DIP/Bridge Claims so transferred relative to the aggregate amount of all FILO DIP/Bridge Claims outstanding as of the date of such transfer (the "<u>Stapling Requirement</u>"). Notwithstanding anything to the contrary herein, a FILO Party may transfer FILO DIP/Bridge Claims to an entity that is acting in its capacity as a Qualified Marketmaker[8] without the requirement that the Qualified Marketmaker be a signatory to this Term Sheet or execute a joinder; *provided* that any such Qualified

---

[8] "<u>Qualified Marketmaker</u>" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers FILO DIP/Bridge Claims, or enter with customers into long or short positions in FILO DIP/Bridge Claims, in its capacity as a dealer or market maker in such FILO DIP/Bridge Claims and (ii) is in fact regularly in the business of making a market in claims, interests, or securities of issuers or borrowers.

Marketmaker (i) may only subsequently transfer the FILO DIP/Bridge Claims to a transferee that is or becomes a Permitted Transferee at the time of such transfer and to the extent such subsequent transfer complies with the Stapling Requirement and (ii) shall be required to, by the earlier of (x) ten (10) business days after its acquisition of any transferred FILO DIP/Bridge Claims and (y) the Required Joinder Date,[9] either sign a joinder to this Term Sheet or transfer all FILO DIP/Bridge Claims held by such Qualified Marketmaker to one or more Permitted Transferees, in each case, in compliance with the Stapling Requirement.

19. The parties shall negotiate promptly and in good faith to agree on definitive documentation, which shall include the Litigation Trust Agreement (including the funding mechanics with respect to the Class A-1 interests), the Litigation Trustee's engagement letter, the Commitment Letter, the TSA, and the DIP Amendment. Counsel to the Debtors, the UCC, and the FILO Parties to agree on allocation of drafting responsibility and a detailed work plan and fee estimates.

20. All transactions contemplated herein shall be implemented in a tax-efficient manner and are subject to review by tax professionals.

---

[9] "Required Joinder Date" means the third business day before the expiration of the chapter 11 plan voting deadline, if any, applicable to the FILO Bridge Claims.

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**STEWARD HEALTH CARE SYSTEM LLC,
on Behalf of Itself and its Debtor Affiliates**

By: _John R. Castellano_

Name: John Castellano
Title: Chief Restructuring Officer

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

For and on behalf of **OneIM Fund I LP, as DIP Lender,** acting by its General Partner, OneIM GP LLC, acting by its Manager, GCT Capital LLC

By: _____
Name: Munish Varma
Title: Authorized Signatory

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**BRIGADE AGENCY SERVICES LLC,** as FILO Agent

By: BRIGADE CAPITAL MANAGEMENT, LP, Its Managing Manager

By: _____
Name: Patrick Criscillo
Title: Authorized Signer

**BIG RIVER GROUP FUND SPC LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE BADGER FUND, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE DIVERSIFIED CREDIT CIT**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE CREDIT FUND II LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Settlement and Stay Relief Term Sheet*

**BRIGADE HIGH YIELD FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LOAN FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE OPPORTUNISTIC CREDIT LBG
FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Settlement and Stay Relief Term Sheet*

**BRIGADE-SIERRABRAVO FUND LP**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**CITY OF PHOENIX EMPLOYEES'**
**RETIREMENT PLAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FEDEX CORPORATION EMPLOYEES'**
**PENSION TRUST**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FUTURE DIRECTIONS CREDIT**
**OPPORTUNITIES FUND**,
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

*Signature Page to Settlement and Stay Relief Term Sheet*

**JPMORGAN CHASE RETIREMENT PLAN
BRIGADE BANK LOAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**LOS ANGELES COUNTY EMPLOYEES
RETIREMENT ASSOCIATION**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**SC CREDIT OPPORTUNITIES MANDATE,
LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**MIDOCEAN CREDIT FUND MANAGEMENT, LP**

By: _____

Name: Damion Brown

Title: Managing Director

**MidOcean Tactical Credit Fund III LP**
By: Tactical Credit Fund III GP, LP
By: Ultramar Credit Holdings Ltd., its General Partner

By: _____

Name: Damion Brown
Title: Managing Director

**MidOcean Multi Asset Credit Fund, LP**
By: MidOcean Multi Asset Credit Fund GP, LLC
its General Partner

By: _____

Name: Damion Brown
Title: Managing Director

**Abbott Abbvie Multiple Employer Pension Plan Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

*Signature Page to Settlement and Stay Relief Term Sheet*

**Abbott Laboratories Annuity Retirement Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**OWL CREEK INVESTMENTS I, LLC**

By: OWL CREEK ASSET MANAGEMENT, LP
as Investment Manager

By
Name: Kevin Dibble
Title:  General Counsel

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**WHITEHAWK FINANCE LLC**
By: WHITEHAWK CAPITAL PARTNERS, LP, as Investment Manager


By: _____

Name: Robert Louzan
Title: Managing Partner

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**The Official Committee of Unsecured Creditors**, solely in its representative capacity, and not on behalf of any individual member thereof

By: */s/ Brad M. Kahn*

Name:  Brad M. Kahn

Title:  Partner

Akin Gump Strauss Hauer & Feld LLP, in its capacity as counsel to, and authorized signatory for, the Official Committee of Unsecured Creditors of Steward Health Care System, LLC, *et al*.

*Signature Page to Settlement and Stay Relief Term Sheet*

## Schedule 1

### Litigation Trust Assets

1. All cash and cash equivalents, excluding only (a) the Retained Cash[1], (b) all cash held or received on behalf of buyers of the Debtors' hospital and Stewardship operations pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet ("Buyers"), (c) all cash received from Buyers or other third parties for purposes of paying cure costs, (d) cash to fund checks issued in accordance with the DIP Budget and which remain outstanding immediately prior to the Trust Establishment Date, (e) all cash held for subtenant security deposits or rent collected on behalf of Buyers, subtenants, or overlandlords, (f) all cash held in the Professional Fee Escrow Account, the Physician Insurance Account, the Utility Deposit Account, or the Expense Escrow Account, and (g) any funds of the Debtors in the Vendor Fund Escrow Account pursuant to the Vendor Fund Escrow Agreement, entered into as of March 11, 2025, by and among Golden Sun TSA Services, LLC, a Delaware limited liability company; Steward Health Care System LLC, a Delaware limited liability company; MPT Development Services, Inc., a Delaware corporation; Lifespan of Massachusetts, Inc., a Massachusetts nonprofit corporation; BMC Community Hospital Corporation and BMC Community Hospital Corporation II, Massachusetts nonprofit corporations; Orlando Health, Inc., a Florida corporation; and Kroll Restructuring Administration LLC, a Delaware limited liability company.

2. All accounts receivable, excluding only (a) accounts receivable that the Debtors sold to Buyers pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet and (b) any accounts receivable that cannot be transferred to the Litigation Trust or a subsidiary thereof pursuant to applicable law (such accounts receivables described in this clause (b), the "Non-Transferrable A/R"). With respect to any Non-Transferrable A/R, the Estate shall, at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost), (i) use commercially reasonable efforts to collect or otherwise monetize such Non-Transferrable A/R in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (ii) promptly turn over any cash or other value realized on account of such Non-Transferrable A/R to the Litigation Trust.

3. The equity interests in Steward A/R Co, LLC. Promptly upon transfer of the equity interests in Steward A/R Co, LLC to the Litigation Trust, the current

---

[1] Each capitalized term that is used but not defined herein has the meaning ascribed to it in (a) the Term Sheet to which this **Schedule 1** is attached or (b) the mutual releases set forth in **Exhibit A** to the Term Sheet.

manager of Steward A/R Co, LLC, John Castellano, shall submit his resignation as manager and the Litigation Trustee and Steward A/R Co, LLC shall grant Mr. Castellano a release of claims against Mr. Castellano in connection with his services as manager, in form and substance reasonably acceptable to Mr. Castellano, and the Litigation Trust shall appoint his replacement.

4. All Claims[2] and Causes of Action[3] of the Debtors and the Estate, including, without limitation, in each case, to the extent not released pursuant to the mutual releases set forth in **Exhibit A** to the Term Sheet, the following Claims and Causes of Action:

   a. all Claims and Causes of Action asserted by the Debtors in the *Second Amended Complaint and Jury Demand* filed by Steward Health Care System LLC at Docket No. 61 in Civil Action No. 21-cv-11902-PBS in the United States District Court for the District of Massachusetts (the "Norwood Complaint") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the Norwood Complaint;

   b. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against healthcare payors, including, without limitation, the commercial payors identified in **Schedule 1-A** hereto;

   c. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Non-Released Parties, including, without limitation, arising from or relating to the 2016 Distribution, the 2020 Transactions, the 2021 Distribution, the 2022 Distribution, or any Plane

---

[2] "Claim" means a "claim," as defined in section 101(5) of the Bankruptcy Code.

[3] "Cause of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license or franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whenever arising, whether in law or equity, whether sounding in tort or contract, whether asserted in arbitration, a court or regulatory proceeding, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including under any state or federal securities laws. Causes of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) Avoidance Actions, and (iii) any claim or defense, including fraud, mistake, duress, or usury and any other defenses set forth in section 558 of the Bankruptcy Code.

Sale,[4] or otherwise arising from or relating to the payment of unlawful dividends, the avoidance of prepetition dividend payments or other distributions, or one or more breaches of fiduciary or other duties;

d. all Avoidance Actions[5] asserted or assertable by the Debtors or the Estate against the transferees identified in **Schedule 1-B** hereto or any other prepetition vendors of the Debtors;

e. all Claims and Causes of Action against Blue Cross Blue Shield Association ("BCBS") or any of its independent Affiliates, including, without limitation, arising from or relating to the Claims and Causes of Action asserted in the class action lawsuits against BCBS and its various licensees consolidated in *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (MDL No. 2406) (N.D. Ala. 2013) (the "BCBS Antitrust Litigation") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the BCBS Antitrust Litigation;

f. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Commonwealth of Massachusetts, including, without limitation, any Claims or counterclaims of the Debtors or the Estate in connection with *The Commonwealth of Massachusetts' Motion for Relief from the Automatic Stay to Allow for the Setoff of Mutual Obligations if and to the Extent that Recoupment is Not Available* (Docket No. 3393) and the adversary proceeding filed by the Debtors against the Commonwealth of Massachusetts (Docket No. 3983) (Adv. Pro. No. 25-03053);

g. all Claims and Causes of Action with respect to the escrow account holding the Adjustment Escrow Amount (as defined in the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) the Asset Purchase Agreement with Brady Health Buyer, LLC (B) the Sale of Stewardship Health Assets Free and Clear of Liens and Liabilities and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (Docket No. 2135)) and the funds deposited therein; and

---

[4] "Plane Sales" means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

[5] "Avoidance Actions" means all Claims and Causes of Action under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, any other avoidance actions under the Bankruptcy Code, and any state law fraudulent transfer claims.

h. all Claims and Causes of Action with respect to the right of certain Debtors to receive reimbursement from Golden Sun TSA Services, LLC in connection with the renewal of that certain Software Licensing Agreement, dated September 9, 2009, by and between IASIS Healthcare LLC and Microsoft Corporation, as amended, under Section 9.7 of the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4192).

5. All rights of the Debtors and the Estate to recover insurance proceeds from the D&O Policies (as defined in the *Motion of Debtors for Order Authorizing the Use of Proceeds of Directors and Officers Liability Insurance Policies for Insureds Defense Costs* (Docket No. 2540)) in connection with any Claim or Cause of Action that is not released pursuant to the mutual releases set forth in **Exhibit A** to the Term Sheet. For the avoidance of doubt, the transfer of the rights of the Debtors and the Estate to recover insurance proceeds from the D&O Insurance shall not hinder the ability of any beneficiaries or insureds of such D&O Insurance to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

6. All of the Debtors' remaining interests in joint ventures and the Meadows Hospital Promissory Note, in each case, unless otherwise directed by the FILO Parties, which shall be transferred to one or more corporate subsidiaries of the Litigation Trust; provided that in the event any transfer of interests in joint ventures triggers any put, call, ROFO or ROFR, or other similar rights of third parties, such interests shall be excluded (the "Excluded Interests") and only the proceeds of sale of such interests will be transferred to the Litigation Trust. The Estate shall, at Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize the Excluded Interests in coordination, and in a manner reasonably agreed upon, with the Litigation Trust, and (b) promptly turn over any cash or other value realized on account of such Excluded Interests to the Litigation Trust.

7. All proceeds, products, offspring, or profits of any employee retention tax credits ("ERTCs") owned by any Debtors, net of any reasonable and documented out-of-pocket expenses of any broker or consultant retained in connection with a sale of such ERTCs (to the extent not paid in advance by the Litigation Trust in accordance with the succeeding sentence). The Estate shall at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize such ERTCs

in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (b) promptly turn over any cash or other value realized on account of such ERTCs to the Litigation Trust.

8. All proceeds, products, offspring, or profits of any of the foregoing assets and property.

Case 24-90054 Document 529-21 Filed in TXSB on 11/12/25 Page 744 of 1832

# Schedule 1-A

## **Payors**

| Column1 |
| --- |
| Aetna Better Health of Florida |
| Aetna Health Management, LLC |
| Aetna Health, Inc. |
| Aetna Network Services LLC |
| Aetna U.S. Healthcare Inc. |
| AmeriGroup Texas, Inc. |
| Arizona Physicians IPA, Inc. |
| AvMed, Inc. |
| BHP of Ohio, Inc. |
| Blue Cross and Blue Shield of Florida, Inc. |
| Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. |
| Blue Cross and Blue Shield of Massachusetts, Inc. |
| Blue Cross and Blue Shield of Texas |
| Boston Medical Center Health Plan, Inc. |
| Caritas Christi |
| Cenpatico Behavioral Health LP |
| Cigna Behavioral health of Texas |
| Cigna Health and Life Insurance Company |
| Cigna HealthCare of Florida, Inc. |
| Cigna HealthCare of Massachusetts, Inc. |
| CIGNA Healthcare of Texas, Inc |
| Community Insurance Company |
| Connecticut General Life Insurance Company |
| Employers Health Insurance Company |
| Evercare of Texas, LLC |
| First Health Group Corp. |
| GHS Property and Casualty Insurance Company |
| Harvard Pilgrim Health Care, Inc. |
| Health Options, Inc. |
| Health Value Management, Inc. |
| Healthease of Florida |
| HealthSpring Life & Health Insurance Company, Inc. |
| Highmark Blue Cross Blue Shield |
| Humana Health Insurance Company of Florida |
| Humana Health Plan of Florida |
| Humana Health Plan of Texas, Inc. |
| Humana Insurance Company |
| Humana Medical Plan, Inc. |
| Leon Health, Inc. |
| Massachusetts Benefit Administrators LLC |
| MetraHealth Inruance Company |
| Metropolitan Life Insurance Company |
| Neighborhood Health Plan of Rhode Island |

| |
|---|
| NovaSys Health, Inc. |
| Oscar Insurance Company of Florida |
| PacifiCare of Arizona, Inc. |
| PacifiCare of Texas, Inc. |
| SelectCare of Texas, LLC |
| Senior Whole Health LLC |
| Simply Healthcare Plans, Inc. |
| Steward Health Care System, LLC |
| Sunshine State Health Plan, Inc. |
| Superior HealthPlan, Inc. |
| Texas HealthSpring, LLC |
| Total Health Plan, Inc, |
| Travelers Insurance Company |
| Tufts Associated Health Maintenance Organization, Inc. |
| Tufts Associated Health Plans, Inc. |
| Tufts Benefit Administrators |
| Tufts Health Plan, Inc. |
| Tufts Insurance Company |
| Tufts Public Plans, Inc. |
| U.S. Behavioral Health Plan, California |
| United Behavioral Health, Inc. |
| United Benefits of Texas, Inc. |
| United Community Plans of Texas, L.L.C. |
| United Health and Life Insurance Company |
| United Healthcare |
| United Healthcare Insurance Company |
| United Healthcare of Arizona, Inc. |
| United Healthcare of New England Inc. |
| United HealthCare of Ohio, Inc. |
| United Healthcare of Texas, Inc. |
| UnitedHealthcare Community Plan of Ohio, Inc. |
| UnitedHealthcare Insurance Company |
| UnitedHealthcare of Arizona, Inc. |
| UnitedHealthcare of Florida, Inc. |
| UnitedHealthcare of New England, Inc. |
| UnitedHealthcare of Ohio, Inc. |
| Universal American Corp. |
| US Behavioral Health |
| Warren Ohio Rehab Hospital Company |
| WellCare of Florida, Inc. |
| WellCare of Texas, Inc. |

**Schedule 1-B**

**Preference Defendants**

m o r n r

NORTHWIN  PHARMACEUTICALS LLC
 EFOREST  OSCELNI  & BERAR  INELLI
TOTAL ORTHOPAE  IC CARE
PROVI  ENCE ME  ICAL TECHNOLOG  INC
ACUME   LLC
THE PAR  ER  VMC TRUST
ALL PRO CLEANING S  STEMS
SPINEOLOG  INC
AEROSEAL LLC
MO  ULAR  EVICES
GALLOWA  OFFICE SUPPLIES INC
BLEN  EN ROTH LAW FIRM PLLC
ME  ICAL CONSULTANTS NETWOR  INC
COLE SCOTT &  ISSANE PA
ENVIRONMENTAL S  STEMS INC
SI-BONE, INC
  -CENTRI  LLC
TOTAL SCOPE INC
TREACE ME  ICAL CONCEPTS INC
 ESIGN B  NATURE CORP
FIRETROL PROTECTION S  STEMS INC
IMMUCOR INC
LSI SOLUTIONS
INNOVATIVE ME  ICAL PRO  UCTS INC
HERSHE  CREAMER  COMPAN
HEALTHCARE FINANCIAL INC
LANMOR SERVICES INC
SIGNET ELECTRONIC S  STEMS INC
TERUMO ME  ICAL CORPORATION
FINTHRIVE INC
CARCO GROUP, INC.
ME  ISOLV INC
BLOOMBERG IN  USTR  GROUP INC
WHELAN PROPERT  MANAGEMENT
AMERICAN COLLEGE OF RA  IOLOG
SMITH & NEPHEW INC
LABORATOR  CORPORATION OF AMERICA
 IMMER US INC
RICE MCVANE
MIST  HA

WILSON ELSER MOS OWIT E ELMAN

COMPLIANT HEALTHCARE

FU IFILM HEALTHCARE AMERICAS

THE FILTER MAN

BRIGHTER HEALTH NETWOR LLC

NETWOR PROVI ERS INC

CHARTER COMMUNICATIONS

VIRTUAL RA IOLOG PROFESSIONALS OF N

  ext Capital LLC

 EVETS IN USTRIES INC

PFEIFFER & SON LT

PROLACTA BIOSCIENCE INC

STR ER ORTHOPAE ICS

AGILITI HEALTH INC

STR ER SALES CORP

OL MPUS AMERICA INC.

ENVIRONMENTAL HEALTH & ENGINEERING

STR ER EN OSCOP

STR ER SUSTAINABILIT SOLUTIONS

HEALOGICS WOUN CARE &

ME TRONIC USA INC

GENCON SERVICE INC

PRORENATA LABS LLC

MA O SURGICAL CORP

ELEVATE PATIENT FINANCIAL

CONVERGE TECHNOLOG SOLUTIONS

   O SURGICAL

LPS ENTERPRISES LLC

INARI ME ICAL INC

Global Healthcare Exchange

BRISTOL LAW PLLC AN CLINICAL

BOSTON SCIENTIFIC CORPORATION

ARC IAL SIS SOUTH FLORI A

BROC TON HOSPITAL INC

GASTROENTEROLOG AFFILIATES OF

IMAGEFIRST OF NEVA A LLC

LIFENET HEALTH

FAVORITE HEALTHCARE STAFFING INC

STR ER NEUROVASCULAR

NUVASIVE INC

R AN LLC

SIEMENS HEALTHCARE   IAGNOSTICS
STR   ER SPINE
CHEM-A   UA INC
HEMOSTASIS LLC
STR   ER CRANIOMA   ILLOFACIAL
IRON MOUNTAIN
SMART SOURCE LLC
UTAH HEALTH INFORMATION NETWOR
ALLSTON BRIGHTON COMMUNIT
CATAL  ST ORTHOSCIENCE LLC
CUBE   STU  IO LLC
TAP  RI  E TRANSPORTSATION INC
AIRGAS USA LLC
CORC  M INC
MARSH USA INC
AFSCME OHIO COUNCIL
BCM CONTROLS CORPORATION
CHG COMPANIES INC
BEC  EL CONTROLS INC
HOLLAN   & HART LLP
BROC  TON NEIGHBORHOO   HEALTH CENTER
E     MARTINE  PLUMBING SERVICE INC
FLORI  A BIRTH RELATE   NEUROLOGICAL
  &   HEALTH CARE S  STEMS INC
UMASS CHAN ME  ICAL SCHOOL
PENUMBRA INC
NE  TME  PLAIN STATES LLC
  UIC  BASE INC
AARON BARLOW PI  E
REME  I  LLC
LUME     CORPORATION
LUME     CORPORATION
TRANSLOGIC CORPORATION
HILL BARTH &  ING LLC
EPSTEIN BEC  ER & GREEN PC
PENRA   TECHNOLOGIES INC
TRI-M MAINTENANCE INC
VMG HEALTH
WELLS PHARMA OF HOUSTON LLC
THOMAS  OUNG ASSOCIATES INC
 AMES W FLETT CO INC

THE ME  ICUS FIRM INC
NORTH COAST FIRE PROTECTION INC
HAMILTON ME  ICAL INC
  UENCH USA INC
CO  E RE   CONSULTANTS LLC
EC  S STEMS LLC
ME  TO  LABORATORIES INC
A ME  E  O LOC  SMITH SECURIT
  FA  AIR  BRAN  S - GARELIC  FARMS
CS ME  ICAL LLC
ER
PC INSTITUTE FOR ME  ICAL E  UCATION
TENNANT SALES AN  SERVICE COMPAN
VICTOR  MECHANICAL HOL  ING LLC
G  USA INC
GREGOR  WATTS
NATIONAL FIRE ALARM PROTECTION
EARL  BIR  POWER LLC
WA  LAN  MULLI  IN
SOUTHFIEL  ME  ICAL CARE LLC
MICROSURGICAL TECHNOLOG
NEW ENGLAN  REVENUE C  CLE
  RS TUMOR REGISTER  SERVICES
NOVO HEALTH SERVICES FLORI  A LLC
ALLIE  UNIVERSAL TECHNOLOG  SERVICE
ALLIE   OOR AN  HAR  WARE CO INC
CINTAS
SHEA  LE  UNISERVICE INC
RICHAR  CELLER LEGAL PA
SOUTHERN LITHO  I LLC
ORTHALIGN INC
GENSET FIRE & SECURIT  LLC
BOGGS FIRE E  UIPMENT INC
CROWN HEALTH CARE LAUN  R
TAN  EM THEOR
IN  USTRIAL BURNER S  STEMS INC
CLAU  CLEANING CORPORATION
FE  E  FREIGHT INC
IMAGING PH  SICS LLC
REGIONAL MANAGEMENT ASSOCIATES
PARAGON  INC

COMMTAN
ILAGOS PLUMBING SERVICES INC
PROIECTUS SERVICES LLC
EAST EN   ME   ICAL I LLC
PITNE   BOWES GLOBAL FINANCIAL
COMMUNIT   BAN   OF TE   AS
SONE   HEALTH INC
THE   OINT COMMISSION
HERMAN M EPSTEIN M
A   VANTECH INC
CENTER POINTE SLEEP ASSOCIATES LLC
PHARMAC   ONESOURCE
PITNE   BOWES INC
SMART CARE E   UIPMENT SOLUTIONS
BIOREFERENCE LABORATORIES INC
M   M TRANSPORTATION CONSULTANTS INC
APO PUMPS & COMPRESSORS LLC
TE   AS   EPT OF STATE HEALTH
E   WAR   ON & COMPAN
CENTRAL COMMUNICATIONS AN
REMOTE ICU LLC
ME   ISTIM USA INC
PLANT PROFESSIONALS INC
CITI PROGRAM
ME   IPRO
Edwards Lifesciences LLC
THE PITNE   BOWES RESERVE ACCOUNT
ALSCO INC
REAALT   TRUST
MICHAEL   ISER
ME   AIR INC
RE   RIVER PHARMAC   SVCS
ROSE BROS SEPTIC &   RAINAGE INC
COMPASS CR   OGENICS INC
ALL ME   ICAL PERSONNEL LLC
MELISSA ALWORTH   O PA
CAL   ERA ME   ICAL INC
FARI   GHEBLEH M   PC
C &   LEASING CORPORATION
MUNIR SHAH M
GREENTEAM PLUMBING LLLC

SIEMENS ME ICAL SOLUTIONS USA
CENTRAL A MI TURE PHARMAC
 MG CLEANING SOLUTION LLC
HANNA CAMPBELL & POWELL LLP
CROWN UNIFORM & LINEN SERVICE
E PERT ME ICAL NAVIGATION
A VANCE AIR AN HEAT CO INC
 & LABORATOR LLC
VERATHON INC
 OHNSON OCONNOR FERON &
WB MASON CO INC
MATHESON TRI GAS INC
TLC ENGINEERING SOLUTIONS INC
TIERPOINT LLC
US POSTAL SERVICE
ME TRONIC SOFAMOR ANE USA INC
Globus Medical North America
FRESHPOINT SOUTH FLORI A INC
GLE CONSULTING INC
 UEST IAGNOSTICS INCORPORATE
HACHE URBANOS I LLC
UNITE TE TILE RENTAL SERVICES
COTTON COMMERCIAL USA
GLOBAL ET CAPITAL LLC
MILESTONE HEALTHCARE LLC
 UGGAN MECHANICAL SERVICES INC
REPUBLIC SERVICES INC
BAM BAM ENTERPRISES LLC
HUNTON SERVICES
SOUTHEAST TE AS INPATIENT PH SICIAN
BIO RA LABORATORIES
OCEANS BEHAVIORAL HOSPITAL
PALOI A VISORS LLC
BLUS RESTORATION CONTRACTORS LLC
FA I NA OUR M
PREMIER IAGNOSTIC SERVICES INC
CUTT EN ELL & OLSON ATTORNE
TRAILRUNNER INTERNATIONAL LLC
WINSTON & STRAWN LLP
BOW ITCH & EWE LLP
LIFESHARE BLOO CENTERS

ANGELICA URENA AN   LAW OFFICE
NEOGENOMICS LABORATORIES
MERCHANT SERVICE
SAPPHIRE ELEVATOR LLC
CONCUR TECHNOLOGIES INC
NEIGHBORWOR  S HOUSING SOLUTIONS
AM SURGICAL
CT CORPORATION S  STEM
CCMMA T   PLLC
SERPE AN   REWS PLLC
OHIO VALLE   PERFUSION ASSOCIATES
ASAHI INTECC USA INC
VIRTUAL RA   IOLOGIC CORPORATION
ROLLS-RO  CE PLC
ECRI
LUBIN & ME  ER AS ATTORNE   FOR THE
PA  FIEL   AN   STOUT LLP TRUST
TE  AS HEALTHCARE LINEN LLC
MI   A  E LLC
BAL   WIN GROUP   BA ROGERS GRA
OMRAM LLC
PE  IATRIC PROFESSIONAL ASSOC PC
ACCESS TELECARE PLLC
BRIAN T. CART
SALT   MICHELSON ARCHITECTS
PUEBLO MECHANICAL AN   CONTROLS LLC
TELERA  IOLOG  SOLUTIONS
ALLHEART ELECTRIC COMPAN
ME   ICAL BUSINESS ASSOCIATES INC
GOR   ON & PARTNERS TRUST ACCT
SOUTHWEST ME   ICAL IMAGING PA
HOLI   A  CVS LLC
METTEL
STREAMLINE VERIF   LLC
  UALIT   HEALTHCARE PARTNERS
CHARLIE WILLIAMS PAINTING
 CB ORTHO LLC
NORTHWIN   STRATEGIES LLC
E  ECUTIVE ME   ICAL PH  SICS ASSOC
EASTSI   E ENTERPRISES INC
BOILER SPECIALISTS INC

TO    S ENVIROSCAPES LLC
MN & COMPAN   ME   IA MANAGEMENT INC
HARR   W   ONIAS M   LLC
 ACOB COHEN M
IMPERATIVE CARE INC
B  B   ELIVER   LLC
MORTON HOSPITAL
ME   IALAB INC
BOWIE COUNT   TE   AS LOCAL PROVI   ER PARTIC
MARICE GU  MAN PLLC FBO   ELL
   TANT ME   ICAL INC
CC ANESTHESIA SOLUTIONS LLC
HOART   TREE E   PERTS INC
  A MA   ANS M
ELEVATOR REPAIR SERVICE INC
STUART BREISCH M
MI   LAN   PLASTIC SURGER   CENTER
TSNE MISSION WOR   S
TEN   HEALTH LLC
PRI   ESTAR EMS INC
ARHC NCO   ST   LLC
PACIFIC PREMIER TRUST COMPAN
UMS MR FUSION SVC OF NE LLC
ALLAN M   ORGE M   PA
POPP HUTCHESON PLLC
MERGE HEALTHCARE SOLUTIONS INC
TTG ISOTOPES LLC
ENTECH SALES & SERVICE LLC
  ONSULT INC
TAN   WI  AR   S INC
WEST TE   AS UROLOG   PA
  OHN   ORMAN
BASIN NEUROSURGICAL & SPINE
UMS URS LITHOTRIPS   SERVICES
S R   EME M   PA
AMERICAN ARBITRATION ASSOCIATION
CAR   IOVASCULAR   IAGNOSTIC CENTER
VI   RAM PATEL M   PA
VOGEL   ANG LAW PC
PURCHASING POWER LLC
FUSION ORTHOPE   ICS USA LLC

GREATER HAMPSTEA   FAMIL   ME   ICINE
UMS LITHO SERVICE OF BRISTOL COUNT
AVASURE LLC
VSI SURGICAL
  MILLER CONSULTING LLC
PINE ISLAN   ASSOCIATES LLC
ARIOL LABRA   A M   PA
A  VANCE   CAR   IOVASCULAR
ACCRE   ITATION COUNCIL FOR GRA   UATE
MASS PAR   INC
GIANT PEACH CONSTRUCTION LLC
STEINER-ATLANTIC LLC
M   E VERA LAN   SCAPING LLC
WINTER ST PARTNERS NEW BE   FOR   LLC
SATCOM   IRECT INC
B  RNES MECHANICAL CONTRACTORS INC
SAN ANTONIO MERCHANT SHIPPERS LLC
VTR PAPAGO ME   ICAL PAR   LLC
ENVELOPE SUPERSTORE
RAMON HECHAVARRIA M
SOUTH FLORI   A ME   ICAL IMAGING PA
UNITE   RENTALS NORTH AMERICA INC
G  RC TECHNOLOGIES LLC
SOUTH MI    LESE   OPPORTUNIT   COUNCIL
Associates in Medical Imaging LLC
PRECISION PH  SICS SERVICES LLC
MP
FW WEBB COMPAN
FU  IFILM SONOSITE INC
 AMES M POTTS M
MBA ME   ICAL INC
EVE  IAS HEALTH SOLUTIONS LLC
  CM   HOL   INGS LLC
S  STEM   OF BOSTON
PERMIAN BASIN ANESTHESIA PLLC
 ASON R MURPH
GEROW E   UIPMENT COMPAN
CR HALL COMPAN   LT
MELTWATER NEWS US INC
BER  SHIRE BAN
GEN   IGITAL INC.

AEP SOUTHWESTERN   ES
SAMBASIVA R SU  HAVASI M   PA
FARRU  H   URESHI
MILLERS RIVER   EVELOPMENT LLC
WA  LE  REGIONAL ME  ICAL CENTER
MRUNAL PATEL
REIS LAN  SCAPING & GAR  ENING LLC
SLIPPER  ROC   COMMERCIAL ROOFING
  BA  ER LAW GROUP PC
THE PICAR   GROUP LLC
COWBO  S STA  IUM LP
MERRITT ME  ICAL CENTER II
AL  O H MARTINE  FLEITES M   PA
THE SUFFOL   GROUP LLC
A  VI  E  TECHNOLOGIES LLC
GRANGER ME  ICAL INC
WORL   FUEL SERVICES EUROPE LT   AVIATION
ANANIA PLUMBING & HEATING INC
HEALTHCARE FINANCIAL GROUP INC
INNERFACE ARCHITECTURAL SIGNAGE INC
  ONSTANT  N S  WA  UN
SENSO SCIENTIFIC
  AVI    HEN  ERSON M
EPREWAR   INC
  OCTORS PAR  II CON  O ASSOCIATION
CHRISTOPHER  TROIANO M
SPAR  LIGHT BILL PA
T  ONCOLOG  PA
  ARL STOR  EN  OSCOP
GREER LABORATORIES
MOUNTAIN ME  ICAL PH  SICIAN
SMARTRISE HEALTH LLC
PE  IATRIC ECHOCAR  IOGRAPH   SERVICES
LIN  BIO CORP
CHARLES CROFT M   PA
THE   ELTA PATHOLOG   GROUP LLC
HA  STAC  I   LLC
EN  OLOGI   LLC
ACCESS CORP
INTEGRIT   HEALTHCARE LOCUMS LLC
TA  LOR COMMUNICATIONS

AGILITI SURGICAL INC
INSPIRE ME ICAL S STEMS INC
AGILITI SURGICAL E UIPMENT REPAIR
 ONNELLE FINANCIAL LLC
WM CORPORATE SERVICES INC
FLORI A EPARTMENT OF CHIL REN
SERVPRO OF CENTRAL BREVAR
IMAGEFIRST
 IGISONICS INC
FRESH PROVISIONS INC
S SCO SOUTH FLORI A INC
ISMAEL MONTANE M PA
RM ARI ONA HOL INGS INC
VO CE INC
RE LABEL SERVICES
CORIN USA LIMITE
AMERICAN RE CROSS
NATIONAL GOVERNMENT SERVICES
SERVICEMASTER B GILIMORE
HELGESEN HOUT & ONES PC
ENGIE RESOURCES
SPECTRUM
IMAGEFIRST OF NEW ENGLAN
UNIVERSAL ELECTRICAL SERVICES INC
TECO PEOPLES GAS
 AIME E CAMPOS M PA
TRICARE Management
GREAT-WEST LIFE
GCB IN USTRIES LLC
NITEEN AN AL AR
HUNTON TRANE
TLC ANITORIAL INC
BEACONME AES LLC
PROLIN HEALTHCARE
ABBOTT LABORATORIES INC.
ABBOTT RAPI IAGNOSTICS
ABBOTT VASCULAR INC
ACCRE ITATION PARTNERS LLC
AMERICAN ACA EM HOL INGS LLC
AMN HEALTHCARE LANGUAGE SERVICES
A UIT SOLUTIONS LLC

BECTON  IC  INSON AN  COMPAN
BIOMERIEU
BIOMERIEU  VITE  INC
BLUEVO  ANT LLC
CAREFUSION SOLUTIONS LLC
CHANGE HEALTHCARE SOLUTIONS LLC
COLLEGE OF AMERICAN PATHOLOGISTS
  OCTORS BILLING INC
  RFIRST.COM
ELE  TA INC
E  PERIAN HEALTH INC
FORWAR  A  VANTAGE INC
GE HEALTHCARE IITS USA
GETINGE USA SALES LLC
GUI  EPOINT SECURIT  LLC
HOLOGIC SALES AN  SERVICES LLC
IMALOGI  LLC
INSITEONE LLC
INTELLIGENT ME  ICAL OB ECTS INC
  ORCHE  TECHNOLOGIES LLC
LAN  AUER INC
ME  ASOURCE
MERATIVE US LP
MICROSOFT CORP
NET HEALTH S  STEMS INC
Philips Medical Capital
PHILIPS NORTH AMERICA LLC
PRESS GANE  ASSOCIATES LLC
PROVATION SOFTWARE INC
RA  IOMETER AMERICA INC
RL  ATI  NORTH AMERICA INC
ROCHE  IAGNOSTICS CORPORATION
SAGILIT  OPERATIONS INC F  A HGS
SECURITAS HEALTHCARE LLC
SHARECARE HEALTH  ATA
SOURCEHOV HEALTHCARE INC
SPO  , INC.
STERIC  CLE INC
TRINIS  S LLC
TWIAGE SOLUTIONS INC
VARIAN ME  ICAL S  STEMS INC

VI  IENT INC
WERFEN USA LLC
  C   GENERAL CONTRACTORS
ME   LINE MO  ART HOL  ING
SO   E  O INC & AFFILIATES
   TEST CORP
A MURPH   INC
AB   OMINAL SURGEONS LT
ABIOME   INC
ACA   IAN AMBULANCE SERVICES INC
ACCESS CIG LLC
ACCLARENT INC
ACUTANE INC STAMPS CONCENTRATION
A    ISON GROUP
A  VANCE   STERILI  ATION PRO  UCTS
AESCULAP INSTRUMENTS
ALGORE   HEALTH TECHNOLOGIES INC
ALTER    INC
AMERICAN COLLEGE OF SURGEONS
AMERICAN HEART ASSOCIATION INC.
AMERICAN ME   ICAL RESPONSE OF
AMERICAN PORTABLE
ANGIO    NAMICS INC
AR CATAL   O CORPORATION
ARI  ONA GASTRO CARE PLLC
ARM ELECTRICAL SERVICES LLC
ARTHRE   INC
ARTHROSURFACE INC
ASSURGENT ME   ICAL STAFFING
ATI RESTORATION LLC
ATRICURE
BA   STATE INTERPRETERS INC
BEC   MAN COULTER INC
BIO-RA    LABORATORIES INC
BIOTE ME   ICAL LLC
BREA   AWA   COURIER BOSTON INC
BREWSTER AMBULANCE SERVICE
CAR   IOVASCULAR S  STEMS INC
CARRIER CORPORATION
CARRIER RENTAL S  STEMS
CERAPE   ICS INC

COLLECTIVE ME ICAL TECHNOLOGIES INC
CONCOR ME ICAL GROUP OF TE AS
CONCOR ME ICAL GROUP PLLC
COR IS US CORP
CORE IAL SIS SERIES LLC
COVI IEN SALES LLC
CRA INTERNATIONAL INC
CTL Amedica
C RACOM LLC
  ASSAULT FALCON ET CO
  HHS - UNIFIE STATE LABORATORIES
  IGIRA IMAGING SOLUTIONS INC
  OVER FLOORS INC
  RUC ER ME IA INC
     INC
ELIOT COMMUNIT HUMAN
ELL A LLC
EMERGENCHEALTH LLC
EMPOWER ANNUIT INS CO OF AMERICA,
ENCORE FIRE PROTECTION
ERBE USA INC
EVO UA WATER TECHNOLOGIES LLC
FAGRON STERILE SERVICES LLC
FLE CARE LLC
FLORI A PEST CONTROL
FONAR CORPORATION
F MASSE ASSOCIATES INC
F SHOUL ER USA INC
GASTON ELECTRICAL CO INC
GLENSTONE CAPITAL LLC
GOR ON FOO SERVICE INC
GULF COAST REGIONAL BLOO CENTER
HARBINGER COMMUNICATIONS INC
HATCH LLC
HEALTHPRO HERITAGE
HIGH ESERT MECHANICAL CORP
HUB INTERNATIONAL NEW ENGLAN LLC PREMI
INO THERAPEUTICS LLC
INSIGHT IMAGING
INTEGRA LIFESCIENCES CORP
Intuitive Surgical Inc.

AC  SON LLO    SELECT RIS
AMES CARROLL AS AGENT LABORIE
ANI-  ING OF RHO  E ISLAN
ENSEN HUGHES INC
 FRAN  LAN  SCAPING INC
UST PRESS PLA
 CI USA INC
 IC    RUM TECHNOLOG  GROUP LLC
  NOWTION HEALTH
LAB LOGISTICS LLC
LANTHEUS ME  ICAL IMAGING INC.
LEMAITRE VASCULAR INC
LIFE SPINE INC
LIGHTNING BOLT SOLUTIONS
LIMBACH COMPAN   LLC
LINCOLN HARRIS CSG
LIVANOVA USA INC
MCT E  PRESS INC
ME   ACTA USA INC
MERIT ME  ICAL S  STEMS INC
MESSAGE MANAGEMENT CENTER LLC
MESSER LLC
MICRO-TECH EN   OSCOP  USA INC
MI  LAN   PATHOLOGIST P A
MS  SONLINE INC
NEOGENOMICS LABORATORIES INC
NMS LABS
ONEBLOO   INC
ORTHO CLINICAL   IAGNOSTICS
OSSIO INC
OSTEOME
PARIS HEALTHCARE
PARTNERSOURCE
PENNS  LVANNIA STATESHENANGO
PEPSI COLA COMPAN
PHREESIA INC
PREPM   PROFESSIONALS LLC
PRO HEALTH ME  ICAL STAFFING LLC
PROFESSIONAL PIPING INC
PROFICIO SURGICAL ASSISTANTS LLC
PULMONAR   CONSULTANTS PC

REAU   MORGAN &   UINN LLP TRUST
RENTO  IL NORTH AMERICA
REPUBLIC SPINE LLC
RESOURCES GLOBAL PROFESSIONALS
RESTORI  HEALTH
RE  NOL  S  EWALT
RICHAR   WOLF ME  ICAL
RICHAR  S BRAN  T MILLER NELSON
RICOH USA INC
RI  E MOBILE TRANSPORTATION INC
ROOFS INC
SCA PHARMACEUTICALS LLC
SCHIN  LER ELEVATOR CORPORATION
SEMPERIS INC
SERVICEHUB CORPORATION
SHOC  WAVE ME  ICAL INC
SHRE  IT
SIGNATURE AVIATION USA LLC
SIL   ROA  ME  ICAL INC
S  ELETAL    NAMICS LLC
SOUTH TE  AS BOILER IN  USTRIES
SOUTHWORTH-MILTON INC
SPECIALT  CARE CAR  IOVASCULAR
SPINEART USA INC
STAT BIO ME  ICAL SALES & SERVICE
STEVEN A CALLAHAN ELECTRICAL
STEWART & STEVENSON
SUNBELT RENTALS
S  SCO ARI  ONA INC
S  SCO BOSTON LLC
S  SCO CENTRAL FLORI  A INC
S  SCO EAST TE  AS
S  SCO HOUSTON INC
S  SCO  AC  SON LLC
S  SCO WEST TE  AS
S  SME   AMERICA INC
TAC ME   INC
THE FACTOR INC
THE ROMANS GROUP
THERAPEUTIC RESEARCH CENTER
TMHP

TORNIER INC

TOWNE PAR   LLC

TRANE US INC

UNUM LIFE INSURANCE COMPAN   OF

UROLOGIC SURGEONS OF ARI  ONA PLC

US FOO   S INC

US ME   E  UIP LLC

WASTE CONNECTIONS OF FLORI   A

WEST TECHS CHILL WATER SPECIALIST

WESTPORT LINEN SERVICES INC

WHITMAN PARTNERS INC

WIC  ER SMITH O HARA MCCO   & FOR

WLG WL GORE&ASSOC MP

WOLF & COMPAN   PC

WRIGHT ME   ICAL TECHNOLOG   INC

 M HEALTH INFORMATION S  STEMS

ACCLARA SOLUTIONS LLC

CLOU   ME

COGNI  ANT TECHNOLOG   SOLUTIONS

CONSENSUS CLOU   SOLUTIONS

 ELL FINANCIAL SERVICES

ERGONOMIC GROUP

HEWLETT PAC  AR   FINANCIAL SERVICES

HP INC

INOVALON PROVI  ER INC

INTERLACE HEALTH LLC

IO  INE SOFTWARE LLC

 AMS INC

LOGI  HEALTH INC

MRO CORPORATION

PRESI  IO NETWOR  E

REVSPRING INC

TEGRIA RCM GROUP US INC.

BREA  EALE SACHSE & WILSON LLP

BRUCE &  ELLE  PC

CAPPLIS CONNORS CARROLL & ENNIS

 RAFFIN & TUC  ER LLP

FAL  WAAS HERNAN  E  ET AL

FOSTER & EL  RI  GE LLP

HALL PRANGLE & SCHOONVEL  LLC

HAMEL MARCIN  UNN REAR  ON & SHEA PC

ULIE SMITH

 IPP AN  CHRISTIAN PC

MARSHALL  ENNEHE  WARNER

 UINTAIROS PRIETO WOO  & BO  ER PA

RESNIC  & LOUIS PC

SNOW CHRISTENSEN & MARTINEAU

THE CHEC  ETT LAW FIRM PLLC

THOMPSON BOWIE & HATCH LLC

WILLIS TOWERS WATSON US LLC

WIPFLI LLP

AU  ERE INTERNATIONAL LIMITE

E  CELA RECEIVABLES   LLC

H RAMOS FARMS

## Exhibit A[1]

**Mutual Releases.**  Except as otherwise expressly set forth below, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Trust Establishment Date, each of (A) the Debtors, (B) the Estates, (C) the Litigation Trust, (D) the Litigation Trustee, (E) the FILO Parties, (F) the Creditors' Committee and each of its members (solely in their official capacity), and (G) each Related Party of each Person or Entity described in any of the immediately preceding clauses (A) through (F) to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law (each, a "**Releasing Party**" and, collectively, the "**Releasing Parties**"), in each case on behalf of themselves and their respective successors, assigns, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through such Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of such Releasing Party), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Trust Establishment Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the FILO Settlement Term Sheet or any other contract, instrument, release, or document created or entered into in connection with the FILO Settlement or any of the other definitive documents related thereto; any other debt or security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors; the subject matter of, or the transactions or events giving rise to, any Claim or Interest; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the Approval Order and the transactions contemplated thereby; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Trust Establishment Date.  Notwithstanding anything to the contrary in the foregoing, these releases (i)  shall not be construed as releasing (a)  any Released Party from Claims or Causes of Action arising from a material misrepresentation or an act or omission constituting actual fraud, willful misconduct, criminal misconduct, or gross negligence of or by such Released Party, in each case as judicially determined by a Final Order, (b) any Claims or Causes of Action arising after the transfer of the Litigation Trust Assets to the Litigation Trust, (c) the Debtors or the Estates from

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Settlement and Stay Relief Term Sheet*, to which this exhibit is attached (the "**FILO Settlement Term Sheet**"), or **Annex 1** attached hereto, as applicable.

the Retained FILO Claim (including, without limitation, any liens securing the Retained FILO Claim), (d) any rights or obligations of any party or Entity under the Approval Order, the FILO Settlement Term Sheet, the Plan Support Agreement Term Sheet, any definitive document related to the FILO Settlement or the Plan Support Agreement Term Sheet, or any other document, instrument, or agreement executed to implement the Plan or the transactions contemplated by the FILO Settlement, or (e) any Intercompany Claims; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party.  For the avoidance of doubt, no Person or Entity not (i) expressly identified on the list of Individual Released Parties, or (ii) defined as a Released Party, shall be deemed to be granted a release hereunder, regardless of whether such Person or Entity is specifically identified on <u>Schedule 2</u> hereof.

## **Annex 1**

## **Defined Terms**

*2016 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in October 2016 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2020 Transactions* means, individually and/or collectively, (a) the transactions that were entered into and/or occurred in or about May 2020 pursuant to which: (i) Manolete Health, LLC purchased Steward Healthcare International Holdings Ltd. from Steward Health Care System LLC, (ii) Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**") contributed real properties to MPT of Utah-Steward, LLC (together with its subsidiaries, the "**Utah JV**") for common equity interests in the Utah JV and subsequent cash distributions from the Utah JV, and the Utah JV leased such real properties back to Jordan Valley and Davis, and (iii) Cerberus Operations and Advisory Company exchanged its equity in Steward Healthcare Investors LLC for a $350 million convertible note, and (b) all other transactions related thereto, including any transactions in what was referred to at the time as Project Easter.

*2021 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in January 2021 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2022 Transaction* means the transaction or transactions entered into on or about May 31, 2022 (and certain other dates in 2022) by and among, among others, Sparta Merger Sub I Inc., Sparta Merger Sub II Inc., Sparta Merger Sub III Inc., Sparta Merger Sub I LLC, Sparta Merger Sub II LLC, Sparta Merger Sub III LLC, Sparta Sub Inc., SNCN Holdco Inc., SICN Holdco Inc., Steward Integrated Care Network, Inc., Steward Accountable Care Network, Inc., Steward Health Care Network Inc., Sparta Holding Co. LLC, Steward Health Care System LLC and CareMax, Inc. pursuant to which certain value-based care assets were transferred to Sparta Holding Co. LLC and acquired by CareMax, Inc., and all other transactions related thereto or included therein (including any dividends, distributions, and/or allocations paid, made, and/or issued in 2022 in connection with and/or following such transaction(s), and any subsequent transfer of the proceeds thereof or arising therefrom).

2

*Affiliate* means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

*Cause of Action* means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or

Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any Avoidance Actions.

**Chapter 11 Case** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

**Chief Restructuring Officer** means John R. Castellano, in his capacity as Chief Restructuring Officer of each of the Debtors.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code.

**Creditors' Committee** means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

**Debtor Related Parties** means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

**Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**Estate(s)** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**FILO DIP Order** means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

**FILO Parties** means, collectively, the Prepetition Bridge Agent, the FILO Bridge Lenders, the FILO DIP Secured Parties, the Prepetition FILO Agent, and the FILO Lenders (each as defined in the FILO DIP Order), in each case in their capacities as such, and the Litigation Funding Agent and the providers of the Litigation Funding in their capacities as such.

*FILO Settlement* means the settlement embodied in the FILO Settlement Term Sheet.

*Final Order* means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

*Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

*Hospital Debtors* means all Debtors, other than, for the avoidance of doubt, Steward Health Care Holdings LLC and Steward Health Care System LLC, that held or owned a license to operate a hospital at any time during the Chapter 11 Cases.

*Identified Non-Released Parties* means (i) the Persons and Entities listed on **Schedule 2** annexed hereto, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

*Individual Released Parties* means the individuals listed on the **Schedule 1** annexed hereto, each in their capacity as a current or former director, officer, manager, employee, advisor, or consultant of one or more of the Debtors.

*Interest* means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and whether fully vested or vesting in the future, including

any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor.

**Intercompany Claim** means any pre- or postpetition Claim against a Debtor held by another Debtor.

**Investigation Subcommittee** means the subcommittee of the Transformation Committee, consisting of Alan J. Carr and William Transier.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Person** means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

**Petition Date** means May 6, 2024.

**Plan Administrator Committee** means a committee comprised of Monica Blacker, Alan J. Carr, and William Transier.

**Plan Support Agreement Term Sheet** means the Plan Support Agreement Term Sheet referred to in the FILO Settlement Term Sheet and executed in connection therewith.

**Plane Sales** means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

**Prepetition Transactions** means the (i) 2016 Distribution, (ii) 2020 Transactions, (iii) 2021 Distribution, (iv) 2022 Transaction, and (v) the Plane Sales.

**Related Parties** means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, and (b) the Litigation Trust and the Litigation Trustee; (iii) each of the following, solely in their capacities as such, (a) the Creditors' Committee and each of its members, and (b) the FILO Parties; and (iv) with respect to each of the foregoing Entities identified in the immediately preceding clauses (ii) or (iii), such Entities' Related Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Released Party.

**Representative** means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

**Transformation Committee** means the special committee of the board of managers of Steward Health Care Holdings LLC comprised of Alan J. Carr, John R. Castellano, and William Transier.

## <u>Exhibit A</u>

**Individual Released Parties**

- Alan Carr
- Ann-Marie Driscoll
- Carlos Hernandez
- David Barnhardt
- Eugene (Jay) Sullivan
- Gail Schlesinger
- General H.R. McMaster
- Henry (Nick) Nickells
- Jeffrey Morales
- Jennifer Hunt
- John Boehner
- John Castellano
- Joseph Weinstein
- Katchena Potter
- Mary Beth Taylor
- Nathalie Hibble
- Octavio Diaz
- Patrick Lombardo
- Rich Iannessa
- Sr. Vimala Vadakumpadan
- Susan Brown
- William Transier

## Schedule 2

### Identified Non-Released Parties

- Alessandra Pace
- Armin Ernst
- Brian Carty
- Christopher Dunleavy
- Craig Jesiolowski
- David Chicoine
- David Friend
- David Morales
- Herbert Holtz
- James Karam
- James Lenehan
- Jill Moretto
- John Polanowicz
- Joseph Ciccolo
- Joseph Maher
- Joshua Putter
- Mark Girard
- Mark Rich
- Michael Callum
- Miroslav Boyanov
- Nadine Delicata
- Ralph de la Torre
- Robert Guyon
- Ruben King-Shaw Jr.
- Sanjay Shetty

- 5326 Old Buena Vista Road LLC
- Ad Astra Per Aspera LLC
- CareMax, Inc.
- Cayman TRS Holdings
- Cerberus Capital Management, L.P.
- Cerberus International II Master Fund LP
- Cerberus Partners II LP
- Cerberus Series Four Holdings LLC
- de la Torre Foundation
- de la Torre Family Foundation
- Management Health Services Colombia S.A.S.
- Management Health Services LLC
- Manolete Health Investors LLC
- Manolete Health LLC
- Medical Properties Trust, Inc.
- MPT Sycamore Opco LLC
- Ralph de la Torre Revocable Trust
- RDLT – SHCI Investor LLC
- RDLT – SHCI Manager LLC
- Sagamore Capital Management, LLC
- Santa Clara Holdings LLC
- Sparta Holding Co. LLC
- Steward Health Care International
- Steward Health Care International (Malta) Ltd
- Steward Health Care International Colombia S.A.S.
- Steward Health Care Investors LLC
- Steward Health Care International Investors LLC
- Steward Health Care International Kingdom of Saudi Arabia, S.L.
- Steward Health Care International Ltd
- Steward Health Care International S.L
- Steward Malta Assets Ltd
- Steward Malta Ltd
- Steward Malta Management Ltd
- Steward Malta Personnel Limited
- Steward Management Holdings LLC
- Tenet Healthcare Corporation
- TRACO International Group S. DE R.L.

**Exhibit D**

**Medical Liability Claims Procedures**

## <u>MEDICAL LIABILITY CLAIMS PROCEDURES</u>[1]

The Estate Representative shall adopt and implement the below procedures (the "**Medical Liability Claims Procedures**") for reviewing and liquidating all unliquidated claims against the Debtors arising out of or related to alleged negligence in connection with the rendering of medical care arising prior to the Effective Date (the "**Debtor Medical Liability Claims**"). The below procedures will allow and permit the Estate Representative to make determinations as to the allowance of asserted Debtor Medical Liability Claims, including the allowed amount thereof (the "**Allowed Claim Amount**"). The Estate Representative shall administer the Medical Liability Claims Procedures with the goals of securing the just, speedy, and cost-efficient determination of allowance of every Debtor Medical Liability Claim, and providing substantially similar treatment to all holders of Debtor Medical Liability Claims.

Subject to the procedures and conditions set forth below, the Estate Representative shall have the authority to determine the allowance of any Debtor Medical Liability Claim. Pursuant to that authority, the Estate Representative may investigate any Debtor Medical Liability Claim and may request information from any holder of a Debtor Medical Liability Claim to ensure compliance with the terms outlined herein. Subject to section [6.11] of the Plan, the Estate Representative shall retain all property, rights, privileges and defenses of the Debtors with respect to all Debtor Medical Liability Claims. The Estate Representative shall have the authority to compromise, settle, withdraw, or otherwise resolve any Debtor Medical Liability Claims without approval of the Bankruptcy Court in accordance with these Medical Liability Claims Procedures. Any finding or determination by the Estate Representative with respect to a Debtor Medical Liability Claim shall not be binding or used for any other purpose other than allowance of the Debtor Medical Liability Claim for distribution purposes under the Plan.[2]

### <u>Procedures</u>

Debtor Medical Liability Claims will be classified into the following categories for consideration and determination under these Medical Liability Claims Procedures:

**Debtor Medical Liability Claims Asserted in the Amount of $350,000 or Less**: If a holder has filed a proof of claim by the applicable Bar Date asserting a Debtor Medical Liability Claim arising prior to the Petition Date in the amount of $350,000 or less, such Debtor Medical Liability Claim shall automatically be deemed Allowed for purposes of distribution under the Plan; <u>provided</u> that such holder has submitted reasonable documentation in support of such Debtor Medical Liability Claim, as determined by the Estate Representative or their designee, each in their sole discretion. The Estate Representative will provide such holder notice that their Debtor

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and its Affiliated Debtors* (Docket No. 4743) (including all exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Plan**").

[2] In all instances, the Estate Representative will treat all individual and collective claim related information in accordance with existing HIPAA Privacy Rules and standards of care.

Medical Liability Claim has been deemed Allowed in the amount asserted in the timely filed proof of claim. For purposes of this category, the Estate Representative reserves the right to exclude any amended proofs of claim filed after the applicable Bar Date.

For holders of Debtor Medical Liability Claims asserted in the amount of $350,000 or less that have not submitted sufficient documentation in their timely filed proofs of claim, such holders will be notified by the Estate Representative that they will have one hundred and eighty (180) days to provide any additional information necessary to the Estate Representative to substantiate such claims. Absent submission of such sufficient documentation by the applicable deadline, such Debtor Medical Liability Claim shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

**Debtor Medical Liability Claims Asserted in an Amount Greater Than $350,000**: After the Confirmation Date, the Estate Representative will send a form (the "**Claim Form**") to all holders who have asserted Debtor Medical Liability Claims in an amount greater than $350,000 or in an unliquidated amount in a timely filed proof of claim. Each such holder shall complete and submit the Claim Form within one hundred and eighty (180) days of service of such form.[3] The Claim Form shall provide holders of Debtor Medical Liability Claims with two options:

**Option 1: Claim Reduction Election**. Holders of Debtor Medical Liability Claims may agree and stipulate to an Allowed Claim Amount of $350,000 (the "**Claim Reduction Election**"); provided that such Allowed Claim Amount shall solely be for purposes of allowance of their Claim in the Chapter 11 Cases and distributions under the Plan. For the avoidance of doubt, treatment of such Debtor Medical Liability Claim and distributions on account thereof shall solely be determined by the Plan. The Claim Reduction Election shall not be available to holders who have asserted Debtor Medical Liability Claims in an unliquidated amount.

**Option 2: Claim Determination**. Holders of Debtor Medical Liability Claims may elect to participate in a claim review process as follows:

**Phase 1: Initial Claim Determination Process**. If a holder of a Debtor Medical Liability Claim does not make the Claim Reduction Election, such holder must demonstrate the following in its Claim Form:

a. **Claim Validity Requirements**. A holder must demonstrate:

   i. The holder received negligent medical care from (a) a Debtor or (b) any individual whose negligent provision of medical care is the legal responsibility of a Debtor;

   ii. Such negligent medical care was the proximate cause of the holder's alleged damages; and

   iii. The holder filed a Proof of Claim on or before the applicable Bar Date.

---

[3] It shall be the responsibility of the holder of the Debtor Medical Liability Claim to provide the Estate Representative with any change of address or contact information.

b. **Claim Evidence**. A holder may demonstrate a qualifying Debtor Medical Liability Claim by submitting to the Estate Representative:

    i. Medical records substantiating the medical treatment received and alleged injuries suffered by the holder as a result of such medical treatment or services;

    ii. Medical bills and other records (e.g., paystubs, receipts, hospital records, insurance records, any applicable funeral or burial expenses) substantiating any economic damages alleged by the holder;

    iii. A sworn statement by a qualified physician establishing that (i) he or she personally examined the holder's medical records and/or the holder, and (ii) based upon that examination, he or she believes to a reasonable degree of medical certainty that the holder's alleged damages were proximately caused by the negligent provision of medical care; and

    iv. Any other credible evidence that tends to establish the existence of an alleged injury and/or economic damages, including, but not limited to, the following information:

        1. Evidence of the holder's condition at the time of the alleged injury;

        2. The nature of the holder's or decedent's alleged bodily injury;

        3. The duration of any medical, mental health, or rehabilitative treatment;

        4. The holder's or decedent's age;

        5. The holder's or decedent's employment history;

        6. The holder's or decedent's medical history;

        7. A death certificate, if the claim is presented for a deceased individual;

        8. Affidavits from holder, heirs, or others with personal knowledge, describing the timing, length and circumstances of holder's or decedent's injuries; and

        9. Whether the holder or decedent had a surviving spouse, parents, or dependents, and if so, the age of those dependents.

    v. A holder must also submit the following information, if available, to the Estate Representative:

        1. Information that might suggest the existence of another source or condition that may have caused or contributed to any injuries;

        2. The potential liability of other entities or persons for some or all of the holder's injuries or damages and any compensation

and recoveries, of any kind, received from any person or entities connected to holder's injuries; and

3. Copies of all claims, complaints, proofs of claim, notices, settlement documents, releases, recoveries, compensation received, or similar documents that holder submits or entered into in respect of claims asserted against or to be asserted against any other entity or person arising from or related to holder's or decedent's injuries that underlie the Debtor Medical Liability Claim presented to the Estate Representative; provided that, to the extent that additional such documents or evidence becomes available to the holder after his or her claim submission and before the Estate Representative determines the allowance of the Debtor Medical Liability Claim, the holder shall supplement his or her claim with such additional evidence.

vi. The holder may submit such additional information that the holder believes will assist the Estate Representative determine that the holder has satisfied the Claim Validity Requirements.

vii. The Estate Representative may request additional information as reasonably necessary in the opinion of the Estate Representative to determine the allowance of a Debtor Medical Liability Claim. The holder shall provide such additional information so that it is received by the Estate Representative within fourteen (14) days of such request.

c. **Claim Determination**. The Estate Representative or its advisors shall evaluate each submission individually and will follow the guidelines set forth above to determine, based on the information obtained, (a) whether or not a submitted Debtor Medical Liability Claim is Allowed or is disallowed and (b) to the extent Allowed, the corresponding Allowed Claim Amount (such determination, the "**Claim Determination**"). The Allowed Claim Amount shall be determined by the Estate Representative to replicate to the extent possible the amount a reasonable jury might award for the Debtor Medical Liability Claim, taking into account the relative shares of fault that may be attributed to any parties potentially responsible for the Debtor Medical Liability Claim under applicable law and applying the same standard of proof that would apply under applicable law. In no circumstances shall the Estate Representative assign any claim value for any punitive damages, exemplary damages, statutory enhanced damages, attorney's fees or costs, or claims presentation-related expenses. If the holder accepts the Allowed Claim Amount, it becomes the final determination of the claim.

d. **Appeal to Mediation**. If the Claim Determination is not satisfactory to the holder, the holder may request to proceed to mediation. A holder must submit notice to the Estate Representative of its intent to appeal the Claim Determination through mediation within thirty (30) days of receipt of the

Claim Determination, otherwise the holder shall be deemed to have accepted the Claim Determination and such claimant's Debtor Medical Liability Claim shall be Allowed in the amount of the Claim Determination without further action by the parties or the Bankruptcy Court.

**Phase 2: Mediation**.  If the Initial Claim Determination Process does not result in a Claim Determination satisfactory to a holder and a notice of appeal of the Claim Determination is timely provided to the Estate Representative, the Estate Representative and the holder shall proceed to non-binding mediation ("**Mediation**") no earlier than one hundred and eighty (180) days after the Estate Representative's receipt of such holder's notice of appeal (unless the Estate Representative agrees to an earlier date).  The Estate Representative shall serve a mediation referral notice on the American Arbitration Association (the "**AAA**").  The Mediation shall conclude within one hundred and twenty (120) days following appointment of a mediator (the "**Mediator**").  The Mediation will be conducted remotely via Zoom or similar platform, unless another location is mutually agreed to by the holder and the Estate Representative.  In Mediation, the Mediator shall consider the same evidentiary requirements as set forth above.

    a.  **Appointment of a Mediator**.

        i.  Within sixty (60) days after the referral to mediation has occurred, the AAA shall prepare a list of five potential mediators from its panel.  The Estate Representative and the holder shall each be permitted to strike two names from the list within five (5) days of receiving the list.  The AAA shall appoint the Mediator from the remaining names and send immediate notice of such appointment and the location and time of the mediation conference to the Estate Representative and the holder.  All Mediators shall be impartial and neutral.  No Mediator shall have any financial or personal interest in or relation to the proceedings or, except where otherwise agreed by the parties, in any related matters.

    b.  **Conduct of Mediation**.

        i.  No written discovery shall be permitted unless mutually agreed to by the parties, provided that any information submitted in the Initial Claim Determination Process shall be permitted to be considered by the Mediator in the Mediation.

    c.  **Fees and Costs of Mediation**.

        i.  Mediation fees shall be divided evenly between the holder and the Plan Trust.  Each party shall bear the expense of its own counsel and all other costs.

    d. **Mediation Report**.

       i. At the conclusion of the Mediation or the final adjournment after any continuation thereof, the parties shall sign a written report (the "**Mediation Report**") before the Mediator stating:

          1. That the holder and the Estate Representative have completed the Mediation in good faith and otherwise complied with the Mediation procedures set forth herein; and either:

             a. That the Debtor Medical Liability Claim has been settled and the terms of the settlement; or

             b. That the holder intends to either (i) subject the Debtor Medical Liability Claim to binding arbitration or (ii) proceed with liquidating the Debtor Medical Liability Claim in the tort system.

**Phase 3(a): Binding Arbitration**. If, at the conclusion of Mediation, the claimant elects to subject the Debtor Medical Liability Claim to arbitration ("**Arbitration**"), an Arbitration hearing shall be held following appointment of an arbitrator (the "**Arbitrator**"). In Arbitration, the Arbitrator shall consider the same evidentiary requirements set forth above.

    a. **Conduct of Arbitration**.

       i. The Arbitration shall be conducted in accordance with applicable law and shall be governed by the Federal Arbitration Act, Title 9, United States Code. Except as otherwise provided herein or as otherwise agreed by the parties, the Arbitration shall be conducted pursuant to the AAA's Commercial Arbitration Rules. Those rules provide procedures and guidelines for, among other things, (a) the qualifications and appointment of the Arbitrator, (b) communications with the Arbitrator, (c) preliminary exchange of information, (d) the introduction of evidence, and (e) the time, form, and scope of the arbitration award.

       ii. No written discovery shall be permitted unless mutually agreed to by the parties.

       iii. Requests for documents shall be required to be made at least thirty (30) calendar days before the hearing to the Arbitrator, who shall rule on the requests within five (5) days and only grant the requests if clearly relevant and necessary. If a request is granted, documents are required to be produced within ten (10) calendar days from the Arbitrator granting the request.

       iv. The Arbitrator shall have sole discretion as to whether depositions can be taken; _provided_ that, to the extent the Arbitrator allows depositions, such depositions must be limited to two (2) hours and each party may only request to depose up to two witnesses.

     v.   The claimant and Estate Representative each must submit a five (5) page pre-arbitration statement at least seven (7) days prior to the Arbitration. Each party shall be granted ninety (90) minutes, including any rebuttal, within which to present its position. The Arbitration shall be conducted remotely via Zoom or similar platform, unless another location is mutually agreed to by the claimant and the Estate Representative. No post-arbitration briefs shall be permitted.

  b. **Fees and Costs of Arbitration**.

     i.   Arbitration fees shall be divided evenly between the claimant and the Plan Trust; provided that the Arbitrator may in his or her sole discretion assess the entire cost of Arbitration against any party delaying or abusing the arbitration proceedings. Each party shall bear the expense of its own counsel, experts, witnesses, prosecution, and all other costs.

  c. **Arbitration Award**.

     i.   The arbitral award must be written and shall be binding and shall be within the discretion of the Arbitrator, but in no event shall the award exceed the claimed amount of the Debtor Medical Liability Claim set forth in the claimant's Claim Form or Proof of Claim, whichever is lower. Neither party shall have the right to appeal the award except on the grounds set forth in the Federal Arbitration Act. There will be no right to a trial *de novo*.

**Phase 3(b): Tort System Alternative**. Holders, who at the conclusion of Mediation elect to proceed with liquidating their Debtor Medical Liability Claim in the tort system, retain the right to institute or continue a lawsuit in the tort system against the Estate Representative in the appropriate jurisdiction. Upon such an election, the automatic stay shall be deemed modified, without further order of the Bankruptcy Court, to allow the holder to proceed against the Estate Representative in the tort system for the sole purpose of liquidating his or her Debtor Medical Liability Claim. For the avoidance of doubt, no holder shall be granted relief from the automatic stay to commence or continue any action, suit or trial, to proceed with discovery, or to pursue its Debtor Medical Liability Claim in a non-bankruptcy forum until the holder has completed the Medical Liability Claims Procedures. Any lawsuit in the tort system must be filed by the holder in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses shall be available to both sides at trial. The final judgment obtained in the tort system shall determine the Allowed Claim Amount that is eligible for distribution from the Plan Trust in accordance with the Plan.

    **Allowed Amounts**. Any Debtor Medical Liability Claim that is Allowed, as determined pursuant to these Medical Liability Claims Procedures, shall be treated in accordance with the Plan confirmed and implemented in the Debtors' Chapter 11 Cases.

**Ability to Settle Debtor Medical Liability Claims**.  Nothing herein shall limit the ability of a holder and the Estate Representative to settle a Debtor Medical Liability Claim by mutual agreement at any time.  All such settlements shall be subject to the terms set forth herein.

**Failure to Comply with the Medical Liability Claims Procedures**.  If a holder fails to comply with the Medical Liability Claims Procedures, negotiate in good faith, or cooperate with the Estate Representative as may be necessary to effectuate the Medical Liability Claims Procedures, the Bankruptcy Court may, after notice and a hearing, find such conduct to be in violation of the Confirmation Order, an abandonment of, or failure to prosecute, the Debtor Medical Liability Claim.  Upon such findings, the Bankruptcy Court may, among other things, disallow and expunge the Debtor Medical Liability Claim, in whole or in part, or grant such other or further remedy deemed just and appropriate under the circumstances, including, without limitation, awarding attorneys' fees and other fees and costs to the Estate Representative.

# EXHIBIT 7

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § | **Chapter 11** |
| **STEWARD HEALTH CARE SYSTEM LLC,** *et al.*, | § § § § | **Case No. 24-90213 (CML)** |
|  | § | **(Jointly Administered)** |
| Debtors.[1] | § § § |  |

## DISCLOSURE STATEMENT
## FOR JOINT CHAPTER 11 PLAN OF LIQUIDATION
## OF STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
Loren M. Findlay (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Attorneys for Debtors and Debtors in Possession*

June 1, 2025                                        Houston, Texas

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

**DISCLOSURE STATEMENT, DATED JUNE 1, 2025**

**Solicitation of Votes on the**
**Joint Plan of Liquidation of**

**STEWARD HEALTH CARE SYSTEM LLC, *ET AL.***

> **THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE PLAN (AS DEFINED HEREIN).**
>
> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M. (CENTRAL TIME) ON JULY 2, 2025, UNLESS EXTENDED BY THE DEBTORS.  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS MAY 21, 2025 (THE "VOTING RECORD DATE").**

> **RECOMMENDATION BY THE DEBTORS TO VOTE TO ACCEPT THE PLAN**
>
> The Transformation Committee of the Board of Managers of Steward Health Care Holdings LLC ("**SHC Holdings**"), on behalf each of the governing bodies for each of its debtor affiliates, have unanimously approved the transactions contemplated by the Plan.  The Debtors believe the Plan is in the best interests of the Debtors' estates and all stakeholders.  Accordingly, the Debtors recommend that holders of claims and interests whose votes are being solicited submit ballots to accept the Plan.
>
> Further, holders of 100% of the aggregate outstanding principal amount of the Bridge Facility (as defined herein) have agreed to vote in favor of the Plan.  The FILO Parties also support confirmation of the Plan and recommend that all creditors entitled to vote submit a ballot to accept the Plan.

> **RECOMMENDATION BY THE CREDITORS' COMMITTEE**
> **TO VOTE TO ACCEPT THE PLAN**
>
> The Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), as stated in any Creditors' Committee Position Letter (as defined herein), (i) believes that the Plan is in the best interests of the Debtors' estates and all stakeholders, (ii) supports confirmation of the Plan, and (iii) recommends that all creditors entitled to vote on the Plan submit a ballot to accept the Plan.

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (AS MAY BE AMENDED, SUPPLEMENTED, OR MODIFIED FROM TIME TO TIME, THE "DISCLOSURE STATEMENT") IS INCLUDED HEREIN FOR THE PURPOSES OF SOLICITING VOTES ON THE *JOINT CHAPTER 11 PLAN OF LIQUIDATION OF STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS*, DATED MAY 30, 2025 (THE "PLAN"),[2] AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT A.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT**

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

PURSUANT TO SECTION 1125 OF CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE").

ALL HOLDERS OF CLAIMS OR INTERESTS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  IN PARTICULAR, ALL HOLDERS OF CLAIMS OR INTERESTS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION V (CERTAIN RISK FACTORS AFFECTING DEBTORS) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (THE "BANKRUPTCY RULES") AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

UPON CONFIRMATION OF THE PLAN, THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT, WILL BE OFFERED AND SOLD WITHOUT REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR U.S. FEDERAL, STATE, OR LOCAL LAWS IN RELIANCE ON AVAILABLE EXEMPTIONS UNDER THE SECURITIES LAWS OF THE UNITED STATES.  WITH RESPECT TO THE SECURITIES OFFERED AND SOLD PURSUANT TO THE EXEMPTION UNDER SECTION 1145(A) OF THE BANKRUPTCY CODE, SUCH SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE.  IN ADDITION, SUCH SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.  WITH RESPECT TO SECURITIES OFFERED AND SOLD PURSUANT TO THE EXEMPTION UNDER SECTION 4(A)(2) OF THE SECURITIES ACT, SUCH SECURITIES MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OR THE SECURITIES ACT OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.  THE SECURITIES ISSUED UNDER THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE

iii

INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS AFFECTING DEBTORS" BELOW. PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS, AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. THE DEBTORS DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE LIQUIDATION ANALYSIS ATTACHED HERETO. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT, EXCLUDING THE CREDITORS' COMMITTEE POSITION LETTER.

THE INFORMATION IN THE DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THE DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

PLEASE BE ADVISED THAT SECTIONS 12.3, 12.4, 12.5, 12.6, 12.7, 12.8; AND 12.9 OF THE PLAN CONTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND SUCH

iv

**SECTIONS ARE ANNEXED HERETO AS <u>EXHIBIT D</u>.  YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED.**

v

**TABLE OF CONTENTS**

Page

I. Introduction ...................................................................................................................1

    A.    **Overview of The Plan** .................................................................................3

        1.    Plan Administration ........................................................................ 3

        2.    Litigation Trust ............................................................................. 4

        3.    Litigation Funding ........................................................................ 6

        4.    Plan Trust ..................................................................................... 7

    B.    **Administrative Expense Claims Consent Program** ...........................11

        1.    Answers to Frequently Asked Questions Regarding the Administrative Expense Claims Consent Program.......................... 11

            a.    What Happens if a Holder Does Not Opt-Out? ..................................... 11

            b.    What Happens if a Holder Does Opt-Out? ............................................ 12

            c.    Is the Administrative Expense Claims Consent Program Guaranteed to Occur? ........................................................................... 12

            d.    Which Administrative Expense Claimants are Eligible to Participate? ............................................................................................ 13

            e.    How Will the Debtors Calculate Each Reconciled Amount? ................. 13

            f.    What Happens if a Holder Disagrees With Their Reconciled Amount? ............................................................................................... 13

            g.    When Will the Effective Date Occur? ................................................... 14

        2.    Administrative Expense Claims Consent Process & Procedures........................ 14

        3.    Administrative Expense Claim Bar Date Process for Asserting Claim .............. 15

    C.    **Summary of Plan Treatment** ................................................................15

    D.    **Inquiries** ..................................................................................................20

II. Overview of Debtors' Operations.................................................................................21

    A.    **History & Formation** ..............................................................................21

    B.    **Historical Operations and Key Assets**..................................................22

        1.    Steward Health ............................................................................ 22

        2.    Stewardship Health ..................................................................... 23

    C.    **Remaining Operations** ...........................................................................23

    D.    **Corporate Governance & Management** ...............................................24

    E.    **Capital Structure** ...................................................................................25

        1.    ABL/FILO Facility ..................................................................... 27

vi

|  |  |  |  |
|---|---|---|---|
|  | 2. | Prepetition Bridge Facility | 28 |
|  | 3. | MPT Loans and Obligations | 29 |

**III. Events Preceding the Commencement of the Chapter 11 Cases** ...... 30

| A. | Industry and Operational Challenges | 30 |
|---|---|---|
| B. | Prepetition Initiatives | 30 |

**IV. Overview of the Chapter 11 Cases** ...... 31

| A. | Overview of Events of Chapter 11 Cases | 31 |
|---|---|---|
| B. | Commencement of Chapter 11 Cases | 32 |
| C. | First/Second Day Pleadings | 33 |
| D. | Other Procedural and Administrative Motions | 34 |
| E. | Captive Insurance Program | 35 |
| F. | DIP Financing | 37 |

|  | 1. | MPT DIP Facility | 37 |
|---|---|---|---|
|  | 2. | DIP Commitment Fee | 38 |
|  | 3. | FILO DIP Facility | 38 |

| G. | Appointment of Creditors' Committee | 40 |
|---|---|---|
| H. | Appointment of Patient Care Ombudsmen | 40 |
| I. | Overview of Sale Process | 41 |

|  | 1. | Prepetition Sale Process | 41 |
|---|---|---|---|
|  | 2. | Global Bidding Procedures and Postpetition Sale Process | 41 |

| J. | Stewardship Health Sale | 42 |
|---|---|---|

|  | 1. | Stewardship Sale Process | 42 |
|---|---|---|---|
|  |  | a. | Stewardship IOI with Optum | 42 |
|  |  | b. | Stewardship Sale with Kinderhook | 42 |

| K. | Hospital Sale Process, Key Creditor Disputes & Mediation | 43 |
|---|---|---|

|  | 1. | Massachusetts Sale Process | 44 |
|---|---|---|---|
|  | 2. | Master Lease I Hospitals Sale Process | 48 |
|  |  | a. | Overview of Process & Key Disputes | 48 |
|  |  | b. | Space Coast Hospitals | 48 |
|  |  | c. | Specified MLI Hospitals Sale Process | 50 |
|  |  | d. | Wadley at Hope Sale Process | 54 |
|  |  | e. | Glenwood Sale Process | 55 |
|  |  | f. | Wadley (Texarkana) Sale Process | 55 |

vii

|  |  | g. | Sharon Regional Medical Center Sale Process | 56 |
|  | 3. | TSA / EPDA Settlement | | 57 |
|  | 4. | Unexpired Leases | | 60 |
| **L.** | **Hospital Closures** | | | 60 |
|  | 1. | Closure of Carney and Nashoba | | 60 |
|  | 2. | Closure of Norwood Satellite Facilities | | 60 |
| **M.** | **Monetization of Additional Assets** | | | 62 |
|  | 1. | Overview | | 62 |
|  | 2. | Accounts Receivables | | 63 |
|  | 3. | JV Interests in Clinics & Other Health Centers | | 64 |
|  | 4. | Stewardship Purchase Price Adjustment | | 64 |
|  | 5. | Litigation Claims | | 64 |
|  |  | a. | Claims Against Commercial Payors | 64 |
|  |  | b. | Norwood Litigation | 65 |
|  |  | c. | BCBS Antitrust Litigation | 67 |
|  |  | d. | Preference and Avoidance Actions | 68 |
|  |  | e. | Other Potential Claims and Causes of Action | 68 |
| **N.** | **Adversary Proceedings & Other Bankruptcy Litigation** | | | 69 |
|  | 1. | BMI Adversary Proceeding & BMI Bankruptcy Litigation | | 69 |
|  |  | a. | Commencement and Preliminary Injunction Hearing | 69 |
|  |  | b. | Declaratory Judgment Hearing | 70 |
|  |  | c. | October 23, 2024 Status Conference and Transition Services Agreement | 70 |
|  |  | d. | BMI Motion to Compel Payment | 71 |
|  | 2. | MPT Adversary Proceeding | | 71 |
|  | 3. | TRACO Adversary Proceeding | | 72 |
|  | 4. | Massachusetts Adversary Proceeding | | 73 |
|  | 5. | CommonSpirit Adversary Proceeding | | 73 |
|  | 6. | Rabbi Trust Litigation | | 74 |
|  | 7. | Urban Hospitals Motion to Segregate Proceeds | | 78 |
|  | 8. | Sub-Committee Investigations | | 78 |
| **O.** | **Investigations** | | | 80 |
|  | 1. | Government Investigations | | 80 |
|  |  | a. | Malta Investigation | 80 |

viii

|  |  | b. | DOJ Investigation | 81 |
|  |  | c. | Boston USAO Investigation | 81 |
|  | 2. |  | Civil Investigative Demands | 81 |
| **P.** | **Exclusivity** |  |  | 81 |
| **Q.** | **Claims Bar Dates** |  |  | 82 |
|  | 1. |  | General/Governmental Bar Date | 82 |
|  | 2. |  | Administrative Expense Claims Bar Date | 83 |
| **R.** | **Administrative Expense Claims** |  |  | 84 |
| **S.** | **PBGC Settlement** |  |  | 87 |
| **T.** | **Plan Settlement** |  |  | 88 |
|  |  | a. | The Plan Settlement is Equitable | 89 |
|  |  | b. | The Plan Settlement Satisfies Section 1129(a)(9) of the Bankruptcy Code | 90 |
| **U.** | **Timetable for Chapter 11 Cases** |  |  | 91 |
| **V. Certain Risk Factors Affecting Debtors** |  |  |  | 91 |
| **A.** | **Certain Bankruptcy Law Considerations** |  |  | 91 |
|  | 1. |  | Risk of Non-Confirmation of Plan | 91 |
|  | 2. |  | Non-Consensual Confirmation | 92 |
|  | 3. |  | Risk of Non-Occurrence of Effective Date | 92 |
|  | 4. |  | Risks Related to Possible Objections to Plan | 92 |
|  | 5. |  | Risk of Termination of Plan Settlement | 92 |
|  | 6. |  | Releases, Injunctions, and Exculpation Provisions May Not be Approved | 93 |
|  | 7. |  | Risks Related to Classification of Claims and Interests | 93 |
|  | 8. |  | Alternative Restructuring | 93 |
|  | 9. |  | Factors Affecting the Recoveries of Holders of Allowed Administrative Expense Claims | 93 |
|  | 10. |  | Claims Could Be More than Projected | 94 |
|  | 11. |  | Projected Distributions to Holders of Allowed Claims | 94 |
|  | 12. |  | Administrative Insolvency | 94 |
|  | 13. |  | Conversion to Chapter 7 | 95 |
|  | 14. |  | Dismissal of Chapter 11 Cases | 95 |
|  | 15. |  | Cost of Administering Debtors' Estates | 95 |
| **B.** | **Additional Factors to Be Considered** |  |  | 96 |
|  | 1. |  | Debtors Could Withdraw Plan | 96 |

ix

2.    No Duty to Update ...................................................................... 96

3.    No Representation Outside Disclosure Statement Are Authorized ................... 96

4.    No Legal or Tax Advice Is Provided ............................................... 96

5.    No Admission Made ................................................................. 96

6.    Certain Tax Consequences .......................................................... 96

7.    The Debtors are Under Investigation ............................................... 96

8.    Ongoing Litigation and Other Contingencies Could Affect the Outcome of the Chapter 11 Cases ............................................................. 97

9.    No Waiver of Right to Object or Right to Recover Transfers and Assets .......... 97

10.   Failure to Identify Litigation Claims or Causes of Action....................... 97

11.   The Expected Valuations of the Debtors' Remaining Assets are Inherently Uncertain ............................................................. 97

12.   Objection to Amount or Classification of Claims ................................. 98

**VI. Certain U.S. Federal Income Tax Consequences Of The Plan** .........................98

   **A.**     **Consequences to the Debtors** ...............................................99

       1.    The Wind-Down of the Debtors ................................................ 100

       2.    Cancellation of Debt and the Reduction of Tax Attributes...................... 101

   **B.**     **Consequences To U.S. Holders of Certain Allowed Claims**.....................102

       1.    Treatment of Allowed FILO Bridge Claims and Allowed General Unsecured Claims ............................................................. 102

             a.    Gain or Loss With Respect to Allowed FILO Bridge Claims .............. 103

             b.    Gain or Loss With Respect to Allowed General Unsecured Claims ...................................................................... 104

             c.    Tax Basis and Holding Period ........................................ 104

       2.    Timing and Character of Gain or Loss .......................................... 105

       3.    Distributions in Discharge of Accrued Interest or OID ......................... 105

   **C.**     **Tax Treatment of the Trusts and Their Beneficiaries**...................106

       1.    Classification of the Trusts as "Liquidating Trusts"............................ 106

       2.    General Tax Reporting by the Trusts and their Beneficiaries..................... 108

       3.    Tax Reporting for Plan Trust Assets Allocable to Disputed Claims ................ 109

   **D.**     **Withholding on Distributions and Information Reporting**.....................110

**VII. Confirmation of Plan** ........................................................111

   **A.**     **Confirmation Hearing** ...................................................111

   **B.**     **Objections** ............................................................112

   **C.**     **Requirements for Confirmation of Plan** ....................................112

x

1.    Requirements of Section 1129(a) of Bankruptcy Code ..................................... 112

2.    Acceptance of Plan ............................................................................................. 113

3.    Cramdown ............................................................................................................ 113

    a.    No Unfair Discrimination ................................................................... 114

    b.    Fair and Equitable Test ...................................................................... 114

4.    Best Interests Test .............................................................................................. 115

5.    Feasibility ........................................................................................................... 115

**VIII. Alternatives to Confirmation and Consummation of Plan** ............................................116

1.    Liquidation under Chapter 7 of Bankruptcy Code ............................................ 116

2.    FILO Settlement ................................................................................................. 116

**IX. Conclusion** .................................................................................................................................116

## EXHIBITS

**EXHIBIT A**      Plan

**EXHIBIT B**      Plan Support Agreement Term Sheet

**EXHIBIT C**      Liquidation Analysis

**EXHIBIT D**      Release, Injunction, and Exculpation Provisions

**EXHIBIT E**      Solicitation and Voting Procedures

**EXHIBIT F**      Debtors' Organizational Structure

**EXHIBIT G**      PBGC Settlement Term Sheet

# I. **INTRODUCTION**[1]

On May 6, 2024 (the "**Petition Date**"), Steward Health Care System LLC ("**SHC**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**," and, together with the Debtors' direct and indirect non-Debtor subsidiaries, the "**Company**" or "**Steward**") commenced voluntary cases in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") pursuant to chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

The purpose of the Disclosure Statement is to provide creditors of the Debtors with sufficiently detailed information to make an informed decision on whether to vote to accept or reject the Plan. The Disclosure Statement contains, among other things, a summary of (i) the treatment of Claims against and Interests in the Debtors under the Plan; (ii) the Debtors' business and certain historical events; (iii) key events during these chapter 11 cases; (iv) risk factors affecting the Debtors; and (v) the standard for seeking confirmation of the Plan.

As described in more detail below, faced with a number of financial challenges prior to the Petition Date, the Debtors commenced these chapter 11 cases to raise debtor in possession ("**DIP**") financing to allow them to complete their prepetition sale and marketing process and effectuate the sale of their hospitals and of Stewardship Health, the Company's risk-based payor contracting network and related primary care practices ("**Stewardship Health**").

On May 15, 2024, the Debtors filed a motion seeking approval of bidding procedures (Docket No. 281), which was entered by the Bankruptcy Court on June 3, 2024 (Docket No. 626) (the "**Bidding Procedures Order**"). In accordance with the procedures set forth in the Bidding Procedures Order, and following extensive negotiations with multiple interested buyers, the Debtors entered into binding purchase agreements for certain of their businesses and hospital operations that were approved by the Bankruptcy Court, which included the sales of: (i) Stewardship Health to Brady Buyer, LLC, an affiliate of Kinderhook Industries, LLC ("**Brady**") (Docket No. 2135) for $245 million (subject to certain adjustments), and (ii) twelve of the Debtors' hospitals, including (a) six (6) hospitals in Massachusetts to LGH, Lifespan, and BMC (Docket Nos. 2519, 2520, and 2523, respectively), (b) one (1) hospital in Arkansas to Pafford (Docket No. 2494), (c) three (3) hospitals in Florida to Orlando Health (Docket No. 2445), (d) one (1) hospital in Texarkana, Texas to CHRISTUS (Docket No. 2671), and (e) one (1) hospital in Pennsylvania to Tenor (Docket No. 3688). The Debtors' ability to consummate the sales of these twelve (12) hospitals was, in large part, facilitated by extensive mediation sessions between the Debtors, FILO Parties, Medical Properties Trust, Inc. (together with its affiliates, "**MPT**"), and the Creditors' Committee, among others, as described more fully herein. As of the date hereof, each of these sale transactions have closed.

In addition, following extensive mediation, the Debtors reached an agreement on the terms of a global settlement (the "**Global Settlement**") with MPT, the Creditors' Committee, the FILO Secured Parties, and the ABL Lenders (collectively, the "**Global Settlement Parties**") regarding the treatment of sixteen (16) of the Debtors' hospitals subject to Master Lease I (as defined herein), which was approved by the Bankruptcy Court on September 18, 2024 (Docket No. 2610) (the "**Global Settlement Order**"). The Global Settlement enabled the Debtors to immediately appoint interim managers identified by MPT to manage the Debtors' operations at the Specified MLI Hospitals (as defined herein), and ultimately transfer such hospitals to five (5) operators designated by MPT (each, a "**Designated Operator**" and collectively, the "**Designated Operators**"). The Debtors successfully negotiated the documentation with each of the

---

[1]     Capitalized terms used but not defined in the Introduction shall have the meanings ascribed to such terms elsewhere in this Disclosure Statement or the Plan, as applicable.

Designated Operators, and filed and obtained Bankruptcy Court approval to transition sixteen (16) hospitals to the Designated Operators, including (i) one (1) hospital in Louisiana to HSA (Docket No. 2599), (ii) three (3) hospitals in Arizona to HonorHealth (Docket No. 2776), (iii) two (2) hospitals in Texas to Quorum Health (Docket No. 2887); (iii) two (2) hospitals in Ohio to Insight (Docket No. 2939); (iv) two (2) hospitals in Texas and five (5) hospitals in South Florida to HSA (Docket No. 3046), and (v) St. Luke's Behavioral Facility in Arizona (the "**Behavioral Facility**") to College Health (Docket No. 3982). As of the date hereof, all of the transitions to the Designated Operators contemplated by the Global Settlement have closed. Following the Global Settlement, the Debtors entered into TSAs (as defined herein) with the purchasers and operators of the hospitals to ensure a smooth transition of services and continuity of patient care. Thereafter, the Debtors entered into mediation and eventually reached the TSA / EPDA Settlement (as defined herein) with the Creditors' Committee, MPT, certain hospital operators, and the FILO Parties to transfer the TSAs to Quorum Health. The TSA / EPDA Settlement became effective as of March 12, 2025.[2]

As of the date hereof, the Debtors have used approximately $573 million of the proceeds from their hospital assets and the sale of Stewardship Health to repay the prepetition ABL/FILO Facility in full and partially pay down the FILO DIP Facility, and have made over $89 million in additional mandatory repayments under the FILO DIP Credit Agreement. Additionally, pursuant to the terms of the Global Settlement, MPT released over $842 million in funded debt and guarantee claims, including their $152 million MPT DIP Facility, as well as all claims under the Master Leases, which had over $6.6 billion in remaining lease obligations, and agreed to allow the Debtors to retain $395 million in sale proceeds on account of the disposition of the Space Coast Hospitals in exchange for (among other things) a release of claims and causes of action that were investigated by the Creditors' Committee.

Following the Global Settlement and comprehensive sale process involving the disposition of substantially all the Debtors' assets, the Debtors engaged in discussions with the FILO Secured Parties and Creditors' Committee regarding a chapter 11 plan that would allow the Debtors to wind-down their affairs, liquidate their remaining assets (including but not limited to, accounts receivable from their prior operations, valuable insurance claims and other estate claims and causes of action), and distribute the proceeds to creditors.

After months of mediation overseen by the Honorable Judge Marvin Isgur among the Debtors, FILO Secured Parties, and Creditors' Committee, on April 28, 2025, the parties reached an agreement on the Plan Support Agreement Term Sheet, attached hereto as **Exhibit B**, and an agreement in settlement of the FILO Secured Parties' requests for relief from the automatic stay to exercise remedies with respect to their collateral and to terminate the Debtors' use of cash collateral (the "**FILO Settlement**"), reflected in the term sheet (the "**FILO Settlement Term Sheet**") attached to the *Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* (Docket No. 4746) (the "**FILO Settlement Motion**"). The Plan embodies each of these settlements and is supported by both the FILO Secured Parties and the Creditors' Committee, pursuant to the terms and conditions set forth therein. The FILO Settlement was approved by the Bankruptcy Court on May 30, 2025. On the earlier of (i) July 14, 2025 (the "**Outside Date**") and (ii) one (1) business day after

---

[2]    A more complete description of the terms of the Global Settlement and the TSA / EPDA Settlement can be found herein at Section IV.K.3.

the date on which the Bankruptcy Court enters an order of any confirmed plan pursuant to section 1129 of the Bankruptcy Code (the "**Litigation Trust Establishment Date**"), the Debtors shall transfer substantially all of the Debtors' assets, including valuable estate claims and causes of action (the "**Litigation Trust Assets**") to a trust (the "**Litigation Trust**").

Subject to the terms and conditions of the FILO Settlement Term Sheet, the FILO Secured Parties (i) consented to up to an 81-day extension of the FILO DIP Facility and authorize the Debtors to continue to use cash collateral so the Debtors can continue to monetize assets and pursue confirmation of the Plan, (ii) agreed to provide an up to $125 million long-term financing commitment that will support the pursuit of substantial asset recoveries (including extremely valuable litigation claims) for the benefit of all creditors of the Debtors' estates, and (iii) agreed to provide up to $21.5 million in funding to the Debtors to support near-term payments to administrative creditors as well as the administration and wind-down of the Debtors' estates ($15 million of which is conditioned on the Debtors confirming a chapter 11 plan).  The Debtors believe that continued access to use of cash collateral and the financing provided by the FILO Secured Parties avoids the potential for value-destructive exercise of remedies by the FILO Secured Parties on account of the maturity of the FILO DIP Facility and will allow the Debtors to monetize their assets that will deliver recoveries for administrative and priority creditors and the potential to provide meaningful recoveries for general unsecured claimants.

The Debtors believe that the Plan provides all holders of Claims, including Allowed Administrative Expense Claims, greater recoveries than any alternative path, including dismissal or conversion of these chapter 11 cases to proceedings under chapter 7 of the Bankruptcy Code.  Please refer to Sections I.B and IV.Q.2 of this Disclosure Statement for additional detail regarding the treatment of Administrative Expense Claims under the Plan.

## A.    OVERVIEW OF THE PLAN

The Debtors believe the Plan maximizes value for all stakeholders.  The Plan contemplates a liquidation and wind down of the Debtors' estates to provide distributions to creditors in accordance with the absolute priority rule and certain settlements provided for in the Plan, as described herein, in the most efficient and expeditious manner possible.

### 1.    *Plan Administration*

Upon the Confirmation Date, an oversight committee (the "**Plan Administrator Committee**") shall be appointed in accordance with Section 5.10 of the Plan.  The Plan Administrator Committee shall consist of three (3) members: (1) William Transier, (2) Alan Carr, and (3) Monica Blacker of Force 10 Partners.  The initial chairperson of the Plan Administrator Committee (the "**Committee Chairperson**") will be Monica Blacker.  On and after the Confirmation Date and until the Plan Trust Establishment Date (as defined below), the Plan Administrator Committee shall administer the Debtors' estates and act as the successor to and representative of the Debtors and their estates and shall have exclusive governance rights over the Debtors and their estates and be authorized to implement the Plan and any applicable orders of the Bankruptcy Court.  Any decisions by the Plan Administrator Committee shall require the affirmative vote of at least two (2) of the three (3) members of the Plan Administrator Committee; *provided that* the Plan Administrator Committee shall not act without the consent of the Committee Chairperson.  Upon the Plan Trust Establishment Date, the Plan Trustee shall accede to the rights and obligations of the Plan Administrator Committee.

3

The Plan Administrator Committee shall act for the Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the terms of an agreement among the Plan Administrator Committee and the Debtors, which shall be in form and substance reasonably acceptable to the Creditors' Committee, regarding the administration of the Debtors' estates on and after the Confirmation Date and until the Plan Trust Establishment Date.

2.    *Litigation Trust[3]*

Under the terms of the FILO Settlement Term Sheet, the Debtors are required to obtain an order of the Bankruptcy Court (the "**FILO Settlement Order**") providing that on the earlier of the Outside Date and one (1) business day following the Confirmation Date, the Plan Administrator Committee shall transfer the Litigation Trust Assets to the Litigation Trust.  On the Litigation Trust Establishment Date, Mark Kronfeld of Province, LLC will be appointed (the "**Litigation Trustee**") to carry out the disposition of the Litigation Trust Assets.  The terms of the Litigation Trustee's engagement shall be acceptable to the Debtors, FILO Parties, and the Creditors' Committee. The Debtors and the Creditors' Committee will have the right to consent to the selection of any successor Litigation Trustee (including the terms of such successor Litigation Trustee's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.  Pursuant to the FILO Settlement and the Plan, the Litigation Trust will have three beneficiary classes:

1.    Class A-1 interests, which shall (i) represent the rights and entitlements of the parties that from time to time extend or are deemed to have extended funding under the Litigation Funding (the "**Litigation Funders**") and their representative (the "**Litigation Funding Agent**"), and (ii) have a distribution and liquidation preference as set forth in the FILO Settlement Term Sheet.

2.    Class A-2 interests will be held by the FILO Parties and their successors, which interests shall have a distribution and liquidation preference as set forth in the FILO Settlement Term Sheet (together with the Class A-1 interests, the "**Class A Interests**" or "**Class A Litigation Trust Interests**").[4] The FILO Agent or its designee, acting at the direction of FILO Parties holding Class A-2 interests entitled to a majority in amount of the outstanding Class A-2 Preference, shall be the representative of the Class A-2 interests (the "**Class A-2 Representative**").

3.    Class B interests (the "**Class B Interests**" or "**Class B Litigation Trust Interests**" and, collectively, with the Class A Interests, the "**Litigation Trust Interests**"), which will be held by Steward Health Care Holdings LLC on behalf of the Estate.  Upon confirmation

---

[3]    Capitalized terms used in this Section I.A.2 but not otherwise defined herein shall have the meanings ascribed to such terms in the Litigation Trust Agreement (Docket No. 4966).

[4]    The Class A Interests will only be transferrable (i) pursuant to an available exemption under the Securities Act, or a registration of such Class A Interests under the Securities Act, and (ii) so long as any proposed transfer would not result in a requirement that the Class A Interests be registered under the Securities Act.

4

of the Plan, the Class B Interests will be transferred to the Plan Trust (as defined below). There shall be a single representative of the Class B Interests at any given time (the "**Class B Representative**"), which shall initially be the Plan Administrator Committee.[5]

Distributions from the Litigation Trust shall be subject to the following priorities:

1. 100% to pay the Trust Expenses (including amounts owing under the Transition Services Agreement) until the Trust Expenses have been repaid in full (subject to the Monthly Expense Reimbursement Cap);

2. Subject to Section 4.3 of the Litigation Trust Agreement, 100% to the Class A-1 Trust Beneficiaries *pro rata* based on the aggregate Class A-1 Trust Interests then held by all Class A-1 Trust Beneficiaries until any earned, due and payable Variable Component (which survives repayment of the Class A-1 Preference and the FILO Balance and which shall be subject to potential increases from time to time in accordance with Section 4.3 of the Litigation Trust Agreement) has been paid in full in cash;

3. 100% to the Class A-1 Trust Beneficiaries *pro rata* based on the aggregate Class A-1 Trust Interests then held by all Class A-1 Trust Beneficiaries until the Class A-1 Preference is $0;

4. 100% to the Class A-2 DIP Trust Beneficiaries *pro rata* based on the aggregate Class A-2 DIP Trust Interests then held by all Class A-2 DIP Trust Beneficiaries until the Class A-2 DIP Preference is $0 (which distributions shall, for the avoidance of doubt, be applied to the FILO DIP Balance and the FILO Exit Premium Balance *pro rata*);

5. 100% to the Class A-2 Bridge Trust Beneficiaries pro rata based on the aggregate Class A-2 Bridge Trust Interests then held by all Class A-2 Bridge Trust Beneficiaries until the FILO Bridge Balance is $0;

6. 100% to the Class A-2 Bridge Trust Beneficiaries pro rata based on the aggregate Class A-2 Bridge Trust Interests then held by all Class A-2 Bridge Trust Beneficiaries until the MOIC Balance is $0; and

---

[5] The Class B Interests will only be transferrable (i) to any liquidating trust or other similar vehicle formed under and following a plan or any other liquidating trust or other vehicle formed pursuant to applicable law, in each case, only if such Class B Interests have not previously been transferred to a Person other than the Debtors or its affiliates or (ii) (A) (1) with the consent of the Litigation Trustee (not to be unreasonable withheld, conditioned or delayed) or (2) in accordance with any exemption from the registration requirements of the Securities Act and (B) so long as any proposed transfer would not result in a requirement that the Class B Trust Interests be registered under the Securities Act and, in the case of (ii), subject to the transferee and transferor delivering certain transfer, certificates and/or opinions as required by the Litigation Trust Agreement.

5

7. 100% to the Class B Trust Beneficiaries *pro rata* based on the aggregate Class B Trust Interests then held by all Class B Trust Beneficiaries.

The Litigation Trust Interests will not, and are not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Litigation Trust Interests constitute "securities," the offer and sale of such Litigation Trust Interests will be exempt from registration pursuant to section 4(a)(2) of the Securities Act and equivalent exemptions under state securities laws.

The Litigation Trustee shall be authorized to consummate settlement proposals or monetization opportunities with respect to the Litigation Trust Assets in accordance the Litigation Trust Agreement. The Litigation Trustee, in accordance therewith, may consummate settlement proposals or monetization opportunities above certain thresholds that are listed on the Threshold Schedule without consent of the beneficiaries. The Threshold Schedule contains commercially sensitive information and is subject to relevant privileges, including the attorney-client privilege, and disclosure of the Threshold Schedule could prejudice Debtors' ability to prosecute their claims in a manner that maximizes the value of the Litigation Trust Assets. The Debtors are therefore unable to publicly disclose the Threshold Schedule.

3. *Litigation Funding*

Pursuant to the FILO Settlement Order, the FILO Secured Parties have agreed to provide the Debtors and their estates with the use of cash collateral through the Litigation Trust Establishment Date as well as a long-term litigation financing commitment for the purpose of monetizing the Litigation Trust Assets. On the Litigation Trust Establishment Date, the FILO Parties shall extend funds (solely in accordance with the terms of and limitations contained in the FILO Settlement) to the Litigation Trust (the "**Litigation Funding**") on a delayed draw basis in an aggregate amount of up to $125 million (the "**Initial Commitment Amount**") (which is inclusive of (a) a budgeted amount of $61 million through June 27, 2025, together with any additional amounts budgeted thereafter under the DIP Budget, which, in each case, may only be incurred in the form of Secured Interim Advances,[6] and (b) the $6.5 million of Estate Funding), which funded amounts shall be available to pay litigation costs of the Litigation Trust, costs of administration of the Litigation Trust, and monetization of the Litigation Trust Assets. The Litigation Funding is necessary and incidental to the liquidating purpose of the Plan Trust.

The Litigation Funding shall also include an uncommitted accordion of 25% of the Initial Commitment Amount. The Litigation Funders' Class A-1 Preference shall accrete at a rate between 10 and 12%,[7] and such funders shall also be entitled to a variable portion of gross litigation proceeds received that will be calculated in accordance with the terms of the FILO Settlement Term Sheet.

Specifically, the Litigation Funding will be entitled to: (i) an upfront premium (the "**Upfront Premium**"), payable in kind, in an amount equal to $4.25 million; provided that if the Litigation Funding

---

[6] "**Secured Interim Advances**" means the aggregate amount of cash collateral used from April 1, 2025, through the Trust Establishment Date, together with interest thereon at the Applicable Rate.

[7] The Class A-1 Preference shall accrete at the Applicable Rate (as defined by the FILO Settlement Term Sheet) and shall not have to be paid in cash; provided that, to the extent the Litigation Funders elect to provide additional funding to support the payment of any accreted amounts in cash, then such amounts shall be paid in cash.

6

accordion is exercised with the consent of the Litigation Trustee, then the Upfront Premium shall be increased by the same percentage that the commitments under the Litigation Funding are increased, and (ii) 20% of gross litigation proceeds (the "**Variable Component**"), of which: (a) 15% is paid in cash at the time of receipt of such litigation proceeds (the "**Upfront Percentage**"), and (b) 5% is deferred, with the applicable deferred cash being held in escrow (the "**Deferred Portion**"), *provided*, that if the litigation proceeds result from a litigation financed with a contingency fee structure or third-party litigation funding, the total Variable Component shall be limited to the lesser of: (i) the applicable Variable Component; and (ii) the greater of: (a) 30% of such gross litigation proceeds minus the amount of contingency fee, success fee, or third-party litigation funding cost related to such litigation, and (b) 10% of such gross litigation proceeds (the "**Reduced Variable Component**").  In the event the Reduced Variable Component is equal to or less than 15% of such gross litigation proceeds, then all of such Reduced Variable Component shall be treated as the Upfront Percentage.  In the event the Reduced Variable Component is greater than 15% of such gross litigation proceeds, then 15% of such gross litigation proceeds shall be treated as the Upfront Percentage and the remaining portion shall be treated as the Deferred Portion.

If the FILO Balance is repaid in full on or before October 1, 2026, the Deferred Portion shall be paid to the Debtors' estates.  On October 2, 2026, if the FILO Balance has not been paid in full by October 1, 2026, the Deferred Portion shall be disbursed in full to the Litigation Funding Agent.  After repayment of the FILO Balance, the Variable Component shall continue to be entitled to a percentage of the gross litigation proceeds: (i) at 15% if the FILO Balance is repaid in full on or before October 1, 2026, or (ii) at 20% if the FILO Balance is not repaid on or before October 1, 2026, in each case, subject to the Reduced Variable Component adjustment (the "**Post-FILO Repayment Variable Component**"); *provided* that to the extent a plan is confirmed, the Post-FILO Repayment Variable Component shall be paid in two installments, with the first installment being paid in cash upon receipt of the applicable litigation proceeds in an amount equal to 62.5% of the Post-FILO Repayment Variable Component, and the payment of the remaining balance of the Post-FILO Repayment Variable Component being deferred until (and subject to) the satisfaction of allowed administrative and other priority claims pursuant to the Plan, and if a plan has not been confirmed, the Post-FILO Repayment Variable Component shall be paid in full in cash upon receipt of the applicable litigation proceeds.

Separate from the Litigation Funding, the FILO Parties have also agreed to provide (i) a 81-day extension of the maturity date of the FILO DIP Facility, (ii) $21.5 million of funding to the Debtors, which the Debtors intend to use to support administration of the Debtors' estates and near-term accelerated payments to administrative creditors as part of an administrative consent program as well as the administration and wind-down of the Debtors' estates, and (iii) additional funding pursuant to a transition services agreement to be entered into between the Estates and Litigation Trust.

4.      *Plan Trust*

On or prior to the Effective Date of the Plan, all assets that will be retained by the Debtors or the Plan Administrator Committee (each an "**Estate Representative**," along with the Litigation Trustee and the Plan Trustee), as applicable, following the Confirmation Date, including the Class B Litigation Trust Interests, together with any property acquired by the Debtors after the Litigation Trust Establishment Date (collectively, the "**Plan Trust Assets**"), will be transferred to a liquidation trust (the "**Plan Trust**" and the date of establishment of the Plan Trust, the "**Plan Trust Establishment Date**").

On the Plan Trust Establishment Date, all duties, rights, and obligations of the Plan Administrator Committee shall vest in a trustee of the Plan Trust (the "**Plan Trustee**"), appointed in accordance with

7

Section 6.3 of the Plan and the Plan Trust Agreement, to oversee the Plan Trust and act as the successor to the Plan Administrator Committee. The Plan Administrator Committee shall serve as the initial Plan Trustee.

Upon the Plan Trust Establishment Date, the Plan Trust shall assume all Claims against the Debtors (other than, for the avoidance of doubt, the FILO DIP Claims and FILO Bridge Claims) with the same validity and priority as such Claims had against the Debtors immediately prior to the Plan Trust Establishment Date. The Plan Trustee shall take any actions necessary to, among other things, (i) effectuate the Plan; (ii) exercise its business judgment to direct and control the Wind Down, including the liquidation, sale and/or abandonment of the Plan Trust Assets (including, for the avoidance of doubt, any Retained Assets) under the Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims; and (iii) resolve all matters related to the Plan Trust Assets and vest such assets in the Plan Trust for the benefit of the Plan Trust Beneficiaries in accordance with the terms of the Plan and the Plan Trust Agreement.

The Plan contemplates distributions on or after the Effective Date as assets are monetized, including from the following sources:

(i)    Cash available on or after the Effective Date in accordance with the Plan;

(ii)    proceeds realized from the Class B Litigation Trust Interests;

(iii)    proceeds realized from the Plan Trust Assets;

(iv)    proceeds realized from the Retained Assets; and

(v)    any additional proceeds of the Wind Down, if any.

The Plan contemplates an orderly liquidation of the Debtors' assets, and distributions will be allocated as outlined below (and as set forth in more detail in the Plan). Distributions to junior classes will only be made if senior classes are satisfied (or adequately reserved for):

(i)    Each known and identified holder of an Administrative Expense Claim (other than holders of (i) Professional Fee Claims; (ii) FILO DIP Claims; or (iii) asserted Administrative Expense Claims that are entirely contingent, unliquidated and/or disputed by the Debtors), unless otherwise agreed to by the Debtors and the applicable holder, will be sent a Consent Program Opt-Out Form (as defined herein) pursuant to which the Debtors seek the agreement of such holder to the treatment afforded to such holder under the Administrative Expense Claims Consent Program (as defined herein). The treatment afforded to such known and identified holders of an Administrative Expense Claim (other than holders of (i) Professional Fee Claims; (ii) FILO DIP Claims; or (iii) asserted Administrative Expense Claims that are entirely contingent, unliquidated and/or disputed by the Debtors, unless otherwise agreed to by the Debtors and the applicable holder) under the Plan is only available if such holder agrees to such

8

treatment.  **The failure to timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program shall be deemed to be such holder's consent to accept less than full payment of its Claim as required by Section 1129(a)(9), and such holder shall be bound by the terms of the Administrative Expense Claims Consent Program.**  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, (i) Cash in an amount equal to the Allowed amount of such Claim, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.  For the avoidance of doubt, to the extent a holder of an Administrative Expense Claim enters into a Quorum Vendor Fund Agreement (as defined herein) and receives payment through such agreement on account of its Administrative Expense Claim, such Administrative Expense Claim shall not receive the treatment or any payment described in this paragraph.

(ii)   Each holder of an Allowed FILO DIP Claim shall receive on the Litigation Trust Establishment Date  its Pro Rata Share of the Class A Litigation Trust Interests.

(iii)  Each holder of an Allowed Priority Tax Claim shall receive (i) payment in full in Cash, (ii) equal annual Cash payments in an aggregate amount equal to the amount of such holder's Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from the Petition Date, or (iii) such other treatment consistent with section 1129(a)(9) of the Bankruptcy Code.

(iv)   Each holder of an Allowed Other Priority Claim shall receive (i) payment in full in Cash; or (ii) such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired.

(v)    Each holder of an Allowed Other Secured Claim shall receive at the option of the Estate Representative (i) payment in full in Cash in an amount equal to such Claim; (ii) transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or (iii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

(vi)   Except to the extent released pursuant to the FILO Settlement Order, each holder of an Allowed FILO Bridge Claim shall (i) receive their Pro Rata Share of the Class A Litigation Trust Interests on account of their Allowed Remaining FILO Bridge Claim (unless previously received), and (ii) retain their Pro Rata Share of their Retained FILO

9

Claims, which shall entitle such holders to their Pro Rata Share of the FILO Plan Trust Interests on the Plan Trust Establishment Date to the extent not repaid prior thereto. With respect to any Distribution of Plan Trust Assets to be made by the Plan Trustee, holders of the Allowed Retained FILO Claims shall receive 10% of the Plan Trust Recovery until paid in full.

(vii) In accordance with the PBGC Settlement,[8] on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests. With respect to any Distribution of Plan Trust Assets to be made by the Plan Trustee, holders of the Allowed PBGC Claims shall receive their Pro Rata Share of 90% of the Plan Trust Recovery until the Allowed Retained FILO Claims are paid in full and 100% of the Plan Trust Recovery after the Allowed Retained FILO Claims are paid in full, to be paid ratably among holders of Allowed PBGC Claims and Allowed General Unsecured Claims.

(viii) Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, on or prior to the Effective Date, each such holder shall receive its Pro Rata Share of the GUC Plan Trust Interests. With respect to any Distribution of Plan Trust Assets to be made by the Plan Trustee, holders of the Allowed General Unsecured Claims shall receive 90% of the Plan Trust Recovery until the Allowed Retained FILO Claims are paid in full and 100% of the Plan Trust Recovery after the Allowed Retained FILO Claims are paid in full, to be paid ratably among holders of Allowed PBGC Claims and Allowed General Unsecured Claims.

(ix) On the Effective Date or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, reinstated, or discharged (each without any Plan Distribution) to the extent reasonably determined to be appropriate by the Estate Representative.

Any right to receive Plan Trust Interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Plan Trust Interests constitute "securities," the exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of such right will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations. Any such Plan Trust Interests (and the underlying Claim giving rise thereto) shall not: (a) be voluntarily or involuntarily, directly or indirectly, assigned, conveyed, hypothecated, pledged, or otherwise transferred or traded, except by will, intestate succession or as may otherwise be required by operation of law; (b) be evidenced by a certificate or other instrument; and (c) possess any voting rights with respect to the Plan Trust or otherwise.

---

[8] The Plan provides for a proposed settlement with the Pension Benefit Guaranty Corporation (the "**PBGC**" and, such settlement, the "**PBGC Settlement**"), and which is more fully described in Section IV.S hereof. The term sheet describing the terms of the PBGC Settlement is attached hereto as **Exhibit G**.

10

The Plan additionally contains certain release, injunction, and exculpation provisions, each of which are attached hereto as **Exhibit D**.  **If you hold a Claim or Interest and do not timely, properly, and affirmatively elect to opt-out of the releases contained in Section 12.6(b) of the Plan, then you shall be deemed to consent to the releases contained in Section 12.6(b).  In addition, if you hold a Medical Liability Claim against the Debtors and do not timely and properly elect to opt-out of the third-party releases contained in Section 12.6(b) of the Plan, then you are electing to release claims against the "Released Parties," including any claims against the Debtors' employed physicians and affiliated physicians related to Medical Liability Claims.**

## B.     ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM

In light of the amount of secured, administrative, and priority claims asserted against the Debtors' estates, as well as the forecasted timeline for the Debtors to monetize and collect on their remaining assets (including significant litigation claims), the Debtors anticipate that there will be a significant executory period between the Confirmation Date of the Plan and the Effective Date of the Plan.

Accordingly, to accelerate cash payments to consenting holders of Allowed Administrative Expense Claims on or reasonably promptly after the Confirmation Date of the Plan and the consummation of the Plan, the Plan provides for a compromise whereby the holders of Allowed Administrative Expense Claims that do not timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program will have their Administrative Expense Claim deemed Allowed in an amount equal to 50% of the Reconciled Amount (as defined below) (the "**Settled Administrative Expense Claim**") and will receive a pro-rated portion of a distribution equal to $12.5 million (the "**Settled Administrative Expense Claims Cash Pool**") following the Confirmation Date on account of such Settled Administrative Expense Claim, which will reduce the amount of the Settled Administrative Expense Claim.  To the extent that the Settled Administrative Expense Claims Cash Pool distribution is less than the Settled Administrative Expense Claim, the remainder of the Settled Administrative Expense Claim will be paid in accordance with Section 2.1 of the Plan (collectively, the "**Administrative Expense Claims Consent Program**").

Regardless of parties' elections with respect to the Administrative Expense Claims Consent Program, any Allowed Administrative Expense Claims accrued after the Voting Record Date (May 21, 2025) will be treated in accordance with Section 2.1 of the Plan.

1.    *Answers to Frequently Asked Questions Regarding the Administrative Expense Claims Consent Program*

a.    *What Happens if a Holder Does Not Opt-Out?*

**All holders of Allowed Administrative Expense Claims accruing prior to May 21, 2025 that (i) receive a Consent Program Opt-Out Form and (ii) do not timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program by the deadline, will be deemed to have agreed to be bound by the terms of the Administrative Expense Claims Consent Program.**  Therefore, such holders will have their Administrative Expense Claim deemed Allowed in an amount equal to 50% of the Reconciled Amount and will receive a pro-rated distribution from the Settled Administrative Expense Claims Cash Pool, which will reduce the amount of the Settled Administrative Expense Claim.  To the extent that the Settled Administrative Expense Claims Cash Pool distribution is less than the Settled

11

Administrative Expense Claim, the remainder of the Settled Administrative Expense Claim will be paid in accordance with Section 2.1 of the Plan.

*Illustrative Example (Based on $93 million in Total Allowed Administrative Expense Claims, 75% Participation, and a $2 million Allowed Administrative Expense Claim):*

As an illustrative example, assuming that the total amount of Allowed Administrative Expense Claims is consistent with the Debtors' good faith estimate of approximately $93 million (as described in greater detail in Section IV.R hereto), and the holders of exactly 75% (in dollar amount) of Allowed Administrative Expense Claims do not opt-out of the Administrative Expense Claims Consent Program, the holders participating in the Administrative Expense Claims Consent Program would hold approximately $69.75 million in Allowed Administrative Expense Claims against the Debtors' estates. The Debtors have also illustrated the example below for a participating holder with a $2 million Administrative Expense Claim (i.e. the Reconciled Amount).

For this example, a holder of a $2 million administrative expense claim (i.e. the Reconciled Amount) would have a $1 million Settled Administrative Expense Claim and would receive, in full satisfaction of their Allowed Administrative Expense Claim in two payments, one following the Confirmation Date and the other on the Effective Date:

- Approximately 17.9% ($358,000) of the Reconciled Amount of their estimated Allowed Administrative Expense Claim (i.e., $2,000,000) on account of the distribution from the Settled Administrative Expense Claims Cash Pool following the Confirmation Date;

- Approximately 32.1% ($642,000) of the Reconciled Amount on the Effective Date; and

- 50% ($1,000,000) of the Reconciled Amount would be waived.

The foregoing example is provided solely for illustrative purposes. The Debtors cannot guarantee any level of participation in the Administrative Expense Claims Consent Program.

        b.       *What Happens if a Holder Does Opt-Out?*

**All holders of Allowed Administrative Expense Claims that <u>do</u> timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program will be paid in full on the Effective Date**. However, the timing of the Effective Date and distributions to holders of Allowed Administrative Expense Claims are indeterminate and will depend in part on the level of participation in the Administrative Expense Claims Consent Program. The Debtors anticipate that the more holders that choose to timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program, the longer it will take for the Debtors to have sufficient cash to satisfy all Allowed Administrative Expense Claims, thus ultimately delaying or even potentially contributing to risking the occurrence of the Effective Date.

        c.       *Is the Administrative Expense Claims Consent Program Guaranteed to Occur?*

**No. The implementation of the Administrative Expense Claims Consent Program is conditioned upon sufficient participation in the Administrative Expense Claims Consent Program**. Specifically, at least 75% (in dollar amount) of the Debtors' estimated Allowed Administrative Expense

WEIL:\100544464\2\76000.0004

Claims must participate in the Administrative Expense Claims Consent Program (the "**Minimum Participation Threshold**"). If Holders of more than 25% (in dollar amount) of the Debtors' estimated Allowed Administrative Expense Claims opt-out of the Administrative Expense Claims Consent Program, and unless such condition is waived by the Debtors and the Creditors' Committee, the Administrative Expense Claims Consent Program will not be consummated. If the Minimum Participation Threshold is not satisfied or waived by the Debtors and the Creditors' Committee, the Debtors' estates shall retain the Settled Administrative Expense Claims Cash Pool equal to $12.5 million.

In addition, the Administrative Expense Claims Consent Program and any and all distributions contemplated thereby are contingent upon confirmation of the Plan. The holders of Allowed Administrative Expense Claims will not have the option to receive expedited payment in exchange for a reduction of such holders' Allowed Administrative Expense Claims in the event that the Plan is not confirmed.

The Debtors believe they will be able to satisfy all Allowed Administrative Expense Claims in full as of the Effective Date regardless of participation in the Administrative Expense Claims Consent Program.

       d.     *Which Administrative Expense Claimants are Eligible to Participate?*

Unless otherwise agreed to by the Debtors and the applicable holder, all holders of known and identified Administrative Expense Claims are eligible to participate and will receive a Consent Program Opt-Out Form other than holders of (i) Professional Fee Claims; (ii) FILO DIP Claims; or (iii) asserted Administrative Expense Claims that are entirely contingent, unliquidated and/or disputed by the Debtors.

For the avoidance of doubt, claims for which the Debtors are not responsible (including any claims that are the responsibility of the Designated Operators (as defined herein) under the Global Settlement Order or claims that will or have been released pursuant to a Quorum Vendor Fund Agreement (as defined herein) will not be eligible to participate in the Administrative Expense Claim Consent Program.

       e.     *How Will the Debtors Calculate Each Reconciled Amount?*

As detailed above, the Debtors will provide each applicable holder of an Allowed Administrative Expense Claim with a Consent Program Opt-Out Form (as defined below). Each Consent Program Opt-Out Form will display a proposed Allowed Administrative Expense Claim amount for the recipient holder (each, a "**Reconciled Amount**"). The Debtors have calculated each Reconciled Amount based upon the Debtors' review of their books and records and the results of their ongoing efforts to reconcile all Administrative Expense Claims filed with the Bankruptcy Court.

       f.     *What Happens if a Holder Disagrees With Their Reconciled Amount?*

If a particular holder of an Allowed Administrative Expense Claim disagrees with the amount listed as the Reconciled Amount but still wishes to participate in the Administrative Expense Claims Consent Program, that holder is encouraged to contact the Debtors' advisors **as soon as possible** upon receipt of the Consent Program Opt-Out Form at stewardvendorteam@weil.com and stewardclaims@alixpartners.com.

g.      *When Will the Effective Date Occur?*

Based on the Debtors' reasonable estimates, the Debtors are estimating that the Effective Date is reasonably likely to occur in early 2027, although the Effective Date may reasonably or in fact occur earlier or later than early 2027.

2.      *Administrative Expense Claims Consent Process & Procedures*

Within three (3) business days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter, Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**") shall send known and identified holders of Administrative Expense Claims (other than holders of (i) Professional Fee Claims; (ii) FILO DIP Claims; or (iii) asserted Administrative Expense Claims that are entirely contingent, unliquidated and/or disputed by the Debtors), unless otherwise agreed to by the Debtors and the applicable holder, an opt-out form (the "**Consent Program Opt-Out Form**"), which shall identify the Debtors' proposed Allowed Administrative Expense Claim for such holder.  Unless otherwise agreed to in writing (e-mail being sufficient) by the Debtors and the holder of the applicable Administrative Expense Claim, holders of Administrative Expense Claims will have until July 2, 2025 at 5:00 p.m. (Central Time) (the "**Consent Program Opt-Out Deadline**") to submit a Consent Program Opt-Out Form in either electronic or paper form, in each case following the procedures outlined in the Disclosure Statement Motion[9] (the "**Consent Program Opt-Out Procedures**") and explained in the Consent Program Opt-Out Form.

To the extent a holder of an Allowed Administrative Expense Claim (other than holders of (i) Professional Fee Claims; (ii) FILO DIP Claims; or (iii) asserted Administrative Expense Claims that are entirely contingent, unliquidated and/or disputed by the Debtors), unless otherwise agreed to by the Debtors and the applicable holder, **does not timely, properly, and affirmatively opt-out** of the Administrative Expense Claims Consent Program, such holder shall be deemed to have agreed (i) to be bound by the terms of the Administrative Expense Claims Consent Program, and (ii) that such holder's acceptance of and consent to the Administrative Expense Claims Consent Program will be deemed consent to the Plan and acceptance of the treatment under the Plan in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Administrative Expense Claim as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code.  Holders of Allowed Administrative Expense Claims that do timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program will be paid in full on the Effective Date.

**For the avoidance of doubt, to the extent a holder of an Administrative Expense Claim enters into a Quorum Vendor Fund Agreement and receives payment through such agreement on account of its Administrative Expense Claim, such Administrative Expense Claim shall not receive the treatment or any payment described in this Section.**

---

[9]      "**Disclosure Statement Motion**" means the *Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Claims Consent Program Opt-Out Procedures; (V) Establishing Notice and Objection Procedures For Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* (Docket No. 4745).

14

3.    *Administrative Expense Claim Bar Date Process for Asserting Claim*

Except as otherwise provided in Article II of the Plan and except with respect to Administrative Expense Claims that are Professional Fee Claims, FILO DIP Claims, or subject to 11 U.S.C. § 503(b)(1)(D), requests for payment of Allowed Administrative Expense Claims must be made in compliance with the Administrative Expense Claims Bar Date Order and the Plan. Holders of Administrative Expense Claims that are required to, but do not timely request payment on account of Administrative Expense Claims by the applicable Administrative Expense Claims Bar Date, as established by the Administrative Expense Claims Bar Date Order, under the Plan or under the Confirmation Order, as applicable, shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, the Plan Trustee, or their property, and such Administrative Expense Claims shall be deemed satisfied, settled, and released as of the Effective Date.

C.    **SUMMARY OF PLAN TREATMENT**

The following table summarizes (i) the type of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, and (iii) which Classes are entitled to vote on the Plan. The following summary table is qualified in its entirety by reference to the full text of the Plan.

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[10] | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 1. | Other Priority Claims | Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, each such holder shall receive: (i) payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the next Plan Distribution Date after such Other Priority Claim becomes an Allowed Other Priority Claim, or as soon as practicable thereafter; or such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired. | Unimpaired (Not entitled to vote because presumed to accept) | $360,000 - $700,000 | 100% |

_____

[10] The estimated Allowed amount of the Claims in each Class is based on, among other things, the Debtors' books and records, the Debtors' and their advisors' extensive reconciliation efforts and analysis of the merits of each asserted Claim, and is subject to potential litigation and disagreement by the holders of such Claims.

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[10] | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 2. | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim, each such holder shall receive at the option of the Estate Representative: (i) payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the next Plan Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim, or as soon as practicable thereafter, paid from the Plan Trust Net Proceeds; (ii) transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or (iii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired (Not entitled to vote because presumed to accept) | $0 - $250,000 | 100% |
| 3. | FILO Bridge Claims | Except to the extent released pursuant to the FILO Settlement Order, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO Bridge Claims, on the Litigation Trust Establishment Date, each such holder shall (i) receive their Pro Rata Share of the Class A-2 Litigation Trust Interests on account of their Allowed Remaining FILO Bridge Claim (unless previously received), and (ii) retain their Pro Rata Share of their Retained FILO Claims, which shall entitle such holders to their Pro Rata Share of the FILO Plan Trust Interests on the Plan Trust Establishment Date to the extent not repaid prior thereto. | Impaired (Entitled to vote) | Remaining FILO Bridge Claims: $30,394,856 plus Allowed Bridge MOIC Amount<br><br>Retained FILO Claim: $10,000,000 | <100% |

16

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[10] | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 4. | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed General Unsecured Claim, on or prior to the Effective Date, each such holder shall receive its Pro Rata Share of the GUC Plan Trust Interests. | Impaired (Entitled to vote) | $1,390,000,000 - $2,320,000,000[11] | 3.9 – 21.6% |
| 5. | PBGC Claims | In accordance with the PBGC Settlement, in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Claims, on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests. For the avoidance of doubt, the PBGC Claims shall be the only Claims on which the PBGC shall be entitled to any Distribution in connection with the Debtors or the Plan. | Impaired (Entitled to vote) | $8,750,000 | 3.9 – 21.6% |
| 6. | Intercompany Claims | On or prior to the Effective Date or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, reinstated, or discharged (each without any Plan Distribution) to the extent reasonably determined to be appropriate by the Estate Representative. | Impaired (Not entitled to vote because presumed to accept) | N/A | None. |
| 7. | Subordinated Securities Claims | All Subordinated Securities Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Securities Claims will not receive any distribution on account of such Allowed Subordinated Securities Claims. | Impaired (Not entitled to vote because deemed to reject) | N/A | None. |
| 8. | Intercompany Interests | On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Intercompany Interests shall be adjusted, | Impaired (Not entitled To vote because presumed to accept) | N/A | None. |

---

[11] Estimate includes an estimated approximately $72 million to $158 million in Medical Liability Claims asserted against the Debtors.

17

| Class | Designation | Treatment under Plan | Impairment and Entitlement to Vote | Estimated Allowed Amount[10] | Approx. Percentage Recovery |
|-------|-------------|---------------------|-----------------------------------|------------------------------|------------------------------|
| | | reinstated, or discharged at the election of the Estate Representative; *provided* that no Plan Distributions shall be made to holders of an Intercompany Interest on account of such Intercompany Interest under the Plan. | | | |
| 9. | Non-Debtor Owned Subsidiary Interests | On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Non-Debtor-Owned Subsidiary Interests shall be cancelled and there shall be no distribution to holders of Non-Debtor Owned Subsidiary Interests on account of such Non-Debtor Owned Subsidiary Interests under the Plan. | Impaired (Not entitled to vote because deemed to reject) | N/A | None. |
| 10. | Parent Interests | On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Parent Interests shall be cancelled and there shall be no distribution to holders of Parent Interests under the Plan. | Impaired (Not entitled to vote because deemed to reject) | N/A | None. |

Pursuant to the Bankruptcy Code, only those holders of claims or interests in classes that are impaired under a plan of reorganization or liquidation and that are not deemed to have rejected the plan are entitled to vote to accept or reject such proposed plan. Classes of claims or interests in which the holders of claims or interests are unimpaired under a proposed plan are deemed to have accepted such proposed plan and are not entitled to vote to accept or reject the plan. Classes of claims or interests in which the holders of claims or interests receive no distribution under a proposed plan are deemed to have rejected such proposed plan and are not entitled to vote to accept or reject the plan.

*Treatment of Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim at the option of the Estate Representative (in consultation with the Creditors' Committee), either: (i) Cash in an amount equal to such Allowed Priority Tax Claim on the latest of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is forty-five (45)

18

calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (c) the next Plan Distribution Date after such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (d) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (*provided* that the Estate Representative reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. For illustrative purposes, the Debtors estimate that the total Allowed Priority Tax Claims are approximately $29 million. The Debtors currently dispute a number of asserted Priority Tax Claims and maintain that such claims are General Unsecured Claims. In the event that the Debtors cannot successfully reclassify such claims as General Unsecured Claims, the total amount of Allowed Priority Tax Claims may exceed $29 million.

### *Medical Liability Claim Procedures*

The Plan provides that all Medical Liability Claims against the Debtors arising prior to the Effective Date (each, a "**Debtor Medical Liability Claim**") shall be reconciled in accordance with the Medical Liability Claim Procedures, which are summarized herein and set forth in the Plan. The procedures set forth in the Medical Liability Claim Procedures attached to the Plan as Exhibit D will be the sole and exclusive method by which the holder of a Debtor Medical Liability Claim may seek allowance of his or her Debtor Medical Liability Claim.

Following entry of the Confirmation Order, the automatic stay shall be in effect with respect to all Debtor Medical Liability Claims and shall only be modified in accordance with the Medical Liability Claims Procedures. To the extent the automatic stay was previously lifted in the Chapter 11 Cases with respect to any particular Debtor Medical Liability Claim, upon entry of the Confirmation Order, the automatic stay shall be reimposed and remain in effect unless or until modified in accordance with the Medical Liability Claims Procedures.

Pursuant to the Medical Liability Claim Procedures, if a holder has filed a proof of claim by the applicable Bar Date asserting a Debtor Medical Liability Claim arising prior to the Petition Date in the amount of $350,000 or less, such Debtor Medical Liability Claim shall automatically be deemed Allowed for purposes of distribution under the Plan; *provided* that such holder has submitted reasonable documentation in support of such Debtor Medical Liability Claim, as determined by the Estate Representative or their designee, each in their sole discretion.

If a holder has filed a proof of claim by the applicable Bar Date asserting a Debtor Medical Liability Claim in an amount greater than $350,000 or in an unliquidated amount, the Estate Representative will send a form (the "**Claim Form**") to all such holders which must be completed and submitted within one hundred and eighty (180) days of service. The Claim Form shall provide holders of Debtor Medical Liability Claims with two options: (1) the ability to reduce their asserted claim amount to an Allowed Claim Amount of $350,0000 (unless the claim was filed in an unliquidated amount) (the "**Claim Reduction Election**") or (2) the ability to participate in a claim review process conducted by the Estate Representative. If a holder elects to participate in the claim review process, such holder must demonstrate certain evidentiary and claim validity criteria outlined in the Medical Liability Claim Procedures. The Estate Representative or its advisors shall then determine, based on the information obtained from the holder, (a) whether or not a submitted Debtor Medical Liability Claim is Allowed or disallowed and (b) to the extent Allowed, the

19

corresponding Allowed amount thereof (the "**Allowed Claim Amount**" and such determination, the "**Claim Determination**").

If the Claim Determination is not satisfactory to the holder, the holder may request to proceed to non-binding mediation ("**Mediation**") in accordance with the guidelines set forth in the Medical Liability Claim Procedures. At the conclusion of the Mediation, the parties shall sign a written report before the Mediator stating, among other things, (a) that the allowance of the Debtor Medical Liability Claim has been resolved and the agreed Allowed Claim Amount; or (b) that the holder intends to either (i) subject the Debtor Medical Liability Claim to binding arbitration ("**Arbitration**") or (ii) proceed with liquidating the Debtor Medical Liability Claim in the tort system.

If the holder elects Arbitration, at the conclusion of the Arbitration, the Arbitrator shall issue an arbitral award in his or her discretion. Neither party shall have the right to appeal the award except on the grounds set forth in the Federal Arbitration Act. If the holder elects to proceed with liquidating the Debtor Medical Liability Claim in the tort system, the holder retains the right to institute or continue a lawsuit in the tort system against the Estate Representative in the appropriate jurisdiction. Upon such election, the automatic stay shall be deemed modified, without further order of the Bankruptcy Court, to allow the holder to proceed against the Estate Representative in the tort system for the sole purpose of liquidating his or her Debtor Medical Liability Claim. For the avoidance of doubt, no holder shall be granted relief from the automatic stay to commence or continue any action, suit or trial, to proceed with discovery, or to pursue its Debtor Medical Liability Claim in a non-bankruptcy forum until the holder has completed the Medical Liability Claim Procedures.

*Physician Insurance Account*

As discussed in greater detail in Section IV.E hereof, the Debtors sought and obtained authority under the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Granting Related Relief* (Docket No. 1538) (the "**FILO DIP Order**") to establish a segregated account (the "**Physician Insurance Account**") to hold funds to defend against and resolve Postpetition Physician Claims (as defined herein). Pursuant to paragraph 7(e) of the FILO DIP Order, any amounts funded into the Physician Insurance Account shall not be subject to the liens of the FILO Parties and shall not be available for general corporate purposes or any purpose other than for payments on account of Postpetition Physician Claims. The Physician Insurance Account and proceeds thereof will constitute Retained Assets and will not be transferred to the Litigation Trust on the Litigation Trust Establishment Date. However, on the Plan Trust Establishment Date, the Physician Insurance Account shall vest in, and be transferred to, the Plan Trust, and the Plan Administrator Committee shall administer the funds in the Physician Insurance Account in accordance with the terms of the FILO DIP Order. Upon payment in full of all Postpetition Physician Claims, including defense costs, any amounts remaining in the Physician Insurance Account shall be transferred to the Litigation Trust. In the event that the amount of Postpetition Physician Claims (including the cost to defend such claims) exceeds the amount in the Physician Insurance Account, no additional funds are required to be paid into the Physician Insurance Account.

**D.     INQUIRIES**

If you have any questions regarding this Disclosure Statement or the packet of materials you have received in connection herewith, please contact Kroll, the Debtors' claims, noticing, and balloting agent

(the "**Claims and Noticing Agent**"), at +1 (888) 505-1257 (U.S. and Canada; toll-free) or +1 (646) 893-5546 (International, toll) or via e-mail message to: stewardinfo@ra.kroll.com.

## II. OVERVIEW OF DEBTORS' OPERATIONS

### A. HISTORY & FORMATION

Steward was formed in 2010 following the acquisition of six (6) hospitals in Massachusetts from Caritas Christi Health Care. Over the next decade, Steward expanded its footprint and recapitalized its business through a series of transactions that broadened its national reach and expanded its model and philosophy of value-based care, including:

- In 2016, Steward and affiliates of MPT entered into a series of transactions, whereby Steward (i) sold and leased-back five (5) of its hospital facilities (pursuant to the original *Master Lease Agreement*, dated as of October 3, 2016, by and among certain affiliates of the Debtors as tenants and certain affiliates of MPT as landlords); (ii) obtained a mortgage loan for four (4) of its hospital facilities located in Massachusetts (pursuant to that certain *Real Estate Loan Agreement*, dated as of October 3, 2016, by and among certain affiliates of the Debtors as borrowers and certain affiliates of MPT as lenders (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Mortgage Loan Agreement**")) for approximately $1.2 billion; and (iii) received a $50 million equity investment from an affiliate of MPT.

- In early 2017, the Company acquired seven hospital facilities from Community Health Systems in Ohio, Pennsylvania, and Florida in a single transaction.

- Also in 2017, the Company merged with IASIS Healthcare LLC, adding 18 hospitals in Arizona, Arkansas, Colorado, Louisiana, Texas, and Utah to its healthcare network (the "**IASIS Merger**").

- In 2018, all of the hospitals subject to the Mortgage Loan Agreement, except for the two mortgaged hospitals in Utah, were sold to and leased-back from MPT.

- In 2021, Steward acquired another five (5) hospitals in South Florida from Tenet Healthcare.

By 2022, MPT owned the real property underlying all but one of the Debtors' hospitals (including several ancillary facilities and related properties) and leased such property to the Debtors under two master leases: (1) that certain *Master Lease Agreement (Master Lease I)*, dated as of March 14, 2022 (as amended, restated, or modified from time to time, "**Master Lease I**") that relates to the Debtors' hospital operations in Pennsylvania, Ohio, Louisiana, Arkansas, Arizona, Texas, and Florida (the "**Master Lease I Hospitals**"); and (2) that certain *Master Lease Agreement (Master Lease II)*, dated as of March 14, 2022 (as amended, restated, or modified from time to time, "**Master Lease II**" and, together with Master Lease I, the "**Master Leases**") that relates to the Debtors' hospital operations in Massachusetts (the "**Master Lease II Hospitals**"). The Debtors leased the Master Lease II properties from a joint venture owned by MPT and Macquarie. As described further in Section IV.K, pursuant to the Global Settlement, the Master

Leases were terminated and all claims of MPT and Macquarie (solely with respect to Master Lease II) arising under the Master Leases have been waived and are disallowed.

Prior to the Petition Date, because certain portions of the properties owned by MPT and leased to the Debtors under Master Lease I were no longer necessary for the Debtors' operations, the Debtors agreed, pursuant to that certain *Excess Property Disposition Agreement* dated as of February 21, 2024 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among SHC, the lessor entities party thereto, the lessee entities party thereto and the Prepetition Bridge Agent (the "**EPDA**"), to market and sell such specified properties to third parties (the "**Excess Properties**"), subject to certain terms and conditions set forth in the EPDA. MPT agreed to pledge the proceeds of such sales to the Debtors, who in turn pledged such proceeds to the FILO Secured Parties.

Three (3) of the Excess Properties were transferred to Orlando Health in connection with the sale of the Space Coast Hospitals. As described further in Section IV.K.3 hereof, pursuant to the EPDA Settlement (as defined herein), (i) four (4) Excess Properties were transferred to a special purpose vehicle owned by the FILO Secured Parties in exchange for the FILO Secured Parties agreeing to reduce the obligations under the Prepetition Bridge Facility by $12.75 million, and (ii) six (6) of the Excess Properties were retained by MPT in exchange for MPT making a payment to the Debtors of $26.5 million, including $500,000 transferred from the Expense Escrow Account (as defined in the Global Settlement). The EPDA Settlement closed on March 12, 2025.

## B.    HISTORICAL OPERATIONS AND KEY ASSETS

As of the Petition Date, Steward operated one of the largest accountable care organizations (an "**ACO**")[12] in the United States, including through its hospital operations and Stewardship Health managed care business, and had nearly 30,000 employees, including nearly 1,800 employed physicians and 300 physician assistants, 9,100 employed nurses and nurse practitioners, 9,200 other skilled health care workers, and had approximately 3,250 affiliate providers, including approximately 900 affiliate primary care providers and 2,350 affiliate specialty providers. The Debtors' operations were historically comprised of two primary business lines: (1) Steward Health, the Company's hospital operations, and (2) Stewardship Health, the Company's risk-based payor contracting network and related primary care practices. Each business line was served by the Company's network of employed, contracted, and affiliated physicians.

### 1.    *Steward Health*

As of the Petition Date, Steward Health consisted of Steward's hospital operations, including the Company's 31 acute care hospital campuses ("**Steward Hospital Management**") and approximately 2,350 of the Company's specialist providers ("**Steward Specialty Group**" and together with Steward Hospital Management, "**Steward Health**"). Specifically, Steward Specialty Group housed the Company's multi-specialty physician group practice, which included medical specialties and surgical specialties, affiliated

---

[12]    ACOs are an alternative payment model in which physicians and hospitals assume responsibility for the total cost of care for a population of patients. If the ACO meets certain targets for quality of care and keeps healthcare costs below certain predetermined benchmarks, then the ACO is eligible to share in the implied savings. If, on the other hand, the ACO exceeds total cost of care, then the ACO may be required to repay a portion of total cost of care above the applicable benchmark.

skilled nursing facilities, ambulatory surgery centers, urgent care units, imaging and diagnostic centers, and laboratories.

    2.    *Stewardship Health*

Stewardship Health managed a portfolio of the Debtors' risk-based contracts with local health plans, government entities, and third-party insurance providers. As of the Petition Date, Stewardship Health served over 800,000 patients annually and had approximately 3,250 affiliate providers, including 900 primary care providers, and 2,350 specialist providers serving patients in Arkansas, Arizona, Florida, Louisiana, Ohio, Pennsylvania, Massachusetts, New Hampshire, Rhode Island, and Texas.

As of the Petition Date, Stewardship Health also administered, via a contractual services arrangement with Brighton Marine, Inc. (a non-profit organization) ("**BMI**," and the Debtors' Management and Services Agreement with BMI, the "**BMI MSA**"), the Uniformed Services Family Health Plan (the "**USFHP**"), a Tricare Prime insurance option funded by the United States Department of Defense and overseen by the Defense Health Agency for active-duty military family members, National Guard, Reserves, and retired uniformed services beneficiaries and their families.[13]

    **C.**    **REMAINING OPERATIONS**

As of the date hereof, the Debtors have consummated the sale of substantially all of their operating assets. To that end, Steward is now a nimble organization designed to carry out three primary directives: (i) provide transition services under a limited number of transition services agreements ("**TSAs**")[14] entered into in connection with the sale of Stewardship Health, as well as the transition of the USFHP to BMI; (ii) oversee and execute asset monetization efforts including the prosecution of a number of significant litigation claims; and (iii) to manage and wind down and sale of Ancillary Properties (as defined herein).

Of the nearly 30,000 employees employed by the Debtors as of the Petition Date, approximately only thirty (30) remained at Steward as of May 27, 2025. The Debtors' remaining employees are primarily tasked with providing transition services to BMI and Rural Health Group ("**Rural**"), overseeing asset monetization efforts and the wind-down of the Debtors' estates, and performing various administrative and legal duties including processing payroll and benefits for employees, monitoring ongoing litigation, and ensuring regulatory, tax, and insurance compliance.

The Debtors' remaining assets also include a limited number of properties, clinics, interests in joint ventures, and other miscellaneous assets that the Debtors are actively working to monetize through engagement and negotiations with potential buyers. A total of ten (10) clinics and other health-care centers continue to be operated by Steward or joint ventures in which the Debtors maintains an interest. The Debtors anticipate selling or liquidating all of such clinics by the first half of 2025. The Debtors have also sold or are in the process of marketing their equity interests in various joint ventures, including joint ventures which employ healthcare providers. Through the monetization of these clinics, healthcare centers,

---

[13]    Additional information regarding events relating to BMI are set forth in Section IV.N.1.

[14]    As described in further detail in section IV.K.3 hereto, the Debtors entered into a number of TSAs to provide IT, revenue collection, supply chain procurement, and accounts payable services to purchasers and operators until such purchasers and operators establish their own systems. In return, the TSA counterparties paid the Debtors a fee for such services. Following entry of the TSA / EPDA Settlement Order (as defined herein), the Debtors continued to provide limited services under two (2) TSAs.

23

and joint venture interests, the Debtors anticipate receiving approximately $13.5 million, which will be used to pay creditors in accordance with the Plan.

D.    **CORPORATE GOVERNANCE & MANAGEMENT**

A chart summarizing the Debtors' corporate organization structure, as of the date hereof, is attached hereto as **Exhibit F**.  As set forth therein, each of the Debtors is either a direct or indirect subsidiary of SHC Holdings.  Non-Debtor Steward Health Care Investors LLC owns 90.1% of the equity interests in SHC Holdings and MPT Sycamore Opco LLC (an affiliate of MPT) owns a passive, non-voting 9.9% equity interest in SHC Holdings.

The board of SHC Holdings (the "**Board**") is comprised of the following members, shown below alongside their respective positions:

| Name | Position |
|---|---|
| Mark Rich | Director |
| Hon. John Boehner | Director |
| Sister Vimala Vadakumpadan | Director |
| Carlos M. Hernandez | Director |
| James J. Karam | Director |
| William Transier | Independent Director (Transformation Committee Member) |
| Alan Carr | Independent Director (Transformation Committee Member) |

In December 2023, the Board established the Transformation Committee, which is comprised of William Transier, Alan Carr, and John R. Castellano, the Debtors' Chief Restructuring Officer.  The Transformation Committee has full, sole, and exclusive authority of the Board to pursue, oversee, negotiate, and approve transactions, as well as oversee the administration of these chapter 11 cases.  In addition, the Debtors conducted an independent investigation into claims or causes of action that may be held by the Debtors.  The investigation was led by a sub-committee of the Transformation Committee comprised of William Transier and Alan Carr (the "**Investigation Sub-Committee**").  The Investigation Sub-Committee has sole authority to investigate, prosecute, and settle avoidance actions and causes of action against the Debtors' insiders.

Effective as of October 1, 2024, Dr. Ralph de la Torre, the former Chairman and Chief Executive Officer of SHC Holdings resigned from all positions as an officer, director, manager (or similar) of the Debtors.  In addition, on October 15, 2024, Dr. Michael Callum, the former director and Executive Vice President for Physician Services of SHC Holdings resigned from all positions as an officer, director, manager (or similar) of the Debtors.  Mr. Rubén José King-Shaw, Jr. resigned from the Board thereafter.

## E.    CAPITAL STRUCTURE

As of the Petition Date, the Debtors had approximately $1.2 billion in aggregate principal amount of funded debt obligations outstanding, and approximately $6.6 billion in long-term lease obligations. The table below summarizes the Debtors' prepetition capital structure.[15]

| Prepetition Indebtedness | Principal Amount Outstanding as of the Petition Date | All-in Interest Rate[16] | Maturity |
|---|---|---|---|
| *Funded Secured Debt* | | | |
| ABL First Out Loans | $49.3 mm | ABR + 6.50% | 8/4/2027 |
| ABL Facility (Remainder) | $247.3mm | ABR + 9.00% | 8/4/2027 |
| FILO Facility | $305.5mm | ABR + 12.75% | 12/31/2027 |
| Prepetition Bridge Facility | $274.5mm[17] | SOFR + 10.75% | 6/30/2024 |
| MPT Facility | $216.7 mm | Various | 1/1/2028 |
| MPT Stewardship Note | $82.5mm[18] | SOFR + 15.00% | 6/30/2024 |
| **Total Funded Secured Debt** | $1.2 billion | | |
| *Select Liabilities* | | | |
| Est. MPT Lease Obligations | $6.6 billion[19,20] | N/A | 10/31/41 (lease end) |
| MPT Investor Note | $363.3mm | 4.0% | 2/2029 |

---

[15]    As described further herein, pursuant to the Global Settlement Order (Docket No. 2610), certain Claims against the Debtors held by MPT, including certain of the Debtors' lease obligations and secured funded debt obligations, have been released and waived with prejudice. Additionally, outstanding loans under the ABL/FILO Facility have been repaid in full.

[16]    The default interest rates under the credit documents are as follows: (i) ABL/FILO Facility – applicable rate + 2%; (ii) Prepetition Bridge Facility – applicable rate + 2%; (iii) MPT Facility – Interest Rate + 5%; and (iv) MPT Stewardship Note – Floating Interest Rate + 5%.

[17]    Includes 1.85x minimum MOIC due at maturity and upon certain defaults.

[18]    Includes 1.25x minimum MOIC due at maturity and upon certain defaults.

[19]    Amount represents (i) contractually deferred rent; (ii) other unpaid additional amounts; and (iii) future, undiscounted rent due under the Master Leases through October 31, 2041. Includes average rent escalators ranging from 2.5% to 3.5% annually. Amount is approximate, unaudited, and does not include all amounts payable under the Master Leases.

[20]    Undiscounted future rents are presented for illustrative purposes only and do not represent balance sheet lease liabilities under generally accepted accounting principles.

25

| Prepetition Indebtedness | Principal Amount Outstanding as of the Petition Date | All-in Interest Rate[16] | Maturity |
|---|---|---|---|
| MAAPP Loans | $32.2mm | 4.0% | Various |
| Est. Trade Payables | $979.4mm | N/A | N/A |
| **Total Select Liabilities** | $8.0 billion | | |
| **Total Secured Funded Debt and Select Liabilities** | **$9.2 billion** | | |

As discussed herein, following the Petition Date, the Debtors obtained two separate debtor-in-possession financing facilities, including the MPT DIP Facility[21] and the FILO DIP Facility (the lenders, agent, bridge lenders, and bridge agent thereto, collectively, the "**FILO Parties**"), in an aggregate original principal amount of $300 million in new money loans, plus $225 million of roll-up loans.

As required under the FILO DIP Credit Agreement and the FILO DIP Order, since the Petition Date, the Debtors (i) utilized approximately $565 million of the proceeds from their hospital assets and the sale of Stewardship Health to repay the Loans outstanding under the ABL/FILO Facility in full and partially pay down the FILO DIP Facility, (ii) have made over $89 million in additional mandatory prepayments of the FILO DIP Facility, and (iii) have made over $41 million in mandatory prepayments of the Bridge Facility.

In addition, upon the effective date of the Global Settlement, which occurred no later than November 20, 2024 (*see* Docket No. 3265), any and all MPT Claims, including under the MPT DIP Facility, Prepetition Bridge Credit Agreement, MPT Facility, MPT Stewardship Note, Master Lease I, Master Lease II, and the Investor Note (each as defined in the Global Settlement Order) have been released and waived with prejudice. The Debtors' remaining funded debt as of May 27, 2025 is as follows:

| Current Indebtedness | Amount Outstanding | All-in Interest Rate[22] | Maturity Date |
|---|---|---|---|
| ***Secured Debt*** | | | |
| FILO DIP Facility | $206,197,079[23] | SOFR + 10.00% | 7/11/2025 |
| Bridge Facility (excluding MOIC Amount) | | SOFR + 10.75% | 6/30/2024 |
|    a. Remaining Original Principal Amount | $30,394,856 | | |

---

[21] Capitalized terms used but not defined in this Section II.E shall have the meanings ascribed to such terms in the FILO DIP Order.

[22] Subject to an additional 2% default interest rate if an Event of Default (as defined under each facility) has occurred and is continuing. Reflects $12.75 reduction on account of the Excess Properties received by the FILO Lenders on account of the EPDA Settlement, as described in Section IV.K.3 hereto.

[23] Excludes any remaining exit premium.

| Current Indebtedness | Amount Outstanding | All-in Interest Rate[22] | Maturity Date |
|---|---|---|---|
| b.  Capitalized Interest | $11,959,199 | | |
| **Total Secured Debt** | **$248,551,134** | | |

Subject to the Carve-Out (as defined in the FILO DIP Order),[24] the FILO DIP Facility is secured by a perfected security interest in and senior lien upon all of the Debtors' tangible and intangible prepetition and postpetition property, with certain carve-outs, including avoidance actions. The FILO DIP Facility is also secured by a perfected security interest in and lien upon the FILO Bridge Exclusive Collateral (as defined in the FILO DIP Order) that is junior to the lien on the FILO Bridge Exclusive Collateral that secures the Bridge Facility. The Debtors' obligations to the Prepetition Bridge Lenders under the Bridge Facility is secured by substantially all of the assets of the Debtors, subject to the terms of the FILO DIP Order.

1.  *ABL/FILO Facility[25]*

On August 4, 2023, SHC (as borrower) and certain other Debtor affiliates of SHC from time to time party thereto (together with SHC, collectively, the "**Prepetition ABL/FILO Loan Parties**"), entered into that certain Credit Agreement (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition ABL/FILO Credit Agreement**") with Sound Point Agency LLC, as administrative agent (the "**Prepetition ABL/FILO Administrative Agent**"), Chamberlain Commercial Funding (Cayman) L.P., as collateral agent (the "**Prepetition Collateral Agent**"), Brigade Agency Services LLC, as FILO agent (the "**Prepetition FILO Agent**" and, together with the Prepetition ABL/FILO Administrative Agent and the Prepetition Collateral Agent, the "**Prepetition ABL/FILO Agents**"), and the lenders parties thereto from time to time (the "**Prepetition ABL/FILO Lenders**" and, together with the Prepetition ABL/FILO Agents and any other Secured Parties (as defined in the Prepetition ABL/FILO Credit Agreement), the "**Prepetition ABL/FILO Secured Parties**"), providing for (a) a senior secured revolving credit facility in an original aggregate principal amount of $300 million (the "**ABL Facility**" and the lenders thereunder, the "**ABL Lenders**") and (b) a senior secured term loan facility in an aggregate original principal amount of $200 million (the "**FILO Facility**" and the lenders thereunder, the "**FILO Lenders**" and the FILO Facility, together with the ABL Facility, the "**ABL/FILO Facility**"). Pursuant to the Prepetition ABL/FILO Credit Agreement, the ABL Facility had payment priority over the FILO Facility. SHC's obligations under the ABL/FILO Facility were guaranteed by the other Prepetition ABL/FILO Loan Parties.

On October 16, 2023, SHC borrowed an additional $30 million of term loans under the FILO Facility pursuant to the second amendment to the Prepetition ABL/FILO Credit Agreement. On November 17, 2023, SHC borrowed a further $70 million of term loans under the FILO Facility pursuant to the third amendment to the Prepetition ABL/FILO Credit Agreement. As of the Petition Date, including

---

[24]  Specifically, the Debtors' remaining funded secured debt is subject and subordinate to payment of the Carve-Out.

[25]  The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

WEIL:\100544464\2\76000.0004

all outstanding and accrued interest, approximately $607.8 million of obligations under the ABL/FILO Facility were outstanding.

As discussed in Section IV.F.3, upon entry of the FILO DIP Order, $150 million of the Debtors' obligations under the FILO Facility were deemed "rolled up" and converted into an equivalent principal amount of DIP Roll-Up Loans under the FILO DIP Facility. The remainder of the outstanding loans under the ABL/FILO Facility were repaid in full in October 2024 using proceeds from the sales of the Space Coast Hospitals (as defined herein) and Stewardship Health.

2. *Prepetition Bridge Facility*

On February 21, 2024, Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc., Stewardship Health Medical Group, Inc., and Stewardship Services Inc., collectively, as borrower (the "**Prepetition Bridge Borrower**"), together with certain Debtor affiliates of the Prepetition Bridge Borrower (together with the Prepetition Bridge Borrower, collectively, the "**Prepetition Bridge Loan Parties**") entered into that certain Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Prepetition Bridge Credit Agreement**") with certain of the FILO Lenders and the Prepetition MPT Secured Party (as defined below) (collectively, the "**Prepetition Bridge Lenders**") and Brigade Agency Services LLC, as administrative agent and collateral agent (in such capacities, the "**Prepetition Bridge Agent**"). The Prepetition Bridge Credit Agreement provided for a $150 million delayed draw term facility (the "**Prepetition Bridge Facility**" or the "**Bridge Facility**") with commitments to be funded equally between the participating FILO Lenders and the Prepetition MPT Secured Party. Under the Bridge Facility, the Prepetition Bridge Loan Parties contracted to pay an amount to the Prepetition Bridge Lenders equal to (a) 0.85x the aggregate amount of commitments (excluding, for the avoidance of doubt, interest that is paid in kind, capitalized and added to the principal amount of the Bridge Facility pursuant to the terms of the Prepetition Bridge Credit Agreement) under the Bridge Facility on February 21, 2024 (which was $150 million) less (b) the amount of cash interest previously received by the Prepetition Bridge Lenders on or prior to such date of payment (the "**MOIC Amount**") upon the occurrence of (i) the maturity date, the payment in full of the obligations under the Bridge Facility, an event of default under the Bridge Facility and/or the acceleration of loans under the Bridge Facility and (ii) subject to the application of proceeds provisions in the Bridge Facility, any other repayment or prepayment of loans under the Bridge.

As discussed in Section IV.K.2.c hereto, upon the effective date of the Global Settlement, any and all of the claims that MPT had in its capacity as a Prepetition Bridge Lender under the Prepetition Bridge Credit Agreement were deemed released and waived with prejudice.

Under the FILO DIP Order, the Debtors did not stipulate to the allowance of the claims and liens under the Bridge Facility, nor did the Debtors waive the right to surcharge the collateral under the Bridge Facility.

From the outset of the Chapter 11 Cases, certain parties, including the Creditors' Committee, have raised concerns with the allowance and treatment of any claim for the MOIC Amount under the Bridge Facility. The terms of the Plan and the FILO Settlement Order represent a settlement among the FILO Parties, Creditors' Committee, and the Debtors pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of any disputes with respect to, among other things, the treatment of the MOIC Amount.

28

3. *MPT Loans and Obligations*

On June 30, 2020, SHC executed that certain Second Amended and Restated Promissory Note with MPT TRS Lender-Steward, LLC (the "**Prepetition MPT Secured Party**"), providing for a term loan in the original amount of $85.6 million (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended and restated pursuant to that certain *Amended and Restated Promissory Note*, dated January 22, 2024, the "**MPT Facility**"). From April 2022 through January 2024, SHC and the MPT Secured Party executed various amendments pursuant to which MPT provided additional loans to SHC under such note. As of the Petition Date, approximately $218.4 million of obligations, including all outstanding and accrued interest, were outstanding with respect to the MPT Facility.

On January 2, 2024, Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., and Steward Medicaid Care Networks, Inc. (together with other subsidiaries of SHC party thereto as supplemented from time to time, collectively, the "**Prepetition Stewardship Borrowers**") executed that certain Promissory Note with the Prepetition MPT Secured Party (the "**Original Prepetition Stewardship Note**") providing for an emergency term loan in the original principal amount of $60 million (as may be amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including as amended and restated pursuant to that Amended and Restated Promissory Note, dated as of April 25, 2024, the "**MPT Stewardship Note**"). The obligations of the Prepetition Stewardship Borrowers were guaranteed by SHC and certain Debtor subsidiaries of SHC. On February 2, 2024, the Prepetition Stewardship Borrowers and the Prepetition MPT Secured Party executed the First Amendment to Promissory Note (Tranche 2) to provide an additional $20 million emergency loan under the MPT Stewardship Note (the "**Interim Bridge Funding**"). On February 21, 2024, SHC and the Prepetition Bridge Borrower used the proceeds of the Bridge Facility to refinance the Interim Bridge Funding. As of the Petition Date, approximately $82.5 million of obligations were outstanding with respect to the MPT Stewardship Note. As described in Section IV.F.1 below, upon entry of the MPT DIP Order (as defined herein), all of the of the Debtors' obligations under the MPT Stewardship Note were deemed "rolled up" and converted into an equivalent principal amount of DIP Roll-Up Loans (as defined in the MPT DIP Order) under the MPT DIP Facility.

As of the Petition Date, Debtor SHC Holdings was also guarantor under that certain Secured Promissory Note, dated as of February 3, 2022 (as amended, restated, amended and restated, supplemented, refinanced or otherwise modified from time to time, the "**Investor Note**"), made by Steward Health Care Investors LLC ("**Steward Investors**") in favor of Cayman TRS Holding, an affiliate of MPT (the "**MPT Noteholder**") in an original principal amount of $363.3 million. As of the Petition Date, including all outstanding and accrued interest, approximately $397.9 million of obligations were outstanding under the Investor Note. Steward Investors owned an approximately 90.1% interest in SHC Holdings and such equity interest in SHC Holdings was pledged by Steward Investors to the MPT Noteholder under the Investor Note. Prior to the Petition Date, MPT Noteholder agreed to a forbearance in favor of Steward Investors.

As discussed herein, pursuant to the terms of the Global Settlement Order, any and all MPT Claims, including claims arising under the Prepetition Bridge Credit Agreement, Investor Note, MPT Facility, and MPT Stewardship Note, have been deemed to be released and waived with prejudice.

WEIL:\100544464\2\76000.0004

## III. EVENTS PRECEDING THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    INDUSTRY AND OPERATIONAL CHALLENGES

As mentioned in Section II.A hereto, Steward expanded its operations by 30 hospitals from 2017 to 2021.  This accelerated growth strategy presented various challenges.  For example, although the facilities Steward acquired in Utah in 2017 were high performing and profitable, the Company was confronted with a highly competitive market that was largely controlled by an existing vertically-integrated hospital operator that controlled a majority of market share.  The Utah hospitals were ultimately sold in May 2023 to Catholic Health Initiatives of Colorado, CommonSpirit Health, and Centura Health Corporation (collectively, "**CommonSpirit**").  As another example, the Company experienced material unforeseen costs associated with the acquisition of their South Florida hospitals, including technology integration issues, as discussed further below.

The Company also faced significant external challenges that ultimately led Steward to suffer financial difficulties and commence these chapter 11 cases.  First, like many other hospital operators, the COVID-19 pandemic (i) caused a sharp decline in elective patient visits while simultaneously accelerating the switch of services from higher-margin inpatient settings to lower-margin outpatient settings, which resulted in a significant and ongoing decline in net patient revenue, and (ii) required a significant increase in fixed costs, driving significant reductions in earnings and liquidity.[26]  Second, the healthcare labor market substantially tightened in the wake of the COVID-19 pandemic, leading to materially higher labor costs for the Company while inflationary pressures also strained the Company's cash position.  Third, certain operational challenges in revenue cycle management and lagging, industry-wide reimbursement rates resulted in lower net patient revenues and thus lower collections.  In particular, Steward suffered significant liquidity issues due to the failure of commercial payors to reimburse the Company for services rendered to patients.

### B.    PREPETITION INITIATIVES

In response to the challenges described above, the Board and the Company's management team proactively sought to undertake cost reduction initiatives and asset sales, including, but not limited to, the sale of its Medicare value-business to CareMax in November 2022.  However, recurring liquidity shortfalls meant the Company could not meet its trade obligations for goods provided and services rendered in the ordinary course.  This situation grew dire in 2023, when vendors and service providers no longer continued to service the Company, forcing the Company to enter into payment plans with vendors or find alternative suppliers which, in many instances, impacted costs and efficiencies.[27]  As a direct result, the Company engaged AlixPartners LLP ("**AlixPartners**") in October 2023.

---

[26]    Nationally, from 2019 to 2023, Steward's cost of supplies increased by 22% while the cost of medications increased by 15% over the same time period.

[27]    In August 2023, the Company entered into the Prepetition ABL/FILO Credit Agreement; however, the ABL/FILO Facility only provided the Company with $500 million of proceeds, most of which was used to pay down the Company's then-existing asset based lending credit facility.  The additional $100 million of proceeds that the Company received under the FILO Facility between October and November 2023 was used immediately to pay vendors, leaving the Company with no incremental liquidity under the ABL/FILO Facility.  As a result, the Company was left without any incremental revolver capacity despite having just borrowed $600 million in the aggregate under the ABL/FILO Facility.

In November 2023, the Company retained Lazard Frères & Co. LLC ("**Lazard**") to assist the Company and explore strategic and financing alternatives. As Steward's operations became challenged by vendors declining to provide goods and services or otherwise tightening terms, the Company's borrowing base began to decline, and in December 2023, the Company defaulted under the ABL/FILO Facility for failure to make mandatory repayments and comply with certain financial reporting obligations. In response, the Board established the Transformation Committee to oversee the Company's strategic transaction and restructuring efforts in December 2023.

In late-2023, the Company also engaged Leerink Partners LLC ("**Leerink**") to initiate outreach to third parties to solicit interested investors in Stewardship Health. Additionally, in January 2024, the Company retained Weil, Gotshal & Manges LLP ("**Weil**") as restructuring counsel and Cain Brothers, a division of KeyBanc Capital Markets Inc. ("**Cain**") to conduct a comprehensive marketing process for the sale of the Company's hospitals in various markets. The Company expanded the scope of Leerink's retention in February 2024 to market its hospitals in Northern Massachusetts, and from March 2024 to April 2024, expanded the scope of Cain and Leerink's hospital marketing efforts to encompass the remainder of Steward's hospital operations.

To fund operating costs throughout the sale process, the Debtors, through Lazard, secured emergency financing from MPT (in the form of the $60 million Original Prepetition Stewardship Note in January 2024 and $6 million in April 2024) and the Prepetition Bridge Lenders (in the form of the $150 million Bridge Facility in February 2024). Each financing was coupled with forbearance agreements from MPT and the Prepetition ABL/FILO Lenders, as well as other concessions from the MPT with respect to the Master Leases. This financing, along with certain accommodations from MPT, provided the Debtors with a runway to negotiate with a potential acquirer of Stewardship Health and negotiate the terms of the proposed debtor-in-possession financing. However, by May 2024, MPT and the Prepetition ABL/FILO Lenders were unwilling to extend further capital to the Company out-of-court, the Company's only option was to seek the protections of chapter 11 and advance its marketing process under the protection of the Bankruptcy Court.

Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (Docket No. 38).

## IV. OVERVIEW OF THE CHAPTER 11 CASES

### A. OVERVIEW OF EVENTS OF CHAPTER 11 CASES

The Debtors commenced these chapter 11 cases to secure debtor in possession financing needed to complete the prepetition marketing process of their assets and operations. Following the Petition Date, the Debtors remained focused on their goal to safely transition their 31 hospitals and physician network group to new operators in a manner that maximized value for stakeholders, avoid hospital closures, and ensure continuity of patient care.

The Debtors' hospital sale process was subject to various disputes regarding the allocation of sale proceeds to the owners of the underlying real property.[28] Specifically, MPT challenged the allocation of

---

[28] The Debtors were leased the Master Lease II properties from a joint venture (the "**MPT-Macquarie JV**") owned by MPT and Macquarie Group ("**Macquarie**"). Prior to the Petition Date, ACREFI CS U, LLC ("**Apollo**") made

sale proceeds with respect to the Master Lease I Hospitals, and MPT, Macquarie, and Apollo challenged the allocation of sale proceeds with respect to the Master Lease II Hospitals, and the Creditors' Committee asserted challenges with respect to MPT's alleged claims and the constitution of its alleged property rights. Potential delays in the sale process resulting from these disputes posed a fundamental threat in light of the Debtors' need to sell hospitals being operated at a loss expeditiously and triage a growing liquidity crisis. As a result, the Debtors, the Creditors' Committee, MPT, and various parties entered into mediation, and the Debtors filed motions to reject both Master Lease I and Master Lease II, and filed an adversary proceeding against MPT. Through the parties' efforts in mediation and the backdrop of potential litigation, the Debtors achieved global settlements resolving the various Master Lease I and Master Lease II disputes, allowing for the transfer of their hospitals.

Through these efforts, the Debtors consummated the sale or transfer of twenty-eight (28) of their hospitals, including transferring sixteen (16) of their hospitals to operators designated by MPT in accordance with the terms of the Global Settlement Order, and assumed and assigned approximately 9,900 contracts to purchasers and operators. Additional details regarding the sale process and the Global Settlement mediation efforts are set forth in Section IV.K.2.c herein.

The Debtors also entered chapter 11 with a prepetition non-binding indication of interest ("IOI") in-hand from Collaborative Care Holdings, LLC ("**Collaborative Care**"), an affiliate of United Health Group (together with its affiliates, "**United**") for the purchase of Stewardship Health for $850 million. However, due to, among other things, antitrust regulatory scrutiny of the transaction, Collaborative Care ultimately withdrew the IOI and did not submit a binding bid. The Debtors continued to solicit interest for Stewardship Health from prospective buyers, and ultimately sold Stewardship Health to Brady Health Buyer, LLC, an affiliate of Kinderhook Industries, LLC, for a headline purchase price of $245 million (subject to certain purchase price adjustments).

As of the date hereof, the Debtors' remaining assets include significant claims and causes of action (as further described in Section IV.M hereto), as well as a limited number properties, clinics, interests in joint ventures, and other miscellaneous assets that the Debtors are actively working to monetize. The proceeds of these remaining assets will be used to pay creditors in accordance with the provisions of the Plan. The Debtors also continue to collect accounts receivables from the operation of their hospitals and Stewardship Health arising prior to the closing dates of the applicable transactions, and estimate that up to approximately $128 million in pre-closing accounts receivable remain outstanding and unpaid.

Additional details on the Debtors' remaining assets can be found in Section IV.M herein. A summary of the outstanding accounts receivables and related litigation assets is set forth below in Section IV.M.2.

B.     **COMMENCEMENT OF CHAPTER 11 CASES**

Upon the commencement of these chapter 11 cases, the Debtors obtained various relief from the Bankruptcy Court to maintain their operations in the ordinary course, including approval of debtor-in-possession financing to provide the Debtors with the needed liquidity to continue its prepetition strategic market solicitation strategy to seek out buyers and investors to continue to operate Steward's hospitals and

---

a mortgage loan to the MPT-Macquarie JV secured by, among other collateral, the real property underlying the Master Lease II Hospitals.

Stewardship Health. The Debtors continue managing certain remaining assets and operate as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### C. FIRST/SECOND DAY PLEADINGS

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, the Debtors filed an application to retain a claims and noticing agent (the "**Claims Agent Application**") and several motions (the "**First Day Motions**") designed to allow the Debtors to meet necessary obligations, fulfill their duties as debtors in possession, stabilize operations, ensure continued patient care, and enable the Debtors to transition into, and operate efficiently in, chapter 11 with minimal disruption. Following a hearing on May 7, 2024, the Bankruptcy Court granted all of the relief requested in the First Day Motions on a final or an interim basis, as applicable, including authorizing the Debtors to, among other things:

- pay prepetition employee obligations and continued employee benefits programs (Docket No. 86);

- file a consolidated creditor matrix and consolidated list of thirty (30) largest unsecured creditors, and redact certain personal identification information (Docket No. 90);

- establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service (Docket No. 91);

- pay prepetition refund obligations and honor refund programs (Docket No. 112);

- pay certain prepetition taxes, fees, and assessments (Docket No. 114);

- continue the use of the Debtors' cash management system, bank accounts, and checks (Docket No. 115);

- continue their insurance policies, surety bonds, and letters of credit and satisfy obligations related thereto (Docket No. 116); and

- pay prepetition claims of certain critical vendors and service providers (Docket No. 137).

On June 3, 2024, the Bankruptcy Court entered orders granting certain first-day relief on a final basis, including authority to pay certain vendor claims (Docket No. 612) and continue refunds programs (Docket No. 624). Also on June 3, 2024, the Bankruptcy Court entered the second interim order authorizing the Debtors to continue their insurance policies, to provide the Creditors' Committee and Debtors with additional time to conduct diligence regarding the Debtors' cash management system and TRACO (as defined and described in further detail in Section IV.E below).

On August 23, 2024, the Bankruptcy Court entered an order on a final basis approving the Debtors' continued use of cash management system (Docket No. 2168) and continued use of insurance policies, surety bonds, and letters of credit (Docket No. 2166).

The First Day Motions, Claims Agent Application, and all orders for relief granted in the chapter 11 cases can be viewed free of charge at https://restructuring.ra.kroll.com/Steward.

## D. OTHER PROCEDURAL AND ADMINISTRATIVE MOTIONS

The Debtors filed various other motions to further facilitate the smooth and efficient administration of the chapter 11 cases and reduce the administrative burdens associated therewith, including:

- SOFAs and Schedules Extension Motion. The Debtors filed a motion and obtained authority from the Bankruptcy Court to extend the deadline to file (i) the statement of financial affairs ("SOFAs") and schedule of assets and liabilities ("Schedules") for each of the 167 Debtors to July 9, 2024, and (ii) the 2015.3 Reports for 21 non-Debtor entities until August 7, 2024 (Docket Nos. 11, 92). The Debtors filed the SOFAs and Schedules on July 9, 2024 (Docket Nos. 1192-1526), and subsequently filed amendments to certain Schedules and SOFAs (Docket Nos. 1583, 1584, and 1637).

- Ordinary Course Professionals Motion. The Debtors filed a motion and obtained authority to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course of their businesses (Docket Nos. 225, 784).

- Retention Applications and Interim Compensation. The Debtors filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the chapter 11 cases. These professionals include: (i) Weil, as restructuring counsel to the Debtors (Docket No. 209), (ii) AlixPartners, as financial advisor, (Docket No. 210) (iii) Lazard, as restructuring investment banker (Docket No. 211), (iv) Leerink, as healthcare investment banker (Docket No. 212), (v) Cain, as hospital investment banker (Docket No. 213), (vi) McDermott Will & Emery LLP ("McDermott"), as special counsel (Docket No. 214), (vii) PwC US Business Advisory LLP ("PwC"), as a business and accounting advisory services provider to the Debtors (Docket No. 688), (viii) BDO USA, P.C. ("BDO"), as tax accountant (Docket No. 1088), (ix) Latham & Watkins, LLP ("Latham") as co-counsel (Docket No. 3617), (x) King & Spalding LLP ("K&S") as special litigation counsel for matters related to accounts receivables litigation (Docket No. 3959) and as special litigation counsel to pursue the Debtors' BCBS Claims (as defined herein) (Docket No. 4366), (xi) Togut, Segal & Segal LLP ("Togut") as special litigation counsel for matters related to preference litigation (Docket No. 3671), and (xii) Kobre & Kim LLP ("Kobre & Kim") as special litigation counsel for certain investigation claims (Docket No. 4445). The Bankruptcy Court has entered orders authorizing the retention of these professionals (Docket Nos. 673 (Weil), 675 (McDermott), 782 (AlixPartners), 785 (Lazard), 786 (Leerink), 787 (Cain), 1566 (PwC), 1822 (BDO), 4007 (Latham), 3886 (Togut), 4373 (K&S – commercial payor litigation), 4710 (K&S – BCBS Claims litigation), and 4818 (Kobre & Kim). In connection with such retentions, the Debtors filed a motion to establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals, which the Bankruptcy Court granted on June 12, 2024 (Docket Nos. 224, 783) (the "Interim Compensation Order").

- De Minimis Asset Disposition Procedures Motion. The Debtors filed a motion and obtained authority to establish procedures for the disposition of de minimis assets (Docket Nos. 709, 1665) (the "De Minimis Order"). The Debtors have filed two quarterly reports of Non-Noticed De

34

Minimis Asset Sales (as defined in the De Minimis Order) consummated in accordance with the terms of the De Minimis Order (Docket Nos. 3313 and 4082).

- Rejection Procedures Motion. On June 10, 2024, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving Procedures for Rejection of Executory Contracts and Unexpired Leases of Nonresidential Real Property; (II) Amendments to Certain Unexpired Leases of Nonresidential Real Property; (III) Abandonment of Property in Connection Therewith; and (IV) Granting Related Relief* (Docket No. 753) seeking authority to establish procedures for the rejection of executory contracts and unexpired leases in addition to the abandonment of property in connection therewith (the "**Rejection Procedures**").  As of the Petition Date, the Debtors were party to approximately 270 unexpired leases and approximately 57,000 executory contracts in total.  The Debtors proposed the Rejection Procedures in an effort to streamline the contract and lease rejection process, consistent with applicable law, minimize costs to the Debtors' estates, reduce the burden on the Bankruptcy Court, and provide counterparties with adequate notice and an opportunity to object to any proposed rejections.  An order approving the Rejection Procedures was entered by the Bankruptcy Court on July 10, 2024 (Docket No. 1535).  As of the date hereof, the Debtors have rejected a total of 209 unexpired leases and approximately 26,000 executory contracts pursuant to the Rejection Procedures.[29]

- Facility Closure Procedures. On July 26, 2024, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Approving (A) Funding from the Commonwealth of Massachusetts for the Planned Transition and Sale of Massachusetts Hospitals, (B) the Closure of Carney Hospital and Nashoba Valley Medical Center, and (C) Procedures Related to Facility Closures; and (II) Granting Related Relief* (Docket No. 1711) (the "**Closure Procedures Motion**") which sought, among other things, approval of procedures to provide for a streamlined process for Court approval of facility closures, including rejecting executory contracts and abandoning certain assets in connection therewith.  On August 22, 2024, the Bankruptcy Court entered the *Order (I) Approving Procedures Related to Facility Closures on a Final Basis and (II) Granting Related Relief* (Docket No. 2146) (the "**Closure Procedures Order**").  The Closure Procedures Order approved the facility closure procedures and the form of facility closure notice (contained therein) on a final basis.

### E.  CAPTIVE INSURANCE PROGRAM

As of the Petition Date, the Debtors obtained professional liability coverage through a wholly-owned non-Debtor subsidiary, TRACO International Group S. de R.L. ("**TRACO**").[30]  TRACO is a captive insurance company incorporated and domiciled in Panama.  In addition to providing professional liability to the Debtors, TRACO provided comprehensive general liability coverage, excess liability coverage, and

---

[29]  As of the date hereof, the Debtors have filed fifty one (51) different notices of rejection of executory contracts and unexpired leases pursuant to the Rejection Procedures.  *See* Docket Nos. 2093, 2239, 2265, 2733, 2769, 3037, 3038, 3039, 3077, 3136, 3226, 3297, 3316, 3446, 3447, 3480, 3500, 3501, 3502, 3503, 3513, 3515, 3516, 3517, 3548, 3590, 3595, 3605, 3723, 3912, 4000, 4001, 4002, 4004, 4005, 4006, 4050, 4051, 4142, 4189, 4190, 4208, 4209, 4409, 4410, 4411, 4412, 4432, 4756, and 4757.

[30]  The Debtors did not renew their professional liability policy for the 2025 policy year following the sale of substantially all of their hospital operations.

certain workers' compensation and employer liability coverages to the Debtors (the "**Captive Insurance Program**"). Certain of the excess liability policies issued by TRACO are subject to reinsurance arrangements.

TRACO also insured certain of the Debtors' employed and affiliated physicians for professional liability coverage.[31] As of the Petition Date, TRACO provided professional liability coverage to approximately 1,400 medical practitioners, including approximately 1,200 physicians who were employed by the Debtors and approximately 200 physicians who were in private practice and were affiliated with the Debtors. TRACO did not provide insurance coverage to any entities or individuals other than the Debtors, non-Debtor affiliates, employed physicians, and affiliated physicians and their employers.

TRACO historically contracted directly with service providers such as third-party administrators, managers, legal advisors, and various consultants (including actuarial consultants, tax advisors, investment managers, compliance officers, and auditors) to manage and administer the various coverages under the Captive Insurance Program. TRACO, through its third-party administrators, also retained defense counsel to defend against claims covered by its policies, including professional liability claims against the Debtors and physicians. The costs of these services were paid directly by SHC on behalf of TRACO and such payments resulted in intercompany payables being owed by TRACO to SHC. In addition, any claim payments covered by the TRACO policies, including payments on account of any judgments and settlements, were paid directly by SHC, and such payments also resulted in intercompany payables owed by TRACO to SHC.

Under the Captive Insurance Program, the Debtors incurred insurance premiums on account of the coverages provided by TRACO. However, the Debtors typically did not pay the insurance premiums to TRACO in cash. Instead, the premiums resulted in intercompany claims between SHC and TRACO.

On August 13, 2024, the Debtors filed the *Supplement to, and Certification of Counsel Regarding, Final Insurance Order and Final Cash Management Order, and Supplement to Statement Provided Under Federal Rule of Bankruptcy Procedure 2015.3* (Docket No. 1956) (the "**Insurance Supplement**"). In the Insurance Supplement, the Debtors disclosed that TRACO had a limited amount of cash on its balance sheet (approximately $3.5 million as of the date of the filing) and that the vast majority of TRACO's other assets were intercompany receivables owed by the Debtors or affiliates of the Debtors.

Since the Petition Date, the Debtors have taken measures to ensure there is funding set aside to cover professional liability claims that may be asserted against physicians covered by the Captive Insurance Program arising out of care rendered after the Petition Date and covered by the TRACO policies (collectively, "**Postpetition Physician Claims**"). With the consent of the Debtors' various stakeholder groups (including the ABL Lenders, the FILO Parties, MPT, and the Creditors' Committee), the Debtors sought and obtained authority under the FILO DIP Order to establish Physician Insurance Account to hold funds that will be used exclusively to defend against, and resolve, such Postpetition Physician Claims. The Debtors funded the Physician Insurance Account with $1.25 million per month from the Petition Date through October 2024, when the Debtors had sold or transitioned nearly all of their hospitals. As of the date hereof, there is $7.25 million on deposit in the Physician Insurance Account. Under the Plan, the Plan Trustee will assume responsibility for administering the Postpetition Physician Claims. Upon reconciliation and payment of all Postpetition Physician Claims, any remaining amounts in the Physician

---

[31] The Debtors and physicians were covered under separate policies.

36

Insurance Account will be transferred to the Litigation Trust. *See* Section I.C herein for additional details regarding treatment of the Physician Insurance Account .

As discussed in Section IV.N.3 herein, on December 2, 2024, TRACO filed a motion seeking an order from the Bankruptcy Court compelling the Debtors to pay all premiums due and owing under the Debtors' 2024 professional liability policies in cash (in addition to other relief, including payment of certain prepetition settlement and defense costs covered by TRACO's policies). On January 20, 2025, the Debtors filed the *Debtors' Objection to TRACO's Motion to Compel* (Docket No. 3762), asking the Bankruptcy Court to disallow TRACO's administrative expense claim and deny the remainder of the relief requested in the motion.

As further discussed in Section IV.N.3 herein, TRACO also initiated an adversary proceeding against the Debtors, in which TRACO seeks an order from the Bankruptcy Court, among other things, compelling the Debtors to turn over a portion of the proceeds from the sales of the Debtors' former Odessa and Davis (each as defined herein) hospitals. On February 21, 2025, TRACO filed the TRACO First Amended Complaint (as defined herein) which additionally seeks an order from the Bankruptcy Court to compel the Debtors to turn over certain interest payments made by Prima Care, P.C. pursuant to a note and security agreement between Prima Care and TRACO. On March 21, 2025, the Debtors filed their answer to the TRACO First Amended Complaint, denying all allegations in therein. Since May 8, 2025, the Debtors, the Creditors' Committee, the FILO Parties and TRACO have been in mediation with respect to these disputes.

### F.    DIP FINANCING

After extensive prepetition marketing and negotiations with the Debtors' existing prepetition secured lenders and potential third-party lenders to obtain postpetition debtor-in-possession financing, the Debtors and their advisors determined that the proposal received from MPT TRS Lender-Steward, LLC, an affiliate of MPT (the "**MPT DIP Lender**") provided terms that were the most favorable available to the Debtors at the time, and entered into chapter 11 with a commitment from the MPT DIP Lender for $75 million in new-money DIP financing, with the ability to fund an additional $225 million, subject to the MPT DIP Lender's discretion.

Given the uncertainty of receiving any additional funds from the MPT DIP Lender under the MPT DIP Facility (as defined herein), immediately following the Petition Date, the Debtors, through Lazard and overseen by the Debtors' Transformation Committee, relaunched a market solicitation process seeking commitments for additional financing that would provide a comprehensive funding solution for their chapter 11 cases. Ultimately, after a robust and competitive market solicitation, the Debtors received and obtained approval of a commitment from the FILO Parties to provide $225 million in new-money postpetition financing.

1.    *MPT DIP Facility*

Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying The Automatic Stay; and (IV) Granting Related Relief* (Docket No. 46), filed on May 6, 2024, the Debtors requested authority to, among other things, obtain junior lien postpetition financing and approval of their entry into a multiple draw junior lien debtor-in-possession

credit facility (the "**MPT DIP Facility**"). The MPT DIP Facility was a multiple draw term loan consisting of (i) $300 million of new money, of which $75 million was made available in the first thirty (30) days of the chapter 11 cases (and the remainder subject to satisfaction of certain conditions acceptable to the MPT DIP Lender), and (ii) subject to entry of a final order, a roll-up of all of the obligations under the MPT Prepetition Stewardship Note.

On June 3, 2024, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying The Automatic Stay; and (IV) Granting Related Relief* (Docket No. 625) (the "**MPT DIP Order**"). No draws beyond the initial $75 million draw were made available to the Debtors. As discussed herein, all Claims related to the MPT DIP Facility have been waived by the MPT DIP Lender in accordance with the terms of the Global Settlement.

2. *DIP Commitment Fee*

Following interim approval of the MPT DIP Facility, the Debtors, led by Lazard, commenced a broad marketing process to solicit additional DIP financing from both third parties and the Debtors' existing lenders. Through this process, several third-party lenders expressed significant interest in providing the Debtors with additional postpetition financing on a priming basis, contingent on receiving compensation for their efforts and expenses extended in committing to financing that would prime the Debtors' prepetition secured lenders and that would likely be challenged by such lenders.

In light of these circumstances, the Debtors filed and obtained Court approval of the *Emergency Motion of Debtors for Entry of Order (I) Authorizing Debtors to Incur and Pay Commitment Fee and Expense Reimbursement to Potential Lenders in Connection with Postpetition Financing and (II) Granting Related Relief* (Docket Nos. 551, 635) (the "**DIP Commitment Fee Order**") on June 3, 2024. The Debtors utilized the relief granted by the Bankruptcy Court, including the ability to grant a commitment fee of up to 3% and up to $750,000 in the aggregate in reasonable and documented out-of-pocket fees and expenses, to advance negotiations with a number of third-party lenders and create competitive tensions with the Debtors' existing lenders. As a result, within only a few days of entry of the DIP Commitment Fee Order, the Debtors received and were evaluating four (4) DIP financing proposals, including a joint proposal by the ABL Lenders and MPT, a proposal led by the FILO Lenders, and two proposals from third-party lenders. In accordance with the DIP Commitment Fee Order, the Debtors paid a potential third-party lender a 3% commitment fee and a total of $343,296 in expense reimbursement in the aggregate.

3. *FILO DIP Facility[32]*

Ultimately, after evaluating all DIP financing proposals received as a result of the competitive process borne out of the relief granted in the DIP Commitment Fee Order, the Debtors and their advisors determined that a proposal from the Debtors' prepetition FILO Lenders (the "**FILO DIP Financing**") represented the best financing proposal available at the time. Accordingly, on June 11, 2024, the Debtors filed the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition*

---

[32] Capitalized terms used but not defined in this Section shall have the meaning ascribed to them in the FILO DIP Order.

*Secured Parties; (III) Modifying The Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (Docket No. 765) (the "**FILO DIP Motion**").

The FILO DIP Financing is a multiple draw term loan credit facility (the "**FILO DIP Facility**") consisting of (i) $225 million principal of new money loans and (ii) a roll-up of $150 million principal of obligations under the Debtors' prepetition FILO Facility. The new money loans accrue interest a rate equal to the Adjusted Term SOFR (as defined in the ABL/FILO Credit Agreement) plus 10% per annum, payable monthly in cash. The rolled-up loans accrue interest at a rate equal to the Adjusted Term SOFR plus 10.75% per annum, payable in cash. The Bankruptcy Court approved the FILO DIP Motion on an interim basis (Docket No. 839) on June 14, 2024, and on a final basis (Docket No. 1538) on July 10, 2024. The FILO DIP Facility was initially scheduled to mature on December 31, 2024.

On August 7, 2024, the Debtors and the FILO Parties entered into that certain *Limited Waiver No. 1 to Debtor-in-Possession Credit Agreement*, which, among other things, waived certain conditions to funding of term loans under the FILO DIP Credit Agreement.

On September 2, 2024, the FILO Parties sent a letter to the Debtors reserving their rights regarding certain alleged events of default that had occurred under the FILO DIP Credit Agreement and FILO DIP Order, including with respect to the Debtors' variance reporting requirements, the healthcare institute license for the Behavioral Facility (as defined herein), and the sales of the Massachusetts Hospitals (as defined herein) (the "**Reservation of Rights Letter**"). Pursuant to the Global Settlement Order, the FILO Parties waived through October 31, 2024 (i) the asserted events of default enumerated in the Reservation of Rights Letter and (ii) any other defaults or events of default under the FILO DIP Credit Agreement and the FILO DIP Order relating to, or arising out of, a Budget Event (as defined in the FILO DIP Credit Agreement).

On December 31, 2024, the Debtors filed the *Notice of Filing of Amendment to FILO DIP Credit Agreement* (Docket No. 3594), which attached that certain *Limited Waiver No. 2 and Amendment to Debtor-in-Possession Credit Agreement* as <u>Exhibit A</u> thereto (the "**DIP Amendment**"). The DIP Amendment, among other things, (i) extended the maturity date under the FILO DIP Credit Agreement from December 31, 2024 to January 31, 2025, (ii) waived certain alleged defaults and events of default, as well as compliance with certain covenants, under the FILO DIP Credit Agreement, and (iii) formalized an agreement on a new approved budget through the extended maturity date. On January 6, 2025, the Debtors filed a motion seeking authority from the Bankruptcy Court to grant the FILO Parties a "DIP Extension Premium" in exchange for the FILO Parties' agreement to enter into the DIP Amendment (*see* Docket No. 3631) (the "**DIP Extension Premium Motion**"). The DIP Extension Premium contemplated compensating the FILO Parties with an additional claim under the Prepetition Bridge Credit Agreement (or, in certain circumstances, the FILO DIP Credit Agreement) solely to the extent they, in the future, purchase or contribute to the purchase, of certain Excess Properties. The Bankruptcy Court entered an order approving the DIP Extension Premium Motion on January 13, 2025 (Docket No. 3699).[33] The Debtors and the FILO Parties entered into several subsequent amendments to the FILO DIP Credit Agreement, which among other things, provided for further short-term extensions of the maturity date. *See* Docket Nos. 3874, 3909, 3991, 4091, 4232, 4400, 4472, and 4690). The maturity date under FILO DIP Credit Agreement was April 18, 2025. The Debtors and the FILO Parties, with the consent of the Creditors' Committee, have agreed to

---

[33] Pursuant to paragraph 40(f) the TSA / EPDA Settlement Order (as defined herein), upon receipt of the Transferred Properties (as defined in the TSA / EPDA Settlement Order), the FILO Parties irrevocably and forever waived all rights, entitlements, and interests in receipt of the DIP Extension Premium.

further extend the maturity date of the FILO DIP Credit Agreement to (a) the date that is the earlier of (x) July 11, 2025 and (y) one (1) business day after the confirmation date of any confirmed plan, subject to certain milestones, as set forth in that certain *Amendment No. 6 to Debtor-in-Possession Credit Agreement*, attached as Exhibit 2 to the FILO Settlement Order (the "**Sixth DIP Amendment**").

### G.    APPOINTMENT OF CREDITORS' COMMITTEE

On May 16, 2024, the United States Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the chapter 11 cases (Docket No. 290).  The members of the Creditors' Committee are: (i) Philips North America LLC, (ii) Medline Industries LP, (iii) Cross Country Healthcare, Inc., (iv) Cerner Corporation, (v) Sodexo, Inc., (vi) R1 RCM, Inc., (vii) Creditor Initials: J.D.C., (viii) Pension Benefit Guaranty Corporation, and (ix) 1199SEIU United Healthcare Workers East.  The Creditors' Committee retained Akin Gump Strauss Hauer & Feld LLP ("**Akin**"), as counsel, FTI Consulting, Inc. ("**FTI**"), as financial advisor, and Jefferies LLC ("**Jefferies**"), as investment banker.  The Bankruptcy Court entered orders authorizing the retention of such professionals by the Creditors' Committee (Docket Nos. 1560 (Akin), 1581 (Jefferies), and 1607 (FTI)).

### H.    APPOINTMENT OF PATIENT CARE OMBUDSMEN

On May 20, 2024, the United States Trustee for the Southern District of Texas filed the *Notice of Appointment of Patient Care Ombudsman Covering Massachusetts, Ohio, Pennsylvania, and Miami-Dade Florida Locations Under 11 U.S.C. § 333* (Docket No. 311) appointing Suzanne Koenig as the Patient Care Ombudsman for the Debtors' hospitals and healthcare facilities in Massachusetts, Ohio, Pennsylvania, and Miami-Dade Florida (Coral Gables, Hialeah, and Miami), and the *Notice of Appointment of Patient Care Ombudsman Covering Arizona, Arkansas, Central/North Florida Locations, Louisiana, and Texas under 11 U.S.C. § 333* (Docket No. 312) appointing Susan Nielson Goodman as the Patient Care Ombudsman for the Debtors' hospitals and healthcare facilities in Arizona, Arkansas, Central/North Florida (Lauderdale Lakes, Sebastian River, Rockledge, and Melbourne), Louisiana, and Texas. Ms. Koenig and Ms. Goodman were appointed as patient care ombudsmen to monitor the quality of care provided to the Debtors' patients and file periodic reports with the Bankruptcy Court regarding the same.  Ms. Koenig filed and received authority to retain Greenberg Traurig, LLP as counsel (Docket Nos. 891, 2879) and SAK Management Services, LLC as medical operations advisor (Docket Nos. 892, 2878) and Ms. Goodman filed and received authority to retain Ross, Smith & Binford, PC as counsel (Docket Nos. 409, 2880), and filed an application to retain Kane Russell Coleman Logan PC as counsel in connection with discharging Ms. Goodman's Patient Care Ombudsman duties (Docket No. 4383).

The Patient Care Ombudsmen filed various reports during the pendency of these chapter 11 cases, including by Ms. Goodman at Docket Nos. 1653, 1654, 1655, 1656, 1853, 1932, 1608, 2775, 2968, 3062, 3251, 3553, 4025, and 4286, and by Ms. Koenig at Docket Nos. 1659, 1660 2637, 2709, 3128, 3247, and 3766. On January 21, 2025, because all of the Debtors' hospitals in Massachusetts, Ohio, Pennsylvania, and Miami-Dade Florida had been either closed or transitioned to new operators, Ms. Koenig filed a final report at Docket No. 3776 her appointment as Patient Care Ombudsman concluded.  On April 15, 2025, the Bankruptcy Court approved the *Stipulation and Agreed Order Terminating and Discharging Suzanne A. Koenig, Patient Care Ombudsman for the Hospital and Facilities Located in Massachusetts, Ohio, and Pennsylvania as Well as the Miami-Dade Florida Locations* (Docket No. 4680), officially terminating and discharging Ms. Koenig's duties as patient care ombudsman.

40

On March 22, 2025, because all of the Debtors' hospital operations in Arizona, Arkansas, Central/North Florida, Louisiana, and Texas had been transitioned to new operators, Ms. Goodman filed a final report at Docket No. 4286 and her appointment as Patient Care Ombudsman concluded.

## I.     OVERVIEW OF SALE PROCESS[34]

1.    *Prepetition Sale Process*

As discussed above, in late-2023, the Company engaged Leerink to initiate outreach to third parties to solicit interested investors in Stewardship Health to allow the Company to de-leverage its capital structure and position the Company for long-term success by focusing on its core hospital and specialist-provider operations. Subsequently, in January 2024, the Company engaged Cain to conduct a comprehensive marketing process for the sale of the Company's hospitals in Southern Massachusetts, Arizona, Ohio, Pennsylvania, Louisiana, and Arkansas. Furthermore, in February 2024, the Company expanded the scope of Leerink's engagement to market its hospitals in Northern Massachusetts, and from March 2024 to April 2024, the Debtors further expanded the scope of Cain and Leerink's hospital marketing efforts to encompass Steward's entire hospital portfolio, including all of Steward's Texas and Florida hospitals.

2.    *Global Bidding Procedures and Postpetition Sale Process*

The Debtors continued to market their comprehensive sale process of their hospital operations following the Petition Date. On May 15, 2024, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Approving (A) Global Bidding Procedures for Sales of the Debtors' Assets, (B) Form and Manner of Notice of Sales, Auctions, and Sale Hearings, and (C) Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; (II) Authorizing Designation of Stalking Horse Bidders; (III) Scheduling Auctions and Sale Hearings; and (IV) Granting Related Relief* (Docket No. 281), pursuant to which the Debtors sought approval to establish certain procedures with respect to a competitive sale and marketing process for their assets on an accelerated timeline. On June 3, 2024, the Bankruptcy Court entered the Bidding Procedures Order, approving the global bidding procedures contained therein (the "**Global Bidding Procedures**").

The Global Bidding Procedures enabled the Debtors to continue their marketing efforts and continue competitive, independent sale processes for all of the Debtors' hospital operations and Stewardship Health simultaneously. Collectively, Cain contacted more than 200 parties, and Leerink contacted more than 120 parties—including both for-profit operators and not-for-profit hospital owners and systems—to gauge interest in the Debtors' hospital operations, and Leerink engaged 57 parties to gauge interest in Stewardship Health. More than 100 parties contacted by Cain and nearly 50 parties contacted by Leerink executed non-disclosure agreements, were granted access to a virtual data room, and conducted diligence regarding the Debtors' operations.

The Global Bidding Procedures set forth timelines and related deadlines for bidding on and acquiring the Debtors' hospitals and Stewardship Health. Throughout the process, parties' interest in the Debtors' hospital operations and the sale process depended heavily on both negotiations between individual bidders and MPT related to the underlying real property, as well as the outcome of a dispute between the

---

[34]   Capitalized terms used but not otherwise defined in this section shall have the meanings ascribed to them in the Bidding Procedures Order (as defined herein).

Debtors and MPT regarding the allocation of proceeds from such hospital sales. In light of these circumstances, and to ensure there was enough time for the Debtors to receive the highest or otherwise best offers, the Debtors adjusted the sales process timelines from time to time in accordance with the Global Bidding Procedures.

### J. STEWARDSHIP HEALTH SALE

1. *Stewardship Sale Process*

In December 2023, Leerink commenced a marketing and sale process for Stewardship Health designed to provide a large number of potential purchasers with information concerning the business's assets and operations and allow potential purchasers to submit bids and request further diligence.

    a. *Stewardship IOI with Optum*

As a result of the Debtors' prepetition marketing efforts, four (4) parties submitted non-binding indications of interest ("**IOIs**") for Stewardship Health prior to the Petition Date. Based on a careful evaluation of the IOIs received, the Debtors determined that the IOI submitted by Optum Inc., a subsidiary of United, was the highest and best offer it had received. United, through its subsidiary Collaborative Care, subsequently executed a non-binding letter of intent, dated March 19, 2024, outlining the proposed terms for Collaborative Care's purchase of Stewardship Health, and promptly submitted a premerger notification under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. Good faith, arms' length negotiations toward definitive documentation commenced and continued following the Petition Date while antitrust regulatory review of the potential transaction with United remained pending. However, United ultimately withdrew its interest and did not submit a binding bid pursuant to the Global Bidding Procedures.

    b. *Stewardship Sale with Kinderhook*

Following a re-solicitation process conducted by Leerink following the Petition Date, the Debtors received a bid from Brady with a headline value of between $175–215 million, subject to certain purchase price adjustments.[35] The Debtors also received a credit bid from the FILO Parties of $225 million, and reviewed and evaluated both bids with the Transformation Committee. After further negotiations and a competitive bidding process, Brady submitted a revised bid with a headline purchase price of $245 million, subject to purchase price adjustments.

On August 12, 2024, the Debtors filed the *Notice of Designation of Successful Bid and Proposed Sale Order for Stewardship Health* (Docket No. 1953), with an asset purchase agreement by and between Brady and certain of the Debtors attached thereto as <u>Exhibit B</u> (the "**Stewardship APA**"). A hearing was scheduled to consider the sale of Stewardship Health on August 16, 2024. The Debtors received various objections, responses, and reservations in advance of the hearing, including informal responses from the ABL Lenders, FILO Parties, and Creditors' Committee. The Debtors worked with each of the parties that had filed a response, making according changes to the form of sale order contained in the Stewardship APA, and reaching a consensual resolution to virtually all objections in advance of the hearing. On August 16, 2024, the Bankruptcy Court approved the sale of Stewardship Health. On August 22, 2024, the Bankruptcy Court entered the *Order (I) Authorizing and Approving (A) the Asset Purchase Agreement with Brady Health Buyer, LLC (B) the Sale of Stewardship Health Assets Free and Clear of Liens and Liabilities and*

---

[35] Details regarding such purchase price adjustments are described in greater detail in Section IV.M.5 hereto.

(C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Granting Related Relief (Docket No. 2135) (the "**Stewardship Sale Order**").

The Stewardship APA provided for a number of closing conditions, most notably the rejection of certain contracts related to CareMax, the joint manager of the Debtors' Medicare value business.[36] In the lead-up to closing, the Debtors, Brady, and CareMax worked towards and arrived at a consensual resolution with respect to the CareMax-Steward Contracts. On October 30, 2024, the Bankruptcy Court entered the *Stipulation and Agreed Order Regarding CareMax-Steward Contracts* (Docket No. 3071), authorizing the assignment of certain of the CareMax-Steward Contracts to Brady, and authorizing the rejection of the remainder of the CareMax-Steward Contracts effective as of the closing.

The Stewardship APA also provided that Brady may elect, at its discretion, to exclude all assets related to the USFHP from the Stewardship Health transaction prior to closing. *See* Stewardship APA, at § 1.5(b). Moreover, the Stewardship Sale Order provided that Brady may also elect not to "proceed with the non-consensual assumption and assignment of the [BMI] MSA at the BMI Hearing[.]" *See* Stewardship Sale Order (Docket No. 2028) at ¶ 54. On September 6, 2024, the Debtors filed the *Notice Regarding Further Revised Proposed Stewardship Sale Order* (Docket No. 2387), indicating an election had been made not to pursue the non-consensual assumption or assignment of the BMI MSA. On October 25, 2024, Brady exercised its option to pursue a "provider only" transaction under the terms of the Stewardship Sale Order, excluding all assets related to the USFHP from the Stewardship Health transaction.

The Stewardship Health transaction proceeded to close on the target outside date of October 30, 2024 for a headline purchase price of $245 million. In accordance with the terms of the Stewardship APA, this headline purchase price was subject to various adjustments and subsequent reductions including with respect to net working capital, cure costs paid by the Debtors on behalf of the purchaser, costs related to TSA arrangements, deferred compensation, and retention bonus payments payable by the purchaser to third parties upon the closing of the transaction. Steward received net proceeds in the approximate amount of $187 million on the date the transaction closed, which comprised of (1) a cash payment of approximately $167 million and (2) a deposit in the net amount of approximately $21 million released from escrow on the closing date. Approximately $183 million of these proceeds were used for purposes of paying down the FILO DIP Facility or satisfying outstanding FILO Parties' professional fees, while the remainder was used for seller costs attendant to the transaction or reserved for post-closing obligations under the Stewardship APA.

### K.     HOSPITAL SALE PROCESS, KEY CREDITOR DISPUTES & MEDIATION

Simultaneously with the Stewardship Health sale process, the Debtors also advanced the marketing and sale process for their 31 hospitals. MPT owned the real estate underlying thirty (30) out of thirty-one (31) of the Debtors' hospitals, each of which were subject to either Master Lease I or Master Lease II, and which resulted in disputes between the Debtors, the FILO Parties, and the Creditors' Committee, on hand,

---

[36]    Prior to entry of the Stewardship APA, on June 22, 2024, the Debtors filed the *Debtors' Motion for Order (I) Authorizing Rejection of Executory Contracts with CareMax and Certain Related Executory Contracts Effective As of June 22, 2024 and (II) Granting Related Relief* (Docket No. 969) which sought to reject forty-one (41) contracts (the "**CareMax-Steward Contracts**"), including various contracts between the Debtors and CareMax, and certain related services agreements between the Debtors and third-parties.

and MPT, on the other hand, regarding the allocation of sale proceeds between the value of the real estate and the Debtors' hospital operations.

To address these disputes, on June 11, 2024, the Debtors filed the *Emergency Motion of Debtors Requesting Entry of an Order Directing Mediation of Disputes Relating to Allocation of Sale Proceeds and Related Issues with Medical Properties Trust* (Docket No. 776), which sought to commence mediation with the Honorable Judge Marvin Isgur amongst the Debtors, MPT, Macquarie, Apollo, the Creditors' Committee, the Debtors' secured lenders, regarding, among other things, the appropriate allocation of proceeds obtained from the Sales Process (the "**Allocation Mediation**"). Additionally, the Allocation Mediation sought to resolve potential challenges the Creditors' Committee may have had with respect to (i) the Master Leases, including relating to recharacterization of such leases as financings, (ii) MPT's claims against the estates, and (iii) potential causes of action the estates could bring against MPT arising from various postpetition conduct.

By September 2024, the Debtors concluded countless mediation sessions overseen by the Honorable Judge Marvin Isgur with certain stakeholders to minimize material disputes when possible and obtain certainty with respect to the treatment of certain valuable estate assets. Given that certain parties had limited interests in certain disputes, the Allocation Mediation was bifurcated based off which Master Lease the hospital sale related. Disputes between the Debtors, MPT, Macquarie, Apollo, the Commonwealth of Massachusetts, the Creditors' Committee, and the Debtors' secured lenders related to the sale of the Debtors' Massachusetts Hospitals under Master Lease II. The mediation to resolve the various disputes pertaining to the sale of the Debtors' Master Lease I Hospitals involved the Debtors, MPT, the Creditors' Committee, and the Debtors' secured lenders (the "**Master Lease I Mediation**"), the resolution of which is set forth in the Global Settlement.

1. *Massachusetts Sale Process*

    (i) *Prepetition Sale Process*

Prior to the Petition Date, the Debtors' advisors launched a marketing process for the sale of all the Debtors' Massachusetts hospital operations, with Cain marketing Morton Hospital in Taunton, Massachusetts ("**Morton**"), Saint Anne's Hospital in Fall River, Massachusetts ("**St. Anne's**"), and Good Samaritan Medical Center in Brockton, Massachusetts ("**Good Samaritan**") (collectively, the "**Southern Massachusetts Hospitals**"), and Leerink marketing Holy Family Methuen Hospital in Methuen, Massachusetts ("**Methuen**"), Holy Family Haverhill Hospital in Haverhill, Massachusetts ("**Haverhill**," and together with Methuen, the "**Holy Family Hospitals**,") and St. Elizabeth's Medical Center in Boston, Massachusetts ("**St. Elizabeth's**") (collectively, the "**Northern Massachusetts Hospitals**," and together with the Southern Massachusetts Hospitals, Carney, and Nashoba, the "**Massachusetts Hospitals**").

    (ii) *Postpetition Sale Process and Master Lease II Rejection & Mediation*

Following the Petition Date, significant operating losses at the Massachusetts Hospitals (including on account of the $114 million annual rent obligations payable to the MPT-Macquarie JV under Master Lease II) began to exacerbate the Debtors' growing liquidity crisis. While the Debtors attempted to triage these losses via the expedited sale of the Massachusetts Hospitals, (i) the Debtors and MPT came to an impasse regarding the allocation of value of the sale proceeds on account of MPT's interest in the underlying real property of the Massachusetts Hospitals, and (ii) bidders were reluctant to submit binding bids until they knew they had the support of the Commonwealth and path for an agreed allocation of value

44

between the Debtors and MPT. The Debtors filed notices of adjournment (Docket Nos. 1190 and 1721) extending the bid deadlines under the Bidding Procedures Order while liquidity pressures mounted.

Despite the fact that the Massachusetts Hospitals generated significant operating losses, through their extensive marketing efforts, and facilitated by promises of financial support from the Commonwealth, the Debtors obtained binding bids from reputable buyers to acquire six (6) out of the eight (8) Massachusetts Hospitals, Carney and Nashoba being the two exceptions. However, the Debtors did not receive any bids that provided for a bidder to assume Master Lease II or acquire the underlying real estate at a value that exceeded the "lease base" under Master Lease II. Rather, the bids received contemplated a purchase price for the total hospital enterprise (i.e., inclusive of real estate and operations) that were significantly less than the value of the real estate implied by the rent obligations and the lease base under Master Lease II.

Eventually, it became apparent that the sale proceeds of the Massachusetts Hospitals would be insufficient to repay the mortgage loan made to MPT by a joint venture owned Apollo and Macquarie in full, which was secured by the real estate underlying Master Lease II properties. This dynamic entrenched the stalemate between the parties as Apollo and Macquarie sought to reach an agreement with MPT to enable them to transact on the underlying real estate. Moreover, increased liquidity pressures and an absence of consent by the FILO Secured Parties to use cash collateral for the Debtors' Massachusetts Hospital operations required the Debtors to seek an alternate source of external funding to cover operating losses prior to the closing of the sales of the Massachusetts Hospitals.

As a result of these challenges, the Debtors moved to reject Master Lease II[37] and commenced an adversary proceeding against MPT (Adv. Proc. No. 24-03168) while simultaneously pursuing the Allocation Mediation. A significant focus of the Allocation Mediation was the allocation of proceeds received in connection with the disposition of the Massachusetts Hospitals as between the Debtors, the MPT-Macquarie JV, and Apollo, the mortgage lender to the MPT-Macquarie JV. Because the proceeds of the sale of the real estate underlying the Massachusetts Hospitals were insufficient to repay the mortgage loans held by Apollo in full, Apollo and MPT engaged in good-faith and arm's length negotiations to reach a consensual agreement whereby MPT would transfer ownership of such properties to the MPT-Macquarie JV, so that the MPT-Macquarie JV could sell or lease the underlying real estate to the buyers of the Debtors' Massachusetts Hospital operations.[38] In exchange, the Debtors agreed to release MPT of claims under Master Lease II on the earlier of the closing of the sales of the Massachusetts Hospitals or the entry of the Global Settlement Order. Upon the closing of each of the Massachusetts Hospitals, Master Lease II would be deemed severed with respect to the properties sold without any further liability to the applicable buyer.

---

[37]   *See Emergency Motion of Debtors for Order (I) Authorizing Rejection of Master Lease II Agreements Effective as of the Rejection Date in Connection with Planned Transition and Sale of Massachusetts Hospitals to New Operators, and (II) Granting Related Relief* (Docket No. 1712), which was approved by the Bankruptcy Court on July 31, 2024 on the terms set forth in the *Order (I) Authorizing Rejection of Master Lease II Agreements Effective as of the Rejection Date in Connection with Planned Transition and Sale of Massachusetts Hospitals to New Operators, and (II) Granting Related Relief* (Docket No. 1782) (the "**MLII Rejection Order**"). Although the MLII Rejection Order deemed Master Lease II rejected as of the effective date of rejection, it stated that a decision as to effective rejection date would be determined at a later time following further briefing and a hearing.

[38]   Further details regarding the discussions and resolutions reached between MPT and Apollo are contained in *Statement of ACREFI CS U, LLC Regarding The Sale Orders for Certain Massachusetts Hospitals* (Docket No. 2642)

As a result of these negotiations and this consensual resolution reached between the parties, the Debtors were able to proceed with the sale process of the Massachusetts Hospitals.

(iii) <em>Initial Massachusetts Funding Agreement</em>

In addition, in response to the unsustainable operating losses the Debtors were incurring in connection with operating the Massachusetts Hospitals, the Debtors and the Commonwealth of Massachusetts (the "**Commonwealth**") entered into a funding agreement whereby the Commonwealth would advance $30 million of funding support for the Massachusetts Hospitals' operations during August 2024 (the "**Funding Agreement**"). The Debtors filed an emergency motion seeking approval of the Funding Agreement on July 26, 2024 (Docket No. 1771). The Funding Agreement was subsequently approved by the Bankruptcy Court on August 6, 2024 (Docket No. 1855).

(iv) <em>Massachusetts Sale Transactions and Designation of Successful Bids</em>

Through the Allocation Mediation process, the Debtors ultimately received actionable bids for St. Anne's, Morton, the Holy Family Hospitals, St. Elizabeth's, and Good Samaritan on the terms detailed below.

a) *Lifespan*. Lifespan of Massachusetts, Inc., a Massachusetts not for-profit corporation ("**Lifespan**") submitted a bid of, in the aggregate (for both the Debtors' hospital operations and the underlying real property of Morton and St. Anne's), $175 million ($75 million in Cash and a $100 million note) with $166.8 million being allocated to the underlying real property from Apollo and approximately $8.2 million allocated to the Debtors' hospital operations.

b) *Lawrence General*. LG Newcorp, Inc. a Massachusetts not-for-profit corporation affiliated with Lawrence General Hospital ("**LGH**") submitted a bid for the Debtors' hospital operations and the underlying real property of the Holy Family Hospitals of $28 million, with the proceeds being paid for the acquisition of the underlying real property from Apollo, and the Debtors getting the benefit of avoiding a closure of the hospital and LGH assuming a number of the Debtors' liabilities.

c) *Boston Medical Center*. Boston Medical Center ("**BMC**") submitted a bid for the hospital operations of St. Elizabeth's and Good Samaritan (and the real property underlying Good Samaritan) with a headline value of $140 million, $9.5 million of which was allocated to the Debtors hospital operations.

After accounting for purchase price adjustments and the costs to the estates to implement transactions with Lifespan, LGH, and BMC, the Debtors' estates would not receive net proceeds from sales of the Massachusetts Hospitals. However, given the Debtors' liquidity pressures, the Debtors stood to benefit given, among other things, the significant assumption of liabilities by the buyers, the stemming of losses the Debtors would incur by continuing to operate the Massachusetts Hospitals, and the avoidance of hospital closure costs. Therefore, the Debtors filed the *Notice of (I) Designation of Successful Bids; (II) Proposed Sale Orders; (III) Scheduling of Sale Hearing With Respect to (A) Holy Family Methuen Hospital, (B) Holy Family Haverhill Hospital, (C) Saint Anne's Hospital, and (D) Morton Hospital; and (IV) Reservation of Rights to Seek Approval of Sale of St. Elizabeth's Medical Center and Good Samaritan Medical Center at Sale Hearing* (Docket No. 2242), naming Lifespan as the successful bidder for St. Anne's

46

and Morton, LGH as the successful bidder for the Holy Family Hospitals, and reserving the right to seek approval of the sale of the remaining Massachusetts Hospitals. The next day, on August 30, 2024, the Debtors filed the *Notice of Designation of Successful Bid and Proposed Sale Order for St. Elizabeth's Medical Center and Good Samaritan Medical Center* (Docket No. 2260), naming BMC as the successful bidder for St. Elizabeth's and Good Samaritan and setting the hearing to consider the sale of all of the Massachusetts Hospitals on September 4, 2024 (the "**Massachusetts Sale Hearing**").

(v)      *Incremental Funding Agreement*

In connection with the finalization of definitive documentation for each of the Debtors' Massachusetts Hospitals and in recognition of the Debtors' liquidity constraints, the Commonwealth agreed to advance an incremental $42 million in funding to neutralize operating losses at the Massachusetts Hospitals throughout the month of September (the "**Incremental Funding Agreement**"). The Debtors filed an emergency motion seeking approval of the incremental funding advancements on September 2, 2024 (Docket No. 2286), which was entered by the Bankruptcy Court on September 4, 2024 (Docket No. 2345).

(vi)      *Sale Hearing and FF&E Dispute*

The Debtors sought to present a consensual proposed sale order for approval by the Bankruptcy Court in advance of the Massachusetts Sale Hearing. However, the Debtors were unable to resolve an objection from the FILO Parties (Docket No. 2043), who argued that the Debtors could not sell the Massachusetts Hospitals' furniture, fixtures, and equipment ("**FF&E**") free and clear of the FILO Parties' liens (the "**FILO Objection**"), and that the proceeds of the sale of the FF&E should be payable to the FILO Parties and not Apollo as the owner of the underlying real property. On September 4, 2024, in advance of the Massachusetts Sale Hearing, the Debtors filed a formal reply to the FILO Objection (Docket No. 2323).

At the Massachusetts Sale Hearing, the Bankruptcy Court approved the Debtors' entry into the Incremental Funding Agreement and the sale of the Massachusetts Hospitals over the FILO Parties' objection pending the filing of revised proposed sale orders finalizing the changes negotiated with all parties in interest. The Bankruptcy Court further held that $17 million would be withheld from the proceeds of the sales pending resolution of the dispute with the FILO Parties regarding the FF&E, which the Debtors, the FILO Parties, and Apollo would continue to negotiate in advance of the proposed closing date for each of the sale transactions. The Bankruptcy Court subsequently entered an order approving the Incremental Funding Agreement (Docket No. 2345). On September 13, 2024, the Bankruptcy Court entered sale orders approving the sales to LGH (Docket No. 2519), Lifespan (Docket No. 2520), and BMC (Docket No. 2523).

Prior to the proposed closing of each of the sale transactions with BMC, Lifespan, and LGH, a hearing was held on September 29, 2024 to reach a final resolution with respect to the FILO Objection. A resolution was reached at the sale hearing that would allow the Debtors to proceed with the closing of each of the Massachusetts sales, and whereby the Commonwealth would work to attempt to procure and provide an additional $5 million of adequate protection for the FILO Parties. On September 30, the Bankruptcy Court entered the *Emergency Motion of Debtors for Entry of an Order (I) Approving Additional Funding from the Commonwealth of Massachusetts for the Planned Transition and Sale of Massachusetts Hospitals; and (II) Granting Related Relief* (Docket No. 2286), approving the agreement reached by the parties, and approving the Debtors' closing of the sale transactions with Lifespan, LGH, and BMC. The sales of Massachusetts Hospitals to LGH, Lifespan, and BMC each closed on or around October 1, 2024. To date, no additional adequate protection has been provided by the Commonwealth to the FILO Parties.

47

2.     *Master Lease I Hospitals Sale Process*

    a.     *Overview of Process & Key Disputes*

Simultaneous with the marketing and sale process of Stewardship Health and the Massachusetts Hospitals, the Debtors also pursued the sale of their hospitals that were leased under Master Lease I. As discussed herein, the Debtors and MPT disputed the methodology for allocation of sale proceeds between the value of the underlying real property that MPT owned and the value of the Debtors' hospital operations. After months of marketing the Master Lease I Hospitals, the Debtors determined that Master Lease I challenged the sale processes related to the Debtors' hospital operations at the Master Lease I Hospitals, as MPT would require hospital buyers to obtain MPT's consent to sever the applicable Master Lease and enter into an agreement with MPT to acquire or lease the underlying real property. As a result, the Debtors determined the rejection of Master Lease I was necessary to facilitate the sale of such hospitals, and on August 16, 2024, the Debtors filed the *Motion of Debtors for Order (I) Authorizing Rejection of Master Lease I Agreements Effective as of August 11, 2024 in Connection with Planned Sales of Master Lease I Hospitals to New Operators, and (II) Granting Related Relief* (Docket No. 2026), which sought to reject Master Lease I, retroactive to the date of filing the motion.

The disputes regarding the Master Lease I Hospitals were mediated over the course of several months before the Honorable Judge Marvin Isgur in the Master Lease I Mediation. The Master Lease I Mediation culminated in the Global Settlement, as described in Section IV.K.2.c(i) herein.

    b.     *Space Coast Hospitals*

       (i)     *Stalking Horse Designation*

On August 14, 2024, following a competitive marketing process, the Debtors designated a bid from Orlando Health, Inc. and Orlando Health Medical Group, Inc. (collectively, "**Orlando Health**") as the stalking horse bid for Melbourne Regional Medical Center, Rockledge Regional Medical Center, and Sebastian River Medical Center in Florida (collectively, the "**Space Coast Hospitals**," and the stalking horse bid submitted by Orlando Health, the "**Space Coast Stalking Horse Bid**"). That same day, the Debtors filed the *Notice of Designation of Stalking Horse Bidder for Certain of the Debtors' Florida Hospitals* (Docket No. 1991) (the "**Stalking Horse Notice**"), which attached the asset purchase agreement by and between certain of the Debtors and Orlando Health as Exhibit C thereto (the "**Space Coast APA**"). Pursuant to the Stalking Horse Notice, the Debtors sought approval of (i) a break up-fee in an amount equal to $13.7 million and (ii) reasonable, out-of-pocket and documented expenses of Orlando Health incurred in connection with the contemplated sale transaction up to an aggregate amount of $6.5 million (collectively, the "**Bid Protections**"). The Space Coast Stalking Horse Bid provided for a headline purchase price of $439 million for the hospital operations and the underlying real estate owned by MPT (subject to adjustments provided therein).

On August 19, 2024, MPT filed an objection to the proposed Bid Protections, arguing that the Space Coast Stalking Horse Bid did not comply with the Global Bidding Procedures and vitiated MPT's real property rights (Docket No. 2037). At the August 22, 2024 hearing, the Debtors, Orlando Health, and MPT resolved their disputes regarding the Bid Protections by modifying the proposed sale order and confirming that the transaction required a consensual resolution between MPT, Orlando Health, and the Debtors regarding allocation of the purchase price with respect to the hospital operations and the underlying real estate.

48

(ii)     *Successful Bidder and Sale Hearing*

After receiving no other Qualified Bids (as defined by the Global Bidding Procedures) by the August 26, 2024 bid deadline, the Debtors determined that the designation of the Space Coast Stalking Horse Bid as the successful bid with respect to the Space Coast Hospitals was in the best interest of the Debtors and their estates.  Accordingly, on August 28, 2024, the Debtors filed the *Notice of (I) Designation of Orlando Health as Successful Bidder and (II) September 10, 2024 Sale Hearing with Respect to Space Coast Hospitals* (Docket No. 2240).

Following the announcement of Orlando Health as the successful bidder with respect to the Space Coast Hospitals, the Debtors worked with each of the parties that had filed an objection, response, or reservation and made according changes to the form of sale order to reach a consensual resolution on virtually all responses in advance of the hearing; however, the issues related to the allocation of the purchase price between the hospital operations and underlying real estate remained unresolved.  On September 10, 2024, the Bankruptcy Court approved the sale of the Space Coast Hospitals and entered the *Order (I) Authorizing and Approving (A) the Sale of Melbourne Regional Medical Center, Rockledge Regional Medical Center, and Sebastian River Medical Center Free and Clear of Liens, Claims, Encumbrances, and Interests, (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) the Severance of Real Property from an Unexpired Lease; and (II) Granting Related Relief (*Docket No. 2445) (the "**Space Coast Sale Order**").  Following approval of the Space Coast Sale Order, the Debtors entered into the Global Settlement with MPT, which resolved, among other things, the purchase price allocation issues by providing the Debtors with $395 million of the net proceeds from the sale of the Space Coast Hospitals.

On October 22, 2024, the Bankruptcy Court entered the *Order (I) Clarifying the Definition of "Space Coast Real Property" Sold Pursuant to the Space Coast Sale Transaction and (II) Granting Related Relief* (Docket No. 2990), which (i) clarified that under the Global Settlement Order, MPT was permitted to convey to the Debtors (and in turn the Debtors were permitted to convey to Orlando Health) the real property underlying the Space Coast Hospitals in addition to certain other ancillary properties (the "**Space Coast Ancillary Properties**") to the Space Coast Hospitals' operations (collectively, the "**Space Coast Real Property**"), (ii) provided for customary sale order provisions regarding the conveyance of the Space Coast Real Property, and (iii) approved the form of real estate purchase and sale agreement and an amendment to the Space Coast APA.  In exchange for the Space Coast Ancillary Properties, an additional $3 million in proceeds was generated to pay down the secured claims held by the FILO Secured Parties against the Debtors, which was comprised of: (i) an additional $1 million payable by Orlando Health and (ii) $2 million in proceeds that would otherwise be payable to MPT.  Thereafter, on October 23, 2024, the Space Coast Hospitals sale closed, resulting in the Debtors transferring the hospital operations and the Space Coast Real Property to Orlando Health.  The Debtors used the proceeds from the sale of the Space Coast Hospitals to repay in full their obligations under the ABL/FILO Facility.

49

c. *Specified MLI Hospitals Sale Process*

(i) *Overview of Global Settlement*[39]

Following months of extensive arm's-length negotiations, on September 10, 2024, the Debtors, MPT, and the other Global Settlement Parties reached an agreement on the terms of the Global Settlement, which resolved numerous disputes amongst the Global Settlement Parties, including regarding the disposition and allocation of value of the Master Lease I Hospitals and the Creditors' Committee's potential challenges with respect to MPT's claims and claims the estates could assert against MPT arising from MPT's pre and post-petition conduct. On September 11, 2024, the Bankruptcy Court approved the Global Settlement on an interim basis and entered the *Interim Order Approving (I) Global Settlement with Medical Properties Trust, Prepetition ABL/FILO Secured Parties, FILO Secured Parties, and Creditors' Committee, (II) Interim Management Procedures, and (III) Granting Related Relief* (Docket No. 2483) (the "**Interim Global Settlement Order**"). On September 18, 2024, the Bankruptcy Court entered the Global Settlement Order, which, among other things, approved the Global Settlement on a final basis, authorized the Debtors to enter into interim management arrangements with interim managers designated by MPT (each, an "**Interim Manager**") for certain facilities, and approved procedures for the conveyance of the Master Lease I Hospitals (the "**Specified MLI Hospitals**")[40] to Designated Operators and the assumption and assignment of contracts in connection therewith.

Pursuant to the Global Settlement:

- MPT designated an Interim Manager for each Specified MLI Hospital, who agreed to be bound by interim management procedures set forth in the Interim Global Settlement Order and to manage the applicable Specified MLI Hospital until it was transferred or conveyed to a Designated Operator, which were the same party as the Interim Manager;

- all of the Specified MLI Hospitals were to be conveyed or otherwise transferred to a Designated Operator by October 30, 2024;

- starting September 11, 2024, the Interim Managers assumed responsibility for the costs of operating the Specified MLI Hospitals with MPT having agreed to fund certain initial expenses (including payroll);

- upon entry of the Global Settlement Order, the Debtors were not required to pay any rent or other obligations under Master Lease I and Master Lease II;

- on October 23, 2024, the real property underlying the Space Coast Hospitals was transferred or conveyed to the Debtors and upon consummation of the sale of the Space Coast Hospitals to Orlando Health, the Debtors and their estates retained $395 million of the net sale proceeds, with the balance paid to MPT;

---

[39] Capitalized terms used in this Section but not defined herein shall have the meanings ascribed to them in the Global Settlement.

[40] The Specified MLI Hospitals exclude Sharon Regional Medical Center in Sharon, Pennsylvania.

WEIL:\100544464\2\76000.0004

- all of MPT's claims against the Debtors' estates (up to approximately $7.5 billion in the aggregate, consisting of approximately $83.4 million in MPT DIP Claims, $448.1 million in MPT Prepetition Secured Claims, $403.4 million in MPT HoldCo Claims, and $6.6 billion in future lease obligations) were waived;

- upon the Settlement Effective Date, subject to certain limited exceptions, MPT released and discharged any and all claims it may have against the Debtors, the ABL Lenders, the FILO Secured Parties, and the Creditors' Committee, and the Debtors, the ABL Lenders, the FILO Secured Parties, and the Creditors' Committee released and discharged any and all claims they may have against MPT; and

- upon the sale, transfer, abandonment, or closure of any of the Debtors' hospitals, all accounts receivable held by or owed to any of the Debtors relating to services provided by or at such hospital on or prior to the date of such sale, transfer, abandonment, or closure, and all proceeds thereof, were deemed automatically transferred and assigned to a newly created, direct subsidiary of SHCS (such subsidiary, "**A/R Co**").[41]

> (ii) *Appointment of HonorHealth as Designated Operator of Mountain Vista, Florence, and St. Luke's in Arizona*

Pursuant to the Global Settlement Order, MPT designated HonorHealth ("**HonorHealth**") as the Designated Operator for the Debtors' Mountain Vista Medical Center ("**Mountain Vista**"), Florence Hospital ("**Florence**"), and Tempe St. Luke's Hospital ("**St. Luke's**").

On September 27, 2024, the Debtors filed the *Notice of Designation of HonorHealth as Designated Operator for, and Sale of, Mountain Vista Medical Center, Florence Hospital, and Tempe St. Luke's Hospital* (Docket No. 2698), with a proposed form of sale order attached thereto as Exhibit A (the "**Proposed HonorHealth Sale Order**"). A copy of that certain *Bill of Sale, Assignment and Assumption Agreement* by and among HonorHealth and certain of the Debtors was attached to the Proposed HonorHealth Sale Order as Exhibit 1.

On October 3, 2024, the Bankruptcy Court entered the *Order (I) Authorizing and Approving (A) the Sale of Tempe St. Luke's Hospital, Mountain Vista Medical Center, and Florence Hospital Free and Clear of Liens, Claims, Encumbrances, and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 2776), approving the conveyance of Mountain Vista, Florence, and St. Luke's to HonorHealth. That same day, the sale of Mountain Vista, Florence, and St. Luke's to HonorHealth was consummated.

> (iii) *Appointment of Quorum Health as Designated Operator of Odessa and Scenic Mountain in Texas*

On September 26, the Debtors filed the *Notice of Designation of Quorum Health as Designated Operator for, and Sale of, Odessa Regional Medical Center and Scenic Mountain Medical Center* (Docket No. 2697) with a proposed form of sale order attached thereto as Exhibit A (the "**Proposed Quorum Sale Order**"), announcing that MPT had selected certain affiliates of Quorum Health (collectively, "**Quorum**

---

[41] A/R Co is a limited liability company established pursuant to and in accordance with the Delaware Limited Liability Company Act, effective as of December 31, 2024.

**Health**") to operate two (2) of the Debtors' hospital operations in Texas. Specifically, the Debtors announced the designation of (i) Odessa Texas Hospital Company, LLC as the operator of Odessa Regional Medical Center ("**Odessa**") and (ii) Big Spring Texas Hospital Company, LLC as the operator of Scenic Mountain Medical Center ("**Scenic Mountain**"). Copies of (i) that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among Odessa Texas Hospital Company, LLC and certain of the Debtors and (ii) that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among Big Spring Texas Hospital Company, LLC and certain of the Debtors were attached to the Proposed Quorum Sale Order as Exhibit 1 and Exhibit 2, respectively.

The Debtors received various responses to the Proposed Quorum Sale Order, and initially set a hearing to consider the relief requested on October 11, 2024, which was subsequently adjourned to a date to be determined (Docket Nos. 2841, 2773). However, the Debtors worked with each objecting party to resolve all outstanding responses to the Quorum Sale Order, and the *Order (I) Authorizing and Approving (A) the Sale of Odessa Regional Medical Center and Scenic Mountain Medical Center Free and Clear of Liens, Claims, Encumbrances, and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 2887) was entered on October 11, 2024 without need for a sale hearing. On October 17, 2024, the relevant bill of sale and assignment and assumption agreements were executed, and the sale of Odessa and Scenic Mountain to Quorum Health was consummated.

        (iv)     *Appointment of HSA as Designated Operator of St. Joseph and Port Arthur in Texas and the South Florida Hospitals*

Pursuant to the Global Settlement Order, MPT designated affiliates of Healthcare Systems of America (together with its affiliates, "**HSA**") as the Designated Operator of the Debtors' St. Joseph Medical Center ("**St. Joseph**"), Medical Center of Southeast Texas ("**Port Arthur**"), and the South Florida Hospitals.[42] Accordingly on October 3, 2024, the Debtors filed the *Notice of Designation of Healthcare Systems of America as Designated Operator for St. Joseph Medical Center, Medical Center of Southeast Texas, and South Florida Hospitals* (Docket No. 2786), with a proposed form of sale order attached thereto as Exhibit A.

Following the objection deadline with respect to the designation of HSA as the Designated Operator of St. Joseph, Port Arthur, and the South Florida Hospitals, the Debtors worked with each of the parties that filed an objection, response, or reservation and made according changes to the form of sale order to reach a consensual resolution on all response except for one outstanding objection from a landlord of Port Arthur, which was resolved at the sale hearing. Following the hearing, the Debtors filed the *Notice of Filing of Further Revised Proposed Order Approving the Sale of St. Joseph Medical Center, Medical Center of Southeast Texas, and South Florida Hospitals to Healthcare Systems of America* (Docket No. 3034).

On October 28, 2024, the Bankruptcy Court entered the *Order (I) Authorizing and Approving (A) the Sale of St. Joseph Medical Center, Medical Center of Southeast Texas, and South Florida Hospitals Free and Clear of Liens, Claims, Encumbrances, and Interests, and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 3046) (the "**HSA Sale Order**"), approving the conveyance of St. Joseph, Port Arthur, and the South Florida Hospitals to affiliates of HSA. Copies of (i) that certain *Bill of Sale, Assignment and Assumption*

---

[42] The South Florida Hospitals include: (i) Coral Gables Hospital, (ii) Hialeah Hospital, (iii) North Shore Medical Center, (iv) Florida Medical Center, and (v) Palmetto General Hospital.

*Agreement*, by and among HSA St Joseph LLC and certain of the Debtors, (ii) that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among HSA Port Arthur LLC and certain of the Debtors, and (iii) that certain *Bill of Sale, Assignment and Assumption Agreement,* by and among Healthcare Systems of America-Florida LLC and certain of the Debtors, in substantially final form, were attached to the HSA Sale Order as Exhibits 1, 2, and 3, respectively. The sales of St. Joseph, Port Arthur, and the South Florida Hospitals were consummated on October 30, 2024.

(v)    <em>Appointment of Insight as Designated Operator of Hillside and Trumbull in Ohio[43]</em>

On October 4, 2024 the Debtors filed the *Notice of Designation of Insight Health as Designated Operator for Hillside Rehabilitation Hospital and Trumbull Regional Medical Center* (Docket No. 2791) with a proposed form of sale order attached thereto as Exhibit A (the "**Proposed Insight Sale Order**"), announcing that MPT had selected certain affiliates of Insight Health ("**Insight**") to operate two (2) of the Debtors' hospital operations in Ohio. Specifically, the Debtors announced the designation of (i) Insight Foundation of Hillside as the operator of Hillside and (ii) Insight Foundation of Trumbull as the operator of Trumbull. Copies of (i) that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among Insight Foundation of Hillside and certain of the Debtors and (ii) that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among Insight Foundation of Trumbull and certain of the Debtors were attached to the Proposed Insight Sale Order as Exhibit 1 and Exhibit 2, respectively.

The Debtors received one limited objection to the Proposed Insight Sale Order. However, the Debtors worked with the objecting party to resolve the limited objection prior to the sale hearing, and filed a certificate of counsel seeking approval of the Proposed Insight Sale Order on October 14, 2024 (Docket No. 2912). An order approving the designation of Insight affiliates as operators of Hillside and Trumbull was entered on October 16, 2024 (Docket No. 2939).

(vi)    <em>Appointment of College Health as Designated Operator of St. Luke's Behavioral Health in Arizona</em>

In October 2024 the Debtors reached an agreement with College Medical Center Phoenix LLC ("**College Health**") to act as an Interim Manager with respect to the Behavioral Facility to avoid the closure of the facility and whom had agreed to assume the remediation expenses and operating liabilities of the facility as of October 3, 2024. On October 22, 2024, the Bankruptcy Court entered the *Order Supplementing Global Settlement Order to Authorize Debtors to Designate Interim Manager for St. Luke's Behavioral Health* (Docket No. 2989), which supplemented the Global Settlement Order to (i) authorize the Debtors' entry into an interim management arrangement with College Health as Interim Manager with respect to the Behavioral Facility and (ii) allow MPT to designate College Health as a Designated Operator

---

[43] Prior to entry into the Global Settlement, because the Debtors did not receive qualified bids for Hillside Rehabilitation Hospital ("**Hillside**") or Trumbull Memorial Hospital ("**Trumbull**") following the applicable bid deadline under the Global Bidding Procedures, on August 21, 2024, the Debtors filed the *Notice of Closure of Trumbull Regional Medical Center and Abandonment of Property in Connection Therewith* (Docket No. 2097). On the same date, the Debtors also filed the *Notice of Closure of Hillside Rehabilitation Hospital and Abandonment of Property in Connection Therewith* (Docket No. 2101) (together, the "**Ohio Closure Notices**"). However, following the filing of the Ohio Closure Notices, the Debtors entered into the Global Settlement, which designated Hillside and Trumbull as "Specified MLI Hospitals" and provided a path for the Debtors to keep Hillside and Trumbull open and operating.

53

and/or the Behavioral Facility as a Specified MLI Hospital, in accordance with the Interim Management Procedures and the Global Settlement Order.

On February 5, 2025, the Debtors filed the *Notice of Designation of College Health as Designated Operator for St. Luke's Behavioral Health* (Docket No. 3908) with a proposed form of sale order attached thereto as Exhibit A (the "**Proposed Behavioral Health Sale Order**"), announcing that MPT had designated College Health to operate Behavioral Health. A copy of that certain *Bill of Sale, Assignment and Assumption Agreement*, by and among College Health and certain of the Debtors was attached to the Proposed Behavioral Health Sale Order as Exhibit 1.

On February 14, 2025, the Bankruptcy Court approved the sale of the Behavioral Facility and entered the *Order (I) Authorizing and Approving the Sale of St. Luke's Behavioral Health Free and Clear of Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief* (Docket No. 3982). The Behavioral Facility sale closed on March 20, 2025.

### d. *Wadley at Hope Sale Process*

On July 11, 2024, the Debtors designated a bid from Pafford Health Systems, Inc. ("**Pafford**" and such bid, the "**Pafford Bid**"), which provided for a purchase price of $200,000 for the hospital operations plus the value of inventory and prepaid expenses less assumption of PTO obligations at closing, as the successful bid for Wadley Regional Medical Center in Hope Arkansas ("**Wadley at Hope**"). Accordingly, the Debtors filed the *Notice of (I) Cancellation of Certain Auctions and Sale Hearings, (II) Designation of Successful Bids, (III) Proposed Sale Orders, and (IV) Scheduling of Sale Hearing with Respect to (A) Wadley Regional Medical Center at Hope and (B) Glenwood Regional Medical Center* (Docket No. 1645) (the "**LA/AR Notice of Successful Bids**"), with a substantially final form of an asset purchase agreement by and between Pafford and certain of the Debtors attached thereto as Exhibit A (the "**Wadley at Hope APA**").[44]

Following the announcement of the Pafford Bid as the successful bid for Wadley at Hope, the FILO Secured Parties indicated they intended to object to the allocation of value between MPT and the Debtors with respect to the transaction, and requested that the Debtors adjourn the hearing on the sale of the Wadley at Hope to a later date to allow time for discovery, and ultimately submitted formal and informal discovery requests relating to MPT's involvement in the sale process. The Debtors adjourned the Wadley at Hope sale hearing and subsequently engaged in extensive negotiations with the FILO Secured Parties, MPT, and the Creditors' Committee on the allocation of value and other issues, including multiple mediation sessions with the Honorable Judge Marvin Isgur. As described herein, the Debtors entered into the Global Settlement with MPT regarding the disposition of the hospitals subject to Master Lease I (as defined herein), which included Wadley at Hope.

On September 12, 2024, the Bankruptcy Court approved the sale of Wadley at Hope and entered the *Order (I) Authorizing and Approving (A) the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and (B) the Assumption and Assignment of Certain Executory*

---

[44] On September 11, 2024, the Debtors filed the *Notice of Filing of Asset Purchase Agreement, Schedules, and Exhibits (Wadley Regional Medical Center at Hope)* (Docket No. 2487), with a final executed Wadley at Hope APA attached thereto as Exhibit B. The Debtors also attached that certain *Assignment and Assumption Agreement*, dated August 20, 2024, pursuant to which the Wadley at Hope APA was assigned from Pafford to Southwest Arkansas Regional Medical Center, LLC, an affiliate of Pafford.

54

*Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 2494). The Wadley at Hope sale closed on September 20, 2024.

e. *Glenwood Sale Process*

On July 5, 2024, the Debtors designated a bid submitted by AHS South LLC, as buyer, and HSA, as buyer guarantor (the "**HSA Bid**"), which provided for a purchase price of $500,000 for the hospital operations (but with no purchase price adjustment for inventories, prepaid expenses, or assumption of PTO), as a Qualified Bid pursuant to the Global Bidding Procedures, and communicated the same to HSA. As a result of further negotiations with HSA, on July 11, 2024, the Debtors, designated the HSA Bid as the Successful Bid for Glenwood and filed the LA/AR Notice of Successful Bids, with an asset purchase agreement by and between HSA and certain of the Debtors attached thereto as Exhibit B (the "**Glenwood APA**").

Following the announcement of the HSA Bid as the Successful Bid for Glenwood, the FILO Secured Parties indicated they intended to object to the sale of the Glenwood and requested the Debtors to adjourn the sale hearings to allow time for discovery. The Debtors entered into the Global Settlement with MPT regarding the disposition of the hospitals subject to Master Lease I, which included the Glenwood. Pursuant to the Global Settlement, HSA (i) became the interim manager of Glenwood on September 11, 2024, and (ii) is the "Designated Operator" for Glenwood by MPT. Upon entry into the Global Settlement, the Debtors engaged with MPT and HSA on the documentation necessary to effectuate the conveyance of Glenwood to HSA, and the parties agreed to proceed with the sale under the existing Glenwood APA, subject to modifications to account for the terms of the Global Settlement.[45]

On September 17, 2024, the Bankruptcy Court approved the sale of Glenwood and entered the *Order (I) Authorizing and Approving (A) the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 2599). The Glenwood sale closed on October 30, 2024.

f. *Wadley (Texarkana) Sale Process*

On August 30, 2024, the Debtors designated CHRISTUS Health Ark-La-Tex ("**CHRISTUS**") as the Stalking Horse Bidder (as defined by the Global Bidding Procedures) for Wadley Regional Medical Center in Texarkana, Texas ("**Wadley Texarkana**") with a bid valued at $4.5 million with purchase price adjustments. On September 3, 2024, the Debtors filed the *Notice of Designation of Stalking Horse Bidder for Wadley Regional Medical Center (Texarkana)* (Docket No. 2293) announcing the designation of CHRISTUS as the stalking horse bidder for Wadley Texarkana. The Debtors did not receive any objections to the designation of CHRISTUS as the stalking horse bidder for Wadley Texarkana, and on September 9, 2024, the Bankruptcy Court entered the *Order Approving Stalking Horse Bid Protections for Christus* (Docket No. 2408). On September 19, 2024, the Debtors filed the *Notice of (I) Designation of Christus Health Ark-La-Tex as Successful Bidder and (II) September 24, 2024 Sale Hearing with Respect to Wadley Regional Medical Center (Texarkana)* (Docket No. 2628), designating CHRISTUS as the Successful

---

[45] On September 16, 2024, the Debtors and HSA entered into that certain *Assignment and Assumption Agreement*, whereby AHS South LLC assigned its rights and obligations as buyer to an affiliate of HSA, HSA Glenwood LLC. The original guarantor entity, American Healthcare Systems, LLC, continues to serve as buyer guarantor for the Glenwood sale transaction.

Bidder and setting a sale hearing to consider the sale order approving the asset purchase agreement with CHRISTUS on September 24, 2024.

Leading up to the scheduled hearing, the Debtors received a variety of responses, letters, and objections to the proposed sale order, including an objection to the transaction with CHRISTUS from DPN Logistics, LLC (Docket No. 2641) (the "**DPN Objection**") on the basis that the sale of Wadley Texarkana to CHRISTUS would result in a purported healthcare monopoly in the Texarkana region. The Debtors were able to resolve all other formal responses to the sale order in advance of the hearing and filed a formal response to the DPN Objection (Docket No. 2664). At the hearing, the Bankruptcy Court approved the sale of Wadley Texarkana to CHRISTUS over the DPN Objection, and subsequently entered the *Order (I) Authorizing and Approving (A) the Sale of Wadley Regional Medical Center Free and Clear of all Liens, Claims, Encumbrances, and Interests and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 2671) on September 24, 2024. On October 31, 2024, the sale of Wadley Texarkana to CHRISTUS closed, netting the Debtors a total of $7.1 million in sale proceeds of which approximately $6.4 million was used to pay down the FILO DIP Facility.

g.    *Sharon Regional Medical Center Sale Process*

Despite the Debtors' extensive marketing efforts, the Debtors did not receive any actionable bids for Steward Sharon Regional Health Systems, Inc. in Pennsylvania ("**Sharon Hospital**") by the June 24, 2024 bid deadline. Following the bid deadline, it became clear that the ongoing operating losses the Debtors were incurring in connection with Sharon Hospital were unsustainable. In an effort to keep the hospital operating and continuing to provide high quality care, the Debtors and advisors evaluated all potential alternatives to avoid a closure of the facility, including (i) re-engaging with potential bidders who showed the most interest prior to the bid deadline, and (ii) engaging in extensive discussions with MPT, their lenders, and the Creditors' Committee, and (iii) seeking potential third party funding of the operations.

Following the Bankruptcy Court's interim approval of the Closure Procedures Motion, the Debtors and the Commonwealth of Pennsylvania ("**Pennsylvania**") engaged in discussions to find a viable solution to keep Sharon Hospital open. As a result of those efforts, on August 16, 2024, Meadville Medical Center ("**Meadville**") submitted a letter of intent to the Debtors to acquire Sharon Hospital contingent on financial support to be provided by Pennsylvania to the Debtors. On September 10, 2024, the Debtors and Pennsylvania entered into the *Stipulation Regarding Funding by the Commonwealth of Pennsylvania for the Potential Transition and Sale of Sharon Regional Medical Center* (Docket No. 2422), whereby Pennsylvania agreed to advance $1.5 million per month from September through November 2024 in exchange for the Debtors agreeing to continue operations at Sharon Hospital and not issue a notice to close the facility before December 2, 2024.

On December 4, 2024, a status conference was held to apprise the Bankruptcy Court of ongoing negotiations with Pennsylvania regarding the potential advancement of additional financial support to fund operating losses at Sharon Hospital through the month of December 2024. On December 5, 2024, the Bankruptcy Court entered the *Order on Emergency Motion (A) for Status Conference and (B) Motion for Continuance of Notice Deadline Regarding Sharon Regional Medical Center* (Docket No. 3386), authorizing the Debtors to file a notice of facility closure of Sharon Hospital if Pennsylvania did not provide such additional funding by December 9, 2024.

56

On December 10, Pennsylvania and MPT filed a *Notice of Filing of Proposed Stipulation and Agreed Order Approving Mediation Between the Commonwealth of Pennsylvania and Medical Properties Trust Inc. (MPT)* (Docket No. 3412). On the same date, the Bankruptcy Court entered the *Stipulation and Agreed Order Approving Mediation Between the Commonwealth of Pennsylvania and Medical Properties Trust, Inc. (MPT) Before the Honorable Marvin Isgur* (Docket No. 3421) (the "**Sharon Mediation Order**"), whereby Pennsylvania and MPT were to engage in mediation regarding an acceptable sales price for which the Sharon Hospital real property can be sold to Meadville, or such other party as designated by Pennsylvania and Meadville, such that the Debtors and Meadville could proceed with a potential sale of Sharon Hospital. The Sharon Mediation Order authorized the Honorable Judge Marvin Isgur to conduct the mediation between Pennsylvania and MPT and terminate such mediation on the date that the Honorable Judge Marvin Isgur determines that it has concluded.

On December 13, 2024, the mediation terminated following the parties being unable to reach a resolution that would keep the hospital open and operating. Thus, on December 16, 2024, the Debtors filed the *Notice of Closure of Sharon Regional Medical Center and Abandonment of Property in Connection Therewith* (Docket No. 3461). On December 27, the Bankruptcy Court entered the *Order (I) Authorizing Debtors to (A) Close Sharon Regional Medical Center and (B) Reject Executory Contracts and Abandon Property in Connection Therewith; and (II) Granting Related Relief* (Docket No. 3570) (the "**Sharon Closure Order**"). The Sharon Closure Order authorized, but did not direct, the Debtors to close Sharon Hospital on a final basis on January 6, 2025, in accordance with the closure plan contained therein.

Following entry of the Sharon Closure Order, the Debtors continued their efforts to locate a potential purchaser with an actionable bid for Sharon Hospital. Following good faith, arm's-length negotiations and mediations between the Debtors, Tenor Health Foundation Sharon, LLC ("**Tenor**"), the Commonwealth of Pennsylvania, and MPT, on January 10, 2025, the Debtors designated Tenor as the successful bidder for Sharon Hospital and filed the *Notice of (I) Designation of Tenor Health Foundation Sharon, LLC as Successful Bidder and (II) Emergency Sale Hearing on January 10, 2025 with Respect to Sharon Regional Medical Center* (Docket No. 3682).

On January 10, 2025, the Bankruptcy Court entered the *Order (I) Authorizing and Approving (A) the Sale of Sharon Regional Medical Center Free and Clear of Liens, Claims, Encumbrances, and Interests and (B) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) Granting Related Relief* (Docket No. 3688) and the *Order Compelling Transfer of License Obligations* (Docket No. 3687), approving the sale of Sharon Hospital, and the transfer of the license to operate the Hospital, to Tenor. The Sharon Hospital sale closed on January 21, 2025.

3.    *TSA / EPDA Settlement*

The Debtors entered into a number of TSAs[46] with the purchasers and new operators of their hospitals to ensure the smooth transition of operations and continuity of patient care. The Debtors provided two primary types of services under the TSAs—information technology services and revenue cycle management—until the applicable operator or purchaser could establish their own systems, processes, and

---

[46]    The Debtors entered into a total of 14 TSAs with purchasers and operators of their hospitals, including (i) the TSA with affiliates of BMC; (ii) the TSA with CHRISTUS; (iii) the TSA with HonorHealth; (iv) the TSA with affiliates of Insight; (v) the TSA with LGH, (vi) the TSA with Lifespan; (vii) the TSA with Orlando Health; (viii) the TSA with an affiliate of Quorum Health, (ix) the TSA with Tenor; (x) four (4) TSAs with affiliates of HSA; and (xi) the TSA with an affiliate of Pafford.

contracts. Approximately 700 of the Debtors' employees were involved in the provision of transition services under the TSAs to the operators of the Debtors' former hospitals (the "**TSA Employees**").

Following the conclusion of Debtors' primary sale process, during which the Debtors sold a total of twenty-seven (27) hospitals to twelve (12) different buyers (in addition to the sale of Stewardship Health), the Debtors began to face challenges associated with the unprecedented act of becoming a "TSA-only" company virtually overnight. In particular, the Debtors faced liquidity constraints, TSA Employee retention issues, and challenges with engaging certain vendors with historical payables to provide services that were necessary for the Debtors to honor their obligations under the TSAs (the "**TSA Vendors**"). Further, the FILO Parties' approved budget required that the Debtors secure additional revenues under the TSAs to address such concerns. The Debtors considered a number of potential solutions to these challenges, including negotiating an increase of the monthly TSA baseline fees with the operators or entirely transitioning the TSA services to a new provider. The Debtors solicited third parties' interest in taking over the TSAs, but were initially unsuccessful with such efforts. However, in late December 2024, Quorum Health—the operator of two (2) of the Debtors' former hospitals—indicated an interest in providing a comprehensive outsourcing solution for the benefit of all operators.

In parallel with negotiating the terms of a transaction to transfer their hospital TSAs to Quorum Health, beginning on January 21, 2025, the Debtors, MPT, certain hospital operators, the FILO Parties, and the Creditors' Committee engaged in mediation before the Honorable Judge Marvin Isgur to resolve various disputes surrounding the transition of the TSA operations and the disposition of Excess Properties under the EPDA. Following weeks of negotiations, the parties reached a settlement, and on March 2, 2025, the Debtors filed the *Emergency Motion of Debtors for Entry of an Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4081) (the "**TSA / EPDA Settlement Motion**"),[47] which documented the terms of the settlement reached between the various parties (the "**TSA / EPDA Settlement**").

On March 7, 2025, the Bankruptcy Court held a hearing to consider the relief requested in the TSA / EPDA Settlement Motion, among other things. At the hearing, the Bankruptcy Court approved the transactions contemplated by the TSA / EPDA Settlement Motion, subject to the finalization of certain language in the revised proposed form of order to be filed with the Bankruptcy Court. On March 11, 2025, the Bankruptcy Court entered the *Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4167) (the "**TSA / EPDA Settlement Order**").

---

[47] Capitalized terms used but not defined in this Section IV.K.3 shall have the meanings ascribed to them in the TSA / EPDA Settlement Motion.

The key terms of the TSA / EPDA Settlement included:

- As of the closing, the Debtors would sell all of their rights, title, and interest in the Transferred TSAs[48] to an affiliate of Quorum Health (the "**Quorum TSA Sale**") pursuant to the terms of the asset purchase agreement attached as Exhibit 1 of the TSA / EPDA Settlement Order (the "**Quorum Asset Purchase Agreement**").

- Under the Quorum Asset Purchase Agreement, Quorum Health agreed to provide the Debtors with services and access to certain information technology systems and personnel integral to their remaining operations, including with respect to collecting legacy accounts receivables and reconciling claims for the times set forth in the Quorum Asset Purchase Agreement.

- The Debtors and Quorum Health agreed to establish a vendor fund (the "**Vendor Fund**") funded by MPT, BMC, Lifespan, and Orlando Health in accordance with the terms of the escrow agreement attached as Exhibit 2 of the TSA / EPDA Settlement Order (the "**Vendor Fund Escrow Agreement**"). The Vendor Fund Escrow Agreement provides that the Debtors and Quorum Health may utilize the funds deposited in Vendor Fund to pay certain TSA Vendors if such TSA Vendor agrees to accept a partial payment in full satisfaction of TSA Vendor's Administrative Expense Claim against the Debtors' estates pursuant to a form stipulation (each such stipulation, a "**Quorum Vendor Fund Agreement**").

- To resolve a number of issues regarding the Excess Properties subject to the EPDA, the Debtors, the FILO Parties and MPT have reached a settlement (the "**EPDA Settlement**") providing that on the closing of the Quorum TSA Sale, MPT will transfer certain of the Excess Properties to the FILO Parties with all use restrictions and floor prices waived. The Debtors and FILO Parties have agreed that the transfer of the transferred Excess Properties to the FILO Parties will result in a reduction of $12.75 million of the Prepetition Bridge Facility (subject to potential adjustments in accordance with the terms of the TSA / EPDA Settlement Order). Further, on the closing, MPT shall pay $26.5 million to the Debtors for the MPT Retained Properties.[49]

On March 12, 2025, the Quorum TSA / EPDA Settlement closed, resulting in the reduction of the principal amount remaining on the Debtors' Prepetition Bridge Facility by approximately $38 million, the reduction of the Debtors' workforce to approximately 40 employees, and the alleviation of a number of

---

[48] "**Transferred TSAs**" means the Debtors' TSAs with (i) affiliates of BMC; (ii) CHRISTUS; (iii) HonorHealth; (iv) affiliates of Insight; (v) LGH, (vi) Lifespan; (vii) Orlando Health; (viii) an affiliate of Quorum Health, and (ix) Tenor. The Debtors' TSAs with Rural and BMI were not transferred to Quorum Health. The Debtors' TSAs with HSA were terminated effective as of January 21, 2025, and as of March 2, 2025, the Debtors' TSAs with Pafford had expired.

[49] "**MPT Retained Properties**" means collectively, (i) the Elm Road Property; (ii) the Miami Excess Property; (iii) Rockledge Residential, Rockledge, FL; (iv) the Youngstown Excess Property; and (v) Las Sendas Development Land, North Mesa, AZ; and (vi) the George W. Strake Building (each as defined and described in the EPDA).

burdensome obligations and key liabilities from the Debtors' estates (each as further described in the TSA / EPDA Motion).

    4.    *Unexpired Leases*

On September 2, 2024, the Debtors filed a motion seeking approval of an extension of the time to assume or reject unexpired leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code (the "**365(d)(4) Deadline**") (Docket No. 2288). On September 3, 2024, the Bankruptcy Court entered an order extending the 365(d)(4) Deadline to the earlier of (a) December 2, 2024, and (b) the date of the entry of an order confirming a chapter 11 plan (Docket No. 2298). In advance of the Designation Deadline, the Debtors entered into ten (10) consensual extensions of the 365(d)(4) Deadline for certain nonresidential real property leases to afford additional time for the applicable buyers and Designated Operators to identify leases to be assumed and assigned. *See* Docket Nos. 3260, 3261, 3262, 3280, 3282, 3283, 3290, 3291, 3311,[50] 3335, 3336, and 3355. The Bankruptcy Court approved each extension stipulation by December 3, 2024. *See* Docket Nos. 3267, 3268, 3269, 3286, 3287, 3288, 3302, 3306, 3361, and 3376.

As of December 2, 2024, all nonresidential real property leases other than those that have been assumed or those for which an extension of the 365(d)(4) Deadline was granted were deemed rejected pursuant to section 365(d)(4) of the Bankruptcy Code. In total, the Debtors have rejected 209 unexpired leases since the Petition Date.

    **L.**    **HOSPITAL CLOSURES**

    1.    *Closure of Carney and Nashoba*

As described in the Closure Procedures Motion, despite the Debtors' extensive marketing efforts, the Debtors did not receive any actionable bids for Carney Hospital ("**Carney**") or Nashoba Valley Medical Center ("**Nashoba**"). Given that Carney and Nashoba were incurring significant losses and no party had agreed to fund either hospital, the Debtors sought and obtained approval to close Carney and Nashoba in connection with the Closure Procedures Motion. *See Order (I) Approving (A) the Closure of Carney Hospital and Nashoba Valley Medical Center on a Final Basis, and (B) Procedures Related to Facility Closures on an Interim Basis; and (II) Granting Related Relief* (Docket No. 1850). Carney and Nashoba closed their operations on August 31, 2024. *See Declaration of Octavio J. Diaz Providing a Status Update as Requested By This Court on the Closure of Carney Hospital and Nashoba Valley Medical Center* (Docket No. 2446).

    2.    *Closure of Norwood Satellite Facilities*

On or about June 29, 2020, a flood caused significant damage to the Norwood Hospital, which has not been in operation since that date. However, the Debtors continued to operate four (4) satellite facilities under the Norwood license, including cancer therapy, imaging, and physical therapy clinics (collectively, the "**Norwood Clinics**"). On October 7, 2024, the Debtors filed the *Notice of Closure of Norwood Hospital Facilities and Abandonment of Property in Connection Therewith* (Docket No. 2803) (the "**Norwood Closure Notice**"), which sought entry of an order authorizing the Debtors to close Norwood Clinics in

---

[50]    This corrected stipulation and agreed order makes certain corrections to the description of the Properties filed at Docket No. 3281 and entered at Docket No. 3284.

accordance with the closure plan contained therein (the "**Closure Plan**"). The Closure Plan provided for a closure date of November 5, 2024, the date the license to operate the Norwood Clinics expired.

Following filing of the Norwood Closure Notice, Lifespan expressed interest in purchasing two (2) of the Norwood Clinics (the "**Sold Clinics**" and the Norwood Clinics that were not sold, the "**Closed Clinics**"), and the parties negotiated a transaction for the sale of the Sold Clinics to Lifespan, which closed on November 6, 2024.

On November 5, 2024, the Bankruptcy Court entered the *Order (I) Authorizing Debtors to (A) Close Norwood Hospitals Facilities and (B) Reject Executory Contracts and Abandon Property in Connection Therewith; and (II) Granting Related Relief* (Docket No. 3124) (the "**Norwood Closure Order**"). The Norwood Closure Order authorized, but did not direct, the Debtors to close the Norwood Clinics on a final basis in accordance with the Closure Plan. The Closed Clinics officially closed on November 5, 2024.

61

## M.   MONETIZATION OF ADDITIONAL ASSETS

1.   *Overview*

The Debtors continue to pursue efforts to monetize their remaining assets, including their accounts receivable that arose prior to the consummation of their asset sales, the Debtors' interests in certain joint ventures and other health care centers and clinics, and various litigation claims.  The Debtors may hold additional assets, claims, and causes of action not listed.  In addition, the details of the Debtors' BCBS Claims are discussed in Section IV.M.5.c hereto.

| Asset | Estimated Amounts/Claims[51] |
|---|---|
| *Material Additional Assets* | |
| Accounts Receivables | $102.0 million |
| JV Interests/Ancillary Properties | $18.7 million |
| *Potential Litigation Claims*[52] | |
| Commercial Payor Claims | $369.7 million |
| Norwood Litigation | $885.0 million[53] |
| Preference Claims | $300.0 million[54] |
| Potential Claims Against Current and/or Former Insiders | > $1.0 billion |

In this Section IV.M, the Debtors have provided substantial detail regarding each of their potential litigation claims and causes of action.  The Debtors believe that the information provided herein is sufficient to enable creditors to evaluate each of the Debtors' claims for purposes of electing whether to vote in favor of the Plan.  The Debtors have provided an estimated recovery range for the holders of General Unsecured Claims and PBGC Claims.  However, the Debtors have not provided an estimate of anticipated distributable proceeds that will actually be received on account of each of their litigation claims.  Any estimate of actually recoverable distributable proceeds on account of the Debtors' claims would need to take into account typical litigation risks as well as claim-specific factors, which would necessarily include the Debtors' advisors'

---

[51]   These "Estimated Amounts/Claims" do not represent the Debtors' estimate of the actual fair market value of such assets and claims.  All estimates provided in this Section IV.M.1 have been provided as of May 27, 2025 and are subject to change over time.

[52]   Except as specified otherwise herein, the "Estimated Amounts/Claims" on account of the Potential Litigation Claims excludes pre- and post-judgment interest, attorney's fees or adverse cost awards, punitive damages, or similar amounts, as applicable.

[53]   Represents the Debtors' estimated amount of their claims on account of the Norwood Claims including treble damages and recoverable fees and costs, as further detailed in Section IV.M.5.a.  The Debtors believe their estimated damages on account the Norwood Claims (excluding treble damages and recoverable fees and costs) are at least $295 – 300 million.

[54]   Represents total gross demands made as of the date hereof upon over 670 parties based on the Debtors' total estimates of potentially preferential and avoidable transfers.

evaluations of the value of claims and the likelihood of settlement. Such estimates are therefore protected by relevant privileges, including the attorney-client privilege, and would constitute attorney work product, and if disclosed, could prejudice the Debtors' ability to prosecute their claims and causes of action in a manner that maximizes value for the benefit of their estates and creditors. Similarly, the Debtors' estimates of when they may receive distributable proceeds on account of any particular litigation claim or cause of action is subject to relevant privileges, including the attorney-client privilege, and if disclosed, could compromise the value of the Debtors' claims and causes of action. Moreover, the Debtors' litigation actions are legally and factually complex, inherently uncertain, and are developing. Any attempt by the Debtors to estimate the distributable proceeds arising out of any particular claim would necessarily involve speculation. Given the potential for prejudice to the Debtors' ability prosecute their claims and causes of action in a manner that maximizes value and the legal and factual complexities of their claims, the Debtors have not provided estimates of the anticipated distributable proceeds actually recoverable on account of their claims in this Disclosure Statement.

      2.    *Accounts Receivables*

Despite having sold all of their hospital assets, the Debtors continue to collect accounts receivable on account of the pre-closing periods of each of the Debtors' hospital sales (as well as Stewardship Health). Due to the nature of payor reimbursement, the insurance claim reconciliation process, and hospital operations as a general matter, operators such as the Debtors are not able to collect all outstanding accounts receivable from a given time period at once, and it may take months—or longer—to collect outstanding accounts receivable. Therefore, the Debtors continue to collect aged accounts receivable arising from prior to the closing of the sales of the Debtors' hospital operations, and will continue to collect accounts receivable throughout the calendar year of 2025. The Debtors also continue to pursue ordinary-course disputes with payors in order to maximize the value of historical claims.

Based on an initial revenue cycle management assessment performed by the Debtors and their professionals, the Debtors estimate there is currently an unreserved receivable balance totaling up to approximately $102 million, a material portion of which is greater than 180 days outstanding and may not be collectible through ordinary course collection efforts. These amounts do not account for additional sums that may be recovered on account of payor breach of contracts claims and other causes of action related to the ongoing collection of outstanding accounts receivable, which are further described in Section IV.M.5.a hereto.

Included in the approximately $102 million balance of pre-closing accounts receivable are approximately $29.937 million in (i) Hospital Directed Payment Program ("**HDPP**") receivables (the "**HDPP Funds**") that the Debtors expect and are entitled to receive from the Florida Agency for Healthcare Administration ("**AHCA**") on account of plan year 4 (October 1, 2023 through September 30, 2024) and (ii) Low Income Pool Supplemental Payment Program funds ("**LIP Funds**"), which are funds made available to reimburse hospitals for charity care costs incurred to treat uninsured patients. On April 24, 2024, HSA filed the *Emergency Motion of Healthcare Systems of America to Enforce the Global Settlement Order and Compel the Debtors to Comply with its Obligations Thereunder* (Docket No. 4718) (the "**HSA HDPP Motion**"), seeking to enjoin the Debtors from obtaining the HDPP Funds. On May 8, 2025, the Debtors filed *Debtors' (I) Objection to Healthcare Systems of America's Motion to Enforce and (II) Emergency Cross-Motion to Enforce the Global Settlement Order, HSA Sale Order, and Bill Of Sale* (Docket No. 4842), denying the claims made in the HSA HDPP Motion and arguing that (i) of a total of $26.2 million to be received on account of the HDPP Funds, the Debtors are entitled to receive 93.671%, and (ii) of a total of $29.0 million in LIP Funds, the Debtors are entitled to receive 18.607% (in each case,

with HSA being entitled to the remainder), thereby entitling the Debtors to a total of $29.937 million on account of both the HDPP Funds and the LIP Funds.  On May 16, 2025, the Bankruptcy Court held a hearing to consider the merits of the HSA HDPP Motion, including with respect to whether either the Debtors or HSA are entitled to receive the HDPP Funds and LIP Funds.  Following the hearing, the Bankruptcy Court took the matter under advisement.

### 3.   *JV Interests in Clinics & Other Health Centers*

As of the date hereof, the Debtors continue to maintain an interest in five (5) clinics and health centers either directly or via their equity interest in a joint venture with a third party (the "**Ancillary Properties**") as well as other miscellaneous joint venture assets (the "**JVs**").  The Ancillary Properties provide supplemental services to hospital systems within their vicinity, including special ambulatory surgical care, imaging services, hospice, and other services.  The Debtors are actively working to liquidate their interest in all of the remaining Ancillary Properties.  Through the disposition of their equity interests in the Ancillary Properties and JVs, the Debtors realized approximately $7.3 million in proceeds as of May 27, 2025.  The Debtors are, further, working to finalize the sale of one of their JVs at a headline purchase price of $8.5 million.  The Debtors anticipate that they will fully divest from all of their remaining clinics and health centers by Q2 2025, and realize approximately $18.7 million on account of the disposition of their interest in the Ancillary Properties and JVs.

### 4.   *Stewardship Purchase Price Adjustment*

The Stewardship APA contemplates a purchase price adjustment (the "**Purchase Price Adjustment**") based upon the calculations contained in a written notice sent from Brady to the Debtors following the closing date (the "**Stewardship Closing Statement**") setting forth, among other things, final net working capital, the total cure costs actually paid by Brady on behalf of the Debtors, and the final purchase price of Stewardship Health.  Under the terms of the Stewardship APA, any net-positive difference between the final purchase price (as identified and calculated in the Stewardship Closing Statement) and the estimated, headline purchase price for Stewardship Health must be remitted to the Debtors.

On March 13, 2025, the Debtors issued a written notice (the "**Stewardship Dispute Notice**") to Brady disputing certain calculations contained in the Stewardship Closing Statement.  On May 27, 2025, the Debtors and Brady filed the *Stipulation And Agreed Order Regarding That Certain Management Services Agreement* (Docket No. 4982) in resolution of the Stewardship Dispute Notice, pursuant to which (i) the Debtors shall be entitled to $15 million on account of the Stewardship Purchase Price Adjustment, and (ii) $11 million of the $15 million to which the Debtors are entitled shall be used to satisfy payment obligations, on a historical and go-forward basis, to Brady pursuant to that certain *Management Services Agreement* by and between certain of the Debtors and Brady until such services are no longer needed.

### 5.   *Litigation Claims*

#### a.   *Claims Against Commercial Payors*

In addition to, and separate from, the Debtors' ordinary course collection of accounts receivable described in Section IV.M.2 hereto, the Debtors have retained K&S to investigate, identify, and pursue via dispute resolution, arbitration, and litigation proceedings a multitude of potential claims against large commercial payors in connection with outstanding accounts receivable. K&S is performing an ongoing analysis of, among other things, the viability of a number of causes of action for underpayment and for

64

improperly denied hospital claims.  The Debtors currently estimate that the total amount of underpayments and improperly denied claims which may be pursued through dispute resolution, arbitration, and litigation proceedings is approximately $349 million.  To date, K&S has reviewed over 3,600 contract documents accounting for approximately $349 million in underpaid or improperly denied claims, issued a total of 33 dispute notices, and initiated approximately $349 million in underpayment disputes, including 7 filed adversary proceedings accounting for approximately $120 million in underpayment claims.  In addition to the claims against commercial payors, the Debtors also hold certain claims and causes of action against government payors that will be transferred to the Litigation Trust to be monetized.

> b.  *Norwood Litigation*

The Debtors hold certain claims and causes of action arising under an insurance policy for property damage and business interruption losses sustained at Norwood (all such claims and potential claims, the "**Norwood Claims**").  The Debtors estimate that they are entitled to basic damages in the approximate amount of at least $295 to $300 million on account of the Norwood Claims.

On June 28, 2020, a weather event in the town of Norwood, Massachusetts produced approximately 5.75 inches of rainfall in 90 minutes, causing catastrophic floodwater and damage throughout Steward's Norwood hospital.  The storm caused damage to approximately 369,341 of the Norwood hospital's 399,833 total square feet of space.  Under orders from the town of Norwood, Steward was forced to cease all operations at the Norwood hospital.

Steward was insured under an all-risk insurance policy issued by American Guarantee and Liability Insurance Company ("**AGLIC**") for the Norwood hospital that covered business personal property, time element, and medical equipment losses (the "**Steward Norwood Policy**").  On December 4, 2020, Steward filed claims with AGLIC for its losses, including business interruption losses from being unable to continue hospital operations and damage to business personal property such as hospital equipment.  The Steward Norwood Policy contains an $850 million total policy limit and an annual aggregate "Flood" sublimit of $150 million, which limits insurable losses caused by any incident falling under what the policy defines as a "Flood" event, specifically, in pertinent part, "[a] general and temporary condition of partial or complete inundation of normally dry land areas or structure(s) caused by [t]he unusual and rapid accumulation or runoff of surface waters, waves, tides, tidal waves, tsunami, the release of water, the rising, overflowing or breaking of boundaries of nature or manmade bodies of water; or the spray therefrom all whether driven by wind or not . . . ." Steward Norwood Policy at § 7.22.  MPT, as owners of the building, also had its own commercial property insurance policy covering the Norwood hospital's real estate from Zurich American Insurance Company ("**Zurich**").  Steward and MPT worked with AGLIC and Zurich to seek recovery under their individual policies, and AGLIC made certain payments to Steward of approximately $97 million. However, AGLIC and Zurich would not agree to indemnify Steward or MPT for the full extent of their claimed insurable losses.  The Debtors contend that there are hundreds of millions of dollars of such unreimbursed insurable losses.

As a result, on November 23, 2021, Steward filed an action against both AIGLIC and Zurich (as the parent company largely responsible for managing the claims) in the United States District Court of Massachusetts (the "**MA District Court**") alleging failure of Zurich to indemnify Steward pursuant to the Steward Norwood Policy for the substantial losses incurred (the "**Norwood Insurance Action**").  On January 24, 2022, Steward filed an amended complaint.  In the Norwood Insurance Action, Steward has asserted the following claims: (i) a declaratory judgment against AGLIC of the nature and extent of Steward's rights and AGLIC's obligations under the Steward Norwood Policy with respect to Steward's

WEIL:\100544464\2\76000.0004

losses resulting from the weather event, and a finding that AGLIC is in breach of those obligations, together with a determination of the nature, manner, extent, and impact of such breaches; (ii) breach of contract against AGLIC for, among other things, failing to pay Steward for all its covered causes of loss under the Steward Norwood Policy; (iii) breach of the implied covenant of good faith and fair dealing against AGLIC for failing to adjust Steward's insurance claim in good faith; (iv) tortious interference with contractual relations against Zurich for knowingly and intentionally interfering with the Steward Norwood Policy, and inducing AGLIC to breach that policy; and (v) unfair or deceptive acts or practices in the conduct of trade or commerce against AGLIC and Zurich. Steward sought damages to be determined at trial for claims (ii) through (iv), and damages, plus multiple damages (e.g., treble damages) and attorney's fees and costs for claim (v). In total the Debtors believe that such claims, including treble damages, are approximately $885 million.

In their answers, Zurich and AGLIC asserted many affirmative defenses to Steward's claims, including: (i) failure to state a claim, (ii) Steward's claims were barred because Defendants fully met their obligations under the terms of the Steward Norwood Policy; (iii) Steward's claims against Zurich were barred because it was not an insured party under the insurance policy issued by Zurich to MPT; (iv) Steward's claims were barred because it did not fulfill conditions precedent to coverage pursuant to the terms of the Steward Norwood Policy; (v) lack of subject matter jurisdiction; (vi) failure to comply with policy reference requirements and Massachusetts General Laws chapter 175 § 99 (which governs the allowable contents of an insurance policy providing coverage for losses from natural events); and (vii) failure to mitigate damages. AGLIC also asserted a counterclaim, seeking a declaration that Steward's total recovery under the Steward Norwood Policy could not exceed the $150 million sublimit applicable to "Flood" under the Steward Norwood Policy.

On April 15, 2022, Steward filed a Motion for Partial Summary Judgment, arguing that AGLIC's coverage position—that the Flood sublimit applied to Steward's entire loss—had no basis in law, fact or the language of the Steward Norwood Policy.

Zurich then filed a Motion for Partial Summary Judgment, to which AGLIC joined, seeking "a declaratory judgment [in its favor] on the purely legal question of whether damage caused to Norwood Hospital by water accumulation on, and infiltration through, a roof or other raised surface falls within the property insurance policy's 'Flood' sublimit."

On November 15, 2022, the MA District Court denied Steward's Motion for Partial Summary Judgment and granted AGLIC's Motion for Partial Summary Judgment, relying on its prior holding in the related case, *Zurich American Insurance Company v. Medical Properties Trust, Inc.*, No. 21-cv-11621, in which the MA District Court held that "surface water" includes water from artificial surfaces above the ground. Steward appealed the denial.

On appeal, on December 19, 2023, the First Circuit certified as a question of law to the Massachusetts Supreme Judicial Court ("**SJC**") whether rainwater that lands and accumulates on either (i) a building's second-floor outdoor rooftop courtyard or (ii) a building's parapet roof and that subsequently inundates the interior of the building unambiguously constitutes "surface water" under Massachusetts law for the purposes of the insurance policies at issue in the case.

On July 23, 2024, the Massachusetts SJC held that "[r]ainwater that lands and accumulates on either a building's second-floor outdoor rooftop courtyard or a building's parapet roof does not unambiguously constitute 'surface waters' under Massachusetts law for the purposes of the policies at issue in [the] case."

*Zurich Am. Ins. Co. v. Med. Props. Tr., Inc.*, No. SJC-13535, 2024 WL 3504060, at *9 (Mass. July 23, 2024). On July 29, 2024, the Massachusetts United States Court of Appeals for the First Circuit, on the basis of the SJC's holding, ruled in favor of both Steward and MPT and reversed the MA District Court's rulings granting AGLIC's and Zurich's Motions for Partial Summary Judgment, and remanded both cases to the MA District Court for further proceedings consistent with the SJC's opinion.

On January 6, 2025, the MA District Court adopted a Scheduling Order[55] setting various deadlines in advance of a trial (the "**Norwood Trial**") and requiring that the parties would confer to propose a date for mediation. Steward, AGLIC, and Zurich participated in mediation in January 2025; however, the parties' participation in mediation did not resolve the matter. As such, the parties are proceeding with litigation on the timeline set forth in the Scheduling Order, with all discovery to be completed in advance of the Norwood Trial by June 10, 2025 and all dispositive motions filed by September 24, 2025. The Norwood Trial will subsequently begin in January 2026.

On April 25, 2025, AGLIC and Zurich filed a motion requesting the MA District Court to extend the deadlines set forth in the Scheduling Order (including the Norwood Trial) by approximately eleven (11) months. On May 22, 2025, the MA District Court denied AGLIC and Zurich's request to extend the deadlines.[56]

c.     *BCBS Antitrust Litigation*

Prior to the Petition Date, various healthcare providers (the "**Provider Plaintiffs**") brought several class action lawsuits against the national Blue Cross Blue Shield Association and its various licensees that provide commercial health insurance in their respective territories ("**BCBS**"), consolidated in *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (MDL No. 2406) (N.D. Ala. 2013) (the "**BCBS Provider Antitrust Litigation**"), in which the Provider Plaintiffs alleged that BCBS engaged in anticompetitive conduct throughout the United States that resulted in healthcare providers being reimbursed at levels below those which would prevail in a competitive market. As a result, all healthcare providers who were reimbursed by BCBS during the relevant period suffered economic losses. On October 14, 2024, the Provider Plaintiffs and BCBS filed a settlement agreement providing for a resolution of the BCBS Provider Antitrust Litigation. *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (Docket No. 3192-1) (the "**BCBS Settlement**"). The Bankruptcy Court granted preliminary approval to the BCBS Settlement on December 4, 2024 and scheduled a final fairness hearing for July 29, 2025. *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (Docket No. 3225). Under the terms of the BCBS Settlement, healthcare providers that provided services to BCBS patients from July 24, 2008 to October 4, 2024 are able submit a proof of claim and may receive subsequent payment from a settlement fund with a total value of approximately $2.2 billion (the "**BCBS Fund**"). The BCBS Fund will be allocated among all providers who participate. Providers had until March 4, 2025 to opt-out of the BCBS Settlement and, instead, pursue independent litigation against BCBS. The hearing to consider approval of the BCBS Settlement will take place on July 29, 2025.

---

[55]    *Steward Health Care Sys, LLC v. Am. Guar. and Liab. Ins. Co.*, No. 1:21-cv-11902-PBS (D. Mass. Jan. 1, 2025) (No. 79).

[56]    *Steward Health Care Sys, LLC v. Am. Guar. and Liab. Ins. Co.*, No. 1:21-cv-11902-PBS (D. Mass. Jan. 1, 2025) (No. 89).

After undertaking a thorough evaluation of their potential claims against BCBS, along with the likely recovery that Debtors reasonably could expect if they remained in the class, the Debtors determined that pursuing independent litigation against BCBS would be the best course of action for purposes of maximizing the value of the Debtors' estates. As a result, the Debtors opted-out of the BCBS Settlement in a timely manner. On April 23, 2025, the Debtors filed an antitrust case against BCBS, Case No. 5:25-cv-03570 (Docket No. 1) (the "**BCBS Antitrust Complaint**"). The BCBS Antitrust Complaint asserts significant claims that arise from the same factual and legal nexus as those asserted in the BCBS Provider Antitrust Litigation (the "**Debtors' BCBS Claims**"). The Debtors' BCBS Claims will entitle the Debtors to damages in amount to be proven at trial which is anticipated to be multiples of what the Debtors would have obtained had they not opted out of the BCBS Settlement. Moreover, under federal antitrust law the damages awarded at trial will be automatically trebled. The Debtors have retained K&S to bring this independent litigation against BCBS.

### d.    *Preference and Avoidance Actions*

The Debtors have retained Togut to identify, assess, and litigate preference claims, avoidance actions, fraudulent transfer claims, and other claims and causes of action arising under chapter 5 of the Bankruptcy Code. As of the date hereof, Togut has made over 670 demands to certain parties who received distributions of $25,000 or more within the ninety (90) days prior to the Petition Date, asserting a total gross demand of $300 million. As of the date hereof, the Debtors have recovered approximately $1,365,775.00 on account of twenty-two (22) claims that have been entirely resolved.

On February 20, 2025, Togut filed the *Motion of Debtors for Entry of an Order Establishing Streamlined Procedures for the Prosecution and Resolution of Avoidance Claims* (Docket No. 4014) (the "**Avoidance Actions Motion**"), which requested the Bankruptcy Court to enter an order establishing streamlined procedures to govern the prosecution, mediation, and resolution of adversary proceedings involving certain avoidance causes of action of the Debtors against non-insider, non-affiliate transferees that the Debtors anticipated commencing, and authorizing the Debtors to settle each in accordance with the settlement procedures proposed in the Avoidance Actions Motion. Exhibits 1 and 2 of the proposed order describe the default scheduling order for defendants not opting into the voluntary mediation program and defendants opting into the voluntary mediation program, respectively. On March 20, 2025, the Bankruptcy Court entered the *Order Establishing Streamlined Procedures for the Prosecution and Resolution of Avoidance Claims* (Docket No. 4269). Subsequently, on April 11, 2025, Togut commenced over 150 adversary proceedings seeking, among other things, (i) to recover value on account of avoidable and fraudulent transfers and (ii) to disallow a number of Claims, asserting a total gross demand of over $50 million. As of the date hereof, Togut has initiated discussions with 338 potential preference defendants. As of the date hereof, the Debtors have recovered approximately $171,492 on account of said filed adversary proceedings.

### e.    *Other Potential Claims and Causes of Action*

The Investigation Sub-Committee has evaluated and identified a number of potential claims against various third parties on account of the transactions described in Section IV.N.8 hereto, including, but not limited to, potential claims on account of fraudulent conveyance (and other causes of action arising under chapter 5 of the Bankruptcy Code), breach of fiduciary duty, corporate waste, and unlawful distribution against certain of the Debtors' current and former insiders. The Debtors, acting through the Investigation Sub-Committee, have retained Kobre & Kim (Docket No. 4818) to further pursue any such identified claims

(the "**Investigation Claims**") against third parties on behalf of the Debtors' estates. As of the date hereof, the Debtors estimate that they may assert Investigation Claims in aggregate amounts in excess of $1 billion.

The Debtors are continuing to assess any and all other claims and causes of action that may be available to them, including additional preference claims, fraudulent transfer claims, and other claims arising under chapter 5 of the Bankruptcy Code.

For the avoidance of doubt, the Estate Representative shall retain the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any and all claims or causes of action that are expressly preserved and not released, vested, settled or sold to a third party under any order of the Bankruptcy Court until the Confirmation Date, at which point all such rights (including all proceeds from any such preserved causes of action) shall transfer to the Plan Trust and/or the Litigation Trust, as applicable, in accordance with the terms of the Plan.

## N.     ADVERSARY PROCEEDINGS & OTHER BANKRUPTCY LITIGATION

1.     *BMI Adversary Proceeding & BMI Bankruptcy Litigation*

    a.     *Commencement and Preliminary Injunction Hearing*

On May 16, 2024, BMI initiated an adversary proceeding against Debtor-Defendants SHC and Stewardship Services, Inc. ("**SSI**," and together with SHC, the "**Debtor-Defendants**"), captioned Adv. Proc. No. 24-03102 (the "**BMI Adversary Proceeding**"), seeking, among other things, declaratory relief that a termination notice sent by BMI to the Debtor-Defendants on April 26, 2024 with respect to the BMI MSA (the "**Termination Notice**") was valid and enforceable.[57]

On May 17, 2024, BMI filed a motion for a preliminary injunction against the Debtor-Defendants (Adv. Proc. Docket No. 14) seeking to prevent Steward from allegedly interfering with the transition of the USFHP to another administrator and the exercise of certain of BMI's rights under the BMI MSA, and compelling Steward to assign certain subcontracts to BMI (the "**BMI Preliminary Injunction Motion**"). The Debtors filed an opposition to the BMI Preliminary Injunction Motion on June 10, 2024 (Adv. Proc. Docket No. 62) arguing, among other things, that BMI failed to show (1) a substantial likelihood that it would prevail on the merits that the Debtor-Defendants breached the BMI MSA and (2) harm sufficient to support a preliminary injunction (the "**Opposition**"). The Debtors' Opposition was joined by the Creditors' Committee on June 12, 2024 (Adv. Proc. Docket No. 73). BMI filed a reply brief in support of the BMI Preliminary Injunction Motion on June 14, 2024 (Adv. Proc. Docket No. 82), responding to the arguments made by the Debtor-Defendants in the Opposition.

On June 17, 2024, at a hearing on the BMI Preliminary Injunction Motion, the Bankruptcy Court raised issues that led BMI to withdraw that Motion during the hearing. The Bankruptcy Court urged BMI and the Debtor-Defendants to continue discussions aimed at resolving the BMI Adversary Proceeding consensually while proceeding toward a hearing to consider BMI's request for a declaratory judgment in the BMI Complaint. In response, and pursuant to the *Joint Stipulation and Agreed Order Appointing a Mediator and Governing Mediation Procedures* entered June 27, 2024 (Adv. Proc. Docket No. 105)

---

[57]     A sealed copy of *Brighton Marine, Inc.'s Adversary Complaint for Declaratory Judgment* was filed at Adv. Proc. Docket No. 2 (the "**BMI Complaint**").

(the "**BMI Mediation Order**"), the Debtor-Defendants, the Creditors' Committee, and BMI commenced mediation in an attempt to resolve the BMI Adversary Proceeding.

        b.    *Declaratory Judgment Hearing*

On June 20, 2024, the Debtors filed a formal answer to the BMI Complaint, maintaining that the Termination Notice was invalid, and asserted a counterclaim against BMI on the basis that, among other things, BMI's attempt to compel Steward to transition Plan administration violated the automatic stay set forth in 11 U.S.C. § 362(k) (Adv. Proc. Docket No. 100). In response, BMI filed *Brighton Marine's Reply to Defendant's Counterclaim Complaint* (Adv. Proc. Docket No. 116), answering the allegations and asserting various affirmative defenses to the Debtors' counterclaim. Pursuant to the BMI Mediation Order, the Debtor-Defendants, the Creditors' Committee, and BMI engaged in several mediation sessions overseen by the Honorable Judge Marvin Isgur. However, the parties were unable to reach a consensual resolution. Subsequently, on September 9, 2024, the Debtor-Defendants filed a pre-trial brief (Adv. Proc. Docket No. 126) arguing that (i) BMI failed to establish that it had a right to terminate the BMI MSA; (ii) BMI's Termination Notice was an impermissible post-petition termination of the Debtor-Defendants' rights under an executory contract; and (iii) BMI breached the BMI MSA and violated the automatic stay and the Debtor-Defendants' bankruptcy rights. That same day, BMI filed a pre-trial brief (Adv. Proc. Docket No. 128) arguing that (i) BMI validly terminated the BMI MSA pre-petition; (ii) the Bankruptcy Court had the authority to compel the Debtor-Defendants to assume and assign subcontracts related to the BMI MSA; and (iii) the Debtor-Defendants' counterclaim failed to establish that BMI had breached the BMI MSA or violated the automatic stay. The Bankruptcy Court held a trial on September 12, 2024 to hear the Debtor-Defendants' and BMI's arguments on the merits with respect to BMI's request for declaratory judgment and related relief.

Following the September 12, 2024 hearing, on October 1, 2024, the Bankruptcy Court granted in part and denied in part BMI's request for a declaratory judgment, holding, among other things, that (i) the BMI MSA would validly terminate on October 31, 2024, and (ii) the Debtor-Defendants would not be required to assume and assign to BMI certain subcontracts related to administration of the USFHP. Noting the importance of BMI, Brady, and the Debtor-Defendants coming to an agreement to transition administration of the USFHP to a new operator, the Bankruptcy Court scheduled a status conference for October 23, 2024, to ensure all involved parties coordinate to preserve the uninterrupted care of USFHP beneficiaries. *See* Adv. Proc. Docket No. 170.

        c.    *October 23, 2024 Status Conference and Transition Services Agreement*

On October 23, 2024, the Debtors and BMI attended a status conference (the "**BMI Status Conference**") to provide an update with respect to the transition of the USFHP to a new operator. At the BMI Status Conference, the Debtors and BMI informed the Bankruptcy Court that the parties were negotiating a transition services agreement (the "**BMI TSA**") that would ensure the organized transition of the administration of the USFHP to Brighton Marine. On October 31, 2024, the Debtors and BMI entered into the *Stipulation Between Steward Health Care System LLC and Brighton Marine, Inc.* (Adv. Proc. Docket No. 177) to extend the termination date of the BMI MSA by one day to November 1, 2024 as negotiations between the Debtors and BMI finalized, which was approved by the Bankruptcy Court that same day entered the *Order Approving Stipulation Between Steward Health Care System LLC and Brighton Marine, Inc.* (Adv. Proc. Docket No. 178).

On November 1, 2024, the Debtors filed the *Emergency Motion of Debtors For Entry of an Order Approving Entry Into Transition Services Agreement With Brighton Marine, Inc.* (Docket No. 3093), seeking entry of an order approving the BMI TSA. The Bankruptcy Court entered the *Order Approving Entry Into Transition Services Agreement With Brighton Marine, Inc.* (Docket No. 3123) on November 5, 2024. On January 27, 2025, BMI notified the Debtors that the initial term of the BMI TSA was extended to May 30, 2025 in accordance with its terms.

> d.  *BMI Motion to Compel Payment*

On March 20, 2025, BMI filed *Brighton Marine, Inc.'s Emergency Motion (I) To Compel Payment of Funds Held in Trust; (II) To Compel Compliance with the Transition Services Agreement; (III) To Permit Set Off; or Alternatively (IV) For Conversion to Chapter 7 of the Bankruptcy Code* (Docket No. 4271) (the "**BMI Motion**"), seeking an order compelling the Debtors to transfer approximately $5 million of estate assets to BMI (or to one of BMI's creditors) through a mandatory injunction and a constructive trust, or converting the chapter 11 cases to chapter 7. The BMI Motion requested such relief by March 28, 2025 on an emergency basis.

On March 28, 2025, the Debtors filed the *Debtors' Preliminary Objection to Brighton Marine, Inc.'s Emergency Motion (I) To Compel Payment of Funds Held in Trust; (II) To Compel Compliance with the Transition Services Agreement; (III) To Permit Set Off; or Alternatively (IV) For Conversion to Chapter 7 of the Bankruptcy Code* (Docket No. 4387) (the "**Preliminary Objection**"). In the Preliminary Objection, the Debtors argued that BMI's Motion should be summarily denied as procedurally improper because it is a proceeding that must be pursued in an adversary proceeding, that BMI's request for emergency relief does not meet the standards to warrant emergency consideration, and even if BMI's Motion could proceed, it fails on the merits. Additionally, the Debtors argued that the BMI Motion was an attempt to circumvent the Administrative Expense Claims Bar Date Order, as BMI failed to assert an administrative expense claim by the applicable bar date.

On May 16, 2025, the Bankruptcy Court held a hearing to consider the relief requested in the BMI Motion. Following the hearing, the Bankruptcy Court took the matter under advisement.

> 2.  *MPT Adversary Proceeding*

Pursuant to the Global Bidding Procedures, the Debtors engaged in a robust marketing and sales process to explore all available transactions that would allow them to sell their hospitals to new operators who can continue to serve the Debtors' patients and communities. However, those efforts were complicated by the fact that, while the Debtors owned the licenses to operate their hospitals as well as all related operating assets, including equipment, inventory, contracts, and accounts, 30 out of 31 of the Debtors' hospital locations were subject to master leases with MPT—*i.e.*, Master Lease I and Master Lease II. Accordingly, as bidders proposed acquisition terms to purchase these facilities as ongoing operating hospitals, the Debtors and MPT had competing interests as it related to the value attributed to the Debtors' operating assets versus the value allocated to the real estate owned by MPT or the proposed terms of a new lease with MPT. The Debtors alleged that the sales process was challenged by MPT's involvement.

The Debtors took certain actions in response including, on August 19, 2024, initiating an adversary proceeding against MPT, captioned Adv. Proc. No. 24-03168 (the "**MPT Adversary Proceeding**"), seeking a declaratory judgment as to the amount of value attributable to hospital operations, on one hand, and hospital real estate, on the other. Following the initiation of the MPT Adversary Proceeding, the

Debtors entered into the Global Settlement, and the MPT Adversary Proceeding did not advance beyond the filing of the complaint.

3.    *TRACO Adversary Proceeding*

On November 26, 2024, TRACO filed an objection to various stipulations submitted by the Debtors and various motions filed by medical malpractice claimants to lift the automatic stay to permit the claimants to liquidate their claims and collect from the TRACO insurance policies (Docket No. 3289) (the "**TRACO Objection**").  Despite all transactions between the Debtors and TRACO being done on an intercompany basis since 2021, the TRACO Objection alleged the Debtors had not paid any postpetition premiums due and owing under the 2024 insurance policies.  The TRACO Objection noted that although TRACO had continued to fulfill its obligations to individual physicians, the Debtors' non-payment of funds paid by the covered physicians to TRACO put such coverage at risk.

On December 2, 2024, TRACO filed a motion against the Debtors seeking an order from the Bankruptcy Court compelling the Debtors to, among other things, (i) pay postpetition premiums to TRACO in the amount of $35.5 million, (ii) provide $1.3 million of funding to TRACO to satisfy its prepetition settlement and defense costs relating to litigations against the Debtors' hospitals and doctors and health care providers, and (iii) turn over to TRACO a portion of the proceeds from the Debtors' sales of the Davis and Odessa assets (Docket No. 3341) (the "**TRACO Motion**").  Specifically, the TRACO Motion alleged that TRACO had a 12.36% equity interest in Odessa and 30.18% equity interest in Davis, which provided TRACO with an alternative source of funding if the Debtors failed to provide funding for their obligations under the insurance policies.  According to the TRACO Motion, $72 million of the proceeds from the sale of the Davis assets to CommonSpirit in 2023 (the "**Davis Proceeds**") were allocated to TRACO as a return on its equity investment in the assets.  The TRACO Motion also asserted that TRACO is entitled to an accounting and a portion of the proceeds from the postpetition sale of the Odessa assets (the "**Odessa Proceeds,**" and together with the Davis Proceeds, the "**TRACO Sale Proceeds**").  According to TRACO, the TRACO Sale Proceeds are held in constructive trust for the benefit of TRACO.  The TRACO Motion further stated that TRACO will seek relief from the automatic stay to cancel the Debtors' insurance policies if the Debtors did not pay the postpetition premiums.

On December 6, 2024, TRACO initiated an adversary proceeding against the Debtors, captioned Adv. Proc. No. 24-03261 (the "**TRACO Adversary Proceeding**").  In its adversary complaint filed at Adv. Proc. Docket No. 1 (the "**TRACO Complaint**"), TRACO seeks, among other things, turnover of the TRACO Sale Proceeds.  Subsequently, on February 15, 2025 TRACO filed the *Emergency Motion for an Order Directing Debtors, Committee, and FILO Lenders to Participate In Mediation with TRACO International Group S. De R.L.* (Docket No. 3985), seeking to compel the Debtors and other stakeholders to engage in formal mediation proceedings with TRACO.  On January 31, 2025, the Debtors filed a formal answer to TRACO at Adv. Proc. Docket No. 6, denying the allegations made in the TRACO Complaint.  On February 21, 2025, TRACO filed its *First Amended Complaint* (Adv. Proc. Docket No. 8), which additionally seeks an order from the Bankruptcy Court to compel the Debtors to turn over certain interest payments made by Prima Care, P.C. pursuant to a note and security agreement between Prima Care and TRACO (the "**TRACO First Amended Complaint**").  On March 21, 2025, the Debtors filed their answer to the TRACO First Amended Complaint, denying all allegations in therein.

4.     *Massachusetts Adversary Proceeding*

On December 6, 2024, the Commonwealth filed *The Commonwealth of Massachusetts' Motion for Relief from the Automatic Stay to Allow for the Setoff of Mutual Obligations if and to the Extend that Recoupment is Not Available* (Docket No. 3393) (the "**MA Stay Relief Motion**") seeking, among other things, relief to recoup or set off approximately $5.5 million in prepetition advance payments, approximately $8.0 million in postpetition advancements, approximately $4.5 million in identified or expected overpayments made by the Massachusetts Medicaid Program, and approximately $19.9 million in postpetition unpaid amounts associated with certain Hospital Assessments (as defined in the MA Stay Relief Motion).  Moreover, in the MA Stay Relief Motion, the Commonwealth noted that it had been unable to secure the approximately $8 million in additional funding from an alternative source as contemplated in the Incremental Funding Agreement despite its good faith efforts.

On January 3, 2025, the Debtors and the Commonwealth filed the *Stipulation and Agreed Order Between Debtors and the Commonwealth of Massachusetts Setting Briefing Schedule for the Commonwealth's Motion for Relief From the Automatic Stay to Allow for the Setoff of Mutual Obligations if and to the Extent That Recoupment is Not Available* (Docket No. 3608), setting a briefing schedule with respect to the MA Stay Relief Motion.  On February 14, 2025, the Debtors filed the *Complaint for Declaratory Judgment, Turnover, and Enforcement of Court Order Against the Commonwealth of Massachusetts* (Docket No. 3983) (the "**MA Complaint**") and commenced an adversary proceeding against the Commonwealth at Adv. Proc. No. 25-03053.  In the MA Complaint, the Debtors objected to the relief sought in the MA Stay Relief Motion and sought (i) a declaratory judgment that the Commonwealth is not entitled to recoupment or setoff; (ii) an order compelling the Commonwealth to turnover amounts owed to the Debtors, including approximately $22 million in withheld patient claims, and (3) enforcement of the order approving the Incremental Funding Agreement.  On May 26, 2025, the Debtors filed the *Motion of Debtors for Order Reclassifying Certain Priority Tax Claims and Administrative Expense Claims Filed by the Commonwealth of Massachusetts as General Unsecured Claims* (Docket No. 4970), seeking to reclassify over $50 million in Priority Tax Claims and Administrative Expense Claims asserted by the Commonwealth against the Debtors as General Unsecured Claims.

5.     *CommonSpirit Adversary Proceeding*

In connection with the IASIS Merger in 2017, Steward acquired equity interests in Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**").  In 2023, Steward determined to sell certain of its operations located in Utah, including its operations at Jordan Valley and Davis.  To that end, it entered into that certain (i) *Asset Purchase Agreement*, dated as of February 15, 2023, by and among certain Steward entities (collectively, the "**Utah Sellers**") and CommonSpirit, (ii) *Letter Agreement to the Asset Purchase Agreement*, dated as of May 1, 2023, by and among the Utah Sellers and CommonSpirit, and (iii) *Transition Services Agreement*, dated as of May 1, 2023, by and between SHCS and an affiliate of CommonSpirit (collectively, the "**Utah Transaction Documents**").

On January 3, 2025, CommonSpirit initiated an adversary proceeding against the Debtors captioned Adv. Proc. No. 25-03001 (the "**CommonSpirit Adversary Proceeding**").  In their adversary complaint filed at Adv. Proc. Docket No. 1 (the "**CommonSpirit Complaint**"), CommonSpirit seeks, among other relief, an order of specific performance requiring the Debtors to remit funds in the approximate amount of $16.8 million and the creation a constructive trust over such assets on account of alleged breaches of the Utah Transaction Documents.  On January 16, 2025, the Debtors and CommonSpirit filed the *Stipulation and Order Extending Defendants' Time to Answer Plaintiffs' Adversary Complaint* (Adv. Proc.

73

Docket No. 28) extending the Debtors' deadline to respond the CommonSpirit Complaint until March 17, 2025. On March 14, the Debtors and CommonSpirit filed the *Joint Statement Regarding Scheduling Proposals and Discovery* (Adv. Proc. Docket No. 31), establishing a schedule for the CommonSpirit Adversary Proceeding leading to the commencement of trial at a date to be determined. On March 17, 2025, the Debtors filed *Steward Health Care System, LLC's Answer to Catholic Health Initiatives Colorado's Complaint* (Adv. Proc. Docket No. 32), denying the allegations raised in the CommonSpirit Complaint and requesting the matter be dismissed with prejudice. On April 7, 2025, the Debtors filed *Steward Health Care System, LLC's Memorandum of Law in Support of Its Motion for Judgment on the Pleadings* (Adv. Proc. No. 36). On April 28, 2025, CommonSpirit filed *Plaintiff's Response to Debtors' Motion for Judgment on the Pleadings* (Adv. Proc. No. 40) (the "**CommonSpirit Response**"), requesting that the Court deny the Debtors' motion for judgment on the pleadings in its entirety. On May 19, 2025, the Debtors filed their *Reply in Further Support of Motion for Judgment on the Pleadings* (Adv. Proc. No. 41), responding to the arguments set forth in the CommonSpirit Response and again asking the Bankruptcy Court to grant the Debtors' motion for judgment on the pleadings and dismiss the CommonSpirit Complaint with prejudice.

CommonSpirit filed the CommonSpirit Complaint seeking relief with respect to no less than $16,836,922.05 (the "**Disputed Funds**"). CommonSpirit contends that the Debtors failed to remit the Disputed Funds to CommonSpirit prior to the Petition Date and that the Disputed Funds are the absolute property of CommonSpirit. CommonSpirit seeks a constructive trust, express trust, implied trust, resulting trust, and/or equitable lien with respect to the Disputed Funds. CommonSpirit alleges that in the event CommonSpirit is successful on any one of the foregoing claims for relief, the Disputed Funds must be paid to CommonSpirit outside of the Bankruptcy Code's priority scheme and ahead of all other creditors in the chapter 11 cases, including holders of secured claims and administrative claims. The Plan does not contemplate a separate class for constructive trust claims (or similar claims) that are pending adjudication before the Bankruptcy Court.

6.      *Rabbi Trust Litigation*

    (a)      *Nonqualified Deferred Compensation Plans*

The Debtors historically sponsored two "top hat" nonqualified, unfunded, deferred compensation plans: (i) the Steward Health Care Deferred Compensation Plan, administered by NFP Corp. (the "**SHC Plan**") and (ii) the IASIS Healthcare Executive Savings Plan, administered by Principal Life Insurance Company (the "**IASIS Plan**," together with the SHC Plan, the "**Deferred Compensation Plans**"). The SHC Plan was frozen on the Petition Date and no participant deferrals have been made since the Petition Date, while the IASIS Plan was frozen in 2017 and no participant deferrals have been made since 2017. The deferred amounts were not placed in a separate account. Instead, the Debtors maintained a "notional" account for each participant that tracks the deferred amounts and credits such account with gains and losses based on hypothetical investments.

The Deferred Compensation Plans were created and maintained for the purpose of providing deferred compensation to a select group of physicians and other select members of management or highly compensated employees (each, a "**Participant**" and collectively, the "**Participants**") of SHC and IASIS Healthcare, LLC ("**IASIS**" and together with SHC, the "**Plan Sponsors**") under Title I of the Employee Retirement Income Security Act of 1974 ("**ERISA**") on an unfunded basis. Specifically, the Deferred Compensation Plans were unfunded, non-tax qualified deferred compensation plans that were intended to

74

(i) comply with the requirements of section 409A of the Internal Revenue Code of 1986, as amended, and (ii) qualify for the exemptions provided under sections 201, 301, and 401 of ERISA, as amended.

Pursuant to the *Order Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, Expenses, and Other Compensation, (B) Maintain Employee Benefits Programs, and (C) Continue to Pay Workforce Obligations, and (II) Granting Relate Relief* (Docket No. 86) (the "**Wages Order**"), the Debtors terminated the Deferred Compensation Plans retroactive to the Petition Date.

### (b) The Rabbi Trusts

The Debtors maintained two "rabbi trusts" to support the Deferred Compensation Plans. One rabbi trust was maintained with Matrix Trust Company, as trustee ("**Matrix**"), for the benefit of Participants of the SHC Plan (the "**SHC Trust**") pursuant to that certain *Amended and Restated Rabbi Trust Agreement* (the "**SHC Trust Agreement**"). The assets of the SHC Trust primarily consisted of corporate-owned life insurance contracts on certain current or former employees as a means to fund the Debtors' obligations under the SHC Plan.

The Debtors separately maintained a "rabbi trust" with Delaware Charter Guarantee & Trust Company, conducting business as Principal Trust Company, as trustee ("**Principal Trust**" and together with Matrix, the "**Rabbi Trustees**"), for the benefit of the Participants of the IASIS Plan (the "**IASIS Trust**" and together with the SHC Trust, the "**Rabbi Trusts**") pursuant to that certain *IASIS Healthcare Executive Savings Plan Trust Agreement* (the "**IASIS Trust Agreement**" and together with the SHC Trust Agreement, the "**Rabbi Trust Agreements**"). The assets of the IASIS Trust consisted of mutual funds, cash, and cash equivalents as a means to fund the Debtors' obligations under the IASIS Plan.

Each of the Rabbi Trust Agreements provided that the assets of the two Rabbi Trusts (the "**Rabbi Trust Assets**") were property of the Debtors and that the rights of the Participants to benefits provided by the Deferred Compensation Plans and the Rabbi Trusts do not exceed those of a general creditor of the Plan Sponsors in the event of the Plan Sponsors' bankruptcy. Specifically, each Rabbi Trust was a "grantor" trust pursuant to which Participants under the Deferred Compensation Plans had no preferred claim on, or any beneficial ownership interest in, any assets of such trusts.

### (c) Rabbi Trust Motion and Objection

On November 24, 2024, the Debtors filed a motion seeking entry of an order from the Bankruptcy Court, among other things, authorizing and directing the Rabbi Trustees to liquidate the Rabbi Trust Assets and transfer the proceeds thereof to the Debtors' estates and authorizing the Debtors to exercise their ownership rights over such Rabbi Trust Assets (Docket No. 3277) (the "**Rabbi Trust Motion**").

On December 17, 2024, a group of Participants (the "**Objecting Participants**") filed an objection to the Rabbi Trust Motion (Docket No. 3497) (the "**Rabbi Trust Objection**") and filed a notice regarding their intent to conduct discovery pursuant to Bankruptcy Rule 2004 (Docket No. 3581). The Rabbi Trust Objection asserted that the Debtors failed to prove the Deferred Compensation Plan were "top hat" plans and the Rabbi Trust Assets were subject to an ERISA statutory trust or a constructive trust and/or the documents governing the Deferred Compensation Plans and Rabbi Trusts must be reformed such that the Rabbi Trust Assets are held by the Debtors in trust for the exclusive benefit of the Participants and the beneficiaries of the Deferred Compensation Plans. On January 14, 20245, an additional Participant filed a joinder to the Rabbi Trust Objection (Docket No. 3705).

75

On January 29, 2025, the Bankruptcy Court entered the *Stipulation and Agreed Order Regarding the Liquidation of Certain Trust Assets* (Docket No. 3842) (the "**Rabbi Trust Liquidation Order**"), which, among other things, authorized and directed the Rabbi Trustees to liquidate the Rabbi Trust Assets, with the proceeds thereof to be placed and held in the Segregated Accounts (as defined in the Rabbi Trust Liquidation Order) pending further Bankruptcy Court order or consent by the Participants who filed the Rabbi Trust Objection. The Rabbi Trust Assets were fully liquidated, and (i) $51,353,852.89 of proceeds were wired to the SHC Account (as defined in the Rabbi Trust Liquidation Order) and (ii) $10,989,245.34 of proceeds were wired to the IASIS Account (as defined in the Rabbi Trust Liquidation Order). The Rabbi Trust Liquidation Order made clear that nothing in the Rabbi Trust Liquidation Order, nor any actions taken pursuant thereto, was deemed a waiver or limitation of the Debtors, or any other party in interest's, rights under the Bankruptcy Code or any other applicable law.

On March 3, 2025, the Objecting Participants filed the *Emergency Motion of Certain Participants for an Order Staying the Contested Matter Relating to the Turnover Motion* (Docket No. 4089) (the "**Motion to Stay**"), the *Complaint for Injunctive, Equitable, and Declaratory Relief and Request for Class Action* (Adv. Proc. No. 25-03066, Docket No. 1) (the "**Rabbi Trust Complaint**"), and the *Motion of Named Plaintiffs for an Order (I) Withdrawing the Reference and (II) Staying the Contested Matter Relating to the Turnover Motion* (Adv. Proc. No. 25-03066, Docket No. 3) (the "**Motion to Withdraw**"). The filing of the Rabbi Trust Complaint created an adversary proceeding. On March 24, 2025, the Debtors filed the *Debtors' Objection to Motion of Named Plaintiffs for an Order (I) Withdrawing the Reference and (II) Staying the Contested Matter Relating to the Turnover Motion* (Adv. Proc. No. 25-03066, Docket No. 14). On April 25, 2025, the Debtors filed the *Steward Health Care System, LLC and IASIS Healthcare, LLC's Rule 12(c) Motion for Judgment on the Pleadings* (Adv. Proc. No. 25-03066, Docket No. 17), requesting the Bankruptcy Court to grant judgment on the pleadings in favor of Steward and IASIS on all of the counts in the Rabbi Trust Complaint.

On March 5, 2025, the Debtors filed the *Debtors' Reply to Objection of Certain Participants to Debtors' Motion to Turn Over Trust Assets* (Docket No. 4105), which argued that the Rabbi Trust Objection should be overruled because, among other things, (i) the Deferred Compensation Plans constituted "top hat" plans, (ii) even if the Deferred Compensation Plans did not satisfy the requirements of being a "top hat" plan, the Participants would only have an unsecured claim against the Debtors for violating ERISA because the Deferred Compensation Plans were unfunded, and (iii) the imposition of a constructive trust or reformation of the Deferred Compensation Plans and Rabbi Trust Agreements was inappropriate.

On March 6, 2025, the Debtors filed the *Debtors' Objection to Rabbi Trust Motion Objectors' Motion to Stay* (Docket No. 4144), which argued, among other things, the Motion to Stay should be denied because (i) the movants could not prove they were likely to succeed on their Motion to Withdraw and (ii) the Debtors would suffer immense harm if the Motion to Stay was granted, and any harm suffered by the movants would be self-inflicted.

On March 7, 2025, the Bankruptcy Court held a hearing on the Motion to Stay. The Bankruptcy Court denied the Motion to Stay, but rescheduled the trial on the Rabbi Trust Motion from March 11, 2025 to March 26 and March 27, 2025 to allow parties more time to conduct discovery and allow for adequate time to examine witnesses during the trial.

On March 13, 2025, the Objecting Participants filed, in the District Court for the Southern District of Texas (the "**SDTX District Court**"), the *Emergency Motion for an Order Staying Hearing on Turnover Motion* (Case No. 4:25-mc-00461, Docket No. 1) (the "**Emergency Motion to Stay**"). On March 20, 2025,

the Debtors filed their *Response in Opposition to Emergency Motion for an Order Staying Hearing on Turnover Motion* (Case No. 4:25-mc-00461, Docket No. 34), and the Objecting Participants filed their *Reply in Support of Emergency Motion for an Order Staying Hearing on Turnover Motion* (Case No. 4:25-mc-00461, Docket No. 37). The Objecting Participants then filed a *Supplement in Support of Emergency Motion for an Order Staying Hearing on Turnover Motion* (Case No. 4:25-mc-00461, Docket No. 40). On March 24, 2025, the SDTX District Court issued an order denying the Emergency Motion to Stay (Case No. 4:25-mc-00461, Docket No. 46).

The Bankruptcy Court heard arguments on the Rabbi Trust Motion on March 26 and March 27, 2025. On April 2, 2025, the Bankruptcy Court issued an oral ruling in favor of the Debtors, holding, among other things, that the Rabbi Trust Assets were property of the Debtors estates, and entered the *Order (I) Directing Trustees to Turn Over and Deliver Trust Assets or Proceeds Thereof to the Debtors; (II) Authorizing the Debtors to Exercise Ownership Rights Over Such Assets; (III) Authorizing Termination of Trusts; and (IV) Granting Related Relief* (Docket No. 4418) (the "**Rabbi Trust Order**"). Following the oral ruling, the Objecting Participants (i) moved orally for an immediate stay pending appeal of the Bankruptcy Court's entry of the Rabbi Trust Order and (ii) argued that the Rabbi Trust Order should be subject to the fourteen (14) day stay required by Bankruptcy Rule 6004(h). The Bankruptcy Court overruled the Objecting Participants' oral motion for an immediate stay pending appeal, and determined that notwithstanding Bankruptcy Rule 6004(h), that the Rabbi Trust Order would be effective as of April 11, 2025. Subsequently, the Objecting Participants filed the *Appellant's Emergency Motion to Stay Pending Appeal (Including Motion for Immediate Stay Pending Hearing on the Emergency Motion for Stay Pending Appeal)*, No. 4:25-CV-01584 (S.D. Tex. April 7, 2025) (Docket No. 2) (the "**Second Emergency Motion to Stay**").[58] On April 11, 2025, the SDTX District Court issued a ruling denying the Second Emergency Motion to Stay.

On April 12, 2025, the Rabbi Trust Order became effective. Pursuant to the Rabbi Trust Order, the Rabbi Trust Assets were deemed property of the Debtors' estates under section 541 of the Bankruptcy Code and the Debtors were authorized to exercise any and all of their ownership rights over the liquidated Rabbi Trust Assets. Further, the Bankruptcy Court ordered that the Rabbi Trustees shall transfer the liquidated Rabbi Trust Assets to the Debtors. Finally, the Rabbi Trust Order held that upon turnover of the liquidated Rabbi Trust Assets to the Debtors (i) Matrix and Principal Trust, as Trustees, shall be deemed to have fulfilled their duties under their respective Rabbi Trust Agreements with respect to the Debtors and their Participants and their beneficiaries in accordance with the terms of the applicable Rabbi Trust Agreement and applicable law, (ii) the Debtors and the Rabbi Trustees are authorized to terminate each of the Rabbi Trusts, (iii) Matrix and Principal Trust, as Rabbi Trustees, shall not be liable to the Debtors, any of the Participants or their beneficiaries, or any of the Debtors' creditors for any actions taken in furtherance of the Rabbi Trust Order, and (iv) Principal Life Insurance Company, as recordkeeper of the IASIS Plan, shall not be liable to the Debtors, any of the Participants or their beneficiaries, or any of the Debtors' creditors for any actions taken in furtherance of the Rabbi Trust Order.

---

[58] On April 7, 2025, the Objecting Participants filed the *Emergency Motion Plan Participants' Emergency Motion to Reinstate Rule 6004(h)'s 14-day Administrative Stay* (Docket No. 4436) (the "**Motion to Reinstate**"), seeking relief from the Bankruptcy Court to require that the Rabbi Trust Order be subject to a 14-day stay on account of Bankruptcy Rule 6004(h) notwithstanding language to the contrary in the Rabbi Trust Order. The Debtors objected to the Motion to Reinstate at Docket No. 4436, arguing that the Objecting Participants' appeal had been docketed and assigned to a judge. Notwithstanding the Motion to Reinstate, the Rabbi Trust Order became effective on April 12, 2025.

WEIL:\100544464\2\76000.0004

On April 3, 2025, the Objecting Participants filed the *Election to Appeal to District Court* (Docket No. 4422) and notified the Bankruptcy Court that the Objecting Participants had appealed the Rabbi Trust Order to the SDTX District Court. Following the Rabbi Trust Order becoming effective, the Objecting Participants filed a *Statement of Issues on Appeal* (Docket No. 4691) and their *Designation of Record on Appeal* (Docket No. 4692). On May 29, 2025, the record for the Objecting Participants' appeal was transmitted to the SDTX District Court (Docket No. 5002), and the deadline for the Objecting Participants to file a brief was set as June 28, 2025.

7. *Urban Hospitals Motion to Segregate Proceeds*

On April 18, 2025, Ector County Hospital District d/b/a Medical Center Health System, Hendrick Health, Midland County Hospital District d/b/a Midland Memorial Hospital a/k/a Midland Health, Odessa Regional Medical Center, Scenic Mountain Medical Center, Shannon Medical Center, and United Regional Health Care System (collectively, the "**Urban Hospitals**") filed the *First Emergency Motion to Segregate Proceeds* (Docket No. 4695) (the "**Motion to Segregate**"). In the Motion to Segregate, the Urban Hospitals claimed that certain of the Debtors' hospitals had received approximately $34 million in quality incentive funds (the "**QIF**," and the funds allegedly received by the Debtors, the "**QIF Proceeds**") pursuant to various contracts with certain managed care organizations that are ultimately owed to the Urban Hospitals under the QIF framework, and requested that the Bankruptcy Court create a constructive trust over the QIF Proceeds no later than April 25, 2025. On April 25, 2025, the Debtors filed the *Debtors' Opposition to Urban Hospitals' Emergency Motion to Require Segregation of Proceeds Debtor Received for Benefit of Urban Hospitals* (Docket No. 4727), asking the Bankruptcy Court to deny relief sought in the Motion to Segregate as (i) the Motion to Segregate was procedurally improper and substantively groundless; (ii) movants failed to establish irreparable harm as to the QIF; (iii) movants failed to establish that the balance of the equities favor an injunction; and (iv) movants failed to establish that the public interest favors an injunction. On April 28, 2025, the Urban Hospitals commenced an adversary proceeding (Adv. Proc. No. 25-03312) and filed a complaint (Adv. Proc. Docket No. 1) (the "**Complaint**") seeking, among other things, substantially the same relief requested in the Motion to Segregate.

On April 25, 2025, the Debtors filed *Debtors' Opposition to Urban Hospitals' Emergency Motion to Require Segregation of Proceeds Debtor Received for Benefit of Urban Hospitals* (Docket No. 4727), denying the allegations contained in the Motion to Segregate and requesting that the Bankruptcy Court summarily deny the Motion to Segregate. For the avoidance of doubt, the Debtors additionally deny all of the allegations the Complaint and intend to file an answer to the Complaint.

On May 15, 2025, the Urban Hospitals filed the *Motion for Preliminary Injunction* (Adv. Proc. Docket No. 12) seeking a preliminary injunction requiring the Debtors to segregate the QIF Proceeds pending a trial on the merits (the "**Preliminary Injunction Motion**"). On May 28, 2025, the Debtors filed *Debtors' Opposition To Urban Hospitals' Motion For Entry Of Preliminary Injunction* (Adv. Proc. Docket No. 19), opposing the relief requested in the Preliminary Injunction Motion.

8. *Sub-Committee Investigations*

On April 29, 2024, the Transformation Committee created the Investigation Sub-Committee, which instructed Weil to conduct an investigation to identify any potential claims and/or causes of action in favor of the Debtors, including potential claims and/or causes of action against current and former members of the Board, current and former members of the applicable governing bodies of Steward and its subsidiaries, as well as affiliates, equity holders, officers or other insiders of Steward and any of its subsidiaries

78

(the "**Investigation**"). The Investigation included a review of claims based on, among other things, breach of fiduciary duty (including related-party transactions), corporate waste, unlawful distribution, and fraudulent conveyance.

During the Investigation, Weil, among other things: (i) collected and reviewed thousands of the Debtors' documents and email correspondence, including audited and non-audited financial statements; (ii) collected and reviewed thousands of documents and email correspondence from third parties including Cerberus Capital ("**Cerberus**"), MPT, KPMG, PwC, Crowe LLP, E&Y, Deloitte, and Kroll; (iii) reviewed minutes of meetings of the Board and the Audit Committee and accompanying materials; (iv) conducted fourteen (14) interviews; (v) reviewed and analyzed appraisal reports, valuations, and solvency memoranda prepare by third-parties; and (vi) performed substantive legal and factual analysis. The Investigation Sub-Committee's Investigation focused on the following transactions:

- **2016 Dividend**: In October 2016, the Debtors issued dividends to Cerberus and other shareholders that amounted to over $780 million.

- **May 2020 Transactions**: In May 2020, the Debtors undertook three transactions: (1) Cerberus exchanged its equity in the Debtors for a convertible preferred note for approximately $350 million from Steward Investors; (2) the Debtors sold Steward International (as defined herein) to Manolete Health Holdings ("**Manolete**") (a non-Debtor entity owned by Dr. de La Torre and MPT) for approximately $200 million; and (3) the Debtors entered into a sale-leaseback transaction with MPT for the Jordan Valley and Davis hospitals in Utah wherein MPT paid the Debtors approximately $195 million.

- **2021 Distribution**: In January 2021, the Debtors distributed $111 million to its investors, including, but not limited to, Dr. de la Torre and Steward International.

- **2021 Miami Hospitals Acquisition**: In June 2021, the Debtors and MPT purchased five (5) Miami-area hospitals from Tenet Healthcare Corporation wherein the Debtors paid approximately $200 million to purchase the hospital operations and subsequently leased the underlying real properties from MPT.

- **2022 CareMax Transaction and Share Distribution**: In November 2022, the Debtors sold their value-based care assets to CareMax for $25 million, plus 23.5 million in CareMax shares, which shares were ultimately distributed to certain equity holders and other individuals affiliated with the Debtors.

- **Transactions with Steward International**: Subsequent to the Debtors' sale of Steward International (as defined herein) to Manolete in May 2020, the Debtors and Steward International engaged in several transactions including loans, advancing payment of salaries for employees of Steward International, and other expenses borne by the Debtors.

- **Transactions with Management Health Services ("MHS")**: MHS is a non-debtor affiliate and subsidiary of the Debtors' largest shareholder, Steward Investors. The relationship between the Debtors and MHS was governed by a master services agreement, which included a services fee and other transactions between the parties

79

including the payment of salaries of MHS employees, loan payments for MHS's airplanes, and other expenses borne by the Debtors.

- **Transactions with TRACO**: as discussed in Section IV.E hereto, TRACO is a non-debtor captive insurance company that is a subsidiary of the Debtors and based in Panama. TRACO provided malpractice insurance to Steward doctors and other hospital personnel. Steward Medical Group and SHC have TRACO policies with doctors/employees as the insureds.

The Investigation Sub-Committee believes that the Debtors own valuable estate claims and causes of action related to some or all of the foregoing transactions. The Debtors, acting through the Investigation Sub-Committee, have retained Kobre & Kim (Docket No. 4818) to pursue such estate claims and causes of action. As of the date hereof, Kobre & Kim has filed subpoenas and sought discovery against a number of third parties, including with respect to certain of the Debtors' former insiders, under Bankruptcy Rule 2004 in connection with the Investigation (Docket Nos. 4805, 4806, 4807, 4823, and 4824). As described in Section IV.M.5.e hereto, it is anticipated that Kobre & Kim will commence and prosecute claims and causes of action against various third parties on behalf of the Debtors' estates, as appropriate, following the results of the investigation and discovery processes.

## O.   INVESTIGATIONS

1.   *Government Investigations*

Non-Debtor Steward Health Care International LTD ("**Steward Malta**") and its non-Debtor parent, Steward Health Care International LLC (together with Steward Malta, "**Steward International**")[59], along with SHC, and SHC's former chief executive officer Dr. Ralph de la Torre (among certain other non-Debtor executives) have been the subject of investigations by the Government of Malta, the U.S. Department of Justice ("**DOJ**"), and the Boston U.S. Attorney's Office (the "**Boston USAO**"), including but not limited to the Concession (defined below) and the financial condition and resulting bankruptcy of Steward (the "**Governmental Investigations**").

During the pendency of these chapter 11 cases, the Debtors, through counsel, have provided cooperation in the Governmental Investigations, including, but not limited to, attending several in person meetings, establishing and attending recurring calls with the DOJ and the Boston USAO, facilitating document collections and productions, as well as conducting relevant interviews. As of the filing of this Disclosure Statement, the Governmental Investigations are ongoing.[60]

a.   *Malta Investigation*

In March 2015, the Government of Malta solicited proposals for the renovation and operation of three hospitals in Malta, which would be run a public-private partnership with continuous funding from the Government of Malta over the course of thirty (30) years (the "**Concession**"). Vitals Global Healthcare

---

[59]   Steward International was a subsidiary of SHC until May 2020.

[60]   Relevant to the DOJ Investigation in particular, on February 10, 2025, President Trump signed an Executive Order pausing all investigations and prosecutions under the U.S. Foreign Corrupt Practices Act ("**FCPA**") for at least 180 days, and directing the Attorney General to review (and potentially alter) the existing guidelines and policies related to the enforcement of the FCPA.

("**VGH**") was awarded the Concession and began operating it on June 1, 2016. On February 19, 2018, Steward International took over the Concession from VGH, and Steward International operated the Concession until February 24, 2023, when Maltese courts rescinded the Concession and returned the three hospitals to the Government of Malta. In late May 2024, the Maltese Magistrate released a report recommending charges against dozens of individuals in Malta and elsewhere involved in the Concession, alleging bribery, money laundering, conspiracy, and fraud-related crimes. It has been reported to the Debtors that formal charges have been posited against Dr. de la Torre, as well as certain executives of Steward International (Mr. Armin Ernst and Mr. Miro Boyanov), though, those individuals have not yet appeared in court in Malta.

  b.    *DOJ Investigation*

In April 2023, the Company commenced an internal investigation as a result of the press reports in Malta. This internal investigation included document collection and review, witness interviews, voluntary self-disclosure of potential issues to the DOJ. In September 2023, the Company's counsel presented to the DOJ the results of its preliminary review and findings from the internal investigation and also produced approximately 1,000 relevant documents. In response, on October 10, 2023, the DOJ issued a subpoena seeking all documents concerning the acquisition and operation of the hospital concession in Malta; a list of government officials involved in that process; payments made in relation to the concessions; communications and payments between Steward and certain specified individuals, entities, and national governments; org charts; travel records; communications with Malta's National Audit Office; and financial records relating to operations in Malta (the "**DOJ Investigation**"). Thereafter, and until President Trump's Executive Order pausing the investigation and enforcement of the FCPA, the Company through its counsel had been working cooperatively with the DOJ to provide the information requested, and had been making productions of documents on a rolling basis.

  c.    *Boston USAO Investigation*

Beginning in February 2024 and continuing through August 2024, the Boston USAO served a series of grand jury subpoenas and requests for information, seeking documents and information related to the use of the Company's funds through a variety of means, including employee compensation, dividends, profit distributions, the retention of certain third-party vendors, and the use of the Company's private planes, among other things. The Company has been working cooperatively with the Boston USAO to provide the information requested, and has been making productions on a rolling basis.

  2.    *Civil Investigative Demands*

Both prior to and after the Petition Date, the Company received Civil Investigative Demand letters ("**CIDs**") from various state attorney generals (collectively, the "**State AGs**") in certain of the states in which the Debtors operate. The CIDs generally seek information related to Steward's financial status, compensation of executives, contracts and relationships with vendors, audit documents, and compliance with relevant state regulations. The Company has been working cooperatively with the State AGs to provide the information requested, and has been making productions on a rolling basis.

**P.    EXCLUSIVITY**

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a chapter 11 plan

81

(the "**Exclusive Filing Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Filing Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan, before the expiration of which no other party in interest may file a plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Filing Period, the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.

On September 2, 2024, the Debtors filed the *Motion of the Debtors for Order Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* (Docket No. 2287) pursuant to which they sought to extend the Exclusive Filing Period and the Exclusive Solicitation Period to December 2, 2024 and February 3, 2025, respectively.  On September 26, 2024, the Bankruptcy Court entered an order (Docket No. 2693) extending the Exclusive Filing Period to November 4, 2024 and the Exclusive Solicitation Period through January 3, 2025.

On November 4, 2024, the Debtors filed the *Motion of the Debtors for Order Further Extending Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code* (Docket No. 3112).  On December 9, 2024, the Bankruptcy Court entered the *Order Further Extending Exclusive Periods Pursuant to Section 1121(D) of the Bankruptcy Code* (Docket No. 3400) extending the Debtors' Exclusive Filing Period to and including December 19, 2024 and the Debtors' Exclusive Solicitation Period to and included February 17, 2025; provided that the Exclusive Filing Period shall be extended to and including January 21, 2025, and the Debtors' Exclusive Solicitation Period shall be extended to and including March 24, 2025, if (i)(a) the Debtors file a notice with the Bankruptcy Court advising the Bankruptcy Court and parties in interest of such extensions and (b) the Creditors' Committee and FILO Parties each consent to such extensions or (ii) the Debtors file a chapter 11 plan on or before December 19, 2024 that is reasonably acceptable to the Creditors' Committee and FILO Parties.

On December 17, 2024, the Debtors filed the *Notice of Extension of Debtors' Exclusive Periods* (Docket No. 3499), noticing that the Creditors' Committee and the FILO Parties had consented to the extension of the Exclusive Filing Period to January 21, 2024 and the Exclusive Solicitation Period to March 24, 2025.  On January 21, 2025 (Docket No. 3769) and February 13, 2025 (Docket No. 3970), the Debtors filed motions further extending the Exclusive Filing Period and the Exclusive Solicitation Period to April 7, 2025 and June 9, 2025, respectively.  On April 7, 2025, the Debtors filed a motion (Docket No. 4439) further extending the Exclusive Filing Period and the Exclusive Solicitation Period to June 23, 2025 and August 25, 2025, respectively.  On April 30, 2025, the Bankruptcy Court entered an order (Docket No. 4764) extending the Exclusive Filing Period and the Exclusive Solicitation Period to June 23, 2025 and August 25, 2025, respectively.

## Q.     CLAIMS BAR DATES

### 1.     *General/Governmental Bar Date*

On June 17, 2024, the Debtors filed with the Bankruptcy Court a motion (Docket No. 882) seeking authority to establish certain deadlines for filing proofs of claims in the Chapter 11 Cases.  On July 11, 2024, the Bankruptcy Court entered an order, among other things, approving August 23, 2024 at 5:00 p.m. (Central Time) as the deadline for each 'person' (as defined in section 101(41) of the Bankruptcy Code, excluding governmental units) to file Proofs of Claims against the Debtors (the "**General Bar Date**") and November 4, 2024 at 5:00 p.m. (Central Time) for governmental units to file Proofs of Claims

against the Debtors (the "**Governmental Bar Date**" and, together with the General Bar Date, the "**Bar Dates**") (Docket No. 1564) (the "**Prepetition Bar Date Order**").

    2.    *Administrative Expense Claims Bar Date*

On November 14, 2024, the Bankruptcy Court granted the *Emergency Motion of Debtors for Entry of an Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claims Bar Date and (V) Granting Related Relief* (Docket No. 3217) (the "**Administrative Expense Claims Bar Date Order**").

The Administrative Expense Claims Bar Date Order established December 20, 2024 as the bar date for filing requests for payment of Administrative Expense Claims arising on or prior to November 15, 2024 (the "**Administrative Expense Claims Bar Date**").  The Administrative Expense Claims Bar Date also set forth certain requirements for filing Administrative Expense Claims, which are identified in paragraph eight of the Administrative Expense Claims Bar Date Order.

The Administrative Expense Claims Bar Date Order exempts the following parties from having to file a proof of Administrative Expense Claim by the Administrative Expense Claims Bar Date:

- any person or entity on account of a postpetition claim that has previously been allowed by order of the Bankruptcy Court and paid by the Debtors;

- any person or entity on account of a claim arising under section 503(b)(9) of the Bankruptcy Code, which claims must have been filed pursuant to the Prepetition Bar Date Order;

- any person or entity on account of a claim that has been paid in full by the Debtors pursuant to the Bankruptcy Code or in accordance with an order of the Bankruptcy Court;

- any person or entity on account of a clam for which a previously filed proof of claim asserts on the face of such proof of claim that such claim is entitled to administrative priority under section 503 of the Bankruptcy Code;

- any Debtor having a claim against another Debtor;

- any current employee of the Debtors as of the date of Administrative Expense Claims Bar Date Order, on account of claims that the Wages Order authorized the Debtors to honor; *provided* that a current employee must submit a proof of Administrative Expense Claim by the Administrative Expense Claims Bar Date for all other claims arising after the Petition Date;

- any current officer, manager, director, employee, advisor, attorney, investment banker, or consultant of the Debtors for claims based on indemnification, contribution, or reimbursement;

- any entity holding a claim for which a separate deadline is fixed by the Bankruptcy Court, including requests for payment under the Interim Compensation Order (Docket No. 783) or the Ordinary Couse Professional Order (Docket No. 784); and

- any patients who were discharged by the Debtors on or after the Petition Date.

Governmental units with respect to taxes are permitted to file a proof of Administrative Expense Claim with respect to such claim on the 90th day (or the 150th day for the Internal Revenue Service (the "**IRS**")) following (i) the filing of the applicable tax return to which such claim relates or (ii) with respect to any claim relating to a tax for which no tax return is required to be filed, the date on which such tax is incurred.

The Administrative Expense Claims Bar Date Order also (i) provided that through January 21, 2025, the Debtors and other parties in interest shall not be required to respond to any motions, applications, or other requests for allowance and payment of Administrative Expense Claims filed before November 6, 2024, and (ii) stayed or adjourned any hearings relating to the same to a date following January 21, 2025.

## R.  ADMINISTRATIVE EXPENSE CLAIMS[61]

In total, 2,838 Proofs of Administrative Claims were filed with the Bankruptcy Court asserting approximately $102.88 billion in Administrative Expense Claims. The Debtors have conducted a thorough analysis of all of these filed claims, which is ongoing, to estimate the amount of Administrative Expense Claims that are likely to be valid and Allowed. Over the last several months, the Debtors held two status conferences (on December 20, 2025 and on February 6, 2025) to apprise the Bankruptcy Court and all parties in interest of their progress.

To date, the Debtors have successfully (i) reconciled substantially all asserted Administrative Expense Claims based on dollar amount; (ii) objected to and had disallowed over $100 billion of asserted Administrative Expense Claims, and (iii) negotiated with a number of administrative expense claimants directly regarding the valid Allowed amount of such holders' Administrative Expense Claims. Based on the results of the Debtors' thorough review, the Debtors estimate that the total number of Administrative Expense Claims in the aggregate that are likely be Allowed and the responsibility of the Debtors is approximately $108 million[62] (the "**Aggregate Administrative Expense Claims Amount**"), including (i) up to approximately $13 million in 503(b)(9) claims; (ii) approximately $89 million of accounts payable claims; and (iii) approximately $6 million in other claims (including employee, litigation, regulatory, patient, insurance, tax, and real estate claims). After accounting for claims arising under chapter 5 of the Bankruptcy Code that the Debtors hold and/or have asserted against the holders of likely Allowed Administrative Expense Claims, to the extent such claims are set-off against administrative expense claims, the Debtors estimate the outstanding amount of Allowed Administrative Expense Claims that will likely be allowed is approximately $93 million.

---

[61]  Capitalized terms used but not otherwise defined in this section and Section IV.R shall have the meanings ascribed to them in the Administrative Expense Claims Bar Date Order.

[62]  Amount assumes the Debtors will execute additional Quorum Vendor Fund Agreements that the Debtors are in the process of negotiating, which would result in a $2 million reduction in Administrative Expense Claims.

84

The Aggregate Administrative Expense Claims Amount includes any and all Administrative Expense Claims that the Debtors have agreed are Allowed (such as, for example, by stipulation or other agreement with the holders of such claims). The Aggregate Administrative Expense Claims Amount includes claims that the Debtors do not dispute, and therefore anticipate will be Allowed based on the present results of (i) their review of their books and records and (ii) the supporting documentation provided by the holders of reconciled Administrative Expense Claims directly to the Debtors' advisors and/or filed with the Bankruptcy Court, including approximately $15 million in outstanding accounts payable claims that have accrued following the Administrative Expense Claims Bar Date. The undisputed portion of each such Allowed Administrative Expense Claim shall be disclosed to the applicable holder on the Consent Program Opt-Out Form.[63]

The Aggregate Administrative Expense Claims Amount **does not include any claims that fall into any of the following categories**:

1. Disputed Claims. Asserted Administrative Expense Claims (or portions thereof) that the Debtors dispute have not been have included in the Aggregate Administrative Expense Claims Amount. For the avoidance of doubt, the Debtors presently dispute and have objected to the Administrative Expense Claims asserted by the Executive Office of Health and Human Services of the Commonwealth of Massachusetts[64] and TRACO,[65] among others.

2. Claims that are not the Debtors' Responsibility. Under the terms of the Global Settlement Order, each Designated Operator assumed, among other things, "full responsibility for paying all go-forward hospital-level operating disbursements and expenses of the Specified ML[I] Hospitals incurred" after September 11, 2024. Any Administrative Expense Claims filed against the Debtors for services rendered at any Specified MLI Hospital following September 11, 2024 have therefore been excluded from the Aggregate Administrative Expense Claims Amount, as such amounts are the liability of the applicable Designated Operator and not the liability of the Debtors.

3. TSA Vendor Administrative Expense Claims that Will Be or Have Been Released. The Aggregate Administrative Expense Claims Amount does not include accounts payable claims or other Asserted Administrative Expense Claims that are contemplated to be, or have been, released in connection with or cured or otherwise assumed by Golden Sun TSA Services, LLC pursuant to a Quorum Vendor Fund Agreement that has been executed or is pending finalization and execution.

---

[63] As described in Section I.B hereto, if a particular holder of an Allowed Administrative Expense Claim disagrees with the amount listed as the Reconciled Amount but still wishes to participate in the Administrative Expense Claims Consent Program, that holder is encouraged to contact the Debtors' advisors **as soon as possible** upon receipt of the Consent Program Opt-Out Form at stewardvendorteam@weil.com and stewardclaims@alixpartners.com.

[64] *Motion of Debtors for Order Reclassifying Certain Priority Tax Claims and Administrative Expense Claims Filed by the Commonwealth of Massachusetts as General Unsecured Claims* (Docket No. 4970).

[65] *Debtors' Objection to TRACO's Motion to Compel*, No. 24-90213 (Bankr. S.D. Tex. Jan. 20, 2025) (Docket No. 3762).

4. **Postpetition Medical Malpractice and Workers Compensation Claims**.  Based on actuarial estimates, the Debtors estimate that an additional $18 million in medical malpractice and workers' compensation claims arising during the postpetition period in which the Debtors continued to operate hospitals could be asserted against the Debtors' estates.

5. **Accrued and Unpaid Postpetition Professional Fees**.  The Aggregate Administrative Expense Claims Amount does not include approximately $34 million in accrued and unpaid professional fees, which are, in accordance with the terms of the FILO DIP Order, cash collateralized by the Professional Fees Escrow Account (as defined therein).

Notwithstanding the foregoing, the Debtors' Administrative Expense Claims reconciliation process is still ongoing.  All amounts described in this Section IV.R, including the Administrative Expense Claims Amount, are subject to change as the Debtors continue their efforts to finalize their analysis of the asserted Administrative Expense Claims and maximize the value of their estates.  These estimates are based on, among other things, the Debtors' books and records, the Debtors' and their advisors' extensive reconciliation efforts and analysis of the merits of each asserted Administrative Expense Claim, and is subject to potential litigation and disagreement by the holders of such Administrative Expense Claims.  The Debtors' continuing efforts to negotiate, expunge, and/or minimize Asserted Administrative Expense Claims against their estates include, among other things:

1. **Negotiating Administrative Expense Claim Stipulations**.  The Debtors have negotiated directly with holders of Administrative Expense Claims (and in particular, with various claimants that filed motions to compel immediate payment) to efficiently confirm an Allowed portion of such claimants' Administrative Expense Claims and avoid further litigation.  As of the date hereof, the Debtors have entered into thirty-four (34) stipulations (including Quorum Vendor Fund Agreements) with holders of Administrative Expense Claims.  Pursuant to such stipulations (other than Quorum Vendor Fund Agreements), the Debtors have agreed to a total Allowed Administrative Expense Claim amount of $25,557,745 on account of such stipulations.

2. **Identifying Claims that Should Be Disallowed**.  Based on their comprehensive analysis, the Debtors have and continue to identify a substantial amount of Administrative Expense Claims that should be disallowed on account of being (i) duplicate claims; (ii) claims that were amended and/or superseded; (iii) claims against parties other than the Debtors; (iv) claims for goods or services which the Debtors never received; (v) claims with insufficient documentation;, and/or (vi) reclassified as general unsecured claims.  As of the date hereof, the Bankruptcy Court has sustained ten (10) omnibus objections expunging over $100 billion in filed Administrative Expense Claims (Docket Nos. 4347, 4348, 4351, 4352, 4353, 4354, 4355, 4356, 4358, 4359, and 4360).  On March 21, 2025, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Approving Omnibus Claims Objections Procedures and Filing of Substantive Omnibus Claims Objections, (II) Waiting the Requirement of Bankruptcy Rule 3007(6), and (III) Granting Related Relief* (Docket No. 4279), seeking approval to object on an omnibus basis to various claims filed on additional grounds, including, but not limited to, satisfied claims, unliquidated claims, and claims that seek recovery of amounts for which the Debtors are not liable.

3. **Identifying Claims that are the Designated Operators' Responsibility**. The Debtors further anticipate that a number of Administrative Expense Claims will be disallowed because

such Administrative Expense Claims are the responsibility of either the purchasers of the Debtors' former hospital operations or the Designated Operators as opposed to the Debtors. In particular, under the terms of the Global Settlement Order, each Designated Operator assumed, among other things, "full responsibility for paying all go-forward hospital-level operating disbursements and expenses of the Specified ML[I] Hospitals incurred" after September 11, 2024. As a result, any Administrative Expense Claims filed against the Debtors for services rendered at any Specified MLI Hospital following September 11, 2024 are the liability of the applicable Designated Operator and not the liability of the Debtors. The Debtors currently estimate a substantial portion of filed Administrative Expense Claims are ultimately the responsibility of the Designated Operators under the Global Settlement Order or were otherwise assumed by the Designated Operators in connection therewith.

4. <u>Utilizing the Vendor Fund Escrow Agreement</u>. Moreover, in connection with the TSA / EPDA Settlement Order, the Debtors entered into the Vendor Fund Escrow Agreement and established the Vendor Fund of approximately $14.8 million funded by MPT, BMC, Lifespan, and Orlando Health. The TSA / EPDA Settlement Order further authorized the Debtors and Quorum Health to resolve and pay certain TSA Vendors immediately on account of their outstanding Administrative Expense Claim pursuant to a Quorum Vendor Fund Agreement if such TSA Vendors agree to partial payment in full satisfaction of their Administrative Expense Claim against the Debtors. Specifically, the Vendor Fund Escrow Agreement contemplates that Quorum Health may offer payment out of the Vendor Fund pursuant to a Quorum Vendor Fund Agreement in the event a TSA Vendor agrees to at least a 60% reduction of their assured Administrative Expense Claim. Pursuant to the relief granted by the TSA / EPDA Settlement Order, the Debtors have secured the release of approximately $6.4 million of Administrative Expense Claims. The Debtors and Quorum Health are continuing to negotiate with a number of TSA Vendors and anticipate executing additional Quorum Vendor Fund Agreements with such parties to release other asserted Administrative Expense Claims against the Debtors' estates.

5. <u>Utilizing Preference and Avoidance Action Exposure</u>. Finally, the Debtors anticipate that their work to pursue preference and avoidance actions arising under chapter 5 of the Bankruptcy Code will reduce outstanding Administrative Expense Claims against the Debtors' estates. Through their retention of Togut and as detailed in Section IV.M.5.d hereof, the Debtors have undertaken a significant effort to monetize preference and avoidance actions on account of distributions made in the ninety (90) day period prior to the Petition Date. Many parties against which the Debtors hold preference and avoidance actions have asserted Administrative Expense Claims against the Debtors' estates. The Debtors may utilize such parties' preference exposure to reduce outstanding Administrative Expense Claims against the Debtors' estates.

## S. PBGC SETTLEMENT

The Plan provides for an additional settlement of certain outstanding issues between the Debtors and PBGC regarding the terms of termination of the Debtors' New England Sinai Hospital Pension Plan (the "**Pension Plan**") and a number of outstanding claims filed by PBGC against the Debtors. Specifically, PBGC has asserted claims against the Debtors on account of, among other things, (i) unfunded benefit liability in the amount of $4,606,480; (ii) unpaid minimum required contributions in the amount of

$813,677; and (iii) flat-rate and variable-rate in the amount of $1,794,915 (the "**PBGC Claims**"). PBGC asserted the PBGC Claims against every Debtor entity jointly and severally.

In an effort to reach a settlement with the PBGC on all outstanding issues, the Debtors' professionals and representatives of the PBGC engaged in a number of discussions to attempt to reach a consensual resolution on the termination of the Pension Plan and the appointment of PBGC as Trustee of the Pension Plan (pursuant to the Agreement for Appointment of Trustee and Termination of Plan), and have agreed to the resolution of all such issues pursuant to the terms of the PBGC Settlement and such trusteeship agreement. The Debtors and the PBGC have memorialized the terms of the PBGC Settlement in the Plan and term sheet attached hereto as **Exhibit G** (the "**PBGC Settlement Term Sheet**").

The key components of the PBGC Settlement are set forth in Section 4.5 of the Plan and PBGC Term Sheet and are summarized below:

     i.    The PBGC Claims shall be Allowed, as a prepetition general unsecured claim, in the amount of $8,750,000 (the "**Allowed PBGC Claims**").

     ii.    The holders of PBGC Claims will accept the Plan and not opt-out of the third party releases provided thereunder.

     iii.    In full settlement, in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Claims, on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests. With respect to any distribution of Plan Trust Assets to be made by the Plan Trustee, holders of PBGC Claims shall share ratably with holders of General Unsecured Claims in (i) 90% of GUC distributions until the Retained FILO Claims are paid in full and (ii) 100% of GUC distributions after the Retained FILO Claims are paid in full.

     iv.    For the avoidance of doubt, the PBGC Claims shall be the only Claims on which the PBGC shall be entitled to any Distribution in connection with the Debtors or the Plan.

The Debtors believe that the PBGC Settlement avoids the costly, time consuming and wasteful litigation that could have arisen out of reconciling and litigating the characterization of the PBGC Claims, and as a result, will increase recoveries to holders of Allowed Claims. Accordingly, the Debtors believe that the PBGC Settlement balances the risks and provides an equitable solution that is reasonable, fair and efficient.

## T.    PLAN SETTLEMENT

The Plan incorporates the proposed Plan Settlement by and between the Debtors, the Creditors' Committee, and the FILO Secured Parties, which is reflected in the Plan Support Agreement Term Sheet. The Plan Settlement provides that, among other things, (i) on or before the Effective Date, the Plan Trust Assets will be transferred to the Plan Trust, which shall be administered by the Plan Trustee; (ii) the Plan Trust Assets will be liquidated and the proceeds of the Plan Trust Assets will be distributed in accordance with the waterfall detailed in Section I.A hereof; (iii) the estates will retain $15,000,000 to be used in accordance with the terms of the Plan; (iv) subject to satisfying the condition, the Debtors will establish a fund in the amount of $12,500,000 for purposes of paying the holders of Allowed Administrative Expense

88

Claims that do not timely, properly, and affirmatively opt-out of the Administrative Expense Claims Consent Program up to 50% of their Allowed Administrative Expense Claims; and (v) the Plan will leave unaltered and shall not challenge the FILO Settlement Order. Moreover, the Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order approving the Plan Settlement, including the Bankruptcy Court's findings that the Plan Settlement is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the estates and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing. As a result of the Plan Settlement, each Class of Claims and Interests shall be treated as against a single consolidated estate without regard to the separate legal existence of the Debtors.

The Debtors believe that the Plan Settlement, which is supported by the Creditors' Committee and the FILO Secured Parties, is a fair and equitable resolution of all of these issues and the Debtors' chapter 11 cases, and in the best interests of all creditors. The Plan further constitutes a motion pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 seeking approval of the Plan Settlement. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such motion and each of the compromises or settlements contained in the Plan. Furthermore, the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interest, and fair and equitable.

> a.    *The Plan Settlement is Equitable*

Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve a compromise or settlement that is fair, reasonable, and in the best interest of the estate. *See In re Age Refin. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Settlements are considered "a desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act). The factors the Fifth Circuit courts consider in analyzing proposed settlements are: "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise." *See Age Refin. Inc.*, 801 F.3d at 540 (internal citations omitted). Under the rubric of the third factor, the Fifth Circuit has specified that courts should specifically consider "the paramount interest of creditors with proper deference to their reasonable views," *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995), and the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540 (citations omitted); *see also In re Goodman Networks, Inc.*, No. 22-31641-MVL7, 2024 WL 460478, slip op. at *8 (Bankr. N.D. Tex. Feb. 6, 2024).

In consideration of the legal and economic risks to all parties in interest, the Debtors have determined that the Plan Settlement (including the implementation of the FILO Settlement pursuant to the Plan and Confirmation Order) is a fair resolution of these chapter 11 cases that carries the Debtors' burden under Rule 9019, is fair and equitable, and is consistent with applicable law and the approaches taken by other debtors facing similar circumstances.

The Plan Settlement (including the implementation of the FILO Settlement pursuant to the Plan and Confirmation Order) is the product of arms' length, good faith negotiations between the Debtors, the

FILO Parties, and the Creditors' Committee, all mediated and overseen by the Honorable Judge Marvin Isgur.  Through the Plan Settlement (including the implementation of the FILO Settlement pursuant to the Plan and Confirmation Order), the Debtors seek to provide stakeholders with certainty as well as maximum distributions.  The Debtors and their advisors undertook an extensive analysis of the Debtors' operations and liquidity, the Administrative Proofs of Claim filed with the Bankruptcy Court ahead of the Administrative Expense Claims Bar Date, and carefully analyzed alternatives to Plan confirmation.  Given the quantum of Administrative Expense Claims in light of the Bankruptcy Code's requirement that all administrative expense claims be paid in full to confirm a chapter 11 plan, the Administrative Expense Claims Consent Program provides for a compromise and settlement with holders of Allowed Administrative Expense Claims that do not timely, properly, and affirmatively opt-out prior to the Consent Program Opt-Out Deadline to be deemed satisfied in full on account of such claim once they have received payment in cash equal to 50% of the applicable Allowed Administrative Expense Claims.  Moreover, the $15,000,000 advance made to the Debtors by the FILO Parties will allow the Debtors to have immediate access to the capital needed to allow the Debtors (i) to expedite an initial distribution to holders of Allowed Administrative Expense Claims that do not timely, properly, and affirmatively opt-out and (ii) to incentivize the holders of Administrative Expense Claims to participate in the Administrative Expense Claims Consent Program for the collective benefit of the Debtors' creditors.

The Debtors do not believe that further mediation—or engaging in value destructive litigation with the Creditors' Committee and the FILO Parties—would produce terms more advantageous to the Debtors' estates than the Plan Settlement (including the implementation of the FILO Settlement pursuant to the Plan and Confirmation Order).  The Debtors further believe that the attendant expenses to further mediation and/or litigation would ultimately cost the Debtors' estates more than any incremental value realized.  In light of the support of the Creditors' Committee, the expedited payments contemplated by the Administrative Expense Claims Consent Program, and the likelihood that the Administrative Expense Claims Consent Program will reduce the total amount of outstanding Allowed Administrative Expense Claims, the Debtors submit that all factors bearing on the wisdom of the compromise, including the paramount interest of the Debtors' creditors, weigh in favor of the Plan Settlement (including the implementation of the FILO Settlement pursuant to the Plan and Confirmation Order).

As such, the Debtors believe the Plan Settlement will minimize the chance of a value-destructive alternative to confirmation of the Plan, evade the possible delays associated with prolonged litigation, and adequately provide the Debtors with the resources and opportunity to maximize the value of their estates for the benefits of all creditors.  Therefore, the Debtors maintain that they carry their burden under Rule 9019 with respect to the Plan Settlement and have concluded that the Plan Settlement is fair, reasonable, and in the best interest of the Debtors and their estates.

b.      *The Plan Settlement Satisfies Section 1129(a)(9) of the Bankruptcy Code*

The treatment of Administrative Expense Claims under the Plan Settlement and the Administrative Expense Claims Consent Program comports with applicable law and is consistent with approaches adopted by other debtors facing similar circumstances and approved by courts.  Section 1129(a)(9) provides that "[e]xcept to the extent that the holder of a particular claim has agreed to different treatment of such claim," a plan must provide that the holder of a claim under sections 507(a)(2) and 507(a)(3) of the Bankruptcy Code "will receive on account of such claim cash equal to the allowed amount of such claim."  The holders of Administrative Expense Claims will be provided with a Consent Program Opt-Out Form in accordance with the instructions contained therein and the Consent Program Opt-Out Procedures.  The rights of the holders of Administrative Expense Claims to object to the Plan and opt-out of the Administrative Expense

90

Claims Consent Program have been fully preserved. Moreover, the provisions of this Disclosure Statement have been designed to ensure that the holders of Administrative Expense Claims are fully informed of their rights and make clear that any holder of an Allowed Administrative Expense Claim that **does not timely, properly, and affirmatively opt-out** of the Administrative Expense Claims Consent Program shall be deemed to consent to the Administrative Expense Claims Consent Program and support the Plan. For the avoidance of doubt, to the extent a holder of an Administrative Expense Claim enters into a Quorum Vendor Fund Agreement and receives payment through such agreement on account of its Administrative Expense Claim, such Administrative Expense Claim shall not receive the treatment or any payment in connection with the Administrative Expense Claims Consent Program.

U.  **TIMETABLE FOR CHAPTER 11 CASES**

On the earlier of the Outside Date and one (1) business day following the Confirmation Date, the Litigation Trust will be formed, and, subject to certain exceptions, the Plan Administrator will transfer substantially all of the estates' assets to the Litigation Trust. To the extent the Plan is confirmed prior to the Outside Date, the Litigation Trust will be formed pursuant to the terms of the Plan and the Confirmation Order. However, if the Plan is not confirmed prior to the Outside Date, the Litigation Trust will be formed pursuant to the terms of the FILO Settlement Order and the FILO Settlement Term Sheet.

In the event that a plan is not confirmed by August 1, 2025, the FILO Parties may exercise remedies with respect to the Retained Cash, and the Retained Cash shall no longer be available to pay the holders of Administrative Expense Claims or otherwise be utilized by the Debtors' estate.

V.

**CERTAIN RISK FACTORS AFFECTING DEBTORS**

Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement, together with the attachments, exhibits, or documents incorporated by reference herein, including the letter from the Creditors' Committee to holders of unsecured claims setting forth, among other things, any Creditors' Committee's recommendation that holders of General Unsecured Claims entitled to vote on the Plan vote to accept the Plan (the "**Creditors' Committee Position Letter**").

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. NEW FACTORS, RISKS, AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS, AND UNCERTAINTIES.

A.  **CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

1.  *Risk of Non-Confirmation of Plan*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion, that modifications to the Plan will not be required for

WEIL:\100544464\2\76000.0004

confirmation, or that such modifications would not necessitate re-solicitation of votes. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.

Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all holders of Claims and Interests entitled to vote in favor of the Plan vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation (including under section 1129 of the Bankruptcy Code) are not met. Confirmation of the Plan is also subject to certain conditions as described in Article XI of the Plan. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive, if anything, with respect to their Claims or Interests in a subsequent plan.

2.      *Non-Consensual Confirmation*

In the event any Impaired Class of Claims or Interests entitled to vote on the Plan does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the proponent's request if at least one Impaired Class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such Class), and as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Classes. Should any Class vote to reject the Plan, these requirements must be satisfied with respect to such rejecting Class. The Debtors believe that the Plan satisfies these requirements.

3.      *Risk of Non-Occurrence of Effective Date*

Although the Debtors believe that the Effective Date will occur, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article XI of the Plan, then all distributions contemplated under the Plan to occur on the Effective Date would not be made and the obligations with respect to the applicable Claims and Interests would remain unchanged.

4.      *Risks Related to Possible Objections to Plan*

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

5.      *Risk of Termination of Plan Settlement*

In the event that the Plan is not confirmed by the Outside Date, as contemplated by the FILO Settlement Order, substantially all of the Debtors' assets will be transferred to the Litigation Trust. Failure of the Debtors to obtain confirmation of the Plan prior to the Outside Date could result in, among other things, an extended chapter 11 confirmation process or no chapter 11 plan being confirmed at all, which could in turn significantly and detrimentally impact the Debtors' remaining assets and liquidity.

6. *Releases, Injunctions, and Exculpation Provisions May Not be Approved*

Article XII of the Plan provides for certain releases, injunctions, and exculpations, for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Exculpated Parties, or the Released Parties, as applicable. Nothing contained in the terms of the Plan, nor the release of any claims pursuant thereto, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it evidence, indicative of the merits, or a waiver of any Claims against any Non-Released Party. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

7. *Risks Related to Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

The Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

8. *Alternative Restructuring*

If the Plan cannot be confirmed or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Debtors thereafter will consider all available restructuring alternatives, including filing an alternative chapter 11 plan or converting to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. In addition, the Litigation Trust Assets will be transferred to the Litigation Trust by the Outside Date regardless of whether the Plan is confirmed. The terms of any alternative restructuring proposal, including any alternative proposal developed following the Outside Date, are uncertain and may be less favorable to holders of Claims and Interests against the Debtors than the terms of the Plan as described in this Disclosure Statement.

9. *Factors Affecting the Recoveries of Holders of Allowed Administrative Expense Claims*

It is possible that the amount of Allowed Administrative Expense Claims will be higher than the range the Debtors have estimated to date, and thus recoveries could be materially reduced or eliminated. In addition, the timing or amount of actual distributions to holders of Allowed Administrative Expense Claims may be affected by many factors, including the level of participation in the Administrative Expense Claims Consent Program, which cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Administrative Expense Claim. The Debtors further cannot guarantee the level of participation, and therefore cannot guarantee the amount of any distributions to the holders of Administrative Expense Claims on account of the Administrative Expense Claims Consent Program, or the

timing of subsequent distributions. Moreover, the Administrative Expense Claims Consent Program is conditioned upon the meeting of the Minimum Participation Threshold. If the Minimum Participation Threshold is not satisfied or waived by the Debtors and the Creditors' Committee, the Debtors' estates shall retain the Settled Administrative Expense Claims Cash Pool equal to $12.5 million.

10.  *Claims Could Be More than Projected*

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to other Classes to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Specifically, the Allowed Administrative Expense Claims may be higher than anticipated. Accordingly, there is a risk that the Debtors will not be able to pay in full in Cash all Administrative Expense Claims, which is a condition to the occurrence of the Effective Date.

11.  *Projected Distributions to Holders of Allowed Claims*

While the Debtors have endeavored to project what they believe are likely distributions to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that holders will receive the distributions described in the Plan. The projections will necessarily be affected by, among other things, (i) recoveries generated in connection with the liquidation of all of the Debtors' remaining assets; (ii) the outcome of objections to Claims; (iii) the outcome of Causes of Action brought by the Debtors' estates; and (iv) the cost and expenses of such actions, implementing the Plan, and generally administering and winding down the Debtors' Estates.

12.  *Administrative Insolvency*

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code (i.e., allowed Administrative Expense Claims) receive Cash equal to the full allowed amount of such claim, unless such holder agrees to different treatment. To the extent that a Debtor is unable to pay such Claims in full or otherwise agree to treatment with the applicable holder, such Debtor may be unable to confirm a chapter 11 plan. Furthermore, certain factors could also impact the Debtors' administrative solvency, including reconciliation of 503(b)(9) Claims, ongoing litigation, and professional fees, which may also impact the Debtors' ability to confirm a chapter 11 plan. Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim entitled to priority under section 507(a) of the Bankruptcy Code (i.e., allowed priority tax claims) receive regular installment payments in Cash of a total value equal to the allowed amount of such claim over a period ending not later than five (5) years after the petition date, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under such plan. Finally, other priority claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as Cash equal to the full allowed amount of such claim).

To the extent that the Debtors are unable to pay section 507(a)(2) and (a)(3) claims in full or otherwise agree to treatment with the applicable holder, the Debtors may be unable to achieve the Effective Date of the Plan. The Debtors believe they will be able to satisfy all Allowed Administrative Expense Claims in full as of the Effective Date. However, certain factors could impact the Debtors' administrative

94

solvency, including reconciliation of Administrative Expense Claims, ongoing litigation, and professional fees, which may also impact the Debtors' ability to confirm or achieve the Effective Date of the Plan.

13.     *Conversion to Chapter 7*

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, the chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. Under section 704 of the Bankruptcy Code, a chapter 7 trustee must, among other duties, collect and convert property of the estates as expeditiously as is compatible with the best interests of parties in interest, which could result in potentially reduced recoveries.

The Debtors believe that liquidation under chapter 7 would likely result in significantly smaller distributions being made to the Debtors' creditors, including the holders of administrative expense claims under section 503(b) of the Bankruptcy Code, than as provided for in the Plan due in part to, among other things, (i) additional administrative expenses generated by the appointment of a chapter 7 trustee and the liquidation; (ii) the incurrence of other additional Claims, some of which may be entitled to priority (including pursuant to the requirements of section 726 of the Bankruptcy Code); (iii) the possibility that certain claims or causes of action, including claims under chapter 5 of the Bankruptcy Code, may be brought against the Debtors; (iv) the risk that certain of the Debtors' or the Litigation Trust's remaining assets may be sold, disposed of, or otherwise liquidated in a disorderly fashion over a short period of time, or the Debtors' resources necessary to support the Litigation Trust may become unavailable; (v) the possibility that conversion to cases under chapter 7 of the Bankruptcy Code could cause employees with critical information to leave the Debtors' estates; and (vi) increased postpetition tax Claims, which would be administrative claims senior to general unsecured claims. *See* Section 116VIII.1 of this Disclosure Statement, as well as the Liquidation Analysis attached hereto as **Exhibit C**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of the holders of Claims and Interests.

14.     *Dismissal of Chapter 11 Cases*

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, one or more of the chapter 11 cases may be dismissed by order of the Bankruptcy Court.

15.     *Cost of Administering Debtors' Estates*

Liquidation of the Debtors' remaining assets and the disbursement of the proceeds of such liquidation, as well as the wind-down of the Debtor entities, will require certain administrative costs that may vary based on a variety of factors, including many out of the Debtors' control. Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan, including recoveries of the holders of Allowed Administrative Expense Claims.

95

### B. ADDITIONAL FACTORS TO BE CONSIDERED

1. *Debtors Could Withdraw Plan*

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors, including in accordance with Section 14.7 of the Plan.

2. *No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the Petition Date, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3. *No Representation Outside Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, these chapter 11 cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement or any Creditors' Committee Position Letter should not be relied upon by you in arriving at your decision.

4. *No Legal or Tax Advice Is Provided*

The contents of this Disclosure Statement should **not** be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest. This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5. *No Admission Made*

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

6. *Certain Tax Consequences*

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Section VI hereof.

7. *The Debtors are Under Investigation*

The Debtors are or may be subject to various investigations, inquiries, requests for information or informal or formal proceedings from federal, state and international authorities related to certain prepetition conduct of certain Debtor entities, as well as certain affiliated non-Debtor entities and former directors and officers of the Debtors. The Debtors have cooperated with the relevant authorities regarding these investigations and provided documents responsive to the requests, and continue to work with such

96

authorities on investigations related to the businesses and prepetition conduct of certain Debtor and affiliated non-debtor entities. At this time, it is impossible to estimate the impact of such investigations.

The Debtors continue to be subject to ongoing proceedings, as well as investigations of potential claims, and it is possible that parties (including governmental parties) may commence additional litigation against the Debtors. In addition, as a result of these investigations, the Debtors could be subject to additional civil or criminal penalties or administrative sanctions, including fines, disgorgement, restitution, compliance orders and suspension of licenses, any of which could adversely affect the Debtors' financial condition and creditor recoveries.

8.      *Ongoing Litigation and Other Contingencies Could Affect the Outcome of the Chapter 11 Cases*

The Plan contemplates that the Estate Representative will collect on certain present and future Claims and Causes of Action and distribute recovered amounts to creditors, including the Claims and Causes of Action described in Section IV.M hereto. The Debtors cannot predict with certainty the outcome or effect of the resolution of claims arising from such pending and future litigation. An adverse outcome in any litigation on which distributions under the Plan depend could materially affect the recovery of creditors or the Debtors' ability to confirm the Plan. Specifically, the occurrence of such contingencies could, among other things, materially affect (i) the amount of distributions to holders of Claims and Interests under the Plan and the Plan Trust Agreement; (ii) result in protracted chapter 11 cases and/or delay the timing of distributions to Plan Trust Beneficiaries; (iii) significantly and detrimentally impact the Debtors' relationships with, among others, vendors, suppliers, and employees; and/or (iv) result in the dismissal of these chapter 11 cases or the conversion of these chapter 11 cases to chapter 7 of the Bankruptcy Code.

9.      *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Estate Representative or any entity as the case may be, to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

10.      *Failure to Identify Litigation Claims or Causes of Action*

No reliance should be placed on the fact that a particular litigation claim or a projected objection to a particular Claim or Cause of Action is, or is not, identified in this Disclosure Statement. The Estate Representative may seek to investigate, file, and prosecute Claims or Causes of Action and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Causes of Action or objections to such Claims or Interests.

11.      *The Expected Valuations of the Debtors' Remaining Assets are Inherently Uncertain*

The estimated valuations of the Debtors' Assets reflect estimates of future value based on limited information available to the Debtors as of the date of this Disclosure Statement. The estimated valuations reflect numerous assumptions with respect to future events, including general litigation risks and other matters specific to such assets, many of which are difficult to predict and/or beyond the Debtors' control.

97

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court and that the Effective Date will occur, there can be no assurance that the value realized on account of the Debtors' assets will be consistent with any estimates herein, and actual results may differ materially from any such estimates contained in this Disclosure Statement. Particularly, realizing the value of the Debtors' assets may take multiple years. Such estimates, by their nature, may fluctuate and/or become subject to greater uncertainty over time. In addition, whether actual financial results, litigation, and any other future developments are ultimately consistent with the Debtors' expectations and assumptions as reflected herein may depend on factors outside of the Debtors' control that could adversely affect the value of such assets.

12.     *Objection to Amount or Classification of Claims*

The Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimate set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of any Claim whose Claim is or may be subject to an objection may not receive its specified share of the estimated distributions described in this Disclosure Statement.

# VI.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Allowed Claims. This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are unimpaired or deemed to reject the Plan or will be paid in full in cash.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), the U.S. Treasury regulations thereunder (the "**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their individual circumstances or to a holder that may be subject to special tax rules (*e.g.*, any person who is not a U.S. Holder (as defined below), controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, broker-dealers, mutual funds, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, governmental authorities or agencies, retirement plans, individual retirement and other tax-deferred

98

accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction or other integrated investment). In addition, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes.

Additionally, this discussion assumes that the various debt and other arrangements to which any of the Debtors is a party (including, prior to the Plan Trust Establishment Date, the Retained FILO Claims) will be respected for U.S. federal income tax purposes in accordance with their form and, except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

## A. CONSEQUENCES TO THE DEBTORS

Each of the Debtors is either a member of an affiliated group of corporations that files a consolidated U.S. federal income tax return with SHC Holdings as the common parent (such group, the "**Steward Group**"), an entity disregarded as separate from its owner for U.S. federal income tax purposes whose activities and operations are reflected on the consolidated U.S. federal income tax return of the Steward Group, or a partnership for U.S. federal income tax purposes in which one or more other Debtors owns a partnership interest.

The Steward Group has changed its fiscal year to an August 31st year end as of August 31, 2024. Accordingly, the Steward Group is currently in the process of filing tax forms necessary to effectuate the change in its U.S. federal taxable year from the calendar year to a fiscal year ending August 31st, using certain automatic change procedures that are available in certain circumstances, effective August 31, 2024 (the "**Taxable Year Change**"). This will result in the Steward Group having a short taxable year for the period beginning January 1, 2024 and ending August 31, 2024 (the "**2024 Short Year**"), with a new taxable year beginning on September 1, 2024 and ending on August 31, 2025 (or such earlier date as the Debtors liquidate for U.S. federal income tax purposes) (the "**2024-2025 Taxable Year**"). The remainder of this discussion assumes that, as the Debtors intend, the Taxable Year Change will be completed. If the Taxable Year Change is not completed, it is expected that the Steward Group's U.S. federal income tax liability as a result of the transactions contemplated by the Plan would be substantially higher than the current projections discussed below.

As a result of losses from operations during the 2024 Short Year, the Debtors currently expect the Steward Group to have a substantial U.S. federal net operating loss ("**NOL**") and substantial disallowed business interest expense carryforwards as of September 1, 2024, as well as certain state NOL carryforwards. For the 2024-2025 Taxable Year, the Steward Group expects to recognize a significant

amount of taxable income as a result of, among other things, dispositions of assets, the Global Settlement (*see* Sections IV.K.2.c of this Disclosure Statement) and the transactions contemplated by the Plan (including the deemed transfer of assets to the beneficiaries of the Plan Trust and the Litigation Trust (together, the "**Trusts**") in respect of their Allowed Claims, as discussed below).  However, as discussed below, it is also expected that the Steward Group will recognize substantial taxable losses in connection with the wind-down of the Debtors that, in addition to available loss carryovers, could largely or entirely offset the taxable income and gain for the taxable year depending on the circumstances.

1.      *The Wind-Down of the Debtors*

On the Litigation Trust Establishment Date, in accordance with the Plan and the FILO Settlement Order, the Debtors will transfer the Litigation Trust Assets to the Litigation Trust.  On the Plan Trust Establishment Date, in accordance with the Plan, the Debtors will transfer all their then remaining assets (other than any Intercompany Interests and any assets distributed to holders of Allowed Claims on the Plan Trust Establishment Date) to the Plan Trust. The Plan Trust Establishment Date potentially could occur concurrently with or shortly after the Litigation Trust Establishment Date, depending in part on the timing of confirmation of the Plan, or at some later point in time. The Debtors' transfer of assets to the Litigation Trust is expected to be treated a taxable transfer of the Litigation Trust Assets, at a minimum to the extent of the undivided interest in such assets represented by the Class A Litigation Trust Interests.  The Debtors' concurrent or subsequent transfer of assets to the Plan Trust (including the Class B Litigation Trust Interests) for the benefit of creditors is expected to result in the taxable transfer of such assets (including any portion of the Litigation Trust Assets not taxed upon the transfer to the Litigation Trust) and the constructive liquidation of the Debtors for U.S. federal income tax purposes on the Plan Trust Establishment Date (since the Debtors will have no continuing economic interest in the Trusts). Accordingly, assuming the Plan Trust Establishment Date occurs on or before August 31, 2025, the Debtors expect the 2024-2025 Taxable Year to be the final taxable year of the Steward Group.  For a further discussion of the tax treatment of the transfers of assets to the Litigation Trust and the Plan Trust, *see* Section VI.C., below, "Tax Treatment of the Trusts and their Beneficiaries."

The Debtors have a substantial amount of built-in tax gain in certain assets that will be transferred to the Trusts (based on alternative valuation assumptions within a range of potential recoveries). Thus, the transfers to the Trusts are expected to generate a significant amount of taxable gain to the Debtors. In addition, the Debtors are expected to recognize additional income or gain as a result of the liquidation of certain of the Debtors, such as due to the existence of negative tax basis (also called "excess loss accounts") in the stock of certain members of the Steward Group.  On the other hand, the Debtors are expected to recognize a substantial amount of deductions and losses in connection with the liquidation of the Debtors pursuant to the Plan.  Assuming the Debtors completely liquidate for U.S. federal income tax purposes on or before August 31, 2025, preliminary projections (based on certain valuation and other assumptions) indicate that expected taxable losses could largely or entirely offset the Steward Group's expected taxable income for the 2024-2025 Taxable Year.  If the Debtors were to remain in existence for U.S. federal income tax purposes after the end of the 2024-2025 Taxable Year, the Debtors' income tax liability for the 2024-2025 Taxable Year or subsequent taxable years could be significantly higher than otherwise would be incurred due to a combination of consequences (including the reduction in any end-of-year NOL carryforwards to the extent of excluded cancellation of debt income during the year, as discussed in the next section). In addition, if the Debtors' intended tax treatment of certain transactions related to the Global Settlement is ultimately not sustained, the Debtors' U.S. federal, state and local income tax liability for the 2024-2025 Taxable Year could materially increase. Under current law, any NOL incurred by the Steward Group in a succeeding taxable year cannot be carried back to reduce such tax liability.

100

As discussed below, the Trusts are intended to qualify as "liquidating trusts" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301.7701-4(d) (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity) and the Plan requires that all parties report for U.S. federal income tax purposes consistent therewith. *See* Section C. below, "Tax Treatment of the Trusts and their Beneficiaries." Accordingly, for U.S. federal income tax purposes, the Debtors will treat the transfer of beneficial interests in a Trust with respect to a Class of Claims and the Estate Funding as a first step transfer of the underlying assets to which such beneficial interests relate.

2. *Cancellation of Debt and the Reduction of Tax Attributes*

In general, absent an applicable exception, a taxpayer must recognize cancellation of debt ("**COD**") income from the satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD income is generally the excess of (a) the "adjusted issue price" (within the meaning of the Treasury Regulations) of the indebtedness satisfied over (b) the sum of the amount of cash paid, the issue price of any new indebtedness issued, and the fair market value of any other non-cash consideration, given in satisfaction of such indebtedness at the time of the exchange.

However, if the taxpayer is under the jurisdiction of a court in a case under title 11 of the Bankruptcy Code and the cancellation or discharge of debt occurs pursuant to a bankruptcy court order or confirmed plan, any resulting COD income is excluded from gross income. As a consequence of such exclusion, a debtor must reduce certain of its tax attributes by up to the amount of the excluded COD income. Tax attributes are generally reduced in the following order: (a) current year NOLs and NOL carryforwards, (b) general business credit carryovers, (c) current year net capital losses and capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the taxpayer remains subject immediately after the discharge), (e) passive activity loss and credit carryovers, and (f) foreign tax credit carryovers. Alternatively, if advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOLs or other tax attributes. In the absence of contrary guidance, it appears that disallowed business interest expense carryovers under section 163(j) of the Tax Code are not subject to reduction under these rules. Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the other members of the tax consolidated group also be reduced. Any reduction in tax attributes in respect of excluded COD income does not occur until after the determination of the debtor's income or loss for the taxable year in which the excluded COD income is incurred.

Any excess excluded COD income over the amount of available tax attributes described above generally will not give rise to U.S. federal income tax. However, if the debtor joins in the filing of a consolidated U.S. federal income tax return and has an excess loss account with respect to its stock, a group member holding such stock may recognize income or gain in respect of such excess loss account to the extent that the debtor's excluded COD income is not applied to reduce tax attributes of the tax consolidated group.

The Debtors expect to incur a substantial amount of excluded COD income and related attribute reduction as a result of the Global Settlement and the transactions contemplated by the Plan. The U.S. federal income tax consequences of such attribute reduction depends on whether the Plan Trust Establishment Date and expected resulting liquidation of the Debtors for U.S. federal income tax purposes occurs on or before August 31, 2025 (*i.e.*, the end of the 2024-2025 Taxable Year). Assuming the liquidation of the Debtors for U.S. federal income tax purposes occurs on or before such date, the resulting

101

tax attribute reduction generally would not occur until after the determination of the tax liability for such taxable year, at which point any reduction in tax attributes would have no practical impact (since the Debtors would no longer exist for U.S. federal income tax purposes after such taxable year). If the Debtors were to remain in existence for U.S. federal income tax purposes after such date (*i.e.*, after the end of the 2024-2025 Taxable Year), the tax attribute reduction resulting from COD transactions during the 2024-2025 Taxable Year (in particular, the Global Settlement) could materially increase the Debtors' income tax liability in subsequent taxable years in connection with the implementation of the Plan.

## B.    CONSEQUENCES TO U.S. HOLDERS OF CERTAIN ALLOWED CLAIMS

This section of the Disclosure Statement discusses the U.S. federal income tax consequences to holders of Allowed FILO Bridge Claims and Allowed General Unsecured Claims who are U.S. Holders (and does not discuss tax consequences for those who are not U.S. Holders). As used herein, the term "**U.S. Holder**" means a beneficial owner of an Allowed FILO Bridge Claim or Allowed General Unsecured Claim that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds any such Claim, the tax treatment of a partner in such partnership generally will depend upon the status of the partner, the activities of the partnership and certain determinations made at the partner-level. If you are a partnership holding any such Claim or a partner in any such partnership, you are urged to consult your own tax advisor regarding the U.S. federal income and other tax consequences of the Plan.

1.    *Treatment of Allowed FILO Bridge Claims and Allowed General Unsecured Claims*

Pursuant to the FILO Settlement Order in conjunction with and pursuant to the Plan, each holder of an Allowed Remaining FILO Bridge Claim and an Allowed FILO DIP Claim will receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Claim, its Pro Rata Share of the Class A-2 Litigation Trust Interests and, in the case of an Allowed FILO DIP Claim, in respect of the Secured Interim Advances, Class A-1 Litigation Trust Interests.

Pursuant to the Plan (in conjunction with the FILO Settlement Order), each holder of a Retained FILO Claim, an Allowed General Unsecured Claim, or an Allowed PBGC Claim will receive, in full and final satisfaction, settlement, release and discharge of such Allowed Claim, Plan Trust Interests. Upon

102

establishment of the Plan Trust, the Debtors will transfer to the Plan Trust all of their then remaining assets (including all rights with respect to the Class B Litigation Trust Interests), other than Intercompany Interests and any assets distributed to holders of Claims on the Litigation Trust Establishment Date or Plan Trust Establishment Date.

As discussed below, each holder of an Allowed FILO Bridge Claim, Allowed FILO DIP Claim, Allowed General Unsecured Claim and Allowed PBGC Claim and each FILO Party that provided the Estate Funding generally will be treated for U.S. federal income tax purposes as directly receiving in satisfaction of and exchange for such Allowed Claim or Estate Funding, and thereafter as a direct owner of, an undivided interest in the underlying assets of the Litigation Trust or of the Plan Trust (which itself includes an interest in the Litigation Trust and, thus, an undivided interest in the Litigation Trust Assets), subject to any assets of the Plan Trust allocable to, or held on account of, Disputed Claims being treated as a "disputed ownership fund" or other separate taxable entity for U.S. federal income tax purposes.

The Estate Representative, in consultation with the Litigation Trustee, will in good faith value the assets transferred to the Litigation Trust, and the Plan Trustee will in good faith value the assets transferred to the Plan Trust. All parties (including holders of Allowed Claims receiving interests in the Litigation Trust or the Plan Trust) must consistently use such valuations for all U.S. federal income tax purposes. The Estate Representative or Plan Trustee, as applicable, will inform the holders of beneficial interests and other applicable parties of such valuations, as may be relevant from time to time.

For a further discussion of the U.S. federal income tax treatment of receiving and owning a beneficial interest in the Litigation Trust or Plan Trust, *see* Section VI.C below, "Tax Treatment of the Trusts and their Beneficiaries." The combined trust assets potentially include all A/R Co Assets, certain joint venture interests, rights to certain insurance proceeds and various causes of action (subject to any liabilities and obligations for which the Trusts are responsible under the Plan or applicable trust agreement).

a.      *Gain or Loss With Respect to Allowed FILO Bridge Claims*

The Debtors expect that U.S. Holders of Allowed FILO Bridge Claims will have a taxable event in connection with the satisfaction of their Allowed Remaining FILO Bridge Claim upon formation of the Litigation Trust and a second taxable event upon the satisfaction of their Retained FILO Claims upon formation of the Plan Trust, unless the two transactions occur concurrently, in which event the Allowed FILO Bridge Claims should be treated as satisfied for the combination of Class A-2 Litigation Trust Interests and Plan Trust Interests.

Although the Plan purports to treat an Allowed Remaining FILO Bridge Claim and a Retained FILO Claim as distinct claims, they actually represent parts of a single Claim – an Allowed FILO Bridge Claim. The Debtors therefore believe that, for U.S. federal income tax purposes, the holders of Allowed FILO Bridge Claims should be treated, upon the receipt of Class A-2 Litigation Trust Interests for their Allowed Remaining FILO Bridge Claims, as receiving in satisfaction of their Allowed FILO Bridge Claims the combination of (i) the Class A-2 Litigation Trust Interests and (ii) the Retained FILO Claims (which the Debtors expect to treat for U.S. federal income tax purposes as a new debt obligation under the tax rules for debt modifications, unless the Plan Trust Interests are concurrently distributed with respect to such Claims, in which event the Plan Trust Interests should simply be viewed as additional consideration in respect of the Allowed FILO Bridge Claims and the Retained FILO Claims should be disregarded).

103

Accordingly, the Debtors expect that, on the Litigation Trust Establishment Date, a U.S. Holder of an Allowed FILO Bridge Claim generally should recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value of any other property deemed received by reason of its undivided interest in the assets transferred to the Litigation Trust and the issue price (as determined for U.S. federal income tax purposes) of the Retained FILO Claims (unless such Claims are concurrently satisfied, in which event one would substitute for the Retained FILO Claims the amount of any cash and the fair market value of any other property deemed received by reason of the holder's undivided interest in the assets transferred to the Plan Trust), and (ii) the U.S. Holder's adjusted tax basis in such Allowed Claim, excluding both from the consideration received and a holder's tax basis in its Claim any amounts attributable to a Claim for accrued but unpaid interest and possibly accrued original issue discount ("**OID**").

Unless a holder's Retained FILO Claim is satisfied concurrently with its Remaining FILO Bridge Claim, the Debtors expect that, on the Plan Trust Establishment Date, the holder generally should recognize gain or loss with respect to its Retained FILO Claims in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value of any other property deemed received by reason of the holder's undivided interest in the assets transferred to the Plan Trust (other than any consideration attributable to a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. holder's adjusted tax basis in such Retained FILO Claim (excluding, in the case of any U.S. Holder, any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* Section VI.B.2 below, "Timing and Character of Gain or Loss." For a discussion of the accrued but unpaid interest and accrued OID, *see* Section VI.B.3 below, "Distributions in Discharge of Accrued Interest or OID".

Holders of Allowed FILO Bridge Claims are urged to consult their tax advisor with respect to the income tax consequences of the Plan to them.

b.    *Gain or Loss With Respect to Allowed General Unsecured Claims*

In general, a U.S. Holder of an Allowed General Unsecured Claim should recognize gain or loss with respect to its Allowed Claim in an amount equal to the difference between (i) the sum of the amount of any cash and the fair market value of any other property deemed received by reason of the holder's undivided interest in the assets transferred to the Plan Trust (other than any consideration attributable to a Claim for accrued but unpaid interest and possibly accrued OID) and (ii) the U.S. Holder's adjusted tax basis in such Allowed Claim (excluding, in the case of any U.S. Holder, any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* Section VI.B.2 below, "Timing and Character of Gain or Loss." For a discussion of the accrued but unpaid interest and accrued OID, *see* Section VI.B.3 below, "Distributions in Discharge of Accrued Interest or OID".

c.    *Tax Basis and Holding Period*

A holder should obtain a tax basis in such holder's respective interest in each of the underlying assets of the Litigation Trust and the Plan Trust (including, in the case of holders of Plan Trust Interests, such holders' respective portion of the underlying Litigation Trust Assets treated as directly held by such holders for U.S. federal income tax purposes by reason of the Class B Litigation Trust Interests held by the Plan Trust) equal to the fair market value of such holder's interest in such assets as of the date such assets are treated as having been transferred to the holder. For U.S. federal income tax purposes, such holder's holding period with respect to such assets should begin on the day following such transfer to the holder.

104

2. *Timing and Character of Gain or Loss*

In the event of a subsequent disallowance of a Disputed General Unsecured Claim, it is possible that a U.S. Holder of a previously Allowed FILO Bridge Claim or General Unsecured Claim may be considered to receive additional distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed FILO Bridge Claim or Allowed General Unsecured Claim may be deferred until all Disputed General Unsecured Claims that affect the amount distributable to such previously Allowed Claim are Allowed or disallowed. In addition, it is possible that a holder will have additional gain in respect of any such additional distributions received. For additional information regarding tax reporting related to Disputed Claims, *see* Section VI.C.3 below, "Tax Reporting for Trust Assets Allocable to Disputed Claims."

After the date of establishment of the applicable Trust, a U.S Holder's share of any collections received on the assets of the Litigation Trust or Plan Trust (as applicable) (other than as a result of the subsequent disallowance of Disputed Claims or the reallocation of undeliverable distributions) should not be included, for U.S. federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Litigation Trust or Plan Trust, as applicable.

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether such Claim was acquired at a market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction or worthless security deduction with respect to such Claim.

A U.S. Holder that purchased its Allowed FILO Bridge Claim or Allowed General Unsecured Claim from a prior holder at a "market discount" (relative to the principal amount of such Claim at the time of acquisition) may be subject to the market discount rules of the Tax Code unless an exception applies. A U.S. Holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the U.S. Holder's adjusted tax basis in its Claim immediately after its acquisition is less than the adjusted issue price of such Claim (or, in the case of a Claim issued without OID, the sum of all remaining payments to be made on the Claim, excluding "qualified stated interest") by at least a statutorily defined *de minimis* amount. Under these rules, gain recognized on the taxable disposition of a Claim that is subject to the market discount rules generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued.

3. *Distributions in Discharge of Accrued Interest or OID*

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income for U.S. federal income tax purposes). Conversely, a U.S. Holder may be entitled to recognize an ordinary loss to the extent any accrued interest claimed or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID.

105

Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that consideration received in respect of an Allowed Claim is allocable first to the principal portion of the Allowed Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remaining portion of the Allowed Claim. *See* Section 8.14 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in income for U.S. federal income tax purposes.

## C.      TAX TREATMENT OF THE TRUSTS AND THEIR BENEFICIARIES

### 1.      *Classification of the Trusts as "Liquidating Trusts"*

The Litigation Trust and the Plan Trust are intended to qualify as "liquidating trusts" within the meaning of Treasury Regulation section 301.7701-4(d) for U.S. federal income tax purposes (except to the extent that any assets of the Plan Trust allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 et seq. or other separate taxable entity, as discussed below). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Trusts will be structured with the intention of complying with such general criteria, to the extent possible.

Pursuant to the Plan, all parties (including, without limitation, the Debtors, the Litigation Trustee, the Plan Trustee, the Litigation Trust Beneficiaries, and the Plan Trust Beneficiaries) are required to treat the assets transferred to the respective trusts as (i) transferred directly to the holders of Allowed Claims, or providers of Estate Funding, entitled to receive the beneficial interests therein (other than to the extent any assets allocable to, or held on account of, Disputed Claims are treated as held by a disputed ownership fund or other separate taxable entity, and other than to the extent, if any, of the Debtors' interest in such trust), and (ii) immediately thereafter, transferred to the applicable trust(s) by such parties (and, if applicable, the Debtors). Any persons or group of persons will be treated as directly receiving an undivided interest in the assets transferred in accordance with their relative economic interest in the respective trust.

Accordingly, as to the transfer of the assets to the Plan Trust, the parties are required to treat the transfer of assets by the Debtors to the Plan Trust (including the Class B Litigation Trust Interests) as (A) the transfer of such assets and, by reason of the transfer of the Class B Litigation Trust Interests, a respective portion of the underlying assets of the Litigation Trust (in each case, subject to any liabilities and obligations relating to those Assets) by the Debtors directly to the holders of Allowed Claims entitled to receive Plan Trust Interests in satisfaction of their Claims, other than to the extent such assets are treated as held by a disputed ownership fund or other separate taxable entity, followed by (B) the transfer of such assets (subject to such liabilities and obligations) by such holders to the Plan Trust in exchange for Plan Trust Interests.

106

As to the transfer of the Litigation Trust Assets to the Litigation Trust, the parties are required to treat such transfer as follows:

(i)     if the transfer of assets to the Litigation Trust and Plan Trust (and distribution of Litigation Trust Interests and Plan Trust Interests) occur *concurrently*, as (A) the transfer of the Litigation Trust Assets directly to the holders of Allowed Claims entitled to receive Litigation Trust Interests, to the FILO Parties that provided the Estate Funding and, by reason of the Class B Litigation Trust Interests transferred to the Plan Trust, to holders of Allowed Claims entitled to receive Plan Trust Interests (subject to any liabilities and obligations relating to the Litigation Trust Assets) in satisfaction of and in exchange for their Allowed Claims and Estate Funding, other than to the extent any such assets allocable to, or held on account of, Disputed Claims are treated as held by a disputed ownership fund or other separate taxable entity in respect of the Plan Trust, followed by (B) the transfer of such assets (subject to such liabilities and obligations) by such persons to the Litigation Trust (in the case of the holders of Plan Trust Interests, first as a transfer of such assets to the Plan Trust, in accordance with the Plan Trust transfer discussion above, and then from the Plan Trust to the Litigation Trust) in exchange for their Litigation Trust Interests.

(ii)    if the transfer of assets to the Litigation Trust occurs *prior to* (and not concurrently with) the transfer of assets to and distribution of beneficial interests in the Plan Trust, as (A) the transfer of the portion of the Litigation Trust Assets to which the Class A Litigation Trust Interests relate (in the case of the Class A-1 Litigation Trust Interests, to the extent of the Secured Interim Advances and the Estate Funding) directly to the holders of Allowed FILO DIP Claims, the holders of Allowed Remaining FILO Bridge Claims and the FILO Parties that provided the Estate Funding (subject to any liabilities and obligations relating to those assets) in satisfaction of and in exchange for their Allowed Claims and Estate Funding, followed by (B) the transfer of such assets by such persons, and of the remaining Litigation Trust Assets by the Debtors, to the Litigation Trust in exchange for their beneficial interests in the Litigation Trust. In such event, pursuant to the Plan, the subsequent transfer of the Class B Litigation Trust Interests by the Debtors to the Plan Trust shall be treated as a direct transfer of the applicable portion of the assets of the Litigation Trust underlying such Class B Litigation Trust Interests to the Plan Trust Beneficiaries, followed by the transfer of such assets by the Plan Trust Beneficiaries to the Plan Trust, in accordance with the Plan Trust transfer discussion above.

Accordingly, absent definitive guidance to the contrary, (A) prior to the establishment of the Plan Trust, the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests and the Debtors, as the holders of the Class B Litigation Trust Interests, will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (B) after the establishment of the Plan Trust, (1) the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (2) the holders of the Plan Trust Interests will be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of the Litigation Trust Assets; in each case, other than to the extent any assets of the Plan Trust allocable to, or held on account of, Disputed Claims are treated as held by a disputed ownership fund or other separate taxable entity.

No ruling is currently being requested from the IRS concerning the tax status of the Litigation Trust or the Plan Trust as a grantor trust or the identity of any particular party as a grantor with respect to the Litigation Trust or the Plan Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Litigation Trust or the Plan Trust as a grantor trust or the status of any party as a grantor with respect to the Litigation Trust or the Plan Trust (including as a result of the Debtors' retention of an interest in the Litigation Trust until the Plan Trust Establishment Date, if the transfer of assets to and distribution of beneficial interests in each Trust do not occur concurrently, or the receipt of Class A-1 Litigation Trust Interests by the FILO Parties providing funding pursuant to the Litigation Funding Agreement). If the IRS were to successfully challenge such classification or status, the U.S. federal income tax consequences to the Litigation Trust, the Plan Trust and the applicable holders of Claims could vary from those discussed herein (including as a result of the trust potentially being treated for U.S. federal income tax purposes as a partnership or a corporation). Certain U.S. federal income tax consequences of the Plan Trust or any portion thereof being treated as a disputed ownership fund or other separate taxable entity are also discussed below.

2.    *General Tax Reporting by the Trusts and their Beneficiaries*

In accordance with the intended treatment of the Trusts as liquidating trusts for U.S. federal income tax purposes, the Plan provides that all parties (including the Debtors, the Litigation Trustee, the Plan Trustee, the Litigation Trust Beneficiaries, and the Plan Trust Beneficiaries) shall report consistently with such treatment for U.S. federal, state and local income tax purposes. Accordingly, as described above, all parties must (a) treat the Litigation Trust as a grantor trust of which (i) the holders of Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests and (ii) the Debtors (before the transfer of the Plan Trust Interests to holders of Allowed Claims) or the holders of Plan Trust Interests (after such transfer of Plan Trust Interests, by reason of the Plan Trust's beneficial interest in the Litigation Trust) are the owners and grantors, and treat such holders as the direct owners of an undivided interest in the assets transferred to the Litigation Trust, and (b) treat the Plan Trust as a grantor trust of which the Plan Trust Beneficiaries are the owners and grantors, and treat such holders as the direct owners of an undivided interest in the assets transferred to the Plan Trust, in each case for all U.S. federal income tax purposes (other than with respect to any assets allocable to, or held on account of, Disputed Claims treated as held by a disputed ownership fund or other separate taxable entity, as discussed in the Section VI.C.3. below).

As soon as reasonably practicable after the transfer of assets to the applicable Trust, the Estate Representative (in consultation with the Litigation Trustee) or the Plan Trustee (as applicable) will make a good faith valuation of the fair market value of such assets. All parties to the Litigation Trust and the Plan Trust (including, without limitation, the Debtors, the Litigation Trustee, the Plan Trustee, the Litigation Trust Beneficiaries, and the Plan Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

The Litigation Trustee will file tax returns for the Litigation Trust, and the Plan Trustee will file tax returns for the Plan Trust, treating such Trusts as grantor trusts pursuant to Treasury Regulations section 1.671-4(a). The Litigation Trustee and the Plan Trustee, as applicable, will annually provide to each holder of Litigation Trust Interests or Plan Trust Interests a separate statement regarding the receipts and expenditures of the Litigation Trust or Plan Trust as relevant for U.S. federal income tax purposes.

All taxable income and loss of the Litigation Trust or Plan Trust will be allocated among, and treated as directly earned and incurred by, the holders of Litigation Trust Interests (including, before the

108

transfer of Plan Trust Interests, the Debtors, and after such transfer, the holders of Plan Trust Interests) or Plan Trust Interests, as applicable, with respect to such holder's interest in the assets of the Litigation Trust or Plan Trust (and not as income or loss with respect to its Claims), with the exception of any taxable income and loss allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims. Allocations of a trust's taxable income among beneficiaries of such trust (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the trust had distributed all its assets (valued at their tax book value, other than any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of beneficial interests in the trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the trust. Similarly, taxable loss of the trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the trust's remaining assets. The tax book value of trust assets for purposes of this paragraph will equal their fair market value on the date the assets are transferred to the trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. The character of any income and the character and ability to use any loss would depend on the particular situation of the holder.

The U.S. federal income tax obligations of a holder of Litigation Trust Interests or Plan Trust Interests are not dependent on the Litigation Trust or Plan Trust distributing any cash or other proceeds, subject to any portion of the assets of the Litigation Trust or Plan Trust being treated as held by a disputed ownership fund or other separate taxable entity. *Thus, a holder of Litigation Trust Interests or Plan Trust Interests may incur a U.S. federal income tax liability with respect to its allocable share of the applicable Trust's income even if such Trust does not make a concurrent distribution to the beneficiary.* In general, other than in respect of any cash treated as owned by a disputed ownership fund or other separate taxable entity (the subsequent distribution or reallocation of which to holders of previously Allowed Claims still relates to the holders' Allowed Claims), a distribution of cash by either Trust will not be separately taxable to a beneficiary of such Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxable at the time the cash was earned or received by the Trusts).

The Trusts will comply with all applicable governmental withholding requirements.

3. *Tax Reporting for Plan Trust Assets Allocable to Disputed Claims*

Under IRS guidance, a liquidating trust's income must be treated as subject to tax on a current basis. Such guidance does not provide a specific methodology for accounting for disputed claims, but provides that the requirement to treat income as subject to tax on a current basis applies regardless of whether a reserve is established for disputed claims. Thus, all income or loss of the Litigation Trust and the Plan Trust will be subject to current taxation, notwithstanding the existence of any Disputed Claims or reserve in respect of the Plan Trust. Of particular significance, the Debtors anticipate that, as of the Plan Trust Establishment Date, a substantial portion of the Plan Trust will be allocable to Disputed Claims.

The person (or persons) subjected to current taxation on income or loss attributable to assets that are allocable to, or held on account of, Disputed Claims will depend on the approach adopted by the Plan Trustee. Under one potential approach, subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of an IRS private letter ruling if the

109

Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), the Plan Trustee may elect to treat any assets of the Plan Trust that are allocable to, or held on account of, Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 or other taxable entity. If a disputed ownership fund election is made, such disputed ownership fund will be subject to tax on a separate entity basis as discussed below, and the Plan Trustee will report consistently with such election for U.S. federal, state and local income tax purposes, to the extent permitted by applicable law. Alternatively, the Plan Trustee may determine to report using such other reasonable alternative treatment (*e.g.*, treatment of all or a portion of the applicable trust as another form of separate taxable entity) that is permissible under applicable law and results in all of the trust's income being subject to tax on a current basis.

If a disputed ownership fund election is made or the Plan Trustee determines to otherwise treat all or part of the trust as a separate taxable entity, such regarded fund or other entity (although still commercially part of the Plan Trust) will be subject to tax annually on a separate entity basis on any net income earned with respect to the assets allocable to the disputed ownership fund or other separate entity, including any income or gain recognized upon the disposition of such assets or the deemed distribution of the assets out of the disputed ownership fund or separate taxable entity to holders of Allowed Claims. In the case of the Plan Trust, amounts subject to current taxation will include income of the Litigation Trust that is allocable to any disputed ownership fund or other separate taxable entity in respect of the Plan Trust, and may result in the Plan Trust incurring tax attributable to Litigation Trust Assets without receiving distributions from the Litigation Trust. The Plan Trust will be responsible for payment from the assets of any respective disputed ownership fund or other separate taxable entity of any taxes imposed on or with respect to such assets, and will be permitted to sell any assets of the disputed ownership fund or other separate taxable entity to the extent necessary to satisfy such tax liability (including any tax liability arising in connection with such sale). All distributions of assets out of a disputed ownership fund to holder(s) of Allowed Claims (which distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by holders in respect of their Allowed Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Plan Trustee, and the Plan Trust Beneficiaries) will be required to report for U.S. federal, state and local income tax purposes consistently with the foregoing.

Under another possible approach, income or loss of the Plan Trust (including any income or loss allocable to assets held on account of Disputed Claims) may be allocated entirely to beneficial interests distributed in respect of already Allowed Claims. In such case, the income or loss allocated to such holders may be excessive in relation to such holders' ultimate relative interest in the Trust. In such event, such holder may subsequently have an incremental offsetting amount of income or loss upon the disposition of the underlying assets of the trust or upon the termination of such holder's beneficial interest in the trust, which in the case of any loss may be subject to limitations depending on the character and timing of such loss and thus might not provide an equivalent offsetting tax deduction.

## D.     WITHHOLDING ON DISTRIBUTIONS AND INFORMATION REPORTING

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding and information reporting requirements. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends,

WEIL:\100544464\2\76000.0004

or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a Litigation Trust Beneficiary or Plan Trust Beneficiary that is a not a U.S. person may be subject to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. *A non-U.S. holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders of Allowed Claims.*

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

**VII.**

**CONFIRMATION OF PLAN**

**A.    CONFIRMATION HEARING**

SECTION 1128(A) OF THE BANKRUPTCY CODE REQUIRES THE BANKRUPTCY COURT TO HOLD A CONFIRMATION HEARING UPON APPROPRIATE NOTICE TO ALL REQUIRED PARTIES. NOTICE OF THE CONFIRMATION HEARING WILL BE PROVIDED TO ALL KNOWN CREDITORS AND EQUITY HOLDERS OR THEIR REPRESENTATIVES. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR THE ANNOUNCEMENT OF THE CONTINUATION DATE MADE AT THE CONFIRMATION HEARING, AT ANY SUBSEQUENT CONTINUED CONFIRMATION HEARING, OR PURSUANT TO A NOTICE FILED ON THE DOCKET FOR THE CHAPTER 11 CASES.

111

## B.    OBJECTIONS

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the chapter 11 cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY
> FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## C.    REQUIREMENTS FOR CONFIRMATION OF PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (i) accepted by all impaired Classes of Claims and Interests entitled to vote or, if the Plan is rejected or deemed rejected by an impaired Class, at least one impaired Class has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) in the "best interests" of the holders of Claims and Interests impaired under the Plan, and (iii) feasible.

1.    *Requirements of Section 1129(a) of Bankruptcy Code*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied, including whether:

(a)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(b)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(c)    the Plan has been proposed in good faith and not by any means forbidden by law;

(d)    any payment made or promised by the Debtors, for services or for costs and expenses in or in connection with these chapter 11 cases, or in connection with the Plan and incident to these chapter 11 cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    the Debtors have disclosed, to the extent known, the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy;

112

(f)     with respect to each Class of Claims or Interests, each holder of an Impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(g)     except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims or Interests either accepted the Plan or is not impaired under the Plan;

(h)     except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims and other priority claims will be paid in full on the Effective Date, or receive such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code;

(i)     at least one Class that is Impaired has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(j)     confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation is proposed in the Plan; and

(k)     all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

The Debtors believe the Plan meets all the applicable requirements of Section 1129 of the Bankruptcy Code.

2.     *Acceptance of Plan*

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in amount and (ii) with respect to holders of Claims, more than a majority in number of the Allowed Claims in such Class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept such plan.  Holders of Claims that fail to vote are not counted in determining the thresholds for acceptance of such plan.

3.     *Cramdown*

If any Impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, at least one Impaired Class has voted to accept the Plan and as to each Impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code.

113

a.        No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority but are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe that, under the Plan, all Impaired Classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other Classes of Claims and Interests having the same priority.  Accordingly, the Debtors believe the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

b.        Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**.  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred Cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (ii) has the right to credit bid, subject to section 363(k) of the Bankruptcy Code, the amount of its claim if its property on which it has a lien is sold and retains its lien on the proceeds of the sale, or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**.  Either (i) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such equity interest and (b) the value of the equity interest or (ii) the holders of interest that are junior to the interest of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE

THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

4. *Best Interests Test*

As noted above, with respect to each impaired class of claims and interests, confirmation of a plan requires that each such holder either (i) accept such plan or (ii) receive or retain under such plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires the Bankruptcy Court to determine what holders of allowed claims and allowed interests in each impaired class would receive from a liquidation of the relevant Debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from proceeds of the liquidation of the Debtor's assets and properties (after subtracting amounts attributable to the aforesaid claims) is compared with the value offered to such classes of claims and interests under the plan.

The Debtors believe that under the Plan all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit C**.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

5. *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation, or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the Plan. Because the Plan provides for the liquidation of the Debtors, the Bankruptcy Court will find that the Plan is feasible. Further, the Debtors believe that the Estate Representative will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds for the Estate Representative to liquidate the Plan Trust Assets.

115

# VIII.

## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) a liquidation under chapter 7 of the Bankruptcy Code or (ii) the preparation and presentation of an alternative chapter 11 plan.

1. *Liquidation under Chapter 7 of Bankruptcy Code*

If no plan can be confirmed, these chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect that the Debtors expect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the chapter 11 cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the chapter 11 cases, and the loss in value attributable to a considerably expeditious liquidation of the Debtors' assets as required by chapter 7.

2. *FILO Settlement*

The Debtors believe creditors are likely to receive inferior recoveries than provided for in the Plan in the event that the Debtors are unable to confirm the Plan. The Administrative Expense Claims Consent Program and any and all distributions contemplated thereby are contingent upon confirmation of the Plan, and the holders of Allowed Administrative Expense Claims will not have the option to receive expedited payment in exchange for a reduction of such holders' Allowed Administrative Expense Claims under any alternative chapter 11 plan.

# IX.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urges holders of Impaired Claims in Classes 3, 4, and 5 to vote to accept the Plan.

116

Dated: June 1, 2025
Chicago, Illinois

Respectfully submitted,

STEWARD HEALTH CARE SYSTEM LLC

on behalf of itself and its Debtor Affiliates

By:     /s/ *John R. Castellano*
Name:  John R. Castellano
Title:   Chief Restructuring Officer

**EXHIBIT A**

**Plan**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| **STEWARD HEALTH CARE SYSTEM LLC**, *et al.*, | § § § § | Case No. 24-90213 (CML) |
| Debtors.[1] | § § § | (Jointly Administered) |

## JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
## STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Attorneys for Debtors and Debtors in Possession*

May 30, 2025
Houston, Texas

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

## Table of Contents

ARTICLE I.    Definitions and Interpretation. ........................................................................1

   1.1   Definitions. ....................................................................................................................1
   1.2   Interpretation; Application of Definitions; Rules of Construction. ..............................20
   1.3   Reference to Monetary Figures ...................................................................................21
   1.4   Controlling Document. ................................................................................................21

ARTICLE II.    Administrative Expense Claims, FILO DIP Claims, Professional Fee
               Claims, and Priority Tax Claims. ..........................................................................21

   2.1   Administrative Expense Claims. .................................................................................21
   2.2   FILO DIP Claims. ......................................................................................................22
   2.3   Professional Fee Claims..............................................................................................22
   2.4   Priority Tax Claims.....................................................................................................23

ARTICLE III.    Classification of Claims and Interests. .................................................................24

   3.1   Classification in General..............................................................................................24
   3.2   Summary of Classification of Claims and Interests.....................................................24
   3.3   Special Provision Governing Unimpaired Claims. ......................................................25
   3.4   Elimination of Vacant Classes. ...................................................................................25
   3.5   Voting Classes; Presumed Acceptance by Non-Voting Classes. .................................25
   3.6   Voting; Presumptions; Solicitation. ............................................................................25
   3.7   Cramdown. ..................................................................................................................25
   3.8   No Waiver. ..................................................................................................................26

ARTICLE IV.    Treatment of Claims and Interests. .......................................................................26

   4.1   Class 1:  Other Priority Claims. ..................................................................................26
   4.2   Class 2:  Other Secured Claims. .................................................................................26
   4.3   Class 3:  FILO Bridge Claims. ...................................................................................27
   4.4   Class 4:  General Unsecured Claims. ..........................................................................27
   4.5   Class 5: PBGC Claims. ...............................................................................................28
   4.6   Class 6:  Intercompany Claims. ..................................................................................28
   4.7   Class 7:  Subordinated Securities Claims. ..................................................................28
   4.8   Class 8: Intercompany Interests. .................................................................................29
   4.9   Class 9:  Non-Debtor Owned Subsidiary Interests. .....................................................29
   4.10  Class 10:  Parent Interests. .........................................................................................29

ARTICLE V.    Means for Implementation. ...................................................................................29

   5.1   Joint Chapter 11 Plan. ................................................................................................29
   5.2   Compromise and Settlement of Claims, Interests, and Controversies..........................30
   5.3   Plan Settlement. ..........................................................................................................30
   5.4   Sources of Consideration for Plan Distribution...........................................................31
   5.5   Implementation. ..........................................................................................................31

5.6     Transition Services Agreement...................................................................33
5.7     Litigation Funding Agreement..................................................................33
5.8     Coordination between the Litigation Trust and the Plan Trust.................34
5.9     Corporate Action......................................................................................34
5.10    Plan Administrator Committee..................................................................35
5.11    Governance...............................................................................................35
5.12    Cancellation of Existing Securities, Agreements, and Liens....................36
5.13    Merger or Dissolution of Debtors.............................................................36
5.14    Preservation of Causes of Action.............................................................37
5.15    Effectuating Documents; Further Transactions.........................................37
5.16    Closing of the Chapter 11 Cases..............................................................37

ARTICLE VI.    Plan Trust. ................................................................................38

6.1     Establishment of the Plan Trust. ...............................................................38
6.2     Funding of and Transfer of Assets into the Plan Trust. .............................39
6.3     Plan Trustee...............................................................................................40
6.4     Plan Trust Agreement. ...............................................................................42
6.5     Fees and Expenses of the Plan Trust. ........................................................43
6.6     Creation and Maintenance of Trust Accounts. ..........................................43
6.7     Limitation of Liability. ..............................................................................43
6.8     Indemnification..........................................................................................44
6.9     Insurance...................................................................................................44
6.10    Dissolution of the Plan Trust....................................................................44
6.11    Records.....................................................................................................45
6.12    Section 1145 Exemption; Non-Transferability of Plan Trust Interests. ......45
6.13    Plan Trust Tax and Other Matters.............................................................45

ARTICLE VII.   Litigation Trust ........................................................................49

7.1     Establishment of the Litigation Trust. .......................................................49
7.2     Funding of and Transfer of Assets into the Litigation Trust. .....................50
7.3     Litigation Trustee.......................................................................................52
7.4     Litigation Trust Agreement. ......................................................................53
7.5     Class B Representative. ..............................................................................53
7.6     Fees and Expenses of the Litigation Trust.................................................54
7.7     Indemnification..........................................................................................54
7.8     Dissolution of the Litigation Trust............................................................54
7.9     Records.....................................................................................................55
7.10    Transferability of Litigation Trust Interests..............................................55
7.11    Litigation Trust Tax and Other Matters. ...................................................55

ARTICLE VIII. Distributions. ..............................................................................59

8.1     Distributions Generally..............................................................................59
8.2     No Postpetition Interest on Claims. ...........................................................59
8.3     Distribution Record Date. ..........................................................................59

| | | |
|---|---|---|
| 8.4 | Date of Distributions. | 59 |
| 8.5 | Reserve on Account of Disputed Claims. | 60 |
| 8.6 | Distributions After Effective Date. | 61 |
| 8.7 | Plan Distributions Made by Plan Trustee. | 61 |
| 8.8 | Delivery of Distributions. | 61 |
| 8.9 | Unclaimed Property. | 61 |
| 8.10 | Satisfaction of Claims. | 62 |
| 8.11 | Manner of Payment Under Plan. | 62 |
| 8.12 | Minimum Distribution. | 62 |
| 8.13 | No Distribution in Excess of Amount of Allowed Claim. | 62 |
| 8.14 | Allocation of Distributions Between Principal and Interest. | 62 |
| 8.15 | Setoffs and Recoupments. | 63 |
| 8.16 | Withholding and Reporting Requirements. | 63 |
| 8.17 | Securities Registration Exemption. | 64 |
| 8.18 | Disbursing Agent. | 64 |

**ARTICLE IX.   Procedures for Resolving Claims** ........... 65

| | | |
|---|---|---|
| 9.1 | Allowance of Claims. | 65 |
| 9.2 | Objections to Claims. | 65 |
| 9.3 | Estimation of Claims. | 65 |
| 9.4 | Claim Resolution Procedures Cumulative. | 66 |
| 9.5 | Adjustment to Claims Register Without Objection. | 66 |
| 9.6 | No Distributions Pending Allowance. | 66 |
| 9.7 | Distributions After Allowance. | 66 |
| 9.8 | Elimination of Duplicate Claims. | 67 |
| 9.9 | Late Filed Claims. | 67 |
| 9.10 | Amendments to Claims. | 67 |
| 9.11 | Insured Claims. | 67 |
| 9.12 | Medical Liability Claims Procedures. | 67 |

**ARTICLE X.   Executory Contracts and Unexpired Leases.** ........... 68

| | | |
|---|---|---|
| 10.1 | Rejection of Executory Contracts and Unexpired Leases. | 68 |
| 10.2 | Survival of Indemnification Obligations. | 69 |
| 10.3 | Determination of Cure Disputes and Deemed Consent. | 69 |
| 10.4 | Rejection Damages Claims. | 70 |
| 10.5 | Joint Ventures. | 71 |
| 10.6 | Insurance Policies. | 71 |
| 10.7 | Assignment. | 71 |
| 10.8 | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 72 |
| 10.9 | Reservation of Rights. | 72 |

**ARTICLE XI.   Conditions Precedent to Occurrence of Effective Date.** ........... 73

| | | |
|---|---|---|
| 11.1 | Conditions Precedent to Effective Date. | 73 |
| 11.2 | Waiver of Conditions Precedent. | 73 |

11.3    Effect of Failure of a Condition. .................................................................74
11.4    Effect of Vacatur of Confirmation Order. ...................................................74

**ARTICLE XII.  Effect of Confirmation.** ...............................................................**74**

12.1    Binding Effect. ............................................................................................74
12.2    Vesting of Assets. ........................................................................................74
12.3    Pre-Confirmation Injunctions and Stays. ....................................................75
12.4    Injunction Against Interference with Plan. .................................................75
12.5    Plan Injunction. ...........................................................................................76
12.6    Releases. ......................................................................................................77
12.7    Exculpation. .................................................................................................80
12.8    Waiver of Statutory Limitation on Releases. ..............................................81
12.9    Injunction Related to Releases and Exculpation ..........................................81
12.10  Subordinated Claims. ...................................................................................82
12.11  Retention of Causes of Action and Reservation of Rights. ..........................82
12.12  Ipso Facto and Similar Provisions Ineffective. ...........................................82
12.13  Solicitation of Plan. .....................................................................................82
12.14  Corporate and Limited Liability Company Action. .....................................83
12.15  Release of Liens. .........................................................................................83

**ARTICLE XIII. Retention of Jurisdiction.** ..............................................................**83**

13.1    Retention of Jurisdiction. ............................................................................83
13.2    Courts of Competent Jurisdiction. ...............................................................86

**ARTICLE XIV. Miscellaneous Provisions.** ............................................................**86**

14.1    Statutory Fees. .............................................................................................86
14.2    Exemption from Certain Transfer Taxes. ....................................................86
14.3    Dissolution of Creditors' Committee. .........................................................87
14.4    Request for Expedited Determination of Taxes of the Debtors. ...................87
14.5    Dates of Actions to Implement Plan. ...........................................................87
14.6    Amendments. ...............................................................................................87
14.7    Revocation or Withdrawal of Plan. .............................................................88
14.8    Notice of Effective Date. .............................................................................88
14.9    Substantial Consummation. .........................................................................88
14.10  Governing Law. ...........................................................................................88
14.11  Immediate Binding Effect. ...........................................................................89
14.12  Waiver of Stay. ............................................................................................89
14.13  Successors and Assigns. ...............................................................................89
14.14  Entire Agreement. ........................................................................................89
14.15  Severability of Plan Provisions. ...................................................................89
14.16  Additional Documents. ................................................................................90
14.17  Deemed Acts. ...............................................................................................90
14.18  Computing Time. .........................................................................................90
14.19  Exhibits to Plan. ..........................................................................................90

14.20   Notices. ...................................................................................................90

14.21   Reservation of Rights. ..........................................................................92

Each of the debtors in the above-captioned chapter 11 cases (each, a "**Debtor**" and, collectively, the "**Debtors**") proposes the following joint chapter 11 plan of liquidation pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

## ARTICLE I.  DEFINITIONS AND INTERPRETATION.

### 1.1  *Definitions.*

The following terms shall have the respective meanings specified below:

*2016 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in October 2016 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2020 Transactions* means, individually and/or collectively, (i) the transactions that were entered into and/or occurred in or about May 2020 pursuant to which: (a) Manolete Health, LLC purchased Steward Healthcare International Holdings Ltd. from Steward Health Care System LLC, (b) Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**") contributed real properties to MPT of Utah-Steward, LLC (together with its subsidiaries, the "**Utah JV**") for common equity interests in the Utah JV and subsequent cash distributions from the Utah JV, and the Utah JV leased such real properties back to Jordan Valley and Davis, and (c) Cerberus Operations and Advisory Company exchanged its equity in Steward Healthcare Investors LLC for a $350 million convertible note, and (ii) all other transactions related thereto, including any transactions in what was referred to at the time as Project Easter.

*2021 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in January 2021 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2022 Transaction* means the transaction or transactions entered into on or about May 31, 2022 (and certain other dates in 2022) by and among, among others, Sparta Merger Sub I Inc., Sparta Merger Sub II Inc., Sparta Merger Sub III Inc., Sparta Merger Sub I LLC, Sparta Merger Sub II LLC, Sparta Merger Sub III LLC, Sparta Sub Inc., SNCN Holdco Inc., SICN Holdco Inc., Steward Integrated Care Network, Inc., Steward Accountable Care Network, Inc., Steward Health Care Network Inc., Sparta Holding Co. LLC, Steward Health Care System LLC and CareMax, Inc. pursuant to which certain value-based care assets were transferred to Sparta Holding Co. LLC and acquired by CareMax, Inc., and all other transactions related thereto or included therein (including any dividends, distributions, and/or allocations paid, made, and/or issued in 2022 in connection with and/or following such transaction(s), and any subsequent transfer of the proceeds thereof or arising therefrom).

*Administrative Expense Claim* means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under sections 327, 328, 330, 365, 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and

operating the Debtors' businesses and (ii) Professional Fee Claims, but excluding FILO DIP Claims, FILO Bridge Claims, Intercompany Claims, and Priority Tax Claims.

**Administrative Expense Claims Bar Date** means (i) the date fixed by the Administrative Expense Claims Bar Date Order by which any Person (including any Governmental Unit) asserting an Administrative Expense Claim against any Debtor (subject to the exceptions contained therein) must have filed a proof of Administrative Expense Claim with the Bankruptcy Court or application for allowance of such Administrative Expense Claim (as applicable) against any such Debtor or be forever barred from asserting such Administrative Expense Claim, (ii) the first Business Day that is twenty (20) days following the Confirmation Date with respect to Administrative Expense Claims (other than Professional Fee Claims) held by any Person (including any Governmental Unit) arising prior to the Confirmation Date that are not subject to the Administrative Expense Claims Bar Date Order, or (iii) the first Business Day that is twenty (20) days following the Effective Date, with respect to Administrative Expense Claims (other than Professional Fee Claims) held by any Person (including any Governmental Unit) arising between the Confirmation Date and the Effective Date. The Confirmation Order shall provide for the Administrative Expense Claims Bar Dates set forth in clauses (ii) and (iii) of the immediately preceding sentence.

**Administrative Expense Claims Bar Date Order** means the *Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claims Bar Date, and (V) Granting Related Relief* (Docket No. 3217), entered by the Bankruptcy Court on November 14, 2024.

**Administrative Expense Claims Consent Program** means the consent program proposed to certain holders of Administrative Expense Claims with respect to the treatment of such Administrative Expense Claims as set forth in the Confirmation Order and the Plan.

**Administrative Expense Claims Consent Program Condition** means that, in accordance with the terms and conditions of the Administrative Expense Claims Consent Program, holders of more than seventy-five percent (75%) of the aggregate dollar amount of Administrative Expense Claims, in the amounts set forth in the Administrative Expense Claims Consent Program Opt-Out Form, do not opt out of participating in the Administrative Expense Claims Consent Program, which such condition may be waived by the Debtors and the Creditors' Committee.

**Administrative Expense Claims Consent Program Opt-Out Form** means the opt-out form, approved under the Disclosure Statement Order, sent to holders of Administrative Expense Claims pursuant to which holders may opt out of participating in the Administrative Expense Claims Consent Program.

**Affiliate** means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity

twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Allowed* means, with respect to any Claim against or Interest in a Debtor, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in this Plan or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, (iii) any Claim or Interest expressly Allowed under this Plan, or (iv) any Claim that is listed in the Debtors' Schedules as liquidated, non-contingent, and undisputed; *provided* that the Debtors, the Plan Administrator Committee, and the Plan Trustee, as applicable, will retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to this Plan, except that no such Claims shall be retained against Released Parties other than as expressly set forth in ARTICLE XII of this Plan.

*Allowed Bridge MOIC Amount* means $11,250,000 through March 31, 2026 and increasing by: (i) $1,000,000 on April 1, 2026, (ii) $1,500,000 on May 1, 2026, (iii) $2,000,000 on June 1, 2026, (iv) 2,500,000 on July 1, 2026, (v) $3,000,000 on August 1, 2026, and (vi) $3,750,000 on September 1, 2026 and on the first day of each month thereafter until the FILO Balance (as defined in the FILO Settlement Term Sheet) is paid in full in Cash; *provided* that the Allowed Bridge MOIC Amount shall not exceed 85% of $75,000,000 *minus* any interest paid or accreted on account of the FILO Bridge Claims (including any interest paid or accreted on account of the Class A-2 Preference that is allocable to FILO Bridge Claims).

*Asset* means any right, title, and interest of a Debtor in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible.

*Available Cash* means Cash on hand (including any amounts invested pending distribution) of the Plan Trust or the Litigation Trust, as applicable, as of the date of determination, net of any amounts reserved in respect of Disputed Claims and any reserves established in the good faith discretion of the Plan Trustee or the Litigation Trustee, as applicable, in consultation with the Creditors' Committee, to provide for payment of any obligations or liabilities of the Plan Trust or Litigation Trust, as applicable, including any Claims assumed by the Plan Trust or the Litigation Trust pursuant to this Plan and any costs or expenses of the Plan Trust or Plan Trustee or the Litigation Trust or Litigation Trustee and any taxes (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes of such fund or separate taxable entity), or to maintain the value of any Assets of the Plan Trust or the Litigation Trust, as applicable.

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550,

551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

*Ballot* means each of the ballots distributed to the holders of Impaired Claims entitled to vote on the Plan.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or if the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

*Bar Date* means the date fixed by order(s) of the Bankruptcy Court (including the Bar Date Order or otherwise in this Plan or the Confirmation Order) by which any Persons, asserting a Claim against any Debtor must have filed a Proof of Claim or application for allowance of such Claim (as applicable) with the Bankruptcy Court against any such Debtor or be forever barred from asserting such Claim.

*Bar Date Order* means the *Order (I) Establishing Deadlines and Procedures for Filing Proofs of Claim; (II) Approving Form and Manner of Notice Thereof; and (III) Granting Related Relief* (Docket No. 1564) as may be modified, supplemented, or amended from time to time.

*Bridge Credit Agreement* means that certain *Credit Agreement*, dated as of February 21, 2024, by and among Steward Health Care Network, Inc., Steward Emergency Physicians, Inc., Steward Physician Contracting, Inc., Steward Medicaid Care Network, Inc., Stewardship Health, Inc. and Stewardship Health Medical Group, Inc., as borrowers thereunder, and the other loan parties party thereto, the lenders party thereto and Brigade Agency Services LLC, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time.

*Bridge MOIC* means the obligations of certain Debtors constituting the MOIC Amount (as defined in the Bridge Credit Agreement) under the Bridge Credit Agreement.

*Business Day* means any calendar day that is not a Saturday, Sunday, or other calendar day on which banks are authorized or required to be closed in New York, New York.

*Cash* means legal tender of the United States of America.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including but not limited to any and all rights of a Debtor, Debtor-in-possession, or Estate Representative to assert rights to extend time under 11 U.S.C. § 108. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any Avoidance Actions.

**Chapter 11 Case** means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

**Chief Restructuring Officer** means John R. Castellano, in his capacity as Chief Restructuring Officer of each of the Debtors.

**Claim** means a "claim," as defined in section 101(5) of the Bankruptcy Code.

**Claims and Noticing Agent** means Kroll Restructuring Administration LLC, the claims, noticing, and solicitation agent retained by the Debtors.

**Claims Register** means the official register of Claims maintained by the Claims and Noticing Agent in the Chapter 11 Cases.

**Class** means any group of Claims or Interests classified under this Plan pursuant to section 1122(a) of the Bankruptcy Code.

**Class A Litigation Trust Interests** means, collectively, the Class A-1 Litigation Trust Interests and the Class A-2 Litigation Trust Interests.

**Class A-1 Litigation Trust Interests** shall mean the "Class A-1 interests" as set forth in the FILO Settlement Term Sheet.

**Class A-2 Litigation Trust Interests** shall mean the "Class A-2 interests" as set forth in the FILO Settlement Term Sheet.

**Class A-2 Preference** shall have the meaning set forth in the FILO Settlement Term Sheet.

**Class B Litigation Trust Interests** shall mean the "Class B interests" as set forth in the FILO Settlement Term Sheet.

**Class B Representative** means the representative of the Class B Litigation Trust Interests in accordance with the Litigation Trust Agreement, which shall initially be the Plan Administrator Committee.

**Confirmation Date** means the date on which the Bankruptcy Court enters the Confirmation Order.

**Confirmation Hearing** means the hearing held by the Bankruptcy Court regarding approval of the Disclosure Statement and confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**Confirmation Order** means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

**Creditors' Committee** means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

**Cure Amount** means the payment of Cash or the distribution of other property (as the applicable parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume or assume and assign such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**Cure Dispute** means an unresolved objection regarding assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code, including objections based on the appropriate Cure Amount or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or any other issue relating to assumption of an executory contract or unexpired lease.

**D&O Policy** means all directors and officers liability insurance policies (including any runoff policies or tail coverage) issued or providing coverage at any time to any of the Debtors, for current or formers directors', managers', and officers' liability and all agreements, documents, or instruments relating thereto.

**Debtor(s)** has the meaning set forth in the introductory paragraph of this Plan.

**Debtor Related Parties** means (i) with respect to each Debtor and each Estate, such

Debtor's or Estate's (a) attorneys, accountants, investment bankers, consultants, professional advisors, and independent auditors, (b) employed and affiliated physicians and other medical personnel (solely with respect to Medical Liability Claims asserted against such individuals and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), and (c) Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee) and Chief Restructuring Officer, as applicable, in each case of the immediately preceding clauses (a) – (c), solely in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

**Definitive Documents** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Plan, including, but not limited to: (i) the Plan; (ii) the Disclosure Statement; (iii) the motion seeking approval of the adequacy of the Disclosure Statement and solicitation of the Plan; (iv) the Disclosure Statement Order; (v) each of the documents comprising the Plan Supplement; (vi) the Confirmation Order; (vii) the Plan Administrator Agreement; (viii) Plan Trust Agreement; and (ix) the Litigation Trust Agreement, each of which shall be in form and substance reasonably acceptable to the Creditors' Committee.

**DIP Orders** means (i) the FILO DIP Order and (i) the MPT DIP Order.

**Disbursing Agent** means the Plan Trustee or such Entity or Entities designated by the Plan Trustee to make or facilitate distributions required by the Plan.

**Disclosure Statement** means the disclosure statement in respect of this Plan, including all exhibits and schedules thereto, as may be amended, supplemented, or otherwise modified from time to time, and which is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3016 and 3018.

**Disclosure Statement Order** means the order entered by the Bankruptcy Court (a) finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code; and (b) authorizing solicitation of the Plan.

**Disputed** means, with respect to a Claim, (i) any Claim that is disputed under <u>ARTICLE IX</u> of this Plan or as to which the Debtors or any party in interest have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order, (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of Claim was not timely or properly filed, (iii) any Claim that is listed in the Schedules as unliquidated, contingent or disputed, and as to which no request for payment or proof of Claim has been filed, or (iv) any Claim that is otherwise disputed by any of the Debtors, the

Plan Administrator Committee, or the Plan Trustee or any party in interest in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order. To the extent the Debtors or any party in interest dispute the amount of an asserted Claim, such Claim shall be deemed Allowed in the amount that is not disputed, if any, and a Disputed Claim as to the balance of such Claim.

**Disputed Claim Reserve** means any Plan Trust Assets allocable to, or held on account of, Disputed Claims, including one or more reserve accounts to be funded, in consultation with the Creditors' Committee, with Cash and/or proceeds of the Plan Trust Assets, as applicable, in accordance with the terms of the Plan, for Disputed Claims.

**Distribution Record Date** means the Effective Date.

**Effective Date** means the date that is the first Business Day on which all conditions to the effectiveness of this Plan set forth in <u>Section 11.1</u> of this Plan have been satisfied or waived in accordance with <u>Section 11.2</u> of this Plan.

**Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

**Estate(s)** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**Estate Funding** means $6,500,000 of Cash paid by the Litigation Trust to the Debtors or the Plan Trust on the Litigation Trust Establishment Date to fund the administration of the Chapter 11 Cases after the Litigation Trust Establishment Date, in respect of which the FILO Parties indirectly providing such funding shall receive pursuant hereto, at the direction of the Debtors, Class A-1 Litigation Trust Interests having a liquidation preference (along with a proportionate interest in all other rights and obligations therein) equal to the amount of the Estate Funding; *provided* that, for the avoidance of doubt, the Estate Funding shall not otherwise be required to be repaid by the Debtors, the Estates, or the Plan Trust.

**Estate Representative** means either (i) the Debtors (prior to the Confirmation Date), (ii) the Plan Administrator Committee (on or after the Confirmation Date until the Plan Trust Establishment Date), or (iii) the Plan Trustee (on or after the Plan Trust Establishment Date), each as applicable.

**Exculpated Parties** means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

**Expense Escrow Account** shall have the meaning set forth in the MPT Settlement Order.

**FILO Bridge Agent** means Brigade Agency Services LLC, in its capacity as agent under the Bridge Credit Agreement.

8

**FILO Bridge Claims** means all Claims held by a FILO Bridge Lender under the Bridge Credit Agreement and DIP Orders, including, for the avoidance of doubt, the Remaining FILO Bridge Claims and the Retained FILO Claims.

**FILO Bridge Lenders** means all lenders that are not the MPT Bridge Lender under the Bridge Credit Agreement, each in their capacity as lender under the Bridge Credit Agreement.

**FILO DIP Agent** means the "Agent" under the FILO DIP Credit Agreement.

**FILO DIP Claim** means all Claims held by a FILO DIP Lender on account of, arising under the FILO DIP Credit Agreement and FILO DIP Order.

**FILO DIP Credit Agreement** means that certain *Debtor-in-Possession Credit Agreement*, dated as of July 10, 2024, by and among Steward Health Care System LLC, as borrower, the other Debtors jointly and severally, as guarantors, the FILO DIP Lenders, as lenders, and Brigade Agency Services LLC, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof.

**FILO DIP Lenders** shall have the meaning set forth in the FILO DIP Order.

**FILO DIP Order** means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

**FILO Lenders** shall have the meaning set forth in the FILO DIP Order.

**FILO Parties** means the (i) FILO DIP Lenders, (ii) FILO DIP Agent, (iii) FILO Bridge Lenders, (iv) FILO Bridge Agent, (v) Prepetition FILO Agent, (vi) FILO Lenders, and (vii) the providers of the Litigation Funding (as defined in the FILO Settlement Term Sheet).

**FILO Plan Trust Interests** means the beneficial interests in the Plan Trust granted to the holders of Allowed Retained FILO Claims, which beneficial interests shall entitle such holders to share in the FILO Plan Trust Recovery in accordance with the Plan.

**FILO Plan Trust Recovery** means 10% of the Plan Trust Recovery until Allowed Retained FILO Claims are paid in full, to be paid *pro rata* to the holders of the FILO Plan Trust Interests.

**FILO Settlement Order** means the [●] (Docket No. [●]), entered by the Bankruptcy Court on [●], 2025.

**FILO Settlement Term Sheet** means the term sheet approved by the FILO Settlement Order and annexed hereto as **Exhibit C**.

**Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**General Unsecured Claim** means (i) any unsecured Claim against any Debtor (including any prepetition Medical Liability Claim) that is not (a) an Administrative Expense Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) a PBGC Claim; (e) a Retained FILO Claim; (f) an Intercompany Claim, or (g) otherwise entitled to priority under the Bankruptcy Code or any Final Order, and (ii) other than Intercompany Claims, any prepetition claim against a Debtor held by a non-Debtor that is a direct or indirect subsidiary of SHC Holdings.

**Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

**GUC Plan Trust Interests** means the beneficial interests in the Plan Trust granted to holders of Allowed General Unsecured Claims, which beneficial interests shall entitle such holders to share in the GUC Plan Trust Recovery in accordance with the Plan.

**GUC Plan Trust Recovery** means 90% of the Plan Trust Recovery until Allowed Retained FILO Claims are paid in full and 100% of the Plan Trust Recovery after Allowed Retained FILO Claims are paid in full, to be paid *pro rata* to the holders of the GUC Plan Trust Interests and PBGC Plan Trust Interests based on the aggregate amount of Allowed General Unsecured Claims and Allowed PBGC Claims.

**Hospital Debtors** means all Debtors, other than, for the avoidance of doubt, Steward Health Care Holdings LLC and Steward Health Care System LLC, that (i) held or owned a license to operate a hospital or (ii) operated a hospital located in Ohio, in each case, at any time during the Chapter 11 Cases.

**Identified Non-Released Parties** means (i) the Persons and Entities listed on **Exhibit B** annexed hereto, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in

connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

**Impaired** means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

**Indemnification Obligations** means each of the Debtors' indemnification obligations in place immediately prior to the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors and officers that are currently employed by, or serving on the board of directors of, any of the Debtors, as of the date immediately prior to the Effective Date, and the attorneys, accountants, investment bankers, and other Professionals that are retained by any of the Debtors as of the date immediately prior to the Effective Date.

**Individual Released Parties** means the individuals listed on **Exhibit A** annexed hereto, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

**Intercompany Claim** means any pre- or postpetition Claim against a Debtor held by another Debtor or by a controlled non-Debtor direct or indirect subsidiary of SHC Holdings; *provided* that any Claim that TRACO may have against the Debtors shall not be considered an Intercompany Claim.

**Intercompany Interests** means an Interest in a Debtor held by another Debtor.

**Initial Plan Distribution** means the first Plan Distribution that the Estate Representative makes to holders of Allowed Claims**.**

**Initial Plan Distribution Date** means the date selected by the Estate Representative, which will be no later than a date that is on or as soon as reasonably practicable after the Effective Date, on which the Estate Representative will make the Initial Plan Distribution; *provided* that, prior to the Effective Date, (i) the Estate Representative may distribute the Settled Administrative Expense Claims Cash Pool to holders of Settled Administrative Expense Claims pursuant to Section 2.1 of this Plan, (ii) the Plan Trustee may distribute the Plan Trust Interests in accordance with Section 6.1 of this Plan, (iii) the Litigation Trustee may distribute the Litigation Trust Interests in accordance with Section 7.1 of this Plan, and (iv) the Plan Trustee and Liquidation Trustee may distribute any Available Cash.

**Insured Claim** means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' insurance policies.

**Interest** means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, that existed immediately before the Effective Date.

**Interim Compensation Procedures Order** means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* (Docket No. 783), as may be amended, modified, or supplemented from time to time.

**Investigation Subcommittee** means the subcommittee of the Transformation Committee, consisting of Alan J. Carr and William Transier.

**IRS** means the United States Internal Revenue Service.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Litigation Funding Agreement** means the commitment letter and any ancillary documents thereto pursuant to which the FILO Parties shall provide financing to the Litigation Trust to fund (i) the cost of administering the Litigation Trust and monetizing the Litigation Trust Assets, (ii) the Secured Interim Advances, and (iii) the Estate Funding, and which shall be consistent with the FILO Settlement Term Sheet and otherwise in form and substance mutually agreeable to the Debtors, the Creditors' Committee, and the FILO Parties, with approval not to be unreasonably withheld, conditioned or delayed. A substantially final form of such letter mutually agreeable to the parties was filed with the Bankruptcy Court on May 25, 2025 [Docket No. 4966], and any changes to such substantially final form will be disclosed in the Plan Supplement.

**Litigation Trust** means that certain trust to be established in accordance with ARTICLE VII of this Plan and the FILO Settlement Order to hold the Litigation Trust Assets and make distributions to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement.

**Litigation Trust Agreement** means the agreement evidencing the terms and provisions governing the Litigation Trust, dated as of the Litigation Trust Establishment Date, establishing the terms and conditions of the Litigation Trust, the rights of, and limitations on, the Litigation Trust Interests, and pursuant to which the Litigation Trustee shall manage and administer the Litigation Trust Assets, and which shall be consistent with the FILO Settlement Term Sheet and otherwise in form and substance mutually agreeable to the Debtors, the Creditors' Committee, and the FILO Parties, with approval not to be unreasonably withheld, conditioned or delayed. A substantially final form of such agreement mutually agreeable to the parties was filed with the Bankruptcy Court on May 25, 2025 [Docket No. 4966], and any changes to such substantially final form will be disclosed in the Plan Supplement.

**Litigation Trust Assets** means, as of the Litigation Trust Establishment Date, all Assets of the Estates (including the Litigation Trust Causes of Action) identified on Schedule 1 of the FILO Settlement Term Sheet.

**Litigation Trust Beneficiaries** shall mean the holders of the Litigation Trust Interests.

**Litigation Trust Causes of Action** means all Claims and Causes of Action held by the Debtors that are not released or settled under the Plan, the FILO Settlement Order, or the Confirmation Order.

**Litigation Trust Establishment Date** means the date the Litigation Trust is established and the Litigation Trust Assets are transferred thereto in accordance with Section 7.1 of this Plan and the FILO Settlement Order.

**Litigation Trust Expenses** means any and all reasonable fees, costs and expenses incurred by the Litigation Trust or the Litigation Trustee (or any professional or other Person retained by the Litigation Trustee) on or after the Litigation Trust Establishment Date in connection with any of their duties under the Litigation Trust Agreement, including any administrative fees, attorneys' fees and expenses, insurance fees, taxes and escrow expenses.

**Litigation Trust Interests** means, collectively, the Class A Litigation Trust Interests and the Class B Litigation Trust Interests.

**Litigation Trustee** means [●], as trustee for the Litigation Trust.

**Mediator** means the Honorable Marvin Isgur, or in the event the Honorable Marvin Isgur is not available, such other entity or individual reasonably acceptable to the Litigation Trustee and the Estate Representative.

**Medical Liability Claims** means any Claim against any Debtor, any employed or affiliated physician of a Debtor, or any other medical personnel employed by a Debtor arising out of or related to alleged negligence in connection with the rendering of medical care prior to the Effective Date.

**Medical Liability Claims Procedures** means the procedures pursuant to which a general process and timeline will be established for reconciling and determining the Allowed amount of Medical Liability Claims against the Debtors, which procedures are annexed to this Plan as **Exhibit D**.

**MPT Bridge Lender** means the MPT Lender (as defined in the Bridge Credit Agreement) under the Bridge Credit Agreement.

**MPT DIP Order** means the *Final Order (I) Authorizing the Debtors to (A) Obtain Junior Lien Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 625), entered by the Bankruptcy Court on June 3, 2024.

**MPT Settlement Order** means the *Final Order Approving (I) Global Settlement with Medical Properties Trust, Prepetition ABL/FILO Secured Parties, FILO Secured Parties, and*

*Creditors' Committee, (II) Interim Management Procedures, and (III) Granting Related Relief* (Docket No. 2610), entered by the Bankruptcy Court on September 18, 2024.

       ***Non-Debtor Owned Subsidiary Interests*** means Interests in Debtors (other than Parent Interests) that are owned by non-Debtors.

       ***Other Priority Claim*** means any Claim other than an Administrative Expense Claim, a FILO DIP Claim, a FILO Bridge Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

       ***Other Secured Claim*** means any Secured Claim other than an Administrative Expense Claim, a Priority Tax Claim, a FILO DIP Claim, or a FILO Bridge Claim.

       ***Parent Interests*** means Interests in SHC Holdings.

       ***PBGC*** means the Pension Benefit Guaranty Corporation.

       ***PBGC Claims*** means the Claims of the PBGC, which shall be Allowed as prepetition unsecured claims, in the amount of $8,750,000 in accordance with Section 4.5 herein.

       ***PBGC Plan Trust Interests*** means the beneficial interests in the Plan Trust granted to the PBGC, as the holder of the Allowed PBGC Claim, which beneficial interests shall entitle the PBGC to share in the GUC Plan Trust Recovery in accordance with the Plan.

       ***PBGC Settlement*** means the settlement between the Debtors and the PBGC, to which the Creditors' Committee has concurred, the agreed terms of which are incorporated herein (including Section 4.5 hereof) and described in the Disclosure Statement.

       ***Pension Plan*** means the New England Sinai Hospital Pension Plan.

       ***Person*** means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

       ***Petition Date*** means May 6, 2024.

       ***Physician Insurance Account*** shall have the meaning set forth in the FILO DIP Order.

       ***Plan*** means this joint chapter 11 plan, including all exhibits, annexes, supplements, and schedules hereto (including the Plan Supplement), as may be amended, supplemented, or modified from time to time in accordance with the Bankruptcy Code and the terms of this Plan.

       ***Plan Administrator Agreement*** means the agreement setting forth, among other things, the identity, the terms of compensation, and the authority of the Plan Administrator Committee, and the scope of services to be provided by the Plan Administrator Committee, which agreement shall be in form and substance reasonably acceptable to the Creditors' Committee.

***Plan Administrator Committee*** means a committee comprised of Monica Blacker, Alan J. Carr, and William Transier.

***Plan Distribution*** means the payment or distribution of consideration to holders of Allowed Claims under this Plan.

***Plan Distribution Date*** means a date or dates, including the Initial Plan Distribution Date, as determined by the Estate Representative, in accordance with the terms of the Plan and Confirmation Order, on which the Plan Trustee makes a Plan Distribution to holders of the Plan Trust Interests on account of Allowed Claims.

***Plan Supplement*** means a supplemental appendix to this Plan, containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of this Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and Bankruptcy Rules, which may include: (i) the Schedule of Identified Non-Released Parties; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Schedule of Alternative Plan Debtors; (v) the Wind Down Budget; (vi) the Plan Administrator Agreement; (vii) disclosure of the identity of the Plan Trustee; (viii) the Plan Trust Agreement; (ix) disclosure of the identity of the Litigation Trustee; (x) the Litigation Trust Agreement; (xi) the Transition Services Agreement; and (xii) the Litigation Funding Agreement. Through the Effective Date, the Debtors shall have the right to amend any schedules, exhibits, or amendments to any of the documents contained in, and exhibits to, the Plan Supplement, subject to the consent rights of the Creditors' Committee and the FILO Parties herein.

***Plan Support Agreement Term Sheet*** means the term sheet attached to the Disclosure Statement as <u>Exhibit B</u>.

***Plan Trust*** means that certain trust to be established in accordance with <u>ARTICLE VI</u> of this Plan to hold the Plan Trust Assets and make distributions to holders of Allowed Claims pursuant to the Plan.

***Plan Trust Agreement*** means the agreement evidencing the terms and provisions governing the Plan Trust, dated as of the Plan Trust Establishment Date, establishing the terms and conditions of the Plan Trust and pursuant to which the Plan Trustee shall manage and administer the Plan Trust Assets, which shall be in form and substance reasonably acceptable to the Creditors' Committee.

***Plan Trust Assets*** means, on the Plan Trust Establishment Date, all Retained Assets and any property acquired by the Debtors after the establishment of the Litigation Trust (including, for the avoidance of doubt, the Class B Litigation Trust Interests), other than Intercompany Interests.

***Plan Trust Beneficiaries*** means the holders of the Plan Trust Interests.

***Plan Trust Establishment Date*** means the date the Plan Trust is established in accordance with <u>Section 6.1</u> of this Plan.

15

**Plan Trust Interests** means, collectively, (i) the GUC Plan Trust Interests, (ii) the PBGC Plan Trust Interests, and (iii) the FILO Plan Trust Interests.

**Plan Trust Net Proceeds** means all Cash proceeds realized from the Plan Trust Assets (net of any taxes, including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity, any taxes imposed on or with respect to any such fund or other separate taxable entity) after reserving in full for the Wind Down Reserve.

**Plan Trust Recovery** means one hundred percent (100%) of the Plan Trust Net Proceeds after satisfying or reserving in full for all Allowed Other Secured Claims, Administrative Expense Claims (including Professional Fee Claims), Priority Tax Claims, and Other Priority Claims, which reserves shall be determined by the Debtors in consultation with the Creditors' Committee.

**Plan Trustee** means a Person or Entity who shall serve as trustee of the Plan Trust, as contemplated by <u>Section 6.3</u> of this Plan and the Plan Trust Agreement.

**Plane Sales** means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

**Prepetition FILO Agent** shall have the meaning set forth in the FILO DIP Order.

**Prepetition Transactions** means the (i) 2016 Distribution, (ii) 2020 Transactions, (iii) 2021 Distribution, (iv) 2022 Transaction, and (v) Plane Sales.

**Priority Tax Claim** means any Claim of a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Pro Rata Share** means (i) that proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interest in that Class entitled to share in the same recovery as such Class under the Plan, or (ii) that proportion that Allowed Claims in a particular Class bears to the aggregate amount of Allowed Claims in multiple Classes, as applicable.

**Professional** means any Entity retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

**Professional Fee Claim** means a Claim for fees and expenses incurred by a Professional on or after the Petition Date through and including the Effective Date under sections 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code.

**Professional Fees Escrow Account** shall have the meaning ascribed to such term in the DIP Orders.

**Proof of Claim** means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

**Related Parties** means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in this Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

**Releasing Parties** means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

**Reinstate, Reinstated, or Reinstatement** means with respect to Claims and Interests, the treatment provided for in section 1124(2) of the Bankruptcy Code.

**Representative** means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

**Remaining FILO Bridge Claims** means the FILO Bridge Claims, other than the Retained FILO Claims.

**Retained Assets** means those assets that will be retained by the Debtors following the establishment of the Litigation Trust, including (i) the Class B Litigation Trust Interests, (ii) Intercompany Interests, (iii) Intercompany Claims, (iv) the Physician Insurance Account (and the proceeds thereof), (v) the Professional Fees Escrow Account (solely to the extent of the Debtors' interest in such account), (vi) the Expense Escrow Account (and the proceeds thereof), and (vii) any other asset identified as a "Retained Asset" in the FILO Settlement Term Sheet.

**Retained Causes of Action** means the Causes of Action retained by the Debtors and transferred either to the Plan Trust on the Plan Trust Establishment Date or the Litigation Trust on the Litigation Trust Establishment Date, as listed and described in the Schedule of Retained Causes of Action.

**Retained FILO Claims** means FILO Bridge Claims in principal amount totaling $10,000,000, which shall be unsecured, accrue interest at 7.0% per annum commencing on the Effective Date (provided that such interest shall not have to be paid in cash and shall be paid in kind and capitalized and added to the balance of the Retained FILO Claims on a quarterly basis), and shall be junior in payment priority only to all Secured Claims, Priority Claims, Administrative Expense Claims, and Professional Fee Claims.

**Schedule of Alternative Plan Debtors** means the list of Debtors, if any, who will be decoupled from this Plan in accordance with Section 5.3(c), which list which shall be filed with the Plan Supplement.

**Schedule of Assumed Contracts** means a schedule to be filed as part of the Plan Supplement of executory contracts and unexpired leases to be assumed by the Debtors on the Effective Date pursuant to the Plan, which schedule shall be reasonably acceptable to the Creditors' Committee.

**Schedule of Identified Non-Released Parties** means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

**Schedule of Retained Causes of Action** means a schedule to be filed as part of the Plan Supplement of Causes of Action to be retained by the Debtors and the Plan Trust.

**Schedules** means, collectively, any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors with the Bankruptcy Court and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, supplemented, or otherwise modified from time to time.

**Secured Claim** means a Claim (i) secured by a Lien on any Debtor's interest in property to the extent of the value of such interest as (a) set forth in this Plan, (b) agreed to by the holder of such Claim and the Debtors or the Plan Trustee, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*Secured Interim Advances* means the aggregate amount of cash collateral used by the Debtors from April 1, 2025 through the Litigation Trust Establishment Date together with interest thereon at the Applicable Rate (as defined in the FILO Settlement Term Sheet); on the Litigation Trust Establishment Date, the Debtors shall repay the FILO DIP Loans with Class A-1 interests having a liquidation preference (along with a proportionate interest in all other rights and obligations therein) equal to the amount of such Secured Interim Advances.

*Security* has the meaning set forth in section 101(49) of the Bankruptcy Code.

*Settled Administrative Expense Claims* means Administrative Expense Claims of holders who receive the Administrative Expense Claims Consent Program Opt-Out Form and do not affirmatively opt out on or before the deadline set forth in such form, and therefore, are deemed to have an Allowed Administrative Expense Claim in an amount equal to fifty percent (50%) of the reconciled amount set forth in the Administrative Expense Claims Consent Program Opt-Out Form.

*Settled Administrative Expense Claims Cash Pool* means $12,500,000.

*SHC Holdings* means Steward Health Care Holdings LLC.

*Statutory Fees* means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code.

*Subordinated Securities Claims* means a Claim subject to subordination under section 510(b) of the Bankruptcy Code.

*TRACO* means TRACO International Group S. DE R.L.

*Transformation Committee* means the special committee of the board of managers of SHC Holdings comprised of Alan J. Carr, John R. Castellano, and William Transier.

*Transition Services Agreement* means that certain agreement between the Debtors and the Litigation Trust pursuant to which the Debtors (and following the Plan Trust Establishment Date, the Plan Trust) provide certain transition services to the Litigation Trust, which shall be consistent with the FILO Settlement Term Sheet and otherwise acceptable to the Debtors, the Creditors' Committee, and the FILO Parties, and filed as part of the Plan Supplement. A substantially final form of such agreement mutually agreeable to the parties was filed with the Bankruptcy Court on May 25, 2025 [Docket No. 4966], and any changes to such substantially final form will be disclosed in the Plan Supplement.

*U.S. Trustee* means the United States Trustee for Region 7.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of section 1124 of the Bankruptcy Code.

*Waived Bridge MOIC Claims* means all Claims held by the FILO Bridge Lenders under the Bridge Credit Agreement for the Bridge MOIC other than the Allowed Bridge MOIC Amount.

**Wind Down** means the process to (i) sell, abandon, wind down, dissolve, liquidate, or distribute the Retained Assets and the Plan Trust Assets, (ii) resolve, terminate, or wind down any remaining liabilities of the Estates and the Plan Trust, (iii) reconcile all Claims, and (iv) administer the Plan and make Plan Distributions, in each case in accordance with the Plan.

**Wind Down Budget** means a budget setting forth the estimate of costs and expenses necessary to effectuate the Wind Down through the Wind Down Completion Date, which budget (i) shall be prepared by the Debtors, in consultation with the Creditors' Committee, and (ii) after the Plan Trust Establishment Date, may be amended, modified, or supplemented from time to time by the Plan Trustee in its reasonable discretion.

**Wind Down Completion Date** means the date upon which the Retained Assets and the Plan Trust Assets have been sold, abandoned, dissolved, liquidated, realized, or otherwise disposed of, and all proceeds thereof have been distributed in accordance with the Plan.

**Wind Down Reserve** means a deposit account or other Cash reserve held by the Estate Representative, to be funded, including from the Estate Funding, in accordance with the Wind Down Budget with a cash reserve, which shall be available and used only to satisfy wind down costs of the Debtors, the Plan Administrator Committee, and the Plan Trust and shall not be subject to prepetition Liens or Liens or superpriority Claims granted under the DIP Orders, the Confirmation Order, or the Plan; *provided* that any funds remaining in the Wind Down Reserve on the Wind Down Completion Date shall be distributed by the Plan Trust as Plan Trust Net Proceeds pursuant to the Plan and the Plan Trust Agreement.

### 1.2  *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in or exhibit to this Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively. The words "includes" and "including" are not limiting. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein:  (i) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (iv) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (v) all references herein to consent, acceptance, or approval may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail.

### 1.3  *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4  *Controlling Document.*

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each. If there is any inconsistency between any provision of this Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan. In the event of any inconsistency between this Plan, the Plan Supplement, the Disclosure Statement, the Disclosure Statement Order, or the Confirmation Order, on the one hand, and the FILO Settlement Order or any other instrument or document created or executed pursuant to the FILO Settlement Order, on the other hand, the Confirmation Order shall control; *provided* that any provision of the Confirmation Order that is inconsistent with the FILO Settlement Term Sheet shall require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent).

## ARTICLE II.  ADMINISTRATIVE EXPENSE CLAIMS, FILO DIP CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1  *Administrative Expense Claims.*

**(a)**  On, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (iii) the next Plan Distribution Date after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, distributions to holders of Allowed Administrative Expense Claims shall have commenced, with each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) to receive, in full and final satisfaction, settlement, release, and discharge of such Claim, (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

**(b)**  Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court, or as provided by Section 2.1 hereof, requests for payment of Administrative Expense Claims, other than requests for payment of Professional Fee Claims, must be filed and served on the Debtors no later than the applicable Administrative Expense Claims Bar Date pursuant to the procedures specified in the Administrative Expense Claims Bar Date Order, the

Confirmation Order, the notice of entry of the Confirmation Order, and the notice of Effective Date.

**(c)      Holders of Administrative Expense Claims that are required to file and serve a request for payment of such Administrative Expense Claims and that do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Estate Representative, as applicable, and their property, and such Administrative Expense Claims shall be deemed compromised, settled, and released without consideration as of the Effective Date.**

(d)      The Confirmation Order shall provide that, to the extent the Administrative Expense Claims Consent Program Condition is satisfied or waived in accordance with the Plan, on the first Business Day after the date that is (45) calendar days after the Confirmation Date, or as soon thereafter is reasonably practicable, distributions to holders of Settled Administrative Expense Claims shall have commenced, with each holder of a Settled Administrative Expense Claim set to receive their Pro Rata Share of the Settled Administrative Expense Claims Cash Pool, with the balance of the Settled Administrative Expense Claim paid in Cash in accordance with Section 2.1(a) of the Plan.

## 2.2      _FILO DIP Claims._

(a)      Except to the extent released pursuant to the FILO Settlement Order, on the Litigation Trust Establishment Date, the FILO DIP Claims shall be deemed Allowed in the full amount outstanding under the FILO DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses provided for thereunder.

(b)      Except to the extent that a holder of an Allowed FILO DIP Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO DIP Claim, on the Litigation Trust Establishment Date, each such holder shall receive its Pro Rata Share of the Class A-2 Litigation Trust Interests and, in respect of the Secured Interim Advances, its Pro Rata Share of the Class A-1 Litigation Trust Interests.

## 2.3      _Professional Fee Claims._

(a)      All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall file, on or before the date that is thirty (30) calendar days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Confirmation Date. Objections to any Professional Fee Claims must be filed and served no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

(b)      Allowed Professional Fee Claims shall be paid in full in Cash in such amounts as are Allowed by the Bankruptcy Court (i) on the date upon which an order relating to any such Allowed Professional Fee Claim is entered; or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Estate Representative, (x) first out of the Professional Fees Escrow Account; and (y) if the amount

available for distribution pursuant to the foregoing clause (x) is insufficient to remit all distributions required to be made to such holders pursuant to this sentence, from Cash on hand or the Plan Trust Net Proceeds.

**(c)** Notwithstanding the foregoing, any Professional Fee Claims that are authorized to be paid pursuant to any administrative orders entered by the Bankruptcy Court, including the Interim Compensation Procedures Order may be paid at the times and in the amounts authorized pursuant to such orders.

**(d)** Five (5) Business Days before the Confirmation Date, holders of Professional Fee Claims shall provide a reasonable estimate of unpaid Professional Fee Claims incurred in rendering services to the Debtors and the Creditors' Committee, and the Debtors or Litigation Trust shall fund such estimated amounts into the Professional Fees Escrow Account for the benefit of the holders of the Professional Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties. If a holder of a Professional Fee Claim does not provide an estimate, the Debtors may estimate the unpaid and unbilled reasonable and necessary fees and out-of-pocket expenses of such holder of a Professional Fee Claim. When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in such Professional Fees Escrow Account for purposes of this paragraph shall promptly be released from such escrow and revert to, and ownership thereof shall vest in, the Litigation Trust without any further action or order of the Bankruptcy Court.

**(e)** From and after the Confirmation Date, the Estate Representative and the Litigation Trust, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals after the Confirmation Date. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**(f)** The Estate Representative is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

### 2.4 *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim at the option of the Estate Representative (in consultation with the Creditors' Committee), either: (i) Cash in an amount equal to such Allowed Priority Tax Claim on the latest of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (c) the next Plan Distribution Date after such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (d) the date such Allowed Priority Tax

Claim is due and payable in the ordinary course as such obligation becomes due; (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (*provided* that the Estate Representative reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

## ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1    *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2    *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (i) Impaired and Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject this Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, FILO DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 3 | FILO Bridge Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5 | PBGC Claims | Impaired | Yes |
| 6 | Intercompany Claims | Impaired | No (Presumed to Accept) |
| 7 | Subordinated Securities Claims | Impaired | No (Deemed to Reject) |
| 8 | Intercompany Interests | Impaired | No (Presumed to Accept ) |
| 9 | Non-Debtor Owned Subsidiary Interests | Impaired | No (Deemed to Reject) |
| 10 | Parent Interests | Impaired | No (Deemed to Reject) |

### 3.3 *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Estate Representative in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.4 *Elimination of Vacant Classes*.

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.5 *Voting Classes; Presumed Acceptance by Non-Voting Classes*.

With respect to each Debtor, if a Class contained Claims or Interests eligible to vote and no holder of such Claims or Interests, as applicable, votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims or Interests, as applicable, in such Class.

### 3.6 *Voting; Presumptions; Solicitation*.

(a) **Acceptance by Certain Impaired Classes.** Only holders of Claims in Classes 3, 4, and 5 are entitled to vote to accept or reject this Plan. An Impaired Class of Claims or Interests shall have accepted this Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims or Interests actually voting in such Class have voted to accept this Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims or Interests actually voting in such Class have voted to accept this Plan.

(b) **Presumed Acceptance by Unimpaired Classes.** Holders of Claims in Classes 1 and 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Additionally, holders of Claims and Interests in Classes 6 and 8 are presumed to accept or deemed to reject the Plan. Accordingly, such holders are not entitled to vote to accept or reject this Plan.

(c) **Deemed Rejection by Certain Impaired Classes.** Holders of Claims and Interests in Classes 7, 9, and 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.7 *Cramdown*.

If any Class entitled to vote on this Plan does not vote to accept this Plan, the Debtors may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, is

Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.8 _No Waiver._

Nothing contained in this Plan shall be construed to waive a Debtor's or other Entity's right to object on any basis to any Claim.

## ARTICLE IV. TREATMENT OF CLAIMS AND INTERESTS.

### 4.1 _Class 1:  Other Priority Claims._

**(a) Treatment:** Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, each such holder shall receive:

> (i) payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the next Plan Distribution Date after such Other Priority Tax Claim becomes an Allowed Other Priority Claim, or as soon as practicable thereafter; or

> (ii) such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired.

**(b) Impairment and Voting:** Class 1 is Unimpaired, and holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

### 4.2 _Class 2:  Other Secured Claims._

**(a) Treatment:** Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Secured Claim, each such holder shall receive at the option of the Estate Representative:

> (i) payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, and (z) the next Plan Distribution Date after such Other Secured Claim becomes an Allowed Other Secured Claim,  or as soon as practicable thereafter;

(ii)    transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or

(iii)   such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

**(b)**    **Impairment and Voting:**  Class 2 is Unimpaired, and holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Secured Claims.

### 4.3    *Class 3:  FILO Bridge Claims.*

**(a)**    **Allowance.**

(i)    <u>Remaining FILO Bridge Claims</u>: As of April 28, 2025, the Remaining FILO Bridge Claims shall be deemed Allowed in the principal amount of $41,833,761.53, plus any and all interest, fees, costs, other charges, and expenses provided for under the Bridge Credit Agreement (other than with respect to the Bridge MOIC), *minus* the amount of the Allowed Retained FILO Claims, *plus* the Allowed Bridge MOIC Amount; *provided* that the Waived Bridge MOIC Claim is deemed waived without further notice to, approval of or action by any Person or Entity, and each holder of a Waived Bridge MOIC Claim shall not receive any distribution or retain any property on account of its Waived Bridge MOIC Claim.

(ii)    <u>Retained FILO Claims</u>: On the Litigation Trust Establishment Date, the Retained FILO Claims are Allowed in the aggregate amount of $10,000,000.

**(b)**    **Treatment**: Except to the extent released pursuant to the FILO Settlement Order, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO Bridge Claims, on the Litigation Trust Establishment Date, each such holder shall (i) receive their Pro Rata Share of the Class A-2 Litigation Trust Interests on account of their Allowed Remaining FILO Bridge Claim (unless previously received), and (ii) retain their Pro Rata Share of their Retained FILO Claims, which shall entitle such holders to their Pro Rata Share of the FILO Plan Trust Interests on the Plan Trust Establishment Date to the extent not repaid prior thereto.

**(c)**    **Impairment and Voting:**  Class 3 is Impaired, and, thus, holders of Allowed FILO Bridge Claims are entitled to vote to accept or reject the Plan.

### 4.4    *Class 4:  General Unsecured Claims.*

**(a)**    **Treatment:**  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction,

settlement, release, and discharge of such Allowed General Unsecured Claim, on or prior to the Effective Date, each such holder shall receive its Pro Rata Share of the GUC Plan Trust Interests.

(b) **Impairment and Voting:** Class 4 is Impaired, and, thus, holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.5 *Class 5: PBGC Claims*

(a) **Allowance**: The PBGC Claims shall be Allowed, as a prepetition unsecured claim, in the amount of $8,750,000.

(b) **Treatment:** In accordance with the PBGC Settlement, in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Claims, on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests. For the avoidance of doubt, the PBGC Claims shall be the only Claims on which the PBGC shall be entitled to any Distribution in connection with the Debtors or this Plan.

(c) **Impairment and Voting:** Class 5 is Impaired, and, thus, holders of Allowed PBGC Claims are entitled to vote to accept or reject the Plan.

### 4.6 *Class 6:  Intercompany Claims.*

(a) **Treatment:** On or prior to the Effective Date or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, reinstated, or discharged (each without any Plan Distribution) to the extent reasonably determined to be appropriate by the Estate Representative.

(b) **Impairment and Voting:** Holders of Class 6 Intercompany Claims are either plan proponents or controlled by plan proponents and therefore are conclusively presumed to accept the Plan. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Intercompany Claims.

### 4.7 *Class 7:  Subordinated Securities Claims.*

(a) **Treatment:**  All Subordinated Securities Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Securities Claims will not receive any distribution on account of such Allowed Subordinated Securities Claims.

(b) **Impairment and Voting:** Class 7 is Impaired. Holders of Subordinated Securities Claims are conclusively deemed to have rejected the Plan. Therefore, holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders of Subordinated Securities Claims will not be solicited.

### 4.8 *Class 8: Intercompany Interests.*

**(a) Treatment:** On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Intercompany Interests shall be adjusted, reinstated, or discharged at the election of the Estate Representative; *provided* that no Plan Distributions shall be made to holders of an Intercompany Interest on account of such Intercompany Interest under the Plan.

**(b) Impairment and Voting:** Holders of Class 8 Intercompany Interests are plan proponents and are therefore conclusively presumed to have accepted the Plan. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

### 4.9 *Class 9: Non-Debtor Owned Subsidiary Interests.*

**(a) Treatment:** On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Non-Debtor Owned Subsidiary Interests shall be cancelled and there shall be no distribution to holders of Non-Debtor Owned Subsidiary Interests on account of such Non-Debtor Owned Subsidiary Interests under the Plan.

**(b) Impairment and Voting:** Class 9 is Impaired. Holders of Non-Debtor Owned Subsidiary Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Non-Debtor Owned Subsidiary Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Non-Debtor Owned Subsidiary Interests.

### 4.10 *Class 10: Parent Interests.*

**(a) Treatment:** On the Effective Date, and without the need for any further corporate or limited liability company action or approval of any members, board of directors, board of managers, managers, management, or Security holders of any Debtor, all Parent Interests shall be cancelled and there shall be no distribution to holders of Parent Interests under the Plan.

**(b) Impairment and Voting:** Class 10 is Impaired. Holders of Parent Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, holders of Parent Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Parent Interests.

## ARTICLE V. MEANS FOR IMPLEMENTATION.

### 5.1 *Joint Chapter 11 Plan.*

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.

### 5.2 *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, and the releases contained in this Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a holder of a Claim or Interest may have with respect to any Claim or Interest and any distribution to be made on account of such Claim or Interest. This Plan shall be deemed a motion to approve the compromises and settlements contained in this Plan, including the PBGC Settlement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, including the PBGC Settlement, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of this Plan.

### 5.3 *Plan Settlement.*

**(a)** As a proposed compromise and settlement of inter-Estate and inter-creditor issues, including those relating to whether the liability and assets of the Debtors should be substantively consolidated for distribution purposes under the Plan (the "**Plan Settlement**"), the following treatment shall apply if the Plan Settlement is accepted and approved:

> (i) all assets and liabilities of the Debtors shall be treated as though they were pooled;
>
> (ii) each Claim filed or to be filed against any Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Debtors;
>
> (iii) all Intercompany Claims shall be adjusted, reinstated, or discharged in accordance with Section 4.6 herein;
>
> (iv) no Plan Distributions shall be made under the Plan on account of any Intercompany Interest or any Non-Debtor Owned Subsidiary Interest to the extent set forth in Sections 4.8 and 4.9 herein;
>
> (v) any Claims on account of a guarantee provided by a Debtor of the obligations of another Debtor shall be treated as eliminated so that any Claim against any Debtor and any Claim based upon a guarantee thereof by any other Debtor shall be treated as one Claim against a single consolidated Estate; and
>
> (vi) any joint or joint and several liability of any of the Debtors shall be one obligation of the Debtors and any Claims based upon such joint or joint and several liability shall be treated as one Claim against a single consolidated Estate.

**(b)** The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order approving the Plan Settlement, including the Bankruptcy Court's findings that the Plan Settlement is (i) in exchange for good and valuable consideration provided by each of the Estates (including, without limitation, performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (ii) in the best interests of the Debtors, the Estates, and all holders of Claims, (iii) fair, equitable, and reasonable, and (iv) effected after due notice and opportunity for hearing. As a result of the Plan Settlement, each Class of Claims and Interests shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors. The Plan shall not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan. The Plan Settlement shall not (other than for purposes related to funding Plan Distributions under the Plan) affect (u) the legal and organizational structure of the Debtors, (v) executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (w) any agreements entered into by the Plan Trust on or after the Plan Trust Establishment Date, (x) the Estate Representative's ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (y) any Causes of Action or Avoidance Actions or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no Plan Settlement, and (z) distributions to the Debtors or the Plan Trust from any insurance policies or the proceeds thereof.

**(c)** Notwithstanding the foregoing in this <u>Section 5.3</u>, the Debtors reserve the right to examine the Claims asserted against the various Debtors and to withdraw the Plan with respect to any particular Debtor. In the event that the Debtors elect to withdraw the Plan with respect to any Entity prior to the Confirmation Date, such Entity shall be listed on the Schedule of Alternative Plan Debtors included in the Plan Supplement and the Debtors may proceed to seek confirmation of this Plan as to the remaining Debtors in accordance with <u>Section 5.3(a)</u> above.

### 5.4 *Sources of Consideration for Plan Distribution.*

The Debtors and Plan Trustee shall fund Cash distributions under this Plan with Cash proceeds available from: (i) Cash available on or after the Effective Date in accordance with the Plan; (ii) proceeds realized from the Class B Litigation Trust Interests; (iii) proceeds realized from the Plan Trust Assets; (iii) proceeds realized from the Retained Assets; (iv) Cash from the Professional Fees Escrow Account (*provided* that the Cash proceeds of the Professional Fees Escrow Account shall be exclusively used to pay Allowed Professional Fee Claims until paid in full in Cash and any amount remaining thereafter shall be transferred to the Litigation Trust); and (v) any additional proceeds of the Wind Down, if any.

### 5.5 *Implementation.*

(i) On and after the Plan Trust Establishment Date, the Debtors and the Plan Trust shall use commercially reasonable efforts to liquidate and distribute the value of their respective interests in all of their Assets.

(ii) On and after the Litigation Trust Establishment Date, the Litigation Trust shall use commercially reasonable efforts to liquidate and distribute the value of its interests in the Litigation Trust Assets,

including through either prosecuting, settling, or otherwise monetizing the Litigation Trust Causes of Action, in accordance with the terms of the Litigation Trust Agreement; *provided* that notwithstanding anything else contained in this Plan or the Confirmation Order, nothing in the Plan or the Confirmation Order shall limit the Debtors' ability or authority to settle any Litigation Trust Cause of Action prior to the Litigation Trust Establishment Date.

(iii) No later than the Effective Date, the Plan Trust (if not previously established) shall be established pursuant to the Plan and the Plan Trust Agreement.

(iv) No later than one (1) Business Day following the Confirmation Date, the Litigation Trust (if not previously established) shall be established pursuant to the Plan and the Litigation Trust Agreement.

(v) On the Confirmation Date, the Professional Fees Escrow Account shall be funded with an amount of Cash sufficient to pay all accrued Professional Fee Claims based upon estimates provided by the Professionals, as set forth in Section 2.3 of this Plan.

(vi) On the Confirmation Date, the Wind Down Reserve shall be established.

(vii) On the Litigation Trust Establishment Date, the Litigation Trust shall fund the Estate Funding.

(viii) After the Litigation Trust Establishment Date, the Litigation Trust shall make all payments required under the Transition Services Agreement to the Estate Representative.

(ix) On or prior to the Effective Date, the Professional Fees Escrow Account shall be funded with an amount of Cash sufficient to pay all outstanding Professional Fee Claims.

(x) On the Plan Trust Establishment Date, the Physician Insurance Account shall vest in, and be transferred to, the Plan Trust. The Plan Trustee shall assume responsibility for administering and paying the Covered Claims and Covered Amounts (each as defined in the FILO DIP Order) in accordance with the FILO DIP Order. Upon payment in full of all Covered Amounts, any amounts remaining in the Physician Insurance Account shall be transferred to the Litigation Trust.

(xi) On the Plan Trust Establishment Date, the Plan Trust Assets shall transfer to the Plan Trust automatically and without further action of the Bankruptcy Court.

(xii) On the Litigation Trust Establishment Date, the Litigation Trust Assets shall transfer to the Litigation Trust automatically and without further

action of the Bankruptcy Court; *provided* that the Debtors, the FILO Parties, the Litigation Trust, and the Litigation Trustee shall execute all documentation necessary to effectuate such transfer.

(xiii)   On the Litigation Trust Establishment Date, $10,000,000 of FILO Bridge Claims shall automatically convert without any further action by any party into an equal amount of Retained FILO Claims, subject to the terms and conditions of this Plan.

(xiv)   Upon the FILO Balance (as defined in the FILO Settlement Term Sheet) being reduced to $0 such that all amounts distributable in respect of Class A Litigation Trust Interests have been distributed, the Plan Trustee may in its sole discretion (so long as the Plan Trust owns all of the Class B Litigation Trust Interests) direct the Litigation Trustee to effectuate the distribution of all remaining Litigation Trust Assets to the Plan Trust on account of the Plan Trust's Class B Litigation Trust Interests, by transfer in kind, merger or otherwise (which assets shall be distributed subject to (a) any outstanding interests in, and obligations and liabilities of, the Litigation Trust, including the right of the holders of the Class A-1 Litigation Trust Interests to receive distributions on account of the Post-FILO Repayment Variable Component (as defined in the FILO Settlement Term Sheet) and (b) any rights of the Class A-2 Representative (as defined in the FILO Settlement Term Sheet) under the FILO Settlement Term Sheet); *provided* that the Plan Trustee has obtained a favorable private letter ruling from the IRS or an opinion of the Plan Trust's tax advisor, in each case from which the Plan Trustee reasonably concludes that such transaction would not have a material adverse tax impact on the Plan Trust.

**5.6**   *Transition Services Agreement*

The Estate Representative shall provide transition services to the Litigation Trust in accordance with the Transition Services Agreement. The Estate Representative shall be defended, held harmless, and indemnified by the Litigation Trust against any and all liabilities or losses that may be incurred in connection with the rendering of services under the Transition Services Agreement to the Litigation Trust or Litigation Trustee, subject to customary carve outs for fraud, willful misconduct, or gross negligence.

**5.7**   *Litigation Funding Agreement*

On the Litigation Trust Establishment Date (to the extent not previously executed), the applicable parties shall execute and deliver the Litigation Funding Agreement to the Litigation Trust and such document shall become effective in accordance with its terms. Upon execution, the Litigation Funding Agreement shall constitute legal, valid, and binding obligations of the parties thereto and be enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order, and the Litigation Trust

shall be authorized to incur the obligations under the Litigation Funding Agreement and use the proceeds of such Litigation Funding Agreement, in each case, in accordance with the terms of the Plan, the Confirmation Order, the FILO Settlement Order, and the Litigation Funding Agreement without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person. The terms and conditions of the Litigation Funding Agreement shall bind the Litigation Trust and each other Entity that enters into such agreement.

### 5.8    *Coordination between the Litigation Trust and the Plan Trust*.

(a)    The Estate Representative shall coordinate with the Litigation Trustee with respect to issues involving overlapping concerns with respect to third parties.  If the Estate Representative and Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a mediation conference with the Mediator; and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.

(b)    With respect to any such disputes presented to the Bankruptcy Court:

(i)    If the FILO Balance (as defined in the FILO Settlement Term Sheet) is in an Underpayment State (as defined in the FILO Settlement Term Sheet) on the date of any hearing before the Bankruptcy Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate Representative; *provided* that the Litigation Trustee's business judgment shall not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estates or the Plan Trust (other than with respect to claims under section 502(h) of the Bankruptcy Code) without the consent of the Estate Representative.

(ii)    If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate Representative's business judgment shall be applied to the dispute, subject to challenge by the Litigation Trustee; *provided* that the Estate Representative's business judgment shall not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Litigation Trust without the consent of the Litigation Trustee.

### 5.9    *Corporate Action*.

(a)    Following the Confirmation Date, by virtue of the solicitation of votes in favor of this Plan and entry of the Confirmation Order, all actions contemplated by this Plan or the Confirmation Order (including any action to be undertaken by the Plan Trustee or Litigation Trustee) shall be deemed authorized, approved, and, to the extent taken prior to the Confirmation Date, ratified without any requirement for further action by holders of Claims or Interests, the

Debtors, or any other Entity or Person. All matters provided for in this Plan involving the organizational structure of the Debtors, and any other action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

(b)     The authorizations and approvals contemplated by this <u>Section 5.9</u> shall be effective notwithstanding any requirements under non-bankruptcy law.

(c)     The Confirmation Order shall and shall be deemed, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, to authorize and direct parties, as applicable, among other things, to take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan.

### 5.10     *Plan Administrator Committee*

On and after the Confirmation Date and until the Plan Trust Establishment Date, the Plan Administrator Committee shall have exclusive governance rights of the Estates and be authorized to implement the Plan and any applicable orders of the Bankruptcy Court in accordance with the Plan Administrator Agreement. Monica Blacker shall serve as the initial chairperson of the Plan Administrator Committee (the "**Committee Chairperson**"). Any decision by the Plan Administrator Committee shall require the affirmative vote of at least two (2) of the three (3) members of the Plan Administrator Committee; *provided* that the Plan Administrator Committee shall not act without the consent of the Committee Chairperson. Upon the Plan Trust Establishment Date, the Plan Trustee shall accede to the rights and obligations of the Plan Administrator Committee.

### 5.11     *Governance.*

(a)     On the Confirmation Date, the authority, power and incumbency of the persons then acting as directors, officers, managers, members and other authorized persons of the Debtors shall be terminated and such persons shall be deemed to have resigned. On the Confirmation Date, the applicable Estate Representative shall serve as the initial director(s) or manager, as applicable, and sole officer of each Debtor after the Confirmation Date until such time as such Debtor goes out of existence, by merger into another Debtor, by dissolution or otherwise.

(b)     The Estate Representative, on behalf of the Debtors, may appoint a manager of any Debtor to serve after the Confirmation Date. The Estate Representative, on behalf of the Debtors, may elect such additional manager(s) and/or officer(s) of the Debtors as the Estate Representative deems necessary to implement this Plan and the actions contemplated herein. The Estate Representative, on behalf of the Debtors, shall, after the Confirmation Date, have the power to act by written consent to remove any manager or officer of any Debtor at any time with or without cause.

(c)     As of the Confirmation Date, the governing documents of the Debtors may be amended (and shall be deemed amended) to the extent necessary to carry out the provisions of this Plan.

### 5.12    *Cancellation of Existing Securities, Agreements, and Liens.*

(a)    Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)    On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)    After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)    Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 5.13    *Merger or Dissolution of Debtors.*

On or after the Confirmation Date, at the direction of the Estate Representative, any of the Debtors may be merged into SHC Holdings and the Estate Representative may complete the winding up of such Debtors (including SHC Holdings) without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its members, managers, directors, management, or Security holders or any payments to be made in connection therewith, other than the filing of a certificate of dissolution and/or merger with the appropriate governmental authorities, and any such certificate of dissolution and/or merger may be filed by the Estate Representative without need for any authorization, signature or other act of any Person or Entity, including without limitation any holder of any Claim or Interest.  On or after the Confirmation Date, the Estate Representative may engage in any other transaction in furtherance of the Plan.

Any such transactions may be effective without any further action by the members, managers, directors, management, or Security holders of the Debtors.

### 5.14 *Preservation of Causes of Action.*

**Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by order of the Bankruptcy Court, the Debtors preserve and reserve any and all Causes of Action, including, for the avoidance of doubt, the Litigation Trust Causes of Action.** For the avoidance of doubt, any Claim or Cause of Action that is settled or released prior to the Litigation Trust Establishment Date shall not be deemed a Litigation Trust Cause of Action. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order to any Cause of Action or potential Cause of Action against them as any indication that the Debtors, the Plan Administrator Committee, the Plan Trustee, the Plan Trust, the Litigation Trustee, or the Litigation Trust will not pursue any and all available Causes of Action against them. No preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the consummation of the Plan or the occurrence of the Effective Date. Prior to the Effective Date, (i) the Estate Representative, with respect to any Cause of Action that is not a Litigation Trust Asset, and (ii) the Litigation Trustee with respect to any Litigation Trust Cause of Action, shall retain and shall have, including through its authorized agents or representatives, the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 5.15 *Effectuating Documents; Further Transactions.*

**(a)** On and after the Confirmation Date, the Estate Representative is authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of this Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan.

**(b)** Before, on, or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the Security holders, directors, managers, or members of the Debtors shall be deemed to have been so approved and shall be in effect before, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the Security holders, directors, managers, or members of the Debtors, or the need for any approvals, authorizations, actions or consents.

### 5.16 *Closing of the Chapter 11 Cases.*

After the Confirmation Date, the Estate Representative shall be authorized, but not directed, to submit one or more motions for order(s) that close and issue final decrees for any of the Chapter 11 Cases, for any Debtor, in each case in accordance with the Bankruptcy Code and the Bankruptcy Rules. Furthermore, the Claims and Noticing Agent shall be authorized to destroy

all paper/hardcopy records related to the Chapter 11 Cases two (2) years after the Effective Date has occurred.

## ARTICLE VI.    PLAN TRUST.

### 6.1    *Establishment of the Plan Trust.*

On or prior to the Effective Date, the Plan Trust shall be established in accordance with the Plan Trust Agreement for the purpose of being vested with and liquidating the Plan Trust Assets, reconciling Claims and making distributions to holders of Allowed Claims in accordance with the terms of this Plan and the Plan Trust Agreement. Upon the Plan Trust Establishment Date, the Plan Trust shall assume all Claims (including, for the avoidance of doubt, all Administrative Expense Claims (including Professional Fee Claims), Other Secured Claims, Priority Tax Claims, and Other Priority Claims) against the Debtors (other than the FILO DIP Claims, FILO Bridge Claims, and Claims for which Plan Trust Interests are distributed) with the same validity and priority as such Claims had against the Debtors immediately prior to the Plan Trust Establishment Date and there shall be no further recourse against the Debtors with respect to such Claims. For the avoidance of doubt, the Estate Representative may establish the Plan Trust after the Confirmation Date but prior to the Effective Date. On or following the Plan Trust Establishment Date, the Plan Trustee may distribute the Plan Trust Interests to holders of Allowed Claims and establish the Disputed Claim Reserve in accordance with the Plan. Subject to and to the extent set forth in this Plan, the Confirmation Order, the Plan Trust Agreement, or any other order of the Bankruptcy Court entered in connection therewith, the Plan Trust and the Plan Trustee shall be empowered, without the need for Bankruptcy Court approval, to:

(i)    perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Plan Trust;

(ii)    establish, maintain and administer trust accounts, which shall be segregated to the extent appropriate in accordance with this Plan;

(iii)    accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle and protect, as applicable, the Plan Trust Assets in accordance with this Plan;

(iv)    except to the extent any Claims have already been Allowed (including pursuant to the terms of this Plan), control and effectuate the Claims reconciliation process with respect to all Claims, including to object to, seek to subordinate, recharacterize, compromise or settle any and all such Claims against the Debtors, including the Disputed Claims, pursuant to the procedures prescribed in this Plan;

(v)    calculate and make distributions to holders of Allowed Claims;

(vi)    administer each Debtor's tax obligations, including filing tax returns and other reports (including any amended returns or claims for

refund), paying tax obligations and representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(vii)    administer the Plan Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Plan Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(viii)    retain, compensate and employ Professionals (including Estate Professionals) to represent the Plan Trust;

(ix)    direct and control the Wind Down, liquidation, sale or abandonment of the Plan Trust Assets, including the Retained Assets, and any other remaining Assets of the Debtors under the Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims;

(x)    exercise such other powers as may be vested in the Plan Trust under the Plan Trust Agreement and this Plan, or as are deemed by the Debtors or the Plan Trustee to be necessary and proper to implement the provisions of the Plan Trust Agreement and effectuate the purpose of the Plan Trust;

(xi)    dissolve the Plan Trust in accordance with the terms of the Plan Trust Agreement;

(xii)    on behalf of each of the Debtors, carry out and implement all provisions of this Plan; and

(xiii)    wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor.

The Plan Trustee shall have the same authority in respect of all taxes and tax returns of the Debtors as if the Plan Trustee were the Debtors.

Notwithstanding anything to the contrary in this Section 6.1, the Plan Trust's primary purpose is liquidating the Plan Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Plan Trust's liquidating purpose and reasonably necessary to conserve and protect the Plan Trust Assets and provide for the orderly liquidation thereof.

### 6.2    *Funding of and Transfer of Assets into the Plan Trust.*

Except as otherwise provided in this Plan or the Confirmation Order, upon the Plan

Trust Establishment Date, the Debtors shall transfer the Plan Trust Assets, including, but not limited to the Estate Funding, to the Plan Trust, and all such assets shall vest in the Plan Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) on such date, to be administered by the Plan Trustee, in accordance with this Plan and the Plan Trust Agreement. The Plan Trustee shall have the authority to create additional sub-accounts in trust accounts established pursuant to Section 6.6 and sub-trusts within the Plan Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Plan Trust. The act of transferring the Plan Trust Assets, as authorized by this Plan, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Plan Trust as if the asset or right was still held by the applicable Debtor. Upon the transfer of the Plan Trust Assets to the Plan Trust, the Debtors shall have no interest in or with respect to the Plan Trust Assets or the Plan Trust. Upon delivery of the Plan Trust Assets to the Plan Trust, the Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Plan Trust Assets or the Plan Trust. Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Plan Trust Assets to the Plan Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. In connection with the transfer of such assets, any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Plan Trust shall vest in the Plan Trust and its representatives, and the Debtors and the Plan Trustee are directed to take all necessary actions to effectuate the transfer of such privileges. The Plan Trustee shall agree to accept and hold the Plan Trust Assets in the Plan Trust for the benefit of the Plan Trust Beneficiaries, subject to the terms of the Plan and the Plan Trust Agreement.

**6.3** _**Plan Trustee.**_

(a) **Appointment of Plan Trustee.** Upon the Plan Trust Establishment Date, the Plan Administrator Committee shall be appointed as the Plan Trustee. Except as otherwise provided in this Plan, the Plan Trustee (i) shall be the successor to and representative of the Estate of each of the Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code and (ii) shall be the sole representative of, and shall act for, the Debtors, and shall assume any such outstanding responsibility of the Debtors under the Plan. The powers, rights and responsibilities of the Plan Trustee shall be as specified in the Plan Trust Agreement and Plan and shall include the authority and responsibility to fulfill the items identified in this Section 6.3 of the Plan. Other rights and duties of the Plan Trustee and the Plan Trust Beneficiaries shall be as set forth in the Plan Trust Agreement. The FILO Parties will have the right to consent to any successor Plan Trustee that is not a chapter 7 trustee (including the terms of any such successor's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

(b) **Functions of the Plan Trustee.** On and after the Plan Trust Establishment Date, the Plan Trustee and/or the Plan Trust, as applicable, shall carry out the functions set forth in this Section 6.3 and, after the Effective Date, may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation

Order or the Plan Trust Agreement.  Such functions shall include any and all powers and authority to:

> (i)    effectuate the Plan, including the prosecution and any other disposition of all litigation related to any appeals in respect to the approval and/or implementation of the Plan;

> (ii)    wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to dissolve, liquidate, bankrupt, or take other similar action with respect to each Debtor, including by terminating the corporate or organizational existence of each such Debtor;

> (iii)    exercise its business judgment to direct and control the Wind Down, including the liquidation, sale and/or abandonment of the Plan Trust Assets, including the Retained Assets, under this Plan and in accordance with applicable law as necessary to maximize distributions to holders of Allowed Claims;

> (iv)    marshal, market for sale, and wind down any of the Plan Trust Assets, including the Retained Assets;

> (v)    serve as the initial director or manager, as applicable, and sole officer of each Debtor after the Effective Date until such time as such Debtor is merged or dissolved, as applicable, and take any actions necessary to effectuate the terms of the Plan and the Plan Trust Agreement in such capacities;

> (vi)    take any actions necessary to (A) resolve all matters related to the Plan Trust Assets and (B) vest such assets in the Plan Trust;

> (vii)    open and maintain bank accounts on behalf of or in the name of the Plan Trust;

> (viii)    fund the Wind Down Reserve;

> (ix)    amend, modify, or supplement the Wind Down Budget;

> (x)    determine, from time to time, whether the amounts available in the Wind Down Reserve are in excess of the amount necessary to satisfy the purpose for which such reserve was established and amend, modify, or supplement the Wind Down Budget accordingly.  If the Plan Trustee determines that a surplus exists in the Wind Down Reserve as of the date of such determination, the Plan Trustee may transfer such surplus amount to the Plan Trust for distribution in accordance with the Plan;

> (xi)    maintain the books and records and accounts of the Debtors or the Plan Trust;

(xii)    reconcile Claims and calculate and make distributions to holders of Allowed Claims in accordance with the Plan;

(xiii)    administer each Debtor's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of each Debtor or its Estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(xiv)    administer the Plan Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Plan Trust before any taxing authority in all matters including, without limitation, any action, suit, proceeding, audit or examination;

(xv)    file, prosecute, settle or dispose of any and all objections to asserted Claims;

(xvi)    enter into and consummate any transactions for the purpose of dissolving the Debtors;

(xvii)    make distributions of the Plan Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay the expenses of the Plan Trust, to holders of Allowed Claims, in accordance with the Plan;

(xviii)    purchase and carry all insurance policies reasonably necessary or advisable to pay all associated insurance premiums and costs;

(xix)    invest Cash, as available, and any income earned thereon;

(xx)    take such actions as are necessary or appropriate to close any of the Chapter 11 Cases;

(xxi)    retain, compensate and employ Professionals to represent the Plan Trust or the Plan Trustee, as applicable; and

(xxii)    take any other actions not inconsistent with the provisions hereof that the Plan Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

### 6.4    *Plan Trust Agreement*.

Prior to the Plan Trust Establishment Date, the Debtors shall execute and deliver the Plan Trust Agreement.  The Plan Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Plan Trustee.  Any such indemnification shall be the sole responsibility of the Plan Trust and payable solely from the Plan Trust Assets.

### 6.5    *Fees and Expenses of the Plan Trust.*

From and after the Plan Trust Establishment Date, expenses of the Plan Trust shall be paid from the Plan Trust Assets in the ordinary course of business, in accordance with the Plan and the Plan Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Plan Trustee, on behalf of the Plan Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional (including professionals previously employed by the Debtors) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Plan Trustee, are necessary to assist the Plan Trustee in the performance of the Plan Trustee's duties under the Plan and the Plan Trust Agreement, subject to any limitations and procedures established by the Plan Trust Agreement.

### 6.6    *Creation and Maintenance of Trust Accounts.*

On and after the Plan Trust Establishment Date, appropriate trust accounts will be established and maintained in one or more federally insured domestic banks in the name of the Plan Trust. Cash deposited in the trust accounts will be invested, held and used solely as provided in the Plan Trust Agreement. The trust accounts will be funded, as applicable, by Cash proceeds obtained through the disposition of Plan Trust Assets or the proceeds of the Plan Trust or Class B Litigation Trust Interests. Upon obtaining an order of the Bankruptcy Court authorizing final distribution or closure of the Chapter 11 Cases, any funds remaining in the trust accounts shall be distributed in accordance with this Plan and the Plan Trust Agreement, and the trust accounts may be closed.

### 6.7    *Limitation of Liability.*

Neither the Plan Trustee, nor its firms, companies, affiliates, partners, officers, directors, members, employees, designees, professionals, advisors, attorneys, representatives, disbursing agents or agents, and any of such Person's successors and assigns, shall incur any liability by reason of any error of law or fact or of any matter or thing done or suffered or omitted to be done under or in connection with the Plan or Plan Trust Agreement, other than for specific actions or omissions resulting from its willful misconduct, gross negligence or fraud found by a Final Order of a court of competent jurisdiction to be the direct and primary cause of loss, liability, damage or expense suffered by the Plan Trust. The Plan Trustee shall enjoy all of the rights, powers, immunities and privileges applicable to a chapter 7 trustee or any other analogous trustee. The Plan Trustee may, in connection with the performance of its functions, in the Plan Trustee's sole and absolute discretion, consult with his, her or its attorneys, accountants, advisors and agents, and shall not be liable for any act taken, or omitted to be taken, or suggested to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are in writing. Notwithstanding such authority, the Plan Trustee shall be under no obligation to consult with any such attorneys, accountants, advisors or agents, and any determination not to do so shall not result in the imposition of liability on the Plan Trustee or its members unless such determination is based on willful misconduct, gross negligence or fraud. Persons dealing with the Plan Trustee shall look only to the Plan Trust Assets to satisfy any liability incurred by the Plan Trustee to such person in carrying out the terms of the Plan or the Plan Trust Agreement, and the Plan Trustee shall have no personal obligation to satisfy such liability.

### 6.8 *Indemnification*.

In addition to the indemnification provided by the Litigation Trust pursuant to Section 7.7 of this Plan and the Transition Services Agreement, the Plan Trust shall indemnify the Plan Trustee for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred without fraud, gross negligence or willful misconduct on the part of the Plan Trustee (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Plan Trustee in connection with the acceptance, administration, exercise, and performance of their duties under the Plan or the Plan Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct. In addition to the indemnification provided by the Litigation Trust pursuant to Section 7.7 of this Plan and the Transition Services Agreement, the Plan Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Plan Trustee, from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Plan Trust or the implementation or administration of the Plan if the Plan Trustee acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Plan Trust. To the extent the Plan Trust indemnifies and holds the Plan Trustee harmless as provided above, the reasonable legal fees and related costs incurred by counsel to the Plan Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as expenses of the Plan Trust. The costs and expenses incurred in enforcing the right of indemnification in this Section 6.8 shall be paid by the Plan Trust. This provision shall survive the termination of the Plan Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Plan Trustee.

### 6.9 *Insurance*.

The Plan Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Plan Trust's sole expense, for itself and its respective agents, including coverage with respect to the liabilities, duties, and obligations of the Plan Trustee, which insurance coverage may, at the sole option of the Plan Trustee, be extended for a reasonable period after the termination of the Plan Trust Agreement.

### 6.10 *Dissolution of the Plan Trust*.

In no event shall the Plan Trust be dissolved later than five (5) years from the Plan Trust Establishment Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Plan Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Plan Trust Assets.

### 6.11    _Records._

The Plan Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors necessary for the disposition of Plan Trust Assets and objections to Disputed Claims. Following the Plan Trust Establishment Date, the Plan Trustee is authorized, pursuant to section 554(a) of the Bankruptcy Code, without further application to the Bankruptcy Court or notice to any party, to abandon or otherwise destroy documents and records (whether in electronic or paper format), other than any medical records, that the Plan Trustee determines, in its reasonable business judgment, are no longer necessary to the administration of either the Chapter 11 Cases or the Plan, notwithstanding any federal, state, or local law or requirement requiring the retention of the applicable documents or records; _provided_ that, prior to abandoning or destroying any records, the Plan Trustee shall notify the Litigation Trustee of its intent to abandon or destroy such records, which notice shall be provided at least five (5) Business Days prior to such intended abandonment or destruction, and offer to transfer such records to the Litigation Trustee, and if the Litigation Trustee elects to retain or receive such records, the Litigation Trustee shall do so at the Litigation Trustee's sole cost and expense (paid in advance), including the cost of any required continued storage until the transfer can be effectuated.

### 6.12    _Section 1145 Exemption; Non-Transferability of Plan Trust Interests._

Any Plan Trust Interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Plan Trust Interests constitute "securities," the offer and sale of such Plan Trust Interests to the Plan Trust Beneficiaries will be exempt to the extent provided in section 1145 of the Bankruptcy Code from registration, without further action by any person, under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations requiring registration for the offer. Any such Plan Trust Interests (and the underlying Claim giving rise thereto) shall not: (i) be voluntarily or involuntarily, directly or indirectly, assigned, conveyed, hypothecated, pledged, or otherwise transferred or traded, except by will, intestate succession or as may otherwise be required by operation of law; (ii) be evidenced by a certificate or other instrument; and (iii) possess any voting rights with respect to the Plan Trust or otherwise.

### 6.13    _Plan Trust Tax and Other Matters._

**(a)    Tax Treatment.** The Plan Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes (except to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" within the meaning of Treasury Regulations section 1.468B-1 _et seq._ or other separate taxable entity). Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Trustee), all parties (including, without limitation, the Debtors, the Plan Trustee, and the Plan Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of Assets by the Debtors to the Plan Trust (including the Class B Litigation Trust Interests) as (i) the transfer of such Assets and, by reason of the transfer of the Class B Litigation Trust Interests, a respective

portion of the underlying Assets of the Litigation Trust (in each case, subject to any liabilities and obligations relating to those Assets) by the Debtors directly to the holders of Allowed Claims entitled to receive Plan Trust Interests in satisfaction of their Claims, other than to the extent any Assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity, followed by (ii) the transfer of such assets (subject to such liabilities and obligations) by such holders to the Plan Trust in exchange for the beneficial interests in the Plan Trust. Accordingly, absent definitive guidance to the contrary, the Plan Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respect share of Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of Litigation Trust Assets (in each case, other than to the extent any such Assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity).

(b)     **Liquidation Purpose of the Plan Trust; No Successor in Interest.**  The Plan Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust.  Accordingly, the Plan Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Plan Trust Assets, make timely distributions to the Plan Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Plan Trustee shall distribute at least annually to the Plan Trust Beneficiaries any Available Cash. The Plan Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in this Plan or the Plan Trust Agreement.  The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Plan Trustee expressly for such purpose. Notwithstanding anything in the Plan or Plan Trust Agreement to the contrary, the Plan Trustee shall always act consistently with, and not contrary to, the purpose of the Plan Trust as set forth in the Plan.

(c)     **Cash Investments.**  The right and power of the Plan Trustee to invest the Plan Trust Assets, the proceeds thereof, or any income earned by the Plan Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code.  The Plan Trustee may expend the Cash of the Plan Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Assets of the Plan Trust during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Plan Trust) and (iii) to satisfy other respective liabilities incurred by the Plan Trust in accordance with this Plan and the Plan Trust Agreement (including, without limitation, the payment of any taxes).

(d)     **Tax Reporting and Tax Payments.**

(i)     The Plan Trustee shall file tax returns for the Plan Trust treating the Plan Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this <u>Section 6.13(d)</u>. The Plan Trustee also shall annually send to each holder of a Plan Trust Interest, a separate

46

statement regarding the receipts and expenditures of the Plan Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)    As soon as practicable after the Plan Trust Establishment Date, the Plan Trustee shall make a good faith determination of the fair market value of the Plan Trust Assets as of the Plan Trust Establishment Date. The Plan Trustee shall inform all parties of such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii)   Allocations of Plan Trust taxable income among Plan Trust Beneficiaries (other than taxable income allocable to any assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Plan Trust had distributed all its assets (valued at their tax book value, other than assets treated as held by a disputed ownership fund or other separate taxable entity with respect to Disputed Claims) to the holders of Plan Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Plan Trust. Similarly, taxable loss of the Plan Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Plan Trust Assets. The tax book value of Plan Trust Assets for purpose of this paragraph shall equal their fair market value on the date Plan Trust Assets are transferred to the Plan Trust, adjusted in accordance with tax accounting principles prescribed by the United States Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)    The Plan Trust shall be responsible for payment, out of Plan Trust Assets, of any taxes imposed on the Plan Trust or the Plan Trust Assets. More particularly, any taxes imposed on any Disputed Claim Reserve or its assets will be paid out of the assets of the Disputed Claim Reserve (including any Plan Trust Assets allocable to, or held on account of, Disputed Claims), and netted against any subsequent distributions in respect of the allowance or disallowance of such Claims. In the event, and to the extent, any Cash in any Disputed

47

Claim Reserve is insufficient to pay the portion of any taxes attributable to taxable income arising from assets of the Disputed Claim Reserve (including any income that may arise upon an actual or constructive distribution of the assets of the reserve in respect of the resolution of Disputed Claims), assets of the Disputed Claim Reserve (including those otherwise distributable) may be sold to pay such taxes.

(v)    The Plan Trustee may request an expedited determination of taxes of the Plan Trust (including, to the extent any assets allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity in relation to the Plan Trust, taxes of such fund or other separate taxable entity) and the Debtors, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Plan Trust (or any such disputed ownership fund or other separate taxable entity) or the Debtors for all taxable periods through the dissolution of the Plan Trust.

(vi)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Trustee of a private letter ruling if the Plan Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Plan Trustee), the Plan Trustee may elect to treat any Plan Trust Assets allocable to, or held on account of, any Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9 or other separate taxable entity, and shall report consistently therewith for state and local income tax purposes. If a "disputed ownership fund" election is made (or all or any portion of the Plan Trust Assets allocable to, or held on account of, Disputed Claims is otherwise treated as a separate taxable entity), all parties (including the Plan Trustee and Plan Trust Beneficiaries) shall report for U.S. federal, state and local income taxes consistently with the foregoing.

(vii)    The Plan Trustee, the Litigation Trustee and the Debtors shall each cooperate with the other in connection with the preparation and filing of any tax returns, the provision of any required tax forms, and any other matter with respect to taxes, and shall make available to the other, as reasonably requested, any information or records relevant to the preparation or filing of any tax returns or forms or the defense of any audit or other tax proceeding.

(viii)    The treatment provided in this <u>Section 6.13</u>, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

# ARTICLE VII.    LITIGATION TRUST

### 7.1    *Establishment of the Litigation Trust.*

To the extent not previously established pursuant to the FILO Settlement Order, the Confirmation Order shall provide that no later than one (1) Business Days following the Confirmation Date, the Litigation Trust shall be established in accordance with the FILO Settlement Order and the Litigation Trust Agreement for the purpose of being vested with and liquidating the Litigation Trust Assets and making distributions to the Litigation Trust Beneficiaries in accordance with the terms of the Litigation Trust Agreement.  Following the Litigation Trust Establishment Date, the Litigation Trustee shall distribute the Litigation Trust Interests to the Litigation Trust Beneficiaries.  In each case, subject in all respects to the FILO Settlement Order and the Litigation Trust Agreement, the Litigation Trust and the Litigation Trustee shall be empowered, without the need for Bankruptcy Court approval, to:

(i)    perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Litigation Trust;

(ii)    establish, maintain, and administer trust accounts;

(iii)    accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the Litigation Trust Assets in accordance with the Litigation Trust Agreement;

(iv)    make distributions to holders of Litigation Trust Interests in accordance with the Litigation Trust Agreement;

(v)    administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

(vi)    retain, compensate and employ professionals to represent the Litigation Trust;

(vii)    direct and control the pursuit, settlement, liquidation, sale, or abandonment of the Litigation Trust Assets in accordance with the Litigation Trust Agreement and applicable law and as necessary to maximize distributions to Litigation Trust Beneficiaries;

(viii)    exercise such other powers as may be vested in the Litigation Trust under the Litigation Trust Agreement, or as are deemed by the Litigation Trustee to be necessary and proper to implement the provisions of the Litigation Trust Agreement and effectuate the purpose of the Litigation Trust;

(ix)    conduct investigations of the Litigation Trust Causes of Action pursuant to Bankruptcy Rule 2004;

(x)    pursue, prosecute, settle, abandon, or otherwise resolve the Litigation Trust Assets (including any Litigation Trust Causes of Action transferred to the Litigation Trust and including through the commencement, participation, defense, or continuation of legal proceedings, including judicial, arbitration or administrative proceedings, in any domestic or foreign jurisdiction) in accordance with the Litigation Trust Agreement during or after the pendency of these Chapter 11 Cases;

(xi)    protect and enforce the rights of the Litigation Trust in and to the Litigation Trust Assets by utilizing any foreign judicial proceedings and any applicable foreign bankruptcy, insolvency, moratorium, or similar law; and

(xii)    dissolve the Litigation Trust in accordance with the terms of the Litigation Trust Agreement.

Notwithstanding anything to the contrary in this Section 7.1, the Litigation Trust's primary purpose is liquidating the Litigation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Litigation Trust's liquidating purpose and reasonably necessary to conserve and protect the Litigation Trust Assets and provide for the orderly liquidation thereof.

For the avoidance of doubt, any Claim or Cause of Action that is settled or released prior to the Litigation Trust Establishment Date, subject to the consent rights of the FILO Parties, shall not be deemed a Litigation Trust Cause of Action, and until the Litigation Trust Establishment Date, the Estate Representative shall retain the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Claim or Cause of Action, subject to the consent rights of the FILO Parties, the Bankruptcy Code, and applicable orders of the Bankruptcy Court. Nothing in this Plan or in the Confirmation Order shall impair the ability or authority of the Estate Representative to settle any such Claim or Cause of Action, subject to the consent rights of the FILO Parties, prior to the Litigation Trust Establishment Date.

**7.2    _Funding of and Transfer of Assets into the Litigation Trust._**

**(a)**    Upon the Litigation Trust Establishment Date, the Debtors shall transfer the Litigation Trust Assets to the Litigation Trust, and all such assets shall vest in the Litigation Trust (free and clear of all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise)) to the fullest extent permitted by law) on such date, to be administered by the Litigation Trustee, in accordance with the Litigation Trust Agreement.  The Litigation Trustee shall have the authority to create additional sub-accounts in trust accounts and sub-trusts within the Litigation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Litigation Trust.  The act of transferring the Litigation Trust Assets, as authorized by the Confirmation Order, this Plan and the FILO Settlement Order, shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights (specifically

including any extensions available to a trustee or debtor-in-possession under 11 U.S.C. § 108) may be asserted by the Litigation Trust, in any judicial, arbitration, or administrative proceeding, during or after the pendency of these Chapter 11 Cases, as if the asset or right asserted in such judicial, arbitration, or administrative proceeding were an action or other asset still held by the applicable Debtor or Debtor-in-possession. Upon the transfer of the Litigation Trust Assets to the Litigation Trust, the Estates or their successors shall have no interest in or with respect to the Litigation Trust Assets or the Litigation Trust other than the Class B Litigation Trust Interests. Upon delivery of the Litigation Trust Assets to the Litigation Trust, the Debtors and their predecessors, successors and assigns, shall be released from all liability with respect to the delivery thereof and shall have no reversionary or further interest in or with respect to the Litigation Trust Assets or the Litigation Trust (other than the Class B Litigation Trust Interests). Notwithstanding the foregoing, for purposes of section 553 of the Bankruptcy Code, the transfer of the Litigation Trust Assets to the Litigation Trust shall not affect the mutuality of obligations that otherwise may have existed prior to the effectuation of such transfer. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code. The Litigation Trustee shall agree to accept and hold the Litigation Trust Assets in the Litigation Trust for the benefit of the Litigation Trust Beneficiaries, subject to the terms of the Litigation Trust Agreement.

(b)     All attorney-client privileges, work product protections, joint client privilege, mediation privilege, common interest or joint defense privilege or protection and all other privileges, immunities or protections from disclosure (the "**Privileges**") held by any of (1) any one or more of the Debtors or (2) any pre-petition or post-petition committee or subcommittee of the board of directors or equivalent governing body of any of the Debtors and their predecessors (together the "**Privilege Transfer Parties**") related in any way to the Litigation Trust Assets or the analysis or prosecution of any Litigation Trust Assets (the "**Transferred Privileged Information**") shall be transferred and assigned to, and vested in, the Litigation Trust and its authorized representatives. The Transferred Privileged Information shall include documents and information of all manner, whether oral, written or digital, and whether or not previously disclosed or discussed. For the avoidance of doubt, the Privileges shall include any right or obligation to preserve or enforce or waive a privilege that arises from any joint defense, common interest or similar agreement involving any of the Privilege Transfer Parties.

(c)     The foregoing transfer and assignment shall vest the Privileges concerning the Transferred Privileged Information in the Litigation Trust, consistent with sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Litigation Trust and the Litigation Trust Beneficiaries; *provided*, however, that to the extent that any such Privileges or Transferred Privileged Information relates to both the Litigation Trust Assets on one hand and any matter in which the Debtors (or the Plan Trust) have an interest on the other, such Privileges and Transferred Privileged Information shall vest jointly in the Debtors (or, following the Plan Trust Establishment Date, the Plan Trust) (or their designee) and the Litigation Trust. As relates to any Privileges or Transferred Privileged Information held jointly with the Debtors (or, following the Plan Trust Establishment Date, the Plan Trust) (or their designee), (i) with respect to litigations or proceedings concerning matters in which the Debtors (or the Plan Trust) has an interest as a potential defendant, the Debtors shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving

prior written consent from the Litigation Trust, and (ii) with respect to litigations or proceedings concerning the Litigation Trust Assets where the Debtors (or the Plan Trust) has an interest as a potential defendant, the Litigation Trust shall maintain the Privileges and keep the Transferred Privileged Information confidential, and may only waive any Privileges and/or disclose in any such litigation or proceeding any or all of the Transferred Privileged Information upon receiving prior written consent from the Estate Representative. The Litigation Trust and Debtors have agreed that they do not intend to provide a general waiver of all Privileges and that each such party will take commercially reasonable steps to avoid a general waiver of the Privileges.

(d)     Pursuant to, *inter alia*, Federal Rule of Evidence 502(d), no Privileges shall be waived by the transfer and assignment of the Privileges or the production of any Transferred Privileged Information to the Litigation Trust or any of its respective employees, professionals or representatives, or by disclosure of such Transferred Privileged Information between the Privilege Transfer Parties, on the one hand, and the Litigation Trust, on the other hand, or any of their respective employees, professionals or representatives.

(e)     If a Privilege Transfer Party, the Litigation Trust, any of their respective employees, professionals or representatives or any other person inadvertently produces or discloses Transferred Privileged Information to any third party, such production shall not be deemed to destroy any of the Privileges, or be deemed a waiver of any confidentiality protections afforded to such Transferred Privileged Information. In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Trust of the production and shall demand of all recipients of the inadvertently disclosed Transferred Privileged Information that they return or confirm the destruction of such materials.

### 7.3    *Litigation Trustee.*

(a)     **Appointment of Litigation Trustee.**     Upon the Litigation Trust Establishment Date, the Litigation Trustee, to the extent not previously appointed pursuant to the FILO Settlement Order, shall be appointed.  The Litigation Trust shall be administered by the Litigation Trustee pursuant to the Litigation Trust Agreement. The powers, rights and responsibilities of the Litigation Trustee shall be as specified in the Litigation Trust Agreement and shall include the authority and responsibility to fulfill the items identified in this Section 7.3 of the Plan.  Other rights and duties of the Litigation Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

(b)     **Functions of the Litigation Trustee.**  On and after the Litigation Trust Establishment Date, the Litigation Trustee shall carry out the functions set forth in this Section 7.3 and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code and the Bankruptcy Rules, other than any restrictions expressly imposed by the FILO Settlement Order or the Litigation Trust Agreement.  Such functions shall include any and all powers and authority to:

(i)     take any actions necessary to (A) resolve all matters related to the Litigation Trust Assets and (B) vest such assets in the Litigation Trust;

(ii)　open and maintain bank accounts on behalf of or in the name of the Litigation Trust;

(iii)　maintain the books and records and accounts of the Litigation Trust and obtain any necessary insurance;

(iv)　administer the Litigation Trust's tax obligations, including filing tax returns and other reports (including any amended returns or claims for refund), paying tax obligations and representing the interest and account of the Litigation Trust before any taxing authority in all matters, including, without limitation, any action, suit, proceeding, audit or examination;

(v)　fund the Estate Funding;

(vi)　make distributions of the Litigation Trust Assets and any proceeds thereof, in excess of any amounts necessary to pay the Litigation Trust Expenses, to the Litigation Trust Beneficiaries in accordance with the Litigation Trust Agreement;

(vii)　invest Cash, as available, and any income earned thereon;

(viii)　retain, compensate and employ professionals to represent the Litigation Trust or the Litigation Trustee, as applicable; and

(ix)　take any other actions not inconsistent with the provisions hereof, the FILO Settlement Order, and the Litigation Trust Agreement that the Litigation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

### 7.4　_Litigation Trust Agreement._

Prior to the Litigation Trust Establishment Date, the Debtors shall execute and deliver the Litigation Trust Agreement. The Litigation Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Litigation Trustee. Any such indemnification shall be the sole responsibility of the Litigation Trust and payable solely from the Litigation Trust Assets.

### 7.5　_Class B Representative._

The Litigation Trust shall be administered by the Litigation Trustee pursuant to the Litigation Trust Agreement and the Plan. On the Litigation Trust Establishment Date, the Plan Administrator Committee shall be appointed as the Class B Representative to help oversee the activities of the Litigation Trust in accordance with the Litigation Trust Agreement. Upon the Plan Trust Establishment Date, the Plan Trustee shall succeed the Plan Administrator Committee as the Class B Representative. Following the Litigation Trust Establishment Date, the Class B Representative shall be responsible for, among other things, (i) exercising its rights under the

Litigation Trust Agreement, and (ii) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the above duties.

**7.6** *Fees and Expenses of the Litigation Trust.*

(a) From and after the Litigation Trust Establishment Date, Litigation Trust Expenses shall be paid from the Litigation Trust Assets in the ordinary course of business, in accordance with the Litigation Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Litigation Trustee, on behalf of the Litigation Trust, may employ and pay, in the ordinary course of business, the reasonable fees of any professional (including Professionals previously employed by the Debtors or another party-in-interest) for services rendered or expenses incurred on and after the Litigation Trust Establishment Date that, in the discretion of the Litigation Trustee, are necessary to assist the Litigation Trustee in the performance of the Litigation Trustee's duties under the Litigation Trust Agreement, subject to any limitations and procedures established by the Litigation Trust Agreement.

(b) The Litigation Trustee may retain professionals or consultants (including attorneys, accountants, appraisers, financial advisors, expert witnesses or other parties determined by the Litigation Trustee to have qualifications necessary or desirable to assist in the investigation, prosecution and/or settlement of the Litigation Trust Causes of Action).

**7.7** *Indemnification.*

The Litigation Trust shall indemnify the Plan Trustee and its Representatives for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred, in each case, without fraud, gross negligence, breach of fiduciary duties, or willful misconduct on the part of the Plan Trustee or its Representatives, as applicable (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Plan Trustee or its Representatives at the request of the Litigation Trustee in connection with the rendering of services to the Litigation Trust or the Litigation Trustee, including under the Transition Services Agreement. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence or willful misconduct. To the extent the Litigation Trust indemnifies and holds the Plan Trustee harmless as provided above, the reasonable legal fees and related costs incurred by counsel to the Plan Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Litigation Trust Expenses. The costs and expenses incurred in enforcing the right of indemnification in this Section 7.7 shall be paid by the Litigation Trust. This provision shall survive the termination of the Litigation Trust Agreement and the death, dissolution, liquidation, resignation, replacement or removal of the Plan Trustee.

**7.8** *Dissolution of the Litigation Trust.*

In no event shall the Litigation Trust be dissolved later than five (5) years from the Litigation Trust Establishment Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order

54

of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Litigation Trust Assets.

### 7.9 *Records.*

The Litigation Trustee shall be provided with originals or copies of or access to all documents, business records, and other information of the Debtors necessary, as reasonably determined by the Litigation Trustee, for the disposition of Litigation Trust Assets, subject to the payment of any required fees, costs, or expenses under the Transition Services Agreement.

### 7.10 *Transferability of Litigation Trust Interests.*

The Litigation Trust Interests shall be transferable solely to the extent provided for, and subject to the conditions set forth, in the Litigation Trust Agreement.

### 7.11 *Litigation Trust Tax and Other Matters.*

(a) **Tax Treatment.** The Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes, with the holders of Allowed FILO DIP Claims and Allowed FILO Bridge Claims, in respect of their Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests, and the respective FILO Parties providing litigation funding, in respect of their Class A-1 Litigation Trust Interests, being treated as grantors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust Beneficiaries) shall treat for U.S. federal income tax purposes the transfer of Assets by the Debtors to the Litigation Trust as follows:

(i) If the transfers of Assets to the Litigation Trust and Plan Trust (and distribution of Litigation Trust Interests and Plan Trust Interests) occur concurrently, as (A) the transfer of Assets directly to the holders of Allowed Claims entitled to receive Litigation Trust Interests, to the FILO Parties that provided the Estate Funding and, by reason of the Class B Litigation Trust Interests transferred to the Plan Trust, to holders of Allowed Claims entitled to receive Plan Trust Interests (subject to any liabilities and obligations relating to the Litigation Trust Assets), in satisfaction of, and in exchange for, their Claims and Estate Funding, other than to the extent any Assets allocable to, or held on account of, Disputed Claims are treated as a "disputed ownership fund" or other separate taxable entity in respect of the Plan Trust, followed by (B) the transfer of such Assets (subject to such liabilities and obligations) by such persons to the

55

Litigation Trust (in the case of the holders of Plan Trust Interests, first as a transfer of such assets to the Plan Trust and then from the Plan Trust to the Litigation Trust) in exchange for their Litigation Trust Interests.

(ii)     If the transfer of Assets to the Litigation Trust occurs prior to (and not concurrently with) the transfer of Assets to and distribution of beneficial interests in the Plan Trust, as (A) the transfer of the portion of the Litigation Trust Assets to which the Class A Litigation Trust Interests relate (in the case of the Class A-1 Litigation Trust Interests, to the extent of the Secured Interim Advances and the Estate Funding) directly to the holders of Allowed FILO DIP Claims, the holders of Allowed Remaining FILO Bridge Claims and the FILO Parties that provided the Estate Funding (subject to any liabilities and obligations relating to those Assets) in satisfaction of, and in exchange for, their Claims and Estate Funding, followed by (B) the transfer of such Assets by such persons, and of the remaining Litigation Trust Assets by the Debtors, to the Litigation Trust in exchange for their Litigation Trust Interests. In such event, the subsequent transfer of the Class B Litigation Trust Interests by the Debtors to the Plan Trust shall be treated as a direct transfer of the applicable portion of the assets of the Litigation Trust underlying such Class B Litigation Trust Interests to the Plan Trust Beneficiaries, followed by the transfer of such Assets by the Plan Trust Beneficiaries to the Plan Trust, as further described in Section 6.13(a) above.

Accordingly, absent definitive guidance to the contrary, (A) prior to the establishment of the Plan Trust, the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests and the Debtors, as the holders of the Class B Litigation Trust Interests, shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (B) after the establishment of the Plan Trust, (1) the holders of the Class A-1 Litigation Trust Interests and Class A-2 Litigation Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Litigation Trust Assets, and (2) the holders of the Plan Trust Interests shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Plan Trust Assets and, by reason of the Plan Trust's beneficial interest in the Litigation Trust, of the Litigation Trust Assets, in each case, other than to the extent any Assets of the Plan Trust allocable to, or held on account of, Disputed Claims are treated as a disputed ownership fund or other separate taxable entity.

(b)     **Liquidation Purpose of the Litigation Trust; No Successor in Interest.** The Litigation Trust shall be established for the primary purpose of liquidating and distributing the Assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust. Accordingly, the Litigation Trustees shall, in an expeditious but orderly manner, liquidate and

convert to Cash the Litigation Trust Assets, make timely distributions to the Litigation Trust Beneficiaries, as applicable, and not unduly prolong their duration. The Litigation Trustee shall distribute at least annually to the Litigation Trust Beneficiaries any Available Cash. The Litigation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in the Litigation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Litigation Trustee expressly for such purpose. Notwithstanding anything in the Plan or the Litigation Trust Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth in the Plan.

(c)     **Cash Investments.**  The right and power of the Litigation Trustee to invest the Litigation Trust Assets, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements, and to the investment guidelines of section 345 of the Bankruptcy Code. The Litigation Trustee may expend the Cash of the Litigation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Assets of the Litigation Trust during liquidation, (ii) to pay the reasonable administrative expenses (including, but not limited to, any taxes imposed on the Litigation Trust) and (iii) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan and the Litigation Trust Agreement (including, without limitation, the payment of any taxes).

(d)     **Tax Reporting and Tax Payments.**

(i)     The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this <u>Section 7.11(d)</u>. The Litigation Trustee also shall annually send to each holder of a Litigation Trust Interest, a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for U.S. federal income tax purposes and shall instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(ii)     As soon as practicable after the Litigation Trust Establishment Date, the Estate Representative, in consultation with the Litigation Trustee, shall make a good faith determination of the fair market value of the Litigation Trust Assets, as of Litigation Trust Establishment Date. The Estate Representative shall inform all parties of such valuation as relevant from time to time.  This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

(iii) Allocations of Litigation Trust taxable income among Litigation Trust Beneficiaries (including holders of Plan Trust Interests, as grantors and deemed owners of their respective portion of the underlying Litigation Trust Assets) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Litigation Trust had distributed all its assets (valued at their tax book value) to the holders of Litigation Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Litigation Trust. Similarly, taxable loss of the Litigation Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust Assets. The tax book value of Litigation Trust Assets for purpose of this paragraph shall equal their fair market value on the date Litigation Trust Assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the United States Revenue Code of 1986, as amended from time to time, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv) The Litigation Trust shall be responsible for payment, out of Litigation Trust Assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets.

(v) The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

(vi) The Litigation Trustee, the Plan Trustee, and the Debtors shall each cooperate with the other in connection with the preparation and filing of any tax returns, the provision of any required tax forms, and any other matter with respect to taxes, and shall make available to the other, as reasonably requested, any information or records relevant to the preparation or filing of any tax returns or forms or the defense of any audit or other tax proceeding.

(vii) The treatment provided in this Section 7.11, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

# ARTICLE VIII.    DISTRIBUTIONS.

## 8.1    *Distributions Generally*.

On or after the Effective Date, the Plan Trustee (with the assistance of the Disbursing Agent as necessary) shall make all Plan Distributions to holders of Allowed Claims in accordance with the terms of this Plan; *provided* that, for the avoidance of doubt, following the Plan Trust Establishment Date and the Litigation Trust Establishment Date, the Plan Trustee and Litigation Trustee may make distributions of (i) Plan Trust Interests and Litigation Trust Interests, as applicable, and (ii) any Available Cash. The Plan Trust shall make Plan Distributions only in accordance with the terms of the Plan, the Confirmation Order and the Plan Trust Agreement to holders of Allowed Claims, and only to the extent that the Plan Trust has sufficient Plan Trust Assets (or income and/or proceeds realized from Plan Trust Assets) to make such payments in accordance with and to the extent provided for in the Plan, the Confirmation Order and the Plan Trust Agreement.  The Estate Representative shall direct the Initial Plan Distribution (including the Plan Distribution of the Plan Trust Interests as set forth in ARTICLE IV) to holders of Allowed Claims no later than the Initial Plan Distribution Date.  After the Initial Plan Distribution Date, the Estate Representative shall, from time to time, determine the subsequent Plan Distribution Dates.

## 8.2    *No Postpetition Interest on Claims*.

Unless otherwise provided in this Plan, the Confirmation Order, or other order of the Bankruptcy Court, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claim and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

## 8.3    *Distribution Record Date*.

As of the close of business on the Distribution Record Date, the various lists of holders of Claims or Interests in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims or Interests after the Distribution Record Date; *provided* that the Plan Trustee shall file a notice on the docket of the anticipated Effective Date at least ten (10) calendar days before the anticipated Effective Date.  Neither the Debtors nor the Plan Trustee shall have any obligation to recognize any transfer of a Claim (i) occurring after the close of business on the Distribution Record Date, or (ii) that does not comply with Bankruptcy Rule 3001(e) or otherwise does not comply with the Bankruptcy Code or Bankruptcy Rules.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Plan Trustee shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

## 8.4    *Date of Distributions*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**8.5** *Reserve on Account of Disputed Claims.*

(a)     From and after the Plan Trust Establishment Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Bankruptcy Court in an amount constituting the Allowed amount, or Allowed or disallowed by Final Order, the Plan Trust shall retain, for the benefit of each holder of a Disputed Claim, an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed Proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claim has been estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code as constituting and representing the maximum amount in which such Claim may ultimately become an Allowed Claim or (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and the Estate Representative.  Cash held in the Disputed Claim Reserve (including, with respect to Cash, any earnings that have accrued on such Cash, net of any expenses, including any taxes, relating thereto) shall be retained by the Plan Trust for the benefit of holders of Disputed Claims pending determination of their entitlement thereto under the terms of the Plan. Any Cash shall be either (x) held by the Plan Trust in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States government and guaranteed by the United States government, and having (in either case) a maturity of not more than 30 days. No payments or Plan Distributions shall be made with respect to all or any portion of any Disputed Claim pending the entire resolution thereof by Final Order.

(b)     Subject to the other provisions of this Plan regarding timing of Plan Distributions, after a Disputed Claim becomes an Allowed Claim, the Plan Trustee shall distribute to the holder thereof the Plan Distributions, if any, to which such holder is then entitled under the Plan and any earnings related to the portion of the Disputed Claim Reserve allocable to such Allowed Claim (net of any expenses, including any taxes, relating thereto), and a Plan Trust Interest in accordance with the Plan, subject to the provisions concerning distributions from the Plan Trust, including the application of any reserves.  The balance of any Cash previously retained but not distributed to a Disputed Claim holder shall be included in future distributions to holders of Claims in the applicable Class.  Each holder of a Disputed Claim that ultimately becomes an Allowed Claim will be paid (i) first from the Disputed Claim Reserve and (ii) if the amount available for Plan Distribution pursuant to the foregoing clause (i) is insufficient to remit Plan Distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent Distribution Date(s) from Plan Trust Assets.

(c)     If a Disputed Claim is disallowed, assets treated as held in the Disputed Claim Reserve on account of such Claim shall, at such time as reasonably determined by the Plan Trustee, be treated for U.S. federal income tax purposes as an additional distribution of an undivided interest in the underlying assets with respect to previously Allowed Claims.  For the avoidance of doubt, the Plan Trustee shall not be required to make any Plan Distributions as a result of any Disputed Claims that are disallowed until all Disputed Claims either become Allowed Claims or are disallowed.

**(d)**     Unless otherwise ordered by the Bankruptcy Court, the Disputed Claim Reserve shall not be used for operating expenses, costs, or any purpose other than as set forth in this Section 8.5.

### 8.6     *Distributions After Effective Date.*

Plan Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 8.7     *Plan Distributions Made by Plan Trustee.*

All Plan Distributions shall be made by the Plan Trustee on and after the Effective Date as provided herein; *provided* that, for the avoidance of doubt, following the Plan Trust Establishment Date and the Litigation Trust Establishment Date, the Plan Trustee and Litigation Trustee may make distributions of (i) Plan Trust Interests and Litigation Trust Interests, as applicable, and (ii) any Available Cash. The Plan Trustee shall not be required to give any bond or surety or other security for the performance of its duties. The Debtors shall use commercially reasonable efforts to provide the Plan Trustee with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' books and records. The Debtors shall cooperate in good faith with the applicable Plan Trustee to comply with the withholding and reporting requirements outlined in Section 8.16 of this Plan.

### 8.8     *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, the Plan Trustee shall make all Plan Distributions to any holder of an Allowed Claim or its authorized designee or transferee as and when required by this Plan at (a) the address of such holder on the books and records of the Debtors or their agents, (b) at the address in any written notice of address change delivered to the Debtors or the Plan Trustee, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001, or (c) the address of the designee of such holder to the extent practicable. Subject to Section 8.9 of this Plan, in the event that any Plan Distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Plan Trustee has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.

### 8.9     *Unclaimed Property.*

**(a)**     Six (6) months from the later of:  (i) the Effective Date and (ii) the date that is ten (10) Business Days after the date a Claim or Interest is first Allowed, all Plan Distributions payable on account of such Claim or Interest that are unclaimed pursuant to Section 8.9(b) shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Plan Trustee or its successor or assigns, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Plan Trustee shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

**(b)** A Plan Distribution shall be deemed unclaimed if a holder has not (i) accepted a particular distribution or, in the case of distribution made by check, by ninety (90) calendar days after issuance, negotiated such check, (ii) given notice to the Plan Trustee of an intent to accept a particular Plan Distribution, (iii) responded to the Debtors', Plan Trustee's, or Disbursing Agent's as applicable, request for information necessary to facilitate a particular Plan Distribution, or (iv) taken any other action necessary to facilitate such distribution.

### 8.10 *Satisfaction of Claims.*

Unless otherwise provided in this Plan, any Plan Distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims and shall not exceed the amount of such Allowed Claims. Notwithstanding anything to the contrary in the Plan, upon the Plan Trust Establishment Date, the Plan Trust shall assume all Claims (including, for the avoidance of doubt, all Administrative Expense Claims (including Professional Fee Claims), Other Secured Claims, Priority Tax Claims, and Other Priority Claims) against the Debtors (other than the FILO DIP Claims and FILO Bridge Claims except the Retained FILO Claims) with the same validity and priority as such Claims had against the Debtors immediately prior to the Plan Trust Establishment Date and there shall be no further recourse against the Debtors with respect to such Claims.

### 8.11 *Manner of Payment Under Plan.*

Except as specifically provided herein, at the option of the Estate Representative, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Estate Representative. Any wire transfer fees incurred by the Estate Representative in connection with the transmission of a wire transfer shall be deducted from the amount of the recipient holder's Plan Distribution.

### 8.12 *Minimum Distribution.*

The Plan Trustee shall have no obligation to make a Plan Distribution that is less than $100.00 in Cash.

### 8.13 *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

### 8.14 *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in this Plan or as otherwise required by law (as determined by the Debtors or Plan Trustee), Plan Distributions with respect to an Allowed Claim shall be allocated first to the principal amount of such Allowed Claim (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal

amount of such Allowed Claim, to any portion of such Allowed Claim for accrued but unpaid interest.

### 8.15    *Setoffs and Recoupments.*

Except as otherwise provided in this Plan, including in all respects <u>Sections 12.6(a)</u>, <u>12.6(b)</u>, <u>12.7</u>, and <u>12.8</u>, each Debtor or the Plan Trustee on behalf such Debtor, may, pursuant to applicable non-bankruptcy law, set off or recoup against any Allowed Claim and the Plan Distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that such Debtor or its successors may hold against the holder of such Allowed Claim after the Plan Trust Establishment Date. Notwithstanding the foregoing, neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Plan Trustee, a Debtor, or an Estate or its successor of any claims, rights, or Causes of Action that the Plan Trustee, a Debtor, or an Estate or its successor or assign may possess against the holder of such Claim, except as otherwise provided in this Plan, including in all respects <u>Sections 12.6(a)</u>, <u>12.6(b)</u>, <u>12.7</u>, and <u>12.8</u>.

### 8.16    *Withholding and Reporting Requirements.*

**(a)    Withholding Rights.**  In connection with this Plan, any Entity issuing any instrument or making any distribution or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  Any amounts withheld pursuant to this Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a Plan Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any Entity issuing any instrument or making any Plan Distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  Additionally, in the case of a non-Cash distribution that is subject to withholding, the distributing party has the right, but not the obligation, to withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.

**(b)    Forms.**  Any party entitled to receive any property as an issuance or distribution under this Plan shall, upon reasonable request, deliver to the applicable withholding agent or such other Entity or Estate designated by the Plan Trustee, an appropriate IRS Form W-9 or (if the payee is a foreign person) IRS Form W-8 and/or any other forms or documents, as applicable, requested by the Plan Trustee or the applicable withholding agent to reduce or eliminate any required federal, state, or local withholding.  If such request is made by a withholding agent or such other Entity or Estate designated by the Plan Trustee and the party entitled to receive such property as an issuance or distribution fails to comply with any such request within ninety (90)

days after the request is made, the amount of such issuance or distribution shall irrevocably revert to the Plan Trust, as applicable, and any Claim in respect of such distribution under this Plan shall be discharged and forever barred from assertion against any Debtor, Estate, the Plan Trust, and their respective property.

### 8.17 *Securities Registration Exemption.*

Any Plan Trust Interests and Litigation Trust Interests will not, and are not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Plan Trust Interests or Litigation Trust Interests constitute "securities," the offer and sale of (i) such Plan Trust Interests to the Plan Trust Beneficiaries will be exempt to the extent provided in section 1145 of the Bankruptcy Code from registration, without further action by any person, under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations requiring registration for the offer or (ii) such Litigation Trust Interests to the Litigation Trust Beneficiaries will be exempt to the extent provided in Section 4(a)(2) of the Securities Act and similar exemptions under state securities laws. Any such Plan Trust Interests and Litigation Trust Interests shall be subject to the limitations set forth in their respective trust agreements in a manner consistent with this Plan.

### 8.18 *Disbursing Agent.*

**(a)** The Plan Trustee shall have the authority to enter into agreements with one or more Disbursing Agents to facilitate the distributions required under the Plan, the Confirmation Order, and the Plan Trust Agreement. The Plan Trustee may pay to the Disbursing Agent all reasonable and documented fees and expenses of the Disbursing Agent without the need for other approvals, authorizations, actions or consents. For the avoidance of doubt, the reasonable and documented fees of the Disbursing Agent will be paid by the Plan Trustee and will not be deducted from distributions to be made under the Plan to holders of Allowed Claims receiving distributions from the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

**(b)** From and after the Confirmation Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against the Debtors, the Plan Trust Beneficiaries, and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent. No holder of a Claim, a Plan Trust Beneficiary, or other party in interest shall have or pursue any claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making Plan Distributions in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

**(c)**     The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder; (ii) make all Plan Distributions contemplated hereby; and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**(d)**     Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Plan Trust in the ordinary course of business.

## ARTICLE IX.     PROCEDURES FOR RESOLVING CLAIMS.

### 9.1     *Allowance of Claims.*

The Estate Representative shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order in the Chapter 11 Cases allowing such Claim.

### 9.2     *Objections to Claims.*

As of the Plan Trust Establishment Date, objections to Claims against the Debtors may be interposed and prosecuted only by the Plan Trustee.  Any objections to Claims shall be served and filed (i) on or before one hundred and eighty (180) days following the later of (a) the Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date as ordered by the Bankruptcy Court; *provided* that the Estate Representative may extend the Claim Objection Deadline for an additional one hundred and eighty (180) days in their sole discretion upon the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing

### 9.3     *Estimation of Claims.*

The Estate Representative may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Estate Representative may pursue supplementary proceedings to object to the allowance of such Claim.

Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated.

### 9.4 *Claim Resolution Procedures Cumulative.*

All of the objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan without further notice or Bankruptcy Court approval. Except as otherwise provided herein (including the release provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Plan Trust Establishment Date, the Plan Trustee may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Plan Trust may hold against any Person, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.

### 9.5 *Adjustment to Claims Register Without Objection.*

Any Claim or Interest that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Estate Representative upon agreement between the parties in interest without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 9.6 *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under this Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or Plan Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 9.7 *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Plan Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of this Plan. On a date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Plan Trustee in the Plan Trustee's sole discretion, the Plan Trustee shall provide to the holder of such Claim the Plan Distribution (if any) to which such holder is entitled under this Plan, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code. For the avoidance of doubt, and notwithstanding anything in the Plan to the contrary, the Plan Trustee shall not be required to make any Plan Distributions on account of Disputed Claims that become Allowed Claims or as a result of any Disputed Claims that are disallowed until all Disputed Claims either

become Allowed Claims or are disallowed. Notwithstanding anything contained herein, to the extent that a Disputed Claim becomes an Allowed Claim after the Plan Trust Establishment Date or Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Plan Trust Establishment Date or Effective Date (as applicable).

### 9.8 *Elimination of Duplicate Claims.*

Any Proof of Claim filed against one or more of the Debtors shall be deemed to be a single Claim, and all duplicate Proofs of Claim for the same Claim filed against more than one Debtor shall be deemed disallowed and expunged.

### 9.9 *Late Filed Claims.*

Except as otherwise provided herein or as agreed to by the Debtors or Plan Trustee, (i) any Proof of Claim filed after the Bar Date with respect to such Claim and (ii) any proof of Administrative Expense Claim filed after the applicable Administrative Expense Claims Bar Date with respect to such Administrative Expense Claim, shall be deemed Disallowed and expunged without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims and such Administrative Expense Claims may not receive any Plan Distributions on account of such Claims and such Administrative Expense Claims, unless such late Proof of Claim or such proof of Administrative Expense Claim, as applicable, has been deemed timely filed by a Final Order.

### 9.10 *Amendments to Claims.*

A Claim may not be filed, amended, or supplemented without the prior written authorization of the Bankruptcy Court or the Plan Trustee, and any such new, amended, or supplemented Claim filed without such written authorization shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

### 9.11 *Insured Claims.*

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies, other than with respect to any policies issued by TRACO or its predecessors. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court; *provided* that, to the extent that a holder receives a Plan Distribution on account of any portion of an Allowed Claim that is an Insured Claim that is thereafter satisfied by insurance proceeds, the holder shall promptly return that portion of the Plan Distribution attributable to the portion of such Claim so satisfied.

### 9.12 *Medical Liability Claims Procedures.*

All Medical Liability Claims against the Debtors shall be reconciled in accordance with the Medical Liability Claims Procedures. Following entry of the Confirmation Order, the

automatic stay shall remain in effect with respect to all Medical Liability Claims against the Debtors and shall only be modified in accordance with the Medical Liability Claims Procedures. To the extent the automatic stay was previously lifted in the Chapter 11 Cases with respect to any particular Medical Liability Claim, upon entry of the Confirmation Order, the automatic stay shall be reimposed and remain in effect unless or until modified in accordance with the Medical Liability Claims Procedures.

## ARTICLE X.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 10.1    *Rejection of Executory Contracts and Unexpired Leases.*

(a)    As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are a party shall be deemed rejected except for an executory contract or unexpired lease that: (i) is specifically and expressly designated as a contract or lease to be assumed pursuant to this Plan, including as set forth in the Schedule of Assumed Contracts or Confirmation Order; (ii) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate assumption or rejection motion filed by the Estate Representative on or before the Effective Date; (v) is the subject of a pending Cure Dispute; (vi) is a contract, lease, or other agreement or document entered into in connection with the Plan; or (vii) is a D&O Policy or other insurance policy to which any Debtor or Estate Representative is a beneficiary or an insured.  For the avoidance of doubt, the Estate Representative may seek to assume, assume and assign, or reject an executory contract or unexpired lease at any time prior to the Effective Date, whether or not such executory contract or unexpired leases is listed on the Schedule of Assumed Contracts.

(b)    Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code and a determination by the Bankruptcy Court that the Debtors, the Plan Trustee, or the assignee of such executory contract or unexpired lease (as applicable) have provided adequate assurance of future performance under such executory contract or unexpired lease.  Each executory contract or unexpired lease assumed pursuant to this Plan shall vest in and be fully enforceable by the applicable Debtor in accordance with its terms, except as modified by the provisions of this Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law, and shall be assigned by the Debtors to the Plan Trust pursuant to this Plan on the Effective Date.  Notwithstanding anything to the contrary herein, all rights and obligations of the Debtors under or with respect to any executory contracts and unexpired leases to which any of the Debtors are a party shall vest in the Plan Trust on the Plan Trust Establishment Date, whether or not such executory contracts or unexpired leases are otherwise pending assumption, assumption and assignment, or rejection in accordance with Section 10.1(a) of this Plan, and the Plan Trust shall have all rights of the Debtors to assume, assume and assign, or reject such executory contracts and unexpired leases on or prior to the Effective Date.

(c)    Assumption of any executory contract or unexpired lease pursuant to this Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to

68

satisfaction of the Cure Amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the Effective Date.

### 10.2    *Survival of Indemnification Obligations*.

Any and all obligations of the Debtors to indemnify, defend, reimburse, or limit the liability of current and former officers, directors, members, managers, agents, or employees against any Claims or Causes of Action as provided in the Debtors' corporate charters, bylaws, other organizational documents, other agreements, or applicable law shall survive confirmation of the Plan, and shall be assumed by such Debtor solely to the extent necessary to recover and have access to insurance proceeds.  Any indemnification claims arising under the foregoing documents shall be treated as General Unsecured Claims against the Debtors to the extent Allowed. Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, solely for the purposes described in the first sentence of this Section 10.2.

### 10.3    *Determination of Cure Disputes and Deemed Consent*.

Any Cure Amount shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Estate Representative may otherwise agree.

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts.  At least fourteen (14) days before the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to potentially be assumed or assumed and assigned to the Plan Trust, reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any).  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Bankruptcy Court.**  Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i)  prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor under such executory contract or unexpired lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or its Estate, as applicable.  Each such provision shall be deemed to not apply to the

assumption of such executory contract or unexpired lease pursuant to the Plan and counterparties to assumed executory contracts or unexpired leases that fail to object to the proposed assumption in accordance with the terms set forth in this Section 10.3, shall forever be barred and enjoined from objecting to the proposed assumption or to the validity of such assumption (including with respect to any Cure Amounts or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

If there is a Cure Dispute pertaining to assumption of an executory contract or unexpired lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Bankruptcy Court prior to such assumption being effective; *provided* that the Estate Representative may settle any Assumption Dispute without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

To the extent a Cure Dispute relates solely to the Cure Amount, the Debtor may assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of the Cure Dispute; *provided* that the Debtors or the Plan Trustee reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to the extent such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court or otherwise agreed to by such non-Debtor party and the Debtors and the Plan Trustee). The Debtors or the Plan Trustee may settle any dispute regarding the Cure Amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired leases.

### 10.4 *Rejection Damages Claims.*

Unless an earlier date is otherwise provided for by an order of the Bankruptcy Court, any Proofs of Claim based on the rejection of the Debtors' executory contracts or unexpired leases pursuant to this Plan, must be filed with Bankruptcy Court and served on the Claims and Noticing Agent no later than twenty-one (21) days after the Effective Date.

Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of Claim were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, or (ii) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Bankruptcy Court within such time will be

automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, the Plan Trust, the Plan Trustee, or the property for any of the foregoing without the need for any objection by the Plan Trustee or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims, except as otherwise provided by Final Order of the Bankruptcy Court.

### 10.5 *Joint Ventures*.

Notwithstanding anything to the contrary in this Plan, all shareholders' agreements, nominee agreements, call option agreements, and other agreements in respect of joint venture entities to which a Debtor or the Plan Trust is a party are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless otherwise specifically assumed.

### 10.6 *Insurance Policies*.

Each of the Debtors' insurance policies and any agreements, documents, or instruments related thereto, as of the Effective Date (or on such earlier date as determined by the Estate Representative, in consultation with the Creditors' Committee), shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtor and shall continue in full force and effect thereafter in accordance with their respective terms and vest in the Plan Trust. All officers, managers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Policies in effect as of, or purchased on or before, the Effective Date for the full term of such D&O Policies regardless of whether such officers, managers, directors, agents, and/or employees remain in such positions as of the Effective Date, in each case, to the extent set forth in such D&O Policies. Nothing in the Plan shall alter, supplement, change, decrease, or modify the terms (including the conditions, limitations, and/or exclusions) of the Debtors' insurance policies; *provided* that, notwithstanding anything in the foregoing to the contrary, the enforceability and applicability of the terms (including the conditions, limitations, and/or exclusions) of the insurance policies, and thus the rights or obligations thereof, are subject to the Bankruptcy Code and applicable law. For the avoidance of doubt, the transfer of the rights of the Debtors and the Estates to recover proceeds from D&O Policies to the Litigation Trust and the Plan Trust, as applicable, shall not hinder the ability of any beneficiaries or insureds of such D&O Policies to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

### 10.7 *Assignment*.

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned to the Litigation Trust (subject to the consent of the FILO Parties) or Plan Trust hereunder, if applicable, shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type set forth

in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect with respect to any assignment pursuant to the Plan.

### 10.8 *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

### 10.9 *Reservation of Rights.*

**(a)** Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors, the Estates, the Plan Trust, or the Plan Trustee or their respective Affiliates has any liability thereunder.

**(b)** Except as explicitly provided in this Plan, nothing in this Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors, the Estates, the Plan Trust, or the Plan Trustee under any executory or non-executory contract or unexpired or expired lease.

**(c)** Nothing in this Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Estates, the Plan Trust, or the Litigation Trust, as applicable, under any executory or non-executory contract or unexpired or expired lease.

**(d)** If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Estate Representative shall have thirty (30) calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

# ARTICLE XI.     CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.

### 11.1    *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied:

**(a)**     the Disclosure Statement Order shall have been entered;

**(b)**     the Litigation Trust Establishment Date has occurred, including the transfer of the Litigation Trust Assets to the Litigation Trust;

**(c)**     the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

**(d)**     the Confirmation Order shall have been entered by the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction, which Confirmation Order shall be in form and substance reasonably acceptable to the Creditors' Committee;

**(e)**     all actions, documents, certificates, and agreements necessary or appropriate to implement the Plan shall have been effected or executed or deemed executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

**(f)**     all authorizations, consents, regulatory approvals, rulings or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received; and

**(g)**     the Professional Fees Escrow Account and the Wind Down Reserve (in accordance with the Wind Down Budget) shall have been fully funded as provided for in this Plan.

### 11.2    *Waiver of Conditions Precedent.*

**(a)**     Each of the conditions precedent to the occurrence of the Effective Date of the Plan set forth in this ARTICLE XI may be waived, in whole or in part, by the Debtors with the consent of the Creditors' Committee, not to be unreasonably withheld, without leave of or order of the Bankruptcy Court; *provided* that the condition precedent to the occurrence of the Effective Date of the Plan set forth in Section 11.1(b) may be waived only with the consent of the Debtors, the Creditors' Committee, and the FILO DIP Agent.

**(b)**     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

**(c)**     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 11.3  *Effect of Failure of a Condition.*

If the Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other Entity; *provided* that, notwithstanding the foregoing, all actions authorized to be taken pursuant to the Confirmation Order, FILO Settlement Order, and Section 8.10 hereof, and all terms of the Confirmation Order, FILO Settlement Order, and Section 8.10 shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not revert to the Debtors or the Estates.

### 11.4  *Effect of Vacatur of Confirmation Order.*

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise; *provided* that, notwithstanding the foregoing, all actions authorized to be taken pursuant to the Confirmation Order, FILO Settlement Order, and Section 8.10 hereof, and all terms of the Confirmation Order, FILO Settlement Order, and Section 8.10 shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not revert to the Debtors or the Estates.

## ARTICLE XII.    EFFECT OF CONFIRMATION.

### 12.1  *Binding Effect.*

As of the Confirmation Date, this Plan shall bind (i) the Debtors; (ii) the Plan Administrator Committee; (iii) the Plan Trustee and the Plan Trust; (iv) the Litigation Trustee and the Litigation Trust; (v) all holders of Claims against and Interests in the Debtors and their respective successors and assigns, regardless of whether any such holders were (a) Impaired or Unimpaired under this Plan, (b) presumed to accept or deemed to reject this Plan, (c) failed to vote to accept or reject this Plan, (d) voted to reject this Plan, and/or (e) received any Plan Distribution under the Plan; (vi) all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan; (vii) each Entity acquiring property under this Plan and the Confirmation Order; and (viii) any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

### 12.2  *Vesting of Assets.*

Except as otherwise provided in this Plan (including in all respects Sections 12.6(a), 12.6(b), 12.7, and 12.8), the Plan Supplement, or the Confirmation Order, on and after the

Litigation Trust Establishment Date and Plan Trust Establishment Date (as applicable), pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with this Plan or the Plan Supplement, shall vest in the Litigation Trust and the Plan Trust (as applicable) free and clear of all Claims, Liens, encumbrances, charges, constructive trusts, and other interests to the extent permitted under applicable law.  Subject to the terms of this Plan and the Litigation Trust Agreement and Plan Trust Agreement, on and after the Plan Trust Establishment Date or Litigation Trust Establishment Date (as applicable), the Plan Trustee or Litigation Trustee (as applicable) may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Interests without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order.  Without limiting the foregoing, the Plan Trustee may pay the charges that it incurs on behalf of the Estates after the Confirmation Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.  In addition, all rights, benefits, and protections provided to the Debtors or their Estates pursuant to the Plan, the Plan Supplement, or the Confirmation Order including, but not limited to, the release, exculpation, and injunction provisions provided in Section ARTICLE XII of the Plan, shall vest in the Litigation Trust and the Plan Trust, as applicable, unless expressly provided otherwise by the Plan or the Confirmation Order.

### 12.3    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in this Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

As set forth in Section 9.12 of this Plan, following entry of the Confirmation Order, the automatic stay shall remain in effect with respect to all Medical Liability Claims against the Debtors and shall only be modified in accordance with the Medical Liability Claims Procedures. To the extent the automatic stay was previously lifted in the Chapter 11 Cases with respect to any particular Medical Liability Claim, upon entry of the Confirmation Order, the automatic stay shall be reimposed and remain in effect unless or until modified in accordance with the Medical Liability Claims Procedures.

### 12.4    *Injunction Against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date.

**12.5    _Plan Injunction._**

(a)     Except as otherwise expressly provided in this Plan, or for distributions required to be paid or delivered pursuant to this Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under Section 12.6(a) or Section 12.6(b) of this Plan, or (ii) subject to exculpation pursuant to Section 12.7 of this Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 12.7 of this Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:  (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to this Plan, including pursuant to Section 12.6(a) or Section 12.6(b) of this Plan; _provided_ that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of this Plan.

(b)     Subject in all respects to Section 13.1 of this Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure

76

Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under this Plan or, with respect to an Exculpated Party, been exculpated under this Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in <u>Section 13.1</u> of this Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

      **(c)** By participating in the Plan by voting or by accepting Plan Distributions pursuant to this Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to this Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in this <u>Section 12.5</u>, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

      **(d)** The injunctions in this <u>Section 12.5</u> shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

      **12.6** _**Releases.**_

      **(a) Releases by the Debtors and their Estates. Except as otherwise expressly set forth below in this <u>Section 12.6</u>, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable**

consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or the Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 12.6(a) (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive

Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with <u>Section 4.6</u> of this Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on <u>Exhibit B</u> of this Plan or the Schedule of Identified Non-Released Parties.

(b) **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the

transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or the Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases contained in this **Section 12.6(b)** (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by or against the FILO Parties arising from a material misrepresentation, or (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party.  Nothing contained in this Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)     Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

### 12.7   _Exculpation._

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation,

preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in this Section 12.7 shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 12.8 *Waiver of Statutory Limitation on Releases.*

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER ARTICLE XII OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN SECTION 12.6 OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

### 12.9 *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to this Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan or the Confirmation Order.

**12.10** *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right, to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**12.11** *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in this Plan, including in all respects Sections 12.6(a), 12.6(b), 12.6(b), 12.7, and 12.8, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. Except as otherwise provided in this Plan, including in all respects Sections 12.6(a), 12.6(b), 12.6(b), 12.7, and 12.8, the Plan Trustee, on behalf of the Debtors, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

**12.12** *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, or (iii) the confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation.

**12.13** *Solicitation of Plan.*

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer,

issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 12.14 *Corporate and Limited Liability Company Action.*

Upon the Plan Trust Establishment Date or the Effective Date, as applicable, all actions contemplated by the Plan (including any action to be undertaken by the Plan Trust) shall be deemed authorized and approved in all respects, and, to the extent taken prior to the Plan Trust Establishment Date or the Effective Date, as applicable, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, members, managers, or officers of the Debtors, the Plan Trust, or the Plan Trustee. On or (as applicable) before the Effective Date, the authorized officers of the Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan). The authorizations and approvals contemplated by this Section 12.14 shall be effective notwithstanding any requirements under non-bankruptcy law.

### 12.15 *Release of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Plan Trust.

## ARTICLE XIII.    RETENTION OF JURISDICTION.

### 13.1 *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to sections 1334 and 157 of title 28 of the United States Code, over all matters arising in, arising under, or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)     to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     to ensure that Plan Distributions to holders of Allowed Claims and Interests are accomplished as provided in this Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under this Plan;

(e)     to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any administrative or priority Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of claims or interests;

(f)     to hear and determine settlements and disputes with respect to any Plan Trust Asset, including any Cause of Actions transferred to the Plan Trust;

(g)     to hear and determine settlements and disputes with respect to any Litigation Trust Asset, including any Cause of Actions transferred to the Litigation Trust;

(h)     to determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motions, adversary proceeding, application, contested matter or other litigated matter brought by the Plan Trustee or the Litigation Trustee, including any disputes between the Litigation Trustee and the Estate Representative as set forth in the Litigation Trust Agreement and Section 5.8 of the Plan;

(i)     to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(j)     to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(k)     to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code or approve any modification of the Confirmation Order or any contract, instrument, release, or other agreements or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order (in each case, to the extent Bankruptcy Court approval is necessary), or to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, the Confirmation Order, or any order of the Bankruptcy Court, in such a manner as may be necessary to carry out the purposes and effects thereof;

(l)     to hear and determine all Professional Fee Claims;

 **(m)** to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

 **(n)** to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

 **(o)** to hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan;

 **(p)** to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, Plan Supplement, and Confirmation Order;

 **(q)** to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

 **(r)** to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

 **(s)** to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

 **(t)** to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any Bar Date or Administrative Expense Claims Bar Date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purposes;

 **(u)** to hear, adjudicate, decide, or resolve any and all matters related to ARTICLE XII of this Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

 **(v)** to enforce all orders previously entered by the Bankruptcy Court

 **(w)** to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

 **(x)** to recover all Assets of the Plan Trust, the Litigation Trust, the Debtors and property of the Estates, wherever located;

 **(y)** to hear and determine all disputes between the Debtors or Plan Trust, on one hand, and the Litigation Trustee, on the other; and

(z) to enter a final decree closing each of the Chapter 11 Cases;

*provided*, *however*, that (i) any mediation requirements in the FILO Settlement Term Sheet, the Litigation Trust Agreement, the Litigation Funding Agreement, the Transition Services Agreement, the Trustee Engagement Letter (as defined in the FILO Settlement Order), and the DIP Amendment (as defined in the FILO Settlement Order) shall be given full force and effect and (ii) to the extent the Bankruptcy Court lacks, or otherwise abstains from exercising, jurisdiction over any matter relating to the FILO Settlement Term Sheet, the Litigation Trust Agreement, the Litigation Funding Agreement, the Transition Services Agreement, the Trustee Engagement Letter (as defined in the FILO Settlement Order), and the DIP Amendment (as defined in the FILO Settlement Order), then the applicable jurisdictional, forum selection, and dispute resolution clauses in such documents shall govern.

### 13.2 *Courts of Competent Jurisdiction.*

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XIV.  MISCELLANEOUS PROVISIONS.

### 14.1 *Statutory Fees.*

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors or the Plan Trustee in full on the Effective Date. As of the Plan Trust Establishment Date, the Plan Trustee shall assume primary responsibility for the payment of all Statutory Fees. On and after the Plan Trust Establishment Date, the Plan Trustee shall pay any and all Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, each Debtor or Plan Trustee, as applicable, shall remain obligated to file post-confirmation quarterly reports and to pay Statutory Fees to the U.S. Trustee until the earliest of that particular Debtor's, or Plan Trustee's (on behalf of a Debtor), as applicable, case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or any other request for payment of Statutory Fees.

### 14.2 *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (b) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Confirmation Order), shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, document recording tax, intangibles

or similar tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 14.3 *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee, if any, shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases. The Debtors or the Plan Trust, as applicable, shall not be responsible for paying the fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

### 14.4 *Request for Expedited Determination of Taxes of the Debtors.*

The Debtors, Plan Administrator Committee, and Plan Trustee shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns of the Debtors filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Wind Down Completion Date.

### 14.5 *Dates of Actions to Implement Plan.*

In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 14.6 *Amendments.*

(a) **Plan Modifications.** This Plan may be amended, supplemented, or otherwise modified by the Debtors (with the consent of the Creditors' Committee, not to be unreasonably withheld, conditioned, or delayed) in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court; *provided* that any amendment, supplement, or modification that adversely affects the Litigation Trust shall also require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent) (such consent, not to be unreasonably withheld, conditioned, or delayed). In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to this Plan, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of this Plan and any holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, supplemented, or otherwise modified.

(b) **Certain Technical Amendments.** Prior to the Effective Date, the Debtors (with the consent of the Creditors' Committee, not to be unreasonably withheld, conditioned, or

delayed) may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court, as long as such technical adjustments and modifications do not adversely affect in a material way the treatment of the holders of Claims or Interests under this Plan; *provided* that any adjustment or modification that adversely affects the Litigation Trust shall also require the consent of the Litigation Trustee (or prior to the appointment of the Litigation Trustee, the FILO DIP Agent) (such consent, not to be unreasonably withheld, conditioned, or delayed).

### 14.7 *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date. If this Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur on the Effective Date, then (a) this Plan shall be null and void in all respects, (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, any Debtor or any other Entity, (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims, or (iii) constitute an admission, acknowledgement, offering, or undertaking of any sort by any Debtor or any other Entity; *provided* that notwithstanding the foregoing all actions authorized to be taken pursuant to the Confirmation Order and FILO Settlement Order and all terms of the Confirmation Order and FILO Settlement Order shall remain in full force and effect and the Litigation Trust Assets shall remain property of the Litigation Trust and the Plan Trust Assets shall remain property of the Plan Trust, and in each case, not revert to the Debtors or the Estates.

### 14.8 *Notice of Effective Date.*

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 14.9 *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 14.10 *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that this Plan or the Confirmation Order provides otherwise, the rights, duties, and obligations arising under this Plan and the Confirmation Order shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 14.11   *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Confirmation Date, the terms of this Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Plan Trustee, the Litigation Trustee, the holders of Claims or Interests (regardless of whether the holders of such Claims or Interests are deemed to have accepted or rejected this Plan), the Released Parties, and each of their respective successors and assigns.

### 14.12   *Waiver of Stay*.

The requirements under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order shall be waived by the Confirmation Order.  The Confirmation Order shall take effect immediately and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or otherwise.

### 14.13   *Successors and Assigns*.

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

### 14.14   *Entire Agreement*.

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Confirmation Order.

### 14.15   *Severability of Plan Provisions*.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Trust (as the case may be), and (c) non-severable and mutually dependent.

### 14.16    *Additional Documents.*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Plan Trustee, the Litigation Trustee, and all holders of Claims receiving Plan Distributions pursuant to the Plan and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 14.17    *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

### 14.18    *Computing Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth in this Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 14.19    *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full in this Plan.

### 14.20    *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

(1) If to the Debtors, to:

**Steward Health Care System LLC**
2811 McKinney Avenue, Suite 300
Dallas, Texas 75204.
Attn: John R. Castellano, Chief Restructuring Officer
Email: JCastellano@alixpartners.com

with a copy (which will not constitute notice) to:

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, New York 10153

Attn:   Jeffrey D. Saferstein
        Jason H. George
Email: jeffrey.saferstein@weil.com
        jason.george@weil.com

-and-

700 Louisiana Street, Suite 3700
Houston, Texas 77002
Attn:   Clifford W. Carlson
        Stephanie N. Morrison
Email: clifford.carlson@weil.com
        stephanie.morrison@weil.com

-and-

1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Attn:   David J. Cohen
Email: davidj.cohen@weil.com

-and-

**Latham & Watkins LLP**
1271 Avenue of Americas
New York, New York 10020
Attn:   Ray C. Schrock
        Candace M. Arthur
Email: ray.schrock@lw.com
        candace.arthur@lw.com


(2) If to the Creditors' Committee, to:


**Akin Gump Strauss Hauer & Feld LLP**
One Bryant Park
New York, New York 10036
Attn:   Ira S. Dizengoff
        Brad M. Kahn
        Avi E. Luft
Email: idizengoff@akingump.com
        bkahn@akingump.com
        aluft@akingump.com

-and-

2300 N. Field Street, Suite 1800
Dallas, Texas 75201
Attn: Sarah Link Schultz
Email: sschultz@akingump.com


(3) If to the Plan Trustee to:
[●]

(4) If to the Litigation Trustee to:
[●]

(5) If to the FILO Parties to:
Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn:   Mike Price
        Andrew Harmeyer
        Brian Kinney
Email: mprice@milbank.com
        aharmeyer@milbank.com
        bkinney@milbank.com

After the occurrence of the Effective Date, the Debtors and the Plan Trustee have authority to send a notice to Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. Notwithstanding the foregoing, the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary. After the occurrence of the Effective Date, the Debtors and the Plan Trustee are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

## 14.21   *Reservation of Rights.*

Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order. None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

[*Remainder of Page Intentionally Left Blank*]

Dated: May 30, 2025
Chicago, Illinois

Respectfully submitted,

By: /s/ _John R. Castellano_ _____

DocuSigned by:
D6044286547E4F2...

Name: John R. Castellano
Title: Chief Restructuring Officer

*On behalf of Steward Health Care System LLC
and each of Its Debtor Affiliates*

## Exhibit A

### Individual Released Parties

- Alan Carr
- Carlos Hernandez
- David Barnhardt
- Eugene (Jay) Sullivan
- Gail Schlesinger
- General H.R. McMaster
- Henry (Nick) Nickells
- Jeffrey Morales
- Jennifer Hunt
- John Boehner
- John Castellano
- Joseph Weinstein
- Katchena Potter
- Mary Beth Taylor
- Nathalie Hibble
- Octavio Diaz
- Rich Iannessa
- Sr. Vimala Vadakumpadan
- Susan Brown
- William Transier

## Exhibit B

### Identified Non-Released Parties

- Alessandra Pace
- Armin Ernst
- Brian Carty
- Christopher Dunleavy
- Craig Jesiolowski
- David Chicoine
- David Friend
- David Morales
- Herbert Holtz
- James Karam
- James Lenehan
- Jill Moretto
- John Polanowicz
- Joseph Ciccolo
- Joseph Maher
- Joshua Putter
- Mark Girard
- Mark Rich
- Michael Callum
- Miroslav Boyanov
- Nadine Delicata
- Ralph de la Torre
- Robert Guyon
- Ruben King-Shaw Jr.
- Sanjay Shetty

- 5326 Old Buena Vista Road LLC
- Ad Astra Per Aspera LLC
- CareMax, Inc.
- Cayman TRS Holdings
- Cerberus Capital Management, L.P.
- Cerberus International II Master Fund LP
- Cerberus Partners II LP
- Cerberus Series Four Holdings LLC
- de la Torre Foundation
- de la Torre Family Foundation
- Management Health Services Colombia S.A.S.
- Management Health Services LLC
- Manolete Health Investors LLC
- Manolete Health LLC
- Medical Properties Trust, Inc.
- MPT Sycamore Opco LLC
- Ralph de la Torre Revocable Trust
- RDLT – SHCI Investor LLC
- RDLT – SHCI Manager LLC
- Sagamore Capital Management, LLC
- Santa Clara Holdings LLC
- Sparta Holding Co. LLC
- Steward Health Care International
- Steward Health Care International (Malta) Ltd
- Steward Health Care International Colombia S.A.S.
- Steward Health Care Investors LLC
- Steward Health Care International Investors LLC
- Steward Health Care International Kingdom of Saudi Arabia, S.L.
- Steward Health Care International Ltd
- Steward Health Care International S.L
- Steward Malta Assets Ltd
- Steward Malta Ltd
- Steward Malta Management Ltd
- Steward Malta Personnel Limited
- Steward Management Holdings LLC
- Tenet Healthcare Corporation
- TRACO International Group S. DE R.L.

**Exhibit C**

**FILO Settlement Term Sheet**

## SETTLEMENT AND STAY RELIEF TERM SHEET

### April 28, 2025

This Term Sheet sets forth the material substantive terms pursuant to which the Debtors, the FILO DIP/Bridge Agent and Lenders (the "FILO Parties"), and the Unsecured Creditors Committee ("UCC") will support entry of an order resolving requests for relief from the stay by the FILO Parties.

1.  This Term Sheet must be approved by an order of the Bankruptcy Court, pursuant to sections 361, 362, 363 and 105 of the Bankruptcy Code and Bankruptcy Rules 4001(d)(iii), 6004, and 9019 (the "Approval Order"), entered not later than May 28, 2025 (the "Approval Milestone"). In addition, the Debtors shall file a motion seeking the Bankruptcy Court's approval of the Approval Order (the "Approval Motion") by no later than April 28, 2025 (the "Motion Milestone"). If the Debtors do not satisfy either the Motion Milestone or the Approval Milestone, this agreement will be of no further force or effect.[1]

2.  All of the Estate (as defined below) assets identified on **Schedule 1** hereto (the "Litigation Trust Assets") will be transferred free and clear (to the fullest extent permissible by applicable law) to the "Litigation Trust," a trust to be created. The Estate assets that are not Litigation Trust Assets shall be retained by the Estate (the "Retained Assets").[2] The terms of the

---

[1] The milestones and other dates and deadlines contained herein may be extended by e-mail agreement amongst counsel to the Debtors, FILO Parties, and UCC.

[2] The Retained Assets shall include, without limitation, (i) the Estate's reversionary interests (if any) in the Professional Fees Escrow Account, the Physician Insurance Account (each as defined in the FILO DIP Order (Docket No. 1538)), the Expense Escrow Account (as defined in the MPT Settlement Order (Docket No. 2610)), and in each case, the amounts deposited therein, and (ii) any equity interests in any Debtor. To the extent that the Estate realizes cash or other value on account of any Retained Assets that comprise, would have comprised or are derived from FILO DIP collateral ("Retained Collateral") (which shall exclude, for the avoidance of doubt, the Class B interests, any proceeds thereof, and any proceeds funded to, advanced to, or authorized to be used by the Estate in accordance with this Term Sheet) the Estate shall promptly turn over such cash or other value to the Litigation Trust for distribution in accordance with the Litigation Trust's distribution waterfall. To the extent that any Retained Collateral is identified that could be monetized for value, the Estate shall use commercially reasonable efforts to monetize such Retained Collateral in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee at the Litigation Trust's sole expense and paid in advance pursuant to the TSA (for the avoidance of doubt, any reasonable and documented costs incurred by the Estate in connection with such agreed upon monetization process shall be charged to the Litigation Trust at the Estate's cost). The Approval Order shall provide that from and after the Trust Establishment Date (as defined below), the Retained Collateral (which includes, for the avoidance of doubt, all proceeds derived therefrom) shall be held in trust exclusively for the benefit of

Litigation Trust will be governed by a trust agreement consistent with this Term Sheet and otherwise mutually agreeable to the parties, with approval not to be unreasonably withheld, conditioned or delayed (the "<u>Litigation Trust Agreement</u>").

3. The Approval Order will provide that the Litigation Trust Assets will be transferred to the Litigation Trust on the earlier of (i) July 8, 2025; and (ii) one (1) business day after the confirmation date of any confirmed plan (the actual date of transfer of the assets is the "<u>Trust Establishment Date</u>"). The Debtors and FILO DIP Lenders will enter into an amendment to the FILO DIP credit agreement providing for an extension of the FILO DIP maturity date through (i) in the first instance, the Motion Milestone, (ii) if the Debtors satisfy the Motion Milestone, the Approval Milestone, and (iii) if the Debtors satisfy the Approval Milestone, through the date by which the Litigation Trust Assets are required to have been transferred to the Litigation Trust pursuant to the immediately preceding sentence. It shall be an Event of Default under the FILO DIP Credit Agreement if the Debtors or UCC materially breach their respective obligations to the FILO Parties under this Term Sheet or the Plan Support Agreement Term Sheet, and such breach is not cured within three business days of the FILO Parties providing written notice of such breach to Debtors' and UCC's counsel.

4. On the Trust Establishment Date, the releases set forth in **<u>Exhibit A</u>** shall go into full force and effect; provided that, for the avoidance of doubt, the release will not include (i) $10 million of principal claims outstanding under the FILO Bridge facility (the "<u>Retained FILO Claim</u>"), which shall, until the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, remain secured by the Retained Cash and any other assets of the Debtors' estates or any successor(s) thereto (collectively, the "<u>Estate</u>") (provided that the negative pledge provisions and other rights and entitlements of the Litigation Trust with respect to the Retained Collateral shall survive and remain unaffected notwithstanding such timely occurrence of the Confirmation Milestone or satisfaction of the Retained FILO Claim); or (ii) the rights or entitlements of the FILO Parties or the Litigation Trust contemplated by this Term Sheet or the Plan Support Agreement Term Sheet (or any further documentation memorializing the same), including, without limitation, the FILO Parties' rights to receive Retained Cash as a paydown on the Class A-

---

the Litigation Trust and shall be subject to a negative pledge by the Estate and not made available (pursuant to subsequent order of the court or otherwise) other than for distribution in accordance with the Litigation Trust's distribution waterfall as contemplated by this footnote 2.

2 Preference pursuant to paragraph 6 of this Term Sheet and the Litigation Trust's rights under the TSA.

5.  As a condition precedent to the effectiveness of this Term Sheet, (i) the Debtors shall have made a prepayment of the FILO DIP Loans by April 28, 2025, in the amount of no less than $30.3 million (the "<u>Required Prepayment</u>"), and (ii) the Debtors and the FILO Parties shall have executed an amendment to the FILO DIP Credit Agreement (the "<u>DIP Amendment</u>") approving the budget annexed to the DIP Amendment (the "<u>DIP Budget</u>").

6.  The Debtors will hold $15 million (the "<u>Retained Cash</u>") in a third-party escrow account subject to the lien of the Retained FILO Claim.  If the Retained Cash is not authorized to be utilized by the Debtors pursuant to an order confirming a chapter 11 plan consistent with the terms of Section 1 of the Plan Support Agreement Term Sheet ("<u>Plan</u>"), which order is entered on or prior to August 1, 2025 (the "<u>Confirmation Milestone</u>"), the Retained Cash will be paid to the FILO Parties as a paydown on the Retained FILO Claim until paid in full in cash and the remainder as a paydown on the Class A-2 Preference.  If an order confirming the Plan is entered prior to the Confirmation Milestone, the Debtors may use the Retained Cash for any purposes authorized under the Plan.

7.  The Litigation Trust will be governed pursuant to the Litigation Trust Agreement creating and governing the Litigation Trust:

    a.  The Litigation Trust will have three beneficiary classes:

        i.  Class A-1 interests, which shall (i) represent the rights and entitlements of the parties that from time to time extend or are deemed to have extended funding under the Litigation Funding (the "<u>Litigation Funders</u>") and their representative (the "<u>Litigation Funding Agent</u>") and (ii) have a distribution and liquidation preference as set forth in this Term Sheet.

        ii. Class A-2 interests will be held by the FILO Parties and their successors, which interests shall have a distribution and liquidation preference as set forth in this Term Sheet (together with the Class A-1 interests, the "<u>Class A interests</u>").

            The definitive documentation will provide that the Class A interests will only be transferrable (i) pursuant to an available exemption under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or a registration of such Class A

interests under the Securities Act, and (ii) so long as any proposed transfer would not result in a requirement that the Class A interests be registered under the Securities Act. Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class A interests would be effectuated, and shall entitle the Litigation Trustee (as defined below) to, in its reasonable discretion at any time the Class A interests are not registered, and other than with respect to a transfer by operation of law, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

The definitive documentation shall also contain customary representations and warranties of each initial holder of the Class A interests to the effect that it is an accredited investor and a qualified institutional buyer, possesses appropriate investment experience, and is acquiring the interests for its own account and not with a view toward distribution. To the extent such representations cannot be made by each FILO Party on the date of issuance, then at any time the Class A interests are not registered, all such Class A interests shall be non-transferable (other than by will, intestate, or operation of law).

The FILO Agent or its designee, acting at the direction of FILO Parties holding Class A-2 interests entitled to a majority in amount of the outstanding Class A-2 Preference, shall be the representative of the Class A-2 interests (the "Class A-2 Representative").

iii. Class B interests will be held by Steward Health Care Holdings LLC, on behalf of the Estate, or by any successor entity that may be established under a confirmed plan (each, a "Successor Entity").

The definitive documentation will provide that the Class B interests will only be transferrable (i) to any liquidating trust

or other similar vehicle formed under and following a confirmed plan or otherwise formed pursuant to applicable law or (ii) (A) pursuant to an available exemption under the Securities Act of 1933, as amended (the "Securities Act") and so long as any proposed transfer would not result in a requirement that the Class B interests be registered under the Securities Act, or a registration of such Class B interests under the Securities Act, and (B) if such transfer is to occur prior to the effective date of any confirmed plan, with the consent of the Litigation Trustee (not to be unreasonably withheld, conditioned or delayed) if the purpose of the transfer is to obtain proceeds to pay costs and expenses of the Successor Entity, including taxes. Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class B interests would be effectuated, and other than with respect to a transfer by operation of law or pursuant to bankruptcy court order or confirmed plan, shall entitle the Litigation Trustee to, in its reasonable discretion at any time the Class B interests are not registered, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

There shall be a single representative of the Class B interests at any given time (the "Class B Representative"), which shall initially be the Transformation Committee, on behalf of the Estate. If a plan is confirmed, the terms of the Plan and the Confirmation Order will determine the successor Class B Representative on or before the Effective Date of the Plan. If the Chapter 11 Cases are converted to Chapter 7 cases, the Chapter 7 Trustee (or its designee) will be the Class B Representative.

iv. Any right to receive Litigation Trust interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Litigation Trust interests constitute "securities," the exemption provisions of section 4(a)(2) of the Securities Act will be satisfied and the offer and sale of such interests will be exempt from registration under the Securities Act.

5

b. The identity of the trustee of the Litigation Trust (the "<u>Litigation Trustee</u>") shall be a party to be identified. The terms of the Litigation Trustee's engagement shall be acceptable to the Debtors, FILO Parties, and the UCC. The Debtors and the UCC will have the right to consent to the selection of any successor Litigation Trustee (including the terms of such successor Litigation Trustee's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

c. The Litigation Trustee will be a fiduciary and owe fiduciary duties to all Litigation Trust beneficiaries, collectively.

d. Except as specifically set forth in the following subparagraphs, the Litigation Trustee will have exclusive governance authority over the Litigation Trust.

e. With respect to the Litigation Trust Assets set forth on the schedule agreed to contemporaneously herewith among the Debtors, the FILO Parties, and the UCC (the "<u>Threshold Schedule</u>"), the following consents shall be required:

    i. For a settlement proposal or monetization opportunity (each, a "<u>Proposal</u>") for which the Specified Value (as defined below) meets or exceeds the applicable Minimum Thresholds set forth on the Threshold Schedule but that does not meet or exceed the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee may decide, without obtaining the consent of any other party, whether to accept or reject such settlement in its sole judgement consistent with its fiduciary duties, in each case, subject to clauses (iii) – (v) of this paragraph 7.e., including, without limitation, the Minimum Threshold adjustments set forth in such clauses.

    ii. For a Proposal for which the Specified Value exceeds the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee shall accept and implement such Proposal unless the Litigation Trustee reasonably determines based on the advice of outside counsel that accepting and implementing such Proposal is inconsistent with its fiduciary duties.

iii.  If the FILO Balance is in an Underpayment State, (a) each Minimum Threshold shall be deemed to be equal to 80% of its stated value set forth in the Threshold Schedule unless and until the FILO Balance is no longer in an Underpayment State and (b) the Litigation Trustee shall be authorized to accept a Proposal that does not meet or exceed the applicable Minimum Thresholds as then in effect without obtaining the consent of any other party if the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal and (ii) provides five (5) business days' written notice (the "Notice Period") to the Class A-2 Representative and the Class B Representative (the "Notice Parties") of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an objection in writing to the Litigation Trustee and the other Notice Party (which objection shall specify in reasonable detail the grounds for the objection) (an "Objection"), and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator.  If a successful resolution is not achieved within three (3) business days of the commencement of such mediation (which period may be extended by the Litigation Trustee in its sole discretion in writing) (the "Mediation Period"), the parties may seek resolution by the Bankruptcy Court on an emergency basis.

iv.  If the FILO Balance is not in an Underpayment State, the Litigation Trustee will not accept any Proposal unless (a) the Class A-2 Representative and Class B Representative have authorized such acceptance; (b) the Proposal exceeds the applicable Minimum Thresholds by 20% or more, in which case the consent of no other party shall be required; or (c) the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal, in which case the consent of no other party shall be required, and (ii) provides five (5) business days' written notice to the Notice Parties of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an Objection to the Litigation Trustee and the other Notice Party, and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator.  If a

successful resolution is not achieved within the Mediation Period, the parties may seek resolution by the Bankruptcy Court on an emergency basis.

v. At the FILO Parties' election, the FILO Parties may, on one or more occasions, increase the deemed value of a Specified Value with the effect that it is treated as meeting the applicable Minimum Thresholds by contributing Class A-2 interests having a Class A-2 Preference equal to the difference between the Net Offered Specified Value and the highest applicable Net Minimum Specified Value (each as defined below).

vi. "Specified Value" shall be equal to the gross cash and cash equivalent proceeds of a Proposal.

vii. "Net Minimum Specified Value" is equal to the Minimum Threshold set forth in the Threshold Schedule less the pro forma contingency fee that would be payable in connection with a Proposal equal to such Minimum Threshold.

viii. "Net Offered Specified Value" is equal to the Specified Value less any contingency fee payable to the Trust's counsel, in each case, with respect to the applicable Proposal.

f. With respect to the disposition of Litigation Trust Assets not set forth on the Threshold Schedule, the disposition shall be carried out by the Litigation Trustee, exercising its reasonable business judgment.

g. The Litigation Trustee shall not agree to a contingency fee in excess of 20% of the gross proceeds of a litigation without the written consent of the Class A-2 Representative and the Class B Representative, other than any existing contingency fee arrangements approved by the Bankruptcy Court as of the Trust Establishment Date.

h. The Estate or Class B Representative, as applicable, shall have the right to pay in full or any portion of the FILO Balance, in cash, without any prepayment penalty at any time. Once the FILO Balance has been reduced to $0, (i) the rights granted to the Class A-2 Representative hereunder shall inure to the Class B Representative and the rights of the Class B Representative hereunder shall inure to the Litigation Funding Agent for the benefit of the holders of the Variable Component and (ii) the Class B Representative may replace the Litigation Trustee subject to the

8

terms of the Litigation Trustee's agreement with the Litigation Trust (which agreement shall be consistent with this Term Sheet and otherwise reasonably acceptable to the Debtors, the FILO Parties, and the UCC).

    i.   Distributions from the Litigation Trust shall be subject to the following priorities:

        i.   Fees of the Litigation Funding Agent and the Class A-2 Representative (which shall be $50,000 per month for each position), and indemnification and reasonable and documented expenses of (A) the Litigation Trust (including payments owing under the TSA, which shall be paid to the Estate), and (B) the Litigation Funding Agent, the Litigation Funders, the Class A-2 Representative, and the FILO Parties (solely with respect to this clause (B), subject to an aggregate cap not to exceed: (i) $500,000 per month for the initial three-month period commencing on the Trust Establishment Date, (ii) $350,000 per month for the nine-month period following such initial three-month period, and (iii) $220,000 per month[3] thereafter; provided that such cap shall not apply to the FILO Parties before the Trust Establishment Date; provided further that, (i) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) are less than the amount of such monthly cap, the amount of such variance will roll forward and increase such monthly cap in the following months until such variance is used and (ii) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) exceed the amount of such monthly cap, the amount of such variance can be carried forward and satisfied in future months to the extent there is availability under the applicable monthly cap in any such future month).

        ii.   Class A-1 interests until the Class A-1 Preference, the Upfront Premium, and, subject to paragraph 13 of this Term Sheet, the Variable Component (as defined below) (which survives repayment of the Class A-1 Preference and the FILO Balance) are repaid in full in cash.

---

[3] Monthly invoices of the professionals for such parties shall be provided to the Estate with reasonable summaries of activities, which may be redacted for privilege and shall not require time entries to be provided.

      iii. Class A-2 interests until the Class A-2 Preference is repaid in full in cash and the FILO Balance is $0.

      iv. Class B interests.

      v. Notwithstanding anything to the contrary in the immediately preceding clauses (ii) - (iv):

        1. If the FILO Balance is not in an Underpayment State, 25% of any amount otherwise payable to (i) the holders of the Class A-2 interests, and (ii) on or after December 1, 2025, the Class A-1 interests, shall be used to pay unpaid Deferred Fees and Unestimated Fees (each, as defined in the Plan Support Agreement Term Sheet) on a pro rata basis.

        2. If the FILO Balance is less than $25 million, any unpaid Unestimated Fees or Deferred Fees will be paid on a pro rata basis from any available proceeds that would otherwise be payable to the holders of Class A-1 interests as Variable Component (provided that such Variable Component shall be payable with the next proceeds received following repayment in full of such unpaid Unestimated Fees and Deferred Fees).

8. The Estate will coordinate its efforts with the Litigation Trustee with respect to issues involving overlapping concerns among the Estate and the Litigation Trust with respect to third parties. For example, if the same third party is involved in disputes with both the Estate and the Litigation Trust, the effort will be coordinated between the Estate and the Litigation Trustee. If the Estate and the Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a conference with Judge Isgur, in his capacity as mediator in connection with the subject matter of this Term Sheet; and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.

    a. With respect to any such dispute presented to the Bankruptcy Court:

      i. If the FILO Balance is in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate; *provided*, *however*, that the Litigation Trustee's business judgment will not be considered

by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estate (other than with respect to §502(h) claims).

ii. If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate's business judgment will be applied to the dispute, subject to challenge by the Litigation Trustee; *provided*, *however*, that the Estate's business judgment will not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Litigation Trust.

b. Notwithstanding the foregoing, with respect to any constructive trust claims asserted by any third parties with respect to any Litigation Trust Assets or Retained Collateral, as well as any government investigations, the Litigation Trust and the Estate will coordinate efforts to dispute or settle such claims, or to address such investigations, including with respect to funding arrangements for the defense of any such claims or addressing any such investigations.

9. FILO Parties to agree to use of cash collateral from April 1, 2025, through the Trust Establishment Date in an amount up to $61 million through June 27, 2025 and with additional amounts available for use thereafter, in each case, in accordance with the DIP Budget and the Pre-TED Professional Fee Estimates (as defined in the Plan Support Agreement Term Sheet). The aggregate amount of cash collateral used from April 1, 2025, through the Trust Establishment Date, together with interest thereon at the Applicable Rate, shall be the "Secured Interim Advances." On the Trust Establishment Date, the Debtors shall repay the FILO DIP Loans with Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of such Secured Interim Advances, and on account of such repayment, the amount of FILO DIP Loans outstanding shall be reduced by the amount of such Secured Interim Advances.

10. Funding.

a. The FILO Parties shall commit, subject to the terms and conditions to be set forth in a commitment letter consistent with this Term Sheet and otherwise acceptable to the FILO Parties and the Debtors (the "Commitment Letter") (which shall be executed within 10 business days after execution of this Term Sheet), to, commencing on

the Trust Establishment Date, extend funds (solely from the proceeds of FILO DIP/Bridge Claim[4] repayments received after the FILO DIP Agent's receipt of the Required Prepayment, or Class A interests distributions) to the Litigation Trust (the "Litigation Funding") on a delayed draw basis in an aggregate amount of up to $125 million (the "Initial Commitment Amount") (which is inclusive of (x) a budgeted amount of $61 million through June 27, 2025, together with any additional amounts budgeted thereafter under the DIP Budget, which, in each case, may only be incurred in the form of Secured Interim Advances, and (y) the $6.5 million of Estate Funding), which funded amounts shall be available to pay litigation costs of the Litigation Trust, costs of administration of the Litigation Trust and monetization of the Litigation Trust Assets, in each case, subject to (i) budgets delivered from time to time to, and which must be reasonably acceptable to, the Litigation Funding Agent (the "Litigation Funding Budget") and (ii) the satisfaction of any conditions to funding under the Commitment Letter and absence of any uncured material breaches of the Litigation Trustee's obligations under the Litigation Trust Agreement.[5] Requests for funding under the Litigation Funding shall be made solely (a) in compliance with the foregoing terms and (b) by the Litigation Trustee upon at least five business days' written notice to the Litigation Funding Agent, it being understood and agreed that not more than one such funding request shall be made during any 30-day period. Litigation Funding to include an uncommitted accordion of 25% of the Initial Commitment Amount, on the same terms as the initial tranche (to the extent the accordion becomes committed in the sole and absolute discretion of the FILO Parties, the amount of such commitment together with the Initial Commitment Amount, shall be the "Total Commitment Amount"). The commitments under the Commitment Letter shall automatically terminate upon the earlier to occur of (i) the funding of the then applicable commitment amount (whether the Initial Commitment Amount or the Total Commitment Amount, as the case may be) and (ii) the repayment of the FILO Balance.

b. Further financing to be subject to written consent of (x) the Litigation Trustee; (y) the Class B Representative; and (z) unless the further

---

[4] "FILO DIP/Bridge Claim" refers to the claims outstanding under the FILO DIP/Bridge facilities immediately prior to the Trust Establishment Date.

[5] To the extent that the initial Litigation Funding Budget contemplates disbursements to legal counsel on a current basis and the projected amount of such disbursements is subsequently reduced through contingency fee, success fee, or similar arrangements (the aggregate amount of such reduction as agreed by the Litigation Trustee, the "Contingency Fee Savings"), the Total Commitment Amount shall be reduced by the Contingency Fee Savings.

financing is junior to amounts due or to be due to the FILO Parties and under the Litigation Funding, the Class A-2 interests holders and the Litigation Funding Agent. For the avoidance of doubt, the Litigation Trust shall not incur any debt, obligation for borrowed money or other obligation with payment priority senior to or *pari passu* with the Class A interests or secure any obligation with liens on any Litigation Trust Assets or Retained Collateral, in each case, without the prior written consent of the Class A-2 Representative and Class B Representative and the Litigation Funding Agent.

c. Upon the occurrence of the Trust Establishment Date, the Litigation Trust shall provide $6.5 million to the Estate (or any successor liquidating vehicle) (the "Estate Funding") to fund costs and expenses of the Estate and the Estate's professionals incurred after the Trust Establishment Date and of any successor liquidating vehicle (or representative thereof) established to hold the Class B interests and/or any remaining assets of the Debtors.

d. In respect of the Estate Funding, the FILO Parties indirectly providing such funding shall receive Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of the Estate Funding. The Estate Funding shall not be required to be repaid by the Estate.

11. MOIC Payment: The "MOIC Payment" refers to a payment to which the FILO Bridge lenders are entitled (subject to the occurrence of the Trust Establishment Date) in accordance with the terms set forth below. On the Trust Establishment Date, the MOIC Payment will be allowed on the following terms:

a. The Litigation Trust's MOIC obligation will be $11.25 million through March 31, 2026, increasing by:

    i. $1.0 million on April 1, 2026,
   ii. An additional $1.5 million on May 1, 2026,
  iii. An additional $2.0 million on June 1, 2026,
   iv. An additional $2.5 million on July 1, 2026,
    v. An additional $3.0 million on August 1, 2026, and
   vi. An additional $3.75 million on September 1, 2026 and on the first day of each month thereafter until the FILO Balance is paid in full in cash.

b. The total MOIC Payments will not exceed 85% of $75 million *minus* any interest paid or accreted on account of the claims outstanding

under the FILO Bridge facility (the "<u>FILO Bridge Claims</u>") (including any interest paid or accreted on account of the Class A-2 Preference that is allocable to FILO Bridge Claims).

12. Class A-2 interests shall, as of the applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the sum of (i) all principal and accrued interest, fees, expenses,[6] and other amounts outstanding under the FILO DIP/Bridge facilities[7] immediately prior to the Trust Establishment Date (for the avoidance of doubt, excluding the Retained FILO Claim), (ii) all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), (iii) the MOIC Payment, and (iv) the "Exit Premium" under the FILO DIP Loans (which shall be calculated as if the FILO DIP Loans were being fully repaid), in each case, as of such date, *less* (y) the (A) aggregate amount, if any, of cash distributions paid on the Class A-2 interests from the Litigation Trust and (B) aggregate amount, if any, of Class A-2 interests otherwise contributed or waived by the FILO Parties, in each case, as of such date (the "<u>Class A-2 Preference</u>").  Prongs (i) and (ii) of the definition of Class A-2 Preference shall accrete at (a) from the Trust Establishment Date through September 30, 2025, a rate equal to 10% per annum, (b) from October 1, 2025 through December 31, 2025, a rate equal to 10.5% per annum, (c) from January 1, 2026 through March 31, 2026, a rate equal to 11% per annum, and (d) a rate equal to 11.25% per annum commencing on April 1, 2026, and increasing by an additional 25bps at the beginning of each quarter thereafter, subject to a maximum of 12% per annum (the immediately preceding clauses (a)-(d), the "<u>Applicable Rate</u>," which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-2 Preference on a monthly basis); provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

---

[6] Milbank to defer (i) 10% of its fees incurred between April 1, 2025, and the Trust Establishment Date, and (ii) any of its fees incurred in excess of the Pre-TED Professional Fee Estimates.  All outstanding Milbank invoices and Houlihan's March 18, 2025 invoice shall be paid as a condition precedent to the effectiveness of this Term Sheet, and thereafter all Milbank and Houlihan fees and expenses that are not subject to deferral shall be paid current in accordance with the FILO DIP Order and Approval Order, as applicable.

[7] FILO DIP/Bridge facilities to be allowed in full pursuant to the Approval Order, subject to the MOIC Payment settlement set forth in this Term Sheet.

13. Litigation Funding will be made available to the Litigation Trust by the FILO Parties on these terms:

    a. The Class A-1 interests shall, as of each applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the aggregate amount of funding extended or deemed to have been extended under the Litigation Funding plus all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), in each case, as of such date, *less* (y) the aggregate amount, if any, of cash distributions paid on the Class A-1 interests from the Litigation Trust as of such date (the "Class A-1 Preference").  The Class A-1 Preference shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-1 Preference on a monthly basis; provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

    b. The Litigation Funding will, in addition to payment of the Class A-1 Preference and the agency fee of the Litigation Funding Agent, as well as indemnification and reimbursement of all reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), be entitled to:

        i. an upfront premium (the "Upfront Premium"), payable in kind, in an amount equal to $4.25 million; provided that if the Litigation Funding accordion is exercised with the consent of the Litigation Trustee, then the Upfront Premium shall be increased by the same percentage that the commitments under the Litigation Funding are increased.

        ii. 20% of gross litigation proceeds (the "Variable Component"), of which (a) 15% (the "Upfront Percentage") is paid in cash at the time of receipt of such litigation proceeds and (b) 5% is deferred, with the applicable deferred cash being held in escrow (the "Deferred Portion"); provided that if the litigation proceeds result from a litigation financed with a contingency fee structure or third-party litigation funding, the total Variable Component shall be limited to the lesser of (A) the

applicable Variable Component noted above (subject to clause 13.d below), and (B) the greater of (i) 30% of such gross litigation proceeds minus the amount of contingency fee, success fee, or third-party litigation funding cost related to such litigation and (ii) 10% of such gross litigation proceeds (the "Reduced Variable Component").

In the event the Reduced Variable Component is equal to or less than 15% of such gross litigation proceeds, then all of such Reduced Variable Component shall be treated as the Upfront Percentage. In the event the Reduced Variable Component is greater than 15% of such gross litigation proceeds, then 15% of such gross litigation proceeds shall be treated as the Upfront Percentage and the remaining portion shall be treated as the Deferred Portion.

c. If the FILO Balance is repaid in full in cash on or before October 1, 2026, the escrow holding the Deferred Portion shall be paid to the Estate. On October 2, 2026, if the FILO Balance has not been paid in full in cash by October 1, 2026, the escrow holding the Deferred Portion shall be disbursed in full to the Litigation Funding Agent. Following such time and until repayment of the FILO Balance in full in cash, the Variable Component shall be paid in cash at the time of receipt of litigation proceeds in accordance with the terms of clause 13.b. with no amounts deferred.

d. After repayment of the FILO Balance, the Variable Component shall continue to be entitled to a percentage of the gross litigation proceeds (i) at the Upfront Percentage only (i.e., 15%) if the FILO Balance is repaid in full in cash on or before October 1, 2026, or (ii) at 20% if the FILO Balance is not repaid in full in cash on or before October 1, 2026, in each case, subject to the Reduced Variable Component adjustment described above (the "Post-FILO Repayment Variable Component"); provided that (x) to the extent a Plan is confirmed, the Post-FILO Repayment Variable Component shall be paid in two installments, with the first installment being paid in cash upon receipt of the applicable litigation proceeds in an amount equal to 62.5% of the Post-FILO Repayment Variable Component, and the payment of the remaining balance of the Post-FILO Repayment Variable Component being deferred until (and subject to) the satisfaction of allowed administrative and other priority claims pursuant to the Plan, and (y) if a Plan has not been confirmed, the Post-FILO Repayment Variable Component shall be paid in full in cash upon receipt of the applicable litigation proceeds.

14. "<u>FILO Balance</u>" equals on any applicable date of determination: the sum of (a) the outstanding Class A-2 Preference (including all accreted amounts accrued thereon) and fees and expenses of the Class A-2 Representative to the extent payable under this Term Sheet, (b) the outstanding Class A-1 Preference, the Upfront Premium, the agency fee of the Litigation Funding Agent, and outstanding indemnification claims and reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), and (c) any unpaid Variable Component that has been earned (for the avoidance of doubt, (i) other than before October 2, 2026, any Deferred Portion held in escrow and (ii) subject to adjustment, if applicable, in connection with any Post-FILO Repayment Variable Component).

15. The FILO Balance will be in an "<u>Underpayment State</u>" if the aggregate FILO Balance is equal to or greater than

    a. $275 million as of the Trust Establishment Date.
    b. Solely for purposes of paragraph 7.i.v.1., $220 million as of December 1, 2025.
    c. For all purposes other than paragraph 7.i.v.1., $220 million as of December 31, 2025.
    d. $160 million as of April 1, 2026.
    e. $110 million as of July 1, 2026.
    f. $60 million as of September 1, 2026.
    g. $10 million as of December 31, 2026.

16. The Debtors, FILO Parties and UCC to negotiate in good faith and agree prior to entry of the Approval Order on the terms of a transition services agreement pursuant to which the Estate will provide TSA services to the Litigation Trust, including agreement on the scope of services to be provided and pricing at cost (the "<u>TSA</u>"). In advance of each calendar month, the TSA shall provide for the Litigation Trust to advance the Estate's estimated monthly operating expenses, including for payroll and vendors, subject to (i) the initial TSA budget annexed hereto as **Exhibit B**, which may be updated from time to time if approved in writing by the Litigation Trustee and the Class A-2 Representative, and (ii) a reconciliation process with respect to amounts funded in prior months. Payments made by the Litigation Trust to the Estate for any services under the TSA prior to the Estate paying for the budgeted costs of providing such services shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such costs. In addition, the Litigation Trust shall provide, when and to the extent due as evidenced by reasonably detailed evidence thereof delivered by the Estate to the Litigation Trust (the "<u>Tax Package</u>"), up to $4 million in funding to

the Estate for the sole purpose of the Estate paying income taxes for the Debtors' current 2024/2025 income tax year. Payments made by the Litigation Trust to the Estate for such taxes shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such taxes reflected in the Tax Package on a dollar-for-dollar basis. The Estate and its related parties (including employees and advisors) shall be defended, held harmless and indemnified by the Litigation Trust against any and all liabilities or losses that may be incurred in connection with the rendering of services under the TSA to the Litigation Trust or Litigation Trustee, subject to customary carve outs for fraud, willful misconduct, and gross negligence.  All other expenses of the Estate incurred on or after the Trust Establishment Date, including cost of administration of the Estate, must be budgeted and paid from the Retained Cash, Estate Funding, or other Estate (not Litigation Trust) resources.

17. Reporting and Information Sharing.

   a. <u>Regular Conference Calls</u>:  Litigation Trustee to host conference calls on a bi-weekly basis (or more frequently in the Litigation Trustee's discretion) regarding the Litigation Trust Asset monetization process, which calls shall be accessible to the Litigation Funding Agent, the Class A-1 interest holders, the Class A-2 Representative, the Class A-2 interest holders, and the Class B Representative.

   b. <u>Ad Hoc Conference Calls</u>:  In addition to the foregoing, the Litigation Trustee shall make itself reasonably available for conference calls to discuss specific topics reasonably requested in writing by the Litigation Funding Agent, the Class A-2 Representative, or the Class B Representative.

   c. <u>Financial Reporting</u>:  Litigation Trustee shall deliver a written report to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representative on a monthly basis providing, as of the date of the report:

      i. the amount of cash received by the Litigation Trust through the Litigation Trust Asset monetization process (broken down by source), and the application thereof pursuant to paragraph 7(i) hereof;

      ii. the amount of expenses paid by the Litigation Trust (broken down by category and professional firm);

      iii. the FILO Balance;

   iv. the amount of the accrued Variable Component and the Deferred Portion then held in escrow; and

   v. a reasonably detailed summary of the asset monetization activity undertaken in the immediately preceding month.

 d. <u>Preference Actions</u>: Togut shall deliver to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representatives reporting with respect to preference actions, which shall be consistent (with respect to both frequency and format) with the reporting currently required to be delivered to the FILO and UCC counsel under paragraph 5 of the Togut retention order [ECF No. 3886].

 e. <u>Confidentiality/Preservation of Privileges</u>: Access to reporting shall be subject to entry into (i) a confidentiality agreement and (ii) a common interest agreement and other protocols to the extent necessary to protect applicable privileges, as reasonably determined by the Litigation Trustee.

18. Each FILO Party agrees that prior to the Trust Establishment Date, it shall not transfer, directly or indirectly, in whole or in part, any FILO DIP/Bridge Claims, option thereon, or right or interest therein, and any purported such transfer shall be void and without effect, in each case, unless the transferee thereof: (a) is a signatory to this Term Sheet as of the date of such transfer; or (b) has signed a joinder to this Term Sheet and the Plan Support Agreement Term Sheet acceding to the obligations of a holder of FILO DIP/Bridge Claims hereunder and thereunder (each, a "<u>Permitted Transferee</u>"). Any transfer of FILO DIP/Bridge Claims occurring prior to the Trust Establishment Date shall require the transferee to assume the transferor's obligations under the Commitment Letter in proportion to the amount of FILO DIP/Bridge Claims so transferred relative to the aggregate amount of all FILO DIP/Bridge Claims outstanding as of the date of such transfer (the "<u>Stapling Requirement</u>"). Notwithstanding anything to the contrary herein, a FILO Party may transfer FILO DIP/Bridge Claims to an entity that is acting in its capacity as a Qualified Marketmaker[8] without the requirement that the Qualified Marketmaker be a signatory to this Term Sheet or execute a joinder; *provided* that any such Qualified

---

[8] "<u>Qualified Marketmaker</u>" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers FILO DIP/Bridge Claims, or enter with customers into long or short positions in FILO DIP/Bridge Claims, in its capacity as a dealer or market maker in such FILO DIP/Bridge Claims and (ii) is in fact regularly in the business of making a market in claims, interests, or securities of issuers or borrowers.

Marketmaker (i) may only subsequently transfer the FILO DIP/Bridge Claims to a transferee that is or becomes a Permitted Transferee at the time of such transfer and to the extent such subsequent transfer complies with the Stapling Requirement and (ii) shall be required to, by the earlier of (x) ten (10) business days after its acquisition of any transferred FILO DIP/Bridge Claims and (y) the Required Joinder Date,[9] either sign a joinder to this Term Sheet or transfer all FILO DIP/Bridge Claims held by such Qualified Marketmaker to one or more Permitted Transferees, in each case, in compliance with the Stapling Requirement.

19. The parties shall negotiate promptly and in good faith to agree on definitive documentation, which shall include the Litigation Trust Agreement (including the funding mechanics with respect to the Class A-1 interests), the Litigation Trustee's engagement letter, the Commitment Letter, the TSA, and the DIP Amendment. Counsel to the Debtors, the UCC, and the FILO Parties to agree on allocation of drafting responsibility and a detailed work plan and fee estimates.

20. All transactions contemplated herein shall be implemented in a tax-efficient manner and are subject to review by tax professionals.

---

[9] "Required Joinder Date" means the third business day before the expiration of the chapter 11 plan voting deadline, if any, applicable to the FILO Bridge Claims.

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**STEWARD HEALTH CARE SYSTEM LLC,
on Behalf of Itself and its Debtor Affiliates**

By: _____
Name: John Castellano
Title: Chief Restructuring Officer

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

For and on behalf of **OneIM Fund I LP, as DIP Lender,** acting by its General Partner, OneIM GP LLC, acting by its Manager, GCT Capital LLC

By: _____
Name: Munish Varma
Title: Authorized Signatory

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**BRIGADE AGENCY SERVICES LLC,** as FILO Agent

By: BRIGADE CAPITAL MANAGEMENT, LP, Its Managing Manager

By: _____
Name: Patrick Criscillo
Title: Authorized Signer

*Signature Page to Settlement and Stay Relief Term Sheet*

**BIG RIVER GROUP FUND SPC LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE BADGER FUND, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE DIVERSIFIED CREDIT CIT**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE CREDIT FUND II LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE HIGH YIELD FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LOAN FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE OPPORTUNISTIC CREDIT LBG
FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

*Signature Page to Settlement and Stay Relief Term Sheet*

**BRIGADE-SIERRABRAVO FUND LP**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**CITY OF PHOENIX EMPLOYEES'
RETIREMENT PLAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FEDEX CORPORATION EMPLOYEES'
PENSION TRUST**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FUTURE DIRECTIONS CREDIT
OPPORTUNITIES FUND**,
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

*Signature Page to Settlement and Stay Relief Term Sheet*

**JPMORGAN CHASE RETIREMENT PLAN BRIGADE BANK LOAN**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**SC CREDIT OPPORTUNITIES MANDATE, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**MIDOCEAN CREDIT FUND MANAGEMENT, LP**

By: _____

Name: Damion Brown

Title: Managing Director

**MidOcean Tactical Credit Fund III LP**
By: Tactical Credit Fund III GP, LP
By: Ultramar Credit Holdings Ltd., its General Partner

By: _____

Name: Damion Brown

Title: Managing Director

**MidOcean Multi Asset Credit Fund, LP**
By: MidOcean Multi Asset Credit Fund GP, LLC its General Partner

By: _____

Name: Damion Brown

Title: Managing Director

**Abbott Abbvie Multiple Employer Pension Plan Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

**Abbott Laboratories Annuity Retirement Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

*Signature Page to Settlement and Stay Relief Term Sheet*

Case 25-01235  Document 521  Filed in TXSB on 04/26/01 ED  Page 1046 of 1832

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**OWL CREEK INVESTMENTS I, LLC**

By: OWL CREEK ASSET MANAGEMENT, LP
as Investment Manager

By _____
Name: Kevin Dibble
Title:  General Counsel

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**WHITEHAWK FINANCE LLC**
By: WHITEHAWK CAPITAL PARTNERS, LP, as Investment Manager

By: _____

Name: Robert Louzan
Title: Managing Partner

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**The Official Committee of Unsecured Creditors**, solely in its representative capacity, and not on behalf of any individual member thereof

By: */s/ Brad M. Kahn*

Name:  Brad M. Kahn

Title:  Partner

Akin Gump Strauss Hauer & Feld LLP, in its capacity as counsel to, and authorized signatory for, the Official Committee of Unsecured Creditors of Steward Health Care System, LLC, *et al*.

# Schedule 1

## Litigation Trust Assets

1. All cash and cash equivalents, excluding only (a) the Retained Cash[1], (b) all cash held or received on behalf of buyers of the Debtors' hospital and Stewardship operations pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet ("Buyers"), (c) all cash received from Buyers or other third parties for purposes of paying cure costs, (d) cash to fund checks issued in accordance with the DIP Budget and which remain outstanding immediately prior to the Trust Establishment Date, (e) all cash held for subtenant security deposits or rent collected on behalf of Buyers, subtenants, or overlandlords, (f) all cash held in the Professional Fee Escrow Account, the Physician Insurance Account, the Utility Deposit Account, or the Expense Escrow Account, and (g) any funds of the Debtors in the Vendor Fund Escrow Account pursuant to the Vendor Fund Escrow Agreement, entered into as of March 11, 2025, by and among Golden Sun TSA Services, LLC, a Delaware limited liability company; Steward Health Care System LLC, a Delaware limited liability company; MPT Development Services, Inc., a Delaware corporation; Lifespan of Massachusetts, Inc., a Massachusetts nonprofit corporation; BMC Community Hospital Corporation and BMC Community Hospital Corporation II, Massachusetts nonprofit corporations; Orlando Health, Inc., a Florida corporation; and Kroll Restructuring Administration LLC, a Delaware limited liability company.

2. All accounts receivable, excluding only (a) accounts receivable that the Debtors sold to Buyers pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet and (b) any accounts receivable that cannot be transferred to the Litigation Trust or a subsidiary thereof pursuant to applicable law (such accounts receivables described in this clause (b), the "Non-Transferrable A/R"). With respect to any Non-Transferrable A/R, the Estate shall, at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost), (i) use commercially reasonable efforts to collect or otherwise monetize such Non-Transferrable A/R in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (ii) promptly turn over any cash or other value realized on account of such Non-Transferrable A/R to the Litigation Trust.

3. The equity interests in Steward A/R Co, LLC. Promptly upon transfer of the equity interests in Steward A/R Co, LLC to the Litigation Trust, the current

---

[1] Each capitalized term that is used but not defined herein has the meaning ascribed to it in (a) the Term Sheet to which this **Schedule 1** is attached or (b) the mutual releases set forth in **Exhibit A** to the Term Sheet.

manager of Steward A/R Co, LLC, John Castellano, shall submit his resignation as manager and the Litigation Trustee and Steward A/R Co, LLC shall grant Mr. Castellano a release of claims against Mr. Castellano in connection with his services as manager, in form and substance reasonably acceptable to Mr. Castellano, and the Litigation Trust shall appoint his replacement.

4. All Claims[2] and Causes of Action[3] of the Debtors and the Estate, including, without limitation, in each case, to the extent not released pursuant to the mutual releases set forth in **Exhibit A** to the Term Sheet, the following Claims and Causes of Action:

    a. all Claims and Causes of Action asserted by the Debtors in the *Second Amended Complaint and Jury Demand* filed by Steward Health Care System LLC at Docket No. 61 in Civil Action No. 21-cv-11902-PBS in the United States District Court for the District of Massachusetts (the "Norwood Complaint") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the Norwood Complaint;

    b. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against healthcare payors, including, without limitation, the commercial payors identified in **Schedule 1-A** hereto;

    c. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Non-Released Parties, including, without limitation, arising from or relating to the 2016 Distribution, the 2020 Transactions, the 2021 Distribution, the 2022 Distribution, or any Plane

---

[2] "Claim" means a "claim," as defined in section 101(5) of the Bankruptcy Code.

[3] "Cause of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license or franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whenever arising, whether in law or equity, whether sounding in tort or contract, whether asserted in arbitration, a court or regulatory proceeding, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including under any state or federal securities laws. Causes of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) Avoidance Actions, and (iii) any claim or defense, including fraud, mistake, duress, or usury and any other defenses set forth in section 558 of the Bankruptcy Code.

Sale,[4] or otherwise arising from or relating to the payment of unlawful dividends, the avoidance of prepetition dividend payments or other distributions, or one or more breaches of fiduciary or other duties;

d.   all Avoidance Actions[5] asserted or assertable by the Debtors or the Estate against the transferees identified in **Schedule 1-B** hereto or any other prepetition vendors of the Debtors;

e.   all Claims and Causes of Action against Blue Cross Blue Shield Association ("BCBS") or any of its independent Affiliates, including, without limitation, arising from or relating to the Claims and Causes of Action asserted in the class action lawsuits against BCBS and its various licensees consolidated in *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (MDL No. 2406) (N.D. Ala. 2013) (the "BCBS Antitrust Litigation") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the BCBS Antitrust Litigation;

f.   all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Commonwealth of Massachusetts, including, without limitation, any Claims or counterclaims of the Debtors or the Estate in connection with *The Commonwealth of Massachusetts' Motion for Relief from the Automatic Stay to Allow for the Setoff of Mutual Obligations if and to the Extent that Recoupment is Not Available* (Docket No. 3393) and the adversary proceeding filed by the Debtors against the Commonwealth of Massachusetts (Docket No. 3983) (Adv. Pro. No. 25-03053);

g.   all Claims and Causes of Action with respect to the escrow account holding the Adjustment Escrow Amount (as defined in the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) the Asset Purchase Agreement with Brady Health Buyer, LLC (B) the Sale of Stewardship Health Assets Free and Clear of Liens and Liabilities and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (Docket No. 2135)) and the funds deposited therein; and

---

[4] "Plane Sales" means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

[5] "Avoidance Actions" means all Claims and Causes of Action under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, any other avoidance actions under the Bankruptcy Code, and any state law fraudulent transfer claims.

h. all Claims and Causes of Action with respect to the right of certain Debtors to receive reimbursement from Golden Sun TSA Services, LLC in connection with the renewal of that certain Software Licensing Agreement, dated September 9, 2009, by and between IASIS Healthcare LLC and Microsoft Corporation, as amended, under Section 9.7 of the asset purchase agreement attached as <u>Exhibit 1</u> to the *Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4192).

5. All rights of the Debtors and the Estate to recover insurance proceeds from the D&O Policies (as defined in the *Motion of Debtors for Order Authorizing the Use of Proceeds of Directors and Officers Liability Insurance Policies for Insureds Defense Costs* (Docket No. 2540)) in connection with any Claim or Cause of Action that is not released pursuant to the mutual releases set forth in **<u>Exhibit A</u>** to the Term Sheet. For the avoidance of doubt, the transfer of the rights of the Debtors and the Estate to recover insurance proceeds from the D&O Insurance shall not hinder the ability of any beneficiaries or insureds of such D&O Insurance to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

6. All of the Debtors' remaining interests in joint ventures and the Meadows Hospital Promissory Note, in each case, unless otherwise directed by the FILO Parties, which shall be transferred to one or more corporate subsidiaries of the Litigation Trust; provided that in the event any transfer of interests in joint ventures triggers any put, call, ROFO or ROFR, or other similar rights of third parties, such interests shall be excluded (the "<u>Excluded Interests</u>") and only the proceeds of sale of such interests will be transferred to the Litigation Trust. The Estate shall, at Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize the Excluded Interests in coordination, and in a manner reasonably agreed upon, with the Litigation Trust, and (b) promptly turn over any cash or other value realized on account of such Excluded Interests to the Litigation Trust.

7. All proceeds, products, offspring, or profits of any employee retention tax credits ("<u>ERTCs</u>") owned by any Debtors, net of any reasonable and documented out-of-pocket expenses of any broker or consultant retained in connection with a sale of such ERTCs (to the extent not paid in advance by the Litigation Trust in accordance with the succeeding sentence). The Estate shall at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize such ERTCs

in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (b) promptly turn over any cash or other value realized on account of such ERTCs to the Litigation Trust.

8. All proceeds, products, offspring, or profits of any of the foregoing assets and property.

# Schedule 1-A

## **Payors**

| Column1 |
| --- |
| Aetna Better Health of Florida |
| Aetna Health Management, LLC |
| Aetna Health, Inc. |
| Aetna Network Services LLC |
| Aetna U.S. Healthcare Inc. |
| AmeriGroup Texas, Inc. |
| Arizona Physicians IPA, Inc. |
| AvMed, Inc. |
| BHP of Ohio, Inc. |
| Blue Cross and Blue Shield of Florida, Inc. |
| Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. |
| Blue Cross and Blue Shield of Massachusetts, Inc. |
| Blue Cross and Blue Shield of Texas |
| Boston Medical Center Health Plan, Inc. |
| Caritas Christi |
| Cenpatico Behavioral Health LP |
| Cigna Behavioral health of Texas |
| Cigna Health and Life Insurance Company |
| Cigna HealthCare of Florida, Inc. |
| Cigna HealthCare of Massachusetts, Inc. |
| CIGNA Healthcare of Texas, Inc |
| Community Insurance Company |
| Connecticut General Life Insurance Company |
| Employers Health Insurance Company |
| Evercare of Texas, LLC |
| First Health Group Corp. |
| GHS Property and Casualty Insurance Company |
| Harvard Pilgrim Health Care, Inc. |
| Health Options, Inc. |
| Health Value Management, Inc. |
| Healthease of Florida |
| HealthSpring Life & Health Insurance Company, Inc. |
| Highmark Blue Cross Blue Shield |
| Humana Health Insurance Company of Florida |
| Humana Health Plan of Florida |
| Humana Health Plan of Texas, Inc. |
| Humana Insurance Company |
| Humana Medical Plan, Inc. |
| Leon Health, Inc. |
| Massachusetts Benefit Administrators LLC |
| MetraHealth Inruance Company |
| Metropolitan Life Insurance Company |
| Neighborhood Health Plan of Rhode Island |

| |
|---|
| NovaSys Health, Inc. |
| Oscar Insurance Company of Florida |
| PacifiCare of Arizona, Inc. |
| PacifiCare of Texas, Inc. |
| SelectCare of Texas, LLC |
| Senior Whole Health LLC |
| Simply Healthcare Plans, Inc. |
| Steward Health Care System, LLC |
| Sunshine State Health Plan, Inc. |
| Superior HealthPlan, Inc. |
| Texas HealthSpring, LLC |
| Total Health Plan, Inc, |
| Travelers Insurance Company |
| Tufts Associated Health Maintenance Organization, Inc. |
| Tufts Associated Health Plans, Inc. |
| Tufts Benefit Administrators |
| Tufts Health Plan, Inc. |
| Tufts Insurance Company |
| Tufts Public Plans, Inc. |
| U.S. Behavioral Health Plan, California |
| United Behavioral Health, Inc. |
| United Benefits of Texas, Inc. |
| United Community Plans of Texas, L.L.C. |
| United Health and Life Insurance Company |
| United Healthcare |
| United Healthcare Insurance Company |
| United Healthcare of Arizona, Inc. |
| United Healthcare of New England Inc. |
| United HealthCare of Ohio, Inc. |
| United Healthcare of Texas, Inc. |
| UnitedHealthcare Community Plan of Ohio, Inc. |
| UnitedHealthcare Insurance Company |
| UnitedHealthcare of Arizona, Inc. |
| UnitedHealthcare of Florida, Inc. |
| UnitedHealthcare of New England, Inc. |
| UnitedHealthcare of Ohio, Inc. |
| Universal American Corp. |
| US Behavioral Health |
| Warren Ohio Rehab Hospital Company |
| WellCare of Florida, Inc. |
| WellCare of Texas, Inc. |

**Schedule 1-B**

**<u>Preference Defendants</u>**

m o r n r

NORTHWIN   PHARMACEUTICALS LLC
  EFOREST   OSCELNI   & BERAR   INELLI
TOTAL ORTHOPAE   IC CARE
PROVI   ENCE ME   ICAL TECHNOLOG   INC
ACUME   LLC
THE PAR   ER  VMC TRUST
ALL PRO CLEANING S   STEMS
SPINEOLOG   INC
AEROSEAL LLC
MO   ULAR   EVICES
GALLOWA   OFFICE SUPPLIES INC
BLEN   EN ROTH LAW FIRM PLLC
ME   ICAL CONSULTANTS NETWOR   INC
COLE SCOTT &   ISSANE PA
ENVIRONMENTAL S   STEMS INC
SI-BONE, INC
  -CENTRI   LLC
TOTAL SCOPE INC
TREACE ME   ICAL CONCEPTS INC
  ESIGN B   NATURE CORP
FIRETROL PROTECTION S   STEMS INC
IMMUCOR INC
LSI SOLUTIONS
INNOVATIVE ME   ICAL PRO   UCTS INC
HERSHE   CREAMER   COMPAN
HEALTHCARE FINANCIAL INC
LANMOR SERVICES INC
SIGNET ELECTRONIC S   STEMS INC
TERUMO ME   ICAL CORPORATION
FINTHRIVE INC
CARCO GROUP, INC.
ME   ISOLV INC
BLOOMBERG IN   USTR   GROUP INC
WHELAN PROPERT   MANAGEMENT
AMERICAN COLLEGE OF RA   IOLOG
SMITH & NEPHEW INC
LABORATOR   CORPORATION OF AMERICA
  IMMER US INC
RICE MCVANE
MIST   HA

WILSON ELSER MOS  OWIT  E  ELMAN
COMPLIANT HEALTHCARE
FU IFILM HEALTHCARE AMERICAS
THE FILTER MAN
BRIGHTER HEALTH NETWOR   LLC
NETWOR   PROVI  ERS INC
CHARTER COMMUNICATIONS
VIRTUAL RA  IOLOG  PROFESSIONALS OF N
   ext Capital LLC
  EVETS IN  USTRIES INC
PFEIFFER & SON LT
PROLACTA BIOSCIENCE INC
STR   ER ORTHOPAE  ICS
AGILITI HEALTH INC
STR   ER SALES CORP
OL  MPUS AMERICA INC.
ENVIRONMENTAL HEALTH & ENGINEERING
STR   ER EN  OSCOP
STR   ER SUSTAINABILIT  SOLUTIONS
HEALOGICS WOUN   CARE &
ME  TRONIC USA INC
GENCON SERVICE INC
PRORENATA LABS LLC
MA  O SURGICAL CORP
ELEVATE PATIENT FINANCIAL
CONVERGE TECHNOLOG  SOLUTIONS
   O SURGICAL
LPS ENTERPRISES LLC
INARI ME  ICAL INC
Global Healthcare Exchange
BRISTOL LAW PLLC AN  CLINICAL
BOSTON SCIENTIFIC CORPORATION
ARC  IAL  SIS SOUTH FLORI  A
BROC  TON HOSPITAL INC
GASTROENTEROLOG  AFFILIATES OF
IMAGEFIRST OF NEVA  A LLC
LIFENET HEALTH
FAVORITE HEALTHCARE STAFFING INC
STR   ER NEUROVASCULAR
NUVASIVE INC
R  AN LLC

SIEMENS HEALTHCARE  IAGNOSTICS
STR  ER SPINE
CHEM-A  UA INC
HEMOSTASIS LLC
STR  ER CRANIOMA  ILLOFACIAL
IRON MOUNTAIN
SMART SOURCE LLC
UTAH HEALTH INFORMATION NETWOR
ALLSTON BRIGHTON COMMUNIT
CATAL  ST ORTHOSCIENCE LLC
CUBE  STU  IO LLC
TAP  RI  E TRANSPORTSATION INC
AIRGAS USA LLC
CORC  M INC
MARSH USA INC
AFSCME OHIO COUNCIL
BCM CONTROLS CORPORATION
CHG COMPANIES INC
BEC  EL CONTROLS INC
HOLLAN  & HART LLP
BROC  TON NEIGHBORHOO  HEALTH CENTER
E     MARTINE  PLUMBING SERVICE INC
FLORI  A BIRTH RELATE  NEUROLOGICAL
  &  HEALTH CARE S  STEMS INC
UMASS CHAN ME  ICAL SCHOOL
PENUMBRA INC
NE  TME  PLAIN STATES LLC
  UIC  BASE INC
AARON BARLOW PI  E
REME  I  LLC
LUME    CORPORATION
LUME    CORPORATION
TRANSLOGIC CORPORATION
HILL BARTH &  ING LLC
EPSTEIN BEC  ER & GREEN PC
PENRA   TECHNOLOGIES INC
TRI-M MAINTENANCE INC
VMG HEALTH
WELLS PHARMA OF HOUSTON LLC
THOMAS  OUNG ASSOCIATES INC
 AMES W FLETT CO INC

THE ME ICUS FIRM INC
NORTH COAST FIRE PROTECTION INC
HAMILTON ME ICAL INC
 UENCH USA INC
CO E RE CONSULTANTS LLC
EC S STEMS LLC
ME TO LABORATORIES INC
A ME E O LOC SMITH SECURIT
 FA AIR BRAN S - GARELIC FARMS
CS ME ICAL LLC
ER
PC INSTITUTE FOR ME ICAL E UCATION
TENNANT SALES AN SERVICE COMPAN
VICTOR MECHANICAL HOL ING LLC
G USA INC
GREGOR WATTS
NATIONAL FIRE ALARM PROTECTION
EARL BIR POWER LLC
WA LAN MULLI IN
SOUTHFIEL ME ICAL CARE LLC
MICROSURGICAL TECHNOLOG
NEW ENGLAN REVENUE C CLE
 RS TUMOR REGISTER SERVICES
NOVO HEALTH SERVICES FLORI A LLC
ALLIE UNIVERSAL TECHNOLOG SERVICE
ALLIE OOR AN HAR WARE CO INC
CINTAS
SHEA LE UNISERVICE INC
RICHAR CELLER LEGAL PA
SOUTHERN LITHO I LLC
ORTHALIGN INC
GENSET FIRE & SECURIT LLC
BOGGS FIRE E UIPMENT INC
CROWN HEALTH CARE LAUN R
TAN EM THEOR
IN USTRIAL BURNER S STEMS INC
CLAU CLEANING CORPORATION
FE E FREIGHT INC
IMAGING PH SICS LLC
REGIONAL MANAGEMENT ASSOCIATES
PARAGON INC

COMMTAN
  ILAGOS PLUMBING SERVICES INC
PROIECTUS SERVICES LLC
EAST EN   ME   ICAL I LLC
PITNE   BOWES GLOBAL FINANCIAL
COMMUNIT   BAN   OF TE   AS
SONE   HEALTH INC
THE   OINT COMMISSION
HERMAN M EPSTEIN M
A   VANTECH INC
CENTER POINTE SLEEP ASSOCIATES LLC
PHARMAC   ONESOURCE
PITNE   BOWES INC
SMART CARE E   UIPMENT SOLUTIONS
BIOREFERENCE LABORATORIES INC
M   M TRANSPORTATION CONSULTANTS INC
APO PUMPS & COMPRESSORS LLC
TE   AS   EPT OF STATE HEALTH
E   WAR   ON & COMPAN
CENTRAL COMMUNICATIONS AN
REMOTE ICU LLC
ME   ISTIM USA INC
PLANT PROFESSIONALS INC
CITI PROGRAM
ME   IPRO
Edwards Lifesciences LLC
THE PITNE   BOWES RESERVE ACCOUNT
ALSCO INC
      REAALT   TRUST
MICHAEL  ISER
ME   AIR INC
RE   RIVER PHARMAC   SVCS
ROSE BROS SEPTIC &   RAINAGE INC
COMPASS CR  OGENICS INC
ALL ME   ICAL PERSONNEL LLC
MELISSA ALWORTH   O PA
CAL   ERA ME   ICAL INC
FARI   GHEBLEH M   PC
C &  LEASING CORPORATION
MUNIR SHAH M
GREENTEAM PLUMBING LLLC

SIEMENS ME ICAL SOLUTIONS USA
CENTRAL A MI TURE PHARMAC
 MG CLEANING SOLUTION LLC
HANNA CAMPBELL & POWELL LLP
CROWN UNIFORM & LINEN SERVICE
E PERT ME ICAL NAVIGATION
A VANCE AIR AN HEAT CO INC
 & LABORATOR LLC
VERATHON INC
 OHNSON OCONNOR FERON &
WB MASON CO INC
MATHESON TRI GAS INC
TLC ENGINEERING SOLUTIONS INC
TIERPOINT LLC
US POSTAL SERVICE
ME TRONIC SOFAMOR ANE USA INC
Globus Medical North America
FRESHPOINT SOUTH FLORI A INC
GLE CONSULTING INC
 UEST IAGNOSTICS INCORPORATE
HACHE URBANOS I LLC
UNITE TE TILE RENTAL SERVICES
COTTON COMMERCIAL USA
GLOBAL ET CAPITAL LLC
MILESTONE HEALTHCARE LLC
 UGGAN MECHANICAL SERVICES INC
REPUBLIC SERVICES INC
BAM BAM ENTERPRISES LLC
HUNTON SERVICES
SOUTHEAST TE AS INPATIENT PH SICIAN
BIO RA LABORATORIES
OCEANS BEHAVIORAL HOSPITAL
PALOI A VISORS LLC
BLUS RESTORATION CONTRACTORS LLC
FA I NA OUR M
PREMIER IAGNOSTIC SERVICES INC
CUTT EN ELL & OLSON ATTORNE
TRAILRUNNER INTERNATIONAL LLC
WINSTON & STRAWN LLP
BOW ITCH & EWE LLP
LIFESHARE BLOO CENTERS

ANGELICA URENA AN   LAW OFFICE
NEOGENOMICS LABORATORIES
MERCHANT SERVICE
SAPPHIRE ELEVATOR LLC
CONCUR TECHNOLOGIES INC
NEIGHBORWOR  S HOUSING SOLUTIONS
AM SURGICAL
CT CORPORATION S  STEM
CCMMA T   PLLC
SERPE AN   REWS PLLC
OHIO VALLE   PERFUSION ASSOCIATES
ASAHI INTECC USA INC
VIRTUAL RA   IOLOGIC CORPORATION
ROLLS-RO  CE PLC
ECRI
LUBIN & ME  ER AS ATTORNE   FOR THE
PA  FIEL   AN   STOUT LLP TRUST
TE  AS HEALTHCARE LINEN LLC
MI  A  E LLC
BAL   WIN GROUP   BA ROGERS GRA
OMRAM LLC
PE  IATRIC PROFESSIONAL ASSOC PC
ACCESS TELECARE PLLC
BRIAN T. CART
SALT   MICHELSON ARCHITECTS
PUEBLO MECHANICAL AN   CONTROLS LLC
TELERA  IOLOG   SOLUTIONS
ALLHEART ELECTRIC COMPAN
ME   ICAL BUSINESS ASSOCIATES INC
GOR   ON & PARTNERS TRUST ACCT
SOUTHWEST ME   ICAL IMAGING PA
HOLI   A  CVS LLC
METTEL
STREAMLINE VERIF   LLC
  UALIT   HEALTHCARE PARTNERS
CHARLIE WILLIAMS PAINTING
 CB ORTHO LLC
NORTHWIN   STRATEGIES LLC
E  ECUTIVE ME  ICAL PH  SICS ASSOC
EASTSI  E ENTERPRISES INC
BOILER SPECIALISTS INC

TO    S ENVIROSCAPES LLC
MN & COMPAN   ME   IA MANAGEMENT INC
HARR   W   ONIAS M   LLC
 ACOB COHEN M
IMPERATIVE CARE INC
B  B   ELIVER   LLC
MORTON HOSPITAL
ME   IALAB INC
BOWIE COUNT   TE   AS LOCAL PROVI   ER PARTIC
MARICE GU  MAN PLLC FBO   ELL
  TANT ME   ICAL INC
CC ANESTHESIA SOLUTIONS LLC
HOART   TREE E   PERTS INC
  A MA   ANS M
ELEVATOR REPAIR SERVICE INC
STUART BREISCH M
MI   LAN   PLASTIC SURGER   CENTER
TSNE MISSION WOR   S
TEN   HEALTH LLC
PRI   ESTAR EMS INC
ARHC NCO   ST   LLC
PACIFIC PREMIER TRUST COMPAN
UMS MR FUSION SVC OF NE LLC
ALLAN M   ORGE M   PA
POPP HUTCHESON PLLC
MERGE HEALTHCARE SOLUTIONS INC
TTG ISOTOPES LLC
ENTECH SALES & SERVICE LLC
  ONSULT INC
TAN   WI  AR   S INC
WEST TE   AS UROLOG   PA
  OHN   ORMAN
BASIN NEUROSURGICAL & SPINE
UMS URS LITHOTRIPS   SERVICES
S R   EME M   PA
AMERICAN ARBITRATION ASSOCIATION
CAR   IOVASCULAR   IAGNOSTIC CENTER
VI   RAM PATEL M   PA
VOGEL   ANG LAW PC
PURCHASING POWER LLC
FUSION ORTHOPE   ICS USA LLC

GREATER HAMPSTEA   FAMIL   ME   ICINE
UMS LITHO SERVICE OF BRISTOL COUNT
AVASURE LLC
VSI SURGICAL
  MILLER CONSULTING LLC
PINE ISLAN   ASSOCIATES LLC
ARIOL LABRA   A M   PA
A  VANCE   CAR   IOVASCULAR
ACCRE   ITATION COUNCIL FOR GRA   UATE
MASS PAR   INC
GIANT PEACH CONSTRUCTION LLC
STEINER-ATLANTIC LLC
M   E VERA LAN   SCAPING LLC
WINTER ST PARTNERS NEW BE   FOR   LLC
SATCOM   IRECT INC
B  RNES MECHANICAL CONTRACTORS INC
SAN ANTONIO MERCHANT SHIPPERS LLC
VTR PAPAGO ME   ICAL PAR   LLC
ENVELOPE SUPERSTORE
RAMON HECHAVARRIA M
SOUTH FLORI   A ME   ICAL IMAGING PA
UNITE   RENTALS NORTH AMERICA INC
G  RC TECHNOLOGIES LLC
SOUTH MI    LESE   OPPORTUNIT   COUNCIL
Associates in Medical Imaging LLC
PRECISION PH  SICS SERVICES LLC
MP
FW WEBB COMPAN
FU IFILM SONOSITE INC
 AMES M POTTS M
MBA ME   ICAL INC
EVE  IAS HEALTH SOLUTIONS LLC
  CM   HOL   INGS LLC
S  STEM   OF BOSTON
PERMIAN BASIN ANESTHESIA PLLC
 ASON R MURPH
GEROW E   UIPMENT COMPAN
CR HALL COMPAN   LT
MELTWATER NEWS US INC
BER  SHIRE BAN
GEN   IGITAL INC.

AEP SOUTHWESTERN   ES
SAMBASIVA R SU  HAVASI M   PA
FARRU  H   URESHI
MILLERS RIVER   EVELOPMENT LLC
WA  LE  REGIONAL ME  ICAL CENTER
MRUNAL PATEL
REIS LAN  SCAPING & GAR  ENING LLC
SLIPPER  ROC   COMMERCIAL ROOFING
   BA  ER LAW GROUP PC
THE PICAR   GROUP LLC
COWBO  S STA  IUM LP
MERRITT ME  ICAL CENTER II
AL  O H MARTINE  FLEITES M   PA
THE SUFFOL   GROUP LLC
A  VI  E  TECHNOLOGIES LLC
GRANGER ME  ICAL INC
WORL   FUEL SERVICES EUROPE LT   AVIATION
ANANIA PLUMBING & HEATING INC
HEALTHCARE FINANCIAL GROUP INC
INNERFACE ARCHITECTURAL SIGNAGE INC
   ONSTANT  N S  WA   UN
SENSO SCIENTIFIC
   AVI    HEN  ERSON M
EPREWAR   INC
   OCTORS PAR  II CON  O ASSOCIATION
CHRISTOPHER   TROIANO M
SPAR  LIGHT BILL PA
T  ONCOLOG  PA
   ARL STOR  EN  OSCOP
GREER LABORATORIES
MOUNTAIN ME  ICAL PH  SICIAN
SMARTRISE HEALTH LLC
PE  IATRIC ECHOCAR  IOGRAPH   SERVICES
LIN  BIO CORP
CHARLES CROFT M   PA
THE   ELTA PATHOLOG  GROUP LLC
HA  STAC  I   LLC
EN  OLOGI  LLC
ACCESS CORP
INTEGRIT  HEALTHCARE LOCUMS LLC
TA  LOR COMMUNICATIONS

AGILITI SURGICAL INC
INSPIRE ME  ICAL S  STEMS INC
AGILITI SURGICAL E  UIPMENT REPAIR
 ONNELLE  FINANCIAL LLC
WM CORPORATE SERVICES INC
FLORI  A  EPARTMENT OF CHIL  REN
SERVPRO OF CENTRAL BREVAR
IMAGEFIRST
 IGISONICS INC
FRESH PROVISIONS INC
S  SCO SOUTH FLORI  A INC
ISMAEL MONTANE M  PA
RM ARI  ONA HOL  INGS INC
VO  CE INC
RE  LABEL SERVICES
CORIN USA LIMITE
AMERICAN RE  CROSS
NATIONAL GOVERNMENT SERVICES
SERVICEMASTER B  GILIMORE
HELGESEN HOUT  & ONES PC
ENGIE RESOURCES
SPECTRUM
IMAGEFIRST OF NEW ENGLAN
UNIVERSAL ELECTRICAL SERVICES INC
TECO PEOPLES GAS
 AIME E CAMPOS M  PA
TRICARE Management
GREAT-WEST LIFE
GCB IN  USTRIES LLC
NITEEN AN  AL  AR
HUNTON TRANE
TLC  ANITORIAL INC
BEACONME  AES LLC
PROLIN  HEALTHCARE
ABBOTT LABORATORIES INC.
ABBOTT RAPI  IAGNOSTICS
ABBOTT VASCULAR INC
ACCRE  ITATION PARTNERS LLC
AMERICAN ACA  EM  HOL  INGS LLC
AMN HEALTHCARE LANGUAGE SERVICES
A  UIT  SOLUTIONS LLC

BECTON IC INSON AN COMPAN
BIOMERIEU
BIOMERIEU VITE INC
BLUEVO ANT LLC
CAREFUSION SOLUTIONS LLC
CHANGE HEALTHCARE SOLUTIONS LLC
COLLEGE OF AMERICAN PATHOLOGISTS
 OCTORS BILLING INC
 RFIRST.COM
ELE TA INC
E PERIAN HEALTH INC
FORWAR A VANTAGE INC
GE HEALTHCARE IITS USA
GETINGE USA SALES LLC
GUI EPOINT SECURIT LLC
HOLOGIC SALES AN SERVICES LLC
IMALOGI LLC
INSITEONE LLC
INTELLIGENT ME ICAL OB ECTS INC
 ORCHE TECHNOLOGIES LLC
LAN AUER INC
ME ASOURCE
MERATIVE US LP
MICROSOFT CORP
NET HEALTH S STEMS INC
Philips Medical Capital
PHILIPS NORTH AMERICA LLC
PRESS GANE ASSOCIATES LLC
PROVATION SOFTWARE INC
RA IOMETER AMERICA INC
RL ATI NORTH AMERICA INC
ROCHE IAGNOSTICS CORPORATION
SAGILIT OPERATIONS INC F A HGS
SECURITAS HEALTHCARE LLC
SHARECARE HEALTH ATA
SOURCEHOV HEALTHCARE INC
SPO , INC.
STERIC CLE INC
TRINIS S LLC
TWIAGE SOLUTIONS INC
VARIAN ME ICAL S STEMS INC

VI  IENT INC
WERFEN USA LLC
  C   GENERAL CONTRACTORS
ME   LINE MO  ART HOL  ING
SO  E  O INC & AFFILIATES
   TEST CORP
A MURPH   INC
AB   OMINAL SURGEONS LT
ABIOME   INC
ACA   IAN AMBULANCE SERVICES INC
ACCESS CIG LLC
ACCLARENT INC
ACUTANE INC STAMPS CONCENTRATION
A    ISON GROUP
A  VANCE   STERILI  ATION PRO  UCTS
AESCULAP INSTRUMENTS
ALGORE   HEALTH TECHNOLOGIES INC
ALTER    INC
AMERICAN COLLEGE OF SURGEONS
AMERICAN HEART ASSOCIATION INC.
AMERICAN ME   ICAL RESPONSE OF
AMERICAN PORTABLE
ANGIO    NAMICS INC
AR CATAL   O CORPORATION
ARI  ONA GASTRO CARE PLLC
ARM ELECTRICAL SERVICES LLC
ARTHRE   INC
ARTHROSURFACE INC
ASSURGENT ME   ICAL STAFFING
ATI RESTORATION LLC
ATRICURE
BA   STATE INTERPRETERS INC
BEC   MAN COULTER INC
BIO-RA    LABORATORIES INC
BIOTE ME   ICAL LLC
BREA  AWA   COURIER BOSTON INC
BREWSTER AMBULANCE SERVICE
CAR   IOVASCULAR S  STEMS INC
CARRIER CORPORATION
CARRIER RENTAL S  STEMS
CERAPE   ICS INC

COLLECTIVE ME  ICAL TECHNOLOGIES INC

CONCOR   ME   ICAL GROUP OF TE   AS

CONCOR   ME   ICAL GROUP PLLC

COR   IS US CORP

CORE   IAL  SIS SERIES LLC

COVI   IEN SALES LLC

CRA INTERNATIONAL INC

CTL Amedica

C  RACOM LLC

   ASSAULT FALCON  ET CO

   HHS - UNIFIE   STATE LABORATORIES

   IGIRA   IMAGING SOLUTIONS INC

   OVER FLOORS INC

   RUC  ER ME   IA INC

      INC

ELIOT COMMUNIT   HUMAN

ELL  A   LLC

EMERGENCHEALTH LLC

EMPOWER ANNUIT   INS CO OF AMERICA,

ENCORE FIRE PROTECTION

ERBE USA INC

EVO   UA WATER TECHNOLOGIES LLC

FAGRON STERILE SERVICES LLC

FLE  CARE LLC

FLORI   A PEST CONTROL

FONAR CORPORATION

F  MASSE ASSOCIATES INC

F  SHOUL   ER USA INC

GASTON ELECTRICAL CO INC

GLENSTONE CAPITAL LLC

GOR   ON FOO   SERVICE INC

GULF COAST REGIONAL BLOO   CENTER

HARBINGER COMMUNICATIONS INC

HATCH      LLC

HEALTHPRO HERITAGE

HIGH   ESERT MECHANICAL CORP

HUB INTERNATIONAL NEW ENGLAN   LLC PREMI

INO THERAPEUTICS LLC

INSIGHT IMAGING

INTEGRA LIFESCIENCES CORP

Intuitive Surgical Inc.

AC  SON LLO    SELECT RIS

AMES CARROLL AS AGENT LABORIE

ANI-  ING OF RHO  E ISLAN

ENSEN HUGHES INC

 FRAN  LAN  SCAPING INC

UST PRESS PLA

 CI USA INC

 IC    RUM TECHNOLOG  GROUP LLC

 NOWTION HEALTH

LAB LOGISTICS LLC

LANTHEUS ME  ICAL IMAGING INC.

LEMAITRE VASCULAR INC

LIFE SPINE INC

LIGHTNING BOLT SOLUTIONS

LIMBACH COMPAN   LLC

LINCOLN HARRIS CSG

LIVANOVA USA INC

MCT E  PRESS INC

ME  ACTA USA INC

MERIT ME  ICAL S  STEMS INC

MESSAGE MANAGEMENT CENTER LLC

MESSER LLC

MICRO-TECH EN  OSCOP  USA INC

MI  LAN  PATHOLOGIST P A

MS  SONLINE INC

NEOGENOMICS LABORATORIES INC

NMS LABS

ONEBLOO  INC

ORTHO CLINICAL  IAGNOSTICS

OSSIO INC

OSTEOME

PARIS HEALTHCARE

PARTNERSOURCE

PENNS  LVANNIA STATESHENANGO

PEPSI COLA COMPAN

PHREESIA INC

PREPM  PROFESSIONALS LLC

PRO HEALTH ME  ICAL STAFFING LLC

PROFESSIONAL PIPING INC

PROFICIO SURGICAL ASSISTANTS LLC

PULMONAR  CONSULTANTS PC

REAU   MORGAN &   UINN LLP TRUST
RENTO  IL NORTH AMERICA
REPUBLIC SPINE LLC
RESOURCES GLOBAL PROFESSIONALS
RESTORI  HEALTH
RE  NOL  S  EWALT
RICHAR   WOLF ME  ICAL
RICHAR  S BRAN  T MILLER NELSON
RICOH USA INC
RI  E MOBILE TRANSPORTATION INC
ROOFS INC
SCA PHARMACEUTICALS LLC
SCHIN  LER ELEVATOR CORPORATION
SEMPERIS INC
SERVICEHUB CORPORATION
SHOC  WAVE ME  ICAL INC
SHRE  IT
SIGNATURE AVIATION USA LLC
SIL  ROA  ME  ICAL INC
S  ELETAL    NAMICS LLC
SOUTH TE  AS BOILER IN  USTRIES
SOUTHWORTH-MILTON INC
SPECIALT  CARE CAR  IOVASCULAR
SPINEART USA INC
STAT BIO ME  ICAL SALES & SERVICE
STEVEN A CALLAHAN ELECTRICAL
STEWART & STEVENSON
SUNBELT RENTALS
S  SCO ARI  ONA INC
S  SCO BOSTON LLC
S  SCO CENTRAL FLORI  A INC
S  SCO EAST TE  AS
S  SCO HOUSTON INC
S  SCO  AC  SON LLC
S  SCO WEST TE  AS
S  SME   AMERICA INC
TAC ME   INC
THE FACTOR INC
THE ROMANS GROUP
THERAPEUTIC RESEARCH CENTER
TMHP

TORNIER INC
TOWNE PAR   LLC
TRANE US INC
UNUM LIFE INSURANCE COMPAN   OF
UROLOGIC SURGEONS OF ARI  ONA PLC
US FOO   S INC
US ME   E   UIP LLC
WASTE CONNECTIONS OF FLORI   A
WEST TECHS CHILL WATER SPECIALIST
WESTPORT LINEN SERVICES INC
WHITMAN PARTNERS INC
WIC  ER SMITH O HARA MCCO   & FOR
WLG WL GORE&ASSOC MP
WOLF & COMPAN   PC
WRIGHT ME  ICAL TECHNOLOG   INC
  M HEALTH INFORMATION S  STEMS
ACCLARA SOLUTIONS LLC
CLOU   ME
COGNI  ANT TECHNOLOG   SOLUTIONS
CONSENSUS CLOU   SOLUTIONS
  ELL FINANCIAL SERVICES
ERGONOMIC GROUP
HEWLETT PAC  AR   FINANCIAL SERVICES
HP INC
INOVALON PROVI  ER INC
INTERLACE HEALTH LLC
IO  INE SOFTWARE LLC
 AMS INC
LOGI  HEALTH INC
MRO CORPORATION
PRESI  IO NETWOR  E
REVSPRING INC
TEGRIA RCM GROUP US INC.
BREA  EALE SACHSE & WILSON LLP
BRUCE &  ELLE  PC
CAPPLIS CONNORS CARROLL & ENNIS
  RAFFIN & TUC  ER LLP
FAL  WAAS HERNAN  E  ET AL
FOSTER & EL  RI  GE LLP
HALL PRANGLE & SCHOONVEL   LLC
HAMEL MARCIN   UNN REAR   ON & SHEA PC

ULIE SMITH

 IPP AN   CHRISTIAN PC

MARSHALL   ENNEHE  WARNER

 UINTAIROS PRIETO WOO   & BO  ER PA

RESNIC   & LOUIS PC

SNOW CHRISTENSEN & MARTINEAU

THE CHEC  ETT LAW FIRM PLLC

THOMPSON BOWIE & HATCH LLC

WILLIS TOWERS WATSON US LLC

WIPFLI LLP

AU  ERE INTERNATIONAL LIMITE

E  CELA RECEIVABLES    LLC

H RAMOS FARMS

## Exhibit A[1]

**Mutual Releases.**  Except as otherwise expressly set forth below, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Trust Establishment Date, each of (A) the Debtors, (B) the Estates, (C) the Litigation Trust, (D) the Litigation Trustee, (E) the FILO Parties, (F) the Creditors' Committee and each of its members (solely in their official capacity), and (G) each Related Party of each Person or Entity described in any of the immediately preceding clauses (A) through (F) to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law (each, a "**Releasing Party**" and, collectively, the "**Releasing Parties**"), in each case on behalf of themselves and their respective successors, assigns, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through such Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of such Releasing Party), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Trust Establishment Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the FILO Settlement Term Sheet or any other contract, instrument, release, or document created or entered into in connection with the FILO Settlement or any of the other definitive documents related thereto; any other debt or security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors; the subject matter of, or the transactions or events giving rise to, any Claim or Interest; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the Approval Order and the transactions contemplated thereby; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Trust Establishment Date.  Notwithstanding anything to the contrary in the foregoing, these releases (i)  shall not be construed as releasing (a)  any Released Party from Claims or Causes of Action arising from a material misrepresentation or an act or omission constituting actual fraud, willful misconduct, criminal misconduct, or gross negligence of or by such Released Party, in each case as judicially determined by a Final Order, (b) any Claims or Causes of Action arising after the transfer of the Litigation Trust Assets to the Litigation Trust, (c) the Debtors or the Estates from

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Settlement and Stay Relief Term Sheet*, to which this exhibit is attached (the "**FILO Settlement Term Sheet**"), or **Annex 1** attached hereto, as applicable.

the Retained FILO Claim (including, without limitation, any liens securing the Retained FILO Claim), (d) any rights or obligations of any party or Entity under the Approval Order, the FILO Settlement Term Sheet, the Plan Support Agreement Term Sheet, any definitive document related to the FILO Settlement or the Plan Support Agreement Term Sheet, or any other document, instrument, or agreement executed to implement the Plan or the transactions contemplated by the FILO Settlement, or (e) any Intercompany Claims; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party.  For the avoidance of doubt, no Person or Entity not (i) expressly identified on the list of Individual Released Parties, or (ii) defined as a Released Party, shall be deemed to be granted a release hereunder, regardless of whether such Person or Entity is specifically identified on <u>Schedule 2</u> hereof.

**Annex 1**

**Defined Terms**

*2016 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in October 2016 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2020 Transactions* means, individually and/or collectively, (a) the transactions that were entered into and/or occurred in or about May 2020 pursuant to which: (i) Manolete Health, LLC purchased Steward Healthcare International Holdings Ltd. from Steward Health Care System LLC, (ii) Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**") contributed real properties to MPT of Utah-Steward, LLC (together with its subsidiaries, the "**Utah JV**") for common equity interests in the Utah JV and subsequent cash distributions from the Utah JV, and the Utah JV leased such real properties back to Jordan Valley and Davis, and (iii) Cerberus Operations and Advisory Company exchanged its equity in Steward Healthcare Investors LLC for a $350 million convertible note, and (b) all other transactions related thereto, including any transactions in what was referred to at the time as Project Easter.

*2021 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in January 2021 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2022 Transaction* means the transaction or transactions entered into on or about May 31, 2022 (and certain other dates in 2022) by and among, among others, Sparta Merger Sub I Inc., Sparta Merger Sub II Inc., Sparta Merger Sub III Inc., Sparta Merger Sub I LLC, Sparta Merger Sub II LLC, Sparta Merger Sub III LLC, Sparta Sub Inc., SNCN Holdco Inc., SICN Holdco Inc., Steward Integrated Care Network, Inc., Steward Accountable Care Network, Inc., Steward Health Care Network Inc., Sparta Holding Co. LLC, Steward Health Care System LLC and CareMax, Inc. pursuant to which certain value-based care assets were transferred to Sparta Holding Co. LLC and acquired by CareMax, Inc., and all other transactions related thereto or included therein (including any dividends, distributions, and/or allocations paid, made, and/or issued in 2022 in connection with and/or following such transaction(s), and any subsequent transfer of the proceeds thereof or arising therefrom).

*Affiliate* means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

*Cause of Action* means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise. For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or

Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any Avoidance Actions.

*Chapter 11 Case* means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

*Chief Restructuring Officer* means John R. Castellano, in his capacity as Chief Restructuring Officer of each of the Debtors.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code.

*Creditors' Committee* means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

*Debtor Related Parties* means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*FILO DIP Order* means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

*FILO Parties* means, collectively, the Prepetition Bridge Agent, the FILO Bridge Lenders, the FILO DIP Secured Parties, the Prepetition FILO Agent, and the FILO Lenders (each as defined in the FILO DIP Order), in each case in their capacities as such, and the Litigation Funding Agent and the providers of the Litigation Funding in their capacities as such.

*FILO Settlement* means the settlement embodied in the FILO Settlement Term Sheet.

*Final Order* means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired.  However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

*Governmental Unit* has the meaning set forth in section 101(27) of the Bankruptcy Code.

*Hospital Debtors* means all Debtors, other than, for the avoidance of doubt, Steward Health Care Holdings LLC and Steward Health Care System LLC, that held or owned a license to operate a hospital at any time during the Chapter 11 Cases.

*Identified Non-Released Parties* means (i) the Persons and Entities listed on **Schedule 2** annexed hereto, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions  or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

*Individual Released Parties* means the individuals listed on the **Schedule 1** annexed hereto, each in their capacity as a current or former director, officer, manager, employee, advisor, or consultant of one or more of the Debtors.

*Interest* means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and whether fully vested or vesting in the future, including

any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor.

**Intercompany Claim** means any pre- or postpetition Claim against a Debtor held by another Debtor.

**Investigation Subcommittee** means the subcommittee of the Transformation Committee, consisting of Alan J. Carr and William Transier.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Person** means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

**Petition Date** means May 6, 2024.

**Plan Administrator Committee** means a committee comprised of Monica Blacker, Alan J. Carr, and William Transier.

**Plan Support Agreement Term Sheet** means the Plan Support Agreement Term Sheet referred to in the FILO Settlement Term Sheet and executed in connection therewith.

**Plane Sales** means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

**Prepetition Transactions** means the (i) 2016 Distribution, (ii) 2020 Transactions, (iii) 2021 Distribution, (iv) 2022 Transaction, and (v) the Plane Sales.

**Related Parties** means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, and (b) the Litigation Trust and the Litigation Trustee; (iii) each of the following, solely in their capacities as such, (a) the Creditors' Committee and each of its members, and (b) the FILO Parties; and (iv) with respect to each of the foregoing Entities identified in the immediately preceding clauses (ii) or (iii), such Entities' Related Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Released Party.

**Representative** means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

**Transformation Committee** means the special committee of the board of managers of Steward Health Care Holdings LLC comprised of Alan J. Carr, John R. Castellano, and William Transier.

## Exhibit A

### Individual Released Parties

- Alan Carr
- Ann-Marie Driscoll
- Carlos Hernandez
- David Barnhardt
- Eugene (Jay) Sullivan
- Gail Schlesinger
- General H.R. McMaster
- Henry (Nick) Nickells
- Jeffrey Morales
- Jennifer Hunt
- John Boehner
- John Castellano
- Joseph Weinstein
- Katchena Potter
- Mary Beth Taylor
- Nathalie Hibble
- Octavio Diaz
- Patrick Lombardo
- Rich Iannessa
- Sr. Vimala Vadakumpadan
- Susan Brown
- William Transier

## Schedule 2

### Identified Non-Released Parties

- Alessandra Pace
- Armin Ernst
- Brian Carty
- Christopher Dunleavy
- Craig Jesiolowski
- David Chicoine
- David Friend
- David Morales
- Herbert Holtz
- James Karam
- James Lenehan
- Jill Moretto
- John Polanowicz
- Joseph Ciccolo
- Joseph Maher
- Joshua Putter
- Mark Girard
- Mark Rich
- Michael Callum
- Miroslav Boyanov
- Nadine Delicata
- Ralph de la Torre
- Robert Guyon
- Ruben King-Shaw Jr.
- Sanjay Shetty

- 5326 Old Buena Vista Road LLC
- Ad Astra Per Aspera LLC
- CareMax, Inc.
- Cayman TRS Holdings
- Cerberus Capital Management, L.P.
- Cerberus International II Master Fund LP
- Cerberus Partners II LP
- Cerberus Series Four Holdings LLC
- de la Torre Foundation
- de la Torre Family Foundation
- Management Health Services Colombia S.A.S.
- Management Health Services LLC
- Manolete Health Investors LLC
- Manolete Health LLC
- Medical Properties Trust, Inc.
- MPT Sycamore Opco LLC
- Ralph de la Torre Revocable Trust
- RDLT – SHCI Investor LLC
- RDLT – SHCI Manager LLC
- Sagamore Capital Management, LLC
- Santa Clara Holdings LLC
- Sparta Holding Co. LLC
- Steward Health Care International
- Steward Health Care International (Malta) Ltd
- Steward Health Care International Colombia S.A.S.
- Steward Health Care Investors LLC
- Steward Health Care International Investors LLC
- Steward Health Care International Kingdom of Saudi Arabia, S.L.
- Steward Health Care International Ltd
- Steward Health Care International S.L
- Steward Malta Assets Ltd
- Steward Malta Ltd
- Steward Malta Management Ltd
- Steward Malta Personnel Limited
- Steward Management Holdings LLC
- Tenet Healthcare Corporation
- TRACO International Group S. DE R.L.

**Exhibit D**

**Medical Liability Claims Procedures**

# MEDICAL LIABILITY CLAIM PROCEDURES[1]

The Estate Representative shall adopt and implement the below procedures (the "**Medical Liability Claim Procedures**") for reviewing and liquidating all unliquidated claims against the Debtors arising out of or related to alleged negligence in connection with the rendering of medical care arising prior to the Effective Date (the "**Debtor Medical Liability Claims**"). The below procedures will allow and permit the Estate Representative to make determinations as to the allowance of asserted Debtor Medical Liability Claims, including the allowed amount thereof (the "**Allowed Claim Amount**"). The Estate Representative shall administer the Medical Liability Claim Procedures with the goals of securing the just, speedy, and cost-efficient determination of allowance of every Debtor Medical Liability Claim, and providing substantially similar treatment to all holders of Debtor Medical Liability Claims.

Subject to the procedures and conditions set forth below, the Estate Representative shall have the authority to determine the allowance of any Debtor Medical Liability Claim. Pursuant to that authority, the Estate Representative may investigate any Debtor Medical Liability Claim and may request information from any holder of a Debtor Medical Liability Claim to ensure compliance with the terms outlined herein. Subject to section [6.11] of the Plan, the Estate Representative shall retain all property, rights, privileges and defenses of the Debtors with respect to all Debtor Medical Liability Claims. The Estate Representative shall have the authority to compromise, settle, withdraw, or otherwise resolve any Debtor Medical Liability Claims without approval of the Bankruptcy Court in accordance with these Medical Liability Claim Procedures. Any finding or determination by the Estate Representative with respect to a Debtor Medical Liability Claim shall not be binding or used for any other purpose other than allowance of the Debtor Medical Liability Claim for distribution purposes under the Plan.[2]

## Procedures

Debtor Medical Liability Claims will be classified into the following categories for consideration and determination under these Medical Liability Claim Procedures:

**Debtor Medical Liability Claims Asserted in the Amount of $350,000 or Less**: If a holder has filed a proof of claim by the applicable Bar Date asserting a Debtor Medical Liability Claim arising prior to the Petition Date in the amount of $350,000 or less, such Debtor Medical Liability Claim shall automatically be deemed Allowed for purposes of distribution under the Plan; <u>provided</u> that such holder has submitted reasonable documentation in support of such Debtor Medical Liability Claim, as determined by the Estate Representative or their designee, each in their sole discretion. The Estate Representative will provide such holder notice that their Debtor

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and its Affiliated Debtors* (Docket No. 4743) (including all exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Plan**").

[2]   In all instances, the Estate Representative will treat all individual and collective claim related information in accordance with existing HIPAA Privacy Rules and standards of care.

Medical Liability Claim has been deemed Allowed in the amount asserted in the timely filed proof of claim. For purposes of this category, the Estate Representative reserves the right to exclude any amended proofs of claim filed after the applicable Bar Date.

For holders of Debtor Medical Liability Claims asserted in the amount of $350,000 or less that have not submitted sufficient documentation in their timely filed proofs of claim, such holders will be notified by the Estate Representative that they will have one hundred and eighty (180) days to provide any additional information necessary to the Estate Representative to substantiate such claims. Absent submission of such sufficient documentation by the applicable deadline, such Debtor Medical Liability Claim shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

**Debtor Medical Liability Claims Asserted in an Amount Greater Than $350,000**: After the Confirmation Date, the Estate Representative will send a form (the "**Claim Form**") to all holders who have asserted Debtor Medical Liability Claims in an amount greater than $350,000 or in an unliquidated amount in a timely filed proof of claim. Each such holder shall complete and submit the Claim Form within one hundred and eighty (180) days of service of such form.[3] The Claim Form shall provide holders of Debtor Medical Liability Claims with two options:

> **Option 1: Claim Reduction Election**. Holders of Debtor Medical Liability Claims may agree and stipulate to an Allowed Claim Amount of $350,000 (the "**Claim Reduction Election**"); provided that such Allowed Claim Amount shall solely be for purposes of allowance of their Claim in the Chapter 11 Cases and distributions under the Plan. For the avoidance of doubt, treatment of such Debtor Medical Liability Claim and distributions on account thereof shall solely be determined by the Plan. The Claim Reduction Election shall not be available to holders who have asserted Debtor Medical Liability Claims in an unliquidated amount.

> **Option 2: Claim Determination**. Holders of Debtor Medical Liability Claims may elect to participate in a claim review process as follows:

> > **Phase 1: Initial Claim Determination Process**. If a holder of a Debtor Medical Liability Claim does not make the Claim Reduction Election, such holder must demonstrate the following in its Claim Form:

> > > a. **Claim Validity Requirements**. A holder must demonstrate:

> > > > i. The holder received negligent medical care from (a) a Debtor or (b) any individual whose negligent provision of medical care is the legal responsibility of a Debtor;

> > > > ii. Such negligent medical care was the proximate cause of the holder's alleged damages; and

> > > > iii. The holder filed a Proof of Claim on or before the applicable Bar Date.

---

[3] It shall be the responsibility of the holder of the Debtor Medical Liability Claim to provide the Estate Representative with any change of address or contact information.

b. **Claim Evidence**. A holder may demonstrate a qualifying Debtor Medical Liability Claim by submitting to the Estate Representative:

   i. Medical records substantiating the medical treatment received and alleged injuries suffered by the holder as a result of such medical treatment or services;

   ii. Medical bills and other records (e.g., paystubs, receipts, hospital records, insurance records, any applicable funeral or burial expenses) substantiating any economic damages alleged by the holder;

   iii. A sworn statement by a qualified physician establishing that (i) he or she personally examined the holder's medical records and/or the holder, and (ii) based upon that examination, he or she believes to a reasonable degree of medical certainty that the holder's alleged damages were proximately caused by the negligent provision of medical care; and

   iv. Any other credible evidence that tends to establish the existence of an alleged injury and/or economic damages, including, but not limited to, the following information:

      1. Evidence of the holder's condition at the time of the alleged injury;

      2. The nature of the holder's or decedent's alleged bodily injury;

      3. The duration of any medical, mental health, or rehabilitative treatment;

      4. The holder's or decedent's age;

      5. The holder's or decedent's employment history;

      6. The holder's or decedent's medical history;

      7. A death certificate, if the claim is presented for a deceased individual;

      8. Affidavits from holder, heirs, or others with personal knowledge, describing the timing, length and circumstances of holder's or decedent's injuries; and

      9. Whether the holder or decedent had a surviving spouse, parents, or dependents, and if so, the age of those dependents.

   v. A holder must also submit the following information, if available, to the Estate Representative:

      1. Information that might suggest the existence of another source or condition that may have caused or contributed to any injuries;

      2. The potential liability of other entities or persons for some or all of the holder's injuries or damages and any compensation

3

and recoveries, of any kind, received from any person or entities connected to holder's injuries; and

3. Copies of all claims, complaints, proofs of claim, notices, settlement documents, releases, recoveries, compensation received, or similar documents that holder submits or entered into in respect of claims asserted against or to be asserted against any other entity or person arising from or related to holder's or decedent's injuries that underlie the Debtor Medical Liability Claim presented to the Estate Representative; provided that, to the extent that additional such documents or evidence becomes available to the holder after his or her claim submission and before the Estate Representative determines the allowance of the Debtor Medical Liability Claim, the holder shall supplement his or her claim with such additional evidence.

vi. The holder may submit such additional information that the holder believes will assist the Estate Representative determine that the holder has satisfied the Claim Validity Requirements.

vii. The Estate Representative may request additional information as reasonably necessary in the opinion of the Estate Representative to determine the allowance of a Debtor Medical Liability Claim. The holder shall provide such additional information so that it is received by the Estate Representative within fourteen (14) days of such request.

c. **Claim Determination.** The Estate Representative or its advisors shall evaluate each submission individually and will follow the guidelines set forth above to determine, based on the information obtained, (a) whether or not a submitted Debtor Medical Liability Claim is Allowed or is disallowed and (b) to the extent Allowed, the corresponding Allowed Claim Amount (such determination, the "**Claim Determination**"). The Allowed Claim Amount shall be determined by the Estate Representative to replicate to the extent possible the amount a reasonable jury might award for the Debtor Medical Liability Claim, taking into account the relative shares of fault that may be attributed to any parties potentially responsible for the Debtor Medical Liability Claim under applicable law and applying the same standard of proof that would apply under applicable law. In no circumstances shall the Estate Representative assign any claim value for any punitive damages, exemplary damages, statutory enhanced damages, attorney's fees or costs, or claims presentation-related expenses. If the holder accepts the Allowed Claim Amount, it becomes the final determination of the claim.

d. **Appeal to Mediation.** If the Claim Determination is not satisfactory to the holder, the holder may request to proceed to mediation. A holder must submit notice to the Estate Representative of its intent to appeal the Claim Determination through mediation within thirty (30) days of receipt of the

Claim Determination, otherwise the holder shall be deemed to have accepted the Claim Determination and such claimant's Debtor Medical Liability Claim shall be Allowed in the amount of the Claim Determination without further action by the parties or the Bankruptcy Court.

**Phase 2: Mediation**. If the Initial Claim Determination Process does not result in a Claim Determination satisfactory to a holder and a notice of appeal of the Claim Determination is timely provided to the Estate Representative, the Estate Representative and the holder shall proceed to non-binding mediation ("**Mediation**") no earlier than one hundred and eighty (180) days after the Estate Representative's receipt of such holder's notice of appeal (unless the Estate Representative agrees to an earlier date). The Estate Representative shall serve a mediation referral notice on the American Arbitration Association (the "**AAA**"). The Mediation shall conclude within one hundred and twenty (120) days following appointment of a mediator (the "**Mediator**"). The Mediation will be conducted remotely via Zoom or similar platform, unless another location is mutually agreed to by the holder and the Estate Representative. In Mediation, the Mediator shall consider the same evidentiary requirements as set forth above.

    a. **Appointment of a Mediator**.

        i. Within sixty (60) days after the referral to mediation has occurred, the AAA shall prepare a list of five potential mediators from its panel. The Estate Representative and the holder shall each be permitted to strike two names from the list within five (5) days of receiving the list. The AAA shall appoint the Mediator from the remaining names and send immediate notice of such appointment and the location and time of the mediation conference to the Estate Representative and the holder. All Mediators shall be impartial and neutral. No Mediator shall have any financial or personal interest in or relation to the proceedings or, except where otherwise agreed by the parties, in any related matters.

    b. **Conduct of Mediation**.

        i. No written discovery shall be permitted unless mutually agreed to by the parties, provided that any information submitted in the Initial Claim Determination Process shall be permitted to be considered by the Mediator in the Mediation.

    c. **Fees and Costs of Mediation**.

        i. Mediation fees shall be divided evenly between the holder and the Plan Trust. Each party shall bear the expense of its own counsel and all other costs.

    d.  **Mediation Report**.

        i.  At the conclusion of the Mediation or the final adjournment after any continuation thereof, the parties shall sign a written report (the "**Mediation Report**") before the Mediator stating:

            1.  That the holder and the Estate Representative have completed the Mediation in good faith and otherwise complied with the Mediation procedures set forth herein; and either:

                a.  That the Debtor Medical Liability Claim has been settled and the terms of the settlement; or

                b.  That the holder intends to either (i) subject the Debtor Medical Liability Claim to binding arbitration or (ii) proceed with liquidating the Debtor Medical Liability Claim in the tort system.

**Phase 3(a): Binding Arbitration**.  If, at the conclusion of Mediation, the claimant elects to subject the Debtor Medical Liability Claim to arbitration ("**Arbitration**"), an Arbitration hearing shall be held following appointment of an arbitrator (the "**Arbitrator**").  In Arbitration, the Arbitrator shall consider the same evidentiary requirements set forth above.

    a.  **Conduct of Arbitration**.

        i.  The Arbitration shall be conducted in accordance with applicable law and shall be governed by the Federal Arbitration Act, Title 9, United States Code.  Except as otherwise provided herein or as otherwise agreed by the parties, the Arbitration shall be conducted pursuant to the AAA's Commercial Arbitration Rules.  Those rules provide procedures and guidelines for, among other things, (a) the qualifications and appointment of the Arbitrator, (b) communications with the Arbitrator, (c) preliminary exchange of information, (d) the introduction of evidence, and (e) the time, form, and scope of the arbitration award.

        ii.  No written discovery shall be permitted unless mutually agreed to by the parties.

        iii.  Requests for documents shall be required to be made at least thirty (30) calendar days before the hearing to the Arbitrator, who shall rule on the requests within five (5) days and only grant the requests if clearly relevant and necessary.  If a request is granted, documents are required to be produced within ten (10) calendar days from the Arbitrator granting the request.

        iv.  The Arbitrator shall have sole discretion as to whether depositions can be taken; provided that, to the extent the Arbitrator allows depositions, such depositions must be limited to two (2) hours and each party may only request to depose up to two witnesses.

     v.  The claimant and Estate Representative each must submit a five (5) page pre-arbitration statement at least seven (7) days prior to the Arbitration. Each party shall be granted ninety (90) minutes, including any rebuttal, within which to present its position. The Arbitration shall be conducted remotely via Zoom or similar platform, unless another location is mutually agreed to by the claimant and the Estate Representative. No post-arbitration briefs shall be permitted.

b. **Fees and Costs of Arbitration**.

     i.  Arbitration fees shall be divided evenly between the claimant and the Plan Trust; provided that the Arbitrator may in his or her sole discretion assess the entire cost of Arbitration against any party delaying or abusing the arbitration proceedings. Each party shall bear the expense of its own counsel, experts, witnesses, prosecution, and all other costs.

c. **Arbitration Award**.

     i.  The arbitral award must be written and shall be binding and shall be within the discretion of the Arbitrator, but in no event shall the award exceed the claimed amount of the Debtor Medical Liability Claim set forth in the claimant's Claim Form or Proof of Claim, whichever is lower. Neither party shall have the right to appeal the award except on the grounds set forth in the Federal Arbitration Act. There will be no right to a trial *de novo*.

**Phase 3(b): Tort System Alternative**. Holders, who at the conclusion of Mediation elect to proceed with liquidating their Debtor Medical Liability Claim in the tort system, retain the right to institute or continue a lawsuit in the tort system against the Estate Representative in the appropriate jurisdiction. Upon such an election, the automatic stay shall be deemed modified, without further order of the Bankruptcy Court, to allow the holder to proceed against the Estate Representative in the tort system for the sole purpose of liquidating his or her Debtor Medical Liability Claim. For the avoidance of doubt, no holder shall be granted relief from the automatic stay to commence or continue any action, suit or trial, to proceed with discovery, or to pursue its Debtor Medical Liability Claim in a non-bankruptcy forum until the holder has completed the Medical Liability Claim Procedures. Any lawsuit in the tort system must be filed by the holder in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses shall be available to both sides at trial. The final judgment obtained in the tort system shall determine the Allowed Claim Amount that is eligible for distribution from the Plan Trust in accordance with the Plan.

    **Allowed Amounts**. Any Debtor Medical Liability Claim that is Allowed, as determined pursuant to these Medical Liability Claim Procedures, shall be treated in accordance with the Plan confirmed and implemented in the Debtors' Chapter 11 Cases.

**Ability to Settle Debtor Medical Liability Claims**.  Nothing herein shall limit the ability of a holder and the Estate Representative to settle a Debtor Medical Liability Claim by mutual agreement at any time.  All such settlements shall be subject to the terms set forth herein.

**Failure to Comply with the Medical Liability Claim Procedures**.  If a holder fails to comply with the Medical Liability Claim Procedures, negotiate in good faith, or cooperate with the Estate Representative as may be necessary to effectuate the Medical Liability Claim Procedures, the Bankruptcy Court may, after notice and a hearing, find such conduct to be in violation of the Confirmation Order, an abandonment of, or failure to prosecute, the Debtor Medical Liability Claim.  Upon such findings, the Bankruptcy Court may, among other things, disallow and expunge the Debtor Medical Liability Claim, in whole or in part, or grant such other or further remedy deemed just and appropriate under the circumstances, including, without limitation, awarding attorneys' fees and other fees and costs to the Estate Representative.

**EXHIBIT B**

**Plan Support Agreement Term Sheet**

## PLAN SUPPORT AGREEMENT TERM SHEET

### April 28, 2025

This Term Sheet sets forth the substantive terms pursuant to which the FILO Parties and the Unsecured Creditors Committee ("UCC") will support a plan of liquidation to be filed by the Debtors.

### Support by FILO Lenders

1. The FILO Parties will support, not object to, and not interfere with, and, if they are properly solicited with an approved disclosure statement, will vote for a proposed plan (including not opting out of releases) that:

   a. Leaves unaltered in all material respects the Litigation Trust as set forth in the *Settlement and Stay Relief Term Sheet* (the "FILO Settlement Term Sheet") and is otherwise consistent with the FILO Settlement Term Sheet.

   b. Provides for releases of the FILO Parties, their officers, directors, owners, professionals and agents with respect to acts or omissions through the date of confirmation of the plan by the Bankruptcy Court (the "Confirmation Date") and the plan effective date, in each case, that are consistent in substance with the releases attached to the FILO Settlement Term Sheet.

   c. Provides that administration of the Debtors' estates or any successor(s) thereto (collectively, the "Estate") will transfer to an oversight committee comprised of Alan Carr, William Transier, and Monica Blacker (the "Administrator Committee") on the Confirmation Date. The FILO Parties will have the right to consent to any successor to the Administrator Committee that is not (A) a Chapter 7 trustee or (B) a plan trust overseen by the members of the Administrator Committee (including the terms of any such successor's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

      i. The Administrator Committee shall have exclusive governance rights of the Estate, subject to appropriate Bankruptcy Court approvals.

      ii. The Administrator Committee shall retain independent counsel ("Administrator Counsel"). The Debtors and the

UCC agree to use commercially reasonable efforts to identify and transition work that could be transitioned to Administrator Counsel prior to the Confirmation Date. The FILO Parties shall be kept informed on the progress of selection of Administrator Counsel.

iii. The budget for the Administrator Committee's costs and expenses, as well as the budget to administer the Estate following the Confirmation Date (along with the Pre-TED Professional Fee Estimates) shall be acceptable to the UCC and the Debtors (for the avoidance of doubt, subject to the FILO Settlement Term Sheet, including the FILO Parties' budget consent rights).

d. Repays the balance of the Retained FILO Claim (as defined in the FILO Settlement Term Sheet), after the date on which the Plan becomes effective, by paying such claim:

i. With interest at 7% per annum;

ii. Junior in priority only to all administrative, other secured and priority claims;

iii. Out of 10% of all distributions otherwise payable to the general unsecured creditors.

e. Is consistent with all of the requirements of paragraphs 3 – 5 of this Term Sheet.

**Support by Unsecured Creditors Committee**

2. The Unsecured Creditors Committee will support a proposed plan that:

a. Is consistent with all of the requirements of paragraph 1 of this Term Sheet.

b. Establishes a fund, in an amount to be agreed by the Debtors and the UCC of up to $15,000,000 to be administered as follows:

i. The funds will be available to pay administrative claimants up to 50% of their allowed claims pursuant to an

administrative claims consent program on terms and conditions acceptable to the UCC and the Debtors.

ii. The payments to the administrative claimants will be paid only if so authorized in a confirmed plan.

iii. If a plan is not confirmed by August 1, 2025, the funds will no longer be available to pay administrative claims.

c. Provides for the Debtors to use up to $2.5 million, as agreed upon by the Debtors and the UCC, of the Retained Cash (as defined in the FILO Settlement Term Sheet) to fund the administration of the Estate after the Confirmation Date.

d. The proceeds of the Class B interests shall be paid, or the Class B interests distributed, in each case, in accordance with the confirmed Plan; provided that the treatment of, and procedures for liquidating, medical malpractice claims shall be negotiated among the Debtors and the UCC.

e. Contains releases and exculpations for the UCC, its professionals, and its members (solely in their capacities as UCC members).

**ADDITIONAL AGREMENTS TO FACILITATE CONFIRMATION**

3. Through the Trust Establishment Date, the costs and expenses incurred by professionals retained by the Debtors, the UCC, and the FILO Parties listed on the "Pre-TED Professional Fee Estimates" agreed to by each of the Debtors, the UCC, the FILO Parties, and the applicable professionals that have agreed as noted thereon, shall be subject to the following terms.

a. 10% of all allowed fees incurred between April 1, 2025, and the Trust Establishment Date shall be deferred in accordance with the terms herein (the "Deferred Fees").

b. With respect to any (i) Estate professional fees or (ii) fees payable to Milbank or Houlihan under the FILO DIP Order, in each case, that are consistent (on an aggregate basis by firm) with the Pre-TED Professional Fee Estimates ("Estimated Fees"), such Estimated Fees (other than Deferred Fees) shall be paid consistently with, as applicable, (i) the existing interim compensation order and fee escrow structure or (ii) the FILO DIP Order.

       i.    To the extent that, with respect to any firm, the actual fees incurred in any month are less than the amount set forth in the Pre-TED Professional Fee Estimates for that month, the amount of such variance will roll forward and increase the budgeted amount for such firm in the following month.

      ii.    To the extent that, with respect to any firm, the actual fees incurred in any month exceed the amount set forth in the Pre-TED Professional Fee Estimates for that month, the amount of such variance can be carried forward and satisfied in future months to the extent there is availability in the Pre-TED Professional Fee Estimates for such future months.

c.  The Deferred Fees and any fees in excess of the Pre-TED Professional Fee Estimates that are allowed or otherwise payable under the FILO DIP Order ("Unestimated Fees") shall be payable as follows:

       i.    While the FILO Balance is in an Underpayment State (as defined in the FILO Settlement Term Sheet), the Deferred Fees and Unestimated Fees shall be deferred until paid pursuant to (ii), (iii), or (iv) below.

      ii.    If the FILO Balance is not in an Underpayment State, 25% of any amount otherwise payable to (i) the holders of the Class A-2 interests, and (ii) on and after December 1, 2025, the Class A-1 interests, shall be used to pay unpaid Deferred Fees and Unestimated Fees on a pro rata basis.

     iii.    Upon the effectiveness of any confirmed plan, any unpaid Unestimated Fees or Deferred Fees will be payable from Estate assets pursuant to the terms of the confirmed plan.

     iv.    If the FILO Balance is less than $25 million, any unpaid Unestimated Fees or Deferred Fees will be paid on a pro rata basis from any available proceeds that would otherwise be payable to the holders of Class A-1 interests as Variable Component (provided that such Variable Component shall be payable with the next proceeds received following repayment in full of such unpaid Unestimated Fees and Deferred Fees).

4.  The parties shall negotiate in good faith definitive documentation, including Plan, Disclosure Statement, Disclosure Statement Approval Order, and Plan Confirmation Order. Counsel to the Debtors, the UCC, and

the FILO Parties to agree on allocation of drafting responsibility and a detailed work plan and fee estimates.

5. All transactions contemplated herein shall be implemented in a tax-efficient manner and are subject to review by tax professionals. The transactions contemplated herein will be implemented in a manner that is intended to permit the Debtors to completely liquidate for U.S. federal income tax purposes by August 31, 2025, including by permitting all assets and obligations of the Debtors or the Estate to be transferred on or before such date to a trust or other form of bankruptcy remote entity.

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**STEWARD HEALTH CARE SYSTEM LLC,**
**on Behalf of Itself and its Debtor Affiliates**

By: _____
Name:  John Castellano
Title:  Chief Restructuring Officer

*Signature Page to Plan Support Agreement Term Sheet*

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

For and on behalf of **OneIM Fund I LP, as DIP Lender,** acting by its General Partner, OneIM GP LLC, acting by its Manager, GCT Capital LLC

By: _____
Name: Munish Varma
Title: Authorized Signatory

*Signature Page to Plan Support Agreement Term Sheet*

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**BRIGADE AGENCY SERVICES LLC,** as FILO Agent

By: BRIGADE CAPITAL MANAGEMENT, LP, Its Managing Manager

By: _____
Name: Patrick Criscillo
Title: Authorized Signer

**BIG RIVER GROUP FUND SPC LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE BADGER FUND, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE DIVERSIFIED CREDIT CIT**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE CREDIT FUND II LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Plan Support Agreement Term Sheet*

**BRIGADE HIGH YIELD FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LOAN FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE OPPORTUNISTIC CREDIT LBG
FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Plan Support Agreement Term Sheet*

**BRIGADE-SIERRABRAVO FUND LP**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**CITY OF PHOENIX EMPLOYEES'
RETIREMENT PLAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FEDEX CORPORATION EMPLOYEES'
PENSION TRUST**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FUTURE DIRECTIONS CREDIT
OPPORTUNITIES FUND**,
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Plan Support Agreement Term Sheet*

**JPMORGAN CHASE RETIREMENT PLAN BRIGADE BANK LOAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**SC CREDIT OPPORTUNITIES MANDATE, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**MIDOCEAN CREDIT FUND MANAGEMENT, LP**

By: _____
Name: Damion Brown
Title: Managing Director

**MidOcean Tactical Credit Fund III LP**
By: Tactical Credit Fund III GP, LP
By: Ultramar Credit Holdings Ltd., its General Partner

By: _____
Name: Damion Brown
Title: Managing Director

**MidOcean Multi Asset Credit Fund, LP**
By: MidOcean Multi Asset Credit Fund GP, LLC its General Partner

By: _____
Name: Damion Brown
Title: Managing Director

**Abbott Abbvie Multiple Employer Pension Plan Trust**

By: _____
MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

**Abbott Laboratories Annuity Retirement Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**OWL CREEK INVESTMENTS I, LLC**

By: OWL CREEK ASSET MANAGEMENT, LP
as Investment Manager

By:
Name: Kevin Dibble
Title:  General Counsel

*Signature Page to Plan Support Agreement Term Sheet*

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**WHITEHAWK FINANCE LLC**
By: WHITEHAWK CAPITAL PARTNERS, LP, as Investment Manager


By: _____
Name: Robert Louzan
Title: Managing Partner

*Signature Page to Plan Support Agreement Term Sheet*

IN WITNESS WHEREOF, this Plan Support Agreement Term Sheet is duly executed as of the date first set forth above.

**The Official Committee of Unsecured Creditors**, solely in its representative capacity, and not on behalf of any individual member thereof

By: _/s/ Brad M. Kahn_
Name:  Brad M. Kahn
Title:  Partner

Akin Gump Strauss Hauer & Feld LLP, in its capacity as counsel to, and authorized signatory for, the Official Committee of Unsecured Creditors of Steward Health Care System, LLC, _et al_.

**EXHIBIT C**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS[1]

## Introduction

To demonstrate that the Plan satisfies the "best interests of creditors" test, the Debtors, with the assistance of their restructuring advisors, AP Services LLC, an affiliate of AlixPartners, LLP, have prepared a hypothetical liquidation analysis (the "**Liquidation Analysis**"), which is based upon certain assumptions discussed in the Disclosure Statement and accompanying notes to the Liquidation Analysis.

The Liquidation Analysis sets forth an estimated range of recovery values for each Class of Claims and Interests under the Plan upon disposition of the Debtors' assets pursuant to a hypothetical chapter 7 liquidation. Accordingly, and as set forth in greater detail below, the Debtors believe that the Plan satisfies the "best interests of creditors" test set forth in section 1129(a)(7) of the Bankruptcy Code.

## Statement of Limitations

The preparation of a liquidation analysis is an uncertain process involving the use of estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive risks, uncertainties and contingencies, most of which are difficult to predict and many of which are beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. Without limiting the generality of the foregoing, the estimates included in the Liquidation Analysis for post-petition administrative tax claims are based on a variety of assumptions, which may differ materially from the results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated and distributed in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis and values stated herein have not been subject to any review, compilation, or audit by any independent accounting firm. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. As a result, the actual amount of claims that would ultimately be Allowed against the Debtors' estates could vary significantly from the estimates stated herein, depending on the nature and amount of claims asserted during the pendency of the chapter 7 case. Similarly, the value of the Debtors' assets in

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

a liquidation scenario is uncertain and could vary significantly from the values set forth in the Liquidation Analysis.

The Liquidation Analysis should not be used for any other purpose. The Liquidation Analysis does not include estimates for: (i) certain claims that may be entitled to priority under the Bankruptcy Code, including certain administrative priority claims under sections 503(b) and 507(b) of the Bankruptcy Code, or (ii) additional unsecured and contract breakage claims arising from a chapter 7 liquidation. More specific assumptions are detailed in the notes below. ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT, IN WHOLE OR IN PART, APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED HEREIN. THE ACTUAL LIQUIDATION VALUE OF THE DEBTORS IS SPECULATIVE AND RESULTS COULD VARY MATERIALLY FROM ESTIMATES PROVIDED HEREIN.

In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Expense Claims and chapter 7 administrative claims such as wind-down costs and trustee fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

**Basis of Presentation**

This Liquidation Analysis has been prepared assuming that the Debtors' chapter 11 cases are converted to chapter 7 cases on or about July 9, 2025 (the "**Liquidation Date**"), which is after the FILO Settlement has been consummated, including the creation of the Litigation Trust and the transfer of substantially all of the Debtors' assets free and clear to the Litigation Trust (to the fullest extent permissible by applicable law).  It is assumed that on the Liquidation Date, the Bankruptcy Court would appoint a chapter 7 trustee to oversee the liquidation of the Debtors' estates.  The Debtors' assets that have been transferred to the Litigation Trust would be monetized through that Litigation Trust with proceeds distributed to the holders of Class A-1 Interests, Class A-2 Interests, and Class B Interests in accordance with the waterfall structure for the Litigation Trust. To the extent there is any distribution to Class B Interests in the Litigation Trust, that value would be available for distribution by the chapter 7 trustee.

The timeframe associated with the Liquidation Analysis is uncertain and there is no assurance that the recoveries assigned to the Class B Interests would in fact be realized.  Under section 704 of the Bankruptcy Code, a trustee must, among other duties, collect and convert the property of the estate as expeditiously (generally in a distressed process) as is compatible with the best interests of parties-in-interest.

The Liquidation Analysis is based on estimated asset and liability values as of the Liquidation Date (except as otherwise indicated).  The actual assets available for distribution to the Debtors' estates and claims arising in the event of an actual liquidation may differ from the assets assumed to be available pursuant to the Liquidation Analysis.

The Debtors have neither fully evaluated all claims filed against the Debtors or adjudicated all such claims before the Bankruptcy Court.  Accordingly, the amount of the total Allowed Claims against the Debtors' estates may differ from the claim amounts used in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of books and records and a review of claims asserted against the Debtors to account for estimated liabilities.

In addition, in the event of a chapter 7 liquidation, it is possible that a chapter 7 liquidation would result in increased costs and expenses arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee.  This Liquidation Analysis assumes that the Debtors' costs of liquidation under chapter 7 includes the fees payable to the chapter 7 trustee as well as those fees that might be payable to attorneys and other professionals that the chapter 7 trustee might engage.  Other liquidation costs include the expenses incurred during the chapter 11 cases that are allowed as administrative Claims in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and statutory committees appointed in the chapter 11 cases and costs and expenses of members of such committees, as well as other compensation Claims.  The foregoing types of Claims, costs,

expenses, fees, and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims, or available for distribution to the holders of Interests.

Moreover, as of the Liquidation Date, the total distributable assets will already be held in the Litigation Trust, whereby the Estate or its successors, including any chapter 7 trustee, will only hold Class B Interests. In accordance with the terms of the FILO Settlement, if the Plan is not confirmed, and the chapter 11 cases are instead converted to chapter 7, $15 million of Retained Cash will no longer be available to the Estate, thus the distributable assets immediately falls by $15 million, including the $12.5 million for the Administrative Expense Claims Consent Program previously made available to the Debtors for satisfying Allowed Administrative Expense Claims. Moreover, under a chapter 7 liquidation, the total amount of the Allowed Administrative Expense Claims will not be reduced as a result of the settlements that would have otherwise been achieved under the Administrative Expense Claims Consent Program pursuant to the Plan. Additionally, in accordance with the terms of the FILO Settlement, if the Plan is not confirmed, the entire Post-FILO Repayment Variable Component will be paid in full in cash upon receipt of the applicable Trust Litigation Proceeds, rather than 37.5% of the Post-FILO Repayment Variable Component being subordinated to administrative and priority claims.

In addition, the Debtors believe that a chapter 7 liquidation may also result in increased post-petition tax Claims, which would be administrative claims senior to the unsecured claims.

Accordingly, the Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of: (1) the likelihood that the assets would have to be sold or otherwise disposed of over a short period of time; (2) potential additional administrative expenses required for the appointment of a chapter 7 trustee, including a 3% trustee fee, along with other inefficiencies associated with new professionals representing the chapter 7 trustee; (3) additional expenses and Claims, some of which would be entitled to priority; and (4) the possibility that a conversion to a chapter 7 could result in employees with critical information and know-how leaving the Debtors' estates, resulting in incremental challenges to recoveries for the Litigation Trust and thus the Class B Interests.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in reduced distributable assets, increased expenses, employee attrition, and the prospect of additional claims that were not asserted in the chapter 11 cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

The Liquidation Analysis was prepared on an entity-by-entity basis for the Debtors and is displayed below on a consolidated basis for convenience. Asset recoveries accrue first to satisfy creditor claims at the legal entity in which liabilities have been incurred. Although presented below on a consolidated basis, the "best interests of creditors" test is satisfied for each Debtor entity on a deconsolidated basis.

# DETAILED LIQUIDATION ANALYSIS

The Liquidation Analysis for the Debtors was analyzed on an entity-by-entity basis. The following Liquidation Analysis summary is displayed on a consolidated basis and should be reviewed in conjunction with the associated notes.

| Liquidation Analysis - Summary of Debtors | | | | |
| --- | --- | --- | --- | --- |
| *In $Thousands* | Note: | | Recovery $ Low | Recovery $ High |
| Estimated Value of Class B Interests | [A] | | 94,294 | 204,080 |
| **Total Distributable Assets** | | **$** | **94,294** | **$ 204,080** |
| | | | | |
| **Trustee Administrative Claims** | [B] | $ | 10,829 | $ 16,122 |
| Trustee Administrative Recovery | | | 10,829 | 16,122 |
| *Trustee Administrative Recovery %* | | | *100.0%* | *100.0%* |
| | | | | |
| **Post-Petition Tax Claims** | [C] | $ | 24,461 | $ 28,141 |
| Post-Petition Tax Recovery | | | 19,660 | 28,141 |
| *Post-Petition Tax Recovery %* | | | *80.4%* | *100.0%* |
| | | | | |
| **Pre-Conversion Administrative Claims** | [D] | $ | 126,000 | $ 126,000 |
| Pre-Conversion Administrative Recovery | | | 55,349 | 81,665 |
| *Pre-Conversion Administrative Recovery %* | | | *43.9%* | *64.8%* |
| | | | | |
| **Priority Claims** | [E] | $ | 66,385 | $ 28,857 |
| Priority Recovery | | | - | 662 |
| *Priority Recovery %* | | | *0.0%* | *2.3%* |
| | | | | |
| **General Unsecured Claims** | [F] | $ | 2,464,870 | $ 1,464,643 |
| General Unsecured Recovery | | | 8,456 | 77,489 |
| *General Unsecured Recovery %* | | | *0.3%* | *5.3%* |

## Notes to the Liquidation Analysis

[A] Estimated Value of Class B Interests:  Estimated Value of Class B Interests reflect the estimated value of a chapter 7 trustee's interest in the Litigation Trust.  Importantly, the chapter 7 trustee would not have ready access to capital to fund the winddown of the estate and would need to quickly monetize the Class B Interests to cover estate claims and expenses, including taxes. Given this lack of liquidity, the chapter 7 trustee would likely have to sell its Class B Interests at a significant discount in order to raise the liquidity necessary to meet its obligations.  Accordingly, the Debtors assume that such Class B Interests would be sold at a 50% discount.

[B] Trustee Administrative Claims:  Trustee Administrative Claims reflect that, in a chapter 7 scenario, the trustee will incur incremental administration expenses due to a new chapter 7 trustee and its professionals, including general inefficiencies handing over the estate to a new, uninformed party, as well as the trustees' 3% fee on proceeds.  Trustee Administrative Claims are expected to receive a 100% recovery.

[C] Post-Petition Tax Claims:  Post-petition tax claims consist of approximately $24.5-$28.1 million related to income taxes for the tax years ending on and after August 31, 2025, which will be paid in full prior to any payment of Pre-Conversion Administrative Claims.  The amounts for post-petition tax claims reflect additional post-petition administrative tax claims that the Debtors expect they would incur in a chapter 7 liquidation scenario, which the Debtors anticipate would largely come due in December 2025.[2]  Post-Petition Tax Claims are expected to receive a 80.4% to 100.0% recovery.

[D] Pre-Conversion Administrative Claims:  Pre-Conversion Administrative Claims consist of approximately $18 million of post-petition medical malpractice and workers compensation claims, and approximately $108 million of other post-petition administrative expense claims.  Because under a chapter 7 conversion, the Retained Cash will not be available to fund the Administrative Expense Claim Consent Program, no administrative claim concessions are made for the Pre-Conversion Administrative Claims.  Pre-Conversion Administrative Claims are expected to receive a 43.9% to 64.8% recovery.

[E] Priority Claims:  Priority Claims consist of asserted pre-petition tax claims that have priority under section 507 of the Bankruptcy Code.  Priority Claims are asserted on an entity-level basis. As a result, there are no Priority Claims at certain entities.  Holders of Priority Claims are expected to receive a 0.0% to 2.3% recovery in a chapter 7 liquidation.

[F] General Unsecured Claims:  General Unsecured Claims include deficiency claims from Administrative Claims and Priority Claims (i.e. the Administrative Claims and Priority Claims that would not be satisfied because the liable Debtor entity did not have sufficient asset values to satisfy such claims) and are expected to receive a 0.3% to 5.3% recovery.  The Plan recoveries range from 3.9% to 21.6%.

---

[2]   Under the Plan, the Debtors expect that such income taxes for tax years ending August 31, 2025 and after would either be eliminated or significantly reduced if the Plan Trust is implemented prior to the end of the Debtors' 2024-2025 taxable year (August 31, 2025).

**EXHIBIT D**

**Release, Exculpation, and Plan Injunction Provisions**

12.3        **Pre-Confirmation Injunction and Stays.**

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

As set forth in Section 9.12 of the Plan, following entry of the Confirmation Order, the automatic stay shall remain in effect with respect to all Medical Liability Claims against the Debtors and shall only be modified in accordance with the Medical Liability Claims Procedures. To the extent the automatic stay was previously lifted in the Chapter 11 Cases with respect to any particular Medical Liability Claim, upon entry of the Confirmation Order, the automatic stay shall be reimposed and remain in effect unless or until modified in accordance with the Medical Liability Claims Procedures.

12.4        **Injunction Against Interference with Plan.**

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date.

12.5        **Plan Injunction.**

(a)        Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under Section 12.6(a) or Section 12.6(b) of the Plan, or (ii) subject to exculpation pursuant to Section 12.7 of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 12.7 of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:  (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such

Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to Section 12.6(a) or Section 12.6(b) of the Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b)    Subject in all respects to Section 13.1 of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in Section 13.1 of the Plan, shall have jurisdiction

to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)     By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in this Section 12.5, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

(d)     The injunctions in this Section 12.5 shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

12.6     **Releases.**

(a)     **Releases by the Debtors and their Estates.    Except as otherwise expressly set forth below in this Section 12.6, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into**

in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in this Section 12.6(a) (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with Section 4.6 of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on Exhibit B of the Plan or the Schedule of Identified Non-Released Parties.

(b) **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or

unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in this <u>Section 12.6(b)</u> (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, or (b) any Claims or Causes of Action assertable by or against the FILO Parties arising from a material misrepresentation, or (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)     Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan. PBGC

and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

12.7    **Exculpation.**

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the exculpations in this Section 12.7 shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

12.8    **Waiver of Statutory Limitation on Releases.**

EACH RELEASING PARTY IN EACH OF THE RELEASES CONTAINED IN THE PLAN (INCLUDING UNDER ARTICLE XII OF THE PLAN) EXPRESSLY ACKNOWLEDGES THAT ALTHOUGH ORDINARILY A GENERAL RELEASE MAY NOT EXTEND TO CLAIMS WHICH THE RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE PARTY RELEASED, IT HAS CAREFULLY CONSIDERED AND TAKEN INTO ACCOUNT IN DETERMINING TO ENTER INTO THE

ABOVE RELEASES THE POSSIBLE EXISTENCE OF SUCH UNKNOWN LOSSES OR CLAIMS. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EACH RELEASING PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS CONFERRED UPON IT BY ANY STATUTE OR RULE OF LAW WHICH PROVIDES THAT A RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CLAIMANT DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT MAY HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE RELEASED PARTY, INCLUDING THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542. THE RELEASES CONTAINED IN <u>SECTION 12.6</u> OF THE PLAN ARE EFFECTIVE REGARDLESS OF WHETHER THOSE RELEASED MATTERS ARE PRESENTLY KNOWN, UNKNOWN, SUSPECTED OR UNSUSPECTED, FORESEEN OR UNFORESEEN.

12.9     **Injunction Related to Releases and Exculpation.**

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

**EXHIBIT E**

**Voting Procedures**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

## SOLICITATION AND VOTING PROCEDURES

      **PLEASE TAKE NOTICE** that on May 6, 2024, Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") each filed a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On May 16, 2024, the U.S. Trustee appointed an official committee of unsecured creditors. No trustee or examiner has been appointed in these chapter 11 cases. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

      **PLEASE TAKE FURTHER NOTICE** that on [●], 2025, the Court entered the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* (Docket No. [●]) (the "**Disclosure Statement Order**"), which, among other things, (i) authorized the Debtors to solicit votes on the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and its Affiliated Debtors]* (Docket No. [●]) (the "**Plan**") and (ii) conditionally approved the *Disclosure Statement for Joint Plan of Liquidation of Steward Healthcare System LLC and Its Affiliated Debtors* (Docket No. [●]) (the "**Disclosure Statement**").[2]

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Voting Agent (as defined below) at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2]    Capitalized terms not otherwise defined herein have the same meaning as set forth in the Disclosure Statement Order, Plan, or Disclosure Statement, as applicable.

## A. Parties Entitled to Vote.

Holders of Claims in Class 3 (FILO Bridge Claims), Class 4 (General Unsecured Claims), and Class 5 (PBGC Claims) are Impaired and entitled to receive distributions under the Plan and, thus, may vote to accept or reject the Plan, subject to certain exceptions discussed below (each, a "**Voting Class**," and collectively, the "**Voting Classes**").

A holder of a Claim in a Voting Class is nonetheless not entitled to vote to the extent that:

(a)      as of the Voting Record Date (as defined below), the outstanding amount of such creditor's Claim is zero ($0.00);

(b)      as of the Voting Record Date, such holders' Claim has been disallowed, expunged, disqualified or suspended;

(c)      such creditor has not timely filed a Proof of Claim in accordance with the *Order (I) Establishing Deadlines and Procedures for Filing Proofs of Claim; (II) Approving Form and Manner of Notice Thereof; and (III) Granting Related Relief* (Docket No. 1564) (the "**Bar Date Order**") as of the General Bar Date or the Government Bar Date, as applicable, and the Debtors have not scheduled such creditor's Claim or have scheduled such creditor's Claim in an undetermined amount or as contingent, unliquidated, or disputed or such creditor is not required to file a Proof of Claim pursuant to the Bar Date Order; *provided*, that to the extent that such creditor's deadline to file a Claim arising from any rejection of an Executory Contract or Unexpired Lease to which such creditor is party has not yet occurred, such creditor will be entitled to vote in the amount of $1.00 on account of such Claim; or

(d)      such creditor's Claim is subject to an objection, a request for estimation, or an adversary proceeding as of **June 18, 2025 at 5:00 p.m. (Central Time)**, subject to the procedures set forth below; *provided* that, any such holder shall receive a Ballot and may submit such Ballot on a provisional basis and may elect to opt out of the Third-Party Releases contained in the Plan. To the extent such holder does not file a Rule 3018 Motion in accordance with the instructions set forth below, the Ballot will not be counted for voting purposes; however, any opt-out election made by such holder on its Ballot with respect to the Third-Party Releases contained in the Plan shall be valid so long as such Ballot is submitted in accordance with the procedures set forth herein. To the extent such holder files a Rule 3018 Motion in accordance with the instructions set forth below, the extent to which such Ballot shall be counted for voting purposes will be determined by the Court or as otherwise agreed by the Debtors and the holder.

With respect to transfers of Claims required to be filed pursuant to Bankruptcy Rule 3001(e), the transferee shall be entitled to receive a Solicitation Package (as defined below) and,

if the holder of such Claim is otherwise entitled to vote with respect to the Plan, cast a Ballot (defined below) on account of such Claim only if: (i) all actions necessary to transfer such Claim are completed by the Voting Record Date; or (ii) the transferee files with the Court, by the Voting Record Date, (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer.  In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote or election on the Plan made by the holder of such Claim as of the Voting Record Date.

Where any portion of a single Claim has been transferred to a transferee and notice of such transfer is required to be filed pursuant to Bankruptcy Rule 3001(e), all holders of any portion of such single Claim may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code, and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that: (a) a Ballot; (b) a group of Ballots within a Voting Class received from a single creditor; or (c) a group of Ballots received from the various holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion.

## B.   Parties Not Entitled to Vote.

Holders of Claims in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) will: (i) receive full recovery of their Allowed Claims under the Plan; or (ii) otherwise receive treatment as to render such holder's Claim Unimpaired (collectively, the "**Unimpaired Classes**").  Pursuant to section 1126(f) of the Bankruptcy Code, the holders of such Claims in these Unimpaired Classes are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote on the Plan.

Holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) are either plan proponents or controlled by plan proponents (the "**Plan Proponent Classes**").  Therefore, they are conclusively presumed to accept the plan and will not be solicited.

Holders of Claims and Interests in Class 7 (Subordinated Securities Claims), Class 9 (Non-Debtor Owned Subsidiary Interests), and Class 10 (Parent Interests) are Impaired and such holders are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, accordingly, are not entitled to vote on the Plan (together with the Unimpaired Classes and the Plan Proponent Classes, the "**Non-Voting Classes**").

## C.   Voting Record Date.

The Court has established **May 21, 2025** as the record date for purposes of determining (i) which holders of Claims in the Voting Classes are entitled to vote on the Plan, and (ii) which holders of Claims and Interests are entitled to receive a Notice of Non-Voting Status (as defined below) (the "**Voting Record Date**").

**D.      Establishing Claim Amounts for Voting Purposes.**

       **FILO Bridge Claims (Class 3)**.  The amount of each FILO Bridge Claim, for voting purposes only, will be established by reference to the list of FILO Bridge Lenders to the Bridge Credit Agreement and those FILO Bridge Lenders' corresponding FILO Bridge Claim amounts as of the Voting Record Date, as reflected on the loan register maintained by the FILO Bridge Agent, which shall be provided by the FILO Bridge Agent to the Debtors and the Voting Agent no later than one (1) Business Day following the Voting Record Date.

       **General Unsecured Claims (Class 4)**.  Except as otherwise provided herein and solely to the extent a holder is entitled to vote under these procedures, the amount of each General Unsecured Claim in Class 4, for voting purposes only, shall be established pursuant to the following hierarchy:

      (a)    if a Claim has been estimated or otherwise Allowed for voting purposes by order of the Court, such Claim is temporarily Allowed in the amount so estimated or Allowed by this Court;

      (b)    if (a) does not apply, but the Claim has been estimated or otherwise Allowed for voting purposes pursuant to a stipulation, settlement, or other agreement in writing reached between the applicable Debtor(s) and the holder of the Claim (whether such stipulation, settlement, or agreement is filed or not), such Claim is temporarily Allowed against such Debtor(s) in the amount set forth in the stipulation, settlement, or other agreement;

      (c)    if neither (a) nor (b) applies, then in the liquidated, non-contingent, and undisputed amount set forth on a Proof of Claim timely filed in accordance with the Bar Date Order as of the Voting Record Date; *provided that*, if the amount set forth on a timely-submitted Proof of Claim is wholly unliquidated, contingent, and/or disputed (as determined on the face of the Claim or based on reasonable review by the Debtors and/or the Voting Agent), then the Claim shall be temporarily Allowed for voting purposes in the amount of $1.00;

      (d)    if neither (a), (b), nor (c) applies, then in the liquidated, non-contingent, and undisputed amount set forth on the Debtors' Schedules; *provided that*, if the Claim appearing on the Debtors' Schedules is either contingent, unliquidated, and/or disputed, or in a $0.00 amount, then the Claim shall be disallowed for voting purposes, except to the extent that such creditor's deadline to file a Claim arising from any rejection of an Executory Contract or Unexpired Lease to which such creditor is party has not yet occurred; *provided*, that, to the extent such creditor's deadline to file a Claim has not yet occurred, such creditor will be entitled to vote in the amount of $1.00 on account of such Claim;

      (e)    notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class may

be provided with only one Solicitation Package and one Ballot for voting on a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and

(f)     if a Proof of Claim has been amended by a later Proof of Claim that is filed on or prior to the Bar Date, the later filed amended Proof of Claim shall be entitled to vote in a manner consistent with these tabulation rules, and the earlier filed Proof of Claim shall be disallowed for voting purposes, regardless of whether the Debtors have objected to such amended claim. Except as otherwise ordered by the Court, any amendments to Proofs of Claim after the Bar Date shall not be considered for purposes of these tabulation rules.

**PBGC Claims (Class 5)**.  The amount of PBGC Claims, for voting purposes only, will be $8,750,000.

**General**.

If the Debtors have filed an objection to, a request for estimation of, or an adversary proceeding relating to a Claim, on or before **June 18, 2025 at 5:00 p.m. (Central Time)**, such Claim shall be temporarily disallowed for voting purposes, except as ordered by the Court before the Voting Deadline; *provided*, *however*, that, if the Debtors' objection seeks only to reclassify or reduce the Allowed amount of such Claim, then such Claim is temporarily Allowed for voting purposes in the reduced amount and/or as reclassified (as applicable), except as may be ordered by the Court before or concurrent with, entry of an order confirming the Plan; *provided*, *further*, that if the Debtors' objection seeks only to disallow a Proof of Claim purportedly filed on behalf of a class of claimants, then such Claim is temporarily Allowed for voting purposes only as to the individual that filed such Proof of Claim and not as to the class of claimants on behalf of which such Proof of Claim was filed.

If any holder seeks to challenge the Allowed amount of its Claim for voting purposes, such creditor must file with the Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes in a different amount (a "**Rule 3018(a) Motion**").  Any Rule 3018(a) Motion must be filed with the Court so as to be actually received not later than **June 25, 2025, at  5:00 p.m. (Central Time)**.

Upon the filing of any such Rule 3018(a) Motion, such holder's Provisional Ballot shall be counted in accordance with the above-designated guidelines, unless temporarily Allowed in a different amount by an order of the Court entered prior to or concurrent with entry of an order confirming the Plan.

For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims against one Debtor held by a single holder in a particular Class shall be aggregated as if such holder held one Claim in such Debtor in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan.

**E.      Form, Content, and Manner of Notices.**

<u>Voting Agent</u>

The Debtors have retained Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**") as their claims, noticing, and solicitation agent pursuant to the *Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* (Docket No. 29).  Pursuant to the Disclosure Statement Order, Kroll is authorized to assist the Debtors in (i) distributing the Solicitation Packages and, as applicable, the Consent Program Materials, the Notice of Non-Voting Status, or the Release Opt-Out Forms (collectively referred to as the "**Election Packages**"), (ii) receiving, tabulating, and reporting on Consent Program Opt-Out Forms cast to opt out of the Administrative Expense Claims Consent Program by holders of Allowed Administrative Expense Claims, (iii) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims, (iv) receiving, tabulating, and reporting on Release Opt-Out Forms cast to opt out of the Third-Party Releases by Non-Voting Classes, (v) responding to inquiries from holders of Claims or Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the Administrative Expense Claims Consent Program by the Consent Program Materials, or the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, or the procedures and requirements to opt out of the Third-Party Releases by the Release Opt-Out Form or the Third-Party Release Opt-Out Election, (vi) soliciting votes on the Plan, and (vii) if necessary or appropriate, contacting creditors and equity holders regarding the Plan, the Ballots, the Solicitation Packages, the Election Packages, and all other related documents and matters related thereto.

<u>The Solicitation Package</u>

The following materials shall constitute the Solicitation Package:

(a)      the Disclosure Statement Order, as entered by the Court and without attachments;

(b)      the conditionally approved Disclosure Statement with all exhibits thereto, including the Plan;

(c)      the Combined Hearing Notice;

(d)      these Solicitation and Voting Procedures;

(e)      the applicable Ballot customized (where possible and appropriate) for such holder and conforming to Official Bankruptcy Form No. B 314, in the form described below;[3]

---

[3]      Official Bankruptcy Form No. B 314 can be found at http://www.uscourts.gov/forms/bankruptcy-forms, the official website for the United States Bankruptcy Courts.

(f)     for holders of Claims in Class 4, the letter from the Creditors' Committee to holders of unsecured claims setting forth, among other things, the Creditors' Committee's recommendation that holders of General Unsecured Claims vote to accept the Plan (the "**Creditors' Committee Position Letter**"); and

(g)     a postage-prepaid return envelope.

Holders of Claims or Interests in a Non-Voting Class (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) shall only receive the Combined Hearing Notice, the Notice of Non-Voting Status (as defined and described below), and the Release Opt-Out Form (as defined and described below).

## Distribution of the Solicitation Package

The Solicitation Package shall provide the Disclosure Statement, the Plan, and the Disclosure Statement Order in electronic format (on a QR code included in the Combined Hearing Notice) instead of printed hard copies. Only the Ballots and the Combined Hearing Notice will be provided in paper format. Moreover, the Plan and the Disclosure Statement will be available at no charge via the internet at the Online Portal. If service by QR code imposes a hardship for any party entitled to receive a copy of the Plan and the Disclosure Statement (*e.g.*, the party does not own or have access to a smartphone), such party may request a paper copy or a USB flash drive that includes copies of the Plan, Disclosure Statement, and Disclosure Statement Order (without attachments, except the Solicitation and Voting Procedures as annexed as Exhibit 2 thereto) by contacting Kroll by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Upon receipt of such request, in a timely manner, the Debtors will provide such party with a paper copy, or USB flash drive containing, of the Plan and the Disclosure Statement at no cost to the party.

The Debtors shall mail to holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date the Solicitation Packages on or before the date that is three (3) Business Days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter (the "**Solicitation Mailing Deadline**"). The Debtors will also provide complete Solicitation Packages (excluding Ballots) to the U.S. Trustee and all parties in interest required to be notified under Bankruptcy Rule 2002 and Local Rule 2002-1.

The Debtors shall request that the FILO Bridge Agent post to its electronic datasite (i) a non-customized Solicitation Package (not including Ballots) and (ii) information to request customized Ballots from Kroll for FILO Bridge Lenders' as of the Voting Record Date as reflected on the loan register maintained by the FILO Bridge Agent. Such postings to the electronic datasite shall occur within five (5) calendar days of the mailing of the Solicitation Packages.

The Debtors are not required to mail Solicitation Packages to creditors or interest holders (i) who have Claims or Interests that have already been paid in full during the Chapter 11 Cases, (ii) whose prior mailings in these chapter 11 cases were returned as undeliverable and who have not provided a forwarding address by the Voting Record Date, (iii) who hold Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 6 (Intercompany Claims), Class 7 (Subordinated Securities Claims), Class 8 (Intercompany Interests) and Class 9 (Non-Debtor Owned Subsidiary Interests), and/or (iv) who are not otherwise entitled to vote to accept or reject the Plan in accordance with the terms and provisions of these Solicitation and Voting Procedures.

In the event that the United States Postal Service returns any mailings as undeliverable, the Debtors are excused from mailing Solicitation Packages or Notices of Non-Voting Status to addresses from which the Debtors received mailings returned as undeliverable. For purposes of serving the Solicitation Packages and Notices of Non-Voting Status, the Debtors may rely on the address information for the holders of Claims and Interests as compiled, updated, and maintained by the Voting Agent as of the Voting Record Date. The Debtors and the Voting Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitation Packages (including Ballots) and will not be required to resend Solicitation Packages or other materials, including Notices of Non-Voting Status, that are returned as undeliverable unless the Debtors are provided with accurate addresses for such parties prior to the Voting Record Date.

To avoid duplication and reduce expenses, the Debtors will use commercially reasonable efforts to ensure that each holder of a Claim receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against the Debtors.

### Forms of Ballots

Holders of Claims in the Voting Classes that are eligible to vote (as set forth herein) shall receive ballots substantially in the forms attached to the Disclosure Statement Order as **Exhibits 3-5** (the "**Ballots**"), as applicable.[4] All holders of Claims in the Voting Classes will receive a Ballot that includes an election to opt out of the third party releases in section 12.6(b) of the Plan (the "**Third-Party Releases**"). Holders of Claims in the Voting Classes that properly and timely elect to opt out of the Third-Party Releases will not be a Releasing Party or Released Party under the Plan.

### Notice of Non-Voting Status and Release Opt-Out Forms

Holders of Claims and Interests in the Non-Voting Classes in lieu of a Solicitation Package, will receive (i) the Combined Hearing Notice, (ii) a Notice of Non-Voting Status substantially in the form attached to the Disclosure Statement Order as **Exhibit 6** (the "**Notice of Non-Voting Status**"), and (iii) a Release Opt-Out Form (as defined below); *provided* that, the

---

[4]   Kroll is required to retain all paper copies of Ballots and all solicitation-related correspondence for one (1) year following the Effective Date, whereupon Kroll is authorized to destroy and/or otherwise dispose of all paper copies of Ballots; printed solicitation materials including unused copies of the Solicitation Package; and all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Court in writing within such one (1) year period.

Debtors are not required to serve holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) copies of the Combined Hearing Notice, Notice of Non-Voting Status, Release Opt-Out Form, or any other type of notice in connection with solicitation of the Plan because such Claims and Interests are held by the Debtors or the Debtors' affiliates.

The Notice of Non-Voting Status provides (i) notice of the Court's conditional approval of the Disclosure Statement, (ii) notice of the filing of the Plan and Disclosure Statement, (iii) notice of the holders' non-voting status, and (iv) information about how to obtain copies of the Disclosure Statement and the Plan. In addition, the Notice of Non-Voting Status contains the full text of the release, exculpation, and injunction provisions set forth in Article XII of the Plan and advises such holders in Non-Voting Classes that they will be bound by the Third-Party Releases unless they timely, properly, and affirmatively opt out.

The Debtors shall cause to be mailed a release opt-out form, substantially in the form attached to the Disclosure Statement Order as **Exhibit 7** (the "**Release Opt-Out Form**"), to holders of Claims and Interests in the Non-Voting Classes. For holders of Claims in the Voting Classes, the opt out option shall be on such holder's Ballot.

A holder that properly, timely, and affirmatively elects on the Release Opt-Out Form to opt out of the Third-Party Releases will not be a Releasing Party or Released Party under the Plan. An encrypted opt-out data and audit trail will be created through the electronic submission process and become part of the record of any opt-out election submitted in this manner. Additionally, any holder's electronic signature will be deemed to be legally valid and effective immediately. For the avoidance of doubt, the Voting Agent's online portal at https://restructuring.ra.kroll.com/steward/(the "**Online Portal**") is the sole method for holders of Claims and Interests in the Non-Voting Classes to transmit the Release Opt-Out Form electronically. All Release Opt-Out Forms must be properly completed and returned so as to be **actually received** by the Voting Agent by **July 2, 2025 at 5:00 p.m. (Central Time)** (the "**Release Opt-Out Deadline**") either by (i) delivering the Release Opt-Out Form to the Voting Agent by first-class mail, hand delivery, or overnight courier or (ii) submitting the Release Opt-Out Form by electronic, online transmission through the Online Portal, each in accordance with the instructions included on the Release Opt-Out Form.

F.      **Voting Deadline.**

The Court has established **July 2, 2025 (Central Time)** as the deadline to submit votes to accept or reject the Plan (the "**Voting Deadline**"). The Debtors may extend the Voting Deadline, in their discretion (in consultation with the Creditors' Committee), without further order of the Court. To be counted as a vote to accept or reject the Plan, each Ballot must be properly executed, completed, and timely delivered to the Voting Agent: (i) by first-class mail in the return envelope provided with each Ballot; (ii) by overnight mail; (iii) by hand delivery, or (iv) via E-Ballot through the Online Portal, so that (in each instance) it is **actually received** by the Voting Agent no later than the Voting Deadline.

The Voting Agent is authorized to accept Ballots through the Online Portal. The encrypted Ballot data and audit trail created by such electronic submission will become part of the

record of any Ballot submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

Holders of Claims submitting their Ballots in hard copy to the Voting Agent shall mail or deliver them to the following address:

> Steward Health Care System LLC Ballot Processing
> c/o Kroll Restructuring Administration LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

In all instances, holders should consult their Ballot for specific instructions regarding submission of their votes and any elections. The manner of Ballot submission is at the election and risk of the holders of Claims in the Voting Classes who vote on the Plan. Regardless of the manner of submission, to be counted, Ballots must be **actually, timely, and properly received** by the Voting Agent by the Voting Deadline. The Debtors strongly recommend submitting electronic Ballots through the Online Portal.

## G.      Tabulation Procedures.

### General Rules

The following voting procedures and standard assumptions shall be used in tabulating the Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of the Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Local Rules:

(a)      Whenever a holder of Claims casts more than one Ballot voting the same Claims before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline shall be deemed to reflect such creditor's intent, and thus supersede any previously received Ballot. Following the Voting Deadline, no Ballot may be changed or revoked, absent further order of the Court or as directed by the Debtors.

(b)      Whenever a holder of Claims casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but does not indicate either an acceptance or rejection of the Plan, such Ballot will not be counted.

(c)      Whenever a holder of a Claim casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but indicates both an acceptance and a rejection of the Plan, the Ballot will not be counted.

(d)      A holder shall be deemed to have voted the full amount of its Claim in each Class and shall not be entitled to split its vote within a particular Class or between more than one Debtor. Any such holder's Ballot that partially

accepts and partially rejects the Plan, between the same or multiple Debtors, will not be counted.

(e)     A Person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims should indicate such capacity when signing, and if so requested by the Debtors or the Voting Agent, must submit proper evidence satisfactory to the Debtors of its authority to so act.

(f)     A holder of Claims against more than one Debtor that casts a single Ballot shall have its votes counted separately with respect to each such Debtor.

(g)     A holder of Claims in more than one Class must use separate Ballots for each Class of Claims.

(h)     The Debtors (in consultation with the Creditors' Committee), unless subject to contrary order of the Court, may waive any defects or irregularities as to any particular irregular Ballot at any time, either before or after the Voting Deadline.

(i)     The following Ballots shall not be counted:

i.     any Ballot received after the Voting Deadline unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot or waived the late submission;

ii.     any Ballot that is illegible or contains insufficient information to permit the identification of the voting party;

iii.     any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

iv.     any Ballot cast by a Person or Entity that is not entitled to vote, even if such individual or Entity holds a Claim in a Voting Class;

v.     any unsigned Ballot, provided that E-Ballots submitted on the Online Portal will be deemed to contain a legal, valid signature;

vi.     any Ballot containing a vote that the Court determines, after notice and a hearing, was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code; or

vii.     any Ballot transmitted to the Voting Agent by e-mail, facsimile, or other means not specifically approved herein.

### Miscellaneous Rules

Each holder of Claims that votes to accept or reject the Plan is deemed to have voted the full amount of its Claim therefor.

The Voting Agent may, but is not required to, contact parties who submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies, provided that, neither the Debtors nor Voting Agent is required to contact such parties to provide notification of defects or irregularities with respect to completion or delivery of Ballots, nor will any of them incur any liability for failure to provide such notification. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors, in consultation with the Creditors' Committee, (or the Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived prior to the Voting Deadline) will be invalidated.

The Debtors and/or their Voting Agent, as applicable, in consultation with the Creditors' Committee, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots or Release Opt-Out Forms, which determination will be final and binding on all parties.

The Debtors are authorized to reject any and all Ballots submitted by any holders of Claims not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, in consultation with the Creditors' Committee, be unlawful.

The Debtors (in consultation with the Creditors' Committee) are further authorized to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any holders of Claims. The interpretation (including the Ballot and the respective instructions thereto) by the Debtors in accordance with the foregoing sentence will be final and binding on all parties.

The Debtors or their Voting Agent shall file the Voting Report on or before **July 9, 2025**.

### H. Combined Hearing Notice.

Within three (3) Business Days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Notice Parties and holders of Claims and Interests in the Non-Voting Classes via e-mail or first-class mail a copy of the Combined Hearing Notice, which sets forth (i) the Voting Deadline, (ii) the Combined Objection Deadline and procedures for filing objections and responses to confirmation of the Plan, (iii) the time, date, and place for the Combined Hearing, and (iv) information about the Plan's release and injunction provisions in compliance with Bankruptcy Rule 2002(c)(3). The Debtors will separately serve holders of Claims in the Voting Classes with the Combined Hearing Notice as part of their Solicitation Packages.

The Debtors may, in their discretion, give supplemental publication notice of the Combined Hearing, no later than twenty-eight (28) days prior to the Combined Hearing, in one or more local or foreign newspapers, trade journals, or similar publications as the Debtors deem appropriate.

**The Debtors (in consultation with the Creditors' Committee) reserve the right and are authorized to make non-substantive or immaterial changes to the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Ballots, the Solicitation and Voting Procedures, the Combined Hearing Notice, the Release Opt-Out Form, and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages before their distribution.**

**EXHIBIT F**

**Debtors' Organizational Chart**



**EXHIBIT G**

**PBGC Settlement Term Sheet**

**New England Sinai Hospital Pension Plan -- PBGC Settlement Term Sheet**

1. Parties.

   a. Steward Health Care System LLC (the "**Company**") and its affiliated chapter 11 debtors (collectively, the "**Debtors**").

   b. Pension Benefit Guaranty Corporation ("**PBGC**").

2. Termination of Pension Plan. The Company and PBGC agree to a PBGC-initiated termination of the New England Sinai Hospital Pension Plan (the "**Pension Plan**"), effective as of April 30, 2024 (the "**Plan Termination Date**").

3. Agreed PBGC Claim. Under the terms of the Debtors' chapter 11 plan (the "**Chapter 11 Plan**"), PBGC's claims against the Debtors (collectively, the "**PBGC Claim**"), will be allowed against the Debtors in the amount of $8,750,000. For all purposes under the terms of this settlement and the Chapter 11 Plan, the PBGC Claim shall be treated solely as a prepetition general unsecured claim.

4. PBGC Claims Class Recovery. The Chapter 11 Plan will separately classify the PBGC Claim, which shall be an impaired class and entitled to vote whether to accept the Chapter 11 Plan consistent with the terms hereof.

5. PBGC Support for Chapter 11 Plan. PBGC agrees to use commercially reasonable efforts to support, and not to object to approval of the Debtors' disclosure statement, confirmation of the Chapter 11 Plan, and agrees to vote in favor of the Chapter 11 Plan and not opt-out of the third-party releases provided thereunder, provided that the terms of the Chapter 11 Plan incorporate the terms of this term sheet and the terms of the Confirmation Order (as defined in the Chapter 11 Plan) incorporates the PBGC Release Carve-Out.

6. Consolidated Claim. The PBGC Claim shall be treated as against a single consolidated estate without regard to the separate legal existence of the Debtors and the PBGC Claim shall be deemed filed as a single claim against, and a single obligation of, the Debtors. For the avoidance of doubt, the PBGC Claim shall be the only claim on which PBGC shall be entitled to any distribution in connection with the Debtors or the Chapter 11 Plan.

7. Release of PBGC Claims. Upon the entry of an order confirming the Chapter 11 Plan, PBGC shall grant a full release of all claims and causes of action against all the Debtors (and any successor-in-interest thereto, including any liquidation or litigation trust), other than the PBGC Claim; provided that the Confirmation Order shall provide that PBGC does not release non-Debtor Company controlled group members as of the Plan Termination Date. Moreover, the Chapter 11 Plan shall contain language substantially identical to the following (the "**PBGC Release Carve-Out**"): "Notwithstanding any provision in this Plan to the contrary, no provision contained in this Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' bankruptcy cases shall be construed as discharging, releasing, exculpating or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under

Title I of ERISA with respect to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code or any other document filed in the Debtors' bankruptcy cases."

8. <u>Agreement to Promptly Document</u>. The parties agree to take all reasonable actions to promptly document the terms of this action in the Chapter 11 Plan. Concurrently with signing this term sheet, the Company and PBGC shall execute a Trusteeship Agreement with respect to the termination of the Pension Plan in connection with the foregoing.

9. <u>Preservation of Plan Records</u>. The Chapter 11 Plan will provide for (i) the Debtors to transfer the documents and records necessary for the administration of the Pension Plan to the Plan Trustee (as defined in the Chapter 11 Plan) if PBGC is not yet the Pension Plan's trustee or if PBGC has not yet completed the transition of the Pension Plan to PBGC, and (ii) for the Liquidation Trustee to store and preserve such records for twelve (12) months after the Confirmation Date of the Chapter 11 Plan, (iii) the Liquidation Trustee must provide at least sixty (60) days' notice to PBGC before disposing such records and (iv) the Liquidation Trustee to, upon reasonable notice, make such documents available to PBGC for inspection and copying.

10. <u>Transfer of PBGC Claim</u>. PBGC shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of, in whole or in part, the PBGC Claim unless the transferee thereof, prior to such transfer, agrees to be bound by all of the terms of this agreement.

11. <u>Counterparts</u>. This Term Sheet may be executed in any number of counterparts (including by facsimile or by attachment to electronic mail in portable document format (PDF)), each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

WEIL\100152358\6\76000.0003

The parties agree to the foregoing terms as of the date the last signatory signs below.

**STEWARD HEALTH CARE SYSTEM LLC**

By: John Castellano
Its: Chief Restructuring Officer

Dated: _____

**PENSION BENEFIT GUARANTY CORPORATION**

By: _____
Its: _____

Dated: _____

Digitally signed by JULIE BERGER
Date: 2025.04.25 11:21:53 -04'00'

The parties agree to the foregoing terms as of the date the last signatory signs below.

**STEWARD HEALTH CARE SYSTEM LLC**

*John R. Castellano*

D6044286547E4E2

By: John Castellano
Its: Chief Restructuring Officer

Dated: April 25, 2025
_____

**PENSION BENEFIT GUARANTY CORPORATION**

_____

By: _____
Its: _____

Dated: _____

# EXHIBIT 8

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  | § |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC**, *et al.*, | § |  |
|  | § | (Jointly Administered) |
| Debtors.[1] | § |  |
|  | § |  |

**MOTION OF DEBTORS FOR ENTRY OF
ORDER (I) SCHEDULING COMBINED HEARING ON
(A) ADEQUACY OF DISCLOSURE STATEMENT AND
(B) CONFIRMATION OF PLAN; (II) CONDITIONALLY
APPROVING DISCLOSURE STATEMENT AND FORM
AND MANNER OF NOTICE OF CONDITIONAL DISCLOSURE
STATEMENT HEARING; (III) ESTABLISHING SOLICITATION
AND VOTING PROCEDURES; (IV) ESTABLISHING ADMINISTRATIVE
EXPENSE CLAIMS CONSENT PROGRAM NOTICE AND OPT-OUT
PROCEDURES; (V) ESTABLISHING NOTICE AND OBJECTION
PROCEDURES FOR CONFIRMATION OF PROPOSED PLAN; (VI) APPROVING
NOTICE PROCEDURES FOR ASSUMPTION OR REJECTION OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (VII) GRANTING RELATED RELIEF**

---

**IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING.  UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED.  IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is: 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Background

1.     On May 6, 2024, the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.     On May 16, 2024, the U.S. Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**").  No trustee or examiner has been appointed in these chapter 11 cases.

3.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

## Jurisdiction

4.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

5.     Pursuant to sections 105, 365, 1124, 1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3001, 3016, 3017, 3018, 3020, 6004 and 9006, Bankruptcy Local Rules 2002-1 and 3016-1, and the Procedures for Complex Chapter 11 Cases in

the Southern District of Texas (effective as of September 18, 2024, the "**Complex Case Procedures**"), the Debtors request entry of an order, substantially in the form attached hereto as **Exhibit A** (the "**Proposed Order**"), granting the following relief:

**Plan, Disclosure Statement & Related Procedures, Dates/Deadlines and Materials**

i.    scheduling a combined hearing ("**Combined Hearing**") to approve the Disclosure Statement (as defined below) on a final basis and consider confirmation of the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. 4743) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Plan**");

ii.   conditionally[2] approving the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. 4744) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Disclosure Statement**")[3] as containing adequate information pursuant to section 1125 of the Bankruptcy Code;

iii.  approving the form and manner of notice of the hearing to conditionally consider the proposed Disclosure Statement;

iv.   approving the form and manner of the notice (the "**Combined Hearing Notice**") of the Combined Hearing, substantially in the form attached to the Proposed Order as **Exhibit 1**;

v.    establishing July 1, 2025 at 5:00 p.m. (Central Time) as the deadline to object to the adequacy of the Disclosure Statement and/or confirmation of the Plan (the "**Combined Objection Deadline**");

vi.   approving the procedures for assumption, assumption and assignment, or rejection of the Debtors' executory contracts and unexpired leases;

**Solicitation and Voting**

vii.  establishing May 21, 2025 as the record date for the purpose of determining which holders of Claims are entitled to vote on the Plan and receive the applicable notice(s) relating to solicitation and confirmation (the "**Voting Record Date**");

---

[2]    The Debtors reserve the right to seek final approval of the Disclosure Statement prior to the Combined Hearing to the extent the hearing to consider approval of the Disclosure Statement is moved to a date after the 28-day objection deadline under Bankruptcy Rule 2002(b).

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement or the Plan, as applicable.

viii.    approving procedures for (a) soliciting, receiving, and tabulating votes to accept or reject the Plan and (b) voting to accept or reject the Plan (the "**Solicitation and Voting Procedures**"), substantially in the form attached to the Proposed Order as **Exhibit 2**;

ix.    approving the ballots (the "**Ballots**") that the Debtors will send to holders of Claims entitled to vote to accept or reject the Plan, substantially in the forms attached to the Proposed Order as **Exhibits 3-5**;

x.    finding that the solicitation materials and documents included in the solicitation packages to be sent to holders of Claims entitled to vote to accept or reject the Plan as described in paragraph 38 herein (the "**Solicitation Packages**") are in compliance with Bankruptcy Rules 2002(b) and 3017(d);

xi.    approving the form of notice the Debtors will send to holders of Claims and Interests of the Non-Voting Classes (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests)) that are, pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, conclusively presumed to accept or deemed to reject the Plan, as applicable (the "**Notice of Non-Voting Status**"), substantially in the form attached to the Proposed Order as **Exhibit 6**;

xii.    approving (a) the form to opt out of the Third-Party Releases (the "**Release Opt-Out Form**"), substantially in the form attached to the Proposed Order as **Exhibit 7**, which the Debtors will send to holders of Claims and Interests of the Non-Voting Classes (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests)) that are, pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, conclusively presumed to accept or reject the Plan, as applicable, and (b) July 1, 2025 at 5:00 p.m. (Central Time) as the deadline by which holders of Claims and Interests of the Non-Voting Classes (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests)) must submit the Release Opt-Out Form (the "**Release Opt-Out Deadline**");

xiii.    establishing July 1, 2025 at 5:00 p.m. (Central Time) as the deadline by which holders of Claims entitled to vote may vote to accept or reject the Plan (the "**Voting Deadline**");

### Administrative Expense Claims Consent Program

xiv.    approving the form of opt-out the Debtors will send to holders of Administrative Expense Claims (other than as otherwise provided herein) for the Administrative Expense Claims Consent Program (the "**Consent Program Opt-Out Form**"), substantially in the form attached to the Proposed Order as **Exhibit 8**;

xv.    establishing May 21, 2025 as the record date for determining which holders of Administrative Expense Claims are entitled to participate in the Administrative Expense Claims Consent Program and receive the Consent Program Opt-Out Form (the "**Administrative Claims Record Date**");

xvi. approving the materials and documents to be sent to eligible holders of Administrative Expense Claims (as provided in paragraph 69 herein) (the "**Consent Program Materials**");

xvii. approving (a) the Consent Program Opt-Out Procedures (as defined herein) and (b) July 1, 2025 at 5:00 p.m. (Central Time) as the deadline by which holders of Administrative Expense Claims must submit the Consent Program Opt-Out Form (the "**Consent Program Opt-Out Deadline**"); and

xviii. granting related relief.

6. The following chart provides a summary of key dates and deadlines the Debtors are seeking pursuant to the Proposed Order:

| PROPOSED SOLICITATION AND CONFIRMATION TIMETABLE | |
|---|---|
| Voting Record Date and Administrative Claims Record Date | **May 21, 2025** |
| Requested Conditional Disclosure Statement Hearing | **May 28, 2025 (subject to the Court's availability)** |
| Mailing Deadline for Combined Hearing Notice, Solicitation Packages, and Election Packages | **No later than three (3) business days after entry of the Proposed Order, or as soon as reasonably practicable thereafter** |
| Supplemental Publication Deadline | **As soon as reasonably practicable after entry of the Proposed Order** |
| Deadline for Debtors to File Claims Objections for Voting Purposes or to Request Claim Estimation for Voting Purposes | **June 17, 2025 at 5:00 p.m. (Central Time)** |
| Mailing Deadline for Cure Amounts and Filing of Cure Notice | **June 20, 2025** |
| Plan Supplement Filing Deadline | **June 24, 2025** |
| Rule 3018(a) Motion Deadline | **June 24, 2025 at 5:00 p.m. (Central Time)** |
| Voting Deadline, Consent Program Opt-Out Deadline, and Release Opt-Out Deadline | **July 1, 2025 at 5:00 p.m. (Central Time)** |

| PROPOSED SOLICITATION AND CONFIRMATION TIMETABLE | |
|---|---|
| Deadline to Object to Disclosure Statement and Plan | **July 1, 2025 at 5:00 p.m. (Central Time)** |
| Assumption and Cure Objection Deadline | **July 2, 2025** |
| Deadline to File Confirmation Brief and Reply to Plan Objection(s) | **July 6, 2025** |
| Ballot Certification Deadline | **July 7, 2025** |
| Requested Combined Hearing | **July 8, 2025 (Subject to the Court's Availability)** |

7.      For further reference, below is a list of the various exhibits and documents cited throughout this Motion:

| DOCUMENT | EXHIBIT |
|---|---|
| Proposed Order | Exhibit A |
| Disclosure Statement | Filed Contemporaneously Herewith |
| Plan | Filed Contemporaneously Herewith |
| Form of Combined Hearing Notice | Exhibit 1 to the Proposed Order |
| Form of Solicitation and Voting Procedures | Exhibit 2 to the Proposed Order |
| Form of Ballot for FILO Bridge Claims (Class 3) | Exhibit 3 to the Proposed Order |
| Form of Ballot for General Unsecured Claims (Class 4) | Exhibit 4 to the Proposed Order |
| Form of Ballot for PBGC Claims (Class 5) | Exhibit 5 to the Proposed Order |
| Form of Notice of Non-Voting Status | Exhibit 6 to the Proposed Order |
| Form of Release Opt-Out Form | Exhibit 7 to the Proposed Order |
| Form of Consent Program Opt-Out Form | Exhibit 8 to the Proposed Order |

## Summary of Plan

8. As further described in the Disclosure Statement filed contemporaneously herewith, following the Global Settlement with MPT and the sale of all of the Debtors' hospital operations, the Debtors, the FILO Parties, and the Creditors' Committee (collectively, the "**Mediation Parties**") entered into negotiations regarding the process to monetize the Debtors' remaining assets, prosecute a chapter 11 plan and bring the chapter 11 cases to a conclusion. Following weeks of mediation overseen by the Honorable Judge Isgur between the Debtors, FILO Parties, and Creditors' Committee, on April 28, 2025, the parties reached an agreement on the material terms of the Plan (the "**Plan Settlement**"), as reflected in the *Plan Support Agreement Term Sheet* (the "**Plan Term Sheet**") attached to the Disclosure Statement as <u>Exhibit B</u>, and an agreement in settlement of the FILO Parties' requests for relief from stay to exercise remedies with respect to their collateral and to terminate the Debtors' use of cash collateral (the "**FILO Settlement**") reflected in the *Settlement and Stay Relief Term Sheet* (the "**FILO Settlement Term Sheet**") attached to the *Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral, (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* (the "**FILO Settlement Motion**") filed contemporaneously herewith.

9. The Plan embodies both the Plan Settlement and the FILO Settlement and is supported by both the FILO Parties and the Creditors' Committee pursuant to the terms and conditions set forth in both settlements. The Plan contemplates an orderly liquidation of the Debtors' assets, and distributions will be allocated as outlined below (and as set forth in more

detail in the Plan). Distributions to junior classes will only be made if senior classes are satisfied

(or adequately reserved for):

(i)        Administrative Expense Claims (other of (i) Professional Fee Claims; (ii) FILO DIP Claims; or (iii) asserted Administrative Expense Claims that the Debtors dispute in their entirety) will be given the option to opt out of the Administrative Expense Claims Consent Program. Holders that do not timely, properly, and affirmatively opt-out will receive a pro-rated portion of a set cash distribution in accordance with the Administrative Expense Claims Consent Program prior to the Effective Date as set forth in section 2.1 of the Plan and such holders who do timely, properly, and affirmatively opt out will receive payment on account of their Administrative Expense Claims on or after the Effective Date of the Plan, subject to the priority of payment made from the Plan Trust.

(ii)       FILO DIP Claims, except to the extent a holder of an Allowed FILO DIP Claim agrees to less favorable treatment of such claim, shall receive its Pro Rata Share of the Class A Litigation Trust Interests.

(iii)      Allowed Other Priority Claims shall receive (i) payment in full in Cash; or (ii) such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired.

(iv)      Allowed Other Secured Claims shall receive at the option of the Estate Representative, (i) payment in full in Cash in an amount equal to such Claim, payable in accordance with the Plan; (ii) transfer of the collateral securing such Other Secured Claim or the proceeds thereof in satisfaction of the Allowed amount of such Secured Claim; or (iii) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

(v)       FILO Bridge Claims, on the Litigation Trust Establishment Date, shall (i) receive their Pro Rata Share of the Class A Litigation Trust Interests on account of their Allowed Remaining FILO Bridge Claim, and (ii) retain their Pro Rata Share of their Retained FILO Bridge Claims, which shall entitle such holders to their Pro Rata Share of the FILO Plan Trust Interests on the Plan Trust Establishment Date to the extent not repaid prior thereto.

(vi)     PBGC Claims shall receive the PBGC Plan Trust Interests on or prior to the Effective Date.

(vii)    General Unsecured Claims shall receive their Pro Rata Share of the GUC Plan Trust Interests.

(viii)   Intercompany Claims shall be adjusted, reinstated, or discharged (each without any Plan Distribution) to the extent reasonably determined to be appropriate by the Estate Representative.

10.     The Debtors propose to solicit votes to accept or reject the Plan from holders of Claims in Class 3 (FILO Bridge Claims), Class 4 (General Unsecured Claims), and Class 5 (PBGC Claims) (each, a "**Voting Class**" and collectively, the "**Voting Classes**"). The Debtors do not propose to solicit votes from holders of Claims or Interests in Class 1 (Other Priority Claims), 2 (Other Secured Claims), 6 (Intercompany Claims), 7 (Subordinated Securities Claims), 8 (Intercompany Interests), 9 (Non-Debtor Owned Subsidiary Interests), and 10 (Parent Interests) (each a "**Non-Voting Class**" and collectively, the "**Non-Voting Classes**").

## Disclosure Statement

### A.    Conditional Approval of Disclosure Statement is Warranted

11.     The Debtors seek limited relief from the requirements of section 1125(b) of the Bankruptcy Code[4] for the purposes of permitting the Debtors to solicit acceptances of the Plan from holders of Claims, with final approval of the Disclosure Statement to be determined at the Combined Hearing. Such relief is consistent with section P of the Complex Case Procedures, which provides that the bankruptcy court may consider motions seeking conditional approval of a Disclosure Statement.

---

[4]    Section 1125(b) of the Bankruptcy Code provides, in relevant part, "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."

12.     Conditional approval of the Disclosure Statement is warranted and appropriate in these chapter 11 cases because it will enable the Debtors to commence solicitation, eliminate the need for the scheduling of a separate disclosure statement hearing, shorten the length of these cases, facilitate the expeditious confirmation and consummation of the Plan, ensure that the Debtors have sufficient liquidity to prosecute the Plan, and ensure the orderly reconciliation of claims, including Administrative Expense Claims.

13.     Additionally, section P of the Complex Case Procedures provides that the Court may consider motions seeking conditional approval of a disclosure statement so long as such motions include a proposed order that: (i) finally approves the balloting and voting procedures to be utilized; (ii) finally approves the form of notice to be provided to creditors and interest holders of the debtors; (iii) finally approves the form of ballot which will be provided to creditors and interest holders entitled to vote on the proposed plan; (iv) establishes a record date; and (v) establishes a voting deadline. This Motion and the Proposed Order comply with these requirements of the Complex Case Procedures and the other requirements of the Bankruptcy Rules.

14.     Accordingly, the Court should conditionally approve the Disclosure Statement and authorize the Debtors to use the Disclosure Statement for solicitation of acceptances and rejection of the Plan from holders of Claims in the Voting Classes.

**B.     Disclosure Statement Provides Adequate Information Regarding the Proposed Chapter 11 Plan**

15.     At the Combined Hearing, the Debtors will seek final approval of the Disclosure Statement. Section 1125(b) of the Bankruptcy Code requires a plan proponent to provide holders of impaired claims and equity interests with "adequate information" regarding the

proposed chapter 11 plan. Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

16. Accordingly, a debtor's disclosure statement must provide sufficient information to permit an informed judgment by impaired creditors entitled to vote on the plan. *See, e.g.*, *In re Shea, Ltd.*, 545 B.R. 529, 538 n.6 (Bankr. S.D. Tex. 2016) ("The purpose of a disclosure statement is to provide adequate information to creditors in order to allow them to make informed judgments about the proposed plan."); *In re Tex. Rangers Baseball Partners*, 521 B.R. 134, 176 (Bankr. N.D. Tex. 2014) ("Section 1125 of the Bankruptcy Code entitles creditors to 'adequate information' so they can make an informed decision on whether to accept or reject a chapter 11 plan.") (quoting *In re Tex. Wyoming Drilling, Inc.*, 647 F.3d 547, 551 (5th Cir. 2011)). The essential requirement of a disclosure statement is that it "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Keisler*, No. 08-34321, 2009 WL 1851413, at *4 (Bankr. E.D. Tenn. June 29, 2009) (quoting *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991)).

17. Whether a disclosure statement contains adequate information "is not governed by any otherwise applicable nonbankruptcy law, rule, or regulation." 11 U.S.C. § 1125(d). Instead, bankruptcy courts have broad discretion to determine the adequacy of the

information contained in a disclosure statement. *See, e.g.*, *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1157 (5th Cir. 1988) (noting that the determination of what is adequate information is "largely within the discretion of the bankruptcy court"); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005) ("Section 1125 affords the Bankruptcy Court substantial discretion in considering the adequacy of a disclosure statement.") (citing *In re River Village Assoc.*, 181 B.R. 795, 804 (E.D. Pa. 1995)). Congress granted bankruptcy courts wide discretion in determining the adequacy of a disclosure statement, taking into account the various facts and circumstances that accompany chapter 11 cases. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 408–09 (1977) ("Precisely what constitutes adequate information will develop on a case-by-case basis."); *see also In re Cajun Elec. Power Coop.*, 150 F.3d 503, 518 (5th Cir. 1998) ("[W]ith respect to a particular disclosure statement, 'both the kind and form of information are left essentially to the judicial discretion of the court.'" (quoting S. Rep. No. 95-989, at 121 (1978))). Accordingly, the determination of whether a disclosure statement contains adequate information is made on a case-by-case basis, focusing on the unique facts and circumstances of each case. *See Tex. Extrusion Corp.*, 844 F.2d at 1157 ("The determination of what is adequate information is subjective and made on a case by case basis.").

18.     To determine whether a disclosure statement contains adequate information, courts generally examine whether the disclosure statement contains the following types of information, as applicable:

> (a)     the circumstances that gave rise to the filing of the bankruptcy petition;
>
> (b)     an explanation of the available assets and their value;
>
> (c)     the anticipated future of the debtor(s);
>
> (d)     the source of the information provided in the disclosure statement;
>
> (e)     a disclaimer, which typically indicates that no statements or information

concerning the debtor or its assets or securities are authorized, other than those set forth in the disclosure statement;

(f)   the condition and performance of the debtor while in chapter 11;

(g)   information regarding claims against the estate;

(h)   a liquidation analysis setting forth the estimated return that creditors would receive under chapter 7;

(i)   the accounting and valuation methods used to produce the financial information in the disclosure statement;

(j)   information regarding the future management of the debtor, including the amount of compensation to be paid to any insiders, directors and/or officers of the debtor;

(k)   a summary of the chapter 11 plan;

(l)   an estimate of all administrative expenses, including attorneys' fees and accountants' fees;

(m)    the collectability of any accounts receivable;

(n)   any financial information, valuations, or pro forma projections that would be relevant to creditors' determinations of whether to accept or reject the plan;

(o)   information relevant to the risks being taken by the creditors and interest holders;

(p)   the actual or projected value that can be obtained from avoidable transfers;

(q)   the existence, likelihood, and possible success of nonbankruptcy litigation;

(r)   the tax consequences of the plan; and

(s)   the relationship of the debtor with its affiliates.

See, e.g., In re Metrocraft Pub. Servs., Inc., 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984); In re ReoStar Energy, No. 10-47176, 2012 Bankr. LEXIS 2418, at *4–5 (Bankr. N.D. Tex. May 30, 2012) (noting that "courts have developed checklists for determining whether a disclosure statement meets the requirements of section 1125").  Such a list is not meant to be comprehensive and a debtor is not required to provide all the information on the list.  Rather, the bankruptcy court must

decide what is appropriate in each case in light of the particular facts and circumstances present. *See In re Divine Ripe, L.L.C.*, 554 B.R. 395, 401–02 (Bankr. S.D. Tex. 2016) (adopting a similar list); *see also In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) (making use of a similar list but cautioning that "no one list of categories will apply in every case").

19.     The Disclosure Statement provides many of the types of information identified in the applicable categories above, including, but not limited to:

(a)     an introduction providing background and an overview of the Plan and restructuring (Section I);

(b)     a summary of the Administrative Expense Claims Consent Program (Section I.B.);

(c)     a summary of Plan classification and treatment of Claims and Interests (Section I.C);

(d)     an overview of the Debtors' operations (Section II);

(e)     a description of the Debtors' capital structure (Section II.E);

(f)     significant events leading to the commencement of the Debtors' chapter 11 cases (Section III);

(g)     events during the chapter 11 cases (Section IV);

(h)     certain risk factors to be considered (Section V);

(i)     certain U.S. federal income tax consequences of the Plan (Section VI);

(j)     requirements for confirmation of the Plan (Section VII); and

20.     In addition to the type of information that courts typically look for in a disclosure statement, the Disclosure Statement provides an analysis of the alternatives to confirmation and consummation of the Plan (Section VIII) and begins with the Debtors' recommendation that the holders of Claims in Classes 3, 4 and 5 vote in favor of the Plan.

21.     Based on the foregoing, the Debtors submit that the Disclosure Statement contains adequate information for a voting creditor to make an informed judgment regarding

whether to vote to accept or reject the Plan, and therefore satisfies the requirements of section 1125 of the Bankruptcy Code. Accordingly, at the Combined Hearing, the Debtors will demonstrate, as summarized above, that the Disclosure Statement provides "adequate information" in satisfaction of the requirements of section 1125 of the Bankruptcy Code, and therefore should be approved by the Court.

**C.  Disclosure Statement Provides Sufficient Notice of the Release, Exculpation, and Injunction Provisions in the Plan**

22.  Pursuant to Bankruptcy Rule 3016(c), "[i]f a plan provides for an injunction against conduct not otherwise enjoined under the [Bankruptcy] Code, the plan and disclosure statement [must] describe in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identify the entities that would be subject to the injunction." Fed. R. Bankr. P. 3016(c).

23.  The Plan provides for certain settlements, injunctions, releases, and exculpations in Article XII. Exhibit D to the Disclosure Statement describes in detail the releases provided under the Plan, the entities to provide such releases, the entities to be released, and the Claims and Interests and causes of action to be released. Additionally, Exhibit D to the Disclosure Statement sets forth the terms of the proposed exculpations, releases and injunctions provisions in the Plan. Each of the foregoing is in conspicuous (bold) print. Accordingly, the Debtors respectfully submit that the Disclosure Statement complies with Bankruptcy Rule 3016(c).

## Solicitation and Voting Procedures

**A.  The Court Should Approve the Solicitation and Voting Procedures, Ballots, Timeline, and Forms of Notices Related to Solicitation and Confirmation of the Plan**

24.  In connection with the Disclosure Statement and the Plan, the Debtors, with the assistance of Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**") as their claims, noticing, and solicitation agent pursuant to the *Order Authorizing the Employment and*

*Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* (Docket No. 29), propose to implement the Solicitation and Voting Procedures summarized below and as set forth more fully in **Exhibit 2** to the Proposed Order.

       **1.**     **Solicitation and Voting Procedures, Including Tabulation Procedures**

       25.     Section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designed under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c). Additionally, Bankruptcy Rule 3018(c) provides, in part, that "[a]n acceptance or rejection [of a plan] shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent, and conform to the appropriate Official Form." Fed. R. Bankr. P. 3018(c). Consistent with these requirements, the Debtors propose to use the Solicitation and Voting Procedures, which include specific voting and tabulation requirements and processes (the "**Tabulation Procedures**"), to facilitate the process of tabulating all votes received.

       26.     The proposed Solicitation and Voting Procedures set forth specific criteria with respect to the voting procedures applicable to holders of Claims in Voting Classes and the general tabulation of Ballots, including clear requirements for determining whether a Ballot will be counted in determining the acceptance or rejection of the Plan. For example, the Tabulation Procedures provide that the Debtors are not required to count a Ballot if it is, among other things, illegible, submitted by a holder of a Claim or Interest that is not entitled to vote on the Plan, unsigned, not clearly marked with a vote to accept or reject the Plan, or marked to both accept and reject the Plan. Further, the Debtors, in consultation with the Creditors' Committee and unless

otherwise ordered by the Court, may waive any defects or irregularities as to any particular Ballot at any time, either before or after the Voting Deadline, provided that any such waivers are documented in the report tabulating votes on the Plan.

27.     The Tabulation Procedures will facilitate the Plan confirmation process by creating a straightforward process by which the Debtors can determine whether they have satisfied the requirements of section 1126(c) of the Bankruptcy Code. Accordingly, the Debtors submit that the Solicitation and Voting Procedures, including the authorization of Kroll's assistance therewith, are in the best interests of their estates, holders of Claims and Interests, and other parties in interest, comply with Bankruptcy Rule 3018(c), and that good cause supports the relief requested herein.

**2.     Voting Record Date**

28.     Bankruptcy Rule 3017(d) provides, in relevant part, that, for the purposes of soliciting votes in connection with confirmation of a chapter 11 plan, and except to the extent the court orders otherwise, the debtor must mail the relevant solicitation materials to all creditors and equity security holders, including "holders of stock, bonds, debentures, notes, and other securities of record on the date the order approving the disclosure statement is entered or another date fixed by the court, for cause, after notice and a hearing." Fed. R. Bankr. P. 3017(d).

29.     To identify and establish the universe of creditors entitled to vote on the Plan, the Debtors request that the Court set May 21, 2025 as the date for determining (a) which holders of Claims in the Voting Classes are entitled to vote on the Plan and (b) which holders of Claims or Interests in Non-Voting Classes are entitled to receive a Notice of Non-Voting Status and the Release Opt-Out Form.

30.     With respect to transfers of Claims filed pursuant to Bankruptcy Rule 3001(e), the Debtors propose that the transferee be entitled to receive a Solicitation Package and,

if the holder of such Claim is otherwise entitled to vote with respect to the Plan, such holder may cast a Ballot on account of such Claim only if: (i) all actions necessary to transfer such Claim are completed by the Voting Record Date; or (ii) by the Voting Record Date, the transferee files (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer. Further, the Debtors request that, in the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote on the Plan made by the holder of such Claim as of the Voting Record Date.

31.     The foregoing timing and materials will afford holders of Claims entitled to vote on the Plan sufficient time to review and analyze such materials and subsequently make an informed decision as to whether to vote to accept or reject the Plan before the Voting Deadline, consistent with the requirements of the applicable Bankruptcy Rules. *See* Fed. R. Bankr. P. 3017(d) (after approval of a disclosure statement, the debtor must transmit the plan, the approved disclosure statement, a notice of the time within which acceptances and rejections of such plan may be filed, and any other information that the court may direct to certain holders of claims). The Voting Record Date complies with Bankruptcy Rule 3017(d) and, therefore, should be approved.

**3.     Form of Ballots**

32.     Bankruptcy Rule 3017(d) requires debtors to mail a form of ballot that substantially conforms to Official Bankruptcy Form No. B 314 to "creditors and equity security holders entitled to vote on the plan." Fed. R. Bankr. P. 3017(d). The Debtors propose to distribute Ballots to holders of Claims in the Voting Classes that are eligible to vote as of the Voting Record Date.[5] Although the Ballots are based on Official Bankruptcy Form No. B 314, they have been

---

[5]     Kroll is required to retain all paper copies of Ballots and all solicitation-related correspondence for one (1) year following the Effective Date, whereupon, Kroll is authorized to destroy and/or otherwise dispose of all paper copies of Ballots; printed solicitation materials including unused copies of the Solicitation Package; and all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the

modified to address the specific circumstances of these chapter 11 cases and to include certain additional information that the Debtors believe is relevant and appropriate for holders of Claims in the Voting Classes. The proposed forms of Ballots for each Voting Class are annexed as **Exhibits 3-5** to the Proposed Order. The Debtors submit that the forms of Ballots comply with Bankruptcy Rule 3018(c) and, therefore, should be approved.

33. If the Court grants the requested relief, all holders of Claims in the Voting Classes will receive a Ballot that includes an election to opt out of the third party releases provision in section 12.6(b) of the Plan (the "**Third-Party Releases**"). Holders of Claims in the Voting Classes that timely, properly, and affirmatively elect to opt out of the Third-Party Releases will not be deemed a Releasing Party (or, by extension, a Released Party).

34. The Debtors propose to distribute Ballots to each of the holders of (i) FILO Bridge Claims in Class 3, (ii) General Unsecured Claims in Class 4, and (iii) PBGC Claims in Class 5.

35. In connection with the Solicitation and Voting Procedures, if, prior to June 17, 2025 at 5:00 p.m. (Central Time), a Claim has either (i) been objected to for its full amount, (ii) had a request for estimation filed with respect to such Claim, or (iii) had an adversary proceeding commenced relating such Claim, such Claim will be Disallowed for voting purposes (such Claim, a "**Potentially Disallowed Claim**"). All holders of Potentially Disallowed Claims will receive a Ballot (such Ballot, a "**Provisional Ballot**"). Such holders shall be subject to the same requirements set forth in the Proposed Order applicable to the Class in which such holder's Claim is included. The Provisional Ballot shall only be included in the tabulation of votes if (i) such holder timely submits a motion for an order pursuant to Bankruptcy Rule 3018(a)

---

Debtors or the Clerk of the Court in writing within such one (1) year period.

temporarily allowing such Claim for voting purposes in a different amount (a "**Rule 3018(a) Motion**") and (ii) the Court grants the relief requested in such holder's Rule 3018(a) Motion. Each Provisional Ballot will contain a box for such holder to check to opt out of the Third-Party Releases contained in section 12.6 of the Plan (the "**Third-Party Release Opt-Out Election**"). Each holder of a Potentially Disallowed Claim will be deemed to consent to the Third-Party Releases unless such holder (i) timely and properly submits such holder's Provisional Ballot, and (ii) affirmatively makes the Third-Party Release Opt-Out Election contained on the Provisional Ballot.

36.     Each holder of a Claim in a Voting Class will be instructed to complete and return its Ballot in accordance with the directions provided therein. Ballots may be submitted via Kroll's online balloting portal (each such electronically submitted Ballot, an "**E-Ballot**") at https://restructuring.ra.kroll.com/Steward (the "**Online Portal**"), so long as the E-Ballot is submitted on or before the Voting Deadline. The encrypted E-Ballot data and audit trail created by such electronic submission through the Online Portal will become part of the record of any Ballot submitted in this manner, and the holder's electronic signature will be deemed to be immediately legally valid and effective. Alternatively, in lieu of submitting an E-Ballot, holders of Claims may return their Ballots in the return envelope provided, or otherwise via first-class mail, overnight courier, or hand delivery, so long as the Ballots are actually received on or before the Voting Deadline. Holders of Claims mailing their Ballots to the Voting Agent shall mail them to the following address:

> Steward Health Care System LLC Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

### 4. Approval of Solicitation Packages and Procedures for Distribution Thereof

37.     Bankruptcy Rule 3017(d) lists the materials that must be provided to holders of claims or interests for the purpose of soliciting votes on a chapter 11 plan and providing adequate notice of the hearing to consider confirmation thereof.  Specifically, Bankruptcy Rule 3017(d) provides, in relevant part, that:

> [u]pon approval of a disclosure statement,—except to the extent that the court orders otherwise with respect to one or more unimpaired classes of creditors or equity security holders—the debtor in possession, trustee, proponent of the plan, or clerk as the court orders shall mail to all creditors and equity security holders, and in a chapter 11 reorganization case shall transmit to the United States trustee:
>
> (a)     the plan or a court-approved summary of the plan;
>
> (b)     the disclosure statement approved by the court;
>
> (c)     notice of the time within which acceptances and rejections of the plan may be filed; and
>
> (d)     any other information as the court may direct, including any court opinion approving the disclosure statement or a court-approved summary of the opinion.

Fed. R. Bankr. P. 3017(d).

38.     In accordance with Bankruptcy Rule 3017(d), the Debtors propose to mail, or cause to be mailed, Solicitation Packages, within three (3) business days after entry of an order approving the Disclosure Statement, or as soon as reasonably practicable thereafter (the "**Mailing Deadline**"), to holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date.  In addition, the Debtors propose to mail, or cause to be mailed, the Solicitation Packages (excluding the Ballots) to the U.S. Trustee and all parties in interest required to be

notified under Bankruptcy Rule 2002 and Local Rule 2002 1 (except to the extent that such party

is entitled to receive an Election Package). Solicitation Packages shall contain copies of:

(a)    the Proposed Order, as entered by the Court and without attachments;

(b)    the conditionally approved Disclosure Statement with all exhibits thereto, including the Plan;

(c)    the Combined Hearing Notice;

(d)    the Solicitation and Voting Procedures;

(e)    the applicable Ballot customized (where possible and appropriate) for such holder and conforming to Official Bankruptcy Form No. B 314, in the form described below;[6]

(f)    for holders of Claims in Class 4, the letter from the Creditors' Committee to holders of unsecured claims setting forth, among other things, the Creditors' Committee's recommendation that holders of General Unsecured Claims vote to accept the Plan (the "**Creditors' Committee Position Letter**"); and

(g)    a postage-prepaid return envelope.

39.    To reduce costs and the impact on the environment, the Debtors propose to

send the Disclosure Statement, the Plan, and the Proposed Order in electronic format (on a QR

code included in the Combined Hearing Notice) instead of printed hard copies. Only the Ballots

and the Combined Hearing Notice will be provided in paper format. Moreover, the Plan and the

Disclosure Statement will be available at no charge via the Internet at the Online Portal. However,

the Debtors propose that if service by QR code imposes a hardship for any party entitled to receive

a copy of the Plan and the Disclosure Statement (*e.g.*, the party does not own or have access to a

smartphone), such party may request a paper copy or a USB flash drive that includes copies of the

Plan, Disclosure Statement, and Proposed Order (without attachments, except the Solicitation and

---

[6]    Official Bankruptcy Form No. B 314 can be found at http://www.uscourts.gov/forms/bankruptcy-forms, the official website for the United States Bankruptcy Courts.

Voting Procedures as annexed as **Exhibit 2** thereto) by contacting Kroll by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Upon receipt of such request, in a timely manner, the Debtors will provide such party with a paper copy, or USB flash drive containing, of the Plan and the Disclosure Statement at no cost to the party.

40. Further, the Debtors request that Kroll be authorized to assist the Debtors in: (i) distributing the applicable Solicitation Packages and, as applicable, the Consent Program Materials, the Notice of Non-Voting Status, or the Release Opt-Out Forms (collectively referred to as the "**Election Packages**"); (ii) receiving, tabulating, and reporting on Consent Program Opt-Out Forms cast to opt out of the Administrative Expense Claims Consent Program by holders of Allowed Administrative Expense Claims; (iii) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims; (iv) receiving, tabulating, and reporting on Release Opt-Out Forms cast to opt out of the Third-Party Releases by Non-Voting Classes; (v) responding to inquiries from holders of Claims or Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the Administrative Expense Claims Consent Program by the Consent Program Materials, or the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, or the procedures and requirements to opt out of the Third-Party Releases by the Release Opt-Out Form or the Third-Party Release Opt-Out Election; (vi) soliciting votes on the Plan; and (vii) if necessary or appropriate, contacting creditors

and equity holders regarding the Plan, the Ballots, the Solicitation Packages, the Election Packages, and all other related documents and matters related thereto.

41.     Additionally, the Debtors request that the Court not require the Debtors or the Voting Agent to mail Solicitation Packages or Election Packages to parties (i) who have Claims that have already been paid in full during these chapter 11 cases or (ii) whose prior mailings in these chapter 11 cases were returned as undeliverable and that have not provided a forwarding address by the Voting Record Date or Administrative Claims Record Date, as applicable.[7]  In the event that the United States Postal Service returns some Solicitation Packages or Election Packages as undeliverable, the Debtors request that they be excused from re-mailing such Solicitation Packages or Election Packages.

42.     Although the Debtors have made, and will make, every effort to ensure that the Solicitation Packages and Election Packages as described herein and as approved by the Court are in final form, the Debtors nonetheless request authority to make non-substantive changes, in consultation with the Creditors' Committee, to the Disclosure Statement, the Plan, and all related documents without further order of the Court, including ministerial changes to correct typographical and grammatical errors, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages and Election Packages prior to mailing.

---

[7]     For purposes of serving the Solicitation and Election Packages, the Debtors request that they be authorized to rely on the address information for (i) known holders of Administrative Expense Claims (other than as set forth herein) and (ii) holders of the Voting and Non-Voting Classes as compiled, updated, and maintained by the Voting Agent or, with respect to Class 3 FILO Bridge Claims, as maintained by the applicable administrative agent, if any, as of the Voting Record Date.  The Debtors further request that the Debtors and the Voting Agent not be required to conduct any additional research for updated addresses based on undeliverable Solicitations Packages (including the Ballots, the Consent Program Opt-Out Forms, and the Release Opt-Out Forms).

43.     The Debtors submit that they have shown good cause for implementing the proposed notice and service procedures and that the proposed Solicitation Packages comply with Bankruptcy Rule 3017(d).   Accordingly, the Debtors request the Court's approval of such Solicitation and Voting Procedures, the Solicitation Packages, and the Election Packages.

**5.     Approval of Release Opt-Out Procedures**

**a.     Release Opt-Out Procedures for Voting Classes**

44.     Paragraph 40 of the Complex Case Procedures provide that:

"If a proposed plan seeks consensual pre- or post-petition releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties-in-interest.  The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice."

Complex Case Procedures ¶ 40.

45.     As described above, the Debtors propose to mail the Ballots to all holders of Claims in the Voting Classes, which will contain, among other things, (i) the release and exculpation language contained in the Plan and (ii) a box for such holder to check to opt out of the Third-Party Releases contained in section 12.6 of the Plan.  Holders of Claims in the Voting Classes that timely and properly elect to opt out of the Third-Party Releases will not be deemed a Releasing Party (or, by extension, a Released Party).

**b.     Release Opt-Out Procedures for Non-Voting Classes**

**i.     Notice of Non-Voting Status**

46.     Bankruptcy Rule 3017(d) permits a court to excuse a debtor from mailing its plan and disclosure statement to unimpaired classes.  In lieu thereof, a court may order that "notice that the class is designated in the plan as unimpaired and notice of the name and address of the person from whom the plan or summary of the plan and disclosure statement may be

obtained upon request and at the plan proponent's expense" and "notice of the time fixed for filing objections to and the hearing on confirmation" be mailed to the members of such classes. Fed. R. Bankr. P. 3017(d). The Debtors request that the Court grant such relief with respect to holders of Claims and Interests in the Non-Voting Classes. Distributing Solicitation Packages to non-voting creditors is an unnecessary expense, and the Debtors' resources should be preserved for the benefit of all stakeholders and not diverted to satisfy a mailing requirement that has no clear benefit. The Debtors will also make the Solicitation Package (excluding the Ballots) available at no cost on the Online Portal.

47.     In lieu of a Solicitation Package, on or before the Mailing Deadline, the Debtors propose to mail, or cause to be mailed, to holders of Claims in the Non-Voting Classes (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) (as discussed below)) the Notice of Non-Voting Status, the Release Opt-Out Form (described below in more detail), and the Combined Hearing Notice (described below in more detail). The Notice of Non-Voting Status provides (i) notice of the Court's conditional approval of the Disclosure Statement, (ii) notice of filing the Plan, (iii) notice of the holder's non-voting status, (iv) notice of the Third-Party Release Opt-Out Election, and (v) information about how to obtain copies of the Disclosure Statement and the Plan. In addition, the Notice of Non-Voting Status contains the full text of the release, exculpation, and injunction provisions set forth in Article XII of the Plan and advises such holders of Claims in Non-Voting Classes that they will be bound by the Third-Party Releases in section 12.6 of the Plan unless they timely, properly, and affirmatively opt out. Holders of Claims in the Non-Voting Classes that choose to opt out of the Third-Party Releases may do so by submitting their Release Opt-Out Form in the return envelope provided or otherwise by: (i) by first-class mail;

(ii) by overnight courier; (iii) by hand delivery; or (iv) via the Online Portal[8] so that (in each instance) their opt-out election is actually received by the Voting Agent no later than the Release Opt-Out Deadline of July 1, 2025 at 5:00 p.m. (Central Time). A holder that timely and, properly, and affirmatively elects to opt out of the Third-Party Releases by the Release Opt-Out Deadline will not be deemed a Releasing Party under the Plan.

48. The Debtors request that in the event that the United States Postal Service returns some Notices of Non-Voting Status as undeliverable, they be excused from re-mailing such Notices of Non-Voting Status.

49. With respect to Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests), the Debtors request a waiver of any requirement to serve a Combined Hearing Notice, Notice of Non-Voting Status, Solicitation Packages, Election Packages, or any other type of notice in connection with solicitation of the Plan because such Claims and Interests are held by the Debtors or the Debtors' affiliates.

50. The Debtors submit that the above-described notices and procedures with respect to Non-Voting Classes provide appropriate notice to holders of Claims and Interests in the Non-Voting Classes, and therefore respectfully request that the Court approve them.

### ii. Release Opt-Out Form

51. The Debtors propose to mail, or cause to be mailed, in compliance with Paragraph 40 of the Complex Case Procedures, a Release Opt-Out Form, substantially in the form attached to the Proposed Order as **Exhibit 7**, to certain of the Non-Voting Classes along with a

---

[8] The Release Opt-Out Form includes information on how parties can opt-out electronically via the Online Portal. An encrypted opt out data and audit trail will be created through the electronic submission process and become part of the record of any opt-out election submitted in this manner. Additionally, the parties' electronic signature will be deemed to be legally valid and effective immediately. For the avoidance of doubt, the Online Portal is the sole method for holders of Claims in Non-Voting Classes to transmit opt out elections electronically.

Combined Hearing Notice and a Notice of Non-Voting Status. For the Voting Classes, the option to opt out of the Third-Party Releases shall be on such holders' Ballots.

52.     The Release Opt-Out Form (i) contains the full text of the release provisions set forth in Article XII of the Plan and advises the recipients that they will be bound by the Third-Party Releases unless they timely, properly, and affirmatively choose to opt out by completing the Release Opt-Out Form and (ii) provides detailed instructions to the recipient regarding the manner in which such recipient can submit their election to opt out of the Third-Party Releases.

53.     The Debtors propose that the Release Opt-Out Form must be timely, properly, and affirmatively completed and returned either by (i) delivering the Release Opt-Out Form to the Voting Agent or (ii) submitting the Release Opt-Out Form by electronic, online transmission through the Online Portal, each in accordance with the instructions included on the Release Opt-Out Form.

54.     The Debtors submit that the Release Opt-Out Form satisfies the requirements of paragraph 40 of the Complex Case Procedures regarding consensual releases against non-debtor parties and, therefore, respectfully request that the Court approve the Release Opt-Out Form and procedures for holders of Claims and Interests to opt out of being bound by Third-Party Releases provided for in the Plan.

## 6.     Combined Hearing Notice

55.     Pursuant to Bankruptcy Rule 3017(d), notice of a plan confirmation objection deadline and hearing must be provided to all creditors and equity security holders in accordance with Bankruptcy Rule 2002 and Bankruptcy Local Rule 2002-1. Bankruptcy Rule 2002 requires notice to, among others, all creditors, indenture trustees, and equity security holders of the time set for filing objections to, and the hearing to consider confirmation of, a plan. In addition, Bankruptcy Rule 2002(c)(3) provides that if a plan provides for an injunction against

conduct not otherwise enjoined under the Bankruptcy Code, the plan confirmation notice must include, in conspicuous language, a statement that the plan proposes an injunction, a brief description of the nature of the injunction, and identification of the entities that would be subject to such injunction. *See* Fed. R. Bankr. P. 2002(c)(3).

56.     In accordance with the foregoing, the Debtors propose to provide (i) the parties entitled to notice pursuant to Bankruptcy Rules 2002 and 3017 and Bankruptcy Local Rule 2002-1 and (ii) holders of Claims and Interests in the Voting and Non-Voting Classes, subject to the exceptions set forth above, a copy of the Combined Hearing Notice, which sets forth (i) the Voting Deadline, (ii) July 1, 2025 at 5:00 p.m. (Central Time) as the deadline to object to the adequacy of the Disclosure Statement on a final basis and confirmation of the Plan and procedures for filing objections and responses to confirmation of the Plan, (iii) the time, date, and place for the Combined Hearing, and (iv) information about the Plan's release and injunction provisions in compliance with Bankruptcy Rule 2002(c)(3).  The Debtors propose completing this service via e-mail or first-class mail within the Mailing Deadline.  The Debtors will also serve holders of Claims in the Voting Classes with the Combined Hearing Notice as part of their Solicitation Packages.  As a result, parties in interest will receive 30 days' notice of the Combined Objection Deadline and 37 days' notice of the Combined Hearing pursuant to these proposed procedures.

57.     The Debtors further request that this Court authorize the Debtors, in their discretion, to give supplemental publication notice of the Combined Hearing, as soon as reasonably practicable following entry of the Proposed Order (the "**Supplemental Publication Deadline**") in one or more of any of the following publications: *Boston Globe, Houston Chronicle, New York Times National Edition, Arizona Republic, Florida Today, Indian River Press Journal, Miami*

*Herald, Midland Reporter-Telegram, South Florida Sun Sentinel, Texarkana Gazette, Youngstown Vindicator, Monroe News-Star*, as well as other publications as the Debtors deem appropriate.

58.     The Debtors submit that the foregoing notice procedures comply with all notice requirements under Bankruptcy Rules 3017(d) and 2002.  Accordingly, the Debtors request that the Court find that such notice is due and proper and no further notice is necessary.

### Administrative Expense Claims Consent Program Procedures

**A.     Approval of Consent Program Opt-Out Form and Consent Program Opt-Out Procedures**

59.     In light of the amount of secured, administrative, and priority claims against the Debtors' estates, as well as the forecasted timeline for the Debtors to monetize and collect on their remaining assets (including significant litigation claims), the Debtors anticipate that there will be a significant executory period between the Confirmation Date of the Plan and the Effective Date of the Plan.  Accordingly, to accelerate (i) cash payments to consenting holders of Allowed Administrative Expense Claims prior to the Effective Date of the Plan, and (ii) the consummation of the Plan, the Plan provides for the Administrative Expense Claims Consent Program.  As further detailed in section I.B of the Disclosure Statement and section 2.1 of the Plan, the Administrative Expense Claims Consent Program provides for a compromise whereby each eligible holder of an Administrative Expense Claim (other than as provided herein) that is entitled to participate in the Administrative Expense Claims Consent Program and does not effectively opt-out will (i) have its Administrative Expense Claim deemed allowed in the amount equal to 50% of the amount set forth in the Debtors' books and records (the "**Settled Administrative Expense Claim**"); and (ii) receive an accelerated payment following the Confirmation Date on account of their Settled Administrative Expense Claim, which shall consist of a pro rata portion up to the Settled Administrative Expense Claim of a distribution equal to $12.5 million (the "**Settled**

**Administrative Expense Claims Cash Pool**") following the Confirmation Date.  If the pro rata distribution under the Settled Administrative Expense Claims Cash Pool is less than the Settled Administrative Expense Claim, the remainder of such Settled Administrative Expense Claim will be paid the later of (i) the Effective Date, (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or (iii) the next Plan Distribution Date after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim in accordance with Section 2.1 of the Plan.  Holders of (i) asserted Administrative Expense Claims that the Debtors dispute in their entirety, (ii) Professional Fee Claims, and (iii) FILO DIP Claims will not be entitled to participate in the Administrative Expense Claims Consent Program.

60.     To the extent a holder of an Allowed Administrative Claim does not timely, properly, and affirmatively, opt out of the Administrative Expense Claims Consent Program, such holder shall be deemed to have agreed (i) to be bound by the terms of the Administrative Expense Claims Consent Program, and (ii) upon entry of the Confirmation Order, that such holder's acceptance of and consent to the Administrative Expense Claims Consent Program will be deemed consent to the Plan and acceptance of the treatment under the Plan in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Administrative Expense Claim (other than as set forth herein) as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code.

61.     The implementation of the Administrative Claims Consent Program is conditioned upon sufficient participation in the Administrative Claims Consent Program. Specifically, at least 75% (in dollar amount) of the Debtors' estimated Allowed Administrative Expense Claims must participate in the Administrative Claims Consent Program

(the "**Administrative Expense Claims Consent Program Condition**").  If Holders of more than 25% (in dollar amount) of the Debtors' estimated Allowed Administrative Expense Claims opt out of the Administrative Claims Consent Program, and unless such condition is waived by the Debtors and the Creditors' Committee, the Administrative Claims Consent Program will not be consummated.  If the Administrative Expense Claims Consent Program Condition is not met or waived by both the Debtors and the Creditors' Committee, the Debtors' estates shall retain the Settled Administrative Expense Claims Cash Pool equal to $12.5 million.

       1.     **Form and Notice of Administrative Expense Claims Consent Program Materials**

       a.     **Consent Program Opt-Out Form**

      62.    The Consent Program Opt-Out Form contains (i) a detailed description of the Administrative Expense Claims Consent Program, (ii) the amount of a holder's Administrative Expense Claim on the Debtor's books and records as of the Administrative Claims Record Date (the "**Reconciled Amount**"), (iii) the amount that will be the holder's Allowed Administrative Claim if such holder does not opt out of the Administrative Expense Claims Consent Program (*i.e.*, 50% of the Reconciled Amount, the "**Settled Administrative Expense Claim**") and (iv) provides detailed instructions on how to properly fill out the Consent Program Opt-Out Form.  The Debtors further propose that the Consent Program Opt-Out Form must be timely and properly completed and returned either by (i) delivering the Consent Program Opt-Out Form to the Voting Agent or (ii) submitting the Consent Program Opt-Out Form by electronic, online transmission through the Online Portal, each in accordance with Consent Program Opt-Out Procedures.  The Debtors request authority to, in consultation with the Creditors' Committee, adjust any Administrative Expense Claim on the Claims Register (i) if a holder declines to opt out of the Administrative Expense Claims Consent Program, in accordance with the Settled Administrative Expense Claim

listed on such holders Consent Program Opt-Out Form, or (ii) upon agreement between the parties in interest, in consultation with the Creditors' Committee, in each case, without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

63.     The Debtors' proposed Consent Program Opt-Out Procedures and Consent Program Opt-Out Form provide eligible holders of Administrative Expense Claims ample opportunities and clear instructions to timely, properly, and affirmatively opt out of the Administrative Expense Claims Consent Program.  The use of the Consent Program Opt-Out Form to facilitate participation in the Administrative Expense Claims Consent Program is similar to the opt-out mechanism of various other administrative claim settlement programs that were approved by the bankruptcy courts in a number of districts.  *See, e.g., In re Pier 1 Imp., Inc.*, Case No. 20-30805 (KRH) (Bankr. E.D. Va. June 24, 2020) (ECF No. 804) (authorizing a consent form notice that provided that parties who do not opt out in accordance with the procedures set forth thereon will be deemed to consent to less than full payment as contemplated by the debtors' chapter 11 plan); *In re Gemstone Sols. Grp., Inc.*,  Case No. 19-30258 (KLP) (Bankr. E.D. Va. March 13, 2020) (ECF No. 1426) (approving an election form that provided that failure to opt out on the election form shall be deemed as consent to partial payment of allowed administrative claims in accordance with the administrative claim settlement terms contemplated in the debtors' chapter 11 plan); *In re Barneys N.Y., Inc.*, Case No. 19-36300 (CGM)  (Bankr. S.D.N.Y. Dec. 19, 2019) (ECF No. 612) (approving disclosure statement and solicitation procedures where holders of administrative, priority tax, and other priority claims that do not object to the debtors' chapter 11 plan are deemed to have consented to receiving a smaller distribution than the full amount of the allowed administrative claims); *In re Sears Holdings Corp.*, Case No. 18-23538 (RDD) (Bankr.

S.D.N.Y. Oct. 15, 2019) (ECF No. 5370) (confirming the debtors' chapter 11 plan where holders of administrative expense claims who do not opt out of the administrative expense claims consent program will be deemed to be satisfied in full on account of such claims once they have received payment in cash equal to 80% of the applicable allowed administrative claims); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Aug. 8, 2018), (ECF No. 4083) (approving opt-out procedures that provided for mailing a notice of the settlement agreement to administrative claim holders that provided each claimant with the opportunity to affirmatively opt out of the settlement); *In re Teligent, Inc.*, 282 B.R. 765 (Bankr. S.D.N.Y. 2002) (confirming chapter 11 plan where administrative claimants that did not respond to solicitation were deemed to have consented to treatment of less than 100% payment proposed by debtors).

64.     The Debtors' proposed use of the Consent Program Opt-Out Form is analogous to the "opt-out" mechanism of third party releases that is frequently approved by this Court and courts in several other districts: including both proper notice of the opportunity to opt-out (with detailed instructions for doing so) and the consequences of failure to opt-out (*i.e.*, being deemed to be bound by the releases, or in this case, the treatment under the Administrative Expense Claims Consent Program).  *See, e.g., DRF Logistics, LLC, et al.,* (Case No. 24-90447) (CML) (Bankr. S.D. Tex. Nov 25, 2024) (ECF No. 530) (confirming a chapter 11 Plan with a consensual third-party release with an opt-out mechanism)*; In re Robertshaw US Holding Corp., et al.,* Case No. 24-90052 (CML) (Bankr. S.D. Tex. Aug 16, 2024) (ECF No. 959) ("Hundreds of chapter 11 cases have been confirmed in this District with consensual third party releases with an opt-out."). As such, the Debtors believe that the Consent Program Opt-Out Form provides for a fair and equitable opportunity to opt out.

65. The Debtors submit that the Consent Program Opt-Out Form should be approved.

### 2. Administrative Claims Record Date

66. To identify and establish the universe of holders of Administrative Expense Claims eligible to participate in the Administrative Expense Claims Consent Program, the Debtors request that the Court set May 21, 2025 as the date for determining which holders of Administrative Expense Claims are entitled to receive the Consent Program Opt-Out Form.

67. With respect to transfers of Claims filed pursuant to Bankruptcy Rule 3001(e), the Debtors proposed that the transferee be entitled to receive Consent Program Materials, and, if the holder of such claim is otherwise entitled to opt out of the Administrative Expense Claims Consent Program, such holder may submit a Consent Program Opt-Out Form on account of such Claim only if (i) all actions necessary to transfer such Claim are completed by the Administrative Claims Record Date or (ii) by the Administrative Claims Record Date, the transferee files (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer. Further, the Debtors request that, in the event an Administrative Expense Claim is transferred after the Administrative Claims Record Date, the transferee of such Administrative Expense Claim shall be bound by any election on the Consent Program Opt-Out Form made by the holder of such Administrative Expense Claim as of the Administrative Claims Record Date pursuant to the Consent Program Opt-Out Procedures.

68. The foregoing timing and materials will afford holders of Claims entitled to make an election with respect to the Administrative Expense Claims Consent Program sufficient time to review and analyze such materials and subsequently make an informed decision as to whether to elect to opt out of the Administrative Expense Claims Consent Program before the

Consent Program Opt-Out Deadline, consistent with the requirements of the applicable Bankruptcy Rules. *See* Fed. R. Bankr. P. 3017(d) (after approval of a disclosure statement, the debtor must transmit the plan, the approved disclosure statement, a notice of the time within which acceptances and rejections of such plan may be filed, and any other information that the court may direct to certain holders of claims). The Administrative Claims Record Date complies with Bankruptcy Rule 3017(d) and, therefore, should be approved.

**3.** **Approval of the Consent Program Materials and Procedures for Distribution Thereof**

69. To ensure that each eligible administrative expense claimant has sufficient information to identify whether to participate in the Administrative Expense Claims Consent Program, the Debtors propose to mail, or cause to be mailed, Consent Program Materials within the Mailing Deadline to holders of Administrative Expense Claims; provided that holders of (i) Professional Fee Claims (ii) FILO DIP Claims, or (iii) asserted Administrative Expense Claims that the Debtors dispute in their entirety, are not entitled to participate in the Administrative Expense Claims Consent Program and will not receive Consent Program Materials as of the Administrative Claims Record Date. Consent Program Materials shall contain copies of:

    (a)    the Proposed Order, as entered by the Court and without attachments;

    (b)    the conditionally approved Disclosure Statement with all exhibits thereto, including the Plan;

    (c)    the Combined Hearing Notice;

    (d)    a Consent Program Opt-Out Form customized (where possible and appropriate) for such holder; and

    (e)    a postage-prepaid return envelope.

70. The Debtors propose to implement the proposed notice and service procedures set forth in paragraphs 39-42 hereof with regard to the Consent Program Materials,

except that the Consent Program Opt-Out Forms rather than the Ballots (in addition to the Combined Hearing Notice) will be sent in paper format. Debtors further propose that, to the extent a holder is entitled to receive both a Solicitation Package and one of the Election Packages, the Voting Agent is authorized to consolidate such packages to limit costs to the estate.

71. The Debtors propose that the Consent Program Opt-Out Form be submitted and tabulated in accordance with the following procedures (the "**Consent Program Opt-Out Procedures**"):

| Administrative Claims Record Date | • May 21, 2025. |
|---|---|
| Consent Program Opt-Out Deadline | • All Consent Program Opt-Out Forms must be timely and properly completed and returned so as to be **actually received** by the Voting Agent by **July 1, 2025 at 5:00 p.m. (Central Time)** either by (i) delivering the Consent Program Opt-Out Form to the Voting Agent in the return envelope provided or otherwise by first-class mail, hand delivery, or overnight courier or (ii) submitting the Consent Program Opt-Out Form by electronic, online transmission through the Online Portal (as defined herein), each in accordance with the instructions included on the Consent Program Opt-Out Form. |
| Tabulation | • Whenever a holder of an Administrative Expense Claim submits a Consent Program Opt-Out Form that does not properly check the box to affirmatively indicate such holder's decision to opt out of the Administrative Expense Claims Consent Program, such Form will not be counted, and such creditor shall be deemed not to have opted out of the Administrative Expense Claims Consent Program.<br><br>• A holder that timely and properly submits a Consent Program Opt-Out Form shall be deemed to have opted out of the Administrative Expense Claims Consent Program.<br><br>• A holder of Administrative Expense Claims against more than one Debtor that timely and properly submits a Consent Program Opt-Out Form shall have its election to affirmatively opt out counted with respect to each of such Debtors.<br><br>• The Debtors, in consultation with the Creditors' Committee, may waive any defects or irregularities as to any particular irregular Consent Program Opt-Out Form at any time, either before or after the Consent Program Opt-Out Deadline.<br><br>• Failure to properly follow the instructions on, and timely submit, the Consent Program Opt-Out Form may result in the Consent |

| | Program Opt-Out Form not being counted.<br>• The Debtors and/or their Voting Agent, as applicable, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Consent Program Opt-Out Forms, which determination will be final and binding on all parties.<br>• The Debtors are further authorized, in consultation with the Creditors' Committee, to waive any defects or irregularities or conditions of delivery as to any particular Consent Program Opt-Out Form by any holders of Administrative Expense Claims. |
|---|---|

72.     The Debtors submit that they have shown good cause for implementing the proposed notice and service procedures.  The Debtors believe that the foregoing procedures will provide a fair and equitable election process and request that the Court approve the Consent Program Opt-Out Procedures and that holders who do not opt out of the Administrative Expense Claims Consent Program via the Consent Program Opt-Out Form are deemed to consent to the Administrative Expense Claims Consent Program.

<u>**Confirmation Schedule**</u>

**A.      Confirmation Schedule Complies with Applicable Bankruptcy Law**

73.     The Debtors seek a Combined Hearing to consider final approval of the Disclosure Statement and the Plan.  Bankruptcy Rule 3017(c) provides that, "[o]n or before approval of the disclosure statement, the court . . . may fix a date for the hearing on confirmation" of a chapter 11 plan.  Fed. R. Bankr. P. 3017(c).  Section 105(d)(2)(B)(vi) of the Bankruptcy Code provides that the Court may combine the hearing on approval of a disclosure statement with the hearing on confirmation of a chapter 11 plan.  Notably, paragraph P of the Complex Case Procedures provides that "[c]ontemporaneously with the filing of a disclosure statement and proposed plan, a plan proponent may file a motion requesting . . . the scheduling of a joint hearing to consider final approval of the proposed disclosure statement."

74. The Debtors submit that holding a Combined Hearing is appropriate and respectfully request that the Court schedule the Combined Hearing on July 8, 2025 or as soon thereafter as is practicable in light of the Court's calendar. The Combined Hearing may be adjourned or continued from time to time by the Court or the Debtors, in consultation with the Creditors' Committee, without further notice other than adjournments announced in open Court or as indicated in any notice of agenda of matters scheduled for hearing filed with the Court. The Debtors request that the Court find that the date for the Combined Hearing is in compliance with the Bankruptcy Rules and the Bankruptcy Local Rules.

75. A Combined Hearing in these chapter 11 cases will promote judicial economy and reduce administrative expenses by allowing the Debtors to quickly confirm the Plan, preserve the value of the Debtors' estates, and allow the Estate Representative (as defined in the Plan and Disclosure Statement) to monetize remaining assets.

**B. Confirmation Objection Procedures**

76. Pursuant to Bankruptcy Rule 3020(b)(1), objections to confirmation of a plan must be filed and served "within a time fixed by the court." Fed. R. Bankr. P. 3020(b)(1). Bankruptcy Rule 2002(b) provides that parties must receive at least twenty-eight (28) days' notice of the deadline for filing objections to confirmation. Accordingly, and in view of the Debtors' proposed solicitation schedule outlined herein—which provides for a Mailing Deadline of June 2, 2025, or as soon as reasonably practical thereafter—the Debtors request that the Court set July 1, 2025 at 5:00 p.m. (Central Time) as the Combined Objection Deadline. The Combined Objection Deadline will provide creditors with sufficient notice of the deadline for filing objections to the adequacy of the Disclosure Statement and confirmation of the Plan, while affording the Debtors and other parties time to file a responsive brief and, if possible, consensually resolve any objections received.

77.     The Debtors request that objections and responses, if any, to the adequacy of the Disclosure Statement and confirmation of the Plan must:  (i) be in writing; (ii) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any order of the Court; (iii) set forth the name of the objecting party and the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' estates or property; and (iv) provide the basis for the objection and the specific grounds therefor, and, if practicable, a proposed modification to the Plan that would resolve such objection.  The Debtors request that registered users of the Court's case filing system be required to electronically file their objections and responses on or before the Combined Objection Deadline and that all other parties in interest be required to file their objections and responses in writing, together with proof of service thereof, with the United States Bankruptcy Court Clerk's Office, United States Courthouse, 515 Rusk Avenue, Courtroom 401, 4th Floor, Houston, Texas 77002, on or before the Combined Objection Deadline.

78.     The Debtors further request that they (and other parties in support of the Plan) be authorized to file a brief in support of confirmation of the Plan and in reply to any objections to the adequacy of the Disclosure Statement on a final basis or confirmation of the Plan on or before July 1, 2025.

79.     The Debtors respectfully request that the Court approve the procedures for filing objections to the adequacy of the Disclosure Statement on a final basis and the confirmation of the Plan and replies thereto and find that such procedures comply with Bankruptcy Rules 2002 and 3020 and provide due process to all of the Debtors' stakeholders.

### C.     Proposed Deadline for Filing Plan Supplement Is Appropriate

80.     Pursuant to the Plan, the Debtors intend to file a supplement to the Plan (the "**Plan Supplement**"), containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented

from time to time in accordance with the terms of the Plan and the Bankruptcy Code and Bankruptcy Rules, which shall include, but not be limited to: (i) the Schedule of Identified Non-Released Parties; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Schedule of Alternative Plan Debtors; (v) the Wind Down Budget; (vi) the Plan Administrator Agreement; (vii) disclosure of the identity of the Plan Trustee; (viii) the Plan Trust Agreement; (ix) disclosure of the identity of the Litigation Trustee; (x) the Litigation Trust Agreement; (xi) the Transition Services Agreement; (xii) the Litigation Funding Agreement; and (xiii) the Medical Liability Claims Procedures.

81. The Debtors request that the Court authorize the Debtors to file the Plan Supplement with the Court by June 24, 2025 which is seven (7) days before the Combined Objection Deadline (the "**Plan Supplement Filing Deadline**").

82. The Debtors submit that the Plan Supplement Filing Deadline is prudent and attainable under the circumstances of these chapter 11 cases. Thus, the Debtors respectfully request that the Court approve the Plan Supplement Filing Deadline.

**D.    Procedures with Respect to Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases**

83. Article X of the Plan provides that, all executory contracts and unexpired leases to which any of the Debtors are a party shall be deemed rejected except for an executory contract or unexpired lease that: (i) is specifically and expressly designated as a contract or lease to be assumed pursuant to the Plan, including as set forth in the Schedule of Assumed Contracts or Confirmation Order; (ii) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Court or assumed and assigned pursuant to pursuant to a Final Order of the Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate assumption or rejection motion filed by the Estate

Representative on or before the Effective Date; (v) is the subject of a pending Cure Dispute; (vi) is a contract, lease, or other agreement or document entered into in connection with the Plan; or (vii) is a D&O Policy or other insurance policy to which any Debtor or Estate Representative is a beneficiary or an insured. For the avoidance of doubt, the Estate Representative may seek to assume, assume and assign, or reject an executory contract or unexpired lease at any time prior to the Effective Date, whether or not such executory contract or unexpired leases is listed on the Schedule of Assumed Contracts.

84. Pursuant to section 10.3 of the Plan, at least fourteen (14) days before the Combined Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to potentially be assumed or assumed and assigned to the Plan Trust, reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any). Additionally, section 10.3 of the Plan provides that any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Estate Representative (as applicable) within ten (10) days of the service of the assumption notice, or such shorter period as agreed to by the parties or authorized by the Court. Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have consented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the

ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor under such Executory Contract or Unexpired Lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or its Estate, as applicable.

85.     Section 10.3 of the Plan will also provide that, if there is a Cure Dispute (as defined in the Plan) pertaining to assumption of an Executory Contract or Unexpired Lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Court prior to such assumption being effective; *provided,* that the Estate Representative, as applicable, may settle any such Cure Dispute without any further notice to any party or any action, order, or approval of the Court.  To the extent a Cure Dispute relates solely to the Cure Amount, the Estate Representative, as applicable, may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of the Cure Dispute; *provided,* that the Estate Representative reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to the extent such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Court or otherwise agreed to by such non-Debtor party and the Estate Representative).

86.     Section 10.4 of the Plan provides that in the event that the rejection of an executory contract or unexpired lease by an Estate Representative results in damages to the other party or parties to such executory contract or unexpired lease, a Claim for such damages shall not (i) be treated as a creditor with respect to such Claim, or (ii) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the

Debtors, the Estates, the Plan Trust, the Plan Trustee, or the property for any of the foregoing without the need for any objection by the Plan Trustee or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims, except as otherwise provided by Final Order of the Court.

87. The Debtors respectfully submit that notice of the Debtors' assumption of Executory Contracts and Unexpired Leases is appropriate under the circumstances and request that the Court approve such procedures.

**Reservation of Rights**

88. Nothing contained herein is intended to be or shall be deemed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver or limitation of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action that may exist against any creditor or interest holder, or (vii) an approval, assumption, adoption, or rejection of any executory contract or unexpired lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve all of their rights with respect to the foregoing matters. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as

an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

### Notice

89.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Local Rule 9013-1(d).

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: April 28, 2025
        Houston, Texas


 */s/ Clifford W. Carlson*

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email:     Gabriel.Morgan@weil.com
           Clifford.Carlson@weil.com
           Stephanie.Morrison@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email:     Jeffrey.Saferstein@weil.com
           Jason.George@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159
Email:     DavidJ.Cohen@weil.com

*Attorneys for Debtors and*
*Debtors in Possession*

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:     Ray.Schrock@lw.com
           Candace.Arthur@lw.com

*Attorneys for Debtors*
*and Debtors in Possession*

## Certificate of Service

I hereby certify that on April 28, 2025 a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


                 *__/s/ Clifford W. Carlson_____*
                 Clifford W. Carlson



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC**, *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors. [1] | § | |
| | § | |

**ORDER (I) SCHEDULING COMBINED HEARING ON
(A) ADEQUACY OF DISCLOSURE STATEMENT AND
(B) CONFIRMATION OF PLAN; (II) CONDITIONALLY
APPROVING DISCLOSURE STATEMENT AND FORM
AND MANNER OF NOTICE OF CONDITIONAL DISCLOSURE
STATEMENT HEARING; (III) ESTABLISHING SOLICITATION
AND VOTING PROCEDURES; (IV) ESTABLISHING ADMINISTRATIVE
EXPENSE CLAIMS CONSENT PROGRAM NOTICE AND OPT-OUT
PROCEDURES; (V) ESTABLISHING NOTICE AND OBJECTION
PROCEDURES FOR CONFIRMATION OF PROPOSED PLAN; (VI) APPROVING
NOTICE PROCEDURES FOR ASSUMPTION OR REJECTION OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (VII) GRANTING RELATED RELIEF**

Upon the motion, dated April 28, 2025 (the "**Motion**"), Steward Health Care

System LLC, and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and

debtors in possession (collectively, the "**Debtors**"), for entry of an order pursuant to sections 105,

365, 1124, 1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3001, 3016,

3017, 3018, 3020, 6004, and 9006, Bankruptcy Local Rules 2002-1 and 3016-1, and the

Procedures for Complex Chapter 11 Cases in the Southern District of Texas (effective as of

September 18, 2024, the "**Complex Case Procedures**"), the Debtors request entry of an order (this

"**Order**"), granting the following relief:

---

[1]     A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Voting
Agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is
2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

**Plan, Disclosure Statement & Related Procedures, Dates/Deadlines and Materials**

i.    scheduling a combined hearing ("**Combined Hearing**") to approve the Disclosure Statement (as defined below) on a final basis and consider confirmation of the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. [●]) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Plan**");

ii.    conditionally[2] approving the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* (Docket No. [●]) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Disclosure Statement**")[3] as containing adequate information pursuant to section 1125 of the Bankruptcy Code;

iii.    approving the form and manner of notice of the hearing to conditionally consider the proposed Disclosure Statement;

iv.    approving the form and manner of the notice (the "**Combined Hearing Notice**") of the Combined Hearing, substantially in the form attached herein as **Exhibit 1**;

v.    establishing July 1, 2025 at 5:00 p.m. (Central Time) as the deadline to object to the adequacy of the Disclosure Statement and/or confirmation of the Plan (the "**Combined Objection Deadline**");

vi.    approving the procedures for assumption, assumption and assignment, or rejection of the Debtors' executory contracts and unexpired leases;

**Solicitation and Voting**

vii.    establishing May 21, 2025 as the record date for the purpose of determining which holders of Claims are entitled to vote on the Plan and receive the applicable notice(s) relating to solicitation and confirmation (the "**Voting Record Date**");

viii.    approving procedures for (a) soliciting, receiving, and tabulating votes to accept or reject the Plan and (b) voting to accept or reject the Plan (the "**Solicitation and Voting Procedures**"), substantially in the form attached herein as **Exhibit 2**;

ix.    approving the ballots (the "**Ballots**") that the Debtors will send to holders of Claims entitled to vote to accept or reject the Plan, substantially in the forms attached herein as **Exhibits 3-5**;

---

[2]    The Debtors reserve the right to seek final approval of the Disclosure Statement prior to the Combined Hearing to the extent the hearing to consider approval of the Disclosure Statement is moved to a date after the 28-day objection deadline under Bankruptcy Rule 2002(b).

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement or the Plan, as applicable.

x.  finding that the solicitation materials and documents included in the solicitation packages to be sent to holders of Claims entitled to vote to accept or reject the Plan as described in paragraph 8 herein (the "**Solicitation Packages**") are in compliance with Bankruptcy Rules 2002(b) and 3017(d);

xi.  approving the form of notice the Debtors will send to holders of Claims and Interests of the Non-Voting Classes (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests)) that are, pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, conclusively presumed to accept or deemed to reject the Plan, as applicable (the "**Notice of Non-Voting Status**"), substantially in the form attached herein as **Exhibit 6**;

xii.  approving (a) the form to opt out of the Third-Party Releases (the "**Release Opt-Out Form**"), substantially in the form attached herein as **Exhibit 7**, which the Debtors will send to holders of Claims and Interests of the Non-Voting Classes (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests)) that are, pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, conclusively presumed to accept or reject the Plan, as applicable, and (b) July 1, 2025 at 5:00 p.m. (Central Time) as the deadline by which holders of Claims and Interests of the Non-Voting Classes (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests)) must submit the Release Opt-Out Form (the "**Release Opt-Out Deadline**");

xiii.  establishing July 1, 2025 at 5:00 p.m. (Central Time) as the deadline by which holders of Claims entitled to vote may vote to accept or reject the Plan (the "**Voting Deadline**");

### Administrative Expense Claims Consent Program

xiv.  approving the form of opt-out the Debtors will send to holders of Administrative Expense Claims (other than as otherwise provided herein) for the Administrative Expense Claims Consent Program (the "**Consent Program Opt-Out Form**"), substantially in the form attached herein as **Exhibit 8**;

xv.  establishing May 21, 2025 as the record date for determining which holders of Administrative Expense Claims are entitled to participate in the Administrative Expense Claims Consent Program and receive the Consent Program Opt-Out Form (the "**Administrative Claims Record Date**");

xvi.  approving the materials and documents to be sent to eligible holders of Administrative Expense Claims (as provided in paragraph 30 herein) (the "**Consent Program Materials**");

xvii.  approving (a) the Consent Program Opt-Out Procedures (as defined herein) and (b) July 1, 2025 at 5:00 p.m. (Central Time) as the deadline by which holders of Administrative Expense Claims must submit the Consent Program Opt-Out Form (the "**Consent Program Opt-Out Deadline**"); and

xviii.    granting related relief;

all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion

and the relief requested therein pursuant to 28 U.S.C. § 1334; and this Court having found that this

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that venue of

this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409;

and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing

on the Motion were appropriate and no other notice need be provided; and this Court having

reviewed the Motion; and this Court having held a hearing to consider the relief requested in the

Motion (the "**Conditional Disclosure Statement Hearing**"); and all objections, if any, to the

Motion having been withdrawn, resolved, or overruled; and this Court having determined that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and

it appearing that the relief requested in the Motion is in the best interests of the Debtors and their

respective estates and creditors; and upon all of the proceedings had before this Court and after

due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

**Conditional Approval of Disclosure Statement.**

1.    The Disclosure Statement is hereby conditionally approved as providing

holders of Claims entitled to vote on the Plan with adequate information to make an informed

decision as to whether to vote to accept or reject the Plan within the meaning of section 1125 of

the Bankruptcy Code and complies with Bankruptcy Rule 3016(c) and is subject to final approval

of the Court at the Combined Hearing.  No further or additional information is necessary or

required.

2.    The Disclosure Statement (including all applicable exhibits thereto)

provides holders of Claims and other parties in interest with sufficient notice of the proposed

releases, injunctions, and exculpation provisions contained in Article XII of the Plan, in accordance with Bankruptcy Rule 3016(c).

3.    The procedures pursuant to which the Debtors provided notice to the parties entitled to notice of the time, date, and place of the Conditional Disclosure Statement Hearing provided due, proper, and adequate notice, comport with due process, and comply with all applicable Bankruptcy Rules and Bankruptcy Local Rules. No further notice is required or necessary.

**Approval of Solicitation and Voting Procedures and Materials and Timeline for Soliciting Votes for Confirming Plan.**

a.    **Solicitation and Voting Procedures.**

4.    The Solicitation and Voting Procedures, attached hereto as **Exhibit 2**, provide for a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018 and are hereby approved in their entirety.

5.    The Debtors are hereby authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation and Voting Procedures. The solicitation period during which the Debtors will solicit votes to accept or reject the Plan is a reasonable and sufficient period of time for holders of Claims in the Voting Classes to make an informed decision regarding whether to accept or reject the Plan and timely return Ballots evidencing such decision.

b.    **Solicitation and Confirmation Timeline.**

6.    The following dates and deadlines are hereby established (subject to modification as necessary by the Debtors in consultation with the Creditors' Committee) with respect to the solicitation of the Plan, voting on the Plan, and confirmation of the Plan, as well as filing objections to confirmation of the Plan and approving the Disclosure Statement on a final basis:

| SOLICITATION AND CONFIRMATION TIMETABLE | |
|---|---|
| Voting Record Date and Administrative Claims Record Date | **May 21, 2025** |
| Mailing Deadline for Combined Hearing Notice, Solicitation Packages, and Election Packages | **No later than three (3) business days after entry of this Order, or as soon as reasonably practicable thereafter** |
| Supplemental Publication Deadline | **As soon as reasonably practicable after entry of this Order** |
| Deadline for Debtors to File Claims Objections for Voting Purposes or to Request Claim Estimation for Voting Purposes | **June 17, 2025 at 5:00 p.m. (Central Time)** |
| Mailing Deadline for Cure Amounts and Filing of Cure Notice | **June 20, 2025** |
| Plan Supplement Filing Deadline | **June 24, 2025** |
| Rule 3018(a) Motion Deadline | **June 24, 2025 at 5:00 p.m. (Central Time)** |
| Voting Deadline, Consent Program Opt-Out Deadline, and Release Opt-Out Deadline | **July 1, 2025 at 5:00 p.m. (Central Time)** |
| Deadline to Object to Disclosure Statement and Plan | **July 1, 2025 at 5:00 p.m. (Central Time)** |
| Assumption and Cure Objection Deadline | **July 2, 2025** |
| Deadline to File Confirmation Brief and Reply to Plan Objection(s) | **July 6, 2025** |
| Ballot Certification Deadline | **July 7, 2025** |
| Combined Hearing | **July 8, 2025 at [●] [a.m. / p.m.] (Central Time)** |

**c.    Solicitation Packages.**

7.    The Solicitation Packages, and each of the documents contained therein (substantially in the form attached hereto), including, but not limited to the Ballots, are APPROVED.

8.    The Debtors shall mail, or cause to be mailed, the Solicitation Packages on or before the Mailing Deadline to holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date, as required by Bankruptcy Rule 3017(d).   The Debtors shall also provide complete Solicitation Packages (excluding Ballots, as applicable) to the U.S. Trustee and all parties required to be notified under Bankruptcy Rule 2002 and Local Rule 2002-11 (except to the extent that such party is entitled to receive an Election Package).   Solicitation Packages shall contain copies of:

(a)    this Order, as entered by this Court and without attachments;

(b)    the conditionally approved Disclosure Statement with all exhibits thereto, including the Plan;

(c)    the Combined Hearing Notice;

(d)    the Solicitation and Voting Procedures;

(e)    the applicable Ballot customized (where possible and appropriate) for such holder and conforming to Official Bankruptcy Form No. B 314, in the form described below;[4]

(f)    for holders of claims in Class 4, the letter from the Creditors' Committee to holders of unsecured claims setting forth, among other things, the Creditors' Committee's recommendation that holders of General Unsecured Claims vote to accept the Plan (the "**Creditors' Committee Position Letter**"); and

(g)    a postage-prepaid return envelope.

---

[4]    Official Bankruptcy Form No. B 314 can be found at http://www.uscourts.gov/forms/bankruptcy-forms, the official website for the United States Bankruptcy Courts.

9.     The Debtors are authorized to serve the Plan, the Disclosure Statement, and this Order in electronic format (on a QR code included in the Combined Hearing Notice), such that only the Ballots and the Combined Hearing Notice shall be served in paper format, except as otherwise provided in this Order, the Solicitation and Voting Procedures, or the Consent Program Opt-Out Procedures.   Any creditor or equity holder for which service by QR code imposes a hardship may request an additional copy of the Plan, the Disclosure Statement (and attachments), and this Order (without attachments except the Solicitation and Voting Procedures) in paper format or via USB flash drive by contacting Kroll by (a) calling (646) 893-5546 (international) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line.   Upon receipt of an email, telephonic, or written request, in a timely manner, the Debtors shall provide such creditor with a paper copy, or a USB flash drive, of the Plan and the Disclosure Statement at no cost to the creditor.

10.     The Voting Agent is authorized to assist the Debtors in (i) distributing the Solicitation Packages and, as applicable, the Consent Program Materials, Notice of Non-Voting Status, or the Release Opt-Out Forms (collectively referred to as the "**Election Packages**") (ii) receiving, tabulating, and reporting on Consent Program Opt-Out Forms cast to opt out of the Administrative Expense Claims Consent Program by holders of Allowed Administrative Expense Claims, (iii) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims, (iv) receiving, tabulating, and reporting on Release Opt-Out Forms cast to opt out of the Third-Party Releases by Non-Voting Classes, (v) responding to inquiries from holders

of Claims or Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the Administrative Expense Claims Consent Program by the Consent Program Materials, or the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, or the procedures and requirements to opt out of the Third-Party Releases by the Release Opt-Out Form or the Third-Party Release Opt-Out Election, (vi) soliciting votes on the Plan, and (vii) if necessary or appropriate, contacting creditors and equity holders regarding the Plan, the Ballots, the Solicitation Packages, the Election Packages, and all other related documents and matters related thereto.  To the extent a holder is entitled to receive both a Solicitation Package and one of the Election Packages, the Voting Agent is authorized to consolidate such packages to limit costs to the estate.

11.     Holders of transferred Claims entitled to vote on the Plan shall receive a Solicitation Package only if: (i) all actions necessary to transfer such Claim are completed by the Voting Record Date or (ii) the transferee files, by the Voting Record Date, (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer.  In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote on the Plan made by the holder of such Claim as of the Voting Record Date.

12.     The Voting Agent is authorized to accept the Ballots on or before the Voting Record Date: (i) by first-class mail in the return envelope provided with each Ballot, (ii) by overnight courier; (iii) by hand delivery; or (iv) via Kroll's online balloting portal (each such electronically submitted Ballot, an "**E-Ballot**") at the Online Portal.   The encrypted E-Ballot data and audit trail created by electronic submission via Kroll's Online Portal shall become part of the

record of any Ballot submitted in this manner and the creditor's electronic signature shall be deemed to be immediately legally valid and effective. Alternatively, in lieu of submitting an E-Ballot, holders of Claims may return their Ballots in the return envelope provided, or otherwise via first class mail, overnight courier, or hand delivery, so long as the Ballots are actually received on or before the Voting Deadline. Holders of Claims mailing their Ballots to the Voting Agent shall mail them to the following address:

> Steward Health Care System LLC Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

13. The Debtors are authorized, but not required, to (i) waive any defects or irregularities as to any Ballot at any time, either before or after the Voting Deadline, or (ii) extend the Voting Deadline (in consultation with the Creditors' Committee).

14. At any time during which Bankruptcy Court or other approval would otherwise be required to change or withdraw any ballots submitted or votes cast in connection with the Plan, if the Debtors or the Creditors' Committee have materially breached their respective obligations to the FILO Parties under the FILO Settlement Term Sheet, the Plan Support Agreement Term Sheet, or the FILO Settlement Order, and such breach is not cured by the earlier of (x) three business days after the FILO Parties have provided written notice of such breach to the Debtors' and Creditors' Committee's counsel or (y) the date that is two business days before the Confirmation Hearing, any holder of FILO Bridge Claims may modify or withdraw any ballots or votes previously submitted or cast by such holder and such ballots or votes may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need for further order or consent from the Debtors or any other party allowing such change or

resubmission); *provided* that, upon any such modification or withdrawal of any accepting ballots or votes of any such holder or change or resubmission of such votes, all parties shall be released from any obligations under the FILO Settlement Term Sheet, the Plan Support Agreement Term Sheet, or the FILO Settlement Order, which obligations shall be deemed terminated, other than with respect to any breach occurring prior to such termination.

15.     The Debtors are not required to mail Solicitation Packages or Notices of Non-Voting Status to holders (i) that have Claims that have already been paid in full during these chapter 11 cases, (ii) whose prior mailings in these chapter 11 cases were returned as undeliverable and that have not provided a forwarding address by the Voting Record Date,[5] and (iii) that have Claims and Interests, as applicable, in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests).   In the event that the United States Postal Service returns some Solicitation Packages, Election Packages, or Notices of Non-Voting Status as undeliverable, the Debtors shall be excused from re-mailing such Solicitation Packages, Election Packages, or Notices of Non-Voting Status.   The failure to mail such Solicitation Packages, Election Packages, Notices of Non-Voting Status, or any other materials related to voting or confirmation of the Plan to such entities will not constitute inadequate notice of the Combined Hearing or the Voting Deadline and shall not constitute a violation of Bankruptcy Rule 3017.

**Notice of Non-Voting Status.**

16.     The Notice of Non-Voting Status is APPROVED.

---

[5]    For purposes of serving the Solicitation Packages, the Debtors are authorized to rely on the address information for (i) known holders of Administrative Expense Claims (other than Professional Fee Claims and FILO DIP Claims) and (ii) holders of the Voting and Non-Voting Classes as compiled, updated, and maintained by the Voting Agent as of the Voting Record Date, and the Debtors and the Voting Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitations Packages (including the Ballots).

17.     The proposed form and manner of service of the Notice of Non-Voting Status provide due, proper, and adequate notice, comport with due process, and comply with  all applicable Bankruptcy Rules and Bankruptcy Local Rules.   No further notice is required or necessary.

18.     Except to the extent that the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to holders of Claims and Interests in the Non-Voting Classes, as such holders are not entitled to vote on the Plan.    Instead, on or before the Mailing Deadline, the Voting Agent shall mail a Notice of Non-Voting Status, substantially in the form attached hereto as **Exhibit 6**, a Combined Hearing Notice, substantially in the form attached hereto as **Exhibit 1**, and a Release Opt-Out Form, substantially in the form attached hereto as **Exhibit 7** to the holders of Claims and Interests in the Non-Voting Classes in lieu of a Solicitation Package.

19.     The Notice of Non-Voting Status provides (i) notice of the Court's conditional approval of the Disclosure Statement, (ii) notice of filing the Plan, (iii) notice of the holder's non-voting status, (iv) notice of the Third-Party Releases Election (as described herein), and (iv) information about how to obtain copies of the Disclosure Statement and the Plan.  In addition, the Notice of Non-Voting Status contains the full text of the release, exculpation, and injunction provisions set forth in Article XII of the Plan and advises such holders of Claims in Non-Voting Classes that they will be bound by the Third-Party Releases in section 12.6(c) of the Plan unless they timely, properly, and affirmatively opt out.  Holders of Claims in the Non-Voting Classes that choose to opt out of the Third-Party Releases may do so by submitting their Release Opt-Out Form in the return envelope provided, or otherwise: (i) by first-class mail, (ii) by overnight courier, (iii) by hand delivery, or (iv) via the Online Portal, so that (in each instance)

their opt-out election is actually received by the Voting Agent no later than the Release Opt-Out Deadline.

20. The requirement to serve a Notice of Non-Voting Status, Release Opt-Out Form, Combined Hearing Notice, or any other type of notice in connection with solicitation of the Plan to Holders of Claims in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) is hereby waived.

**Release Opt-Out Form.**

21. The Release Opt-Out Form is APPROVED.

22. The Release Opt-Out Form complies with the Bankruptcy Code, applicable Bankruptcy Rules, and the applicable Bankruptcy Local Rules and Complex Case Procedures and, together with the Combined Hearing Notice and, as applicable, the Notice of Non-Voting Status, provides adequate notice to holders of Claims and Interests in the Non-Voting Classes. No further notice is required or necessary.

23. The Release Opt-Out Deadline shall be **July 1, 2025 at 5:00 p.m. (Central Time)**.

24. All Release Opt-Out Forms must be properly completed and returned either by (i) delivering the Release Opt-Out Form to the Voting Agent or (ii) submitting the Release Opt-Out Form by electronic, online transmission through the Online Portal, each in accordance with the instructions included on the Release Opt-Out Form. The Voting Agent is authorized to assist the Debtors in (i) receiving, tabulating, and reporting on Release Opt-Out Forms and (ii) responding to inquiries from holders of Claims or Interests and other parties in interest relating to the procedures and requirements to opt out of the Third Party Releases by the Release Opt-Out Form.

25.     A holder that timely, properly, and affirmatively elects to opt out of the

Third-Party Releases by the Release Opt-Out Deadline will not be deemed a Releasing Party under

the Plan (or, by extension, a Releasing Party).

**Approval of Consent Program Opt-Out Procedures and Materials and Timeline for Providing Consent Program Materials to Holders of Administrative Expense Claims.**

    **a.**    **Consent Program Opt-Out Procedures**

26.     The Consent Program Opt-Out Procedures (including the Consent Program

Opt-Out Deadline) are APPROVED.

| Administrative Claims Record Date | • May 21, 2025. |
|---|---|
| Consent Program Opt-Out Deadline | • All Consent Program Opt-Out Forms must be timely and properly completed and returned so as to be **actually received** by the Voting Agent by **July 1, 2025 at 5:00 p.m. (Central Time)** either by (i) delivering the Consent Program Opt-Out Form to the Voting Agent in the return envelope provided or otherwise by first-class mail, hand delivery, or overnight courier or (ii) submitting the Consent Program Opt-Out Form by electronic, online transmission through the Online Portal (as defined herein), each in accordance with the instructions included on the Consent Program Opt-Out Form. |
| Tabulation | • Whenever a holder of an Administrative Expense Claim submits a Consent Program Opt-Out Form that does not properly check the box to affirmatively indicate such holder's decision to opt out of the Administrative Expense Claims Consent Program, such Form will not be counted, and such creditor shall be deemed not to have opted out of the Administrative Expense Claims Consent Program.<br>• A holder that timely and properly submits a Consent Program Opt-Out Form shall be deemed to have opted out of the Administrative Expense Claims Consent Program.<br>• A holder of Administrative Expense Claims against more than one Debtor that timely and properly submits a Consent Program Opt-Out Form shall have its election to affirmatively opt out counted with respect to each of such Debtors.<br>• The Debtors, in consultation with the Creditors' Committee, may waive any defects or irregularities as to any particular irregular Consent Program Opt-Out Form at any time, either before or after the Consent Program Opt-Out Deadline.<br>• Failure to properly follow the instructions on, and timely submit, |

| | the Consent Program Opt-Out Form may result in the Consent Program Opt-Out Form not being counted. |
| | • The Debtors and/or their Voting Agent, as applicable, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Consent Program Opt-Out Forms, which determination will be final and binding on all parties. |
| | • The Debtors are further authorized, in consultation with the Creditors' Committee, to waive any defects or irregularities or conditions of delivery as to any particular Consent Program Opt-Out Form by any holders of Administrative Expense Claims. |

27.     The Debtors are authorized to adjust any Administrative Expense Claim on the Claims Register (i) if a holder declines to opt out of the Administrative Expense Claims Consent Program, in accordance with the Settled Administrative Expense Claim listed on such holders Consent Program Opt-Out Form, or (ii) upon agreement between the parties in interest (in consultation with the Creditors' Committee), in each case, without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

28.     The Consent Program Materials and the Consent Program Opt-Out Procedures (including the Consent Program Opt-Out Deadline) are adequate to solicit opt-out elections from eligible holders of Administrative Expense Claims with respect to the Administrative Expense Claims Consent Program and to otherwise inform holders of Administrative Expense Claims regarding their rights and available choices with respect to such program.  Those parties who do not timely, properly, and affirmatively opt out of the Administrative Expense Claims Consent Program in accordance with the Consent Program Opt-Out Procedures by the Consent Program Opt-Out Deadline shall be deemed to have consented to the settlement of their Administrative Expense Claims in the amount of the Settled Administrative Expense Claim listed on the Consent Program Opt-Out Form and treatment set forth in the Administrative Expense Claims Consent Program for such parties.  To the extent a holder of an

Allowed Administrative Expense Claim does not timely, properly, and affirmatively opt out of the Administrative Expense Claims Consent Program, upon entry of the Confirmation Order, such holder's acceptance of and consent to the Administrative Expense Claims Consent Program will be deemed consent to the Plan and acceptance of the treatment under the Plan in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Administrative Expense Claim (other than Professional Fee Claims and FILO DIP Claims) as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code. No further notice is required or necessary.

   **b.**  **Consent Program Materials**

   29.  The Consent Program Materials, and each of the documents contained therein (substantially in the form attached hereto), including, but not limited to the Consent Program Opt-Out Form, are APPROVED.

   30.  The Debtors are hereby authorized to take all actions necessary to implement the terms of the Consent Program Opt-Out Procedures, including mailing the Consent Program Materials to holders of Administrative Expense Claims in accordance with this Order and the Consent Program Opt-Out Procedures. Consent Program Materials shall contain copies of:

   (a)  this Order, as entered by the Court and without attachments;

   (b)  the conditionally approved Disclosure Statement with all exhibits thereto, including the Plan;

   (c)  the Combined Hearing Notice;

   (d)  the Consent Program Opt-Out Form customized (where possible and appropriate) for such holder; and

   (e)  a postage-prepaid return envelope.

   31.  The Debtors are authorized to serve the Disclosure Statement, the Plan, and this Order in electronic format (on a QR code included in the Combined Hearing Notice) instead

of printed hard copies. Only the Consent Program Opt-Out Form and the Combined Hearing

Notice will be provided in paper format. Moreover, the Plan and the Disclosure Statement will be

available at no charge via the Internet at the Online Portal. If service by QR code imposes a

hardship for any party entitled to receive a copy of the Plan and the Disclosure Statement (*e.g.*, the

party does not own or have access to a smartphone), such party may request a paper copy of, or a

USB flash drive that includes the Plan, Disclosure Statement, and this Order (without attachments,

except the Solicitation and Voting Procedures as annexed as **Exhibit 2** hereto) by contacting Kroll

by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b)

writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring

Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand

delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health

Solicitation Inquiry" in the subject line. Upon receipt of an email, telephonic, or written request,

in a timely manner, the Debtors shall provide such administrative creditor with a paper copy of, or

a USB flash drive containing, the Plan and the Disclosure Statement at no cost to such creditor.

32.     The Voting Agent is Authorized to assist the Debtors in (i) receiving and

reporting on Consent Program Opt-Out Forms cast to opt out of the Administrative Expense

Claims Consent Program and (ii) responding to inquiries from holders of Administrative Expense

Claims relating to the Consent Program Materials, including the Consent Program Opt-Out Form,

and all other related documents and matters related thereto, including the Consent Program Opt-

Out Procedures.

33.     Holders of transferred Administrative Expense Claims are entitled to opt out

of the Administrative Expense Claims Consent Program only if: (i) all actions necessary to transfer

such Claim are completed by the Administrative Claims Record Date or (ii) by the Administrative

Claims Record Date, the transferee files (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer. In the event an Administrative Expense Claim is transferred after the Administrative Claims Record Date, the transferee of such Administrative Expense Claim shall be bound by any election on the Consent Program Opt-Out Form made by the holder of such Claim as of the Administrative Claims Record Date pursuant to the Consent Program Opt-Out Procedures.

34.     The Voting Agent is authorized to accept the Consent Program Opt-Out Forms on or before the Consent Program Opt-Out Deadline: (i) by first-class mail in the return envelope provided with each Consent Program Opt-Out Form; (ii) by overnight courier; (iii) by hand delivery; or (iv) by electronic, online transmission at https://restructuring.ra.kroll.com/Steward/ (the "**Online Portal**"). The encrypted Consent Program Opt-Out Form data and audit trail created by electronic submission via Kroll's Online Portal shall become part of the record of any Consent Program Opt-Out Form submitted in this manner and the creditor's electronic signature shall be deemed to be immediately legally valid and effective.

35.     The Debtors are authorized, but not required, to (i) waive any defects or irregularities as to any Consent Program Opt-Out Form at any time, either before or after the Consent Program Opt-Out Deadline, or (ii) extend (in consultation with the Creditors' Committee) the Consent Program Opt-Out Deadline.

36.     In the event that the United States Postal Service returns the Consent Program Materials as undeliverable, the Debtors shall be excused from re-mailing such Consent Program Materials.

**Combined Hearing Notice.**

37.     The Combined Hearing Notice is APPROVED.

38.    The form and proposed manner of service of the Combined Hearing Notice provide due, proper, and adequate notice, comport with due process, and comply with all applicable Bankruptcy Rules and Bankruptcy Local Rules.  No further notice is required or necessary.

39.    The Debtors are authorized to give supplemental publication notice of the Combined Hearing in one or more of any of the following publications *Boston Globe, Houston Chronicle, New York Times National Edition, Arizona Republic, Florida Today, Indian River Press Journal, Miami Herald, Midland Reporter-Telegram, South Florida Sun Sentinel, Texarkana Gazette, Youngstown Vindicator, Monroe News-Star*, as well as other publications, as the Debtors deem appropriate.

**Combined Hearing.**

40.    The Combined Hearing will begin on **July 8, 2025 at [●] [a.m. / p.m.] (Central Time)**; *provided*, *however*, that the Combined Hearing may be adjourned or continued from time to time by the Court or the Debtors (in consultation with the Creditors' Committee) without further notice other than adjournments announced in open Court or as indicated in any notice of agenda of matters scheduled for hearing filed by the Debtors with the Court.

**Combined Objection Procedures.**

41.    The deadline to file an objection to the adequacy of the Disclosure Statement and/or confirmation of the Plan shall be **July 1, 2025 at 5:00 p.m. (Central Time)** (the "**Combined Objection Deadline**").

42.    Objections and responses, if any, to confirmation of the Plan, must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules, and any order of the Court; (iii) set forth the name of the objecting party, the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' estates or property; and (iv) provide

the basis for the objection and the specific grounds therefor, and, if practicable, a proposed modification to the Plan that would resolve such objection. Registered users of this Court's case filing system must electronically file their objections and responses on or before the Combined Objection Deadline. All other parties in interest must file their objections and responses in writing, together with proof of service thereof, with the United States Bankruptcy Court Clerk's Office, United States Courthouse, 515 Rusk Avenue, Courtroom 401, 4th Floor, Houston, Texas 77002, on or before the Combined Objection Deadline.

43. Pursuant to Bankruptcy Rule 3020(b), if no objection is timely filed, this Court may determine that the Plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues.

44. Objections to confirmation of the Plan that are not timely filed, served, and actually received in the manner set forth above shall not be considered and shall be deemed overruled.

45. The Debtors and any parties in interest are authorized to file and serve replies or an omnibus reply to any such objections along with a brief in support of confirmation of the Plan (the "**Confirmation Brief**") either separately or in a single, consolidated document on or before **July 6, 2025**.

**Approval of Notices to Executory Contract and Unexpired Lease Counterparties.**

46. The procedures set forth in the Motion regarding notice to all parties of the assumption, assumption and assignment, or rejection of the applicable Debtors' Executory Contracts and Unexpired Leases, provide due, proper, and adequate notice, comport with due process and comply with Bankruptcy Rules 2002, 3017 and 3020, and are hereby approved. No further or additional notice is required or necessary.

**Plan Supplement Filing Deadline.**

47.     The Debtors are authorized to file the Plan Supplement with the Court on or before **June 24, 2025** (the "**Plan Supplement Filing Deadline**").

**General.**

48.     The Debtors, in consultation with the Creditors' Committee, are authorized to make non-substantive changes to the Disclosure Statement, the Plan, the Ballots, the Consent Program Opt-Out Forms, the Consent Program Opt-Out Procedures, the Solicitation and Voting Procedures, the Combined Hearing Notice, the Notice of Non-Voting Status, the Release Opt-Out Form, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages or Election Packages prior to mailing.

49.     Nothing contained in the Motion or this Order or any payment made pursuant to the authority granted by this Order is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any Claims, (vi) a waiver of any Claims or causes of action which may exist against any creditor or interest holder, or (vii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.

50.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

51.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

52.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of the Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice.

53.     The Debtors are authorized to take all steps necessary or appropriate to carry out the relief granted in this Order.

54.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Signed:  [•], 2025

_____

Christopher Lopez
United States Bankruptcy Judge

## Exhibit 1

### Form of Combined Hearing Notice

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
| In re: | § | Chapter 11 |
| | § | |
| STEWARD HEALTH CARE SYSTEM | § | Case No. 24-90213 (CML) |
| LLC, *et al.*, | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |

NOTICE OF (I) CONDITIONAL
APPROVAL OF DISCLOSURE STATEMENT;
(II) APPROVAL OF (A) SOLICITATION AND VOTING
PROCEDURES, (B) ADMINISTRATIVE EXPENSE CLAIMS
CONSENT PROGRAM NOTICE AND OPT-OUT PROCEDURES;
AND (C) NOTICE PROCEDURES FOR THE ASSUMPTION OR
REJECTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
(III) COMBINED HEARING TO CONSIDER FINAL APPROVAL OF
DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN; AND
(IV) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR FINAL
APPROVAL OF DISCLOSURE STATEMENT AND CONFIRMATION OF PLAN

TO ALL PARTIES IN INTEREST IN THE CHAPTER 11 CASES OF:

| Name of Debtors | Case Numbers | Name of Debtors | Case Numbers |
|---|---|---|---|
| SJ Medical Center, LLC | 24-90210 (CML) | Choice Care Clinic III, Inc. | 24-90287 (CML) |
| Downtown Houston Physician Hospital Organization | 24-90211 (CML) | Choice Care Clinic of Louisiana, Inc. | 24-90291 (CML) |
| | | Choice Care Clinic of Utah, Inc. | 24-90299 (CML) |
| Steward Health Care Holdings LLC | 24-90212 (CML) | Converse Medical Center LLC | 24-90306 (CML) |
| Steward Health Care System LLC | 24-90213 (CML) | Davis Hospital & Medical Center, LP | 24-90315 (CML) |
| Arizona Diagnostic & Surgical Center, Inc. | 24-90214 (CML) | Davis Hospital Holdings, Inc. | 24-90318 (CML) |
| Beaumont Hospital Holdings, Inc. | 24-90215 (CML) | Davis Surgical Center Holdings, Inc. | 24-90324 (CML) |
| Biltmore Surgery Center Holdings, Inc. | 24-90216 (CML) | De Zavala Medical Center LLC | 24-90340 (CML) |
| Biltmore Surgery Center, Inc. | 24-90217 (CML) | Glenwood Specialty Imaging, LLC | 24-90344 (CML) |
| Blackstone Medical Center, Inc. | 24-90219 (CML) | HC Essential Co. | 24-90347 (CML) |
| Blackstone Rehabilitation Hospital, Inc. | 24-90223 (CML) | Health Choice Florida, Inc. | 24-90350 (CML) |
| Boston Orthopedic Center, LLC | 24-90225 (CML) | Health Choice Louisiana, Inc. | 24-90218 (CML) |
| Boston Sports Medicine and Research Institute, LLC | 24-90230 (CML) | Health Choice Managed Care Solutions LLC | 24-90224 (CML) |
| | | Health Choice Northern Arizona LLC | 24-90227 (CML) |
| Brevard SHC Holdings LLC | 24-90236 (CML) | Health Choice Preferred Accountable Care LLC | 24-90229 (CML) |
| Brim Healthcare of Colorado, LLC | 24-90242 (CML) | Health Choice Preferred Louisiana ACO LLC | 24-90234 (CML) |
| Brim Healthcare of Texas, LLC | 24-90248 (CML) | Health Choice Preferred Louisiana Physician Association LLC | 24-90237 (CML) |
| Brim Holding Company, Inc. | 24-90261 (CML) | | |
| Brim Physicians Group of Colorado, LLC | 24-90266 (CML) | Health Choice Preferred Texas ACO – Alamo Region LLC | 24-90239 (CML) |
| Choice Care Clinic I, Inc. | 24-90278 (CML) | | |
| Choice Care Clinic II, Inc. | 24-90283 (CML) | Health Choice Preferred Texas ACO – Gulf Coast | 24-90244 (CML) |

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

| Name of Debtors | Case Numbers |
|---|---|
| Region LLC | |
| Health Choice Preferred Texas Physician Association – Alamo Region LLC | 24-90250 (CML) |
| Health Choice Preferred Texas Physician Association – Gulf Coast Region LLC | 24-90253 (CML) |
| Health Choice Utah Accountable Care LLC | 24-90257 (CML) |
| HealthUtah Holdco LLC | 24-90262 (CML) |
| Heritage Technologies, LLC | 24-90273 (CML) |
| IASIS Capital Corporation | 24-90276 (CML) |
| IASIS Finance II LLC | 24-90281 (CML) |
| IASIS Finance III LLC | 24-90285 (CML) |
| IASIS Finance, Inc. | 24-90290 (CML) |
| IASIS Finance Texas Holdings, LLC | 24-90295 (CML) |
| IASIS Glenwood Regional Medical Center, LP | 24-90301 (CML) |
| IASIS Healthcare Corporation | 24-90311 (CML) |
| IASIS Healthcare Holdings, Inc. | 24-90317 (CML) |
| IASIS Healthcare LLC | 24-90319 (CML) |
| IASIS Management Company | 24-90322 (CML) |
| IASIS Transco, Inc. | 24-90325 (CML) |
| Indigent Care Services of Northeast Louisiana, Inc. | 24-90247 (CML) |
| Jordan Valley Hospital Holdings, Inc. | 24-90252 (CML) |
| Jordan Valley Medical Center, LP | 24-90263 (CML) |
| Legacy Trails Medical Center LLC | 24-90269 (CML) |
| Mesa General Hospital, LP | 24-90277 (CML) |
| Morton Hospital, A Steward Family Hospital, Inc. | 24-90282 (CML) |
| Mountain Point Holdings, LLC | 24-90289 (CML) |
| Mountain Vista Medical Center, LP | 24-90297 (CML) |
| MT Transition LP | 24-90303 (CML) |
| Nashoba Valley Medical Center, A Steward Family Hospital, Inc. | 24-90313 (CML) |
| New England Sinai Hospital, A Steward Family Hospital, Inc. | 24-90329 (CML) |
| Odessa Fertility Lab, Inc. | 24-90334 (CML) |
| Odessa Regional Hospital, LP | 24-90348 (CML) |
| OnSite Care, Inc. | 24-90352 (CML) |
| OnSite Care MSO, LLC | 24-90358 (CML) |
| Permian Basin Clinical Services, Inc. | 24-90365 (CML) |
| Permian Premier Health Services, Inc. | 24-90371 (CML) |
| Physician Group of Arizona, Inc. | 24-90373 (CML) |
| Physician Group of Arkansas, Inc. | 24-90374 (CML) |
| Physician Group of Florida, Inc. | 24-90375 (CML) |
| Physician Group of Louisiana, Inc. | 24-90376 (CML) |
| Physician Group of Utah, Inc. | 24-90220 (CML) |
| Podiatric Physicians Management of Arizona, Inc. | 24-90226 (CML) |
| PP Transition, Inc. | 24-90228 (CML) |
| PP Transition LP | 24-90231 (CML) |
| Quincy Medical Center, A Steward Family Hospital, Inc. | 24-90235 (CML) |
| Riverwoods ASC Holdco LLC | 24-90241 (CML) |
| Salt Lake Regional Medical Center, LP | 24-90245 (CML) |
| Salt Lake Regional Physicians, Inc. | 24-90251 (CML) |
| Seaboard Development LLC | 24-90256 (CML) |
| Seaboard Development Port Arthur LLC | 24-90258 (CML) |
| SHC Youngstown Ohio Laboratory Services Company LLC | 24-90267 (CML) |
| SHC Youngstown Ohio Outpatient Services LLC | 24-90270 (CML) |
| SHC Youngstown Ohio PSC LLC | 24-90274 (CML) |
| Southridge Plaza Holdings, Inc. | 24-90275 (CML) |
| Southwest General Hospital, LP | 24-90280 (CML) |
| St. Luke's Behavioral Hospital, LP | 24-90284 (CML) |
| St. Luke's Medical Center, LP | 24-90294 (CML) |
| Steward Accountable Care Organization, Inc. | 24-90302 (CML) |
| Steward Anesthesiology Physicians of Florida, Inc. | 24-90307 (CML) |
| Steward Anesthesiology Physicians of Massachusetts, Inc. | 24-90310 (CML) |
| Steward Anesthesiology Physicians of Pennsylvania, Inc. | 24-90328 (CML) |
| Steward ASC Holdings LLC | 24-90332 (CML) |
| Steward Carney Hospital, Inc. | 24-90336 (CML) |
| Steward CGH, Inc. | 24-90339 (CML) |
| Steward Easton Hospital, Inc. | 24-90341 (CML) |
| Steward Emergency Physicians, Inc. | 24-90343 (CML) |
| Steward Emergency Physicians of Arizona, Inc. | 24-90346 (CML) |
| Steward Emergency Physicians of Florida, Inc. | 24-90349 (CML) |
| Steward Emergency Physicians of Pennsylvania, Inc. | 24-90351 (CML) |
| Steward Emergency Physicians Ohio, Inc. | 24-90353 (CML) |
| Steward Employer Solutions LLC | 24-90355 (CML) |
| Steward Fall River Management Care Services LLC | 24-90356 (CML) |
| Steward Florida ALF LLC | 24-90359 (CML) |
| Steward Florida ASC LLC | 24-90361 (CML) |
| Steward Florida Holdings LLC | 24-90222 (CML) |
| Steward FMC, Inc. | 24-90233 (CML) |
| Steward Good Samaritan Medical Center, Inc. | 24-90240 (CML) |
| Steward Good Samaritan Occupational Health Services, Inc. | 24-90246 (CML) |
| Steward Good Samaritan Radiation Oncology Center, Inc. | 24-90255 (CML) |
| Steward Health Care International LLC | 24-90260 (CML) |
| Steward Health Care Network ACO Texas, Inc. | 24-90265 (CML) |
| Steward Health Care Network, Inc. | 24-90271 (CML) |
| Steward Health Care OZ Fund, Inc. | 24-90279 (CML) |
| Steward Health Choice, Inc. | 24-90286 (CML) |
| Steward Healthcare Management Services LLC | 24-90293 (CML) |
| Steward HH, Inc. | 24-90298 (CML) |
| Steward Hillside Rehabilitation Hospital, Inc. | 24-90304 (CML) |
| Steward Holy Family Hospital, Inc. | 24-90309 (CML) |
| Steward Hospital Holdings LLC | 24-90314 (CML) |
| Steward Hospital Holdings Subsidiary One, Inc. | 24-90320 (CML) |
| Steward Imaging & Radiology Holdings LLC | 24-90326 (CML) |
| Steward Medicaid Care Network, Inc. | 24-90331 (CML) |
| Steward Medical Group Express Care, Inc. | 24-90337 (CML) |
| Steward Medical Group, Inc. | 24-90352 (CML) |
| Steward Medical Group Pennsylvania Endoscopy LLC | 24-90354 (CML) |
| Steward Medical Holdings LLC | 24-90357 (CML) |
| Steward Medical Ventures, Inc. | 24-90360 (CML) |
| Steward Melbourne Hospital, Inc. | 24-90363 (CML) |
| Steward New England Initiatives, Inc. | 24-90364 (CML) |
| Steward Norwood Hospital, Inc. | 24-90366 (CML) |
| Steward NSMC, Inc. | 24-90367 (CML) |
| Steward Ohio Holdings LLC | 24-90368 (CML) |
| Steward Operations Holdings LLC | 24-90369 (CML) |
| Steward Pathology Physicians of Massachusetts, Inc. | 24-90370 (CML) |
| Steward Pennsylvania Holdings LLC | 24-90372 (CML) |
| Steward PET Imaging, LLC | 24-90221 (CML) |
| Steward PGH, Inc. | 24-90232 (CML) |
| Steward Physician Contracting, Inc. | 24-90238 (CML) |
| Steward Radiology Physicians of Arizona, Inc. | 24-90243 (CML) |
| Steward Radiology Physicians of Florida, Inc. | 24-90249 (CML) |
| Steward Radiology Physicians of Massachusetts, Inc. | 24-90254 (CML) |
| Steward Radiology Physicians of Pennsylvania, Inc. | 24-90259 (CML) |
| Steward Rockledge Hospital, Inc. | 24-90264 (CML) |
| Steward SA FSED Holdings, Inc. | 24-90268 (CML) |
| Steward Sebastian River Medical Center, Inc. | 24-90272 (CML) |
| Steward Sharon Regional Health System, Inc. | 24-90288 (CML) |
| Steward Special Projects LLC | 24-90292 (CML) |
| Steward St. Anne's Hospital Corporation | 24-90296 (CML) |
| Steward St. Elizabeth's Medical Center of Boston, Inc. | 24-90300 (CML) |
| Steward St. Elizabeth's Realty Corp. | 24-90305 (CML) |
| Steward Texas Hospital Holdings LLC | 24-90308 (CML) |
| Steward Trumbull Memorial Hospital, Inc. | 24-90312 (CML) |
| Steward TSC Investments LLC | 24-90316 (CML) |
| Steward Valley Regional Ventures, Inc. | 24-90321 (CML) |
| Steward West Ventures Co. | 24-90323 (CML) |
| Stewardship Health, Inc. | 24-90327 (CML) |
| Stewardship Health Medical Group, Inc. | 24-90330 (CML) |
| Stewardship Services Inc. | 24-90333 (CML) |
| The Medical Center of Southeast Texas, LP | 24-90335 (CML) |
| TNC Transition LP | 24-90338 (CML) |
| TRACO Investment Management LLC | 24-90342 (CML) |
| Utah Transcription Services, Inc. | 24-90345 (CML) |

2

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.        ***Conditional Approval of Disclosure Statement***.  On [●], 2025, the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") held a hearing (the "**Conditional Disclosure Statement Hearing**") at which it conditionally approved the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Disclosure Statement**") of Steward Health Care System LLC and its affiliated debtors in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), and thereafter entered an order (the "**Disclosure Statement Order**") with respect thereto.  The Disclosure Statement Order, among other things, authorizes the Debtors to solicit votes to accept the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Plan**").[2]

2.        ***Combined Hearing***.  A hearing to consider confirmation of the Plan and final approval of the Disclosure Statement (the "**Combined Hearing**") has been scheduled for **July 8, 2025 at [●] [a.m. / p.m.] (Central Time)** before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, in the Bankruptcy Court.  The Combined Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by a Bankruptcy Court announcement providing for such adjournment or continuation on its agenda.  The Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing.

3.        ***Voting Record Date***.  Holders of Claims in Class 3 (FILO Bridge Claims) Class 4 (General Unsecured Claims), and Class 5 (PBGC Claims) who are otherwise eligible to vote shall be entitled to vote to accept or reject the Plan as of **May 21, 2025** (the "**Voting Record Date**").

4.        ***Voting Deadline***.  If you received a Solicitation Package, including a Ballot, and intend to vote on the Plan, you must: (i) follow the instructions carefully; (ii) complete all of the required information on the Ballot; and (iii) execute and return your completed Ballot according to and as set forth in detail in the voting instructions on your Ballot so that it is actually received by the Debtors' solicitation and voting agent, Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**") on or before **July 1, 2025 at 5:00 p.m. (Central Time)** (the "**Voting Deadline**").  **ANY FAILURE TO FOLLOW THE VOTING INSTRUCTIONS INCLUDED WITH YOUR BALLOT MAY DISQUALIFY YOUR BALLOT AND YOUR VOTE.**

5.        ***Parties in Interest Not Entitled to Vote***.  Holders of Claims or Interests in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 6 (Intercompany Claims), Class 7 (Subordinated Securities Claims), Class 8 (Intercompany Interests), Class 9 (Non-Debtor Owned Subsidiary Interests), and Class 10 (Parent Interests) are not entitled to vote on the Plan and will not receive a Ballot.  If any creditor seeks to challenge the Allowed amount of its Claim for voting purposes, such creditor must file with the Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes in a different amount (a "**Rule 3018(a) Motion**").  Any Rule 3018(a) Motion must be filed with the Court not later than **June 24, 2025 at 5:00 p.m. (Central Time)**.  Upon the filing of any such Rule 3018(a) Motion, such creditor's Ballot shall be counted in accordance with the guidelines provided in the Solicitation and Voting Procedures attached as **Exhibit 2** to the Disclosure Statement Order, unless temporarily Allowed in a different amount by an order of the Court entered prior to or concurrent with entry of an order confirming the Plan.

6.        ***Consent Program Opt-Out Deadline***.  If you received a Consent Program Opt-Out Form and intend to opt out of the Administrative Expense Claims Consent Program, you must:  (i) follow

---

[2]        All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, attached as Exhibit A to the Disclosure Statement.

the instructions carefully; (ii) complete all of the required information on the Consent Program Opt-Out Form; and (iii) timely execute and return your completed Consent Program Opt-Out Form according to and as set forth in detail in the voting instructions on your Consent Program Opt-Out Form so that it is actually received by Kroll on or before **July 1, 2025 at 5:00 p.m. (Central Time)** (the "**Consent Program Opt-Out Deadline**"). To the extent a holder of an Allowed Administrative Claim does not timely, properly, and affirmatively, opt out of the Administrative Claims Consent Program, such holder shall be deemed to have agreed (i) to be bound by the terms of the Administrative Claims Consent Program, and (ii) upon entry of the Confirmation Order, that such holder's acceptance of and consent to the Administrative Claims Consent Program will be deemed consent to the Plan and acceptance of the treatment under the Plan in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Administrative Claim (other than Professional Fee Claims and FILO DIP Claims) as required by section 1129(a)(9) and as contemplated under sections 1124 and 1123(a)(4) of the Bankruptcy Code. **ANY FAILURE TO FOLLOW THE VOTING INSTRUCTIONS INCLUDED WITH YOUR CONSENT PROGRAM OPT-OUT FORM MAY DISQUALIFY YOUR ELECTION.**

7. *Objections to Confirmation*. The deadline to object or respond to confirmation of the Plan or final approval of the Disclosure Statement is **July 1, 2025 at 5:00 p.m. (Central Time)** (the "**Combined Objection Deadline**").

8. *Form and Manner of Objections to Confirmation*. Objections and responses, if any, to confirmation of the Plan or final approval of the Disclosure Statement, must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Bankruptcy Local Rules, and any order of the Court; (iii) set forth the name of the objecting party and the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' estates or property; (iv) provide the basis for the objection and the specific grounds therefor, and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed with the Bankruptcy Court (with proof of service) via ECF or by mailing to the Bankruptcy Court at United States Bankruptcy Court Clerk's Office, United States Courthouse, 515 Rusk Avenue, Courtroom 401, 4th Floor, Houston, Texas 77002, so as to be actually received no later than the Combined Objection Deadline.

9. **IF AN OBJECTION TO CONFIRMATION OF THE PLAN OR FINAL APPROVAL OF THE DISCLOSURE STATEMENT IS NOT FILED AND SERVED STRICTLY AS PRESCRIBED HEREIN, THEN THE OBJECTING PARTY MAY BE BARRED FROM OBJECTING TO CONFIRMATION OF THE PLAN OR FINAL APPROVAL OF THE DISCLOSURE STATEMENT OR THE ADEQUACY THEREOF AND MAY NOT BE HEARD AT THE COMBINED HEARING.**

10. *Additional Information*. Any party in interest wishing to obtain information about the solicitation procedures or copies of the Disclosure Statement, the Plan, or other solicitation materials should contact Kroll by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Interested parties may also review and download the Disclosure Statement and the Plan free of charge at https://restructuring.ra.kroll.com/Steward. In addition, the Disclosure Statement and Plan are on file with the Bankruptcy Court and may be reviewed for a fee by accessing the Bankruptcy Court's website: https://www.txs.uscourts.gov/page. Note that a PACER password and login are needed to access documents on the Bankruptcy Court's website. A PACER password can be obtained at: https://pacer.uscourts.gov/.

11.     You may also access electronic copies of the Plan, Disclosure Statement, and any other solicitation materials via the QR Code below.  Please be advised that Kroll cannot provide legal advice.



**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED. UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS COMBINED HEARING NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### Notice of Assumption and Rejection of Executory Contracts and Unexpired Leases of Debtors and Related Procedures

1.     Article X of the Plan provides that, all executory contracts and unexpired leases to which any of the Debtors are a party shall be deemed rejected except for an executory contract or unexpired lease that: (i) is specifically and expressly designated as a contract or lease to be assumed pursuant to the Plan, including as set forth in the Schedule of Assumed Contracts or Confirmation Order; (ii) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Court or assumed and assigned pursuant to a Final Order of the Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate assumption or rejection motion filed by the Estate Representative on or before the Effective Date; (v) is the subject of a pending Cure Dispute; (vi) is a contract, lease, or other agreement or document entered into in connection with the Plan; or (vii) is a D&O Policy or other insurance policy to which any Debtor or Estate Representative is a beneficiary or an insured.  For the avoidance of doubt, the Estate Representative may seek to assume, assume and assign, or reject an executory contract or unexpired lease at any time prior to the Effective Date, whether or not such executory contract or unexpired leases is listed on the Schedule of Assumed Contracts.

2.     Pursuant to section 10.3 of the Plan, at least fourteen (14) days before the Combined Hearing, the Debtors shall serve a notice on parties to executory contracts or unexpired leases to potentially be assumed or assumed and assigned to the Plan Trust, reflecting the Debtors' intention to potentially assume or assume and assign the contract or lease in connection with this Plan and, where applicable, setting forth the proposed Cure Amount (if any).  Additionally, section 10.3 of the Plan provides that any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Estate Representative (as applicable) within ten (10) days of the service of the assumption notice, or such shorter

period as agreed to by the parties or authorized by the Court. Any counterparty to an executory contract or unexpired lease that does not timely object to the notice of the proposed assumption of such executory contract or unexpired lease shall be deemed to have consented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (i) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (ii) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (iii) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor under such Executory Contract or Unexpired Lease; or (iv) create or impose a Lien upon any property or Asset of any Debtor, or its Estate, as applicable.

12. Section 10.3 of the Plan will also provide that, if there is a Cure Dispute (as defined in the Plan) pertaining to assumption of an Executory Contract or Unexpired Lease (other than a dispute pertaining to a Cure Amount), such dispute shall be heard by the Court prior to such assumption being effective; *provided,* that the Estate Representative, as applicable, may settle any such Cure Dispute without any further notice to any party or any action, order, or approval of the Court. To the extent a Cure Dispute relates solely to the Cure Amount, the Estate Representative, as applicable, may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of the Cure Dispute; *provided,* that the Estate Representative reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the non-Debtor party to the extent such executory contract or unexpired lease (or such smaller amount as may be fixed or estimated by the Court or otherwise agreed to by such non-Debtor party and the Estate Representative).

13. Section 10.4 of the Plan provides that in the event that the rejection of an executory contract or unexpired lease by an Estate Representative results in damages to the other party or parties to such executory contract or unexpired lease, a Claim for such damages shall not (i) be treated as a creditor with respect to such Claim, or (ii) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an executory contract or unexpired lease not filed with the Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, the Plan Trust, the Plan Trustee, or the property for any of the foregoing without the need for any objection by the Plan Trustee or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of such contract or lease shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' prepetition executory contracts or unexpired leases shall be classified as General Unsecured Claims, except as otherwise provided by Final Order of the Court.

## QUESTIONS:

If you have questions about this Combined Hearing Notice, please contact Kroll by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line, or (d) visiting https://restructuring.ra.kroll.com/Steward/.

Dated:  **[●]**, 2025
           Houston, Texas

_/s/  DRAFT_
**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:    Gabriel.Morgan@weil.com
           Clifford.Carlson@weil.com
           Stephanie.Morrison@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted _pro hac vice_)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:    Jeffrey.Saferstein@weil.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted _pro hac vice_)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:    DavidJ.Cohen@weil.com

_Attorneys for Debtors_
_and Debtors in Possession_

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted _pro hac vice_)
Candace M. Arthur (admitted _pro hac vice_)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:    Ray.Schrock@lw.com
           Candace.Arthur@lw.com

_Attorneys for Debtors_
_and Debtors in Possession_

**Exhibit 2**

**Form of Solicitation and Voting Procedures**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|   |   |   |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
|  | § |  |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC,** *et al.*, | § |  |
|  | § | **(Jointly Administered)** |
| Debtors.[1] | § |  |
|  | § |  |

## SOLICITATION AND VOTING PROCEDURES

      **PLEASE TAKE NOTICE** that on May 6, 2024, Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") each filed a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of Texas (the "**Court**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On May 16, 2024, the U.S. Trustee appointed an official committee of unsecured creditors. No trustee or examiner has been appointed in these chapter 11 cases. The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1.

      **PLEASE TAKE FURTHER NOTICE** that on [●], 2025, the Court entered the *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* (Docket No. [●]) (the "**Disclosure Statement Order**"), which, among other things, (i) authorized the Debtors to solicit votes on the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and its Affiliated Debtors]* (Docket No. [●]) (the "**Plan**") and (ii) conditionally approved the *Disclosure Statement for Joint Plan of Liquidation of Steward Healthcare System LLC and Its Affiliated Debtors* (Docket No. [●]) (the "**Disclosure Statement**").[2]

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Voting Agent (as defined below) at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2]    Capitalized terms not otherwise defined herein have the same meaning as set forth in the Disclosure Statement Order, Plan, or Disclosure Statement, as applicable.

## A.      Parties Entitled to Vote.

Holders of Claims in Class 3 (FILO Bridge Claims), Class 4 (General Unsecured Claims), and Class 5 (PBGC Claims) are Impaired and entitled to receive distributions under the Plan and, thus, may vote to accept or reject the Plan, subject to certain exceptions discussed below (each, a "**Voting Class**," and collectively, the "**Voting Classes**").

A holder of a Claim in a Voting Class is nonetheless not entitled to vote to the extent that:

(a)  as of the Voting Record Date (as defined below), the outstanding amount of such creditor's Claim is zero ($0.00);

(b)  as of the Voting Record Date, such holders' Claim has been disallowed, expunged, disqualified or suspended;

(c)  such creditor has not timely filed a Proof of Claim in accordance with the *Order (I) Establishing Deadlines and Procedures for Filing Proofs of Claim; (II) Approving Form and Manner of Notice Thereof; and (III) Granting Related Relief* (Docket No. 1564) (the "**Bar Date Order**") as of the General Bar Date or the Government Bar Date, as applicable, and the Debtors have not scheduled such creditor's Claim or have scheduled such creditor's Claim in an undetermined amount or as contingent, unliquidated, or disputed or such creditor is not required to file a Proof of Claim pursuant to the Bar Date Order; *provided*, that to the extent that such creditor's deadline to file a Claim arising from any rejection of an Executory Contract or Unexpired Lease to which such creditor is party has not yet occurred, such creditor will be entitled to vote in the amount of $1.00 on account of such Claim; or

(d)  such creditor's Claim is subject to an objection, a request for estimation, or an adversary proceeding as of **June 17, 2025 at 5:00 p.m. (Central Time)**, subject to the procedures set forth below; *provided* that, any such holder shall receive a Ballot and may submit such Ballot on a provisional basis and may elect to opt out of the Third-Party Releases contained in the Plan.  To the extent such holder does not file a Rule 3018 Motion in accordance with the instructions set forth below, the Ballot will not be counted for voting purposes; however, any opt-out election made by such holder on its Ballot with respect to the Third-Party Releases contained in the Plan shall be valid so long as such Ballot is submitted in accordance with the procedures set forth herein.  To the extent such holder files a Rule 3018 Motion in accordance with the instructions set forth below, the extent to which such Ballot shall be counted for voting purposes

will be determined by the Court or as otherwise agreed by the Debtors and the holder.

With respect to transfers of Claims required to be filed pursuant to Bankruptcy Rule 3001(e), the transferee shall be entitled to receive a Solicitation Package (as defined below) and, if the holder of such Claim is otherwise entitled to vote with respect to the Plan, cast a Ballot (defined below) on account of such Claim only if: (i) all actions necessary to transfer such Claim are completed by the Voting Record Date; or (ii) the transferee files with the Court, by the Voting Record Date, (a) all documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and (b) a sworn statement of the transferor supporting the validity of the transfer. In the event a Claim is transferred after the Voting Record Date, the transferee of such Claim shall be bound by any vote or election on the Plan made by the holder of such Claim as of the Voting Record Date.

Where any portion of a single Claim has been transferred to a transferee and notice of such transfer is required to be filed pursuant to Bankruptcy Rule 3001(e), all holders of any portion of such single Claim may be (i) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code, and (ii) required to vote every portion of such Claim collectively to accept or reject the Plan. In the event that: (a) a Ballot; (b) a group of Ballots within a Voting Class received from a single creditor; or (c) a group of Ballots received from the various holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion.

## B. Parties Not Entitled to Vote.

Holders of Claims in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) will: (i) receive full recovery of their Allowed Claims under the Plan; or (ii) otherwise receive treatment as to render such holder's Claim Unimpaired (collectively, the "**Unimpaired Classes**"). Pursuant to section 1126(f) of the Bankruptcy Code, the holders of such Claims in these Unimpaired Classes are conclusively presumed to accept the Plan and, accordingly, are not entitled to vote on the Plan.

Holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) are either plan proponents or controlled by plan proponents (the "**Plan Proponent Classes**"). Therefore, they are conclusively presumed to accept the plan and will not be solicited.

Holders of Claims and Interests in Class 7 (Subordinated Securities Claims), Class 9 (Non-Debtor Owned Subsidiary Interests), and Class 10 (Parent Interests) are Impaired and such holders are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, accordingly, are not entitled to vote on the Plan (together with the Unimpaired Classes and the Plan Proponent Classes, the "**Non-Voting Classes**").

## C. Voting Record Date.

The Court has established **May 21, 2025** as the record date for purposes of determining (i) which holders of Claims in the Voting Classes are entitled to vote on the Plan, and

(ii) which holders of Claims and Interests are entitled to receive a Notice of Non-Voting Status (as defined below) (the "**Voting Record Date**").

**D.      Establishing Claim Amounts for Voting Purposes.**

**FILO Bridge Claims (Class 3)**.  The amount of each FILO Bridge Claim, for voting purposes only, will be established by reference to the list of FILO Bridge Lenders to the Bridge Credit Agreement and those FILO Bridge Lenders' corresponding FILO Bridge Claim amounts as of the Voting Record Date, as reflected on the loan register maintained by the FILO Bridge Agent, which shall be provided by the FILO Bridge Agent to the Debtors and the Voting Agent no later than one (1) Business Day following the Voting Record Date.

**General Unsecured Claims (Class 4)**.  Except as otherwise provided herein and solely to the extent a holder is entitled to vote under these procedures, the amount of each General Unsecured Claim in Class 4, for voting purposes only, shall be established pursuant to the following hierarchy:

(a)      if a Claim has been estimated or otherwise Allowed for voting purposes by order of the Court, such Claim is temporarily Allowed in the amount so estimated or Allowed by this Court;

(b)      if (a) does not apply, but the Claim has been estimated or otherwise Allowed for voting purposes pursuant to a stipulation, settlement, or other agreement in writing reached between the applicable Debtor(s) and the holder of the Claim (whether such stipulation, settlement, or agreement is filed or not), such Claim is temporarily Allowed against such Debtor(s) in the amount set forth in the stipulation, settlement, or other agreement;

(c)      if neither (a) nor (b) applies, then in the liquidated, non-contingent, and undisputed amount set forth on a Proof of Claim timely filed in accordance with the Bar Date Order as of the Voting Record Date; *provided that*, if the amount set forth on a timely-submitted Proof of Claim is wholly unliquidated, contingent, and/or disputed (as determined on the face of the Claim or based on reasonable review by the Debtors and/or the Voting Agent), then the Claim shall be temporarily Allowed for voting purposes in the amount of $1.00;

(d)      if neither (a), (b), nor (c) applies, then in the liquidated, non-contingent, and undisputed amount set forth on the Debtors' Schedules; *provided that*, if the Claim appearing on the Debtors' Schedules is either contingent, unliquidated, and/or disputed, or in a $0.00 amount, then the Claim shall be disallowed for voting purposes, except to the extent that such creditor's deadline to file a Claim arising from any rejection of an Executory Contract or Unexpired Lease to which such creditor is party has not yet occurred; *provided*, that, to the extent such creditor's deadline to file a Claim has not yet occurred, such creditor will be entitled to vote in the amount of $1.00 on account of such Claim;

(e)     notwithstanding anything to the contrary contained herein, any creditor who has filed or purchased duplicate Claims within the same Voting Class may be provided with only one Solicitation Package and one Ballot for voting on a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and

(f)     if a Proof of Claim has been amended by a later Proof of Claim that is filed on or prior to the Bar Date, the later filed amended Proof of Claim shall be entitled to vote in a manner consistent with these tabulation rules, and the earlier filed Proof of Claim shall be disallowed for voting purposes, regardless of whether the Debtors have objected to such amended claim. Except as otherwise ordered by the Court, any amendments to Proofs of Claim after the Bar Date shall not be considered for purposes of these tabulation rules.

**PBGC Claims (Class 5)**. The amount of PBGC Claims, for voting purposes only, will be $8,750,000.

**General**.

If the Debtors have filed an objection to, a request for estimation of, or an adversary proceeding relating to a Claim, on or before <u>June 17, 2025 at 5:00 p.m. (Central Time)</u>, such Claim shall be temporarily disallowed for voting purposes, except as ordered by the Court before the Voting Deadline; *provided*, *however*, that, if the Debtors' objection seeks only to reclassify or reduce the Allowed amount of such Claim, then such Claim is temporarily Allowed for voting purposes in the reduced amount and/or as reclassified (as applicable), except as may be ordered by the Court before or concurrent with, entry of an order confirming the Plan; *provided*, *further*, that if the Debtors' objection seeks only to disallow a Proof of Claim purportedly filed on behalf of a class of claimants, then such Claim is temporarily Allowed for voting purposes only as to the individual that filed such Proof of Claim and not as to the class of claimants on behalf of which such Proof of Claim was filed.

If any holder seeks to challenge the Allowed amount of its Claim for voting purposes, such creditor must file with the Court a motion for an order pursuant to Bankruptcy Rule 3018(a) temporarily allowing such Claim for voting purposes in a different amount (a "**Rule 3018(a) Motion**"). Any Rule 3018(a) Motion must be filed with the Court so as to be actually received not later than <u>June 24, 2025, at 5:00 p.m. (Central Time)</u>.

Upon the filing of any such Rule 3018(a) Motion, such holder's Provisional Ballot shall be counted in accordance with the above-designated guidelines, unless temporarily Allowed in a different amount by an order of the Court entered prior to or concurrent with entry of an order confirming the Plan.

For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims against one Debtor held by a single holder in a particular Class shall be aggregated as if such holder held one Claim in such Debtor in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan.

### E.      Form, Content, and Manner of Notices.

#### Voting Agent

The Debtors have retained Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**") as their claims, noticing, and solicitation agent pursuant to the *Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent* (Docket No. 29).  Pursuant to the Disclosure Statement Order, Kroll is authorized to assist the Debtors in (i) distributing the Solicitation Packages and, as applicable, the Consent Program Materials, the Notice of Non-Voting Status, or the Release Opt-Out Forms (collectively referred to as the "**Election Packages**"), (ii) receiving, tabulating, and reporting on Consent Program Opt-Out Forms cast to opt out of the Administrative Expense Claims Consent Program by holders of Allowed Administrative Expense Claims, (iii) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims, (iv) receiving, tabulating, and reporting on Release Opt-Out Forms cast to opt out of the Third-Party Releases by Non-Voting Classes, (v) responding to inquiries from holders of Claims or Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Packages, and all other related documents and matters related thereto, including the Administrative Expense Claims Consent Program by the Consent Program Materials, or the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, or the procedures and requirements to opt out of the Third-Party Releases by the Release Opt-Out Form or the Third-Party Release Opt-Out Election, (vi) soliciting votes on the Plan, and (vii) if necessary or appropriate, contacting creditors and equity holders regarding the Plan, the Ballots, the Solicitation Packages, the Election Packages, and all other related documents and matters related thereto.

#### The Solicitation Package

The following materials shall constitute the Solicitation Package:

(a)      the Disclosure Statement Order, as entered by the Court and without attachments;

(b)      the conditionally approved Disclosure Statement with all exhibits thereto, including the Plan;

(c)      the Combined Hearing Notice;

(d)      these Solicitation and Voting Procedures;

(e)      the applicable Ballot customized (where possible and appropriate) for such holder and conforming to Official Bankruptcy Form No. B 314, in the form described below;[3]

---

[3]      Official Bankruptcy Form No. B 314 can be found at http://www.uscourts.gov/forms/bankruptcy-forms, the official website for the United States Bankruptcy Courts.

(f)     for holders of Claims in Class 4, the letter from the Creditors' Committee to holders of unsecured claims setting forth, among other things, the Creditors' Committee's recommendation that holders of General Unsecured Claims vote to accept the Plan (the "**Creditors' Committee Position Letter**"); and

(g)     a postage-prepaid return envelope.

Holders of Claims or Interests in a Non-Voting Class (except Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) shall only receive the Combined Hearing Notice, the Notice of Non-Voting Status (as defined and described below), and the Release Opt-Out Form (as defined and described below).

### Distribution of the Solicitation Package

The Solicitation Package shall provide the Disclosure Statement, the Plan, and the Disclosure Statement Order in electronic format (on a QR code included in the Combined Hearing Notice) instead of printed hard copies. Only the Ballots and the Combined Hearing Notice will be provided in paper format. Moreover, the Plan and the Disclosure Statement will be available at no charge via the internet at the Online Portal. If service by QR code imposes a hardship for any party entitled to receive a copy of the Plan and the Disclosure Statement (*e.g.*, the party does not own or have access to a smartphone), such party may request a paper copy or a USB flash drive that includes copies of the Plan, Disclosure Statement, and Disclosure Statement Order (without attachments, except the Solicitation and Voting Procedures as annexed as Exhibit 2 thereto) by contacting Kroll by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Upon receipt of such request, in a timely manner, the Debtors will provide such party with a paper copy, or USB flash drive containing, of the Plan and the Disclosure Statement at no cost to the party.

The Debtors shall mail to holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date the Solicitation Packages on or before the date that is three (3) Business Days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter (the "**Solicitation Mailing Deadline**"). The Debtors will also provide complete Solicitation Packages (excluding Ballots) to the U.S. Trustee and all parties in interest required to be notified under Bankruptcy Rule 2002 and Local Rule 2002-1.

The Debtors shall request that the FILO Bridge Agent post to its electronic datasite (i) a non-customized Solicitation Package (not including Ballots) and (ii) information to request customized Ballots from Kroll for FILO Bridge Lenders' as of the Voting Record Date as reflected on the loan register maintained by the FILO Bridge Agent. Such postings to the electronic datasite shall occur within five (5) calendar days of the mailing of the Solicitation Packages.

The Debtors are not required to mail Solicitation Packages to creditors or interest holders (i) who have Claims or Interests that have already been paid in full during the Chapter 11 Cases, (ii) whose prior mailings in these chapter 11 cases were returned as undeliverable and who have not provided a forwarding address by the Voting Record Date, (iii) who hold Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 6 (Intercompany Claims), Class 7 (Subordinated Securities Claims), Class 8 (Intercompany Interests) and Class 9 (Non-Debtor Owned Subsidiary Interests), and/or (iv) who are not otherwise entitled to vote to accept or reject the Plan in accordance with the terms and provisions of these Solicitation and Voting Procedures.

In the event that the United States Postal Service returns any mailings as undeliverable, the Debtors are excused from mailing Solicitation Packages or Notices of Non-Voting Status to addresses from which the Debtors received mailings returned as undeliverable.  For purposes of serving the Solicitation Packages and Notices of Non-Voting Status, the Debtors may rely on the address information for the holders of Claims and Interests as compiled, updated, and maintained by the Voting Agent as of the Voting Record Date.  The Debtors and the Voting Agent are not required to conduct any additional research for updated addresses based on undeliverable Solicitation Packages (including Ballots) and will not be required to resend Solicitation Packages or other materials, including Notices of Non-Voting Status, that are returned as undeliverable unless the Debtors are provided with accurate addresses for such parties prior to the Voting Record Date.

To avoid duplication and reduce expenses, the Debtors will use commercially reasonable efforts to ensure that each holder of a Claim receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against the Debtors.

### Forms of Ballots

Holders of Claims in the Voting Classes that are eligible to vote (as set forth herein) shall receive ballots substantially in the forms attached to the Disclosure Statement Order as **Exhibits 3-5** (the "**Ballots**"), as applicable.[4]  All holders of Claims in the Voting Classes will receive a Ballot that includes an election to opt out of the third party releases in section 12.6(b) of the Plan (the "**Third-Party Releases**").  Holders of Claims in the Voting Classes that properly and timely elect to opt out of the Third-Party Releases will not be a Releasing Party or Released Party under the Plan.

### Notice of Non-Voting Status and Release Opt-Out Forms

Holders of Claims and Interests in the Non-Voting Classes in lieu of a Solicitation Package, will receive (i) the Combined Hearing Notice, (ii) a Notice of Non-Voting Status substantially in the form attached to the Disclosure Statement Order as **Exhibit 6** (the "**Notice of Non-Voting Status**"), and (iii) a Release Opt-Out Form (as defined below); *provided* that, the

---

[4]  Kroll is required to retain all paper copies of Ballots and all solicitation-related correspondence for one (1) year following the Effective Date, whereupon Kroll is authorized to destroy and/or otherwise dispose of all paper copies of Ballots; printed solicitation materials including unused copies of the Solicitation Package; and all solicitation-related correspondence (including undeliverable mail), in each case unless otherwise directed by the Debtors or the Clerk of the Court in writing within such one (1) year period.

Debtors are not required to serve holders of Claims and Interests in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) copies of the Combined Hearing Notice, Notice of Non-Voting Status, Release Opt-Out Form, or any other type of notice in connection with solicitation of the Plan because such Claims and Interests are held by the Debtors or the Debtors' affiliates.

The Notice of Non-Voting Status provides (i) notice of the Court's conditional approval of the Disclosure Statement, (ii) notice of the filing of the Plan and Disclosure Statement, (iii) notice of the holders' non-voting status, and (iv) information about how to obtain copies of the Disclosure Statement and the Plan. In addition, the Notice of Non-Voting Status contains the full text of the release, exculpation, and injunction provisions set forth in Article XII of the Plan and advises such holders in Non-Voting Classes that they will be bound by the Third-Party Releases unless they timely, properly, and affirmatively opt out.

The Debtors shall cause to be mailed a release opt-out form, substantially in the form attached to the Disclosure Statement Order as **Exhibit 7** (the "**Release Opt-Out Form**"), to holders of Claims and Interests in the Non-Voting Classes. For holders of Claims in the Voting Classes, the opt out option shall be on such holder's Ballot.

A holder that properly, timely, and affirmatively elects on the Release Opt-Out Form to opt out of the Third-Party Releases will not be a Releasing Party or Released Party under the Plan. An encrypted opt-out data and audit trail will be created through the electronic submission process and become part of the record of any opt-out election submitted in this manner. Additionally, any holder's electronic signature will be deemed to be legally valid and effective immediately. For the avoidance of doubt, the Voting Agent's online portal at https://restructuring.ra.kroll.com/steward/(the "**Online Portal**") is the sole method for holders of Claims and Interests in the Non-Voting Classes to transmit the Release Opt-Out Form electronically. All Release Opt-Out Forms must be properly completed and returned so as to be **actually received** by the Voting Agent by **July 1, 2025 at 5:00 p.m. (Central Time)** (the **"Release Opt-Out Deadline"**) either by (i) delivering the Release Opt-Out Form to the Voting Agent by first-class mail, hand delivery, or overnight courier or (ii) submitting the Release Opt-Out Form by electronic, online transmission through the Online Portal, each in accordance with the instructions included on the Release Opt-Out Form.

## F.     Voting Deadline.

The Court has established **July 1, 2025 (Central Time)** as the deadline to submit votes to accept or reject the Plan (the "**Voting Deadline**"). The Debtors may extend the Voting Deadline, in their discretion (in consultation with the Creditors' Committee), without further order of the Court. To be counted as a vote to accept or reject the Plan, each Ballot must be properly executed, completed, and timely delivered to the Voting Agent: (i) by first-class mail in the return envelope provided with each Ballot; (ii) by overnight mail; (iii) by hand delivery, or (iv) via E-Ballot through the Online Portal, so that (in each instance) it is **actually received** by the Voting Agent no later than the Voting Deadline.

The Voting Agent is authorized to accept Ballots through the Online Portal. The encrypted Ballot data and audit trail created by such electronic submission will become part of the

record of any Ballot submitted in this manner and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

Holders of Claims submitting their Ballots in hard copy to the Voting Agent shall mail or deliver them to the following address:

> Steward Health Care System LLC Ballot Processing
> c/o Kroll Restructuring Administration LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

In all instances, holders should consult their Ballot for specific instructions regarding submission of their votes and any elections. The manner of Ballot submission is at the election and risk of the holders of Claims in the Voting Classes who vote on the Plan. Regardless of the manner of submission, to be counted, Ballots must be **actually, timely, and properly received** by the Voting Agent by the Voting Deadline. The Debtors strongly recommend submitting electronic Ballots through the Online Portal.

## G. Tabulation Procedures.

### General Rules

The following voting procedures and standard assumptions shall be used in tabulating the Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of the Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Local Rules:

(a) Whenever a holder of Claims casts more than one Ballot voting the same Claims before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline shall be deemed to reflect such creditor's intent, and thus supersede any previously received Ballot. Following the Voting Deadline, no Ballot may be changed or revoked, absent further order of the Court or as directed by the Debtors.

(b) Whenever a holder of Claims casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but does not indicate either an acceptance or rejection of the Plan, such Ballot will not be counted.

(c) Whenever a holder of a Claim casts a Ballot that is properly completed, executed, and timely returned to the Voting Agent but indicates both an acceptance and a rejection of the Plan, the Ballot will not be counted.

(d) A holder shall be deemed to have voted the full amount of its Claim in each Class and shall not be entitled to split its vote within a particular Class or between more than one Debtor. Any such holder's Ballot that partially

accepts and partially rejects the Plan, between the same or multiple Debtors, will not be counted.

(e)    A Person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims should indicate such capacity when signing, and if so requested by the Debtors or the Voting Agent, must submit proper evidence satisfactory to the Debtors of its authority to so act.

(f)    A holder of Claims against more than one Debtor that casts a single Ballot shall have its votes counted separately with respect to each such Debtor.

(g)    A holder of Claims in more than one Class must use separate Ballots for each Class of Claims.

(h)    The Debtors (in consultation with the Creditors' Committee), unless subject to contrary order of the Court, may waive any defects or irregularities as to any particular irregular Ballot at any time, either before or after the Voting Deadline.

(i)    The following Ballots shall not be counted:

    i.    any Ballot received after the Voting Deadline unless the Debtors shall have granted an extension of the Voting Deadline in writing with respect to such Ballot or waived the late submission;

    ii.    any Ballot that is illegible or contains insufficient information to permit the identification of the voting party;

    iii.    any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan;

    iv.    any Ballot cast by a Person or Entity that is not entitled to vote, even if such individual or Entity holds a Claim in a Voting Class;

    v.    any unsigned Ballot, provided that E-Ballots submitted on the Online Portal will be deemed to contain a legal, valid signature;

    vi.    any Ballot containing a vote that the Court determines, after notice and a hearing, was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code; or

    vii.    any Ballot transmitted to the Voting Agent by e-mail, facsimile, or other means not specifically approved herein.

**Miscellaneous Rules**

Each holder of Claims that votes to accept or reject the Plan is deemed to have voted the full amount of its Claim therefor.

The Voting Agent may, but is not required to, contact parties who submit incomplete or otherwise deficient Ballots to make a reasonable effort to cure such deficiencies, provided that, neither the Debtors nor Voting Agent is required to contact such parties to provide notification of defects or irregularities with respect to completion or delivery of Ballots, nor will any of them incur any liability for failure to provide such notification. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors, in consultation with the Creditors' Committee, (or the Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived prior to the Voting Deadline) will be invalidated.

The Debtors and/or their Voting Agent, as applicable, in consultation with the Creditors' Committee, are authorized to determine all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots or Release Opt-Out Forms, which determination will be final and binding on all parties.

The Debtors are authorized to reject any and all Ballots submitted by any holders of Claims not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, in consultation with the Creditors' Committee, be unlawful.

The Debtors (in consultation with the Creditors' Committee) are further authorized to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any holders of Claims. The interpretation (including the Ballot and the respective instructions thereto) by the Debtors in accordance with the foregoing sentence will be final and binding on all parties.

The Debtors or their Voting Agent shall file the Voting Report on or before **July 7, 2025**.

## H.    Combined Hearing Notice.

Within three (3) Business Days after entry of the Disclosure Statement Order, or as soon as reasonably practicable thereafter, the Debtors will serve the Notice Parties and holders of Claims and Interests in the Non-Voting Classes via e-mail or first-class mail a copy of the Combined Hearing Notice, which sets forth (i) the Voting Deadline, (ii) the Combined Objection Deadline and procedures for filing objections and responses to confirmation of the Plan, (iii) the time, date, and place for the Combined Hearing, and (iv) information about the Plan's release and injunction provisions in compliance with Bankruptcy Rule 2002(c)(3). The Debtors will separately serve holders of Claims in the Voting Classes with the Combined Hearing Notice as part of their Solicitation Packages.

The Debtors may, in their discretion, give supplemental publication notice of the Combined Hearing, no later than twenty-eight (28) days prior to the Combined Hearing, in one or more local or foreign newspapers, trade journals, or similar publications as the Debtors deem appropriate.

**The Debtors (in consultation with the Creditors' Committee) reserve the right and are authorized to make non-substantive or immaterial changes to the Disclosure Statement, the Plan (including, for the avoidance of doubt, the Plan Supplement), the Ballots, the Solicitation and Voting Procedures, the Combined Hearing Notice, the Release Opt-Out Form, and any related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Packages before their distribution.**

**Exhibit 3**

**Form of Ballot for FILO Bridge Claims (Class 3)**

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE DISCLOSURE STATEMENT AND OTHER MATERIALS ACCOMPANYING THIS BALLOT.[1]**

**PLEASE NOTE THAT, EVEN IF YOU INTEND TO VOTE TO REJECT THE PLAN, YOU MUST STILL READ, COMPLETE, AND EXECUTE THIS ENTIRE BALLOT.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[2] | § | |

**BALLOT FOR VOTING TO ACCEPT OR REJECT
THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS
CLASS 3 (FILO BRIDGE CLAIMS)**

> **IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS <u>ACTUALLY RECEIVED</u> BY THE VOTING AGENT ON OR BEFORE JULY 1, 2025 AT 5:00 P.M. (CENTRAL TIME) (THE "<u>VOTING DEADLINE</u>"), UNLESS EXTENDED BY THE DEBTORS IN CONSULTATION WITH THE CREDITORS' COMMITTEE.**

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") are soliciting votes with respect to the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be modified, amended, or supplemented, the "**Plan**"). The Plan is attached as **<u>Exhibit A</u>** to the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and schedules thereto, and as may be modified, amended, or supplemented, the "**Disclosure Statement**").

---

[1]  All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to them in the Plan, attached as <u>Exhibit A</u> to the Disclosure Statement.

[2]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is: 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

You are receiving this ballot (the "**Ballot**") because records indicate that you are the holder (a "**Holder**") of a FILO Bridge Claim as of May 21**,** 2025 (the "**Voting Record Date**"). Your receipt of this Ballot does not indicate that your Claim(s) has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of, or distribution on account of, Class 3 FILO Bridge Claims.

The Disclosure Statement provides information to assist you in deciding whether to accept or reject the Plan. If you do not have the Disclosure Statement, you may obtain a copy from Kroll Restructuring Administration LLC (the "**Voting Agent**" or "**Kroll**") at no charge by accessing the Debtors' restructuring website at https://restructuring.ra.kroll.com/Steward/.

If you have any questions on how to properly complete this Ballot, please contact the Voting Agent by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Please be advised that the Voting Agent cannot provide legal advice. You may wish to seek legal advice concerning the Plan and the classification and treatment of your Class 3 FILO Bridge Claim under the Plan.

---

**IMPORTANT NOTICE REGARDING TREATMENT FOR FILO BRIDGE CLAIMS IN CLASS 3**

As described in more detail in the Disclosure Statement, if the Plan is confirmed and the Effective Date occurs, except to the extent released pursuant to the FILO Settlement Order, in full and final satisfaction, settlement, release, and discharge of such Allowed FILO Bridge Claims, on the Litigation Trust Establishment Date, each such holder shall (i) receive their Pro Rata Share of the Class A-2 Litigation Trust Interests on account of their Allowed Remaining FILO Bridge Claim (unless previously received), and (ii) retain their Pro Rata Share of their Retained FILO Claims, which shall entitle such holders to their Pro Rata Share of the FILO Plan Trust Interests on the Plan Trust Establishment Date to the extent not repaid prior thereto.

**PLEASE READ THE DISCLOSURE STATEMENT AND PLAN FOR MORE DETAILS.**

---

The Plan can be confirmed by the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") and thereby made binding on you if it is accepted by the Holders of (i) at least two-thirds in amount of the Allowed Claims voted in each Impaired Class, and (ii) if the Impaired Class is a Class of Claims, more than one-half in number of the Allowed Claims voted in each Impaired Class, and if the Plan otherwise satisfies the applicable requirements of section 1129(a) under the Bankruptcy Code. If the requisite acceptances are not obtained, the Bankruptcy Court may nonetheless confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes rejecting the Plan, and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or if you vote to reject the Plan. To have your vote counted, you must complete, sign, and return this Ballot to the Voting Agent by the Voting Deadline. You must

provide all of the information requested by this Ballot.  Failure to do so may result in the disqualification of your vote.

**NOTICE REGARDING CERTAIN RELEASE,
EXCULPATION, AND INJUNCTION PROVISIONS IN PLAN**

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan. Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party).  The releases as presented in the Plan are provided below:**

**SECTION 12.5      PLAN INJUNCTION.**

**(a)      Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under Section 12.6(a) or Section 12.6(b) of the Plan, or (ii) subject to exculpation pursuant to Section 12.7 of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 12.7 of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action:  (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been**

assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to <u>Section 12.6(a)</u> or <u>Section 12.6(b)</u> of the Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b)     Subject in all respects to <u>Section 13.1</u> of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in <u>Section 13.1</u> of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of

Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c) **By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 12.5 of the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.**

(d) **The injunctions in Section 12.5 of the Plan shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.**

**SECTION 12.6** **RELEASES.**

(a) **Releases by the Debtors and their Estates. Except as otherwise expressly set forth below in Section 12.6 of the Plan, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into**

in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in **Section 12.6(a)** of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with **Section 4.6** of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on **Exhibit B** of the Plan or the Schedule of Identified Non-Released Parties.

(b)      **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or

unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in <u>Section 12.6(b)</u> of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)     Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties

or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

**SECTION 12.7      EXCULPATION.**

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in Section 12.7 of the Plan shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**SECTION 12.15     RELEASE OF LIENS**

Except as otherwise provided in the plan or in any contract, instrument, release, or other agreement or document created pursuant to the plan, on the effective date, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests against any property of the estates shall revert to the plan trust.

**SECTION 5.12 Cancellation of Existing Securities, Agreements, and Liens.**

(a)       Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)       On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)       After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)       Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

**Relevant Definitions Related to Release and Exculpation Provisions**:

*Exculpated Parties* means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

*Related Parties* means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed

accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in the Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

**Releasing Parties** means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

**Individual Released Parties** means the individuals listed on Exhibit A of the Plan, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

**Debtor Related Parties** means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, employed and affiliated physicians (solely with respect to Medical Liability Claims asserted against such physicians and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything

10

in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

*Identified Non-Released Parties* means (i) the Persons and Entities listed on Exhibit B of the Plan, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

*Schedule of Identified Non-Released Parties* means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

*Specified Non-Released Parties* means the Persons identified as "Specified Non-Released Parties" in (i) Exhibit B to the Plan, or (ii) the Schedule of Identified Non-Released Parties.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

---

**PLEASE COMPLETE ITEMS 1, 2, 3, AND 4.  IF THIS BALLOT HAS NOT BEEN PROPERLY SIGNED IN THE SPACE PROVIDED, YOUR VOTE MAY NOT BE VALID OR COUNTED AS HAVING BEEN CAST.**

---

**Item 1.        Amount of Claim**.  The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder (or authorized signatory of such a Holder) of a FILO Bridge Claim in the aggregate unpaid principal amount under the Bridge Credit Agreement set forth below.

$\$\text{\underline{\hspace{4cm}}}$

**Item 2.        Votes on the Plan**.  Please vote either to accept or to reject the Plan with respect to your Claims below.  Any Ballot not marked either to accept or reject the Plan, or marked both to accept and reject the Plan, shall not be counted in determining acceptance or rejection of the Plan.

---

**Prior to voting on the Plan, please note the following:**

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan.  Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party).  The releases as presented in the Plan are provided below:**

**The Disclosure Statement and the Plan must be referenced for a complete description of the release, injunction, and exculpation provisions.**

---

The undersigned Holder of a Class 3 FILO Bridge Claim votes to (check <u>one</u> box):

☐ **Accept** the Plan        ☐ **Reject** the Plan.

**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

**Item 3.        Optional Opt-Out Release Election**.  Check the box below if you elect not to grant the releases contained in Section 12.6(b) of the Plan.  Election to withhold consent is at your option. If you submit an accepting or a rejecting Ballot, or if you submit a Ballot in which you abstain from voting, and in each case, you do not check the box below, you will be deemed to consent to

12

the releases contained in Section 12.6(b) of the Plan to the fullest extent permitted by applicable law. The Holder of the Class 3 FILO Bridge Claim set forth in <u>Item 1</u> elects to:

☐ **OPT OUT** of the releases contained only in Section 12.6(b) of the Plan.

**Item 4.** **Acknowledgements**. By signing this Ballot, the Holder (or authorized signatory of such Holder) acknowledges review and receipt of the Plan, the Disclosure Statement, and the other applicable solicitation materials, and certifies that (i) it has the power and authority to vote to accept or reject the Plan, (ii) it was the Holder (or is entitled to vote on behalf of such Holder) of the FILO Bridge Claims described in <u>Item 1</u> as of the Voting Record Date, and (iii) all authority conferred, or agreed to be conferred, pursuant to this Ballot, and every obligation of the undersigned hereunder, shall be binding on the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy, and legal representatives of the undersigned, and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

Name of Holder: _____
*(print or type)*

Signature: _____

Name of Signatory: _____
*(if other than Holder, include name and title)*

Title: _____

Address: _____

_____

_____

E-mail Address: _____

Date Completed: _____

# VOTING INFORMATION AND INSTRUCTIONS FOR COMPLETING THE BALLOT

1.  Ballots received after the Voting Deadline (if the Voting Deadline has not been extended) may not, at the Debtors' discretion, be counted. **The Voting Agent will tabulate all properly completed, valid Ballots received on or before the Voting Deadline.**

2.  Complete the Ballot by providing all the information requested, signing, dating, and returning the Ballot to the Voting Agent. Any Ballot that is illegible, contains insufficient information to identify the Holder, or is unsigned[3] will not be counted. Ballots may not be submitted to the Voting Agent by facsimile or electronic mail. If neither the "**accept**" nor "**reject**" box is checked in Item 2, both boxes are checked in Item 2, or the Ballot is otherwise not properly completed, executed, or timely returned, then the Ballot shall not be counted in determining acceptance or rejection of the Plan.

3.  You must vote all your Claims within a single Class under the Plan either to accept or reject the Plan. Accordingly, if you return more than one Ballot voting different or inconsistent Claims within a single Class under the Plan, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan likewise will not be counted.

4.  The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of Claims.

5.  The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.

6.  If you cast more than one Ballot voting the same Claims prior to the Voting Deadline, the latest received, valid Ballot submitted to the Voting Agent will supersede any prior Ballot.

7.  If (i) the Debtors revoke or withdraw the Plan, or (ii) the Confirmation Order is not entered or consummation of the Plan does not occur, this Ballot shall automatically be null and void and deemed withdrawn without any requirement of affirmative action by or notice to you.

8.  There may be changes made to the Plan that do not cause material adverse effects on an accepting Class. If such non-material changes are made to the Plan, the Debtors will not resolicit votes for acceptance or rejection of the Plan.

9.  NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT, ANY SUPPLEMENTAL INFORMATION PROVIDED BY THE DEBTORS, OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT.

---

[3]   E-Ballots submitted on the Online Portal will be deemed to contain a legal, valid signature.

10. PLEASE RETURN YOUR BALLOT PROMPTLY.

11. IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE VOTING AGENT BY (I) CALLING (646) 893-5546 (INTERNATIONAL, TOLL) OR (888) 505-1257 (U.S./CANADA, TOLL FREE); (II) WRITING TO STEWARD HEALTH CARE SYSTEM LLC BALLOT PROCESSING, C/O KROLL RESTRUCTURING ADMINISTRATION LLC, 850 3RD AVENUE, SUITE 412, BROOKLYN, NY 11232 (IF BY FIRST CLASS MAIL, HAND DELIVERY OR OVERNIGHT MAIL); OR (III) EMAILING STEWARDINFO@RA.KROLL.COM WITH "STEWARD HEALTH SOLICITATION INQUIRY" IN THE SUBJECT LINE. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT.

12. THE VOTING AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

**PLEASE SUBMIT YOUR BALLOT BY ONLY <u>ONE</u> OF THE FOLLOWING METHODS:**

---

**By electronic, online submission:**

To submit your Ballot via the Voting Agent's online portal (the "**Online Portal**"), visit https://restructuring.ra.kroll.com/steward/. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.

Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted. If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the Online Portal.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:**

_____

The Online Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

**Holders are strongly encouraged to submit their ballots via the Online Portal. Holders who cast a Ballot using the Voting Agent's Online Portal should NOT also submit a paper Ballot.**

---

**By First Class Mail, Hand Delivery, or Overnight Mail to:**

**Steward Health Care System LLC Ballot Processing**
**c/o Kroll Restructuring Administration LLC**
**850 3rd Avenue, Suite 412**
**Brooklyn, NY 11232**

To arrange hand delivery of your Ballot, please email the Voting Agent at StewardBallots@ra.kroll.com (with "Steward Release Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

**ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS SO THAT THE BALLOTS ARE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS JULY 1, 2025 AT 5:00 P.M. (CENTRAL TIME).**

**<u>Exhibit 4</u>**

**Form of Ballot for General Unsecured  Claims (Class 4)**

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE DISCLOSURE STATEMENT, THE CREDITORS' COMMITTEE POSITION LETTER AND OTHER MATERIALS ACCOMPANYING THIS BALLOT.[1]**

**PLEASE NOTE THAT, EVEN IF YOU INTEND TO VOTE TO REJECT THE PLAN, YOU MUST STILL READ, COMPLETE, AND PROPERLY EXECUTE THIS ENTIRE BALLOT.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC**, *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[2] | § | |

**BALLOT FOR VOTING TO ACCEPT OR REJECT
THE JOINT CHAPTER 11 PLAN OF LIQUIDATION
STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS
CLASS 4 (GENERAL UNSECURED CLAIMS)**

---

**IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS BALLOT MUST BE PROPERLY COMPLETED, FULLY EXECUTED, AND TIMELY RETURNED SO THAT IT IS <u>ACTUALLY RECEIVED</u> BY THE VOTING AGENT ON OR BEFORE JULY 1, 2025 AT 5:00 P.M. (CENTRAL TIME) (THE "<u>VOTING DEADLINE</u>"), UNLESS EXTENDED BY THE DEBTORS IN CONSULTATION WITH THE CREDITORS' COMMITTEE.**

---

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") are soliciting votes with respect to the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be modified, amended, or supplemented, the "**Plan**"). The Plan is attached as **<u>Exhibit A</u>** to the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and

---

[1]  All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to them in the Plan, attached as <u>Exhibit A</u> to the Disclosure Statement.

[2]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Voting Agent (as defined below) at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is: 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

schedules thereto, and as may be modified, amended, or supplemented, the "**Disclosure Statement**").

You are receiving this ballot (the "**Ballot**") because records indicate that you are the holder (a "**Holder**") of a General Unsecured Claim as of May 21**,** 2025 (the "**Voting Record Date**").  Your receipt of this Ballot does not indicate that your Claim(s) has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of, or distribution on account of, Class 4 General Unsecured Claims.

The Disclosure Statement provides information to assist you in deciding whether to accept or reject the Plan.  If you do not have the Disclosure Statement, you may obtain a copy from Kroll Restructuring Administration LLC (the "**Voting Agent**" or "**Kroll**") at no charge by accessing the Debtors' restructuring website at https://restructuring.ra.kroll.com/Steward/.

> **If you hold a Medical Liability Claim against the Debtors and do not elect to opt-out of the third-party releases contained in Section 12.6(b) of the Plan by timely and properly completing <u>Item 3</u> of this Ballot, then you are electing to release claims against the "Released Parties," including any claims against the Debtors' employed physicians and affiliated physicians related to Medical Liability**

If you have any questions on how to properly complete this Ballot, please contact the Voting Agent by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free); (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail); or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line.  Please be advised that the Voting Agent cannot provide legal advice.  You may wish to seek legal advice concerning the Plan and the classification and treatment of your Class 4 General Unsecured Claim under the Plan.

> **IMPORTANT NOTICE REGARDING TREATMENT FOR GENERAL UNSECURED CLAIMS IN CLASS 4**
>
> As described in more detail in the Disclosure Statement, if the Plan is confirmed and the Effective Date occurs, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment of such Claim, in full and final satisfaction, settlement, release, and discharge of such Allowed General Unsecured Claim, on or prior to the Effective Date, each such holder shall receive its Pro Rata Share of the GUC Plan Trust Interests.
>
> **PLEASE READ THE DISCLOSURE STATEMENT AND PLAN FOR MORE DETAILS.**

The Plan can be confirmed by the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") and thereby made binding on you if it is accepted by the Holders of (i) at least two-thirds in amount of the Allowed Claims voted in each Impaired Class, and (ii) if the Impaired Class is a Class of Claims, more than one-half in number of the Allowed Claims voted in each Impaired Class, and if the Plan otherwise satisfies the applicable requirements of section 1129(a) under the Bankruptcy Code.  If the requisite acceptances are not

obtained, the Bankruptcy Court may nonetheless confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes rejecting the Plan, and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or if you vote to reject the Plan. To have your vote counted, you must properly complete, sign, and timely return this Ballot to the Voting Agent by the Voting Deadline. You must provide all of the information requested by this Ballot. Failure to do so may result in the disqualification of your vote.

**NOTICE REGARDING CERTAIN RELEASE,
EXCULPATION, AND INJUNCTION PROVISIONS IN PLAN**

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan. Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:**

**SECTION 12.5        PLAN INJUNCTION.**

**(a)        Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under Section 12.6(a) or Section 12.6(b) of the Plan, or (ii) subject to exculpation pursuant to Section 12.7 of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 12.7 of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action: (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to**

3

any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to <u>Section 12.6(a)</u> or <u>Section 12.6(b)</u> of the Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b)     Subject in all respects to <u>Section 13.1</u> of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such

4

Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in Section 13.1 of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c) By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 12.5 of the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

(d) The injunctions in Section 12.5 of the Plan shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

**SECTION 12.6     RELEASES.**

(a) **Releases by the Debtors and their Estates.** Except as otherwise expressly set forth below in Section 12.6 of the Plan, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their

Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in <u>Section 12.6(a)</u> of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with <u>Section 4.6</u> of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on <u>Exhibit B</u> of the Plan or the Schedule of Identified Non-Released Parties.

(b)     **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released

Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases contained in <u>Section 12.6(b)</u> of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)   Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or

any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

**SECTION 12.7** <u>**EXCULPATION**</u>.

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in <u>Section 12.7</u> of the Plan shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

## SECTION 12.15    RELEASE OF LIENS

**Except as otherwise provided in the plan or in any contract, instrument, release, or other agreement or document created pursuant to the plan, on the effective date, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests against any property of the estates shall revert to the plan trust.**

### SECTION 5.12 Cancellation of Existing Securities, Agreements, and Liens.

(a)     Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)     On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)     After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)     Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

**Relevant Definitions Related to Release and Exculpation Provisions**:

    *Exculpated Parties* means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

    *Related Parties* means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

    *Released Parties* means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in the Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

    *Releasing Parties* means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

    *Individual Released Parties* means the individuals listed on <u>Exhibit A</u> of the Plan, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

    *Debtor Related Parties* means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional

advisors, independent auditors, employed and affiliated physicians (solely with respect to Medical Liability Claims asserted against such physicians and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

> ***Identified Non-Released Parties*** means (i) the Persons and Entities listed on Exhibit B of the Plan, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

> ***Schedule of Identified Non-Released Parties*** means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

> ***Specified Non-Released Parties*** means the Persons identified as "Specified Non-Released Parties" in (i) Exhibit B to the Plan, or (ii) the Schedule of Identified Non-Released Parties.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

> **PLEASE COMPLETE ITEMS 1, 2, 3, AND 4. IF THIS BALLOT HAS NOT BEEN PROPERLY SIGNED IN THE SPACE PROVIDED, YOUR VOTE MAY NOT BE VALID OR COUNTED AS HAVING BEEN CAST.**

**Item 1.** **Amount of Claim**. The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder (or authorized signatory of such a Holder) of a General Unsecured Claim in the aggregate unpaid amount set forth below.

> $ _____
>
> **Debtor:** _____

**Item 2.** **Votes on the Plan**. Please vote either to accept or to reject the Plan with respect to your Claims below. Any Ballot not marked either to accept or reject the Plan, or marked both to accept and reject the Plan, shall not be counted in determining acceptance or rejection of the Plan.

> **Prior to voting on the Plan, please note the following:**
>
> **If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan. Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:**
>
> **The Disclosure Statement and the Plan must be referenced for a complete description of the release, injunction, and exculpation provisions.**

The undersigned Holder of a Class 4 General Unsecured Claim votes to (check <u>one</u> box):

☐ **Accept** the Plan          ☐ **Reject** the Plan.

**Item 3.** **Third-Party Release Opt-Out Election.** Check the box below if you elect not to grant the Third-Party Releases contained in Section 12.6(b) of the Plan. Election to withhold consent is at your option and must be affirmatively exercised. If you submit an accepting or a rejecting Ballot, or if you submit a Ballot in which you abstain from voting, and in each case, you do not check the box below, you will be deemed to consent to, and grant the Third-Party Releases

12

contained in Section 12.6(b) of the Plan to the fullest extent permitted by applicable law. **If you hold a Medical Liability Claim against the Debtors and do not elect to opt-out of the releases contained in Section 12.6(b) of the Plan, then you are electing to release claims against the Debtors' employed physicians and affiliated physicians related to Medical Liability Claims.**

The Holder of the Class 4 General Unsecured Claim set forth in Item 1 elects to:

☐ **OPT OUT** of the Third-Party Releases contained only in Section 12.6(b) of the Plan.

**Item 4.** **Acknowledgements**. By signing this Ballot, the Holder (or authorized signatory of such Holder) acknowledges review and receipt of the Plan, the Disclosure Statement, and the other applicable solicitation materials, and certifies that (i) it has the power and authority to vote to accept or reject the Plan, (ii) it was the Holder (or is entitled to vote on behalf of such Holder) of the General Unsecured Claims described in <u>Item 1</u> as of the Voting Record Date, and (iii) all authority conferred, or agreed to be conferred, pursuant to this Ballot, and every obligation of the undersigned hereunder, shall be binding on the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy, and legal representatives of the undersigned, and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

Name of Holder: _____
*(print or type)*

Signature: _____

Name of Signatory: _____
*(if other than Holder, include name and title)*

Title: _____

Address: _____

_____

_____

_____

E-mail Address: _____

Date Completed: _____

## VOTING INFORMATION AND INSTRUCTIONS FOR COMPLETING THE BALLOT

1.  Ballots received after the Voting Deadline (if the Voting Deadline has not been extended) may not, at the Debtors' discretion, be counted. **The Voting Agent will tabulate all properly completed, valid Ballots received on or before the Voting Deadline.**

2.  Complete the Ballot by providing all the information requested, signing, dating, and returning the Ballot to the Voting Agent. Any Ballot that is illegible, contains insufficient information to identify the Holder, or is unsigned[3] will not be counted. Ballots may not be submitted to the Voting Agent by facsimile or electronic mail. If neither the "**accept**" nor "**reject**" box is checked in Item 2, or both boxes are checked in Item 2, or the Ballot is otherwise not properly completed, executed, or timely returned, then the Ballot shall not be counted in determining acceptance or rejection of the Plan.

3.  You must vote all your Claims within a single Class under the Plan either to accept or reject the Plan. Accordingly, if you return more than one Ballot voting different or inconsistent Claims within a single Class under the Plan, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan likewise will not be counted.

4.  The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of Claims.

5.  The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.

6.  If you cast more than one Ballot voting the same Claims prior to the Voting Deadline, the latest received, valid Ballot submitted to the Voting Agent will supersede any prior Ballot.

7.  If (i) the Debtors revoke or withdraw the Plan, or (ii) the Confirmation Order is not entered or consummation of the Plan does not occur, this Ballot shall automatically be null and void and deemed withdrawn without any requirement of affirmative action by or notice to you.

8.  There may be changes made to the Plan that do not cause material adverse effects on an accepting Class. If such non-material changes are made to the Plan, the Debtors will not resolicit votes for acceptance or rejection of the Plan.

9.  NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT, ANY SUPPLEMENTAL INFORMATION PROVIDED BY THE DEBTORS, THE

---

[3]   Ballots submitted on the Online Portal ("**E-Ballots**") will be deemed to contain a legal, valid signature.

CREDITORS' COMMITTEE POSITION LETTER, OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT.

10. PLEASE PROPERLY COMPLETE AND PROMPTLY RETURN YOUR BALLOT TO THE VOTING AGENT.

11. IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE VOTING AGENT BY (I) CALLING (646) 893-5546 (INTERNATIONAL, TOLL) OR (888) 505-1257 (U.S./CANADA, TOLL FREE); (II) WRITING TO STEWARD HEALTH CARE SYSTEM LLC BALLOT PROCESSING, C/O KROLL RESTRUCTURING ADMINISTRATION LLC, 850 3RD AVENUE, SUITE 412, BROOKLYN, NY 11232 (IF BY FIRST CLASS MAIL, HAND DELIVERY OR OVERNIGHT MAIL); OR (III) EMAILING STEWARDINFO@RA.KROLL.COM WITH "STEWARD HEALTH SOLICITATION INQUIRY" IN THE SUBJECT LINE.  PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT.

12. THE VOTING AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

**PLEASE SUBMIT YOUR BALLOT BY ONLY <u>ONE</u> OF THE FOLLOWING METHODS**

---

**By electronic, online submission:**

To submit your Ballot via the Voting Agent's online portal (the "**Online Portal**"), visit https://restructuring.ra.kroll.com/steward/. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.

Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted. If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the Online Portal.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:**

_____

The Online Portal is the sole manner in which E-Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

---

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

**Holders are strongly encouraged to submit their ballots via the Online Portal. Holders who cast a Ballot using the Voting Agent's Online Portal should NOT also submit a paper Ballot.**

**By First Class Mail, Hand Delivery, or Overnight Mail to:**

**Steward Health Care System LLC Ballot Processing**
**c/o Kroll Restructuring Administration LLC**
**850 3rd Avenue, Suite 412**
**Brooklyn, NY 11232**

To arrange hand delivery of your Ballot, please email the Voting Agent at StewardBallots@ra.kroll.com (with "Steward Release Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

**ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS SO THAT THE BALLOTS ARE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS JULY 1, 2025 AT 5:00 P.M. (CENTRAL TIME).**

**Exhibit 5**

**Form of Ballot for PBGC Claims (Class 5)**

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE DISCLOSURE STATEMENT AND OTHER MATERIALS ACCOMPANYING THIS BALLOT.[1]**

**PLEASE NOTE THAT, EVEN IF YOU INTEND TO VOTE TO REJECT THE PLAN, YOU MUST STILL READ, COMPLETE, AND EXECUTE THIS ENTIRE BALLOT.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM LLC,** *et al.*, | § | **Case No. 24-90213 (CML)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[2] | § | |

**BALLOT FOR VOTING TO ACCEPT OR REJECT**
**THE JOINT CHAPTER 11 PLAN OF LIQUIDATION OF**
**STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS**
**CLASS 5 (PBGC CLAIMS)**

---

**IN ORDER FOR YOUR VOTE TO BE COUNTED TOWARD CONFIRMATION OF THE PLAN, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO THAT IT IS <u>ACTUALLY RECEIVED</u> BY THE VOTING AGENT ON OR BEFORE JULY 1, 2025 AT 5:00 P.M. (CENTRAL TIME) (THE "<u>VOTING DEADLINE</u>"), UNLESS EXTENDED BY THE DEBTORS WITH IN CONSULTATION WITH THE CREDITORS' COMMITTEE.**

---

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") are soliciting votes with respect to the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be modified, amended, or supplemented, the "**Plan**"). The Plan is attached as **<u>Exhibit A</u>** to the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and schedules thereto, and as may be modified, amended, or supplemented, the "**Disclosure Statement**").

---

[1] All capitalized terms used but not defined herein or in the enclosed voting instructions have the meanings ascribed to them in the Plan, attached as <u>Exhibit A</u> to the Disclosure Statement.

[2] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' Voting Agent (as defined below) at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is: 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

You are receiving this ballot (the "**Ballot**") because records indicate that you are the holder (a "**Holder**") of a PBGC Claim as of May 21**,** 2025 (the "**Voting Record Date**"). Your receipt of this Ballot does not indicate that your Claim(s) has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of, or distribution on account of, Class 5 PBGC Claims.

The Disclosure Statement provides information to assist you in deciding whether to accept or reject the Plan. If you do not have the Disclosure Statement, you may obtain a copy from Kroll Restructuring Administration LLC (the "**Voting Agent**" or "**Kroll**") at no charge by accessing the Debtors' restructuring website at https://restructuring.ra.kroll.com/Steward/.

If you have any questions on how to properly complete this Ballot, please contact the Voting Agent by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Please be advised that the Voting Agent cannot provide legal advice. You may wish to seek legal advice concerning the Plan and the classification and treatment of your Class 5 PBGC Claim under the Plan.

---

**IMPORTANT NOTICE REGARDING TREATMENT FOR PBGC CLAIMS IN CLASS 5**

As described in more detail in the Disclosure Statement, if the Plan is confirmed and the Effective Date occurs, in accordance with the PBGC Settlement, in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Claims, on or prior to the Effective Date, PBGC shall receive the PBGC Plan Trust Interests. For the avoidance of doubt, the PBGC Claims shall be the only Claims on which the PBGC shall be entitled to any Distribution in connection with the Debtors or this Plan.

**PLEASE READ THE DISCLOSURE STATEMENT AND PLAN FOR MORE DETAILS.**

---

The Plan can be confirmed by the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") and thereby made binding on you if it is accepted by the Holders of (i) at least two-thirds in amount of the Allowed Claims voted in each Impaired Class, and (ii) if the Impaired Class is a Class of Claims, more than one-half in number of the Allowed Claims voted in each Impaired Class, and if the Plan otherwise satisfies the applicable requirements of section 1129(a) under the Bankruptcy Code. If the requisite acceptances are not obtained, the Bankruptcy Court may nonetheless confirm the Plan if it finds that the Plan (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes rejecting the Plan, and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. If the Plan is confirmed by the Bankruptcy Court, it will be binding on you whether or not you vote or if you vote to reject the Plan. To have your vote counted, you must complete, sign, and return this Ballot to the Voting Agent by the Voting Deadline. You must provide all of the information requested by this Ballot. Failure to do so may result in the disqualification of your vote.

Case 24-90794 Document 1451-1 Filed in TXSB on 09/03/25 Page 32 of 1832

## NOTICE REGARDING CERTAIN RELEASE,
## EXCULPATION, AND INJUNCTION PROVISIONS IN PLAN

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, <u>you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan.</u> Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:**

**SECTION 12.5        <u>PLAN INJUNCTION</u>.**

**(a)        Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under <u>Section 12.6(a)</u> or <u>Section 12.6(b)</u> of the Plan, or (ii) subject to exculpation pursuant to <u>Section 12.7</u> of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to <u>Section 12.7</u> of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action: (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing**

or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to <u>Section 12.6(a)</u> or <u>Section 12.6(b)</u> of the Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b)     Subject in all respects to <u>Section 13.1</u> of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in <u>Section 13.1</u> of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.  For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)     **By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in <u>Section 12.5 of the Plan</u>, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.**

(d)     **The injunctions in <u>Section 12.5</u> of the Plan shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.**

**SECTION 12.6      <u>RELEASES</u>.**

(a)     **Releases by the Debtors and their Estates.    Except as otherwise expressly set forth below in <u>Section 12.6</u> of the Plan, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors;**

the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in Section 12.6(a) of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with Section 4.6 of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on Exhibit B of the Plan or the Schedule of Identified Non-Released Parties.

(b)     **Third-Party Releases.** Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking

place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases contained in <u>Section 12.6(b)</u> of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party.  Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)     Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

## SECTION 12.7     EXCULPATION.

       To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on relating to, or in, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in <u>Section 12.7</u> of the Plan shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

## SECTION 12.15     <u>RELEASE OF LIENS</u>

       Except as otherwise provided in the plan or in any contract, instrument, release, or other agreement or document created pursuant to the plan, on the effective date, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests against any property of the estates shall revert to the plan trust.

<u>SECTION 5.12 Cancellation of Existing Securities, Agreements, and Liens.</u>

8

(a)    Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)    On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)    After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)    Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

**Relevant Definitions Related to Release and Exculpation Provisions**:

*Exculpated Parties* means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

*Related Parties* means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and

with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in the Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

**Releasing Parties** means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

**Individual Released Parties** means the individuals listed on <u>Exhibit A</u> of the Plan, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

**Debtor Related Parties** means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, employed and affiliated physicians (solely with respect to Medical Liability Claims asserted against such physicians and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything

in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

      ***Identified Non-Released Parties*** means (i) the Persons and Entities listed on Exhibit B of the Plan, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions  or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

      ***Schedule of Identified Non-Released Parties*** means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

      ***Specified Non-Released Parties*** means the Persons identified as "Specified Non-Released Parties" in (i) Exhibit B to the Plan, or (ii) the Schedule of Identified Non-Released Parties.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

---

**PLEASE COMPLETE ITEMS 1, 2, 3, AND 4.  IF THIS BALLOT HAS NOT BEEN PROPERLY SIGNED IN THE SPACE PROVIDED, YOUR VOTE MAY NOT BE VALID OR COUNTED AS HAVING BEEN CAST.**

---

**Item 1.        Principal Amount of Claim**.  The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Holder (or authorized signatory of such a Holder) of a PBGC Claim in the aggregate unpaid principal amount set forth below.

$\$$_____

**Item 2.        Votes on the Plan**.  Please vote either to accept or to reject the Plan with respect to your Claims below.  Any Ballot not marked either to accept or reject the Plan, or marked both to accept and reject the Plan, shall not be counted in determining acceptance or rejection of the Plan.

---

**Prior to voting on the Plan, please note the following:**

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan.  Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party).  s The releases as presented in the Plan are provided below:**

**The Disclosure Statement and the Plan must be referenced for a complete description of the release, injunction, and exculpation provisions.**

---

The undersigned Holder of a Class 5 PBGC Claim votes to (check <u>one</u> box):

☐ **Accept** the Plan          ☐ **Reject** the Plan.

**<u>Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.</u>**

**Item 3.        Optional Opt-Out Release Election**.  Check the box below if you elect not to grant the releases contained in Section 12.6(b) of the Plan.  Election to withhold consent is at your option.  If you submit an accepting or a rejecting Ballot, or if you submit a Ballot in which you abstain from voting, and in each case, you do not check the box below, you will be deemed to consent to the releases contained in Section 12.6(b) of the Plan to the fullest extent permitted by applicable law.  The Holder of the Class 5 PBGC Claim set forth in <u>Item 1</u> elects to:

12

☐ **OPT OUT** of the releases contained only in Section 12.6(b) of the Plan.

**Item 4.** **Acknowledgements**. By signing this Ballot, the Holder (or authorized signatory of such Holder) acknowledges review and receipt of the Plan, the Disclosure Statement, and the other applicable solicitation materials, and certifies that (i) it has the power and authority to vote to accept or reject the Plan, (ii) it was the Holder (or is entitled to vote on behalf of such Holder) of the PBGC Claims described in <u>Item 1</u> as of the Voting Record Date, and (iii) all authority conferred, or agreed to be conferred, pursuant to this Ballot, and every obligation of the undersigned hereunder, shall be binding on the transferees, successors, assigns, heirs, executors, administrators, trustees in bankruptcy, and legal representatives of the undersigned, and shall not be affected by, and shall survive, the death or incapacity of the undersigned.

Name of Holder: _____
(*print or type*)

Signature: _____

Name of Signatory: _____
(*if other than Holder, include name and title*)

Title: _____

Address: _____

_____

_____

_____

E-mail Address: _____

Date Completed: _____

## VOTING INFORMATION AND INSTRUCTIONS FOR COMPLETING THE BALLOT

1.  Ballots received after the Voting Deadline (if the Voting Deadline has not been extended) may not, at the Debtors' discretion, be counted. **The Voting Agent will tabulate all properly completed, valid Ballots received on or before the Voting Deadline.**

2.  Complete the Ballot by providing all the information requested, signing, dating, and returning the Ballot to the Voting Agent. Any Ballot that is illegible, contains insufficient information to identify the Holder, or is unsigned[3] will not be counted. Ballots may not be submitted to the Voting Agent by facsimile or electronic mail. If neither the "**accept**" nor "**reject**" box is checked in <u>Item 2</u>, both boxes are checked in <u>Item 2</u>, or the Ballot is otherwise not properly completed, executed, or timely returned, then the Ballot shall not be counted in determining acceptance or rejection of the Plan.

3.  You must vote all your Claims within a single Class under the Plan either to accept or reject the Plan. Accordingly, if you return more than one Ballot voting different or inconsistent Claims within a single Class under the Plan, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan likewise will not be counted.

4.  The Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of Claims.

5.  The Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.

6.  If you cast more than one Ballot voting the same Claims prior to the Voting Deadline, the latest received, valid Ballot submitted to the Voting Agent will supersede any prior Ballot.

7.  If (i) the Debtors revoke or withdraw the Plan, or (ii) the Confirmation Order is not entered or consummation of the Plan does not occur, this Ballot shall automatically be null and void and deemed withdrawn without any requirement of affirmative action by or notice to you.

8.  There may be changes made to the Plan that do not cause material adverse effects on an accepting Class. If such non-material changes are made to the Plan, the Debtors will not resolicit votes for acceptance or rejection of the Plan.

9.  NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT, ANY SUPPLEMENTAL INFORMATION PROVIDED BY THE DEBTORS, OR OTHER MATERIALS AUTHORIZED BY THE BANKRUPTCY COURT.

---

[3] E-Ballots submitted on the Online Portal will be deemed to contain a legal, valid signature.

10. PLEASE RETURN YOUR BALLOT PROMPTLY.

11. IF YOU HAVE RECEIVED A DAMAGED BALLOT OR HAVE LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT OR THE VOTING PROCEDURES, PLEASE CONTACT THE VOTING AGENT BY (I) CALLING (646) 893-5546 (INTERNATIONAL, TOLL) OR (888) 505-1257 (U.S./CANADA, TOLL FREE); (II) WRITING TO STEWARD HEALTH CARE SYSTEM LLC BALLOT PROCESSING, C/O KROLL RESTRUCTURING ADMINISTRATION LLC, 850 3RD AVENUE, SUITE 412, BROOKLYN, NY 11232 (IF BY FIRST CLASS MAIL, HAND DELIVERY OR OVERNIGHT MAIL); OR (III) EMAILING STEWARDINFO@RA.KROLL.COM WITH "STEWARD HEALTH SOLICITATION INQUIRY" IN THE SUBJECT LINE. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE BANKRUPTCY COURT.

12. THE VOTING AGENT IS NOT AUTHORIZED TO AND WILL NOT PROVIDE LEGAL ADVICE.

**PLEASE SUBMIT YOUR BALLOT BY ONLY <u>ONE</u> OF THE FOLLOWING METHODS:**

---

**By electronic, online submission:**

To submit your Ballot via the Voting Agent's online portal (the "<u>Online Portal</u>"), visit <u>https://restructuring.ra.kroll.com/steward/</u>. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Ballot.

Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted. If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the Online Portal.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:**

_____

The Online Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in Item 1 of your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

---

> **Holders are strongly encouraged to submit their ballots via the Online Portal. Holders who cast a Ballot using the Voting Agent's Online Portal should NOT also submit a paper Ballot.**

> **By First Class Mail, Hand Delivery, or Overnight Mail to:**
>
> **Steward Health Care System LLC Ballot Processing**
> **c/o Kroll Restructuring Administration LLC**
> **850 3rd Avenue, Suite 412**
> **Brooklyn, NY 11232**
>
> To arrange hand delivery of your Ballot, please email the Voting Agent at StewardBallots@ra.kroll.com (with "Steward Release Ballot Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

**ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED ACCORDING TO THE VOTING INSTRUCTIONS SO THAT THE BALLOTS ARE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE.**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS JULY 1, 2025 AT 5:00 P.M. (CENTRAL TIME).**

## **Exhibit 6**

**Notice of Non-Voting Status**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|   |   |   |
|---|---|---|
| In re: | § | Chapter 11 |
|   | § |   |
| **STEWARD HEALTH CARE SYSTEM LLC,** *et al.*, | § | Case No. 24-90213 (CML) |
|   | § |   |
|   | § | (Jointly Administered) |
| Debtors.[1] | § |   |

## NOTICE OF NON-VOTING STATUS

On May 6, 2024 (the "**Petition Date**"), Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), each commenced a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

On [●], 2025, the Bankruptcy Court held a hearing at which it conditionally approved the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (the "**Disclosure Statement**"), and thereafter entered an order (the "**Disclosure Statement Order**") with respect thereto. The Disclosure Statement Order, among other things, authorizes the Debtors to solicit votes to accept the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (including any exhibits and schedules thereto, and as may be modified, amended, or supplemented, the "**Plan**").[2]

If you have any questions about the status of your Claim or Interest or if you wish to obtain paper copies of the Plan and the Disclosure Statement, you may contact the Debtors' voting agent, Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**"), by: (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line. Copies of the Plan and Disclosure Statement can also be accessed online at https://restructuring.ra.kroll.com/Steward/. Please be advised that Kroll cannot provide legal advice.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is: 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Disclosure Statement or the Plan, as applicable.

You are receiving this notice (this "Notice of Non-Voting Status") because, according to the Debtors' books and records, as of May 21, 2025, you are a holder of:

i.   **<u>Class 1 Other Priority Claims</u>** under the Plan, which provides that your Claim(s) against the Debtors is unimpaired and therefore, pursuant to section 1126(f) of the Bankruptcy Code, you are presumed to have accepted the Plan and are not entitled to vote on the Plan;

ii.  **<u>Class 2 Other Secured Claims</u>** under the Plan, which provides that your Claim(s) against the Debtors is unimpaired and therefore, pursuant to section 1126(f) of the Bankruptcy Code, you are presumed to have accepted the Plan and are not entitled to vote on the Plan;

iii. **<u>Class 7 Subordinated Securities Claims</u>** under the Plan, which provides that your Claim(s) against the Debtors is not entitled to a recovery and therefore, pursuant to section 1126(g) of the Bankruptcy Code, you are deemed to have rejected the Plan and are not entitled to vote on the Plan;

iv.  **<u>Class 9 Non-Debtor Owned Subsidiary Interests</u>** under the Plan, which provides that your Interest(s) in the Debtors is not entitled to a recovery and therefore, pursuant to section 1126(g) of the Bankruptcy Code, you are deemed to have rejected the Plan and are not entitled to vote on the Plan; and/or

v.   **<u>Class 10 Parent Interests</u>** under the Plan, which provides that your Interest(s) in the Debtors is not entitled to a recovery and therefore, pursuant to section 1126(g) of the Bankruptcy Code, you are deemed to have rejected the Plan and are not entitled to vote on the Plan.

**UNDER THE TERMS OF THE PLAN, YOUR NON-VOTING STATUS DOES NOT PRECLUDE YOU FROM OPTING OUT OF THE RELEASES CONTAINED IN SECTION 12.6(B) OF THE PLAN. OPTING OUT OF SUCH RELEASES IS AT YOUR OPTION AND MUST BE AFFIRMATIVELY EXERCISED ON THE RELEASE OPT-OUT FORM PROVIDED AND TIMELY RETURNED TO THE VOTING AGENT. <u>FAILURE TO ELECT TO OPT OUT OF THE THIRD-PARTY RELEASES WILL DEEM YOU TO CONSENT TO THE THIRD-PARTY RELEASES CONTAINED IN SECTION 12.6(B) OF THE PLAN</u>.**

The deadline for filing objections to confirmation of the Plan or final approval of the Disclosure Statement is **July 1, 2025 at 5:00 p.m. (Central Time) (the "Combined Objection Deadline")**. Any objections to the confirmation of the Plan or final approval of the Disclosure Statement must: (i) be in writing; (ii) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any order of the Bankruptcy Court; (iii) set forth the name of the objecting party and the nature and amount of Claims or Interests held or asserted by the objecting party against the Debtors' estates or property; and (iv) provide the basis for the objection, and the specific grounds therefor, and, if practicable, a proposed modification to the Plan that would resolve such objection. Registered

users of the Bankruptcy Court's case filing system must electronically file their objections and responses on or before the Combined Objection Deadline. All other parties in interest must file their objections and responses in writing with the United States Bankruptcy Court Clerk's Office, Rosario Saldana, United States Courthouse, 515 Rusk Avenue, Courtroom 401, 4th Floor, Houston, Texas 77002, on or before the Combined Objection Deadline.

---

If you have questions about this Notice of Non-Voting Status, please contact Kroll at:

**Telephone**: (888) 505-1257 (U.S./Canada, toll free) or (646) 893-5546 (international, toll)

**Email**: stewardinfo@ra.kroll.com

**Website**: https://restructuring.ra.kroll.com/Steward/

---

### NOTICE REGARDING CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS IN PLAN

**If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, <u>you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan.</u> Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:**

**SECTION 12.5**      <u>**PLAN INJUNCTION**</u>**.**

**(a)      Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under <u>Section 12.6(a)</u> or <u>Section 12.6(b)</u> of the Plan, or (ii) subject to exculpation pursuant to <u>Section 12.7</u> of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to <u>Section 12.7</u> of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action: (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities**

or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to <u>Section 12.6(a)</u> or <u>Section 12.6(b)</u> of the Plan; *provided* that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b)     Subject in all respects to <u>Section 13.1</u> of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date

4

related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in Section 13.1 of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c)     By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 12.5 of the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.

(d)     The injunctions in Section 12.5 of the Plan shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

**SECTION 12.6     RELEASES.**

(a)     **Releases by the Debtors and their Estates.** Except as otherwise expressly set forth below in Section 12.6 of the Plan, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement,

event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in **Section 12.6(a)** of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with **Section 4.6** of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified

Non-Released Party on <u>Exhibit B</u> of the Plan or the Schedule of Identified Non-Released Parties.

(b)        **Third-Party Releases.  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases contained in <u>Section 12.6(b)</u> of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party.  Nothing contained in the Plan, nor the release of any claims pursuant to the**

Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(c)     Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan.  PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

**SECTION 12.7     <u>EXCULPATION</u>.**

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in Section 12.7 of the Plan shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation

Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

## SECTION 12.15     RELEASE OF LIENS

Except as otherwise provided in the plan or in any contract, instrument, release, or other agreement or document created pursuant to the plan, on the effective date, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests against any property of the estates shall revert to the plan trust.

## SECTION 5.12 Cancellation of Existing Securities, Agreements, and Liens.

(a)     Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)     On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)     After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)     Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

**Relevant Definitions Related to Release and Exculpation Provisions**:

**Exculpated Parties** means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

**Related Parties** means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in the Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

**Releasing Parties** means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

**Individual Released Parties** means the individuals listed on Exhibit A of the Plan, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

**Debtor Related Parties** means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional

advisors, independent auditors, employed and affiliated physicians (solely with respect to Medical Liability Claims asserted against such physicians and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

*Identified Non-Released Parties* means (i) the Persons and Entities listed on Exhibit B of the Plan, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

*Schedule of Identified Non-Released Parties* means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

*Specified Non-Released Parties* means the Persons identified as "Specified Non-Released Parties" in (i) Exhibit B to the Plan, or (ii) the Schedule of Identified Non-Released Parties.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

Dated: [•], 2025
      Houston, Texas

   /s/ DRAFT

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: Gabriel.Morgan@weil.com
       Clifford.Carlson@weil.com
       Stephanie.Morrison@weil.com


-and-


**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*) Jason
H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: Jeffrey.Saferstein@weil.com
      Jason.George@weil.com


-and-


**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted pro hac vice)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159
Email: DavidJ.Cohen@weil.com

*Attorneys for Debtors and*
*Debtors in Possession*

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: Ray.Schrock@lw.com
      Candace.Arthur@lw.com

*Attorneys for Debtors*
*and Debtors in Possession*

## Exhibit 7

### Form of Release Opt-Out

**OPTIONAL:**          **RELEASE OPT-OUT FORM**

You are receiving this opt-out form (the "**Release Opt-Out Form**") because you are or may be a holder (a "**Holder**") of a Claim against or Interest in Steward Health Care System LLC and its debtor affiliates (collectively, the "**Debtors**") that is not entitled to vote on the *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be modified, amended, or supplemented, the "**Plan**").[1] A holder of Claims or Interests is deemed to grant the third-party releases set forth below unless such holder affirmatively opts out on or before July 1, 2025 at 5:00 P.M. (Central Time) (the "**Opt-Out Deadline**").

If you believe you are a holder of a Claim or Interest with respect to the Debtors or Released Parties (as defined below) and choose to opt out of the third-party releases set forth in Section 12.6(b) of the Plan, please submit your election to opt out through one of the following methods: (i) completing, signing, dating, and returning this Release Opt-Out Form promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to the Debtors' voting agent, Kroll Restructuring Administration LLC ("**Kroll**" or the "**Voting Agent**"), at the address set forth below, so that it is actually received by the Voting Agent prior to the Opt-Out Deadline, or (ii) by completing and signing the Release Opt-Out Form via the Online Portal located at https://restructuring.ra.kroll.com/Steward/ (the "**Online Portal**").

**To ensure that your Release Opt-Out Form is counted, you must complete, clearly sign, and timely return your Release Opt-Out Form so that it is actually received by the Voting Agent by the Opt-Out Deadline by *ONLY ONE* of the following methods:**

**Hard Copy Submission**

| **If by First Class Mail, Hand Delivery, or Overnight Mail:** |
|---|
| Steward Health Care System LLC Ballot Processing c/o Kroll Restructuring Administration LLC 850 3rd Avenue, Suite 412 Brooklyn, NY 11232 To arrange hand delivery of your Release Opt-Out Form, please email the Voting Agent at StewardBallots@ra.kroll.com (with "Steward Release Opt-Out Form Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery. |

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**"), as applicable.

## Electronic Online Submission

| If by Online Portal |
|---|
| To submit your Release Opt-Out Form via the Voting Agent's Online Portal, visit https://restructuring.ra.kroll.com/steward/. Click on the "Submit E-Ballot" section of the website and follow the instructions to submit your Release Opt-Out Form.<br><br>Release Opt-Out Forms submitted by facsimile, email, or other means of electronic transmission will not be counted. If submitting online, to have your Opt-Out election counted, you must electronically complete, sign, and submit your electronic Release Opt-Out Form by utilizing the Online Portal.<br><br>**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Opt-Out Form:**<br><br>**Unique E-Opt-Out ID#: _____**<br><br>The Online Portal is the sole manner in which Release Opt-Out Forms will be accepted via electronic or online transmission. Release Opt-Out Forms submitted by facsimile, email, or other means of electronic transmission will not be counted.<br><br>**Holders are strongly encouraged to submit their Release Opt-Out Forms via the Online Portal. Parties who submit a Release Opt-Out Form using the Voting Agent's Online Portal should NOT also submit a hard copy Opt-Out Form.** |

**THIS RELEASE OPT-OUT FORM MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BY THE OPT-OUT DEADLINE. IF THE RELEASE OPT-OUT FORM IS RECEIVED AFTER THE OPT-OUT DEADLINE, IT WILL NOT BE COUNTED.**

**Item 1.** **Amount of Claim**. The undersigned hereby certifies that, as of May 21, 2025, the undersigned was the Holder (or authorized signatory of such a Holder) of Claims or Interests in the amount set forth below.

| | |
|---|---|
| **Class 1 Other Priority Claims** | Amount: $_____ |
| **Class 2 Other Secured Claims** | Amount: $_____ |
| **Class 7 Subordinated Securities Claims** | Amount: $_____ |

| Class 9 Non-Debtor Owned Subsidiary Interests | Amount: $_____ |
|---|---|
| Class 10 Parental Interests | Amount: $_____ |

## NOTICE REGARDING CERTAIN RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS IN PLAN

If you (i) are solicited to vote to accept or reject the Plan, but do not vote to either accept or reject the Plan, and do not opt out of granting the releases set forth in the Plan, (ii) vote, or are deemed, to reject the Plan or vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, or (iii) were given notice of the opportunity to opt out of granting the releases contained in the Plan but do not opt out, **you shall be deemed to have consented to the releases contained in Section 12.6(b) of the Plan.** Holders of Claims that timely, properly, and affirmatively elect to opt out will not be deemed a Releasing Party (or, by extension, a Releasing Party). The releases as presented in the Plan are provided below:

**SECTION 12.5**      **PLAN INJUNCTION.**

(a) Except as otherwise expressly provided in the Plan, or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims, Interests, or Causes of Action that are (i) released or discharged pursuant to the Plan, including under Section 12.6(a) or Section 12.6(b) of the Plan, or (ii) subject to exculpation pursuant to Section 12.7 of the Plan, and all other parties in interest, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, an Estate, the Plan Trust, the Plan Trustee, the Litigation Trust, the Plan Trustee, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 12.7 of the Plan with respect to the Exculpated Parties), as applicable, with respect to such Claims, Interests, and Causes of Action: (A) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (B) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly, or indirectly, any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (C) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless (x) such Entity has timely asserted such setoff right either in a filed proof of Claim, or in another document filed with the

Bankruptcy Court explicitly preserving such setoff or that otherwise indicates that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise or (y) such right to setoff arises under a postpetition agreement with the Debtors or (i) an executory contract or (ii) an unexpired lease, in the case of (i) and (ii), that has been assumed by the Debtors as of the Effective Date; (E) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan and Confirmation Order, to the full extent permitted by applicable law; and (F) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan, including pursuant to Section 12.6(a) or Section 12.6(b) of the Plan; provided that such Entities that have held, hold, or may hold Claims against, Interests in, or Causes of Action against, a Debtor or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

(b)     Subject in all respects to Section 13.1 of the Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part:  the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party or Exculpated Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine

whether a Claim or Cause of Action is colorable and has not been released or exculpated (as applicable) and, only to the extent legally permissible and as provided for in Section 13.1 of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, the foregoing sentence is subject to applicable law regarding the Bankruptcy Court's subject matter jurisdiction to hear such matter.

(c) **By participating in the Plan by voting or by accepting Plan Distributions pursuant to the Plan (in whatever sum), each holder of an Allowed Claim extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 12.5 of the Plan, and each such holder acknowledges and accepts that the Plan is a binding compromise of an Allowed Claim or an Interest extinguished and releases all rights in respect of such Allowed Claim or Interest extinguished such that such holders of Claims agree to waive any right (if any) to object to or otherwise challenge the Plan and its effect on Claims or any other matter whatsoever and that such release and waiver shall be effective irrespective of which law governs the rights of the said holder as against a Debtor.**

(d) The injunctions in <u>Section 12.5</u> of the Plan shall extend to any successors of the Debtors, the Plan Trust, and their respective property and interests in property.

**SECTION 12.6     <u>RELEASES</u>.**

(a) **Releases by the Debtors and their Estates.   Except as otherwise expressly set forth below <u>Section 12.6</u> of the Plan, notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Confirmation Date and the Effective Date, the Debtors, the Estates, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee, in each case on behalf of themselves and their respective successors, assigns, any Estate representative(s) appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through any of the foregoing Entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors or the Estates), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Confirmation Date or the Effective Date, as applicable, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the**

(b) Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Debtor and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Confirmation Date or the Effective Date, as applicable. Notwithstanding anything to the contrary in the foregoing, the releases contained in Section 12.6(a) of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, (b) any Claims or Causes of Action assertable by the Debtors, their Estates, or the FILO Parties arising from a material misrepresentation, (c) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (d) prior to the Effective Date, any post-Confirmation Date obligations of any party or Entity under the Plan, the Confirmation Order, the FILO Settlement Order, the FILO Settlement Term Sheet, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order, (e) the Debtors or the Estates from the Retained FILO Claims, or (f) any Intercompany Claims, which, for the avoidance of doubt, shall be treated in accordance with Section 4.6 of the Plan; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. Notwithstanding anything else in the Plan, Disclosure Statement, or the Confirmation Order, no Person or Entity not (a) expressly identified on the list of Individual Released Parties, or (b) defined as a Released Party, shall be deemed to be granted a release under the Plan or Confirmation Order, regardless of whether they are specifically identified as a Identified Non-Released Party on Exhibit B of the Plan or the Schedule of Identified Non-Released Parties.

(c) Third-Party Releases. Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Released Party from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action

asserted or assertable on behalf of the Releasing Parties that such Releasing Parties would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in the Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or the Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases contained in Section 12.6(b) of the Plan (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, criminal misconduct, or gross negligence, or (b) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the transactions contemplated by the Confirmation Order; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party.  Nothing contained in the Plan, nor the release of any claims pursuant to the Plan, is evidence of the merit, or lack of merit, of the Claims or Causes of Action released by the Plan, nor is it intended to be evidence, indicative or the merits, or a waiver of any Claims against any Identified Non-Released Party.

(d)      Notwithstanding any provision in the Plan to the contrary, nothing in the Plan, the Confirmation Order, the Bankruptcy Code (including section 1141 thereof), or any other document filed in the Debtors' Chapter 11 Cases shall be construed as releasing, discharging, exculpating, or relieving any Person (other than the Debtors) from any

fiduciary duties or liabilities under Title I of the Employee Retirement Income Security Act of 1974, as amended from time to time ("ERISA"), with respect to the Pension Plan. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duties or liabilities under Title I of ERISA as a result of any of the provisions of the Plan, the Confirmation Order, the Bankruptcy Code, or any other document filed in the Debtors' Chapter 11 Cases.

## SECTION 12.7    EXCULPATION.

To the fullest extent permitted by applicable law, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action based on, relating to, or in any manner arising from, in whole or in part, from the Petition Date through the Effective Date: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with the Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the business or contractual or other arrangements or other interactions between any Debtor and any Exculpated Party; the restructuring of any Claim or Interest during the Chapter 11 Cases or on the Effective Date; any intercompany obligations, transactions, or transfers; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of the Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of the Plan; the administration and implementation of the Plan or Confirmation Order, including the distribution of property under the Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the exculpations in Section 12.7 of the Plan shall not release or exculpate any Entity from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (*provided* that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state or foreign laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

## SECTION 12.15    RELEASE OF LIENS

Except as otherwise provided in the plan or in any contract, instrument, release, or other agreement or document created pursuant to the plan, on the effective date, all mortgages, deeds of trust, liens, pledges, or other security interests against any property

of the estates shall be fully released, settled, and compromised and all rights, titles, and interests of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests against any property of the estates shall revert to the plan trust.

### SECTION 5.12 Cancellation of Existing Securities, Agreements, and Liens.

(a)    Except for the purpose of evidencing a right to a Plan Distribution, on the Effective Date and without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(b)    On the Litigation Trust Establishment Date, without the need for any further organizational action or approval of any member, board of directors, board of managers, managers, management, or Security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued, and any rights of any holder of FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims) in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

(c)    After the Litigation Trust Establishment Date, the Estate Representative may, in its sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FILO DIP Claims and the FILO Bridge Claims (including, for the avoidance of doubt, the Retained FILO Claims), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the FILO Parties, including, without limitation, UCC-3 termination statements.

(d)    Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Estate Representative any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### Relevant Definitions Related to Release and Exculpation Provisions:

*Exculpated Parties* means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors; (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

*Related Parties* means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former

subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

**Released Parties** means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; *provided* that any non-Debtor Person or Entity that opts out of granting the releases set forth in the Plan will not be a Released Party; *provided further* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

**Releasing Parties** means collectively, and in each case solely in their capacity as such: (i) the holders of all Claims and Interests that vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases set forth in the Plan, (ii) the holders of all Claims and Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan, (iii) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in the Plan but do not opt out, (iv) the Released Parties (other than the Debtors, the Debtor Related Parties, the Plan Trust, the Plan Trustee, the Litigation Trust, and the Litigation Trustee), and (v) with respect to each of the foregoing Persons and Entities in clauses (i) through (iv), such Persons' and Entities' (x) Related Parties, to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

**Individual Released Parties** means the individuals listed on Exhibit A of the Plan, each in their capacity as a current or former director, officer, manager, employee**,** advisor, or consultant of one or more of the Debtors.

**Debtor Related Parties** means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, employed and affiliated physicians (solely with respect to Medical Liability Claims asserted against such physicians and solely to the extent employed by or affiliated with a Debtor at the time such Medical Liability Claim arose), Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their

capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

   ***Identified Non-Released Parties*** means (i) the Persons and Entities listed on <u>Exhibit B</u> of the Plan, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

   ***Schedule of Identified Non-Released Parties*** means a schedule to be filed as part of the Plan Supplement of Identified Non-Released Parties to be identified by the Investigation Subcommittee.

   ***Specified Non-Released Parties*** means the Persons identified as "Specified Non-Released Parties" in (i) <u>Exhibit B</u> to the Plan, or (ii) the Schedule of Identified Non-Released Parties.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PURSUANT TO THE PLAN, IF YOU, AS A HOLDER OF A CLAIM(S) WHO HAS BEEN GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH IN SECTION 12.6(b) OF THE PLAN BUT DO NOT OPT OUT, YOU ARE AUTOMATICALLY DEEMED TO HAVE CONSENTED TO THE RELEASE PROVISIONS IN SECTION 12.6(b) OF THE PLAN.**

**By checking the box below, the undersigned Holder of a Claim not entitled to vote identified in Item 1 above, having received notice of the opportunity to opt out of granting the releases contained in Section 12.6(b) of the Plan:**

☐ **Elects to <u>OPT OUT</u> of the releases contained in Section 12.6(b) of the Plan.**

**Item 3.** **Certifications**. By signing this Release Opt-Out Form, the undersigned certifies that:

    a.     as of the Voting Record Date, either: (i) the Holder is the Holder of the Claims or Interests set forth in Item 1; or (ii) the Holder is an authorized signatory for an entity that is the Holder of the Claims or Interests set forth in Item 1;

    b.     the undersigned has received a copy of the Notice of Non-Voting Status and the Release Opt-Out Form and that the Release Opt-Out Form is made pursuant to the terms and conditions set forth therein;

    c.     if applicable, the undersigned has submitted the same election concerning the releases with respect to all Claims or Interests held by the undersigned; and

    d.     no other Release Opt-Out Forms have been submitted with respect to the Holder's Claims or Interests, or, if any other Release Opt-Out Forms have been submitted with respect to such Claims or Interests, then any such earlier Release Opt-Out Forms are hereby revoked.

Name of Holder: _____

                                  (*print or type*)

Signature: _____

Name of Signatory: _____

                                  (*if other than Holder, include name and title*)

Title: _____

Address: _____

_____

_____

_____

E-mail Address: _____

Date Completed: _____

**IF YOU WISH TO OPT OUT, PLEASE COMPLETE, SIGN, AND DATE THIS RELEASE OPT-OUT FORM AND RETURN IT TO THE VOTING AGENT BY *JUST ONE* OF THE PREVIOUSLY OUTLINED METHODS: FIRST CLASS OR OVERNIGHT MAIL, HAND DELIVERY, OR BY ONLINE TRANSMISSION VIA THE ONLINE PORTAL.**

---

**THIS OPT-OUT FORM MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT ON OR BEFORE THE OPT-OUT DEADLINE OF JULY 1, 2025 at 5:00 P.M. (CENTRAL TIME).**

**<u>Exhibit 8</u>**

**Consent Program Opt-Out Form**

**OPTIONAL:    CONSENT PROGRAM OPT-OUT FORM**

You are receiving this opt-out form (the "**Consent Program Opt-Out Form**") because you are a holder (a "**Holder**") of an Administrative Expense Claim against Steward Health Care System LLC and its debtor affiliates (collectively, the "**Debtors**") that is entitled to participate in the Administrative Expense Claims Consent Program in connection with the *Joint Chapter 11 Plan of Liquidation of Steward Health Care Systems LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be modified, amended, or supplemented, the "**Plan**").[1]  A Holder of Administrative Expense Claims is deemed to have elected to participate in the Administrative Expense Claims Consent Program set forth below **unless such Holder affirmatively opts out by completing Item 2 and Item 3 of this Consent Program Opt-Out Form and submitting such completed Consent Program Opt-Out Form in accordance with the procedures set forth below so that it is <u>actually received</u> by Kroll Restructuring Administration ("Kroll" or the "Voting Agent") on or before 5:00 P.M. (Central Time) on July 1, 2025 (the "Consent Program Opt-Out Deadline")**.

If you are a Holder of an Administrative Expense Claim against the Debtors and choose to opt out of the Administrative Expense Claims Consent Program, please submit your election to opt out through one of the following methods: (i) completing, signing, dating, and returning this Consent Program Opt-Out Form promptly in the enclosed reply envelope provided, or otherwise via first class mail, overnight courier, or hand delivery to the Voting Agent at the address set forth below, so that it is received by the Voting Agent prior to the Consent Program Opt-Out Deadline, or (ii) by completing and signing the electronic version of your Consent Program Opt-Out Form and submitting it via the Online Portal located at https://restructuring.ra.kroll.com/Steward/.  Instructions for submitting this Consent Program Opt-Out Form via either of the specified, valid methods are outlined later in this document.

**If you received this Consent Program Opt-Out Form, but do not timely, properly, and affirmatively opt out, you shall be deemed to have consented to the Administrative Expense Claims Consent Program, and your Administrative Expense Claim will be deemed Allowed in the amount listed in Item 1 below next to "Settled Administrative Expense Claim," which is equal to 50% of the Reconciled Amount (as defined below).**

If you have any questions about the status of your Claim or if you wish to obtain paper copies of the Plan and the Disclosure Statement, you may contact the Voting Agent, by : (a) calling (646) 893-5546 (international, toll) or (888) 505-1257 (U.S./Canada, toll free), (b) writing to Steward Health Care System LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232 (if by first class mail, hand delivery or overnight mail), or (c) emailing stewardinfo@ra.kroll.com with "Steward Health Solicitation Inquiry" in the subject line.  Copies of the Plan and Disclosure Statement can also be accessed, free of charge, online at https://restructuring.ra.kroll.com/Steward/.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, filed on [●], 2025 (Docket No. [●]) (as may be amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**"), as applicable.

You may also access electronic copies of the Plan, Disclosure Statement, and any other solicitation materials via the QR Code below. Please be advised that Kroll cannot provide legal advice.



**To ensure that your hard copy Consent Program Opt-Out Form is counted, clearly sign and timely return your properly completed Consent Program Opt-Out Form in the enclosed prepaid pre-addressed business reply envelope, or via first-class mail, overnight courier, or hand delivery to:**

**Paper Copy Consent Program Opt-Out Form Submission**

> Steward Health Care System LLC Ballot Processing Center
> c/o Kroll Restructuring Administration LLC
> 850 3rd Avenue, Suite 412
> Brooklyn, NY 11232

**THIS CONSENT PROGRAM OPT-OUT FORM MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BY THE CONSENT PROGRAM OPT-OUT DEADLINE. IF THE CONSENT PROGRAM OPT-OUT FORM IS RECEIVED AFTER THE CONSENT PROGRAM OPT-OUT DEADLINE, IT WILL NOT BE COUNTED AND YOU WILL BE DEEMED TO HAVE CONSENTED TO THE FINAL SETTLEMENT AND COMPROMISE OF YOUR ADMINISTRATIVE EXPENSE CLAIM(S) IN THE AMOUNT LISTED IN ITEM 1 BELOW NEXT TO "SETTLED ADMINISTRATIVE EXPENSE CLAIM" IN EXCHANGE FOR THE TREATMENT PROVIDED IN THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM SET FORTH BELOW.**

**Item 1.** **Amount of Administrative Expense Claim**. As of May 21, 2025, (the "**Administrative Claims Record Date**") the Debtors' books and records show that you held unpaid Administrative Expense Claims in the aggregate amount listed in the table below as the "**Reconciled Amount**." If you do not opt out of the Administrative Expense Claims Consent Program, your Administrative Expense Claim will be deemed allowed in an amount equal to **50%** of the Reconciled Amount (the "**Settled Administrative Expense Claim**") and you will receive

an accelerated payment in accordance with the Administrative Expense Claims Consent Program (as set forth below).

| Reconciled Amount | $ _____ |
|---|---|
| Settled Administrative Expense Claim | $ _____ |

If you disagree with the amount listed as the Reconciled Amount but still wish to participate in the Administrative Expense Claims Consent Program, you are encouraged to contact the Debtors' advisors **as soon as possible** upon receipt of this form at stewardvendorteam@weil.com and stewardclaims@alixpartners.com.

**Item 2.        Administrative Expense Claims Consent Program.**

### CRITICAL INFORMATION REGARDING ADMINISTATIVE EXPENSE CLAIMS AND PROCEDURES FOR AGREEING TO DIFFERENT TREATMENT

Generally, holders of administrative claims that have become allowed by the Bankruptcy Court are entitled to be paid the allowed amount of such administrative expense claims in full as a condition to the effectiveness of a chapter 11 plan.  However, holders of administrative claims can agree to "different treatment" for such claim and such agreement can enable a debtor to confirm and consummate a chapter 11 plan.

In light of the amount of secured, administrative, and priority claims against the Debtors' estates, as well as the forecasted timeline for the Debtors to monetize and collect on their remaining assets (including significant litigation claims), the Debtors anticipate that there will be a significant executory period between the Confirmation Date of the Plan and the Effective Date of the Plan. Accordingly, to accelerate (i) cash payments to consenting Holders of Allowed Administrative Expense Claims prior to the Effective Date of the Plan, and (ii) the consummation of the Plan, the Plan provides for the Administrative Expense Claims Consent Program.

**Pursuant to the Plan, each holder of an Administrative Expense Claim that is entitled to participate in the Administrative Expense Claims Consent Program and does not timely, properly, and affirmatively opt-out will**:

i.    have its Administrative Expense Claim deemed allowed in the amount listed as the Settled Administrative Expense Claim in Item 1 above, which is equal to 50% of the amount set forth in the Debtors' books and records (*i.e.*, the Reconciled Amount in **Item 1** above) ; and

ii.    receive an accelerated payment following the Confirmation Date on account of their Settled Administrative Expense Claim, which shall consist of a pro rata portion up to the Settled Administrative Expense Claim of a distribution equal to $12.5 million (the "**Settled Administrative Expense Claims Cash Pool**") following the Confirmation Date.

If your distribution under the Settled Administrative Expense Claims Cash Pool is less than your Settled Administrative Expense Claim as listed in Item 1, the remainder of your Settled Administrative Expense Claim will be paid on the Effective Date in accordance with section 2.1 of the Plan.

Regardless of your election herein, any Administrative Expense Claims accrued after the Administrative Claims Record Date will be treated in accordance with Section 2.1 of the Plan.

**If you choose to opt-out of the Administrative Expense Claims Consent Program**, your Administrative Expense Claim will be treated in accordance with Section 2.1(a) of the Plan and, to the extent such Administrative Expense Claim becomes Allowed by the Bankruptcy Court (through settlement or adjudication), such Allowed Administrative Expense Claim will be paid in full on the later of (a) the Effective Date, (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (c) the next Plan Distribution Date (as defined in the Plan) after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim.

The timing of the Effective Date and distributions to Holders of Allowed Administrative Expense Claims may depend in part on the level of participation in the Administrative Expense Claims Consent Program. The Debtors anticipate that the more Holders that choose to opt-out of the Administrative Expense Claims Consent Program, the longer it will take for the Debtors to have sufficient cash to satisfy all Allowed Administrative Expense Claims, thus ultimately delaying or even potentially risking the occurrence of the Effective Date. In addition, the Administrative Expense Claims Consent Program and any and all distributions contemplated thereby are contingent upon confirmation of the Plan. The Holders of Allowed Administrative Expense Claims will not have the option to receive expedited payment in exchange for a reduction of such Holders' Allowed Administrative Expense Claims in the event that the Plan is not confirmed.

**The implementation of the Administrative Expense Claims Consent Program is conditioned upon participation in the Administrative Expense Claims Consent Program**. Specifically, at least 75% (in dollar amount) of the Debtors' estimated Allowed Administrative Expense Claims must participate in the Administrative Expense Claims Consent Program (the "**Administrative Expense Claims Consent Program Condition**"). If Holders of more than 25% (in dollar amount) of the Debtors' estimated Allowed Administrative Expense Claims opt-out of the Administrative Claims Consent Program, and unless such condition is waived by the Debtors and the Creditors' Committee, the Administrative Claims Consent Program will not be consummated. If the Administrative Expense Claims Consent Program Condition is not met or waived by the Debtors and the Creditors' Committee, the Debtors' estates shall retain the Settled Administrative Expense Claims Cash Pool equal to $12.5 million.

Please take notice that regardless of whether you participate in the Administrative Expense Claims Consent Program, the Debtors rights of setoff, recoupment, and any and all potential Claims (as that term is defined in section 101(5) of the Bankruptcy Code) and causes of action of the Debtors and/or the Creditors' Committee, including under chapter 5 of the Bankruptcy Code or applicable law, are expressly preserved.

All Holders of Administrative Expense Claims **that do not timely, properly, and affirmatively opt-out** of the Administrative Expense Claims Consent Program by the Consent Program Opt-Out Deadline by completing and submitting a Consent Program Opt-Out Form in accordance with the procedures set forth herein will be deemed to have agreed to be bound by the terms of the Administrative Expense Claims Consent Program, including the settlement and compromise of your Administrative Expense Claim.

The Debtors will seek approval of the Administrative Expense Claims Consent Program by the Bankruptcy Court at the hearing to consider confirmation of the Plan scheduled to be held on July 8, 2025 at [●] [●].m. (Central Time), before the Honorable Christopher M. Lopez, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of Texas Courtroom 401, 4th floor, 515 Rusk Avenue, Houston, TX 77002.

Procedures for the submission and tabulation of the Consent Program Opt-Out Forms (*i.e.*, the Consent Program Opt-Out Procedures) are located in paragraphs 26-28 of the Disclosure Statement Order.

**YOU ARE ADVISED AND ENCOURAGED TO CAREFULLY REVIEW AND CONSIDER THE DISCLOSURE STAEMENT AND THE PLAN, INCLUDING THE ADMINISTRATIVE EXPENSE CLAIM AND ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM PROVISIONS THEREIN, AS YOUR RIGHTS MIGHT BE AFFECTED.**

**PURSUANT TO THE PLAN, IF YOU, AS A HOLDER OF CLAIMS WHO HAS BEEN GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM BUT DO NOT TIMELY, PROPERLY, AND AFFIRMATIVELY OPT OUT, YOU ARE AUTOMATICALLY DEEMED TO HAVE CONSENTED TO RECEIVE A PRO RATA DISTRIBUTION OF THE SETTLED ADMINISTRATIVE EXPENSE CLAIMS CASH POOL UP TO THE AMOUNT OF YOUR SETTLED ADMINISTRATIVE EXPENSE CLAIM.**

**By checking the box below, the undersigned Holder of Administrative Expense Claim(s), having received notice of the opportunity to opt out of the Administrative Expense Claims Consent Program:**



☐ **Elects to OPT OUT of the Administrative Expense Claims Consent Program.**

Item 3.　**Certifications**. By signing this Consent Program Opt-Out Form, the undersigned certifies that:

　　　　　　a.　　as of the Administrative Claims Record Date, either: (i) the Holder is the Holder of Administrative Expense Claims; or (ii) the Holder is an authorized signatory for an entity that is the Holder of Administrative Expense Claims;

b.   the undersigned has received a copy of this Consent Program Opt-Out Form; and

c.   no other Consent Program Opt-Out Form has been submitted with respect to the Holder's Administrative Expense Claims, or if any other Consent Program Opt-Out Forms have been submitted with respect to such Claims, then any such earlier Consent Program Opt-Out Forms are hereby revoked.

Name of Holder:          _____
                         (*print or type*)

Signature:               _____

Name of Signatory:       _____
                         (*if other than Holder, include name and title*)

Title:                   _____

Address:                 _____

                         _____

                         _____

                         _____

E-mail Address:          _____

Date Completed:          _____

**IF YOU WISH TO OPT OUT OF THE ADMINISTRATIVE EXPENSE CLAIMS CONSENT PROGRAM, PLEASE COMPLETE, SIGN, AND DATE THIS CONSENT PROGRAM OPT-OUT FORM AND RETURN IT TO THE VOTING AGENT VIA *JUST ONE* OF THE FOLLOWING METHODS SO THAT IT IS *ACTUALLY RECEIVED* BY THE VOTING AGENT ON OR BEFORE THE CONSENT PROGRAM OPT-OUT DEADLINE:**

| To Submit Your Consent Program Opt-Out Form Via Online Portal |
| --- |
| To submit your Consent Program Opt-Out Form via the Voting Agent's Online Portal, visit https://restructuring.ra.kroll.com/Steward/.  Click on the "**Submit E-Ballot**" section of the website and follow the instructions to submit your Consent Program Opt-Out Form.<br><br>IMPORTANT NOTE: You will need the following information to retrieve and submit your electronic Consent Program Opt-Out Form:<br><br>     **Unique E-Opt-Out ID#:** _____<br><br>The Online Portal is the sole manner in which your Consent Program Opt-Out Form will be |

accepted via electronic or online transmission. Consent Program Opt-Out Forms submitted by facsimile, email or other means of electronic transmission will not be valid. Any Consent Program Opt-Out Form submitted through the Online Portal will be deemed to contain an electronic Holder signature that is immediately legally valid and effective.

Please complete and submit an electronic Consent Program Opt-Out Form for each Unique E-Opt-Out ID# you receive, as applicable. Holders who cast a Consent Program Opt-Out Form using the Online Portal should NOT also submit a paper copy of their Consent Program Opt-Out Form.

**To Submit Your Consent Program Opt-Out Form Via Paper Copy**

To submit your opt-out election via a Consent Program Opt-Out Form, review Item 1 and complete Items 2 and 3 above and submit your paper Consent Program Opt-Out Form in the pre-addressed, pre-paid return envelope provided, or otherwise, by first-class mail, hand delivery, or overnight courier to:

Steward Health Care System LLC Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 3rd Avenue, Suite 412
Brooklyn, NY 11232

To arrange hand delivery of your Consent Program Opt-Out Form, please email the Voting Agent at StewardBallots@ra.kroll.com (with "Steward Consent Program Opt-Out Form Delivery" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.

# EXHIBIT 9

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC,** *et al.*, | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

## MOTION OF DEBTORS FOR ENTRY OF
## AN ORDER (I) APPROVING SETTLEMENT WITH FILO SECURED
## PARTIES; (II) AUTHORIZING AND DIRECTING TRANSFER OF ASSETS IN
## CONNECTION THEREWITH; (III) AUTHORIZING AMENDMENT TO FILO
## DIP CREDIT AGREEMENT AND CONTINUED USE OF CASH COLLATERAL;
## (IV) GRANTING ADEQUATE PROTECTION; (V) APPROVING ASSUMPTION
## AND ASSIGNMENT PROCEDURES AND FORM AND MANNER OF NOTICE OF
## ASSUMPTION AND ASSIGNMENT; AND (VI) GRANTING RELATED RELIEF

> **IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXSB.USCOURTS.GOV/ WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK WITHIN TWENTY-ONE DAYS FROM THE DATE THIS MOTION WAS FILED. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

## **Preliminary Statement**[2]

1.      Following several months of mediation led by the Honorable Marvin Isgur, the Debtors have reached a settlement (the "**Settlement**") with the FILO Secured Parties and the official committee of unsecured creditors appointed by the United States Trustee (the "**Creditors' Committee**," and collectively with the Debtors and the FILO Secured Parties, the "**Parties**") that provides the Debtors and their estates with the financing needed to confirm a chapter 11 plan that will preserve and maximize the value of the Debtors' remaining assets for the estate, and avert the catastrophic loss of value that the Debtors' estates would suffer if the FILO Secured Parties exercised remedies against their collateral (including foreclosing on all of the Debtors' assets, including valuable estate causes of action seeking over $2 billion).  The only alternative path of these chapter 11 cases—the FILO Secured Parties moving to lift the stay to foreclose on all of the Debtors' assets—would guarantee a result where the Debtors' assets (including those valuable litigation claims) will not be monetized to maximize value for the estates, administrative expense claims will not be repaid, and unsecured creditors will have no chance at any recovery.

2.      As set forth in the *Settlement and Stay Relief Term Sheet* (the "**Term Sheet**") annexed to the Proposed Order as <u>Exhibit 1</u>, the Settlement provides for:

   a.      resolution of the FILO Secured Parties' threatened demand for relief from the automatic stay pursuant to the FILO DIP Order to exercise remedies over their collateral,

   b.      extension of the maturity date of the FILO DIP Facility by eighty-one (81) days, to July 8, 2025,

   c.      a $125 million financing commitment from the FILO Secured Parties (including continued use of cash collateral) to support the pursuit of substantial asset recoveries (including extremely valuable litigation claims)

---

[2]      Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to such terms elsewhere in this Motion.

for the benefit of all creditors, as well as continued administration of these chapter 11 cases and pursuit of confirmation of a chapter 11 plan,

d.  $21.5 million of funding to the Debtors, which the Debtors intend to use to support administration of the Debtors' estates and near-term payments to administrative creditors as part of an administrative consent program,

e.  as adequate protection for the FILO Secured Parties and as a condition for consenting to the use of their cash collateral, extending financing to the Debtors and all other concessions made under the Settlement, the transfer of substantially all of the Debtors' assets into a Litigation Trust for the benefit of the FILO Secured Parties and the Debtors' estates;

f.  the subordination of $10 million of the FILO Secured Parties' claims under the Prepetition Bridge Facility to all administrative and priority claims and a substantial reduction of the asserted claim for a multiple on invested capital ("**MOIC**") under such facility, and

g.  a reduction in the interest rate under the Prepetition Bridge Facility and FILO DIP Facility, and the cessation of all cash interest payments thereunder.

3.  The Settlement will allow the Debtors to pursue confirmation of a chapter 11 plan of liquidation supported by the FILO Secured Parties and Creditors' Committee that provides for repayment of the Debtors' secured debt, repayment of administrative expense claims and priority claims, and the opportunity to provide meaningful recoveries to unsecured creditors. Without the Settlement, the Debtors' estates face the imminent risk of a maturity of the FILO DIP Facility and the FILO Secured Parties' moving to lift the automatic stay to foreclose on all of the Debtors' assets (including assuming ownership and control of the Debtors' valuable estate causes of action), thereby depriving administrative expense and priority creditors of the opportunity to be repaid under a plan once those assets are monetized, as well as depriving unsecured creditors of the opportunity of any recovery.

4.  Contemporaneously herewith, the Debtors have filed a proposed chapter 11 plan (Docket No. 4743) (the "**Plan**"), proposed disclosure statement (Docket No. 4744)

(the "**Disclosure Statement**"), and a motion seeking conditional approval of the Disclosure Statement and solicitation of the Plan and administrative claim consent program (Docket No. 4745) (the "**Solicitation Motion**") and have requested a hearing to seek approval of the Motion and the Solicitation Motion on May 28, 2025, with a targeted hearing on Plan confirmation by no later than July 8, 2025.

5.     As of the initial December 31, 2024 maturity of the FILO DIP Facility (the "**Initial Maturity Date**"), $335 million in principal amount remained outstanding under the FILO DIP Facility and Prepetition Bridge Facility in the aggregate (excluding the MOIC obligation under the Prepetition Bridge Facility). Accordingly, as announced at various status conferences, over the past several months, the Debtors engaged in a concerted effort to marshal and monetize the Debtors' assets that could be readily liquidated, build momentum and support from the FILO Secured Parties and Creditors' Committee for a chapter 11 plan, and secure approval of a long-term budget and commitment of long-term financing from the FILO Secured Parties that would support the Debtors' liquidation of assets that would take longer to recover (including valuable litigation claims), but that would deliver recoveries for administrative, priority, and general unsecured claimants.

6.     The Debtors' efforts to monetize assets and obtain consensus have been successful, as the Debtors have secured significant receipts since the Initial Maturity Date (including, but not limited to, over $62 million from the deferred compensation trusts, $37 million from the sale of certain "excess properties," $100 million from accounts receivable, and $14 million from other operational assets, including joint venture interests and other receipts).

7.     Over the course of negotiations since the Initial Maturity Date, the FILO Secured Parties agreed to a series of short extensions of the FILO DIP Facility maturity date and

continued use of their cash collateral.  Indeed, since the Initial Maturity Date, the FILO DIP Maturity Date has been extended eight times—once for a month (*see* Docket No. 3594), once for two weeks (*see* Docket No. 3991), and seven times for less than two weeks (*see* Docket Nos. 3874, 3909, 4091, 4232, 4400, 4472, 4690).  In exchange, the FILO Secured Parties required the Debtors to use a portion of the proceeds from such monetization efforts to paydown their first-lien, superpriority claims.  The FILO DIP Facility then matured on April 18, 2025 without an extension (prior to the DIP Amendment described herein).

8.      Importantly, given that the Debtors do not have the means to repay the FILO DIP Facility, without an agreement with the FILO Secured Parties, the Debtors have no alternative for continuing these chapter 11 cases and face the imminent threat of the FILO Secured Parties moving to lift the automatic stay to exercise remedies, including foreclosing on their collateral. Throughout mediation, the FILO Secured Parties have been steadfast that they would only be willing to forbear from exercising such remedies and agree to a long-term extension of the FILO DIP Facility and use of cash collateral, as well as provide additional funding to support the pursuit of valuable litigation and the continued administration of these cases, if, in each case, they are provided adequate protection that preserves the FILO Secured Parties' first-lien and superpriority claims, and ensures that the FILO Secured Parties' collateral is protected from potential value-destructive litigation or actions by third parties.  On the other hand, the Debtors and the Creditors' Committee were focused on ensuring the preservation of the value of estate assets for the benefit of all creditors, as well as securing financing to confirm and administer a chapter 11 plan, make payments to administrative and other creditors, and maximize the value of such estate assets.

9.      Following several months of mediation, with the assistance of Judge Isgur, the Parties ultimately negotiated a settlement structure that (i) adequately protects the FILO

Secured Parties' interests in their collateral by transferring such collateral into a trust on the terms set forth below, (ii) provides significant financing to support the monetization of valuable remaining estate assets, (iii) establishes a value-maximizing governance structure, pursuant to which an independent experienced fiduciary, subject to the consent rights of an estate representative, will monetize such assets for the benefit of all of the estates' creditors, and (iv) allows the Debtors to confirm a chapter 11 plan that maximizes value for the estates. Pursuant to the Settlement:[3]

    a)    <u>Litigation Trust Formation</u>: On the earlier of (i) July 8, 2025 (the "**Outside Date**"), and (ii) one (1) business day after the confirmation date of any confirmed plan (the "**Litigation Trust Establishment Date**"), a trust (the "**Litigation Trust**") will be formed, and, the Debtors will transfer the assets listed on <u>Schedule 1</u> of the Term Sheet (the "**Litigation Trust Assets**") to the Litigation Trust. To the extent the Plan is confirmed prior to the Outside Date, the Litigation Trust will be formed pursuant to the terms of the Plan and the confirmation order. However, if the Plan is not confirmed prior to the Outside Date, the Litigation Trust will be formed pursuant to the terms of the Proposed Order and the Term Sheet.

    b)    <u>Beneficial Interests</u>: The Litigation Trust will have three beneficiary classes: (i) Class A-1 interests, which will be held by the parties that extend litigation funding and entitle the holders to a first priority liquidation preference equal to the aggregate amount of funding extended plus all accreted amounts accrued thereon; (ii) Class A-2 interests, which will be held by the FILO Secured Parties and entitle the holders to a second priority liquidation preference equal to the amount of their claims under the FILO DIP Facility and Prepetition Bridge Facility (to the extent allowed by the Settlement); and (iii) Class B interests, which will be held by the Debtors' estates (or a successor liquidating vehicle), and entitle the Debtors (or a successor liquidating vehicle) to the proceeds of the Litigation Trust Assets following the repayment of the Class A-1 and Class A-2 interest holders' liquidation preference.

    c)    <u>Administration of Litigation Trust and Estate</u>: A person to be identified shall be appointed as trustee (the "**Litigation Trustee**") of the Litigation Trust on the Litigation Trust Establishment Date and shall owe fiduciary duties to the Class A-1, Class A-2, and Class B interest holders (i.e., the

---

[3]    The following is intended to be a summary of the Settlement and is subject in all respects to the terms set forth in the Term Sheet, attached to the Proposed Order as <u>Exhibit 1</u>. To the extent of any conflict between the description of the Settlement in this Motion and in the Term Sheet, the Term Sheet shall govern in all respects.

Debtors). Subject to the terms of the Plan, and pending confirmation, the Debtors' Transformation Committee will continue to oversee the administration of the Debtors' estates and these chapter 11 cases.

d)   <u>Governance / Consent Rights</u>: The Litigation Trustee shall carry out the disposition of the Litigation Trust Assets in accordance with his or her fiduciary duties to maximize the value of the Litigation Trust Assets and will be subject to the consent rights of the interest holders. The Class A-2 and Class B interest holders will be represented by a representative (the "**Class A-2 Representative**" or "**Class B Representative**," as applicable), entitled to certain consent rights over the disposition of Litigation Trust Assets, and other actions taken by the Litigation Trustee. The Transformation Committee will act as the initial Class B Representative.

e)   <u>Estate Funding</u>: The FILO Secured Parties have agreed to (i) extend the FILO DIP Facility and the Debtors' continued use of cash collateral through the Litigation Trust Establishment Date in an amount of $61 million through June 27, 2025 and additional amounts budgeted thereafter, in accordance with the DIP Budget, and (ii) following the Litigation Trust Establishment Date, make $21.5 million available to fund the costs and expenses of the Debtors' estates, including to fund accelerated payments to administrative creditors following confirmation of the Plan pursuant to an administrative claim consent program on terms and conditions agreed by the Debtors and the Creditors' Committee.

f)   <u>Litigation Funding</u>: On the Litigation Trust Establishment Date, the FILO Secured Parties will provide an $125 million (the "**Initial Commitment Amount**") financing facility to the Litigation Trust to fund litigation, costs of administration of the Litigation Trust and monetization of the Litigation Trust Assets on the terms outlined herein, which shall entitle the FILO Secured Parties to PIK interest (initially at 10% per annum), a PIK upfront premium of $4.25 million, and up to 20% of the proceeds of litigation (subject to various reductions as described herein).

g)   <u>FILO Claims</u>: The FILO Secured Parties have also agreed to (i) materially reduce the interest rate under the FILO DIP Facility and Prepetition Bridge Facility following the Litigation Trust Establishment Date, (ii) compromise the MOIC under the Prepetition Bridge Facility at a substantial discount based on the timing of repayment of the FILO Secured Parties' claims,[4] (iii) subordinate $10 million of principal claims under the Prepetition

---

[4]   The contracted-for MOIC Amount (85% of $75 million) would be capped at $11.25 million (plus accrued interest) if the FILO Secured Parties' claims are repaid in full by March 31, 2026, which amount increases each month thereafter in accordance with the schedule set forth in paragraph 11 of the Term Sheet until the FILO Secured Parties are paid in full.

Bridge Facility, and (iv) support a chapter 11 plan so long as it preserves the terms of the Settlement.

h) <u>Releases</u>: The parties (including the Debtors, the Creditors' Committee, the FILO Secured Parties, the Litigation Trust, and certain of their respective related parties (including certain limited Debtor related parties)) shall exchange mutual releases on the Litigation Trust Establishment Date.

10.     The Settlement, which is supported by and was heavily negotiated by the Creditors' Committee for months, involves significant concessions by the FILO Secured Parties of their rights and remedies under both the Prepetition Bridge Credit Agreement and the FILO DIP Credit Agreement, and represents a settlement and agreement on adequate protection under sections 361 and 362 of the Bankruptcy Code to the continued use of the FILO Secured Parties' collateral and cash collateral.

11.     Most importantly, the Settlement maximizes the value of the estates and distributions to administrative expense, priority and unsecured creditors by providing funding for monetizing the Debtors' remaining assets and preserving for the Debtors' estates all of the value of such assets in excess of the FILO Secured Parties' claims.  Without the approval of the Settlement, these cases will fail.  The FILO Secured Parties would seek to lift the stay to foreclose on their collateral, including valuable estate claims and causes of action, with no obligation to maximize value or distribute the proceeds of such collateral to any other creditors of the Debtors. Administrative expense and unsecured creditors would therefore lose the ability to recover from the Debtors' remaining assets, including litigation claims of over $2 billion in the aggregate that will be asserted.  Without the approval of the Settlement, the Debtors' cases would likely convert to a chapter 7, and administrative, priority, and general unsecured creditors potentially would likely receive little to no recovery on account of their respective claims.  Instead, with the Settlement, the Debtors will be able to pursue solicitation and confirmation of a plan with the

support of the Creditors' Committee and FILO Secured Parties and allow the Debtors to implement the Settlement pursuant to the Plan.

12.     Accordingly, the Court should approve the Settlement and each of the transactions contemplated thereunder as a sound exercise of the Debtors' business judgement and in the best interests of the Debtors and their estates.

### Jurisdiction

13.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

14.     By this Motion, pursuant to sections 362, 363 and 105 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 4001, 6004, and 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Debtors request entry of an order: (i) approving the terms and conditions of the Settlement; (ii) authorizing and directing the transfer by the Debtors of the Litigation Trust Assets free and clear (to the fullest extent permitted under applicable law) to the Litigation Trust under section 363(f) of the Bankruptcy Code; (iii) authorizing the DIP Amendment (as defined below) and use of cash collateral; (iv) granting adequate protection to the FILO Secured Parties; (v) authorizing and approving procedures for the assumption and assignment of certain Contracts in connection with the Settlement, as applicable (collectively, the "**Assigned Contracts**") and determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**") as set forth in paragraphs 22 through 34 of the Proposed Order; and (vi) granting related relief.

15.     A proposed form of order granting the relief requested herein is attached hereto as **Exhibit A** (the "**Proposed Order**").[5]

## Background

### A.     Debtors' Chapter 11 Cases

16.     On May 6, 2024, (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

17.     On May 16, 2024, the U.S. Trustee for Region 7 (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Creditors' Committee**"). No trustee or examiner has been appointed in these chapter 11 cases.

18.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

19.     As of the Petition Date, the Debtors owned and operated the largest private physician-owned for-profit healthcare network in the United States. Headquartered in Dallas, Texas, the Debtors' operations on the Petition Date included 31 hospitals across eight states, approximately 400 facility locations, 4,500 primary and specialty care physicians, 3,600 staffed beds, and a company-wide workforce of nearly 30,000 employees that provide care to more than two million patients annually.

---

[5]     The Debtors intend to file one or more declarations in support of this Motion in advance of any hearing on the Motion.

20. Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* (Docket No. 38).

21. During these chapter 11 cases, the Debtors successfully formulated, and then orchestrated, one of the most complex hospital system sales processes with the support of their key stakeholders—selling substantially all of their operating assets, including twenty-seven (27) hospitals and various facilities located across eight (8) states to numerous different acquirors, as well as Stewardship Health, the Debtors' risk-based physician and payor network, all while saving more than 24,000 jobs and concurrently ensuring minimal disruptions to the care provided to the millions of patients treated annually at these facilities.

22. The Debtors also supported the continued provision of healthcare services by providing services to the sold hospitals under transition services agreements with acquirers of the Debtors' hospitals and physician network and then facilitated the sale of eight (8) transition services agreements involving twenty-five (25) hospitals to an affiliate of Quorum Health Corporation ("**Quorum**"). Following the recent sale of the Debtors' transition services business to Quorum, the Debtors continue to support the provision of healthcare services under their two remaining transition services agreements with (i) Rural Health Group for the sale of Stewardship Health and (ii) with Brighton Marine, Inc. for the transition of the Uniformed Services Family Health Plan.

23. As of now, the Debtors have just approximately 40 remaining employees, who are focused on winding down the estates and monetizing assets, including by supporting (i) the collection of valuable accounts receivable, (ii) the investigation and pursuit of estate claims

11

and causes of action, (iii) the provision of transition services under the two remaining transition services agreements, and (iv) the efficient sale, transfer, or abandonment of other assets.

**B.**    **Debtors' Prepetition Indebtedness and DIP Financing**

24.    As of the Petition Date, the Debtors significant prepetition indebtedness totaled approximately $9.2 billion consisting of the following:

| Prepetition Indebtedness | Principal Amount Outstanding | All-in Interest Rate | Maturity |
|---|---|---|---|
| *Funded Secured Debt* | | | |
| ABL First Out Loans | $49.3 mm | ABR + 6.50% | 8/4/2027 |
| ABL Facility (Remainder) | $247.3mm | ABR + 9.00% | 8/4/2027 |
| FILO Facility | $305.5mm | ABR + 12.75% | 12/31/2027 |
| Prepetition Bridge Facility | $274.5mm[6] | SOFR + 10.75% | 6/30/2024 |
| MPT Facility | $216.7mm | Various | 1/1/2028 |
| MPT Stewardship Note | $82.5mm[7] | SOFR + 15.00% | 6/30/2024 |
| **Total Funded Secured Debt** | $1.2 billion | | |
| *Select Liabilities* | | | |
| Est. MPT Lease Obligations | $6.6 billion[8,9] | N/A | 10/31/41 (lease end) |
| MPT Investor Note | $363.3mm | 4.0% | 2/2029 |
| MAAPP Loans | $32.2mm | 4.0% | Various |
| Est. Trade Payables | $979.4mm | N/A | N/A |
| **Total Select Liabilities** | $8.0 billion | | |
| **Total Secured Debt and Select Liabilities** | **$9.2 billion** | | |

---

[6]    Includes 1.85x minimum MOIC due at maturity and upon certain defaults.

[7]    Includes 1.25x minimum MOIC due at maturity and upon certain defaults.

[8]    Amount represented (i) contractually deferred rent; (ii) other unpaid additional amounts; and (iii) future, undiscounted rent due under the Master Leases through October 31, 2041. Includes average rent escalators ranging from 2.5% to 3.5% annually. Amount is approximate, unaudited, and does not include all amounts payable under the Master Leases.

[9]    Undiscounted future rents are presented for illustrative purposes only and do not represent balance sheet lease liabilities under generally accepted accounting principles.

25.     Following the Petition Date, the Debtors' funded these chapter 11 cases with, among other things, $75 million of new money DIP financing provided by Medical Properties Trust ("**MPT**") and $225 million of new money DIP financing provided by certain of their prepetition FILO Secured Parties, (the "**FILO DIP Lenders**") which was approved by the Bankruptcy Court on July 10, 2024 pursuant to the FILO DIP Order (Docket No. 1538), as well as consensual use of the FILO Secured Parties' cash collateral.  Under the FILO DIP Credit Agreement, the FILO DIP Loans are secured by a security interest in, and lien upon, all tangible and intangible prepetition and postpetition property of the Debtors, except for certain Excluded Assets.  The Initial Maturity Date under the FILO DIP Credit Agreement was December 31, 2024.

26.     The FILO DIP Order provides that all of obligations under the FILO DIP Credit Agreement shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or rising thereafter, of any kind whatsoever, including all administrative expenses, whether or not such expenses or claims are secured by a judgment lien or other non-consensual lien, levy, or attachment.  *See* FILO DIP Order ¶ 5.  The FILO DIP Order also provides that the superpriority claims shall be payable from, and have recourse to, all prepetition and postpetition property of Debtors and all proceeds thereof.  *Id.*  The FILO DIP Order also provides that upon the occurrence and during the continuation of an event of default under the FILO DIP Credit Agreement, upon five (5) business days' notice to the Debtors and the Creditors' Committee, the FILO DIP Agent may, without further notice to, hearing of, or order from the Court: (a) immediately terminate and/or revoke the Debtors' right under the FILO DIP Order and any other FILO DIP Credit Agreement to use any cash collateral; (b) terminate the FILO DIP Facility and any FILO DIP Credit Agreement as to any future liability

or obligation of the FILO DIP Lenders but without affecting any of the obligations under the FILO DIP Credit Agreement or the liens securing such obligations; (c) declare all FILO DIP Obligations to be immediately due and payable; and (d) invoke the right to charge interest at the default rate under the FILO DIP Credit Agreement from the date of such default. *Id.* at ¶ 7.

27.     Additionally, the FILO Secured Parties were granted adequate protection as set forth in the Junior DIP Order (Docket No. 625), which provides the Prepetition Bridge Agent (as defined therein), on behalf of certain FILO Secured Parties, a valid, perfected replacement security interest in and lien solely to the extent of any diminution of value upon the collateral under the Prepetition Bridge Facility and an allowed superpriority administrative expense claim against the Debtors on a joint and several basis (without the need to file any proof of claim) solely to the extent of any diminution in value under section 507(b) of the Bankruptcy Code. *See* Junior DIP Order ¶ 13.

28.     In October 2024, the Debtors repaid all obligations under the Prepetition ABL/FILO Credit Facility in full with the proceeds of their asset sales.  On November 22, 2024, following court approval of a global settlement with MPT, the Debtors filed the *Notice of Settlement Effective Date* (Docket No. 3265), which extinguished all of MPT's claims against the Debtors, including all of MPT's prepetition and postpetition indebtedness.  In addition, the Debtors have partially repaid the FILO DIP Facility and Prepetition Bridge Facility with proceeds of collateral.  Accordingly, as of the date hereof, the only outstanding funded secured indebtedness owed by the Debtors is as follows, a significant reduction from the approximately $9.2 billion (including $1.5 billion of funded secured debt) owed by the Debtors earlier in these cases:

| Current Indebtedness | Amount Outstanding | All-in Interest Rate[10] | Maturity Date |
|---|---|---|---|
| **Secured Debt** | | | |
| FILO DIP Facility | $206,197,079[11] | SOFR + 10.00% | 7/8/2025 |
| Prepetition Bridge Facility (excluding MOIC Amount) | | SOFR + 10.75% | 6/30/2024 |
| a.   Remaining Original Principal Amount | $30,394,856[12] | | |
| b.   Capitalized Interest | $11,438,905 | | |
| **Total Secured Debt** | **$248,030,840** | | |

29.     In addition to the Debtors' outstanding secured indebtedness, as outlined in further detail in the Disclosure Statement, the Debtors estimate that approximately $125 million of unpaid administrative expense claims (excluding the claims of estate professionals and claimants entitled to recover against the purchasers of the Debtors' hospitals) remain outstanding.

30.     On December 31, 2024, the Debtors filed the *Notice of Filing of Amendment to FILO DIP Credit Agreement* (Docket No. 3594), which attached that certain *Limited Waiver No. 2 and Amendment to Debtor-in-Possession Credit Agreement* as <u>Exhibit A</u> thereto (the "**First DIP Amendment**").  The First DIP Amendment, among other things, (i) extended the maturity date under the FILO DIP Credit Agreement from December 31, 2024 to January 31, 2025, (ii) waived certain alleged defaults and events of default, as well as compliance with certain covenants, under the FILO DIP Credit Agreement, and (iii) formalized an agreement on a new Approved Budget (as defined in the First DIP Amendment) through the extended maturity date. On January 6, 2025, the Debtors filed a motion seeking authority from the Bankruptcy Court to grant the FILO DIP Lenders a "DIP Extension Premium" in exchange for the FILO DIP Lenders'

---

[10]   Subject to an additional 2% default interest rate if an Event of Default (as defined under each facility) has occurred and is continuing.

[11]   Excludes any remaining exit premium.

[12]   Excludes 1.85x minimum MOIC due at maturity and upon certain defaults.

agreement to enter into the First DIP Amendment (*see* Docket No. 3631) (the "**DIP Extension Premium Motion**"). The Bankruptcy Court entered an order approving the DIP Extension Premium Motion on January 13, 2025 (Docket No. 3699).[13] The Debtors and the FILO DIP Lenders have entered into several subsequent amendments to the FILO DIP Credit Agreement, which among other things, provided for further short-term extensions of the maturity date. *See* Docket Nos. 3874, 3909, 3991, 4091, 4232, 4400, 4472, 4690. The FILO DIP Facility then matured on April 18, 2025 without an extension (prior to the DIP Amendment described herein).

### C.  Remaining Estate Assets

31.     The Debtors' remaining assets, which are outlined in further detail in the Debtors' Disclosure Statement, include the following:

a)  <u>Cash</u>: As of the date of this Motion, the Debtors will have approximately $7 million in cash, in addition to other amounts held or escrowed on behalf of third parties (which would not constitute Litigation Trust Assets).[14]

b)  <u>Accounts Receivable</u>: Following the sale of their hospital assets, the Debtors have continued to collect accounts receivable on account of the pre-closing periods of each of the Debtors' hospital sales (as well as Stewardship Health). The Debtors continue to collect aged accounts receivable arising from prior to the closing of the sales of the Debtors' hospital operations and will continue to collect accounts receivable throughout the 2025 calendar year. The Debtors also continue to pursue ordinary-course disputes with payors in order to maximize the value of historical claims.

---

[13]   Pursuant to paragraph 40(f) of the TSA / EPDA Settlement Order (as defined in the Disclosure Statement), upon receipt of the Transferred Properties (as defined in the TSA / EPDA Settlement Order), the FILO DIP Lenders irrevocably and forever waive all rights, entitlements, and interests in receipt of the DIP Extension Premium.

[14]   The Debtors also hold cash on behalf of certain hospital operators and other entities, as well as maintain several escrow accounts for the benefit of third parties, including the (i) Physician Insurance Account (as defined in the FILO DIP Order), which the Debtors funded with amounts to ensure postpetition professional liability coverage for physicians under their captive insurance program, (ii) Expense Escrow Account (as defined in the MPT Settlement Order (Docket No. 2610)), which was established pursuant to a global settlement with MPT, and funded with $5 million by MPT to backstop certain operating expenses at the Debtors' hospitals outside Massachusetts that were sold to new operators, and (iii) Professional Fees Escrow Account (as defined in the FILO DIP Order), which the Debtors fund to provide security to estate professionals under the terms of the FILO DIP Order.

c)    <u>Joint Venture Interests</u>: As of the date hereof, the Debtors continue to maintain an interest in 10 clinics and health centers either directly or via their equity interest in a joint venture with a third party (the "**Ancillary Properties**").  The Ancillary Properties provide supplemental services to hospital systems in their vicinity, including special ambulatory surgical care, imaging services, hospice, and other services.  The Debtors are actively working to liquidate their interests in all of the remaining Ancillary Properties.

d)    <u>Estate Claims and Causes of Action</u>: As described in greater detail in the Disclosure Statement, the Debtors hold a number of significant litigation claims and causes of action, including, but not limited to, the following, pursuant to which, over $2 billion in claims will be asserted: (i) claims against large commercial payors in connection with outstanding accounts receivable; (ii) claims and causes of action arising under an insurance policy for property damage and business interruption losses sustained at Norwood Hospital, after experiencing significant damage in a flood; (iii) claims against Blue Cross Blue Shield on account of anticompetitive conduct; (iv) preference claims arising under chapter 5 of the Bankruptcy Code; and (v) claims against certain of the Debtors' current and former insiders, including on account of fraudulent conveyance (and other causes of action arising under chapter 5 of the Bankruptcy Code), breach of fiduciary duty, and unlawful distributions.

**D.**    <u>**Mediation**</u>

32.    Towards the end of 2024, following the sale of substantially all of the Debtors' hospital assets, the Parties entered into negotiations regarding the process to monetize the Debtors' remaining assets and bring the chapter 11 cases to a conclusion.  Those discussions were overseen by the Honorable Marvin Isgur pursuant to the Mediation Order.[15]  In connection with this process, and to allow the parties additional time to negotiate the terms of a chapter 11 plan, the FILO Secured Parties agreed to extend the maturity date under the FILO DIP Credit Agreement on multiple occasions, as discussed above.

33.    Despite making significant progress in mediation, by early March 2025, the Parties still had not reached an agreement on the terms of a chapter 11 plan.  The FILO Secured

---

[15]   *Order Regarding Mediation Of Disputes Relating To Allocation Of Sale Proceeds And Related Issues With Medical Properties Trust* (Docket No. 829).

Parties expressed that, absent being provided certain requested protections as adequate protection for their collateral, they would be unwilling to continue to consent to the use of their cash collateral and further extend the maturity date of the FILO DIP Credit Agreement.

34. Accordingly, in an effort to obtain the financing needed to fund these chapter 11 cases to conclusion and resolve FILO Secured Parties' threat to move to terminate the use of cash collateral and lift the stay to foreclose on their collateral, the Debtors and Creditors' Committee, with the assistance of Judge Isgur, began to explore and negotiate a settlement structure that would provide additional protections to the FILO Secured Parties as adequate protection, while continuing to negotiate the terms of a chapter 11 plan.

35. These negotiations resulted in the agreements contemplated by the Term Sheet, as well as the parties entering into that certain *Plan Support Agreement Term Sheet* attached as Exhibit B to the Disclosure Statement (the "**Plan Term Sheet**") setting forth (i) the FILO Secured Parties' agreement to support a chapter 11 plan that is consistent with the Term Sheet and satisfies certain other conditions, and (ii) the Creditors' Committee's agreement to support a chapter 11 plan that satisfies certain conditions.

36. Contemporaneously herewith, the Debtors filed the Plan, Disclosure Statement, and Disclosure Statement Motion, which the Debtors will request to be heard by the Court concurrently with this Motion in May 2025. The Plan filed by the Debtors is supported by the FILO Secured Parties and the Creditors' Committee.

## Settlement

37.     The Settlement provides for the following:[16]

| Litigation Trust | | |
|---|---|---|
| **Litigation Trust Agreement** | The terms of the Litigation Trust shall be governed by a trust agreement (the "**Litigation Trust Agreement**") to be entered by the Parties prior to the Litigation Trust Establishment Date.   The Debtors will file the substantially final version of the Litigation Trust Agreement prior to the hearing on this Motion. | Term Sheet ¶ 2 |
| **Litigation Trust Establishment Date** | The Litigation Trust Establishment Date shall be the earlier of (i) July 8, 2025 and (ii) one (1) business day after the confirmation date of any confirmed plan. | Term Sheet ¶ 3 |
| **Litigation Trust Assets** | The Litigation Trust Assets are the assets listed on <u>Schedule 1</u> to the Term Sheet, which will be transferred free and clear (to the fullest extent permissible by applicable law) to the Litigation Trust on the Litigation Trust Establishment Date. | Term Sheet ¶ 2 and Schedule 1 |
| **Litigation Trustee** | The identity of the Litigation Trustee of the Litigation Trust shall be a party to be identified.  The terms of engagement of the Litigation Trustee shall be acceptable to the Debtors, the FILO Secured Parties, and the Creditors' Committee pursuant to an engagement letter (the "**Trustee Engagement Letter**").  The Debtors will file the substantially final version of the Trustee Engagement Letter prior to the hearing on this Motion. | Term Sheet ¶ 7(b), 19 |
| **Litigation Trust Interests** | The Litigation Trust will have three beneficiary classes:<br><br>• Class A-1 interests will be held by the parties that have extended Litigation Funding (the "**Litigation Funders**") and their agent (the "**Litigation Funding Agent**"), which interests entitle the holders to the Class A-1 Preference, [17] which shall accrete at the Applicable Rate.[18]<br><br>• Class A-2 interests will be held by the FILO Secured Parties, on account of their FILO DIP and Bridge Claims, which interests | Term Sheet ¶ 7(a), 13(a) |

---

[16]   The following is intended to be a summary of the Settlement and is subject in all respects to the terms set forth in the Term Sheet, attached to the Proposed Order as <u>Exhibit 1</u>.  To the extent of any conflict between the description of the Settlement in this Motion and in the Term Sheet, the Term Sheet shall govern in all respects.

[17]   The "**Class A-1 Preference**" means a distribution and liquidation preference in an amount equal to (x) the aggregate amount of funding extended or deemed to have been extended under the Litigation Funding plus all accreted amounts accrued thereon, in each case, as of such date, less (y) the aggregate amount, if any, of cash distributions paid on the Class A-1 interests from the Litigation Trust as of such date.  Any accretion on the Class A-1 Preference shall not have to be paid in cash; provided that, to the extent the Litigation Funders elect to provide additional funding to support the payment of any accreted amounts in cash, then such amounts shall be paid in cash.

[18]   The "**Applicable Rate**" shall be (a) from the Litigation Trust Establishment Date through September 30, 2025, 10%, (b) from October 1, 2025, through December 31, 2025, 10.5%, (c) from January 1, 2026, through March 31, 2026, 11%, and (d) 11.25% commencing on April 1, 2026, and increasing by an additional 25bps at the beginning of each quarter thereafter, subject to a maximum of 12%.

| | | | |
|---|---|---|---|
| | entitle the holders to the Class A-2 Preference, [19] which shall accrete at the Applicable Rate.<br><br>• Class B interests will be held by Steward Health Care Holdings LLC, on behalf of the Estate, or its successors. | |
| **Class Representatives** | The Class A-1 Representative shall be the Litigation Funding Agent, on behalf of the Litigation Funders.<br><br>The Class A-2 Representative shall be the FILO Bridge Agent or its designee, acting at the direction of FILO Secured Parties holding a majority in amount of the outstanding Class A-2 Preference.<br><br>The Class B Representative shall initially be the Transformation Committee, [20] on behalf of the Estate. [21] | Term Sheet ¶ 7(a) |
| **TSA** | The parties shall negotiate in good faith and agree prior to entry of the Proposed Order on the terms of a transition services agreement (the "**TSA**") pursuant to which the Estate will provide transition services to the Litigation Trust, including an agreement on the scope of services to be provided and pricing at cost.<br><br>In advance of each month, the TSA shall provide for the Litigation Trust to advance the Estate's monthly operating expenses, including for payroll and vendors, subject to (i) the initial TSA budget annexed to the Term Sheet as <u>Exhibit B</u>, which may be updated from time to time if approved in writing by the Litigation Trustee and the Class A-2 Representative, and (ii) a reconciliation process with respect to amounts funded in prior months. | Term Sheet ¶ 16 |
| **Consent for Disposition of Certain Litigation Trust Assets** | The Litigation Trustee shall carry out the disposition of the Litigation Trust Assets with respect to such assets set forth on the schedule agreed to by the Parties simultaneously with execution of the Term Sheet (the "**Threshold Schedule**"), in accordance with consents detailed in the Term Sheet, including:<br><br>i. that the Litigation Trustee may decide in his or her sole judgment consistent with his or her fiduciary duties, without obtaining the consent of any party, whether to accept or reject a proposal for which the value is between the minimum and maximum thresholds (subject to clause (v) below);<br><br>ii. that the Litigation Trustee shall be authorized to accept a proposal that exceeds the maximum threshold unless the Litigation Trustee | Term Sheet ¶ 7(e)-(f) |

---

[19] The "**Class A-2 Preference**" means a distribution and liquidation preference in an amount equal to (x) the sum of (i) all principal and accrued interest, fees, expenses, and other amounts outstanding under the FILO DIP Facility and Prepetition Bridge Facility immediately prior to the Litigation Trust Establishment Date (for the avoidance of doubt, excluding the Retained FILO Claim), (ii) all accreted amounts accrued thereon, (iii) the MOIC Payment, and (iv) the "Exit Premium" under the FILO DIP Loans (which is 2% of the FILO DIP Loans and shall be calculated as if the FILO DIP Loans were being fully repaid), less (y) the (A) amount, if any, of cash distributions paid on the Class A-2 interests from the Litigation Trust and the (B) amount, if any, of Class A-2 interests otherwise contributed or waived by the FILO Secured Parties.

[20] The "**Transformation Committee**" means the special committee of the Board of Managers of Steward Health Care Holdings LLC, comprised of William Transier, John R. Castellano, and Alan Carr.

[21] The "**Estate**" means the Debtors' estates or any successor(s) thereto.

|  | reasonably determines based on the advice of outside counsel that accepting such proposal is inconsistent with its fiduciary duties; |  |
|---|---|---|
|  | iii.   if the FILO Balance is in an Underpayment State (as defined in the Term Sheet), (a) each minimum threshold is reduced to 80% and (b) the Litigation Trustee shall be authorized to accept a proposal without obtaining consent of any other party if the Litigation Trustee (x) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept such proposal and (y) provides five (5) business days' written notice to the Class A-2 Representative and the Class B Representative (the "**Notice Parties**") of its intent to accept a proposal; |  |
|  | iv.   if the FILO Balance is not in an Underpayment State, the Litigation Trustee shall not accept any proposal unless (a) the Representatives have authorized such acceptance, (b) the proposal exceeds the applicable minimum threshold by 20%, in which case the consent of no other party is required, or (c) the Litigation Trustee (x) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept such proposal and (y) provides five (5) business days' written notice to the Notice Parties of its intent to accept a proposal; and |  |
|  | v.   that the FILO Secured Parties may increase the value of proposals that are less than the minimum threshold by contributing Class A-2 interests. |  |
|  | With respect to assets not set forth on the Threshold Schedule, the Litigation Trustee may exercise its reasonable business judgment. |  |
| **Litigation Trust Waterfall** | Distributions from the Litigation Trust shall be subject to the following priorities:<br><br>• *First*, fees of the Litigation Funding Agent and the Class A-2 Representative (which shall be $50,000 per month for each position), and indemnification and reasonable and documented expenses of the Litigation Trust (including payments owing to the Estate under the TSA) and of the Litigation Funding Agent, the Litigation Funders, Class A-2 Representative, and the FILO Secured Parties (subject to an aggregate cap)<br><br>• *Second*, Class A-1 interests until the Class A-1 Preference, the Upfront Premium, the Variable Component (which survives repayment of the Class A-1 Preference and the FILO Balance) are repaid in full in cash<br><br>• *Third*, Class A-2 interests until the Class A-2 Preference (including interest thereon) is repaid in full in cash and the FILO Balance is $0[22] | Term Sheet ¶ 7(i) |

---

[22] The "**FILO Balance**" equals the sum of (a) the outstanding Class A-2 Preference, plus all accreted amounts accrued thereon and fees and expenses of the Class A-2 Representative to the extent payable under the Term Sheet, (b) the outstanding Class A-1 Preference, the Upfront Premium, the agency fee of the Litigation Funding Agent, and outstanding indemnification claims and reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders, and (c) any unpaid Variable Component that has been

|  |  |  |
|---|---|---|
|  | • *Fourth*, Class B interests |  |
| **MOIC** | The "**MOIC Payment**" under the Prepetition Bridge Facility will be allowed on the following terms:<br><br>The Litigation Trust's MOIC obligation will be $11.25 million through March 31, 2026, increasing by:<br><br>• $1.0 million on April 1, 2026;<br><br>• An additional $1.5 million on May 1, 2026;<br><br>• An additional $2.0 million on June 1, 2026;<br><br>• An additional $2.5 million on July 1, 2026;<br><br>• An additional $3.0 million on August 1, 2026; and<br><br>• An additional $3.75 million on September 1, 2026 and on the first day of each month thereafter until paid in full.<br><br>The total MOIC Payments will not exceed 85% of $75 million *minus* any interest paid or accreted on account of the FILO Bridge Claims (including any interest paid or accreted on account of the Class A-2 Preference that is allocable to FILO Bridge Claims). | Term Sheet ¶ 11 |
| **Funding and Cash Collateral** | | |
| **DIP Maturity Date** | The Debtors and FILO Secured Parties have entered into that certain *Amendment No. 6 to Debtor-In-Possession Credit Agreement* attached to the Proposed Order as <u>Exhibit 2</u> (the "**DIP Amendment**") providing for an extension of the maturity date through the Litigation Trust Establishment Date, subject to the milestones contained therein. | Term Sheet ¶ 3 |
| **Cash Collateral** | The FILO Secured Parties agree to the Debtors' use of cash collateral through the Trust Establishment Date in an amount of $61 million through June 27, 2025 (the "**Secured Interim Advances**") in accordance with the budget annexed to the DIP Amendment (the "**DIP Budget**"), with additional amounts available for use thereafter. | Term Sheet ¶ 9 |
| **Retained Cash** | The Debtors' estates will retain $15,000,000 (the "**Retained Cash**") in a third-party escrow account subject to the liens of the Retained FILO Claim.[23]<br><br>If the Retained Cash is not authorized to be utilized by the Debtors pursuant to an order confirming a chapter 11 plan by the Confirmation Milestone,[24] the Retained Cash will be paid to the FILO Secured Parties as a paydown on the Retained FILO Claim until paid in full and the remainder as a paydown on the Class A-2 Preference. | Term Sheet ¶ 6 |

---

earned (for the avoidance of doubt, (i) other than before October 2, 2026, any Deferred Portion held in escrow and (ii) subject to adjustment, if applicable, in connection with any Post-FILO Repayment Variable Component).

[23] The "**Retained FILO Claim**" means $10 million of principal claims outstanding under the Prepetition Bridge Facility, which shall remain secured by the Retained Cash and any other assets of the Debtors' Estates.

[24] The "**Confirmation Milestone**" means August 1, 2025.

| | | |
|---|---|---|
| | If the Retained Cash is authorized pursuant to an order confirming the Plan entered prior to the Confirmation Milestone, the Debtors may utilize the Retained Cash for any purposes authorized under the Plan. | |
| **Litigation Funding** | The terms of the Litigation Funding shall be governed by a commitment letter consistent with the Term Sheet and otherwise acceptable to the FILO Secured Parties and the Debtors (the "**Commitment Letter**"). The Debtors will file the substantially final version of the Commitment Letter prior to the hearing on this Motion. | Term Sheet ¶¶ 10(a), 13, 19 |

| | | |
|---|---|---|
| | On the Litigation Trust Establishment Date, the FILO Secured Parties shall provide a loan to the Litigation Trust (from the proceeds of repayment) in an amount up to $125 million (the "**Initial Commitment Amount**"), which is inclusive of the Secured Interim Advances and Estate Funding, which shall be available to fund litigation, costs of administration of the Litigation Trust and monetization of assets, subject to the applicable budgets. | |
| | The Litigation Funding shall include an uncommitted accordion of 25% of the Initial Commitment Amount, on the same terms as the initial tranche. | |
| | The Litigation Funding will, in addition to payment of the Class A-1 Preference and the agency fee of the Litigation Funding Agent, as well as indemnification and reimbursement of all reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders to the extent provided by the Term Sheet, be entitled to: | |

    i.   an upfront premium (the "**Upfront Premium**"), payable in kind, equal to $4.25 million, provided that if the Litigation Funding accordion is exercised, the Upfront Premium shall be increased by the same percentage as the increased funding; and

    ii.  20% of gross litigation proceeds (the "**Variable Component**"), of which:

        a.   15% is paid in cash at the time of receipt of such litigation proceeds (the "**Upfront Percentage**"), and

        b.   5% is deferred (the "**Deferred Portion**"), with the applicable deferred cash being held in escrow;

*provided* that if the litigation proceeds result from a litigation financed with a contingency fee structure or third-party litigation funding, the total Variable Component shall be limited to the lesser of:

    i.   the applicable Variable Component; and

    ii.  the greater of:

        a.   30% of such gross litigation proceeds minus the amount of continency fee, success fee, or third-party litigation funding cost related to such litigation, and

        b.   10% of such gross litigation proceeds (the "**Reduced Variable Component**").

In the event such reduced Variable Component is equal to or less than 15% of such gross litigation proceeds, then all of such Reduced Variable Component shall be treated as the Upfront Percentage. In the event that the Reduced Variable Component is greater than 15% of such gross litigation

| | proceeds, then 15% of such gross litigation proceeds shall be treated as the Upfront Percentage and the remaining portion shall be treated as the Deferred Portion.<br><br>If the FILO Balance is repaid in full on or before October 1, 2026, the Deferred Portion shall be paid to the Estate.<br><br>After repayment of the FILO Balance, the Variable Component shall continue to be entitled to a percentage of the gross litigation proceeds:<br><br>   i.   at the Upfront Percentage if the FILO Balance is repaid in full on or before October 1, 2026, or<br><br>   ii.   at 20% if the FILO Balance is not repaid on or before October 1, 2026, in each case subject to the Reduced Variable Component (the "**Post-FILO Repayment Variable Component**");<br><br>*provided* that (x) to the extent a Plan is confirmed, 62.5% of the Post-FILO Repayment Variable Component shall be paid in cash and the remainder shall be deferred until (and subject to) the satisfaction of allowed administrative and other priority claims pursuant to the Plan, and (y) if a Plan has not been confirmed, the Post-FILO Repayment Variable Component shall be paid in full in cash upon receipt of the applicable litigation proceeds.<br><br>On October 2, 2026, if the FILO Balance has not been paid in full by October 1, 2026, the Deferred Portion shall be disbursed in full to the Litigation Funding Agent. | |
|---|---|---|
| **Estate Funding** | On the Litigation Trust Establishment Date, the Litigation Trust shall make $6.5 million available to the Estate (or any successor liquidating vehicle) to fund costs and expenses of the Estate and the Estate's professionals incurred after the Litigation Trust Establishment Date and of any successor liquidating vehicle (the "**Estate Funding**"). | Term Sheet ¶ 10(c)-(d) |
| | **Other Provisions** | |
| **Releases** | As of the Litigation Trust Establishment Date, the Releasing Parties[25] shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties[26] from any and all | Term Sheet ¶ 4; Exhibit A |

---

[25] "**Releasing Parties**" means each of (A) the Debtors, (B) the Estates, (C) the Litigation Trust, (D) the Litigation Trustee, (E) the FILO Parties, (F) the Creditors' Committee and each of its members (solely in their official capacity), and (G) each Related Party of each Person or Entity described in any of the immediately preceding clauses (A) through (F) to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law.

[26] "**Released Parties**" means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, and (b) the Litigation Trust and the Litigation Trustee; (iii) each of the following, solely in their capacities as such, (a) the Creditors' Committee and each of its members, and (b) the FILO Parties; and (iv) with respect to each of the foregoing Entities in clauses (ii) and (iii), such Entities' Related Parties; *provided* that, no Identified Non-Released Party shall be a Released Party.

The "**Debtor Related Parties**" means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such;

| | Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, except as otherwise expressly set forth in Exhibit A to the Term Sheet and pursuant to the terms and conditions therein (collectively, the "**Releases**")). | |
| **Settlement Approval** | The Term Sheet must be approved by an order of the Bankruptcy Court entered not later than May 28, 2025 (the "**Approval Milestone**"). In addition, the Debtors agreed to file this Motion by no later than April 28, 2025 (the "**Motion Milestone**"). If the Debtors do not satisfy the Approval Milestone, the Settlement will be of no further force and effect. | Term Sheet ¶ 1 |

38.     As noted above, the Settlement includes amendments with respect to the FILO DIP Facility and the Debtors' use of cash collateral. The below chart summarizes the terms, in accordance with Bankruptcy Rules 4001(b)-(d) and the Complex Case Procedures, as incorporated by Bankruptcy Local Rule 1075-1.

| DIP Amendment[27] | | Location |
|---|---|---|
| **Maturity Date; Duration for Use of DIP Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Maturity Date is extended to the Litigation Trust Establishment Date (i.e., July 8, 2025), subject to the milestones below. | DIP Amendment § 2 |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi) | Pursuant to the Term Sheet, the Debtors were required to file this Motion by no later than April 28, 2025 and the Proposed Order must be approved by the Court by no later than May 28, 2025. | DIP Amendment § 2 |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | The use of cash collateral through the Litigation Trust Establishment Date shall strictly be in accordance with the DIP Budget. | Term Sheet ¶¶ 6, 9 |

---

(ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

27    The following summary of the terms of the Settlement, including the DIP Amendment, is subject entirely to the express terms of the Term Sheet and DIP Amendment, as applicable. If there are any inconsistencies between the summary below and the Term Sheet and the DIP Amendment, as applicable, then the Term Sheet or DIP Amendment, as applicable shall control. Capitalized terms used but not defined in this table shall have the meanings ascribed in the DIP Amendment.

| DIP Amendment[27] | | Location |
|---|---|---|
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** <br> Bankruptcy Rule 4001(b)(1)(B)(iv) | <u>Adequate Protection.</u>  The FILO Secured Parties were granted adequate protection as set forth in paragraph 13 of the Junior DIP Order and paragraph 13(a) of the FILO DIP Order.  Such Adequate Protection remains in full force and effect. <br><br> As adequate protection for the FILO Secured Parties' consent to use cash collateral and provide financing, on the Litigation Trust Establishment Date, among other things, (i) the Debtors' assets will be transferred to the Litigation Trust on the Litigation Trust Establishment Date, in accordance with the terms of the Settlement, and (ii) the claims under the Prepetition Bridge Credit Agreement will be allowed in accordance with the Proposed Order. | Proposed Order ¶ 6, 18 |
| **Waiver or Modification of the Automatic Stay** <br> Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay is modified solely to the extent necessary to permit the parties to take all actions as are necessary or appropriate to implement the terms of the Settlement and Proposed Order. | Proposed Order ¶ 4 |
| **Limitations on the Use of Cash Collateral** <br> Complex Case Procedures ¶ 8(g) | Through the Litigation Trust Establishment Date, cash collateral may only be used in accordance with the DIP Budget. | Term Sheet ¶ 9 |

## **Assumption and Assignment Procedures**

39.     The Assumption and Assignment Procedures set forth in the Proposed Order will, among other things, govern the Debtors' provision of notice to each non-Debtor counterparty (each, a "**Contract Counterparty**") to an executory contract or unexpired lease of non-residential real property of the Debtors (each, a "**Contract**") regarding the potential assumption and assignment of such Contracts and the Debtors' calculations of the amount necessary to cure any monetary defaults under such Contracts (the "**Cure Costs**"), substantially in the form attached to the Proposed Order as **Exhibit 3** (the "**Cure Notice**"), in connection with the transfer of Contracts to the Litigation Trust.  Within five (5) business days after entry of the Proposed Order, the Debtors will file the Cure Notices with the Court and serve the Cure Notices on the Contract Counterparties, which will be specified in the applicable Cure Notice.

40.     Objections, if any, to any proposed Cure Costs set forth on the Cure Notice (each, a "**Cure Objection**") must: (i) be in writing; (ii) state the name and address of the objecting

party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Rules and the Local Rules; and (v) be filed with the Court and served on the Debtors, the Creditors' Committee, and FILO Secured Parties within ten (10) days after receipt of Cure Notice.

41.     If (a) the Debtors, in consultation with the Creditors' Committee and the FILO Secured Parties, identify (i) additional contracts or leases to be assumed and assigned to the Litigation Trust or (ii) modifications that need to be made to a proposed Cure Cost previously stated in the Cure Notice, or (b) the Litigation Trust designates any additional contracts or leases not previously included on the Cure Notice for assumption and assignment, the Debtors may, after consultation with the Creditors' Committee and subject to the consent of the FILO Secured Parties, at any time before the Litigation Trust Establishment Date, file with the Court and serve by first class mail on the applicable Contract Counterparty a supplemental Cure Notice (each, a "**Supplemental Cure Notice**").  As soon as reasonably practicable after filing a Supplemental Cure Notice, the Debtors shall post a copy of the Supplemental Cure Notice on the website maintained by Kroll Restructuring Administration LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://restructuring.ra.kroll.com/Steward.  Any Cure Objection with respect to Cure Costs set forth in a Supplemental Cure Notice must be filed within seven (7) days of the filing of such Supplemental Cure Notice.

42.     If a Contract Counterparty to any Assigned Contract files a Cure Objection to the assumption and assignment of such Assigned Contract to the Litigation Trust, then such contract shall be deemed a "**Disputed Contract**."  The Debtors, in consultation with the Creditors' Committee, shall be authorized to resolve or settle any Cure Objection to the assumption and

27

assignment of Disputed Contracts in accordance with the terms of the Settlement and the Proposed Order, including with respect to Cure Costs without need for any further order or action from this Court. Once any objection to a Disputed Contract is resolved, the Disputed Contract shall be subject to the terms of the Proposed Order, including without limitations paragraphs 22-34, in all respects.

43. Any Disputed Contract that is the subject of an unresolved Cure Objection may be assumed and assigned to the Litigation Trust prior to the resolution of such Cure Objection, so long as the Litigation Trust (i) pays any undisputed Cure Costs on or before the Litigation Trust Establishment Date and (ii) appropriately reserves funding for the disputed portion of the Cure Costs pending resolution of the dispute.

44. Notwithstanding anything herein to the contrary, the Debtors shall assume and assign contracts and leases to the Litigation Trust by the Litigation Trust Establishment Date. The Litigation Trust shall be responsible for paying all Cure Costs and all costs of the Estate associated with assuming and assigning any contracts or leases to the Litigation Trust, including any related advisor or personnel costs incurred by the Estate.

45. The Debtors request that any party failing to file a timely Cure Objection be deemed to consent to the treatment of its executory contract and/or unexpired lease under section 365 of the Bankruptcy Code and be forever barred from asserting any objection with respect to the treatment of such executory contract and/or unexpired lease.

## Relief Requested Should Be Granted

### A. Settlement Satisfies Bankruptcy Rule 9019 and Should Be Approved

46. Bankruptcy Rule 9019(a) provides that "[o]n motion by the [debtors in possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may approve

a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interests of the estate. *See In re Age Refin. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, "approval of a compromise is within the discretion of the bankruptcy court." *See U.S. v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984). Settlements are considered a "normal part of the process of reorganization" and "a desirable and wise method[] of bringing to a close proceedings otherwise lengthy, complicated, and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980) (citations omitted) (decided under the Bankruptcy Act).

47. The Fifth Circuit sets forth a three-factor balancing test under which bankruptcy courts are to analyze proposed settlements. *Id*. The factors the Court considers are: "(1) the probability of success in litigating the claim subject to settlement, with due consideration for the uncertainty in fact and law; (2) the complexity and likely duration of litigation and any attendant expense, inconvenience, and delay, and (3) all other factors bearing on the wisdom of the compromise." *See Age Refin. Inc.*, 801 F.3d at 540 (internal citations omitted).

48. Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*, *see also Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms'-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540 (citations omitted); *Foster Mortg. Corp.*, 68 F.3d at 918.

49. Generally, the role of the bankruptcy court is not to decide the issues in dispute when evaluating a settlement. *Watts v. Williams*, 154 B.R. 56, 59 (S.D. Tex. 1993).

29

Instead, the court should determine whether the settlement as a whole is fair and equitable. *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968).

50. The Debtors bear the burden of establishing that the balance of the above factors leads to a fair and equitable compromise vis-à-vis the Settlement. *In re Allied Props.*, LLC, No. 06-33754 (MI), 2007 WL 1849017, at *4 (Bankr. S.D. Tex. June 25, 2007) (citing *In re Lawrence & Erausquin, Inc.*, 124 B.R. 37, 38 (Bankr. N.D. Ohio 1990)); *see also In re GHR Cos., Inc.*, 50 B.R. 925, 931 (Bankr. D. Mass. 1985). "The burden is not high"; rather, the Debtors "need only show that [their] decision falls within the 'range of reasonable litigation alternatives.'" *In re Allied Props.*, LLC, 2007 WL 1849017, at *4 (emphasis added) (citing *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also Cook v. Waldron*, No. 06-36406 (MI), 2006 WL 1007489 at *4 (S.D. Tex. Apr. 18, 2006).

51. Here, weighing the foregoing factors demonstrates that the Settlement is reasonable and supports finding that the Debtors' entry into the Settlement is in the best interest of creditors and other stakeholders.

52. <u>Likelihood of Success</u>. *First*, the likelihood of success of defending against the threat of the FILO Secured Parties demanding relief from the automatic stay and the terminating of the Debtors' consensual use of cash collateral on account of the maturity of the FILO DIP Facility is risky and highly uncertain. Specifically, even if the Debtors could prevail against the FILO Secured Parties in a lift stay litigation or otherwise delay or limit their ability to exercise remedies against estate assets, absent the consent of the FILO Secured Parties and entry into the Settlement, the Debtors would be unable to secure funding needed to monetize their remaining assets and prosecute a chapter 11 plan. Under the Settlement, the FILO Secured Parties

will (a) consent to the continued use of cash collateral, (b) provide funding to the estate, and (c) provide Litigation Funding to the Litigation Trust to fund (i) the pursuit of valuable causes of action, (ii) costs of administration of the Litigation Trust and the Debtors' estates, (iii) monetization of Litigation Trust Assets to allow for recoveries to the FILO Secured Parties as well as administrative, priority and unsecured creditors. Accordingly, the certainty of outcome realized by entry into and consummation of the Settlement provides significant benefits to the Debtors and their estates.

53. <u>Complexity of Litigation and Attendant Expense, Inconvenience, and Delay.</u> *Second*, as noted above, the Settlement allows the Debtors to avoid the substantial litigation costs and risk associated with seeking to enforce the automatic stay and the non-consensual use of cash collateral. Litigating over issues such as use of cash collateral before the Debtors attempt confirmation of a chapter 11 plan would deplete the Debtors' remaining resources, and would leave insufficient funds to pursue an alternative to consummation, such as a global settlement. The Debtors do not believe taking such risk is warranted, especially after weighing the potential detrimental impact to all creditors. Additionally, the Settlement allows the Debtors to avoid the high costs and risks associated with litigating the Debtors' claims against the FILO Secured Parties concerning the allowed amount of the MOIC Amount.

54. <u>Arms'-Length Bargaining.</u> *Third*, the Settlement is the product of hard fought negotiations between the Debtors, the FILO Secured Parties, and the Creditors' Committee, each of which were represented by independent, sophisticated counsel. The Parties exchanged countless proposals and counter-proposals over months as part of extensive mediation overseen by Judge Isgur, which ultimately led to the terms of both the Settlement and the Plan.

55.     Moreover, the Litigation Funding to the Litigation Trust and funding to the estate provided by the FILO Secured Parties is the best financing available.  Beginning in January 2025, the Debtors' advisors, overseen by the Transformation Committee, launched a process to solicit potential proposals to finance or fund potential litigation on behalf of the estates.  In the solicitation, the advisors made clear that the estate was open to a variety of potential solutions, including: (i) outright purchase of some or all of the litigation claims; (ii) purchase with a distribution waterfall; (iii) financing of all claims; and (iv) financing of select claims.  Each bidder received access to an identical data room.  The Debtors contacted nineteen (19) third parties, in addition to the FILO Secured Parties, to gauge their interest in providing a proposal to the Debtors for litigation financing.  Out of the nineteen (19) third parties contacted, fifteen (15) executed non-disclosure agreements and were provided with diligence information.  The Debtors received 14 proposals from 9 third parties and a proposal from the FILO Secured Parties.

56.     The Debtors ultimately determined that the proposal from the FILO Secured Parties was the best litigation financing alternative available to the Debtors because it was on reasonable and market-based terms, actionable, and the only proposal that provided the comprehensive funding needed to confirm a chapter 11 case, fund the estate, and effectively pursue all of the Debtors' litigation assets.  Further, the FILO Secured Parties were unwilling to be primed or subordinate their recoveries to other litigation funders.

57.     <u>Paramount Interest of Creditors.</u>  *Fourth*, the Settlement is reasonable, in the best interests of the Debtors' estates, and serves the paramount interests of creditors because, if approved, it will allow the Debtors to maximize distributions and recoveries to creditors, including potential recoveries to unsecured creditors.  The Debtors have monetized the majority of their operating assets through the hospital sales, and the majority of the Debtors' remaining

assets are litigation assets that must be pursued to settlement or judgment in order to provide fair value to the estates. Indeed, the Debtors' most important remaining assets are valuable litigation claims seeking more than $2 billion, which, if even a material portion is realized, will be sufficient to repay administrative expense and priority claims in full and provide a meaningful recovery to unsecured creditors. To maximize recoveries for creditors, however, the Debtors require time and money, and the support of key stakeholders. Absent resolution, the Debtors would not have adequate funding to monetize their remaining assets and would likely be forced to convert their cases to chapter 7.

58. The Settlement, if approved, affords the Debtors and their estates with numerous benefits, including: (i) providing a path to confirming a chapter 11 plan that avoids conversion to chapter 7; (ii) providing the Litigation Trust with a $125 million Litigation Funding facility; (iii) providing ongoing use of cash collateral through the Trust Establishment Date ($61 million for the Debtors' estates through June 27, 2025 and additional amounts budgeted thereafter); (iv) providing $21.5 million to the Debtors' estates after the Litigation Trust Establishment Date to fund the administration of the estate and payments to administrative creditors, (v) providing a process and time to monetize the Debtors' remaining assets, including valuable estate claims and causes of action; and (vi) the reduction of the FILO Secured Parties' interest rate and MOIC claims against the Debtors' estates, and the subordination of the Retained FILO Claim to administrative and priority claims.

## B. Adequate Protection Provided to FILO Secured Parties

59. Although the Bankruptcy Code does not expressly define adequate protection, "it suggests a broad and flexible definition" and "confers upon 'the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved.'" *In re 495 Cent. Park Ave. Corp.*, 136

B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (citation omitted); *see also In re Las Torres Dev. LLC*, 413 B.R. 687, 696–97 (Bankr. S.D. Tex. 2009) (noting that the "Fifth Circuit has aptly noted that the Code contains no specific, definitive definition of adequate protection") (citing *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir.1987)); *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396–97 (10th Cir. 1987) (stating adequate protection "is to be decided flexibly on the proverbial 'case-by-case' basis"); *Martin v. United States (In re Martin)*, 761 F.2d 472, 474 (8th Cir. 1985) (same); *see also* 11 U.S.C. § 361 (providing a non-exhaustive list of examples of adequate protection, including (i) a lump sum or periodic cash payments; (ii) replacement liens; and (iii) administrative priority claims).

60.     The purpose of adequate protection is to "protect a secured creditor against a decrease in the value of its collateral due to the debtor's use, sale or lease of that collateral during the stay." *In re Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1389 (5th. Cir. 1986*); see also In re Geijsel*, 480 B.R. 238, 265 & n.19 (Bankr. N.D. Tex. 2012) ("The purpose of adequate protection payments is to adequately protect creditors from the diminution of value in a creditor's collateral."); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988).

61.     In exchange for the FILO Secured Parties consent to the use of their collateral and cash collateral, the FILO Secured Parties are entitled to adequate protection pursuant to sections 361 and 362 of the Bankruptcy Code.   The Settlement ultimately recognizes the superpriority of the FILO Secured Parties' claims and liens and implements the existing rights and

remedies of the FILO Secured Parties, as lenders under both the Prepetition Bridge Credit Agreement and the FILO DIP Credit Agreement, including by providing adequate protection required under sections 361 and 362 of the Bankruptcy Code. The Settlement provides for protections to the FILO Secured Parties with respect to their collateral without foreclosing on the Debtors' assets, while also preserving the Debtors' interest in such assets in a manner that will allow the Debtors to confirm a plan that will provide their creditors with substantial recoveries consistent with the Bankruptcy Code's priority scheme.

62.     The alternative to the Settlement is that the FILO Secured Parties would seek to lift the stay and foreclose on their collateral (including valuable estate claims and causes of action) which the FILO Secured Parties would have no obligation to maximize the value beyond their own claims or distribute any excess to administrative, priority, or general unsecured creditors of the Debtors. To avoid the FILO Secured Parties' foreclosure on their cash collateral, the Settlement provides that the Litigation Trust Assets will be administered by an independent Litigation Trustee with fiduciary duties to all parties to maximize value of the Litigation Trust Assets and be subject to the governance and the consent rights of the Debtors' estates, which in stark contrast to the alternative, will serve the paramount interests of creditors.

63.     The Settlement represents a major milestone in the Debtors' chapter 11 cases, and lays the groundwork for the Debtors to solicit and seek confirmation of their Plan. Accordingly, the Settlement should be approved.

## C.      Releases Are Appropriate and Should Be Approved

64.     As described above, the Settlement provides for the Releases set forth in Exhibit A to the Term Sheet, including, among others, of: (i) the Debtors, the Transformation Committee, the Debtors' Chief Restructuring Officer and certain other limited Debtor related parties, (ii) the Creditors' Committee, its members and professionals, (iii) the FILO Secured

Parties and their professionals, and (iv) the Litigation Trust, the Litigation Trustee, and its professionals. The Releases are an integral component of the Settlement, appropriate and necessary under the circumstances, consistent with the Bankruptcy Code, and compliant with the applicable case law and precedent in the Fifth Circuit, and, for the reasons set forth below, should be approved.

65. Releases are evaluated under the standard for settlements set forth in Bankruptcy Rule 9019, which is set forth above. *See In re Asarco LLC*, No. 05-21207, 2009 WL 8176641, *33 (Bankr. S.D. Tex. June 5, 2009) (approving releases provided in multiple settlements under the 9019 standard); *see also In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Sept. 29, 2022) (Docket No. 1303) (approving mutual releases in a settlement under the 9019 standard). In considering the appropriateness of releases, courts consider whether the release is (i) "fair and equitable" and (ii) "in the best interest of the estate." *See Jackson Brewing*, 624 F.2d at 602 (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *In re Bigler LP*, 442 B.R. 537, 543 n.6 (Bankr. S.D. Tex. 2010); *In re Derosa-Grund*, 567 B.R. 773, 784–85 (Bankr. S.D. Tex. 2017); *see also In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities*, No. 06-744-A, 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007).

66. The Releases were heavily negotiated by sophisticated parties, each of which was represented by competent counsel and financial advisors, and were only granted following a thorough months'-long investigation by the Investigation Sub-committee of the Transformation Committee. The result is a comprehensive, integrated compromise that reflects true arm's-length negotiations. Additionally, in consideration of the Releases, the FILO Secured

Parties have provided, and continue to provide, integral support to the Debtors' chapter 11 cases, by, among other things: (i) providing liquidity and necessary funding to continue to pursue efforts to monetize the Debtors' remaining assets, (ii) not seeking to lift the automatic stay to exercise their rights and remedies against the Debtors' assets, such as foreclosure on their collateral, and (iii) agreeing to further extend the maturity date of the FILO DIP Credit Agreement and allowing the Debtors' continued use of cash collateral. Additionally, the Released Parties listed on Exhibit A to the Term Sheet include a limited subset of professionals and individuals that provided pre- and postpetition services to the Debtors in their capacity as directors, managers, officers, and advisors and have guided the Debtors through these chapter 11 cases. The Debtors, the Creditors' Committee, and their disinterested related parties worked diligently throughout these chapter 11 cases to sell the Debtors' assets (which resulted in the realization thus far of approximately $630 million in sale proceeds and the preservation of over 24,000 jobs) and ultimately reach the terms of the MPT Settlement, this Settlement, and the Plan (amongst other milestones and achievements). The Releases are sought in consideration of that work, among other things. Importantly, the release provisions of the Settlement expressly exclude (i) liability for any acts of actual fraud, willful misconduct, criminal misconduct, gross negligence, or material representation, on the part of such Released Parties and (ii) releases for any parties for which the Investigation Sub-Committee of the Transformation Committee believes the Debtors potentially may have claims against.

67. The Investigation Sub-Committee of the Transformation Committee has determined that the proposed releases are appropriate and warranted. The Releases constitute an integral part of the Debtors' arms'-length negotiations with the FILO Secured Parties and the Creditors' Committee that resulted in the Settlement and are being granted in exchange for, among other things, the significant benefits provided to the Debtors leading up to and throughout these

chapter 11 cases. Many of the Released Parties were instrumental throughout these chapter cases and in negotiating the Settlement and managed intense demands associated with these chapter 11 cases, while maintaining their regular operational duties. Accordingly, the Releases incentivize certain parties to continue to assist with the remainder of the Debtors' chapter 11 cases. Further, the Releases will preclude the erosion of the Debtors' valuable directors and officers liability insurance policies (the "**D&O Policies**") or the assertion of additional indemnification claims against the Estate as a result of claims being brought against Released Parties (including physicians and other front-line workers who were directors and officers of the Debtors' hospital subsidiaries) that the Debtors contend are not warranted.

68. The Debtors do not believe that there exists any valuable, colorable, or material claims against the Released Parties. As described in the Disclosure Statement, the Investigation Sub-Committee, composed of independent directors William Transier and Alan Carr, instructed Weil to conduct an investigation to identify any potential claims and/or causes of action in favor of the Debtors (the "**Investigation**"). The Investigation included a review of claims based on, among other things, breach of fiduciary duty (including related-party transactions), corporate waste, unlawful distribution, and fraudulent conveyance. The Investigation was completed in December 2024 and an investigation summary of potential Claims and Causes of Action was presented to the Investigation Sub-Committee, the results of which are described in more detail in the Disclosure Statement. Based upon the information available to the Investigation Sub-Committee, including, but not limited to, the results of the Investigation, additional considerations relating to the assistance and support provided by certain of the Released Parties, as well as the potential for erosion of the D&O Policies and increased claims against the Estate, the Investigation Sub-Committee voted to approve the Settlement and the Releases set forth therein. The

Investigation Sub-Committee's approval of the releases demonstrates an independent view that there were no valuable, colorable or material Claims against the Released Parties. In addition, the Creditors' Committee and the FILO Secured Parties have determined that the proposed releases being provided are fair and in exchange for fair consideration provided by the Released Parties, and each supports the Releases.

69. Courts have approved similar release provisions for debtors in connection with global settlements or the wind down and resolution of bankruptcy cases. *See*, *e.g.*, *In re Basic Energy Servs., Inc.*, No. 21-90002 (DRJ) (Bankr. S.D. Tex. Nov. 08, 2021) (Docket No. 686) (approving releases "essential to the formulation and implementation" of a global settlement); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Sept. 29, 2022) (Docket No. 1303) (approving mutual releases as a component of global settlement with multiple parties); *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Jan. 24, 2024) (Docket No. 6365) (approving global settlement that included releases for the debtors and debtor-related parties); *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Aug. 8, 2018) (Docket No. 4083) (approving comprehensive settlement that granted releases of the estates' potential litigation claims against certain lenders and provided for mutual releases of claims among creditor constituencies); *CBL & Assocs. Props., Inc.*, No. 20-35226 (DRJ) (Bankr. S.D. Tex. Aug. 19, 2021) (Docket No. 1417) (approving settlement agreement containing mutual releases of dismissed debtor, secured lender, and guarantor for obligations other than contained in the agreement and dismissing chapter 11 cases); *In re Buffet Partners, L.P.*, No. 14-30699 (HDH), 2014 Bankr. LEXIS 3204 (Bankr. N.D. Tex. July 23, 2014) (dismissing debtors' cases and leaving effective an order approving a settlement containing mutual releases among the debtors, the purchaser of the debtors' assets, and the creditors' committee); *In re ICL Holding Co.*, No. 12-13319 (KG) (Bankr.

D. Del. May 8, 2014) (Docket 1255) (dismissing debtors' chapter 11 cases pursuant to sections 305(a) and 1112(b) and approving partially mutual releases for, among others, debtors' professionals and fiduciaries and certain other parties in interest, except for an enumerated list of claims).

70.     Accordingly, the Debtors submit that the Releases are appropriately tailored to the circumstances of the chapter 11 cases and request that they be approved.

**D.**     **Section 363(b) of the Bankruptcy Code Authorizes Debtors to Enter Into and Perform Under the Settlement**

71.     Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *In re Black v. Shor* (*In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016) (granting debtor's request to enter settlement agreement because the agreement "provided the estate with immediate cash and also eliminated the underlying controversy"); *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (citations omitted) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989) (("[T]here must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (quoting *In re Cont'l Air Lines, Inc.,* 780 F.2d at 1226)).

72.     The business judgment standard under section 363(b) is "flexible and encourages discretion." *ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) (citations omitted) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale (other than the appeasement of major creditors) . . . ."). Generally, courts "give great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute its views for those of the board if the latter's decision can be attributed to any rational business purpose." *In re Glob. Crossing Ltd.*, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (quoting *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 n.17 (Del.1994)).

73.     As noted above, without the approval of the Settlement, the Debtors will be unable to secure the funding needed to monetize their remaining assets and confirm a chapter 11 plan.  Under the Settlement, the FILO Secured Parties will (a) consent to the continued use of cash collateral, and (b) provide Litigation Funding to the Litigation Trust to fund (i) litigation, (ii) costs of administration of the Litigation Trust and monetization of Litigation Trust Assets, as well as funding to administer and wind-down the estate (and fund payment to administrative creditors). Absent resolution, the Debtors would not have adequate funding to monetize their remaining assets and would likely be forced to convert their cases to chapter 7 cases, which would likely result in little to no recoveries for any administrative, priority, or general unsecured creditors.  Thus, the Settlement is required to avoid the value-destructive scenario of a chapter 7 liquidation.

74.     Additionally, the transfer of the Litigation Trust Assets to the Litigation Trust was a requirement by the FILO Secured Parties in order to protect their collateral, while

preserving the Debtors' assets in a manner that allows other creditors to receive recoveries. Without such protections, the Debtors understand that the FILO Secured Parties would seek to lift the automatic stay and terminate the Debtors' use of cash collateral, resulting in litigation, significant diminution of the value of the Debtors' assets, and if the FILO Secured Parties were to succeed—the FILO Secured Parties reaping all of the value of the Debtors' assets for themselves with little to no protections for the estates' remaining creditors.

75. Further, the Term Sheet is a building block towards the Plan, confirmation of which will be sought prior to the anticipated Litigation Trust Establishment Date. Accordingly, the Settlement allows the Debtors to confirm the Plan and implement the Settlement pursuant to the Plan and confirmation order.

76. In light of the foregoing, the Debtors determined, in their business judgment and in consultation with their advisors, that entry into and performance under the Term Sheet is reasonable and in the best interest of the Debtors and their estates.

**E.** **Transfer or Conveyance of Litigation Trust Assets Should Be Approved**

77. Pursuant to the Term Sheet, the Debtors propose to transfer or convey the Litigation Trust Assets, consisting of substantially all of the Debtors' assets, including claims and causes of action, free and clear of all liens, claims, encumbrances, and interests into the Litigation Trust, to the fullest extent available under applicable law. Parties in interest will be provided with notice and an opportunity to object to the proposed transfer or conveyance and the terms thereof. Accordingly, the Debtors submit that the transfer or conveyance of the Litigation Trust Assets pursuant to the Settlement is a sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their estates, and their creditors, and should be approved by the Court.

### a. Adequate and Reasonable Notice of the Transfer or Conveyance of the Litigation Trust Assets Are Provided

78.     This Motion (i) informs interested parties of the deadline for objecting to the Settlement and (ii) otherwise includes all information relevant to parties interested in, or affected by, the Settlement.  Notice of this Motion will be provided to any party entitled to notice pursuant to Bankruptcy Rule 2002 and 6004 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d), and will be published on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward.     Accordingly, reasonable and adequate notice of the transfer or conveyance of the Litigation Trust Assets and the Settlement will be provided to all interested parties.

### b. Transfer or Conveyance of Litigation Trust Assets Should be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code

79.     Section 363(f) of the Bankruptcy Code permits the Debtors to sell assets free and clear of all liens, claims, interests, charges, and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).  As section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f).  *In re Nature Leisure Times, LLC*, No. 06-41357 (BTR), 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be approved if any one of the aforementioned conditions contained in § 363(f) are satisfied.").

80.     Additionally, the Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply.  *See In re Ditech Holding Corp.*, 606 B.R. 544, 591 (Bankr. S.D.N.Y. 2019) ("[P]lan sales can be free and clear of claims without invoking section 363(f)."); *In re Trans World Airlines,*

*Inc.*, No. 01–0056 (PJW), 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001), *aff'd sub nom. In re Trans World Airlines, Inc.,* 322 F.3d 283 (3d Cir. 2003) (citation omitted) ("[B]ankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (citation omitted) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11."). The Debtors believe that one or more of the tests of section 363(f) will be satisfied with respect to the transfer or conveyance of the Litigation Trust Assets. For example, certain parties have asserted that they hold a constructive trust over certain of the Debtors' assets. In each case, however, the Debtors dispute that such parties hold any such interests and have filed pleadings disputing such alleged interests. [28] Therefore, any such alleged interest is subject to a bona fide dispute and the Debtors are authorized to transfer the Litigation Trust Assets free and clear of any such disputed interests. Moreover, even if any party could prevail on its constructive trust theory (which they cannot), any such recovery would be limited to the lowest intermediate balance of the applicable bank account. [29]

---

[28] *See Steward Health Care System, LLC's Answer to Catholic Health Initiatives Colorado's Complaint* (Adv. Proc. No. 25-03001, Docket No. 32); *Defendant's Answer to TRACO International Group S. DE R.L.'s First Amended Complaint* (Adv. Proc. No. 24-03261, Docket No. 13); *Debtors' Preliminary Objection to Brighton Marine, Inc.'s Emergency Motion (I) To Compel Payment of Funds Held in Trust; (II) To Compel Compliance with the Transition Services Agreement; (III) To Permit Set Off; or Alternatively (IV) For Conversion to Chapter 7 of the Bankruptcy Code* (Docket No. 4387); *Debtors' Reply to Objection of Certain Participants to Debtors' Motion to Turn Over Trust Assets* (Docket No. 4105).

[29] *See In re Vaughn Motors*, 248 F.3d 1140 (5th Cir. 2001) (holding that when a trust beneficiary's funds, despite being traceable into the debtor's account, are "commingled in accounts that were drawn upon, the trust beneficiary's recovery [is] limited to the lowest balance between the time of deposit of the overpayments and the filing of the [bankruptcy] petition"); *United States v. McConnell*, 258 B.R. 869 (N.D. Tex. 2001) (same).

81.     Accordingly, the Debtors request that the Court authorize the transfer of the Litigation Trust Assets free and clear of any liens, claims, interests, and encumbrances, in accordance with section 363(f) of the Bankruptcy Code and the Term Sheet.

**F.      DIP Amendment, Use of Cash Collateral, and Grant of Adequate Protection Should Be Approved**

82.     A FILO DIP Facility maturity extension is required because the Debtors have no unencumbered cash with which to operate, and presently lack the funds to repay the FILO DIP Facility.   Pursuant to the Settlement, the FILO Secured Parties entered into the DIP Amendment, agreeing to an extension of the maturity date through the anticipated entry of the Proposed Order, and, if the Proposed Order is entered, through the anticipated Litigation Trust Establishment Date when the FILO Secured Parties' claims against the estates, including under the FILO DIP Credit Agreement, will be released.   In addition, the FILO Secured Parties have agreed to the continued use by the Debtors of their cash collateral through the Litigation Trust Establishment Date in accordance with the DIP Budget.   Although paragraph 2(c)(ii) of the FILO DIP Order provides that the FILO Secured Parties may execute, deliver, and perform under one or more amendments, waivers, consents, or other modifications to and under the FILO DIP Credit Agreement without need for further approval of the Court and the extension of the Maturity Date is effective without entry of the Proposed Order, the Debtors hereby request entry of a comfort order authorizing the granting of adequate protection to the FILO Secured Parties as described herein in connection with entry into the DIP Amendment.

83.     The Debtors require access to liquidity in these chapter 11 cases to, among other things, monetize their remaining assets, wind-down their estates, and secure recoveries for the estates' creditors.   The Debtors' cash on hand is subject to liens and constitutes cash collateral. Without continued access to cash collateral, the Debtors will lose their ability to monetize assets,

including to pursue the estates' valuable claims and causes of action, creating a far-reaching and adverse impact on the Debtors' estates and their creditors. Accordingly, the Debtors require access to cash collateral to ensure that they are able maximize and preserve the value of their estates for the benefit of all parties in interest. To provide adequate protection to the FILO Secured Parties and ensure the continued consensual use of cash collateral, the Debtors have agreed to the terms of the Settlement.

### G. Assumption and Assignment of the Assigned Contracts Should Be Approved

84. Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). The Debtors' decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Richmond Leasing Co. v. Cap. Bank, N.A.*, 762 F.2d 1303, 1308-09 (5th Cir. 1985) (applying a business judgment standard to debtor's determination to assume an unexpired lease); *COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 383 (2d Cir. 2008) (explaining that the business judgment test "rather obviously presupposes that the estate will assume a contract only where doing so will be to its economic advantage"); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard. . . ."). Accordingly, any assumption of the Assigned Contracts is an exercise of the Debtors' sound business judgment because the transfer of such contracts or leases is necessary to the Debtors' ability to obtain the best value for their businesses or assets. Moreover, the Assigned Contracts will be assumed and assigned in accordance with the Assumption and Assignment Procedures approved by the Court pursuant to the Proposed Order, which will be reviewed by the Debtors' key stakeholders. Accordingly, the

Debtors' assumption of the Assigned Contracts is an exercise of sound business judgment and should be approved.

85.     Further, the consummation of the Settlement, which will involve the assignment of the Assigned Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code and applicable non-bankruptcy law.  Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assigned Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured.  As set forth above, the Debtors propose to file with the Court and serve on each Contract Counterparty, the Cure Notice indicating the Debtors' calculation of the Cure Cost for each such contract.  The Contract Counterparties will have the opportunity to file objections to the proposed assumption and assignment of the Assigned Contracts to the Litigation Trust, including the proposed Cure Costs.  Based on the foregoing, the Debtors' assumption and assignment of the Assigned Contracts satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

86.     In addition, to facilitate the assumption and assignment of the Assigned Contracts, the Debtors further request that the Court find that all anti-assignment provisions in the Assigned Contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code.[30]

---

[30]     Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease[.]"  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

87.    The Debtors believe that the Assumption and Assignment Procedures are fair and reasonable, provide sufficient notice, and provide certainty to all parties-in-interest regarding their obligations and rights in respect thereof.  Accordingly, the Debtors request that the Court approve the Assumption and Assignment Procedures.

### H.    Automatic Stay Should Be Modified On a Limited Basis

88.    Section 362(d)(1) of the Bankruptcy Code provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating, annulling, modifying, or conditioning such stay . . . for cause[.]"  11 U.S.C. § 362(d)(1).  The Bankruptcy Code does not define the term "cause," and "whether cause exists must be determined on a case by case basis."  *In re Xenon Anesthesia of Tex., PLLC*, 510 B.R. 106, 112 (Bankr. S.D. Tex. 2014).  "The Bankruptcy Code gives the court broad discretion to provide appropriate relief from the automatic stay as may fit the facts of a particular case." *In re Kao*, No. 15-31193 (LZP), 2015 WL 9412744, at *2 (Bankr. S.D. Tex. Dec. 21, 2015) (citing *Atkins v. Atl. Ambulance Assocs., Inc. (In re Atl. Ambulance Assocs., Inc.*, 166 B.R. 613 (Bankr. E.D. Va. 1994)).

89.    The Debtors seek modification of the automatic stay provisions of section 362 to the extent necessary to allow the Parties to take action in accordance with the Term Sheet and with respect to transactions approved under the Proposed Order.  Here, cause exists to modify the automatic stay because such relief is contemplated by the Term Sheet, and absent the Debtors agreeing to such term, certain of the Parties thereto would not have agreed to the Term Sheet.  As discussed above, without the Settlement, the Debtors' estates face the imminent risk that the FILO Secured Parties obtain relief from the automatic stay to foreclose on all of the Debtors' assets.  The Settlement resolves the threat of a whole-sale lifting of the stay and foreclosure, and instead provides only the limited modification of the stay in order to consummate

the transactions, preserving the Debtors' interests in the assets. Additionally, the Settlement provides a clear path to monetizing the Debtors' remaining assets and allowing the Debtors to maximize the value of the estates for the benefit of their creditors under the Plan. The Settlement also provides a compromise on claims held by the FILO Secured Parties against the Debtors' estates and resolves a dispute with the FILO Secured Parties that could otherwise cause a detrimental impact on the recovery of all creditors.

90.     Stay modifications of this kind are ordinary and standard features to implement transactions and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re Diamond Sports Group, LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. February 26, 2024) (Docket No. 1834) (modifying as necessary to effectuate the terms of a DIP order); *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex. November 14, 2023) (Docket No. 225) (same); *see also In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Sept. 29, 2022) (Docket No. 1303) (modifying as necessary to effectuate terms of a settlement order). Accordingly, the Debtors believe that modification of the automatic stay is reasonable under the circumstances and is in the best interest of their estates and all parties in interest in these chapter 11 cases.

### I.  Section 105(a) of the Bankruptcy Code Forms a Basis to Grant Relief Requested Herein

91.     Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Approval of the Term Sheet is necessary to maximize the value of the estates for all of the Debtors' creditors. Therefore, the Debtors believe that application of section 105(a) of the Bankruptcy Code forms a basis to grant the relief requested.

92.     Accordingly, the Debtors believe that the relief requested in this Motion is in the best interests of the Debtors, their estates, and their creditors and respectfully request that the Court enter the Proposed Order granting the relief requested herein.

### Reservation of Rights

93.     Nothing contained herein is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, or (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder, or (vii) an admission as to the validity of any liens satisfied pursuant to this Motion.  The Debtors expressly reserve all of their rights with respect to the foregoing matters.

### Notice

94.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WHEREFORE, the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:     April 28, 2025
           Houston, Texas

 */s/ Clifford W. Carlson*
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
         Clifford.Carlson@weil.com
         Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Jeffrey D. Saferstein (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Jeffrey.Saferstein@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:   DavidJ.Cohen@weil.com

*Attorneys for Debtors
and Debtors in Possession*

LATHAM & WATKINS LLP
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 906-1200
Facsimile:  (212) 751-4864
Email:   Ray.Schrock@lw.com
         Candace.Arthur@lw.com

*Attorneys for Debtors
and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on April 28, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

    */s/ Clifford W. Carlson*
Clifford W. Carlson

**Exhibit A**

**Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| **STEWARD HEALTH CARE SYSTEM** | § | **Case No. 24-90213 (CML)** |
| **LLC,** *et al.,* | § |  |
|  | § | **(Jointly Administered)** |
| Debtors.[1] | § |  |
|  | § |  |

## ORDER (I) APPROVING SETTLEMENT WITH FILO SECURED PARTIES; (II) AUTHORIZING AND DIRECTING TRANSFER OF ASSETS IN CONNECTION THEREWITH; (III) AUTHORIZING AMENDMENT TO FILO DIP CREDIT AGREEMENT AND CONTINUED USE OF CASH COLLATERAL; (IV) GRANTING ADEQUATE PROTECTION; (V) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES AND FORM AND MANNER OF NOTICE OF ASSUMPTION AND ASSIGNMENT; AND (VI) GRANTING RELATED RELIEF

Upon the motion, dated April 28, 2025 (the "**Motion**"),[2] of Steward Health Care

System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned

chapter 11 cases (collectively, the "**Debtors**"), for entry of an order pursuant to sections 362, 363,

and 105 of the Bankruptcy Code and Bankruptcy Rules 4001, 6004, and 9019, (i) approving the

terms and conditions of the settlement with the FILO Secured Parties and the Creditors' Committee

as set forth in the Settlement Term Sheet (the "**Settlement**"); (ii) authorizing and directing the

transfer by the Debtors of the Litigation Trust Assets to the Litigation Trust; (iii) authorizing the

DIP Amendment and use of cash collateral; (iv) granting adequate protection to the Prepetition

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the FILO DIP Order, or the *Settlement and Stay Relief Term Sheet* annexed to this Order as Exhibit 1 (the "**Settlement Term Sheet**"), as applicable.

Bridge Agent, the FILO Bridge Lenders, and the FILO DIP Secured Parties (collectively, the "**FILO Secured Parties**"); (v) authorizing and approving the Assumption and Assignment Procedures set forth in paragraphs 22 through 34 of this Order; and (vi) granting related relief; all as more fully set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion and the hearing thereof having been provided; and such notice having been adequate and appropriate under the circumstances and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion; and upon the hearing held on the Motion; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their respective estates, creditors, and all parties in interest; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor, and the Debtors having demonstrated good, sufficient and sound business justification for the relief granted herein, it is **HEREBY FOUND AND DETERMINED THAT:**[3]

      A.    **Findings and Conclusions.** The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Rule 7052 of the Bankruptcy Rules.

following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. **Jurisdiction.** This Court has jurisdiction to hear and determine the Motion and to grant the relief requested in the Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b), and as such, this Court has the authority to enter a final order and authority to grant the relief contained herein.

C. **Venue.** Venue of these chapter 11 cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

D. **Statutory Predicates.** The statutory and legal predicates for the relief requested in the Motion are sections 105, 361, 362, and 363 of the Bankruptcy Code and Bankruptcy Rules 4001, 6004, and 9019.

E. **Business Justification; Fiduciary Duties.** The Debtors have demonstrated that entry into and consummation of the Settlement constitute the exercise by the Debtors of sound business judgment, and such acts are in the best interests of the Debtors, their estates, and creditors, and all parties in interest. The Court finds that the Debtors have articulated good and sufficient business reasons justifying the entry into and consummation of the Settlement. The Debtors' decision to enter into and consummate the Settlement constitutes a proper exercise of the fiduciary duties of the Debtors and their respective directors, managers, and officers.

F. **Corporate Authority.** The Debtors (i) have the corporate or other organizational power and authority necessary to fully perform under the Settlement and execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers, and take any and all actions, in each case contemplated thereby, (ii) have all of the power and authority necessary to consummate the Settlement, and (iii) have taken or are deemed to have taken

3

all corporate or other organizational action necessary to authorize and approve the Settlement and any actions required to be performed by the Debtors to consummate such transactions. Upon the entry of this Order, no further consents or approvals of the Debtors are required for the Debtors or their estates to consummate the Settlement.

G. **Arms'-Length and Good Faith.** The Settlement was negotiated and is undertaken by the Debtors, the FILO Secured Parties, and the Creditors' Committee (collectively, the "**Parties**") at arms'-length, without collusion or fraud, and in good faith.

H. **Insider Status.** The Litigation Trust shall not become, as a result of its obligations under the Settlement or otherwise, an "insider" of any Debtor, as that term is defined in section 101(31) of the Bankruptcy Code.

I. **No Fraudulent Transfer.** The consideration provided pursuant to the Settlement Term Sheet and the Settlement constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other applicable law, and may not be avoided under section 363(n) of the Bankruptcy Code or any other applicable law. The Settlement Term Sheet was not entered into, and the Settlement is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. None of the Debtors, the FILO Secured Parties, or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective current or former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors, or assigns have engaged in any conduct that would cause or permit the Settlement or the consummation of the transactions

contemplated thereby to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code and no party is entitled to damages or recovery in connection therewith under section 363(n) of the Bankruptcy Code.

        J.      **No Avoidance.**  The Settlement cannot be avoided.  None of the Parties or any of their respective affiliates, officers, directors, members, partners, principals, or shareholders (or equivalent) or any of their respective current or former members, managers, officers, directors, employees, advisors, professionals, agents, predecessors, successors or assigns have engaged in any conduct that would cause or permit the consummation of the Settlement to be avoided, or costs or damages to be imposed.

        K.      **No Successor Liability.**  Neither the Litigation Trust nor any of its affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates except to the extent explicitly provided in the Settlement Term Sheet and this Order.  Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the Settlement Term Sheet, neither the Litigation Trust nor any of its affiliates shall (a) be liable for any claims that may be asserted against the Debtors, the Debtors' estates or any of their predecessors or affiliates, or (b) be subject to successor liability or similar liability (including, without limitation, to the United States, any state thereof or otherwise) for any claims, or causes of action of any kind or character against the Debtors, the Debtors' estates or otherwise, whether known or unknown, and neither the Litigation Trust nor any of its affiliates shall have any successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer liability, labor law, de facto merger, mere continuation, or substantial continuation, whether known or unknown, whether now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or

equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, claims or defenses (including rights of recoupment) that may be asserted against the Debtors, the Debtors' estates or otherwise. Neither the Litigation Trust nor any of its affiliates is, and the consummation of the Settlement will not render such parties, a mere continuation, and neither the Litigation Trust nor any of its affiliates is holding itself out as a mere continuation, of any of the Debtors or their respective estates, enterprise, or operations, and there is no continuity or common identity between the Litigation Trust or any of its affiliates, on the one hand, and any of the Debtors or their estates, on the other hand. Accordingly, the Settlement does not amount to a consolidation, merger, or de facto merger of the Litigation Trust or any of their affiliates with or into any of the Debtors or their estates, and neither the Litigation Trust nor any of its affiliates is, or shall be deemed to be, a successor to any of the Debtors or their estates as a result of the consummation of Settlement; *provided*, however, that, notwithstanding anything in this Order to the contrary, the Litigation Trust shall receive, retain, and may enforce all rights to commence, pursue, litigate, compromise, abandon, or settle, in each case in accordance with the Litigation Trust Agreement, any and all estate claims or causes of action constituting Litigation Trust Assets and nothing contained in this Order shall prohibit or impair the Litigation Trust from taking all necessary or desirable actions to liquidate the Litigation Trust Assets.

L. **No Sub Rosa Plan.** The Settlement Term Sheet and the Settlement contemplated thereby do not constitute a *sub rosa* chapter 11 plan. The Settlement Term Sheet and the Settlement do not impermissibly restructure the rights of the Debtors' creditors nor do they impermissibly dictate a chapter 11 plan for the Debtors.

M. **Releases.** This Court has jurisdiction under 28 U.S.C. §§ 1334(a) and 1334(b) to approve the release provisions set forth in Exhibit A to the Settlement Term Sheet (the "**Releases**"). Section 105(a) of the Bankruptcy Code permits approval of the releases set forth in the Settlement and this Order. Based upon the record in these chapter 11 cases, the Releases (i) were consensual; (ii) were an integral part of the Settlement, and are essential to the formulation and implementation of the Settlement; (iii) were negotiated at arms' length and in good faith between the Debtors, the Creditors' Committee, and the FILO Secured Parties; and (iv) are fair, equitable, and reasonable. Additionally, such releases have been given in exchange for and are supported by fair consideration provided by each and all of the parties providing such releases. Accordingly, based upon the record of these chapter 11 cases, this Court finds that the Releases are consistent with the Bankruptcy Code and applicable law. The Releases are appropriately tailored to the circumstances of these chapter 11 cases and reasonable in scope.

N. The Debtors' decision to enter into the Settlement and consummate the transactions therein constitutes a proper exercise of the fiduciary duties of the Debtors and their directors, managers, and officers. Because the entry into and consummation of the Settlement constitute the exercise by the Debtors of sound business judgment, the Debtors, and their respective current members, managers, officers, directors, employees, advisors, professionals or agents (in each case, solely in their capacity as such), shall have or incur no liability to the estates or any holder of a Claim against or Interest in the Debtors for any act or omission in connection with, related to, or arising out of the negotiations of Settlement or the consummation of the transactions contemplated thereunder, other than liability arising out of or relating to any breach of the terms of the Settlement or willful misconduct or fraud, in each case as determined by a court

of competent jurisdiction; *provided*, however, that nothing in this paragraph shall amend, modify or supersede the releases set forth in the Settlement.

O.  **Assumption and Assignment Procedures.**  The Debtors have articulated good and sufficient business reasons for the Court to approve the Assumption and Assignment Procedures.  The Assumption and Assignment Procedures, including the form Cure Notice attached hereto as **Exhibit 3**, are fair, reasonable, and appropriate.  The Assumption and Assignment Procedures provide an adequate opportunity for all Contract Counterparties to raise any objections to the proposed assumption and assignment or to the proposed Cure Costs.  The Assumption and Assignment Procedures comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

P.  **Cure Notice.**  The Cure Notice, the form of which is attached hereto as **Exhibit 3**, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Assumption and Assignment Procedures, as well as any and all objection deadlines related thereto, and no other or further notice shall be required for the Motion and the procedures described therein, except as expressly required herein.

Q.  **Notice.**  Notice of the hearing on the Motion and the opportunity for any party in interest to object was adequate and sufficient under the circumstances as to all parties affected by the Settlement.  The Debtors provided due, adequate, and sufficient notice to creditors and parties in interest, and no other or further notice need be provided.

R.  **Time is of the Essence.**  Time is of the essence in consummating the Settlement.  In order to maximize the value of the Debtors' assets, it is essential that the Settlement occur within the time constraints set forth herein and in the Settlement Term Sheet.  Good and sufficient reasons for approval of the Settlement Term Sheet and the Settlement have been

articulated by the Debtors. The Parties may consummate the Settlement any time after entry of this Order and subject to the terms and conditions set forth herein and in the Settlement Term Sheet.

S.      **Final Order; Immediate Effect.**  This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and, sufficient cause having been shown, waives any such stay, and expressly directs entry of judgment as set forth herein.

## ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1.      The Motion is granted.

2.      **Approval of Settlement**.  The Settlement is approved pursuant to sections 362, 363 and 105 of the Bankruptcy Code and Bankruptcy Rules 4001, 6004, and 9019.  Each of the Parties, as well as their directors, managers, officers, employees, and agents, is authorized, and the Parties are directed (a) to fully perform under the Settlement Term Sheet, annexed hereto as **Exhibit 1**, and the  Definitive Documents (as defined below) and (b) to execute, deliver, implement and fully perform any and all other obligations, instruments, documents, and papers, including the Definitive Documents, and to take any and all actions, in each case under clause (b), reasonably necessary or appropriate to consummate the Settlement.  This Order and the Settlement are enforceable and binding on the Debtors, the Debtors' estates, the FILO Secured Parties, the Creditors' Committee and all other parties in interest, including, without limitation, any subsequently appointed chapter 11 or chapter 7 trustee, any other estate representative, and all

recording officers each in accordance with the terms thereof. For the avoidance of doubt, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Litigation Trust Assets to the Litigation Trust in accordance with this Order and the Settlement.

3. **Approval of Settlement Term Sheet and Definitive Documents.** The Settlement Term Sheet, the Litigation Trust Agreement, the TSA, the Trustee Engagement Letter, the Commitment Letter, and the DIP Amendment (collectively, the "**Definitive Documents**"), and the terms and provisions included therein are approved in their entirety. The failure to describe specifically or include any particular provision of the Settlement Term Sheet, any of the Definitive Documents, or related documents in the Motion or this Order shall not diminish or impair the effectiveness of such provision or related documents, it being the intent of this Court that the Settlement Term Sheet, all other Definitive Documents, and the transactions and related documents contemplated therein be approved in their entirety.

4. **Automatic Stay Modification.** The automatic stay provisions of section 362 are hereby modified to the extent necessary to allow the Parties to take action in accordance with the Settlement Term Sheet and with respect to transactions approved under this Order. Before the Litigation Trust Establishment Date or, solely with respect to the Retained FILO Claim, before the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, the FILO Secured Parties shall not be allowed to move (or direct or support any party to move) to convert the cases to chapter 7, or for relief from the automatic stay unless either the Debtors or the Creditors' Committee materially breach the terms of the Settlement, including the terms of the Settlement Term Sheet, the Plan Term Sheet, or any Definitive Document, and such breach has not been cured within three (3) business days following

written notice from the FILO Secured Parties to the Debtors and the Creditors' Committee of such breach. On and after the Litigation Trust Establishment Date or, solely with respect to the Retained FILO Claim, on and after the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, the FILO Secured Parties shall not be allowed to move (or direct or support any party to move) to convert the cases to chapter 7, or for relief from the automatic stay under any circumstance (without prejudice to the FILO Secured Parties' rights to seek to enforce the Settlement, including the Settlement Term Sheet, the Plan Term Sheet, and the Definitive Documents).

5.     **Establishment of the Litigation Trust.** On the earlier of (i) July 8, 2025 and (ii) one (1) business day after entry of an order confirming the Plan (the "**Litigation Trust Establishment Date**"), the Litigation Trust shall be established in accordance with the Settlement Term Sheet and the Litigation Trust Agreement, which shall be consistent with the Settlement Term Sheet and otherwise mutually agreeable to the Parties, with approval not to be unreasonably withheld, conditioned or delayed. The powers, authority, responsibilities, and duties of the Litigation Trust and the Litigation Trustee (as defined below) are set forth in, and shall be governed by, the Litigation Trust Agreement.

6.     **Transfer of Litigation Trust Assets.** Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, on the Litigation Trust Establishment Date, the Debtors shall automatically, with no further action of any party, be deemed to have transferred the Litigation Trust Assets, including all interests, rights, and privileges relating thereto, to the Litigation Trust and shall execute all documentation necessary to effectuate such transfer, and the Litigation Trust shall have and take title to and possession of the Litigation Trust Assets free and clear of all liens, claims, charges, encumbrances, contractually imposed restrictions, interests, and constructive

trusts ("**Claims**"), and, to the fullest extent of the law, shall have no obligation with respect to Claims, of any kind or nature whatsoever, including, without limitation, rights or claims based on any successor, transferee, derivative, or vicarious liabilities, de facto merger, continuation or continuity, setoff or recoupment rights, or any similar theories under applicable state or federal law or otherwise.  This Order: (a) is and shall be effective as a determination that upon the Litigation Trust Establishment Date in accordance with the Settlement, all Claims of any kind or nature whatsoever existing as to Litigation Trust Assets, and any tax liability, prior to the applicable closing have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected; and (b) is and shall be binding upon and shall authorize all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, report or insure any title or state of title, or otherwise record or release any documents or instruments necessary or appropriate to effectuate, implement, or consummate the Settlement.  Upon the transfer of the Litigation Trust Assets to the Litigation Trust, in no event shall any part of the Litigation Trust Assets revert to the Estate (other than any distributions made on account of the Class B interests in accordance with the Litigation Trust Agreement).  For the avoidance of doubt, the transfer of the rights of the Debtors and the Estate to recover insurance proceeds from the Debtors' directors and officers liability insurance policies (the "**D&O Policies**") shall not hinder the ability of any beneficiaries of such D&O Policies to submit claims and otherwise pursue and obtain coverage under the D&O Policies, subject to the terms of the *Order Authorizing the Use of Proceeds of Directors and Officers Liability Insurance*

12

*Policies for Defense Costs of Individual Insurers* (Docket No. 3887) (the "**D&O Insurance Order**") and provided that the D&O Insurance Order is in full force and effect.

      7.     **Preservation of Privilege.**  Pursuant to Federal Rule of Evidence 502(d), any attorney client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) in the possession of the Debtors, any pre-petition or post-petition committee or subcommittee of the board of directors (including the Transformation Committee and the Sub-Committee (each, as defined below)) or equivalent governing body of any of the Debtors or their predecessors, or any of their respective employees, representatives, attorneys or advisors, may be shared with the Litigation Trustee, the Creditors' Committee, or the FILO Secured Parties, or any of their respective representatives, attorneys or advisors on either or both a joint representation or common interest privilege basis without waiver of the relevant underlying privilege.  Similarly, any privileged information in possession of such parties may be shared with the Debtors (including the Transformation Committee and the Sub-Committee), the Estate or any successor thereto, or any of their respective representatives, attorneys or advisors, on either or both a joint representation or common interest privilege basis without waiver of the relevant underlying privilege.  The Litigation Trustee and the Estate shall have the exclusive authority and sole discretion to maintain such privileges and keep the privileged material confidential, or waive such privileges and/or disclose and/or use such privileged information (other than privileged information of the Creditors' Committee and/or FILO Secured Parties shared with the Debtors, the Estate or any successor thereto on either or both a joint representation or common interest privilege basis) in litigation of any claim or cause of action that is a Litigation Trust Asset.  If the Litigation Trustee or the Estate, any of their employees, professionals, or representatives or any other person inadvertently produces or discloses privileged

13

information to any third party, such production shall not be deemed to destroy or waive any privileges, or be deemed a waiver of any confidentiality protections afforded to such privileged information. In such circumstances, the disclosing party shall promptly upon discovery of the production notify the Litigation Trustee and the Estate of the production and shall demand of all recipients of the inadvertently disclosed privileged information that they return or confirm the destruction of such materials.

8. **Litigation Trustee**. As of the Litigation Trust Establishment Date, [●] shall serve as the person responsible for the governance and administration of the Litigation Trust, pursuant to the terms of the Settlement and the Definitive Documents (the "**Litigation Trustee**"). The Litigation Trustee shall be a fiduciary and owe fiduciary duties to all beneficiaries of the Litigation Trust, collectively. In the event that the Litigation Trustee resigns, is removed for cause in accordance with the Litigation Trust Agreement, or is otherwise unable to serve in such capacity, the Litigation Trustee will be replaced by the terms of the Settlement and Definitive Documents, as applicable. The powers, authority, responsibilities, and duties of the Litigation Trust and the Litigation Trustee (as defined below) are set forth in, and shall be governed by, the Litigation Trust Agreement. Upon the Litigation Trust Establishment Date, the Litigation Trust and the Litigation Trustee shall be empowered to act or refrain from acting in accordance with the Litigation Trust Agreement, in each case, without the need for Bankruptcy Court approval and free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or the Local Rules.

9. **Distribution of Litigation Trust Interests**. Upon the Litigation Trust Establishment Date, the Litigation Trustee shall distribute the interests in the Litigation Trust to the beneficiaries of the Litigation Trust in accordance with the terms of the Litigation Trust

Agreement, which shall be consistent with the Settlement Term Sheet and otherwise mutually agreeable to the Parties, with approval not to be unreasonably withheld, conditioned or delayed.

10.     **Class B Representative**.  The Transformation Committee shall serve as the initial Class B Representative.  The Class B Representative shall have the responsibilities set forth in the Settlement Term Sheet and the Litigation Trust Agreement.

11.     **Coordination.**  The Estate will coordinate its efforts with the Litigation Trustee with respect to issues involving overlapping concerns among the Estate and the Litigation Trust with respect to third parties.  If the Estate and the Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a mediation conference with the Mediator (as defined in Docket No. 829); and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.  With respect to any such disputes presented to the Bankruptcy Court:

> a.     If the FILO Balance is in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate; *provided*, *however*, that the Litigation Trustee's business judgment shall not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estate (other than with respect to claims under section 502(h) of the Bankruptcy Code).

> b.     If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate's business judgment shall be applied to the dispute, subject to challenge by the Litigation Trustee; *provided*, *however*, that the Estate's business judgement shall not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Litigation Trust.

12.     Notwithstanding the foregoing, with respect to any constructive trust claims asserted by any third parties with respect to any Litigation Trust Assets or Retained Collateral, as well as any government investigations, the Litigation Trust and the Estate will coordinate efforts

to dispute or settle such claims, or to address such investigations, including with respect to funding arrangements for the defense of any such claims or addressing any such investigations.

13.     **Litigation Funding.**   The Litigation Funding terms set forth in the Commitment Letter, which shall be consistent with the Settlement Term Sheet and otherwise mutually agreeable to the Parties, with approval not to be unreasonably withheld, conditioned or delayed, are hereby approved.  Upon execution of the Commitment Letter, the Commitment Letter shall constitute legal, valid, and binding obligations of the Litigation Trust and be enforceable in accordance with its terms and such obligations shall not be enjoined (temporarily, preliminarily or permanently) or subject to any contest, attack, rejection, defense, counterclaim, disallowance, reduction, discharge, impairment, release, avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), or other claim, cause of action or other challenge of any nature under the Bankruptcy Code or any applicable law or regulation, and the Litigation Trust shall be authorized to incur the obligations under the Commitment Letter and use the proceeds of such Commitment Letter, in each case, in accordance with the Litigation Trust Agreement without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any person. The terms and conditions of the Commitment Letter shall bind the Litigation Trust, each other entity that enters into such agreement, and all beneficiaries of the Litigation Trust.  The FILO Secured Parties are approved to provide litigation funding on the terms outlined in the Commitment Letter and the Settlement Term Sheet, as applicable.

14.     **Transition Services Agreement.**   On the Litigation Trust Establishment Date, the Debtors and the Litigation Trust shall enter into the TSA.  Payments made by the Litigation Trust to the Estate for any services under the TSA prior to the Estate paying for the

budgeted costs of providing such services shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such costs.

15. **Releases.** The Releases are: (a) consensual; (b) supported by adequate consideration; (c) a necessary and integral part of the settlement embodied in the Settlement Term Sheet; (d) a good-faith settlement and compromise; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties (as defined in Exhibit A to the Settlement Term Sheet) asserting any claim or cause of action released thereby. Additionally, the Releases are fair and equitable and in the best interests of the Debtors, their estates, creditors, and all parties in interest considering (x) the probability of success in litigation; (y) the complexity and likely duration and expense of litigating; and (z) the arms'-length negotiations which produced the settlement embodied in the Settlement Term Sheet.

16. As of the Litigation Trust Establishment Date, the release provisions embodied in the Settlement, including those set forth in Exhibit A to the Settlement Term Sheet, are hereby approved and shall be effective and binding on all Persons and Entities, without further order or action by this Court.

17. **FILO DIP Facility and Cash Collateral.** For the avoidance of doubt, the DIP Amendment, attached hereto as **Exhibit 2**, is authorized in its entirety. The Debtors are authorized, subject to the terms and conditions of the Settlement Term Sheet and the DIP Amendment, to continue to use the FILO Secured Parties' cash collateral through the Litigation Trust Establishment Date. For the avoidance of doubt, notwithstanding anything to the contrary in the DIP Orders, no amounts on account of any Deferred Fees or Unestimated Fees (each as defined in the Plan Term Sheet) shall be deposited into the Professional Fees Escrow Account, and such amounts shall instead be paid in accordance with paragraph 3 of the Plan Term Sheet.

18.  **FILO Secured Parties' Claims.**  Upon entry of this Order, the FILO DIP Obligations in the principal amount of $206,197,079 and the Prepetition Bridge Obligations held by the FILO Secured Parties in the principal amount of $30,394,856, in each case calculated as of April 28, 2025, plus any and all accrued but unpaid or uncapitalized interest, fees, costs, expenses, charges, advances, claims, debts, and other obligations that have accrued to the FILO Secured Parties as of April 28, 2025 or accrue at any time thereafter, including to the extent capitalized into additional principal thereafter (excluding any amounts on account of the MOIC Amount (as defined in the Prepetition Bridge Credit Agreement)), shall constitute allowed claims secured by valid and perfected liens on the FILO DIP Collateral and Prepetition Bridge Collateral, respectively, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for all purposes in these cases and any Successor Cases; *provided* that nothing in this Order allows the MOIC Amount (other than, upon the Litigation Trust Establishment Date, the MOIC Payment), *provided* further that, upon the Litigation Trust Establishment Date, the MOIC Payment will be allowed on the terms set forth in paragraph 11 of the Settlement Term Sheet.

19.  **Binding Effect of Order**.  This Order and the Settlement are binding in all respects on the Debtors, the Debtors' estates, the FILO Secured Parties, the Creditors' Committee and all other parties in interest, including, without limitation, all creditors of, and holders of equity interests in, the Debtors, any subsequently appointed chapter 11 or chapter 7 trustee, any other estate representative, all recording officers and all successors and assigns to any of the foregoing, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any

trustees, examiners, "responsible persons," or other fiduciaries in these chapter 11 cases or upon a conversion to a case under chapter 7 of the Bankruptcy Code, and the Settlement Term Sheet and the obligations thereunder shall not be subject to rejection or avoidance under any circumstances. If any order under section 1112 of the Bankruptcy Code is entered, such order shall provide, or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that this Order, including the rights granted to and obligations of the FILO Secured Parties hereunder, shall remain effective and, notwithstanding such dismissal, shall remain binding on the Debtors and all parties in interest. Upon entry of this Order, the Settlement authorized herein shall be of full force and effect regardless of whether the Debtors or any of their affiliates lack good standing in any jurisdiction in which such entity is formed or is authorized to transact business. To the extent of any conflict between the express terms of this Order and the Settlement Term Sheet, the terms of this Order shall control. To the extent of any conflict between this Order and the Settlement Term Sheet, on the one hand, and any previous order of the Court, this Order and the Settlement Term Sheet shall control.

20. On the Litigation Trust Establishment Date (which is subject to the issuance of the Litigation Funding, the Class A-1 interests, Class A-2 interests, and the Class B interests in the Litigation Trust in accordance with the Settlement), without the need for any further organizational action or approval of any board of directors, board of managers, member, manager, management, or security holders of any Debtor, all notes, instruments, other securities, and other evidence of debt issued with respect to the FILO DIP Claims and FILO Bridge Claims (other than the Retained FILO Claims), and any rights of any holder in respect thereof, including any "claims" against the Debtors (as such term is defined in the Bankruptcy Code) shall be deemed cancelled,

discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

21.    After the Litigation Trust Establishment Date (which is subject to the issuance of the Litigation Funding, the Class A-1 interests, Class A-2 interests, and the Class B interests in the Litigation Trust in accordance with the Settlement), the Debtors or the Transformation Committee may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, liens, pledges, and other security interests with respect to the FILO DIP Obligations and the Prepetition Bridge Obligations held by the FILO Secured Parties (excluding the Retained FILO Claim, which, for the avoidance of doubt, shall, until the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, remain secured by the Retained Cash and any other assets of the Debtors' estates or any successor(s) thereto (provided that the negative pledge provisions and other rights and entitlements of the Litigation Trust with respect to the Retained Collateral shall survive and remain unaffected notwithstanding such timely satisfaction of the Confirmation Milestone or satisfaction of the Retained FILO Claim)), including, without limitation, the preparation and filing of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, liens, pledges, and other security interests held by the FILO Secured Parties (excluding with respect to the Retained FILO Claim prior to the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash), including, without limitation, UCC-3 termination statements.

22.    **Assumption and Assignment Procedures.**  The following Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all

Contract Counterparties, comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and are approved.

23.     The Cure Notice, substantially in the form attached hereto as **Exhibit 3**, is reasonable, fair, and appropriate, contains the type of information required under Bankruptcy Rule 2002, and complies in all respects with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules, and is hereby approved.

24.     The Cure Notice, including any Supplemental Cure Notice (as defined below), is reasonably calculated to provide sufficient notice to the Contract Counterparties of the Debtors' proposed assumption and assignment of the Assigned Contracts and constitutes adequate notice thereof, and no other or further notice of the Debtors' proposed Cure Costs or the proposed assumption and assignment of the Assigned Contracts shall be required if the Debtors file and serve such notice in accordance with the Assumption and Assignment Procedures and this Order.

25.     Within five (5) Business Days after entry of this Order, the Debtors shall file the Cure Notice with the Court and serve the Cure Notice on the Contract Counterparties. Service of the Cure Notice in accordance with this Order on all Contract Counterparties is hereby deemed to be good and sufficient notice of the proposed Cure Costs for, and the proposed assumption and assignment of, the Assigned Contracts.  As soon as reasonably practicable after filing the Cure Notice, the Debtors shall post a copy of the Cure Notice on the website maintained by Kroll Restructuring Administration LLC, the Debtors' claims and noticing agent in these chapter 11 cases, located at https://restructuring.ra.kroll.com/Steward (the "**Kroll Website**").

26.     The Debtors shall use commercially reasonable efforts to provide or cause to be provided to all Contract Counterparties to a proposed Assigned Contract a notice that sets forth a list of proposed Assigned Contracts that may be assumed by the Debtors.

27.     Objections, if any, to any proposed Cure Costs (each, a "**Cure Objection**") must:  (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and, to the extent applicable, provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Rules and the Local Rules; and (v) be filed with the Court and served on the Debtors, the Creditors' Committee, and the FILO Secured Parties within ten (10) days after receipt of Cure Notice (the "**Cure Objection Deadline**").

28.     If a Cure Objection cannot otherwise be resolved by the parties, the Debtors may, after consultation with the Creditors' Committee and subject to the consent of the FILO Secured Parties, assume and assign the Contract(s) to the Litigation Trust pending resolution of the Cure Objection.

29.     If a Contract Counterparty to any Assigned Contract files a Cure Objection to the assumption and assignment of such Assigned Contract to the Litigation Trust, then such contract shall be deemed a "**Disputed Contract**."  The Debtors, in consultation with the Creditors' Committee, shall be authorized to resolve or settle any Cure Objection to the assumption and assignment of Disputed Contracts in accordance with the terms of the Settlement and this Order, including with respect to Cure Costs without need for any further order or action from this Court. Once any objection to a Disputed Contract is resolved, the Disputed Contract shall be subject to the terms of this Order, including without limitations paragraphs 22-34, in all respects.

30.     Any Disputed Contract that is the subject of an unresolved Cure Objection may be assumed and assigned prior to the resolution of such Cure Objection, so long as the Litigation Trust (i) pays any undisputed Cure Costs on or before the Litigation Trust Establishment

Date and (ii) appropriately reserves funding for the disputed portion of the Cure Costs pending resolution of the dispute.

31.    If (a) the Debtors, in consultation with the Creditors' Committee and the FILO Secured Parties, identify (i) additional contracts or leases to be assumed and assigned to the Litigation Trust or (ii) modifications that need to be made to a proposed Cure Cost previously stated in the Cure Notice, or (b) the Litigation Trust designates any additional contracts or leases not previously included on the Cure Notice for assumption and assignment, the Debtors may, after consultation with the Creditors' Committee and subject to the consent of the FILO Secured Parties, at any time before the Litigation Trust Establishment Date, file with the Court and serve by first class mail on the applicable Contract Counterparty a supplemental Cure Notice (each, a "**Supplemental Cure Notice**," the form of which shall be substantially similar to the form of Cure Notice attached hereto as **Exhibit 3**).  As soon as reasonably practicable after filing a Supplemental Cure Notice, the Debtors shall post a copy of the Supplemental Cure Notice on the Kroll Website.  Any Cure Objection with respect to Cure Costs set forth in a Supplemental Cure Notice must be filed within seven (7) days of the filing of such Supplemental Cure Notice.

32.    The Litigation Trust shall be responsible for paying all Cure Costs and all reasonable and documented costs of the Estate associated with assuming and assigning any contracts or leases to the Litigation Trust, including any related advisor or personnel costs incurred by the Estate, to the extent that the Litigation Trustee (or, prior to the Litigation Trust Establishment Date, the FILO DIP Agent) has consented to the Estate's incurrence of such costs, such consent not to be unreasonably withheld, conditioned, or delayed.  Notwithstanding anything to the contrary in this Order, the assumption by the Debtors and assignment of any contracts or leases to the Litigation Trust shall be subject to the consent of the FILO Secured Parties.

33.     If no Cure Objection is timely received with respect to an Assigned Contract: (i) the Contract Counterparty to such Assigned Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Litigation Trust of the Assigned Contract, and be forever barred from asserting any objection with regard to such assumption and assignment; (ii) any and all defaults under the Assigned Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and upon payment of the Cure Costs set forth in the Cure Notice for such Assigned Contract; and (iii) the Contract Counterparty shall be forever barred from asserting any other claims related to such Assigned Contract against the Debtors and their estates or the Litigation Trust, or the property of any of them, that existed prior to the assignment of such Assigned Contract to the Litigation Trust.

34.     The inclusion of a contract, lease, or other agreement on the Cure Notice or any Supplemental Cure Notice shall not constitute or be deemed a determination or admission by the Debtors or any other party in interest that such contract or other document is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that the stated Cure Cost is due (all rights with respect thereto being expressly reserved). The Debtors and the applicable counterparties reserve all of their rights, claims, defenses, and causes of action with respect to each contract or other document listed on the Cure Notice or any Supplemental Cure Notice.

35.     **Provider Agreements.** Pursuant to section 363(b) of the Bankruptcy Code, the Debtors' rights under any provider, payor, or similar agreement (including any such agreement with the Centers for Medicare and Medicaid Services or in connection with any state Medicaid program) (collectively, the "**Provider Agreements**"), including, but not limited to, (i) the right to

payments of accounts receivable, and (ii) the rights retained by the Debtors with respect to any Provider Agreement that was transferred to any purchaser of the Debtors' assets (each, a "**Purchaser**"), in each case, are hereby assigned to the Litigation Trust and shall constitute Litigation Trust Assets upon the Litigation Trust Establishment Date as permitted under 42 C.F.R. § 424.73(b)(2); provided that, to the extent the Debtors are required to pay any accounts receivable that become due and owing under a Provider Agreement to a Purchaser pursuant to court order or any asset purchase agreement, bill of sale, or provider-leaseback arrangement entered into after the Petition Date and prior to the date of this Order (each, a "**Sale Document**"), the Litigation Trust shall, to the extent it receives any proceeds of such accounts receivable, pay such accounts receivable proceeds to the applicable Purchaser in accordance with the applicable court order or Sale Document.

36. **Litigation Trust Tax Requirements.** The Litigation Trust shall be subject to, and the Litigation Trustee shall comply with, the Litigation Trust Tax and Other Matters provisions set forth in **Exhibit 4**. Such provisions shall be included in the Litigation Trust Agreement. The Litigation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust and reasonably necessary to conserve and protect the assets transferred to the Litigation Trust and provide for the orderly liquidation thereof. The funding provided pursuant to the Commitment Letter is necessary and incidental to the liquidating purpose of the Litigation Trust. In accordance therewith, the Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes, with the holders of

allowed FILO DIP Claims and allowed FILO Bridge Claims, in respect of their Class A-1 and Class A-2 interests in the Litigation Trust, and the respective FILO Secured Parties providing Litigation Funding, in respect of their Class A-1 interests in the Litigation Trust, being as grantors. Subject to definitive guidance from the Internal Revenue Service (the "**IRS**") or a court of competent jurisdiction to the contrary, all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust beneficiaries) shall report consistent therewith for U.S. federal income tax purposes and, to the extent permitted by applicable law, for state and local income tax purposes.

37.     In no event shall the Litigation Trust be dissolved later than five (5) years from the Litigation Trust Establishment Date unless the Bankruptcy Court, upon motion made within the six (6) month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made within the six (6) month period before the end of the preceding extension), determines that a fixed period extension (not to exceed three years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Litigation Trustee that any further extension would not adversely affect the status of the Litigation Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the assets of the Litigation Trust.

38.     **Objections Overruled.**   Any objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled are hereby overruled on the merits and denied with prejudice.  All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein, including, without limitation, the Releases.

39. **Retention of Causes of Action/Reservation of Rights.** Except as otherwise provided in this Order, nothing contained in this Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, or other legal or equitable defenses that any of the Debtors and their estates had immediately prior to the Litigation Trust Establishment Date in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, any affirmative causes of action against parties with a relationship with the Debtors. Subject to the terms of the Settlement, including the Releases, the Debtors and their estates shall have, retain, reserve, and be entitled to assert all claims, causes of action, rights of setoff or recoupment, and other legal or equitable defenses that do not constitute Litigation Trust Assets transferred to the Litigation Trust on the Litigation Trust Establishment Date.

40. Notice of the Motion is adequate under Bankruptcy Rule 6004(a).

41. Notwithstanding the provisions of Bankruptcy Rule 6004(h) or 6006(d), this Order shall be immediately effective and enforceable upon its entry.

42. The Debtors are authorized to take all actions necessary or appropriate to carry out the relief granted in this Order.

43. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order and the Settlement Term Sheet; *provided*, *however*, that any mediation requirements in the Definitive Documents shall be given full force and effect.

Signed:

_____
Christopher M. Lopez
United States Bankruptcy Judge

**Exhibit 1**

**Settlement Term Sheet**

## SETTLEMENT AND STAY RELIEF TERM SHEET

### April 28, 2025

This Term Sheet sets forth the material substantive terms pursuant to which the Debtors, the FILO DIP/Bridge Agent and Lenders (the "FILO Parties"), and the Unsecured Creditors Committee ("UCC") will support entry of an order resolving requests for relief from the stay by the FILO Parties.

1. This Term Sheet must be approved by an order of the Bankruptcy Court, pursuant to sections 361, 362, 363 and 105 of the Bankruptcy Code and Bankruptcy Rules 4001(d)(iii), 6004, and 9019 (the "Approval Order"), entered not later than May 28, 2025 (the "Approval Milestone"). In addition, the Debtors shall file a motion seeking the Bankruptcy Court's approval of the Approval Order (the "Approval Motion") by no later than April 28, 2025 (the "Motion Milestone"). If the Debtors do not satisfy either the Motion Milestone or the Approval Milestone, this agreement will be of no further force or effect.[1]

2. All of the Estate (as defined below) assets identified on **Schedule 1** hereto (the "Litigation Trust Assets") will be transferred free and clear (to the fullest extent permissible by applicable law) to the "Litigation Trust," a trust to be created. The Estate assets that are not Litigation Trust Assets shall be retained by the Estate (the "Retained Assets").[2] The terms of the

---

[1] The milestones and other dates and deadlines contained herein may be extended by e-mail agreement amongst counsel to the Debtors, FILO Parties, and UCC.

[2] The Retained Assets shall include, without limitation, (i) the Estate's reversionary interests (if any) in the Professional Fees Escrow Account, the Physician Insurance Account (each as defined in the FILO DIP Order (Docket No. 1538)), the Expense Escrow Account (as defined in the MPT Settlement Order (Docket No. 2610)), and in each case, the amounts deposited therein, and (ii) any equity interests in any Debtor. To the extent that the Estate realizes cash or other value on account of any Retained Assets that comprise, would have comprised or are derived from FILO DIP collateral ("Retained Collateral") (which shall exclude, for the avoidance of doubt, the Class B interests, any proceeds thereof, and any proceeds funded to, advanced to, or authorized to be used by the Estate in accordance with this Term Sheet) the Estate shall promptly turn over such cash or other value to the Litigation Trust for distribution in accordance with the Litigation Trust's distribution waterfall. To the extent that any Retained Collateral is identified that could be monetized for value, the Estate shall use commercially reasonable efforts to monetize such Retained Collateral in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee at the Litigation Trust's sole expense and paid in advance pursuant to the TSA (for the avoidance of doubt, any reasonable and documented costs incurred by the Estate in connection with such agreed upon monetization process shall be charged to the Litigation Trust at the Estate's cost). The Approval Order shall provide that from and after the Trust Establishment Date (as defined below), the Retained Collateral (which includes, for the avoidance of doubt, all proceeds derived therefrom) shall be held in trust exclusively for the benefit of

Litigation Trust will be governed by a trust agreement consistent with this Term Sheet and otherwise mutually agreeable to the parties, with approval not to be unreasonably withheld, conditioned or delayed (the "<u>Litigation Trust Agreement</u>").

3.  The Approval Order will provide that the Litigation Trust Assets will be transferred to the Litigation Trust on the earlier of (i) July 8, 2025; and (ii) one (1) business day after the confirmation date of any confirmed plan (the actual date of transfer of the assets is the "<u>Trust Establishment Date</u>"). The Debtors and FILO DIP Lenders will enter into an amendment to the FILO DIP credit agreement providing for an extension of the FILO DIP maturity date through (i) in the first instance, the Motion Milestone, (ii) if the Debtors satisfy the Motion Milestone, the Approval Milestone, and (iii) if the Debtors satisfy the Approval Milestone, through the date by which the Litigation Trust Assets are required to have been transferred to the Litigation Trust pursuant to the immediately preceding sentence. It shall be an Event of Default under the FILO DIP Credit Agreement if the Debtors or UCC materially breach their respective obligations to the FILO Parties under this Term Sheet or the Plan Support Agreement Term Sheet, and such breach is not cured within three business days of the FILO Parties providing written notice of such breach to Debtors' and UCC's counsel.

4.  On the Trust Establishment Date, the releases set forth in **Exhibit A** shall go into full force and effect; provided that, for the avoidance of doubt, the release will not include (i) $10 million of principal claims outstanding under the FILO Bridge facility (the "<u>Retained FILO Claim</u>"), which shall, until the earlier of (a) the timely satisfaction of the Confirmation Milestone or (b) satisfaction of such Retained FILO Claim in full in cash, remain secured by the Retained Cash and any other assets of the Debtors' estates or any successor(s) thereto (collectively, the "<u>Estate</u>") (provided that the negative pledge provisions and other rights and entitlements of the Litigation Trust with respect to the Retained Collateral shall survive and remain unaffected notwithstanding such timely occurrence of the Confirmation Milestone or satisfaction of the Retained FILO Claim); or (ii) the rights or entitlements of the FILO Parties or the Litigation Trust contemplated by this Term Sheet or the Plan Support Agreement Term Sheet (or any further documentation memorializing the same), including, without limitation, the FILO Parties' rights to receive Retained Cash as a paydown on the Class A-

---

the Litigation Trust and shall be subject to a negative pledge by the Estate and not made available (pursuant to subsequent order of the court or otherwise) other than for distribution in accordance with the Litigation Trust's distribution waterfall as contemplated by this footnote 2.

2 Preference pursuant to paragraph 6 of this Term Sheet and the Litigation Trust's rights under the TSA.

5. As a condition precedent to the effectiveness of this Term Sheet, (i) the Debtors shall have made a prepayment of the FILO DIP Loans by April 28, 2025, in the amount of no less than $30.3 million (the "<u>Required Prepayment</u>"), and (ii) the Debtors and the FILO Parties shall have executed an amendment to the FILO DIP Credit Agreement (the "<u>DIP Amendment</u>") approving the budget annexed to the DIP Amendment (the "<u>DIP Budget</u>").

6. The Debtors will hold $15 million (the "<u>Retained Cash</u>") in a third-party escrow account subject to the lien of the Retained FILO Claim. If the Retained Cash is not authorized to be utilized by the Debtors pursuant to an order confirming a chapter 11 plan consistent with the terms of Section 1 of the Plan Support Agreement Term Sheet ("<u>Plan</u>"), which order is entered on or prior to August 1, 2025 (the "<u>Confirmation Milestone</u>"), the Retained Cash will be paid to the FILO Parties as a paydown on the Retained FILO Claim until paid in full in cash and the remainder as a paydown on the Class A-2 Preference. If an order confirming the Plan is entered prior to the Confirmation Milestone, the Debtors may use the Retained Cash for any purposes authorized under the Plan.

7. The Litigation Trust will be governed pursuant to the Litigation Trust Agreement creating and governing the Litigation Trust:

   a. The Litigation Trust will have three beneficiary classes:

      i. Class A-1 interests, which shall (i) represent the rights and entitlements of the parties that from time to time extend or are deemed to have extended funding under the Litigation Funding (the "<u>Litigation Funders</u>") and their representative (the "<u>Litigation Funding Agent</u>") and (ii) have a distribution and liquidation preference as set forth in this Term Sheet.

      ii. Class A-2 interests will be held by the FILO Parties and their successors, which interests shall have a distribution and liquidation preference as set forth in this Term Sheet (together with the Class A-1 interests, the "<u>Class A interests</u>").

      The definitive documentation will provide that the Class A interests will only be transferrable (i) pursuant to an available exemption under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), or a registration of such Class A

3

interests under the Securities Act, and (ii) so long as any proposed transfer would not result in a requirement that the Class A interests be registered under the Securities Act. Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class A interests would be effectuated, and shall entitle the Litigation Trustee (as defined below) to, in its reasonable discretion at any time the Class A interests are not registered, and other than with respect to a transfer by operation of law, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

The definitive documentation shall also contain customary representations and warranties of each initial holder of the Class A interests to the effect that it is an accredited investor and a qualified institutional buyer, possesses appropriate investment experience, and is acquiring the interests for its own account and not with a view toward distribution. To the extent such representations cannot be made by each FILO Party on the date of issuance, then at any time the Class A interests are not registered, all such Class A interests shall be non-transferable (other than by will, intestate, or operation of law).

The FILO Agent or its designee, acting at the direction of FILO Parties holding Class A-2 interests entitled to a majority in amount of the outstanding Class A-2 Preference, shall be the representative of the Class A-2 interests (the "Class A-2 Representative").

iii. Class B interests will be held by Steward Health Care Holdings LLC, on behalf of the Estate, or by any successor entity that may be established under a confirmed plan (each, a "Successor Entity").

The definitive documentation will provide that the Class B interests will only be transferrable (i) to any liquidating trust

4

or other similar vehicle formed under and following a confirmed plan or otherwise formed pursuant to applicable law or (ii) (A) pursuant to an available exemption under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") and so long as any proposed transfer would not result in a requirement that the Class B interests be registered under the Securities Act, or a registration of such Class B interests under the Securities Act, and (B) if such transfer is to occur prior to the effective date of any confirmed plan, with the consent of the Litigation Trustee (not to be unreasonably withheld, conditioned or delayed) if the purpose of the transfer is to obtain proceeds to pay costs and expenses of the Successor Entity, including taxes. Such definitive documentation will specify the process, conditions, and documentation under which any such transfer of the Class B interests would be effectuated, and other than with respect to a transfer by operation of law or pursuant to bankruptcy court order or confirmed plan, shall entitle the Litigation Trustee to, in its reasonable discretion at any time the Class B interests are not registered, obtain an opinion from counsel to the transferor to the effect that the proposed transfer may be made to the applicable transferee without registration under the Securities Act, in reliance upon an exemption from such registration requirement.

There shall be a single representative of the Class B interests at any given time (the "<u>Class B Representative</u>"), which shall initially be the Transformation Committee, on behalf of the Estate. If a plan is confirmed, the terms of the Plan and the Confirmation Order will determine the successor Class B Representative on or before the Effective Date of the Plan. If the Chapter 11 Cases are converted to Chapter 7 cases, the Chapter 7 Trustee (or its designee) will be the Class B Representative.

iv.  Any right to receive Litigation Trust interests will not, and is not intended to, constitute "securities" and, accordingly, will not be registered pursuant to the Securities Act or any applicable state or local securities law. However, if it should be determined that any such Litigation Trust interests constitute "securities," the exemption provisions of section 4(a)(2) of the Securities Act will be satisfied and the offer and sale of such interests will be exempt from registration under the Securities Act.

b.  The identity of the trustee of the Litigation Trust (the "<u>Litigation Trustee</u>") shall be a party to be identified.  The terms of the Litigation Trustee's engagement shall be acceptable to the Debtors, FILO Parties, and the UCC.  The Debtors and the UCC will have the right to consent to the selection of any successor Litigation Trustee (including the terms of such successor Litigation Trustee's engagement), such consent not to be unreasonably withheld, conditioned, or delayed.

c.  The Litigation Trustee will be a fiduciary and owe fiduciary duties to all Litigation Trust beneficiaries, collectively.

d.  Except as specifically set forth in the following subparagraphs, the Litigation Trustee will have exclusive governance authority over the Litigation Trust.

e.  With respect to the Litigation Trust Assets set forth on the schedule agreed to contemporaneously herewith among the Debtors, the FILO Parties, and the UCC (the "<u>Threshold Schedule</u>"), the following consents shall be required:

   i.  For a settlement proposal or monetization opportunity (each, a "<u>Proposal</u>") for which the Specified Value (as defined below) meets or exceeds the applicable Minimum Thresholds set forth on the Threshold Schedule but that does not meet or exceed the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee may decide, without obtaining the consent of any other party, whether to accept or reject such settlement in its sole judgement consistent with its fiduciary duties, in each case, subject to clauses (iii) – (v) of this paragraph 7.e., including, without limitation, the Minimum Threshold adjustments set forth in such clauses.

   ii. For a Proposal for which the Specified Value exceeds the applicable Maximum Thresholds set forth on the Threshold Schedule, the Litigation Trustee shall accept and implement such Proposal unless the Litigation Trustee reasonably determines based on the advice of outside counsel that accepting and implementing such Proposal is inconsistent with its fiduciary duties.

iii. If the FILO Balance is in an Underpayment State, (a) each Minimum Threshold shall be deemed to be equal to 80% of its stated value set forth in the Threshold Schedule unless and until the FILO Balance is no longer in an Underpayment State and (b) the Litigation Trustee shall be authorized to accept a Proposal that does not meet or exceed the applicable Minimum Thresholds as then in effect without obtaining the consent of any other party if the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal and (ii) provides five (5) business days' written notice (the "Notice Period") to the Class A-2 Representative and the Class B Representative (the "Notice Parties") of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an objection in writing to the Litigation Trustee and the other Notice Party (which objection shall specify in reasonable detail the grounds for the objection) (an "Objection"), and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator. If a successful resolution is not achieved within three (3) business days of the commencement of such mediation (which period may be extended by the Litigation Trustee in its sole discretion in writing) (the "Mediation Period"), the parties may seek resolution by the Bankruptcy Court on an emergency basis.

iv. If the FILO Balance is not in an Underpayment State, the Litigation Trustee will not accept any Proposal unless (a) the Class A-2 Representative and Class B Representative have authorized such acceptance; (b) the Proposal exceeds the applicable Minimum Thresholds by 20% or more, in which case the consent of no other party shall be required; or (c) the Litigation Trustee (i) determines in the exercise of its fiduciary duties based on the advice of outside counsel that it is required to accept the Proposal, in which case the consent of no other party shall be required, and (ii) provides five (5) business days' written notice to the Notice Parties of its intent to accept a Proposal; *provided* that during the Notice Period, each Notice Party shall be entitled to object to the Litigation Trustee accepting a Proposal by delivering an Objection to the Litigation Trustee and the other Notice Party, and upon such an Objection, the objecting party shall promptly arrange a conference with Judge Isgur, in his capacity as mediator. If a

successful resolution is not achieved within the Mediation Period, the parties may seek resolution by the Bankruptcy Court on an emergency basis.

v. At the FILO Parties' election, the FILO Parties may, on one or more occasions, increase the deemed value of a Specified Value with the effect that it is treated as meeting the applicable Minimum Thresholds by contributing Class A-2 interests having a Class A-2 Preference equal to the difference between the Net Offered Specified Value and the highest applicable Net Minimum Specified Value (each as defined below).

vi. "Specified Value" shall be equal to the gross cash and cash equivalent proceeds of a Proposal.

vii. "Net Minimum Specified Value" is equal to the Minimum Threshold set forth in the Threshold Schedule less the pro forma contingency fee that would be payable in connection with a Proposal equal to such Minimum Threshold.

viii. "Net Offered Specified Value" is equal to the Specified Value less any contingency fee payable to the Trust's counsel, in each case, with respect to the applicable Proposal.

f. With respect to the disposition of Litigation Trust Assets not set forth on the Threshold Schedule, the disposition shall be carried out by the Litigation Trustee, exercising its reasonable business judgment.

g. The Litigation Trustee shall not agree to a contingency fee in excess of 20% of the gross proceeds of a litigation without the written consent of the Class A-2 Representative and the Class B Representative, other than any existing contingency fee arrangements approved by the Bankruptcy Court as of the Trust Establishment Date.

h. The Estate or Class B Representative, as applicable, shall have the right to pay in full or any portion of the FILO Balance, in cash, without any prepayment penalty at any time. Once the FILO Balance has been reduced to $0, (i) the rights granted to the Class A-2 Representative hereunder shall inure to the Class B Representative and the rights of the Class B Representative hereunder shall inure to the Litigation Funding Agent for the benefit of the holders of the Variable Component and (ii) the Class B Representative may replace the Litigation Trustee subject to the

8

terms of the Litigation Trustee's agreement with the Litigation Trust (which agreement shall be consistent with this Term Sheet and otherwise reasonably acceptable to the Debtors, the FILO Parties, and the UCC).

i. Distributions from the Litigation Trust shall be subject to the following priorities:

    i. Fees of the Litigation Funding Agent and the Class A-2 Representative (which shall be $50,000 per month for each position), and indemnification and reasonable and documented expenses of (A) the Litigation Trust (including payments owing under the TSA, which shall be paid to the Estate), and (B) the Litigation Funding Agent, the Litigation Funders, the Class A-2 Representative, and the FILO Parties (solely with respect to this clause (B), subject to an aggregate cap not to exceed: (i) $500,000 per month for the initial three-month period commencing on the Trust Establishment Date, (ii) $350,000 per month for the nine-month period following such initial three-month period, and (iii) $220,000 per month[3] thereafter; provided that such cap shall not apply to the FILO Parties before the Trust Establishment Date; provided further that, (i) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) are less than the amount of such monthly cap, the amount of such variance will roll forward and increase such monthly cap in the following months until such variance is used and (ii) to the extent that the aggregate expenses incurred in any given month by the parties referenced in the immediately preceding clause (B) exceed the amount of such monthly cap, the amount of such variance can be carried forward and satisfied in future months to the extent there is availability under the applicable monthly cap in any such future month).

    ii. Class A-1 interests until the Class A-1 Preference, the Upfront Premium, and, subject to paragraph 13 of this Term Sheet, the Variable Component (as defined below) (which survives repayment of the Class A-1 Preference and the FILO Balance) are repaid in full in cash.

[3] Monthly invoices of the professionals for such parties shall be provided to the Estate with reasonable summaries of activities, which may be redacted for privilege and shall not require time entries to be provided.

iii.  Class A-2 interests until the Class A-2 Preference is repaid in full in cash and the FILO Balance is $0.

iv.  Class B interests.

v.  Notwithstanding anything to the contrary in the immediately preceding clauses (ii) - (iv):

1.  If the FILO Balance is not in an Underpayment State, 25% of any amount otherwise payable to (i) the holders of the Class A-2 interests, and (ii) on or after December 1, 2025, the Class A-1 interests, shall be used to pay unpaid Deferred Fees and Unestimated Fees (each, as defined in the Plan Support Agreement Term Sheet) on a pro rata basis.

2.  If the FILO Balance is less than $25 million, any unpaid Unestimated Fees or Deferred Fees will be paid on a pro rata basis from any available proceeds that would otherwise be payable to the holders of Class A-1 interests as Variable Component (provided that such Variable Component shall be payable with the next proceeds received following repayment in full of such unpaid Unestimated Fees and Deferred Fees).

8.  The Estate will coordinate its efforts with the Litigation Trustee with respect to issues involving overlapping concerns among the Estate and the Litigation Trust with respect to third parties.  For example, if the same third party is involved in disputes with both the Estate and the Litigation Trust, the effort will be coordinated between the Estate and the Litigation Trustee. If the Estate and the Litigation Trustee are unable to resolve a matter that should be coordinated, they must (i) arrange a conference with Judge Isgur, in his capacity as mediator in connection with the subject matter of this Term Sheet; and (ii) failing a successful mediation, obtain resolution by the Bankruptcy Court.

a.  With respect to any such dispute presented to the Bankruptcy Court:

i.  If the FILO Balance is in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Litigation Trustee's business judgment will be applied to the dispute, subject to challenge by the Estate; *provided*, *however*, that the Litigation Trustee's business judgment will not be considered

by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Estate (other than with respect to §502(h) claims).

ii. If the FILO Balance is not in an Underpayment State on the date of any hearing before the Bankruptcy Court, the Estate's business judgment will be applied to the dispute, subject to challenge by the Litigation Trustee; *provided*, *however*, that the Estate's business judgment will not be considered by the Bankruptcy Court with respect to a matter (or a portion thereof) as to which such business judgment would allow or increase the liabilities of the Litigation Trust.

b. Notwithstanding the foregoing, with respect to any constructive trust claims asserted by any third parties with respect to any Litigation Trust Assets or Retained Collateral, as well as any government investigations, the Litigation Trust and the Estate will coordinate efforts to dispute or settle such claims, or to address such investigations, including with respect to funding arrangements for the defense of any such claims or addressing any such investigations.

9. FILO Parties to agree to use of cash collateral from April 1, 2025, through the Trust Establishment Date in an amount up to $61 million through June 27, 2025 and with additional amounts available for use thereafter, in each case, in accordance with the DIP Budget and the Pre-TED Professional Fee Estimates (as defined in the Plan Support Agreement Term Sheet). The aggregate amount of cash collateral used from April 1, 2025, through the Trust Establishment Date, together with interest thereon at the Applicable Rate, shall be the "Secured Interim Advances." On the Trust Establishment Date, the Debtors shall repay the FILO DIP Loans with Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of such Secured Interim Advances, and on account of such repayment, the amount of FILO DIP Loans outstanding shall be reduced by the amount of such Secured Interim Advances.

10. Funding.

a. The FILO Parties shall commit, subject to the terms and conditions to be set forth in a commitment letter consistent with this Term Sheet and otherwise acceptable to the FILO Parties and the Debtors (the "Commitment Letter") (which shall be executed within 10 business days after execution of this Term Sheet), to, commencing on

the Trust Establishment Date, extend funds (solely from the proceeds of FILO DIP/Bridge Claim[4] repayments received after the FILO DIP Agent's receipt of the Required Prepayment, or Class A interests distributions) to the Litigation Trust (the "Litigation Funding") on a delayed draw basis in an aggregate amount of up to $125 million (the "Initial Commitment Amount") (which is inclusive of (x) a budgeted amount of $61 million through June 27, 2025, together with any additional amounts budgeted thereafter under the DIP Budget, which, in each case, may only be incurred in the form of Secured Interim Advances, and (y) the $6.5 million of Estate Funding), which funded amounts shall be available to pay litigation costs of the Litigation Trust, costs of administration of the Litigation Trust and monetization of the Litigation Trust Assets, in each case, subject to (i) budgets delivered from time to time to, and which must be reasonably acceptable to, the Litigation Funding Agent (the "Litigation Funding Budget") and (ii) the satisfaction of any conditions to funding under the Commitment Letter and absence of any uncured material breaches of the Litigation Trustee's obligations under the Litigation Trust Agreement.[5]  Requests for funding under the Litigation Funding shall be made solely (a) in compliance with the foregoing terms and (b) by the Litigation Trustee upon at least five business days' written notice to the Litigation Funding Agent, it being understood and agreed that not more than one such funding request shall be made during any 30-day period.  Litigation Funding to include an uncommitted accordion of 25% of the Initial Commitment Amount, on the same terms as the initial tranche (to the extent the accordion becomes committed in the sole and absolute discretion of the FILO Parties, the amount of such commitment together with the Initial Commitment Amount, shall be the "Total Commitment Amount").  The commitments under the Commitment Letter shall automatically terminate upon the earlier to occur of (i) the funding of the then applicable commitment amount (whether the Initial Commitment Amount or the Total Commitment Amount, as the case may be) and (ii) the repayment of the FILO Balance.

b.   Further financing to be subject to written consent of (x) the Litigation Trustee; (y) the Class B Representative; and (z) unless the further

---

[4] "FILO DIP/Bridge Claim" refers to the claims outstanding under the FILO DIP/Bridge facilities immediately prior to the Trust Establishment Date.

[5] To the extent that the initial Litigation Funding Budget contemplates disbursements to legal counsel on a current basis and the projected amount of such disbursements is subsequently reduced through contingency fee, success fee, or similar arrangements (the aggregate amount of such reduction as agreed by the Litigation Trustee, the "Contingency Fee Savings"), the Total Commitment Amount shall be reduced by the Contingency Fee Savings.

financing is junior to amounts due or to be due to the FILO Parties and under the Litigation Funding, the Class A-2 interests holders and the Litigation Funding Agent. For the avoidance of doubt, the Litigation Trust shall not incur any debt, obligation for borrowed money or other obligation with payment priority senior to or *pari passu* with the Class A interests or secure any obligation with liens on any Litigation Trust Assets or Retained Collateral, in each case, without the prior written consent of the Class A-2 Representative and Class B Representative and the Litigation Funding Agent.

c. Upon the occurrence of the Trust Establishment Date, the Litigation Trust shall provide $6.5 million to the Estate (or any successor liquidating vehicle) (the "<u>Estate Funding</u>") to fund costs and expenses of the Estate and the Estate's professionals incurred after the Trust Establishment Date and of any successor liquidating vehicle (or representative thereof) established to hold the Class B interests and/or any remaining assets of the Debtors.

d. In respect of the Estate Funding, the FILO Parties indirectly providing such funding shall receive Class A-1 interests having a distribution and liquidation preference (along with a proportionate interest in all other rights therein) equal to the amount of the Estate Funding. The Estate Funding shall not be required to be repaid by the Estate.

11. MOIC Payment: The "<u>MOIC Payment</u>" refers to a payment to which the FILO Bridge lenders are entitled (subject to the occurrence of the Trust Establishment Date) in accordance with the terms set forth below. On the Trust Establishment Date, the MOIC Payment will be allowed on the following terms:

a. The Litigation Trust's MOIC obligation will be $11.25 million through March 31, 2026, increasing by:

   i. $1.0 million on April 1, 2026,
   ii. An additional $1.5 million on May 1, 2026,
   iii. An additional $2.0 million on June 1, 2026,
   iv. An additional $2.5 million on July 1, 2026,
   v. An additional $3.0 million on August 1, 2026, and
   vi. An additional $3.75 million on September 1, 2026 and on the first day of each month thereafter until the FILO Balance is paid in full in cash.

b. The total MOIC Payments will not exceed 85% of $75 million *minus* any interest paid or accreted on account of the claims outstanding

13

under the FILO Bridge facility (the "<u>FILO Bridge Claims</u>") (including any interest paid or accreted on account of the Class A-2 Preference that is allocable to FILO Bridge Claims).

12. Class A-2 interests shall, as of the applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the sum of (i) all principal and accrued interest, fees, expenses,[6] and other amounts outstanding under the FILO DIP/Bridge facilities[7] immediately prior to the Trust Establishment Date (for the avoidance of doubt, excluding the Retained FILO Claim), (ii) all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), (iii) the MOIC Payment, and (iv) the "Exit Premium" under the FILO DIP Loans (which shall be calculated as if the FILO DIP Loans were being fully repaid), in each case, as of such date, *less* (y) the (A) aggregate amount, if any, of cash distributions paid on the Class A-2 interests from the Litigation Trust and (B) aggregate amount, if any, of Class A-2 interests otherwise contributed or waived by the FILO Parties, in each case, as of such date (the "<u>Class A-2 Preference</u>").  Prongs (i) and (ii) of the definition of Class A-2 Preference shall accrete at (a) from the Trust Establishment Date through September 30, 2025, a rate equal to 10% per annum, (b) from October 1, 2025 through December 31, 2025, a rate equal to 10.5% per annum, (c) from January 1, 2026 through March 31, 2026, a rate equal to 11% per annum, and (d) a rate equal to 11.25% per annum commencing on April 1, 2026, and increasing by an additional 25bps at the beginning of each quarter thereafter, subject to a maximum of 12% per annum (the immediately preceding clauses (a)-(d), the "<u>Applicable Rate</u>," which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-2 Preference on a monthly basis); provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

---

[6] Milbank to defer (i) 10% of its fees incurred between April 1, 2025, and the Trust Establishment Date, and (ii) any of its fees incurred in excess of the Pre-TED Professional Fee Estimates.  All outstanding Milbank invoices and Houlihan's March 18, 2025 invoice shall be paid as a condition precedent to the effectiveness of this Term Sheet, and thereafter all Milbank and Houlihan fees and expenses that are not subject to deferral shall be paid current in accordance with the FILO DIP Order and Approval Order, as applicable.

[7] FILO DIP/Bridge facilities to be allowed in full pursuant to the Approval Order, subject to the MOIC Payment settlement set forth in this Term Sheet.

13. Litigation Funding will be made available to the Litigation Trust by the FILO Parties on these terms:

a. The Class A-1 interests shall, as of each applicable date of determination, have a distribution and liquidation preference in an amount equal to (x) the aggregate amount of funding extended or deemed to have been extended under the Litigation Funding plus all accreted amounts accrued thereon (calculated in accordance with the immediately succeeding sentence), in each case, as of such date, *less* (y) the aggregate amount, if any, of cash distributions paid on the Class A-1 interests from the Litigation Trust as of such date (the "Class A-1 Preference"). The Class A-1 Preference shall accrete at the Applicable Rate, which such accreted amount shall not be required to be paid in cash and, to the extent not paid in cash, such accreted amount shall be paid in-kind and capitalized and added to the balance of the Class A-1 Preference on a monthly basis; provided that, in each case, to the extent the FILO Parties commit to provide additional funding in excess of the Initial Commitment Amount (without any additional fees or premiums) to cover the payment of such monthly accreted amount in cash, then such monthly accreted amount shall be paid in cash.

b. The Litigation Funding will, in addition to payment of the Class A-1 Preference and the agency fee of the Litigation Funding Agent, as well as indemnification and reimbursement of all reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), be entitled to:

i. an upfront premium (the "Upfront Premium"), payable in kind, in an amount equal to $4.25 million; provided that if the Litigation Funding accordion is exercised with the consent of the Litigation Trustee, then the Upfront Premium shall be increased by the same percentage that the commitments under the Litigation Funding are increased.

ii. 20% of gross litigation proceeds (the "Variable Component"), of which (a) 15% (the "Upfront Percentage") is paid in cash at the time of receipt of such litigation proceeds and (b) 5% is deferred, with the applicable deferred cash being held in escrow (the "Deferred Portion"); provided that if the litigation proceeds result from a litigation financed with a contingency fee structure or third-party litigation funding, the total Variable Component shall be limited to the lesser of (A) the

15

applicable Variable Component noted above (subject to clause 13.d below), and (B) the greater of (i) 30% of such gross litigation proceeds minus the amount of contingency fee, success fee, or third-party litigation funding cost related to such litigation and (ii) 10% of such gross litigation proceeds (the "<u>Reduced Variable Component</u>").

In the event the Reduced Variable Component is equal to or less than 15% of such gross litigation proceeds, then all of such Reduced Variable Component shall be treated as the Upfront Percentage. In the event the Reduced Variable Component is greater than 15% of such gross litigation proceeds, then 15% of such gross litigation proceeds shall be treated as the Upfront Percentage and the remaining portion shall be treated as the Deferred Portion.

c.  If the FILO Balance is repaid in full in cash on or before October 1, 2026, the escrow holding the Deferred Portion shall be paid to the Estate. On October 2, 2026, if the FILO Balance has not been paid in full in cash by October 1, 2026, the escrow holding the Deferred Portion shall be disbursed in full to the Litigation Funding Agent. Following such time and until repayment of the FILO Balance in full in cash, the Variable Component shall be paid in cash at the time of receipt of litigation proceeds in accordance with the terms of clause 13.b. with no amounts deferred.

d.  After repayment of the FILO Balance, the Variable Component shall continue to be entitled to a percentage of the gross litigation proceeds (i) at the Upfront Percentage only (i.e., 15%) if the FILO Balance is repaid in full in cash on or before October 1, 2026, or (ii) at 20% if the FILO Balance is not repaid in full in cash on or before October 1, 2026, in each case, subject to the Reduced Variable Component adjustment described above (the "<u>Post-FILO Repayment Variable Component</u>"); provided that (x) to the extent a Plan is confirmed, the Post-FILO Repayment Variable Component shall be paid in two installments, with the first installment being paid in cash upon receipt of the applicable litigation proceeds in an amount equal to 62.5% of the Post-FILO Repayment Variable Component, and the payment of the remaining balance of the Post-FILO Repayment Variable Component being deferred until (and subject to) the satisfaction of allowed administrative and other priority claims pursuant to the Plan, and (y) if a Plan has not been confirmed, the Post-FILO Repayment Variable Component shall be paid in full in cash upon receipt of the applicable litigation proceeds.

14. "Underpayment State" equals on any applicable date of determination: the sum of (a) the outstanding Class A-2 Preference (including all accreted amounts accrued thereon) and fees and expenses of the Class A-2 Representative to the extent payable under this Term Sheet, (b) the outstanding Class A-1 Preference, the Upfront Premium, the agency fee of the Litigation Funding Agent, and outstanding indemnification claims and reasonable and documented out-of-pocket expenses of the Litigation Funding Agent and the Litigation Funders (subject to clause i. of paragraph 7.i.), and (c) any unpaid Variable Component that has been earned (for the avoidance of doubt, (i) other than before October 2, 2026, any Deferred Portion held in escrow and (ii) subject to adjustment, if applicable, in connection with any Post-FILO Repayment Variable Component).

15. The FILO Balance will be in an "Underpayment State" if the aggregate FILO Balance is equal to or greater than

   a. $275 million as of the Trust Establishment Date.
   b. Solely for purposes of paragraph 7.i.v.1., $220 million as of December 1, 2025.
   c. For all purposes other than paragraph 7.i.v.1., $220 million as of December 31, 2025.
   d. $160 million as of April 1, 2026.
   e. $110 million as of July 1, 2026.
   f. $60 million as of September 1, 2026.
   g. $10 million as of December 31, 2026.

16. The Debtors, FILO Parties and UCC to negotiate in good faith and agree prior to entry of the Approval Order on the terms of a transition services agreement pursuant to which the Estate will provide TSA services to the Litigation Trust, including agreement on the scope of services to be provided and pricing at cost (the "TSA"). In advance of each calendar month, the TSA shall provide for the Litigation Trust to advance the Estate's estimated monthly operating expenses, including for payroll and vendors, subject to (i) the initial TSA budget annexed hereto as **Exhibit B**, which may be updated from time to time if approved in writing by the Litigation Trustee and the Class A-2 Representative, and (ii) a reconciliation process with respect to amounts funded in prior months. Payments made by the Litigation Trust to the Estate for any services under the TSA prior to the Estate paying for the budgeted costs of providing such services shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such costs. In addition, the Litigation Trust shall provide, when and to the extent due as evidenced by reasonably detailed evidence thereof delivered by the Estate to the Litigation Trust (the "Tax Package"), up to $4 million in funding to

the Estate for the sole purpose of the Estate paying income taxes for the Debtors' current 2024/2025 income tax year. Payments made by the Litigation Trust to the Estate for such taxes shall be deemed to be held by the Estate in trust for such purpose and shall not be used for any purpose other than paying such taxes reflected in the Tax Package on a dollar-for-dollar basis. The Estate and its related parties (including employees and advisors) shall be defended, held harmless and indemnified by the Litigation Trust against any and all liabilities or losses that may be incurred in connection with the rendering of services under the TSA to the Litigation Trust or Litigation Trustee, subject to customary carve outs for fraud, willful misconduct, and gross negligence. All other expenses of the Estate incurred on or after the Trust Establishment Date, including cost of administration of the Estate, must be budgeted and paid from the Retained Cash, Estate Funding, or other Estate (not Litigation Trust) resources.

17. Reporting and Information Sharing.

    a. <u>Regular Conference Calls</u>: Litigation Trustee to host conference calls on a bi-weekly basis (or more frequently in the Litigation Trustee's discretion) regarding the Litigation Trust Asset monetization process, which calls shall be accessible to the Litigation Funding Agent, the Class A-1 interest holders, the Class A-2 Representative, the Class A-2 interest holders, and the Class B Representative.

    b. <u>Ad Hoc Conference Calls</u>: In addition to the foregoing, the Litigation Trustee shall make itself reasonably available for conference calls to discuss specific topics reasonably requested in writing by the Litigation Funding Agent, the Class A-2 Representative, or the Class B Representative.

    c. <u>Financial Reporting</u>: Litigation Trustee shall deliver a written report to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representative on a monthly basis providing, as of the date of the report:

        i. the amount of cash received by the Litigation Trust through the Litigation Trust Asset monetization process (broken down by source), and the application thereof pursuant to paragraph 7(i) hereof;

        ii. the amount of expenses paid by the Litigation Trust (broken down by category and professional firm);

        iii. the FILO Balance;

            iv.  the amount of the accrued Variable Component and the Deferred Portion then held in escrow; and

            v.  a reasonably detailed summary of the asset monetization activity undertaken in the immediately preceding month.

    d.  <u>Preference Actions</u>: Togut shall deliver to the Litigation Funding Agent, the Class A-2 Representative, and the Class B Representatives reporting with respect to preference actions, which shall be consistent (with respect to both frequency and format) with the reporting currently required to be delivered to the FILO and UCC counsel under paragraph 5 of the Togut retention order [ECF No. 3886].

    e.  <u>Confidentiality/Preservation of Privileges</u>: Access to reporting shall be subject to entry into (i) a confidentiality agreement and (ii) a common interest agreement and other protocols to the extent necessary to protect applicable privileges, as reasonably determined by the Litigation Trustee.

18. Each FILO Party agrees that prior to the Trust Establishment Date, it shall not transfer, directly or indirectly, in whole or in part, any FILO DIP/Bridge Claims, option thereon, or right or interest therein, and any purported such transfer shall be void and without effect, in each case, unless the transferee thereof: (a) is a signatory to this Term Sheet as of the date of such transfer; or (b) has signed a joinder to this Term Sheet and the Plan Support Agreement Term Sheet acceding to the obligations of a holder of FILO DIP/Bridge Claims hereunder and thereunder (each, a "<u>Permitted Transferee</u>"). Any transfer of FILO DIP/Bridge Claims occurring prior to the Trust Establishment Date shall require the transferee to assume the transferor's obligations under the Commitment Letter in proportion to the amount of FILO DIP/Bridge Claims so transferred relative to the aggregate amount of all FILO DIP/Bridge Claims outstanding as of the date of such transfer (the "<u>Stapling Requirement</u>"). Notwithstanding anything to the contrary herein, a FILO Party may transfer FILO DIP/Bridge Claims to an entity that is acting in its capacity as a Qualified Marketmaker[8] without the requirement that the Qualified Marketmaker be a signatory to this Term Sheet or execute a joinder; *provided* that any such Qualified

---

[8] "<u>Qualified Marketmaker</u>" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers FILO DIP/Bridge Claims, or enter with customers into long or short positions in FILO DIP/Bridge Claims, in its capacity as a dealer or market maker in such FILO DIP/Bridge Claims and (ii) is in fact regularly in the business of making a market in claims, interests, or securities of issuers or borrowers.

Marketmaker (i) may only subsequently transfer the FILO DIP/Bridge Claims to a transferee that is or becomes a Permitted Transferee at the time of such transfer and to the extent such subsequent transfer complies with the Stapling Requirement and (ii) shall be required to, by the earlier of (x) ten (10) business days after its acquisition of any transferred FILO DIP/Bridge Claims and (y) the Required Joinder Date,[9] either sign a joinder to this Term Sheet or transfer all FILO DIP/Bridge Claims held by such Qualified Marketmaker to one or more Permitted Transferees, in each case, in compliance with the Stapling Requirement.

19. The parties shall negotiate promptly and in good faith to agree on definitive documentation, which shall include the Litigation Trust Agreement (including the funding mechanics with respect to the Class A-1 interests), the Litigation Trustee's engagement letter, the Commitment Letter, the TSA, and the DIP Amendment. Counsel to the Debtors, the UCC, and the FILO Parties to agree on allocation of drafting responsibility and a detailed work plan and fee estimates.

20. All transactions contemplated herein shall be implemented in a tax-efficient manner and are subject to review by tax professionals.

---

[9] "Required Joinder Date" means the third business day before the expiration of the chapter 11 plan voting deadline, if any, applicable to the FILO Bridge Claims.

Docusign Envelope ID: 6AAE9DE7-9572-4364-9EC2-10EE83D795A8

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**STEWARD HEALTH CARE SYSTEM LLC,**
**on Behalf of Itself and its Debtor Affiliates**

By: _____
Name:  John Castellano
Title:  Chief Restructuring Officer

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

For and on behalf of **OneIM Fund I LP, as DIP Lender,** acting by its General Partner, OneIM GP LLC, acting by its Manager, GCT Capital LLC

By: _____
Name: Munish Varma
Title: Authorized Signatory

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**BRIGADE AGENCY SERVICES LLC,** as FILO Agent

By: BRIGADE CAPITAL MANAGEMENT, LP, Its Managing Manager

By: _____
Name: Patrick Criscillo
Title: Authorized Signer

**BIG RIVER GROUP FUND SPC LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE BADGER FUND, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE DIVERSIFIED CREDIT CIT**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE CREDIT FUND II LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE HIGH YIELD FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE LOAN FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE OPPORTUNISTIC CREDIT LBG
FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


*Signature Page to Settlement and Stay Relief Term Sheet*

**BRIGADE-SIERRABRAVO FUND LP**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**CITY OF PHOENIX EMPLOYEES'**
**RETIREMENT PLAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FEDEX CORPORATION EMPLOYEES'**
**PENSION TRUST**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FUTURE DIRECTIONS CREDIT**
**OPPORTUNITIES FUND**,
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**JPMORGAN CHASE RETIREMENT PLAN**
**BRIGADE BANK LOAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**LOS ANGELES COUNTY EMPLOYEES**
**RETIREMENT ASSOCIATION**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**SC CREDIT OPPORTUNITIES MANDATE,**
**LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**MIDOCEAN CREDIT FUND MANAGEMENT, LP**

By: _____
Name: Damion Brown
Title: Managing Director

**MidOcean Tactical Credit Fund III LP**
By: Tactical Credit Fund III GP, LP
By: Ultramar Credit Holdings Ltd., its General Partner

By: _____
Name: Damion Brown
Title: Managing Director

**MidOcean Multi Asset Credit Fund, LP**
By: MidOcean Multi Asset Credit Fund GP, LLC its General Partner

By: _____
Name: Damion Brown
Title: Managing Director

**Abbott Abbvie Multiple Employer Pension Plan Trust**

By: _____
MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

*Signature Page to Settlement and Stay Relief Term Sheet*

**Abbott Laboratories Annuity Retirement Trust**

By: _____

MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

*Signature Page to Settlement and Stay Relief Term Sheet*

Case 24-50792-hlb Doc 1246-1 Filed 09/26/25 Page 584 of 1832

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**OWL CREEK INVESTMENTS I, LLC**

By: OWL CREEK ASSET MANAGEMENT, LP
as Investment Manager

By:
Name: Kevin Dibble
Title:  General Counsel

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**WHITEHAWK FINANCE LLC**
By: WHITEHAWK CAPITAL PARTNERS, LP, as Investment Manager


By: _____
Name: Robert Louzan
Title: Managing Partner

*Signature Page to Settlement and Stay Relief Term Sheet*

IN WITNESS WHEREOF, this Settlement and Stay Relief Term Sheet is duly executed as of the date first set forth above.

**The Official Committee of Unsecured Creditors**, solely in its representative capacity, and not on behalf of any individual member thereof

By: */s/ Brad M. Kahn*
Name:  Brad M. Kahn
Title:  Partner

Akin Gump Strauss Hauer & Feld LLP, in its capacity as counsel to, and authorized signatory for, the Official Committee of Unsecured Creditors of Steward Health Care System, LLC, *et al*.

*Signature Page to Settlement and Stay Relief Term Sheet*

# Schedule 1

## Litigation Trust Assets

1. All cash and cash equivalents, excluding only (a) the Retained Cash[1], (b) all cash held or received on behalf of buyers of the Debtors' hospital and Stewardship operations pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet ("Buyers"), (c) all cash received from Buyers or other third parties for purposes of paying cure costs, (d) cash to fund checks issued in accordance with the DIP Budget and which remain outstanding immediately prior to the Trust Establishment Date, (e) all cash held for subtenant security deposits or rent collected on behalf of Buyers, subtenants, or overlandlords, (f) all cash held in the Professional Fee Escrow Account, the Physician Insurance Account, the Utility Deposit Account, or the Expense Escrow Account, and (g) any funds of the Debtors in the Vendor Fund Escrow Account pursuant to the Vendor Fund Escrow Agreement, entered into as of March 11, 2025, by and among Golden Sun TSA Services, LLC, a Delaware limited liability company; Steward Health Care System LLC, a Delaware limited liability company; MPT Development Services, Inc., a Delaware corporation; Lifespan of Massachusetts, Inc., a Massachusetts nonprofit corporation; BMC Community Hospital Corporation and BMC Community Hospital Corporation II, Massachusetts nonprofit corporations; Orlando Health, Inc., a Florida corporation; and Kroll Restructuring Administration LLC, a Delaware limited liability company.

2. All accounts receivable, excluding only (a) accounts receivable that the Debtors sold to Buyers pursuant to the definitive documents filed with the Bankruptcy Court prior to the execution of the Term Sheet and (b) any accounts receivable that cannot be transferred to the Litigation Trust or a subsidiary thereof pursuant to applicable law (such accounts receivables described in this clause (b), the "Non-Transferrable A/R").  With respect to any Non-Transferrable A/R, the Estate shall, at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost), (i) use commercially reasonable efforts to collect or otherwise monetize such Non-Transferrable A/R in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (ii) promptly turn over any cash or other value realized on account of such Non-Transferrable A/R to the Litigation Trust.

3. The equity interests in Steward A/R Co, LLC.  Promptly upon transfer of the equity interests in Steward A/R Co, LLC to the Litigation Trust, the current

---

[1] Each capitalized term that is used but not defined herein has the meaning ascribed to it in (a) the Term Sheet to which this **Schedule 1** is attached or (b) the mutual releases set forth in **Exhibit A** to the Term Sheet.

manager of Steward A/R Co, LLC, John Castellano, shall submit his resignation as manager and the Litigation Trustee and Steward A/R Co, LLC shall grant Mr. Castellano a release of claims against Mr. Castellano in connection with his services as manager, in form and substance reasonably acceptable to Mr. Castellano, and the Litigation Trust shall appoint his replacement.

4. All Claims[2] and Causes of Action[3] of the Debtors and the Estate, including, without limitation, in each case, to the extent not released pursuant to the mutual releases set forth in **Exhibit A** to the Term Sheet, the following Claims and Causes of Action:

    a. all Claims and Causes of Action asserted by the Debtors in the *Second Amended Complaint and Jury Demand* filed by Steward Health Care System LLC at Docket No. 61 in Civil Action No. 21-cv-11902-PBS in the United States District Court for the District of Massachusetts (the "Norwood Complaint") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the Norwood Complaint;

    b. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against healthcare payors, including, without limitation, the commercial payors identified in **Schedule 1-A** hereto;

    c. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Non-Released Parties, including, without limitation, arising from or relating to the 2016 Distribution, the 2020 Transactions, the 2021 Distribution, the 2022 Distribution, or any Plane

---

[2] "Claim" means a "claim," as defined in section 101(5) of the Bankruptcy Code.

[3] "Cause of Action" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license or franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whenever arising, whether in law or equity, whether sounding in tort or contract, whether asserted in arbitration, a court or regulatory proceeding, or otherwise, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise, including under any state or federal securities laws. Causes of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) Avoidance Actions, and (iii) any claim or defense, including fraud, mistake, duress, or usury and any other defenses set forth in section 558 of the Bankruptcy Code.

Sale,[4] or otherwise arising from or relating to the payment of unlawful dividends, the avoidance of prepetition dividend payments or other distributions, or one or more breaches of fiduciary or other duties;

d. all Avoidance Actions[5] asserted or assertable by the Debtors or the Estate against the transferees identified in **Schedule 1-B** hereto or any other prepetition vendors of the Debtors;

e. all Claims and Causes of Action against Blue Cross Blue Shield Association ("BCBS") or any of its independent Affiliates, including, without limitation, arising from or relating to the Claims and Causes of Action asserted in the class action lawsuits against BCBS and its various licensees consolidated in *In re Blue Cross Blue Shield Antitrust Litig.*, Case No. 2:13-cv-20000-RDP (MDL No. 2406) (N.D. Ala. 2013) (the "BCBS Antitrust Litigation") or otherwise assertable by the Debtors or the Estate based upon, in full or in part, facts, events, or circumstances alleged in the BCBS Antitrust Litigation;

f. all Claims and Causes of Action asserted or assertable by the Debtors or the Estate against the Commonwealth of Massachusetts, including, without limitation, any Claims or counterclaims of the Debtors or the Estate in connection with *The Commonwealth of Massachusetts' Motion for Relief from the Automatic Stay to Allow for the Setoff of Mutual Obligations if and to the Extent that Recoupment is Not Available* (Docket No. 3393) and the adversary proceeding filed by the Debtors against the Commonwealth of Massachusetts (Docket No. 3983) (Adv. Pro. No. 25-03053);

g. all Claims and Causes of Action with respect to the escrow account holding the Adjustment Escrow Amount (as defined in the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) the Asset Purchase Agreement with Brady Health Buyer, LLC (B) the Sale of Stewardship Health Assets Free and Clear of Liens and Liabilities and (C) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (II) Granting Related Relief* (Docket No. 2135)) and the funds deposited therein; and

---

[4] "Plane Sales" means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

[5] "Avoidance Actions" means all Claims and Causes of Action under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, any other avoidance actions under the Bankruptcy Code, and any state law fraudulent transfer claims.

h. all Claims and Causes of Action with respect to the right of certain Debtors to receive reimbursement from Golden Sun TSA Services, LLC in connection with the renewal of that certain Software Licensing Agreement, dated September 9, 2009, by and between IASIS Healthcare LLC and Microsoft Corporation, as amended, under Section 9.7 of the asset purchase agreement attached as Exhibit 1 to the *Order (I) Authorizing and Approving (A) Sale of Transition Services Agreement Assets Free and Clear of All Interests and Encumbrances to Golden Sun TSA Services, LLC, an Affiliate of Quorum Health Corporation, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Settlements; and (II) Granting Related Relief* (Docket No. 4192).

5. All rights of the Debtors and the Estate to recover insurance proceeds from the D&O Policies (as defined in the *Motion of Debtors for Order Authorizing the Use of Proceeds of Directors and Officers Liability Insurance Policies for Insureds Defense Costs* (Docket No. 2540)) in connection with any Claim or Cause of Action that is not released pursuant to the mutual releases set forth in **Exhibit A** to the Term Sheet. For the avoidance of doubt, the transfer of the rights of the Debtors and the Estate to recover insurance proceeds from the D&O Insurance shall not hinder the ability of any beneficiaries or insureds of such D&O Insurance to submit claims and otherwise pursue and obtain coverage under the D&O Policies.

6. All of the Debtors' remaining interests in joint ventures and the Meadows Hospital Promissory Note, in each case, unless otherwise directed by the FILO Parties, which shall be transferred to one or more corporate subsidiaries of the Litigation Trust; provided that in the event any transfer of interests in joint ventures triggers any put, call, ROFO or ROFR, or other similar rights of third parties, such interests shall be excluded (the "Excluded Interests") and only the proceeds of sale of such interests will be transferred to the Litigation Trust. The Estate shall, at Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize the Excluded Interests in coordination, and in a manner reasonably agreed upon, with the Litigation Trust, and (b) promptly turn over any cash or other value realized on account of such Excluded Interests to the Litigation Trust.

7. All proceeds, products, offspring, or profits of any employee retention tax credits ("ERTCs") owned by any Debtors, net of any reasonable and documented out-of-pocket expenses of any broker or consultant retained in connection with a sale of such ERTCs (to the extent not paid in advance by the Litigation Trust in accordance with the succeeding sentence). The Estate shall at the Litigation Trust's sole expense (paid in advance and charged at the Estate's cost) (a) use commercially reasonable efforts to monetize such ERTCs

in coordination, and in a manner reasonably agreed upon, with the Litigation Trustee, and (b) promptly turn over any cash or other value realized on account of such ERTCs to the Litigation Trust.

8. All proceeds, products, offspring, or profits of any of the foregoing assets and property.

**Schedule 1-A**

**Payors**

| Column1 |
| --- |
| Aetna Better Health of Florida |
| Aetna Health Management, LLC |
| Aetna Health, Inc. |
| Aetna Network Services LLC |
| Aetna U.S. Healthcare Inc. |
| AmeriGroup Texas, Inc. |
| Arizona Physicians IPA, Inc. |
| AvMed, Inc. |
| BHP of Ohio, Inc. |
| Blue Cross and Blue Shield of Florida, Inc. |
| Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. |
| Blue Cross and Blue Shield of Massachusetts, Inc. |
| Blue Cross and Blue Shield of Texas |
| Boston Medical Center Health Plan, Inc. |
| Caritas Christi |
| Cenpatico Behavioral Health LP |
| Cigna Behavioral health of Texas |
| Cigna Health and Life Insurance Company |
| Cigna HealthCare of Florida, Inc. |
| Cigna HealthCare of Massachusetts, Inc. |
| CIGNA Healthcare of Texas, Inc |
| Community Insurance Company |
| Connecticut General Life Insurance Company |
| Employers Health Insurance Company |
| Evercare of Texas, LLC |
| First Health Group Corp. |
| GHS Property and Casualty Insurance Company |
| Harvard Pilgrim Health Care, Inc. |
| Health Options, Inc. |
| Health Value Management, Inc. |
| Healthease of Florida |
| HealthSpring Life & Health Insurance Company, Inc. |
| Highmark Blue Cross Blue Shield |
| Humana Health Insurance Company of Florida |
| Humana Health Plan of Florida |
| Humana Health Plan of Texas, Inc. |
| Humana Insurance Company |
| Humana Medical Plan, Inc. |
| Leon Health, Inc. |
| Massachusetts Benefit Administrators LLC |
| MetraHealth Inruance Company |
| Metropolitan Life Insurance Company |
| Neighborhood Health Plan of Rhode Island |

| |
|---|
| NovaSys Health, Inc. |
| Oscar Insurance Company of Florida |
| PacifiCare of Arizona, Inc. |
| PacifiCare of Texas, Inc. |
| SelectCare of Texas, LLC |
| Senior Whole Health LLC |
| Simply Healthcare Plans, Inc. |
| Steward Health Care System, LLC |
| Sunshine State Health Plan, Inc. |
| Superior HealthPlan, Inc. |
| Texas HealthSpring, LLC |
| Total Health Plan, Inc, |
| Travelers Insurance Company |
| Tufts Associated Health Maintenance Organization, Inc. |
| Tufts Associated Health Plans, Inc. |
| Tufts Benefit Administrators |
| Tufts Health Plan, Inc. |
| Tufts Insurance Company |
| Tufts Public Plans, Inc. |
| U.S. Behavioral Health Plan, California |
| United Behavioral Health, Inc. |
| United Benefits of Texas, Inc. |
| United Community Plans of Texas, L.L.C. |
| United Health and Life Insurance Company |
| United Healthcare |
| United Healthcare Insurance Company |
| United Healthcare of Arizona, Inc. |
| United Healthcare of New England Inc. |
| United HealthCare of Ohio, Inc. |
| United Healthcare of Texas, Inc. |
| UnitedHealthcare Community Plan of Ohio, Inc. |
| UnitedHealthcare Insurance Company |
| UnitedHealthcare of Arizona, Inc. |
| UnitedHealthcare of Florida, Inc. |
| UnitedHealthcare of New England, Inc. |
| UnitedHealthcare of Ohio, Inc. |
| Universal American Corp. |
| US Behavioral Health |
| Warren Ohio Rehab Hospital Company |
| WellCare of Florida, Inc. |
| WellCare of Texas, Inc. |

**Schedule 1-B**

**Preference Defendants**

m o r n r

NORTHWIN   PHARMACEUTICALS LLC
  EFOREST  OSCELNI  & BERAR  INELLI
TOTAL ORTHOPAE  IC CARE
PROVI  ENCE ME  ICAL TECHNOLOG  INC
ACUME   LLC
THE PAR  ER  VMC TRUST
ALL PRO CLEANING S  STEMS
SPINEOLOG  INC
AEROSEAL LLC
MO  ULAR  EVICES
GALLOWA  OFFICE SUPPLIES INC
BLEN  EN ROTH LAW FIRM PLLC
ME  ICAL CONSULTANTS NETWOR  INC
COLE SCOTT &  ISSANE PA
ENVIRONMENTAL S  STEMS INC
SI-BONE, INC
  -CENTRI  LLC
TOTAL SCOPE INC
TREACE ME  ICAL CONCEPTS INC
  ESIGN B  NATURE CORP
FIRETROL PROTECTION S  STEMS INC
IMMUCOR INC
LSI SOLUTIONS
INNOVATIVE ME  ICAL PRO  UCTS INC
HERSHE  CREAMER  COMPAN
HEALTHCARE FINANCIAL INC
LANMOR SERVICES INC
SIGNET ELECTRONIC S  STEMS INC
TERUMO ME  ICAL CORPORATION
FINTHRIVE INC
CARCO GROUP, INC.
ME  ISOLV INC
BLOOMBERG IN  USTR  GROUP INC
WHELAN PROPERT  MANAGEMENT
AMERICAN COLLEGE OF RA  IOLOG
SMITH & NEPHEW INC
LABORATOR  CORPORATION OF AMERICA
  IMMER US INC
RICE MCVANE
MIST  HA

WILSON ELSER MOS OWIT E ELMAN
COMPLIANT HEALTHCARE
FU IFILM HEALTHCARE AMERICAS
THE FILTER MAN
BRIGHTER HEALTH NETWOR LLC
NETWOR PROVI ERS INC
CHARTER COMMUNICATIONS
VIRTUAL RA IOLOG PROFESSIONALS OF N
  ext Capital LLC
  EVETS IN USTRIES INC
PFEIFFER & SON LT
PROLACTA BIOSCIENCE INC
STR ER ORTHOPAE ICS
AGILITI HEALTH INC
STR ER SALES CORP
OL MPUS AMERICA INC.
ENVIRONMENTAL HEALTH & ENGINEERING
STR ER EN OSCOP
STR ER SUSTAINABILIT SOLUTIONS
HEALOGICS WOUN CARE &
ME TRONIC USA INC
GENCON SERVICE INC
PRORENATA LABS LLC
MA O SURGICAL CORP
ELEVATE PATIENT FINANCIAL
CONVERGE TECHNOLOG SOLUTIONS
  O SURGICAL
LPS ENTERPRISES LLC
INARI ME ICAL INC
Global Healthcare Exchange
BRISTOL LAW PLLC AN CLINICAL
BOSTON SCIENTIFIC CORPORATION
ARC IAL SIS SOUTH FLORI A
BROC TON HOSPITAL INC
GASTROENTEROLOG AFFILIATES OF
IMAGEFIRST OF NEVA A LLC
LIFENET HEALTH
FAVORITE HEALTHCARE STAFFING INC
STR ER NEUROVASCULAR
NUVASIVE INC
R AN LLC

SIEMENS HEALTHCARE  IAGNOSTICS
STR  ER SPINE
CHEM-A  UA INC
HEMOSTASIS LLC
STR  ER CRANIOMA  ILLOFACIAL
IRON MOUNTAIN
SMART SOURCE LLC
UTAH HEALTH INFORMATION NETWOR
ALLSTON BRIGHTON COMMUNIT
CATAL  ST ORTHOSCIENCE LLC
CUBE  STU  IO LLC
TAP  RI  E TRANSPORTSATION INC
AIRGAS USA LLC
CORC  M INC
MARSH USA INC
AFSCME OHIO COUNCIL
BCM CONTROLS CORPORATION
CHG COMPANIES INC
BEC  EL CONTROLS INC
HOLLAN  & HART LLP
BROC  TON NEIGHBORHOO  HEALTH CENTER
E     MARTINE  PLUMBING SERVICE INC
FLORI  A BIRTH RELATE  NEUROLOGICAL
  &  HEALTH CARE S  STEMS INC
UMASS CHAN ME  ICAL SCHOOL
PENUMBRA INC
NE  TME  PLAIN STATES LLC
  UIC  BASE INC
AARON BARLOW PI  E
REME  I  LLC
LUME    CORPORATION
LUME    CORPORATION
TRANSLOGIC CORPORATION
HILL BARTH &  ING LLC
EPSTEIN BEC  ER & GREEN PC
PENRA  TECHNOLOGIES INC
TRI-M MAINTENANCE INC
VMG HEALTH
WELLS PHARMA OF HOUSTON LLC
THOMAS  OUNG ASSOCIATES INC
 AMES W FLETT CO INC

THE ME ICUS FIRM INC
NORTH COAST FIRE PROTECTION INC
HAMILTON ME ICAL INC
 UENCH USA INC
CO E RE CONSULTANTS LLC
EC S STEMS LLC
ME TO LABORATORIES INC
A ME E O LOC SMITH SECURIT
 FA AIR BRAN S - GARELIC FARMS
CS ME ICAL LLC
ER
PC INSTITUTE FOR ME ICAL E UCATION
TENNANT SALES AN SERVICE COMPAN
VICTOR MECHANICAL HOL ING LLC
G USA INC
GREGOR WATTS
NATIONAL FIRE ALARM PROTECTION
EARL BIR POWER LLC
WA LAN MULLI IN
SOUTHFIEL ME ICAL CARE LLC
MICROSURGICAL TECHNOLOG
NEW ENGLAN REVENUE C CLE
 RS TUMOR REGISTER SERVICES
NOVO HEALTH SERVICES FLORI A LLC
ALLIE UNIVERSAL TECHNOLOG SERVICE
ALLIE OOR AN HAR WARE CO INC
CINTAS
SHEA LE UNISERVICE INC
RICHAR CELLER LEGAL PA
SOUTHERN LITHO I LLC
ORTHALIGN INC
GENSET FIRE & SECURIT LLC
BOGGS FIRE E UIPMENT INC
CROWN HEALTH CARE LAUN R
TAN EM THEOR
IN USTRIAL BURNER S STEMS INC
CLAU CLEANING CORPORATION
FE E FREIGHT INC
IMAGING PH SICS LLC
REGIONAL MANAGEMENT ASSOCIATES
PARAGON INC

COMMTAN
  ILAGOS PLUMBING SERVICES INC
PROIECTUS SERVICES LLC
EAST EN   ME   ICAL I LLC
PITNE   BOWES GLOBAL FINANCIAL
COMMUNIT   BAN   OF TE   AS
SONE   HEALTH INC
THE   OINT COMMISSION
HERMAN M EPSTEIN M
A   VANTECH INC
CENTER POINTE SLEEP ASSOCIATES LLC
PHARMAC   ONESOURCE
PITNE   BOWES INC
SMART CARE E   UIPMENT SOLUTIONS
BIOREFERENCE LABORATORIES INC
M   M TRANSPORTATION CONSULTANTS INC
APO PUMPS & COMPRESSORS LLC
TE   AS   EPT OF STATE HEALTH
E   WAR   ON & COMPAN
CENTRAL COMMUNICATIONS AN
REMOTE ICU LLC
ME   ISTIM USA INC
PLANT PROFESSIONALS INC
CITI PROGRAM
ME   IPRO
Edwards Lifesciences LLC
THE PITNE   BOWES RESERVE ACCOUNT
ALSCO INC
      REAALT   TRUST
MICHAEL   ISER
ME   AIR INC
RE   RIVER PHARMAC   SVCS
ROSE BROS SEPTIC &   RAINAGE INC
COMPASS CR   OGENICS INC
ALL ME   ICAL PERSONNEL LLC
MELISSA ALWORTH   O PA
CAL   ERA ME   ICAL INC
FARI   GHEBLEH M   PC
C &   LEASING CORPORATION
MUNIR SHAH M
GREENTEAM PLUMBING LLLC

SIEMENS ME ICAL SOLUTIONS USA
CENTRAL A MI TURE PHARMAC
 MG CLEANING SOLUTION LLC
HANNA CAMPBELL & POWELL LLP
CROWN UNIFORM & LINEN SERVICE
E PERT ME ICAL NAVIGATION
A VANCE AIR AN HEAT CO INC
 & LABORATOR LLC
VERATHON INC
 OHNSON OCONNOR FERON &
WB MASON CO INC
MATHESON TRI GAS INC
TLC ENGINEERING SOLUTIONS INC
TIERPOINT LLC
US POSTAL SERVICE
ME TRONIC SOFAMOR ANE USA INC
Globus Medical North America
FRESHPOINT SOUTH FLORI A INC
GLE CONSULTING INC
 UEST IAGNOSTICS INCORPORATE
HACHE URBANOS I LLC
UNITE TE TILE RENTAL SERVICES
COTTON COMMERCIAL USA
GLOBAL ET CAPITAL LLC
MILESTONE HEALTHCARE LLC
 UGGAN MECHANICAL SERVICES INC
REPUBLIC SERVICES INC
BAM BAM ENTERPRISES LLC
HUNTON SERVICES
SOUTHEAST TE AS INPATIENT PH SICIAN
BIO RA LABORATORIES
OCEANS BEHAVIORAL HOSPITAL
PALOI A VISORS LLC
BLUS RESTORATION CONTRACTORS LLC
FA I NA OUR M
PREMIER IAGNOSTIC SERVICES INC
CUTT EN ELL & OLSON ATTORNE
TRAILRUNNER INTERNATIONAL LLC
WINSTON & STRAWN LLP
BOW ITCH & EWE LLP
LIFESHARE BLOO CENTERS

ANGELICA URENA AN   LAW OFFICE
NEOGENOMICS LABORATORIES
MERCHANT SERVICE
SAPPHIRE ELEVATOR LLC
CONCUR TECHNOLOGIES INC
NEIGHBORWOR  S HOUSING SOLUTIONS
AM SURGICAL
CT CORPORATION S  STEM
CCMMA T  PLLC
SERPE AN   REWS PLLC
OHIO VALLE   PERFUSION ASSOCIATES
ASAHI INTECC USA INC
VIRTUAL RA   IOLOGIC CORPORATION
ROLLS-RO  CE PLC
ECRI
LUBIN & ME  ER AS ATTORNE   FOR THE
PA  FIEL   AN   STOUT LLP TRUST
TE  AS HEALTHCARE LINEN LLC
MI   A  E LLC
BAL   WIN GROUP   BA ROGERS GRA
OMRAM LLC
PE  IATRIC PROFESSIONAL ASSOC PC
ACCESS TELECARE PLLC
BRIAN T. CART
SALT   MICHELSON ARCHITECTS
PUEBLO MECHANICAL AN   CONTROLS LLC
TELERA  IOLOG   SOLUTIONS
ALLHEART ELECTRIC COMPAN
ME   ICAL BUSINESS ASSOCIATES INC
GOR   ON & PARTNERS TRUST ACCT
SOUTHWEST ME   ICAL IMAGING PA
HOLI   A  CVS LLC
METTEL
STREAMLINE VERIF   LLC
  UALIT   HEALTHCARE PARTNERS
CHARLIE WILLIAMS PAINTING
 CB ORTHO LLC
NORTHWIN   STRATEGIES LLC
E  ECUTIVE ME  ICAL PH  SICS ASSOC
EASTSI  E ENTERPRISES INC
BOILER SPECIALISTS INC

TO   S ENVIROSCAPES LLC
MN & COMPAN  ME  IA MANAGEMENT INC
HARR  W  ONIAS M   LLC
 ACOB COHEN M
IMPERATIVE CARE INC
B  B   ELIVER  LLC
MORTON HOSPITAL
ME  IALAB INC
BOWIE COUNT  TE  AS LOCAL PROVI  ER PARTIC
MARICE GU  MAN PLLC FBO  ELL
  TANT ME  ICAL INC
CC ANESTHESIA SOLUTIONS LLC
HOART  TREE E  PERTS INC
 A MA  ANS M
ELEVATOR REPAIR SERVICE INC
STUART BREISCH M
MI  LAN  PLASTIC SURGER  CENTER
TSNE MISSION WOR  S
TEN  HEALTH LLC
PRI  ESTAR EMS INC
ARHC NCO  ST   LLC
PACIFIC PREMIER TRUST COMPAN
UMS MR FUSION SVC OF NE LLC
ALLAN M  ORGE M  PA
POPP HUTCHESON PLLC
MERGE HEALTHCARE SOLUTIONS INC
TTG ISOTOPES LLC
ENTECH SALES & SERVICE LLC
 ONSULT INC
TAN  WI  AR  S INC
WEST TE  AS UROLOG  PA
 OHN   ORMAN
BASIN NEUROSURGICAL & SPINE
UMS URS LITHOTRIPS  SERVICES
S R  EME M  PA
AMERICAN ARBITRATION ASSOCIATION
CAR  IOVASCULAR  IAGNOSTIC CENTER
VI  RAM PATEL M  PA
VOGEL  ANG LAW PC
PURCHASING POWER LLC
FUSION ORTHOPE  ICS USA LLC

GREATER HAMPSTEA  FAMIL  ME  ICINE
UMS LITHO SERVICE OF BRISTOL COUNT
AVASURE LLC
VSI SURGICAL
  MILLER CONSULTING LLC
PINE ISLAN   ASSOCIATES LLC
ARIOL LABRA  A M  PA
A  VANCE  CAR  IOVASCULAR
ACCRE  ITATION COUNCIL FOR GRA  UATE
MASS PAR  INC
GIANT PEACH CONSTRUCTION LLC
STEINER-ATLANTIC LLC
M  E VERA LAN  SCAPING LLC
WINTER ST PARTNERS NEW BE  FOR  LLC
SATCOM  IRECT INC
B  RNES MECHANICAL CONTRACTORS INC
SAN ANTONIO MERCHANT SHIPPERS LLC
VTR PAPAGO ME  ICAL PAR  LLC
ENVELOPE SUPERSTORE
RAMON HECHAVARRIA M
SOUTH FLORI  A ME  ICAL IMAGING PA
UNITE  RENTALS NORTH AMERICA INC
G  RC TECHNOLOGIES LLC
SOUTH MI  LESE  OPPORTUNIT  COUNCIL
Associates in Medical Imaging LLC
PRECISION PH  SICS SERVICES LLC
MP
FW WEBB COMPAN
FU  IFILM SONOSITE INC
 AMES M POTTS M
MBA ME  ICAL INC
EVE  IAS HEALTH SOLUTIONS LLC
  CM  HOL  INGS LLC
S  STEM  OF BOSTON
PERMIAN BASIN ANESTHESIA PLLC
 ASON R MURPH
GEROW E  UIPMENT COMPAN
CR HALL COMPAN  LT
MELTWATER NEWS US INC
BER  SHIRE BAN
GEN  IGITAL INC.

AEP SOUTHWESTERN   ES
SAMBASIVA R SU  HAVASI M   PA
FARRU  H   URESHI
MILLERS RIVER   EVELOPMENT LLC
WA  LE  REGIONAL ME  ICAL CENTER
MRUNAL PATEL
REIS LAN  SCAPING & GAR  ENING LLC
SLIPPER  ROC   COMMERCIAL ROOFING
  BA  ER LAW GROUP PC
THE PICAR   GROUP LLC
COWBO  S STA  IUM LP
MERRITT ME  ICAL CENTER II
AL  O H MARTINE  FLEITES M   PA
THE SUFFOL   GROUP LLC
A  VI  E  TECHNOLOGIES LLC
GRANGER ME  ICAL INC
WORL   FUEL SERVICES EUROPE LT   AVIATION
ANANIA PLUMBING & HEATING INC
HEALTHCARE FINANCIAL GROUP INC
INNERFACE ARCHITECTURAL SIGNAGE INC
  ONSTANT  N S  WA   UN
SENSO SCIENTIFIC
  AVI    HEN  ERSON M
EPREWAR   INC
  OCTORS PAR  II CON  O ASSOCIATION
CHRISTOPHER   TROIANO M
SPAR  LIGHT BILL PA
T  ONCOLOG  PA
  ARL STOR  EN  OSCOP
GREER LABORATORIES
MOUNTAIN ME  ICAL PH  SICIAN
SMARTRISE HEALTH LLC
PE  IATRIC ECHOCAR  IOGRAPH   SERVICES
LIN  BIO CORP
CHARLES CROFT M   PA
THE   ELTA PATHOLOG   GROUP LLC
HA  STAC  I   LLC
EN  OLOGI   LLC
ACCESS CORP
INTEGRIT   HEALTHCARE LOCUMS LLC
TA  LOR COMMUNICATIONS

AGILITI SURGICAL INC
INSPIRE ME ICAL S STEMS INC
AGILITI SURGICAL E UIPMENT REPAIR
 ONNELLE FINANCIAL LLC
WM CORPORATE SERVICES INC
FLORI A EPARTMENT OF CHIL REN
SERVPRO OF CENTRAL BREVAR
IMAGEFIRST
 IGISONICS INC
FRESH PROVISIONS INC
S SCO SOUTH FLORI A INC
ISMAEL MONTANE M PA
RM ARI ONA HOL INGS INC
VO CE INC
RE LABEL SERVICES
CORIN USA LIMITE
AMERICAN RE CROSS
NATIONAL GOVERNMENT SERVICES
SERVICEMASTER B GILIMORE
HELGESEN HOUT & ONES PC
ENGIE RESOURCES
SPECTRUM
IMAGEFIRST OF NEW ENGLAN
UNIVERSAL ELECTRICAL SERVICES INC
TECO PEOPLES GAS
 AIME E CAMPOS M PA
TRICARE Management
GREAT-WEST LIFE
GCB IN USTRIES LLC
NITEEN AN AL AR
HUNTON TRANE
TLC ANITORIAL INC
BEACONME AES LLC
PROLIN HEALTHCARE
ABBOTT LABORATORIES INC.
ABBOTT RAPI IAGNOSTICS
ABBOTT VASCULAR INC
ACCRE ITATION PARTNERS LLC
AMERICAN ACA EM HOL INGS LLC
AMN HEALTHCARE LANGUAGE SERVICES
A UIT SOLUTIONS LLC

BECTON  IC  INSON AN   COMPAN
BIOMERIEU
BIOMERIEU  VITE   INC
BLUEVO  ANT LLC
CAREFUSION SOLUTIONS LLC
CHANGE HEALTHCARE SOLUTIONS LLC
COLLEGE OF AMERICAN PATHOLOGISTS
  OCTORS BILLING INC
  RFIRST.COM
ELE  TA INC
E  PERIAN HEALTH INC
FORWAR   A   VANTAGE INC
GE HEALTHCARE IITS USA
GETINGE USA SALES LLC
GUI  EPOINT SECURIT   LLC
HOLOGIC SALES AN   SERVICES LLC
IMALOGI   LLC
INSITEONE LLC
INTELLIGENT ME  ICAL OB ECTS INC
  ORCHE  TECHNOLOGIES LLC
LAN  AUER INC
ME  ASOURCE
MERATIVE US LP
MICROSOFT CORP
NET HEALTH S  STEMS INC
Philips Medical Capital
PHILIPS NORTH AMERICA LLC
PRESS GANE  ASSOCIATES LLC
PROVATION SOFTWARE INC
RA  IOMETER AMERICA INC
RL  ATI  NORTH AMERICA INC
ROCHE   IAGNOSTICS CORPORATION
SAGILIT  OPERATIONS INC F  A HGS
SECURITAS HEALTHCARE LLC
SHARECARE HEALTH   ATA
SOURCEHOV HEALTHCARE INC
SPO  , INC.
STERIC  CLE INC
TRINIS  S LLC
TWIAGE SOLUTIONS INC
VARIAN ME  ICAL S  STEMS INC

VI  IENT INC
WERFEN USA LLC
 C   GENERAL CONTRACTORS
ME  LINE MO  ART HOL  ING
SO  E  O INC & AFFILIATES
 TEST CORP
A MURPH   INC
AB  OMINAL SURGEONS LT
ABIOME   INC
ACA  IAN AMBULANCE SERVICES INC
ACCESS CIG LLC
ACCLARENT INC
ACUTANE INC STAMPS CONCENTRATION
A   ISON GROUP
A  VANCE   STERILI  ATION PRO  UCTS
AESCULAP INSTRUMENTS
ALGORE   HEALTH TECHNOLOGIES INC
ALTER   INC
AMERICAN COLLEGE OF SURGEONS
AMERICAN HEART ASSOCIATION INC.
AMERICAN ME  ICAL RESPONSE OF
AMERICAN PORTABLE
ANGIO    NAMICS INC
AR CATAL   O CORPORATION
ARI  ONA GASTRO CARE PLLC
ARM ELECTRICAL SERVICES LLC
ARTHRE   INC
ARTHROSURFACE INC
ASSURGENT ME  ICAL STAFFING
ATI RESTORATION LLC
ATRICURE
BA  STATE INTERPRETERS INC
BEC  MAN COULTER INC
BIO-RA   LABORATORIES INC
BIOTE ME  ICAL LLC
BREA  AWA   COURIER BOSTON INC
BREWSTER AMBULANCE SERVICE
CAR  IOVASCULAR S  STEMS INC
CARRIER CORPORATION
CARRIER RENTAL S  STEMS
CERAPE  ICS INC

COLLECTIVE ME ICAL TECHNOLOGIES INC

CONCOR ME ICAL GROUP OF TE AS

CONCOR ME ICAL GROUP PLLC

COR IS US CORP

CORE IAL SIS SERIES LLC

COVI IEN SALES LLC

CRA INTERNATIONAL INC

CTL Amedica

C RACOM LLC

ASSAULT FALCON ET CO

HHS - UNIFIE STATE LABORATORIES

IGIRA IMAGING SOLUTIONS INC

OVER FLOORS INC

RUC ER ME IA INC

INC

ELIOT COMMUNIT HUMAN

ELL A LLC

EMERGENCHEALTH LLC

EMPOWER ANNUIT INS CO OF AMERICA,

ENCORE FIRE PROTECTION

ERBE USA INC

EVO UA WATER TECHNOLOGIES LLC

FAGRON STERILE SERVICES LLC

FLE CARE LLC

FLORI A PEST CONTROL

FONAR CORPORATION

F MASSE ASSOCIATES INC

F SHOUL ER USA INC

GASTON ELECTRICAL CO INC

GLENSTONE CAPITAL LLC

GOR ON FOO SERVICE INC

GULF COAST REGIONAL BLOO CENTER

HARBINGER COMMUNICATIONS INC

HATCH LLC

HEALTHPRO HERITAGE

HIGH ESERT MECHANICAL CORP

HUB INTERNATIONAL NEW ENGLAN LLC PREMI

INO THERAPEUTICS LLC

INSIGHT IMAGING

INTEGRA LIFESCIENCES CORP

Intuitive Surgical Inc.

AC SON LLO    SELECT RIS
AMES CARROLL AS AGENT LABORIE
ANI- ING OF RHO E ISLAN
ENSEN HUGHES INC
 FRAN LAN SCAPING INC
UST PRESS PLA
 CI USA INC
 IC RUM TECHNOLOG GROUP LLC
 NOWTION HEALTH
LAB LOGISTICS LLC
LANTHEUS ME ICAL IMAGING INC.
LEMAITRE VASCULAR INC
LIFE SPINE INC
LIGHTNING BOLT SOLUTIONS
LIMBACH COMPAN  LLC
LINCOLN HARRIS CSG
LIVANOVA USA INC
MCT E PRESS INC
ME ACTA USA INC
MERIT ME ICAL S STEMS INC
MESSAGE MANAGEMENT CENTER LLC
MESSER LLC
MICRO-TECH EN OSCOP USA INC
MI LAN PATHOLOGIST P A
MS SONLINE INC
NEOGENOMICS LABORATORIES INC
NMS LABS
ONEBLOO INC
ORTHO CLINICAL IAGNOSTICS
OSSIO INC
OSTEOME
PARIS HEALTHCARE
PARTNERSOURCE
PENNS LVANNIA STATESHENANGO
PEPSI COLA COMPAN
PHREESIA INC
PREPM PROFESSIONALS LLC
PRO HEALTH ME ICAL STAFFING LLC
PROFESSIONAL PIPING INC
PROFICIO SURGICAL ASSISTANTS LLC
PULMONAR CONSULTANTS PC

REAU    MORGAN &    UINN LLP TRUST
RENTO  IL NORTH AMERICA
REPUBLIC SPINE LLC
RESOURCES GLOBAL PROFESSIONALS
RESTORI   HEALTH
RE  NOL  S   EWALT
RICHAR    WOLF ME   ICAL
RICHAR  S BRAN   T MILLER NELSON
RICOH USA INC
RI   E MOBILE TRANSPORTATION INC
ROOFS INC
SCA PHARMACEUTICALS LLC
SCHIN   LER ELEVATOR CORPORATION
SEMPERIS INC
SERVICEHUB CORPORATION
SHOC   WAVE ME   ICAL INC
SHRE   IT
SIGNATURE AVIATION USA LLC
SIL   ROA   ME   ICAL INC
S  ELETAL     NAMICS LLC
SOUTH TE   AS BOILER IN   USTRIES
SOUTHWORTH-MILTON INC
SPECIALT  CARE CAR  IOVASCULAR
SPINEART USA INC
STAT BIO ME   ICAL SALES & SERVICE
STEVEN A CALLAHAN ELECTRICAL
STEWART & STEVENSON
SUNBELT RENTALS
S  SCO ARI  ONA INC
S  SCO BOSTON LLC
S  SCO CENTRAL FLORI   A INC
S  SCO EAST TE   AS
S  SCO HOUSTON INC
S  SCO  AC  SON LLC
S  SCO WEST TE   AS
S  SME   AMERICA INC
TAC ME   INC
THE FACTOR INC
THE ROMANS GROUP
THERAPEUTIC RESEARCH CENTER
TMHP

TORNIER INC
TOWNE PAR LLC
TRANE US INC
UNUM LIFE INSURANCE COMPAN OF
UROLOGIC SURGEONS OF ARI ONA PLC
US FOO S INC
US ME E UIP LLC
WASTE CONNECTIONS OF FLORI A
WEST TECHS CHILL WATER SPECIALIST
WESTPORT LINEN SERVICES INC
WHITMAN PARTNERS INC
WIC ER SMITH O HARA MCCO & FOR
WLG WL GORE&ASSOC MP
WOLF & COMPAN PC
WRIGHT ME ICAL TECHNOLOG INC
M HEALTH INFORMATION S STEMS
ACCLARA SOLUTIONS LLC
CLOU ME
COGNI ANT TECHNOLOG SOLUTIONS
CONSENSUS CLOU SOLUTIONS
ELL FINANCIAL SERVICES
ERGONOMIC GROUP
HEWLETT PAC AR FINANCIAL SERVICES
HP INC
INOVALON PROVI ER INC
INTERLACE HEALTH LLC
IO INE SOFTWARE LLC
AMS INC
LOGI HEALTH INC
MRO CORPORATION
PRESI IO NETWOR E
REVSPRING INC
TEGRIA RCM GROUP US INC.
BREA EALE SACHSE & WILSON LLP
BRUCE & ELLE PC
CAPPLIS CONNORS CARROLL & ENNIS
RAFFIN & TUC ER LLP
FAL WAAS HERNAN E ET AL
FOSTER & EL RI GE LLP
HALL PRANGLE & SCHOONVEL LLC
HAMEL MARCIN UNN REAR ON & SHEA PC

ULIE SMITH
IPP AN CHRISTIAN PC
MARSHALL ENNEHE WARNER
UINTAIROS PRIETO WOO & BO ER PA
RESNIC & LOUIS PC
SNOW CHRISTENSEN & MARTINEAU
THE CHEC ETT LAW FIRM PLLC
THOMPSON BOWIE & HATCH LLC
TO & WEL LLP
WILLIS TOWERS WATSON US LLC
WIPFLI LLP
AU ERE INTERNATIONAL LIMITE
E CELA RECEIVABLES LLC
H RAMOS FARMS

## Exhibit A[1]

**Mutual Releases.** Except as otherwise expressly set forth below, for good and valuable consideration, the adequacy of which is hereby confirmed, as of the Trust Establishment Date, each of (A) the Debtors, (B) the Estates, (C) the Litigation Trust, (D) the Litigation Trustee, (E) the FILO Parties, (F) the Creditors' Committee and each of its members (solely in their official capacity), and (G) each Related Party of each Person or Entity described in any of the immediately preceding clauses (A) through (F) to the extent that such Person or Entity is legally entitled to bind such Related Party under applicable law (each, a "**Releasing Party**" and, collectively, the "**Releasing Parties**"), in each case on behalf of themselves and their respective successors, assigns, and any and all other Entities that may purport to assert any Claim or Cause of Action derivatively by or through such Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims, asserted or assertable on behalf of such Releasing Party), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part: any act or omission, obligation, transaction, transfer, agreement, event, or other occurrence taking place on or before the Trust Establishment Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the FILO Settlement Term Sheet or any other contract, instrument, release, or document created or entered into in connection with the FILO Settlement or any of the other definitive documents related thereto; any other debt or security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or security of the Debtors; the subject matter of, or the transactions or events giving rise to, any Claim or Interest; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the Approval Order and the transactions contemplated thereby; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Trust Establishment Date. Notwithstanding anything to the contrary in the foregoing, these releases (i) shall not be construed as releasing (a) any Released Party from Claims or Causes of Action arising from a material misrepresentation or an act or omission constituting actual fraud, willful misconduct, criminal misconduct, or gross negligence of or by such Released Party, in each case as judicially determined by a Final Order, (b) any Claims or Causes of Action arising after the transfer of the Litigation Trust Assets to the Litigation Trust, (c) the Debtors or the Estates from

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Settlement and Stay Relief Term Sheet*, to which this exhibit is attached (the "**FILO Settlement Term Sheet**"), or **Annex 1** attached hereto, as applicable.

the Retained FILO Claim (including, without limitation, any liens securing the Retained FILO Claim), (d) any rights or obligations of any party or Entity under the Approval Order, the FILO Settlement Term Sheet, the Plan Support Agreement Term Sheet, any definitive document related to the FILO Settlement or the Plan Support Agreement Term Sheet, or any other document, instrument, or agreement executed to implement the Plan or the transactions contemplated by the FILO Settlement, or (e) any Intercompany Claims; and (ii) shall not release any Claims or Causes of Action against any Identified Non-Released Party. For the avoidance of doubt, no Person or Entity not (i) expressly identified on the list of Individual Released Parties, or (ii) defined as a Released Party, shall be deemed to be granted a release hereunder, regardless of whether such Person or Entity is specifically identified on Schedule 2 hereof.

## Annex 1

### Defined Terms

*2016 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in October 2016 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2020 Transactions* means, individually and/or collectively, (a) the transactions that were entered into and/or occurred in or about May 2020 pursuant to which: (i) Manolete Health, LLC purchased Steward Healthcare International Holdings Ltd. from Steward Health Care System LLC, (ii) Jordan Valley Medical Center, LP ("**Jordan Valley**") and Davis Hospital and Medical Center, LP ("**Davis**") contributed real properties to MPT of Utah-Steward, LLC (together with its subsidiaries, the "**Utah JV**") for common equity interests in the Utah JV and subsequent cash distributions from the Utah JV, and the Utah JV leased such real properties back to Jordan Valley and Davis, and (iii) Cerberus Operations and Advisory Company exchanged its equity in Steward Healthcare Investors LLC for a $350 million convertible note, and (b) all other transactions related thereto, including any transactions in what was referred to at the time as Project Easter.

*2021 Distribution* means the dividends, distributions, and/or allocations paid, made, and/or issued in January 2021 by Steward Health Care System LLC and all other transactions related thereto (including any subsequent transfer of the proceeds thereof).

*2022 Transaction* means the transaction or transactions entered into on or about May 31, 2022 (and certain other dates in 2022) by and among, among others, Sparta Merger Sub I Inc., Sparta Merger Sub II Inc., Sparta Merger Sub III Inc., Sparta Merger Sub I LLC, Sparta Merger Sub II LLC, Sparta Merger Sub III LLC, Sparta Sub Inc., SNCN Holdco Inc., SICN Holdco Inc., Steward Integrated Care Network, Inc., Steward Accountable Care Network, Inc., Steward Health Care Network Inc., Sparta Holding Co. LLC, Steward Health Care System LLC and CareMax, Inc. pursuant to which certain value-based care assets were transferred to Sparta Holding Co. LLC and acquired by CareMax, Inc., and all other transactions related thereto or included therein (including any dividends, distributions, and/or allocations paid, made, and/or issued in 2022 in connection with and/or following such transaction(s), and any subsequent transfer of the proceeds thereof or arising therefrom).

*Affiliate* means, with respect to any specified Entity: (i) an "affiliate," as defined in section 101(2) of the Bankruptcy Code, of such specified Entity as if such specified Entity were a debtor in a case under the Bankruptcy Code; (ii) any Entity that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Entity; (iii) any Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity; or (iv) any Entity twenty percent (20%) or more of whose outstanding equity securities are directly or indirectly owned, controlled, or held by the specified Entity or by an Entity that directly or indirectly owns, controls, or holds twenty percent (20%) or more of the outstanding equity securities of the specified Entity. As used in the prior sentence, "control" includes (without limitation) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the specified Entity (whether through the ownership of equity, by contract or otherwise).

*Avoidance Actions* means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code, or (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas, Houston Division having jurisdiction over the Chapter 11 Cases.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and any local rules of the Bankruptcy Court, in each case as applicable to the Chapter 11 Cases.

*Cause of Action* means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise.  For the avoidance of doubt, "Cause of Action" includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or

Interests, (iii) any claim pursuant to section 362 of the Bankruptcy Code, (iv) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any Avoidance Actions.

*Chapter 11 Case* means, with respect to a Debtor, such Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Bankruptcy Court, jointly administered with all other Debtors' cases under chapter 11 of the Bankruptcy Code.

*Chief Restructuring Officer* means John R. Castellano, in his capacity as Chief Restructuring Officer of each of the Debtors.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code.

*Creditors' Committee* means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as set forth in the *Notice of Appointment of Official Committee of Unsecured Creditors* (Docket No. 290) filed on May 16, 2024, as reconstituted from time to time.

*Debtor Related Parties* means (i) with respect to each Debtor and each Estate, such Debtor's or Estate's attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, Transformation Committee (including the members thereof, and any sub-committee thereof, including the Investigation Subcommittee), and Chief Restructuring Officer, as applicable, each in their capacity as such; (ii) with respect to each Debtor Related Party listed in the immediately preceding clause (i), such Person's or Entity's current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such; (iii) with respect to any Hospital Debtor, such Debtor's current and former officers, presidents, directors, individual managers, and advisory board members, each in their capacity as such; and (iv) the Individual Released Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Debtor Related Party or Released Party.

*Entity* has the meaning set forth in section 101(15) of the Bankruptcy Code.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*FILO DIP Order* means the *Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* (Docket No. 1538), entered by the Bankruptcy Court on July 10, 2024.

*FILO Parties* means, collectively, the Prepetition Bridge Agent, the FILO Bridge Lenders, the FILO DIP Secured Parties, the Prepetition FILO Agent, and the FILO Lenders (each as defined in the FILO DIP Order), in each case in their capacities as such, and the Litigation Funding Agent and the providers of the Litigation Funding in their capacities as such.

**FILO Settlement** means the settlement embodied in the FILO Settlement Term Sheet.

**Final Order** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing shall have expired. However, notwithstanding anything herein to the contrary, no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

**Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

**Hospital Debtors** means all Debtors, other than, for the avoidance of doubt, Steward Health Care Holdings LLC and Steward Health Care System LLC, that held or owned a license to operate a hospital at any time during the Chapter 11 Cases.

**Identified Non-Released Parties** means (i) the Persons and Entities listed on **Schedule 2** annexed hereto, (ii) any other Person or Entity identified by the Debtors on the Schedule of Identified Non-Released Parties, (iii) with respect to the Persons and Entities described in the immediately preceding clauses (i) or (ii), each such Person's or Entity's (a) successors, (b) assigns, (c) current and former relatives, (d) non-Debtor nominees or alter egos, (e) current and former non-Debtor Affiliates, and (f) subsequent transferees of payments or consideration received in connection with the Prepetition Transactions or any fraudulent transfer or unlawful dividend, in each case of the immediately preceding clauses (a) – (f), solely in their capacity as such, and (iv) solely with respect to a Claim or Cause of Action arising from or relating to a Prepetition Transaction, any Person that advised or represented a Debtor and/or any Identified Non-Released Party in a Prepetition Transaction (solely in their capacity as such) at the time such Prepetition Transaction was consummated or in connection with any subsequent transfer of the proceeds thereof or arising therefrom.

**Individual Released Parties** means the individuals listed on the **Schedule 1** annexed hereto, each in their capacity as a current or former director, officer, manager, employee, advisor, or consultant of one or more of the Debtors.

**Interest** means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in a Debtor, including all shares, units, common stock, preferred stock, membership interests, partnership interests or other instruments evidencing any fixed or contingent ownership interest in any Debtor, whether or not transferable, and whether fully vested or vesting in the future, including

any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor.

*Intercompany Claim* means any pre- or postpetition Claim against a Debtor held by another Debtor.

*Investigation Subcommittee* means the subcommittee of the Transformation Committee, consisting of Alan J. Carr and William Transier.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*Person* means any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

*Petition Date* means May 6, 2024.

*Plan Administrator Committee* means a committee comprised of Monica Blacker, Alan J. Carr, and William Transier.

*Plan Support Agreement Term Sheet* means the Plan Support Agreement Term Sheet referred to in the FILO Settlement Term Sheet and executed in connection therewith.

*Plane Sales* means the sales by certain of the Debtors or the Debtors' Affiliates of (i) a Lear airplane in February 2021, (ii) a Challenger airplane in 2018, (iii) a Global Jet 6000 airplane in 2024, and (iv) a Falcon airplane in 2024.

*Prepetition Transactions* means the (i) 2016 Distribution, (ii) 2020 Transactions, (iii) 2021 Distribution, (iv) 2022 Transaction, and (v) the Plane Sales.

*Related Parties* means, with respect to any Entity, such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' respective current and former subsidiaries, officers, directors, principals, equity holders (regardless of whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, advisory board members, management companies, managed accounts or funds, affiliated investment funds or investments vehicles, and Representatives, and with respect to each of the foregoing, their respective predecessors, successors, and assigns, in each case, solely in their capacity as such.

*Released Parties* means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, and (b) the Litigation Trust and the Litigation Trustee; (iii) each of the following, solely in their capacities as such, (a) the Creditors' Committee and each of its members, and (b) the FILO Parties; and (iv) with respect to each of the foregoing Entities identified in the immediately preceding clauses (ii) or (iii), such Entities' Related Parties; *provided* that, notwithstanding anything herein to the contrary, no Identified Non-Released Party shall be a Released Party.

**Representative** means, with respect to any Entity, such Entity's outside attorneys, accountants, investment bankers, consultants, professional advisors, independent auditors, trustees, fund advisors, investment managers, investment advisors, sub-advisors, sub-managers, and other professionals, and each of their respective current and former officers, directors, principals, equity holders (regardless whether such interests are held directly or indirectly), members, partners (including both general and limited partners), managers, employees, agents, and advisory board members, each in their capacity as such.

**Transformation Committee** means the special committee of the board of managers of Steward Health Care Holdings LLC comprised of Alan J. Carr, John R. Castellano, and William Transier.

**<u>Schedule 1</u>**

**Individual Released Parties**

- Alan Carr
- Ann-Marie Driscoll
- Carlos Hernandez
- David Barnhardt
- Eugene (Jay) Sullivan
- Gail Schlesinger
- General H.R. McMaster
- Henry (Nick) Nickells
- Jeffrey Morales
- Jennifer Hunt
- John Boehner
- John Castellano
- Joseph Weinstein
- Katchena Potter
- Mary Beth Taylor
- Nathalie Hibble
- Octavio Diaz
- Patrick Lombardo
- Rich Iannessa
- Sr. Vimala Vadakumpadan
- Susan Brown
- William Transier

## Schedule 2

### Identified Non-Released Parties

- Alessandra Pace
- Armin Ernst
- Brian Carty
- Christopher Dunleavy
- Craig Jesiolowski
- David Chicoine
- David Friend
- David Morales
- Herbert Holtz
- James Karam
- James Lenehan
- Jill Moretto
- John Polanowicz
- Joseph Ciccolo
- Joseph Maher
- Joshua Putter
- Mark Girard
- Mark Rich
- Michael Callum
- Miroslav Boyanov
- Nadine Delicata
- Ralph de la Torre
- Robert Guyon
- Ruben King-Shaw Jr.
- Sanjay Shetty

- 5326 Old Buena Vista Road LLC
- Ad Astra Per Aspera LLC
- CareMax, Inc.
- Cayman TRS Holdings
- Cerberus Capital Management, L.P.
- Cerberus International II Master Fund LP
- Cerberus Partners II LP
- Cerberus Series Four Holdings LLC
- de la Torre Foundation
- de la Torre Family Foundation
- Management Health Services Colombia S.A.S.
- Management Health Services LLC
- Manolete Health Investors LLC
- Manolete Health LLC
- Medical Properties Trust, Inc.
- MPT Sycamore Opco LLC
- Ralph de la Torre Revocable Trust
- RDLT – SHCI Investor LLC
- RDLT – SHCI Manager LLC
- Sagamore Capital Management, LLC
- Santa Clara Holdings LLC
- Sparta Holding Co. LLC
- Steward Health Care International
- Steward Health Care International (Malta) Ltd
- Steward Health Care International Colombia S.A.S.
- Steward Health Care Investors LLC
- Steward Health Care International Investors LLC
- Steward Health Care International Kingdom of Saudi Arabia, S.L.
- Steward Health Care International Ltd
- Steward Health Care International S.L
- Steward Malta Assets Ltd
- Steward Malta Ltd
- Steward Malta Management Ltd
- Steward Malta Personnel Limited
- Steward Management Holdings LLC
- Tenet Healthcare Corporation
- TRACO International Group S. DE R.L.

**Exhibit B**

**TSA Budget**



# Post-TED TSA Forecast

**($ in thousands)**

| Month Ending | Jul-25 | Aug-25 | Sep-25 | Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 | Mar-26 | Apr-26 | May-26 | Jun-26 | Jul-26 | Aug-26 | Sep-26 | Oct-26 | Nov-26 | Dec-26 | Total Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst |
| **_Illus. Estate Expenses (Covered by TSA with Litigation Trust)_** | | | | | | | | | | | | | | | | | | | |
| Payroll & Payroll Related | $ (481) | $ (350) | $ (350) | $ (250) | $ (250) | $ (250) | $ (100) | $ (100) | $ (100) | $ (100) | $ (100) | $ (100) | $ (50) | $ (50) | $ (50) | $ (50) | $ (50) | $ (50) | $ (2,831) |
| Suppliers & Trade Vendors | (850) | (750) | (650) | (550) | (400) | (350) | (150) | (150) | (150) | - | - | - | - | - | - | - | - | - | (4,000) |
| Rent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Operating Disbursements | (75) | (75) | (75) | (75) | (75) | (50) | (25) | (25) | (25) | - | - | - | - | - | - | - | - | - | (500) |
| Medical Records | (3,500) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (3,500) |
| U.S. Trustee Fees | (875) | - | - | (129) | - | - | (81) | - | - | (80) | - | - | (60) | - | - | (56) | - | - | (1,281) |
| **Total Illus. TSA Covered Expenses** | **$ (5,781)** | **$ (1,175)** | **$ (1,075)** | **$ (1,004)** | **$ (725)** | **$ (650)** | **$ (356)** | **$ (275)** | **$ (275)** | **$ (180)** | **$ (100)** | **$ (100)** | **$ (110)** | **$ (50)** | **$ (50)** | **$ (106)** | **$ (50)** | **$ (50)** | **$ (12,113)** |

**Exhibit 2**

**DIP Amendment**

# AMENDMENT NO. 6
# TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **AMENDMENT NO. 6 TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT** is entered into as of April 28, 2025 (this "Amendment"), by and among Steward Health Care System LLC, a Delaware limited liability company (the "Borrower"), Holdings, the other Loan Parties, the Lenders party hereto and Brigade Agency Services LLC, as administrative agent for the Lenders (in such capacity, the "Administrative Agent").

## RECITALS

**WHEREAS**, reference is made to that certain Debtor-In-Possession Credit Agreement, dated as of July 10, 2024 (as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time prior to the date hereof, the "Existing Credit Agreement"; the Existing Credit Agreement after giving effect to this Amendment, the "Credit Agreement"), by and among the Borrower, the other Loan Parties party thereto, the Lenders party thereto, the Administrative Agent and the Collateral Agent;

**WHEREAS**, the Loan Parties have requested to amend the Existing Credit Agreement to, among other things, extend the maturity date under the Existing Credit Agreement through (i) in the first instance, April 28, 2025 (the "Motion Milestone"), (ii) if the Debtors have filed a motion seeking the Bankruptcy Court's approval of an order (the "Approval Order"), pursuant to sections 361, 362, 363 and 105 of the Bankruptcy Code and Bankruptcy Rules 4001(d)(iii), 6004, and 9019, approving the Settlement and Stay Relief Term Sheet executed by (x) the Debtors, (y) the FILO DIP Secured Parties, the Prepetition Bridge Agent, and the FILO Bridge Lenders (collectively, the "FILO Parties"), and (z) the Creditors' Committee (together with the Debtors and the FILO Parties, the "Settlement Parties") (the "Settlement Term Sheet") by the Motion Milestone, May 28, 2025 (the "Approval Milestone"), and (iii) if the Approval Order is entered by the Approval Milestone, the date that is the earlier of (x) July 8, 2025 and (y) one business day after the confirmation date of any confirmed plan; and

**WHEREAS**, subject to the terms and conditions set forth herein, the Administrative Agent and the Lenders party hereto, constituting all of the Lenders under the Existing Credit Agreement immediately prior to the effectiveness of this Amendment on the Amendment Effective Date (as defined below), are willing to extend the maturity under the Existing Credit Agreement as detailed herein, only on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto hereby agree as follows:

1.     Defined Terms.  Capitalized terms used (including in the preamble and recitals hereto) but not defined herein shall have the meanings ascribed to them in the Credit Agreement or, if not defined in the Credit Agreement, the order entered by the Bankruptcy Court at Docket No. 1538 in the Chapter 11 Cases (the "FILO DIP Order").

2.     Maturity Extension.  In accordance with Section 9.02(c) of the Existing Credit Agreement, the Administrative Agent and the Lenders party hereto, constituting all of the Lenders under the Existing Credit Agreement as in effect immediately prior to the effectiveness of this

Amendment, hereby agree to amend the Existing Credit Agreement, and the Existing Credit Agreement is hereby amended to amend and restate clause (a) in the definition of "Maturity Date" in Section 1.01 of the Existing Credit Agreement to read as follows: "(a) April 28, 2025,"; *provided*, that if the Debtors have filed a motion seeking the Bankruptcy Court's approval of the Approval Order by the Motion Milestone, the Existing Credit Agreement shall be automatically and without any further actions deemed amended to amend and restate clause (a) in the definition of "Maturity Date" in Section 1.01 of the Existing Credit Agreement to read as follows: "(a) May 28, 2025,"; *provided*, *further*, that if the Approval Order is entered by the Approval Milestone, the Existing Credit Agreement shall be automatically and without any further actions deemed amended to amend and restate clause (a) in the definition of "Maturity Date" in Section 1.01 of the Existing Credit Agreement to read as follows: "(a) the date that is the earlier of (x) July 8, 2025 and (y) one business day after the confirmation date of any confirmed plan,".

3.    <u>Amendments and Waivers</u>.  In accordance with Section 9.02(b) of the Existing Credit Agreement, the Borrower, the Administrative Agent and the Lenders party hereto, constituting all of the Lenders under the Existing Credit Agreement as in effect immediately prior to the effectiveness of this Amendment, hereby agree:

a.    to amend the Existing Credit Agreement, and the Existing Credit Agreement is hereby amended, to amend and restate Section 5.17(a) of the Existing Credit Agreement to read as follows:

"(i) host a bi-weekly conference call on a day that is a Business Day among the Chief Restructuring Officer, the advisors to the Loan Parties and the Lender Advisors, at a time to be mutually agreed upon and (ii) host a bi-weekly conference call on a day that is a Business Day among one or more members of the Transformation Committee of the Board of Managers of Steward Health Care Systems LLC, one or more representatives of the Lenders, including the Administrative Agent, and at the option of the Lenders, the Lender Advisors, at a time to be mutually agreed upon, each of which conference calls shall be used to discuss, among other things, the Debtors' asset monetization process, preparation for strategic processes and/or any issues related to the financial affairs, finances, business, assets, operations or condition (financial or otherwise) of the Loan Parties and their Subsidiaries, including such matters as may be requested by the Lenders or Lender Advisors; provided, that the Lenders and Lender Advisors shall confine attendance to those parties reasonably necessary to participate and such conference calls will be subject to reasonable time limits; and";

b.    that it shall be an Event of Default under the Credit Agreement if the Debtors or the Creditors' Committee materially breach their respective obligations to the FILO Parties under the Settlement Term Sheet or the Plan Support Agreement Term Sheet entered into by the Settlement Parties on or about the date hereof, and such breach is not cured within three business days of the FILO Parties providing written notice of such breach to the Debtors' and the Creditors' Committee's counsel; and

c.    to waive any Default or Event of Default (including any Event of Default under Section VII(b) of the Existing Credit Agreement and/or arising as a failure to give notice thereof) existing as of the Amendment Effective Date relating to the Borrower's

failure to pay interest with respect to $237,304,853.71 of Term SOFR Loans with an Interest Period ending March 31, 2025 on the date due.

4. <u>Covenants of the Borrower</u>. In consideration of the maturity extension set forth above, each of the Loan Parties hereby agrees that:

a. The covenants of the Loan Parties set forth in Sections 4(e), (f), and (g) of the Limited Waiver No. 2 and Amendment to Debtor-in-Possession Credit Agreement, entered into as of December 31, 2024, by and among the Borrower, Holdings, the other Loan Parties, the Lenders party thereto, and the Administrative Agent, and Sections 3(f), (g), and (h) of the Amendment No. 5 to Debtor-in-Possession Credit Agreement, entered into as of December 31, 2024, by and among the Borrower, Holdings, the other Loan Parties, the Lenders party thereto, and the Administrative Agent, are incorporated herein by reference.

b. The Loan Parties delivered a budget annexed hereto as <u>Annex A</u> for the weeks ending May 2, 2025 through July 11, 2025, which has been approved by the Lenders and which constitutes the Approved Budget for all purposes of the Credit Agreement as of the Amendment Effective Date.

c. The Loan Parties and their Subsidiaries shall not make any payments to any vendors during the period set forth in the Approved Budget delivered pursuant to clause 4(b) above other than as set forth in such applicable Approved Budget.

5. <u>Representations and Warranties</u>. In order to induce the Administrative Agent and the Lenders to enter into this Amendment and the agreements contemplated hereby regarding the Existing Credit Agreement in the manner provided herein, Holdings, the Borrower and the other Loan Parties hereby represent and warrant on and as of the Amendment Effective Date that:

a. this Amendment has been duly executed and delivered by each Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms;

b. at the time of and immediately after giving effect to this Amendment, the representations and warranties of the Loan Parties contained in Article III of the Credit Agreement are true and correct in all material respects (except, with respect to the representation contained in Section 3.06 of the Credit Agreement, to the extent otherwise disclosed by the Borrower (or its counsel) to the Lenders (or their counsel)) on and as of the Amendment Effective Date (it being understood that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct in all respects after giving effect to any such qualification therein) with the same effect as though made on and as of the Amendment Effective Date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date); and

c. at the time of and immediately after giving effect to this Amendment, no Default or Event of Default has occurred or is continuing.

6. <u>Conditions to Effectiveness to Amendment</u>. The effectiveness of this Amendment is subject to the satisfaction or waiver of the following conditions (the time at which all such conditions are so satisfied or waived is referred to herein as the "<u>Amendment Effective Date</u>"):

a. Each of the parties hereto shall have received a counterpart signature page of this Amendment, duly executed by each of the Borrower, Holdings, the other Loan Parties, the Administrative Agent and the Lenders (constituting all of the Lenders under the Credit Agreement immediately prior to the effectiveness of this Amendment);

b. To the extent required by the FILO DIP Order, either the Creditors' Committee shall have consented in writing to this Amendment or the Bankruptcy Court shall have entered an order in the Chapter 11 Cases approving the Debtors' entry into this Amendment in accordance with paragraph 2(c)(ii) of the FILO DIP Order; and

c. The Settlement Term Sheet has been executed by all parties thereto and shall have become effective in accordance with the terms and conditions thereof.

7. <u>No Modification</u>. Nothing contained herein shall be deemed to constitute a waiver of compliance with any term or condition contained in the Existing Credit Agreement, the Credit Agreement or any of the other Loan Documents or constitute a course of conduct or dealing among the parties except as explicitly set forth herein. The parties hereto hereby reserve all rights, privileges and remedies under the Loan Documents. Except as explicitly set forth herein, the Existing Credit Agreement remains unmodified and in full force and effect. All references in the Loan Documents to the Existing Credit Agreement shall be deemed to be references to the Existing Credit Agreement after giving effect hereto.

8. <u>Governing Law; Jurisdiction; Consent to Service of Process; WAIVER OF JURY TRIAL</u>. Section 9.09 and Section 9.10 of the Existing Credit Agreement are hereby incorporated by reference, *mutatis mutandis.* The parties hereto hereby agree to cooperate with one another in having any dispute as to the validity, enforceability, or interpretation of this Amendment heard by the Bankruptcy Court on an expedited basis.

9. <u>Severability of Provisions</u>. Any provision of this Amendment which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. All rights, remedies and powers provided in this Amendment may be exercised only to the extent that the exercise thereof does not violate any applicable mandatory provisions of law, and all the provisions of this Amendment are intended to be subject to all applicable mandatory provisions of law which may be controlling and to be limited to the extent necessary so that they will not render this Amendment invalid or unenforceable.

10. <u>Integration</u>. The Existing Credit Agreement, after giving effect to this Amendment, and the other Loan Documents constitute the entire understanding of the parties hereto and thereto with respect to the subject matter thereof and thereof and any prior agreements, whether written or oral, with respect thereto are superseded hereby and thereby.

11.     <u>Execution in Counterparts</u>.  This Amendment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which shall together constitute one and the same instrument.  Delivery of an executed counterpart hereof by facsimile or electronic transmission shall be as effective as delivery of any original executed counterpart hereof. By its signature hereto, each Person signing this Amendment on behalf of a party represents and warrants to the other parties that it is duly authorized to execute and deliver this Amendment.  The words "execution," "signed," "signature," and words of like import in this Amendment shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

12.     <u>Headings</u>. The headings of the several sections and subsections of this Amendment are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Amendment.

13.     <u>Loan Document</u>. The parties hereto hereby agree that this Amendment is a Loan Document.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to be executed and delivered by their duly authorized officers as of the date first above written.

> **BRIGADE AGENCY SERVICES LLC,** as FILO Agent
>
> By: BRIGADE CAPITAL MANAGEMENT, LP, Its Managing Manager
>
> By: _____
> Name: Patrick Criscillo
> Title: Authorized Signer

**LENDERS:**

**BIG RIVER GROUP FUND SPC LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE BADGER FUND, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE DIVERSIFIED CREDIT CIT**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**BRIGADE CREDIT FUND II LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**LENDERS:**

**BRIGADE HIGH YIELD FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE LEVERAGED CAPITAL
STRUCTURES FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE LOAN FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**BRIGADE OPPORTUNISTIC CREDIT LBG
FUND LTD**.
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

**LENDERS:**

**BRIGADE-SIERRABRAVO FUND LP**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**CITY OF PHOENIX EMPLOYEES'
RETIREMENT PLAN**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FEDEX CORPORATION EMPLOYEES'
PENSION TRUST**
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**FUTURE DIRECTIONS CREDIT
OPPORTUNITIES FUND**,
By: BRIGADE CAPITAL MANAGEMENT, LP,
as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**LENDERS:**

**JPMORGAN CHASE RETIREMENT PLAN BRIGADE BANK LOAN**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer


**SC CREDIT OPPORTUNITIES MANDATE, LLC**
By: BRIGADE CAPITAL MANAGEMENT, LP, as Investment Manager

By: _____
Name: Patrick Criscillo
Title: Chief Financial Officer

**LENDERS:**

**MIDOCEAN CREDIT FUND MANAGEMENT, LP**

By: _____
Name: ~~Damion Brown~~
Title:  Managing Director

**MidOcean Tactical Credit Fund III LP**
By: Tactical Credit Fund III GP, LP
By: Ultramar Credit Holdings Ltd., its General Partner

By: _____
Name: ~~Damion Brown~~
Title: Managing Director

**MidOcean Multi Asset Credit Fund, LP**
By: MidOcean Multi Asset Credit Fund GP, LLC
its General Partner

By: _____
Name: ~~Damion Brown~~
Title: Managing Director

**Abbott Abbvie Multiple Employer Pension Plan Trust**

By: _____
~~MidOcean Credit Fund Management LP~~
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

**LENDERS:**

**Abbott Laboratories Annuity Retirement Trust**

By: _____
MidOcean Credit Fund Management LP
(Investment Advisor to above)
Name: Damion Brown
Title: Managing Director

**LENDER:**

For and on behalf of **OneIM Fund I LP, as DIP Lender,** acting by its General Partner, OneIM GP LLC, acting by its Manager, GCT Capital LLC

By: _____
Name: Munish Varma
Title: Authorized Signatory

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

**LENDER:**

**OWL CREEK INVESTMENTS I, LLC**

By: OWL CREEK ASSET MANAGEMENT, LP
as Investment Manager

By: _____
Name: Kevin Dibble
Title:  General Counsel

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

**LENDER:**

**WHITEHAWK FINANCE LLC**
By: WHITEHAWK CAPITAL PARTNERS, LP, as
Investment Manager


By: _____
Name: Robert Louzan
Title: Managing Partner

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

**BORROWER:**

**STEWARD HEALTH CARE SYSTEM LLC**

By: _____
Name: John Castellano
Title: Chief Restructuring Officer

**LOAN GUARANTORS:**

**ARIZONA DIAGNOSTIC & SURGICAL CENTER, INC.**
**BEAUMONT HOSPITAL HOLDINGS, INC.**
**BILTMORE SURGERY CENTER HOLDINGS, INC.**
**BILTMORE SURGERY CENTER, INC.**
**BRIM HEALTHCARE OF TEXAS, LLC**
**BRIM HOLDING COMPANY, INC.**
**CHOICE CARE CLINIC I, INC.**
**CHOICE CARE CLINIC II, INC.**
**CHOICE CARE CLINIC III, INC.**
**CHOICE CARE CLINIC OF LOUISIANA, INC.**
**CHOICE CARE CLINIC OF UTAH, INC.**
**DAVIS HOSPITAL HOLDINGS, INC.**
**DAVIS SURGICAL CENTER HOLDINGS, INC.**
**GLENWOOD SPECIALTY IMAGING, LLC**
**HERITAGE TECHNOLOGIES, L.L.C.**
**IASIS CAPITAL CORPORATION**
**IASIS FINANCE II LLC**
**IASIS FINANCE III LLC**
**IASIS FINANCE TEXAS HOLDINGS, LLC**
**IASIS FINANCE, INC.**
**IASIS GLENWOOD REGIONAL MEDICAL CENTER, LP**
**IASIS HEALTHCARE CORPORATION**
**IASIS HEALTHCARE HOLDINGS, INC.**
**IASIS HEALTHCARE LLC**
**IASIS MANAGEMENT COMPANY**
**IASIS TRANSCO, INC.**
**INDIGENT CARE SERVICES OF NORTHEAST LOUISIANA, INC.**
**JORDAN VALLEY HOSPITAL HOLDINGS, INC.**
**MESA GENERAL HOSPITAL, LP**
**MORTON HOSPITAL, A STEWARD FAMILY HOSPITAL, INC.**
**MOUNTAIN POINT HOLDINGS, LLC**
**MOUNTAIN VISTA MEDICAL CENTER, LP**
**MT TRANSITION LP**

By: _____
Name: John Castellano
Title:   Chief Restructuring Officer

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

NASHOBA VALLEY MEDICAL CENTER, A
STEWARD FAMILY HOSPITAL, INC.
NEW ENGLAND SINAI HOSPITAL, A STEWARD
FAMILY HOSPITAL, INC.
ODESSA FERTILITY LAB, INC.
ODESSA REGIONAL HOSPITAL, LP
PERMIAN BASIN CLINICAL SERVICES, INC.
PERMIAN PREMIER HEALTH SERVICES, INC.
PHYSICIAN GROUP OF ARIZONA, INC.
PHYSICIAN GROUP OF ARKANSAS, INC.
PHYSICIAN GROUP OF FLORIDA, INC.
PHYSICIAN GROUP OF LOUISIANA, INC.
PODIATRIC PHYSICIANS MANAGEMENT OF
ARIZONA, INC.
PP TRANSITION LP
PP TRANSITION, INC.
QUINCY MEDICAL CENTER, A STEWARD
FAMILY HOSPITAL, INC.
RIVERWOODS ASC HOLDCO LLC
SEABOARD DEVELOPMENT PORT ARTHUR LLC
SHC YOUNGSTOWN OHIO LABORATORY
SERVICES COMPANY LLC
SHC YOUNGSTOWN OHIO OUTPATIENT
SERVICES LLC
SHC YOUNGSTOWN OHIO PSC LLC
SJ MEDICAL CENTER, LLC
ST. LUKE'S BEHAVIORAL HOSPITAL, LP
ST. LUKE'S MEDICAL CENTER, LP
STEWARD CARNEY HOSPITAL, INC.
STEWARD CGH, INC.
STEWARD EMERGENCY PHYSICIANS, INC.
STEWARD FALL RIVER MANAGEMENT CARE
SERVICES LLC
STEWARD FLORIDA ALF LLC
STEWARD FLORIDA HOLDINGS LLC
STEWARD GOOD SAMARITAN MEDICAL
CENTER, INC.
STEWARD GOOD SAMARITAN OCCUPATIONAL
HEALTH SERVICES, INC.
STEWARD GOOD SAMARITAN RADIATION
ONCOLOGY CENTER, INC.
STEWARD HEALTH CARE HOLDINGS LLC
STEWARD HEALTH CARE NETWORK, INC.
STEWARD HH, INC.

By: _____
Name: John Castellano
Title:   Chief Restructuring Officer

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

STEWARD HILLSIDE REHABILITATION
HOSPITAL, INC.
STEWARD HOLY FAMILY HOSPITAL, INC.
STEWARD HOSPITAL HOLDINGS LLC
STEWARD IMAGING & RADIOLOGY HOLDINGS
LLC
STEWARD MEDICAID CARE NETWORK, INC.
STEWARD MEDICAL GROUP, INC.
STEWARD MEDICAL HOLDINGS LLC
STEWARD MELBOURNE HOSPITAL, INC.
STEWARD NEW ENGLAND INITIATIVES, INC.
STEWARD NORWOOD HOSPITAL, INC.
STEWARD NSMC, INC.
STEWARD OHIO HOLDINGS LLC
STEWARD OPERATIONS HOLDINGS LLC
STEWARD PENNSYLVANIA HOLDINGS LLC
STEWARD PGH, INC.
STEWARD PHYSICIAN CONTRACTING, INC.
STEWARD ROCKLEDGE HOSPITAL, INC.
STEWARD SEBASTIAN RIVER MEDICAL
CENTER, INC.
STEWARD SHARON REGIONAL HEALTH
SYSTEM, INC.
STEWARD ST. ANNE'S HOSPITAL
CORPORATION
STEWARD ST. ELIZABETH'S MEDICAL CENTER
OF BOSTON, INC.
STEWARD ST. ELIZABETH'S REALTY CORP.
STEWARD TEXAS HOSPITAL HOLDINGS LLC
STEWARD TRUMBULL MEMORIAL HOSPITAL,
INC.
STEWARD VALLEY REGIONAL VENTURES, INC.
THE MEDICAL CENTER OF SOUTHEAST TEXAS,
LP
TNC TRANSITION LP
UTAH TRANSCRIPTION SERVICES, INC.
STEWARDSHIP HEALTH, INC.
STEWARDSHIP HEALTH MEDICAL GROUP, INC.
STEWARDSHIP SERVICES INC.
SEABOARD DEVELOPMENT LLC
SOUTHWEST GENERAL HOSPITAL, LP
STEWARD FLORIDA ASC LLC
BREVARD SHC HOLDINGS LLC

By: _____

Name: John Castellano
Title: Chief Restructuring Officer

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

STEWARD MEDICAL GROUP EXPRESS CARE, INC.
STEWARD HEALTH CARE NETWORK ACO TEXAS, INC.
STEWARD HEALTHCARE MANAGEMENT SERVICES LLC
STEWARD EASTON HOSPITAL, INC.
SALT LAKE REGIONAL MEDICAL CENTER, LP
JORDAN VALLEY MEDICAL CENTER, LP
STEWARD PET IMAGING, LLC
STEWARD ANESTHESIOLOGY PHYSICIANS OF FLORIDA, INC.
STEWARD EMERGENCY PHYSICIANS OHIO, INC.
STEWARD EMERGENCY PHYSICIANS OF PENNSYLVANIA, INC.
STEWARD RADIOLOGY PHYSICIANS OF FLORIDA, INC.
STEWARD EMERGENCY PHYSICIANS OF FLORIDA, INC.
ONSITE CARE, INC.
STEWARD ANESTHESIOLOGY PHYSICIANS OF PENNSYLVANIA, INC.
BOSTON SPORTS MEDICINE AND RESEARCH INSTITUTE, LLC
STEWARD RADIOLOGY PHYSICIANS OF MASSACHUSETTS, INC.
STEWARD PATHOLOGY PHYSICIANS OF MASSACHUSETTS, INC.
STEWARD EMERGENCY PHYSICIANS OF ARIZONA, INC.
STEWARD RADIOLOGY PHYSICIANS OF ARIZONA, INC.
STEWARD ANESTHESIOLOGY PHYSICIANS OF MASSACHUSETTS, INC.
STEWARD MEDICAL GROUP PENNSYLVANIA ENDOSCOPY LLC
STEWARD RADIOLOGY PHYSICIANS OF PENNSYLVANIA, INC.
PHYSICIAN GROUP OF UTAH, INC.
SALT LAKE REGIONAL PHYSICIANS, INC.

By: _____
Name: John Castellano
Title:  Chief Restructuring Officer

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

DAVIS HOSPITAL & MEDICAL CENTER, LP
SOUTHRIDGE PLAZA HOLDINGS, INC.
STEWARD FMC, INC.
HC ESSENTIAL CO.
HEALTH CHOICE FLORIDA, INC.
HEALTH CHOICE LOUISIANA, INC.
HEALTH CHOICE MANAGED CARE SOLUTIONS
LLC
HEALTH CHOICE PREFERRED LOUISIANA ACO
LLC
HEALTH CHOICE PREFERRED LOUISIANA
PHYSICIAN ASSOCIATION LLC
HEALTH CHOICE PREFERRED TEXAS ACO –
ALAMO REGION LLC
HEALTH CHOICE PREFERRED TEXAS ACO –
GULF COAST REGION LLC
HEALTH CHOICE PREFERRED TEXAS
PHYSICIAN ASSOCIATION – ALAMO REGION
LLC
HEALTH CHOICE PREFERRED TEXAS
PHYSICIAN ASSOCIATION – GULF COAST
REGION LLC
STEWARD HOSPITAL HOLDINGS SUBSIDIARY
ONE, INC.
STEWARD HEALTH CARE OZ FUND, INC.
STEWARD HEALTH CHOICE, INC.
STEWARD HEALTH CARE INTERNATIONAL
LLC
STEWARD EMPLOYER SOLUTIONS LLC
STEWARD MEDICAL VENTURES, INC.
BOSTON ORTHOPEDIC CENTER, LLC
HEALTH CHOICE NORTHERN ARIZONA LLC
STEWARD SPECIAL PROJECTS LLC
STEWARD ACCOUNTABLE CARE
ORGANIZATION, INC.
BLACKSTONE MEDICAL CENTER, INC.
BLACKSTONE REHABILITATION HOSPITAL,
INC.
HEALTHUTAH HOLDCO LLC
STEWARD ASC HOLDINGS LLC
STEWARD TSC INVESTMENTS LLC
STEWARD SA FSED HOLDINGS, INC.
STEWARD WEST VENTURES CO.

By: _____

Name: John Castellano

Title:   Chief Restructuring Officer

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

HEALTH CHOICE UTAH ACCOUNTABLE CARE
LLC
HEALTH CHOICE PREFERRED ACCOUNTABLE
CARE LLC
CONVERSE MEDICAL CENTER LLC
DE ZAVALA MEDICAL CENTER LLC
LEGACY TRAILS MEDICAL CENTER LLC
BRIM PHYSICIANS GROUP OF COLORADO, LLC
BRIM HEALTHCARE OF COLORADO, LLC
ONSITE CARE MSO, LLC
TRACO INVESTMENT MANAGEMENT LLC
DOWNTOWN HOUSTON PHYSICIAN HOSPITAL
ORGANIZATION

By:

Name: John Castellano
Title: Chief Restructuring Officer

*[Signature Page to Amendment No. 6 to Debtor-In-Possession Credit Agreement]*

## ANNEX A

## Budget

[See attached.]



# DIP Budget

($ in millions)

| Week # | Wk 1 | Wk 2 | Wk 3 | Wk 4 | Wk 5 | Wk 6 | Wk 7 | Wk 8 | Wk 9 | Wk 10 | Wk 11 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 2-May | 9-May | 16-May | 23-May | 30-May | 6-Jun | 13-Jun | 20-Jun | 27-Jun | 4-Jul | 11-Jul | |
| Status | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Forecast |
| Hospital Receipts | $ 0.8 | $ 0.8 | $ 0.8 | $ 0.8 | $ 0.8 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.6 | $ 0.3 | $ 0.3 | $ 6.9 |
| Supplemental Programs | 21.6 | - | - | - | - | 4.5 | - | - | - | - | - | 26.1 |
| Other Operating Receipts | - | - | - | - | - | - | - | - | 1.9 | - | - | 1.9 |
| **Total Operating Receipts** | **$ 22.4** | **$ 0.8** | **$ 0.8** | **$ 0.8** | **$ 0.8** | **$ 5.1** | **$ 0.6** | **$ 0.6** | **$ 2.5** | **$ 0.3** | **$ 0.3** | **$ 34.9** |
| **Operating Disbursements** | | | | | | | | | | | | |
| Payroll & Payroll Related | (0.1) | (0.4) | (0.2) | (0.4) | (0.2) | (0.2) | (0.1) | (0.2) | (0.1) | (0.2) | (0.0) | (2.2) |
| Suppliers & Trade Vendors | (0.4) | (0.3) | (0.3) | (0.3) | (0.5) | (0.3) | (0.3) | (0.3) | (0.3) | (0.2) | (0.2) | (3.3) |
| Other Operating Disbursements | (0.2) | (0.1) | (1.1) | (0.1) | (0.1) | (0.1) | - | - | (0.1) | - | - | (1.5) |
| **Total Operating Disbursements** | **$ (0.6)** | **$ (0.8)** | **$ (1.6)** | **$ (0.8)** | **$ (0.8)** | **$ (0.6)** | **$ (0.4)** | **$ (0.5)** | **$ (0.4)** | **$ (0.3)** | **$ (0.2)** | **$ (7.0)** |
| **Net Cash Flow From Operations** | **$ 21.8** | **$ 0.0** | **$ (0.8)** | **$ 0.0** | **$ 0.0** | **$ 4.5** | **$ 0.2** | **$ 0.1** | **$ 2.1** | **$ (0.1)** | **$ 0.1** | **$ 27.9** |
| **Non-Operating Disbursements** | | | | | | | | | | | | |
| Debt Service | (2.8) | - | - | - | (2.6) | - | - | - | - | (2.5) | - | (7.8) |
| Restructuring Professional Fees, Net of Deferral | (2.0) | (2.4) | (3.6) | (2.3) | (2.3) | (2.0) | (2.2) | (2.0) | (2.0) | (1.9) | (2.3) | (25.1) |
| Litigation Professional Fees | (1.0) | (0.3) | (0.3) | (0.3) | (0.7) | (0.3) | (0.3) | (0.6) | (0.3) | (0.1) | (0.1) | (4.0) |
| Lender Professional Fees, Net of Deferral | (0.1) | - | - | (2.5) | (0.1) | (2.5) | - | - | (0.2) | (1.9) | - | (7.3) |
| U.S. Trustee Fees | (0.7) | - | - | - | - | - | - | - | - | - | - | (0.7) |
| **Total Non-Operating Disbursements** | **$ (6.6)** | **$ (2.7)** | **$ (3.9)** | **$ (5.0)** | **$ (5.6)** | **$ (4.8)** | **$ (2.5)** | **$ (2.6)** | **$ (2.5)** | **$ (6.3)** | **$ (2.4)** | **$ (44.8)** |
| **Net Cash Flow** | **$ 15.2** | **$ (2.6)** | **$ (4.7)** | **$ (5.0)** | **$ (5.6)** | **$ (0.3)** | **$ (2.3)** | **$ (2.6)** | **$ (0.4)** | **$ (6.4)** | **$ (2.3)** | **$ (16.9)** |
| **Beg. Cash Balance** | **$ 6.9** | **$ 24.4** | **$ 22.7** | **$ 20.8** | **$ 16.8** | **$ 12.2** | **$ 12.4** | **$ 17.4** | **$ 21.9** | **$ 23.4** | **$ 17.0** | **$ 6.9** |
| ( + / - ) Net Cash Flow | 15.2 | (2.6) | (4.7) | (5.0) | (5.6) | (0.3) | (2.3) | (2.6) | (0.4) | (6.4) | (2.3) | (16.9) |
| ( + ) Transaction & Litigation Proceeds | 2.4 | 1.0 | 2.8 | 1.0 | 1.0 | 0.4 | 7.3 | 7.0 | 1.9 | - | - | 24.8 |
| **End. Book Cash Balance** | **$ 24.4** | **$ 22.7** | **$ 20.8** | **$ 16.8** | **$ 12.2** | **$ 12.4** | **$ 17.4** | **$ 21.9** | **$ 23.4** | **$ 17.0** | **$ 14.8** | **$ 14.8** |
| *Est. Secured Interim Advance* | *$ (25.7)* | *(29.1)* | *(34.5)* | *(40.3)* | *(46.7)* | *(52.0)* | *(54.9)* | *(58.1)* | *(61.0)* | *(67.7)* | *(70.2)* | *$ (70.2)* |

**Exhibit 3**

**Cure Notice**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| STEWARD HEALTH CARE SYSTEM | § | Case No. 24-90213 (CML) |
| LLC, *et al.*, | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

## NOTICE OF CURE COSTS AND POTENTIAL
## ASSUMPTION AND ASSIGNMENT OF EXECUTORY
## CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH SETTLEMENT

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

On April 28, 2025, Steward Health Care System LLC and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**") filed with the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") a motion (Docket No. [●]) (the "**Motion**") seeking, among other things, entry of an order:

a) approving a settlement (the "**Settlement**") with the FILO Secured Parties and the Creditors' Committee;

b) authorizing and directing the transfer by the Debtors of the Litigation Trust Assets "free and clear" (to the fullest extent permitted by law) to the Litigation Trust under section 363(f) of the Bankruptcy Code;

c) authorizing the DIP Amendment (as defined therein and attached thereto as **Exhibit 2**) and use of cash collateral in accordance with the Settlement;

d) granting adequate protection to the FILO Secured Parties;

e) authorizing and approving notice to each non-Debtor counterparty (each, a "**Contract Counterparty**") to an executory contract or unexpired lease of non-residential real property of the Debtors (each, a "**Contract**") regarding the potential assumption and assignment of such Contracts and the Debtors' calculations of the amount necessary to cure any monetary defaults under such Contracts (the "**Cure**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

Costs"), substantially in the form attached thereto as **Exhibit 3** (the "**Cure Notice**");

    f)   authorizing and approving procedures for the assumption and assignment of certain Contracts in connection with the Settlement, as applicable (collectively, the "**Assigned Contracts**") and determination of Cure Costs with respect thereto (collectively, the "**Assumption and Assignment Procedures**"); and

    g)   granting related relief.

On [●], 2025, the Bankruptcy Court entered the *Order (I) Approving Settlement With FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* (Docket No. [●]) (the "**Settlement Order**").[2]

## Cure Costs

In accordance with the Assumption and Assignment Procedures and the Settlement Order, the Debtors shall, in connection with the Settlement, assume and assign to the Litigation Trust (or its designated assignee, as applicable) certain contracts and leases of the Debtors, subject to the consent of the FILO Secured Parties.

Each of the contracts and leases that may potentially be assumed and assigned in connection with the Settlement and the Debtors' calculation of the Cure Costs with respect thereto are set forth on **Exhibit A** annexed hereto.

The inclusion of any contract or lease on **Exhibit A** does not constitute an admission that a particular contract or lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or require or guarantee that such contract or lease ultimately will be assumed or assigned. All rights of the Debtors and the counterparties with respect thereto are reserved.

Notwithstanding the inclusion of any lease or contract on **Exhibit A**, the Litigation Trust is not bound to accept assignment of such Contract, and may amend the schedule of Assigned Contracts to remove any contract or lease in its sole discretion.

If: (a) the Debtor, subject to the consent of the FILO Secured Parties, identifies (i) additional contracts or leases to be assumed and assigned to the Litigation Trust, or (ii) modifications that need to be made to a proposed Cure Cost previously stated in the Assignment and Cure Notice; or (b) the Litigation Trust designates any additional contracts or leases not previously included on this Assignment and Cure Notice for assumption and assignment,

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Settlement Order.

the Debtor shall file with the Court and serve by first class mail on the applicable Contract Counterparty a supplemental Assignment and Cure Notice (a "**Supplemental Cure Notice**").

**Cure Objections**

Objections, if any, to any proposed Cure Costs (each, a "**Cure Objection**") with respect to the Contracts identified on **Exhibit A** must: (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the claim or interest of such party; (iii) state with particularity the basis and nature of any objection, and, to the extent applicable, provide proposed language that, if accepted and incorporated by the Debtors, would obviate such objection; (iv) conform to the Bankruptcy Rules and the Local Rules; and (v) be filed with the Court and served on the Debtors, the Creditors' Committee, and the FILO Secured Parties within ten (10) days after receipt of Cure Notice:

Any Cure Objection with respect to Cure Costs set forth in a Supplemental Cure Notice must be filed within seven (7) days of filing of that Supplemental Cure Notice.

**IF NO TIMELY CURE OBJECTION IS FILED WITH RESPECT TO AN ASSIGNED CONTRACT: (I) THE CONTRACT COUNTERPARTY TO SUCH PROPOSED ASSIGNED CONTRACT SHALL BE DEEMED TO HAVE CONSENTED TO THE ASSUMPTION BY THE DEBTOR AND ASSIGNMENT TO THE LITIGATION TRUST, AS APPLICABLE, OF THE ASSIGNED CONTRACT, AND BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO SUCH ASSUMPTION AND ASSIGNMENT; (II) ANY AND ALL DEFAULTS UNDER THE ASSIGNED CONTRACT AND ANY AND ALL PECUNIARY LOSSES RELATED THERETO SHALL BE DEEMED CURED AND COMPENSATED PURSUANT TO BANKRUPTCY CODE SECTION 365(B)(1)(A) AND UPON PAYMENT OF THE CURE COSTS SET FORTH IN THE CURE NOTICE FOR SUCH ASSIGNED CONTRACT; AND (III) THE CONTRACT COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OTHER CLAIMS RELATED TO SUCH ASSIGNED CONTRACT AGAINST THE DEBTOR AND ITS ESTATE OR THE LITIGATION TRUST OR ITS PROPERTY THAT EXISTED PRIOR TO THE ASSIGNMENT OF SUCH CONTRACT TO THE LITIGATION TRUST.**

**Additional Information**

Copies of the Motion, the Settlement Order, and the Assumption and Assignment Procedures may be obtained free of charge at the website dedicated to the Debtor's chapter 11 case maintained by the Debtor's claims and noticing agent, Kroll Restructuring Administration, LLC, located at https://cases.ra.kroll.com/Steward.

*[Remainder of page intentionally left blank.]*

Dated:      [●], 2025
            Houston, Texas

  _/s/ Draft_____
WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
             Clifford.Carlson@weil.com
             Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Jeffrey D. Saferstein (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Jeffrey.Saferstein@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:   DavidJ.Cohen@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

LATHAM & WATKINS LLP
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864
Email:   Ray.Schrock@lw.com
             Candace.Arthur@lw.com

*Attorneys for Debtors*
*and Debtors in Possession*

4

# Exhibit 4

## Litigation Trust Tax and Other Matters

# Litigation Trust Tax and Other Matters

1. **Tax Treatment.** The Litigation Trust is intended to be treated for U.S. federal income tax purposes as a "liquidating trust" described in Treasury Regulation section 301.7701-4(d) that is a "grantor trust" for U.S. federal income tax purposes, with the holders of allowed FILO DIP Claims and allowed FILO Bridge Claims, in respect of their Class A-1 and Class A-2 interests in the Litigation Trust, and respective FILO Secured Parties providing Litigation Funding, in respect of their Class A-1 interests in the Litigation Trust, being treated as grantors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Litigation Trustee), all parties (including, without limitation, the Debtors, the Litigation Trustee, and the Litigation Trust beneficiaries) shall treat for U.S. federal income tax purposes the transfer of assets by the Debtors to the Litigation Trust as (a) the transfer of the portion of the assets to which the Class A-1 and Class A-2 interests in the Litigation Trust relate (in the case of Class A-1 interests, to the extent of the Secured Interim Advances and the Estate Funding) directly to the holders of allowed FILO DIP Claims, the holders of allowed FILO Bridge Claims, and the FILO Secured Parties that provided the Estate Funding (subject to any liabilities and obligations relating to those assets) in satisfaction of and in exchange for their claims and the Estate Funding, followed by (b) the transfer of such assets by such persons, and of the remaining Litigation Trust assets by the Debtors, to the Litigation Trust in exchange for beneficial interests in the Litigation Trust; provided that, if concurrent with the establishment of the Litigation Trust the Debtors have or will transfer their rights and obligations with respect to the Litigation Trust to a successor liquidating vehicle pursuant to a confirmed chapter 11 plan, the parties shall abide by the provisions of the chapter 11 plan relating thereto. Accordingly, absent definitive guidance to the contrary, the holders of the Class A-1 and Class A-2 interests in the Litigation Trust and the Debtors, as the holders of the Class B interests in the Litigation Trust, shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the assets of the Litigation Trust, subject to any chapter 11 plan provisions relating to the foregoing.

2. **Liquidation Purpose of the Litigation Trust; No Successor in Interest.** The Litigation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Litigation Trust and reasonably necessary to conserve and protect the assets transferred to the Litigation Trust and provide for the orderly liquidation thereof. Accordingly, the Litigation Trustee shall, in an expeditious but orderly manner, liquidate and convert to cash the Litigation Trust assets, make timely distributions to the beneficiaries of the Litigation Trust, as applicable, and not unduly prolong their duration. The Litigation Trustee shall distribute at least annually to the Litigation Trust beneficiaries any cash on hand (including any amounts invested pending distribution) of the Litigation Trust, net of any amounts reserved in respect of disputed claims and any reserves established in the good faith discretion of the Litigation Trustee to provide for payment of any obligations or liabilities of the Litigation Trust, including any claims assumed by the Litigation Trust pursuant to any chapter 11

plan and any costs or expenses of the Litigation Trust or Litigation Trustee and any taxes, or to maintain the value of any assets of the Litigation Trust. Notwithstanding anything herein or in the Litigation Trust Agreement to the contrary, the Litigation Trustee shall always act consistently with, and not contrary to, the purpose of the Litigation Trust as set forth herein.

3. **Cash Investments.** The right and power of the Litigation Trustee to invest the assets of the Litigation Trust, the proceeds thereof, or any income earned by the Litigation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, and to the investment guidelines of section 345 of the Bankruptcy Code.

4. **Tax Reporting and Tax Payments.**

    (a) The Litigation Trustee shall file tax returns for the Litigation Trust treating the Litigation Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 4.

    (b) As soon as practicable after the Litigation Trust Establishment Date, the Debtors (or its designee), in consultation with the Litigation Trustee, shall make a good faith determination of the fair market value of the Litigation Trust assets, as of Litigation Trust Establishment Date. The Debtors (or its designee) shall inform all parties of such valuation as relevant from time to time. This valuation shall be used consistently by all parties for all U.S. federal income tax purposes.

    (c) The Litigation Trust shall be responsible for payment, out of Litigation Trust assets, of any taxes imposed on the Litigation Trust or the Litigation Trust Assets.

    (d) The Litigation Trustee may request an expedited determination of taxes of the Litigation Trust, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Litigation Trust for all taxable periods through the dissolution of the Litigation Trust.

    (e) The Litigation Trustee and the Debtors (and any successor liquidating vehicle) shall each cooperate with the other in connection with the preparation and filing of any tax returns, the provision of any required tax forms, and any other matter with respect to taxes, and shall make available to the other, as reasonably requested, any information or records relevant to the preparation or filing of any tax returns or forms or the defense of any audit or other tax proceeding.

    (f) The treatment provided in this Exhibit, to the extent permitted by applicable law, shall also apply for state and local tax purposes and all parties shall report consistent therewith.

# EXHIBIT 10

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC**, *et al.*, | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

**AGENDA OF MATTERS SET FOR HYBRID**
**HEARING ON MAY 29, 2025 AT 10:30 A.M. (CENTRAL TIME)**

> A HEARING WILL BE CONDUCTED ON THESE MATTERS ON MAY 29, 2025 AT 10:30 A.M. (CENTRAL TIME) IN COURTROOM 401, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002. YOU MAY PARTICIPATE IN THE HEARING IN-PERSON OR BY AN AUDIO AND VIDEO CONNECTION.
>
> AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE LOPEZ'S CONFERENCE ROOM NUMBER IS 590153. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE LOPEZ'S HOME PAGE. THE MEETING CODE IS "JUDGELOPEZ". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.
>
> HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LOPEZ'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), hereby file this Agenda of Matters Set for Hybrid Hearing on **May 29, 2025 at 10:30 a.m. (Central Time)** before the Honorable Christopher M. Lopez.

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

## I.   **CONTESTED MATTERS**

1.      **Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4746)**

Status: This matter is going forward on a contested basis. The Debtors have resolved a number of objections and are working to resolve or narrow as many of the other objections as possible.

Unresolved Responses:

A.      Objection of Certain Participants to Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement And Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4907)

B.      TRACO International Group S. De R.L.'s Objection to Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4919)

C.      The Commonwealth of Massachusetts' Objection to the Debtors' Solicitation Motion and Settlement Motion (Docket No. 4921)

D.      Limited Objection to Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4928)

E.  Joinder of NorthStar Anesthesia, P.A. in Commonwealth of Massachusetts' Objections to Debtors' Solicitation Motion and Settlement Motion (Docket No. 4930)

F.  Joinder of Cigna to Limited Objection of United Healthcare to the Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (Iii) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4932)

G.  Joinder of Health Care Service Corporation to the Motion of Debtor's for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to the FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment and (VI) Granting Related Relief (Docket No. 4939)

H.  Aetna's Joinder to United Healthcare Insurance Company's Limited Objection (Docket No. 4940)

I.  Limited Objection and Reservation of Rights of Hartford Fire Insurance Company and Certain of Its Affiliated Insurance Companies to the Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4941)

J.  Blue Cross and Blue Shield of Massachusetts, Inc.'s Preliminary Limited Objection and Reservation of Rights to Disclosure Statement, Plan, and Motion (Docket No. 4956)

K.  Tac Med, Inc.'s Limited Objection to Disclosure Statement/Plan and Motions for Entry of Order (Docket No. 4981)

Resolved Responses:

A.    Objection and Reservation of Rights of the Chubb Companies to Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4927)

B.    Elevance's Joinder to United Healthcare Insurance Company's Limited Objection (Docket No. 4942)

C.    Joinder of DJO Entities to (I) Objection of Humana Entities to Disclosure Statement, Plan and Motion and (II) UnitedHealthcare Insurance Company's Limited Objection to the Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to the FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment and (VI) Granting Related Relief (Docket No. 4958)

Related Documents:

A.    Final Order (I) Authorizing the Debtors to (A) Obtain New Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims; (II) Granting Adequate Protection to Certain Prepetition Secured Parties; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief (Docket No. 1538)

B.    Final Order Approving (I) Global Settlement with Medical Properties Trust, Prepetition ABL/FILO Secured Parties, FILO Secured Parties, and Creditors' Committee, (II) Interim Management Procedures, and (III) Granting Related Relief (Docket No. 2610)

C.    Notice of Filing of Amendment to FILO DIP Credit Agreement (Docket No. 3594)

D.    Notice of Filing of Second Amendment to FILO DIP Credit Agreement (Docket No. 3874)

E.   Notice of Filing of Third Amendment to FILO DIP Credit Agreement (Docket No. 3909)

F.   Notice of Filing of Fourth Amendment to FILO DIP Credit Agreement (Docket No. 3991)

G.   Notice of Filing of Fifth Amendment to FILO DIP Credit Agreement (Docket No. 4091)

H.   Notice of Extension of Maturity Date Under FILO DIP Credit Agreement (Docket No. 4232)

I.   Notice of Further Extension of Maturity Date Under FILO DIP Credit Agreement (Docket No. 4690)

J.   Notice of May 29, 2025 Hearing on Disclosure Statement Motion and FILO Settlement Motion (Docket No. 4777)

K.   Declaration of John R. Castellano in Support of Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing And Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4903)

L.   Declaration of William Transier (Docket No. 4904)

M.   Notice of Intent to Adduce Testimony from a Remote Location by Telephone and Video Technology (Docket No. 4949)

N.   Notice of Filing (I) Litigation Trust Agreement, (II) Commitment Letter and (III) Transition Services Agreement (Docket No. 4966)

O.   FILO Secured Parties' Witness and Exhibit List for Hearing on May 29, 2025 at 10:30 a.m. (Prevailing Central Time) (Docket No. 4971)

P.   Declaration of Carolyn Redding In Support of the Limited Objection and Reservation of rights of Hartford Fire Insurance Company and Certain of Its Affiliated Insurance Companies to the Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of

Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4972)

Q.   The Official Committee of Unsecured Creditors' Witness and Exhibit List for Hearing on May 29, 2025 (Docket No. 4973)

R.   Debtors' Witness and Exhibit List for the Hearing Scheduled May 29, 2025 (Docket No. 4974)

S.   Witness and Exhibit List of Hartford Fire Insurance Company and Certain of Its Affiliated Insurance Companies' Limited Objection to Debtors FILO Settlement Motion (Docket No. 4975)

T.   Supplemental Declaration of John Castellano (Docket No. 4977)

U.   Witness and Exhibit List of Certain Participants For May 29, 2025 Hearing (Docket No. 4978)

V.   The Commonwealth of Massachusetts' Witness and Exhibit List for Hearing on May 29, 2025 (Docket No. 4979)

W.   FILO Secured Parties' Reply In Support of Motion of Debtors for Entry of an Order (I) Approving Settlement With FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4983)

X.   Notice of Filing of (I) Revised Proposed FILO Settlement Order; (II) Joint Chapter 11 Plan of Liquidation and (III) Related Disclosure Statement and Exhibits Thereto (Docket No. 4987)

Y.   Debtors' Omnibus Reply to Objections to Motion of Debtors for Entry of an Order (I) Approving Settlement With FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4989)

2. **Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief (Docket No. 4745)**

<u>Status</u>: This matter is going forward on a contested basis. The Debtors have resolved a number of objections and are working to resolve or narrow as many of the other objections as possible.

<u>Unresolved Responses</u>:

A. Motion to Determine Yasmany Sosa's Status and Treatment of His Settled Personal Injury Tort Claim Covered by Insurance Proceeds; and Request for More Sufficient Information in the Disclosure Statement (Docket No. 4826)

B. Objection of Certain Participants to Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief (Docket No. 4908)

C. United States Trustee's Objection to Conditional Approval of Disclosure Statement for the Joint Chapter 11 Plan and Related Solicitation Procedures (Docket No. 4909)

D. Lexington Insurance Company Objection to Disclosure Statement for the Joint Chapter 11 Plan Docket No. 4744 (Docket No. 4911)

E. Joinder of Greater Anesthesia Solutions, LLC in Objections of the (1) United States Trustee (Docket No. 4909), (2) Careplus Health Plans, Inc., Human Governmental Business, Inc. and Their Affiliates (Docket No. 4905), (3) Ana Beesen, *et. al.* (Docket No. 4908) to Debtors' Omnibus Motion Respecting: (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan;

(II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief (Docket No. 4913)

F.  VRC Companies, LLC's Limited Objection and Continued Reservation of Rights to Debtor's Disclosure Statement, Plan, and Settlement Motion (Docket No. 4914)

G.  Health Care Service Corporation Objection and Joinder to Humana Insurance Company's Objection to Disclosure Statement, Plan and Motion (Docket No. 4916)

H.  Siemens Healthcare Diagnostics Inc. and Siemens Medical Solutions USA, Inc.'s Objection to (A) Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief and (B) Disclosure Statement for Joint Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors (Docket No. 4917)

I.  Sodexo Operations, LLC and Affiliates' Limited Objection to the Motion of Debtors for Entry of an Order Seeking Conditional Approval of Disclosure Statement and Related Relief (Docket No. 4920)

J.  The Commonwealth of Massachusetts' Objection to the Debtors' Solicitation Motion and Settlement Motion (Docket No. 4921)

K.  United States' (IRS) Objection to Debtors' Motion for Conditional Approval of Disclosure Statement and Related Solicitation and Voting Procedures, Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures (Dkt #4745); and Joinder to United States' Trustee's Objection (Filed at Dkt. #4909) (Docket No. 4922)

L.  TRACO International Group S. De R.L.'s Objection to (1) Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief and (2) Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors (Docket No. 4923)

M.  Joinder of NorthStar Anesthesia, P.A. in Commonwealth of Massachusetts' Objections to Debtors' Solicitation Motion and Settlement Motion (Docket No. 4930)

N.  Interconn Resources, LLC's Objection to the Motion of the Debtors for Entry of an Order Seeking Conditional Approval of Disclosure Statement and Related Relief (Docket No. 4968)

O.  Melissa Williams Joinder in TRACO International Group S. De R.L.'s Objection to (1) Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief and (2) Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors (Docket No. 4980)

P.  Tac Med Inc.'s Limited Objection to Disclosure Statement/Plan and Motions for Entry of Order (Docket No. 4981)

Resolved Responses:

A.  Objection to the Disclosure Statement, Plan and Motion (Docket No. 4905)

B.  Elevance's Joinder to United Healthcare Insurance Company's Limited Objection (Docket No. 4942)

C.  Joinder of DJO Entities to (I) Objection of Humana Entities to Disclosure Statement, Plan and Motion and (II) UnitedHealthcare Insurance Company's Limited Objection to the Motion of Debtors for Entry of an Order (I) Approving Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to the FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief (Docket No. 4958)

D.  Blue Cross and Blue Shield of Massachusetts, Inc.'s Preliminary Limited Objection and Reservation of Rights to Disclosure Statement, Plan, and Motion (Docket No. 4956)

Related Documents:

A.  Declaration of John R. Castellano in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings (Docket No. 38)

B.  Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors (Docket No. 4743)

C.  Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors (Docket No. 4744)

D.  Notice of May 29, 2025 Hearing on Disclosure Statement Motion and FILO Settlement Motion (Docket No. 4777)

E.  Notice of Intent to Adduce Testimony from a Remote Location by Telephone and Video Technology (Docket No. 4949)

F.  Notice of Filing of Liquidation Analysis with Respect to Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors (Docket No. 4967)

G.     FILO Secured Parties' Witness and Exhibit List for Hearing on May 29, 2025 at 10:30 a.m. (Prevailing Central Time) (Docket No. 4971)

H.     The Official Committee of Unsecured Creditors' Witness and Exhibit List for Hearing on May 29, 2025 (Docket No. 4973)

I.     Debtors' Witness and Exhibit List for the Hearing Scheduled May 29, 2025 (Docket No. 4974)

J.     Witness and Exhibit List of Hartford Fire Insurance Company and Certain of Its Affiliated Insurance Companies' Limited Objection to Debtors FILO Settlement Motion (Docket No. 4975)

K.     Supplemental Declaration of John Castellano (Docket No. 4977)

L.     Witness and Exhibit List of Certain Participants For May 29, 2025 Hearing (Docket No. 4978)

M.     The Commonwealth of Massachusetts' Witness and Exhibit List for Hearing on May 29, 2025 (Docket No. 4979)

N.     Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors (Docket No. 4985)

O.     Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors (Docket No. 4986)

P.     Notice of Filing of (I) Revised Proposed FILO Settlement Order; (II) Joint Chapter 11 Plan of Liquidation and (III) Related Disclosure Statement and Exhibits Thereto (Docket No. 4987)

Q.     Debtors' Reply in Support of Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief (Docket No. 4989)

R.     Notice of Filing Revised Proposed Disclosure Statement Order (To Be Filed)

Dated: May 28, 2025
      Houston, Texas

  /s/ Clifford W. Carlson
**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email:  Gabriel.Morgan@weil.com
        Clifford.Carlson@weil.com
        Stephanie.Morrison@weil.com


-and-

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email:  Jeffrey.Saferstein@weil.com


-and-

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Facsimile: (305) 374-7159
Email:  DavidJ.Cohen@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  Ray.Schrock@lw.com
        Candace.Arthur@lw.com

*Attorneys for Debtors*
*and Debtors in Possession*

<u>**Certificate of Service**</u>

I hereby certify that on May 28, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


*/s/ Clifford W. Carlson*
Clifford W. Carlson

# EXHIBIT 11

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 24-90213-11 |
| | § | HOUSTON, TEXAS |
| STEWARD HEALTH CARE SYSTEM, | § | WEDNESDAY, |
| LLC, | § | JULY 16, 2025 |
| | § | |
| DEBTORS. | § | 2:00 P.M. 3:47 P.M. |

**PLAN CONFIRMATION HEARING DAY THREE**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

COURTROOM DEPUTY/ERO:           YESENIA LILA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

2

**APPEARANCES:**

FOR DEBTORS, STEWARD HEALTH        WEIL GOTSHAL & MANGES, LLP
CARE SYSTEM, LLC, ET AL.:          David J. Cohen, Esq.
                                   767 Fifth Avenue
                                   New York, NY 10153
                                   212-310-8000


FOR THE COMMONWEALTH               PILLSBURY WINTHROP SHAW PITTMAN
OF MASSACHUSETTS AND               Andrew M. Troop, Esq.
ATTORNEY GENERAL OF THE            31 West 52nd Street
COMMONWEALTH OF MASSACHUSETTS:     New York, NY 10019
                                   212-858-1660



(Please also see Electronic Appearances.)

3

1       **HOUSTON, TEXAS; WEDNESDAY, JULY 16, 2025; 2:00 P.M.**

2           THE COURT:  Okay.  Good afternoon.  This is Judge

3   Lopez.  Today is July 16th, 2:00 p.m.  I will issue a ruling

4   in the Steward bankruptcy cases.

5           Before I begin, I believe folks can hear me.  But if

6   someone can just turn a camera on and wave, so I know that you

7   can hear me, that would be awesome.  Okay.  That's what I

8   needed.  Thank you, Mister ... that's what I needed.

9           So I'll note the Court has conducted hearings over

10  the last couple of days in connection with plan confirmation

11  and in connection with a motion to convert the cases or to

12  dismiss them.  I appreciate everyone's time and attention to

13  detail and -- okay.  Here we go.

14          I'll note the Court has jurisdiction to consider

15  these matters under 28 U.S.C. 1334.

16          This is a core proceeding under 28 U.S.C. 157.

17          The Court has authority to issue a final order in

18  connection with plan confirmation issues and -- or to convert

19  or dismiss these cases.

20          I'm going to be reading for quite some time, so

21  there will be a recording available.  We'll see.  Here we go.

22          Before these Chapter 11 cases started, Steward was

23  the largest private physician-owned network in the United

24  States.  This is coming from the disclosure statement.

25  Steward provided care to more than 2 million patients annually

1    and employed about 30,000 people.  Steward's network spanned

2    across 10 states, at 31 hospitals, and over 400 facility

3    locations.  That includes physician practice offices,

4    ambulatory surgical centers, and diagnostic imaging centers.

5    There were over 4,500 primary and specialty care physicians

6    that worked with Steward.

7         So why and how could a robust hospital network like

8    Steward file bankruptcy cases?  While there were standard

9    related issues given to the Court, some were operational

10   issues, COVID-19-related issues, all of that was true, but a

11   primary driver was its pre-petition capital structure.

12        Steward had over 9 billion debt, over 300 million

13   becoming due at the end of June of 2024, but nowhere near the

14   cash to sustain that type of debt.

15        The collateral mix here is worth noting.  As a

16   result of some pre-petition transactions, one group of

17   lenders, called the "MPT parties," had a first lien on much of

18   the real property where Steward's hospitals stood; and another

19   set of lenders called the "FILO parties" had a lien, a first

20   lien, on Stewards accounts, accounts receivable, and

21   inventory.

22        Steward filed these cases with the stated intent to

23   try and sell its hospitals and maximize value for the estates.

24   Steward had to get a loan to get to the point where it could

25   file the cases, then it had to borrow more money to get to the

1    point where it could sell the hospitals.  Getting a loan and

2    selling the hospitals was extremely challenging.

3         Try selling a hospital where a buyer -- or excuse me

4    -- where the MPT parties owned the dirt and the FILO parties

5    had a lien on the assets and the A/R related to the facility,

6    but Steward owns the facility.  Layer on top of that there are

7    real people with real medical issues in these hospitals and

8    facilities.  Factor on top of that that some of these

9    hospitals were located and serving deserving Americans in

10    rural areas.

11         So what do you sell the hospital for?  Steward may

12    think X is a good price.  But what if MPT says the land is

13    worth more?  What if FILO said it wasn't taking a cut on the

14    A/R to make others whole just at its expense?  If you don't

15    find a willing buyer at the right terms for each of these

16    parties, then hospitals close and people could die.  I'm not

17    exaggerating here.

18         It was a long and complicated process, and the work

19    that went into saving hospitals from closing was

20    extraordinary.  The work that the UCC, the professionals

21    involved, the work that they did during this case to keep

22    hospitals alive, many of them in rural areas where, if you

23    close one hospital, getting to the next hospital, where every

24    second counts, was extraordinary.

25         Most of the hospitals were successfully

1    transitioned.  A few, unfortunately, they didn't stay open.  I
2    think about that all the time.  A building doesn't close.
3    It's unfortunate.  But I often wonder if everybody is okay,
4    including the workers.
5         But based on what I saw in this case, it was not due
6    to a lack of effort from the estate professionals, the UCC,
7    and Steward.  The estate professionals were duty bound to do
8    everything, so was the Committee and their professionals.
9    That costs money.  And I don't begrudge MPT or the FILO
10   parties, either, right?  This is America.  There were no legal
11   bases to require a party to take less than what they believe
12   they were owed.  Parties mediated for months in what I presume
13   were hundreds of hours, working on complex and tough issues.
14        During the case, everyone acted in good faith.  I
15   called parties in for hearings on the weekend; everyone showed
16   up.  You can't ask for more than that.
17        Almost all of the hospitals sold, and that's a
18   tremendous feat.  It doesn't feel like that when you don't
19   make as much money as you hoped for.  But the market spoke in
20   a fair and transparent process.  It doesn't mean the work
21   wasn't successful, meaningful, and impactful.  The Debtors'
22   sales didn't yield significant value, as much as it wanted to,
23   for the estates.  But the reasons are obvious, for the reasons
24   I just described, you don't get all the money.
25        Professional fees were high in this case.  But for -

1    - reasons for that were obvious, too.  They have to be high;

2    they had to do the work.

3              And I'll say this now to kind of get it out of the

4    way.  There was talk of disgorgement of fees as a possibility

5    of fueling a Chapter 7 case.  I don't know exactly how that

6    would work because there's nothing in the Code that allows me

7    to claw back professional fees that I awarded and entered

8    under an order approving them just because, allegedly, the

9    estate can't pay everyone at this precise moment.

10             I entered a professional compensation procedures

11   order that permitted professionals to seek compensation during

12   the case.  Virtually 99.9 percent of the orders -- don't quote

13   me on the percentage, but it's really, really high -- I

14   reviewed every -- virtually every one, and they were

15   unopposed.  But unopposed doesn't mean unreviewed.  I reviewed

16   every application submitted.  I'm duty bound to do so.  I read

17   the time entries and the work.  I found it necessary, that's

18   why I signed the orders, even if there was no objections.

19             Bankruptcy Courts -- let me just note, there's no --

20   what I can tell -- basis for equitable disgorgement, whatever

21   that means and if it's even a thing.  Bankruptcy Courts have a

22   statutory authority under Section 105 of the Code to enter an

23   order, process, or judgment that is necessary or appropriate

24   to carry out the provisions of the Bankruptcy Code, basically

25   the bankruptcy equivalent of the power the District Courts

1    have under the All Writs Act.  The Fifth Circuit has made it

2    clear that 105 cannot be used as a roving commission to,

3    quote/unquote, "do justice," whatever justice would be in this

4    case.  And that makes sense.

5            But for what it's worth, they were court-approved

6    fees under a transparent process.  Everyone had -- all parties

7    have the right to object to the approval of fees on a final

8    basis.  But the concept of disgorgement, to me, means that

9    someone lied to me or I find out someone did something really

10    bad.  Regardless, I don't think disgorgement is the answer.

11    There's a process in place, and process over everything.  The

12    proper procedural basis is to object to the final approval of

13    fees whenever that comes up.

14            With that being said, I don't want to leave anyone

15    with the impression that I think these professionals did

16    anything wrong, based on the record before me in this case and

17    at the confirmation hearing, and the opposite is true.

18    Whether this plan gets confirmed or this case converted are

19    matters that will be independently assessed now, based on

20    applicable law and the record.  And I don't want to leave

21    anyone with the impression that my silence was to be left

22    thinking that the estate professionals or the Committee were

23    picking themselves over everyone else.

24            To get to a plan confirmation hearing, Steward

25    recently got approval of a settlement with the FILO parties.

1             And I should note for the record, FILO, F-I-L-O.

2             The settlement provided for the means to get to the

3 plan confirmation hearing and the funds to pursue estate

4 causes of action against select parties, based on certain

5 actions.  Today is not the day to have a trial on the merits

6 on the potential causes of action.

7             Not everyone who could be subject to litigation

8 attended the confirmation hearing, nor were they required to

9 attend.  Everyone will have their day in court.

10             I find that the FILO settlement -- I should say I

11 found that the FILO settlement prevented an immediate, harmful

12 conversion to Chapter 7 and was permitted under applicable

13 law.  That ruling is under appeal, so I refer to it as

14 background.  Nothing I say here should be construed as an

15 attempt to add substance or comment on the appeal or my

16 decision approving the FILO settlement.  There is a transcript

17 of what I said and the reasons that I said it, and that --

18 those matters will be judged independently.

19             Steward now seeks final approval of the disclosure

20 statement and confirmation of a Chapter 11 plan that would

21 wind down the estates through the formation of liquidating

22 trusts that would work together to pursue and monetize

23 remaining assets, reconcile claims, and make distributions to

24 creditors.

25             A number of parties objected to the plan.  Many were

1    resolved through clarifications or language in a proposed

2    confirmation order; some remain unresolved.

3            The Office of the United States Trustee objected.

4    And there were also what I would call three primary objectors,

5    not to say that anyone who -- well, I'll identify them:  One

6    was the Commonwealth of Massachusetts, one I'll refer to as

7    TRACO -- T-R-A-C-O -- and one is a group of physicians who

8    appealed the ruling I made about deferred compensation held in

9    a rabbi trust.

10           The rabbi trust ruling is on appeal, too, so I say

11   nothing more about the merits of that dispute.

12           I see Mr. Troop there.  I did -- I'll note I have

13   never ordered mediation in a case, and I won't be doing so

14   today.  But at some point during the cases, I'll confess that

15   I strongly considered ordering the Commonwealth of

16   Massachusetts and Steward to mediating as my first.  I don't

17   profess to have a deep understanding of the underlying issues

18   between the parties, but I do know they're both represented by

19   really smart lawyers.  It is my hope that the parties give

20   consensual discussions or consensual mediations a chance.

21           Let me get back to plan confirmation.

22           The primary objections from these parties was

23   focused on a litany of alleged problems with the plan.  It's

24   clear they don't want the plan confirmed.

25           Steward highlighted possible motives of their

1    primary objectors, right?  They note that the Debtors --

2    excuse me -- that the doctors subject to the rabbit trust are

3    appealing my order, and that involves deferred comp.

4         TRACO's board members include former Steward board

5    members who are subject to potential material litigation

6    claims held by the estate.

7         Some of the objecting parties focused on

8    professional fees disgorgement.  There was a little bit of

9    that on both sides.

10        I didn't focus on motives in this case because the

11   objecting parties made legal arguments based on the plan, and

12   it's Steward's burden to prove by a preponderance of the

13   evidence that confirmation is warranted under applicable

14   sections of the Code.

15        I want to highlight a few of the main objections.

16   One was feasibility of the plan and a proposed effective date

17   in early 2027.  That implicates Bankruptcy Code sections like

18   1129(a)(9) and 1129(a)(11).

19        Can a plan -- I should say can a Debtor propose a

20   plan effective date that's about one and a half to two years

21   out, like is contemplated in this plan, or does Steward have

22   to prove it can pay all allowed administrative and priority

23   claims now, and is it realistic that Steward could pay allowed

24   claims even in 2027, or should the cases be converted and

25   liquidated in Chapter 7 now.  Is Steward relying too heavily

12

1    on unrealistic hopes of winning big in litigation?

2         I also think there's at least an implied argument by

3    these objectors that the plan was not proposed in good faith.

4         There are also bankruptcy-specific objections to the

5    classification scheme.

6         Another big one is that the plan doesn't satisfy the

7    best interests of creditors test, which means that creditors

8    who have voted to reject the plan won't receive as much under

9    the plan than in a Chapter 7.

10        Parties like the U.S. Trustee and the Department of

11   Justice, on behalf of the IRS, also objected to the proposed

12   Debtor releases under the plan, proposed exculpations, and the

13   IRS had some specific comments to language in the proposed

14   confirmation order that could be seen as limiting the IRS's

15   ability to go after responsible parties in connection with

16   unpaid unemployment taxes, what I'll call "941 taxes."  I'm

17   sure there are some other IRS numbers in there, as well.

18        The rabbi trust appellants also moved to convert the

19   cases under Section 1112 of the Bankruptcy Code.  This was

20   joined by TRACO and the U.S. Trustee.

21        At the plan confirmation hearing yesterday -- it was

22   over two days -- but at the one yesterday, counsel for the

23   appellants argued that I must convert in this case based on

24   the tenants of the Bankruptcy Code, even if I were to find

25   that this plan could be confirmed.

1    I'll explain my reasons in a bit, but I can and I

2    did consider plan confirmation and dismissal simultaneously.

3    And if I find that the plan is confirmable, then there's no

4    cause under 112 to convert.

5    I found counsel's argument creative, for sure, but

6    wrong on the law and the facts here.  I don't make rulings

7    based on policy issues, but my answer will hopefully quell any

8    concern companies who, for example, may be losing money in a

9    couple of months in a Chapter 11 case due to tariffs or just

10   business issues or the market, are subject to mandatory

11   conversion simply by the filing of a motion to dismiss, even

12   if there's a potential confirmable plan proposed, even if

13   that's a liquidating plan.

14   The Court conducted an evidentiary hearing on

15   confirmation and conversion, also considered dismissal.  I

16   considered the testimony, the documents admitted, and the

17   legal arguments of supporting and opposing parties.

18   For the reasons I'll explain, I'm prepared to

19   confirm the plan with some changes.

20   First, there's going to be a change to what is

21   referred to as the Debtor medical claim procedures to remove

22   mandatory mediation.

23   And I will not be reimposing the automatic stay on

24   parties for whom I previously signed orders granting relief

25   from the stay.

14

1    There will also be a change to the Debtor releases.

2    The Debtor releases, you know, I'll have to think about this,

3    and so I don't want to do it today because you're going to

4    have to think about this.  But no one is going to be released

5    for any independent pre-petition actions that don't relate --

6    or let me put it this way.

7    You can -- the Debtor release will apply to pre-

8    petition actions related to the filing of the Chapter 11 cases

9    or maybe a restructuring effort in connection with the Chapter

10   11 case, you have to go get some financing to get to the case,

11   but no independent pre-petition actions.  I want to be clear

12   about that and I'll say it again later.

13   But there are allegations and potential litigation

14   about pre-petition actions that took place in 2016 and 2020

15   and 2021.  You know, I want a level playing field in a

16   liquidating 11, so no one gets released based on those acts.

17   I don't know if there's anything there.

18   But there also must be language struck in the

19   confirmation order or added to ensure that the plan does not

20   impact the IRS's rights to pursue claims against potential

21   responsible parties under non-applicable -- excuse me -- under

22   applicable non-bankruptcy law.  That's not a finding that

23   there is a responsible party.

24   My understanding is that the IRS and the Debtors

25   continue to work on it.  But the basic concept is, if the

1    Debtors remain liable for 941 taxes -- right?  Then the IRS --

2    obviously, the plan can't impair the IRS's rights to pursue

3    other remedies with respect to that, when matters includes

4    responsible parties.  I really hope the parties continue to

5    work on that, as well; and it sounds like, for all intents and

6    purposes, based upon what I heard, that's the case.

7         The confirmation order must also require additional

8    language, requiring that the ability to pay admin claims in

9    full is a condition precedent to the effective date that

10   cannot be waived.

11        There must also be language that the Court will hold

12   a conference about litigation matters and the administrative

13   and claims reconciliation process.  There will be a hearing on

14   December 15th, 2025 at 1:00 p.m. central, June 15, 2026 at

15   1:00 p.m. central, December 15, 2026 at 1:00 p.m. central, and

16   June 15, 2027 at 1:00 p.m. central.  I'll say that again.

17   December 15, 2025 at 1:00 p.m., June 15, 2026 at 1:00 p.m.,

18   December 15, 2026 at 1:00 p.m., and June 15, 2027 at 1:00 p.m.

19        The Court reserves the right to immediately find

20   that the plan cannot go effective *sua sponte* at the 2026 and

21   2027 conferences.  The most important conference will be the

22   June 15, 2027 conference.  If the Court finds that the plan

23   cannot go effective, has no hopes of going effective, let's

24   just say in late 2026, the practical matter is that the case

25   will convert right then and there.

16

I'm going to explain my reasoning a little bit more
later. But you should think about the conferences this way:

There are a number of omnibus objections and dozens
of preference actions underway. We'll know the answer to most
of the omnibus objections by December 2025, for sure. Some of
the objections arguing billions in alleged administrative
claims are unsupported by any documentation. I intend to take
those matters in the ordinary course and set contested
evidentiary hearings, if necessary, in the ordinary course, as
well. There will be no delay.

TRACO has also asserted an administrative claim for
about 176 million. I don't know how I can say "about 176
million," but let's just call it over 170 million. I see no
reason why the TRACO matter can't be adjudicated before the
end of the year.

There is also, supposedly, potentially, a large
fraudulent transfer action getting filed before me soon. That
matter could be tried in 2026.

But if it becomes clear to me that the
administrative claims remain exorbitant and Steward is losing
in litigation, I'm not going to wait until 2027 to do what
needs to be done in 2026. This protects against intentionally
slowing litigation with the hopes of running out a clock and
also puts the litigation before me at a premium.

It's very possible to try a fraudulent transfer

1   action in two years.  And absent settlement, there's really no

2   splitting the difference in fraudulent transfer cases, either

3   a transfer is avoidable or not.  See the Tronox case, right?

4           But if Steward settles or wins a major litigation

5   that's not before me, we can discuss it at the status

6   conference.  And not -- nor would I never tell another court

7   at what time table it must decide matters and by when it must

8   decide them.

9           Oh, before I forget, too, TRACO gets the requested

10  setoff language that it asked for, mentioned on the record

11  during the confirmation hearing.

12          The record established to support confirmation of

13  the plan includes the documents identified on Steward's

14  witness and exhibit list.  There's a lot of ECF numbers, you

15  all can get it from the transcript.

16          It includes the plan, the disclosure statement, the

17  plan supplement;

18          The declaration of Craig Johnson, Kroll -- K-r-o-l-l

19  for Kroll -- including the voting and tabulation reports;

20          An initial and supplemental declaration of John

21  Castellano, C-a-s-t-e-l-l-a-n-o, both as revised or some

22  paragraphs that were removed on the record;

23          The declaration of Alan Carr, as revised on the

24  terms stated on the record;

25          The declaration as -- of Marc Brown, on the terms as

1    revised on the record.  And I believe Marc is spelled M-a-r-c,

2    Brown.

3            Each of these witnesses testified, as well.

4            The evidence admitted into the record in support of

5    confirmation demonstrates, by a preponderance of the evidence,

6    that the plan is confirmable and should be confirmed.

7            The plan satisfies all applicable requirements under

8    the Bankruptcy Code.

9            The plan is in the best interests of Steward and its

10   estates and its creditors.

11           All consensual resolutions to objections to

12   confirmation are approved.

13           Objections to confirmation on the plan that were not

14   withdrawn or resolved by agreement are overruled.

15           I'm also noting for the record that there was no

16   affirmative case put on by any of the parties moving for

17   conversion or dismissal.  There is not a single document that

18   was admitted into the record or asked to be submitted into the

19   record by any of these parties.  No party elected to put on a

20   witness.  The presumption is, is that they're relying on the

21   testimony that was adduced by the Debtors in their case-in-

22   chief in support of plan confirmation.

23           I would note that the burden for plan confirmation

24   is on the Debtors, it's on Steward.  Moving for conversion or

25   dismissal is on the movant, so that would be -- I don't want

19

1    to keep calling them the "appellant parties" -- Mr. Keach's

2    clients.  I'll call then the "doctors," and I hope that's

3    okay, and anyone who filed a joinder.

4            I'll start with Steward solicited acceptance of the

5    plan from holders of eligible voting classes.  To approve the

6    solicitation of votes to accept or reject the plan, the Court

7    must determine that solicitation complied with Sections 1125

8    and 1126 of the Code and bankruptcy rules like 3017, 3018.

9            The Court previously entered an order conditionally

10   approving the disclosure statement in accordance with Section

11   1125 of the Bankruptcy Code.  But recently, we held a hearing

12   on final confirmation -- final approval of the disclosure

13   statement.

14           I don't recall, to my knowledge, anyone filing an

15   objection to the disclosure statement on a final basis as not

16   containing adequate information; certainly, no one argued it

17   in front of me.

18           That being said, as I said earlier, I don't rubber-

19   stamp.  I have a duty, I'm duty bound to determine whether the

20   Debtors have met their burden.

21           Under Section 1125 of the Code, a plan proponent

22   must provide voting creditors with, quote:

23           "-- adequate information about a proposed plan.  It

24   must contain sufficient information to permit and inform

25   judgment by creditors entitled to vote on the plan."

1        The disclosure statement easily satisfies the

2   standard here.  The disclosure statement provides a summary of

3   the administrative expense consent program, a summary of plan

4   classification and treatment of claims, estimated recoveries,

5   estimate the proposed effective date, an overview of the

6   Debtors' operations, an overview of the Debtors' capital

7   structure, events during the case, risk factors, U.S. federal

8   income tax consequences of the plan, and the requirements for

9   plan confirmation.

10        I apologize, there was one other thing I wanted to

11  make mention of, and I don't want to forget.

12        With respect to the Debtor releases, it's not just

13  for no releases for pre-petition acts.  For related parties,

14  Debtor related parties, related parties, the release afforded

15  to them has to derivative of the release provided to the

16  primary party.  So, if the Debtors granted a release to Party

17  X and Party X has related parties, which could be officers,

18  current and former, directors, it -- that release has to be

19  derivative of the release provided to Party X.  So you got to

20  really think about how to word that.  But again, independent

21  acts are not -- independent pre-petition acts are not going to

22  be released.

23        Another point.  There are independent orders, a

24  final DIP order, final settlement order.  Those stand on their

25  own.  And so, if there are releases for parties in those

1    documents, they stand on their own, and they will be enforced

2    by this Court as a final order; or, if the final settlement

3    gets appealed, then obviously not, but -- overturned.  But

4    they will stand on their own as orders of the Court.

5         Okay.  The plan includes numerous settlements,

6    including a major one with the PBGC.  The PBGC -- that's Paul,

7    Ben, Gary, Chris for the folks.  The PBGC settlement provides

8    that a relevant pension plan was terminated under an initiated

9    -- under a PBGC-initiated termination effective date in April

10   of 2024.

11        The asserted PBGC claims will be allowed as general

12   unsecured claims for about 8.7 million.

13        The holders of the allowed PBGC claims will accept

14   the plan, not opt out of the third-party releases.

15        And in full and final settlement, the PBGC will

16   share ratably with holders of general unsecured claims in the

17   amounts.  And that's like 90 percent of the GUC distributions

18   under whatever attained FILO claims and -- until -- excuse me

19   -- until the final retain claims are paid in full, and then

20   100 percent of GUC distributions, general unsecured creditor

21   distributions, after the retained FILO claims are paid in

22   full.

23        Under the PBGC settlement, they're only going to be

24   allowed one distribution in connection with the Debtors or the

25   plan; that is part of the settlement.  The PBGC, arguably,

1    under federal law, has a right to assert joint and several

2    liability against each party.  So this is a compromise in

3    settlement of claims, which is fully supported by the Official

4    Committee of Unsecured Creditors.

5         The plan also provides that, for distribution

6    purposes only, the claims and classes of interest will be

7    treated as a single consolidated entity.  So assets and

8    liabilities for distribution purposes are going to be treated

9    as if they were pooled in a single obligation of the Debtors.

10   Intercompany claims are going to be adjusted in accordance

11   with the plan.

12        No -- there's also kind of an administrative expense

13   claims consent program, where parties could elect to receive a

14   discounted allowed claim in exchange for kind of faster

15   payment.

16        Section 1123(b)(3)(A) of the Bankruptcy Code

17   provides that a Chapter 11 plan may provide for the settlement

18   or adjustment of any claims belonging to the Debtor or to the

19   estate.

20        The standard for approving settlements is similar to

21   the standard used under Bankruptcy Rule 9019.  And for that,

22   what -- the standard is whether it's fair, equitable, and in

23   the best interests of the estate.  There's plenty of Fifth

24   Circuit case law on that.  I will cite 801 F.3d 530, pin cite

25   540, for these factors.

1    Bankruptcy Courts don't have to conduct a mini-trial

2    to determine the probable outcome of any claims waived in a

3    settlement.  In Re Cajun Electric Power Co-Op, 119 F.3d 349,

4    356, a Fifth Circuit 1997 case.

5    Instead, the Court must apprise itself of the

6    relevant facts and law to make an informed and intelligent

7    decision, and there is great judicial deference given to the

8    Debtor's exercise of business judgment.  And the approval of

9    that settlement is within the sound discretion of the

10   Bankruptcy Court.  725 F.2d 293, pin cite 297 (5th Cir. 1984),

11   United States versus -- I'll spell it, A-w-e-c-o.

12   And based on the evidence that I'm relying on, the

13   declarations and the evidence admitted into the record, Seward

14   analyzed the cost versus the benefits of litigating such

15   claims and causes of action against the PBGC, and there's no

16   real objections on this one; the classification and where

17   they're classified, but not the settlement itself.

18   Regardless, I would overrule it.

19   I've talked about the Debtor releases and the scope

20   of those releases now.

21   I would note that, in support of the Debtor

22   releases, the transformation Committee -- and that includes

23   Alan Carr, C-a-r-r, and William Transier, T-r-a-n-s-I-e-r --

24   there's un-refuted testimony that they conducted an

25   investigation to consider cause -- potential causes of action

24

1    against current and former members of the Board of Steward

2    Health Care Holdings, LLC, current and -- and their

3    subsidiaries and affiliates.  Based on those investigaitons

4    and following extensive deliberation with the Debtors'

5    advisors, this investigation subCommittee included the Debtor

6    releases as part of the plan, including the scope.

7           And I would also note that the Debtor releases --

8    they don't need me to do this, they're already in there --

9    exclude anything for like actual fraud, wilful misconduct,

10   criminal misconduct, gross negligence, right?  Like no one is

11   getting away with the bad stuff here, no ...

12          (Pause in the proceedings)

13          THE COURT:  I would note that, in every case, there

14   are discussions of what's appropriate in the releases.  And

15   people always -- I shouldn't say this.  A lot of times,

16   professionals cite well, this was done in this case and this

17   was done in that case.  I find those analogies meaningless in

18   the context of a Chapter 11 case.

19          Tell me another case that's like Steward, right?

20   Just try, in the country, that's like Steward.  Tell me about

21   the investigations that the subCommittees of those -- just

22   because you see language in order, in every case, there has to

23   be a deeper analysis provided.  It usually comes in the form

24   of testimony.  You can tell me this case is like that case.

25   But just telling me that it's in another case is largely -- it

1    will be taken for that, that there are words that say the same

2    things in two different cases.  But tell me the facts, tell me

3    the analysis.

4           I'm approving the exculpations here.  And again,

5    they're carveouts.  But I'm going to tell you why.  The real

6    issue is whether the -- and the transformation Committee, Mr.

7    Carr, Mr. Transier, the independent directors get exculpated.

8    And there's a Highland 1, a Highland 2, a Highland 2.5,

9    there's just a bunch of Highlands.  And now, in May of 2025,

10   the Supreme Court issued a stay under certain action in

11   Highland, right?  The law is evolving there.  And this says to

12   the -- the exculpations here say to the extent permitted by

13   law.  You know?

14          Do I think that an independent director is

15   automatically granted an exculpation, one that I didn't

16   approve in connection with a case?  I don't think that's what

17   Highland says.  You can argue by analogy, but certainly the

18   Committee, the Debtor, its professionals, the Committee's

19   members, but the law is evolving there.  There's probably a

20   Highland 4 just working its way up.

21          But I'll say this, and I want this to be part of my

22   findings.  The Committee, its members, its professionals, the

23   Debtor, their professionals, Mr. Carr, Mr. Transier, Mr.

24   Castellano, throughout the entire case in front of me -- and

25   we held lots of hearings.  I've never -- this case -- and I

26

1    see a few big cases.  They all pale in comparison to the
2    number of hearings that I've had in this case.  I've had a
3    robust history to see the entire history of this case.  And
4    every one of those people that I mentioned have acted but
5    nothing more in the utmost good faith throughout this entire
6    case and throughout the entire process.

7              No decision that I have seen in connection -- I
8    approved every fee order, I approved every sale order, I
9    approved every rejection in a fair and transparent and open
10   process.

11             It -- each one of those parties have acted in good
12   faith in connection with the proposing of the plan, the
13   actions that were taken during the Chapter 11 cases.  It's
14   real easy to point about who didn't get paid in connection
15   with a case.  But no one has even attempted to present any
16   evidence that these professionals or the Debtors or their
17   professionals but someone ahead of someone else.

18             And $2 million of U.S. Trustee fees were paid in
19   this case, on time, by check.  You know, I don't -- the
20   98 percent of admin claims, and whether it's 98 or 97, I get
21   over 90 percent of admin claims have been paid.  And the fact
22   that more than -- basically, you know, the dec has always
23   worked out language in connection with a proposed confirmation
24   order, who came in and was concerned about payment of its
25   admin claims.  I don't -- I'm just saying no one I've had

1    throughout this entire case -- and we've had lots of hearings,

2    plenty of them -- no one has acted in bad faith throughout the

3    entire case.

4            The plan properly classifies claims under Section

5    1122.  I cite this in all of my decisions, but it is the

6    foundation upon which everything rests.  Interpreting the

7    Bankruptcy Code begins with analyzing the text.  Whitlock v.

8    Lowe, 945 F.3d 943, 947 (5th Cir. 2019).

9            In matters of statutory interpretation, text is

10   always the alpha.  BedRoc Ltd. v. United States, 541 U.S. 176,

11   a 2004 case.  It says the preeminent cannon of statutory

12   interpretation requires the Court to presume that the

13   Legislature says in a statute what it means and means in a

14   statute what it says there.

15           Under Section 1122 of the Bankruptcy Code, a plan

16   may provide for multiple classes of claims or interests, so

17   long as each claim or interest within a clam -- class is

18   substantially similar to other claims or interests in that

19   class.  A plan proponent is afforded significant flexibility

20   in classifying claims under Section 1122, provided there's a

21   reasonable basis for the classification scheme and all claims

22   within a particular class are substantially similar.  That's

23   the Greystone Fifth Circuit case, 995 F.2d 1274, pin cite 1278

24   (5th. Cir. 1991).  Greystone also says you can't classify

25   differently to gerrymander affirmative votes on the

1    reorganization plan.

2            The objectors argue that there was no business

3    justification for the plan's separate classification of

4    general unsecured claims and PBGC claims.  The un-refuted

5    evidence, however, proves otherwise.

6            First, the nature of the PBGC claims under ERISA --

7    E-R-I-S-A -- is different to other general unsecured claims.

8    And there's a settlement with the PBGC here, and that means a

9    separate business reason to classify them.

10            This is not a new concept here, when there's a

11    settlement for joint and several liability and parties are

12    approving that, and then also agreeing to just one

13    distribution for the Debtor and settling litigation; it's not

14    uncommon at all to place that party in a separate class.

15    There are business reasons and separate just -- legal justify

16    -- reasons to do so.

17            I would also add here that the final settlement also

18    justifies putting the FILO parties, their claim in a separate

19    class.  They're agreeing to subordinate part of their recovery

20    and they have a lien on all the Debtors' assets under prior

21    approved financing in this case.

22            I found, based upon the evidence before me and my

23    review, that the plan separately classified claims on valid

24    and legal bases, particularly the classes that I talked about.

25    The classification scheme is rationally based and it's based

1    on the legal rights of each holder of a claim against the

2    Debtors.  And they were not propose -- I have no evidence,

3    zero, that they were proposed to create a consenting impaired

4    class or to manipulate class voting.

5         All right.  I would note, and I think it's important

6    to note here, for purposes of making factual findings, there

7    were declarations submitted.  But you had Mr. Carr here and

8    Mr. Castellano here, and they were both cross-examined.  Not a

9    shred of evidence that there was any manipulation here for

10   purposes of the plan.

11        Let's go to 1129(a)(1).  Section 1129(a) requires

12   that confirmation of a plan is not likely to be followed by

13   the liquidation or for the need for further financial

14   reorganization of the Debtor or any successor under the plan,

15   unless such liquidation or reorganization is proposed in the

16   plan.

17        The Fifth Circuit has said, in In Re Briscoe, B-r-I-

18   s-c-o-e, 994 F.2d 1160, 1165-1166 (5th Cir. 1993), it may not

19   be a guarantee of success, only a reasonable assurance that

20   the commercial viability is required.

21        This is the section that's usually called

22   "feasibility."  That word is nowhere in the text.  We'll stick

23   to the text.  But the concept is, usually, in Chapter 11

24   cases, when a plan is confirmed, there are projections about

25   what the Debtor can do in the future, and you got to make sure

1    that, based upon those projections and the proposed actions,

2    that you're -- that there's at least a likelihood that you're

3    not going to find yourself, shortly thereafter, right back

4    where you started, right?  That there's not a need for another

5    reorganization or a liquidation.  But if the plan itself

6    contemplates a liquidation, then, obviously, 1129(a)(11) would

7    be satisfied.

8         There are some courts -- and I don't want to

9    identify which cases they are -- that appear, upon my reading

10   of them -- that say that feasibility doesn't need to be

11   satisfied and -- when the plan is a liquidating plan.  That

12   can be read in a lot of ways of saying that you don't have to

13   satisfy a particular provision of the Bankruptcy Code.

14        I don't know think there's -- I don't ascribe to

15   that, right?  There's nothing in the Code -- as a matter of

16   fact, it's required that the Debtor satisfy each section of

17   1129.  So, textually, I agree with courts that provide that,

18   if it's a liquidating plan, that you -- that the liquidation

19   itself, if it's provided in there, it's satisfied, and the

20   liquidation is like a realistic liquidation, that that itself

21   satisfies 1129(a)(11) based on the next that it -- based on

22   the text itself because there's not a need -- there's going to

23   -- all right?  It's not likely to be followed by the

24   liquidation because there is a liquidation itself, and

25   1129(a)(11) is satisfied on its own terms.  The text provides

1    the answer here.  Textualism [sic] is the key.

2        Now does that mean that every liquidating plan

3    automatically satisfies 1129(a)(11)?  The answer is I don't

4    know.  No, I'm not making blanket assertions.  I just know

5    this one does, and let me tell you why.  I think courts have

6    to review each plan, and I reviewed this one, and it satisfies

7    1129(a)(11).

8        Here, the plan contemplates liquidation of

9    litigation claims and it contemplates an effective date in

10   early 2027.

11       I'll take a step back.  The first, you know,

12   question is:  Can a plan provide for an effective date that

13   far out?  We look to the text first.  The Bankruptcy Code does

14   not prohibit it.  There's nothing in the Code that says when

15   the effective date must occur; it just says you have to occur

16   by the effective date.  I think the genius of the bankruptcy

17   congress here is that they allowed for flexibility here.

18   There was a lot of talk well, is five months good enough, is

19   three months good enough, is seven months, is a year.  And the

20   Code doesn't talk to any -- about any of that.

21       I would note, though -- and this is consistent with

22   the text -- that 1123(b)(6), which I think may apply as well,

23   says that a plan can include an appropriate provision not

24   inconsistent with the critical provisions of this title.

25   That's different than non-consensual third-party releases,

1    which must be -- which, arguably, conflicted with 524,

2    arguably included with the (indiscernible) under the other

3    versions of the prior portions of it, which dealt with the

4    Debtor and claims that are -- that discussion that was had

5    under Purdue.  And I don't find anything inconsistent with the

6    Code here, and I don't have any kind of like issues with 524

7    and other language.

8            Has this been done in other cases?  Of course it

9    has.  There was quibble about that, but there's no hard and

10   fast rule.

11           As I see it, the questions really blow down to is

12   the extra time necessary and will it benefit the estate and

13   creditors.  I think the Third Circuit, in Westinghouse, which

14   was cited in the briefing, has it absolutely right.  The

15   Bankruptcy Code recognizes the complexity.  Not all cases are

16   the same.

17           Again, I go back.  How can you compare Steward to

18   other cases?  Can you compare Steward to Sears?  No.  But was

19   it done in Sears?  Yes.  Was done in American Airlines?  Yes.

20           And I argue -- and I mentioned this before and I'll

21   mention it again.  In American Airlines, Judge Lane was faced

22   with a critically difficult case, where, before the plan

23   confirmation hearing -- and the plan was premised upon a

24   merger of two major airlines, right?  American and USAir.  The

25   Department of Justice filed an antitrust suit, right?  And

1    that was not before the Bankruptcy Court, right?  To block the

2    merger.

3         So, either, if the plan goes effective -- the plan

4    was premised upon distributions of equity under the

5    reorganized Debtor, right?  So the DOJ won that lawsuit.

6    There was no plan.  The case was confirmed, but no one knew,

7    walking into the plan confirmation hearing, how long that was

8    going to take.  My recollection is the Debtors hadn't even

9    filed an answer to the complaint yet; or, if it had, it was

10   really early in the case.  That case got resolved, that case

11   settled.  But no one knew.

12        Regulatory authority cases, where you've got to get

13   regulatory authority, like government agencies.  My friends

14   from the Department of Justice made it clear at this hearing

15   that they don't like folks getting into their business when --

16   in how long it takes them to do it; it will be done on their

17   time table.  And they will tell me, time and time again, that

18   I'm -- I can't force when the IRS is to review and process a

19   tax return; that will be done on -- in accordance -- there's

20   no special person I can call and tell them to get this done by

21   next week.

22        And I can't tell people when to go do -- I can't go

23   tell DOJ to stop suing under antitrust or to -- I can't tell

24   the judge who's going to be handling the antitrust lawsuit

25   when to prosecute the case or the time tables or when to

34

1    respond to a motion to dismiss or when to deal with the
2    discovery issues or when to deal with summary judgment issues
3    or when to hold his trial or how long it takes to write a
4    decision.  I can't tell anyone anything.
5             The question is:  Is the extra time needed?  Yes.
6    And why?  Does it benefit the estate?  That's what we have
7    here.
8             I heard from Alan Carr, a restructuring
9    professional, who testified live and by declaration.  Carr was
10   an independent manager of the board of managers and a member
11   of the transformation Committee, which was formed in 2023, and
12   the investigation subCommittee, which was formed in 2024.  The
13   transformation subCommittee -- that's at Paragraphs 1, 2, 11,
14   and 13.
15            The transformation Committee was formed to pursue
16   and oversee the administration of the Debtors' Chapter 11
17   cases.  Paragraph 11.
18            The investigation subCommittee was formed to
19   evaluate potential causes of action in favor of the Debtors.
20   Paragraph 13.
21            Carr was an independent manager of both Committees
22   since January of 2024.  Paragraph 1.
23            The investigation that the subCommittee directed
24   involved review of the Debtors and third parties, documents,
25   correspondence, reviewing board minutes, conducting

1    interviews, reviewed and analyzed appraisal reports and

2    valuations, and performed substantive legal analysis.

3    Paragraphs 17 and 18.

4              Carr specifically testified that he and other

5    subCommittee member William Transier, T-r-a-n-s-I-e-r,

6    evaluated whether the Debtors would have colorable and

7    substantial claims arising out a series of pre-petition

8    transactions.  Paragraphs 16 and 18.

9              These transactions included two distributions in

10   2016 totaling about -- over 780 million, that Carr testified

11   he believed could be colorable fraudulent transfer claims.

12   Paragraph 24.

13             Carr also testified that he investigated a 111

14   million distribution made in 2021, that there may be a

15   colorable fraudulent transfer claim in there.  That brings

16   damages to about 900 million.  Paragraph 34.  Carr also

17   testified that he believed this transaction may give rise to

18   breach of fiduciary claims as well.

19             He then testified about a 2022 transaction with an

20   entity called CareMax that presented a colorable and

21   substantial fraudulent transfer claim with damages of over 100

22   million.  That brought the total number of damages to over 1

23   billion.  That's around Paragraph 40.

24             Carr also evaluated a purchase of five hospitals in

25   Miami in 2021, for about 1.1 billion.  That's at Paragraphs 37

1    and 38.

2              Carr also testified he believed there may even be

3    more.

4              The Court also heard from John Castellano, the

5    Debtors' Chief Restructuring Officer, who testified live and

6    in his declarations.  There were certain aspects of

7    Castellano's testimony that I give greater weight than others,

8    but here's what's un-refuted:

9              He thinks that the Debtors could generate

10   distributable proceeds to creditors based on certain

11   commercial payer claims, totaling about 350 million.  That's

12   at Paragraph 15 of the initial declaration.

13             There may be about 20 million against United

14   Healthcare claims.  These are just routine insurance payer

15   claims.  Paragraph 16.

16             There's a trial starting in January of 2026,

17   totaling about -- or at least alleging about 590 million in

18   damages.  Again, I'll call it the "Norwood Hospital trial," N-

19   o-r-w-o-o-d.  17 to 19 in his initial declaration.

20             And he says there could be over 300 million in

21   potential preference actions.  Paragraph 21.

22             And then there's a potential 1 billion damage claim,

23   again, related to a Blue Cross/Blue Shield matter.  That

24   totals -- when you add all that stuff up, that's about 2.3

25   billion.

1    Mr. Castellano -- there were a lot of baseball

2    analogies that were mentioned.  People thought you had to hit

3    home runs.

4    And I don't -- Castellano said, you know, there's

5    about -- over -- when you add all this up, it's over $3

6    billion in potential colorable claims.  And you need to pay

7    all professionals and cross the threshold of admin and

8    priority claimants, and about seventy -- you need -- probably

9    need about a total of 300 million; you need 13 percent or 10

10   percent, right?

11   You don't need Aaron Judge, you just -- right?  Need

12   to hit home runs.  You just need a couple of singles.  Now I

13   don't know if you're going to get them.  I don't know.  I

14   don't know who's going to win that stuff.  I don't even know

15   if the Debtors have colorable -- I don't know if the Debtors

16   can win.  That's -- those matters get tried.  But are there

17   colorable claims based on the allegations that one has heard?

18   I -- of course there are, right?  And of course there are.

19   You know, much was said about timing, right?

20   There's an approximately six-hundred-million-dollar trial set

21   to start in January of 2026.

22   There also is another trial that likely is in front

23   of me that could be tried, from what I -- in two years, a

24   fraudulent transfer claim.  We're not rushing, right?  We're

25   not rushing for the sake or rushing.  But it can be done with

1    diligence.  You set a status conference some time in, I don't

2    know, August, September, you get parties off to discovery and

3    -- right?  It's the transaction, it's happened, right?

4         And a lot of fraudulent transfer litigation -- and

5    again, parties are going to have to come in and prove all

6    this.  But if it's constructive fraud, they don't have to

7    prove intent.  We can get into a valuation fight.  You know,

8    you hire some experts and you go.  And I'm not saying they're

9    not complicated, it could be very hard.  But fraudulent

10   transfer law is -- you know, there's no kind of splitting in

11   damages models.  Either the transfer is avoidable, or it's

12   not.  Either there's valid defenses to it, or there's not.

13   It's just kind of the way the law is set to go.

14        Is the Debtor insolvent?  Now has there ever been a

15   court where -- that has ever found insolvency based on balance

16   sheet tests?  I -- you know, I'll say a couple of comments on

17   that.

18        In the real world, where like not everybody gets to

19   hire a fancy expert, the answer is absolutely.  Okay?  You

20   know, I know we only deal with complex cases here.  But in the

21   real world, in Chapter 13s and in Chapter 7s, the answer is

22   all the time.  Are they reported decisions like -- I don't

23   know, maybe there's no reported complex -- and I'm not saying

24   it would apply here.  But is the answer has there ever been

25   one, would I do one here?  No, we're going to have to fight.

1      It's a fair fight.  We're going to have to come up -- but the

2      answer has it ever happened, I think, needs to be -- I just

3      didn't want to leave that out there.

4           Can the Debtor identify a golden creditor was

5      another objection.  I don't know, right?  But if they can't

6      identify one, that's an easy motion to dismiss; I can get rid

7      of that fast.  It won't take long, summary judgment, it would

8      be fast.

9           So -- but you can't overlook that there's

10     potentially over $2 billion of claims that could be resolved

11     over the next year or could be settled.  That's a valuable

12     estate asset.  It hasn't been liquidated, but it's not small.

13          I think it's what -- that's why I'm saying what case

14     is like Steward.  Tell me a case that's got, you know -- I

15     don't know.  Tronox?  You know, where you had potential causes

16     of action from the beginning, for -- worth billions on

17     fraudulent transfer?  I'm sure there are others.  But I just

18     think it's hard where there's a valuable estate asset, one

19     that be resolved, I think, based on these facts.  I don't

20     know.  Let's tee it up, let's see where it goes.

21          But if it -- I assure everyone, if this is going

22     nowhere in 2026, I will -- I've got no qualms about telling

23     the Debtors it's a no-go on the effective date, you can't do

24     this.  I'm not going to delay this for the sake of delay or to

25     stretch this out.  I think parties are going to have to get to

1    work and get right to work and not rush.  Focused would be the

2    right answer.

3          So, based on the Record, I find that 1129(a)(11) has

4    been satisfied.  You can have an effective date that's far out

5    when there's a need to do it.  The Code doesn't say when you

6    have to have one, but there's flexibility within the Code.

7          And there's no distinction between who's driving the

8    litigation, not driving the litigation.  If that was it, you -

9    - Congress would have put that in there.  You don't hide

10   elephants in mouse holes, right?  That would be a big issue to

11   identify.

12         Section 1129 of the Bankruptcy Code says the plan

13   can -- shall be confirmed, if all the requirements under (a)

14   -- which is why you can't skip (a)(11) -- are met, right?

15         1129(a)(8) requires, among other things, that all

16   impaired classes vote, but that's not the end of the analysis.

17         1129(b) permits confirmation, notwithstanding

18   1129(a)(8), if all other requirements under 1129(a) are met

19   and the plan does not discriminate unfairly and is fair and

20   equitable with respect an impaired non-accepting class.  So a

21   plan may discriminate between classes, but it can't

22   discriminate unfairly.

23         By the way, I'm using Tronox as just an example of a

24   fraudulent transfer litigation.  The facts are like

25   drastically different than what we have here.  So like no one

41

1    read timing or -- what I am saying is that, you know, are big
2    cases with big estate causes of action.  Like don't read too
3    much into the citation of the case.  Read a lot into American
4    Airlines because that's on point and I will state that on
5    point.
6         The Bankruptcy Code doesn't define what it means to
7    discriminate unfairly.  Courts generally assess unfair
8    discrimination based on the facts and circumstances presented
9    in the case.  All right.  In other words, payment preferred to
10   one class over another, the Court must find an articulated
11   basis to do so.
12        The text requires a plan to note unfairly
13   discriminate against impaired non-accepting classes, so
14   Steward must articulate a basis for any discrimination between
15   the two classes.
16        Here, the plan doesn't discriminate unfairly with
17   respect to any class of claims.  Here, the general unsecured
18   claims are going to receive the same ratable recovery under
19   the plan as the PBGC claims, notwithstanding that they were
20   joint and several.
21        Meanwhile, general unsecured claims are going to
22   receive a lower ratable of recovery than the retained FILO
23   claim because the retained FILO claims are secured claims that
24   the FILO parties have agreed to support in aid to all admin
25   and priority claims.  A big point, by the way, there.

42

1        Holders of general unsecured claims benefit from the

2    subordination, which, by the way, is what makes the

3    liquidation analysis a really easy one.  Of course you're

4    going to receive more under this plan than under a 7, there's

5    subordination, right?  And just on its face, you just -- it

6    just gets so easy to do so, which is my Mr. Brown's testimony

7    appeared to be very largely un-refuted.

8        The plan complies with all applicable sections of

9    1123, as well, it really wasn't disputed.

10        The plan specifies classes of claims or interests.

11        The plan provides that we're going to specify the

12    treatment of any class or claims that are impaired under the

13    plan, provide for the same claim of interest, unless the

14    holder of that particular claim to less favorable treatment.

15    You provide for adequate means for the implementation.

16        1123(a)(6) I don't even believe applies, but to the

17    extent it did, 1123(a)(7) is satisfied.  The remainder of

18    applicable sections are satisfied, too.

19        1129(a)(2) is satisfied.  The proponent of the plan

20    complies with the applicable provisions of the title.

21        1129(a)(3), I'm going to pause here.  Was the plan

22    proposed in good faith and not by any mean for permitted by --

23    permitted by law.  This plan was developed to maximize value

24    to stakeholders.  It resulted from arm's length negotiation

25    with the Committee and a primary secured creditor, with lien

43

1    on -- it's a pretty significant lien.  Read the DIP order.

2    And the plan provides for the means to wind down the

3    structure.

4            I find the finding of the plan itself important, and

5    that the Debtors didn't move to liquidate as really important.

6    Based upon the Castellano declaration, based upon the Carr

7    declaration, based upon statements of counsel -- well, that's

8    the evidence, and their testimony.  But the act of filing this

9    plan that provides an attempt to provide -- to pay all allowed

10   admin claimants in full on the effective date -- right?  They

11   didn't just drop the shovel and walk away, right?  They're

12   actually trying to pay these people in full.

13           And by the way, which probably people hardly talked

14   about at the confirmation hearing, which is why Mr. Kahn said

15   unsecured creditors are like, hey, don't forget that this plan

16   is trying to provide a great recovery to unsecured creditors

17   and to liquidate assets with professionals already in place,

18   who have already analyzed this, to kind of start the process,

19   right?  Like it's just so -- they don't just leave -- a lot of

20   talk about professional fees, and like they didn't just drop

21   the shovel and say you know what, I've got mine, I've got a

22   carveout, we'll leave the Chapter 7 Trustee, you know, here's

23   a couple of million bucks and we're out, right?  Good luck.

24   Call me.  You know, it's not that kind of a case.

25           This -- the filing of the case isn't -- is solely

1    intended to try to maximize value, and a secured creditor is

2    subordinating repayment of claims, which, quite frankly, tells

3    me also a market test, as well, that there's value to these

4    litigation claims.  But it also speaks to the fact that

5    economic actors and a Committee with an independent fiduciary

6    duty to think about nothing but the interests, to maximize

7    interests for unsecured creditors, supports this plan, didn't

8    support liquidation.

9    But the filing of the plan itself means that there's

10   good faith in the filing of it because of what it's attempting

11   to do.  It's not immediately turning it over to someone.  It's

12   left with professionals in place, with a plan administrator,

13   proposed plan administrator in place, with a liquidating trust

14   established under the FILO settlement, with the proposed

15   professionals who have been reviewing this already.

16   There's already someone in the Blue Cross/Blue

17   Shield.  Kobre Kim is analyzing what we would call the "D&O,"

18   that litigation, what I would call the "Carr analysis" of

19   litigation.  There are other -- King & Spaulding is doing

20   other work.  Togut is doing preferences matters.  These

21   professionals are already out there hitting the ground

22   running.  And someone is saying just like let's see if we can

23   get everyone paid in full and give something to unsecured

24   creditors.

25   I find this plan to -- an attempt to prove an

1    enhanced recovery to everyone.  I think Steward had a duty to

2    maximize the value of the filing and the estae and I think

3    they did so.  And it's good faith on behalf of them, their

4    professionals, the UCC and their professionals and members,

5    and the Steward Board.

6          Does the plan satisfy 1129(a)(4)?  Yes.  It erases

7    the payment of professional fees in the way that every

8    Chapter 11 case does.  I don't understand what -- a lot was

9    said about this.  This is what happens in every Chapter 11

10   case.

11         Again, I -- much has been said about professional

12   fees.  And I would note that the allowance of professional

13   fees claims is subject to my review and my approval under

14   Section 330 and 328 and 330 -- there's a day for those

15   hearings to happen, and they will happen and I will rule based

16   upon what is said at that time.  And parties-in-interest have

17   the right to make their voices heard.

18         Does the plan satisfy 1129(a)(5), the identity and

19   the affiliations of the proposed parties?  Yes.

20         1129(a)(6), satisfied.

21         1129(a)(7) is the best interests test.  And that

22   provides where the plan proponent must establish that the

23   holder of a claim who was entitled to vote has either accepted

24   the plan or is receiving as much value as they would in a

25   hypothetical Chapter 7 liquidation.

1    You say you look at someone has either rejected the

2    plan; or, if they rejected, that they're going to receive as

3    much, at least as they would in a Chapter 7 liquidation.  The

4    Brown declaration was -- it says what it says.  It was really

5    hardly refuted.  A lot of well, could there be potential tax

6    liabilities, sounds like there could be.  Based on the

7    evidence before me, I found that there could be.

8    You know, and arguments, legal arguments were made

9    about -- well, the answer, before I kind of get into the

10   arguments, based on the evidence, there's a PBGC settlement,

11   right?  That goes away if this plan isn't confirmed.  There's

12   no guarantee that PBGC will agree to that.

13   An additional tax liability, that could continue to

14   get incurred in the -- to the tunes of twenty, 25 million

15   additional tax liability could be incurred.

16   Subordination goes away, additional money that FILO

17   is giving goes away.  A lot of liens snap back into place from

18   the FILO parties, that they already have under a final order.

19   You know, can one -- if some -- on the effective

20   date, can someone receive more money with subordination, with

21   the guaranteed PBGC settlement, with more cash into the -- you

22   know, given to the estate to fund litigation for those that

23   are proceeding on an hourly basis?  Is it in the best

24   interests of the estate?  Like I -- you know, I mean, like

25   it's just math; it's a math problem, but it's easy.  It's not

1    even complicated.  The numbers are for themselves.  Are you
2    going to receive under this plan more than you would under a
3    7?  Yeah, just by virtue of the waterfall in the plan, you're
4    going to receive more.  All the -- a bunch of settlements go
5    away if you don't.

6    Well, I'll read -- I'll stay with the text.  There
7    were arguments that were made that a -- you know, a Chapter 7
8    Trustee could immediately step in and just kind of take over
9    and keep things running.  I've ruled on 1129(a)(7).  I now
10   make the practical point.

11   That is -- that's not my experience, right?  A chap
12   -- and Brown made the point, by the way.  You know, a Chapter
13   7 Trustee, whoever it is -- which we have no idea who it would
14   be -- gets appointed -- I have no idea who it would be -- gets
15   appointed, she or he has to now get smart on -- good luck
16   getting smart on Steward, right?  Like how long is that going
17   to take, right?

18   You know, so you're going to have to go meet with
19   people because you have a fiduciary duty.  But you can't just
20   act, you can't just tell everybody to keep going and doing
21   what you're doing.  You got to get your hands wrapped under
22   Steward.  Well, that's going to take time because they're
23   going to do their job.  They're going to have to figure out
24   what they want to do and how that's going to work.  Sure,
25   there's a plan at -- sure, the FILO settlement remains on its

48

1    own terms.

2         But a Chapter 7 Trustee is going to have to exercise

3    her or his fiduciary duty.  You know, you don't just the

4    matrix.  You don't just download something into that person

5    and they immediately go.  It's -- it takes time, at least --

6    and this is a massive case.  We've had a lot of litigation.

7    It's my experience that that could lead to real chaos.  Not to

8    say that our Chapter 7 Trustees aren't amazing.  They're just

9    human beings who would have to do this.

10        And there are potential appeals that are currently

11   pending now.  Who pursues those?  How do you -- if the Court

12   holds a hearing, who shows up?  There's such a continuum by

13   doing what's going on here.

14        But you know, I mean I should say there's ...

15      (Pause in the proceedings)

16        THE COURT:  I'll say this now, before I get into

17   1129(a)(8), that it was satisfied.  There are unimpaired

18   classes under the plan.

19        1129(a)(9) is satisfied, priority claims will be

20   paid and admin claims will be paid on the effective date, if

21   this plan is to go effective.  It is a non-negotiable now.

22   It's in the confirmation order.  It has to happen.  And

23   there's not -- there is no confusion anymore.  I don't think

24   there was -- well, one could read it as being waivable.  But

25   you can't waive code provisions, so the plan can't go

1    effective.  It is now in effect.

2         And I'm holding hearings every six months to make

3    the call as to what we're going to do.  This is not -- we're

4    not just letting this go and float.

5         The plan satisfies (a)(10).

6         The plan satisfies (a)(12).

7         The remainder, the other forms of 1129(b) were

8    earlier discussed.

9         1125(e) is satisfied.

10        I mean, about voting, let me talk about that.  I've

11   been talking so long, I'm afraid they're going to have to hit

12   the button for an extra hour.

13        (Laughter)

14        (Pause in the proceedings)

15        THE COURT:  There was a lot of questions about --

16   well, some objections were raised about voting in connection

17   with this case.

18        Craig Johnson testified on behalf of Kroll, who was

19   the solicitation and voting agent.  I -- the allegations were

20   made that there were improper tabulations, or that Kroll did

21   something wrong by not following the procedures.  Mr. Johnson

22   testified incredibly credible and here's what he said in

23   addition to his declaration:

24        He said the rule -- the procedures that the Court

25   approved -- and I'm -- here's how I count and here's what I do

50

1    when I receive a vote, and that's what he did, that's what
2    Kroll did.  They followed the rules, they followed the rules.
3    And the rules say, if someone doesn't vote to accept or
4    reject, you don't count it.  So he didn't count a bunch of
5    them.

6          But then they asked him, and they said well, there's
7    a lot of pages of folks who -- does that surprise you, that so
8    many people just didn't vote to accept or reject.  And he said
9    no, not for a case of this size, and I've been doing this for
10   a long time.  And he said -- he was asked by a member of the
11   Committee, by the way, I look at these other -- there's a
12   bunch of folks who voted against each Debtor, there was one
13   creditor who voted against each Debtor, what would you have
14   done if that person would have voted.  He said I would have
15   counted him, I would have followed the procedure.

16         And he has a reason for every person, his
17   declaration said -- his declaration says that here's who
18   didn't count -- here's who didn't get counted and here's the
19   reason.  No one challenged any of the -- the veracity of any
20   of those statements.  No one put up a proof of claim in front
21   of me.  No one asked me -- no one challenged whether he was
22   right or wrong on any of them.  That declaration came in
23   untouched.  No one challenged the veracity of any of the
24   statements that he gave there.  All evidence matters.

25         Mr. Johnson said -- there was a lot of testimony, I

1    should say, about anything called Cross-Country voted multiple

2    times against -- the same amount against other Debtors.  They

3    said, oh, doesn't that strike you as strange.  No, my job is

4    to count the votes, so cross -- my job is to count the votes

5    as they come in.

6    And he's right.  I don't know -- I don't know if

7    Cross-Country has a claim that it alleges -- what was the vote

8    that came in who voted each way?  If that vote would have came

9    in no, he would have had to have counted them no the second

10   way, right?  It cuts both ways, right?  He counted the votes.

11   No one asked me for a -- no one put any evidence

12   refuting Johnson.  No one asked me for ah, well, Your Honor,

13   this is what just happened.  No one asked me for a

14   continuance, hey, I want to look into this a little bit

15   further, hey, I want to go summon, put up the proof of claim,

16   it's on the claims register, Your Honor.  No one put it up, no

17   one put it in my face.  Johnson's declaration, Johnson's

18   testimony shows Kroll did their job, followed the procedures.

19   There was talk about the sophistication of parties

20   and whether they understood how to vote.  No testimony that

21   any person had trouble, other than who asked for help, didn't

22   receive it, no testimony.  No voter came in, no testimony that

23   some voter called Kroll or the Debtors or the UCC, I don't

24   know -- I don't know how I'm doing this and everybody --

25   there's no testimony that no one who asked for help was

1    refused help.

2         I don't know what to do with allegations that it was

3    hard to potentially upload or that clicking buttons on a

4    screen is -- it's easier to upload a PDF than it is to put it

5    on the screen.  I -- you know, that's not evidence before the

6    Court, and evidence matters.

7         I also don't like the word "sophisticated."  And I'm

8    not saying anybody meant it in a pejorative manner.  But I --

9    you can read the word "sophisticated" to mean, you know, that

10    you don't have a fancy degree to hang on your wall.  But I

11    know plenty of people who are very sophisticated, as we all

12    do.  I don't know what that word means.  And I just -- I'll

13    leave that there.

14         There's no evidence that anyone who needed help --

15    and certainly, there could have been people, they would have

16    called Kroll.  Kroll's work here was stellar; they did their

17    job.  And so I overrule any objection about any voting

18    irregularities.  There's no evidence of that.  If there would

19    have been, I would have written on it, trust me.  If my

20    procedures weren't followed, I would have -- be having a

21    different conversation.  They followed the rules.  The orders

22    say that you have a -- you could call them.  Well, "could"

23    doesn't mean you must.

24         And Johnson also said I -- there was thought into

25    what he said and I really want to highlight it.  He said look,

53

1   I -- there were some people who voted, lots of people who --

2   he said who didn't vote to accept or reject, but they opted

3   out, right?  So he saw activity.  So I'm overruling those

4   objections.

5   Let me talk about conversion.  We're getting to the

6   end and I appreciate everyone's patience.  Certain -- all

7   right.  The deferred comp party -- oh, I guess it's really

8   time to go now.

9   The deferred compensation participants moved to

10  convert the case to a Chapter 7.  The U.S. Trustee also filed

11  a motion to dismiss or convert.

12  Going back to the text, I would note that, in 2005,

13  BAPCPA -- B-A-P-C-P-A -- it used to say the Bankruptcy Court

14  "may" convert; they changed it to "shall" covert, which

15  Mr. Keach points to and points to 1112(b)(4) as a non-

16  exhaustive list of the grounds for cause.

17  BAPCPA also added, under BP-4A, which is why it now

18  states that a substantial or -- cause could include a

19  substantial or continuing loss to or diminution of the estate

20  and the absence of a reasonable likelihood of rehabilitation

21  constitutes cause.

22  Mr. Keach, who represents the parties -- it's just

23  easier to call them that, refer to Mr. Keach, who is an

24  outstanding lawyer -- argues that the Court must convert

25  because it says "shall," if there's cause.  And BP-4A says

54

1    cause is if there is a substantial or continuing loss or

2    diminution of the estate.

3          Now a couple of things.  If read the way Mr. Keach

4    says -- and I'm going to get into why I disagree with it --

5    but Mr. Keach would tell me that there's a plan on file here,

6    you don't even read the plan, you see this and you just

7    convert, right?  Which is a frightening proposition for those

8    who are in Chapter 11, who may be -- may have filed a plan,

9    that someone could then file a motion to dismiss or convert

10   your case at the time in which you're seeking plan

11   confirmation and argue cause and say the Bankruptcy Court

12   can't even read or consider it.  You have to consider them

13   both, yeah, you absolutely do.  Do you just drop one and have

14   to think about the other?  I don't see that anywhere in the

15   Code.

16         And BAPCPA, in 2005, certainly put more teeth into

17   1112, for sure.  They didn't say notwithstanding a plan that's

18   filed in -- under 1129.  And I would also note the Bankruptcy

19   Code has always permitted for the filing of liquidation plans

20   under Section 1129.  It simply says a liquidation may be

21   proposed in a Chapter 11 plan.

22         So to require conversion in all cases in which a

23   Chapter 11 has liquidated most of its assets and is proposing

24   a plan, in my opinion, renders 1129(a) basically meaningless.

25   I think that would disharmonious to considering -- when you do

1   statutory interpretation, you got to look at the section, but

2   then you also have to look at the entire section.  You have to

3   look at the entire corpus to then determine how this section

4   fits within the entire section to make a determination as to

5   how it fits, and to give effect to every word, so as to not

6   render any particular section meaningless.

7          So let's look at it.  Under 1112, the Fifth Circuit

8   said, in like the In Re Timbers case, 808 F.2d 363, 371-372

9   (5th Cir. 1987).  The Fifth Circuit has instructed the inquiry

10  is case-specific and the Court must focus on the particular

11  circumstances of the case before it.  The Fifth Circuit has

12  explained that the Bankruptcy Court's role in this inquiry is

13  to evaluate each Debtor's viability and the rate of progress,

14  in light of the best interests of creditors and the estate.

15         I would note that Judge Lane of the Southern

16  District of New York was faced with a similar notion in what I

17  would call the MSR Hotels and Resorts, 2013 WL 5716897 (Bankr.

18  S.D.N.Y.), an October 2013 case.  In that case, the Debtor no

19  longer operated and sought to liquidate.  And the movant, on

20  the motion to convert, argued that the estate faced a

21  substantial and continuing loss and there was no chance of

22  rehabilitation, that the Chapter 11 bankruptcy had no

23  legitimate purpose that could be achieved by a Chapter 7 --

24  that could not be achieved by a Chapter 7 Trustee.

25         Judge Lane disagreed.  First and foremost, he said

1    that liquidation in an 11 is a valid reorganization purpose,

2    noted the time and the complexity of a Chapter 7, found that

3    the Debtor did not face a substantial and continuing loss and

4    diminution in value in the Chapter 11 case because the Chapter

5    11 offered the Debtor advantages unavailable in a Chapter 7

6    that best served the interests of creditors.

7            In this case, the participating -- the participants

8    argued that the substantial loss prong is satisfied because

9    the Debtors' disclosure statement stated that there were

10   allowable administrative claims of 127 million and asserted

11   administrative claims of over a billion.  It's true it says

12   that.

13           Are they allowed?  Are they payable now?  A billion

14   dollars in claims -- I would note that somebody filed like a

15   billion-dollar -- like a nine-hundred-million-dollar proof of

16   claim with no supporting evidence, which is subject to an

17   objection.  TRACO is alleging $176 million, it's not allowed.

18   Another claimant filed an administrative claim, the Igoe

19   claim, I-g-e-o [sic], 35 million, lawsuit just filed.  How

20   much are those worth?  Is that a continuing loss because

21   people keep alleging allegations?  That's what a substantial

22   or continuing loss has to mean?

23           There was zero evidence put on by the movants, zero

24   evidence put on by the movants in their case-in-chief that

25   there was a substantial loss.  The argument is that the

1   Debtors can't pay admin claims, and that they assert this.

2   Okay.  Well, how do I balance that with the fact that like 97

3   percent of them have been paid already.  I mean, does that

4   mean that there's a continuing loss?

5          I think Steward is different than other cases, too.

6   Are we just going to overlook that there's not three -- an

7   asset worth 3 billion, a potential asset of potentially $3

8   billion in claims that could be liquidated timely?  How do you

9   -- is that a substantial loss?  I don't know.  Weighed against

10  $3 billion in claims?  I don't know.

11         I don't think -- I don't think movants satisfied

12  their burden.  I don't think -- in other words, there's no

13  cause here for a substantial -- that there is a substantial

14  loss or a continuing loss.

15         And I would note that the word "continuing"

16  indicates that it is prospective.  You don't just take a

17  snapshot in time and say, at this point, I filed my motion,

18  here's what happened over the last -- here's what happened

19  over -- in the past.  It must continue.

20         Guess what the Debtors did in this case?  They filed

21  a Chapter 11 plan.  It's any continuing loss is now stopped

22  because they're going to litigate claims to pay everybody.

23  How do you -- the loss -- the plan itself means that there's

24  no continuing loss.  No evidence.  The Debtors have pending

25  objections, $2 billion of claims.  And we'll know the answer

1    to them really soon.

2           The Debtors, by code, I would note, are not required

3    to pay administrative claims on the confirmation date, whether

4    it was two weeks from now or two months from now.  Pending

5    contingent administrative claims for billions of dollars that

6    have not been substantiated cannot equate to a substantial

7    loss to mandate conversion.

8           I am confident that a chapter -- a plan of

9    liquidation that proposes to pay admin claimants, priority

10   claimants, and provide a greater distribution than would be

11   available in a Chapter 7 is, by definition, in this case,

12   stopping any alleged continuing loss.  There's no evidence to

13   the contrary and no one put anything on.

14          Castellano also testified that there is likely 46

15   million in distributable proceeds from litigation assets.

16   Evaluating whether you have a substantial or a continuing loss

17   to an estate must be tailored to specific facts and

18   circumstances.  It's not to say that, just because there's a

19   plan of liquidation, that you don't consider it.  But the plan

20   itself could make you find that there's no cause, and that's

21   what we have here.

22          And that's what happens in -- argued in lots of

23   Chapter 11 cases.  There are critical -- creditors come in

24   losing month after month after month after month after month.

25   There could be an industry change.

1    Cases during COVID weren't doing too well in those

2    days, the mall cases weren't doing too well.  Does that mean

3    every mall case -- retailer would have converted in a Chapter

4    7 because, I think the Government didn't let you come in and

5    make money?  You couldn't go to the mall, you couldn't open

6    up, you couldn't pay your rent.  That was like -- I -- was

7    there a likelihood of rehabilitation during COVID?

8        Just taking a snapshot -- and that doesn't mean that

9    there's not teeth.  In other words -- in other words, if this

10   case had no prospect of even trying to pay admin claims, if

11   you just had, you know, small little preference claims here or

12   there, oh, no, we -- this ruling would have been over at 2:15.

13   You know?

14       (Laughter)

15       THE COURT:  But you look at every case on the facts

16   and on the merits and on the text.  This plan is confirmable.

17   There is no substantial or continuing loss, based on the facts

18   or lack of evidence there are.  But I also would note that the

19   plan itself provides substantial evidence that any alleged

20   continuing loss has been stopped.

21       And sure -- and having the time to pay the admin

22   claims on an effective date, by definition, can't be that --

23   the Code gives it to you.  How can you -- how can that be the

24   basis of the cause to convert, as well?

25       There's just -- there's reasonable prospects here.

1    I have no idea who will win.  I am not -- I didn't mention

2    anyone's name because everyone is entitled to their day in

3    court, and they will have it, whether before me or some other

4    court.

5         I want to really stress that, if I don't find that

6    this plan has the potential to be -- to go effective on the

7    time line that is being proposed, which is early 2027 -- I get

8    it, it's not a -- it's not a race to the clock.  But if the

9    Debtors are losing in 2026, and there's nothing to do here, I

10   will shut this down, I will shut it down.  It will not -- the

11   plan will not go effective, which means it will lead to an

12   immediate conversion.

13        If there's -- if money comes in and unsecured

14   creditors are paid in full -- not unsecured creditors -- if

15   admin claimants and priority claimants are paid in full, like

16   that's a really good thing that we shouldn't look past.  If

17   litigation parties got their due process and either had their

18   day in court -- that's a good thing, too.

19        (Pause in the proceedings)

20        THE COURT:  That's my ruling.  I appreciate

21   everyone's time.

22        I don't want to talk about the confirmation order

23   today.  Why don't we pick a date in a couple of days?  And why

24   don't you all talk about language and propose language and run

25   it past Mr. Troop and the IRS, DOJ, the Office of the United

1     States Trustee?  If there's disagreement about and of what I

2     said, maybe -- I don't know if this week makes -- you can

3     listen to it, get a transcript.  If we need to talk about it,

4     let's have a work session, if you will.  I'll make the call on

5     the language.  The parties will have your appellate rights.

6     But let's get an order, so that that process can begin and

7     take its place.

8              So thank you for your time.  Thank you.  We're

9     adjourned.

10             Mr. Troop?

11             MR. TROOP:  Two very quick things, Your Honor.

12     First, if the -- somewhere in your order you spelled Igoe, and

13     I think you transposed the letters, and I think it's I-g-o-e.

14             THE COURT:  I-g-o-e.  Thank you.

15             MR. TROOP:  I think --

16             THE COURT:  It is Igoe because that would make --

17     yes.

18             MR. TROOP:  Okay.

19             THE COURT:  That's --

20             MR. TROOP:  Just to --

21             THE COURT:  Yeah.

22             MR. TROOP:  -- prove I was listening.

23             THE COURT:  Mr. Spears, I apologize.  It's -- that

24     was -- that's why I should read off of paper and not try to

25     freestyle.  No, but you're right.  The parties --

1     (Laughter)

2          THE COURT:  No, no, no, it's important.

3          MR. TROOP:  You know, I've known Mr. Igoe for almost

4     my entire --

5          THE COURT:  I-g-e-o is the correct spelling?

6          MR. TROOP:  I-g-o-e.

7          THE COURT:  I-g-o -- let me get it.  I-g-o-e, Igoe,

8     I-g-o-e is the spelling.  And I'm really sorry.  I should have

9     gotten that right.  Thank you.

10          MR. TROOP:  And then, Your Honor, without breaking

11     any privilege, just so you know, Massachusetts did participate

12     in mediation, both in connection with the sales, with Judge

13     Isgur, and later on as parties were trying to put together a

14     plan of reorganization.  So we'll never say no to listening.

15          But I do think that there was an implication --

16          THE COURT:  That --

17          MR. TROOP:  -- that we had not at all.  I am not

18     going to say that we participated to the same level as any --

19     everyone else.

20          THE COURT:  I think it's a fair --

21          MR. TROOP:  But it --

22          THE COURT:  -- a fair statement.

23          MR. TROOP:  It was --

24          THE COURT:  And --

25          MR. TROOP:  -- (indiscernible).

1    THE COURT:  And no one should read -- and I
2    appreciate the clarification.  And I will certainly note for
3    the record that no one should imply anything with respect to
4    statements I made about who attended a mediation or -- and who
5    didn't.  I honestly have no idea who attended the mediation,
6    other than those parties who told me they did, which was the
7    Committee, the Debtors, and I remember FILO and MPT because I
8    kept dragging them in there.
9        (Laughter)
10   THE COURT:  That was it.  But other parties may have
11   been involved and I -- no one should read anything into that,
12   one way or the other.
13   MR. TROOP:  Okay.  Thank you.
14   MR. COHEN:  And Your Honor, just --
15   MR. TROOP:  It's very much appreciated
16   MR. COHEN:  Just while we're clarifying, David Cohen
17   for the record.  I don't think Massachusetts participated in
18   plan mediation.
19   THE COURT:  Okay.  I --
20   MR. COHEN:  I think there were mediation regarding
21   the TSA transaction.
22   THE COURT:  I --
23   MR. COHEN:  I just wanted to -- if you disagree with
24   that, you can let me know.
25   THE COURT:  Well, I was just going to say they

1    participated in stuff, and no one should --

2             MR. COHEN:  Yes.

3             THE COURT:  -- read it one way or the other that

4    their participation -- I -- when I said that I hoped that

5    parties get together and talk, I knew that there were really

6    smart lawyers that were talk -- undoubtedly were talking.  I

7    was just hoping that, if they're talking, please continue to

8    talk.  If you're not talking, I hope that you do.  That was

9    aspirational more than factual.

10            No, no, but I appreciate it.  It's important.  I

11   think it's important, so that the Record is clear.

12            MR. COHEN:  All right.  Well, thank you, Your Honor.

13   I just wanted also to say thank you to you and your staff.

14   You know, I know you mentioned how many hearings there's been

15   in this case and the amount of work that happens --

16            THE COURT:  Yeah, I appreciate.

17            MR. COHEN:  -- with all the docket, and you and your

18   staff have been incredibly helpful, so thank you --

19            THE COURT:  You all --

20            MR. COHEN:  -- very much.

21            THE COURT:  You all have a good day.  Thank you.

22   Everyone is excused.

23        (Proceedings concluded at 3:47 p.m.)

24

25                          *  *  *  *  *

1    I certify that the foregoing is a correct transcript

2    to the best of my ability produced from the electronic sound

3    recording of the proceedings in the above-entitled matter.

4    /S/ MARY D. HENRY

5    CERTIFIED BY THE AMERICAN ASSOCIATION OF

6    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

7    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

8    JTT TRANSCRIPT #69913

9    DATE FILED:  JULY 20, 2025

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 12

```
 1                UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3   STEWARD HEALTH CARE         ) CASE NO: 24-90213
     SYSTEM LLC,                 )
 4                               ) Houston, Texas
                                 )
 5            Debtor.            ) Friday, May 30, 2025
                                 )
 6                               ) 3:02 p.m. to 4:11 p.m.
     -----------------------------)
 7
                              HEARING
 8
           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
 9                UNITED STATES BANKRUPTCY JUDGE

10
     APPEARANCES:
11
     For Debtors:            DAVID J. COHEN
12                           Weil, Gotschal & Manges LLP
                             767 Fifth Avenue
13                           New York, NY 10153

14   Court Reporter:         YESENIA LILA

15   Courtroom Deputy:       YESENIA LILA

16   Transcribed by:         Veritext Legal Solutions
                             330 Old Country Road, Suite 300
17                           Mineola, NY 11501
                             Tel: 800-727-6396
18

19

20

21

22

23

24   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
25
```

```
 1              HOUSTON, TEXAS; DAY, MONTH DATE, YEAR; TIME

 2                       (Call to Order)

 3         THE COURT:  Good afternoon, everyone.  This is

 4   Judge Lopez.  Today is May 30th.  It is 3:00 p.m.  I'm going

 5   to call the Steward case.  We'll get started in one moment.

 6         Ms. Shells, can you just put a thumbs-up if you

 7   can hear me just so -- would be helpful.  Okay.  I just want

 8   to make sure folks can hear me.  There's about 130 people on

 9   the line.  I didn't want to open it up too much.  Okay.  All

10   right.

11         I think everyone -- this is Judge Lopez,

12   continuation of hearing on two matters.  One I will call the

13   FILO Lender Settlement Motion and two is for conditional

14   approval of the disclosure statement.  I'm going to start

15   with the FILO settlement motion.

16         I would note that there were two motions filed,

17   one seeking approval of a settlement with the FILO secured

18   parties, the Official Committee of Unsecured Creditors, and

19   the Debtors.  I'll start with that and then I'll turn to

20   conditional approval of the disclosure statement and related

21   dates.

22         I'm going to note that the FILO settlement

23   provides for a couple of things.  Resolution of the FILO

24   secured parties' demand for relief from the automatic stay

25   under a FILO DIP order which has been out there for awhile
```

```
 1   to exercise remedies over their collateral.  The settlement
 2   extents the maturity date of the DIP which currently is
 3   expired, unless there was a one-day continuance.  But it
 4   ends today.  It technically ended yesterday.  There may have
 5   been an extension of today for allowing the court to rule.
 6   But that would terminate use of the DIP and terminate the
 7   use of cash collateral.
 8             But this settlement would extend the maturity date
 9   to July 8th, 2025.  It would provide a $125 million
10   financing commitment from the FILO secured parties -- that
11   includes the use of cash collateral -- to support the
12   pursuit of some litigation claims, which the Debtors and
13   others in the Committee believe are valuable.  Would provide
14   a little over $21 million of funding to the Debtors, which
15   according to the relief in the motions would -- the Debtors
16   would use to essentially support administration of the
17   estate and make payments to some short-term creditors and
18   administrative creditors.  It would also provide adequate
19   protection to the FILO secured parties as a condition to
20   consent for the use of this additional money for cash
21   collateral and it would extend and essentially transfer.
22   This is a big point.  It would transfer substantially all of
23   the Debtor's assets into a litigation trust for the benefit
24   of the FILO secured parties and the Debtor's estates.
25             Would also subordinate about $10 million of claims
```

1    under a prepetition bridge facility that -- it would

2    subordinate it to all admin and priority claims on what is

3    known as a multiple on invested capital, which I will refer

4    to as the MOIC, commonly referred to in the proceedings as

5    well.  And it also reduces some interest rates as well.

6            I would note that as of December 31st, 2024 --it's

7    been awhile, this case has been going on for awhile --

8    maturity was about $335 million in principal amount, and

9    that remained outstanding under the DIP facility and the

10   prepetition bridge facility.  That excludes this MOIC piece.

11           The supporting parties who have been referred to

12   as the Debtors, the Committee, and the FILO Secured Parties,

13   believe that the settlement allows the Debtors to pursue

14   confirmation of a Chapter 11 plan of liquidation supported

15   by the FILO secured parties and the Creditors' Committee.

16   They argue that without that, that the states face imminent

17   risk of maturity, the FILO DIP facility, and again, of the

18   moving of the lifting of the stay, which technically could

19   assume today, including -- that would include assuming

20   ownership of the Debtor's remaining and control of the

21   remaining assets of the Debtors.  The Debtors have sold

22   essentially all of the hospitals here, so we really have a

23   few assets left in the estate.  And I'll describe those.

24   But that's really what we're doing.

25           Under this settlement, as I noted, there would be

1    a litigation trust formed.  The litigation trust is proposed

2    to have three beneficiary classes, what is referred to as an

3    A1 interest be held by the parties that extend litigation

4    funding and entitle the holders of them to priority first.

5    And then there's an A2 interest which would be held by the

6    FILO secured parties and entitle them to a second priority

7    liquidation preference equal to the amount of their DIP

8    facility and the prepetition bridge facility.  And then

9    there is a Class B interest which is going to be held by the

10   Debtor's estates or in this case converts to a successor

11   liquidating vehicle and entitle them, the Debtors or this

12   liquidation vehicle, to the proceeds of the interest after

13   repayment of the A1 and 2 interest.  There would be a

14   litigation trustee and a litigation to handle that.  It

15   would -- that litigation trustee would owe fiduciary duties

16   to the Class A1, A2, and B holders.

17        The settlement also includes releases.  The

18   releases include the Debtors, the Committee, and the Filo

19   Secured Parties, the litigation -- the litigation trust, I

20   should say, and certain related parties.  More on that in a

21   second.  And they would exchange mutual releases whenever

22   the trust was established, what is defined as the litigation

23   trust establishment date.

24        The settlement comes out as the result of a multi-

25   month mediation before Judge Isgur.  I would note at the

```
1   same time that this motion was filed, there is a proposed
2   Chapter 11 plan and a proposed disclosure statement that
3   I'll talk about in a minute.  And then as well as a motion
4   seeking conditional approval and solicitation procedures
5   related.
6            I would note that the targeted date for plan
7   confirmation requested there is July 8th.  So there is a
8   syncing of the dates between the litigation trust date,
9   transfer date, and the plan confirmation.
10           Numerous parties have objected to the relief
11  requested in the settlement motion.  The primary arguments
12  deal with what I would call the substance of the settlement.
13  It's not in the best interest of the estates, it doesn't
14  satisfy the 9019 standards, there are broad releases there.
15  At the hearing there was a timing component that was raised;
16  the Court shouldn't consider this motion and should delay
17  and consider the motion in conjunction with plan
18  confirmation.  So I'll call that kind of the timing issue.
19           And then the more substantive is that there is
20  allegations that this is a sub rosa plan, an impermissible
21  sub rosa Chapter 11 plan, the settlement itself is a sub
22  rosa plan.
23           The Court admitted exhibits on the Debtor's
24  witness and exhibit list for 4998 and that includes
25  declarations of John Castellano, the Debtor's chief
```

```
 1    restructuring officer, which was in 4998, but is also ECF
 2    4903 and the declaration of Will Transier, an independent
 3    manager of the Debtors.  That declaration was included in
 4    the exhibits at 4998 as well, but it's also identified in
 5    the hearing at 4904.  I would note that Transier and
 6    Castellano also gave live testimony.  Castellano gave a
 7    supplemental direct in addition to his declaration and was
 8    cross-examined.  Mr. Transier was examined on cross as well.
 9            Before I kind of get into the analysis, I should
10    note that the Debtor's remaining assets based upon the
11    evidence in court, the Debtors have about $7 million in
12    cash.  There are some amounts that are escrowed on behalf of
13    third parties that don't constitute litigation trust assets.
14    There's a number of accounts receivables.  There are some
15    joint venture interests in certain clinics, and then there
16    are estate causes of action.  The Debtors claim that there
17    are significant causes of action that could bring in excess
18    of a multibillion dollar against certain commercial payors
19    in connection with accounts receivable against an insurance
20    policy for property damage, potential claims against Blue
21    Cross Blue Shield, there's a number of preference claims,
22    and then claims against current and former insiders,
23    including fraudulent conveyance, breach of fiduciary duties,
24    and other theories.
25            I want to note from the outset there was -- and I
```

1    understand that the Debtors raised a number of potential

2    actions and named a number of parties.  I take no position

3    one way or the other and nor do I find at this stage that

4    that there's litigation, there are potential causes of

5    actions against parties.  I've made no findings one way or

6    the other whether based on any evidence in front of me

7    whether any party has done any wrongdoing, and I want to be

8    really clear about that.  And I am including certain parties

9    here.  I'm seeing Ms. Jacobson's client (indiscernible).  I

10    make no findings.  I got it.  There could be some litigation

11    down the line.  There's some litigation pending.  Those are

12    issues for another day at another time.  And that's kind of

13    where we are.

14            I note that the Commonwealth of Massachusetts also

15    appeared and there was some potential issues raised and

16    potential litigation against them.  Again, my decision today

17    is not based upon me looking at intent, anyone who filed an

18    objection.  Parties in interest under the Bankruptcy Code

19    have a right to be heard on any matter.  The Bankruptcy

20    Congress gave parties the ability to raise and be heard.

21    And I thought the objections that were raised were valid

22    objections.  I found nothing improper about any objections

23    that were raised by any party.  But I got it, we are where

24    we are.

25            Let me turn to the factors.

1          Bankruptcy Rule 9019  says that on a motion by the

2     debtor and after notice and a hearing, the court may approve

3     a compromise or a settlement.  That's what 9019 says.  The

4     Fifth Circuit has held that a Bankruptcy Court may approve a

5     settlement if the proposed settlement is fair, equitable,

6     and in the best interest of the estate.  And that's In re

7     Age Refining, Inc., 801 F.3d 530, 540 (5th Cir. 2015) case

8     determining whether a settlement is fair and equitable.  And

9     the Fifth Circuit applies a multi-tier test, the probability

10    of success (indiscernible) litigating a claim subject to a

11    settlement with due considerations for the uncertainty and

12    facts in law, the complexity and likelihood and duration of

13    any litigation or any intended (indiscernible).  And three,

14    all other factors bearing on the wisdom of the compromise,

15    including the best interest of creditors with proper

16    deference to their reasonable views and to the extent in

17    which the settlement is truly a product of arm's length

18    bargaining and not of fraud or collusion.

19         The Debtors bear the burden of establishing that

20    the balance of these factors leads to a fair and equitable

21    compromise.

22         As for the first factor, when you kind of think

23    about the probabilities here, Cajun Electric and there's

24    plenty of other cases saying bankruptcy courts don't have to

25    conduct mini trials to determine the probability of any

1    outcome, waived in a settlement.  Said a court must apprise
2    itself of relevant facts and law to make an informed and
3    intelligent decision.  Great judicial deference is given to
4    courts in -- and to the debtors in their exercise of their
5    business judgement.
6            And you look at cases like Aweco, 725 F.2d 293,
7    297 (5th Cir. 1984), approval of a settlement agreement is a
8    matter within the sound discretion of the bankruptcy court.
9            So the Court considered evidence and the testimony
10   and there were a number of evidence.  I took the night and
11   considered everything, carefully considered the evidence
12   before the Court and considered the objecting parties and
13   their concerns.  I've got a lot to say.  I just kind of need
14   to get it all out.  And what I say will fit in some places
15   and some other places.  There may be some overlap because
16   some of these issues overlap.
17           But where the Debtors have based themselves now is
18   that there is an expired several-hundred-million dollar
19   facility with lenders who have the ability to seek relief
20   from the stay and to foreclose on the assets that I've
21   identified.  No party disputes that.  That's why the Court
22   has to consider today this motion.
23           Considering this motion, as other parties have
24   asked me to, to another date 60 days from now, or I should
25   say a month-and-a-half from now, is realistically not

```
1    possible.  And no one provided this Court any legal basis to
2    adjourn for 40 days (indiscernible) that's been on notice.
3    I would note I reviewed the final DIP order and I reviewed
4    the rights that the FILO DIP lenders have under that order.
5    An order has been there for a while.  You're talking a
6    significant amount of time.  The order says what it says.
7    And I think creditors have the right, secured creditors have
8    the right to rely on court orders and that the court will
9    grant the relief that is provided in those orders.  And I
10   read orders literally.  That order has been out there for a
11   while.  And the secured creditors has the right to seek the
12   right to lift the stay to foreclose, not for the Court to
13   then come at the eleventh hour and stay and decide something
14   60 days from now.
15          I would also note that the termination of cash
16   collateral -- probably terminated last night if not -- it
17   doesn't exist now.  So this case stops today completely, 100
18   percent, unless I rule on this motion.  It just does.  No
19   cash, the case can't continue.  I've got to consider this
20   motion today.  And I would note that it's on -- I do find
21   that there has been proper notice of the considerations of
22   the motion here.  I'm going to get into the merits of them.
23          But I am going to overrule the timing
24   consideration.  And I don't think bankruptcy courts should
25   be providing what I would call at best 105 relief to push
```

```
 1   out hearings for a number of days.  I just have to rule up
 2   or down on that.  But secured creditors have rights and
 3   they've got to be able to rely on those orders.  Words
 4   matter on those orders.  If people are going to lend
 5   hundreds of millions of dollars, they're entitled to the
 6   rights that they have under the order.  And courts have to
 7   enforce them as written.
 8            So let me just note I am going to grant the
 9   settlement motion, and I'm going to tell you why.  The
10   settlement agreement, if you look at Castellano's
11   declaration at Paragraph 22, which is unrefuted, states that
12   the settlement agreement allows the Debtors to avoid
13   substantial litigation costs and risks associated with the
14   FILO secured parties seeking relief from the automatic stay,
15   to exercise remedies against their collateral, and
16   terminating consensual use of cash collateral.  And that if
17   the debtors were unsuccessful in that litigation, these
18   cases would convert to Chapter 7 and result in a very
19   material destruction for the Debtor's administrative and
20   unsecured creditors.
21            The unsecured creditors tell me in their arguments
22   and the evidence bore it out that without this settlement,
23   there's virtually no hope of any recover for unsecured
24   creditors.  It goes away.  There is none.  Because the
25   secured creditor can take and foreclose on all of the
```

```
1    assets.  And there's nothing in that final DIP order that
2    requires a secured -- FILO -- secured lenders to foreclose
3    on collateral, own the collateral, and then if they make
4    more money later as a result of foreclosing on the
5    collateral, that they've got to turn it over.  The only
6    option to keep the FILO secured lenders in -- there's a
7    waterfall treatment -- is in connection with the settlement
8    agreement.  It's the only thing that keeps them here.  It's
9    the only legal hook to keep the FILO secured lenders in this
10   case and to agree to allow them to get paid up to the amount
11   of their facility and to give a possibility for an unsecured
12   creditor to receive a dollar based upon the evidence before
13   me.  It is this settlement -- all the cash is gone.  All the
14   admin claim.  There is no runway.  It all stops today.  And
15   that weighs heavily on me.  That's what is unrefuted.  In
16   connection with this case.
17            Castellano's live testimony, he stated on direct
18   examination that if the FILO parties are successful, the
19   Debtors will have no liquidity and no assets left and it
20   would have a detrimental impact on unsecured creditors and
21   that the FILO securities would have title to all assets of
22   the estate, including cash.  It's unrefuted.
23            Castellano testified in his supplemental
24   declaration at ECF 4977, which is admitted as well,
25   Paragraphs 5 through 7, that the FILO secured parties will
```

1    not consent to a priming lien and that there's a substantial

2    risk that the estates lose ownership of the remaining estate

3    assets and that the most likely outcome of a sale or an

4    auction process is that the FILO secured parties will

5    purchase all or substantially all of the Debtor's assets

6    primarily or exclusively using a credit bid.  Mr. Price, who

7    represents the FILO secured parties, stood up in court and

8    confirmed just that.

9         Additionally, Castellano testified in his

10   declaration at 4903 at Paragraph 30 that entry into the

11   settlement agreement is necessary to provide adequate

12   protection to the FILO secured parties and to ensure the

13   continued consensual use of cash collateral, both of which

14   were necessary to avoid litigation with the FILO parties and

15   to avoid conversion.  That's where we are.

16        Thinking about the complexity and the attendant

17   expenses and inconvenience and delay, there's no question

18   that without the use of cash collateral, this case comes to

19   a screeching halt.  There's no question that any debtor with

20   $7 million in cash with no -- with someone who has a priming

21   lien, a secured lien, to try to get someone with a priming

22   lien to come in and -- that's a -- we just never get there.

23   You just never have the opportunity to come up with -- there

24   are no other alternatives.

25        And I would note for the record, and I sat there

1    and listened very carefully, there is no -- no one presented

2    a credible alternative to taking out the secured lender,

3    someone putting up new money.  There was no credible

4    evidence in front of me to even hint that that was a

5    possibility.

6            Castellano's declaration at 13, unrefuted.

7    Without the adequate protection provided for in the

8    settlement agreement, they could foreclose, litigating over

9    issues, the use of cash collateral and a motion to lift the

10   automatic stay before any attempt to confirm a Chapter 11

11   plan would deplete the Debtor's remaining resources and

12   leave insufficient funds to pursue an alternative

13   transaction to maximize value for the estate.

14           Castellano's supplemental declaration in Paragraph

15   8, upon conversion thinks that the trustee would obtain

16   materially less for the remaining assets.  That issue was

17   disputed by objecting parties.

18           And I'm going to talk about this in a minute.

19   Castellano also testified that he talked to numerous parties

20   to see if anyone was going to take up litigation.  And there

21   is a risk, a very real one, that a Chapter 7 trustee would -

22   - the case would convert and the Chapter 7 trustee has no

23   cash to do anything.  And she or he would have to speak to

24   parties to try to get information and try to pursue causes

25   of action which would be owned by the FILO secured parties.

1    And let's even say that she or he is successful about

2    winning and getting a cause of action that is not subject to

3    secured lenders' liens, which I don't see, Castellano also

4    says that no one is going to take it on a contingency.  And

5    that's unrefuted and no one showed up in court to contest

6    any of it.  So there's nothing for priority creditors.

7    There's nothing for unsecured creditors.

8            When you think about all other factors bearing on

9    the wisdom, best interest of creditors, the deference to

10   their reasonable views -- you know, you go back to this FILO

11   secured parties seeking to foreclose and their rights,

12   material value destructing for an admin priority and

13   unsecured creditors.  Castellano also explains in Paragraph

14   24 at ECF 4903 that the settlement provides for $21.5

15   million to the Debtor's estates after litigation trust

16   establishment date to fund the administration of the estate

17   and payments to administrative creditors and that the

18   settlement subordinates the retained FILO claims of $10

19   million to admin and priority to share recovery with general

20   unsecured creditors.

21           Castellano also testified that the global -- in a

22   supplemental declaration in Paragraph 10 that the global

23   settlement negotiated with the FILO parties and the

24   Creditors' Committee provides the only path to avoid these

25   risks and to enable the Debtors to repay admin claims and

1  priority creditors in full and to provide a meaningful

2  recovery to unsecured creditors.

3       Mr. Transier testified in his declaration that the

4  estate has valuable claims against insiders and third

5  parties and that the investigation subcommittee was

6  appointed by the board and instructed counsel to conduct an

7  investigation to identify any potential claims and that he

8  believes that there were hundreds of thousands of the

9  Debtor's financial records and communications between

10  insiders and third parties and meetings and board meetings

11  and that there were 14 interviews with directors, officers,

12  and employees and that the subcommittee reviewed findings

13  and determined that the Debtors have valuable estate claims

14  and causes of action.

15       Castellano testified that he thinks that's the

16  only remaining available asset and that it could be multi-

17  billion.  And he also testified that that's the only way to

18  repay admin and priority claims in full and provide a

19  meaningful recovery, and that the settlement provides the

20  time, the money, and the support for key stakeholders to

21  pursue these claims and to maximize recovery.

22       Transier was crossed on the fact that a

23  contingency billing process may or may not have been

24  proposed to Kobre & Kim, but he also testified that Kobre &

25  Kim was selected because of its experience trying some other

1    cases and saw their credentials.

2              And the Debtor's didn't sit on their hands when it

3    came to potential litigation, potential financing outside of

4    the settlement.  In fact, Castellano testified in his

5    declaration at 4903 that the Debtors contacted 19 other

6    third parties to gauge interest in providing a proposal for

7    litigation financing but ultimately the FILO secured

8    parties' proposal was the best litigation financing

9    alternative available to the Debtors and that it was based

10   on reasonable and market-based terms and actionable, and the

11   only proposal that provided comprehensive funding needed to

12   confirm a Chapter 11 plan, fund the estate, and effectively

13   pursue all the litigation assets.

14             The evidence also shows -- there is no refute --

15   that this was arm's length negotiations in mediation and not

16   the result of any fraud or collusion.  I don't think anyone

17   got anything they wanted, everything, a hundred percent in

18   connection with the settlement agreement.

19             When you look at Paragraph 23 -- Paragraph 25,

20   Transier, non-contested.

21             So you turn to the objections.  Let me start that

22   it's not in the best interest of creditors here -- I know

23   TRACO and others essentially argue that the settlement

24   agreement is not in the best interest of creditors by

25   exacerbating administrative insolvency issues.  And there's

1    a real admin problem, there's no question about it.  There's

2    a very large number out there, an incredibly big number, a

3    number of administrative claims.  And it's been

4    substantiated by the administrative claims bar date.  It has

5    been substantiated by Castellano's testimony and it may be

6    larger than the Debtors think at this point.  But Castellano

7    also testified that absent consent, there's no funding to

8    monetize the remaining assets and pursue a Chapter 11 plan.

9    You just don't get to monetize anything.  The number doesn't

10   get bigger.  There's no chance of getting anywhere.

11   Everything comes to a halt today in this court based on the

12   evidence.

13        Castellano explains in Paragraph 24, unrefuted

14   evidence, it avoids conversion to Chapter 7, which again,

15   it's unclear what a Chapter 7 trustee would have at all if

16   this case converted immediately.  And value-destructive.

17   Provides funding to try to get to a Chapter 11 plan to see

18   what creditors want.  Subordinates $10 million and also

19   allows the use of cash collateral.  You cannot overlook the

20   fact that there is a several-hundred-million dollar

21   financing that has come to term and it immediately stops the

22   use of cash collateral.

23        The evidence from the objecting parties suggest

24   that somehow the Court could continue as the only way, but

25   there is nothing that would stop the continued use of cash

```
 1    collateral.  And without the consensual use of cash
 2    collateral, there is no case.  What -- I'm going to convert
 3    something to Chapter 7?
 4            I would also note -- and I'll say this about
 5    motions to convert -- the case has been out here for a
 6    while.  Every motion to convert the case was filed shortly
 7    before the hearing.  And I was asked to consider it.  But I
 8    do think conversion is a consideration in a 9019, whether it
 9    would be best or not.  But there will be a day to take up a
10    motion to convert the case where people can put on their
11    evidence.  I'm just talking about -- I am not required to
12    conduct a mini-trial on every issue.  There will be proper
13    notice on those and we'll take them up in due course.  But
14    the evidence shows that the only path available to avoid
15    these risks is to put them here.
16            The Commonwealth argued -- and I said this a
17    little earlier about it's premised upon a false threat of
18    foreclosure.  The documents say what they say.  I don't
19    think it's a false threat.  I think it is a very real
20    possibility.  And that would destroy value for every
21    unsecured creditor here today.  And that's what the Official
22    Committee of Unsecured Creditor -- and I would note the
23    Committee -- this is no -- at any point no committee that
24    has rolled over at any point in connection with this case.
25    They have been active and pushed hard on every point in this
```

1    case.  And I want to note that for the record.  I make no

2    findings about the Commonwealth, I make no -- but whether

3    they did anything here.  I don't play around with threats.

4    And this isn't a threat, it's just a statement in a -- it is

5    an order of the Court that allows parties to exercise

6    rights.  That's where we are.  But certainly the use of cash

7    collateral terminates and there's nothing that this Court

8    would do to extend that based upon the lack of adequate

9    protection.

10           And I want to note the Committee and its

11   professionals.  I don't know what took place in the

12   mediation, I just know it took over a couple of months.  But

13   noting about the actions in front of them.  This case, the

14   admin claims are high.  And a lot of them are professional

15   fees.

16           There will be a time to take up professional fees.

17   The Bankruptcy Code guarantees that there is a hearing where

18   we can review and review professional fees and take them up

19   and parties have the right to object.  The Court will

20   consider them.

21           I also have to consider as part of the 9019 -- I

22   know Mr. Keach mentioned we don't need to think about the

23   past.  But I do think when you have to consider whether the

24   settlement and where we are and why the Committee is pushing

25   for it, the Committee, Mr. Castellano, Mr. Transier, the

1    Debtors, the FILO secured parties have been mediating for
2    months and have been showing up in a case that came with
3    really hard facts.  Right?  The -- go back to the MPT
4    parties and someone owning the land.  Held hearing -- you
5    know, live patients, people coming into this court saying
6    that if the Court didn't act or didn't prevent parties from
7    acting, that people would die by actions, decisions that
8    this Court made or decisions that this Court didn't make.
9    The act or failure to act in some instances would lead to
10   death.  Those are really hard facts to deal with.
11          And so at some level professionals who represent
12   the Debtor or who represent the Committee, you've got to do
13   everything.  You didn't create the facts that came into
14   this, but you had to do everything you could to a certain
15   extent to try to make sure that you did everything you
16   could.  If not, then folks can allege that you didn't do
17   enough and that's the reason that there's no cash.  That
18   leads to litigation and people questioning estate
19   professionals and saying you didn't do enough while you were
20   there.  That's Highland II, right?  Or Highland I.  I can't
21   keep track of all the Highlands.
22          So that's professionals have a duty and they are
23   really hard facts.  Selling assets, coming up with sales,
24   continuing.  But the number is really big.  And I'll talk
25   more about admin claims in a moment.

```
1          There's no question the Debtors don't have
2     liquidity.  So I overrule that it's not in the best interest
3     of the estate and the professionals or in the best interest
4     of other creditors.  That's because the admin claims could
5     get larger.  When you look at the remaining assets which
6     I've identified, there's nothing there on its own that you
7     can just sell and magically pay admin claims.  It just
8     doesn't work.
9          Let me talk about the sub rosa plan.  There's
10    arguments that this is a sub rosa plan.  And what is a sub
11    rosa plan?  The Latin phrase -- and Keach stole my thunder
12    yesterday -- the Latin phrase literally translated when used
13    as an adjective here, it means happening or done in secrecy.
14    Right?  So literally translated, it means a plan happening
15    in secret, right?  And that's obviously not what's happening
16    here.  We've had public hearing, there's been a motion with
17    plenty of notice, over 200 participants on the phone, 165
18    today.
19         But sub rosa plan has kind of developed its own
20    meaning in caselaw that really refers to a de facto plan,
21    one in which a Chapter 11 debtor constructs or does
22    something that amounts to a Chapter 11 plan of
23    reorganization, kind of restructuring debt in a way that
24    bypasses many of the Bankruptcy Code's fundamental
25    protections that are set forth in connection with a plan
```

1    confirmation.

2           A court can sometimes deem a sub rosa plan when

3    there's a settlement if the settlement essentially has the

4    effect of dictating the terms of a prospective Chapter 11

5    plan.  And you can hear people making the arguments that the

6    settlement dictates the terms of a Chapter 11 plan, picking

7    up on those Energy Future Holdings Delaware cases and the

8    Capmark cases.

9           There's a famous Fifth Circuit case involving

10   airline slots and airline script.  The Braniff case.  Harold

11   Abramson was still practicing law at the time, if you can

12   believe it, before he became a judge at the time.  Fifth

13   Circuit in Braniff determined -- and you can see caselaw has

14   developed here.  You see cases -- I think Babcock & Wilcox

15   kind of summarized Braniff well.  Judge Smith on the Fifth

16   Circuit wrote that Braniff stands merely for the proposition

17   that the provisions of a Section 363 permitting the trustee

18   to use seller lease and assets don't allow a debtor to gut a

19   bankruptcy estate before the reorganization or to change the

20   fundamental of the assets in a way that limits a future

21   reorganization plan, right?  You would file an order of

22   priority changing.  You know, are you doing something that

23   bypasses the priority scheme that is required in connection

24   with a Chapter 11 plan?  You can see hints of that as well

25   in cases like Jevic (indiscernible) structured dismissals.

1    And what you're saying is we're going to do it this way, but

2    we're going to do it this way but we're going to pay these

3    creditors first in this way, but you couldn't do it in a

4    Chapter 11 plan, but you're trying to do it outside of the

5    plan process.  Are you changing a fundamental priority,

6    protections like best interest of creditors and absolute

7    priority rules?  Are you trying to bypass it -- in other

8    words, really de facto and sub rosa, are you really kind of

9    secretly trying to just do an 11 without doing an 11 to

10   avoid the requirement that creditors get to vote on a plan?

11   And that's not really what's happening here.  Not at all.

12        First of all, the  Court find that it would have

13   the authority to establish a litigation trust outside of a

14   Chapter 11 plan process.  That could happen.  Assets can be

15   transferred to the trust, create a trust outside of the plan

16   process in connection with a settlement and why couldn't

17   they do it in connection with this settlement?  And again,

18   you've got to go back to where we find ourselves.  The

19   secured lender has a right to foreclose on all the property.

20   It has a super priority lien on all these assets.

21        In other words, we talked about the Class A and B,

22   A1, A2.  Helps in the settlement.  The secured creditor has

23   a right to foreclose on all of it.  And I said yesterday I

24   would lift the stay.  Of course I would.  It's been -- over

25   $300 million and no plan and no cash.  No use of cash

```
 1   collateral.  What else is there to -- not a complicated
 2   hearing if one were to hold a lift stay hearing.  There's
 3   nothing here that would stop that secured creditor from
 4   having the right.  And I think I have to enforce court
 5   orders as written and to honor the deal that was struck in
 6   connection with reaching a consensual use of cash
 7   collateral.  It leads to harsh consequences but also allowed
 8   hundreds of millions of dollars to be used in connection
 9   with this Chapter 11 case.  Saved lives during the course of
10   the case.
11          So I think the settlement complies with the
12   Bankruptcy Code and doesn't dictate the terms of a plan.
13   There is another plan there, but it doesn't dictate the
14   terms of that plan, it doesn't dispose of claims against all
15   claims by all parties against the estate, it doesn't
16   restrict creditor votes, either.  And you look at Sections
17   1122, 1123, 1124, 1125, 1126 and 1129, they are important
18   sections of the Code that directly relate to plan
19   confirmation.  Right?  Look at 1123.  It says what has to be
20   in a plan, what must be in a plan and what may be allowed in
21   a plan.
22          I agree with the Capmark analysis, 438 B.R. 471,
23   513 (Bankr. D. Del. 2010).  And if you look at a settlement,
24   you're going to have to dispose of all claims against the
25   estate or restrict the creditor's right to vote.  And that
```

1    was adopted by the district court in the Energy Future

2    Holding case.

3         Here, unlike Braniff, which said here's how the --

4    we're going to get the proceeds in and then here's how we're

5    going to pay it and here's who it's going to pay and here's

6    exactly what's going to happen, right?  That's what the

7    court was against in Braniff.  Dictated the terms of any

8    plan.

9         Here we actually have a plan.  Could there be a

10   hypothetical settlement that dictated all the terms of the

11   plan?  I don't know.  But we don't have that here.  But

12   that's a hypothetical because there is actually a plan here.

13   Do they complement one another?  Yes, sure.  But that

14   doesn't mean it dictates the terms of the plan.

15        And there was some arguments made, well, could

16   someone file a plan that violates the settlement order, they

17   would file at the same time.  Who in the world would do

18   that?  That doesn't make sense.  Of course you reach the

19   settlement in a mediation and there's two separate documents

20   there.  And they both stand and fall on their own.

21        And that's an incredibly important point to me.

22   This settlement stands on its own.  Plan confirmation is an

23   entirely different endeavor in my -- that's the way it's set

24   up and that's the way I'm telling everyone I'm thinking

25   about it.  Make no mistake, there is no guarantee that

1    there's a Chapter 11 plan that could be confirmed.  It will

2    stand and fall on its own merits.

3         The settlement gives the Debtor money to pay --

4    the reference to payment of claims is really dictated under

5    the plan.  It's not dictated under the settlement agreement,

6    right?  But yeah, but the A1, the A2, the B, that still

7    keeps the priorities.  Quite frankly it's giving -- it's

8    really giving up some rights that the secured lender is

9    doing.  There's no path.

10        You know, and you look at cases like Richmond

11   Leasing, 762 F.2d 1303 (5th Cir. 1985), you look at Cajun

12   Electric Power Cooperative, 119 F.3d 349 (5th Cir. 1997).

13   And you don't dispose of all the assets and release -- it

14   doesn't alter creditor rights.  Just the priorities are

15   there.  And just because of where we find ourselves, I think

16   I view the settlement as a necessary first step towards

17   getting to a plan.  You just don't get there without it.

18   There is no path for the Debtors to propose a Chapter 11

19   plan or even negotiate with anyone else.  Everyone loses,

20   especially unsecured creditors.

21        Based on the evidence in support of the

22   settlement, we're talking basically no recovery.  And I mean

23   none.  And priority among admin claimants may be rendered

24   meaningless, too.  Potentially hundreds of millions of

25   dollars of potential litigation claims could go.  And that's

```
 1    a real possibility.  Unsecured creditors would see nothing.
 2              I'll talk about the releases.  I think the
 3    releases are appropriately narrowly tailored with two
 4    exceptions.  All claims by all parties are not being
 5    released under the settlement.  The settlement provides for
 6    mutual releases between the Committee, the FILO lenders, and
 7    debtor-related parties.  There are no third-party releases.
 8    There are no third-party releases.  There is no Purdue,
 9    there are no third-party releases.
10              There was questioning about two individuals, Ann-
11    Marie Driscoll and Joseph Lombardo.  I make no findings
12    about them at all.  They were included as debtor-released
13    parties.  They were included, and then it was questioned.  I
14    just don't have any evidence in front of me to include them
15    as part of the settlement or why they were included in the
16    settlement.  They've got to be excluded.  Maybe they get
17    included in the plan.  I don't know.  That's another issue
18    for another day.  But I can't include them as part of the
19    settlement based upon the evidence before me.  I'm trying to
20    call it as fair as I can.  Including them is about this deal
21    and the evidence.  I say zero about them.
22              So based upon the Court's consideration of all the
23    relevant factors, I'm going to find that the settlement is
24    in the best interest of the estate.  Considering all
25    relevant factors under the Fifth Circuit caselaw, it is the
```

1    only path that provides any opportunity for any runway for

2    the estate to have an opportunity to provide any form of

3    meaningful recovery, even if the case -- if I find based

4    upon the evidence in front of me is to convert at a later

5    date.  Conversion today is not before me.  What would come

6    before me is a motion to lift the stay which I would have to

7    take up in short order and would likely lead to foreclosure

8    on all the assets.  That's where we are.  This provides

9    additional liquidity, provides runway.  I would note for the

10   record provides -- and again, I know there are some firms

11   that are listed.  I'd rather not say their name.  But they

12   are serious professionals.  I take that into consideration

13   as well.  So note that for the record.  I don't know where

14   money would come from, what alternatives would be there.  No

15   one proposed anything.

16        So I grant the motion.  I want the Debtors to

17   submit a proposed order.  I know that there were a bunch of

18   tweaks and revised languages and promises that were left out

19   and put in.  And get whatever is the right version with

20   everything in there that was promised on the record and

21   submit an order and I want to sign it, get this going.

22        I want to note as well and I find that the

23   Committee, its professionals, the Debtor and its

24   professionals, and I include the Transformation Committee

25   based on the evidence before me, Mr. Castellano and his

1    team, all acted in good faith in connection with the

2    mediation and the proposal of this settlement.  It was put

3    on notice to all parties, all members of the Committee who

4    voted to support this.  Find no evidence to put a motion

5    before the court based upon months of mediation, and they

6    put it out in good faith.

7              Now, I am approving it in the best interest of the

8    estate as complying with the Fifth Circuit caselaw with

9    limited exception for the releases.

10             I would note as well that it's not unusual in

11   connection with a large settlement that parties provide

12   mutual releases.  There are scores of cases, scores of cases

13   where parties enter into large agreements outside of a

14   Chapter 11 plan process and provide releases to each other.

15   And the FILO secured parties as well.  I find they acted in

16   good faith and its professionals in connection with this

17   process.  Obviously they are a part of the settlement

18   parties as well.  It's not uncommon.

19             So anyway, I am approving the settlement.  I don't

20   know, calls to Mr. Cohen, someone.  We will find the right

21   person.  You will Ms. Saldana know, and I will sign the

22   order.

23             I'm going to turn to conditional approval.  I'm

24   going to approve conditional approval of the disclosure

25   statement.  It is a -- the disclosure statement has -- its

```
1    over 500 pages.  The Debtors understand that they run the
2    risk by conditional approval that I could change my mind at
3    a later time and find that it didn't contain adequate
4    protection and the Debtors are willing to take that risk and
5    that will be conducted to a final hearing.
6              I note the Committee has asked for a letter to be
7    included, and it should.  I read the letter and it should be
8    included with the parties.
9              I would note that 1125 provides that a disclosure
10   statement must contain adequate information.  Adequate
11   information is determined as (indiscernible) information to
12   allow a holder to make an informed decision as to whether to
13   make an informed decision as to whether to vote to accept or
14   reject the plan.
15             The disclosure statement should go out.  We'll let
16   the vote of creditors -- I want to hear from voters as to
17   what they think about this plan, the admin expense and
18   whether they want it or not.  High threshold to meet.  If
19   it's going to work.  I want to hear from voters.  I want to
20   hear from unsecured creditors.  I want to hear from admin
21   parties.  I heard from a lot of them today, but there's
22   nothing in that disclosure statement that violates the
23   Bankruptcy Code on its face.  The plan is not patently
24   unconfirmable.
25             Certainly there are -- we got a preview of the
```

1    coming attraction, if you will.  And there were two big

2    issues.  Certainly feasibility is one, right?  Can the

3    Debtors actually pay all admin claims in full on the

4    effective date?  And then we'll talk about what that means.

5    But let's just start there.

6            I'm telling the Debtors now I'm concerned about

7    admin claims and the amount of the admin claims and the

8    Debtor's ability to do so.  The Debtors will not at plan

9    confirmation have the right to just tell me that they think

10   it's going to be worth billions of dollars in litigation and

11   leave it there.  They're going to have to put on at least a

12   prima facie case to some of these claims.  They're going to

13   have to articulate it.  They're going to have to identify.

14   That doesn't mean we're going to get into a mini trial, the

15   merits, and how much do you think you're going to make and

16   turning it into a discovery, but there's got to be more to

17   give me comfort and to give me a factual basis that some of

18   these investigations, that they were fruitful and that they

19   resulted in claims.

20           Now, there is a way to do this that has been done

21   plenty of times in other large cases.  I'm not -- you've got

22   to put some meat on the bone.  And it's not just going to --

23   we were at a conditional disclosure statement hearing.  I

24   don't need the legal -- but you've got to put something on

25   to tell me what you think you see and why you think

1    something is going to be worth, is there insurance that

2    parties can go after.

3            And I am making no findings about the other side,

4    either.  That's why we're not conducting a mini trial.  This

5    is not going to be -- it's way too much -- there's way too

6    much rattling of sabers for me on both sides, on everything.

7    Way too much on this side.  Let's just talk about what

8    claims are being reserved, what you think you're doing.  And

9    if you're going to say you think you can make a billion

10   dollars or a couple more, there's got to be some meat on the

11   bone to really provide that.  And there's a way to do this -

12   - talking about opening doors and showing -- I want

13   sufficient information to get me comfortable that you can

14   actually do this.

15           I want to know why you picked 2027.  I want to

16   know.  How long is this litigation going to last, right?

17   Where are you going to go and how do you get there?  What

18   else are you counting?  Are you counting personal injury

19   postpetition claims in connection with this and how are you

20   thinking about those?  And it's different.  I want clarity

21   when it comes there.  I don't know if you get there.

22           I'm going to take up conversion at the same time

23   as I do plan confirmation.  And whenever I make the decision

24   on that, I will make the call and the case will either

25   convert or I'll confirm.

1            It stands on its own.  I should say the FILO

2    secured party settlement agreement stands on its own.  It's

3    supported by law.  So plan confirmation its own.  The Debtor

4    will have to meet its burden on that.  I'm not rattling

5    sabers here.  I'm just saying this is not -- just because

6    you approve one doesn't mean you approve the other.  That's

7    the whole purpose of it is that one doesn't dictate the

8    terms of the others, right?  So we'll see where this goes.

9            I want to hear from voters and voters will talk.

10   And again, I can hear briefing on the effective date.  And

11   it's been done in other cases.  And I read the cases Mr.

12   Keach referred me to, and I know that the Debtors are going

13   to cite cases like Sears and Pier One and other cases.  So

14   you go both ways.  And I think courts have to look at this

15   and make an informed decision about how it works.  And I've

16   read Premier, and they're right, it can go both ways.  But I

17   need to hear what the evidence is.  And I don't have --

18   yesterday wasn't the day for me to say, you know, on the

19   spot you can never do this.  Because it's been done by other

20   courts.  Other courts found it didn't work in those cases.

21   And I do think others are going to have to show up and tell

22   me why -- you know, and maybe analysis changes, maybe the

23   date goes further out, maybe the date comes closer in.  I

24   don't know.  I do think and I encourage the Debtors to

25   continue to work.  There are a number of matters that I

1    think could really clarify and streamline the admin process.

2    I know that they are continuing to work and I strongly

3    encourage them to continue to work with the Committee during

4    this time.  The July 8th period works as well.

5         I want to let the Debtors know that and I want the

6    associates to know that I did not pick July 8th.  It was

7    your partners who picked July 8th.  It was not me.  That's

8    what they asked for.  And we'll show up and we'll try and

9    we'll take this up.  But again, I know that there are

10   serious matters here.  And some real serious issues were

11   raised.

12        I am also going to ask the Debtors, you know, if

13   there are no surprises in terms of Mr. Castellano said they

14   were still kind of doing the reconciliation.  And I'm asking

15   the Committee if something big comes up that I need to know

16   about, I want to have a hearing.  I don't want to show up on

17   July 8th with a big surprise that the number is nowhere near

18   what we heard yesterday.  I want to know about it and I want

19   to make decisions.  I want to make real-time decisions.

20   Just because there's a hearing on the 8th doesn't mean we

21   need to have the hearing on the 8th.  But if something comes

22   up, I want to know.  I'm asking.  And if not, we'll take up

23   plan confirmation.  We'll take up conversion at the same

24   time.  And if we need to have a status conference about what

25   that looks like, I'm happy to do that.

```
 1          There was a lot of talk about professional fees
 2   being paid out at the end of the year.  I haven't approved
 3   anything.  What I have approved today is a settlement
 4   motion.  That's what I approved.  I haven't approved
 5   anything else today.  Oh, I did approve conditional approval
 6   of the disclosure statement, which gets you to send stuff
 7   out and pick dates.  I have not approved any administrative
 8   expense claims, I haven't done anything.
 9          So everybody's rights are preserved on all issues
10   related to plan confirmation.  And I would note that what
11   was argued before me yesterday was largely plan confirmation
12   issues, right?  You know, best interest of creditors and --
13   best interest of creditors is an issue.  I'm assuming that -
14   - I don't know what the vote -- I've got to see the vote.
15   You've got to see the votes to then see if the best interest
16   of creditors kicks in, and then you've got to make a
17   determination as to which class.  And then we can make all
18   kind of arguments, parties can make all kinds of argument
19   about that and the Court will consider all those issues at
20   the appropriate time.
21          So we will take up exculpations, releases, all
22   other related issues that come with -- there were
23   classification issues that were raised, there was issues
24   about feasibility.  And, you know, the Debtors have the
25   burden.  They put on their case.  But again, I still want to
```

1    know if there are surprises before then.  You all let me

2    know and we'll schedule a hearing.

3             I did count there were about a hearing a week on

4    average here.  I'm not holding one on a Saturday anymore,

5    but we'll hold one.  That's unnecessary.  But we'll pick

6    this up.

7             The reason I'm saying it's -- io do agree with the

8    point that these cases need to come to a conclusion one way

9    or the other.  That's what I am stressing.  And I'm not

10   saying no one feels that way, I'm just expressing why I

11   think July 8 is a real date.  But now you're going to have a

12   chance to get there, get some liquidity, extend maturity so

13   we don't have to have an emergency hearing on Monday to lift

14   the automatic stay and have a fight about that.  Some

15   administrative creditors can continue to get paid, the

16   debtors can continue to work.  I've encouraged the Debtors

17   to work with certain parties.

18            I'll rule on the HAS.  I think my case manager is

19   going to reach out to parties to talk about scheduling and

20   getting on a schedule on additional discovery related to

21   that matter.  I'm sure there are other matters that we'll

22   take up before then.  We'll take them up one at a time based

23   upon the law and the facts.

24            Pardon me.  I'm just going to check my notes.  Can

25   you just give me two minutes?  I'm going to step off and

```
 1    then I'll come back on and we'll see where we are.

 2              (Recess)

 3              THE COURT:  We're back on the record.  I have

 4    covered all of my bases.

 5              Mr. Cohen, I forgot to mention, get me an order

 6    that works for the parties.

 7              Mr. Cohen?

 8              MR. COHEN:  We will, Your Honor.  For the record,

 9    David Cohen, Weil Gotshal & Manges, for the Debtors.  We

10    actually will get you a revised settlement order as well as

11    a revised order approving conditional approval of the

12    disclosure statement.

13              Just one request, Your Honor, now that you've put

14    a target on my back.  Will do so (indiscernible) in terms of

15    the July 4th date, number one.

16              Number two, we do agree with the Court.  These are

17    very important issues that I'm just going to have to address

18    at confirmation.  And I would like the opportunity just to

19    speak to Mr. Price about potentially extending that date out

20    at least a few days just so we don't deliver your

21    confirmation briefs from the Sunday of July 4th weekend.

22    (indiscernible).

23              THE COURT:  Don't worry about me.  I'm good.  I'm

24    fine.  I'm ready to go.  I'll be ready.  Don't worry about

25    me one bit.  These are important issues.  This case -- no, I
```

```
 1   knew what I was doing when I was approving it on the 8th.

 2   I'm ready to go.  You all just be ready as well.

 3              MR. COHEN:  Understood, Your Honor.

 4              THE COURT:  Okay?  All right, folks.  Anything

 5   else we need to talk about?  All right.

 6              MR. COHEN:  (indiscernible).  Thank you, Your

 7   Honor.

 8              THE COURT:  Thank you very much.  All right.

 9        (Proceedings adjourned at 4:11 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATION

 2

 3    I certify that the foregoing is a correct transcript from

 4    the electronic sound recording of the proceedings in the

 5    above-entitled matter.

 6

 7    [signature: Sonya N. Ledanski Hyde]

 8

 9

10    Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  June 3, 2025
```

# EXHIBIT 13

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **STEWARD HEALTH CARE SYSTEM** | § | Case No. 24-90213 (CML) |
| **LLC,** *et al.*, | § | |
| | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF (I) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION OF STEWARD HEALTH CARE SYSTEM LLC AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice*)
Candace M. Arthur (admitted *pro hac vice*)
1271 Avenue of Americas
New York, New York 10020
Telephone: (212) 906-1200
Facsimile:  (212) 751-4864

*Attorneys for Debtors and Debtors in Possession*

July 10, 2025
Houston, Texas

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward.  The Debtors' service address for these chapter 11 cases is 2811 McKinney Avenue, Suite 300, Dallas, Texas 75204.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ...................................................................................................7

    I.      Chapter 11 Cases .........................................................................7

    II.     Declarations in Support of Confirmation.........................................8

    III.    Plan Summary ............................................................................9

    IV.    Settlements Embodied in the Plan .................................................10

         A.     FILO Settlement.............................................................11

         B.     PBGC Settlement ...........................................................12

         C.     Plan Settlement .............................................................13

    V.     Plan Solicitation .........................................................................14

    VI.    Plan Supplement .........................................................................16

    VII.   Tabulation .................................................................................17

ARGUMENT .....................................................................................................17

    I.      Disclosure Statement Should be Approved on a Final Basis................18

         A.     Parties in Interest Received Sufficient Notice of Combined Hearing and Plan/DS Objection Deadline ................................18

         B.     Disclosure Statement Contains Adequate Information and Should be Approved ......................................................20

         C.     Solicitation of Votes Complied with Bankruptcy Code, Bankruptcy Rules, and Disclosure Statement Order................24

    II.     Settlement, Release, Exculpation, and Injunction Provisions Are Appropriate and Should Be Approved.....................................25

         A.     Settlements Are Reasonable and Satisfy Bankruptcy Rule 9019 .............25

         B.     The PBGC Settlement Satisfies Bankruptcy Rule 9019 ..........................27

         C.     The Plan Settlement Satisfies Bankruptcy Rule 9019 ..............................27

         D.     Plan Releases, as Encompassed in Settlements, Are Appropriate and Should Be Approved........................................28

         E.     Exculpation Provision Is Appropriate, Consistent with Fifth Circuit Precedent, and Should Be Approved ...............................40

         F.     Injunction Provisions Are Appropriate and Should Be Approved.......................................................................43

    III.   Plan Satisfies Bankruptcy Code's Requirements and Should Be Confirmed .................................................................................44

A.      Section 1129(a)(1) of the Bankruptcy Code: Plan Complies with Applicable Provisions of Bankruptcy Code......................................44

B.      Section 1129(a)(2): Debtors have Complied with Bankruptcy Code ...................................................................................................52

C.      Section 1129(a)(3): Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law.................................................56

D.      Section 1129(a)(4): Plan Provides that Professional Fees and Expenses are Subject to Court Approval ......................................58

E.      Section 1129(a)(5): Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders ..........................59

F.      Section 1129(a)(6): Plan Does Not Contain Any Rate Changes .............60

G.      Section 1129(a)(7): Plan Satisfies Best Interests Test ..............................60

H.      Section 1129(a)(8): Plan Has Been Accepted by Impaired Voting Class...................................................................................73

I.      Section 1129(a)(9): Plan Provides for Payment in Full of All Allowed Priority Claims ...........................................................74

J.      Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted Plan .....................................................................76

K.      Section 1129(a)(11): Plan is Feasible .....................................................76

L.      Section 1129(a)(12): All Statutory Fees Have Been or Will be Paid ........................................................................................93

M.      Sections 1129(a)(13)–(16) and 1129(e): Inapplicable Provisions....................................................................................93

N.      Plan Satisfies "Cram Down" Requirements under Bankruptcy Code Section 1129(b) for Non-Accepting Classes .....................................94

O.      Section 1129(c): Plan is Only Plan on File................................................97

P.      Section 1129(d): Principal Purpose of Plan is Not Avoidance of Taxes......................................................................................97

II.      Bankruptcy Court Should Overrule Unresolved Objections and Confirm Plan .................................................................................97

A.      Objections Related to Timing of the Effective Date Should be Overruled ...............................................................................98

B.      Objections to the Third-Party Releases Should be Overruled .................110

C.      Objections to the Exculpation Provision Should be Overruled ..............114

D.      Objections to the Injunction Provisions Should be Overruled.................116

E.      Objections that the Plan Improperly Discharges Claims Should be Overruled...........................................................................119

F.   Objections Alleging Improper Classification Should be Overruled .................................................................................. 122

G.   Objections to the Treatment of Administrative Expense Claims and Professional Fee Claims Should be Overruled ................................. 129

H.   Objections to Substantive Consolidation Should Be Overruled ............. 137

I.   Objections to the Medical Liability Claim Procedures Should be Overruled ................................................................................ 145

J.   Objections to the Administrative Expense Claims Consent Program Should be Overruled .............................................................. 155

RESERVATION OF RIGHTS ...................................................................... 160

CONCLUSION .................................................................................... 160

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 500 Fifth Ave. Assocs*,
   148 B.R. 1010, 1020 (Bankr. S.D.N.Y. 1993),
   *aff'd,* No. 93 CIV. 844 (LFJ), 1993 WL 316183 (S.D.N.Y. May 21, 1993) ........................124

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007), *appeal dismissed*, 371 B.R. 660
   (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) ............................................69

*In re ADPT DFW Holdings, LLC*,
   574 B.R. 87, 94 (Bankr. N.D. Tex. 2017)....................................................... *passim*

*In re AHF Dev., Ltd.*,
   462 B.R. 186, 195 (Bankr. N.D. Tex. 2011).................................................139

*In re Ameriforge Grp., Inc.*,
   No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) ..........................................36

*Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair Co.)*,
   203 F.3d 914 (5th Cir. 2000) ................................................................35

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006)................................................................95

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 (1999)........................................................................60

*Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*,
   584 F.3d (5th Cir. 2009) ....................................................................41

*Baron v. Sherman (In re Ondova Ltd.)*,
   914 F.3d 990 (5th Cir. 2019) ................................................................41

*In re Bigler LP*,
   442 B.R. 537 (Bankr. S.D. Tex. 2010) ............................................25, 30, 34

*In re Block Shim Dev. Co.-Irving*,
   939 F.2d 289 (5th Cir. 1991) ............................................................56, 60

*In re Briscoe Enters., Ltd., II*,
   994 F.2d 1160 (5th Cir. 1993) ......................................................44, 78, 79, 126

*Cadle Co. v. Mims (In re Moore)*,
   608 F.3d 253 (5th Cir. 2010) ..................................................................31

*In re Chapel Gate Apartments, Ltd.*,
    64 B.R. 569 (Bankr. N.D. Tex. 1986) ....................................................................58

*In re Couture Hotel Corp.*,
    536 B.R. 712 (Bankr. N.D. Tex. 2015) ..................................................................56

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) ...........................................44, 76, 77, 123

*In re DBMP LLC*,
    No. 20-30080 (JCW), 2021 WL 3552350, at *42 (W.D.N.C. Aug. 11, 2021) ....................154

*In re Derosa-Grund*,
    567 B.R. 773 (Bankr. S.D. Tex. 2017) ............................................................30, 31

*Dodson v. Huff (In re Smyth)*,
    207 F.3d 758 (5th Cir. 2000) ...............................................................................41

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) .................................................................95

*Dunway v. Purdue Pharmaceuticals L.P. (In re Purdue Pharms. L.P.)*,
    619 B.R. 38, 58 (S.D.N.Y. 2020) .......................................................................153

*In re Eagle Bus Mfg., Inc.*,
    134 B.R. 584 (Bankr. S.D. Tex. 1991) ................................................................45

*Eastgroup Props. v. S. Motel Assoc., Ltd.*,
    935 F.2d 245, 249 (11th Cir. 1991) ...................................................................140

*In re Energy & Expl. Partners, Inc.*,
    No. 15-44931 (RFN) (Bankr. N.D. Tex. April 21, 2016) ...............................36, 112

*Esso Expl. and Prod. Chad, Inc. v. Taylors Intern Servs., Ltd.*,
    No. 06-4401, 2006 WL 3377595, *2 (S.D.N.Y. Nov. 14, 2006) .........................155

*In re Enron Corp.*,
    No. 01–16034 (AJG), 2004 Bankr. LEXIS 2549, at *195
    (Bankr. S.D.N.Y. July 15, 2004) ........................................................................137

*FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*,
    255 F. App'x 909 (5th Cir. 2007) .......................................................................35

*In re Genesis Glob. Holdco, LLC*,
    660 B.R. 439, 485 (Bankr. S.D.N.Y. 2024) .........................................................92

*In re Gen. Homes Corp.*,
    134 B.R. 853 (Bankr. S.D. Tex. 1991) ................................................................30

*In re GenOn Energy, Inc.*,
No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) ........................................36

*In re Harborwalk, LP*,
Nos. 10-80043, 10-80044, 10-80045, 2010 WL 5116620 (Bankr. S.D. Tex.
Oct. 25, 2010) ................................................................................................................52

*Harrington v. Purdue Pharma, L.P.*,
144 S. Ct. 2071 (2024) ..............................................................................................111

*Harrington v. Purdue Pharma, L.P.*,
603 U.S. 204, 218 (2024) ..........................................................................................146

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007).......................................................... *passim*

*Hilal v. Williams (In re Hilal)*,
534 F.3d 498 (5th Cir. 2008) .....................................................................................41

*Hinojosa Eng'g, Inc. v. Lopez (In re Treyson Dev., Inc.)*,
No. 14-70256 (EVR), 2016 WL 1604347 (Bankr. S.D. Tex. Apr. 19, 2016) ........35

*In re Idearc Inc.*,
423 B.R. 138 (Bankr. N.D. Tex. 2009), *subsequently aff'd,* 662 F.3d 315
(5th Cir. 2011)................................................................................26, 45, 78, 122

*In re Introgen Therapeutics, Inc.*,
429 B.R. 570, 582 (Bankr. W.D. Tex. 2010)................................................139, 140

*In re Itron, Inc.*,
883 F.3d 553, 560 (5th Cir. 2018) ............................................................................91

*In re J T Thorpe Co.*,
308 B.R. 782 (Bankr. S.D. Tex. 2003) ...............................................................44, 52

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
150 F.3d 503 (5th Cir. 1998) .....................................................................................52

*In re Mirant Corp.*,
348 B.R. 725 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3
Claimholders v. New Mirant Entities*, No. 4:06-CV-744-A, 2006 WL 3780884
(N.D. Tex. Dec. 26, 2006) .........................................................................................30

*In re Moody Nat'l SHS Hous. H, LLC*,
No. 10-30172 (MI), 2010 WL 5116872 (Bankr. S.D. Tex. June 30, 2010) .....................35, 52

*Myers v. Martin (In re Martin)*,
91 F.3d 389, 393 (3d Cir. 1996)..............................................................................155

*Nat'l Board Co., Inc. v. Bear Stearns & Co. Inc.*,
  165 F.3d 184, 190 (2d Cir. 1999) ........................................................155

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt. (In re Highland Cap. Mgmt., L.P.)*,
  48 F.4th 419 (5th Cir. 2022), *petition for cert. denied*, No. 22-631 (U.S. Jul. 2,
  2024) ............................................................................41, 44, 114

*Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun
  Elec. Power Coop., Inc.)*,
  119 F.3d 349 (5th Cir. 1997) ..............................................................25, 26

*Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*,
  801 F.3d 530 (5th Cir. 2015) ...................................................................25

*In re Owens Corning*,
  419 F.3d 195, 211 (3d Cir. 1995) ..............................................139, 140, 143

*In re Pisces Energy, LLC*,
  No. 09-36591-H5-11, 2009 WL 7227880 (Bankr. S.D. Tex. Dec. 21, 2009) .................69

*Republic Supply Co. v. Shoaf*,
  815 F.2d 1046 (5th Cir. 1987) ...................................................................35

*In re Residential Cap., LLC*,
  491 B.R. 63, 72 (Bankr. S.D.N.Y. 2013) ........................................................91

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
  624 F.2d 599 (5th Cir. 1980) ...................................................................25

*In re Robertshaw US Holding Corp*,
  662 B.R. 300 (Bankr S.D. Tex. 2024) ...........................................................36

*In re Roqumore*,
  393 B.R. 474 (Bankr. S.D. Tex. 2008) ......................................................26, 31

*Saxby's Coffee Worldwide, LLC v. Larson (In re Saxby's Coffee Worldwide, LLC)*,
  440 B.R. 369, 382 (Bankr. E.D. Pa. 2009) ....................................................154

*In re Sentry Op. Co. of Tex., Inc.*,
  264 B.R. 850 (Bankr. S.D. Tex. 2001) ..........................................................45

*In re Snider Bros.*,
  18 B.R. 230, 234 (Bankr. D. Mass. 1982) ......................................................140

*In re Sun Country Dev., Inc.*,
  764 F.2d 406 (5th Cir. 1985) ...................................................................56

*In re T-H New Orleans Ltd. P'ship*,
   116 F.3d 790 (5th Cir. 1997) ......................................................................56, 79

*In re Tex. Extrusion Corp.*,
   844 F.2d 1142 (5th Cir. 1988) ...........................................................21, 22, 60

*Union Tr. Phila., LLC v. Singer Equip. Co. (In re Union Trust Phila., LLC)*,
   460 B.R. 644, 660 (Bankr. E.D. Pa. 2011) ................................................153

*In re Vill. at Camp Bowie I, L.P.*,
   710 F.3d 239 (5th Cir. 2013) ...................................................................56, 128

*In re Wash. Mut., Inc.*,
   442 B.R. 314, 330 (Bankr. D. Del. 2011) ....................................................92

*In re Wesco Aircraft Holdings, Inc.*,
   No. 23-90611 (MI), 2024 WL 2165430, at *2 (Bankr. S.D. Tex. May 14, 2024)..................91

*In re Winn-Dixie Stores*,
   356 B.R. 239, 249–50 (Bankr. M.D. Fla. 2006) .........................................137, 138

*In re Wool Growers Cent. Storage Co.*,
   371 B.R. 768 (Bankr. N.D. Tex. 2007)..........................................................35

*In re WorldCom, Inc.*,
   No. 02-13533 (AJG), 2003 WL 23861928, at *38, *44–48
   (Bankr. S.D.N.Y. Oct. 31, 2003) ................................................................138

**Statutes**

11 U.S.C. § 105................................................................................146, 152

11 U.S.C. § 109..................................................................................52, 53

11 U.S.C. § 507..................................................................................65, 67

11 U.S.C. § 1103................................................................................41, 51

11 U.S.C. § 1107.............................................................................. *passim*

11 U.S.C. § 1108.....................................................................................7

11 U.S.C. § 1114...................................................................................93

11 U.S.C. § 1122..........................................................................44, 45, 52

11 U.S.C. § 1123.............................................................................. *passim*

11 U.S.C. § 1125.............................................................................. *passim*

11 U.S.C. § 1126 ................................................................................ *passim*

11 U.S.C. 1129 .................................................................................. *passim*

11 U.S.C. § 1141 ......................................................................99, 119, 120

Fed. R. Bankr. P. 1015(b) ...................................................................7

**Other Authorities**

H.R. Rep. No. 95-595, First Session (1977) ......................................22, 45

S. Rep. No. 95-989 (1978) ................................................................22, 45

Steward Health Care System LLC and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully submit this memorandum of law in support of, and omnibus reply to objections to, (i) final approval of the Disclosure Statement,[2] and (ii) confirmation of the Plan,[3] and respectfully represent as follows:[4]

## PRELIMINARY STATEMENT

1. The Debtors are pleased to be before the Court seeking confirmation of a chapter 11 plan of liquidation that provides for the orderly wind down of the Debtors' estates that will maximize value for creditors through the formation of liquidating trusts that will work together to pursue and monetize the Debtors' remaining assets, reconcile claims, and make distributions to creditors.

2. These chapter 11 cases, which have been pending for more than a year, have been extraordinarily complex and challenging, presenting numerous obstacles. Despite these complications, the Debtors have forged a path forward that represents the best possible outcome under the circumstances—one that preserves the remaining value of their estates and maximizes returns to creditors, alongside the Bankruptcy Court-approved settlement with the FILO Parties and the Creditors' Committee (the "**FILO Settlement**") which provides for the distribution of

---

[2]  The Debtors' *Disclosure Statement for Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and its Affiliated Debtors* (Docket No. 5028), dated June 1, 2025, (as amended, supplemented, or otherwise modified from time to time, the "**Disclosure Statement**").

[3]  The Debtors' *Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors*, dated May 30, 2025 (Docket No. 5021) (as amended, supplemented, or otherwise modified from time to time, the "**Plan**").

[4]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or Disclosure Statement, as applicable.

proceeds of the Debtors' interest in the Litigation Trust,[5] stabilizes and streamlines governance for the Debtors' estates (ensuring the preservation of records, historical knowledge of key personnel and counsel, and access to witnesses), provides for $21.5 million in immediate funding to administer the estates as well as fund accelerated payments to administrative expense creditors, and ensures a tax-efficient wind-down of the estates that will significantly reduce liabilities of the estates. None of the limited number of parties raising objections to the Plan have even seriously tried to argue that a better alternative is available for these estates (because they cannot).

3.      The Debtors' Plan is supported by key stakeholders, including the FILO Parties and the Creditors' Committee, and has been ***overwhelmingly accepted*** by holders of claims entitled to vote on the Plan.   In addition to 100% approval by the holders of secured FILO Bridge Claims (Class 3) and joint and several PBGC Claims (Class 5), over 3,700 General Unsecured Claims (Class 4) votes were cast, with approximately 80% in number and 93% in amount voting to accept the Plan.

4.      The Plan, in combination with the FILO Settlement, will provide the Debtors (led by the experienced and knowledgeable Plan Administrator Committee supported by the Debtors' 26 remaining employees) with financing needed to administer their estates and support the Litigation Trust's pursuit of valuable estate claims and causes of action.

5.      As this Court found, the FILO Settlement also averts the catastrophic loss of value that the Debtors' estates would suffer if the FILO Parties exercised remedies against their collateral (including foreclosing on the Debtors' assets) which would "result in a very material

---

[5]     The FILO Settlement was approved by the Court on June 2, 2025 pursuant to the *Order (I) Approving the Settlement with FILO Secured Parties; (II) Authorizing and Directing Transfer of Assets in Connection Therewith; (III) Authorizing Amendment to FILO DIP Credit Agreement and Continued Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Approving Assumption and Assignment Procedures and Form and Manner of Notice of Assumption and Assignment; and (VI) Granting Related Relief* (the "**FILO Settlement Order**") (Docket No. 5035).

destruction for the Debtors' administrative and unsecured creditors."[6]  Instead, the Debtors have achieved a path that provides successors to the Debtors (the Litigation Trust and Plan Trust, each of which will be overseen by independent, experienced fiduciaries) with financing necessary to monetize litigation and other assets that, over time, will generate value sufficient to repay the FILO Parties and administrative expense and priority creditors in full in cash and provide meaningful recoveries to prepetition unsecured creditors.

6.     The Debtors have worked constructively with various parties that filed objections to confirmation of the Plan (collectively, the "**Objections**") and the various parties that contacted the Debtors with informal comments to narrow issues and, where possible, reach consensual resolutions, including through the addition of provisions in the Proposed Confirmation Order (as defined below).  As a result of these efforts, the Proposed Confirmation Order resolves many of the objections to confirmation of the Plan.  To date, the Debtors have resolved twenty-one (21) of the approximately fifty (50) Objections filed, and expect they will resolve all but a handful of the remaining Objections.  The Objections, resolutions, and the Debtors' responses are summarized in the chart annexed hereto as **<u>Exhibit A</u>** (the "**Response Chart**").

7.     A number of Objections focus on the Debtors' ability to satisfy administrative and priority claims in accordance with section 1129(a)(9) of the Bankruptcy Code or the Plan's feasibility in accordance with section 1129(a)(11) of the Bankruptcy Code.  Such Objections, however, fail to accept the reality that the Debtors project having (by a large margin) sufficient assets, including proceeds from significant litigation claims, to satisfy all required payments under the Plan, including all administrative expense and priority claims.  As set forth in the 1129 Declaration (as defined below), the Debtors conservatively estimate their remaining

---

[6]     *See* May 30 Ruling Transcript (Docket No. 5044) at 25:18-25, 12:17-20.

3

assets will generate proceeds of at least $46 million on account of their Non-Litigation Assets (as defined below), and between approximately $529 million (up from $506 million) and $746 million (up from $742 million) (with a midpoint of approximately $631 million (up from $627 million)) on account of their Litigation Assets, which would be sufficient to pay estimated administrative and priority claims in full and provide meaningful recoveries to unsecured creditors.[7]

      8.    As summarized in the table below, the Debtors project that their remaining assets will generate proceeds in an amount that will allow the Debtors to repay all of their allowed secured, administrative and priority claims in full by early 2027 **and** distribute more than $235 million to general unsecured creditors under the Plan.  In other words, the Debtors' mid-case scenario projects a cushion of more than $235 million for what is needed for the Plan to go effective.[8]

| Feasibility Analysis (Midpoint Recovery Scenario) | | | | | |
|---|---|---|---|---|---|
| | **H2 2025** | **FY 2026** | **FY 2027** | **FY 2028** | **Total** |
| **Annual Cash Flows - Receipts** | | | | | |
| **Total Non-Litigation Assets** | $ 40.2 | $ 6.3 | $ - | $ - | $ 46.4 |
| **Total Litigation Proceeds, Net** | $ 88.6 | $ 351.7 | $ 201.3 | $ 76.0 | $ 717.6 |
| **Litigation Funding Variable Component** | $ (16.6) | $ (40.0) | $ (19.7) | $ (10.0) | $ (86.3) |
| **Net Cash from Asset Monetization** | $ 112.2 | $ 317.9 | $ 181.6 | $ 66.0 | $ 677.7 |
| **Total Expenses** | $ (28.7) | $ (19.5) | $ (5.5) | $ (2.0) | $ (55.7) |
| **Net Cash Flow Before Debt Repayment** | $ 83.5 | $ 298.4 | $ 176.2 | $ 64.0 | $ 622.0 |
| **Annual Cash Rollforward** | | | | | |
| **Beginning Cash** | $ 4.5 | $ 8.8 | $ 122.9 | $ 194.0 | |
| (+/-) Net Cash Flow | 83.5 | 298.4 | 176.2 | 64.0 | 622.0 |
| (-) Paydown of Class A Interests | (79.2) | (184.4) | – | – | (263.5) |
| (-) Estimated Allowed Administrative Expense Claims | – | – | (84.2) | – | (84.2) |
| (-) Estimated Allowed Priority Claims | – | – | (11.3) | (22.7) | (34.0) |
| (-) Transaction Fees | – | – | (9.5) | – | (9.5) |
| **Ending Cash** | $ 8.8 | $ 122.9 | $ 194.0 | $ 235.3 | |

---

[7]   *See* 1129 Decl. ¶ 53.

[8]   *See* 1129 Decl., Ex. A

9.       Certain of the Objections falsely assert that the Debtors' estimated amount of Allowed Administrative Expense Claims and Priority Claims (as defined below) is understated because such estimations rely too heavily on the Debtors' ability to successfully object to claims or argue that Debtors overestimate the projected recoveries on the Litigation Assets (as defined below).  The Debtors' estimates of the Administrative Expense and Priority Claims, however, are reasonable and based on a thorough and methodical review of all such asserted claims, and do not depend on the perfect execution of every claim objection.  Moreover, the Debtors' estimates of the projected value of the Litigation Assets are reasonable estimates based upon a commercial understanding of each of the respective claims and causes of action, the progress made, and reasonably expected to be made, with respect to such claims and causes of action, and when proceeds are expected to be received as a result.  Indeed, the amount of proceeds required to be realized by the Debtors on behalf of the Litigation Assets for the Plan to become effective in early 2027 represents ***only approximately 13% of the damages*** sought or expected to be sought by the Debtors in such litigations.  In fact, the evidence will show that even assuming (i) the Debtors' *low-case* recovery scenario and (ii) the highly unlikely scenario that the Debtors lose on all of their pending objections to the disputed administrative and priority claims asserted by the objecting parties (TRACO and the Commonwealth) and other parties, the Debtors' Plan will *still* go effective in early 2027.[9]  Therefore, the overwhelming evidence presented at confirmation will put all objections to feasibility to bed.

10.       While certain of the Objections also raise issues with the contemplated period of time between the Confirmation Date and the anticipated Effective Date, the Debtors and Litigation Trust will use the period following confirmation to continue pursuing litigation or

---

[9]    *See* 1129 Decl. ¶ 54.

settlement of their valuable claims and causes of action, the recoveries of which will be used to make required payments under the Plan. As described in more detail below, the effective date of a plan should occur within a "reasonable" period of time that is "no later than is necessary to accomplish a legitimate purpose."[10] Here, the Debtors' projected Effective Date is no further into the future than is reasonably necessary to generate sufficient proceeds to make payments as required under the Plan. Further, the anticipated period of time between the Confirmation Date and the Effective Date does not unfairly shift risk to creditors. In fact, the opposite is true—the delay provides the Debtors with a reasonable amount of time to realize the full value of their valuable litigation claims and causes of action which will maximize recoveries to the benefit of all stakeholders. Estate fiduciaries, including the Debtors' Transformation Committee and the Creditors' Committee, have determined that failing to confirm the Plan and converting these cases to chapter 7 is the path that would unfairly risk creditor recoveries, and would merely benefit a very small group of objectors that would prefer to see the estates fail because it would impair the estates' ability to defend or prosecute claims against them.

11. These parties also object to the Plan on the basis that the Plan's classification scheme impermissibly gerrymanders certain voting classes in violation of section 1122 of the Bankruptcy Code, asserting that the secured FILO Bridge Claims and joint and several PBGC Claims should not be separately classified from General Unsecured Claims. The classification scheme provided by the Plan, however, is based on material differences between such classes of claims and supported by valid business justifications.

---

[10]   *See In re Rolling Green Country Club*, 26 B.R. 729, 735 (Bankr. D. Minn. 1982); *In re Wonder Corp. of America*, 70 B.R. 1018, 1021 (Bankr. D. Conn. 1987).

12.     Additionally, certain parties object to the Plan on the basis that the Plan does not satisfy the best interests test in accordance with section 1129(a)(7) of the Bankruptcy Code. The Debtors' Liquidation Analysis, however, clearly establishes that all creditors will receive greater distributions under the Plan than in a chapter 7, and that any attacks on the Debtors' methodologies and reasonable assumptions are factually incorrect or unfounded.

13.     For the reasons set forth herein and as the evidence will show, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code. Accordingly, the Court should approve the Disclosure Statement on a final basis and confirm the Plan. A proposed order confirming the Plan will be filed contemporaneously herewith (the "**Proposed Confirmation Order**").

## **BACKGROUND**

### I.     **Chapter 11 Cases**

14.     On May 6, 2024 (the "**Petition Date**"), the Debtors each commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases. On May 16, 2024, the U.S. Trustee for Region 7 (the "**U.S. Trustee**") appointed the official committee of unsecured creditors (the "**Creditors' Committee**") in the Debtors' chapter 11 cases.

15.     The Debtors' chapter 11 cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the Bankruptcy Rules and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

7

16.    The pertinent facts relating to the commencement of these chapter 11 cases and the key events during the cases are set forth more fully in the Disclosure Statement.

## II.    Declarations in Support of Confirmation

17.    In support of Confirmation, the Debtors respectfully refer the Court to the following declarations and affidavits (collectively, the "**Confirmation Declarations**"):

- *Initial Declaration of John R. Castellano in Support of Confirmation of Chapter 11 Plan* (Docket No. 5219) (the "**Feasibility Declaration**"), filed on June 27, 2025, which addresses the Plan's satisfaction of 1129(a)(11) of the Bankruptcy Code;

- *Supplemental Declaration of John R. Castellano in Support of Confirmation of Debtors' Joint Chapter 11 Plan of Liquidation* (the "**1129 Declaration**"), filed contemporaneously herewith, which addresses the satisfaction of the elements under section 1129 of the Bankruptcy Code;

- *Declaration of Alan J. Carr in Support of Confirmation of Chapter 11 Plan* (Docket No. 5220) (the "**Carr Declaration**"), filed on June 27, 2025, which address the Investigation, the Debtor Releases, and the Third-Party Releases (each as defined herein);

- *Declaration of Marc J. Brown in Support of (I) Confirmation of Debtors' Joint Chapter 11 Plan of Liquidation and (II) the Debtors' Omnibus Objection to the Chapter 7 Conversion Motions* (Docket No. 5221) (the "**Brown Declaration**"), filed on June 27, 2025, which addresses the Plan's satisfaction of 1129(a)(7) of the Bankruptcy Code and sets forth the Debtors' Liquidation Analysis (as defined herein);

- *Declaration of Craig E. Johnson of Kroll Restructuring Administration LLC Regarding the (I) Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and its Affiliated Debtors and (II) Solicitation of Administrative Expense Claims Opt-Out Forms and Reporting of Opt-Out Forms Received for Administrative Expense Claims Consent Program* (the "**Solicitation Declaration**"), filed contemporaneously herewith; and

- *Affidavit of Service of Solicitation Materials* (Docket No. 5380), filed on July 7, 2025, and the *Affidavit of Supplemental Service of Solicitation Materials* (Docket No. 5425), filed on July 9, 2025 (collectively, the "**Solicitation Certificates**").

8

18. The Confirmation Declarations and any testimony and other declarations that may be adduced or submitted at, or in connection with, the Combined Hearing (as defined below) are herein incorporated in full.

## III. Plan Summary

19. The Plan provides for the orderly wind down of the Debtors' estates and distributions to creditors in accordance with the absolute priority rule in the most efficient and expeditious manner possible. Specifically, the Plan provides for, among other things:

- the formation of the Plan Trust, the transfer of all of the Debtors' assets, including their beneficial interests in the Litigation Trust (the "**Class B Interests**"), to the Plan Trust, and the Plan Trust's assumption of all Claims against the Debtors (other than the FILO DIP Claims, FILO Bridge Claims, and Claims for which the Plan Trusts Interests are distributed);

- the appointment of the Plan Administrator Committee, consisting of Monica Blacker, Alan J. Carr, and William Transier, to administer the wind down of the Debtors' estates, and following the formation of the Plan Trust, the appointment of the Plan Administrator Committee members as the trustees of the Plan Trust;

- the funding of $9.0 million by the Litigation Trust to the Estates to support administration of the Estate;

- the implementation of the Administrative Expense Claims Consent Program, pursuant to which participating holders will receive their pro rata share of a $12.5 million cash pool in exchange for waiving 50% of their Administrative Expense Claims;[11]

- the following treatment of Claims against, and Interests in, the Debtors:

  o holders of Allowed Administrative Expense Claims will be paid in full in cash on the Effective Date;

  o holders of Allowed Other Priority and Allowed Other Secured Claims will be paid in full in cash on the Effective Date;

---

[11] The Debtors and the Creditors' Committee have agreed to waive the Minimum Condition Threshold (as defined in the Disclosure Statement), and therefore, the Administrative Expense Claims Consent Program will be implemented if the Plan is confirmed.

- o holders of Allowed Priority Tax Claims will either be paid in full in cash on the Effective Date or receive installment payments over a period not to exceed five years from the Petition Date;

- o holders of the Allowed Retained FILO Claims will receive their pro rata share of the FILO Plan Trust Interests, which will entitle such holders to share in 10% of the Plan Trust Recovery until the Retained FILO Claims are satisfied in full;

- o holders of Allowed General Unsecured Claims and Allowed PBGC Claims will receive their pro rata share of the GUC Plan Trust Interests, which will entitle such holders to share in 90% of the Plan Trust Recovery until the Retained FILO Claims are satisfied in full and 100% of the Plan Trust Recovery after the Retained FILO Claims are satisfied in full;

- o holders of Subordinated Securities Claims will not receive any distributions;

- o Intercompany Claims will be adjusted, reinstated, or discharged to the extent reasonably determined by the Estate Representative;

- o Intercompany Interests will be adjusted, reinstated, or discharged at the election of the Estate Representative; and

- o Non-Debtor Owned Subsidiary Interests and Parent Interests will be cancelled and no distribution will be made to the holders of such Interests.

## IV. **Settlements Embodied in the Plan**

20. During these chapter 11 cases, the Debtors engaged in continuous, constructive, and meaningful discussions with many of their key stakeholders to build support for the Plan and resolve disputes, eventually resulting in settlements involving several of the Debtors' key stakeholders, including the Debtors' landlord, Medical Properties Trust ("**MPT**"), the Creditors' Committee, the FILO Parties, and the Pension Benefit Guaranty Corporation ("**PBGC**"), and the numerous administrative creditors that are participating in the Administrative Expense Claims Consent Program or have participated in other programs to settle claims (including through the Vendor Fund that was established in connection with the Debtors' transaction with Quorum Health).

A. **FILO Settlement**

21.     After months of arm's-length negotiations among the Debtors, the FILO Parties, and the Creditors' Committee, overseen by the Honorable Judge Marvin Isgur, the Debtors reached a settlement with the FILO Parties that (i) provides the Debtors with the financing needed to confirm a chapter 11 plan, (ii) preserves and maximizes the value of the Debtors' remaining assets, and (iii) averts the risk of a maturity of the FILO DIP Facility and the FILO Parties' moving to lift the stay to exercise remedies with respect to their collateral, including terminating the Debtors' use of cash collateral.

22.     The FILO Settlement was approved by the Court on June 2, 2025 pursuant to the FILO Settlement Order, representing a significant milestone in these chapter 11 cases and enabling the Debtors to proceed towards confirmation of the Plan with the support of the FILO Parties and the Creditors' Committee. The terms of the FILO Settlement are embodied in the Plan and the Debtors seek to implement the settlement following, and in connection with, confirmation of the Plan. However, to the extent the Plan is not confirmed, the Debtors intend to consummate the FILO Settlement in accordance with the FILO Settlement Order, which provides that the Litigation Trust shall be established on the earlier of (i) July 16, 2025 and (ii) one (1) business day after entry of an order confirming the Plan.[12]

23.     In connection with the FILO Settlement, the settling parties also entered into a support agreement documented in the Plan Support Agreement Term Sheet,[13] pursuant to which the Creditors' Committee committed to support the Plan and the FILO Parties committed

---

[12]     FILO Settlement Order ¶ 5; *Stipulation and Agreed Order Extending Litigation Trust Establishment Date* (Docket No. 5388).

[13]     *See* Plan Support Agreement Term Sheet.

11

to support a chapter 11 plan that leaves unaltered, and is otherwise consistent with, the terms of the FILO Settlement.

### B. *PBGC Settlement*

24.     The Plan provides for a settlement of certain outstanding issues between the Debtors and PBGC regarding the terms of termination of the Debtors' New England Sinai Hospital Pension Plan (the "**Pension Plan**") and a number of outstanding claims filed by PBGC against the Debtors (the "**PBGC Settlement**" and together with the Plan Settlement, the "**Settlements**"). Specifically, PBGC has asserted claims against the Debtors on account of, among other things, (i) unfunded benefit liability in the amount of $4,606,480; (ii) unpaid minimum required contributions in the amount of $813,677, and (iii) flat-rate and variable-rate in the amount of $1,794,915 (the "**Asserted PBGC Claims**").  PBGC asserted the Asserted PBGC Claims against all 167 Debtor entities on a joint and several basis pursuant to 29 U.S.C. § 1362(a), (b).

25.     In an effort to reach a settlement with the PBGC on all outstanding issues, including the Allowed amount of the Asserted PBGC Claims and the Allowed amount of the Asserted PBGC Claims at each Debtor entity, the Debtors' professionals and representatives of the PBGC engaged in a number of discussions to attempt to reach a consensual resolution on the aforementioned issues, the termination of the Pension Plan, and the appointment of PBGC as Trustee of the Pension Plan, and have agreed to the resolution of all such issues pursuant to the terms of the PBGC Settlement, which is subject to the confirmation of the Plan. The Debtors and the PBGC have memorialized the terms of the PBGC Settlement in the Plan and term sheet attached to the Disclosure Statement as Exhibit G.

26.     The key components of the PBGC Settlement include (i) the Pension Plan was terminated pursuant to a PBGC-initiated termination effective as of April 30, 2024; (ii) the Asserted PBGC Claims shall be Allowed, as a prepetition general unsecured claim, in the amount

12

of $8,750,000 (the "**Allowed PBGC Claims**"); (iii) the holder of Allowed PBGC Claims will accept the Plan and not opt-out of the third-party releases provided thereunder; and (iv) in full settlement, in full and final satisfaction, settlement, release, and discharge of such Allowed PBGC Claims, on or prior to the Effective Date, the Plan shall provide that PBGC shall receive the PBGC Plan Trust Interests.  As set forth above, these interests entitle the Allowed PBGC Claims to share ratably with holders of General Unsecured Claims in (i) 90% of GUC distributions until the Retained FILO Claims are paid in full and (ii) 100% of GUC distributions after the Retained FILO Claims are paid in full.  Pursuant to the PBGC Settlement, the Allowed PBGC Claims shall be the only Claims on which the PBGC shall be entitled to any distribution in connection with the Debtors or the Plan.

### C.  *Plan Settlement*

27.  As a proposed compromise and settlement of inter-Estate and inter-creditor issues, the Plan Settlement contemplates that each Class of Claims and Interests shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors. *See* Plan § 5.3(b).  Specifically, Section 5.3(a) of the Plan contemplates the following treatment:

> (i)  all assets and liabilities of the Debtors shall be treated as though they were pooled;
>
> (ii)  each Claim filed or to be filed against any Debtor shall be deemed filed as a single Claim against, and a single obligation of, the Debtors;
>
> (iii)  all Intercompany Claims shall be adjusted, reinstated, or discharged in accordance with Section 4.6 of the Plan;
>
> (iv)  no Plan Distributions shall be made under the Plan on account of any Intercompany Interest or any Non-Debtor Owned Subsidiary Interest to the extent set forth in Sections 4.8 and 4.9 of the Plan;
>
> (v)  any Claims on account of a guarantee provided by a Debtor of the obligations of another Debtor shall be treated as eliminated so that any Claim against any Debtor and any Claim based upon a guarantee

13

thereof by any other Debtor shall be treated as one Claim against a single consolidated Estate; and

(vi)    any joint or joint and several liability of any of the Debtors shall be one obligation of the Debtors and any Claims based upon such joint or joint and several liability shall be treated as one Claim against a single consolidated Estate.

28.    Section 5.3(b) of the Plan expressly provides that the Plan Settlement shall not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to distribution rights under the Plan. *See* Plan § 5.3(b).

## V.    <u>Plan Solicitation</u>

29.    On June 2, 2025, the Court entered the Disclosure Statement Order,[14] which, among other things:

(i)    conditionally approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code;

(ii)    scheduled the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan for July 11, 2025 at 9:00 a.m. (Central Time) (the "**Combined Hearing**");

(iii)    established July 2, 2025 at 5:00 p.m. (Central Time) as the deadline to (a) vote to accept or reject the Plan (the "**Voting Deadline**"), (b) opt-out of Third-Party Releases and the Administrative Expense Claims Consent Program, and (c) object to confirmation of the Disclosure Statement and Plan (the "**Plan/DS Objection Deadline**");

(iv)    approved the proposed procedures for (a) soliciting, receiving, and tabulating Consent Program Opt-Out Form submissions in connection with the Administrative Expense Claims Consent Program (the "**Consent Program Opt-Out Procedures**"), (b) soliciting, receiving, and tabulating votes to accept or reject the

---

[14]  *Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* (Docket No. 5036) (the "**Disclosure Statement Order**").

Plan, (c) voting to accept or reject the Plan, and (d) filing objections to the Plan (the "**Solicitation and Voting Procedures**");

(v)  approved the form of ballots with voting instructions (the "**Ballots**") and certain other notices;

(vi)  approved the materials and documents to be sent to eligible holders of Administrative Expense Claims;

(vii)  approved procedures for assumption, assumption and assignment, or rejection of the Debtors' executory contracts and unexpired leases;

(viii)  approved the form to opt out of Third-Party Releases (the "**Release Opt-Out Form**");

(ix)  approved the form and manner of notice of the Combined Hearing (the "**Combined Hearing Notice**"); and

(x)  established June 25, 2025 as the deadline to file the Plan Supplement.

30.  As set forth in the Solicitation and Voting Procedures, the holders of Claims in Class 3 (FILO Bridge Claims), Class 4 (General Unsecured Claims), and Class 5 (PBGC Claims) were entitled to vote on the Plan, subject to certain exceptions[15] (each a "**Voting Class**," and collectively, the "**Voting Classes**").

31.  On June 5, 2025, the Debtors commenced the solicitation of votes on the Plan in accordance with the Disclosure Statement Order by causing Kroll Restructuring Administration LLC ("**Kroll**"), the Debtors' solicitation agent, to distribute copies of the Plan, the Disclosure Statement (with all exhibits, including the Plan), a copy of the Solicitation and Voting Procedures, a statement from the Creditors' Committee, the Combined Hearing Notice, and the applicable Ballot (collectively, the "**Solicitation Package**") to each creditor entitled to vote on the Plan.  *See* Solicitation Certificates. On June 6, 2025, the Debtors filed the Combined Hearing

---

[15]  Such exceptions are set forth in the Solicitation and Voting Procedures.  *See* Disclosure Statement Order, Ex. 2, at 2.

Notice (Docket No. 5053) to give parties in interest notice of the Combined Hearing and, through Kroll, caused the Combined Hearing Notice to be served in accordance with the Solicitation and Voting Procedures. *See* Solicitation Certificates. The Combined Hearing Notice was also published in the Houston Chronicle and the New York Times on June 9, 2025 and the Boston Globe, Midland Reporter-Telegram, Miami Herald, South Florida Sun-Sentinel, Texarkana Gazette, The Tribune Chronicle and the Vindicator, Arizona Republic, Florida Today, Indian River Press Journal, and the News-Star on June 10, 2025. *See* Publication Aff. (Docket No. 5393).

32. If holders of Claims and Interests were not entitled to vote on the Plan, on or before the Mailing Deadline, Kroll served such holders with (i) the Combined Hearing Notice, (ii) the Release Opt-Out Form, and (iii) notice informing them of their non-voting status (the "**Notice of Non-Voting Status**"), which contained the full text of the release, exculpation, and injunction provisions set forth in Section 12.6(b) of the Plan and advised such holders that they would be deemed to be bound by the Third-Party Releases unless they timely and properly opted out of such releases contained in the Release Opt-Out Form, in accordance with Rule 40 of the *Procedures for Complex Cases in the Southern District of Texas* (the "**Complex Case Rules**") and consistent with the Disclosure Statement Order. *See* Solicitation Certificates; *see generally* Solicitation Decl. The materials included in the Solicitation Package were also made available at no cost on the Debtors' restructuring website maintained by Kroll at https://restructuring.ra.kroll.com/Steward (the "**Case Website**").

## VI.    Plan Supplement

33. On June 25, 2025, the Debtors timely filed the Plan Supplement (Docket No. 5207). The Plan Supplement included the following draft documents and information: (i) the Schedule of Identified Non-Released Parties; (ii) the Schedule of Retained Causes of Action; (iii) the Schedule of Assumed Contracts; (iv) the Schedule of Alternative Plan Debtors; (v) the

16

Wind Down Budget; (vi) the Plan Administrator Agreement; (vii) disclosure of the identity of the Plan Trustee; (viii) the Plan Trust Agreement; (ix) disclosure of the identity of the Litigation Trustee; (x) the Litigation Trust Agreement; (xi) the Transition Services Agreement; and (xii) the Litigation Funding Agreement. The Plan Supplement was also made available on the landing page linked via a QR code provided in the Combined Hearing Notice to the Case Website.

## VII.   Tabulation

34.     After the Voting Deadline, and following a complete review by Kroll of all Ballots received, Kroll tabulated the Ballots. *See* Solicitation Decl. ¶¶ 10-12. Exhibit A to the Solicitation Declaration also describes in detail the voting results for each Debtor. As reflected in the Solicitation Declaration, there is an impaired accepting Class at each Debtor, at least two impaired accepting Classes at 135 Debtors, and three impaired accepting classes at 69 Debtors. *See* Solicitation Decl. Ex. A. Moreover, out of the 3,717 general unsecured creditors who voted on the Plan, 93.5% in amount voted to accept the Plan.

| Aggregate Voting Results | | | | | |
|---|---|---|---|---|---|
| | Accept | | Reject | | |
| Class | Amount (% of Amount Voted) | Number (% of Number Voted) | Amount (% of Amount Voted) | Number (% of Number Voted) | Result |
| Class 3 (FILO Bridge Claims) | $53,083,761 (100%) | 22 (100%) | $0 (0%) | 0 (0%) | Accept |
| Class 4 (General Unsecured Claims) | $6,792,841,775 (93.5%) | 2,968 (79.8%) | $470,965,661 (6.5%) | 749 (20.2%) | Accept |
| Class 5 (PBGC Claims) | $8,750,000 (100%) | 1 (100%) | $0 (0%) | $0 (0%) | Accept |

## ARGUMENT

35.     This argument is divided into four parts. *Part I* addresses the requirements for final approval of the Disclosure Statement under section 1125(a) of the Bankruptcy Code and

demonstrates the satisfaction of each such requirement. *Part II* addresses satisfaction of the applicable requirements for settlements, releases, exculpation, and injunction provisions contained in a chapter 11 plan pursuant to Bankruptcy Rule 9019, section 1123 of the Bankruptcy Code, and applicable Fifth Circuit law. *Part III* demonstrates the satisfaction of each of the requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code. *Part IV* responds to certain objections raised to the confirmation of the Plan.

## I.    Disclosure Statement Should be Approved on a Final Basis

36.    For the reasons set forth below, the Disclosure Statement satisfies the applicable requirements of section 1125 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules and should be approved on a final basis as containing adequate information.

### A.    *Parties in Interest Received Sufficient Notice of Combined Hearing and Plan/DS Objection Deadline*

37.    Bankruptcy Rule 3017(a) authorizes the Court to fix a time for filing objections to the adequacy of a disclosure statement, and Bankruptcy Rule 3020(b)(1) authorizes the Court to fix a time for filing objections to confirmation of a chapter 11 plan. Bankruptcy Rules 2002(b), 2002(d), and 3017(a) generally provide that parties in interest should receive not less than 28 days' notice by mail of the time fixed for filing objections to approval of a disclosure statement and confirmation of a plan. However, Bankruptcy Rule 9006(c)(1) provides that the Court for cause shown may in its discretion order the time periods reduced, unless Bankruptcy Rule 9006(c)(2) (which is not applicable here) prohibits such reduction.

38.    Further, the Fifth Circuit has adopted the general rule that "[d]ue process requires that notice be 'reasonably calculated, under all the circumstances, to inform interested parties of the pendency' of a proceeding." *Williams v. Placid Oil Co. (In re Placid Oil Co.)*, 753

18

F.3d 151, 154 (5th Cir. 2014) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)). When evaluating the sufficiency of notice, courts in this Circuit consider whether "(1) the notice apprised the claimant of the pendency of the action, and (2) [whether] it was sufficiently timely to permit the claimant to present his objections." *Sequa Corp. v. Christopher (In re Christopher)*, 28 F.3d 512, 518 (5th Cir. 1994); *Otto v. Tex. Tamale Co., Inc. (In re Tex. Tamale Co., Inc.)*, 219 B.R. 732, 739–40 (Bankr. S.D. Tex. 1998). Indeed, "[w]hether a particular method of notice is reasonably calculated to reach interested parties depends upon the particular circumstances of each case." *Walters v. Hunt (In re Hunt)*, 146 B.R. 178, 182 (Bankr. N.D. Tex. 1992).

39. On April 28, 2025, the Debtors filed the Disclosure Statement Motion[16] seeking the relief requested in the Disclosure Statement Order, including to establish the Plan/DS Objection Deadline and set the Combined Hearing. S*ee supra* ¶ 29. The Debtors submitted to the Court that the Combined Hearing was appropriate and would promote judicial economy and save administrative expenses by allowing the Debtors to confirm the Plan quickly and transition expeditiously to winding down the Debtors' estates, thereby preserving value. *See* Disclosure Statement Mot. ¶ 75. On June 5, 2025, the Debtors commenced service of the Solicitation Packages. The Notice of Combined Hearing[17] served in accordance with the Soliciation and

---

[16] *Motion of Debtors for Entry of Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Plan; (II) Conditionally Approving Disclosure Statement and Form and Manner of Notice of Conditional Disclosure Statement Hearing; (III) Establishing Solicitation and Voting Procedures; (IV) Establishing Administrative Expense Claims Consent Program Notice and Opt-out Procedures; (V) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (VI) Approving Notice Procedures for Assumption or Rejection of Executory Contracts and Unexpired Leases; and (VII) Granting Related Relief* (Docket No. 4745) (the "**Disclosure Statement Motion**").

[17] *Notice of (I) Conditional Approval of Disclosure Statement; (II) Approval of (A) Solicitation and Voting Procedures, (B) Administrative Expense Claims Consent Program Notice and Opt-Out Procedures; and (C) Notice Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; (III) Combined Hearing to Consider Final Approval of Disclosure Statement and Confirmation Of Plan; and (IV) Establishing Notice And Objection Procedures For Final Approval Of Disclosure Statement And Confirmation Of Plan* (Docket No. 5053) (the "**Notice of Combined Hearing**").

Voting Procedures provided notice to all parties that he Combined Hearing may be adjourned or continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by a Bankruptcy Court announcement providing for such adjournment or continuation on its agenda. *See* Notice of Combined Hearing ¶ 2.

40.     On June 23, 2025, the Debtors filed the *Notice of Filing of Proposed Order Adjourning Combined Hearing* (Docket No. 5174) attaching a proposed order adjourning the Combined Hearing to July 14, 2024 at 1:00 p.m. (Central Time).  The Court entered the *Order Adjourning Combined Hearing* (Docket No. 5175) on June 23, 2025.

41.     Accordingly, the Debtors submit that all parties in interest had sufficient notice of the Plan/DS Objection Deadline and the Combined Hearing, and no party has been prejudiced by this schedule.

**B.     *Disclosure Statement Contains Adequate Information and Should be Approved***

42.     As set forth in the Solicitation Certificates and in accordance with section 1126 of the Bankruptcy Code, the Debtors solicited acceptances of the Plan from holders of the Voting Classes.  To approve a solicitation of votes to accept or reject a plan, the Court must determine that such solicitation complied with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

43.     On June 2, 2025, the Court entered the Disclosure Statement Order, conditionally approving the Disclosure Statement as containing "adequate information" in accordance with section 1125(b) of the Bankruptcy Code.  In accordance with section 1125(b), the Debtors did not solicit votes on the Plan until after the Disclosure Statement Order was entered.

44.     Under section 1125 of the Bankruptcy Code, a plan proponent must provide voting creditors with "adequate information" regarding a debtor's proposed plan.[18]  A debtor's disclosure statement must provide sufficient information to permit an informed judgment by creditors entitled to vote on the plan.  *See, e.g.*, *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 271 (5th Cir. 2015) ("The proponent of a reorganization plan . . . must provide a court-approved disclosure statement that contains 'adequate information' about the assets, liabilities, and financial affairs of the debtor sufficient to enable creditors to make an 'informed judgment' about the plan."); *Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 521 B.R. 134, 176 (Bankr. N.D. Tex. 2014) ("Section 1125 of the Bankruptcy Code entitles creditors to 'adequate information' so they can make an informed decision on whether to accept or reject a chapter 11 plan.").  The essential requirement of a disclosure statement is that it "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."  *In re Keisler*, No. 08-34321 (RS), 2009 WL 1851413, at *4 (Bankr. E.D. Tenn. June 29, 2009) (quoting *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991)).

45.     Whether a disclosure statement contains adequate information "is not governed by any otherwise applicable nonbankruptcy law, rule, or regulation." 11 U.S.C. § 1125(d).  Instead, bankruptcy courts have broad discretion to determine the adequacy of the information contained in a disclosure statement.  *See, e.g.*, *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988) (noting that the

---

[18]   "Adequate information" is defined in section 1125(a)(1) of the Bankruptcy Code as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."  11 U.S.C. § 1125(a)(1).

determination of what is adequate information is "largely within the discretion of the bankruptcy court").

46.     Congress granted bankruptcy courts wide discretion in determining the adequacy of a disclosure statement, taking into account the various facts and circumstances that accompany chapter 11 cases.  *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 408–09 (1977); *see also Cajun Elec. Power*, 150 F.3d at 518 ("[W]ith respect to a particular disclosure statement, '[b]oth the kind and form of information are left essentially to the judicial discretion of the court'" (quoting S. Rep. No. 95-989, at 121 (1978))).  Accordingly, the determination of whether a disclosure statement contains adequate information is made on a case-by-case basis, focusing on the unique facts and circumstances of each case.  *See Tex. Extrusion*, 844 F.2d at 1157 ("The determination of what is adequate information is subjective and made on a case by case basis.").

47.     Whether a disclosure statement contains adequate information is intended by Congress to be a flexible, fact-specific inquiry left within the discretion of the Court:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis.  Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the cost of preparation of the statements, the need for relative speed in solicitation and confirmation, and, of course, the need for investor protection.  There will be a balancing of interests in each case.

H.R. Rep. 95-595, at 409 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6365.  *See also Tex. Extrusion*, 844 F.2d at 1157.

48.     The Disclosure Statement is extensive and comprehensive.  The Disclosure Statement provides various types of information, including, but not limited to, the following:

> (i)     an introduction providing background and an overview of the Plan, including a summary of the Settlements and related transactions (Section I.A.);

22

(ii) a summary of the Administrative Expense Claims Consent Program (Section I.B.);

(iii) a summary of Plan classification and treatment of Claims and Interests, including procedures for liquidating Medical Liability Claims against the Debtors (Section I.C);

(iv) an estimate of recoveries to all creditors, including those entitled to vote on the Plan (Section I.C);

(v) an estimate of the projected Effective Date (Section I.B);

(vi) an overview of the Debtors' operations (Section II);

(vii) a description of the Debtors' capital structure (Section II.E);

(viii) significant events leading to the commencement of the Debtors' chapter 11 cases (Section III);

(ix) events during the chapter 11 cases (Section IV);

(x) certain risk factors to be considered (Section V);

(xi) certain U.S. federal income tax consequences of the Plan (Section VI); and

(xii) requirements for confirmation of the Plan (Section VII).

49. In addition to providing the above information, the Disclosure Statement provides an analysis of the alternatives to confirmation and consummation of the Plan (Section VIII) and begins with the Debtors' recommendation that the holders of Claims in Classes 3, 4, and 5 vote to accept the Plan.

50. For the reasons set forth above, the Disclosure Statement, which was conditionally approved pursuant to the Disclosure Statement Order, satisfies the requirements of section 1125(a) of the Bankruptcy Code and should be approved on a final basis.

## C. Solicitation of Votes Complied with Bankruptcy Code, Bankruptcy Rules, and Disclosure Statement Order

51. As approved in the Disclosure Statement Order, the Solicitation Packages and Solicitation and Voting Procedures comply with the Bankruptcy Code and Bankruptcy Rules. *See* Disclosure Statement Order ¶¶ 4, 7.

52. Bankruptcy Rule 3017(d) sets forth the materials that must be provided to holders of claims and equity interests for the purpose of soliciting their votes and providing adequate notice of the hearing on confirmation of a plan. Bankruptcy Rule 3018(c) provides for the necessary form of acceptances and rejections of a plan.

53. In accordance with these rules and the Disclosure Statement Order, only holders of Claims or Interests in the Voting Classes were sent Ballots. Such holders also received a copy of the Disclosure Statement, the Disclosure Statement Order, the Combined Hearing Notice, the Solicitation and Voting Procedures, the Creditors' Committee Position Letter, and a postage-prepaid return envelope. The Ballot conformed to Official Form No. 314, as modified to address the facts of these cases and to be appropriate for the Voting Classes. These modifications included bold and capitalized language disclosing the third-party releases and the procedures for opting out of such releases. The Ballots were approved by the Court in the Disclosure Statement Order. Accordingly, the Debtors have satisfied Bankruptcy Rules 3017(d), 3018(c), and 9009.

54. Pursuant to section 1125(e) of the Bankruptcy Code, "[a] person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan. 11 U.S.C. § 1125(e).

55. As set forth in the 1129 Declaration and as further described above, the Debtors engaged in arm's-length, good faith negotiations with their key stakeholders and other

24

parties in interest, and all parties, including Kroll, took appropriate actions in connection with the solicitation of the Plan. *See* 1129 Decl. ¶ 39. Therefore, the Debtors submit that the Court should grant these parties the protections provided under section 1125(e) of the Bankruptcy Code.

## II. Settlement, Release, Exculpation, and Injunction Provisions Are Appropriate and Should Be Approved

### A. *Settlements Are Reasonable and Satisfy Bankruptcy Rule 9019*

56. The Plan embodies a good-faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any such Allowed Claim or Allowed Interest or any distribution to be made on account thereof.

57. In the Fifth Circuit, "[t]he standard for evaluating the validity of a settlement contained in a Chapter 11 plan is the same as the standard for evaluating a settlement between a debtor and another party outside the context of a plan . . . . Stated differently, settlement provisions in a Chapter 11 plan must satisfy the standards used to evaluate compromises under [Bankruptcy] Rule 9019." *In re Bigler LP*, 442 B.R. 537, 543 n.6 (Bankr. S.D. Tex. 2010) (citing *In re MCorp Fin., Inc.*, 160 B.R. 941, 951 (S.D. Tex. 1993)). Accordingly, approval should be given "if the settlement is 'fair and equitable and in the best interest of the estate.'" *Off. Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 355 (5th Cir. 1997) (quoting *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995) (additional citations omitted)).

58. To determine whether a settlement is fair and equitable, courts "apply [a] three-part test . . . with a focus on comparing 'the terms of the compromise with the likely rewards of litigation.'" *Off. Comm. of Unsecured Creditors v. Moeller (In re Age Refin., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015) (quoting *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599,

602 (5th Cir. 1980)).  Specifically, a bankruptcy court evaluates (i) "the probability of success in [] litigat[ing] [the claim subject to settlement], with due consideration for the uncertainty in fact and law," (ii) "the complexity and likely duration of litigation and any attendant expense, inconvenience and delay," and (iii) "all other factors bearing on the wisdom of the compromise," including (a) "the best interests of the creditors, with proper deference to their reasonable views," and (b) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion."  *Id.* (first citing *Jackson Brewing*, 624 F.2d at 602; then quoting *Cajun Elec. Power*, 119 F.3d at 356; and then quoting *Foster Mortg.*, 68 F.3d at 917–18) (internal quotation marks omitted).

59.     Although the debtor bears the burden of establishing that a settlement is fair and equitable based on the balance of the above factors, "the [debtor's] burden is not high."  *See In re Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008).  The court need only determine that the settlement does not "fall beneath the lowest point in the range of reasonableness."  *See In re Idearc Inc.*, 423 B.R. 138, 182 (Bankr. N.D. Tex. 2009), *subsequently aff'd*, 662 F.3d 315 (5th Cir. 2011) (citation omitted); *Roqumore*, 393 B.R. at 480 ("The Trustee need only show that his decision falls within the 'range of reasonable litigation alternatives.'") (citations omitted).

60.     As discussed more fully below, each Settlement is fair and equitable and achieves the best resolution of the issues at hand.  The Settlements are the result of months of good faith, arm's length negotiations.  As described in greater detail above, the Settlements, among other things, provide for a clear path to execution of the Plan and the wind down of the Debtors' estates. The Debtors, the Creditors' Committee, the FILO Parties, and the PBGC are all represented by experienced and competent counsel who vigorously negotiated the Settlements and such parties

26

unanimously agree that approval of the Settlements is a significantly better outcome than the alternatives.

**B.**    ***The PBGC Settlement Satisfies Bankruptcy Rule 9019***

61.    The PBGC Settlement is the result of good-faith, arm's-length negotiation and resolves disputes and potential litigation between the Debtors and the PBGC regarding, among other things, the amount and priority of the Allowed PBGC Claims and the termination of the New England Sinai Hospital Pension Plan.

62.    Approval of the PBGC Settlement will maximize recoveries to creditors. *See* 1129 Decl. ¶ 15.  The PBGC Settlement averts the risk or costly litigation by resolving various issues, including determining the Allowed amount of the PBGC Claims, the Allowed amount of the Asserted PBGC Claim recoverable at each Debtor entity, and the ability of the PBGC to have claims against each Debtor.  *See id.*  Any such litigation would present challenges for the Debtors, the outcome of which would be uncertain and potentially detrimental to the Estates and other creditors.  *See id.*  As such, the PBGC Settlement is fair, reasonable, and in the best interests of the Estates.

**C.**    ***The Plan Settlement Satisfies Bankruptcy Rule 9019***

63.    Solely for convenience, the Plan provides that each Class of Claims and Interests shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors, for the purpose of making distributions in accordance with the Plan.  *See* Plan § 5.3(b).  The settlement of intercompany claims and issues is an essential component of the Debtors' Plan to ensure a timely wind down of these chapter 11 cases and to maximize recoveries for general unsecured creditors.  For administrative ease and to avoid significant costs and time associated with reconciling all of the Debtors' intercompany claims (approximately $11 billion in intercompany payables and receivables as of April 2024), the Plan provides that each Class of

27

Claims and Interests shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors, for the purpose of making distributions in accordance with the Plan. *See* Plan § 5.3(b). Of the approximately three hundred thousand (300,000) creditors who received notice of the Plan and Combined Hearing, only the Commonwealth of Massachusetts (the "**Commonwealth**") has objected to the Plan Settlement.

64. Accordingly, the Debtors submit that the Plan Settlement is fair, reasonable, and in the best interests of the Estates and the limited substantive consolidation contemplated thereby should be approved. Nevertheless, objections to the limited substantive consolidation contemplated by the Plan Settlement are addressed in section II.H below.

### D. *Plan Releases, as Encompassed in Settlements, Are Appropriate and Should Be Approved*

65. The Plan provides for the release of certain Claims and Causes of Action by (i) the Debtors and their estates as set forth in Section 12.6(a) of the Plan (the "**Debtor Releases**") and (ii) certain non-Debtor third parties as set forth in Section 12.6(b) of the Plan (the "**Third-Party Releases**"), in favor of the Released Parties.[19] The Debtor Releases and Third-Party Releases are integral components of the Plan, were negotiated as part of the Settlements, are appropriate and necessary under the circumstances, are consistent with the Bankruptcy Code, and comply with applicable case law and precedent in the Fifth Circuit, and, for the reasons set forth below, should be approved.

---

[19] "**Released Parties**" means (i) the Debtors, the Estates, and the Debtor Related Parties; (ii) each of the following, solely in their capacity as such, (a) the members of the Plan Administrator Committee, (b) the Plan Trust and the Plan Trustee, (c) the Litigation Trust and the Litigation Trustee, (d) the Creditors' Committee and each of its members, and (e) the FILO Parties; and (iii) with respect to each of the foregoing Entities identified in the immediately preceding clause (ii), such Entities' Related Parties; provided that any non-Debtor Person or Entity that opts out of granting the releases set forth in this Plan will not be a Released Party; provided further that, notwithstanding anything in the Plan to the contrary, no Identified Non-Released Party shall be a Released Party.

1.      **Debtor Releases**

66.      The Plan provides for a narrow scope of releases by the Debtors and their Estates of the Released Parties which include, among others, (i) the FILO Parties and their professionals, (ii) the Creditors' Committee and its members and professionals, and (iii) a carefully curated subset of Debtor related parties (the "**Debtor Related Parties**") limited to the special committee, which maintains the exclusive authority of the Board to pursue, oversee, negotiate, and approve transactions as well as oversee the administration of these chapter 11 cases (the "**Transformation Committee**"), the Debtors' Chief Restructuring Officer, officers, presidents, directors, managers and advisory board members of the Debtors' hospital entities (*i.e.*, a Hospital Debtor), and a limited set of corporate-level directors and employees (i) that were not involved in the impugned transactions that were investigated (which was determined based on the timing of their tenure and the extensive review of contemporaneous documents and interviews conducted as part of the Investigation), (ii) for whom there was no indication of any wrongdoing (based on the findings of the Investigation), and/or (iii) who provided, or continue to provide, significant and integral contributions to the Debtors during these chapter 11 cases.  Moreover, the Debtor Releases expressly carve-out from the releases claims against certain "Identified Non-Released Parties" who have been identified to remove any doubt that these individuals and parties are not being released notwithstanding anything else in the Plan.

67.      Releases of a nearly identical scope were already approved by the Court pursuant to the FILO Settlement Order, pursuant to which this Court held that such releases were, among other things, (i) consensual; (ii) supported by adequate consideration; (iii) a necessary and integral; (iv) a good-faith settlement and compromise; (v) given and made after due notice and opportunity for hearing; (vi) are fair and equitable and in the best interests of the Debtors, their estates, creditors, and all parties in interests considering (a) the probability of success in litigation,

(b) the complexity and likely duration and expense of litigating, and (c) the arms'-length negotiations which produced them.[20]

68.     Under section 1123(b)(3)(A) of the Bankruptcy Code, a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). Accordingly, a debtor may release causes of action as consideration for concessions made by its stakeholders pursuant to a chapter 11 plan. *See, e.g.*, *Bigler*, 442 B.R. at 547 (finding that plan release provision "constitutes an acceptable settlement under § 1123(b)(3) because the [d]ebtors and the [e]state are releasing claims that are property of the [e]state in consideration for funding of the Plan . . . ."); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 308 (Bankr. N.D. Tex. 2007) ("[T]he plain language of § 1123(b)(3) provides for the inclusion in a plan of a settlement of claims belonging to the debtor or to the estate . . . .") (emphasis omitted); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991) ("To the extent that . . . the plan purports to release any causes of action against the [creditor] which the [d]ebtor could assert, such provision is authorized by § 1123(b)(3)(A) . . . ."). In considering the appropriateness of a release of claims by a debtor, courts consider whether the release is (i) "fair and equitable" and (ii) "in the best interest of the estate." *See Jackson Brewing*, 624 F.2d at 602 (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)); *see Bigler*, 442 B.R. at 543 n.6; *see In re Derosa-Grund*, 567 B.R. 773, 784–85 (Bankr. S.D. Tex. 2017); *see also In re Mirant Corp.*, 348 B.R. 725, 738 (Bankr. N.D. Tex. 2006), *aff'd sub nom. Objecting Class 3 Claimholders v. New Mirant Entities*, No. 06-CV-744 (JHM), 2006 WL 3780884 (N.D. Tex. Dec. 26, 2006); *Heritage*, 375 B.R. at 259.

---

[20]     *See* FILO Settlement Order ¶ 18.

69.     Courts generally determine whether a release is "fair and equitable" and "in the best interests of the estate" by reference to the following so-called "*Foster Mortgage*" factors:

- the probability of success of litigation, with due consideration for the uncertainty in fact and law;

- the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay, including the difficulties, if any, to be encountered in the matter of collection;

- the paramount interest of the creditors and a proper deference to their respective views;

- the extent to which the settlement is truly the product of arm's-length bargaining and not fraud or collusion; and

- all other factors bearing on the wisdom of the compromise.

*The Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010) (citing *Foster Mortg.*, 68 F.3d at 917–18); *see also Derosa-Grund*, 567 B.R. at 784–85; *Roqumore*, 393 B.R. at 479–80.

70.     The Debtor Releases meet the foregoing standard, are in the best interests of the Estates, and should be approved for the following reasons.  *First*, the Debtors do not believe there exists any valuable, colorable, or material claims against the Released Parties (buttressed by the fact that the release of the Released Parties under the FILO Settlement was already approved by the Court). As detailed in the Carr Declaration, the Debtor Releases of the Debtor Related Parties are narrowly tailored and were only granted following a thorough investigation by the sub-committee of the Transformation Committee comprised of Alan Carr and William Transier which has the sole authority to investigate, prosecute, and settle avoidance actions and causes of action against the Debtors' insiders (the "**Investigation Sub-committee**").[21]  Specifically, in the discharge of its responsibilities, the Investigation Sub-committee instructed Weil to conduct an

---

[21]     *See* Carr Decl. ¶ 51.

investigation to identify any potential claims and/or causes of action in favor of the Debtors, including potential claims and/or causes of action against current and former members of the board of managers (the "**Board**") of Steward Health Care Holdings LLC ("**SHC Holdings**"), current and former members of the applicable governing bodies of SHC Holdings and its subsidiaries, as well as affiliates, equity holders, officers, or other insiders of SHC Holdings and any of its subsidiaries (the "**Investigation**").[22]

71.     During the Investigation, Weil, among other things, collected and reviewed hundreds of thousands of documents and email correspondence of the Debtors and third parties, conducted more than a dozen interviews of the Debtors' directors, officers and employees, reviewed minutes of meetings of SHC Holdings' Board and Audit Committee and accompanying materials, reports, and memoranda prepared by third parties, and performed substantive legal and factual analyses.[23]  Based on the findings of the Investigation, the Investigation Sub-Committee determined that the Debtors have valuable estate claims and Causes of Action, including potential claims on account of fraudulent transfer, breach of fiduciary duty, corporate waste, and unlawful distribution, against certain of the Debtors' current and former Board members, current and former equity holders, directors, managers, and officers, and third parties.[24]  In light thereof, the Investigation Sub-Committee determined that any releases of claims held by the Debtors should be narrow and appropriately tailored to preserve such estate causes of action.[25]

72.     Based on the comprehensive Investigation and following extensive deliberation with the Debtors' advisors and other stakeholders (including the Creditors' Committee

---

[22]   *See id.* ¶ 16.

[23]   *See id.* ¶ 17.

[24]   *See id.* ¶¶ 19, 22-48.

[25]   *See id.* ¶ 51.

and the FILO Parties), the Investigation Sub-Committee approved the inclusion of the Debtor Releases as part of the Plan, including the scope and treatment of the Released Parties, including the Individual Released Parties, and the Identified Non-Released Parties.[26] Importantly, the Debtors do not believe there exists any viable and material claims against the Released Parties that should be pursued.[27] The Investigation Sub-Committee worked closely with the Debtors' advisors to limit the scope of the Debtor Releases to include a limited subset of professionals and individuals that provided pre- and postpetition services to the Debtors in their capacity as directors, managers, officers, and advisors and who were not involved in the impugned transactions that were investigated and for whom there was no indication of any wrongdoing (based on the findings of the Investigation).[28] Many of such parties were instrumental throughout these chapter 11 cases, while maintaining their regular operational duties.[29] Further, the Debtor Releases will preclude the erosion of the Debtors' valuable directors and officers liability insurance policies through the incurrence of defense costs or the assertion of additional indemnification claims against the Debtors' estates as a result of claims being brought against the Released Parties (including physicians and other front-line workers who were directors and officers of the Debtors' hospital subsidiaries) that the Debtors contend are not warranted.[30]

73.     The Debtor Releases also expressly exclude: (i) liability for any acts of actual fraud, willful misconduct, criminal misconduct, gross negligence, or material representation, on the part of such Released Parties and (ii) releases for each of the parties for

---

[26]   *See id.*

[27]   *See id.* ¶ 52.

[28]   *See id.*

[29]   *See id.* ¶ 59.

[30]   *See id.* ¶ 61.

which the Investigation Sub-Committee believes the Debtors potentially may have claims against (*i.e.*, the "**Identified Non-Released Parties**"). Accordingly, the Investigation Sub-Committee determined that the Debtor Releases were appropriately tailored to incentivize the Released Parties to continue supporting the resolution and wind-down of the Debtors' estates following confirmation of the Plan while preserving valuable estate causes of action.[31]

74.     Accordingly, the *Factor Mortgage* factors are satisfied because the Debtor Releases, among other things, (i) are narrowly tailored and only include individuals who were not involved in the impugned transactions subject to the Investigation and who are not associated with any potential wrongdoing (based on the findings of the Investigation); (ii) are not believed to release any valuable, colorable, or material claims; (iii) preclude the erosion of the Debtors' valuable Directors' and Officers' ("**D&O**") insurance policies; (iv) were the result of arms'-length bargaining and hard fought negotiations; and (v) are supported by the FILO Parties and the Creditors' Committee.

75.     Accordingly, the Debtor Releases are fair, equitable, and in the best interest of the estates, are consistent with prevailing Fifth Circuit law, and should be approved by the Court.

## 2.     Third-Party Releases

76.     In addition to the Debtor Releases, Section 12.6(b) of the Plan provides for certain consensual Third-Party Releases. Section 1123(b)(6) of the Bankruptcy Code provides that a chapter 11 plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6). Under Fifth Circuit law, a plan may include releases of third parties if such releases are provided by parties that consented to such releases and received consideration in exchange therefor. *See Bigler*, 442 B.R.

---

[31]     *See id.* ¶ 51.

at 549; *see Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (acknowledging that Bankruptcy Code does not prohibit a non-debtor release "when it has been accepted and confirmed as an integral part of a plan of reorganization"); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007) ("Most courts allow consensual nondebtor releases to be included in a plan." (citations omitted)). If these requirements are satisfied, a release should be approved when it is "an essential means of implementing [a] [p]lan pursuant to Section 1123(a)(5) of the Bankruptcy Code[.]" *In re Moody Nat'l SHS Hous. H, LLC*, No. 10-30172 (MI), 2010 WL 5116872, at *5 (Bankr. S.D. Tex. June 30, 2010) (approving consensual nondebtor release).

77.     Employing that standard, Fifth Circuit courts routinely allow third-party releases in chapter 11 plans when the third-party releases are (i) consensual, (ii) specific in language, (iii) integral to the plan, (iv) a condition of a settlement, and (v) given for consideration, so long as such releases do not otherwise violate provisions of the Bankruptcy Code. *See, e.g.*, *Wool Growers*, 371 B.R. at 776 ("Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate section 524(e).") (citations omitted); *see also FOM P.R. S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 912 (5th Cir. 2007) (enforcing a non-debtor release where "the release of claims was an integral part of the bankruptcy order [and] was not simply boilerplate language that was inserted into the [reorganization plan], but rather a necessary part of the [reorganization plan] itself"); *Applewood Chair Co. v. Three Rivers Plan. & Dev. Dist. (In re Applewood Chair Co.)*, 203 F.3d 914, 920 (5th Cir. 2000) (declining to uphold a general release that did not contain a specific discharge of indebtedness of a third party); *Shoaf*, 815 F.2d at 1050 (upholding a third-party release that was specifically provided for in confirmed plan); *Hinojosa Eng'g, Inc. v. Lopez (In re Treyson Dev., Inc.)*, No. 14-70256 (EVR), 2016 WL 1604347, at *15–17 (Bankr. S.D. Tex. Apr. 19, 2016)

35

(noting that "[t]he Fifth Circuit require[s] that the language in the plan must be specific as to the parties involved and the claim(s) released in order to be sufficient.") (citations omitted).

78.    In determining whether a third-party release is consensual, courts in the Fifth Circuit have focused on two things—notice and an opportunity to object—*i.e.*, whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look over it, [and] the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."  Conf. Hr'g Tr. 47, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. April 21, 2016) (Docket No. 730) (approving third-party releases as consensual, over objection, in light of sufficient notice and opportunity to object); *see also* Conf. Hr'g Tr. 91:15-92:5, *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) (Docket No. 251) (analyzing the facts and circumstances surrounding opt-out third-party releases before determining such releases were appropriate); *In re GenOn Energy, Inc.*, No. 17-33695 (DRJ) (Bankr. S.D. Tex. Dec. 12, 2017) (Docket No. 1250) (approving third-party releases as consensual over objections from parties in interest, including U.S. Trustee); *In re Ameriforge Grp., Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 22, 2017) (Docket No. 142) (confirming chapter 11 plan over objection because certain impaired creditors were deemed to have consented to third-party release provisions unless they opted out).

79.    Moreover, as the Court recently confirmed, nothing in the Supreme Court's recent decision in *Purdue* has modified the law in this jurisdiction which provides that opt-out features are an appropriate mechanism to obtain consensual third-party releases.  *See In re Robertshaw US Holding Corp*, 662 B.R. 300, 323 (Bankr S.D. Tex. 2024) (holding that the use of opt-out mechanisms in plans of reorganization are an appropriate method to obtain consensual third-party releases and explaining that "[h]undreds of chapter 11 cases have been confirmed in

36

this District with consensual third-party releases with an opt-out. And, again, *Purdue* did not change the law in this Circuit."); *see also In re DocuData Solutions, L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (approving chapter 11 plan with opt-out third-party releases); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596) (same); *In re MLN US Holdco LLC*, No. 25-90090 (CML) (Bankr. S.D. Tex. April 17, 2025) (Docket No. 263) (same); *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. April 16, 2025) (Docket No. 237) (same); *In re DRF Logistics, LLC,* No. 24-90447 (CML) (Bankr. S.D. Tex. Nov 25, 2024) (Docket No. 530) (same); *In re Mobileum, Inc.*, No. 24-90414 (CML) (Bankr. S.D. Tex. Sept. 11, 2024), (Docket No. 194) (same); *In re Core Sci., Inc.*, No. 22-90341 (CML) (Bankr. S.D. Tex. Jan. 16, 2024) (Docket No. 1749) (same); *see also In re GOL Linhas Aéreas Inteligentes S.A.*, No. 24-10118 (MG) (Bankr. S.D.N.Y. May 22, 2025) (Docket No. 1658) (approving chapter 11 plan with opt-out third-party releases based upon a reading of *Purdue* and case law from the Fifth Circuit).

80.     Furthermore, the Complex Case Rules for this jurisdiction permit consensual third-party releases with an opt-out. Specifically, the Complex Case Rules provide:

> If a proposed plan seeks consensual pre- or post-petition releases with respect to claims that creditors may hold against non-debtor parties, then a ballot must be sent to creditors entitled to vote on the proposed plan and notices must be sent to non-voting creditors and parties-in-interest. The ballot and the notice must inform the creditors of such releases and provide a box to check to indicate assent or opposition to such consensual releases together with a method for returning the ballot or notice.

Complex Case Rules ¶ 40.

81.     Here, the Third-Party Releases satisfy the Fifth Circuit's standard for approval of third-party releases under the Bankruptcy Code and the Complex Case Rules and should be approved.

37

82.     *First*, as set forth above, and in compliance with the Disclosure Statement Order, parties in interest were provided extensive notice of these chapter 11 cases, the Plan, the proposed Third-Party Releases, and the Plan/DS Objection Deadline.  The Notice of Non-Voting Status and the Ballots expressly included, in bold font, the terms of the Third-Party Releases, as set forth in Section 12.6(b) in the Plan.  *See* Disclosure Statement Order, Exs. 3-6.  The Notice of Non-Voting Status and the Ballots advised careful review and consideration of the terms of the Third-Party Releases.  *Id.*  Additionally, as an added precaution, the Ballots for General Unsecured Claims (Class 4) also advise, in bold font, that if holders of Medical Liability Claims do no elect to opt-out of the Third-Party Releases, then they elect to release claims against the "Released Parties," including any claims against the Debtors' employed physicians and affiliated physicians related to medical liability.  *See* Disclosure Statement Order, Ex. D.  The language of the Third-Party Releases was also emphasized using bold font in the Plan and was included in the Disclosure Statement.  *See* Plan, § 12.6(b); Disclosure Statement, Ex. D.

83.     In addition, the Notice of Non-Voting Status, the Release Opt-Out Form, and the Ballots each set forth the procedures for opting out of such Third-Party Releases, and the Ballots and Release Opt-Out Form each included the appropriate form for parties to opt out of the Third-Party Releases in compliance with the Bankruptcy Code, applicable Bankruptcy Rules, and the applicable Bankruptcy Local Rules and the Complex Case Rules, including Rule 40.  *See* Disclosure Statement Order, ¶¶ 22, Ex. 7.  The Ballots provided a checkbox to opt out of the consensual Third-Party Releases, and the Notice of Non-Voting Status included the Release Opt-Out Form that also provided a checkbox to opt out of the consensual Third-Party Releases.  *See* Disclosure Statement Order, Exs. 3-5.  Ultimately, as of the Voting Deadline, approximately

2,531 holders of Claims (including holders in Non-Voting Classes) completed and returned forms opting out of the Third-Party Releases. *See* Solicitation Decl. Ex. C.

84. *Second*, the Third-Party Releases are sufficiently specific to put the Releasing Parties on notice of the claims being released. The Third-Party Releases describe the nature and type of claims being released, including claims with respect to:

> [T]he Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down; the Disclosure Statement; the DIP Orders; the negotiation, formulation, preparation, dissemination, or consummation of the transactions contemplated by the Definitive Documents or any other contract, instrument, release, or document created or entered into in connection with this Plan (including the Plan Supplement) or any of the other Definitive Documents; any other debt or Security of the Debtors and the ownership thereof; the purchase, sale, or rescission of the purchase or sale of any debt or Security of the Debtors; the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated in this Plan; the business or contractual or other arrangements or other interactions between any Releasing Party and any Released Party in connection with the Debtors; the restructuring of any Claim or Interest before or during the Chapter 11 Cases; any other in-or-out-of-court restructuring efforts of the Debtors; any intercompany obligations, transactions, or transfers; the FILO Settlement Order and the transactions contemplated thereby; the formulation, preparation, negotiation, dissemination, solicitation, filing, confirmation, and consummation of this Plan (including the Plan Supplement) and the transactions contemplated by the Confirmation Order; the funding of this Plan; the administration and implementation of this Plan or the Confirmation Order, including the distribution of property under this Plan; or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date.

Plan § 12.6(b).

85.     *Third*, the Third-Party Releases are an integral part of the Plan.  Indeed, the Third-Party Releases were a material inducement for parties to enter into the Settlements and provide their support for the Plan and the settlements embodied therein.  *See* Carr Decl. ¶ 67.

86.     *Fourth*, the Creditors' Committee has reviewed the Third-Party Releases as part of its oversight of these chapter 11 cases and supports the inclusion of the Third-Party Releases in the Plan, which supports that the Third-Party Releases benefit the Debtors' stakeholders and are appropriate.  In connection with the Third-Party Releases, the Debtors and the Creditors' Committee had extensive discussions regarding each class of parties to be included in the definition of Released Parties, discussed the findings of the Investigation Sub-Committee, and reviewed the forms of Ballots and other solicitation materials relating to the Third-Party Releases including, importantly, those going to the holders of Medical Liability Claims.

87.     As discussed in more detail below, the Court should approve the Third-Party Releases in the Plan.  They comply with the Bankruptcy Code, the Complex Case Rules, and controlling Fifth Circuit standards and are appropriate and justified under the circumstances.

### E.     *Exculpation Provision Is Appropriate, Consistent with Fifth Circuit Precedent, and Should Be Approved*

88.     The Plan provides for the exculpation of certain parties as set forth in Section 12.7 of the Plan (the "**Exculpation Provision**").  The Exculpation Provision protects the Exculpated Parties[32] from, among other things, Causes of Action arising out of or relating to the Debtors' wind down, these chapter 11 cases, and the negotiations and agreements made in connection therewith.  *See* Plan § 12.7.  Unlike the Third-Party Releases, the Exculpation Provision does not affect the liability of third parties *per se*, but rather sets a standard of care in hypothetical

---

[32]   "**Exculpated Parties**" means each of the following in their capacity as such, and in each case, to the maximum extent permitted by law: (i) the Debtors, (ii) the members of the Transformation Committee; and (iii) the Creditors' Committee and each of its members in their official capacity.

future litigation against an exculpated party for acts arising out of these chapter 11 cases, with a carve out for actual fraud, willful misconduct, and gross negligence. As such, the Exculpation Provision prevents future collateral attacks against a limited set of estate fiduciaries that have exercised their fiduciary duties to maximize value for the Debtors and the Estates.

89.     Courts in this circuit permit exculpation of debtors for actions short of gross negligence committed during the course of bankruptcy and, although more carefully scrutinized, permit exculpation of non-debtor parties where a separate statutory basis for exculpation exists. *See NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.),* 48 F.4th 419, 437 (5th Cir. 2022), *pet. for cert. denied*, No. 22-631 (U.S. Jul. 2, 2024) ("***Highland I***") ("[Section] 524(e) does not permit absolving the non-debtor from any negligent conduct that occurred during the course of the bankruptcy absent another source of authority.") (citation omitted) (internal quotation marks omitted). In this vein, section 1103(c) of the Bankruptcy Code is widely recognized as a separate statutory basis for exculpation for creditors' committees. *See Bank of N.Y. Tr. Co. v. Off. Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 253 (5th Cir. 2009) (approving the exculpation of a creditors' committee and its members because section 1103(c) of the Bankruptcy Code implies "qualified immunity for [committee members'] actions within the scope of their duties").

90.     Most recently, in *Highland I* the Fifth Circuit expressly adopted and applied precedent providing qualified immunity to bankruptcy trustees[33] to exculpate certain non-debtors

---

[33]   *See, e.g.*, *Hilal v. Williams (In re Hilal)*, 534 F.3d 498, 501 (5th Cir. 2008) ("In this circuit, trustees cannot be subjected to personal liability for damages to the bankruptcy estate unless they are found to have acted with gross negligence.") (citation omitted); *Dodson v. Huff (In re Smyth)*, 207 F.3d 758, 762 (5th Cir. 2000) ("[W]e conclude that trustees should not be subjected to personal liability unless they are found to have acted with gross negligence.") (citation omitted); *Baron v. Sherman (In re Ondova Ltd.)*, 914 F.3d 990, 993 (5th Cir. 2019) ("We thus hold that bankruptcy trustees in the Fifth Circuit are entitled to qualified immunity for personal harms caused by actions that, while not pursuant to a court order, fall within the scope of their official duties.").

acting within the scope of duties of a trustee. *Highland I*, 48 F.4th at 436–37. Based on the facts and circumstances before it, the court in *Highland I* determined that in such capacity, (i) each of the three independent directors appointed as fiduciaries were properly exculpated by the Plan, and (ii) certain other non-debtor parties that were not acting in such a capacity could not be exculpated. *Id*. Citing section 1107(a) of the Bankruptcy Code, the court reasoned that "[l]ike a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee" and were therefore entitled to exculpation. *Id*. Following *Highland I*, this Court has consistently approved plan exculpation provisions that applied to independent directors. *See, e.g.*, *In re DocuData Solutions, L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (approving plan containing exculpation provision that applied to disinterested director); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596) (approving plan containing exculpation provision that applied to independent directors); *In re DRF Logistics, LLC*, No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) (Docket No. 530) (same).

91.     Here, the Exculpated Parties include the members of the Transformation Committee, each of whom has acted on the Debtors' behalf throughout these chapter 11 cases in a fiduciary capacity, with the same rights and powers as a bankruptcy trustee pursuant to section 1107(a) of the Bankruptcy Code. Indeed, the Transformation Committee has been instrumental throughout these chapter 11 cases, including by overseeing the Debtors' sale process and efforts to save their hospitals and other assets, negotiating the Global Settlement and FILO Settlement, both of which required extensive mediation, leading the Debtors in their ongoing efforts to monetize assets, defending and reconciling claims, cooperating with government investigations, and assisting the Debtors with prosecuting and confirming a chapter 11 plan. *See* Carr Decl. ¶ 60.

Thus, the rationale for granting exculpation to the directors for the *Highland I* debtors applies equally to the Transformation Committee members.

92.     As discussed in more detail below, the Court should reject the U.S. Trustee's objection and approve the Exculpation Provision as it is appropriate and consistent with *Highland I* and Fifth Circuit precedent.

**F.     *Injunction Provisions Are Appropriate and Should Be Approved***

93.     The Plan also provides for the injunction of certain actions as set forth in Section 12.5 of the Plan (the "**Injunction Provisions**").  The Injunction Provisions are appropriate because they comply with the Bankruptcy Code and are necessary to implement and enforce the Plan.

94.     As is common in chapter 11 plans in large chapter 11 cases, the Injunction Provisions permanently enjoin any Entity from commencing or continuing in any manner any claim that was released or exculpated under the Plan.  The Injunction Provisions also include a "gatekeeper" provision to implement the Plan's release and exculpation provisions which provides that, before any Claim or Cause of Action is brought against a Released Party or Exculpated Party, the Court must (i) determine, after notice and a hearing, that such Claim or Cause of Action is colorable and has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorize such person or entity to bring such Claim or Cause of Action (the "**Gatekeeper Provision**").  Notably, the Gatekeeper Provision in the Debtors' Plan only applies to Claims or Causes of Action against Released Parties to the extent they may be assertable by, or on behalf of, a Releasing Party.  In other words, the Gatekeeper Provision only applies to claims that are being consensually released under the Plan.  As discussed in more detail below, the Gatekeeper Provision is consistent with the

43

ones authorized by the Fifth Circuit in *Highland I* and in *In re Highland Cap. Mgmt., L.P.*, 132 F.4th 353 (5th Cir. 2025) ("***Highland II***")[34] and, more recently, by this Court in other cases.

95.     The Injunction Provisions are an integral component of the Plan, appropriate and necessary under the circumstances, consistent with the Bankruptcy Code, narrowly tailored, and compliant with applicable case law and precedent in the Fifth Circuit and, for the reasons set forth above, should be approved.

## III.     Plan Satisfies Bankruptcy Code's Requirements and Should Be Confirmed

96.     To achieve confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies section 1129 of the Bankruptcy Code by a preponderance of the evidence.  *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters.*, *Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[P]reponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 422 (Bankr. S.D. Tex. 2009); *In re J T Thorpe Co.*, 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).  The Plan satisfies all applicable requirements of section 1129 of the Bankruptcy Code and complies with all other applicable sections of the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules, and applicable nonbankruptcy law.

### A.     *Section 1129(a)(1) of the Bankruptcy Code: Plan Complies with Applicable Provisions of Bankruptcy Code*

97.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122

---

[34]     On May 29, 2025, the Supreme Court issued an order providing that the following the Fifth Circuit's *Highland II* decision was stayed pending further order of the Supreme Court.  *See Highland Cap. Mgmt., L.P., v. Nexpoint Advisors, L.P.*, No. 24-10534 (5th Cir. 2025) (Docket No. 110).  On June 9, 2025, the Supreme Court issued an order denying Highland Capital Management's application for a stay.  *See id.* (Docket No. 115).

and 1123 of the Bankruptcy Code governing classification of claims and contents of a plan, respectively. *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978).

### 1.  Section 1122:  Plan's Classification Structure is Proper

98.  Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).  A plan proponent is afforded "significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar."  *In re Idearc Inc.*, 423 B.R. 138, 160 (Bankr. N.D. Tex 2009); *see also Phx. Mut. Life Ins. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1278 (5th Cir. 1991) ("'[S]ubstantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."); *In re Sentry Op. Co. of Tex.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (noting that "[section] 1122 is permissive of any classification scheme that is not proscribed, and that substantially similar claims may be separately classified") (emphasis omitted); *In re Premiere Network Services, Inc.,* 333 B.R. 130, 133 (Bankr. N.D. Tex. 2005) (claims may be separated for "good business reasons."); *In re Heritage Organization, L.L.C.,* 375 B.R. 230 (Bankr. N.D. Tex 2007) (the "general rule" remains that "the division of creditors into classes under a plan of arrangement be according to the nature of the creditors' respective claims"); *In re Eagle Bus Mfg., Inc.*, 134 B.R. 584, 596 (Bankr. S.D. Tex. 1991) ("A classification scheme satisfies section 1122(a) of the Bankruptcy Code when a reasonable basis exists for the choices made and all claims within a particular class are substantially similar.").

99.  The classification structure of the Plan is rational and complies with the Bankruptcy Code.  The Plan provides for the separate classification of Claims and Interests based

upon the different legal nature and priority of such Claims and Interests, which classification generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or circumstances giving rise to such Claims and Interests. *See* Plan, Art. III. Within a given Class, all Claims and Interests have the same or similar rights against the Debtors. *See* Plan, Art. IV.

100. Here, the Plan provides for the following ten (10) Classes of Claims and Interests: (1) Class 1 (Other Priority Claims); (2) Class 2 (Other Secured Claims); (3) Class 3 (FILO Bridge Claims); (4) Class 4 (General Unsecured Claims); (5) Class 5 (PBGC Claims); (6) Class 6 (Intercompany Claims); (7) Class 7 (Subordinated Securities Claims) (8) Class 8 (Intercompany Interests); (9) Class 9 (Non-Debtor Owned Subsidiary Interests); and (10) Class 10 (Parent Interests).[35]

101. The Debtors have a reasonable and permissible basis for the differing classification of Class 2 (Other Secured Claims) and Class 3 (FILO Bridge Claims) which are comprised of dissimilar interests, given that Class 2 contains claims held by secured parties who are not the Debtors' prepetition funded secured debt lender, while Class 3 contains Claims held by the FILO Bridge Parties. *See* 1129 Decl. ¶ 31.

- *Class 2 (Other Secured Claims).* Class 2 is comprised of any Secured Claim other than an Administrative Expense Claim, a Priority Tax Claim, a FILO DIP Claim, or a FILO Bridge Claim. *See* Plan § 1.1.

- *Class 3 (FILO Bridge Claims).* Class 3 is comprised of all Claims held by a FILO Bridge Lender under the Bridge Credit Agreement, including, for the avoidance of doubt, the Remaining FILO Bridge Claims and Retained FILO Claims. *Id.*

---

[35] Administrative Expense Claims, Priority Tax Claims, FILO DIP Claims, and Professional Fee Claims have not been classified and are separately treated under the Plan.

102.  Similarly, the Debtors have a reasonable and permissible basis for the differing classification of each of the six (6) Classes of unsecured Claims:

- *Class 1 (Other Priority Claims).* Class 1 is comprised of any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. *See* Plan § 1.1.

- *Class 4 (General Unsecured Claims).* Class 4 is comprised of any Claim against any Debtor (including any prepetition Medical Liability Claim) that is not a Secured Claim, Priority Tax Claim, FILO DIP Claim, Professional Fee Claim, Other Priority Claim, Other Secured Claim, FILO Bridge Claim, PBGC Claim or Intercompany Claim and other than Intercompany Claims, any prepetition claim against a Debtor held by a non-Debtor that is a direct or indirect subsidiary of SHC Holdings. *Id.*

- *Class 5 (PBGC Claims).* Class 5 is comprised of the Claims of the PBGC. *See* Plan §§ 1.1, 4.5.

- *Class 6 (Intercompany Claims).* Class 6 is comprised of any pre- or postpetition Claim against a Debtor held by another Debtor or by a controlled non-Debtor direct or indirect subsidiary of SHC Holdings; *provided* that any Claim that TRACO may have against the Debtors shall not be considered an Intercompany Claim. *See* Plan § 1.1.

- *Class 7 (Subordinated Securities Claims).* Class 7 is comprised of Claims which are subject to subordination under section 510(b) of the Bankruptcy Code. *Id.*

103.  As shown above, each Class containing unsecured Claims is comprised of Claims arising under different facts and circumstances which evidence their different natures.  In particular, the Debtors established Class 5 due to the unique nature of the PBGC's claims, which have statutory joint and several liability against the Debtors which allows them to recover at a far more rapid rate than general unsecured creditors.  Due to the nature of these claims, the Debtors sought to resolve and have proposed as a part of the Plan the PBGC Settlement described in Section IV.B hereof, which as a result of extensive, arm's-length negotiations with the Creditors' Committee would resolve the issues unique to the PBGC Claims to the benefit of holders of

Allowed General Unsecured Claims, and is therefore separate classification is not only based on the nature of the claim, but valid business justifications. *See* 1129 Decl. ¶ 32.

104.    The Debtors also have a reasonable and permissible basis for the different classification of the three (3) Classes of Interests: Class 8 (Intercompany Interests), Class 9 (Non-Debtor Owned Subsidiary Interests), and Class 10 (Parent Interests) because each of these Classes relate to different Debtors or non-Debtors, as set forth below.

- ***Class 8 (Intercompany Interests).*** Class 8 is comprised of Interests in a Debtor held by another Debtor. *See* Plan § 1.1.

- ***Class 9 (Non-Debtor Owned Subsidiary Interests).*** Class 9 is comprised of Interests in Debtors (other than Parent Interests) that are owned by non-Debtors. *Id.*

- ***Class 10 (Parent Interests).*** Class 10 is comprised of Interests in SHC Holdings. *Id.*

105.    Therefore, the classification structure of the Plan is rational and complies with the Bankruptcy Code.  All Claims and Interests within a Class have the same or similar rights against the Debtors.  The Plan provides for the separate classification of Claims and Interests based upon the different legal nature and priority of such Claims and Interests.  The classification scheme generally tracks the Debtors' prepetition capital structure and divides the applicable Claims and Interests into Classes based on the underlying instruments, debts, or facts and circumstances giving rise to such Claims and Interests.    *See* 1129 Decl. ¶ 30.

106.    Nevertheless, certain parties have objected to confirmation of the Plan, arguing that the Plan cannot be confirmed on the basis that the Plan separately classifies the FILO Bridge Claims and PBGC Claims.  As set forth below, the classification of such claims is rational, based on the nature of the claims, and further supported by a valid business justification.  Accordingly, these objections should be overruled.

48

## 2. Section 1123(a): Plan's Content is Appropriate

107. Section 1123(a) of the Bankruptcy Code sets forth seven requirements that

a plan must satisfy. *See* 11 U.S.C. § 1123(a). The Plan satisfies each such applicable requirement:

- Section 1123(a)(1). Article III of the Plan designates Classes of Claims and Interests as required by section 1123(a)(1). In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, FILO DIP Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the classification of Claims and Interests set forth in Article III of the Plan.

- Section 1123(a)(2). Article III of the Plan specifies whether each Class of Claims or Interests is Impaired or Unimpaired under the Plan as required by section 1123(a)(2).

- Section 1123(a)(3). Article IV of the Plan specifies the treatment of any Class of Claims or Interests that is Impaired as required by section 1123(a)(3).

- Section 1123(a)(4). Article IV of the Plan provides that, except as otherwise agreed to by a holder of a particular Claim or Interest, each Claim or Interest of a particular class is provided the same treatment, as required by section 1123(a)(4).

- Section 1123(a)(5). The Plan provides adequate means for its implementation through, among other things, (i) the implementation of the FILO Settlement, pursuant to this Court's previous FILO Settlement Order, through the formation of the Litigation Trust and the appointment of the Litigation Trustee to pursue and resolve the Litigation Trust Assets, including the Litigation Trust Causes of Action (Plan, § 5.4); (ii) the funding of the Litigation Trust with the Litigation Funding (Plan, § 5.4); (iii) the formation of the Plan Trust and the appointment of the Plan Administrator Committee as the Plan Trustee to direct and control the wind down of the Debtors' estates (Plan, §§ 6.1, 5.10); (iv) the funding of the Plan Trust by the Litigation Trust of the Estate Funding (Plan, § 6.2); (v) the provision of certain transition services by the Plan Trust to the Litigation Trust (Plan, § 5.6); (vi) the compromise and settlement of Claims, Interests, and compromises (Plan, § 5.2); (vii) the Plan Settlement (Plan, § 5.3); (viii) the PBGC Settlement (Plan, § 4.5; (ix) preservation of certain Claims and Causes of Action (Plan, § 5.14); (x) procedures for resolving unliquidated Medical Liability Claims against the Debtors (Plan, Ex. D); (xi) provisions for resolving Disputed Claims (Plan, Art. IX); (xii) provisions governing distributions to creditors (Plan, Art. VIII); (xiii) procedures for assuming and assigning executory contracts and unexpired leases (Plan, Art. X); and (xiv) the Debtor Releases, Third-Party Releases, and Exculpation Provision (Plan, §§ 12.6, 12.7).

- Section 1123(a)(7). Section 6.3 of the Plan provides that the Plan Administrator Committee (composed of Monica Blacker, Alan J. Carr and William Transier) will serve as the Plan Trustee. Section 6.3(a) of the Plan provides that the Plan Trustee shall be the successor to and representative of the Estate of each of the Debtors within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code. The Plan Supplement provides that Mark Kronfeld of Province, LLC will serve as the Litigation Trustee. Section 7.3(a) of the Plan provides that upon the Litigation Trust Establishment Date, the Litigation Trustee, to the extent not previously appointed by the FILO Settlement Order, shall be appointed. Further, the Litigation Trust and the Litigation Trustee, as applicable shall be the exclusive administrators of the Litigation Trust Assets for purposes of pursuing the Retained Causes of Action.

108.    Accordingly, the Plan satisfies section 1123(a) of the Bankruptcy Code.

**3.    Section 1123(b):  Plan's Content is Permitted**

109.    Section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a plan.  Here, the relevant provisions of the Plan are permissible under section 1123(b),[36] as set forth in more detail below.

- Section 1123(b)(1). Pursuant to Article III of the Plan, Classes 1 (Other Priority Claims) and 2 (Other Secured Claims) are Unimpaired under the Plan, and Classes 3 (FILO Bridge Claims), 4 (General Unsecured Claims), 5 (PBGC Claims), 6 (Intercompany Claims), 7 (Subordinated Securities Claims), 8 (Intercompany Claims), 9 (Non-Debtor Owned Subsidiary Interests), and 10 (Parent Interests) are Impaired under the Plan.

- Section 1123(b)(2). The Plan provides for the rejection of the executory contracts and unexpired leases of the Debtors as of the Effective Date, unless such executory contract or unexpired lease (i) is specifically and expressly designated as a contract or lease to be assumed pursuant to the Plan, including as set forth in the Schedule of Assumed Contracts or Confirmation Order; (ii) was previously assumed or rejected by the Debtors pursuant to a Final Order of the Bankruptcy Court or assumed and assigned pursuant to pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a separate assumption or rejection motion filed by the Estate Representative on or before the Effective Date; (v) is the subject of a pending Cure Dispute; (vi) is a contract, lease, or other agreement or

---

[36]    Section 1123(b)(4), which authorizes the sale of substantially all of a debtor's property pursuant to a plan, is inapplicable here.

document entered into in connection with the Plan; or (vii) is a D&O Policy or other insurance policy to which any Debtor or Estate Representative is a beneficiary or an insured. *See* Plan, § 10.1(a).

- <u>Section 1123(b)(3)(A)</u>. As described above, the Settlements represent a good faith compromise and global settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that the parties to the Settlements may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. Additionally, as discussed in more detail above, the Debtor Releases, Third-Party Releases, Exculpation Provision, and Injunction Provisions are permitted pursuant to sections 105, 1103, 1107, 1123(b)(3)(A), 1123(b)(6), 1125(e), and/or 1141 of the Bankruptcy Code.

- <u>Section 1123(b)(3)(B)</u>. The Plan preserves and retains certain rights, claims, and Causes of Action of the Estates to be pursued by the Litigation Trust or the Plan Trust, as applicable, on behalf of the Debtors. *See* Plan §§ 5.14, 12.11.

- <u>Section 1123(b)(5)</u>. <u>Article III</u> of the Plan modifies the rights of holders of FILO Bridge Claims (Class 3), General Unsecured Claims (Class 4), PBGC Claims (Class 5), Intercompany Claims (Class 6), Subordinated Securities Claims (Class 7), and Intercompany Claims (Class 8), and leaves Unimpaired the rights of holders of Other Priority Claims (Class 1) and Other Secured Claims (Class 2).

- <u>Section 1123(b)(6)</u>. There are no provisions in the Plan that are inconsistent with the Bankruptcy Code. In accordance with section 1123(b)(6) of the Bankruptcy Code, <u>Article XII</u> of the Plan includes certain release, exculpation, and injunction provisions that are essential to the Plan and are consistent with the provisions of the Bankruptcy Code and Fifth Circuit precedent. *See id.*, at §§ 12.5–12.7.

110. Accordingly, each of the foregoing permissive provisions are consistent with section 1123(b) of the Bankruptcy Code. In addition, as discussed in more detail above, the Debtor Releases, Third-Party Releases, Exculpation Provision, and Injunction Provisions are permitted pursuant to sections 105, 1103, 1107, 1123(b)(3)(A), 1123(b)(6), 1125(e), and 1141 of the Bankruptcy Code and applicable law. *See supra* § II.

111.    For the foregoing reasons, the Plan complies fully with sections 1122 and 1123 of the Bankruptcy Code, and, therefore, satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**B.**      ***Section 1129(a)(2):  Debtors have Complied with Bankruptcy Code***

112.    Under section 1129(a)(2) of the Bankruptcy Code, "[t]he proponent of the plan [must] compl[y] with the applicable provisions of this title."  11 U.S.C. § 1129(a)(2).  The "applicable provisions" of the Bankruptcy Code have been interpreted to include, principally, sections 1125 and 1126 of the Bankruptcy Code.  *See, e.g.*, *Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 512 n.3 (5th Cir. 1998) (noting that section 1129(a)(2) includes requirement of compliance with section 1125); *In re Star Ambulance Serv. LLC*, 540 B.R. 251, 262 (Bankr. N.D. Tex. 2015) ("Courts interpret this language to require that the plan proponent comply with the disclosure and solicitation requirements set forth in Bankruptcy Code §§ 1125 and 1126.") (citation omitted).  Often, courts have also considered whether the debtor "is a proper debtor under [s]ection 109 of the Bankruptcy Code and a proper proponent of [a plan] under [s]ection 1121(a) of the Bankruptcy Code."  *J T Thorpe*, 308 B.R. at 786 (holding that debtor's compliance with sections 109, 1125, and 1126 satisfied requirements of section 1129(a)(2)); *see also Moody Nat'l*, 2010 WL 5116872, at *4 (same); *In re Harborwalk, LP*, Nos. 10-80043, 10-80044, 10-80045, 2010 WL 5116620, at *4 (Bankr. S.D. Tex. Oct. 25, 2010) (same).

**1.**      **Debtors Are Proper Debtors and Plan Proponents**

113.    Under section 109(a) of the Bankruptcy Code, "a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor . . . ."  11 U.S.C. § 109(a).  Further, "a person that may be a debtor under chapter 7 of [the Bankruptcy Code, with exceptions not applicable here] . . . may be a debtor under chapter 11 . . . ."

11 U.S.C. § 109(d). Each Debtor has a domicile, a place of business, and property in the United

States and is eligible for relief under chapter 7 of the Bankruptcy Code. *See* 1129 Decl. ¶ 38.

Therefore, each Debtor is a proper chapter 11 debtor.

### 2. Debtors Have Complied with Sections 1125 and 1127

114. Under section 1125(b) of the Bankruptcy Code:

> An acceptance or rejection of a plan may not be solicited after the
> commencement of the case under [the Bankruptcy Code] from a
> holder of a claim or interest with respect to such claim or interest,
> unless, at the time of or before such solicitation, there is transmitted
> to such holder the plan or a summary of the plan, and a written
> disclosure statement approved, after notice and a hearing, by the
> court as containing adequate information.

11 U.S.C. § 1125(b).

115. On June 2, 2025, the Bankruptcy Court entered the Disclosure Statement

Order, which conditionally approved the Disclosure Statement as containing "adequate

information" in accordance with section 1125(b) of the Bankruptcy Code and approved the

Solicitation Package. As detailed in the Solicitation Declaration, the Debtors solicited votes from

holders of Claims in the Voting Classes. In accordance with section 1125(b), the Debtors did not

solicit votes on the Plan until after the Disclosure Statement Order was entered.

116. In addition, the Debtors may make certain additional immaterial changes to

the Plan prior to or during the Combined Hearing pursuant to section 1127 of the Bankruptcy Code

and Bankruptcy Rule 3019. In accordance with Bankruptcy Rule 3019, these modifications will

not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation

of votes under section 1126 of the Bankruptcy Code. Further, these modifications to the Plan will

be consistent with section 1129 of the Bankruptcy Code.

117. Based on the foregoing, the Debtors have satisfied the requirements of

sections 1125 and 1127 of the Bankruptcy Code.

### 3. Debtors Have Complied with Section 1126

118.    Section 1126 of the Bankruptcy Code sets forth the procedures for soliciting votes on a chapter 11 plan and determining acceptance thereof.  Pursuant to section 1126 of the Bankruptcy Code, only holders of Allowed Claims or Interests that are Impaired and will receive or retain property under the Plan on account of such Claims or Interests may vote to accept or reject the Plan.  *See* 11 U.S.C. § 1126.

119.    As provided in the Solicitation Declaration, the Debtors solicited acceptances of the Plan from the Voting Classes, which included the holders of FILO Bridge Claims, General Unsecured Claims, and PBGC Claims.  In accordance with sections 1126(f) and 1126(g) of the Bankruptcy Code, the Debtors did not solicit acceptances of the Plan from holders of Claims and Interests in, as applicable, Other Priority Claims, Other Secured Claims, Subordinated Securities Claims, Non-Debtor Owned Subsidiary Interests, and Parent Interests because holders of such Claims and Interests are either Unimpaired and conclusively presumed to have accepted the Plan or are Impaired and deemed to reject the Plan.  The Debtors also did not solicit acceptances of the Plan from holders of Claims and Interests, as applicable, in Intercompany Claims or Intercompany Interests because holders of such Claims and Interests are either plan proponents or controlled by plan proponents and therefore are presumed to accept the Plan.

120.    Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject the plan:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

54

121. Similarly, Section 1126(d) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of interests entitled to vote to accept or reject the plan:

> A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(d).

122. As set forth in the Solicitation Declaration, with respect to each of the Debtors, the Plan has been accepted by at least two-thirds in amount and more than one-half in number of Claims in Class 5 (PBGC Claims). *See* Solicitation Decl., Ex. A. Notably, there is an impaired accepting Class at each Debtor, at least two impaired accepting Classes at 135 Debtors, and three impaired accepting classes at 69 Debtors. *See* Solicitation Decl., Ex. A. With respect to 99 of the Debtors, the Plan has been accepted by at least two-thirds in amount and more than one-half in number of Claims in Class 3 (FILO Bridge Claims). *See* Solicitation Decl., Ex. A. Holders in Class 4 (General Unsecured Claims) voted to *accept* the Plan at 105 of 167 Debtor entities.[37] *See* Solicitation Decl., Ex. A.

123. Based on the foregoing, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

---

[37] Holders in Class 4 (General Unsecured Claims) voted to *reject* the Plan at 62 of 167 Debtor entities (such rejecting Voting Classes, the "**Rejecting GUC Classes**"). *See* Solicitation Decl., Ex. A.

C.      **Section 1129(a)(3):  Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law**

124.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  Good faith is determined through consideration of whether the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."  *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).  The plan must also achieve a result consistent with the Bankruptcy Code.  *See In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991).  The good faith standard is "viewed in light of the totality of circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code to give debtors a reasonable opportunity to make a fresh start."  *In re Sun Country Dev.*, 764 F.2d at 408; *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 247 (5th Cir. 2013) ("Good faith should be evaluated 'in light of the totality of the circumstances' . . . mindful of the purposes underlying the Bankruptcy Code.") (citing *In re Cajun Elec. Power*, 150 F.3d at 519); *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 735 (Bankr. N.D. Tex. 2015) (finding that plan that is "the result of arm's-length discussions and negotiations among the Debtor [and other relevant parties and stakeholders] . . . clearly promotes the objectives and purposes of the Bankruptcy Code and is being proposed in good faith.").

125.    Here, the Plan has been proposed in good faith and for the legitimate purpose of winding down and liquidating the Estates and distributing any remaining proceeds in accordance with the Plan.  The Debtors engaged in extensive, arm's-length negotiations over the Plan with the FILO Parties and the Creditors' Committee, each of which is represented by experienced and sophisticated legal and other advisors, and such negotiations were with the assistance of mediator, the Honorable Marvin Isgur.  *See* 1129 Decl. ¶ 39.  The Plan preserves and

56

maximizes the value of the Debtors' remaining assets for the Estate. *See id.* The Plan provides for repayment of the Debtors' secured debt, repayment of administrative expense claims and priority claims, and the opportunity to provide meaningful recoveries to unsecured creditors.

126. Confirmation of the Plan provides numerous key benefits for the Debtors' estates, including (i) allowing the estate to maximize recoveries on account of its Class B Interests (as opposed to liquidating such interests expeditiously in a chapter 7 at a significant discount), (ii) a substantial reduction in costs necessary to administer the estates, (iii) streamlined governance (*i.e.*, the Plan Administrator Committee and Plan Trustee will administer the estates with the aid of a lower-cost financial advisor and counsel in accordance with a budget), (iv) $15 million in funding for the estate (which is only made available to the Debtors' estates upon confirmation of the Plan), including the $12.5 million for the Administrative Expense Claims Consent Program, (v) less expensive Litigation Funding[6] that will reduce the Class A-1 Interests that are senior to the Class B Interests under the Litigation Trust waterfall, and (vi) reduced priority liabilities (*i.e.*, if the Plan is confirmed, 37.5% of the "Post-FILO Repayment Variable Component" will be subordinated to administrative and priority claims under the Plan, rather than the entire "Post-FILO Repayment Variable Component" being paid in full in cash upon receipt of the applicable proceeds of the Litigation Trust assets if the Plan is not confirmed.). *See id.*

127. Furthermore, the Plan is not by any means forbidden by law, and indeed, is in full compliance with the Bankruptcy Code and applicable nonbankruptcy law. Accordingly, the Debtors have proposed the Plan in good faith in compliance with section 1129(a)(3) of the Bankruptcy Code.

**D.** **Section 1129(a)(4):  Plan Provides that Professional Fees and Expenses are Subject to Court Approval**

128.     Section 1129(a)(4) requires that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).  Section 1129(a)(4) has been construed to require that all payments of professional fees made from estate assets be subject to review and approval as to their reasonableness by the court.  *See In re Cajun Elec. Power*, 150 F.3d at 513-14; *see also In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting "there must be a provision [in the plan] for review by the Court of any professional compensation").  This is a "relatively open-ended standard" involving a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.  *See In re Cajun Elec. Power*, 150 F.3d at 517 (finding with respect to routine legal fees and expenses that have been approved, "the court will ordinarily have little reason to inquire further with respect to the amount charged").

129.     All payments for professional services provided to the Debtors during these cases that require Court approval will continue to be subject to such requirement through confirmation in accordance with section 1129(a)(4) of the Bankruptcy Code.  Specifically, Section 2.3 of the Plan provides that all fees of retained professionals accrued through confirmation must be approved by the Court pursuant to fee applications and according to the order approving procedures for the submission and approval of fee applications by professionals retained by the Debtors and Creditors' Committee in these chapter 11 cases (Docket No. 783).  Further, Section 13.1 of the Plan provides that the Court shall retain jurisdiction to "hear and determine all Fee

58

Claims." Plan, § 13.1(l). Accordingly, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

### E.  Section 1129(a)(5):  Debtors Have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders

130.     Section 1129(a)(5) of the Bankruptcy Code requires the plan proponent disclose the identity and affiliations of the proposed officers and directors of the debtors post-confirmation, that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and, to the extent that there are any insiders that will be retained or employed by the debtors post-confirmation, that there be disclosure of the identity and nature of any compensation of any such insiders.  11 U.S.C. § 1129(a)(5).

131.     The Debtors have satisfied the requirements under section 1129(a)(5) of the Bankruptcy Code through their disclosure that the Plan Administrator Committee (initially comprised of Monica Blacker, Alan Carr, and William Transier) shall serve as the Plan Trustee under the Plan.  *See* Plan § 6.3.  The members of the Plan Administrator Committee are competent, experienced professionals, familiar with the Debtors and their Estates, and well-equipped to assist with the wind down of the Debtors' estates.  Wiliam Transier and Alan Carr have served on the Transformation Committee since December 2023 and January 2024, respectively, and Monica Blacker, whose firm, Force Ten Partners, LLC, is being proposed to serve as the Plan Administrator Committee's financial advisor post-confirmation and has been working to familiarize herself with the Debtors operations, estates, and transition into such role.[38]  The Plan Supplement provides the identity and nature of the compensation of the Plan Administrator

---

[38]  *See Order (I) Authorizing the Debtors to Retain and Employ Force Ten Partners, LLC as Consultants Effective as of May 1, 2025, and (III) Granting Related Relief* (Docket No. 5413).

Committee.  *See* Plan Supplement, Ex. 6A, 6B, 6C. The Plan Supplement further provides that Mark Kronfeld of Province, LLC will serve as the Litigation Trustee and contains the nature of the compensation of the Litigation Trustee.  *See* Plan Supplement, Ex. 10.  Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

### F.    *Section 1129(a)(6):  Plan Does Not Contain Any Rate Changes*

132.    Section 1129(a)(6) of the Bankruptcy Code requires applicable government approval of "any rate change provided for in the plan."  *See* 11 U.S.C. § 1129(a)(6).  The Plan does not provide for rate changes by the Debtors.  *See* 1129 Decl. ¶ 43.  Accordingly, section 1129(a)(6) does not apply to the Plan.

### G.    *Section 1129(a)(7):  Plan Satisfies Best Interests Test*

133.    Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired claim or interest has either accepted the plan or will receive or retain property having, as of the effective date of the plan, a present value of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time—commonly referred to as the "best interests" test.  *See* 11 U.S.C. § 1129(a)(7).  The best interests test is satisfied where the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation are less than or equal to the estimated recoveries for a holder of an impaired claim or interest under the debtor's plan.  *Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Tex. Extrusion Corp.*, 844 F.2d 1142, 1159 n.23 (5th Cir. 1988) (noting that a bankruptcy court is required to determine whether impaired claims would receive no less under a reorganization than through a liquidation). A party's speculation that it would fare better in a hypothetical chapter 7 liquidation is insufficient to challenge a plan proponent's liquidation analysis.  *Block Shim*, 939 F.2d at 292.

60

134.    Here, the relative recoveries of holders of Impaired Claims or Interests under the Plan and in a hypothetical chapter 7 liquidation are set forth in <u>Exhibit C</u> to the Disclosure Statement (the "**Liquidation Analysis**") and more fully described in the Brown Declaration.  *See* Brown Decl. ¶ 4.  The best interests test is satisfied as to every single holder of a Claim against or Interest in the Debtors.  *See* Disclosure Statement, Ex. C; *see also* Brown Decl. ¶ 15.

135.    Specifically, the Debtors determined that (i) section 1129(a)(7) of the Bankruptcy Code does not apply to the holders of Claims in Classes 1 (Other Priority Claims), 2 (Other Secured Claims), 6 (Intercompany Claims), and 8 (Intercompany Interests) as they are Unimpaired and, therefore, are deemed to have accepted the Plan, (ii) the best interests test is satisfied with regard to the holders of Claims in Class 4 (General Unsecured Claims) and Class 5 (PBGC Claims) because holders of Allowed General Unsecured Claims and holders of Allowed PBGC Claims are expected to receive a higher recovery under the Plan than if the cases are converted to chapter 7, and (iii) the best interests test is satisfied with respect to Classes 7 (Subordinated Securities Claims), 9 (Non-Debtor Owned Subsidiary Interests), and 10 (Parent Interests) because there would be no recovery available to these Classes in either a chapter 7 or under the Plan.  *See* Brown Decl. ¶ 14.  Moreover, 100% of the holders of Claims in Class 3 (FILO Bridge Claims) and Class 5 (PBGC Claims) have voted to accept the Plan, satisfying the best interests test for Classes 3 and 5.  *Id.*; *see also* Solicitation Decl. Ex. A.  The Liquidation Analysis demonstrates that each holder of an Allowed Claim will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  *See* Brown Decl. ¶ 15.  Additionally, in a chapter 7 liquidation, given that

recoveries to holders of General Unsecured Claims is only between 0.5% and 5.6%, holders of Allowed Interests will receive no recovery. *Id.*

136. Therefore, the Plan satisfies the "best interests" test. The estimated calculations are set forth in the Disclosure Statement, Liquidation Analysis, the Brown Declaration, and are detailed below.[39]

| Liquidation Analysis - Summary of Debtors | | | | |
|---|---|---|---|---|
| *In $Thousands* | | Recovery $ Low | | Recovery $ High |
| Estimated Value of Class B Interests | | 97,544 | | 207,330 |
| **Total Distributable Assets** | $ | **97,544** | $ | **207,330** |
| | | | | |
| **Trustee Administrative Claims** | $ | 10,926 | $ | 16,220 |
| Trustee Administrative Recovery | | 10,926 | | 16,220 |
| *Trustee Administrative Recovery %* | | *100.0%* | | *100.0%* |
| | | | | |
| **Post-Petition Tax Claims** | $ | 24,461 | $ | 28,141 |
| Post-Petition Tax Recovery | | 19,723 | | 28,141 |
| *Post-Petition Tax Recovery %* | | *80.6%* | | *100.0%* |
| | | | | |
| **Pre-Conversion Administrative Claims** | $ | 126,000 | $ | 126,000 |
| Pre-Conversion Administrative Recovery | | 55,362 | | 80,674 |
| *Pre-Conversion Administrative Recovery %* | | *43.9%* | | *64.0%* |
| | | | | |
| **Priority Claims** | $ | 66,385 | $ | 28,857 |
| Priority Recovery | | - | | 611 |
| *Priority Recovery %* | | *0.0%* | | *2.1%* |
| | | | | |
| **General Unsecured Claims** | $ | 2,464,794 | $ | 1,465,685 |
| General Unsecured Recovery | | 11,533 | | 81,684 |
| *General Unsecured Recovery %* | | *0.5%* | | *5.6%* |

*See id.*

---

[39] The following table is a summary of the recoveries of Claims under the Liquidation Analysis. The Liquidation Analysis should be referred to for additional detail on the assumptions relied on and the facts underlying the recoveries in a chapter 7 liquidation for all Claims.

137.     The Liquidation Analysis represents an estimate of recovery values based upon a hypothetical liquidation of the Debtors and was prepared on an entity-by-entity basis. *Id.* ¶ 16.

138.     As set forth more fully below, and in the Brown Declaration and the Liquidation Analysis, converting these chapter 11 cases to chapter 7 would result in (i) a depletion in asset value and available funding, and (ii) an increase in expenses and Claims, both of which, and collectively, result in a reduction in recoveries to the Debtors' creditors.

139.     In a chapter 7 liquidation, the only assets available to administer the cases and for disposition by the Debtors' estates would be the Class B Interests and $6.5 million of cash. *See* Brown Decl. ¶¶ 10(a), 17; *see also* FILO Settlement Term Sheet ¶ 10(c); FILO Settlement Order ¶ 6 (approving the transfer of substantially all of the Debtors remaining assets to the Litigation Trust on the Litigation Trust Establishment Date and granting the Debtors' estates Class B Interests and $6.5 million in funding).  The Debtors' other assets have either been sold or otherwise liquidated during the chapter 11 cases or will be transferred to the Litigation Trust pursuant to the FILO Settlement Order.  As a result of the limited available assets, the Debtors' projected liquidity in a chapter 7 case, and the anticipated costs and expenses in chapter 7 (as discussed below), the Trustee would not have ready access to capital to fund the winddown of the estate and would need to quickly monetize the Class B Interests to cover estate claims and expenses.  Given this lack of liquidity, the Debtors anticipate that the Trustee would have to sell the estates' Class B Interests at a 50% discount to raise the liquidity necessary to service the estates' ongoing expenses, including income taxes that would become due following a chapter 7 conversion in or before December 2025.

140.     The Debtors determined that, subject to the assumptions and limitations described in the Liquidation Analysis, in a hypothetical chapter 7 liquidation of the Debtors' assets commencing on or about the Liquidation Date (*i.e.*, July 9, 2025), the estimated total distributable assets that would be available for the holder of Class B Interests (*i.e.*, the chapter 7 Trustee), ranges between $97.5 million and $207.3 million, compared to approximately $363 million of total distributable value under the Plan in the mid-recovery scenario.  *See* Brown Decl. ¶ 13; *see also* 1129 Decl., Ex. A.  As further discussed below, this estimated range is based upon the chapter 7 Trustee's interest in the Litigation Trust (*i.e.*, the estimated value of the Class B Interests in a chapter 7 case).

141.     Additionally, under the FILO Settlement Order, the FILO Parties have agreed to provide the Debtors' estates with $15 million of funding, which includes $12.5 million in funding for the Administrative Expense Claims Program to reduce and settle Allowed Administrative Expense Claims, *but only if* the Plan is confirmed, and therefore such funding would not be available if these cases convert to chapter 7.  *See* FILO Settlement Term Sheet ¶ 6.

## 1.     Additional Claims and Expenses

142.     Converting these chapter 11 cases to chapter 7 would also result in an increase in Administrative Expense Claims that would be senior in priority to pre-conversion administrative expense claims, priority claims, and general unsecured claims.

143.     ***First***, without the $12.5 million in funding for the Administrative Expense Claims Program (which is only made available to the Debtors' estates upon confirmation of the Plan), the Pre-Conversion Administrative Claims (as defined in the Liquidation Analysis) increase

by approximately $32.9 million ($20.4 million on account of voluntary claim reductions and $12.5 million on account of paydowns on such claims). *See* Brown Decl. ¶ 19.[40]

144.    ***Second***, if the Plan is not confirmed and the Plan Trust is not put in place on or prior to August 31, 2025, the Debtors will likely incur a material increase in postpetition administrative expense claims in connection with income tax claims for the Debtors' current tax year ending August 31, 2025. Specifically, if these cases convert to chapter 7, it is estimated that there could be incremental U.S. federal and state income tax claims of approximately $24.5–$28.1 million against the Debtors' estates for the Debtors' taxable year ending August 31, 2025, which would constitute administrative claims senior to "pre-conversion" administrative expense claims, priority claims, and unsecured claims. *See* 11 U.S.C. § 507(a)(1)(c); *see also* Brown Decl. ¶ 20; Liquidation Analysis. Post-petition income tax liabilities for such taxable year would be due and payable in or before December 2025. *See* Brown Decl., ¶ 20; Liquidation Analysis.

145.    Specifically, under the Plan, as a result of the transfer of the Debtors' remaining assets (including the Class B Interests) to the Plan Trust for the benefit of creditors on or before August 31, 2025 (the end of the Debtors' 2024-2025 taxable year), the Debtors are expected to be treated as having liquidated for U.S. federal and state income tax purposes, which, among other things, is expected to render immediately deductible certain previously capitalized expenditures. *See* Disclosure Statement § VI.A.1.; *see, e.g.*, Rev. Rul. 61-191, 1961-2 C.B. 251 (ruling that a corporation is liquidated when it "has disposed of all or most of its operating assets, terminated its business activities, and become a mere shell"). In contrast, if these chapter 11 cases

---

[40]    At the time of filing the Brown Declaration, the Consent Program Opt-Out Deadline had not yet occurred and the estimate included therein assumed the 75% participation threshold had been met, which would result in an increase in Pre-Conversion Administrative Claims by approximately $50 million ($38 million on account of voluntary claim reductions and $12.5 million on account of paydowns of such claims). However, given that approximately 39% of Administrative Expense Claims have not opted-out of the Administrative Consent Program, the increase in the Pre-Conversion Administrative Claims in a chapter 7 is approximately $32.9 million.

are converted to chapter 7, a trustee is unlikely to be able to achieve a deemed liquidation of the Debtors for U.S. federal income tax purposes by August 31, 2025. This is because the trustee not only would have to dispose of the Class B Interests by that date (which, consistent with the discussion above, would likely result in a lower amount of realized proceeds), but also reconcile all claims and distribute to creditors all proceeds and remaining assets by such date (other than, if necessary, the minimum amount of assets required to winddown the Debtor entities). *See, e.g.*, 26 CFR § 1.332-2(c) (describing the requirements for a corporate liquidation under an analogous provision, stating that "[l]iquidation is completed when the liquidating corporation and the receiver or trustees in liquidation are finally divested of all the property (both tangible and intangible)" and that "legal dissolution of the corporation is not required"); Rev. Rul. 74-462, 1974-2 C.B. 82 (ruling that a corporation was not de facto liquidated when it retained property to invest as a reserve against possible adverse judgments in pending lawsuits and defended against legal actions that were brought against it). The anticipated delay in the Debtors' tax liquidation to a subsequent taxable year in a chapter 7 is expected to cause, among other things, a corresponding delay in the Debtors' deduction of the above-mentioned capitalized expenditures that only become deductible upon the Debtors' liquidation. *See, e.g.*, 26 CFR § 1.263(a)-5(c)(4) (requiring capitalization of amounts paid to institute or administer a chapter 11 case); Rev. Rul. 77-204, 1977-1 C.B. 40 (ruling that expenses connected with a bankruptcy reorganization were required to be capitalized). Because of this and other factors relating to a post-August 2025 tax liquidation, a chapter 7 is expected to result in a material increase in the Debtors' income tax liability for their 2024-2025 taxable year.

146. ***Third***, the entire Post-FILO Repayment Variable Component[41] payable to the FILO Lenders under the FILO Settlement (which is expected to range in amount from $13.8 million to $25.0 million) will be required to be paid in full in cash upon receipt of the applicable proceeds for the Litigation Trust assets in a chapter 7, rather than 37.5% of the Post-FILO Repayment Variable Component being subordinated to administrative expense claims and priority claims if a chapter 11 plan is confirmed. *See* Liquidation Analysis; *see also* Litigation Trust Agreement § 4.3(c). Hence, in a chapter 7, the costs of litigation financing that must be paid before administrative and priority claims are paid will be significantly increased.

147. ***Fourth***, any liquidation proceeds in a chapter 7 would be reduced by certain costs, including fees for the Trustee (a 3% fee on gross proceeds), the Trustee's professionals, and general inefficiencies caused by suddenly transferring the estate to a new party without access to liquidity or institutional knowledge of the Debtors (including their approximately 25 remaining employees, Transformation Committee members, and existing professionals, who have been supporting the transition of day-to-day administration of the Debtors' estates to new lower cost professionals). Such costs of the Trustee and the Trustee's professionals are payable prior to any distributions that will be made to the Debtors' creditors. *See* 11 U.S.C. § 507(a)(1)(c); *see also* 11 U.S.C. § 348(d) ("A claim against the estate or the debtor that arises after the order for relief but before conversion in a case that is converted under section 1112 . . . of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition."); *In re Simbaki, Ltd*, No. 13-36878, 2015

---

[41] As described in the FILO Settlement Term Sheet, after repayment of the FILO Balance, the Variable Component shall continue to be entitled to a percentage of the gross litigation proceeds (i) at the Upfront Percentage only (*i.e.*, 15%) if the FILO Balance is repaid in full in cash on or before October 1, 2026 or (ii) at 20% if the FILO Balance is not repaid in full in cash on or before October 1, 2026, in each case, subject to the Reduced Variable Component adjustment (the "**Post-FILO Repayment Variable Component**").

WL 1593888, at *4 (Bankr. S.D. Tex. Apr. 3, 2015) ("Section 348(d) provides that post-petition, pre-conversion claims lose their priority over post-petition, post-conversion claims."); *In re Bella Logistics LLC*, 583 B.R. 674, 682 (Bankr. W.D. Tex. 2018) ("Further, because this case has been converted to chapter 7, CIT's allowance, like all pre-conversion administrative expenses allowed under § 503(b), is subordinated to post-conversion administrative expenses allowed under § 503(b). *See* 11 U.S.C. § 726(b)."); *Matter of Peach State Ambulance, Inc.*, No. 16-12121-WHD, 2017 WL 2222236, at *4 (Bankr. N.D. Ga. May 19, 2017) ("However, in a case converted to Chapter 7 from some other chapter, administrative expenses incurred after the conversion have priority over administrative expenses incurred prior to the conversion.").

148.    The Liquidation Analysis provides a fair and reasonable assessment of the effects that a conversion of the Debtors' chapter 11 cases to cases under chapter 7 would have on the proceeds available for distribution to holders of Claims and Interests.  *See* Brown Decl. ¶ 21. Furthermore, the assumptions and methodology used to prepare the Liquidation Analysis, including assuming the Trustee would have to sell the Class B Interests at a 50% discount, are reasonable, justified, and consistent with Mr. Brown's experience as a restructuring advisor and reflect a standard and well-recognized approach.  *See* Brown Decl. ¶¶ 10-11.  As this Court has explained:

> [A] chapter 7 liquidation would increase the administrative costs of the Bankruptcy Cases and adversely affect the ultimate proceeds available for distribution to all holders of Allowed Claims in the Bankruptcy Cases and the Debtors' [post-effective] date operations. Moreover, the increased costs associated with a liquidation under chapter 7 would further reduce the proceeds available for distribution.  These costs would include, among other things, administrative fees and costs payable to a trustee in bankruptcy and professional advisors to such trustee.
>
> . . . The Bankruptcy Court here considers, *inter alia:* (1) the problems associated with the quick sale of assets as contemplated in

68

chapter 7; (2) the limitations of section 721 of the Bankruptcy Code; and (3) loss of value through passage of time.

*Pisces Energy*, 2009 WL 7227880, at *12 & n.7 (holding that plan satisfied best interests test); *accord In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252–58 (Bankr. S.D.N.Y. 2007) (considering, among other things, costs of regulatory compliance, administrative costs of one or more chapter 7 trustees and their professionals; a trustee's lack of familiarity with debtors' business; potential for delays in claim and interest holders' receipt of distributions; and likelihood that chapter 7 trustees would adopt settlements embodied in plan), *appeal dismissed*, 371 B.R. 660 (S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008).

149.    Moreover, the 50% discount is based on reasonable, justified, and widely accepted assumptions regarding a chapter 7 trustee's ability to liquidate the Debtors' assets and the values that such sales would be likely to produce.  As the Southern District of Texas has reasoned:

> The additional costs of three chapter 7 trustees, the short time allowed a plain liquidation, the potential for more claims to be filed against the estates, and the loss of knowledge and momentum . . . about the management of these assets would combine to reduce significantly the cash to be realized by the estates from these assets. The lower prices from the liquidation are reasonable.

*MCorp Fin*, 160 B.R. 941, 961 (S.D. Tex. 1993) (confirming chapter 11 plan); *see also, e.g., In re Exco Res., Inc., et al.*, Case No. 18-30155 (MI) (Docket No. 1831 at Exhibit D) (liquidation analysis assuming estimated recovery range of between 45% and 50% due to the accelerated timeframe of a proposed sale); *In re Core Sci., Inc.*, Case No. 23-90341 (CML) (S.D. Tex. Jan. 12, 2024) (Docket No. 1718) (assuming between approximately $314.2 million and $573.8 million of net liquidation proceeds available for distribution in a chapter 7 compared to approximately $1.06 billion of total distributable value under the chapter 11 plan (a 68.8% to 43% reduction in distributable value)).

69

### 2.      The Objections to the Liquidation Analysis Lack Merit

150.      The Commonwealth, TRACO, and the DCP Participants object to the Plan, arguing that the Plan does not satisfy the best interests test.  However, each of the objectors arguments regarding why the Debtors do not satisfy the best interests test fail.

151.      TRACO and the Commonwealth argue that the Debtors have not demonstrated the Plan satisfies the best interests test because the Liquidation Analysis is based on the assumption that the FILO Settlement will be effective—*i.e.*, that the FILO Settlement Order will not be overturned on appeal.  TRACO Obj. (Docket No. 5335) ¶ 50; Commonwealth Obj. ¶ 48.  First, as this Court found in denying the Commonwealth's motion for a stay pending appeal (Docket No. 5126), an appeal of the FILO Settlement Order is not likely to succeed on the merits as this Court has not made any "mistake of law or erroneous factual finding."  (Docket No. 5177).  Moreover, courts have found that the best interests test is satisfied, even where plan proponents assume a settlement will occur in the chapter 7 context as well.  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 255 (Bankr. S.D.N.Y. 2007) ("It is much more likely that taking into account the complexity and expense of litigating the MIA and the risk of protracted litigation, the chapter 7 trustee for the ACC estate will adopt the Settlement, concluding, as I do, that it is in the best interests of the ACC estate and its creditors.").  Moreover, to date the objecting parties have been unsuccessful in their attempt to stay the FILO Settlement Order and the FILO Settlement is set to be implemented on the earlier of July 16, 2025 and one business day following confirmation of the Plan.  *See* Stipulation and Agreed Order Extending Litigation Trust Establishment Date (Docket No. 5388) ¶ 1.

152.      TRACO also incorrectly claims the Debtors have provided "no explanation for why the path proposed in the Plan is preferrable to the conversion to chapter 7[.]"  TRACO Obj. ¶ 51.  As described in the Plan, the Disclosure Statement, at the hearing on the FILO

Settlement and conditional approval of the Disclosure Statement, and herein, there are many factors that make the Debtors' Plan preferable to a chapter 7 liquidation, including the additional costs incurred in a chapter 7 scenario and the funds provided to the estate under the Plan and FILO Settlement that would not be available in a chapter 7.

153.    The balance of the Commonwealth's arguments that the Debtors fail to satisfy the best interests standard are premised on the notion that the Debtors' Liquidation Analysis makes assumptions that the Commonwealth either disagrees with or does not properly understand.[42]    However, the Debtors' assumptions are reasonable[43] and each of the Commonwealth's assumptions/challenges are faulty for the following reasons:

- **_First_**, the estimated value of the Class B Interests is based on the Debtors' reasonable estimate of distributable proceeds from the monetization of the assets in accordance with the waterfall set forth in the Litigation Trust Agreement.  As set forth in the Brown Declaration, proceeds will first be distributed to holders of Class A-1 Interests, Class A-2 Interests, and then Class B Interests.  Brown Decl. ¶ 9.  Moreover, the estimated value of the assets that the Litigation Trustee will monetize are further described in the Feasibility Declaration.  As discussed herein, the Liquidation Analysis assumes the chapter 7 trustee will then need to quickly sell the Class B

---

[42]    Specifically, the Commonwealth argues that the Liquidation Analysis is "flawed" because it (i) ascribes value to the Class B Interests "without any explanation;" (ii) ignores the fees of the Litigation Trustee and Plan Trustee while including "the possible fee of [a] chapter 7 trustee[;]" (iii) includes a post-conversion tax claim of approximately $25 million that will accrue in a chapter 7 and "assumes a treatment of such claims that is different from the treatment of other non-professional administrative claims;"(iv) ignores approximately $7 million available to satisfy post-petition medical malpractice claims; (v) assumes that holders of General Unsecured Claims will receive distribution before holders of Priority Claims; and (vi) assumes an increase in Administrative Expense Claims because there will be no Administrative Expense Claims Consent Program in a chapter 7. Commonwealth Obj. (Docket No. 5334) ¶ 48.

[43]    The Debtors' chapter 7 analysis makes reasonable assumptions.  The chapter 7 analysis "exercise is hypothetical and valuation evidence is often replete with assumptions and judgments."  *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297–98 (Bankr. S.D.N.Y. 1990); *In re PC Liquidation Corp.*, 383 B.R. 856, 867–68 (E.D.N.Y. 2008) (declining to overturn bankruptcy court's acceptance of a liquidation analysis despite creditor's argument that it was clearly erroneous because "it required the acceptance of a series of highly unlikely assumptions, none of which were subject to proof, concerning the cost of going forward under the Plan."); *In re Boteilho Hawaii Enters., Inc.*, No. 22-00827, 2023 WL 7411176, at *9 (Bankr. D. Haw. Nov. 8, 2023), *aff'd but criticized*, No. BAP HI-23-1186-BSG, 2024 WL 4143933 (B.A.P. 9th Cir. Sept. 11, 2024) ("A hypothetical liquidation 'entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7'") (quoting *In re Sierra-Cal*, 210 B.R. 168, 172 (Bankr. E.D. Cal. 1997)).

Interests given the limited cash on hand and available liquidity and assumes a very conservative discount of 50%. *See supra* ¶ 148.

- **Second**, the Liquidation Analysis does not "ignore" the costs and expenses associated with the Plan Trustee and Litigation Trustee. Rather the estimated total distributable value as outlined in the Feasibility Declaration takes into account costs of both the Litigation Trustee and Plan Trustee. Feasibility Decl. Ex. A; Plan Supplement, Ex. 5.

- **Third**, the estimated post-conversion administrative and priority taxes of $25 million is supported, as discussed above. *See supra* ¶¶ 144-145.

- **Fourth**, the Commonwealth's assertion that the Liquidation Analysis fails to account for the $7 million available to satisfy postpetition Medical Liability Claims reflects a misunderstanding of the Physician Insurance Account (as defined below). Pursuant to the FILO DIP Order (Docket No. 1538), the funds in the Debtors' Physician Insurance Account are exclusively available for (i) the payment of medical professional liability claims against physicians (each, a "**Covered Physician**") covered by, and in accordance with the terms of, the Captive Insurer Program (as defined in the motion filed at Docket No. 6) that arise on or after the Petition Date (each, a "**Covered Claim**") and (ii) any cost of defending a Covered Physician against a Covered Claim in accordance with the terms of the Captive Insurer Program (such account, the "**Physician Insurance Account**"). It would therefore be inconsistent with the terms of the FILO DIP Order to include funds from the Physician Insurance Account in the Liquidation Analysis as such funds are not intended to cover claims against the Debtors. Moreover, upon payment in full of Covered Claims, any amounts remaining in the Physician Insurance Account will be transferred to the Litigation Trust. Plan § 5.5(x).

- **Fifth**, the Liquidation Analysis does not assume that holders of General Unsecured Claims will receive distributions *before* holders of Priority Claims. *See* Brown Decl. ¶ 15 (reflecting the order of priority of payment of claims in a chapter 7 where Priority Claims are senior in priority to General Unsecured Claims).[44]

---

[44] As set forth in the Brown Declaration, the consolidated recoveries to holders of Priority Claims is less than that of holders of General Unsecured Claims because the Priority Claims are asserted on an entity-level basis and not every Debtor is expected to have an Allowed Priority Claim asserted against it. *See* Brown Decl. ¶ 14, n.5 ("Additionally, Priority Claims consist of certain pre-petition tax claims under section 507(a)(8) of the Bankruptcy Code, that are asserted on an entity-level basis. Not every Debtor is expected to have an Allowed Priority Claim against it (the "**No Priority Class Debtors**"). Certain of the No Priority Class Debtors have assets, the estimated value of which, exceeds the estimated Allowed Administrative Claims asserted against such entity. Accordingly, in such instances, holders of General Unsecured Claims at the applicable No Priority Class Debtor are estimated to receive higher recoveries than holders of Priority Claims at other Debtors that are not No Priority Class Debtors.").

- **Sixth**, the Debtors' assumption that there would be a greater quantum of Administrative Expense Claims in a chapter 7 scenario than there would be under the Plan (which provides the benefit of the Administrative Expense Claims Consent Program), is correct.  The $15 million of funding for the Debtors under the Plan, including the $12.5 million in funding for an Administrative Expense Claims Program, is only available from the FILO Secured Parties if the Plan is confirmed.  If the Plan is not confirmed and the Administrative Expense Claims Program is not implemented, the Pre-Conversion Administrative Expense Claims would increase by approximately $32.9 million if the cases are converted to chapter 7.

154.    The DCP Participants assert that chapter 7 is superior because there would be no releases of estate causes of action.  However, as set forth in the Carr Declaration, the Debtors' proposed releases of estate claims and causes of action are narrow and appropriately limited so that they do not release any claims of value.  *See* Carr Decl. ¶¶ 51-65.

155.    Accordingly, the Debtors' assumptions and estimates used in the Liquidation Analysis are reasonable, justified, and appropriate.  Because each holder of a Claim in an impaired Class will receive a distribution under the Plan greater than or equal to what such holder would receive in a hypothetical chapter 7 liquidation, the Plan complies with section 1129(a)(7) of the Bankruptcy Code.  *See* Brown Decl. ¶¶ 14-15.

### H.    *Section 1129(a)(8):  Plan Has Been Accepted by Impaired Voting Class*

156.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan.  11 U.S.C. § 1129(a)(8).  Section 1126(c) of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-thirds in amount and more than one-half in number of the claims voted in their respective class.  11 U.S.C. § 1126(c).

157.    As set forth above, Class 5 (PBGC Claims) voted to accept the Plan at each Debtor entity.  Class 3 (FILO Bridge Claims) voted to accept the Plan at the 99 Debtor entities at which such Class held Claims.  Class 4 (General Unsecured Claims) voted to *accept* Plan at 105

73

of 167 Debtor entities.  At the 62 Debtor entities for which the Class 4 (General Unsecured Claims) voted to reject the Plan,  either (i) Class 3 (FILO Bridge Claims) voted to accept the Plan, (ii) Class 5 (PBGC Claims) voted to accept the Plan, or (iii) both Class 3 (FILO Bridge Claims) and Class 5 (PBGC Claims) voted to accept the Plan.  Holders of Claims or Interests, as applicable, in Class 1 (Other Priority Claims) and Class 2 (Other Secured Claims) are Unimpaired and, therefore, are conclusively presumed to accept the Plan.  Holders of Claims in Class 7 (Subordinated Securities Claims), Class 9 (Non-Debtor Owned Subsidiary Interests), and Class 10 (Parent Interests) will not receive or retain any property on account of their Claims, and as such, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Claims in Class 6 (Intercompany Claims) and Class 8 (Intercompany Interests) are either plan proponents are controlled by plan proponents and, therefore, are conclusively presumed to accept the Plan.

158.    As discussed more fully below, the Debtors have satisfied the "cram down" requirements under section 1129(b) of the Bankruptcy Code and may obtain confirmation of the Plan notwithstanding the rejection by the Rejecting GUC Classes, Class 7 (Subordinated Securities Claims), Class 9 (Non-Debtor Owned Subsidiary Interests) and Class 10 (Parent Interests).

**I.**    ***Section 1129(a)(9):  Plan Provides for Payment in Full of All Allowed Priority Claims***

159.    Consistent with section 1129(a)(9) of the Bankruptcy Code, the Plan expressly provides that:

- On, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, (ii) the first Business Day after the date that is forty-five (45) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, and (iii) the next Plan Distribution Date after such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, distributions to holders of Allowed Administrative Expense Claims shall have commenced, with each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) to receive, in full and final satisfaction,

74

settlement, release, and discharge of such Claim, (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.  Plan § 2.1.

- Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Allowed Priority Tax Claim at the option of the Estate Representative (in consultation with the Creditors' Committee), either: (i) Cash in an amount equal to such Allowed Priority Tax Claim on the latest of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date; (b) the first Business Day after the date that is forty-five (45) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim; (c) the next Plan Distribution Date after such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (d) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date (provided that the Estate Representative reserves the right to prepay all or a portion of any Allowed Priority Tax Claim at any time under this option without penalty or premium); or (iii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.  Plan § 2.4.

- Except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment of such Claim in full and final satisfaction, settlement, release, and discharge of such Allowed Other Priority Claim, each such holder shall receive: (i) payment in full in Cash in an amount equal to such Claim, payable on the later of (x) forty-five (45) calendar days after the Effective Date, (y) the first Business Day after forty-five (45) days from the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, and (z) the next Plan Distribution Date after such Other Priority Tax Claim becomes an Allowed Other Priority Claim, or as soon as practicable thereafter; or (ii) such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired.  Plan § 4.1.

160.    Accordingly, the Plan complies with section 1129(a)(9) of the Bankruptcy Code.  Nevertheless, certain parties have objected to confirmation of the Plan, arguing that the Plan cannot be confirmed because the Debtors project that the Effective Date will occur in early 2027.  As set forth below, an executory period between confirmation and effectiveness is commonplace, and the period of time between the Confirmation Date and the anticipated Effective

Date is appropriate in these circumstances and does not render the Plan unconfirmable. Accordingly, these objections should be overruled.

### J. Section 1129(a)(10): At Least One Class of Impaired Claims Has Accepted Plan

161.    Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  Here, there is an impaired accepting Class at each of the 167 Debtor entities, at least two impaired accepting Classes at 134 Debtors, and three impaired accepting classes at 69 Debtors.  *See* Solicitation Decl. Ex. A.  Thus, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

### K. Section 1129(a)(11): Plan is Feasible

162.    Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, ***unless such liquidation or reorganization is proposed in the plan***.

11 U.S.C. § 1129(a)(11) (emphasis added).

163.    In the context of a liquidating plan, some courts have interpreted section 1129(a)(11) of the Bankruptcy Code to mean that a plan that provides for liquidation automatically satisfies § 1129(a)(11).  *See In re Cypresswood Land Partners, I*, 409 B.R. 396, 432 (Bankr. S.D. Tex. 2009) ("Some courts interpret [1129(a)(11)] to mean that a plan that provides for liquidation automatically satisfies section 1129(a)(11)"); *In re Heritage Organization, L.L.C.*, 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007) ("Several courts take a narrow approach and interpret the plain language of § 1129(a)(11) to say that feasibility need not be established when liquidation is proposed in the plan."); *In re 47th and Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo.

1988) (stating that "feasibility, under the literal wording of §1129(a)(11) of the Bankruptcy Code, is unnecessary to be shown when 'liquidation . . . . is proposed in the plan.'"); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) ("The feasibility test has no application to a liquidation plan."); *see also In re SPC Seller*, No. 09-12647, 2010 Bankr. LEXIS 5321, at *22 (Bankr. D. Del. Dec. 8, 2010) (finding that "[b]ecause the [p]lan is a plan of liquidation, pursuant to 1129(a)(11), the [p]lan is feasible"); *In re ie Corp.*, No. 10-11061 (PJW), 2010 Bankr. LEXIS 5867, at *17 (Bankr. D. Del. Oct. 27, 2010) (finding that the debtor's liquidation plan satisfied section 1129(a)(11) of the Bankruptcy Code and was feasible because the plan provided for liquidation and distribution of the debtor's assets).

164.    Other courts hold that a liquidation plan does not automatically satisfy § 1129(a)(11).  *See In re Holmes*, 301 B.R. 911, 914 (Bankr. M.D. Ga. 2003) (indicating that "a planned liquidation does not create an exception to the feasibility requirement").  However, courts recognize that the feasibility analysis differs when assessing a liquidating plan and inquire whether the liquidation proposed in the plan is itself feasible.  *See In re Two Sts., Inc.*, 597 B.R. 309, 317 (Bankr. S.D. Miss. 2019) (stating that "[t]he focus of the analysis is whether the liquidation itself, as proposed in the plan, is feasible").

165.    Certain other courts have evaluated feasibility under both approaches.  *See, e.g.*, *In re Cypresswood*, 409 B.R. at 432 (explaining that some courts interpret the language of section 1129(a)(11) to mean that a plan that provides for liquidation automatically satisfies section 1129(a)(11) while others inquire whether the liquidation proposed in the plan is feasible and finding that the proposed liquidating plan satisfied both approaches); *In re PC Liquidation Corp.*, No. 05-89022-288, 2006 Bankr. LEXIS 4638, at *9 (Bankr. E.D.N.Y. Nov. 13, 2006) (finding that the plan was feasible under section 1129(a)(11) because "the conditions precedent to confirmation

have been or will be satisfied, and the estate otherwise will have sufficient funds to meet the obligations under the Plan with respect to the payment of Allowed Claims pursuant to the terms of the Plan. Further, the Plan is a plan of liquidation so feasibility is not an issue"); *In re Nailite Int'l*, No. 09-10526, 2009 Bankr. LEXIS 4878, at *12-13 (Bankr. D. Del. Dec. 8, 2009) (finding that, "[b]ecause the [plan] is a plan of liquidation, pursuant to section 1129(a)(11), the [plan] [was] feasible," and that because certain articles of the plan provided for "the means for implementing the [plan] and demonstrate[d] the [d]ebtor's ability to make the payments anticipated [under the plan]," the plan "satisfie[d] the requirements of section 1129(a)(11) of the Bankruptcy Code").

166.     To the extent applicable to liquidating plans, the feasibility test generally requires the Court to determine whether the Plan can be implemented and has a reasonable likelihood of success. To be clear, feasibility does not require guaranteed success. *See In re Pearl Resources LLC*, 622 B.R. 236, 263 (Bankr. S.D. Tex. 2020) ("Under the feasibility standard, a debtor must demonstrate that its plan offers a reasonable possibility of success by a preponderance of the evidence. This court need not require a guarantee of success."). "To establish the feasibility of a plan, [a] debtor must present proof through reasonable projections that there will be sufficient cash flow to fund the plan." *In re Idearc Inc.*, 423 B.R. at 167.

167.     The Debtors must demonstrate satisfaction of § 1129(a)(11) by a preponderance of the evidence. *See In re Briscoe Enters., Ltd. II*, 994 F.2d 1160, 1165 (5th Cir. 1993). In the context of a liquidating plan, this is a relatively low threshold. *See In re Brotby*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003) ("The Code does not require the debtor to prove that success is inevitable. . . [A] relatively low threshold of proof will satisfy § 1129(a)(11), so long as adequate evidence supports a finding of feasibility.") (citing *In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or. 2002) and *In re Sagewood Manor Assocs. Ltd.*, 223 B.R. 756, 762 (Bankr. D. Nev.

1998)); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 202 (Bankr. S.D.N.Y. 2009), aff'd, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), aff'd in part, rev'd in part, 627 F.3d 496 (2d Cir. 2010); *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) ("[I]t is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous.").

168.    The determination of whether a liquidation plan is feasible requires a showing that the plan has a "reasonable assurance of commercial viability."  *See In re T-H New Orleans L.P.*, 116 F.3d 790 (5th Cir. 1997) ("In determining whether a debtor's Chapter 11 plan of reorganization is feasible. . . .'the [bankruptcy] court need not require a guarantee of success. . . . [o]nly a reasonable assurance of commercial viability is required.'") (quoting *In re Briscoe Enter., Ltd., II*, 994 F.2d at 1165-66; *In re Northbelt, LLC*, 630 B.R. 228, 279 (Bankr. S.D. Tex. 2020) ("The court need not require a guarantee of success.  Essentially, Debtor must be able to show that it can accomplish what it proposes to do, in the time period allowed, and on the terms set forth in the plan.").

### 1.    The Plan is Feasible

169.    The Plan is a liquidating chapter 11 plan and, thus, satisfies the plain text of section 1129(a)(11) under the "automatic" feasibility approach.

170.    Under the alternative approach, the Plan also satisfies the feasibility requirements of section 1129(a)(11).  The evidence will show that the Plan can be implemented and has a reasonable likelihood of success, including that the Debtors will have sufficient funds to meet their post-Confirmation Date obligations to pay for the ongoing costs of administering and

consummating the Plan (including satisfying all Allowed Secured Claims, Administrative Expense Claims, and Priority Claims).[45]

171.    The following section (a) summarizes (i) the Debtors' current estimate of Claims required to be paid by the Effective Date, (ii) the Debtors' estimate of funds available to administer and consummate the Plan, including current cash and expected available proceeds from the Debtors' various assets, including litigation claims and causes of action, and (b) outlines the Debtors' conclusion that they will be able to satisfy all Allowed Secured Claims, Administrative Expense Claims, and Priority Claims under the Plan, and why objections to the Debtors' ability to satisfy such claims should be overruled.  As set forth below, the Debtors project satisfying all Allowed Secured Claims, Administrative Expense Claims, and Priority Claims and distributing more than $235 million to general unsecured creditors under the Plan.[46]  In other words, the Debtors project a cushion of $235 million for purposes of going effective.

| Feasibility Analysis (Midpoint Recovery Scenario) | | | | | | |
|---|---|---|---|---|---|---|
|  | **H2 2025** | **FY 2026** | **FY 2027** | **FY 2028** |  | **Total** |
| **Annual Cash Flows - Receipts** | | | | | | |
| Total Non-Litigation Assets | $ 40.2 | $ 6.3 | $ - | $ - |  | $ 46.4 |
| Total Litigation Proceeds, Net | $ 88.6 | $ 351.7 | $ 201.3 | $ 76.0 |  | $ 717.6 |
| Litigation Funding Variable Component | $ (16.6) | $ (40.0) | $ (19.7) | $ (10.0) |  | $ (86.3) |
| Net Cash from Asset Monetization | $ 112.2 | $ 317.9 | $ 181.6 | $ 66.0 |  | $ 677.7 |
| Total Expenses | $ (28.7) | $ (19.5) | $ (5.5) | $ (2.0) |  | $ (55.7) |
| Net Cash Flow Before Debt Repayment | $ 83.5 | $ 298.4 | $ 176.2 | $ 64.0 |  | $ 622.0 |
| **Annual Cash Rollforward** | | | | | | |
| Beginning Cash | $ 4.5 | $ 8.8 | $ 122.9 | $ 194.0 |  |  |
| (+/-) Net Cash Flow | 83.5 | 298.4 | 176.2 | 64.0 |  | 622.0 |
| (-) Paydown of Class A Interests | (79.2) | (184.4) | – | – |  | (263.5) |
| (-) Estimated Allowed Administrative Expense Claims | – | – | (84.2) | – |  | (84.2) |
| (-) Estimated Allowed Priority Claims | – | – | (11.3) | (22.7) |  | (34.0) |
| (-) Transaction Fees | – | – | (9.5) | – |  | (9.5) |
| **Ending Cash** | $ 8.8 | $ 122.9 | $ 194.0 | $ 235.3 |  |  |

---

[45]    *See* Feasibility Decl. ¶¶ 5-25, 47-51; 1129 Decl. ¶ 54.

[46]    *See* 1129 Decl., Ex. A.

(i)     **Debtors' Estimate of Secured Claims, Administrative Expense Claims, and Priority Claims**

172.     For purposes of determining that the Debtors will be able to satisfy the conditions to effectiveness of the Plan, including payment of Allowed Administrative Expense Claims, the Debtors, with the assistance of their financial and legal advisors, undertook a fulsome analysis with respect to the Debtors' remaining assets and conducted a comprehensive reconciliation of the asserted Secured Claims, Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims (together with the Priority Tax Claims, the "**Priority Claims**").[47]  Following this thorough claims reconciliation process, and as detailed further in the Feasibility Declaration, the Debtors estimate that, excluding Professional Fee Claims (which, other than certain amounts deferred pursuant to the FILO Settlement and certain transaction fees payable on the Effective Date, are secured by amounts escrowed in the Professional Fees Escrow Account) and the claims of the FILO Parties (which are addressed in the FILO Settlement), (i) the total amount of Administrative Expense Claims that will be Allowed is approximately $70.9 million, and (ii) the total amount of Priority Claims that will be Allowed is approximately $34.0 million.[48] The Debtors' estimate of Allowed Administrative Expense Claims takes into account that based on the results of the Administrative Expense Claims Consent Program (pursuant to which 39% (in dollar amount) of eligible holders of Administrative Expense Claims have agreed to participate),

---

[47]     *See* Feasibility Decl. ¶ 4; 1129 Decl. ¶ 49.

[48]     *See* 1129 Decl. ¶ 49; Feasibility Decl. ¶ 29.  The Debtors estimate there is approximately $0 - $250,000 of Other Secured Claims that ultimately will be Allowed.  The holders of these claims have collateral that the Debtors expect will be applied in satisfaction of such claims.  The value of such collateral has not been included in the estimate of distributable value to Administrative Expense Claims and Priority Claims set forth above given that such collateral will be used to satisfy Other Secured Claims.

if the Plan is confirmed, the total amount of Allowed Administrative Expense Claims will be reduced by $32.9 million.[49]

173. **Administrative Expense Claims**. As set forth in the 1129 Declaration, the Debtors estimate that, excluding Professional Fee Claims, the total amount of Administrative Expense Claims that ultimately will be Allowed is approximately $70.9 million, as reflected in the below table:[50]

| Administrative Expense Claims | Amount |
|---|---|
| **Claims filed as of July 8, 2025** | **$103.4 billion** |
| *Plus* post-admin bar date claims | $12.0 million |
| *Plus* estimate of postpetition medical liability and workers compensation claims | $18.0 million |
| *Minus* objections ordered and withdrawn/voided claims | ($100.2 billion) |
| *Minus* executed settlements/stipulations | ($87.2 million) |
| *Minus* pending objections filed | ($2.5 billion) |
| *Minus* pending settlements/stipulations | ($178.6 million) |
| *Minus* anticipated forthcoming objections | ($347.9 million) |
| *Minus* claims satisfied pursuant to Administrative Expense Claims Consent Program payments | ($12.5 million) |
| *Minus* claims waived pursuant to Administrative Expense Claims Consent Program | ($20.4 million) |
| *Minus* offsets for preference waivers | ($13.3 million) |
| **Total Estimated Allowed Administrative Expense Claims** | **$70.9 million** |

174. As reflected in the above table, the Debtors have made significant progress objecting to asserted Administrative Expense Claims, and have pending objections filed with respect to a total of $2.5 billion of such claims.[51]

175. **Priority Claims**. As set forth in the Feasibility Declaration and the 1129 Declaration, the Debtors estimate the total amount of Priority Claims that ultimately will be Allowed is approximately $34.0 million, as reflected in the below table:

---

[49]   *See* 1129 Decl. ¶ 50.

[50]   *See* 1129 Decl. ¶ 50.

[51]   *See* 1129 Decl. ¶ 50.

| Priority Claims | Amount |
|---|---|
| **Claims filed as of July 8, 2025** | **$20.4 billion** |
| *Plus* pending settlements/stipulations | $0.3 million |
| *Minus* objections ordered | ($9.1 billion) |
| *Minus* pending objections filed | ($11.1 billion) |
| *Minus* withdrawn/voided claims | ($1.3 million) |
| *Minus* executed settlements/stipulations | ($1.5 million) |
| *Minus* anticipated forthcoming objections | ($100.6 million) |
| **Total Estimated Allowed Priority Claims** | **$34.0 million** |

176.    As reflected in the above table, the Debtors have made significant progress objecting to asserted Priority Claims, and have pending objections filed with respect to a total of $11.1 billion of such claims.[52]

### (ii)    Estimated Amount of Allowed Administrative Expense and Priority Claims Is Reasonable

177.    The Commonwealth and TRACO object to the Plan's feasibility by asserting that the projected amount of Allowed Administrative Expense Claims and Priority Claims is unrealistic, arguing that the Debtors' estimates require "near perfect" execution of the Debtors' objections to claims.[53]  However, the Debtors' projections are reasonable and do not depend on the perfect execution of every claim objection.[54]  Rather, the Debtors' projections are their reasonable good-faith estimates based on the Debtors' and their advisors' thorough and methodical review of all asserted Administrative Expense Claims and Priority Claims.  Moreover, as shown below, the vast majority of the Debtors' anticipated objections to such claims seek disallowance on clear-cut legal and/or procedural grounds.[55]

---

[52]    *See id.* ¶ 51.

[53]    *See* Commonwealth Obj. ¶¶ 16-20; TRACO Obj. ¶ 2; DCP Participants Obj. (Docket No. 5289) ¶ 10.

[54]    *See* Feasibility Decl. ¶ 51.

[55]    *See id.* ¶ 36.

178.　For example, many of the approximately $350 million in asserted Administrative Expense Claims that the Debtors intend to object to are comprised of the following:

- identical claims filed by certain creditors against multiple Debtor entities, and which are not entitled to duplicative recoveries on account of their claims;

- claims asserting amounts that are not valid obligations of the Debtors at all (and are instead the responsibility of third parties, including the various purchasers of the Debtors' hospitals);[56]

- claims subject to reclassification as General Unsecured Claims because they are clearly prepetition unsecured claims or otherwise do not meet the criteria for administrative or priority treatment;[57]

- claims that have already been superseded by subsequently filed amended claims;

- claims with obvious deficiencies such as a complete absence of supporting documentation or are late filed claims;[58] and

- claims that are likely to be reduced during the reconciliation process.[59]

179.　As a result, the Debtors are confident that they will prevail on their pending objections in all material respects.  As stated above, since filing the Feasibility Declaration, the Debtors have objected to an additional $2.1 billion of asserted Administrative Claims, leaving approximately $350 million of Administrative Expense Claims that the Debtors believe are not valid and anticipate objecting to in the near term.

180.　The Commonwealth and TRACO also question whether the Debtors will succeed in their pending objections of approximately $11.2 billion of Priority Claims.  In their objections, the Commonwealth and TRACO fail to mention that $11 billion of the $11.2 billion of

---

[56]　*See id.* ¶ 30.

[57]　*See id.*

[58]　*See id.*

[59]　*See id.*

Priority Claims that the Debtors had objected to as of the filing of the Feasibility Declaration involve two frivolous proofs of claim filed by individuals (Proofs of Claim 2535 and 11502). Proof of Claim 2535 asserts Priority Claims totaling $2 billion under sections 507(a)(7) and 507(a)(4) of the Bankruptcy Code. Even assuming the holder has valid Priority Claims, which is contradicted on the face of the Proof of Claim as it provides virtually no supporting information, the maximum the holder could recover as a Priority Claim is approximately $20,000 based on statutory caps applicable to the most common types of priority claims under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

181. Proof of Claim 11502, which asserts a Priority Claim of $9 billion, is equally suspect on its face. The proof of claim was drafted by hand, names every Debtor, checks the box for secured claim but does not identify any collateral, checks the box for 503(b)(9) claim but does not indicate an amount, and checks the box for priority claim but does not specify the section of the Bankruptcy Code under which the claim qualifies for priority treatment. Moreover, the basis of the claim is listed "threat, abuse, and violation of takeover." The evidence will show that the Debtors will succeed on these objections.

182. The Debtors' projections of their ability to satisfy all Allowed Secured, Administrative Expense Claims, and Priority Claims under the Plan do not hinge on the success of every claim objection.[60] Even in the highly unlikely scenario where (i) the Debtors receive only their low-case recovery estimate and (ii) the Debtors are unsuccessful in their objections to administrative and priority claims filed by the Commonwealth, certain other states with similarly

---

[60] *See id.* ¶ 51.

situated claims, as well as claims asserted by constructive trust claimants, including TRACO[61] and BMI, the Debtors still project having sufficient funds to satisfy all administrative and priority claims and consummate the Plan in early 2027.[62]   Accordingly, objections to the Plan's feasibility on the basis that the Debtors' projections rely on the success of their claim objections are unfounded and should be overruled.

(iii)    <strong>Funds Available to Administer and Consummate the Plan</strong>

183.   The Debtors' non-litigation assets are primarily comprised of: (i) cash and anticipated near-term receipts; (ii) state supplemental program receivables; (iii) Medicare cost report receivables; (iv) non-income tax refunds; and (v) proceeds from the sale of certain real estate and other joint venture interests (collectively, the "**Non-Litigation Assets**").[63]

184.   The Debtors' litigation assets are primarily comprised of: (i) claims against various commercial payors in connection with outstanding accounts receivable; (ii) claims against two insurance carriers for property damage and business interruption losses sustained at Norwood Hospital; (iii)  preference claims arising under chapter 5 of the Bankruptcy Code; (iv) claims against Blue Cross Blue Shield on account of alleged anticompetitive conduct; and (v) claims against certain of the Debtors' current and former directors, officers, and insiders and certain other parties, including on account of fraudulent conveyance, breach of fiduciary duty, and unlawful distributions (collectively, the "**Litigation Assets**" and, collectively with the Non-Litigation

---

[61]   TRACO incorrectly asserts that the Debtors have disregarded its constructive trust claims against the Debtors in analyzing whether they will satisfy all secured, administrative, and priority claims under the Plan.  *See* TRACO Obj. ¶ 22.  As set forth in the Feasibility Declaration, the lowest intermediate balance in the relevant Debtor accounts prepetition was approximately $3.8 million.  Feasibility Decl. ¶ 55.  Even setting aside that TRACO's constructive trust claims are completely meritless, this represents the most TRACO could conceivably recover in its constructive trust litigation against the Debtors, such that even if the Debtors were to lose the litigation, it would not impact the anticipated Effective Date.  *See id.* ¶ 51.

[62]   *See* 1129 Decl. ¶ 54.

[63]   *See* Feasibility Decl. ¶ 5.

Assets, the "**Remaining Assets**").[64]  Each of the Remaining Assets is discussed in greater detail in the Feasibility Declaration.[65]

185.    The Debtors estimate that the Remaining Assets will generate distributable proceeds of at least $46 million on account of their Non-Litigation Assets and between approximately $529 million (up from $506 million) and $746 million (up from $742 million) (with a midpoint of approximately $631 million (up from $627 million)) on account of their Litigation Assets, net of contingency counsel fees and litigation funding costs and expenses, including the variable component payable to the Litigation Funders under the Litigation Funding Agreement.[66]

### (iv)    Estimated Recoveries Are Reasonable

186.    The Commonwealth argues the Debtors' projected recoveries from the Litigation Assets are unrealistic, including because (i) MPT's settlement with its insurer with respect to Norwood Hospital will somehow affect the value of the Debtors' claims against their insurers,[67] (ii) the Debtors overestimate the value of their claims against BCBS,[68] and (iii) the Debtors overestimate the amount they may be able to collect on behalf of their claims against current and former insiders.[69]  As the evidence presented at the Combined Hearing and in the supporting affidavits will establish, the Debtors' estimates of the projected recoveries on the Litigation Assets, are reasonable and based upon a commercial understanding of each of the respective claims and causes of action, the progress made, and reasonably expected to be made,

---

[64]    *See id.* ¶ 6.

[65]    *See id.* ¶¶ 8-24.

[66]    *See* 1129 Decl. ¶ 53.  The Debtors believe this represents a reasonable range of recovery, and is far less than the amount actually asserted by the Debtors, in recognition of the uncertainty and time associated with litigation, and the potential that the Debtors might settle certain litigation claims.

[67]    *See* Commonwealth Obj. ¶¶ 9-11.

[68]    *See id.* ¶ 12.

[69]    *See id.* ¶¶ 13-14.

with respect to such claims and causes of action, collectability, and when proceeds are expected to be realized as a result.[70]  Further, the Debtors' projected recovery scenarios assume reasonable recoveries on account of all of the Debtors' valuable litigation claims.  In fact, the amount of proceeds required to be realized by the Debtors on behalf of the Litigation Assets for the Plan to become effective in early 2027 represents *only approximately 13% of the damages* sought or expected to be sought by the Debtors in such litigations.[71]

187.    The Commonwealth's other challenges to the Debtors' assumptions regarding the Litigation Assets are also unfounded:

- *First*, the Commonwealth has no basis to assert that MPT's settlement of its property damage claims with Zurich Insurance Company ("**Zurich**") reduces the amount the Debtors may recover under their own insurance policies with respect to Norwood Hospital. [72] The fact that MPT recovered under its own insurance policy in no way reduces the value of the Debtors' separate claims against American Guarantee and Liability Insurance Company ("**AGLIC**"); the policies insure completely different interests (*e.g.*, real property damage for MPT as compared to business interruption and personal property damage for the Debtors), and the amount MPT recovered from Zurich does not diminish or dictate what the Debtors may recover from AGLIC for their own covered losses.  Moreover, the timing and amount of MPT's settlement against Zurich *bolsters* the Debtors' own bad faith arguments against both AGLIC and Zurich, increasing the likelihood of recovery.  Further, the Commonwealth's suggestion that the flood sublimit casts doubt on the estimated insurance recovery is unfounded, as the Debtors have already prevailed on appeal that certain damages incurred at Norwood Hospital are not subject to the flood sublimit.[73]

- *Second*, the Commonwealth is simply wrong in asserting that the Debtors rely on a $1 billion recovery in their antitrust case against BCBS.[74]  That assertion is unfounded—if not disingenuous—given that the Debtors' aggregate mid-range recovery estimation for all Litigation Assets is $631 million, which plainly demonstrates that the Debtors are not relying on a $1 billion recovery

---

[70]    *See* Feasibility Decl. ¶ 48.

[71]    *See id.*

[72]    *See* Commonwealth Obj. ¶¶ 9-11.

[73]    *See* Feasibility Decl. ¶ 19.

[74]    *See id.* ¶ 12.

in the BCBS antitrust litigation.[75]   Moreover, the fact that there was a $2.8 billion antitrust class-action settlement with BCBS has no bearing on what the Debtors may independently be able to recover.[76]   Thus, using the class-action settlement, which the Debtors  (along with thousands of other parties) opted out of, as a proxy for the Debtors' potential recovery on its own substantial claims, is not reasonable.

- ***Third***, the Commonwealth makes a similar mistake with respect to the Debtors' potential claims against current and former insiders and certain other parties as a result of the Investigation, incorrectly asserting that the Debtors rely on recovering at least $1 billion in connection with such claims.[77]   While the Debtors have asserted that they hold claims against these parties of at least $1 billion, that figure obviously is not relied upon in the Debtors' recovery estimates which, again, uses a conservative $631 million mid-range recovery estimate on account of *all* Litigation Assets.[78]   The Commonwealth also confuses the amount of D&O coverage available for the Debtors to collect upon on behalf of such claims, asserting that there is only $80 million available (with additional $40 million for insured parties' non-indemnified losses).   To the contrary, the Debtors have approximately $120 million in total D&O coverage available for acts arising between May 11, 2020 and March 1, 2025 and approximately $110 million in remaining D&O coverage for acts arising between November 6, 2010 to May 11, 2020.

188.    Moreover, the Debtors' estimated recoveries have improved as a result of a settlement with HSA with respect to the dispute as to entitlement to the Florida Supplemental Medicaid Funds (as detailed in the Feasibility Declaration), which is expected to generate $15.5 million in near immediate recoveries for the Debtors' estate.

### (v)    Estimated Recoveries are Not Based on Inadmissible Hearsay

189.    TRACO argues that certain testimony proffered by the Debtors through Mr. Castellano and Mr. Carr that it is reasonably likely that the Debtors' litigation assets will generate sufficient aggregate recoveries for the Plan to become effective in early 2027, and, from Mr. Carr,

---

[75]    *See* Feasibility Decl. ¶ 25.

[76]    *See* Commonwealth Obj. ¶ 12.

[77]    *See* Commonwealth Obj. ¶¶ 13-14.

[78]    *See* 1129 Decl. ¶ 25.

that certain insider claims and causes of action are valuable, is inadmissible because it is allegedly based on hearsay.[79]  TRACO also asserts that this testimony is based on attorney-work product, including in the form of undisclosed litigation-specific recovery and timing estimates and thus constitutes a waiver.[80]  TRACO is wrong on both counts.

190.  Mr. Castellano's testimony is explicitly based on his *commercial* understanding of the claims and causes of action as described in the Disclosure Statement and other *non-privileged* facts and circumstances related thereto, as well as the thorough process—with which he is personally familiar—through which those factors were determined.  This provides Mr. Castellano with ample first-hand, non-privileged knowledge, and the requisite foundation, to provide his commercial understanding (and the reasons for it) concerning whether the aggregate recoveries are reasonably likely to be realized by early 2027.  In doing so, Mr. Castellano has not and will not rely on any of the litigation-specific recovery ranges provided by counsel.

191.  The same is true for Mr. Carr: his testimony is based on extensive first-hand knowledge.  Mr. Carr's testimony regarding the Investigation Litigation Assets is based on his personal knowledge and independent assessment of facts learned while evaluating the Debtors' claims, overseeing these chapter 11 cases, and engaging with the Debtors' professional advisors.  Specifically, Mr. Carr was personally involved in the development and assessment of the Investigation Litigation Assets and can testify (and has already testified) to his commercial understanding of them.  And, like Mr. Castellano, Mr. Carr's testimony is not based on privileged information from counsel.

---

[79]  TRACO Obj. ¶¶ 74-79.

[80]  *Id.*

90

192. Additionally, the Debtors have produced non-privileged documents relevant to reasonable recoveries and timing relating to the Litigation Assets. These documents inform and further support the Carr and 1129 Declarations and underscore the breadth of non-privileged information they relied on to support their respective testimony.

193. It follows that the Debtors plainly have not waived privilege. The Debtors have not disclosed litigation-specific values or timing estimates from counsel. Neither witness is relying on such privileged information in their testimony. Indeed, Mr. Carr and Mr. Castellano did not rely on counsel's advice as a substitute for forming their own commercial understanding of the Debtors' ability to achieve confirmation requirements by early 2027. Instead, they utilized non-privileged documents and facts (which the Debtors have produced), coupled with their professional experience, as the basis for their testimony. That they also had privileged communications or that counsel provided a view does not waive the attorney-client privilege. *In re Residential Cap., LLC*, 491 B.R. 63, 72 (Bankr. S.D.N.Y. 2013) ("The attorney-client privilege is not waived if the Debtors argued that they sought the advice of counsel, among other actions, in an effort to reasonably educate themselves as to the merits of the settlement."); *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI), 2024 WL 2165430, at *2 (Bankr. S.D. Tex. May 14, 2024) (finding that there was no basis for finding a waiver of the attorney-client privilege where the witness did ***not*** testify that he "relied on the advice of counsel in forming his [commercial] understanding" as to whether a transaction complied with certain sections of debtors' indentures, and that his conversations with counsel only "confirmed [his] commercial understanding of what the documents were allowing"); *see also In re Itron, Inc.*, 883 F.3d 553, 560 (5th Cir. 2018) (finding no waiver of attorney-client privilege where there is no reliance on an attorney's advice).

194.     Nor is disclosure of core work product about the likely range or timing of recoveries necessary for the Debtors to satisfy their burden, especially because this Court hardly needs to hear a lawyer's opinion about the reasonable outcome of litigation.  *See, e.g., In re Genesis Glob. Holdco, LLC*, 660 B.R. 439, 485 (Bankr. S.D.N.Y. 2024) ("It is sufficient to present the Court with legal positions asserted by each side and the facts relevant to those issues).  Courts frequently make such assessments of feasibility in bankruptcy cases, and whether the Plan submitted by the Debtors is in fact feasible is ultimately a decision for this Court based on the non-privileged evidence presented.  *See In re Wash. Mut., Inc.*, 442 B.R. 314, 330 (Bankr. D. Del. 2011) ("It is not necessary for the Debtors to waive the attorney/client privilege by presenting testimony regarding what counsel felt was the likelihood they would win on the claims being settled . . . [i]t is sufficient to present the Court with the legal positions asserted by each side and the facts relevant to those issues.  The Court itself can then evaluate the likelihood of the parties' prevailing in that litigation to determine whether the settlement is reasonable.").

### (vi)     Debtors Will Be Able to Satisfy All Allowed Secured, Administrative Expense, and Priority Claims under the Plan

195.     Based on the foregoing, the Debtors project they will have sufficient funds to make all required payments under the Plan and provide an estimated recovery of approximately $235 million to unsecured creditors.[81]  As set forth in the Feasibility Declaration, the Debtors and their financial advisors prepared an analysis as to when the Debtors will have sufficient distributable value to satisfy all such Secured, Administrative Expense, and Priority Claims in full in cash, based on the estimated amount of such claims and anticipated timing for receipt of proceeds from the Litigation Trust.[82]  As a result of such analysis, the Debtors determined that the

---

[81]     *See* 1129 Decl., Ex. A.

[82]     *See* Feasibility Decl. ¶ 47.

Plan will be consummated, and that the Effective Date will occur in early 2027.[83] The Debtors'
anticipated Effective Date is no later than is reasonably necessary to consummate the Plan and the
Plan is feasible.[84]

### L. Section 1129(a)(12): All Statutory Fees Have Been or Will be Paid

196. Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll
fees payable under section 1930 of title 28, as determined by the court at the hearing on
confirmation of the plan." 11 U.S.C. § 1129(a)(12). Section 507 of the Bankruptcy Code provides
that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded
priority as administrative expenses. *Id.* § 507(a)(2). In accordance with these provisions, Section
14.1 of the Plan provides that all Statutory Fees due and payable prior to the Effective Date shall
be paid by the Debtors or the Plan Trustee in full on the Effective Date. The Plan therefore
complies with section 1129(a)(12) of the Bankruptcy Code.

### M. Sections 1129(a)(13)–(16) and 1129(e): Inapplicable Provisions

197. Section 1129(a)(13) of the Bankruptcy Code is applicable only to debtors
that maintain "retiree benefits," as that term is defined in section 1114 of the Bankruptcy Code.
The Debtors will not maintain any such retiree benefits and, as such, section 1129(a)(13) does not
apply. *See* 1129 Decl. ¶ 56.

198. Section 1129(a)(14) of the Bankruptcy Code relates to the payment of
domestic support obligations. The Debtors are not subject to any domestic support obligations
and, as such, section 1129(a)(14) does not apply. *See* 1129 Decl. ¶ 56.

---

[83] *See id.* ¶ 49.

[84] Objections with respect to the delayed Effective Date are addressed in Section II.A below.

199. Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" (as that term is defined in the Bankruptcy Code). The Debtors are not "individuals" and, accordingly, section 1129(a)(15) does not apply. *See* 1129 Decl. ¶ 56.

200. Section 1129(a)(16) of the Bankruptcy Code applies to transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. Each Debtor is a moneyed, business, or commercial corporation, and, accordingly, section 1129(a)(16) does not apply. *See* 1129 Decl. ¶ 56.

201. The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business case[s]" as defined by that section. These chapter 11 cases are not "small business cases" and, accordingly, section 1129(e) of the Bankruptcy Code does not apply.

### N. *Plan Satisfies "Cram Down" Requirements under Bankruptcy Code Section 1129(b) for Non-Accepting Classes*

202. Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims or interests. Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

203. The only Classes to which cramdown is relevant are the Classes that have been deemed to reject the Plan or that have voted to reject the Plan: the Rejecting GUC Classes, Class 7 (Subordinated Securities Claims), Class 9 (Non-Debtor Owned Subsidiary Interests), and Class 10 (Parent Interests).[85]

---

[85] *See supra* ¶ 157.

94

### 1. Plan Does Not Discriminate Unfairly

204. Under section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly-situated classes are treated differently without a reasonable basis for the disparate treatment. *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (noting that the '"hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination."') (citing *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004)). As between two classes of claims or two classes of interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment.[86]

205. The Plan does not discriminate unfairly with respect to any Class of Claims. Here, the General Unsecured Claims will receive the same ratable recovery under the Plan as the PBGC Claims (notwithstanding that such claims were asserted joint and several claims against all of the Debtors). Meanwhile, the General Unsecured Claims will receive a lower ratable recovery than the Retained FILO Claims because the Retained FILO Claims are secured claims that the FILO Parties agreed to subordinate to all Administrative Expense and Priority Claims. Holders of General Unsecured Claims benefit from such subordination—without it, the Plan could have provided that the Retained FILO Claims be paid in full before any distributions to holders of General Unsecured Claims. Thus, the Plan does not discriminate against holders of General

---

[86] *See, e.g., In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

Unsecured Claims, and the disparate treatment is not "unfair" to holders of General Unsecured Claims.

206.    In addition, given their joint and several nature, PBGC claims are regularly classified separately from other general unsecured claims in other cases. *See, e.g.*, *In re Sherwin Alumina Co.*, No. 16-20012 (DRJ) (Bankr. S.D. Tex. Feb. 17, 2017) (Docket No. 1194) (confirming plan with separate classification of the PBGC's unsecured claims from other general unsecured claims); *In re BBGI US, Inc.*, No. 20-11785 (CSS) (Bankr. D. Del. March 5, 2021) (Docket No. 1104) (same); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2019) (Docket No. 5370) (same); *In re Avaya Inc.,* No. 17-10089 (SMB), (Bankr. S.D.N.Y. Nov. 28, 2017) (Docket No. 1579) (same); *In re James River Coal Co.*, No. 14-31848 (KRH) (Bankr. E.D. Va. March 21, 2016) (Docket No. 1704) (same); *In re Kaiser Aluminum Corp.*, No. 02-10429 (JKF), 2006 WL 616243, at *6 (Bankr. D. Del. Feb. 6, 2006), *aff'd*, 343 B.R. 88 (D. Del. 2006) (classifying unsecured claims of the PBGC separately from other general unsecured claims "based on the fact that the PBGC Claims are allowed against each of the [reorganizing debtors] and are receiving the treatment negotiated in the [settlement agreement with the PBGC].").   Moreover, despite their separate classification, holders of PBGC Claims and General Unsecured Claims will receive the same treatment.

207.    Accordingly, the Debtors have a reasonable basis for the differing classification and treatment of such Classes as they are not similarly situated.  Therefore, there is no unfair discrimination in the Plan in accordance with section 1129(b) of the Bankruptcy Code. *See* 1129 Decl. ¶ 58.

### 2.    Plan Is Fair and Equitable.

208.    To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide a holder of a claim or interest

that is junior to the claims of the nonaccepting class will not receive or retain any property under the plan. See 11 U.S.C. § 1129(b)(2)(B). Here, the "fair and equitable" rule is satisfied because distributions under the Plan are made in the order of priority prescribed by the Bankruptcy Code. *See* 1129 Decl. ¶ 60. With respect to each Class that has voted or is deemed to reject the Plan— the Rejecting GUC Classes, Class 7 (Subordinated Securities Claims), Class 9 (Non-Debtor Owned Subsidiary Interests) and Class 10 (Parent Interests)—no holder of a junior Claim or Interest at that Debtor will receive or retain property under the Plan. *See id*.

>**O.**    ***Section 1129(c):  Plan is Only Plan on File***

209.    The Plan is the only plan currently on file in these cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply.

>**P.**    ***Section 1129(d):  Principal Purpose of Plan is Not Avoidance of Taxes***

210.    The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act, and no party has objected on any such grounds. The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## II.    Bankruptcy Court Should Overrule Unresolved Objections and Confirm Plan

211.    As set forth herein and in the Response Chart, and as will be demonstrated at the Combined Hearing, the Debtors have resolved the majority of the Objections to confirmation of the Plan and the Plan satisfies all the requirements for confirmation set forth in the Bankruptcy Code. The Objections that remain outstanding are not supported by the facts nor applicable law and should be overruled.

## A. Objections Related to Timing of the Effective Date Should be Overruled

212.    Certain parties object to the Plan on the basis that the Effective Date is not expected to occur immediately or soon after the Confirmation Date.[87]  However, there is nothing in section 1129 (or any other provision of the Bankruptcy Code) that prescribes how soon after confirmation a chapter 11 plan must become effective.  *See In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 3, 2019), Hr'g Tr. 247:3-5 ("As far as [Section 1129](a)(9) is concerned, there's nothing in the [Bankruptcy] [C]ode or the case law that says that a plan has to go effective by [] some specific date.").  Rather, courts have merely held that the effective date should be "no later than is reasonably necessary to accomplish a legitimate purpose." *In re Wonder Corp. of America*, 70 B.R. 1018, 1021 (Bankr. D. Conn. 1987).  And many chapter 11 plans with extended anticipated effective dates have been confirmed by bankruptcy courts across the country for many different reasons, including (among other examples) where additional time is needed to obtain regulatory approvals,[88] secure financing,[89] or, similar to these cases, monetize litigation assets to repay administrative and priority creditors.[90]

213.    Here, because the Debtors and Litigation Trust will use the executory period following confirmation to continue litigating their valuable litigation claims and causes of action, the recoveries of which will be used to make required payments under the Plan, the Debtors' anticipated Effective Date is no longer than is reasonably necessary to consummate the Plan.  Moreover, because the Plan is necessary to avoid the risk of severe creditor impairment and value

---

[87]    *See* GAS Obj. (Docket No. 5284) ¶ 9; Northstar Obj. (Docket No. 5313) ( ¶¶ 6, 9(b), (d); Elevance Obj. (Docket No. 5315) ¶ 18; TRACO Obj. (Docket No. 5335) ¶¶ 30-42; Intuitive Obj. (Docket No. 5339) ¶¶ 9-10; IRS Obj. (Docket No. 5341) ¶ 1; DCP Participants Obj. (Docket No. 5289) ¶ 12; Igoe Obj. (Docket No. 5328) ¶ 12.

[88]    *See infra* ¶ 218.

[89]    *See infra* ¶ 219.

[90]    *See infra* ¶ 220.

destruction to the estates, the projected timing of the Effective Date here does not prejudice creditors. The objectors' argument that a period between the Confirmation Date and Effective Date renders the Plan unconfirmable contradicts the numerous cases and confirmed chapter 11 plans in this and other districts that demonstrate otherwise as well as the language of the Bankruptcy Code,[91] which clearly contemplates that confirmation and effectiveness of a chapter 11 plan need not occur at the same time (or within a short period of time).

1.    **The Period Between the Plan's Confirmation Date and the Anticipated Effective Date is Reasonable Under the Circumstances**

214.    As referenced above, section 1129(a)(9)(A) requires that "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim, . . . on the effective date of the plan, the holder of an [Administrative Expense Claim] [must] receive . . . cash equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9)(A). The Bankruptcy Code does not define the "effective date" of the plan or prescribe when it must occur. *In re Good*, 428 B.R. 235, 244 (Bankr. E.D. Tex. 2010); *see also In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 3, 2019), Hr'g Tr. 177:22-24 ("Section 1129(a)(9) does not require that confirmation of the plan be immediately followed by the effective date of the plan."). However, courts generally agree that the term "effective date" "must be given a reasonable reading and mean within a 'reasonable' time." *In re Rolling Green Country Club*, 26 B.R. 729, 735 (Bankr. D. Minn. 1982). A plan's effective date, then, should be "no later than is reasonably necessary to accomplish a legitimate purpose." *In re Wonder Corp. of Am.*, 70 B.R. at 1021; *see, e.g.*, *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 227 (3rd Cir. 2021) ("[T]here can be a delay of months or longer in cases where, for example, the debtor must wait for regulators to approve the plan or

---

[91]    *See, e.g.*, 11 U.S.C. § 1141(b) ("*Except as otherwise provided in the plan or the order confirming the plan*, the confirmation of a plan vests all of the property of the estate in the debtor.").

investors to finalize financing."). For instance, "[a]n effective date deferred beyond the interval essential for liquidation [] is unreasonable." *In re Krueger*, 66 B.R. 463, 465 (Bankr. S.D. Fla. 1986). However, where between the confirmation and effective dates there is "no real danger [to creditors] of changed facts or prejudice then . . . even a delay of 'months or years' [] 'may be permissible.'" *In re Cent. European Inc.*, 288 B.R. 572, 577 n. 7 (Bankr. N.D. Cal. 2003) (quoting *In re Loveridge Machine & Tool Co., Inc.*, 36 B.R. 159, 166-67 (Bankr. D. Utah 1983)).

215. Importantly, there is nothing unusual about an extended period between confirmation of the plan and its effective date. Many courts have acknowledged that the effective date of a chapter 11 plan may follow the confirmation date by several months, or even years. *See In re Good*, 428 B.R. at 244 ("[A] Chapter 11 plan may contain a different, later contractual effective date[, which, may] coincide with the statutory effective date, [which, occurs 14 days after entry of the confirmation order in most Chapter 11 cases, or] the contractual effective date may occur much later than the statutory effective date."); *In re Vescor Dev. 3, LLC*, 2007 Bankr. LEXIS 5125, at *11 (Bankr. D. Nev. 2007) (reviewing cases that "suggest[] permissible plan effective dates range from the date of the plan confirmation hearing to even 'months or years' thereafter"). For example:

- *In re W.R. Grace & Co.*, Case No. 01-01139 (KJC) (Bankr. D. Del. Feb. 3, 2014) (Docket No. 31732) (approximately three (3) years between confirmation and effective dates);

- *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 31, 2022) (Docket No. 10693) (over three (3) years between confirmation and effective dates);

- *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Dec. 10, 2007) (ECF No. 11386) (over twenty (20) months between confirmation and effective dates);

- *In re PRM Family Holding Company, L.L.C.*, 13-09026 (SSC) (Bankr. D. Ariz. Mar. 18, 2016) (Docket No. 1573) (over fourteen (14) months between confirmation and effective dates);

- *In re Ambac Fin. Grp., Inc.*, No. 10-15973 (SCC) (Bankr. S.D.N.Y. May 1, 2013) (Docket No. 1308) (approximately fourteen (14) months between confirmation and effective dates);

- *In re Caesars Entm't Operating Co.*, No. 15-01145 (ABG) (Bankr. N.D. Ill. Oct. 6, 2017) (Docket No. 7482) (approximately nine (9) months between confirmation and effective dates);

- *In re Lightsquared Inc.*, No. 12-12080 (SCC) (Bankr. S.D.N.Y Dec. 7, 2015) (Docket No. 2433) (approximately eight (8) months between confirmation and effective dates);

- *In re Talen Energy Corporation*, Case No. 22-90339 (MI) (Bankr. S.D. Tex. May 17, 2023) (Docket No. 2060) (approximately five (5) months between confirmation and effective dates);

- *In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) (Docket No. 1095) (approximately five (5) months between confirmation and effective dates);

- *In re N.Y. Racing Assoc. Inc.*, No. 06-12618 (JMP) (Bankr. S.D.N.Y. Sept. 12, 2008) (Docket No. 1091) (over four months between confirmation and effective dates);

- *In re Seadrill Limited*, Case No. 21-30427 (DRJ) (Bankr. S.D. Tex. Feb. 22, 2022) (Docket No. 1399) (approximately four (4) months between confirmation and effective dates);

- *In re iHeart Media, Inc*., No. 18-31274 (MI) (Bankr. S.D. Tex. May 1, 2019) (Docket No. 3298) (approximately three (3) months between confirmation and effective dates); and

- *In re Weatherford International PLC*, 19-33694 (DRJ) (Bankr. S.D. Tex. Dec. 13, 2019) (Docket No. 483) (approximately three (3) months between confirmation and effective dates).

216.     Under these circumstances, where the Debtors have made a "sufficient showing of certainty that the claims of the estate will be pursued" following confirmation, creditors are not prejudiced by the delayed Effective Date.  *See In re Cash Cloud, Inc.*, 2023 Bankr. LEXIS 2561, at *11-13 (Bankr. D. Nev. 2023) (overruling objection based in part on argument that the debtor's plan could not be confirmed where the effective date was not expected to occur for at

least six (6) to nine (9) months following confirmation when the debtor was expected to have sufficient proceeds to pay administrative expense claims in full).

217. Courts in this and other circuits have consistently recognized that a chapter 11 plan can be confirmed even if consummation of the plan is subject to contingencies that are unresolved at the time of confirmation. Rather than being an obstacle to confirmation, such contingencies are often practical and necessary, including to maximize creditor recoveries.

218. First, for example, this court and others have routinely confirmed plans that are contingent upon receipt of post-confirmation regulatory approvals. *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (noting that "[i]t is not at all unusual for consummation of a [c]hapter 11 plan to be conditioned upon the expectation of approval by regulatory authorities, and courts have not typically held up confirmation of a plan to wait for issuance of such approvals"); *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. Jan. 22, 2019) (Docket No. 2525) (confirming chapter 11 plan despite the debtors having not obtained certain regulatory approvals necessary for the plan to become effective); *In re Cumulus Media Inc.*, No. 17-13381 (SCC) (Bankr. S.D.N.Y. May 10, 2018) (Docket No. 769) (same); *In re Lightsquared Inc.*, No. 12-12080 (SCC) (Bankr. S.D.N.Y Mar. 27, 2015) (Docket No. 2276) (same); *In re LBI Media, Inc.*, No. 18-12655 (CSS) (Bankr. D. Del. Apr. 17, 2019) (Docket No. 839) (same); *In re Caesars Entm't Operating Co.*, No. 15-01145 (ABG) (Bankr. N.D. Ill. Jan. 17, 2017) (Docket No. 6334) (same); *In re N.Y. Racing Ass'n, Inc.*, No. 06-12618 (JMP) (Bankr. S.D.N.Y. Apr. 28, 2008) (Docket No. 1008) (same).

219. Second, courts have confirmed plans where effectiveness was contingent on the debtors securing necessary funding post-confirmation or consummating post-confirmation transactions. *See, e.g.*, *In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y. Dec. 10, 2007)

(Docket No. 12359) (confirming debtors' chapter 11 plan which included a condition precedent to the effective date that the reorganized debtors would enter into certain exit financing arrangements "notwithstanding that a firm commitment for exit financing was not entered into as of the Confirmation Hearing"); *In re W.R. Grace & Co.*, No. 01-01139 (JKF) (Bankr. D. Del. Jan. 31, 2011) (Docket No. 26155) (approving debtors' chapter 11 plan which expressly conditioned the plan effective date on a number of material contingencies, including the establishment and funding of certain asbestos trusts pursuant to section 524(g) of the Bankruptcy Code); *In re SunEdison, Inc.*, Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. Jul. 28, 2017) (Docket No. 3735) (confirming the debtors' chapter 11 plan which conditioned the effective date on the debtors selling or otherwise disposing of some or all of their equity interests in certain non-debtor entities to a third-party purchaser); *In re Ambac Financial Group, Inc.*, Case No. 10-15973 (SCC) (Bankr. S.D.N.Y. Mar. 14, 2012) (Docket No. 938) (approving the debtors' chapter 11 plan subject to future approval of a settlement with the IRS by the court and certain interested parties prior to the effective date); *In re Relativity Fashion, LLC*, Case No. 15-11989 (MEW) (Bankr. S.D.N.Y. Feb. 8, 2016) (Docket No. 1573) (confirming chapter 11 plan that provided the plan would not go effective until exit funding and certain licensing and employment agreements were executed).

220. Courts have also approved plans, like the one proposed here, that condition effectiveness on the satisfaction of administrative expense claims projected to be paid primarily from the proceeds of litigation assets. *See, e.g.*, *In re Sears*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 31, 2022) (Docket No. 5370) (confirming liquidating plan that allowed the debtors to pursue significant litigation claims between confirmation and effective date to fund administrative and priority claimants); *In re Cash Cloud, Inc.*, No. 23-10423 (MKN) (Bankr. D. Nev. Aug. 17, 2023) (Docket No. 1126) (confirming liquidating plan where the effective date was

contingent on satisfaction in full of administrative expense claims, primarily projected to be derived from litigation proceeds); *In re PRM Family Holding Co., LLC*, No. 13-09026 (BKM) (Bankr. D. Ariz. Apr. 13, 2015) (Docket No. 1406) (confirming liquidating plan that allowed the effective date to be extended for up to eighteen (18) months so that the debtors could pursue avoidance actions and other causes of action to pay administrative and priority claimants); *In re Rolling Green Country Club*, 26 B.R. 729 (Bankr. D. Minn. 1982) (confirming liquidating plan that set the effective date to the date that "proceeds of liquidation in the hands of the trustee become sufficient to effect the required payments" under the plan); *In re Schwab Industries, Inc.*, No. 10-60702 (RK) (Bankr. N.D. Ohio Dec. 15, 2010) (Docket No. 698) (confirming liquidating plan that allowed the effective date to be extended for up to 180 days after the confirmation date so that the Creditor Trustee could liquidate assets and pursue causes of action to pay administrative and priority claims).

221.    *Sears* provides a particularly instructive example of a court-approved plan that had an effective date that was years after the confirmation date, allowing the debtors to pursue significant litigation claims intended to pay administrative and priority claimants. There, following confirmation, the debtors focused on prosecuting valuable estate claims, including those against former insiders, to produce sufficient proceeds to satisfy administrative and other priority claims.[92]  The Sears plan was approved and the Court held that it satisfied sections 1129(a)(9) and 1129(a)(11) of the Bankruptcy Code (overruling similar objections to those made by the objectors in these cases).[93]

---

[93]    *See, e.g.*, *In re Sears*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 31, 2022) (Docket No. 5370).

## 2. The Plan's Anticipated Effective Date Does Not Shift the Burden of Delay to Creditors

222. The delay between the Confirmation Date and anticipated Effective Date is also reasonable because it does not create any "real danger [to creditors] of changed facts or prejudice." *See Cent. European Inc.*, 288 B.R. at 577, n. 7. In fact, the opposite is true. The Plan is necessary to maximize the value of the Debtors' remaining assets and distributions to creditors. The Plan (unlike certain creditors' requests to convert these cases to chapter 7) protects creditors from risk, rather than shifting risk to creditors.

223. Following Plan confirmation, the Litigation Funding provided under the FILO Settlement will be used to prosecute the estates' valuable litigation claims and causes of action in a manner that maximizes recoveries for creditors,[94] and the Debtors' estates will retain their economic interest in the assets of the Litigation Trust in accordance with the priority scheme established by the Bankruptcy Code.[95] Additionally, upon confirmation, the Debtors will retain an additional $15 million in cash under the FILO Settlement that the Debtors are only entitled to if the Plan is confirmed.[96] This will allow the Debtors to provide holders of Allowed Administrative Expense Claims immediate payment of $12.5 million through the Administrative Expense Claims Consent Program.

224. By contrast, if the Plan is not confirmed, these cases will likely convert to chapter 7, which, as this Court noted at the May 30, 2025 hearing, would be "value destructive."[97] The recoveries of all creditors, including holders of Administrative Expense Claims and Priority

---

[94] Term Sheet ¶ 10(a).

[95] *See* Term Sheet ¶ 7(a)(iii).

[96] *See* FILO Settlement Term Sheet ¶ 6.

[97] May 30, 2025 Hearing Tr. 19:15-16.

Claims, would be severely impaired under this scenario.[98]  A chapter 7 trustee would have little choice but to quickly sell the Class B Interests to fund the estates' expenses – such a premature sale would result in material value erosion.[99]

225.    Plan confirmation is, therefore, necessary to avoid severe creditor impairment and value destruction to the estates.  Accordingly, creditors in these cases are not being forced to subsidize the Debtors' Plan while creditors "bear the risk" that the assets available for distribution are depleted.  Instead, the Debtors' Plan places creditors in the best (and only) position possible to maximize recoveries and avoid a value destructive chapter 7 liquidation.

226.    Lastly, the Creditors' Committee, who has worked tirelessly with the Debtors to negotiate a value maximizing chapter 11 plan, fully supports the Plan, even though the Effective Date is not expected to occur until early 2027.  The support of the Creditors' Committee—and the votes of unsecured creditors—are a strong indication that the Plan does not place unnecessary risks on creditors and should be given considerable weight.  *See In re Cash Cloud, Inc.*, 2023 Bankr. LEXIS 2561, at *10-11 ("[A] Chapter 11 debtor's business judgment to liquidate in Chapter 11, rather than converting to Chapter 7, should be given considerable weight, especially if it is supported by an official committee of unsecured creditors.").

### 3.    The Objectors Rely on Inapposite Case Law

227.    The caselaw relied upon in the objectors' arguments that a delay in the effective date is not permitted by the Bankruptcy Code is easily distinguished.  Importantly, none of the cases cited by the objecting parties support their argument that there cannot be an extended period of time between the confirmation and effective dates.

---

[98]    *See* Liquidation Analysis.

[99]    *See* Liquidation Analysis.

106

| Facts | Debtors' Response |
|---|---|
| ***In re Vagu*, 2023 Bankr. LEXIS 1825 (Bankr. D.P.R. 2023)** | |
| • The debtors sought a fourth extension of the effective date under their confirmed chapter 11 plan, which was conditioned on funding from the opening of a new restaurant.<br><br>• The bankruptcy court denied the extension request and dismissed the chapter 11 cases, finding that (i) the debtors provided no evidence that the restaurant would open and generate the necessary revenue by the requested effective date, and (ii) the debtors impermissibly used estate funds designated for plan distributions for their own benefits. | • The Debtors (i) will establish at the confirmation hearing that they will be able to satisfy all payment obligations under the Plan; (ii) have already commenced many of their valuable litigation claims that are necessary to consummate the Plan and make distributions; and (iii) are not using estate resources for purposes other than monetizing the remaining assets of the estates and making distributions to creditors.<br><br>• Further, Vagu demonstrates that a court can confirm a chapter 11 plan with material contingencies that need to be satisfied to become effective. |
| ***In re Premier Network Servs.*, 2005 Bankr. LEXIS 2298 (Bankr. N.D. Tex. 2005)** | |
| • The debtor's plan required for the plan to go effective that the confirmation order no longer be subject to appeal within 120 days of the confirmation date.<br><br>• The bankruptcy court denied confirmation finding that an appeal was "all but assured" and that resolution of the appeal within 120 days was "unlikely." *Id.* at *14-15.<br><br>• Also, the debtors provided "no persuasive liquidation analysis" to demonstrate that creditors were better off under the debtor's plan than chapter 7. *Id.* at *10. | • The Debtors will establish that all conditions precedent to the Effective Date of the Plan (including payment of all Allowed Administrative Expense Claims and Priority Claims) will be met, and therefore, the Effective Date of the Plan is not contingent on events and circumstances that are unlikely to occur.<br><br>• The Debtors' Liquidation Analysis clearly demonstrates that if the Debtors' Plan is not confirmed, and the cases are converted to chapter 7, creditor recoveries will be significantly impaired. |
| ***In re Cent. European Indus. Dev. Co. LLC*, 288 B.R. 572 (Bankr. N.D. Cal. *2003*)** | |
| • Lehman Brothers, the debtor's only creditor, filed a motion to dismiss the debtor's chapter 11 case.<br><br>• The debtor objected on the basis that its yet-to-be-filed plan would propose to pay Lehman in full after an indeterminate period of time, and therefore, Lehman's claim would not be entitled to vote on the plan as an unimpaired creditor.<br><br>• The bankruptcy court granted the motion to dismiss, finding that (i) Lehman would be impaired where it would have to wait an indefinite period of time for its claim to be paid; and (ii) the delayed effective date would "unacceptably place all the risk on Lehman" *Id.* at 577. | • The Debtors are not relying on the vote of a single creditor who is seeking to dismiss their cases for the Plan to be confirmed.<br><br>• *Central* was a two-party dispute involving a motion to dismiss, and the court believed the risk was too great on Lehman to allow the chapter 11 case to proceed.<br><br>• If the Debtors' Plan is not confirmed, and the cases are converted to chapter 7, creditor recoveries will be significantly impaired, as reflected in the Liquidation Analysis. |
| ***In re Krueger*, 66 B.R. 463 (Bankr. S.D. Fla. 1986)** | |
| • The chapter 11 plan proposed to sell the debtor's commercial building to satisfy a priority tax claim and secured creditors in full. | • The Debtors' Plan does not contemplate an executory period beyond that "essential for liquidation."<br><br>• The Debtors have already commenced many of their valuable litigation claims (and certain litigation claims are substantially progressed). |

| Facts | Debtors' Response |
|---|---|
| • The debtor had received offers for the property throughout the case but had failed to effectuate or schedule a sale.<br><br>• The bankruptcy court explained that the debtor's actions were "unreasonable," where the "effective date [was] deferred beyond the interval essential for liquidation," and refused to force the taxing authorities to "partially subsidize the debtor's plan" while mortgage debt continued to accrue daily. *Id.* at 465. | |
| **In re Potomac, 217 B.R. 170 (Bankr. D. Md. 1997)** | |
| • The success of the chapter 11 plan depended entirely on the litigation trust's ability to collect on the debtor's accounts receivable within the one year period following plan confirmation.<br><br>• The debtor sought to transfer the accounts receivable to a new entity formed by its former president.<br><br>• The bankruptcy court denied confirmation, finding, "**[i]n this instance**," where the debtor "may never collect [the amounts necessary to pay its priority tax creditors] from the accounts receivable," while "[i]n the meanwhile it wishes to transfer the operating entity to an insider free of any concern for the unpaid administrative expenses and free of any concern for the failure of debtor's plan," the court would not "force[] the taxing authorities to bear all the risk of the plan." *Id.* at 174-75. | • The Debtors are not transferring their assets to a third-party operating entity owned by an insider free of any concern for unpaid administrative expenses and priority claims, as the Debtors will retain their economic interest in their remaining assets under the Plan, through the Class B Interests. |
| **In re Yates Dev., 258 B.R. 36 (Bankr. M.D. Fla. 2000)** | |
| • The bankruptcy court denied confirmation, where the effective date of the debtor's plan was contingent on a favorable appellate court ruling that certain price increase provisions within a prepetition option contract were unenforceable under the Bankruptcy Code, and the debtor had already lost on the issue at both the bankruptcy and district court levels. | • The success of the Debtors' Plan is not dependent (let alone wholly contingent) on a favorable appellate court ruling on an issue for which two other courts had previously ruled against the Debtors. |
| **In re 4848, LLC, 490 B.R. 343 (Bankr. E.D. Wis. 2013)** | |
| • A single-asset real estate debtor's chapter 11 plan proposed to sell property subject to its secured lender's lien in a public auction to be held within 120 days from the plan's effective date.<br><br>• The secured lender filed a motion for relief from the automatic stay to continue its prepetition foreclosure action, arguing that the debtor's plan did not have a "reasonable possibility of being confirmed within a reasonable time" under 11 U.S.C. § 362(d)(3)(A). | • The Debtors are not single-asset real estate debtors and the court is not deciding between lifting the stay to allow a foreclosure to continue and confirming a plan.<br><br>• Instead, the choice is between confirmation and conversion to chapter 7, and the Debtors will demonstrate at the confirmation hearing that confirmation of the Plan is the far better alternative for creditors. |

| Facts | Debtors' Response |
|---|---|
| • The bankruptcy court granted stay relief, finding that the debtor had already been given four years "to try to turn this operation around by either selling [the property] or refinancing," and that "it is not fair to delay [the secured lender] any longer," where "it is highly doubtful an additional four months of marketing will result in a better scenario than lifting the stay now," and instead, allowing a sheriff's sale of the property. *Id.* at 350-51.<br><br>• The bankruptcy court found the bank was better off in the foreclosure process where it could control expenses. *Id.* at 352. | |
| ***In re Star Ambulance Serv., LLC***, 540 B.R. 251 (Bankr S.D. Tex. 2015) | |
| • The bankruptcy court denied plan confirmation where, among other things, (i) the debtors proposed to implement their plan by "generating additional revenues" and "reducing expenditures," but provided no details as to how these goals would be accomplished; (ii) the debtors' liquidation analysis was based merely on presumptions, and conflicted with their schedules, which showed that the debtors' assets outweighed their debts, and (iii) the debtors provided no financial projections to demonstrate its ability to fund the plan. *Id.* at 261 | • The Debtors will establish at the confirmation hearing that they will be able to satisfy all payment obligations under the Plan.<br><br>• The Debtors' Liquidation Analysis demonstrates that if these cases are converted to chapter 7, creditor recoveries will be significantly impaired. |

228.    The case law cited by the objectors is easily distinguishable to the Debtors'

chapter 11 cases and does not establish that the Plan cannot be confirmed simply because there is

an anticipated executory period between the Confirmation Date and Effective Date.  The Debtors

will demonstrate at the confirmation hearing by a preponderance of the evidence that they will be

able to satisfy each of their obligations under the Plan.  Therefore, these objections should be

overruled.

**B.** *Objections to the Third-Party Releases Should be Overruled*

229.     The U.S. Trustee, among other parties,[100] raises the same arguments in its Objection with respect to the Plan's Third-Party Releases that this Court has repeatedly rejected, including in a written decision in *Robertshaw*. *See In re Robertshaw US Holding Corp.*, No. 24-90052 (CML), 2024 WL 3897812, at *17–18 (Bankr. S.D. Tex. Aug. 16, 2024) (overruling U.S. Trustee's objection to opt-out third-party releases); *In re DocuData Solutions, L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (same); *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 17, 2025) (Docket No. 237) (same); *In re Indep. Cont. Drilling Inc.*, No. 24-90612 (ARP) (Bankr. S.D. Tex. Jan. 24, 2025) (Docket No. 124) (same); *In re The Container Store Group, Inc.*, No. 24-90627 (ARP) (Bankr. S.D. Tex. Jan. 9, 2025) (Docket No. 181) (same).     There, as here, the U.S. Trustee "want[ed] to use the *Purdue* holding as an opportunity to advance its long-held position that consensual third-party releases in a plan should require an opt-in feature, rather than an opt-out." *See Robertshaw*, 2024 WL 3897812, at *17. The Court, however, should deny such an attempt to undermine settled law in this jurisdiction that opt-out releases *are* consensual releases.

230.     Although the Supreme Court in *Purdue* held that **non-consensual** releases by third-parties are impermissible, it did not say that all third-party releases are impermissible, and the Supreme Court was careful to be clear that it was not expressing a view on what qualifies as a "consensual" release:

> As important as the question we decide today are ones we do not. ***Nothing in what we have said should be construed to call into question consensual third-party releases*** offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the

---

[100]    *See* U.S. Trustee Obj. (Docket No. 5301) ¶¶ 7-9; Grogg Obj. (Docket No. 5318) ¶13; Commonwealth Obj. ¶ 31; TRACO Obj. ¶ 66.

nonconsensual release at issue here.  ***Nor do we*** have occasion today to ***express a view on what qualifies as a consensual release*** or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.

*Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2087–88 (2024) (emphasis added). Accordingly, the Supreme Court (i) preserved consensual releases and (ii) did not restrict the ability of courts to determine what constitutes consent.

231.    In the Southern District of Texas, a process where third parties have the opportunity to opt-out of granting releases is sufficient to render a release consensual and has been for some time, as "[h]undreds of chapter 11 cases have been confirmed in this District with consensual third-party releases with an opt-out." *Robertshaw*, 2024 WL 3897812, at *17.  That is because, as the Court found in *Robertshaw*, "[t]here is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan," when parties giving such releases receive a "meaningful opportunity to opt out." *Id.*  Importantly, as this Court recognized, "*Purdue* did not change the law in this Circuit."  *Robertshaw*, 2024 WL 3897812, at *17; *see also In re DocuData Solutions, L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (approving chapter 11 plan with opt-out third-party releases); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596) (same); *In re MLN US Holdco LLC*, No. 25-90090 (CML) (Bankr. S.D. Tex. April 17, 2025) (Docket No. 263) (same); *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. April 15, 2025) (Docket No. 227) (same); *In re DRF Logistics, LLC,* No. 24-90447 (CML) (Bankr. S.D. Tex. Nov 25, 2024) (Docket No. 530) (same); *In re Mobileum, Inc.*, No. 24-90414 (CML) (Bankr. S.D. Tex. Sept. 11, 2024), (Docket No. 194) (same); *In re Core Sci., Inc.* No. 22-90341 (CML) (Bankr. S.D. Tex. Jan. 16, 2024) (Docket No. 1749) (same); *see also In re GOL Linhas Aéreas Inteligentes S.A.*, No. 24-10118

(MG) (Bankr. S.D.N.Y. May 22, 2025) (Docket No. 1658) (approving chapter 11 plan with opt-out third-party releases based upon a reading of *Purdue* and case law from the Fifth Circuit).

232. When analyzing whether third-party releases are consensual, courts in the Fifth Circuit largely focus on the facts and circumstances of the specific process, including whether "notice has gone out, parties have actually gotten it, they've had the opportunity to look it over [and] the disclosure is adequate so that they can actually understanding what they're being asked to do and the options that they're being given." Conf. Hr'g Tr. 47:7–11, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (Bankr. N.D. Tex. Apr. 21, 2016), (Docket No. 730) (approving third-party releases as consensual, over objection of U.S. Trustee, in light of sufficient notice and opportunity to object); *see also* Conf. Hr'g Tr. 91:15-92:5, *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. Apr. 16, 2025) (analyzing the facts and circumstances surrounding opt-out third-party releases before determining such releases were appropriate).

233. Here, the Plan, Disclosure Statement, Ballots, Notice of Non-Voting Status, and Release Opt-Out Form provide a similar "meaningful opportunity" in compliance with the long-standing practice in this district and the Complex Case Procedures. Exhibit D of the Disclosure Statement clearly sets forth the releases contained in the Plan and adequately describes both the entities and claims being released. The Ballots, Notice of Non-Voting Status, and Release Opt-Out Form each conspicuously disclose (in **bolded** text) the proposed releases in the Plan, the procedures for opting out, and the consequences of failing to do so. The Ballots for General Unsecured Claims (Class 4) also provide, in bolded text, "If you hold a Medical Liability Claim against the Debtors and do no elect to opt-out of the third-party releases contained in Section 12.6(b) of the Plan by timely and properly completing Item 3 of [the] Ballot, then you are electing to release claims against the 'Released Parties,' including any claims against the Debtors'

112

employed physicians and affiliated physicians related to Medical Liability." *See* Disclosure Statement Order, Ex. 4. These provide ample notice and information regarding the releases, what the Releasing Parties are being asked to do, and benefits they would forego should they choose to opt out. The Plan allows any party the option to opt-out of the third-party release provision, including those creditors that vote to accept the Plan.[101]

234. The Release Opt-Out Form has also already been expressly approved and ordered by this Court in the Disclosure Statement Order. *See* Disclosure Statement Order ¶ 21. This Court determined that the "Release Opt-Out Form complies with the Bankruptcy Code, applicable Bankruptcy Rules, and the applicable Bankruptcy Local Rules and Complex Case Procedures and . . .provides adequate notice to holders of Claims and Interests in the Non-Voting Classes. No further notice is required or necessary." *Id.* ¶ 22. Accordingly, the issue of whether the Release Opt-Out Form complies with the Bankruptcy Code and is valid, has already been determined in the affirmative by this Court and is binding in these chapter 11 cases.

235. As detailed above, the objections which assert that the Plan provides for non-consensual third-party releases are without merit and should be overruled, consistent with long-standing law in this District.

---

[101] Only the following holders of Claims and Interests will be deemed to have released the Released Parties pursuant to the Plan: those who (i) vote, or are deemed, to reject the Plan or that vote, or are presumed, to accept the Plan but do not opt out of granting the releases, (ii) are solicited to vote on the Plan but do not vote and do not opt out of granting the releases, (iii) are given notice of the opportunity to opt out of granting the releases but do not opt out, (iv) certain Released Parties, and (v) with respect to (i) through (iv), such Persons' and Entities' (x) Related Parties to the extent such Person or Entity is legally entitled to bind such related party under applicable law, (y) predecessors, successors, or assigns, and (z) all persons entitled to assert Claims or Causes of Action through or on behalf of such entities with respect to the matters for which such Persons and Entities are providing releases.

### C. *Objections to the Exculpation Provision Should be Overruled*

236.     Certain Objectors[102] argue the Plan's Exculpation Provision is overly broad in violation of Fifth Circuit precedent because it exculpates members of the Transformation Committee for actions taken during the bankruptcy.[103]  The inclusion of the three members of the Transformation Committee as "Exculpated Parties," however, is consistent with Fifth Circuit precedent, including the Fifth Circuit's holding in *Highland I*[104] because the Transformation Committee members acted as estate fiduciaries throughout the Debtors' chapter 11 cases.

237.     Specifically, the U.S. Trustee alleges that under *Highland I*, exculpation provisions must be limited to the debtor and the creditors' committee and its members for conduct within the scope of their duties.[105]  However, the Court should reject this improper reading of *Highland I* because, there, the court found that each of the three independent directors appointed as fiduciaries were properly exculpated under the plan.[106]  Citing section 1107(a) of the Bankruptcy Code, the Court reasoned that "[l]ike a debtor-in-possession, the Independent Directors are entitled to all the rights and powers of a trustee" and were therefore entitled to exculpation.[107]  Nor did *Highland I* impose the requirement that independent directors must be appointed by the Court in order to qualify for an exculpation, as the U.S. Trustee suggests.  *Id*. Accordingly, following *Highland I*, this Court has consistently approved plan exculpation

---

[102]  *See* U.S. Trustee Obj. ¶ 9 (incorporating by reference arguments previously raised in the U.S. Trustee's objection to the Disclosure Statement (Docket No. 4909) (the "**U.S. Trustee DS Objection**")); Commonwealth Obj. ¶¶ 32-35; IRS Obj. (Docket No. 5341) ¶ 5.

[103]  The Transformation Committee is the special committee of the board of managers of SHC Holdings comprised of (i) Alan J. Carr, (ii) John R. Castellano, and (iii) William Transier.

[104]  *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419, 439 (5th Cir. 2022) ("**Highland I**").

[105]  U.S. Trustee DS Obj. ¶ 56.

[106]  *See Highland I*, 48 F.4th at 437-38.

[107]  *Id.* at 437.

114

provisions that applied to independent directors. *See, e.g.*, *In re DocuData Solutions, L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834) (approving plan containing exculpation provision that applied to disinterested director); *In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. May 1, 2025) (Docket No. 2596) (approving plan containing exculpation provision that applied to independent directors); *In re DRF Logistics, LLC*, No. 24-90447 (CML) (Bankr. S.D. Tex. Nov. 25, 2024) (Docket No. 530) (same).

238.    Case law in this Circuit and others is also clear that the individuals serving as directors, managers, and officers of a corporation are empowered with the corporation's authority and therefore, are themselves, acting as the debtor in possession within the scope of duties under section 1107 of the Bankruptcy Code. Where a trustee is not appointed pursuant to section 1104 of the Bankruptcy Code and the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985); *see also In re Hous. Reg'l Sports Network, L.P.*, 505 B.R. 468, 481 (Bankr. S.D. Tex. 2014) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'") (quoting *Commodity Futures Trading*, 471 U.S. at 355).

239.    Here, the Exculpated Parties include the members of the Transformation Committee, each of whom has acted on the Debtors' behalf throughout these chapter 11 cases in a fiduciary capacity, with the same rights and powers as a bankruptcy trustee pursuant to section 1107(a) of the Bankruptcy Code. Thus, the rationale for granting exculpation to the directors for the *Highland I* debtors applies equally to the Transformation Committee members, who are

independent directors that have exercised all of their duties and at all times acted in the best interests of the Debtors and their Estates.

240.     Accordingly, objections to the Plan's Exculpation Provision lack merit and should be overruled.

### D.     *Objections to the Injunction Provisions Should be Overruled*

241.     The U.S. Trustee and certain other parties[108] also object to the Plan's Injunction Provisions and Gatekeeper Provision, arguing that issuance of the injunction would exceed this Court's authority under the Bankruptcy Code and that the Gatekeeper Provision is overly broad because it extends to Claims and Causes of Action asserted against not only Exculpated Parties, but also Released Parties, allegedly in violation of the Fifth Circuit's holding in *Highland II*.  The Injunction Provisions and Gatekeeper Provision, however, are consistent with the Bankruptcy Code and applicable Fifth Circuit precedent, including *Highland II*.

242.     As detailed above, the Plan's Injunction Provision permanently enjoins any Entity from commencing or continuing in any manner any claim that was released or exculpated under the Plan.[109]  The Injunction Provision also includes the Gatekeeper Provision to implement the Plan's release and exculpation provisions which provides that, before any Claim or Cause of Action is brought against a Released Party or Exculpated Party, the Court must (i) determine, after notice and a hearing, that such Claim or Cause of Action is colorable and has not, with respect to a Released Party, been released under the Plan or, with respect to an Exculpated Party, been exculpated under the Plan and (ii) specifically authorize such person or entity to bring such Claim

---

[108]   *See* U.S. Trustee DS Obj. ¶¶ 59-71; Texas Comptroller Obj. (Docket No. 5306) ¶ 17; Orlando Health Obj. (Docket No. 5337) ¶¶ 18-20; IRS Obj. (Docket No. 5341) ¶ 5; CHRISTUS Obj. (Docket No. 5342) ¶¶ 18-20; HSA Obj. (Docket No. 5346) ¶¶ 21-22; Igoe Obj. (Docket No. 5328) ¶ 16.

[109]   *See* Plan § 12.5(a).

or Cause of Action.  Notably, the Gatekeeper Provision in the Debtors' Plan only applies to Claims or Causes of Action against Released Parties to the extent they may be assertable by, or on behalf of, *a Releasing Party*.[110]  In other words, the Gatekeeper Provision only applies to claims that are being consensually released under the Plan (*i.e.* the Gatekeeper Provision does not require parties that opted-out of the third-party release provision to obtain Bankruptcy Court approval before pursuing claims or causes of actions against a "Released Party") or subject to the exculpation provision.

243.  There is no precedent to support the U.S. Trustee's assertion that the Bankruptcy Code itself does not permit the issuance of an injunction to enforce a Plan's release and exculpation provisions.[111]  On the contrary, such an injunction is permissible under prevailing Fifth Circuit law so long as such injunction is consensual.  *See, e.g.*, *In re Camp Arrowhead*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex. 2011) ("the Fifth Circuit does allow permanent injunctions *so long as there is consent* . . . [w]ithout an objection, this court was entitled to rely on . . . silence to infer consent at the confirmation hearing") (citations omitted).  Because, as described above, the third-party releases are consensual, a holder who consents to such releases is also consenting to the corresponding injunction enforcing such release, including the Gatekeeper Provision.

---

[110]  *See* Plan § 12.5(b).  "Subject in all respects to Section 13.1 of this Plan, no Entity may commence or pursue a Claim or Cause of Action of any kind against any Released Party (solely with respect to Claims or Causes of Action that purportedly may be assertable by, or on behalf of, a Releasing Party) or Exculpated Party that arose or arises from, in whole or in part: the Debtors (including the governance, management, direct or indirect ownership, transactions with, or operation thereof) or their Estates; the Plan Trust; the Plan Trustee; the Litigation Trust; the Litigation Trustee; the Chapter 11 Cases (including the filing and administration thereof); the Wind Down. . .or any other agreement, act or omission, transaction, transfer, event, or other occurrence related to the foregoing and taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable claim that has not, with respect to a Released Party, been released under this Plan or, with respect to an Exculpated Party, been exculpated under this Plan and (ii) specifically authorizing such Entity to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.

[111]  In fact, the U.S. Trustee cites two cases that analyze the Patent Act (*eBay*) and the Federal Water Pollution Control Act (*Weinberger*), but do not analyze the Bankruptcy Code.  *See* U.S. Trustee DS Obj. ¶ 70.

244. Moreover, in *Highland I*, the Fifth Circuit approved a gatekeeper provision related to claims that were being exculpated under the plan,[112] and in *Highland II*, the Fifth Circuit clarified that the scope of a gatekeeper provision may not extend beyond claims subject to the plan's injunction (there, the exculpated claims).[113] While the Gatekeeper Provision here applies to claims brought against Released Parties, contrary to the U.S. Trustee's objection, *Highland II* does not prohibit gatekeeper provisions from applying to claims of third parties that are consensually released and thus subject to the Plan's injunction. Thus, because the Gatekeeper Provision is narrowly tailored to apply only to *Claims or Causes of Action against Released Parties* to the extent they are asserted by, or on behalf of, *a Releasing Party*, it is consistent with the Fifth Circuit precedent set forth in *Highland I* and *Highland II*.

245. The Gatekeeper Provision is also consistent with gatekeeper provisions recently approved by this Court in *Cutera* and *DocuData*, each of which applied to claims against both exculpated parties and released parties, but only to the extent such claims are brought by releasing parties.[114] In *Cutera* and *DocuData*, this Court overruled similar objections from the U.S. Trustee which argued that the plans' gatekeeper provisions violated *Highland II* because they applied to potential claims against non-debtors.[115] In overruling the objection from the U.S.

---

[112] *See Highland I*, 48 F.4th at 439 ("In sum, the Plan violates § 524(e) but only insofar as it exculpates and enjoins certain non-debtors. . . We otherwise affirm the inclusion of the injunction and the gatekeeper provisions in the Plan.").

[113] *See Highland II*, 132 F.4th at 362 ("The clear weight of Supreme Court and Fifth Circuit precedent dictates our holding: that a proper reading of *Highland I* requires that the definition of 'Protected Parties' used in the Plan's Gatekeeper Clause be narrowed coextensively with the definition of 'Exculpated Parties' used in the Exculpation Provision.").

[114] *See In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. April 15, 2025) (Docket No. 227); *In re DocuData Solutions, L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 23, 2025) (Docket No. 834).

[115] *See United States Trustee's Objection to Disclosure Statement and Joint Prepackaged Chapter 11 Plan of Reorganization of Cutera, Inc. and its Affiliated Debtors*, *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. April 9, 2025) (Docket No. 200); *United States Trustee's Objection to Confirmation of the Joint Plan of Reorganization of DocuData Solutions, L.C. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, *In re DocuData Solutions, L.C.*, No. 25-90023 (CML) (Bankr. S.D. Tex. June 11, 2025) (Docket No. 772).

Trustee in *Cutera*, this Court stated that "*Highland II* really focused on the scope issue and whether you could have an injunction that was broader than the exculpated parties" and ruled that the gatekeeping function for a consensual release was "appropriate" based off a reading of *Highland II*.[116] Similarly, here, the Gatekeeper Provision is appropriate because it only applies to Claims or Causes of Action against Exculpated Parties and against Released Parties, but solely to the extent such Claims or Causes of Action are assertable by, or on behalf of, Releasing Parties

246.    Accordingly, objections with respect to the Plan's Injunction Provisions and Gatekeeper Provision are without merit and should be overruled.

**E.    *Objections that the Plan Improperly Discharges Claims Should be Overruled***

247.    The Commonwealth argues[117] that Section 12.5 of the Plan (the Plan Injunction) operates as a discharge in violation of section 1141(d)(3) of the Bankruptcy Code.  The Commonwealth asserts that the Plan Injunction is "permanent" and should be modified to be only "temporary relief until such time that the Debtors' assets have been liquidated." *Id*.  This argument misconstrues the Plan Injunction, which allows for parties to seek relief from the injunction and is an essential tool to implement the Plan and assure creditor recoveries are not impaired by third-party actions.

248.    The Plan Injunction is well within the norm of what other liquidating plans have confirmed, and does not effectuate a discharge in violation of section 1141(d)(3) by its terms. To remove any doubt, the Confirmation Order expressly provides that the Debtors will not receive a discharge under section 1141, similar to other chapter 11 liquidating plans which have been confirmed.  *See* Proposed Confirmation Order ¶ 16 ("In accordance with the Plan and pursuant to

---

[116]    *See* Hr'g Tr. 94:14-16, 95:17, *In re Cutera, Inc.*, No. 25-90088 (ARP) (Bankr. S.D. Tex. April 16, 2025) (Docket No. 251).

[117]    Commonwealth Obj. ¶ 30.

119

this Confirmation Order, confirmation of the Plan does not provide the Debtors with a discharge under section 1141 of the Bankruptcy Code, because the Debtors and their Estates will be wound down in accordance with the Plan."). In *Midway Gold US. Inc.*, the court overruled an objection to a plan injunction and confirmed the liquidating chapter 11 plan with similar express language in the plan injunction which stated:

> Pursuant to Section 1141(d)(3) of the Bankruptcy Code, confirmation of this Plan will not discharge the Debtors; *provided, however*, upon confirmation of the Plan, the occurrence of the Effective Date, and Distributions hereunder, Claimants may not seek payment or recourse against or otherwise be entitled to any Distribution from the Liquidating Trust Assets except as expressly provided in this Plan and the Liquidating Trust Agreement.

*In re Midway Gold US, Inc.*, 575 B.R. 475, 515 (Bankr. D. Colo. 2017). The court held the "express limitation on any discharge awarded the Debtors" contained was sufficient to hold there was no *de facto* discharge.

249. The terms of the Plan are similar to other injunction provisions which have been approved and provide that the rights which parties have against the Debtors and their estates are administered through the Plan. *See* Hr'g Tr. 23:9-24:15; *In re JRV Grp. USA L.P.*, No. 19-11095 (CSS) (Bankr. D. Del. June 19, 2020) (Docket No. 456) (overruling objection that plan violated 1141(d)(3) by granting a de facto discharge, holding that the express releases, third-party releases, and injunction provided under the plan all independently were "appropriate and authorized by the Code" and as such were permissible); *see In re Kal Freight Inc.*, No. 24-90614 (CML) (Docket No. 1023) (Bankr. S.D. Tex. Apr. 17, 2025); *In re GWG Holdings, Inc.*, No. 22-90032 (MI) (Bankr. S.D. Tex. June 22, 2023) (Docket No. 1952) (approving similar plan injunction in liquidating case); *In re BBGI US, Inc.*, No. 20-11785 (CSS) (Bankr. S.D.N.Y. Mar. 5, 2021) (Docket 1104) (same); *In re Sears*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2019) (Docket No. 5370) (same).

250.     Unlike the Debtors' Plan and the cases cited above,  the case cited by the Commonwealth—*In re New Towne Dev., LLC*— involved a plan injunction provision that was broader by its terms. 410 B.R. 225 (Bankr. M.D. La. 2009).[118]    The injunction at issue in *New Towne* impermissibly sought to include acts which were wholly unconnected to the chapter 11 cases and as such is inapplicable.  *Id*. at 232.  The Plan Injunction is limited in scope and designed for the purpose of effectuating the Plan.

251.     The Commonwealth has misconstrued the plain language of the Plan Injunction.  By preventing extraneous litigation outside of the Plan, the Plan Injunction ensures that creditors are not impaired in seeking and obtaining their recoveries under the Plan.  The Plan Injunction implements the Debtor Releases, the Third Party Releases, and the Exculpation Provision embodied in the Plan, in part, by enjoining all persons and entities from, among other things, commencing or continuing in any manner any claim that was released or exculpated pursuant to such provisions.  Without the Injunction Provision, the carefully crafted and heavily negotiated structure and purposes of the Plan could be contravened.  Defending against lawsuits that are otherwise subject to the release and exculpation provisions of the Plan would be costly and would deplete the Estates' scarce resources, ultimately reducing the recoveries of all creditors.  Such prohibited actions would clearly disrupt the proposed distribution structure incorporated in the Plan.  Further, the Plan is not a permanent discharge as it allows for parties to seek relief from the injunction, which is not possible under the power of a bankruptcy discharge.  As such, the objection should be overruled.

---

[118] Commonwealth Obj. ¶ 29.

### F. Objections Alleging Improper Classification Should be Overruled

252.    Certain objecting parties[119] allege that the Plan's classification scheme impermissibly gerrymanders certain voting classes in violation of section 1122 of the Bankruptcy Code.  These objecting parties argue that the FILO Bridge Claims and PBGC Claims should not be classified separately from General Unsecured Claims.   However, plan proponents have "significant flexibility in classifying claims under section 1122(a) of the Bankruptcy Code provided there is a reasonable basis for the classification scheme and all claims within a particular class are substantially similar." *Idearc*, 423 B.R. at 160; *see also In re Heritage Organization, L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex 2007) (recognizing "the Fifth Circuit has continued to recognize the existence of valid business justifications for separate classification of claims of equal rank and priority"); *In re Dow Corning Corp*, 280 F.3d 648, 661 (6th Cir. 2002) ("Section 1122(a) does not demand that all similar claims be in the same class. To the contrary, the bankruptcy court has substantial discretion to place similar claims in different classes.") (internal citations omitted).  The classification scheme provided by the Plan is based on material differences between the claims in different classes and their separate classification is supported by valid business justifications.[120]  The objections misstate the record and misconstrue applicable law and should therefore be overruled.

#### 1.    Separate Classification of the FILO Bridge Claims Is Appropriate

253.    First, separate classification of the FILO Bridge Claims (Class 3) from General Unsecured Claims (Class 4) and PBGC Claims (Class 5) is clearly rational and justified, as the FILO Bridge Claims are secured claims and therefore not "substantially similar" to the

---

[119] Commonwealth Obj. ¶¶ 39-46, TRACO Obj. ¶¶ 52-55, DCP Participants Obj. ¶¶ 13-14.

[120] *Infra* section III.A.1.

General Unsecured Claims or the PBGC Claims. Classes of claims are not substantially similar where parties have "different legal rights against the estate that justify their separate classification." *In re Heritage Organization,* 375 B.R. at 301. It is well established that secured claims have different legal rights than unsecured claims and must be classified separately from unsecured claims. *See In re Premiere Network Services, Inc.*, 333 B.R. 130, 134-35 (Bankr. N.D. Tex. 2005) (to the extent the claim at issue was secured, "its rights are legally different from the unsecured creditors, and § 1122(a) does not allow classification of SBC together with the unsecured creditors"); *In re Cypresswood Land Partners I*, 409 B.R. 396, 434 (Bankr. S.D. Tex) ("secured creditors can, and usually must, be classified separately.").

254. The FILO Bridge Claims are secured by a lien on substantially all of the Debtors' assets. *See* FILO DIP Order ¶ H. The FILO Settlement has not yet been consummated, and the FILO Parties are entitled to vote all of their secured FILO Bridge Claims as they exist today. As in any chapter 11 plan, pre-petition secured claims are separately classified because they hold rights distinct from those of General Unsecured Claims.

255. Pursuant to the Plan, the FILO Parties have agreed that the Retained FILO Claims, a portion of the FILO Bridge Claims that is secured by the property of the Debtors, will be subordinated and receive a lower recovery than it is otherwise entitled to. The objecting parties mischaracterize this subordination, incorrectly asserting that the Retained FILO Claims is presently unsecured. In truth, absent confirmation of the Plan, the Retained FILO Claims will continue to be secured by the Retained Cash (as defined in the FILO Settlement Term Sheet) and any other assets of the Debtors' assets.[121] However, as part of the global settlement with the Debtors and the Creditors' Committee, the FILO Parties have agreed to subordinate the Retained

---

[121] *See* FILO Settlement Term Sheet ¶ 4.

FILO Claims to administrative and priority creditors. Under that settlement, they have also agreed to accept interests in multiple liquidating trusts (*i.e.*, the Plan Trust and the Litigation Trust), make significant concessions on their interest rate and contractual multiple on invested capital, and allow the Debtors' obligations on such claims to cease on the Litigation Trust Establishment Date. *See* Disclosure Statement § 4.3(b).

256. The FILO Parties agreeing as part of the Plan to (i) subordinate their FILO Retained Claims to administrative and priority creditors and (ii) accept a lesser recovery on such claims, in each case pursuant to the Plan, does not alter the nature of their *underlying secured claims*, which is at the core of the inquiry for plan classification. *In re 500 Fifth Ave. Assoc.*, 148 B.R. 1010, 1020 (Bankr. S.D.N.Y. 1993), *aff'd*, No. 93 CIV. 844 (LFJ), 1993 WL 316183 (S.D.N.Y. May 21, 1993) (overruling an objection which "improperly focuse[d] on the motives and agenda of the claim holder rather than on the nature of the underlying claim").

257. The cases cited by the Commonwealth, TRACO and DCP Participants are inapposite. *Greystone III* held that a secured creditor's *unsecured* deficiency claim was incorrectly separately classified from general unsecured creditors under section 1122. *See Matter of Greystone III Joint Venture,* 995 F.2d 1274, 1279 (5th Cir. 1991). *Greystone III* is distinguishable for a number of reasons, most notably because it involved a case where the debtors separately classified deficiency claims from other unsecured claims without offering any valid business justification for such separate classification. *Id*. at 1279. In contrast, the FILO Bridge Claims are secured claims against the Debtors.

## 2. Separate Classification of the PBGC Claims Is Appropriate

258. Separate classification of the PBGC Claims (Class 5) from General Unsecured Claims (Class 4) is also rational and justified because the legal rights and the nature of the PBGC Claims are clearly distinct from holders of General Unsecured Claims. Unlike General

Unsecured Claims, PBGC Claims, by operation of law under ERISA, are entitled to and have been asserted as a joint and several liability of all Debtors. The PBGC filed three proofs of claim which were deemed filed against all Debtors[122] for amounts owed under certain ERISA provisions regarding unfunded or unpaid amounts relating to the New England Sinai Hospital Pension Plan. *See* Claim Nos. 3031, 3032, 3035. In the event of a single-employer pension plan being terminated by the plan sponsor in a distressed termination or by PBGC in an involuntary termination, ERISA provides for joint and several liability against any "contributing sponsor of the [pension] plan or a member of such a contributing sponsor's controlled group." 29 U.S.C. § 1362(a). The PBGC has asserted that all of the 167 Debtors qualify as either a contributing sponsor or a member of the controlled group, and are therefore joint and severally liable for their claims. *See PBGC Stipulation and Agreed Order* ¶ D.

259.   As such, the nature of the PBGC Claims under ERISA is dissimilar to the other General Unsecured Claims. Courts have regularly upheld plans separately classifying PBGC claims where separate classification is justified by this joint and several liability. *In re Sears Holding Corp.*, No. 18-23538 (RDD) (Hr'g Tr. 104:9-12) (Bankr. S.D.N.Y. Oct. 7, 2019) (overruling objection to separate classification of PBGC from general unsecured claims under a plan settlement "given PBGC's unusual rights against the Debtors . . . it was entirely reasonable and appropriate to classify it separately"); *In re Hardinge Inc.*, No. 24-11605 (JKS) (Docket No. 600) (Bankr. Del. Dec. 20, 2024) (confirming plan where PBGC Claims were separately classified from general unsecured claims on the basis of the difference of their legal rights and the nature of their claim and as a result of a plan settlement); *see, e.g.*, *In re BBGI US, Inc.*, No. 20-11785 (CSS)

---

[122]   *Stipulation and Agreed Order Permitting Pension Benefit Guaranty Corporation to File Consolidated Proofs of Claim Under One Case Number* (Docket No. 1824) (the "**PBGC Stipulation and Agreed Order**").

(Docket No. 1104) (Bankr. S.D.N.Y. Mar. 5, 2021) (same); *In re Dawson International Investments (Kinross) Inc.*, No. 16-11551 (JLG) (Docket No. 226) (Bankr. S.D.N.Y May 3, 2018) (same); *In re Avaya Inc.*, No. 17-10089 (SMB), (Bankr. S.D.N.Y., Nov. 28, 2017) (Docket No. 1579) (same); *In re Kaiser Aluminum Corp.*, No. 02-10429 (JKF), 2006 WL 616243, at *6 (Bankr. D. Del. Feb. 6, 2006), aff'd, 343 B.R. 88 (D. Del. 2006) (confirming a plan which classified unsecured claims of the PBGC separately from general unsecured claims "based on the fact that the PBGC Claims are allowed against each of the Reorganizing Debtors and are receiving the treatment negotiated in the PBGC Settlement Agreement").

260.    In contrast, none of the Objecting Parties have pointed to a single case holding that separate classification of PBGC claims from general unsecured claims is improper.

261.    The separate classification of the PBGC Claims is further supported by reasonable business justifications in light of the PBGC Settlement.  Courts have upheld separate classification where a settlement resolved unique issues posed by the nature of particular creditors' claims.  *See, e.g.*, *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 10-24549 (RDD), Hr'g Tr. 44:24–46:17 (Bankr. S.D.N.Y. Feb. 27, 2012) (ECF No. 3505) (approving separate classification of unsecured claims over accusation of improper gerrymandering where such groups had "holdup value" based on the legal rights of their claims and the cost of "unscrambl[ing] the various subsidiaries" was prohibitive);  *In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1167 (5th Cir. 1993) (upholding separate classification of unsecured creditors under proposed chapter 11 plan as appropriate due to unique business reasons surrounding creditors' claims); *In re Simon*, 2008 Bankr. Lexis 2787, at *18-19 (Bankr. E.D. Va. 2008) (finding appropriate the separate classification of certain general unsecured claims where "financial burden" of litigating such claims was a threat to the Debtor's estate and threatened viability of reorganization); *In re Colonial*

126

*Bancgroup, Inc.*, 2011 Bankr. 1984 (Bankr. M.D. Ala. May 20, 2011) (treating the resolution of potential litigation between bond issues as a proper purpose for separate classification from general unsecured creditors).

262.     The PBGC Settlement resolves potential litigation concerning the unique nature of PBGC's claims, including issues related to the Plan's proposed substantive consolidation for distribution purposes and the classification and amount of PBGC's claims.  Resolving these issues benefits all holders of Allowed General Unsecured Claims.  Absent the PBGC Settlement, because the Debtors are jointly and severally liable for the PBGC Claims under ERISA, the PBGC could assert and therefore recover their entire claim, up to the allowed amount, against each of the 167 Debtors independently, providing them with the opportunity for faster and greater recoveries than holders of General Unsecured Claims.

263.     As such, there are valid business justifications for separately classifying the PBGC Claims, including to (i) account for the PBGC's enhanced rights compared to general unsecured creditors, and (ii) settle disputes and avoid litigation with the PBGC by entering into the PBGC Settlement.[123]

---

[123] Further, certain objecting parties argue that Class 5 (PBGC Claims) should not be classified separately from General Unsecured Claims.  For the reasons discussed herein, the Debtors strongly disagree.  However, even if Class 5 (PBGC Claims) and Class 4 (General Unsecured Claims) voted in a single consolidated class, the General Unsecured Claims (inclusive of PBGC Claims) would only have voted to reject the Plan at 13 Debtor entities.  Of those 13 Debtor entities, 6 of the Debtor entities would have an impaired accepting class based on the Class 3 (FILO Bridge Claims).  Accordingly, even if the objecting parties were to succeed on their separate classification arguments with respect to PBGC Claims, only those 7 Debtor entities (each of which have limited to no activity) would not have an impaired accepting class.  Notably, none of the objecting parties have any claims at those 7 entities.  Therefore, none of the objecting parties are harmed by the separate classification of the PBGC Claims. In the alternative, the Debtors submit the Court should adopt a per plan approach for purposes of satisfying section 1129(a)(10).  *See, e.g., In re Transwest Resort Properties, Inc.*, 881 F.3d 724, 730 (9th Cir. 2018).

### 3. Arguments that Classes 3 and 5 Are Not Impaired Mischaracterize the Treatment of Such Classes Under the Plan.

264. The DCP Participants and the Commonwealth's arguments that Classes 3 and 5 are not impaired by the Plan are equally unavailing. The Commonwealth and the DCP Participants both assert that treatment of Classes 3 and 5 are the result of separate settlements and therefore the Plan itself does not impair these classes.[124] However, the FILO Bridge Claims and the PBGC Claims are impaired by Sections 4.3 and 4.5 of the Plan, respectively, and such impairment is contingent upon confirmation of the Plan. That the parties agreed to such impairment as part of a holistic plan settlement proves that their legal, equitable, and contractual rights are altered by the Plan itself. *See W. Real Estate Equities, L.L.C. v. Vill. at Camp Bowie I, L.P. (In re Vill. at Camp Bowie I, L.P.)*, 710 F.3d 239, 244 (5th Cir. 2013) ("a plan impairs a class of claims unless it 'leaves unaltered the legal, equitable, and contractual rights' of the claim holders."). Accordingly, both the FILO Bridge Claims and the PBGC Claims are properly identified as impaired classes.

265. The subordination of the Retained FILO Claims pursuant to Section 4.3 of the Plan is, by definition, impairment of the FILO Bridge Claims.[125] *See* 11 U.S.C. § 1124; *see also In re Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc.*, 914 F.2d 810 (6th. Cir. 1990) (holding that lenders' "loan would be impaired as a matter of law if [the debtor's] obligation to pay the loan was extinguished and a different party substituted to assume the payments"); *see also In re G.L. Bryan Investments, Inc.*, 2006 Bankr. LEXIS 577, at *8–9 (Bankr. D. Col. Mar. 8, 2006)

---

[124] *See* Commonwealth Objection ¶ 45; DCP Participants Objection ¶ 13.

[125] Moreover, the FILO Parties have agreed to accept interests in multiple liquidating trusts (*i.e.*, the Plan Trust and the Litigation Trust) with significant compromises on their interest rate and contractual multiple on invested capital).

(creditors' claims were impaired because the chapter 11 plan deferred the payment of their claims and reduced the interest rate).

266.     Similarly, the PBGC Claims are impaired by Section 4.5 of the Plan which is contingent on Plan approval.  Accordingly, the PBGC Claims qualify as impaired under section 1124 of the Bankruptcy Code.  Indeed, it is well accepted that a creditor can agree to impairment of its claims as part of a plan settlement.  *See In re Robertshaw*, No. 24-90052, (CML) (Bankr. S.D. Tex. Oct. 2, 2024) (confirming plan where certain creditors were impaired under settlement approved as a part of plan); *see In re the Great Atlantic & Pacific Tea Co.,* No. 10-24549, Hr'g. Tr. 52:12-24 (RDD) (Bankr. S.D.N.Y. Mar. 7, 2012) (where settlement agreement was conditioned upon confirmation of the plan and confirmation was integral to the agreement, such claim is impaired).  This is exactly what the PBGC claimants have agreed to.

267.     Accordingly, in accordance with section 1124 of the Bankruptcy Code, the FILO Bridge Claims and PBGC Claims are both properly identified as impaired classes and the objections should be overruled.

### G.     *Objections to the Treatment of Administrative Expense Claims and Professional Fee Claims Should be Overruled*

268.     Certain objecting parties[126] argue that the treatment of Administrative Expense Claims and Professional Fee Claims violate section 1123(a)(4) of the Bankruptcy Code.  These objections are deficient as a matter of law.  Section 1123(a)(4) applies only to the treatment of claims in the *same* class.  As priority claims, neither Administrative Expense Claims nor Professional Fee Claims are classified under the Plan, and they certainly do not share the *same*

---

[126]   DCP Participants Obj. ¶ 17; Access Obj. ¶¶ 16-17; NorthStar Obj. ¶ 9; Igoe Obj. ¶¶10-12; Commonwealth Obj. ¶¶25-28.

class. Objections based on section 1123(a)(4) are therefore irrelevant and should be overruled without further consideration.

269. Moreover, the Plan does not discriminate against Administrative Expense Claims in favor of Professional Fee Claims, rather, Professional Fee Claims have different rights that result in different treatment under the Plan. Specifically, the Professional Fee Claims are secured by the Carve Out funds in the Professional Fee Escrow Account, covered by an existing Interim Compensation Order, and subject to a stringent review and allowance process under the Plan. Accordingly, objections that the Plan discriminates against Administrative Expense Claims or violates section 1123(a)(4) should be overruled.

### 1. Section 1123(a)(4) is Inapplicable.

270. Section 1123(a)(4) applies only to the treatment of claims within the *same* class. *See* 11 U.S.C. § 1123(a)(4) (requiring that a plan "provide the same treatment for each claim . . . of a particular class, unless the holder of a particular claim . . . agrees to a less favorable treatment."); *see also In re Superior Offshore Int'l, Inc.*, 591 F.3d 350, 355 (5th Cir. 2009) ("Section 1123(a)(4) only requires equal treatment of members within the same *class*."); 7 Collier on Bankruptcy ¶ 1123.01 (16th ed. 2025) ("The equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims."). However, consistent with the Bankruptcy Code, neither Administrative Expense Claims nor Professional Fee Claims are classified under the Plan. *See* 11 U.S.C. § 1123(a)(1) (A plan must designate classes of claims "other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of" the Bankruptcy Code); *see also In re Tree of Life Church* 522 B.R. 849, 859 (Bankr. S.C. 2015) ("[A] debtor's discretion [in classifying claims] is expressly limited by the statutory exclusion from designation as part of a 'class' for voting purposes of claims of the types specified in §§ 507(a)(2), 507(a)(3), and . . . § 507(a)(8)."). Therefore, any alleged disparate treatment among

130

Administrative Expense Claims and Professional Fee claims cannot violate section 1123(a)(4) because the Administrative Expense Claims and Professional Fee Claims are not in any class, let alone the *same* class.

271. The cases cited by the Objections, including *Serta Simmons*, are inapposite. *See, e.g.*, *In re Serta Simmons Bedding, L.L.C.*, 125 F.4th 555, 592 (5th. Cir. 2024) (finding that disparate treatment between members of the *same* class violated § 1123(a)(4), but saying nothing about differently situated priority claimants which do not share a class); *In re Superior Tomato-Avocado, Ltd.*, 481 B.R. 866, 871-72 (Bankr. W.D. Tex. 2012) (approving separate treatment to PACA claimants who were differently situated); *In re Albert Lindley Lee Memorial Hosp.*, 428 B.R. 283, 288 (Bankr. N.D.N.Y. 2010) (approving different treatment for differently situated tax claimants). In fact, no Objecting Party cites a single case holding that a Plan's treatment of administrative expense claims and professional fee claims violated section 1123(a)(4).

## 2. The Plan Does Not Discriminate Against Administrative Expense Claims.

272. Even if section 1123(a)(4) were applicable (it is not), the Plan does not unfairly discriminate against Administrative Expense Claims. As a preliminary matter, Professional Fee Claims and Administrative Expense Claims are differently situated, and thus treated differently under the Plan. Unlike other administrative claimants, the Estate Professionals agreed to provide their services in these chapter 11 cases because they were guaranteed certain protections embodied in the Interim Compensation Order and by the negotiated Carve Out from secured lenders' collateral under DIP Orders, including an exclusive entitlement to funds held in the Professional Fee Escrow Account. Specifically, the DIP Orders provide:

> The Debtors shall use funds held in the Professional Fees Escrow Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Local Rules, in accordance

131

> with any interim or final orders of the Court . . . . [T]he Carve-Out
> and the entitlement of the Professional Persons to the Carve-Out and
> the Professional Fees Escrow Account proceeds shall be senior to
> all liens and claims, including those securing the DIP Facility, the
> Adequate Protections Liens, and the 507(b) Claims, and any and all
> forms of adequate protection, liens, or claims securing the DIP
> Obligations or the Prepetition Secured Obligations.

MPT DIP Order ¶¶ 4(d), (g); FILO DIP Order ¶¶ 4(d), (g).  The DIP Orders further provide that

the Professional Fee Escrow Account, "shall not be subject to the control, liens, or claims of the

FILO DIP Secured Parties, the Junior DIP Lender, or any of the Prepetition Secured Parties, or

any other party or entity (other than the control of the Debtors)."  FILO DIP Order ¶ 4(c); *see also*

MPT DIP Order ¶ 4(c) (including substantially similar language).  Accordingly, the funds in the

Professional Fee Escrow Account are not property of the estate and non-Estate Professional

administrative claimants cannot recover from such funds.  *See, e.g.*, *In re Dolphin Titan Int'l, Inc.*,

93 B.R. 508, 512 (Bankr. S.D. Tex. 1988) (holding that  funds placed in escrow to assure payment

of worker's compensation claims was not estate property); *In re U.S. Flow Corp.*, 332 B.R. 792,

797-98 (Bankr. W.D. Mich. 2005) ("The property earmarked and conveyed for the benefit of the

court-appointed professionals is specifically reserved solely for the purpose of compensating a

category of chapter 11 professionals.").  Because the DIP Orders provide professional fee

claimants with protections that other administrative creditors do not have, the treatment of

Professional Fee Claims is justified.

273.    In *In re Sears Holdings Corp.*, the court cast doubt on the merits of an attack

on estate professionals' fees noting that the professionals negotiated for carve-out protections that

were not challenged prior to court approval.  *See In re Sears Holdings Corp.*, Case No. 18-23538

(Bankr. S.D.N.Y. Aug. 22, 2019), Hr'g Tr. 109:15-110:1 (stating that professional fees are subject

to the carve-out and the possible risk of administrative insolvency did not require changing the

interim compensation procedures).  The *Sears* Court stated:

> [T]he point of a carve-out is to deal with [the issue of administrative insolvency]. . . . There's no reason to have a carve-out other than if you're worried about that very issue. So if anyone was worried about it, they could've stood up and said, ' . . . [T]his isn't the type of carve-out you should be granting, Judge. Instead, it should be a 506(c) carve-out. So in fact, some amount of the expenses should actually be deducted from the secured creditor's claim.' . . . But to say that this order should be vacated based on the now reality of what was then the possibility for which the carve-out was expressly negotiated, which in the event of an administrative insolvency or risk of that, this doesn't seem to make a lot of sense to me.

*In re Sears Holdings Corp.*, Case No. 18-23538 (Bankr. S.D.N.Y. Oct. 3, 2019), Hr'g Tr. 229:3-18. This Court made similar statements in denying a similar attack on professionals' fees in *In re MLCJR, LLC.* Cox Oral Ruling at 12:15-18 ("The carveout for professional fees, in connection with the Debtor-in-possession financing, and the carveout in the conversion order were fully transparent and approved by the Court."). The record of the Debtors' chapter 11 cases demonstrates that no party challenged the Carve Outs in either of the DIP Orders. Accordingly, the Court should not modify the Estate Professionals' bargained-for rights embodied in the DIP Orders. *In re U.S. Flow Corp.*, 332 B.R. at 797 ("[I]t is now unfair to require the court-appointed professionals to lose their entitlement . . . after they relied upon a final nonappealable court order.").

274. This treatment is not unique to the Debtors' Plan. Nearly all complex chapter 11 cases provide a carve out for professional fees and distinct treatment under a plan that provides for payment in accordance with the bankruptcy court's interim compensation procedures. *See, e.g.*, *Docudata Sols.*, L.C., No. 25-90023 (CML) (Docket No. 834) (Bankr. S.D. Tex. Jun. 23, 2025); *In re DRF Logistics, LLC*, No. 24-90447 (CML) (Docket No. 530) (Bankr. S.D. Tex. Nov. 25, 2024); *Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Docket No. 2671) (Bankr. S.D. Tex. Nov. 14, 2024); *In re Robertshaw US Holding Corp.*, No. 24-90052 (CML) (Docket No. 960)

(Bankr. S.D. Tex. Aug. 16, 2024); *In re Envision Healthcare Corp.*, No. 23-90342 (CML) (Docket No. 1687) (Bankr. S.D. Tex. Oct. 11, 2023).

275.    The Plan also provides appropriate protections and procedures for the allowance of Professional Fee Claims that affords all parties in interest with an opportunity to review and object to the fees of Estate Professionals.  Pursuant to the Plan, Professional Fee Claims are only paid in accordance with the existing Interim Compensation Order and the payment of such professional fees are subject to  entry of an Order approving each professional's application for final allowance of compensation.  *See*  Plan § 2.3.  All parties in interest will have a full and fair opportunity to review the final fee applications and object to the extent such fees should not be allowed.  *Id*.  Professional Fee Claims will only paid in such amounts as are allowed by the Bankruptcy Court.  *Id*.

276.    Despite these distinguishing features and significant procedural protections, the objecting parties continue to advance the false narrative that professionals are receiving unfair preferential treatment at the expense of other administrative creditors that are providing services without being paid.[127]  The objecting parties are wrong.  Since establishing the Administrative Claims Bar Date,  the Debtors have generally been paying administrative expense claims as such claims are incurred for critical services rendered to the estate, including non-professionals. Numerous Administrative Expense Claims belonging to other critical service providers, such as employees and vendors, among others, have been and continue to be paid on a regular basis.  These critical service providers, like estate professionals, are necessary for the Debtors to administer their chapter 11 cases and monetize their remaining assets for the benefit of all creditors.  None of the

---

[127]    The Objections also mischaracterize the Plan to suggest the Debtors are pursuing confirmation for the benefit of estate professionals.  For example, the DCP Objection contends that the only function of the Plan is to secure $15 million to pay estate professionals.  In truth, the $15 million of Retained Cash is largely being set aside for vendors under the Administrative Expense Claims Consent Program, not professionals.

objecting parties argue that these payments to critical Administrative Expense Claims violate section 1123(a)(4). Instead, the Objecting Parties draw an arbitrary line at paying Professional Fee Claims seemingly for no reason other than estate professionals tend to be the typical targets for frustrated parties in challenging chapter 11 proceedings.

277. Accordingly, for the foregoing reasons, this Court should overrule objections that the Plan unfairly discriminates between professionals and other administrative expense creditors.[128]

### 3. The Consent Program Does Not Discriminate

278. Certain objecting parties also argue that the Administrative Expense Claims Consent Program creates unequal treatment in violation of section 1123(a)(4) of the Bankruptcy Code.[129] This objection fails for multiple reasons. First, section 1123(a)(4) does not apply to administrative expense claims because such claims are not classified under the Plan. Moreover, because participation in the program is consensual, the program complies with that section. *See* 1123(a)(4) (requiring each claim in a class to receive the same treatment "unless the holder of a particular claim . . . agrees to a less favorable treatment"). Each holder that is eligible to participate in the Administrative Expense Claims Consent Program received a form, identifying a reconciled amount of their asserted Administrative Expense Claim and containing instructions on how to opt out of the program by the July 2, 2025 deadline. Those holders which elected to not participate in the Administrative Expense Claims Consent Program will not waive any portion of their claims and instead will be paid in full on the Effective Date of the Plan. As such, even if section

---

[128] Professionals retained by the Debtors, the Creditors' Committee, and the FILO Parties agreed to defer compensation to enhance the Debtors' liquidity and allow the Debtors to pursue confirmation of the Plan. *See* Plan Support Agreement § 3 (providing that 10% of all allowed fees incurred between April 1, 2025, and the Trust Establishment Date shall be deferred in accordance with that agreement).

[129] DCP Participants Obj. ¶ 17; Access Obj. ¶¶ 16-17.

1123(a)(4) were applicable to Administrative Expense Claims (which it is not), the Plan complies with its requirements. Further, the Administrative Expense Claims Consent Program is consistent with section 1129(a)(9)(A), which requires payment in full of allowed administrative expense claims on the effective date of a plan "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim." This Court has already held that "[t]o the extent an eligible holder of an Allowed Administrative Expense Claim does not timely, properly, and affirmatively opt out of the Administrative Expense Claims Consent Program, upon entry of the Confirmation Order, such holder's acceptance of and consent to the Administrative Expense Claims Consent Program will be deemed consent to the Plan and acceptance of the treatment under the Plan. . ." Disclosure Statement Order ¶ 28.

279. Multiple courts have confirmed settlements and chapter 11 plans which contain similar administrative expense claim consent programs. *In re Pier 1 Imps., Inc.* No. 20-30805 (KRH) (Bankr. E.D. Va. July 30, 2020) (Docket No. 967) (confirming a plan that included an administrative consent opt-out program); *In re Southern Foods Grps.*, LLC, No. 19-36313 (DRJ) (Bankr. S.D. Tex. July 21, 2020) (Docket No. 2724) (approving administrative claims consent program where administrative claimants would receive accelerated cash distributions in exchange for reducing the amount of their claims to a cash recovery in the aggregate amount of 80% of such claims); *In re Gemstone Sos. Grp.*, Inc., No. 19-30258 (KLP) (Bankr. E.D. Va. June 5, 2020) (Docket No. 1636) (confirming chapter 11 plan and finding that the administrative claim settlements thereunder were "integral to the Plan"); *In re Sears Holding Corporation*, No. 18-23538 (RDD) (Docket No. 5370) (Oct. 15, 2019) (confirming plan with administrative consent opt-out program); *In re Toys "R" US, Inc.*, No. 17-34665 (KLP) (Docket No. 4083) (E.D. Va. Aug

8, 2018) (approving settlement agreement prior to plan confirmation which, among other things, contained administrative expense opt-out program).

280. Accordingly, objections that the Administrative Expense Claims Consent Program provides for disparate treatment inconsistent with section 1123(a)(4) should be overruled.

## H. *Objections to Substantive Consolidation Should Be Overruled*

281. As a proposed compromise and settlement of intercompany claims and issues by and among the Debtors, the Plan provides for the substantive consolidation of the Debtors solely for distribution purposes under the Plan. Plan, § 5.3. Here, substantive consolidation should be approved as part of the Plan Settlement reached pursuant to Bankruptcy Rule 9019 and section 1123(a)(5)(C), and because facts and circumstances of these cases easily satisfy the *Augie/Restivo* standard for substantive consolidation.

282. Indeed, bankruptcy courts routinely order substantive consolidation for distribution purposes as part of plan settlements under the Bankruptcy Rule 9019 standard. *See In re Enron Corp.*, No. 01–16034 (AJG), 2004 Bankr. LEXIS 2549, at *195 (Bankr. S.D.N.Y. July 15, 2004) ("It is well established that debtors may properly reach a settlement regarding whether the estates should be substantively consolidated."); *In re Winn-Dixie Stores*, 356 B.R. 239, 249–50 (Bankr. M.D. Fla. 2006) (approving substantive consolidation settlement pursuant to Bankruptcy Rule 9019). Settlements of substantive consolidation issues have been approved under the 9019 Standard pursuant to chapter 11 plans confirmed by courts previously. *See, e.g.*, *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2019) (Docket No. 5370) (approving substantive consolidation settlement under Bankruptcy Rule 9019); *In re The Great Atl. & Pac. Tea Co.,* No. 10-24549 (RDD), at 21 (Bankr. S.D.N.Y. Feb. 28, 2012) (Docket No. 3477) (same); *In re Lehman Bro. Holdings Inc.*, Case No. 08-13555 (JMP), at 13–14 (Bankr. S.D.N.Y. Dec. 6, 2011) (Docket No. 23023) (same); *Enron*, Bankr. LEXIS 2549, at *2–4, *195

(same); *In re WorldCom, Inc.*, Case No. 02-13533 (AJG), 2003 WL 23861928, at *38, *44–48 (Bankr. S.D.N.Y. Oct. 31, 2003) (same); *Winn-Dixie Stores*, 356 B.R. at 250–51 (same). Similarly, the Plan Settlement resolves, among other things, intercompany claims and issues by and among each of the Debtors and, therefore, the proposed substantive consolidation under the Plan should be evaluated under the standard for approving settlements under Bankruptcy Rule 9019. *See In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 10-24549 (RDD), Hr'g Tr. 43:7-21 (Bankr. S.D.N.Y. Feb. 27, 2012) (Docket No. 3505) ("As I noted in my original ruling, there are cases that treat a partial substantive consolidation as a settlement and I think do so appropriately . . . .").

283.    The settlement of intercompany claims and issues is an essential component of the Debtors' Plan to ensure a timely wind down of these chapter 11 cases and to maximize recoveries for general unsecured creditors. For administrative ease and to avoid significant costs and time associated with reconciling all of the Debtors' intercompany claims (approximately $11 billion in intercompany payables and receivables as of April 2024), the Plan provides that each Class of Claims and Interests shall be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors, for the purpose of making distributions in accordance with the Plan. *See* Plan § 5.3(b).

284.    Accordingly, the Debtors submit that the limited substantive consolidation pursuant to the Plan Settlement is fair, reasonable, and in the best interests of the Estates and should therefore be approved.

285.    In addition to satisfying Bankruptcy Rule 9019, the requested substantive consolidation for distribution purposes embodied therein satisfies the applicable substantive consolidation standard.

286.     As one court has stated, "the increase in mega-bankruptcy cases in recent decades, involving numerous interrelated corporate structures and, in particular, subsidiary corporations operating under a parent entity, seems to have created a more 'liberal' view that allows for consolidation more easily." *In re ADPT DFW Holdings, LLC*, 574 B.R. 87, 94 (Bankr. N.D. Tex. 2017); *see also In re AHF Dev., Ltd.*, 462 B.R. 186, 195 (Bankr. N.D. Tex. 2011) ("[T]he increased appearance of cases involving numerous interrelated corporate structures and, in particular, subsidiary corporations operating under a parent entity is credited with giving rise to a 'liberal' view that allows for consolidation more easily."). Substantive consolidation's purpose is to ensure all creditors are treated equitably. *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988) (internal citations omitted).

287.     The Fifth Circuit has not "adopted its own criteria for determining when substantive consolidation is appropriate," but has recognized bankruptcy courts' authority to order it. *ADPT*, 574 B.R. at 94; *see also In re Introgen Therapeutics, Inc.*, 429 B.R. 570, 582 (Bankr. W.D. Tex. 2010). Debtors must show that substantive consolidation is appropriate by a preponderance of the evidence. *Introgen*, 429 B.R. at 582; *see also ADPT*, 574 B.R. at 104. Although substantive consolidation is not ordered based on any "universally accepted standard," courts primarily apply two distinct tests—"a more traditional, factor based test and a balancing test." *Introgen*, 429 B.R. at 582.

288.     The Second and Third Circuits have distilled this test into "two critical factors." *Id.* at 582–83. Accordingly, substantive consolidation is justified where (i) "creditors dealt with the entities as a single economic unit" or (ii) "whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *Augie/Restivo*, 860 F.2d at 518 (internal citations omitted); *see also In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 1995). The presence

of either of these two factors is sufficient to justify substantive consolidation. *ADPT*, 574 B.R. at 96; *see also Introgen*, 429 B.R. at 583. The second factor is referred to as the "hopeless entanglement" test.

289. Under the hopeless entanglement test, substantive consolidation is appropriate where "all creditors will benefit because untangling is either impossible or so costly as to consume the assets." *Augie/Restivo*, 860 F.2d at 519; *see also Owens Corning*, 419 F.3d at 214 (hopeless entanglement justifies substantive consolidation when "separately accounting for the assets and liabilities of the distinct entities will reduce the recovery of every creditor—that is, when every creditor will benefit from the consolidation").

290. Comingling of debtors' assets and business functions justifies substantive consolidation where (i) "the time and expense necessary even to attempt to unscramble [these interrelationships] [is] so substantial as to threaten the realization of any net assets for all the creditors," or (ii) where "no accurate identification and allocation of assets is possible." *Augie/Restivo*, 860 F.2d at 519 (second alteration in original) (citation omitted). Additionally, the benefit to creditors justifying consolidation should derive "from cost savings that make assets available" rather than from the mere shifting of assets to benefit some creditors at the expense of others. *Owens Corning*, 419 F.3d at 214.

291. In addition to the hopeless entanglement test, courts also apply a "harm-balancing test." *ADPT*, 574 B.R. at 100–01; *see also Introgen*, 429 B.R. at 582. Substantive consolidation is warranted under this test when "'the economic prejudice of continued debtor separateness' outweighs 'the economic prejudice of consolidation.'" *Eastgroup Props. v. S. Motel Assoc., Ltd.*, 935 F.2d 245, 249 (11th Cir. 1991) (quoting *In re Snider Bros.*, 18 B.R. 230, 234 (Bankr. D. Mass. 1982)).

292.     When the hopeless entanglement test is satisfied, however, the balancing test points the same way.  2 Collier On Bankruptcy ¶ 105.09[2][a][ii][B] (16th ed. 2025) ("Such a showing of entanglement would undoubtedly satisfy the *Eastgroup* and *Snider* tests of necessity of consolidation to prevent harm or gain a benefit."); *ADPT*, 574 B.R. at 104 (explaining that substantive consolidation was appropriate under both tests where "the liabilities and contracts of the Debtors were a 'tangled mess' to try to unsort" and "separating the Debtors would be prohibitive and hurt all creditors").

293.     "Whether applying a traditional multi-factor test or the harm balancing test, the Debtors have demonstrated that substantive consolidation is appropriate." *Id.*  For example, in *ADPT*, the court found that, among other things, the debtors' liabilities and contracts were a "tangled" mess to try and unsort, and separating the debtors would be prohibitive and hurt all of the creditors.  *Id.*   Faced with no countervailing evidence of prejudice to any individual creditor, the court was "left to conclude that consolidation [would] benefit all creditors."  *Id.*

294.     This case consists of 167 Debtor entities, each of which is either a direct or indirect subsidiary of Debtor Steward Health Care System LLC ("**SHC**"), other than SHC's parent holding company.  *See* 1129 Decl. ¶ 18; *see also ADPT,* 574 B.R. at 102 ("[S]urely all reasonable minds must recognize that having 140 related debtors in bankruptcy together is *rare* and creates unique challenges in order to both: (a) protect stakeholders' legal rights, but at the same time (b) preserve limited resources and not unnecessarily drive up administrative expenses.").  Prior to the Petition Date, the Debtors operated as a substantially consolidated business.  For example, SHC provided shared services to several of its Debtor affiliates and incurred expenses from providing these services.  *See* 1129 Decl. ¶ 18. From a "nerve center," for instance, SHC, operating as a unified enterprise with its affiliated Debtors, provided shared

corporate management services, legal advice and related assistance, financial, tax and other services. *See id.* ¶¶ 18, 19; *ADPT*, 574 B.R. at 102 (noting decisions were made at one corporate headquarters rather than at five hospitals and 99 freestanding emergency rooms spread across three states). Also like the debtor in *ADPT*, (i) the payroll for the Debtors' enterprise was effectuated out of the headquarters in Dallas, Texas and (ii) all Debtors are jointly and severally liable on the FILO DIP Facility, and a majority of the Debtors are jointly and severally liable on the FILO Bridge facility. *See* 1129 Decl. ¶¶ 20, 23; *ADPT*, 574 B.R. at 102.

295.     Additionally, the Debtors maintained "a centralized cash management system," under which "cash for the corporate enterprise [was] swept and managed out of . . . central accounts." *See ADPT*, 574 B.R. at 102. SHC operated a cash management system for all Debtors, maintaining 137 collection accounts where patient and other operating collections were deposited. *See* 1129 Decl. ¶ 20. Cash collected in the accounts was automatically swept every day into SHC's corporate concentration account, and cash from this account was transferred to a master disbursement account and used to directly pay vendors. *See id.*

296.     In short, SHC and its affiliated Debtors accordingly interacted with vendors and other third parties as a unified enterprise. In the ordinary course of business, SHC negotiated and executed vendor contracts on behalf of multiple affiliated entities, often without distinguishing between individual Debtors, reflecting the centralized nature of SHC's operations and further demonstrates the propriety of substantive consolidation. *See id.* ¶ 19.

297.     Moreover, this centralized cash management system resulted in "substantial intercompany claims" between the Debtor entities. *See ADPT*, 574 B.R. at 102. Specifically, funds from the master disbursement account were used to directly pay vendors as well as fund SHC's other disbursement accounts, which in turn were used to pay the majority of the Debtors'

ordinary course operating expenses. *See* 1129 Decl. ¶ 20. In the ordinary course of operations of the Debtors' 31 hospitals, approximately 400 facility locations and 4,500 primary and specialty care physicians, the Debtors engaged in intercompany transactions with each other and other non-Debtor subsidiaries and affiliates. *See id.* ¶ 21

298. As of April 2024, there were approximately $11 billion in both intercompany payables and receivables. *See id.* ¶¶ 17, 27. The $11 billion in total receivables reflects the sum of all positive net balances from one entity to another, with the inverse being true for the total payable figure. *See id.* ¶ 27. These intercompany transactions involved, for instance, the collection of receivables from these facilities and operations into the corporate concentration account, as well as SHC's disbursements on behalf of other Debtors for expenses incurred in the ordinary course of business, such as payroll and vendor payments. *See id.* ¶ 21. In addition, many of the Debtors' hospitals also benefited from SHC corporate contracts when regional and national vendors were available. *See id.* As a consequence of the cash management system and the management of Debtors' enterprise on a substantially consolidated basis, SHC's affiliates were not separately capitalized to operate independently of intercompany transactions with SHC. *See id.*

299. And these assets and liabilities are "so scrambled that separating them is prohibitive and hurts all creditors." *See Owens Corning*, 419 F.3d at 211. The balances owed between these intercompany cannot be determined, much less the individual transactions necessary to validate them. *See* 1129 Decl. ¶ 18. Prepetition, in the ordinary course of business for years, the Debtors did not validate, reconcile and settle intercompany balances. *See id.* ¶ 22. Additionally, entity-by-entity intercompany balances were neither relied upon nor considered to be accurate in the normal course of business. Management instead typically relied on consolidated

financial statements or entity-level profit and loss statements. *See id.* Intercompany balances were similarly not considered reliable or relevant in connection with hospital sales. *See id.*

300. Additionally, transactions between SHC and eighteen hospitals acquired from IASIS Healthcare LLC in 2017 complicate matters further. When these hospitals transferred from a legacy enterprise resource planning system to Steward's accounting system, the transferred data included only account balance information, but not the transaction level detail required to reconcile intercompany transfers between and among these entities. The Debtors are accordingly unable to precisely determine the amounts due or paid between SHC and these others Debtor entities, *id.* ¶ 25, making a "tangled mess" of intercompany receivables and payables. *See ADPT*, 574 B.R. at 104. Compounding the problem, a significant portion of intercompany transactions between SHC and the 166 other Debtors were manually recorded in journal entries. *See* 1129 Decl. ¶ 25.

301. As a result, the Debtors' accounting system does not contain information necessary to determine the nature of these transactions, a necessary first step to determine their accuracy and reconcile them. *See id.* For each transaction, the Debtors would have to locate physical journals, determine whether sufficient documentation underlying the transaction between the respective Debtor entities exists, and if so, undertake a reconciliation of the transaction. *See id.* This would be an extremely expensive and time-consuming endeavor, and may in any event be futile. For one, the Debtors are not aware of whether this required documentation even exists, much less whether it is in usable condition. *See id.* And even if these manual entries do exist and can be secured, validating and reconciling the transactions they reflect would be impracticable if not impossible. *See id.* SHC collected over $5 billion each year on a net basis. *See id.* Even if they existed in suitable condition, reconciling approximately 200,000 intercompany transaction

entries per year (cumulatively in the multi-millions), would require a herculean effort. And this effort would be made all the more difficult and even more expensive by the exit of approximately 25 employees, including those holding key financial positions, which has deprived SHC of effectively all institutional knowledge of these transactions. *See id.*

302.    This exercise would be required for all of the Debtors likely to have distributable assets. The time and expense this process would take would harm every creditor, consuming valuable resources and ultimately reducing value that otherwise will be distributable to unsecured creditors. *See id.* ¶ 27. In short, "separating the Debtors would be prohibitive and hurt all creditors." *See ADPT*, 574 B.R. at 104. Conversely, removing this impediment would benefit general unsecured creditors by maximizing their prospects of recovery. *See* 1129 Decl. ¶ 27. Finally, even if this task could be accomplished, it would remain impossible to accurately determine SHC's intercompany balances for SHC or the eighteen IASIS hospital Debtor entities. *See id.* ¶ 26. For this reason, the Debtors submit that the request for limited substantive consolidation for distribution purposes satisfies the test and should be approved.

**I.**    *Objections to the Medical Liability Claim Procedures Should be Overruled*

303.    The Plan provides that all Medical Liability Claims against the Debtors arising prior to the Effective Date (the "**Debtor Medical Liability Claims**") shall be reconciled and liquidated pursuant to the Medical Liability Claim Procedures.[130] This Court should approve the Medical Liability Claim Procedures because such procedures are consistent with the Bankruptcy Code and applicable law and are justified under the circumstances. The Medical Liability Claim Procedures are the product of good-faith, arms'-length negotiations with the Creditors' Committee, offer an efficient and streamlined approach for attaining the just, speedy,

---

[130]    The Medical Liability Claim Procedures are attached to the Plan as <u>Exhibit D</u>.

and cost-efficient determination of allowance of every Debtor Medical Liability Claim and are designed to provide substantially similar treatment to all holders of Debtor Medical Liability Claims. Importantly, the Medical Liability Claim Procedures expressly preserve the rights of holders of Debtor Medical Liability Claims to pursue the liquidation of their claims in the judicial tort system.

304. This Court has ample authority to authorize the establishment of the Medical Liability Claim Procedures, specifically pursuant to sections 1123(b) and 105(a) of the Bankruptcy Code. Section 1123(b)(6) of the Bankruptcy Code provides that a plan may include "any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6); *see Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 218 (2024) (construing section 1123(b)(6) of the Bankruptcy Code to permit a plan to include provisions that affect the "rights and responsibilities" of the debtor and "its relationship with creditors). Section 105(a) of the Bankruptcy Code authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Bankruptcy courts have authority pursuant to these provisions of the Bankruptcy Code to require claimants to participate in a centralized claims resolution process and have done so when a debtor is faced with resolving a large number of tort claims in a bankruptcy proceeding. *See, e.g.*, *In re Tehum Care Services, Inc.*, No. 23-90086 (CML) (Bankr. S.D. Tex. Mar. 2, 2025) (Docket No. 2014) (confirming plan which allowed creditors to liquidate their claims against the debtor by participating in a personal injury and wrongful death settlement trust in accordance with certain trust distribution procedures); *In re Honx, Inc.*, No. 22-90035 (Bankr. S.D. Tex. Feb. 16, 2024) (Docket No. 1332) (confirming plan with an injunction requiring asbestos claimants to proceed against section 524(g) asbestos channeling trust with distributions to made in

146

accordance with certain trust distribution procedures); *In re Boy Scouts of Am. and Del. BSA, LLC*, No. 210343 (LSS) (Bankr. D. Del. Sept. 8, 2022) (Docket No. 10316) (confirming plan with an injunction requiring abuse claimants to proceed against a settlement trust with distributions to be made in accordance with certain trust distribution procedures); *In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) (Docket No. 1115) (confirming plan requiring the establishment of a Victims Restitution Trust for the benefit of all holders of allowed personal injury claims to be analyzed in accordance with a certain claims analysis protocol).

305.    Utilizing the Medical Liability Claim Procedures, the Debtors anticipate resolving, through negotiations, a sizable number of the Debtor Medical Liability Claims, and having a streamlined process to address any Debtor Medical Liability Claim that cannot be consensually resolved. In light of the benefits of claim resolution procedures, courts in this district and others have granted similar relief in other large chapter 11 cases. *See, e.g.*, *In re NPC Int'l, Inc.*, No. 20-33253 (DRJ) (Bankr. S.D. Tex. May 25, 2021) (Docket No. 1714) (approving alternate dispute resolution procedures requiring participation in an offer and exchange process and mediation for resolution of personal injury, wrongful death and property damage claims prior to providing claimants relief from the plan injunction); *In re Prospect Medical Holdings, Inc.*, No. 25-80002 (SGJ) (Bankr. N.D. Tex. June 4, 2025) (Docket No. 2181) (approving claim resolution procedures to resolve prepetition professional liability and general liability claims against the debtors); *In re Yellow Corp.*, No. 23-11069 (CTG) (Bankr. D. Del. Feb. 26, 2024) (Docket No. 2389) (approving alternative dispute resolution procedures to facilitate the resolution of personal injury, wrongful death and property damage claims against the debtors).

306.    Without the implementation of the Medical Liability Claim Procedures, the Debtors may be forced to individually litigate hundreds of Debtor Medical Liability Claims filed

against them to the detriment of the Debtors' other creditors.  Indeed, the magnitude of the Debtor

Medical Liability Claims (approximately 556 claims), coupled with their aggregate asserted

amounts (over $12 billion) could, if not resolved expeditiously and economically, unduly delay

the reconciliation of the Debtors' claims pool,  deplete the resources of the Estates and substantially

reduce recoveries available for creditors.  The Medical Liability Claim Procedures will allow the

Debtors to resolve a substantial portion of the Debtor Medical Liability Claims consensually

without requiring the Debtors or claimants to expend significant time and resources.

307.    Nevertheless, certain parties object to the Medical Liability Claim

Procedures because such procedures allegedly (i) will prohibit parties from pursuing their claims

against non-Debtor third parties; (ii) impede on the rights of claimants to pursue their Debtor

Medical Liability Claims in the tort system; and (iii) seek to enjoin parties from continuing

litigation on behalf of their Debtor Medical Liability Claims despite that the Debtors previously

agreed to lift the stay with respect to such claims.  Such objections are addressed below.

### 1.    Holders of Debtor Medical Liability Claims Retain Ability to Pursue their Claims Against Non-Debtor Third Parties

308.    Certain objecting parties[131] allege that the Medical Liability Claim

Procedures prevent such parties from pursuing claims they may hold against non-Debtor third

parties.  Such assertions, however, are simply not true.  The Plan is clear that the purpose of the

Medical Liability Claim Procedures is to "reconcil[e] and determin[e] the Allowed amount of

---

[131]    *See* Personal Injury Claimants Obj. (Docket No. 5294) ¶¶ 2, 11-14, 16-20; TRACO Obj. ¶ 69; Grogg Obj. ¶ 8.
The Personal Injury Claimants also allege that implementation of the Medical Liability Claim Procedures would
undo months of work such claimants have made in pursuing their claims against non-debtor insurers and
physicians.  *See* Personal Injury Claimants Obj. ¶¶ 26-32.  Such assertions are plainly inaccurate.  The Medical
Liability Claim Procedures are abundantly clear that they only apply to claims against the Debtors and thus allow
for the continued pursuit of claims against non-debtor insurers and physicians.

Medical Liability Claims *against the Debtors*."[132]   The Medical Liability Claim Procedures are also clear that they do not apply to claims against third parties and state "The Estate Representative shall adopt and implement [the Medical Liability Claim Procedures] for reviewing and liquidating all unliquidated claims *against the Debtors* arising out of or related to alleged negligence in connection with the rendering of medical care arising prior to the Effective Date."[133]   The Medical Liability Claim Procedures also state that any finding or determination by the Estate Representative with respect to a Debtor Medical Liability Claim "shall not be binding or used for any other purpose other than allowance of the Debtor Medical Liability Claim for distribution purposes under the Plan."[134]   Thus, the Medical Liability Claim Procedures are abundantly clear that their application is limited to claims against the Debtors and that the determination of the Allowance of such claims has no application on non-Debtor third parties.

### 2.   Holders of Debtor Medical Liability Claims Retain Ability to Pursue Their Claims in the Tort System

309.   Contrary to the assertions of certain objecting parties,[135] the Medical Liability Claim Procedures do not preclude holders of Debtor Medical Liability Claims from pursuing such claims in the tort system, nor do they interfere with any claimant's right to a jury trial.   Rather, the procedures are designed to facilitate the timely and cost-efficient resolution of claims by encouraging a consensual process in the first instance.   If a consensual resolution cannot be reached, claimants retain the ability to liquidate their claims through the tort system, including

---

[132]   Plan, at 13; *see also* Plan § 9.12 ("All Medical Liability Claims *against the Debtors* shall be reconciled in accordance with the Medical Liability Claim Procedures.").

[133]   Plan, Ex. D (emphasis added).

[134]   *Id.*

[135]   *See* Grogg Obj. ¶ 12; Michelsons Obj. (Docket No. 5320) ¶¶ 5-6.

by jury trial if applicable.[136] This approach is entirely consistent with claims resolution procedures and trust distribution procedures approved by this Court and other bankruptcy courts, which similarly promote the consensual resolution of claims while preserving claimants' rights to proceed in the tort system.[137]

### 3. Injunction to Enforce Medical Liability Claim Procedures is Necessary Under the Circumstances and Consistent with Applicable Law

310.  Enjoining parties from continuing litigation against the Debtors on behalf of Debtor Medical Liability Claims is necessary to implement and enforce the terms of the Plan and this Court has consistently recognized its authority to issue an injunction under such circumstances.  *See, e.g.*, *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. Nov. 14, 2024) (approving chapter 11 plan's injunction upon finding that such injunction was essential to the plan and necessary to implement the plan's terms); *In re Talen Energy Supply, LLC*, No. 22-90054 (MI) (Bankr. S.D. Tex. Dec. 20, 2022) (Docket No. 1760) (same); *In re Fieldwood Energy LLC*, No. 20-33948 (MI) (Bankr. S.D. Tex. June 25, 2021) (Docket No. 1751) (same); *In re PWS Winddown LLC*, No. 20-33642 (DRJ) (Bankr. S.D. Tex. Jan. 11, 2021) (Docket No. 477) (same).

311.  Certain objecting parties allege it is unfair to require their participation in the Medical Liability Claim Procedures because the Debtors previously stipulated to stay relief.[138] However, the stipulations entered by such objecting parties expressly contemplate that such relief

---

[136]  *See* Plan, Ex. D ("Holders, who at the conclusion of Mediation elect to proceed with liquidating their Debtor Medical Liability Claim in the tort system, retain the right to institute or continue a lawsuit in the tort system against the Estate Representative in the appropriate jurisdiction.").

[137]  *See supra* §§ 304-305.

[138]  *See* Personal Injury Claimants Obj. ¶¶ 21-32; Grogg Obj. ¶ 11.

could be reexamined by the Court.[139]   Moreover, such stipulations were negotiated and agreed to

at a time when the Debtors had no chapter 11 plan on file or procedures in place to resolve the

Debtor Medical Liability Claims at issue.   Now that the Debtors (working in good faith with the

Creditors' Committee) have proposed the Plan and developed Medical Liability Claim Procedures

that offer an efficient, streamlined and just approach for determining the allowance of Debtor

Medical Liability Claims, it is fair and appropriate for holders of such claims to be subject to their

requirements.

312.   A stay is also justified under the circumstances pursuant to section 105(a)

of the Bankruptcy Code.   Section 105(a) "empowers the bankruptcy court 'to enjoin parties other

than the bankrupt' from commencing or continuing litigation" that "threatens to interfere in the

rehabilitative process whether in a liquidation or in a reorganization case."   *A.H. Robins Co. v.*

*Piccinin*, 788 F.2d 994, 1002 (4th Cir. 1986) (quoting *In re Otero Mills, Inc.*, 25 B.R. 1018, 1020

(D.N.M. 1982)).   Assessing whether issuance of a section 105 injunction is proper requires a broad

inquiry into "whether the litigation 'could interfere with the reorganization of the debtor' or 'would

interfere with, deplete[,] or adversely affect property of [the] estates or which would frustrate the

statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan of

reorganization."   *In re W.R. Grace Co.*, 115 F. App'x at 570 (quoting *In re A.H. Robins Co.*, 828

F.2d 1023, 1025 (4th Cir. 1987) and *Johns-Manville Corp. v. Asbestos Litig. Grp. (In re Johns-*

*Mansville Corp.)*, 26 B.R. 420, 436 (Bankr. S.D.N.Y. 1983), *aff'd,* 40 B.R. 219 (S.D.N.Y. 1984),

*rev'd in part,* 41 B.R. 926 (S.D.N.Y. 1984)).

---

[139]   Specifically, each of the stay relief stipulations entered into with holders of Debtor Medical Liability Claims state "This stipulation shall not be modified, altered, amended or vacated without the written consent of all Parties hereto **or by further order of the Bankruptcy Court**."   *See, e.g.,* Stipulation Orders (Docket Nos. 1833-35, 2406, 2407, 2563).

151

313.     Section 105(a) can specifically be used to reimpose the automatic stay on parties for whom it was previously lifted.  *See Home Life Ins. Co. v. Abrams Square II, Ltd.*, 95 B.R. 51, 54 (N.D. Tex. 1988) ("[a]fter a stay is lifted it may be reimposed under section 105 and Rule 65 of the Federal Rules of Civil Procedure through Rule 7065 of the Federal Bankruptcy Rules"); *Texas Comptroller of Pub. Accts. v. Adams*, 617 B.R. 84, 90 (N.D. Tex. 2020) ("[c]ontinuance or reinstatement of an automatic stay 'is within the bankruptcy court's authority under 11 U.S.C. § 105(a).' . . . The continuation or reinstatement of the automatic stay under Section 105 is a form of injunctive relief, so the four requirements for injunctive relief must be satisfied."); *In re Zahn Farms*, 206 B.R. 643, 645 (B.A.P. 2d Cir. 1997) ("[a] request to 'reinstate' the § 362(a) stay is, in fact, a request for an injunction and should meet the standards therefor").

314.     When considering whether to grant preliminary injunctive relief under section 105(a), courts generally apply the traditional four-factor test for a preliminary injunction, tailored to the bankruptcy context:  "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the [preliminary injunction] is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the [preliminary injunction] is granted, and (4) that the grant of a [preliminary injunction] will not disserve the public interest." *Jones v. Tex. Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018); *Whole Woman's Health v. Paxton*, 264 F. Supp. 3d 813, 818 (W.D. Tex. 2017).  Here, the Debtors meet each of the four requirements for a preliminary injunction.

315.     The first factor, likelihood of success, is satisfied because the Debtor's prospects for a successful wind down pursuant to the Plan are strong.  In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully restructure in chapter 11.  *See, e.g.*, *In re Tribeca Lofts LP*, 2011 WL 3878369, at *3 n.5 (Bankr. S.D. Tex. Aug. 30, 2011) (explaining that courts have the requirement that the movant show a likelihood of success on the

152

merits to require, in the bankruptcy context, "a reasonable likelihood of successful reorganization") (quoting *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1095 (9th Cir. 2007)); *In re Bestwall LLC*, 2023 WL 4066848, at *10 (4th Cir. June 20, 2023) (explaining that "in a chapter 11 bankruptcy, the focus [of analyzing likelihood of success on the merits] is not on resolving a particular dispute but rather on the debtor's rehabilitation and reorganization"); *In re Purdue Pharms. L.P.*, 619 B.R. 38, 58 (S.D.N.Y. 2020) (explaining that courts have resolved the standard for issuing an injunction under section 105(a) to include "whether there is a likelihood of successful reorganization"); *In re Union Trust Phila., LLC*, 460 B.R. 644, 660 (Bankr. E.D. Pa. 2011) ("In the bankruptcy context, reasonable likelihood of success is equivalent to the debtor's ability to successfully reorganize."). Following months of good faith negotiations, the Debtors have successfully filed and solicited votes on the Plan, which is supported by the Debtors' key creditor constituencies, the FILO Parties and the Creditors' Committee. In addition, the FILO Settlement further maximizes the Debtors' prospects for a successful wind down. Thus, the Debtors are likely to successfully confirm and implement the Plan and the Debtors' prospects for effectuating a successful wind down weigh strongly in favor of the requested injunction.

316. Second, failure to reinstate the automatic stay to holders of Debtor Medical Liability Claims for which the automatic stay was previously lifted would irreparably harm the Debtors and their Estates. In analyzing irreparable harm, the key question is "whether the litigation 'could interfere with the reorganization of the debtor' or 'would interfere with, deplete or adversely affect property of [the] estates or which would frustrate the statutory scheme of chapter 11 or diminish [the debtor's] ability to formulate a plan of reorganization.'" *Grace*, 115 F. App'x at 570 (first quoting *In re A.H. Robins Co.*, 828 F.2d at 1025, then quoting *In re Johns-Manville*, 26 B.R. 420, 436 (Bankr. S.D.N.Y. 1983). Continued pursuit of the Debtor Medical Liability Claims in the tort system could harm the Debtors' ability to wind down their Estates in accordance with the

Plan. Specifically, the Debtors would be forced to expend their limited time and resources defending the Debtor Medical Liability Claims in various courts throughout the country, resulting in additional administrative expense claims, and the holders of Debtor Medical Liability Claims themselves could incur substantial costs in pursuing their claims. These added burdens would diminish the efficiency of the claims resolution process and could significantly reduce the net recovery to holders of unsecured creditors, including holders of Debtor Medical Liability Claims.

317. Third, holders of Debtor Medical Liability Claims for whom the automatic stay was previously lifted will suffer only a potential delay in pursuing their claims if the Court reinstates the automatic stay with respect to such claims. This inconvenience does not outweigh the substantial harm the Debtors and their estates will suffer if their plan is imperiled by allowing the continuance of such suits. Further, "it is well established that a delay is not sufficient to prevent the issuance of an injunction." *In re Bestwall*, 606 B.R. 243, 257 (Bankr. W.D.N.C. 2019); *see also In re DBMP LLC,* No. 20-30080 (JCW), 2021 WL 3552350, at *42 (W.D.N.C. Aug. 11, 2021) (concluding that "potential delays occasioned by the stay and injunction [were] outweighed" by continued litigation and derailing the debtor's reorganization effort); *Union Trust I*, 465 B.R. at 773–74 (same); *In re Saxby's Coffee Worldwide, LLC*, 440 B.R. 369, 382 (Bankr. E.D. Pa. 2009) (granting injunction because defendants had not "identified any particularized harm they are likely to suffer if delayed for a short period of time from enforcing their remedies"). Indeed, holders of Debtor Medical Liability Claims could experience harm if the Court does not grant the preliminary injunction, because as stated above, allowing cases to proceed in the tort system would increase administrative costs, which would be borne by holders of unsecured claims. Moreover, considering the Debtors do not anticipate making any distributions to unsecured creditors until

2027, a delay in proceeding in the tort system should not harm holders of Debtor Medical Liability Claims.

318.    Fourth, the public interest weighs in favor of an injunction.  There is strong public interest in minimizing litigation and resolving the Debtor Medical Liability Claims pursuant to the Medical Liability Claim Procedures.  In fact, there is a "strong federal policy favoring . . . alternative means of dispute resolution." *Nat'l Board Co., Inc. v. Bear Stearns & Co. Inc.*, 165 F.3d 184, 190 (2d Cir. 1999); *see also Esso Expl. and Prod. Chad, Inc. v. Taylors Intern Servs., Ltd.*, No. 06-4401, 2006 WL 3377595, *2 (S.D.N.Y. Nov. 14, 2006) (expressing that "it is difficult to overstate the strong federal policy in favor of [settlement procedures]"); *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (holding that "[t]o minimize litigation and expedite the administration of a bankruptcy [case], '[c]ompromises are favored in bankruptcy'") (quoting 9 Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)). Thus, to minimize litigation costs and the accompanying burden on the judicial system and to maximize recoveries available for unsecured creditors, injunctive relief is both beneficial to the public interest and essential to achieving the orderly wind down of the Debtors' estates pursuant to the Medical Liability Claim Procedures.

**J.    *Objections to the Administrative Expense Claims Consent Program Should be Overruled***

319.    Under section 2.1(a) of the Plan, all holders of Administrative Expense Claims will be paid in full in cash on the Effective Date unless such holders agree to different treatment under the Administrative Expense Claims Consent Program.  *See* Plan § 2.1(a).[140]

---

[140]    Section 2.1(a) of the Plan provides that "except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, distributions to holders of Allowed Administrative Expense Claims shall have commenced, with each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) to receive, in full and final satisfaction, settlement, release, and discharge of such Claim, (i) Cash in an amount equal to the Allowed amount of such Claim or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code." Plan § 2.1(a).

Specifically, holders of Administrative Expense Claims may "agree[] . . . to less favorable treatment" by not opting-out of the Administrative Expense Claims Consent Program. *Id.* Certain of the objecting parties[141] argue that the Administrative Expense Claims Consent Program does not comply with section 1129(a)(9) of the Bankruptcy Code because requiring creditors to opt-out of the Administrative Expense Claims Consent Program does not constitute agreement to different treatment as required under section 1129(a)(9). This argument fails for the reasons set forth below.

### 1. Deemed Consent to the Administrative Expense Claims Consent Program Has Been Approved By the Court

320. As an initial matter, the Court already approved the Consent Program Opt-Out Form, the Consent Program Material, and the Consent Program Opt-Out Procedures, which include the procedures for the distribution, submission, and tabulation thereof. *See* Disclosure Statement Order ¶¶ 26–36. Specifically, the Court held that the Consent Program Materials and the Consent Program Opt-Out Procedures (including the Consent Program Opt-Out Deadline) "were adequate to solicit opt-out elections from eligible holders of Administrative Expense Claims." *Id.* ¶ 28. Additionally, the Court authorized the Debtors to take "all actions necessary to implement the terms of the Consent Program Opt-Out Procedures, including mailing the Consent Program Materials to holders of Administrative Expense Claims." *Id.* ¶ 30. Pursuant to the approved procedures, each holder of an Allowed Administrative Expense Claim was sent a Consent Program Opt-Out Form and was provided the opportunity to return the Consent Program Opt-Out Form to Kroll indicating that they do not consent to the terms of the Administrative

---

[141] *See* TRACO Obj. ¶¶ 24, 27–29 (arguing that the opt-out mechanism for the Administrative Expense Claims Consent Program fails to meet the affirmative consent requirement under Section 1129(a)(9)); Igoe Obj. (Docket No. 5328) ¶ 9 (arguing that the "deemed consent" mechanism of the Administrative Expense Claims Consent Program violates Section 1129(a)(9)); U.S. Trustee Obj. ¶¶ 5-6 (arguing that opt-out mechanism of the Administrative Expense Claims Consent Program conflicts with the plain language of Section 1129(a)(9)); BD Obj. (Docket No. 5344) ¶ 18 (arguing that the Plan "seeks to manufacture" consent through the Administrative Expense Claims Consent Program).

Expense Claims Consent Program. Accordingly, any objection to the Plan on the basis that the Consent Program Opt-Out Procedures run afoul of section 1129(a)(9) because participants in the Administrative Expense Claims Consent Program are not affirmatively consenting to different treatment should be overruled because such procedures were already approved pursuant to the Disclosure Statement Order.

**2.     Deemed Consent to the Administrative Expense Claims Consent Program is Permitted By Applicable Law**

321.     The Consent Program Opt-Out Procedures provided holders of Administrative Expense Claims with notice and ample opportunity to opt-out of the Administrative Expense Claims Consent Program (27 days). Indeed, the Debtors sent a Consent Program Opt-Out Form to approximately 1,780 holders of Administrative Expense Claims, and approximately 160 recipients exercised the opportunity to affirmatively opt-out of the Administrative Expense Claims Consent Program by returning the Consent Program Opt-Out Form. This is sufficient under applicable law to demonstrate that those that did not affirmatively opt-out consented to participation in the Administrative Expense Claims Consent Program.

322.     The Consent Program Opt-Out Procedures are similar to the "opt-out" mechanism for third-party releases that are frequently approved by this Court and others (as described in section II.B herein). Parties are deemed to consent or agree where they have received sufficient notice and an opportunity to object to or opt out of the relevant feature and failed to do so. *See, e.g.*, *In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) ("There is nothing improper with an opt-out feature for consensual third-party releases in a chapter 11 plan. And what constitutes consent, including opt-out features and deemed consent for not opting out, has long been settled in this District.") (internal citations omitted).

323.     Here, the Consent Program Materials approved by the Court clearly state that a creditor's failure to properly complete and timely return a Consent Program Opt-Out Form indicating the claimholder's election to opt-out of the Administrative Expense Claims Consent Program will be deemed to be such creditor's consent to the settlement of their Administrative Expense Claim in the amount of the Settled Administrative Expense Claim listed on the Consent Program Opt-Out Form and the treatment set forth in the Administrative Expense Claims Consent Program.  Disclosure Statement Order ¶ 28.  This complies with applicable law. *See, e.g.*, *In re Teligent, Inc.*, 282 B.R. 765, 771–73 (Bankr. S.D.N.Y. 2002) (holding that failure to return an opt-out form constituted consent to "different treatment" as contemplated by section 1129(a)(9) of the Bankruptcy Code).

324.     Similar opt-out features have been approved and utilized in other cases in this and other courts.  Indeed, numerous courts have found implied consent to constitute agreement in similar contexts*. See, e.g.*, *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Aug. 8, 2018) (Docket No. 4083) (approving opt-out procedures where administrative claim holders were given the opportunity to affirmatively opt-out of the administrative claims settlement and forego treatment thereunder); *In re Pier 1 Imps., Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. June 24, 2020) (Docket No. 804) (authorizing the debtors to mail a consent form notice to all known holders of administrative claims providing that parties who did not follow the procedures set forth thereon would be deemed to consent to less than full payment of their claims); *In re Gemstone Sols. Grp., Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. March 13, 2020) (Docket No. 1426) (approving disclosure statement and election form providing that failure to return the election form would be deemed as consent to partial payment of allowed administrative claims in accordance with the administrative claim settlement terms contemplated in the debtors' chapter 11 plan); *In re*

158

*Barneys N. Y., Inc.*, No. 19-36300 (CMG) (Bankr. S.D.N.Y. Dec. 19, 2019) (Docket No. 612) (approving disclosure statement and solicitation procedures where holders of administrative, priority tax, and other priority claims that did not object to the debtors' chapter 11 plan would be deemed to consent to receiving a smaller distribution than the full amount of the allowed administrative claims); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Oct. 15, 2019) (Docket No. 5370) (confirming chapter 11 plan where holders of administrative expense claims who did not opt out of the administrative expense claims consent program would be deemed to have had their claims satisfied in full once they received payment in cash equal to 80% of the applicable allowed administrative claims); *see also In re Teligent, Inc.*, 282 B.R. 765, 771–73 (Bankr. S.D.N.Y. 2002) (confirming chapter 11 plan where administrative claimants that did not respond to solicitation to accept partial payment on their claims would be deemed, by their silence, to have consented to such treatment).

325. Accordingly, the Consent Program Opt-Out Procedures were approved by the Court in the Disclosure Statement Order, and the Debtors followed such approved procedures in the distribution of the Consent Program Material and the tabulation of the Consent Program Opt-Out Forms, which provided sufficient notice and opportunity to opt-out of the Administrative Expense Claims Consent Program. Additionally, the Consent Program Opt-Out Procedures comply with applicable law and resemble opt-out mechanisms that are routinely upheld by this Court and many others. Therefore, eligible holders of Administrative Expense Claims that did not timely, properly, and affirmatively opt out in accordance with the procedures approved by the Court can be deemed to be bound by the terms of the Administrative Expense Claims Consent Program. In light of the foregoing, the Debtors respectfully submit that the implementation of the

Administrative Expense Claims Consent Program should be authorized, and the objections related thereto should be overruled.

## RESERVATION OF RIGHTS

326.    The Debtors reserve all of their rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this reply, to seek discovery, or to introduce evidence and to raise additional arguments at any hearing to consider confirmation of the Plan.

## CONCLUSION

327.    The Disclosure Statement satisfies all of the applicable requirements of the Bankruptcy Code and the Bankruptcy Rules and should be approved.  In addition, the Plan satisfies all of the applicable requirements of section 1129 of the Bankruptcy Code and should be confirmed.  The Debtors respectfully request that the Court approve the Disclosure Statement on a final basis, confirm the Plan, overrule the outstanding Objections, and grant such other and further relief as is just and appropriate.

Dated: July 10, 2025
        Houston, Texas


   /s/  Clifford W. Carlson
**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Clifford W. Carlson (24090024)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 3700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:   Gabriel.Morgan@weil.com
            Clifford.Carlson@weil.com
            Stephanie.Morrison@weil.com


-and-


**WEIL, GOTSHAL & MANGES LLP**
Jeffrey D. Saferstein (admitted *pro hac vice*)
Jason H. George (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:   Jeffrey.Saferstein@weil.com


-and-


**WEIL, GOTSHAL & MANGES LLP**
David J. Cohen (admitted *pro hac vice*)
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 577-3100
Facsimile:  (305) 374-7159
Email:   DavidJ.Cohen@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

**LATHAM & WATKINS LLP**
Ray C. Schrock (admitted *pro hac vice* )
Candace M. Arthur (admitted *pro hac vice* )
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:                Ray.Schrock@lw.com
            Candace.Arthur@lw.com

*Attorneys for Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I hereby certify that on July 10, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


                       */s/ Clifford W. Carlson*
                       Clifford W. Carlson

**Exhibit A**

**Response Chart**

*In re Steward Health Care System LLC, et al.*
CH. 11 CASE NO. 24-90213 (CML)

SUMMARY CHART OF OBJECTIONS TO PROPOSED DISCLOSURE STATEMENT AND PLAN AND DEBTORS' RESPONSES[1]

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| 1. | 5335 | TRACO International Group S. de R.L. ("**TRACO**") | TRACO objects to the Plan, alleging that: | |
| | | | i. The requirement that holders of Administrative Expense Claims be required to opt-out of the Administrative Expense Claims Consent Program violates section 1129(a)(9) of the Bankruptcy Code. (¶¶27-29) | **Unresolved.** The Bankruptcy Court already approved the procedures for the Administrative Expense Claims Consent Program, and filing to return an opt-out ballot constitutes consent to "different treatment." *See* Confirmation Brief ¶¶ 320-325. |
| | | | ii. The Plan is not feasible because the anticipated Effective Date is too far into the future and the Debtors are unlikely to satisfy all Allowed Administrative Expense and Priority Claims. (¶¶ 30-42) | **Unresolved.** The Debtors and their advisors undertook a comprehensive analysis with respect to estimated recoveries from their remaining assets and reasonably conclude that the Debtors will have sufficient cash flow to make all payments required to consummate the Plan. *See* Feasibility Decl. ¶¶ 4-25. Moreover, the Bankruptcy Code does not require that the effective date occur immediately after confirmation. *See* Confirmation Brief ¶ 212. |
| | | | iii. The Plan does not satisfy the "best interests" test under § 1129(a)(7)(A) because the Debtors have not demonstrated why this highly speculative Plan provides greater recovery to creditors than conversion to chapter 7 and assumes the FILO Settlement will not be overturned on appeal. (¶¶ 43-51) | **Unresolved.** The Plan satisfies the best interests test because in chapter 7 holders of impaired claims will receive recoveries less than or equal to the estimated recoveries under the Plan. *See* Confirmation Brief ¶¶ 133-148. |
| | | | iv. The Plan impermissibly places the PBGC Claims in a separate class from General Unsecured Claims. (¶¶ 52-55) | **Unresolved.** Separate classification of the PBGC Claims from General Unsecured Claims is rational and justified because the legal rights and nature of the PBGC Claims are distinct from holders of General Unsecured Claims. *See* Confirmation Brief ¶¶ 205-206. |
| | | | v. The Plan was not proposed in "good faith" because (i) the Plan fails to treat substantially similar claims similarly by placing such claims in different classes, (ii) the Plan is fundamentally unfair to administrative claimants to wait for over a year for a possible effective date to be paid, and (iii) the Debtors have attempted to manipulate the voting process by not providing TRACO with ballots. (¶¶ 56-64) | **Unresolved.** The Debtors did not manipulate the vote. Upon being contacted by Kroll, the Debtors supplied TRACO with a ballot in accordance with the Voting and Solicitation Procedures and TRACO voted on the Plan. For the reasons set forth in the Debtors' objection to TRACO's Rule 3018 Motion (Docket No. 5285), TRACO is not entitled to vote any other claims. |

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Memorandum of Law In Support of (I) Final Approval of the Disclosure Statement and (II) Confirmation of the Debtors' Joint Chapter 11 Plan of Liquidation of Steward Health Care System LLC and Its Affiliated Debtors* to which this chart is attached (the "**Confirmation Brief**"), the applicable Objection, the Plan, or the Disclosure Statement, as applicable. This chart summarizes certain key issues raised in the Objections. To the extent that an Objection or a specific point raised in an Objection is not addressed herein, the Debtors reserve the right to respond to such Objection up to and at the Combined Hearing.

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | | vi. The third-party releases are overbroad and the opt-out mechanism for releases is not consensual. (¶¶ 65-68) | **Unresolved**. The third-party releases are not overbroad and the opt-out mechanism for third-party releases is consistent with settled law in this Court's jurisdiction. *See* Confirmation Brief ¶¶ 229-235. |
| | | | vii. The Plan violates § 1123 because it does not provide treatment for Medical Liability Claims asserted against affiliated medical professionals. (¶¶ 69-73) | **Unresolved**. There is no legal basis to require the Debtors' chapter 11 plan to address claims against non-Debtor parties. *See* Confirmation Brief ¶ 308. |
| | | | viii. The evidence supporting the valuation of the Litigation Assets is inadmissible hearsay that constitutes a waiver of privilege. (¶¶ 74-79) | **Unresolved**. The testimony of Mr. Castellano and Mr. Carr is not based on hearsay but rather based on commercial understanding and first-hand knowledge, and the Debtors have not waived privileged because litigation-specific values or timing estimates from counsel have not been disclosed. *See* Confirmation Brief ¶¶ 186-194. |
| 2. | 5334 | The Commonwealth of Massachusetts (the "**Commonwealth**") | The Commonwealth objects to the Plan, alleging that: | |
| | | | i. the Plan is not feasible because: | |
| | | | a. the projected litigation recoveries are unrealistic due to undisclosed collection risks associated with the three largest Litigation Claims categories, including with respect to claims against current and/or former insiders. (¶¶ 8-15) | **Unresolved**. The Debtors' estimates of the projected recoveries on the Litigation Assets are reasonable and based upon a commercial understanding of each of the respective claims and causes of action, the progress made, and reasonably expected to be made, with respect to such claims and causes of action, collectability, and when proceeds are expected to be realized as a result. *See* Confirmation Brief ¶¶ 186-194. |
| | | | b. the projected amount of allowed administrative and priority claims is unrealistic and the Debtors have not provided sufficient information to justify the CRO's projections, for which there is a very thin margin of error. (¶¶ 16-20) | **Unresolved**. The Debtors' projections are reasonable and do not depend on the perfect execution of every claim objection. The Debtors' projections are their reasonable good-faith estimates based on the Debtors' and their advisors' thorough and methodical review of all asserted Administrative Expense Claims and Priority Claims. *See* Confirmation Brief ¶ 186. |
| | | | c. the Plan provides no shortfall funding mechanism. (¶¶ 21-24) | **Unresolved**. The Debtors project they will have sufficient funds to make all required payments under the Plan and provide an estimated recovery of approximately $235 million to unsecured creditors. *See* Confirmation Brief ¶ 195. |
| | | | ii. the Plan provides for preferential treatment of professionals over any other administrative creditors, in violation of the equal treatment requirement of section 1123(a)(4) of the Bankruptcy Code. (¶ 27) | **Unresolved**. The Plan does not discriminate against Administrative Expense Claims in favor of Professional Fee Claims. *See* Confirmation Brief ¶¶ 268-277. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | | iii. the Plan injunction operates as discharge, which is impermissible in a plan of liquidation under section 1141(d)(3) of the Bankruptcy Code. (¶ 30) | **Unresolved**. The Plan Injunction is not a *de facto* discharge. *See* Confirmation Brief ¶¶ 247-251. |
| | | | iv. the failure to opt-out of a release does not constitute an affirmative agreement to release and that the failure to opt out of the Administrative Expense Consent Program constitutes affirmative consent. (¶ 31) | **Unresolved**. The opt-out mechanism for third-party releases is consistent with settled law in this Court's jurisdiction. *See* Confirmation Brief ¶¶ 320-235. The opt-out mechanics of the Consent Program Opt-Out Procedures were already approved by the Court in the Disclosure Statement Order and are permitted under applicable law. *See* Confirmation Brief ¶¶ 320-325. |
| | | | v. exculpation of the Transformation Committee is impermissible under *Highland Capital*. (¶¶ 34-35) | **Unresolved**. The Transformation Committee exculpation is appropriate and consistent with Fifth Circuit law. *See* Confirmation Brief ¶¶ 88-92. |
| | | | vi. the Plan injunction eliminates the Commonwealth's setoff and recoupment rights in violation of section 1129(b)(2)(A) of the Bankruptcy Code, and constitutes a decision on the adversary proceeding and a denial of the Commonwealth's motion without any hearings. (¶ 37) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this aspect of the Commonwealth's objection. *See* Confirmation Order, Sched. 1 ¶ 23. *See* Confirmation Brief ¶¶ 93-95. |
| | | | vii. the Plan gerrymanders classes solely for the purposes of cramdown. (¶¶ 43-45) | **Unresolved**. The classification scheme provided by the Plan is based on material differences between the claims in different classes and their separate classification is supported by valid business justifications. *See* Confirmation Brief ¶¶ 252-267. |
| | | | viii. the Plan fails to satisfy the best interests test because the liquidation analysis is flawed in numerous aspects and lacks legal or factual support. (¶ 48) | **Unresolved**. The Plan satisfies the best interests test because in chapter 7 holders of impaired claims will receive recoveries less than or equal to the estimated recoveries under the Plan. *See* Confirmation Brief ¶¶ 133-149; *see also* Brown Decl.. |
| | | | ix. the Plan appears to constitute the consolidation of all of the Debtors for all purposes under the guise of a "Plan Settlement," but there is no record before the Court to justify this remedy and the Debtors' unilateral right under the Plan to undo such consolidation for any Debtor entity prior to the Confirmation Hearing. (¶ 49) | **Unresolved**. The limited substantive consolidation under the Plan is supported by the evidence and appropriate under the circumstances. *See* Confirmation Brief ¶¶ 281-302. |
| | | | The Commonwealth states that it was not given an option to opt out of the Administrative Expense Claims Consent Program and thereby gives notice of its election to opt out. (¶ 52) | **Resolved**. The Commonwealth was not eligible to participate in the Administrative Expense Claims Consent Program. Notwithstanding such ineligibility, the Debtors acknowledge their opt out. |
| 3. | 5289 | | The participants object to the Plan, alleging that: | |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | Dr. Manisha Purohit, Dr. Diane Paggioli, Dr. James Thomas, Dr. Thomas Ross, Dr. Michael Regan, Dr. Peter Lydon, Dr. Sridhar Ganda, Dr. A. Ana Beesen, Dr. Benoy Zachariah, Dr. Barry Arkin, Dr. Bruce Kriegel, and Dr. Gary Miller (collectively, the "**Participants**") | i. the Plan fails the best interests test under section 1129(a)(7) because in chapter 7, there would be no releases of the estates' claims and creditors would not be forced to take action to preserve third-party claims. (¶ 9) | **Unresolved**. The Plan satisfies the best interests test because in chapter 7 holders of impaired claims will receive recoveries less than or equal to the estimated recoveries under the Plan. *See* Confirmation Brief ¶¶ 133-149; *see also* Brown Declaration. |
| | | | ii. the Debtors do not have enough funds or funding to pay the allowable administrative claims of at least $93 million on the Plan's Effective Date. (¶ 10); the Debtors have no real basis for when the Effective Date of the Plan will occur as it will be whenever the Debtors have enough money. (¶¶ 11-12) | **Unresolved**. The Debtors and their advisors undertook a comprehensive analysis with respect to estimated recoveries from their remaining assets and reasonably conclude that the Debtors will have sufficient cash flow to make all payments required to consummate the Plan as of the Effective Date, which, is reasonably expected to occur in early 2027. *See* Feasibility Decl. ¶¶ 4-25; Confirmation Brief ¶¶ 159-160. |
| | | | iii. the claims in Classes 3 and 5 are not impaired and should not be eligible to vote. (¶ 13) | **Unresolved**. Claims in Classes 3 and 5 are "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code as the holders of claims in Classes 3 and 5 are not receiving full recovery. *See* Confirmation Brief ¶¶ 264-267. |
| | | | iv. even if the claims in Classes 3 and 5 were impaired, their placement in separate classes to obtain accepting votes violates section 1122 of the Bankruptcy Code and basic considerations of fairness and good faith, all in violation of sections 1129(a)(1) and (a)(3). (¶ 14) | **Unresolved**. The classification scheme provided by the Plan is based on material differences between the claims in different classes and their separate classification is supported by valid business justifications. *See* Confirmation Brief ¶¶ 258-267. |
| | | | v. the "gatekeeper" provision in the Plan also extends to claims and parties subject to the Plan's release provisions, the scope of which extends to several non-debtor parties and to the prepetition conduct of such parties, which is considerably broader than the Plan's exculpation provisions. (¶ 15) | **Unresolved**. The Plan's gatekeeper and third-party release provisions do not violate Fifth Circuit caselaw. *See* Confirmation Brief ¶¶ 241-246. |
| | | | vi. the releases being provided by the Debtors and their estates under the Plan extend to individual officers, directors, employees and others who are providing no consideration for the releases, and the proposed consensual third-party releases by use of an opt-out mechanism are also overbroad. (¶ 16) | **Unresolved**. The third-party releases are not overbroad and the opt-out mechanism for third-party releases is consistent with settled law in this Court's jurisdiction. *See* Confirmation Brief ¶¶ 229-324. |
| | | | vii. the Plan violates section 1123(a)(4) of the Bankruptcy Code with respect to its proposed bifurcated treatment of administrative claims which provides superior treatment of professional fee claims versus other equal priority administrative claims, including administrative claims that do not consent to the Plan's forced discount alternative. (¶ 17) | **Unresolved**. The Plan does not discriminate against Administrative Expense Claims in favor of Professional Fee Claims. *See* Confirmation Brief ¶¶ 268-278. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| 4. | 5301 | Kevin M. Epstein, the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") | The U.S. Trustee objects to the Disclosure Statement, alleging that it lacks sufficient information for administrative claimants to make informed decisions, particularly regarding: (i) the basis for reduced payments; (ii) why professionals are paid in full while other administrative claimants are not; and (iii) the priority of administrative claims over general unsecured creditors. | **Unresolved**. In approving the Disclosure Statement Order, the Bankruptcy Court found that the Disclosure Statement included adequate information. *See* Disclosure Statement Order ¶ 1; *see also* Confirmation Brief ¶ 36. |
| | | | The U.S. Trustee objects to the Plan, alleging that: | |
| | | | i.  the Effective Date of the Plan remains uncertain, if it will occur at all.  (¶ 2) | **Unresolved**. The Effective Date is expected to occur in early 2027. *See* Feasibility Decl. *See* Feasibility Declaration ¶ 4. |
| | | | ii.  the Plan attempts to circumvent the Bankruptcy Code's mandate under section 1129(a)(9)(A) that all allowed administrative expenses to be paid in full on the Effective Date of the Plan.  (¶ 4) | **Unresolved**. The Plan provides that all Allowed Administrative Expense Claims will be paid in full on the Effective Date. *See* Confirmation Brief ¶¶ 159-160. |
| | | | iii.  the Plan's reliance on an opt-out mechanism under the Administrative Expense Claims Consent Program contravenes the statutory requirement in section 1129(a)(9)(A), which requires that, unless a holder of an allowed administrative claim agrees otherwise, the claimant must be paid in full on the effective date.  (¶ 5) | **Unresolved**. The opt-out mechanics of the Consent Program Opt-Out Procedures were already approved by the Court in the Disclosure Statement Order and are permitted under applicable law. *See* Confirmation Brief ¶¶ 319-325. |
| | | | iv.  the Plan includes non-consensual third-party releases in violation of the Supreme Court's ruling in *Harrington v. Purdue Pharma L.P.*, specifically by using an opt-out mechanism to bind creditors to third-party releases.  (¶ 7) | **Unresolved**. The third-party releases are not in violation of *Harrington v. Purdue Pharma L.P.*, and the opt-out mechanism for third-party releases is consistent with settled law in this Court's jurisdiction. *See* Confirmation Brief ¶¶ 229-235. |
| | | | v.  the Debtors' estates are administratively insolvent and cannot satisfy all allowed administrative expenses on the effective date.  (¶ 9) | **Unresolved**. The Debtors and their advisors undertook a comprehensive analysis with respect to estimated recoveries from their remaining assets and reasonably conclude that the Debtors will have sufficient cash flow to make all payments required to consummate the Plan. *See* Feasibility Decl. ¶¶ 4-25. |
| | | | vi.  The Plan may not be feasible under § 1129(a)(11), given that failure of the consent program could delay or prevent the effective date.  (¶ 6) | **Unresolved**. The Debtors are implementing the Administrative Expense Claims Consent Program and, in any event, the Administrative Expense Claims Program is not necessary for the Debtors' Plan to go effective. *See* Confirmation Brief ¶¶ 169-182. |
| | | | vii.  there are no exigent circumstances that would warrant the proposed elimination of the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 3020(e).  (¶ 10) | **Resolved**. The Debtors are not seeking a waiver of the 14-day stay and therefore believe this aspect of the U.S. Trustee's objection is resolved. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| 5. | 5313 | NorthStar Anesthesia, P.A. ("**NorthStar**") | NorthStar objects to the Debtors' Plan, alleging that: | |
| | | | i. the Plan unfairly discriminates against NorthStar's claim and those of Administrative Trade Claims and in favor of the Bankruptcy Professionals in violation of 11 U.S.C. §1123(a)(4) and §1129(a)(7)(A)(ii). (¶ 9) | **Unresolved**. The Plan does not discriminate against Administrative Expense Claims in favor of Professional Fee Claims. *See* Confirmation Brief ¶¶ 268-271. |
| | | | ii. the Plan fails to provide adequate means for the Plan's implementation, including, without limitation, insufficient funding to provide for payment of administrative claims on a real and non-speculative "effective date" and instead gerrymanders an "effective date" a year or likely several years into the future in violation of 11 U.S.C. §1123(a)(5). (¶ 9) | **Unresolved**. The Debtors and their advisors undertook a comprehensive analysis with respect to estimated recoveries from their remaining assets and reasonably conclude that the Debtors will have sufficient cash flow to make all payments required to consummate the Plan. Feasibility Decl. ¶¶ 4-25. Moreover, the Bankruptcy Code does not require that the effective date occur immediately after confirmation. *See* Confirmation Brief ¶ 212. |
| | | | iii. the Plan fails to provide for payment to NorthStar on account of its administrative claim because, on the Effective Date of the Plan, the Plan does not require the Debtor to pay an amount of cash equal to the amount of NorthStar's previously-allowed claim, in violation of 11 U.S.C. §§ §1129(a)(9)(A), §503(b)(1), and §507(a)(2). (¶ 9) | **Unresolved**. The Plan provides that all Allowed Administrative Expense Claims will be paid in full on the Effective Date. *See* Confirmation Brief ¶¶ 159-160. |
| | | | iv. the Plan has not been proposed in good faith in violation of 11 U.S.C. §1129(a)(3). (¶ 9) | **Unresolved**. The Debtors have proposed the Plan in good faith. *See* Confirmation Brief ¶¶ 124-129. |
| | | | v. the Plan does not satisfy 11 U.S.C. §1129(a)(11) because it is not feasible and will likely result in the filing of another bankruptcy case. (¶ 9) | **Unresolved**. The Debtors and their advisors undertook a comprehensive analysis with respect to estimated recoveries from their remaining assets and reasonably conclude that the Debtors will have sufficient cash flow to make all payments required to consummate the Plan. *See* Feasibility Decl. ¶¶ 4-25. |
| | | | vi. The Plan violates 11 U.S.C. §1124 and §1129(a)(7) because it treats Administrative Trade Claims as unimpaired when they are impaired, discriminatorily denying the ability to vote on the Plan. (¶ 9) | **Unresolved**. The Plan provides that all Allowed Administrative Expense Claims will be paid in full on the Effective Date. *See* Confirmation Brief ¶¶ 159-160. |
| | | | NorthStar objects to the Plan to the extent that the Plan involuntarily releases, exculpates, and/or eliminates claims in excess of what the Bankruptcy Code permits (e.g., involuntary release of or exculpation for any obligation for disgorgement, equalization or contribution from the Bankruptcy Professionals). | **Unresolved**. The Third-Party Releases, releases, and exculpation are all consistent with applicable law. *See* Confirmation Brief ¶¶ 229-240. |
| | 5341 | | The IRS objects to the Plan and Disclosure Statement, alleging that: | |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| 6. | | Internal Revenue Service ("**IRS**") | i. the Plan does not comply with the Bankruptcy Code because the Debtors will be unable to pay administrative claims and priority tax claims on or before the Effective Date. (¶ 1) | **Unresolved**. The Plan provides that all Allowed Administrative Expense Claims will be paid in full on the Effective Date. *See* Confirmation Brief ¶¶ 159-160. |
| | | | ii. the Plan violates § 1126(c) because the tabulation procedures provide that if a class entitled to vote on the Plan does not have any votes, then the class is presumed to have accepted the Plan. (¶ 2) | **Unresolved**. This objection is moot. The Plan has been accepted by an impaired voting class at each Debtor entity. *See* Confirmation Brief ¶ 161. Nonetheless, the Debtors disagree that the Plan provision providing that a class will be deemed to accept the Plan if no one in that class casts a vote should be removed. *See In re Cypresswood Land Partners*, 409 B.R. 396, 430 (Bankr. S.D. Tex. 2009) (holding that impaired classes were deemed to accept where claimants in the classes did not submit a valid ballot and reasoning that "[deeming] non-voters as rejecters runs contrary to the Code's fundamental principle, and the language of section 1126(c) . . . and subjects those who care about the case to burdens (or worse) based on the inaction and disinterest of others.") (quoting *In re Adelphia Comms. Corp.*, 368 B.R. 140, 276–77 (Bankr. S.D.N.Y. 2007)). |
| | | | iii. the Debtors have failed to file required prepetition and postpetition federal tax returns with the Internal Revenue Service in violation of § 1106(a)(6). (¶ 3) | **Pending Resolution**. The Debtors believe that they are in compliance with all prepetition and postpetition federal tax returns. *See* 1129 Decl. ¶¶ 63-65. The Debtors have provided support for such compliance to the IRS and are attempting to resolve any asserted issues. |
| | | | iv. the Plan seeks to impermissibly prohibit the IRS from asserting any setoff under Internal Revenue Code. (¶ 4) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this aspect of the IRS's objection. *See* Confirmation Order ¶¶ 70-71. |
| | | | v. the Plan contains non-consensual third-party releases, and includes injunctions and gatekeeper provisions that violate Fifth Circuit law. (¶ 5) | **Unresolved**. The third-party releases are not overbroad and the opt-out mechanism for third-party releases is consistent with settled law in this Court's jurisdiction. The Plan's injunction and gatekeeper provisions do not violate the Fifth Circuit's decision in *Highland Capital Management, L.P. See* Confirmation Brief ¶¶ 229-246. |
| | | | vi. the Plan injunction attempts to prohibit the IRS from investigating persons responsible for trust fund recovery penalties in violation of the Anti-Injunction Act under 26 U.S.C. § 7421(a). (¶ 6) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this aspect of the IRS's objection. *See* Confirmation Order ¶¶ 70-71. |
| | 5355 | | Hartford objects to the Plan, alleging that: | |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| 7. | 5401 | Hartford Fire Insurance Company ("**Hartford**") | i. the Plan cannot supersede or change language in the FILO Settlement Order negotiated by Hartford. (¶ 22) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order ¶ 76. |
| | | | ii. the Plan cannot bar Hartford from applying the proceeds of letters of credit issued for the benefit of Hartford. (¶ 23) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order ¶ 76. |
| | | | iii. Hartford's administrative expense claims shall be deemed allowed to the extent not satisfied by proofs of letters of credit. (¶ 24) | **Resolved**. Hartford has not filed any Administrative Expense Claim, but to the extent it does, such claim will be reconciled and treated in accordance with the Plan. Accordingly, this objection should be overruled. |
| | | | iv. Hartford should be deemed to have opted-out of the Administrative Expense Claims Consent Program. (¶ 24) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order ¶ 76. |
| | | | v. the Plan shall not expunge Hartford's claims for subrogation or reimbursement, to the extent Hartford pays any claims within the Debtors' deductible or self-insured retention. (¶¶ 25-27) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order ¶ 76. |
| | | | vi. the Plan permits the Debtors to estimate the value of Hartford's claims prematurely. (¶ 28) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order ¶¶ 76. |
| | | | vii. the Plan seeks to strip Hartford of its setoff and recoupment rights. (¶ 29) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order ¶ 76. |
| | | | viii. the Plan cannot eliminate the Debtors' primary obligation to pay amounts within the deductibles and self-insured retentions of Hartford policies. (¶ 30) | **Pending Resolution**. The Debtors have added language to the Confirmation Order providing that nothing in the Plan or Confirmation Order compels Hartford to pay any amounts within a deductible or self-insured retention of a Hartford policy. *See* Confirmation Order ¶ 76. The Debtors believe this language should resolve this objection. |
| | | | ix. Hartford does not intend to grant any third-party release. (¶ 31) | **Pending Resolution**. The Debtors have added language to the Confirmation Order providing Hartford is not a Releasing Party. *See* Confirmation Order ¶ 76. |
| | | | x. the Plan does not permit Hartford to access books and records of the Debtors. (¶ 32) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order ¶ 76. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | | xi. to the extent Hartford assumes any of the Debtors' deductible/SIR obligations, the Debtors should remain liable for reimbursing Hartford for SIR/deductible payments made by Hartford. (Suppl. Obj. ¶¶ 1-6) | **Resolved**. If Hartford believes it has claims arising out of the payment of any deductible or SIR obligation (whether prepetition or administrative), Hartford can file such claims and such claims will be reconciled in accordance with the Plan. Moreover, the Debtors have added language to the Confirmation Order providing that nothing in the Plan or Confirmation Order compels Hartford to pay any amounts within a deductible or self-insured retention of a Hartford policy. *See* Confirmation Order ¶ 76. Accordingly, this objection should be overruled to the extent not resolved by the added language. |
| | | | xii. the Plan should not extinguish Hartford's ability to seek an administrative expense claim to the extent it satisfies any postpetition workers' compensation claim within the Debtors' self-insured retention. (Suppl. Obj. ¶¶ 9-11) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order ¶ 76. |
| 8. | 5328 | Paul G. Igoe, Administrator of the Estate of Julia J. Igoe ("**Igoe**") | Igoe objects to the Plan, alleging that: | |
| | | | i. the Debtors cannot pay administrative claims in full on the Effective Date of the Plan. (¶ 9) | **Unresolved**. The Plan provides that all Allowed Administrative Expense Claims will be paid in full on the Effective Date. *See* Confirmation Brief ¶¶ 159-160. |
| | | | ii. the use of the Administrative Expense Claims Consent Program for extracting "deemed consent" violates Section 1129(a)(9), and the Plan is silent on the treatment of administrative expense claimants who opt-out of the Program. (¶ 9) | **Unresolved**. The Bankruptcy Court already approved the procedures for the Administrative Expense Claims Consent Program, and filing to return an opt-out ballot constitutes consent to "different treatment." *See* Confirmation Brief ¶¶ 320-325. Also, the Plan provides clear treatment of Administrative Expense Claims that are not resolved through the Administrative Expense Claims Consent Program. *See* Plan § 2.1. |
| | | | iii. The Plan provides for different treatment of professional fee claims as compared to administrative expense claims in violation of Section 1123(a)(4) of the Bankruptcy Code. (¶¶ 10-14) | **Unresolved**. The Plan does not discriminate against Administrative Expense Claims in favor of Professional Fee Claims. *See* Confirmation Brief ¶¶ 268-278. |
| | | | iv. The Plan violates Section 1129(a)(9) because it proposes to delay the effective date in the hope that a delay will make the plan feasible. (¶ 12) | **Unresolved**. The Effective Date is anticipated to occur in 2027 and it is common to have a period between confirmation of the plan and its effective date. *See* Confirmation Brief ¶¶ 212-228; Feasibility Decl. ¶ 4. |
| | | | v. the Plan is not feasible because the Debtors' estimate of postpetition medical malpractice and workers' compensation claims is $18 million but Igoe has filed a postpetition claim in the amount of $25 million. (¶ 15) | **Unresolved**. The Plan is feasible. *See* Confirmation Brief ¶¶ 162-188. Also, the Debtors will prove at the Combined Hearing that they will be able to satisfy all estimated Administrative Expense and Priority Claims even if Igoe's administrative claim is Allowed in the amount asserted. Further, Igoe's claim is disputed. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | | vi. the Plan's gatekeeper and third-party release provisions are overbroad and in contravention of the Fifth Circuit's decision in *Highland Capital Management, L.P.* (¶ 16) | **Unresolved**. The Plan's gatekeeper and third-party release provisions do not violate the Fifth Circuit's decision in *Highland Capital Management, L.P. See* Confirmation Brief ¶¶ 229-235, 241-246. |
| | | | vii. Section 14.11 of the Plan, providing that the Plan become effective immediately upon Confirmation, is inappropriate. (¶ 17) | **Resolved**. The Debtors are no longer seeking this relief. Accordingly, this objection is now moot. |
| 9. | 5320 | Linda Michelson and Michael Michelson (collectively, the "**Michelsons**") | The Michelsons object to the Plan, alleging that: | |
| | | | i. the Bankruptcy Court lacks jurisdiction to estimate the Michelson's claims and require the Michelsons to participate in the Medical Liability Claims Procedures. (¶¶ 5-6) | **Unresolved**. The Bankruptcy Court has authority to approve the Medical Liability Claims Procedures. *See* Confirmation Brief ¶ 304. Moreover, pursuant to the Medical Liability Claims Procedures, the Bankruptcy Court will not estimate the Michelsons' claims. Rather, if the Estate Representative and the Michelsons cannot agree on an Allowed amount of the Michelsons' claims, then the Michelsons can choose to either proceed with liquidating their claims in (i) binding arbitration or (ii) the tort system. *See* Plan, Ex. D, at 6-8. |
| | | | ii. the Medical Liability Claims Procedures improperly eliminate the Court's discretion to grant stay relief. (¶ 7) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order, Sched. 1 ¶¶ 35. |
| | | | iii. the Medical Liability Claims Procedures should not require the Michelsons to (i) comply with such procedures, (ii) negotiate in good faith, and (iii) cooperate with the Estate Representative. (¶ 8) | **Unresolved**. The Bankruptcy Court has authority to approve the Medical Liability Claims Procedures. *See* Confirmation Brief ¶ 304. The Michelsons' objection provides no sound legal bases for their allegation that they should not be required to participate in good faith in the procedures or that the Court cannot impose sanctions for failing to comply with its orders. *See In re Yorkshire, LLC*, 540 F.3d 328, 332 (5th Cir. 2008) (affirming the inherent authority of the bankruptcy court to impose sanctions against litigants or lawyers appearing before the court so long as the court makes a specific finding that they engaged in bad faith conduct); *In re Clinch Wireline Servs.*, 2024 Bankr. LEXIS 2956 (W.D. Tex. Dec. 9, 2024) ("11 U.S.C.S. 105 grants bankruptcy courts the authority to take any action necessary or appropriate to enforce or implement court orders, including the ability to grant remedies through civil contempt and monetary sanctions."). Accordingly, this objection should be overruled. |
| | | | iv. the Estate Representative should not be granted the right to withdraw the Michelsons' claims. (¶ 9) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order, Sched. 1 ¶¶ 35. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| 10. | 5318 | Denise Grogg, Individually and as Personal Representative of the Estate of Terence Grogg ("**Grogg**") | Grogg objects to the Plan, alleging that: | |
| | | | i. the Plan cannot retroactively alter the Court's granting of stay relief and compel Grogg to participate in the Medical Liability Claims Procedures. (¶ 11) | **Unresolved**. The agreed stipulations expressly contemplate that the terms of the stipulations may be modified by "further order of the Bankruptcy Court," and temporarily enjoining creditors from pursuing their claims *against the Debtors* in the tort system supports the success of the Medical Liability Claims Procedures. *See* Confirmation Brief ¶ 310. |
| | | | ii. the Plan seeks to permanently enjoin Grogg from adjudicating her claims in the State Court Case. (¶ 12) | **Unresolved**. This allegation is incorrect. The Medical Liability Claims Procedures expressly provide that claimants may seek to liquidate their claim in the tort system. *See* Confirmation Brief ¶¶ 303-307. To the extent applicable, claimants can also seek relief from the Plan Injunction. |
| | | | iii. the Plan seeks to release and enjoin claims against non-debtor third-parties, including employed or affiliated physicians and medical personnel. (¶ 13) | **Unresolved**. The Third-Party Releases are fully consensual. *See* Confirmation Brief ¶¶ 233-235. |
| 11. | 5305 | Sodexo Operations, LLC and its affiliates ("**Sodexo**") | Sodexo objects to the Plan, alleging that: | |
| | | | i. it does not provide for payment in full of all administrative expense claims as contemplated by 11 U.S.C. §1129(a)(9). (¶ 16) | **Unresolved**. The Plan provides that all Allowed Administrative Expense Claims will be paid in full on the Effective Date. *See* Confirmation Brief ¶¶ 159-160. |
| | | | ii. the Administrative Expense Claims Consent Program is inappropriate in this case where approved professional fees are contemplated to be paid in full. (¶ 17) | **Unresolved**. Multiple courts have confirmed settlements with administrative claim consent programs similar to the program provided for in the Plan. *See* Confirmation Brief ¶ 324. Moreover, all professional fees claims are subject to a review and approval process under the Plan by the Bankruptcy Court. *See* Confirmation Brief ¶ 128. |
| | | | iii. the Plan relies on speculative avoidance action recoveries and may not go effective until 2027. (¶¶ 16-17) | **Unresolved**. The Debtors and their advisors undertook a comprehensive analysis with respect to estimated recoveries from their remaining assets and reasonably conclude that the Debtors will have sufficient cash flow to make all payments required to consummate the Plan. Feasibility Decl. ¶¶ 4-25. Moreover, the Bankruptcy Code does not require that the effective date occur immediately after confirmation. *See* Confirmation Brief ¶ 212. |
| | | | Sodexo reserves any such setoff or recoupment rights it may have against any of the Debtors. (¶¶ 21-22) | <u>**Pending Resolution**</u>. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order, Sched. 1 ¶ 31. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | | Sodexo also incorporates by reference its limited objection to the Disclosure Statement Motion, which alleges that the Disclosure Statement lacks adequate information. (¶ 15) | **Unresolved**. In approving the Disclosure Statement Order, the Bankruptcy Court found that the Disclosure Statement included adequate information. *See* Disclosure Statement Order ¶ 1; *see also* Confirmation Brief ¶¶ 42-50. |
| 12. | 5369 | Chubb Companies ("**Chubb**") | Chubb objects to the Plan, alleging that: | |
| | | | i. the Debtors seek to retain the benefits of the Chubb insurance policies but fail to adequately address the Debtors' obligations under the policies. (¶¶ 23-27) | **Unresolved**. The Plan provides that, unless rejected, the Chubb insurance policies will be assumed by the Debtors on the Effective Date. The Debtors' obligations to Chubb will be governed by the assumed contract. The Debtors have added language to the Confirmation Order clarifying these issues and believe this language should resolve this objection. *See* Confirmation Order ¶¶ 79. |
| | | | ii. the Plan does not clearly provide that nothing modifies, alters, or impairs the Chubb Insurance Program, including Chubb's coverage defenses or rights to setoff or recoupment. (¶¶ 28-30) | **Unresolved**. Chubb's proposed language is overly broad. For example, Chubb may have prepetition claims in connection with its insurance policies that are impaired under the Plan. The Debtors have added language to the Confirmation Order preserving Chubb's coverage defenses and affirmative defenses of setoff and recoupment, and believe this language should resolve this objection. *See* Confirmation Order ¶¶ 79. |
| | | | iii. section 365(c) of the Bankruptcy Code prohibits the Debtors from assigning the insurance program without prior written consent of the Chubb Companies. (¶¶ 33-41) | **Pending Resolution**. The Debtors have added language to the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order ¶¶ 79. |
| | | | iv. the Plan contains an improper gatekeeper provision. (¶¶ 42-46) | **Unresolved**. The Plan's gatekeeper provision does not violate the Fifth Circuit's decision in *Highland Capital Management, L.P. See* Confirmation Brief ¶ 245. |
| | | | v. the Plan does not provide for the handling of workers' compensation claims, claims against non-Debtor insureds that may be entitled to coverage under the Insurance Program, and direct action claims. (¶¶ 43-50) | **Pending Resolution**. The Debtors have added language to the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order ¶¶ 79. |
| 13. | 5291 | | The Humana Entities object to the Disclosure Statement and Plan, alleging that: | |
| | | | i. the Plan and Disclosure Statement seek to preemptively cut off or bar the Humana Entities' defenses in future litigation. (¶ 8) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this aspect of the Humana Entities' objection. *See* Confirmation Order, Sched. 1 ¶ 17. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | Humana Entities[2] | ii. the Plan and Disclosure Statement include an overly broad Release and Injunction that seek to wipe out all claims and defenses the Humana Entities may have against third-parties. (¶¶ 13-14) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this aspect of the Humana Entities' objection. *See* Confirmation Order, Sched. 1 ¶ 17. |
| | | | iii. the Plan allows for the Debtors to make a decision regarding whether to assume or reject Humana Entities' executory contracts until the Effective Date of the Plan, rather than entry of the confirmation order. (¶¶ 22-23) | **Pending Resolution**. The Debtors have confirmed to the Humana Entities that the Debtors do not intend to assume their contracts on the Effective Date. |
| | | | iv. the Humana Entities did not receive a Consent Program Opt-Out Form. (¶ 24) | **Pending Resolution**. To the extent Humana did not receive a Consent Program Opt-Out Form, they are not deemed to participate in the Administrative Expense Claims Consent Program by failing to submit one. *See* Disclosure Statement Order ¶¶ 26-27. |
| | | | v. the Humana Entities object to Debtors' attempt to recharacterize their claims as contingent and unliquidated in order to exclude the Humana Entities' votes against the Plan. (¶ 26) | **Pending Resolution**. The Humana Entities received ballots to vote on the Plan, and such ballots were tabulated notwithstanding the Debtors' claim objection and thus the Debtors submit this objection is moot. |
| 14. | 5350 | Molina[3] | Molina joins the Humana Entities' objection and reserves all rights with respect to the objection without limitation. | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve Molina's objection. *See* Confirmation Order, Sched. 1 ¶ 38. |
| 15. | 5293 | Access Information Management Corporation ("**Access**") | Access objects to the Plan, alleging that: | |
| | | | i. it does not provide for payment of all administrative expense claims in full on the Effective Date. (¶ 2) | **Unresolved**. The Plan provides that all Allowed Administrative Expense Claims will be paid in full on the Effective Date. *See* Confirmation Order, Sched. 1 ¶ 18. |
| | | | ii. The Administrative Expense Claims Consent Program impermissibly gerrymanders similarly situated creditors by waiving half of administrative expense claims while professional fees are paid in full. (¶ 2) | **Unresolved**. The Plan does not discriminate against Administrative Expense Claims in favor of Professional Fee Claims. *See* Confirmation Order, Sched. 1 ¶ 18. |

---

[2] "**Humana Entities**" means Humana Insurance Company, Humana Health Plan, Inc., Humana Government Business, Inc., CarePlus Health Plans of Florida, Inc., CarePlus Health Plans, Inc., and their related entities and their affiliates that underwrite or administer health plans.

[3] "**Molina**" means Molina Healthcare, Inc., Molina Healthcare of Florida, Inc., Molina Healthcare of Ohio, Inc., Molina Healthcare of Arizona, Inc., Molina Healthcare of Utah, Inc. dba Molina Healthcare of Idaho, Molina Healthcare of Mississippi, Inc., Senior Whole Health, LLC, Molina Healthcare of South Carolina, Inc., Molina Healthcare of Texas, Inc., Molina Healthcare of Utah, Inc., Molina Healthcare of California, Inc., Molina Healthcare of Michigan, Inc., Molina Healthcare of New Mexico, Inc., Molina Healthcare of Virginia, Inc., Molina Healthcare of Washington, Inc., Senior Whole Health of New York, a/k/a Molina Healthcare of New York and or Affinity by Molina Healthcare, Molina Healthcare of Wisconsin Inc., including their affiliates and subsidiaries that underwrite or administer health plans.

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | | iii. the Plan does not provide for the treatment of the Debtors' medical records, the destruction cost of which would be an administrative expense claim, leaving Access with the possibility of being saddled with the records without payment. (¶ 2) | **Pending Resolution.** The Debtors have included language in the Confirmation Order that they believe should resolve this aspect of Access' objection. *See* Confirmation Order, Sched. 1 ¶ 18. |
| | | | Access objects to the third-party releases contained in the Plan to the extent they apply to any unpaid administrative expenses. (¶ 20) | **Pending Resolution.** The Debtors have included language in the Confirmation Order that they believe should resolve this aspect of Access's objection. *See* Confirmation Order, Sched. 1 ¶ 18. |
| | | | Access objects to any attempt by the Debtors to enjoin, bar, or waive any or all of Access' defenses (including, but not limited to, rights of setoff or recoupment) in connection with any litigation commenced against Access by the Litigation Trust, the Plan Trust, the Plan Trustee, the Debtors' estates, or any other party authorized to prosecute the Causes of Action. (¶ 21) | **Pending Resolution.** The Debtors have included language in the Confirmation Order that they believe should resolve this aspect of Access's objection. *See* Confirmation Order, Sched. 1 ¶ 18. |
| 16. | 5295 | Shannon Real Estate Services ("**Shannon**") | Shannon objects to the Plan, alleging that: | |
| | | | i. the Plan should specify that confirmation of the Plan shall not constitute a rejection, assumption, or assignment of any executory contract or unexpired lease that Quorum Health designated for assumption and assignment pursuant to any of the Quorum Transaction Documents that are the subject of an unresolved objection. (¶ 18) | **Pending Resolution.** The Debtors have included language in the Confirmation Order that they believe should resolve this aspect of Shannon's objection. *See* Confirmation Order, Sched. 1 ¶ 37. |
| | | | ii. the Plan should not delegate the power to resolve Shannon's Cure Dispute to the Plan Trust or Estate Representative. (¶ 18) | **Pending Resolution.** The Debtors have included language in the Confirmation Order that they believe should resolve this aspect of Shannon's objection. *See* Confirmation Order, Sched. 1 ¶ 37. |
| | | | iii. the Plan should specify that any Proofs of Claim based on the rejection of the Purported Lease must be filed with the Bankruptcy Court and served on the Claims and Noticing Agent no later than twenty-one (21) days after the date Shannon receives notice of any such rejection. (¶ 18) | **Pending Resolution.** The Plan already establishes a rejection claims bar date of twenty-one (21) days following the Effective Date. *See* Plan § 10.4 |
| 17. | 5276 | Dr. Ekkehard Kasper ("**Dr. Kasper**") | Dr. Kasper objects to the Plan, alleging that: | |
| | | | i. the Plan seeks to disallow Dr. Kasper's disputed cure claim. (¶¶ 26-33) | **Pending Resolution.** The Debtors have included language in the Confirmation Order that preserves Dr. Kasper's disputed cure claim and believe this language should resolve this objection. *See* Confirmation Order, Sched. 1 ¶ 33. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | | ii.   the Plan should not enjoin creditors from asserting affirmative defenses, including recoupment or setoff. (¶ 34) | **Pending Resolution**. The Debtors have included language in the Confirmation Order preserving Dr. Kasper's affirmative defenses, including setoff and recoupment, and believe this language should resolve this objection. *See* Confirmation Order, Sched. 1 ¶ 33. |
| 18. | 5284 | Greater Anesthesia Solutions, LLC ("**GAS**") | GAS objects to the Plan, alleging that: | |
| | | | i.   the Plan fails to provide for the payment of GAS' Administrative Claim on the Plan's Effective Date as required under § 1129(a)(9), because the Effective Date is an undefined future date when funding to pay administrative claims will be obtained through litigation recoveries. (¶¶ 9-10) | **Unresolved**. The Plan provides that all Allowed Administrative Expense Claims will be paid in full on the Effective Date. *See* Confirmation Brief ¶¶ 159-160. |
| | | | ii.   the Plan does not provide interest to administrative creditors on their claims on account of the delay. (¶ 11) | **Unresolved**. GAS has not established an entitlement to a specific contractual or statutory right to interest, and "[t]here is no provision in the Code to require or permit the payment of interest on an administrative claim." *See In re Express One Intern., Inc.*, 217 B.R. 207, 213 (Bankr. E.D. Tex. 1998); *In re John Clay and Co., Inc.*, 43 B.R. 797, 812 (Bankr. D. Utah 1984). |
| 19. | 5337 5352 | Orlando Health, Inc. and Orlando Health Medical Group, Inc. (collectively, "**Orlando Health**") | Orlando Health objects to the Plan alleging that: | |
| | | | i.   the Plan seeks to bar parties from asserting defenses of setoff and recoupment. (¶ 13) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve Orlando Health's objection and is subject to sign off from the Debtors and Orlando Health. *See* Confirmation Order, Sched. 1 ¶ 22. |
| | | | ii.   the Plan's gatekeeper provision violates Fifth Circuit law. (¶ 15) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve Orlando Health's objection and is subject to sign off from the Debtors and Orlando Health. *See* Confirmation Order, Sched. 1 ¶ 22. |
| | | | iii.   the Plan injunction prohibiting creditors from pursuing claims against *all* Released Parties or Exculpated Parties is overbroad. (¶ 19) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve Orlando Health's objection and is subject to sign off from the Debtors and Orlando Health. *See* Confirmation Order, Sched. 1 ¶ 22. |
| 20. | 5342 | CHRISTUS Health Ark-La-Tex ("**CHRISTUS**"), for itself and on | CHRISTUS objects to the Plan, alleging that: | |
| | | | i.   the Plan seeks to bar parties from asserting defenses of setoff and recoupment. (¶ 8) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve CHRISTUS's objection and is subject to sign off from the Debtors and CHRISTUS. *See* Confirmation Order, Sched. 1 ¶¶ 22. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | behalf of all of its subsidiaries | ii. the Plan's gatekeeper provision violates Fifth Circuit law. (¶ 15) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve CHRISTUS's objection and is subject to sign off from the Debtors and CHRISTUS. *See* Confirmation Order, Sched. 1 ¶¶ 22. |
| | | | iii. the Plan injunction prohibiting creditors from pursuing claims against *all* Released Parties or Exculpated Parties is overbroad. (¶ 19) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve CHRISTUS's objection and is subject to sign off from the Debtors and CHRISTUS. *See* Confirmation Order, Sched. 1 ¶¶ 22. |
| 21. | 5344 | Becton, Dickinson and Company, together with its subsidiary CareFusion Solutions, LLC (collectively, "**BD**") | BD objects to the Plan, alleging that it fails to satisfy § 1129(a)(9) because: | |
| | | | i. the Plan seeks to bar parties from asserting defenses of setoff and recoupment. (¶ 12) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve this objection. *See* Confirmation Order, Sched. 1 ¶¶ 36. |
| | | | ii. the Plan violates § 1129(a)(9) because the Plan requires administrative creditors to opt-out of the Administrative Expense Claims Consent Program. (¶ 17) | **Unresolved**. The Bankruptcy Court already approved the procedures for the Administrative Expense Claims Consent Program, and filing to return an opt-out ballot constitutes consent to "different treatment." *See* Confirmation Brief ¶ 320. Furthermore, the opt-out mechanism is permissible. *See* Confirmation Brief ¶¶ 321-325. Also, Becton has opted out of the Administrative Expense Claims Consent Program so this objection is moot. |
| | | | iii. the Plan treats professionals differently than other administrative creditors. (¶ 19) | **Unresolved**. The Plan does not discriminate against Administrative Expense Claims in favor of Professional Fee Claims. *See* Confirmation Brief ¶ 279. |
| 22. | 5297 | HHS Culinary and Nutrition Solutions, ( "**HHS**") | HHS objects to Article 12.5 of the Plan in order to preserve any and all potential setoff, recoupment or similar rights and defenses to which they are entitled under applicable law. (¶¶ 9-10) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve HHS' objection. *See* Confirmation Order, Sched. 1 ¶ 19. |
| 23. | 5286 | Varian Medical Systems, Inc. ("**Varian**") | Varian objects to the Plan to the extent that the Debtors seek to enjoin, bar or waive any or all of the defenses of Varian (including, but not limited to, rights of setoff or recoupment) in connection with any litigation commenced against Varian by either the Litigation Trust, the Plan Trust, the Plan Trustee, the Debtors' estates or any other party authorized to prosecute Causes of Action under the Plan. (¶ 1) | **Pending Resolution**. The Debtors and Varian are working to resolve this matter. The Debtors anticipate reaching an agreement prior to the Combined Hearing. |
| 24. | 5339 | Intuitive Surgical, Inc. ("**Intuitive**") | Intuitive objects to the Plan alleging that the Plan violates section 1129(a)(9)(A) of the Code because the Effective Date of the Plan is not anticipated to occur until two years after confirmation when the Debtors have received enough litigation proceeds to pay the administrative expense claims in full. (pg. 9) | **Unresolved**. The Bankruptcy Code does not require that the effective date occur immediately after confirmation, such that it is common to have an extended period between confirmation of the plan and its effective date. *See* Confirmation Brief ¶ 212. |

|  | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| 25. | 5332 | Blue Cross and Blue Shield of Florida, Inc. ("**Florida Blue**") | Florida Blue objects to the Plan alleging that it seeks to bar parties from asserting defenses of setoff and recoupment. (¶ 5) | **Pending Resolution**. The Debtors have included language in the Confirmation Order that they believe should resolve Florida Blue's objection.  *See* Confirmation Order, Sched. 1 ¶ 24. |
| 26. | 5331 | Microsoft Corporation ("**Microsoft**") | Microsoft objects to the Plan to the extent it assumes or assigns certain agreements without full cure, in violation of Section 365 of the Code.  (¶¶ 10-17) | **Pending Resolution**.  The Debtors acknowledge the requirements of Section 365 of the Code and have indicated to Microsoft that they would comply with such obligations. |
| 27. | 5308 | The Factor Inc. ("**Factor**") | Factor reserves all of its rights with respect to its election to opt out of the Third-Party Releases under the Plan, its Claim against the Debtors, and all of its rights and defenses in connection with the Adversary Proceeding. | **Resolved**. The Debtors acknowledge that Factor has reserved its rights. |
| 28. | 5270 | Laboratory Corporation of America ("**LabCorp**") | LabCorp reserves their rights with respect to their administrative expense claim; contracts, cure amounts, and rejection damages; and setoff/recoupment defenses in litigation against the Debtors, Estates, and Litigation Trust.  (¶¶ 10-11) | **Resolved**. The Debtors acknowledge that LabCorp have reserved their rights and have included language in the Confirmation Order that reserves LabCorp's rights.  *See* Confirmation Order, Sched. 1 ¶ 32. |
| 29. | 5298 | Westbrook Service Corporation ("**Westbrook**") | Westbrook reserves all rights regarding the treatment and classification of its administrative expense claims and the Administrative Expense Claims Consent Program. (¶ 13) | **Resolved**. The Debtors acknowledge that Westbrook reserved its rights. |
| **Resolved Objections** | | | | |
| 30. | 5186 | Blue Cross and Blue Shield of Texas, ("**BCBSTX**") | BCBSTX objects to the Plan and Disclosure Statement to the extent they attempt to waive or bar any or all defenses BCBSTX could assert in future litigation brought by the Litigation Trust, Debtors or an affiliated entity. (¶ 7) | The Debtors have resolved BCBSTX's objection by including negotiated language in the Confirmation Order.  *See* Confirmation Order, Sched. 1 ¶ 11. |
| 31. | 5201 5296 | Tennessee Attorney General's Office, Bankruptcy Division, on behalf of the Tennessee Department of | The Department objects to confirmation of the Plan: | |
| | | | i.    alleging that the Plan is inconsistent with 11 U.S.C. § 503(b)(1)(D) because the Plan does not exempt governmental units from filing requests for payment of administrative claims as required by the Bankruptcy Code.  (*See* pgs. 1-2 of Docket No. 5201) | The Debtors have resolved the Department's objection by confirming the Department is exempt from filing requests for payment of administrative claims. |

17

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | Revenue (the "**Department**") | ii. alleging that the Plan inappropriately allows the payment of administrative claims by "such other treatment." (*See* pgs. 1-2 of Docket No. 5201) | The Debtors have resolved the Department's objection by confirming the Department's Administrative Expense Claim (to the extent Allowed) will be paid on the Effective Date. |
| | | | iii. to the extent that the Administrative Expense Claims Consent Program places any limitation on the payment of the Department's administrative claims. (*See* p. 1 of Docket No. 5296) | The Debtors have resolved the Department's objection by confirming the Department is not subject to the Administrative Expense Claims Program. |
| | | | iv. alleging that the Plan inappropriately allows the payment of priority tax claims by other treatment. (*See* pgs. 2-3) | The Debtors have resolved the Department's objection by confirming the Department's priority tax claim (to the extent Allowed) will be paid pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. |
| | | | v. alleging that the Plan includes improper third-party releases. (*See* pg. 3) | The Debtors have resolved the Department's objection by confirming the Department has opted out of the Third-Party Releases. |
| 32. | 5275 | DJO Entities[4] | The DJO Entities object to the Plan and Disclosure statement to the extent the Debtors seek to enjoin the DJO Entities from asserting their rights of set off or recoupment. (¶ 4) | The Debtors have resolved the DJO Entities' objection by including negotiated language in the Confirmation Order. *See* Confirmation Order, Sched. 1 ¶ 10. |
| 33. | 5316 | Cintas Corporation No. 2 ("**Cintas**") | Cintas objects to the Plan alleging that it seeks to bar parties from asserting defenses of setoff and recoupment. (¶ 4) | The Debtors have resolved Cintas' objection by including negotiated language in the Confirmation Order. *See* Confirmation Order, Sched. 1 ¶ 13. |
| 34. | 5329 | Dext Capital, LLC ("**Dext**") | Dext objects to the Plan alleging that it seeks to bar parties from asserting defenses of setoff and recoupment. (¶ 5) | The Debtors have resolved Dext's objection by including negotiated language in the Confirmation Order. *See* Confirmation Order, Sched. 1 ¶ 14. |
| 35. | 5287 | University of Colorado Health ("**UCHealth**") | UCHealth asserts and preserves its rights of setoff and recoupment in accordance with applicable law, and joins in the objections of BCBSTX, the DJO Entities, SWARMC, and any other similar, later filed objections. (¶¶ 3-4) | The Debtors have resolved UCHealth's objection by including negotiated language in the Confirmation Order. *See* Confirmation Order, Sched. 1 ¶ 12. |
| 36. | 5288 | Financial Recovery Services, LLC ("**FRS**") | FRS reserves all rights to object to the rejection or assumption of any agreement between FRS and the Debtors related to the *Authorization to File and Manage Claims*, until the Debtors confirm that all such agreements have been assumed. (¶¶ 7-8) | The Debtors have confirmed to FRS that the Debtors do not intend to assume their contracts on the Effective Date. |

---

[4] "**DJO Entities**" mean Medshape, Inc., DJO, LLC, Trilliant Surgical, LLC, Novastep, Inc., Encore Medical, L.P. (d/b/a DJO Surgical) and SURGI-CARE, Inc.

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| 37. | 5279 | Southwest Arkansas Regional Medical Center LLC ("**SWARMC**") | SWARMC objects to the Plan to the extent that: | |
| | | | i. the Plan attempts to or would have the effect of determining any of the issues raised in the pending contested matters between the Debtors and SWARMC involving the sale of the assets of Wadley Regional Medical Center at Hope. (¶ 14) | The Debtors have resolved SWARMC's objection by including negotiated language in the Confirmation Order.  *See* Confirmation Order, Sched. 1 ¶ 3. |
| | | | ii. it seeks to determine, limit waive, or release the rights, remedies, defenses or claims of the parties in the pending contested matter.  (¶ 14) | The Debtors have resolved SWARMC's objection by including negotiated language in the Confirmation Order.  *See* Confirmation Order, Sched. 1 ¶ 3. |
| 38. | 5309 | Blue Cross and Blue Shield of Massachusetts, Inc. and Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. (collectively, "**BCBSMA**") | i. BCBSMA objects to the Plan **and** Disclosure Statement to the extent that they include any provisions purporting to enjoin or bar BCBSMA from asserting any potential defenses in any pending or future litigation, including any rights of setoff and recoupment. (¶ 6) | The Debtors have resolved BCBSMA's objection by including negotiated language in the Confirmation Order.  *See* Confirmation Order, Sched. 1 ¶ 26. |
| | | | ii. BCBSMA argues that the Plan violates the terms of the FILO Lender Settlement Order (Dkt. No. 5035), which explicitly preserved BCBSMA's rights of setoff and recoupment with respect to transferred Litigation Trust Assets. (¶ 8) | The Debtors have resolved BCBSMA's objection by including negotiated language in the Confirmation Order.  *See* Confirmation Order, Sched. 1 ¶ 26. |
| 39. | 5336 | Atlantic Specialty Insurance Company ("**ASIC**") | i. ASIC objects to the Plan alleging that the Plan violates §1129(b)(2)(A) because treatment of ASIC's Class 2 Other Secured Claims is vague and does not guaranty that its rights are not impaired. (¶¶ 11-12) | The Debtors have resolved ASIC's objection by including negotiated language in the Confirmation Order.  *See* Confirmation Order ¶ 77. |
| 40. | 5306 | The Texas Comptroller of Public Accounts, Revenue Accounting Division ("**Texas Comptroller**") | The Texas Comptroller objects to the Plan, alleging that: | |
| | | | i. Article VIII of the Plan provides that holders of Claims shall not be entitled to postpetition interest on their Claims.  (¶ 4) | The Debtors have resolved the Texas Comptroller's objection by including negotiated language in the Confirmation Order.  *See* Confirmation Order ¶ 73.  In any case, the Bankruptcy Code does not require the Debtors to pay interest on administrative expense claims. |
| | | | ii. the Plan does not provide for payment in full of the Texas Comptroller's asserted postpetition taxes. (¶ 4) | The Debtors have resolved the Texas Comptroller's objection by including negotiated language in the Confirmation Order.  *See* Confirmation Order ¶ 72. |
| | | | iii. The Plan requires the Texas Comptroller to file a motion or application for allowance of its administrative claims. (¶ 6) | The Debtors have resolved the Texas Comptroller's objection by including negotiated language in the Confirmation Order.  *See* Confirmation Order ¶ 72. |

|  | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
|  |  |  | iv. the Plan provides for less than payment in full of its administrative claims. (¶ 7) | The Plan complies with all relevant requirements of section 1129 of the Bankruptcy Code, including that all Administrative Expense Claims will be paid in full as of the Effective Date. *See* Confirmation Brief ¶ 72. |
|  |  |  | v. the treatment of priority tax claims in Article II of the Plan does not comply with section 1129(a)(9)(C) of the Bankruptcy Code, which requires that priority tax claimants receive the present value of their claim(s) as of the effective date. (¶ 8) | The Debtors have resolved the Texas Comptroller's objection by including negotiated language in the Confirmation Order. *See* Confirmation Order ¶ 72. In any case, the Plan provides for payment in full of all Allowed Priority Claims. *See* Confirmation Brief ¶¶ 159-160. |
|  |  |  | vi. Article XII of the Plan potentially limits the Texas Comptroller's setoff rights. (¶ 9) | The Debtors have resolved the Texas Comptroller's objection by including negotiated language in the Confirmation Order. *See* Confirmation Order ¶ 72. |
|  |  |  | vii. the Plan contains expansive releases and injunctions for non-debtor parties. (¶ 16) | The Plan's injunction and release provisions do not violate the Bankruptcy Code. The Third-Party Releases are consensual. The Injunction Provisions are appropriate and consistent with the applicable case law and precedent in the Fifth Circuit. *See* Confirmation Brief ¶¶ 229-246. |
|  |  |  | viii. the Plan broadly declares the entire Plan a settlement, and the Plan's statutorily mandated treatment of priority tax claims and administrative tax expenses is not a settlement or compromise. (¶ 16) | The Debtors have resolved the Texas Comptroller's objection by including negotiated language in the Confirmation Order. *See* Confirmation Order ¶ 72. |
|  |  |  | ix. Article XII provides releases and injunctions in language that is broader than the discharge given under Chapter 11, and the Plan expands the injunction and releases to non-debtor third parties. (¶ 17) | The Confirmation Order expressly provides that the Debtors will not receive a discharge under section 1141, similar to other chapter 11 liquidating plans. *See* Confirmation Order ¶¶ 243-247. |
|  |  |  | The Texas Comptroller objects to any requirement that it obtain permission to amend its claims, asserting its right to amend tax claims based on actual assessments. (¶ 21) | The Debtors have resolved the Texas Comptroller's objection by including negotiated language in the Confirmation Order. *See* Confirmation Order ¶ 72. |
|  |  |  | The Texas Comptroller argues that the Bankruptcy Court lacks jurisdiction to enjoin taxing authorities from pursuing non-debtors, citing the Tax Injunction Act and relevant case law. (¶ 19) | The Debtors have resolved the Texas Comptroller's objection by including negotiated language in the Confirmation Order. *See* Confirmation Order ¶ 72. |
| 41. | 5173 | Compass Group USA, Inc. ("**Compass**") | The Compass Parties reserve and preserve any setoff or recoupment rights they may have against any of the Debtors pursuant to applicable law or otherwise. (¶ 3) | The Debtors have resolved Compass Parties' objection by including negotiated language in the Confirmation Order. *See* Confirmation Order, Sched. 1 ¶ 15. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| 42. | 5311 | Sunbelt Rentals, Inc. ("**Sunbelt**") | Sunbelt objects to the Plan and Disclosure Statement to the extent the Debtors seek to enjoin, bar, waive, or release any or all defenses of Sunbelt in connection with the Adversary Proceeding, its various claims filed against the Debtors, or otherwise. (¶ 6) | The Debtors have resolved Sunbelt's objection by including negotiated language in the Confirmation Order. *See* Confirmation Order, Sched. 1 ¶ 28. |
| 43. | 5268 | Mass General Brigham Incorporated, ("**MGB**") | MGB objects to the extent that the Plan seeks to bar parties from asserting affirmative defenses of recoupment. (¶ 9). | The Debtors have resolved MGB's objection by including negotiated language in the Confirmation Order. *See* Confirmation Order, Sched. 1 ¶ 29. |
| 44. | 5315 | Elevance Health Companies, Inc., on behalf of itself and its affiliates (collectively, "**Elevance**") | Elevance objects to confirmation of the Plan, alleging that: | |
| | | | i.   the Plan seeks to bar parties from asserting defenses of setoff and recoupment. (¶ 12) | The Debtors have included negotiated language in the Confirmation Order that resolves Elevance's objection. *See* Confirmation Order, Sched. 1 ¶ 34. |
| | | | ii.  the Plan impairs previously filed cure objections. (¶¶ 16-17) | The Debtors have included negotiated language in the Confirmation Order that resolves Elevance's objection. *See* Confirmation Order, Sched. 1 ¶ 34. |
| | | | iii. the Administrative Expense Claims Consent Program violates § 1129(a)(9) where the Plan is based on an aspirational goal to pay administrative expense claims in the future. (¶ 18) | The Plan provides that all Allowed Administrative Expense Claims will be paid in full on the Effective Date. *See* Confirmation Brief ¶¶ 159-160. |
| 45. | 5294 | Savannah B. Gross,; Sidney Brown; Joni A. Rausch and William J. Rausch, II; Beverly D. Caldwell; James F. Smith; Nancy E. DeSouza (collectively, the "**Personal Injury Claimants**") | The Personal Injury Claimants object to the Plan, alleging that: | |
| | | | the Plan, through the Medical Liability Claims Procedures, seeks to extend the automatic stay to claims against non-Debtor third parties. (¶¶ 15-20) | The Debtors have included negotiated language in the Confirmation Order that resolves this objection. *See* Confirmation Order ¶ 82. |
| | | | there is no basis for the Court to reimpose the automatic stay and disregard of previously agreed stipulations, and the Debtors' proposal to reimpose the automatic stay is an improper attempt to circumvent final and non-appealable orders. (¶¶ 21-25) | The Debtors have included negotiated language in the Confirmation Order that resolves this objection. *See* Confirmation Order ¶ 82. |
| | | | the Plan was not proposed in good faith, because it seeks to reimpose the automatic stay in contravention of previously agreed stipulations. (¶¶ 26-32) | The Debtors have included negotiated language in the Confirmation Order that resolves this objection. *See* Confirmation Order ¶ 82. |
| | 5314 | | WRHE objects to the Plan, alleging that: | |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| 46. | | Western Reserve Health Education Inc. ("**WRHE**") | i. the Plan does not address the treatment of WRHE's claim, pursuant to section 363 of the Bankruptcy Code, to turnover postpetition state and federal grant funds the Debtors have improperly retained, to the extent the claim does not qualify as an administrative expense claim. (¶ 15) | The Debtors have included negotiated language in the Confirmation Order that resolves this objection. *See* Confirmation Order, Sched. 1 ¶ 30. |
| | | | ii. Section 5.2 of the Plan may seek to foreclose WHRE's Turnover Claim. (¶ 16) | The Debtors have included negotiated language in the Confirmation Order that resolves this objection. *See* Confirmation Order, Sched. 1 ¶ 30. |
| 47. | 5346 | Healthcare Systems of America ("**HSA**") | HSA objects to the Plan, alleging that: | |
| | | | i. the Plan seeks to bar parties from asserting defenses of setoff and recoupment. (¶ 11) | The Debtors have resolved this objection via stipulation. *See* Docket No. 5420. |
| | | | ii. the Plan's gatekeeper provision violates Fifth Circuit law. (¶ 17) | The Debtors have resolved this objection via stipulation. *See* Docket No. 5420. |
| | | | iii. the Plan injunction prohibiting creditors from pursuing claims against *all* Released Parties or Exculpated Parties is overbroad. (¶ 21) | The Debtors have resolved this objection via stipulation. *See* Docket No. 5420. |
| 48. | 5366 | Maricopa County Treasurer ("**MCT**") | MCT objects to the Plan to the extent the Plan: | MCT withdrew this objection at Docket No. 5423 |
| | | | i. seeks to strip MCT of its Tax Lien prior to the payment of its Tax Lien claim in full or to otherwise transfer any of the MCT Tax Lien collateral free and clear of the MCT Tax Lien. (¶ 9) | |
| | | | ii. fails to require the payment of postpetition accrued interest on the MCT Tax Lien claim under Arizona law as part of its secured Tax Lien claim. (¶ 12) | |
| 49. | 5307 | Ohio Department of Medicaid ("**ODM**") | i. ODM objects to the Plan to the extent that the Debtors seek to unilaterally enjoin, bar, or waive any and all rights or defenses of ODM, including but not limited to the rights of recoupment and setoff. (¶ 1) | The Debtors have resolved ODM's objection by including negotiated language in the Confirmation Order. *See* Confirmation Order, Sched. 1 ¶ 27. |
| 50. | 5340 | Getinge USA Sales, LLC ("**Getinge**") | Getinge objects to the Plan to the extent that it: | |
| | | | i. seeks to bar parties from asserting setoff and recoupment defenses. (¶ 3) | The Debtors have included negotiated language in the Confirmation Order that resolves Getinge's objection. *See* Confirmation Order, Sched. 1 ¶ 20. |

| | Docket No. | Objecting Party | Summary of Objection(s) | Debtors' Response(s) |
|---|---|---|---|---|
| | | | ii.  fails to provide any mechanism for Section 502(h) claims to become Allowed General Unsecured Claims. (¶ 4) | The Debtors have included negotiated language in the forthcoming amended Plan that resolves Getinge's objection. |
| 51. | 5290 | Stryker Corporation ("**Stryker**") | Stryker objects to the Plan to the extent that the Debtors seek to enjoin, bar, or waive any or all of the defenses of Stryker (including, but not limited to, rights of setoff or recoupment) in connection with any litigation commenced against Stryker by either the Litigation Trust, the Plan Trust, the Plan Trustee, the Debtors' estates, or any other party authorized to prosecute Causes of Action under the Plan. (¶ 1) | The Debtors have included negotiated language in the Confirmation Order that resolves Stryker's objection.  *See* Confirmation Order, Sched. 1 ¶ 16. |

**EXHIBIT B**

*Proposed Order*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| STEWARD HEALTH CARE | § | Case No. 24-90123 (CML) |
| SYSTEM LLC, *et al.*, | § | |
| | § | (Jointly Administered) |
| Debtors and Appellees. | § | |

---

| | | |
|---|---|---|
| THE COMMONWEALTH OF | § | Lead Civil Action No. |
| MASSACHUSETTS, TRACO | § | 4:25-cv-03754 |
| INTERNATIONAL GROUP S. DE | § | |
| R.L., AND DR. MANISHA | § | Consolidated with: |
| PUROHIT, *et al.*, | § | 4:25-cv-02825 |
| | § | 4:25-cv-02829 |
| Appellants. | § | 4:25-cv-02901 |
| | § | 4:25-cv-03755 |
| | § | 4:25-cv-03757 |
| | § | 4:25-cv-03824 |
| | § | 4:25-cv-03830 |

## ORDER CONSOLIDATING AND CERTIFYING APPEALS

Pending before the Court in this bankruptcy appeal is a joint combined motion to consolidate this appeal with seven other related appeals and to certify the consolidated appeals for direct appeal to the Fifth Circuit.

This Court previously consolidated three of those appeals. *See* Civil Action No. 4:25-cv-02825, ECF No. 11. The motion to consolidate has been joined by the appellants in all eight appeals, and no party opposes. The motion to consolidate is accordingly **GRANTED**. This appeal is hereby consolidated with Southern District

of Texas Civil Action Nos.: 4:25-cv-02825, 4:25-cv-02829, 4:25-cv-02901, 4:25-cv-03755, 4:25-cv-03757, 4:25-cv-03824, and 4:25-cv-03830 with this case number being the lead case.

After reviewing the motion to certify and any responses thereto, the Court is of the opinion that it should be **GRANTED**. The foregoing appeals, as consolidated, are hereby certified for direct appeal to the United States Court of Appeals for the Fifth Circuit.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on _____, 2025:

_____
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE

4920-7144-2276