# **EXHIBIT A**

*McDonald Decl.*

## DECLARATION OF HUGH M. MCDONALD IN SUPPORT OF APPELLANTS' RESPONSE IN OPPOSITION TO APPELLEES' MOTION TO DISMISS APPEALS AS MOOT

I, Hugh M. McDonald, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I submit this declaration in support of *Appellants' Response in Opposition to Appellees' Motion to Dismiss Appeals as Moot* (the "Motion").

2.    I am a Special Assistant Attorney General to the Commonwealth of Massachusetts ("Massachusetts" or the "Commonwealth") and a partner at Pillsbury Winthrop Shaw Pittman LLP, counsel to the Commonwealth.

3.    Attached as **Exhibit 1** is a true and correct copy of the transcript of the hearing held by the Bankruptcy Court on July 16, 2025 (the "Oral Ruling on Confirmation").

4.    Attached as **Exhibit 2** is a true and correct copy of the transcript of the hearing held by the Bankruptcy Court on May 30, 2025 (the "Oral Ruling on Settlement").

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Signed:  October 14, 2025                    */s/ Hugh M. McDonald*
         New York, New York                  Hugh M. McDonald

4918-4486-6674

# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | |
|---|---|
| IN RE: | § CASE NO. 24-90213-11 |
| | § HOUSTON, TEXAS |
| STEWARD HEALTH CARE SYSTEM, | § WEDNESDAY, |
| LLC, | § JULY 16, 2025 |
| | § |
| DEBTORS. | § 2:00 P.M. 3:47 P.M. |

**<u>PLAN CONFIRMATION HEARING DAY THREE</u>**

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                          SEE NEXT PAGE

COURTROOM DEPUTY/ERO:          YESENIA LILA

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**<u>APPEARANCES</u>:**


```
FOR DEBTORS, STEWARD HEALTH      WEIL GOTSHAL & MANGES, LLP
CARE SYSTEM, LLC, ET AL.:        David J. Cohen, Esq.
                                 767 Fifth Avenue
                                 New York, NY 10153
                                 212-310-8000


FOR THE COMMONWEALTH            PILLSBURY WINTHROP SHAW PITTMAN
OF MASSACHUSETTS AND            Andrew M. Troop, Esq.
ATTORNEY GENERAL OF THE         31 West 52nd Street
COMMONWEALTH OF MASSACHUSETTS:  New York, NY 10019
                                 212-858-1660



(Please also see Electronic Appearances.)
```

1          **HOUSTON, TEXAS; WEDNESDAY, JULY 16, 2025; 2:00 P.M.**

2          THE COURT:  Okay.  Good afternoon.  This is Judge

3     Lopez.  Today is July 16th, 2:00 p.m.  I will issue a ruling

4     in the Steward bankruptcy cases.

5          Before I begin, I believe folks can hear me.  But if

6     someone can just turn a camera on and wave, so I know that you

7     can hear me, that would be awesome.  Okay.  That's what I

8     needed.  Thank you, Mister ... that's what I needed.

9          So I'll note the Court has conducted hearings over

10    the last couple of days in connection with plan confirmation

11    and in connection with a motion to convert the cases or to

12    dismiss them.  I appreciate everyone's time and attention to

13    detail and -- okay.  Here we go.

14         I'll note the Court has jurisdiction to consider

15    these matters under 28 U.S.C. 1334.

16         This is a core proceeding under 28 U.S.C. 157.

17         The Court has authority to issue a final order in

18    connection with plan confirmation issues and -- or to convert

19    or dismiss these cases.

20         I'm going to be reading for quite some time, so

21    there will be a recording available.  We'll see.  Here we go.

22         Before these Chapter 11 cases started, Steward was

23    the largest private physician-owned network in the United

24    States.  This is coming from the disclosure statement.

25    Steward provided care to more than 2 million patients annually

4

1      and employed about 30,000 people.  Steward's network spanned

2      across 10 states, at 31 hospitals, and over 400 facility

3      locations.  That includes physician practice offices,

4      ambulatory surgical centers, and diagnostic imaging centers.

5      There were over 4,500 primary and specialty care physicians

6      that worked with Steward.

7              So why and how could a robust hospital network like

8      Steward file bankruptcy cases?  While there were standard

9      related issues given to the Court, some were operational

10     issues, COVID-19-related issues, all of that was true, but a

11     primary driver was its pre-petition capital structure.

12             Steward had over 9 billion debt, over 300 million

13     becoming due at the end of June of 2024, but nowhere near the

14     cash to sustain that type of debt.

15             The collateral mix here is worth noting.  As a

16     result of some pre-petition transactions, one group of

17     lenders, called the "MPT parties," had a first lien on much of

18     the real property where Steward's hospitals stood; and another

19     set of lenders called the "FILO parties" had a lien, a first

20     lien, on Stewards accounts, accounts receivable, and

21     inventory.

22             Steward filed these cases with the stated intent to

23     try and sell its hospitals and maximize value for the estates.

24     Steward had to get a loan to get to the point where it could

25     file the cases, then it had to borrow more money to get to the

1    point where it could sell the hospitals.  Getting a loan and

2    selling the hospitals was extremely challenging.

3            Try selling a hospital where a buyer -- or excuse me

4    -- where the MPT parties owned the dirt and the FILO parties

5    had a lien on the assets and the A/R related to the facility,

6    but Steward owns the facility.  Layer on top of that there are

7    real people with real medical issues in these hospitals and

8    facilities.  Factor on top of that that some of these

9    hospitals were located and serving deserving Americans in

10   rural areas.

11           So what do you sell the hospital for?  Steward may

12   think X is a good price.  But what if MPT says the land is

13   worth more?  What if FILO said it wasn't taking a cut on the

14   A/R to make others whole just at its expense?  If you don't

15   find a willing buyer at the right terms for each of these

16   parties, then hospitals close and people could die.  I'm not

17   exaggerating here.

18           It was a long and complicated process, and the work

19   that went into saving hospitals from closing was

20   extraordinary.  The work that the UCC, the professionals

21   involved, the work that they did during this case to keep

22   hospitals alive, many of them in rural areas where, if you

23   close one hospital, getting to the next hospital, where every

24   second counts, was extraordinary.

25           Most of the hospitals were successfully

1    transitioned.  A few, unfortunately, they didn't stay open.  I

2    think about that all the time.  A building doesn't close.

3    It's unfortunate.  But I often wonder if everybody is okay,

4    including the workers.

5         But based on what I saw in this case, it was not due

6    to a lack of effort from the estate professionals, the UCC,

7    and Steward.  The estate professionals were duty bound to do

8    everything, so was the Committee and their professionals.

9    That costs money.  And I don't begrudge MPT or the FILO

10   parties, either, right?  This is America.  There were no legal

11   bases to require a party to take less than what they believe

12   they were owed.  Parties mediated for months in what I presume

13   were hundreds of hours, working on complex and tough issues.

14        During the case, everyone acted in good faith.  I

15   called parties in for hearings on the weekend; everyone showed

16   up.  You can't ask for more than that.

17        Almost all of the hospitals sold, and that's a

18   tremendous feat.  It doesn't feel like that when you don't

19   make as much money as you hoped for.  But the market spoke in

20   a fair and transparent process.  It doesn't mean the work

21   wasn't successful, meaningful, and impactful.  The Debtors'

22   sales didn't yield significant value, as much as it wanted to,

23   for the estates.  But the reasons are obvious, for the reasons

24   I just described, you don't get all the money.

25        Professional fees were high in this case.  But for -

1     - reasons for that were obvious, too.  They have to be high;

2     they had to do the work.

3          And I'll say this now to kind of get it out of the

4     way.  There was talk of disgorgement of fees as a possibility

5     of fueling a Chapter 7 case.  I don't know exactly how that

6     would work because there's nothing in the Code that allows me

7     to claw back professional fees that I awarded and entered

8     under an order approving them just because, allegedly, the

9     estate can't pay everyone at this precise moment.

10          I entered a professional compensation procedures

11    order that permitted professionals to seek compensation during

12    the case.  Virtually 99.9 percent of the orders -- don't quote

13    me on the percentage, but it's really, really high -- I

14    reviewed every -- virtually every one, and they were

15    unopposed.  But unopposed doesn't mean unreviewed.  I reviewed

16    every application submitted.  I'm duty bound to do so.  I read

17    the time entries and the work.  I found it necessary, that's

18    why I signed the orders, even if there was no objections.

19          Bankruptcy Courts -- let me just note, there's no --

20    what I can tell -- basis for equitable disgorgement, whatever

21    that means and if it's even a thing.  Bankruptcy Courts have a

22    statutory authority under Section 105 of the Code to enter an

23    order, process, or judgment that is necessary or appropriate

24    to carry out the provisions of the Bankruptcy Code, basically

25    the bankruptcy equivalent of the power the District Courts

8

1    have under the All Writs Act.  The Fifth Circuit has made it

2    clear that 105 cannot be used as a roving commission to,

3    quote/unquote, "do justice," whatever justice would be in this

4    case.  And that makes sense.

5         But for what it's worth, they were court-approved

6    fees under a transparent process.  Everyone had -- all parties

7    have the right to object to the approval of fees on a final

8    basis.  But the concept of disgorgement, to me, means that

9    someone lied to me or I find out someone did something really

10   bad.  Regardless, I don't think disgorgement is the answer.

11   There's a process in place, and process over everything.  The

12   proper procedural basis is to object to the final approval of

13   fees whenever that comes up.

14        With that being said, I don't want to leave anyone

15   with the impression that I think these professionals did

16   anything wrong, based on the record before me in this case and

17   at the confirmation hearing, and the opposite is true.

18   Whether this plan gets confirmed or this case converted are

19   matters that will be independently assessed now, based on

20   applicable law and the record.  And I don't want to leave

21   anyone with the impression that my silence was to be left

22   thinking that the estate professionals or the Committee were

23   picking themselves over everyone else.

24        To get to a plan confirmation hearing, Steward

25   recently got approval of a settlement with the FILO parties.

1          And I should note for the record, FILO, F-I-L-O.

2          The settlement provided for the means to get to the

3     plan confirmation hearing and the funds to pursue estate

4     causes of action against select parties, based on certain

5     actions.  Today is not the day to have a trial on the merits

6     on the potential causes of action.

7          Not everyone who could be subject to litigation

8     attended the confirmation hearing, nor were they required to

9     attend.  Everyone will have their day in court.

10         I find that the FILO settlement -- I should say I

11    found that the FILO settlement prevented an immediate, harmful

12    conversion to Chapter 7 and was permitted under applicable

13    law.  That ruling is under appeal, so I refer to it as

14    background.  Nothing I say here should be construed as an

15    attempt to add substance or comment on the appeal or my

16    decision approving the FILO settlement.  There is a transcript

17    of what I said and the reasons that I said it, and that --

18    those matters will be judged independently.

19         Steward now seeks final approval of the disclosure

20    statement and confirmation of a Chapter 11 plan that would

21    wind down the estates through the formation of liquidating

22    trusts that would work together to pursue and monetize

23    remaining assets, reconcile claims, and make distributions to

24    creditors.

25         A number of parties objected to the plan.  Many were

1    resolved through clarifications or language in a proposed

2    confirmation order; some remain unresolved.

3            The Office of the United States Trustee objected.

4    And there were also what I would call three primary objectors,

5    not to say that anyone who -- well, I'll identify them:  One

6    was the Commonwealth of Massachusetts, one I'll refer to as

7    TRACO -- T-R-A-C-O -- and one is a group of physicians who

8    appealed the ruling I made about deferred compensation held in

9    a rabbi trust.

10           The rabbi trust ruling is on appeal, too, so I say

11   nothing more about the merits of that dispute.

12           I see Mr. Troop there.  I did -- I'll note I have

13   never ordered mediation in a case, and I won't be doing so

14   today.  But at some point during the cases, I'll confess that

15   I strongly considered ordering the Commonwealth of

16   Massachusetts and Steward to mediating as my first.  I don't

17   profess to have a deep understanding of the underlying issues

18   between the parties, but I do know they're both represented by

19   really smart lawyers.  It is my hope that the parties give

20   consensual discussions or consensual mediations a chance.

21           Let me get back to plan confirmation.

22           The primary objections from these parties was

23   focused on a litany of alleged problems with the plan.  It's

24   clear they don't want the plan confirmed.

25           Steward highlighted possible motives of their

1    primary objectors, right?  They note that the Debtors --

2    excuse me -- that the doctors subject to the rabbit trust are

3    appealing my order, and that involves deferred comp.

4          TRACO's board members include former Steward board

5    members who are subject to potential material litigation

6    claims held by the estate.

7          Some of the objecting parties focused on

8    professional fees disgorgement.  There was a little bit of

9    that on both sides.

10          I didn't focus on motives in this case because the

11    objecting parties made legal arguments based on the plan, and

12    it's Steward's burden to prove by a preponderance of the

13    evidence that confirmation is warranted under applicable

14    sections of the Code.

15          I want to highlight a few of the main objections.

16    One was feasibility of the plan and a proposed effective date

17    in early 2027.  That implicates Bankruptcy Code sections like

18    1129(a)(9) and 1129(a)(11).

19          Can a plan -- I should say can a Debtor propose a

20    plan effective date that's about one and a half to two years

21    out, like is contemplated in this plan, or does Steward have

22    to prove it can pay all allowed administrative and priority

23    claims now, and is it realistic that Steward could pay allowed

24    claims even in 2027, or should the cases be converted and

25    liquidated in Chapter 7 now.  Is Steward relying too heavily

1    on unrealistic hopes of winning big in litigation?

2    I also think there's at least an implied argument by

3    these objectors that the plan was not proposed in good faith.

4    There are also bankruptcy-specific objections to the

5    classification scheme.

6    Another big one is that the plan doesn't satisfy the

7    best interests of creditors test, which means that creditors

8    who have voted to reject the plan won't receive as much under

9    the plan than in a Chapter 7.

10    Parties like the U.S. Trustee and the Department of

11    Justice, on behalf of the IRS, also objected to the proposed

12    Debtor releases under the plan, proposed exculpations, and the

13    IRS had some specific comments to language in the proposed

14    confirmation order that could be seen as limiting the IRS's

15    ability to go after responsible parties in connection with

16    unpaid unemployment taxes, what I'll call "941 taxes."  I'm

17    sure there are some other IRS numbers in there, as well.

18    The rabbi trust appellants also moved to convert the

19    cases under Section 1112 of the Bankruptcy Code.  This was

20    joined by TRACO and the U.S. Trustee.

21    At the plan confirmation hearing yesterday -- it was

22    over two days -- but at the one yesterday, counsel for the

23    appellants argued that I must convert in this case based on

24    the tenants of the Bankruptcy Code, even if I were to find

25    that this plan could be confirmed.

13

1          I'll explain my reasons in a bit, but I can and I

2     did consider plan confirmation and dismissal simultaneously.

3     And if I find that the plan is confirmable, then there's no

4     cause under 112 to convert.

5          I found counsel's argument creative, for sure, but

6     wrong on the law and the facts here.  I don't make rulings

7     based on policy issues, but my answer will hopefully quell any

8     concern companies who, for example, may be losing money in a

9     couple of months in a Chapter 11 case due to tariffs or just

10    business issues or the market, are subject to mandatory

11    conversion simply by the filing of a motion to dismiss, even

12    if there's a potential confirmable plan proposed, even if

13    that's a liquidating plan.

14         The Court conducted an evidentiary hearing on

15    confirmation and conversion, also considered dismissal.  I

16    considered the testimony, the documents admitted, and the

17    legal arguments of supporting and opposing parties.

18         For the reasons I'll explain, I'm prepared to

19    confirm the plan with some changes.

20         First, there's going to be a change to what is

21    referred to as the Debtor medical claim procedures to remove

22    mandatory mediation.

23         And I will not be reimposing the automatic stay on

24    parties for whom I previously signed orders granting relief

25    from the stay.

14

There will also be a change to the Debtor releases. The Debtor releases, you know, I'll have to think about this, and so I don't want to do it today because you're going to have to think about this. But no one is going to be released for any independent pre-petition actions that don't relate -- or let me put it this way.

You can -- the Debtor release will apply to pre-petition actions related to the filing of the Chapter 11 cases or maybe a restructuring effort in connection with the Chapter 11 case, you have to go get some financing to get to the case, but no independent pre-petition actions. I want to be clear about that and I'll say it again later.

But there are allegations and potential litigation about pre-petition actions that took place in 2016 and 2020 and 2021. You know, I want a level playing field in a liquidating 11, so no one gets released based on those acts. I don't know if there's anything there.

But there also must be language struck in the confirmation order or added to ensure that the plan does not impact the IRS's rights to pursue claims against potential responsible parties under non-applicable -- excuse me -- under applicable non-bankruptcy law. That's not a finding that there is a responsible party.

My understanding is that the IRS and the Debtors continue to work on it. But the basic concept is, if the

1    Debtors remain liable for 941 taxes -- right?  Then the IRS --

2    obviously, the plan can't impair the IRS's rights to pursue

3    other remedies with respect to that, when matters includes

4    responsible parties.  I really hope the parties continue to

5    work on that, as well; and it sounds like, for all intents and

6    purposes, based upon what I heard, that's the case.

7         The confirmation order must also require additional

8    language, requiring that the ability to pay admin claims in

9    full is a condition precedent to the effective date that

10   cannot be waived.

11        There must also be language that the Court will hold

12   a conference about litigation matters and the administrative

13   and claims reconciliation process.  There will be a hearing on

14   December 15th, 2025 at 1:00 p.m. central, June 15, 2026 at

15   1:00 p.m. central, December 15, 2026 at 1:00 p.m. central, and

16   June 15, 2027 at 1:00 p.m. central.  I'll say that again.

17   December 15, 2025 at 1:00 p.m., June 15, 2026 at 1:00 p.m.,

18   December 15, 2026 at 1:00 p.m., and June 15, 2027 at 1:00 p.m.

19        The Court reserves the right to immediately find

20   that the plan cannot go effective *sua sponte* at the 2026 and

21   2027 conferences.  The most important conference will be the

22   June 15, 2027 conference.  If the Court finds that the plan

23   cannot go effective, has no hopes of going effective, let's

24   just say in late 2026, the practical matter is that the case

25   will convert right then and there.

1       I'm going to explain my reasoning a little bit more

2  later.  But you should think about the conferences this way:

3       There are a number of omnibus objections and dozens

4  of preference actions underway.  We'll know the answer to most

5  of the omnibus objections by December 2025, for sure.  Some of

6  the objections arguing billions in alleged administrative

7  claims are unsupported by any documentation.  I intend to take

8  those matters in the ordinary course and set contested

9  evidentiary hearings, if necessary, in the ordinary course, as

10  well.  There will be no delay.

11       TRACO has also asserted an administrative claim for

12  about 176 million.  I don't know how I can say "about 176

13  million," but let's just call it over 170 million.  I see no

14  reason why the TRACO matter can't be adjudicated before the

15  end of the year.

16       There is also, supposedly, potentially, a large

17  fraudulent transfer action getting filed before me soon.  That

18  matter could be tried in 2026.

19       But if it becomes clear to me that the

20  administrative claims remain exorbitant and Steward is losing

21  in litigation, I'm not going to wait until 2027 to do what

22  needs to be done in 2026.  This protects against intentionally

23  slowing litigation with the hopes of running out a clock and

24  also puts the litigation before me at a premium.

25       It's very possible to try a fraudulent transfer

action in two years.  And absent settlement, there's really no splitting the difference in fraudulent transfer cases, either a transfer is avoidable or not.  See the Tronox case, right?

But if Steward settles or wins a major litigation that's not before me, we can discuss it at the status conference.  And not -- nor would I never tell another court at what time table it must decide matters and by when it must decide them.

Oh, before I forget, too, TRACO gets the requested setoff language that it asked for, mentioned on the record during the confirmation hearing.

The record established to support confirmation of the plan includes the documents identified on Steward's witness and exhibit list.  There's a lot of ECF numbers, you all can get it from the transcript.

It includes the plan, the disclosure statement, the plan supplement;

The declaration of Craig Johnson, Kroll -- K-r-o-l-l for Kroll -- including the voting and tabulation reports;

An initial and supplemental declaration of John Castellano, C-a-s-t-e-l-l-a-n-o, both as revised or some paragraphs that were removed on the record;

The declaration of Alan Carr, as revised on the terms stated on the record;

The declaration as -- of Marc Brown, on the terms as

1    revised on the record.  And I believe Marc is spelled M-a-r-c,

2    Brown.

3            Each of these witnesses testified, as well.

4            The evidence admitted into the record in support of

5    confirmation demonstrates, by a preponderance of the evidence,

6    that the plan is confirmable and should be confirmed.

7            The plan satisfies all applicable requirements under

8    the Bankruptcy Code.

9            The plan is in the best interests of Steward and its

10   estates and its creditors.

11           All consensual resolutions to objections to

12   confirmation are approved.

13           Objections to confirmation on the plan that were not

14   withdrawn or resolved by agreement are overruled.

15           I'm also noting for the record that there was no

16   affirmative case put on by any of the parties moving for

17   conversion or dismissal.  There is not a single document that

18   was admitted into the record or asked to be submitted into the

19   record by any of these parties.  No party elected to put on a

20   witness.  The presumption is, is that they're relying on the

21   testimony that was adduced by the Debtors in their case-in-

22   chief in support of plan confirmation.

23           I would note that the burden for plan confirmation

24   is on the Debtors, it's on Steward.  Moving for conversion or

25   dismissal is on the movant, so that would be -- I don't want

1    to keep calling them the "appellant parties" -- Mr. Keach's

2    clients.  I'll call then the "doctors," and I hope that's

3    okay, and anyone who filed a joinder.

4         I'll start with Steward solicited acceptance of the

5    plan from holders of eligible voting classes.  To approve the

6    solicitation of votes to accept or reject the plan, the Court

7    must determine that solicitation complied with Sections 1125

8    and 1126 of the Code and bankruptcy rules like 3017, 3018.

9         The Court previously entered an order conditionally

10   approving the disclosure statement in accordance with Section

11   1125 of the Bankruptcy Code.  But recently, we held a hearing

12   on final confirmation -- final approval of the disclosure

13   statement.

14        I don't recall, to my knowledge, anyone filing an

15   objection to the disclosure statement on a final basis as not

16   containing adequate information; certainly, no one argued it

17   in front of me.

18        That being said, as I said earlier, I don't rubber-

19   stamp.  I have a duty, I'm duty bound to determine whether the

20   Debtors have met their burden.

21        Under Section 1125 of the Code, a plan proponent

22   must provide voting creditors with, quote:

23        "-- adequate information about a proposed plan.  It

24   must contain sufficient information to permit and inform

25   judgment by creditors entitled to vote on the plan."

1           The disclosure statement easily satisfies the

2      standard here.  The disclosure statement provides a summary of

3      the administrative expense consent program, a summary of plan

4      classification and treatment of claims, estimated recoveries,

5      estimate the proposed effective date, an overview of the

6      Debtors' operations, an overview of the Debtors' capital

7      structure, events during the case, risk factors, U.S. federal

8      income tax consequences of the plan, and the requirements for

9      plan confirmation.

10          I apologize, there was one other thing I wanted to

11     make mention of, and I don't want to forget.

12          With respect to the Debtor releases, it's not just

13     for no releases for pre-petition acts.  For related parties,

14     Debtor related parties, related parties, the release afforded

15     to them has to derivative of the release provided to the

16     primary party.  So, if the Debtors granted a release to Party

17     X and Party X has related parties, which could be officers,

18     current and former, directors, it -- that release has to be

19     derivative of the release provided to Party X.  So you got to

20     really think about how to word that.  But again, independent

21     acts are not -- independent pre-petition acts are not going to

22     be released.

23          Another point.  There are independent orders, a

24     final DIP order, final settlement order.  Those stand on their

25     own.  And so, if there are releases for parties in those

21

1    documents, they stand on their own, and they will be enforced

2    by this Court as a final order; or, if the final settlement

3    gets appealed, then obviously not, but -- overturned.  But

4    they will stand on their own as orders of the Court.

5         Okay.  The plan includes numerous settlements,

6    including a major one with the PBGC.  The PBGC -- that's Paul,

7    Ben, Gary, Chris for the folks.  The PBGC settlement provides

8    that a relevant pension plan was terminated under an initiated

9    -- under a PBGC-initiated termination effective date in April

10    of 2024.

11         The asserted PBGC claims will be allowed as general

12    unsecured claims for about 8.7 million.

13         The holders of the allowed PBGC claims will accept

14    the plan, not opt out of the third-party releases.

15         And in full and final settlement, the PBGC will

16    share ratably with holders of general unsecured claims in the

17    amounts.  And that's like 90 percent of the GUC distributions

18    under whatever attained FILO claims and -- until -- excuse me

19    -- until the final retain claims are paid in full, and then

20    100 percent of GUC distributions, general unsecured creditor

21    distributions, after the retained FILO claims are paid in

22    full.

23         Under the PBGC settlement, they're only going to be

24    allowed one distribution in connection with the Debtors or the

25    plan; that is part of the settlement.  The PBGC, arguably,

1    under federal law, has a right to assert joint and several

2    liability against each party.  So this is a compromise in

3    settlement of claims, which is fully supported by the Official

4    Committee of Unsecured Creditors.

5        The plan also provides that, for distribution

6    purposes only, the claims and classes of interest will be

7    treated as a single consolidated entity.  So assets and

8    liabilities for distribution purposes are going to be treated

9    as if they were pooled in a single obligation of the Debtors.

10    Intercompany claims are going to be adjusted in accordance

11    with the plan.

12        No -- there's also kind of an administrative expense

13    claims consent program, where parties could elect to receive a

14    discounted allowed claim in exchange for kind of faster

15    payment.

16        Section 1123(b)(3)(A) of the Bankruptcy Code

17    provides that a Chapter 11 plan may provide for the settlement

18    or adjustment of any claims belonging to the Debtor or to the

19    estate.

20        The standard for approving settlements is similar to

21    the standard used under Bankruptcy Rule 9019.  And for that,

22    what -- the standard is whether it's fair, equitable, and in

23    the best interests of the estate.  There's plenty of Fifth

24    Circuit case law on that.  I will cite 801 F.3d 530, pin cite

25    540, for these factors.

23

1          Bankruptcy Courts don't have to conduct a mini-trial

2     to determine the probable outcome of any claims waived in a

3     settlement.  In Re Cajun Electric Power Co-Op, 119 F.3d 349,

4     356, a Fifth Circuit 1997 case.

5          Instead, the Court must apprise itself of the

6     relevant facts and law to make an informed and intelligent

7     decision, and there is great judicial deference given to the

8     Debtor's exercise of business judgment.  And the approval of

9     that settlement is within the sound discretion of the

10     Bankruptcy Court.  725 F.2d 293, pin cite 297 (5th Cir. 1984),

11     United States versus -- I'll spell it, A-w-e-c-o.

12          And based on the evidence that I'm relying on, the

13     declarations and the evidence admitted into the record, Seward

14     analyzed the cost versus the benefits of litigating such

15     claims and causes of action against the PBGC, and there's no

16     real objections on this one; the classification and where

17     they're classified, but not the settlement itself.

18     Regardless, I would overrule it.

19          I've talked about the Debtor releases and the scope

20     of those releases now.

21          I would note that, in support of the Debtor

22     releases, the transformation Committee -- and that includes

23     Alan Carr, C-a-r-r, and William Transier, T-r-a-n-s-I-e-r --

24     there's un-refuted testimony that they conducted an

25     investigation to consider cause -- potential causes of action

24

1    against current and former members of the Board of Steward

2    Health Care Holdings, LLC, current and -- and their

3    subsidiaries and affiliates.  Based on those investigaitons

4    and following extensive deliberation with the Debtors'

5    advisors, this investigation subCommittee included the Debtor

6    releases as part of the plan, including the scope.

7          And I would also note that the Debtor releases --

8    they don't need me to do this, they're already in there --

9    exclude anything for like actual fraud, wilful misconduct,

10   criminal misconduct, gross negligence, right?  Like no one is

11   getting away with the bad stuff here, no ...

12         (Pause in the proceedings)

13         THE COURT:  I would note that, in every case, there

14   are discussions of what's appropriate in the releases.  And

15   people always -- I shouldn't say this.  A lot of times,

16   professionals cite well, this was done in this case and this

17   was done in that case.  I find those analogies meaningless in

18   the context of a Chapter 11 case.

19         Tell me another case that's like Steward, right?

20   Just try, in the country, that's like Steward.  Tell me about

21   the investigations that the subCommittees of those -- just

22   because you see language in order, in every case, there has to

23   be a deeper analysis provided.  It usually comes in the form

24   of testimony.  You can tell me this case is like that case.

25   But just telling me that it's in another case is largely -- it

1    will be taken for that, that there are words that say the same

2    things in two different cases.  But tell me the facts, tell me

3    the analysis.

4              I'm approving the exculpations here.  And again,

5    they're carveouts.  But I'm going to tell you why.  The real

6    issue is whether the -- and the transformation Committee, Mr.

7    Carr, Mr. Transier, the independent directors get exculpated.

8    And there's a Highland 1, a Highland 2, a Highland 2.5,

9    there's just a bunch of Highlands.  And now, in May of 2025,

10   the Supreme Court issued a stay under certain action in

11   Highland, right?  The law is evolving there.  And this says to

12   the -- the exculpations here say to the extent permitted by

13   law.  You know?

14             Do I think that an independent director is

15   automatically granted an exculpation, one that I didn't

16   approve in connection with a case?  I don't think that's what

17   Highland says.  You can argue by analogy, but certainly the

18   Committee, the Debtor, its professionals, the Committee's

19   members, but the law is evolving there.  There's probably a

20   Highland 4 just working its way up.

21             But I'll say this, and I want this to be part of my

22   findings.  The Committee, its members, its professionals, the

23   Debtor, their professionals, Mr. Carr, Mr. Transier, Mr.

24   Castellano, throughout the entire case in front of me -- and

25   we held lots of hearings.  I've never -- this case -- and I

26

1    see a few big cases.  They all pale in comparison to the

2    number of hearings that I've had in this case.  I've had a

3    robust history to see the entire history of this case.  And

4    every one of those people that I mentioned have acted but

5    nothing more in the utmost good faith throughout this entire

6    case and throughout the entire process.

7           No decision that I have seen in connection -- I

8    approved every fee order, I approved every sale order, I

9    approved every rejection in a fair and transparent and open

10    process.

11           It -- each one of those parties have acted in good

12    faith in connection with the proposing of the plan, the

13    actions that were taken during the Chapter 11 cases.  It's

14    real easy to point about who didn't get paid in connection

15    with a case.  But no one has even attempted to present any

16    evidence that these professionals or the Debtors or their

17    professionals but someone ahead of someone else.

18           And $2 million of U.S. Trustee fees were paid in

19    this case, on time, by check.  You know, I don't -- the

20    98 percent of admin claims, and whether it's 98 or 97, I get

21    over 90 percent of admin claims have been paid.  And the fact

22    that more than -- basically, you know, the dec has always

23    worked out language in connection with a proposed confirmation

24    order, who came in and was concerned about payment of its

25    admin claims.  I don't -- I'm just saying no one I've had

1    throughout this entire case -- and we've had lots of hearings,

2    plenty of them -- no one has acted in bad faith throughout the

3    entire case.

4         The plan properly classifies claims under Section

5    1122.  I cite this in all of my decisions, but it is the

6    foundation upon which everything rests.  Interpreting the

7    Bankruptcy Code begins with analyzing the text.  Whitlock v.

8    Lowe, 945 F.3d 943, 947 (5th Cir. 2019).

9         In matters of statutory interpretation, text is

10   always the alpha.  BedRoc Ltd. v. United States, 541 U.S. 176,

11   a 2004 case.  It says the preeminent cannon of statutory

12   interpretation requires the Court to presume that the

13   Legislature says in a statute what it means and means in a

14   statute what it says there.

15        Under Section 1122 of the Bankruptcy Code, a plan

16   may provide for multiple classes of claims or interests, so

17   long as each claim or interest within a clam -- class is

18   substantially similar to other claims or interests in that

19   class.  A plan proponent is afforded significant flexibility

20   in classifying claims under Section 1122, provided there's a

21   reasonable basis for the classification scheme and all claims

22   within a particular class are substantially similar.  That's

23   the Greystone Fifth Circuit case, 995 F.2d 1274, pin cite 1278

24   (5th. Cir. 1991).  Greystone also says you can't classify

25   differently to gerrymander affirmative votes on the

1    reorganization plan.

2         The objectors argue that there was no business

3    justification for the plan's separate classification of

4    general unsecured claims and PBGC claims.  The un-refuted

5    evidence, however, proves otherwise.

6         First, the nature of the PBGC claims under ERISA --

7    E-R-I-S-A -- is different to other general unsecured claims.

8    And there's a settlement with the PBGC here, and that means a

9    separate business reason to classify them.

10        This is not a new concept here, when there's a

11   settlement for joint and several liability and parties are

12   approving that, and then also agreeing to just one

13   distribution for the Debtor and settling litigation; it's not

14   uncommon at all to place that party in a separate class.

15   There are business reasons and separate just -- legal justify

16   -- reasons to do so.

17        I would also add here that the final settlement also

18   justifies putting the FILO parties, their claim in a separate

19   class.  They're agreeing to subordinate part of their recovery

20   and they have a lien on all the Debtors' assets under prior

21   approved financing in this case.

22        I found, based upon the evidence before me and my

23   review, that the plan separately classified claims on valid

24   and legal bases, particularly the classes that I talked about.

25   The classification scheme is rationally based and it's based

29

1    on the legal rights of each holder of a claim against the

2    Debtors.  And they were not propose -- I have no evidence,

3    zero, that they were proposed to create a consenting impaired

4    class or to manipulate class voting.

5           All right.  I would note, and I think it's important

6    to note here, for purposes of making factual findings, there

7    were declarations submitted.  But you had Mr. Carr here and

8    Mr. Castellano here, and they were both cross-examined.  Not a

9    shred of evidence that there was any manipulation here for

10   purposes of the plan.

11          Let's go to 1129(a)(1).  Section 1129(a) requires

12   that confirmation of a plan is not likely to be followed by

13   the liquidation or for the need for further financial

14   reorganization of the Debtor or any successor under the plan,

15   unless such liquidation or reorganization is proposed in the

16   plan.

17          The Fifth Circuit has said, in In Re Briscoe, B-r-I-

18   s-c-o-e, 994 F.2d 1160, 1165-1166 (5th Cir. 1993), it may not

19   be a guarantee of success, only a reasonable assurance that

20   the commercial viability is required.

21          This is the section that's usually called

22   "feasibility."  That word is nowhere in the text.  We'll stick

23   to the text.  But the concept is, usually, in Chapter 11

24   cases, when a plan is confirmed, there are projections about

25   what the Debtor can do in the future, and you got to make sure

1    that, based upon those projections and the proposed actions,

2    that you're -- that there's at least a likelihood that you're

3    not going to find yourself, shortly thereafter, right back

4    where you started, right?  That there's not a need for another

5    reorganization or a liquidation.  But if the plan itself

6    contemplates a liquidation, then, obviously, 1129(a)(11) would

7    be satisfied.

8            There are some courts -- and I don't want to

9    identify which cases they are -- that appear, upon my reading

10   of them -- that say that feasibility doesn't need to be

11   satisfied and -- when the plan is a liquidating plan.  That

12   can be read in a lot of ways of saying that you don't have to

13   satisfy a particular provision of the Bankruptcy Code.

14           I don't know think there's -- I don't ascribe to

15   that, right?  There's nothing in the Code -- as a matter of

16   fact, it's required that the Debtor satisfy each section of

17   1129.  So, textually, I agree with courts that provide that,

18   if it's a liquidating plan, that you -- that the liquidation

19   itself, if it's provided in there, it's satisfied, and the

20   liquidation is like a realistic liquidation, that that itself

21   satisfies 1129(a)(11) based on the next that it -- based on

22   the text itself because there's not a need -- there's going to

23   -- all right?  It's not likely to be followed by the

24   liquidation because there is a liquidation itself, and

25   1129(a)(11) is satisfied on its own terms.  The text provides

31

1    the answer here.  Textualism [sic] is the key.

2         Now does that mean that every liquidating plan

3    automatically satisfies 1129(a)(11)?  The answer is I don't

4    know.  No, I'm not making blanket assertions.  I just know

5    this one does, and let me tell you why.  I think courts have

6    to review each plan, and I reviewed this one, and it satisfies

7    1129(a)(11).

8         Here, the plan contemplates liquidation of

9    litigation claims and it contemplates an effective date in

10   early 2027.

11        I'll take a step back.  The first, you know,

12   question is:  Can a plan provide for an effective date that

13   far out?  We look to the text first.  The Bankruptcy Code does

14   not prohibit it.  There's nothing in the Code that says when

15   the effective date must occur; it just says you have to occur

16   by the effective date.  I think the genius of the bankruptcy

17   congress here is that they allowed for flexibility here.

18   There was a lot of talk well, is five months good enough, is

19   three months good enough, is seven months, is a year.  And the

20   Code doesn't talk to any -- about any of that.

21        I would note, though -- and this is consistent with

22   the text -- that 1123(b)(6), which I think may apply as well,

23   says that a plan can include an appropriate provision not

24   inconsistent with the critical provisions of this title.

25   That's different than non-consensual third-party releases,

1    which must be -- which, arguably, conflicted with 524,

2    arguably included with the (indiscernible) under the other

3    versions of the prior portions of it, which dealt with the

4    Debtor and claims that are -- that discussion that was had

5    under Purdue.  And I don't find anything inconsistent with the

6    Code here, and I don't have any kind of like issues with 524

7    and other language.

8         Has this been done in other cases?  Of course it

9    has.  There was quibble about that, but there's no hard and

10   fast rule.

11        As I see it, the questions really blow down to is

12   the extra time necessary and will it benefit the estate and

13   creditors.  I think the Third Circuit, in Westinghouse, which

14   was cited in the briefing, has it absolutely right.  The

15   Bankruptcy Code recognizes the complexity.  Not all cases are

16   the same.

17        Again, I go back.  How can you compare Steward to

18   other cases?  Can you compare Steward to Sears?  No.  But was

19   it done in Sears?  Yes.  Was done in American Airlines?  Yes.

20        And I argue -- and I mentioned this before and I'll

21   mention it again.  In American Airlines, Judge Lane was faced

22   with a critically difficult case, where, before the plan

23   confirmation hearing -- and the plan was premised upon a

24   merger of two major airlines, right?  American and USAir.  The

25   Department of Justice filed an antitrust suit, right?  And

that was not before the Bankruptcy Court, right?  To block the

merger.

So, either, if the plan goes effective -- the plan

was premised upon distributions of equity under the

reorganized Debtor, right?  So the DOJ won that lawsuit.

There was no plan.  The case was confirmed, but no one knew,

walking into the plan confirmation hearing, how long that was

going to take.  My recollection is the Debtors hadn't even

filed an answer to the complaint yet; or, if it had, it was

really early in the case.  That case got resolved, that case

settled.  But no one knew.

Regulatory authority cases, where you've got to get

regulatory authority, like government agencies.  My friends

from the Department of Justice made it clear at this hearing

that they don't like folks getting into their business when --

in how long it takes them to do it; it will be done on their

time table.  And they will tell me, time and time again, that

I'm -- I can't force when the IRS is to review and process a

tax return; that will be done on -- in accordance -- there's

no special person I can call and tell them to get this done by

next week.

And I can't tell people when to go do -- I can't go

tell DOJ to stop suing under antitrust or to -- I can't tell

the judge who's going to be handling the antitrust lawsuit

when to prosecute the case or the time tables or when to

1    respond to a motion to dismiss or when to deal with the

2    discovery issues or when to deal with summary judgment issues

3    or when to hold his trial or how long it takes to write a

4    decision.  I can't tell anyone anything.

5            The question is:  Is the extra time needed?  Yes.

6    And why?  Does it benefit the estate?  That's what we have

7    here.

8            I heard from Alan Carr, a restructuring

9    professional, who testified live and by declaration.  Carr was

10   an independent manager of the board of managers and a member

11   of the transformation Committee, which was formed in 2023, and

12   the investigation subCommittee, which was formed in 2024.  The

13   transformation subCommittee -- that's at Paragraphs 1, 2, 11,

14   and 13.

15           The transformation Committee was formed to pursue

16   and oversee the administration of the Debtors' Chapter 11

17   cases.  Paragraph 11.

18           The investigation subCommittee was formed to

19   evaluate potential causes of action in favor of the Debtors.

20   Paragraph 13.

21           Carr was an independent manager of both Committees

22   since January of 2024.  Paragraph 1.

23           The investigation that the subCommittee directed

24   involved review of the Debtors and third parties, documents,

25   correspondence, reviewing board minutes, conducting

1    interviews, reviewed and analyzed appraisal reports and

2    valuations, and performed substantive legal analysis.

3    Paragraphs 17 and 18.

4            Carr specifically testified that he and other

5    subCommittee member William Transier, T-r-a-n-s-I-e-r,

6    evaluated whether the Debtors would have colorable and

7    substantial claims arising out a series of pre-petition

8    transactions.  Paragraphs 16 and 18.

9            These transactions included two distributions in

10   2016 totaling about -- over 780 million, that Carr testified

11   he believed could be colorable fraudulent transfer claims.

12   Paragraph 24.

13           Carr also testified that he investigated a 111

14   million distribution made in 2021, that there may be a

15   colorable fraudulent transfer claim in there.  That brings

16   damages to about 900 million.  Paragraph 34.  Carr also

17   testified that he believed this transaction may give rise to

18   breach of fiduciary claims as well.

19           He then testified about a 2022 transaction with an

20   entity called CareMax that presented a colorable and

21   substantial fraudulent transfer claim with damages of over 100

22   million.  That brought the total number of damages to over 1

23   billion.  That's around Paragraph 40.

24           Carr also evaluated a purchase of five hospitals in

25   Miami in 2021, for about 1.1 billion.  That's at Paragraphs 37

1        and 38.

2                    Carr also testified he believed there may even be

3        more.

4                    The Court also heard from John Castellano, the

5        Debtors' Chief Restructuring Officer, who testified live and

6        in his declarations.  There were certain aspects of

7        Castellano's testimony that I give greater weight than others,

8        but here's what's un-refuted:

9                    He thinks that the Debtors could generate

10       distributable proceeds to creditors based on certain

11       commercial payer claims, totaling about 350 million.  That's

12       at Paragraph 15 of the initial declaration.

13                   There may be about 20 million against United

14       Healthcare claims.  These are just routine insurance payer

15       claims.  Paragraph 16.

16                   There's a trial starting in January of 2026,

17       totaling about -- or at least alleging about 590 million in

18       damages.  Again, I'll call it the "Norwood Hospital trial," N-

19       o-r-w-o-o-d.  17 to 19 in his initial declaration.

20                   And he says there could be over 300 million in

21       potential preference actions.  Paragraph 21.

22                   And then there's a potential 1 billion damage claim,

23       again, related to a Blue Cross/Blue Shield matter.  That

24       totals -- when you add all that stuff up, that's about 2.3

25       billion.

1          Mr. Castellano -- there were a lot of baseball

2     analogies that were mentioned.  People thought you had to hit

3     home runs.

4          And I don't -- Castellano said, you know, there's

5     about -- over -- when you add all this up, it's over $3

6     billion in potential colorable claims.  And you need to pay

7     all professionals and cross the threshold of admin and

8     priority claimants, and about seventy -- you need -- probably

9     need about a total of 300 million; you need 13 percent or 10

10    percent, right?

11         You don't need Aaron Judge, you just -- right?  Need

12    to hit home runs.  You just need a couple of singles.  Now I

13    don't know if you're going to get them.  I don't know.  I

14    don't know who's going to win that stuff.  I don't even know

15    if the Debtors have colorable -- I don't know if the Debtors

16    can win.  That's -- those matters get tried.  But are there

17    colorable claims based on the allegations that one has heard?

18    I -- of course there are, right?  And of course there are.

19         You know, much was said about timing, right?

20    There's an approximately six-hundred-million-dollar trial set

21    to start in January of 2026.

22         There also is another trial that likely is in front

23    of me that could be tried, from what I -- in two years, a

24    fraudulent transfer claim.  We're not rushing, right?  We're

25    not rushing for the sake or rushing.  But it can be done with

1    diligence.  You set a status conference some time in, I don't

2    know, August, September, you get parties off to discovery and

3    -- right?  It's the transaction, it's happened, right?

4          And a lot of fraudulent transfer litigation -- and

5    again, parties are going to have to come in and prove all

6    this.  But if it's constructive fraud, they don't have to

7    prove intent.  We can get into a valuation fight.  You know,

8    you hire some experts and you go.  And I'm not saying they're

9    not complicated, it could be very hard.  But fraudulent

10   transfer law is -- you know, there's no kind of splitting in

11   damages models.  Either the transfer is avoidable, or it's

12   not.  Either there's valid defenses to it, or there's not.

13   It's just kind of the way the law is set to go.

14         Is the Debtor insolvent?  Now has there ever been a

15   court where -- that has ever found insolvency based on balance

16   sheet tests?  I -- you know, I'll say a couple of comments on

17   that.

18         In the real world, where like not everybody gets to

19   hire a fancy expert, the answer is absolutely.  Okay?  You

20   know, I know we only deal with complex cases here.  But in the

21   real world, in Chapter 13s and in Chapter 7s, the answer is

22   all the time.  Are they reported decisions like -- I don't

23   know, maybe there's no reported complex -- and I'm not saying

24   it would apply here.  But is the answer has there ever been

25   one, would I do one here?  No, we're going to have to fight.

1    It's a fair fight.  We're going to have to come up -- but the

2    answer has it ever happened, I think, needs to be -- I just

3    didn't want to leave that out there.

4         Can the Debtor identify a golden creditor was

5    another objection.  I don't know, right?  But if they can't

6    identify one, that's an easy motion to dismiss; I can get rid

7    of that fast.  It won't take long, summary judgment, it would

8    be fast.

9         So -- but you can't overlook that there's

10   potentially over $2 billion of claims that could be resolved

11   over the next year or could be settled.  That's a valuable

12   estate asset.  It hasn't been liquidated, but it's not small.

13        I think it's what -- that's why I'm saying what case

14   is like Steward.  Tell me a case that's got, you know -- I

15   don't know.  Tronox?  You know, where you had potential causes

16   of action from the beginning, for -- worth billions on

17   fraudulent transfer?  I'm sure there are others.  But I just

18   think it's hard where there's a valuable estate asset, one

19   that be resolved, I think, based on these facts.  I don't

20   know.  Let's tee it up, let's see where it goes.

21        But if it -- I assure everyone, if this is going

22   nowhere in 2026, I will -- I've got no qualms about telling

23   the Debtors it's a no-go on the effective date, you can't do

24   this.  I'm not going to delay this for the sake of delay or to

25   stretch this out.  I think parties are going to have to get to

1    work and get right to work and not rush.  Focused would be the

2    right answer.

3           So, based on the Record, I find that 1129(a)(11) has

4    been satisfied.  You can have an effective date that's far out

5    when there's a need to do it.  The Code doesn't say when you

6    have to have one, but there's flexibility within the Code.

7           And there's no distinction between who's driving the

8    litigation, not driving the litigation.  If that was it, you -

9    - Congress would have put that in there.  You don't hide

10   elephants in mouse holes, right?  That would be a big issue to

11   identify.

12          Section 1129 of the Bankruptcy Code says the plan

13   can -- shall be confirmed, if all the requirements under (a)

14   -- which is why you can't skip (a)(11) -- are met, right?

15          1129(a)(8) requires, among other things, that all

16   impaired classes vote, but that's not the end of the analysis.

17          1129(b) permits confirmation, notwithstanding

18   1129(a)(8), if all other requirements under 1129(a) are met

19   and the plan does not discriminate unfairly and is fair and

20   equitable with respect an impaired non-accepting class.  So a

21   plan may discriminate between classes, but it can't

22   discriminate unfairly.

23          By the way, I'm using Tronox as just an example of a

24   fraudulent transfer litigation.  The facts are like

25   drastically different than what we have here.  So like no one

1    read timing or -- what I am saying is that, you know, are big

2    cases with big estate causes of action.  Like don't read too

3    much into the citation of the case.  Read a lot into American

4    Airlines because that's on point and I will state that on

5    point.

6         The Bankruptcy Code doesn't define what it means to

7    discriminate unfairly.  Courts generally assess unfair

8    discrimination based on the facts and circumstances presented

9    in the case.  All right.  In other words, payment preferred to

10   one class over another, the Court must find an articulated

11   basis to do so.

12        The text requires a plan to note unfairly

13   discriminate against impaired non-accepting classes, so

14   Steward must articulate a basis for any discrimination between

15   the two classes.

16        Here, the plan doesn't discriminate unfairly with

17   respect to any class of claims.  Here, the general unsecured

18   claims are going to receive the same ratable recovery under

19   the plan as the PBGC claims, notwithstanding that they were

20   joint and several.

21        Meanwhile, general unsecured claims are going to

22   receive a lower ratable of recovery than the retained FILO

23   claim because the retained FILO claims are secured claims that

24   the FILO parties have agreed to support in aid to all admin

25   and priority claims.  A big point, by the way, there.

1          Holders of general unsecured claims benefit from the

2     subordination, which, by the way, is what makes the

3     liquidation analysis a really easy one.  Of course you're

4     going to receive more under this plan than under a 7, there's

5     subordination, right?  And just on its face, you just -- it

6     just gets so easy to do so, which is my Mr. Brown's testimony

7     appeared to be very largely un-refuted.

8          The plan complies with all applicable sections of

9     1123, as well, it really wasn't disputed.

10          The plan specifies classes of claims or interests.

11          The plan provides that we're going to specify the

12     treatment of any class or claims that are impaired under the

13     plan, provide for the same claim of interest, unless the

14     holder of that particular claim to less favorable treatment.

15     You provide for adequate means for the implementation.

16          1123(a)(6) I don't even believe applies, but to the

17     extent it did, 1123(a)(7) is satisfied.  The remainder of

18     applicable sections are satisfied, too.

19          1129(a)(2) is satisfied.  The proponent of the plan

20     complies with the applicable provisions of the title.

21          1129(a)(3), I'm going to pause here.  Was the plan

22     proposed in good faith and not by any mean for permitted by --

23     permitted by law.  This plan was developed to maximize value

24     to stakeholders.  It resulted from arm's length negotiation

25     with the Committee and a primary secured creditor, with lien

1    on -- it's a pretty significant lien.  Read the DIP order.

2    And the plan provides for the means to wind down the

3    structure.

4         I find the finding of the plan itself important, and

5    that the Debtors didn't move to liquidate as really important.

6    Based upon the Castellano declaration, based upon the Carr

7    declaration, based upon statements of counsel -- well, that's

8    the evidence, and their testimony.  But the act of filing this

9    plan that provides an attempt to provide -- to pay all allowed

10   admin claimants in full on the effective date -- right?  They

11   didn't just drop the shovel and walk away, right?  They're

12   actually trying to pay these people in full.

13        And by the way, which probably people hardly talked

14   about at the confirmation hearing, which is why Mr. Kahn said

15   unsecured creditors are like, hey, don't forget that this plan

16   is trying to provide a great recovery to unsecured creditors

17   and to liquidate assets with professionals already in place,

18   who have already analyzed this, to kind of start the process,

19   right?  Like it's just so -- they don't just leave -- a lot of

20   talk about professional fees, and like they didn't just drop

21   the shovel and say you know what, I've got mine, I've got a

22   carveout, we'll leave the Chapter 7 Trustee, you know, here's

23   a couple of million bucks and we're out, right?  Good luck.

24   Call me.  You know, it's not that kind of a case.

25        This -- the filing of the case isn't -- is solely

1        intended to try to maximize value, and a secured creditor is

2        subordinating repayment of claims, which, quite frankly, tells

3        me also a market test, as well, that there's value to these

4        litigation claims.  But it also speaks to the fact that

5        economic actors and a Committee with an independent fiduciary

6        duty to think about nothing but the interests, to maximize

7        interests for unsecured creditors, supports this plan, didn't

8        support liquidation.

9            But the filing of the plan itself means that there's

10       good faith in the filing of it because of what it's attempting

11       to do.  It's not immediately turning it over to someone.  It's

12       left with professionals in place, with a plan administrator,

13       proposed plan administrator in place, with a liquidating trust

14       established under the FILO settlement, with the proposed

15       professionals who have been reviewing this already.

16           There's already someone in the Blue Cross/Blue

17       Shield.  Kobre Kim is analyzing what we would call the "D&O,"

18       that litigation, what I would call the "Carr analysis" of

19       litigation.  There are other -- King & Spaulding is doing

20       other work.  Togut is doing preferences matters.  These

21       professionals are already out there hitting the ground

22       running.  And someone is saying just like let's see if we can

23       get everyone paid in full and give something to unsecured

24       creditors.

25           I find this plan to -- an attempt to prove an

1    enhanced recovery to everyone.  I think Steward had a duty to

2    maximize the value of the filing and the estae and I think

3    they did so.  And it's good faith on behalf of them, their

4    professionals, the UCC and their professionals and members,

5    and the Steward Board.

6         Does the plan satisfy 1129(a)(4)?  Yes.  It erases

7    the payment of professional fees in the way that every

8    Chapter 11 case does.  I don't understand what -- a lot was

9    said about this.  This is what happens in every Chapter 11

10   case.

11        Again, I -- much has been said about professional

12   fees.  And I would note that the allowance of professional

13   fees claims is subject to my review and my approval under

14   Section 330 and 328 and 330 -- there's a day for those

15   hearings to happen, and they will happen and I will rule based

16   upon what is said at that time.  And parties-in-interest have

17   the right to make their voices heard.

18        Does the plan satisfy 1129(a)(5), the identity and

19   the affiliations of the proposed parties?  Yes.

20        1129(a)(6), satisfied.

21        1129(a)(7) is the best interests test.  And that

22   provides where the plan proponent must establish that the

23   holder of a claim who was entitled to vote has either accepted

24   the plan or is receiving as much value as they would in a

25   hypothetical Chapter 7 liquidation.

1          You say you look at someone has either rejected the

2    plan; or, if they rejected, that they're going to receive as

3    much, at least as they would in a Chapter 7 liquidation.  The

4    Brown declaration was -- it says what it says.  It was really

5    hardly refuted.  A lot of well, could there be potential tax

6    liabilities, sounds like there could be.  Based on the

7    evidence before me, I found that there could be.

8          You know, and arguments, legal arguments were made

9    about -- well, the answer, before I kind of get into the

10   arguments, based on the evidence, there's a PBGC settlement,

11   right?  That goes away if this plan isn't confirmed.  There's

12   no guarantee that PBGC will agree to that.

13         An additional tax liability, that could continue to

14   get incurred in the -- to the tunes of twenty, 25 million

15   additional tax liability could be incurred.

16         Subordination goes away, additional money that FILO

17   is giving goes away.  A lot of liens snap back into place from

18   the FILO parties, that they already have under a final order.

19         You know, can one -- if some -- on the effective

20   date, can someone receive more money with subordination, with

21   the guaranteed PBGC settlement, with more cash into the -- you

22   know, given to the estate to fund litigation for those that

23   are proceeding on an hourly basis?  Is it in the best

24   interests of the estate?  Like I -- you know, I mean, like

25   it's just math; it's a math problem, but it's easy.  It's not

even complicated.  The numbers are for themselves.  Are you
going to receive under this plan more than you would under a
7?  Yeah, just by virtue of the waterfall in the plan, you're
going to receive more.  All the -- a bunch of settlements go
away if you don't.

Well, I'll read -- I'll stay with the text.  There
were arguments that were made that a -- you know, a Chapter 7
Trustee could immediately step in and just kind of take over
and keep things running.  I've ruled on 1129(a)(7).  I now
make the practical point.

That is -- that's not my experience, right?  A chap
-- and Brown made the point, by the way.  You know, a Chapter
7 Trustee, whoever it is -- which we have no idea who it would
be -- gets appointed -- I have no idea who it would be -- gets
appointed, she or he has to now get smart on -- good luck
getting smart on Steward, right?  Like how long is that going
to take, right?

You know, so you're going to have to go meet with
people because you have a fiduciary duty.  But you can't just
act, you can't just tell everybody to keep going and doing
what you're doing.  You got to get your hands wrapped under
Steward.  Well, that's going to take time because they're
going to do their job.  They're going to have to figure out
what they want to do and how that's going to work.  Sure,
there's a plan at -- sure, the FILO settlement remains on its

48

1    own terms.

2         But a Chapter 7 Trustee is going to have to exercise

3    her or his fiduciary duty.  You know, you don't just the

4    matrix.  You don't just download something into that person

5    and they immediately go.  It's -- it takes time, at least --

6    and this is a massive case.  We've had a lot of litigation.

7    It's my experience that that could lead to real chaos.  Not to

8    say that our Chapter 7 Trustees aren't amazing.  They're just

9    human beings who would have to do this.

10        And there are potential appeals that are currently

11   pending now.  Who pursues those?  How do you -- if the Court

12   holds a hearing, who shows up?  There's such a continuum by

13   doing what's going on here.

14        But you know, I mean I should say there's ...

15        (Pause in the proceedings)

16        THE COURT:  I'll say this now, before I get into

17   1129(a)(8), that it was satisfied.  There are unimpaired

18   classes under the plan.

19        1129(a)(9) is satisfied, priority claims will be

20   paid and admin claims will be paid on the effective date, if

21   this plan is to go effective.  It is a non-negotiable now.

22   It's in the confirmation order.  It has to happen.  And

23   there's not -- there is no confusion anymore.  I don't think

24   there was -- well, one could read it as being waivable.  But

25   you can't waive code provisions, so the plan can't go

1    effective.  It is now in effect.

2         And I'm holding hearings every six months to make

3    the call as to what we're going to do.  This is not -- we're

4    not just letting this go and float.

5         The plan satisfies (a)(10).

6         The plan satisfies (a)(12).

7         The remainder, the other forms of 1129(b) were

8    earlier discussed.

9         1125(e) is satisfied.

10        I mean, about voting, let me talk about that.  I've

11   been talking so long, I'm afraid they're going to have to hit

12   the button for an extra hour.

13        (Laughter)

14        (Pause in the proceedings)

15        THE COURT:  There was a lot of questions about --

16   well, some objections were raised about voting in connection

17   with this case.

18        Craig Johnson testified on behalf of Kroll, who was

19   the solicitation and voting agent.  I -- the allegations were

20   made that there were improper tabulations, or that Kroll did

21   something wrong by not following the procedures.  Mr. Johnson

22   testified incredibly credible and here's what he said in

23   addition to his declaration:

24        He said the rule -- the procedures that the Court

25   approved -- and I'm -- here's how I count and here's what I do

1    when I receive a vote, and that's what he did, that's what

2    Kroll did.  They followed the rules, they followed the rules.

3    And the rules say, if someone doesn't vote to accept or

4    reject, you don't count it.  So he didn't count a bunch of

5    them.

6           But then they asked him, and they said well, there's

7    a lot of pages of folks who -- does that surprise you, that so

8    many people just didn't vote to accept or reject.  And he said

9    no, not for a case of this size, and I've been doing this for

10   a long time.  And he said -- he was asked by a member of the

11   Committee, by the way, I look at these other -- there's a

12   bunch of folks who voted against each Debtor, there was one

13   creditor who voted against each Debtor, what would you have

14   done if that person would have voted.  He said I would have

15   counted him, I would have followed the procedure.

16          And he has a reason for every person, his

17   declaration said -- his declaration says that here's who

18   didn't count -- here's who didn't get counted and here's the

19   reason.  No one challenged any of the -- the veracity of any

20   of those statements.  No one put up a proof of claim in front

21   of me.  No one asked me -- no one challenged whether he was

22   right or wrong on any of them.  That declaration came in

23   untouched.  No one challenged the veracity of any of the

24   statements that he gave there.  All evidence matters.

25          Mr. Johnson said -- there was a lot of testimony, I

should say, about anything called Cross-Country voted multiple
times against -- the same amount against other Debtors.  They
said, oh, doesn't that strike you as strange.  No, my job is
to count the votes, so cross -- my job is to count the votes
as they come in.

And he's right.  I don't know -- I don't know if
Cross-Country has a claim that it alleges -- what was the vote
that came in who voted each way?  If that vote would have came
in no, he would have had to have counted them no the second
way, right?  It cuts both ways, right?  He counted the votes.

No one asked me for a -- no one put any evidence
refuting Johnson.  No one asked me for ah, well, Your Honor,
this is what just happened.  No one asked me for a
continuance, hey, I want to look into this a little bit
further, hey, I want to go summon, put up the proof of claim,
it's on the claims register, Your Honor.  No one put it up, no
one put it in my face.  Johnson's declaration, Johnson's
testimony shows Kroll did their job, followed the procedures.

There was talk about the sophistication of parties
and whether they understood how to vote.  No testimony that
any person had trouble, other than who asked for help, didn't
receive it, no testimony.  No voter came in, no testimony that
some voter called Kroll or the Debtors or the UCC, I don't
know -- I don't know how I'm doing this and everybody --
there's no testimony that no one who asked for help was

1    refused help.

2              I don't know what to do with allegations that it was

3    hard to potentially upload or that clicking buttons on a

4    screen is -- it's easier to upload a PDF than it is to put it

5    on the screen.  I -- you know, that's not evidence before the

6    Court, and evidence matters.

7              I also don't like the word "sophisticated."  And I'm

8    not saying anybody meant it in a pejorative manner.  But I --

9    you can read the word "sophisticated" to mean, you know, that

10   you don't have a fancy degree to hang on your wall.  But I

11   know plenty of people who are very sophisticated, as we all

12   do.  I don't know what that word means.  And I just -- I'll

13   leave that there.

14             There's no evidence that anyone who needed help --

15   and certainly, there could have been people, they would have

16   called Kroll.  Kroll's work here was stellar; they did their

17   job.  And so I overrule any objection about any voting

18   irregularities.  There's no evidence of that.  If there would

19   have been, I would have written on it, trust me.  If my

20   procedures weren't followed, I would have -- be having a

21   different conversation.  They followed the rules.  The orders

22   say that you have a -- you could call them.  Well, "could"

23   doesn't mean you must.

24             And Johnson also said I -- there was thought into

25   what he said and I really want to highlight it.  He said look,

1    I -- there were some people who voted, lots of people who --

2    he said who didn't vote to accept or reject, but they opted

3    out, right?  So he saw activity.  So I'm overruling those

4    objections.

5            Let me talk about conversion.  We're getting to the

6    end and I appreciate everyone's patience.  Certain -- all

7    right.  The deferred comp party -- oh, I guess it's really

8    time to go now.

9            The deferred compensation participants moved to

10   convert the case to a Chapter 7.  The U.S. Trustee also filed

11   a motion to dismiss or convert.

12           Going back to the text, I would note that, in 2005,

13   BAPCPA -- B-A-P-C-P-A -- it used to say the Bankruptcy Court

14   "may" convert; they changed it to "shall" covert, which

15   Mr. Keach points to and points to 1112(b)(4) as a non-

16   exhaustive list of the grounds for cause.

17           BAPCPA also added, under BP-4A, which is why it now

18   states that a substantial or -- cause could include a

19   substantial or continuing loss to or diminution of the estate

20   and the absence of a reasonable likelihood of rehabilitation

21   constitutes cause.

22           Mr. Keach, who represents the parties -- it's just

23   easier to call them that, refer to Mr. Keach, who is an

24   outstanding lawyer -- argues that the Court must convert

25   because it says "shall," if there's cause.  And BP-4A says

54

1    cause is if there is a substantial or continuing loss or

2    diminution of the estate.

3         Now a couple of things.  If read the way Mr. Keach

4    says -- and I'm going to get into why I disagree with it --

5    but Mr. Keach would tell me that there's a plan on file here,

6    you don't even read the plan, you see this and you just

7    convert, right?  Which is a frightening proposition for those

8    who are in Chapter 11, who may be -- may have filed a plan,

9    that someone could then file a motion to dismiss or convert

10   your case at the time in which you're seeking plan

11   confirmation and argue cause and say the Bankruptcy Court

12   can't even read or consider it.  You have to consider them

13   both, yeah, you absolutely do.  Do you just drop one and have

14   to think about the other?  I don't see that anywhere in the

15   Code.

16        And BAPCPA, in 2005, certainly put more teeth into

17   1112, for sure.  They didn't say notwithstanding a plan that's

18   filed in -- under 1129.  And I would also note the Bankruptcy

19   Code has always permitted for the filing of liquidation plans

20   under Section 1129.  It simply says a liquidation may be

21   proposed in a Chapter 11 plan.

22        So to require conversion in all cases in which a

23   Chapter 11 has liquidated most of its assets and is proposing

24   a plan, in my opinion, renders 1129(a) basically meaningless.

25   I think that would disharmonious to considering -- when you do

1    statutory interpretation, you got to look at the section, but

2    then you also have to look at the entire section.  You have to

3    look at the entire corpus to then determine how this section

4    fits within the entire section to make a determination as to

5    how it fits, and to give effect to every word, so as to not

6    render any particular section meaningless.

7         So let's look at it.  Under 1112, the Fifth Circuit

8    said, in like the In Re Timbers case, 808 F.2d 363, 371-372

9    (5th Cir. 1987).  The Fifth Circuit has instructed the inquiry

10   is case-specific and the Court must focus on the particular

11   circumstances of the case before it.  The Fifth Circuit has

12   explained that the Bankruptcy Court's role in this inquiry is

13   to evaluate each Debtor's viability and the rate of progress,

14   in light of the best interests of creditors and the estate.

15        I would note that Judge Lane of the Southern

16   District of New York was faced with a similar notion in what I

17   would call the MSR Hotels and Resorts, 2013 WL 5716897 (Bankr.

18   S.D.N.Y.), an October 2013 case.  In that case, the Debtor no

19   longer operated and sought to liquidate.  And the movant, on

20   the motion to convert, argued that the estate faced a

21   substantial and continuing loss and there was no chance of

22   rehabilitation, that the Chapter 11 bankruptcy had no

23   legitimate purpose that could be achieved by a Chapter 7 --

24   that could not be achieved by a Chapter 7 Trustee.

25        Judge Lane disagreed.  First and foremost, he said

1    that liquidation in an 11 is a valid reorganization purpose,

2    noted the time and the complexity of a Chapter 7, found that

3    the Debtor did not face a substantial and continuing loss and

4    diminution in value in the Chapter 11 case because the Chapter

5    11 offered the Debtor advantages unavailable in a Chapter 7

6    that best served the interests of creditors.

7            In this case, the participating -- the participants

8    argued that the substantial loss prong is satisfied because

9    the Debtors' disclosure statement stated that there were

10   allowable administrative claims of 127 million and asserted

11   administrative claims of over a billion.  It's true it says

12   that.

13           Are they allowed?  Are they payable now?  A billion

14   dollars in claims -- I would note that somebody filed like a

15   billion-dollar -- like a nine-hundred-million-dollar proof of

16   claim with no supporting evidence, which is subject to an

17   objection.  TRACO is alleging $176 million, it's not allowed.

18   Another claimant filed an administrative claim, the Igoe

19   claim, I-g-e-o [sic], 35 million, lawsuit just filed.  How

20   much are those worth?  Is that a continuing loss because

21   people keep alleging allegations?  That's what a substantial

22   or continuing loss has to mean?

23           There was zero evidence put on by the movants, zero

24   evidence put on by the movants in their case-in-chief that

25   there was a substantial loss.  The argument is that the

57

1    Debtors can't pay admin claims, and that they assert this.

2    Okay.  Well, how do I balance that with the fact that like 97

3    percent of them have been paid already.  I mean, does that

4    mean that there's a continuing loss?

5            I think Steward is different than other cases, too.

6    Are we just going to overlook that there's not three -- an

7    asset worth 3 billion, a potential asset of potentially $3

8    billion in claims that could be liquidated timely?  How do you

9    -- is that a substantial loss?  I don't know.  Weighed against

10   $3 billion in claims?  I don't know.

11           I don't think -- I don't think movants satisfied

12   their burden.  I don't think -- in other words, there's no

13   cause here for a substantial -- that there is a substantial

14   loss or a continuing loss.

15           And I would note that the word "continuing"

16   indicates that it is prospective.  You don't just take a

17   snapshot in time and say, at this point, I filed my motion,

18   here's what happened over the last -- here's what happened

19   over -- in the past.  It must continue.

20           Guess what the Debtors did in this case?  They filed

21   a Chapter 11 plan.  It's any continuing loss is now stopped

22   because they're going to litigate claims to pay everybody.

23   How do you -- the loss -- the plan itself means that there's

24   no continuing loss.  No evidence.  The Debtors have pending

25   objections, $2 billion of claims.  And we'll know the answer

58

1    to them really soon.

2            The Debtors, by code, I would note, are not required

3    to pay administrative claims on the confirmation date, whether

4    it was two weeks from now or two months from now.  Pending

5    contingent administrative claims for billions of dollars that

6    have not been substantiated cannot equate to a substantial

7    loss to mandate conversion.

8            I am confident that a chapter -- a plan of

9    liquidation that proposes to pay admin claimants, priority

10   claimants, and provide a greater distribution than would be

11   available in a Chapter 7 is, by definition, in this case,

12   stopping any alleged continuing loss.  There's no evidence to

13   the contrary and no one put anything on.

14           Castellano also testified that there is likely 46

15   million in distributable proceeds from litigation assets.

16   Evaluating whether you have a substantial or a continuing loss

17   to an estate must be tailored to specific facts and

18   circumstances.  It's not to say that, just because there's a

19   plan of liquidation, that you don't consider it.  But the plan

20   itself could make you find that there's no cause, and that's

21   what we have here.

22           And that's what happens in -- argued in lots of

23   Chapter 11 cases.  There are critical -- creditors come in

24   losing month after month after month after month after month.

25   There could be an industry change.

1          Cases during COVID weren't doing too well in those

2     days, the mall cases weren't doing too well.  Does that mean

3     every mall case -- retailer would have converted in a Chapter

4     7 because, I think the Government didn't let you come in and

5     make money?  You couldn't go to the mall, you couldn't open

6     up, you couldn't pay your rent.  That was like -- I -- was

7     there a likelihood of rehabilitation during COVID?

8          Just taking a snapshot -- and that doesn't mean that

9     there's not teeth.  In other words -- in other words, if this

10    case had no prospect of even trying to pay admin claims, if

11    you just had, you know, small little preference claims here or

12    there, oh, no, we -- this ruling would have been over at 2:15.

13    You know?

14         (Laughter)

15         THE COURT:  But you look at every case on the facts

16    and on the merits and on the text.  This plan is confirmable.

17    There is no substantial or continuing loss, based on the facts

18    or lack of evidence there are.  But I also would note that the

19    plan itself provides substantial evidence that any alleged

20    continuing loss has been stopped.

21         And sure -- and having the time to pay the admin

22    claims on an effective date, by definition, can't be that --

23    the Code gives it to you.  How can you -- how can that be the

24    basis of the cause to convert, as well?

25         There's just -- there's reasonable prospects here.

1    I have no idea who will win.  I am not -- I didn't mention

2    anyone's name because everyone is entitled to their day in

3    court, and they will have it, whether before me or some other

4    court.

5            I want to really stress that, if I don't find that

6    this plan has the potential to be -- to go effective on the

7    time line that is being proposed, which is early 2027 -- I get

8    it, it's not a -- it's not a race to the clock.  But if the

9    Debtors are losing in 2026, and there's nothing to do here, I

10   will shut this down, I will shut it down.  It will not -- the

11   plan will not go effective, which means it will lead to an

12   immediate conversion.

13           If there's -- if money comes in and unsecured

14   creditors are paid in full -- not unsecured creditors -- if

15   admin claimants and priority claimants are paid in full, like

16   that's a really good thing that we shouldn't look past.  If

17   litigation parties got their due process and either had their

18   day in court -- that's a good thing, too.

19           (Pause in the proceedings)

20           THE COURT:  That's my ruling.  I appreciate

21   everyone's time.

22           I don't want to talk about the confirmation order

23   today.  Why don't we pick a date in a couple of days?  And why

24   don't you all talk about language and propose language and run

25   it past Mr. Troop and the IRS, DOJ, the Office of the United

1      States Trustee?  If there's disagreement about and of what I

2      said, maybe -- I don't know if this week makes -- you can

3      listen to it, get a transcript.  If we need to talk about it,

4      let's have a work session, if you will.  I'll make the call on

5      the language.  The parties will have your appellate rights.

6      But let's get an order, so that that process can begin and

7      take its place.

8              So thank you for your time.  Thank you.  We're

9      adjourned.

10             Mr. Troop?

11             MR. TROOP:  Two very quick things, Your Honor.

12     First, if the -- somewhere in your order you spelled Igoe, and

13     I think you transposed the letters, and I think it's I-g-o-e.

14             THE COURT:  I-g-o-e.  Thank you.

15             MR. TROOP:  I think --

16             THE COURT:  It is Igoe because that would make --

17     yes.

18             MR. TROOP:  Okay.

19             THE COURT:  That's --

20             MR. TROOP:  Just to --

21             THE COURT:  Yeah.

22             MR. TROOP:  -- prove I was listening.

23             THE COURT:  Mr. Spears, I apologize.  It's -- that

24     was -- that's why I should read off of paper and not try to

25     freestyle.  No, but you're right.  The parties --

1          (Laughter)

2               THE COURT:  No, no, no, it's important.

3               MR. TROOP:  You know, I've known Mr. Igoe for almost

4      my entire --

5               THE COURT:  I-g-e-o is the correct spelling?

6               MR. TROOP:  I-g-o-e.

7               THE COURT:  I-g-o -- let me get it.  I-g-o-e, Igoe,

8      I-g-o-e is the spelling.  And I'm really sorry.  I should have

9      gotten that right.  Thank you.

10               MR. TROOP:  And then, Your Honor, without breaking

11      any privilege, just so you know, Massachusetts did participate

12      in mediation, both in connection with the sales, with Judge

13      Isgur, and later on as parties were trying to put together a

14      plan of reorganization.  So we'll never say no to listening.

15               But I do think that there was an implication --

16               THE COURT:  That --

17               MR. TROOP:  -- that we had not at all.  I am not

18      going to say that we participated to the same level as any --

19      everyone else.

20               THE COURT:  I think it's a fair --

21               MR. TROOP:  But it --

22               THE COURT:  -- a fair statement.

23               MR. TROOP:  It was --

24               THE COURT:  And --

25               MR. TROOP:  -- (indiscernible).

1          THE COURT:  And no one should read -- and I

2     appreciate the clarification.  And I will certainly note for

3     the record that no one should imply anything with respect to

4     statements I made about who attended a mediation or -- and who

5     didn't.  I honestly have no idea who attended the mediation,

6     other than those parties who told me they did, which was the

7     Committee, the Debtors, and I remember FILO and MPT because I

8     kept dragging them in there.

9          (Laughter)

10         THE COURT:  That was it.  But other parties may have

11    been involved and I -- no one should read anything into that,

12    one way or the other.

13         MR. TROOP:  Okay.  Thank you.

14         MR. COHEN:  And Your Honor, just --

15         MR. TROOP:  It's very much appreciated

16         MR. COHEN:  Just while we're clarifying, David Cohen

17    for the record.  I don't think Massachusetts participated in

18    plan mediation.

19         THE COURT:  Okay.  I --

20         MR. COHEN:  I think there were mediation regarding

21    the TSA transaction.

22         THE COURT:  I --

23         MR. COHEN:  I just wanted to -- if you disagree with

24    that, you can let me know.

25         THE COURT:  Well, I was just going to say they

1    participated in stuff, and no one should --

2         MR. COHEN:  Yes.

3         THE COURT:  -- read it one way or the other that

4    their participation -- I -- when I said that I hoped that

5    parties get together and talk, I knew that there were really

6    smart lawyers that were talk -- undoubtedly were talking.  I

7    was just hoping that, if they're talking, please continue to

8    talk.  If you're not talking, I hope that you do.  That was

9    aspirational more than factual.

10        No, no, but I appreciate it.  It's important.  I

11   think it's important, so that the Record is clear.

12        MR. COHEN:  All right.  Well, thank you, Your Honor.

13   I just wanted also to say thank you to you and your staff.

14   You know, I know you mentioned how many hearings there's been

15   in this case and the amount of work that happens --

16        THE COURT:  Yeah, I appreciate.

17        MR. COHEN:  -- with all the docket, and you and your

18   staff have been incredibly helpful, so thank you --

19        THE COURT:  You all --

20        MR. COHEN:  -- very much.

21        THE COURT:  You all have a good day.  Thank you.

22   Everyone is excused.

23        (Proceedings concluded at 3:47 p.m.)

24

25                         *  *  *  *  *

1              *I certify that the foregoing is a correct transcript*

2         *to the best of my ability produced from the electronic sound*

3         *recording of the proceedings in the above-entitled matter.*

4           */S./  MARY D. HENRY*

5         *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

6         *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

7         *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

8         *JTT TRANSCRIPT #69913*

9         *DATE FILED:  JULY 20, 2025*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **<u>EXHIBIT 2</u>**

```
 1                 UNITED STATES BANKRUPTCY COURT
                   SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3   STEWARD HEALTH CARE          )  CASE NO: 24-90213
     SYSTEM LLC,                  )
 4                                )  Houston, Texas
                                  )
 5            Debtor.             )  Friday, May 30, 2025
                                  )
 6                                )  3:02 p.m. to 4:11 p.m.
     -----------------------------)
 7
                                HEARING
 8
            BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
 9                UNITED STATES BANKRUPTCY JUDGE

10

     APPEARANCES:
11

     For Debtors:            DAVID J. COHEN
12                           Weil, Gotschal & Manges LLP
                             767 Fifth Avenue
13                           New York, NY 10153

14   Court Reporter:         YESENIA LILA

15   Courtroom Deputy:       YESENIA LILA

16   Transcribed by:         Veritext Legal Solutions
                             330 Old Country Road, Suite 300
17                           Mineola, NY 11501
                             Tel: 800-727-6396
18

19

20

21

22

23

24   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
25
```

<pre>
 1              HOUSTON, TEXAS; DAY, MONTH DATE, YEAR; TIME

 2                      (Call to Order)

 3          THE COURT:  Good afternoon, everyone.  This is

 4   Judge Lopez.  Today is May 30th.  It is 3:00 p.m.  I'm going

 5   to call the Steward case.  We'll get started in one moment.

 6          Ms. Shells, can you just put a thumbs-up if you

 7   can hear me just so -- would be helpful.  Okay.  I just want

 8   to make sure folks can hear me.  There's about 130 people on

 9   the line.  I didn't want to open it up too much.  Okay.  All

10   right.

11          I think everyone -- this is Judge Lopez,

12   continuation of hearing on two matters.  One I will call the

13   FILO Lender Settlement Motion and two is for conditional

14   approval of the disclosure statement.  I'm going to start

15   with the FILO settlement motion.

16          I would note that there were two motions filed,

17   one seeking approval of a settlement with the FILO secured

18   parties, the Official Committee of Unsecured Creditors, and

19   the Debtors.  I'll start with that and then I'll turn to

20   conditional approval of the disclosure statement and related

21   dates.

22          I'm going to note that the FILO settlement

23   provides for a couple of things.  Resolution of the FILO

24   secured parties' demand for relief from the automatic stay

25   under a FILO DIP order which has been out there for awhile
</pre>

```
 1    to exercise remedies over their collateral.  The settlement
 2    extents the maturity date of the DIP which currently is
 3    expired, unless there was a one-day continuance.  But it
 4    ends today.  It technically ended yesterday.  There may have
 5    been an extension of today for allowing the court to rule.
 6    But that would terminate use of the DIP and terminate the
 7    use of cash collateral.
 8             But this settlement would extend the maturity date
 9    to July 8th, 2025.  It would provide a $125 million
10    financing commitment from the FILO secured parties -- that
11    includes the use of cash collateral -- to support the
12    pursuit of some litigation claims, which the Debtors and
13    others in the Committee believe are valuable.  Would provide
14    a little over $21 million of funding to the Debtors, which
15    according to the relief in the motions would -- the Debtors
16    would use to essentially support administration of the
17    estate and make payments to some short-term creditors and
18    administrative creditors.  It would also provide adequate
19    protection to the FILO secured parties as a condition to
20    consent for the use of this additional money for cash
21    collateral and it would extend and essentially transfer.
22    This is a big point.  It would transfer substantially all of
23    the Debtor's assets into a litigation trust for the benefit
24    of the FILO secured parties and the Debtor's estates.
25             Would also subordinate about $10 million of claims
```

1    under a prepetition bridge facility that -- it would

2    subordinate it to all admin and priority claims on what is

3    known as a multiple on invested capital, which I will refer

4    to as the MOIC, commonly referred to in the proceedings as

5    well.  And it also reduces some interest rates as well.

6          I would note that as of December 31st, 2024 --it's

7    been awhile, this case has been going on for awhile --

8    maturity was about $335 million in principal amount, and

9    that remained outstanding under the DIP facility and the

10   prepetition bridge facility.  That excludes this MOIC piece.

11         The supporting parties who have been referred to

12   as the Debtors, the Committee, and the FILO Secured Parties,

13   believe that the settlement allows the Debtors to pursue

14   confirmation of a Chapter 11 plan of liquidation supported

15   by the FILO secured parties and the Creditors' Committee.

16   They argue that without that, that the states face imminent

17   risk of maturity, the FILO DIP facility, and again, of the

18   moving of the lifting of the stay, which technically could

19   assume today, including -- that would include assuming

20   ownership of the Debtor's remaining and control of the

21   remaining assets of the Debtors.  The Debtors have sold

22   essentially all of the hospitals here, so we really have a

23   few assets left in the estate.  And I'll describe those.

24   But that's really what we're doing.

25         Under this settlement, as I noted, there would be

1    a litigation trust formed.  The litigation trust is proposed

2    to have three beneficiary classes, what is referred to as an

3    A1 interest be held by the parties that extend litigation

4    funding and entitle the holders of them to priority first.

5    And then there's an A2 interest which would be held by the

6    FILO secured parties and entitle them to a second priority

7    liquidation preference equal to the amount of their DIP

8    facility and the prepetition bridge facility.  And then

9    there is a Class B interest which is going to be held by the

10   Debtor's estates or in this case converts to a successor

11   liquidating vehicle and entitle them, the Debtors or this

12   liquidation vehicle, to the proceeds of the interest after

13   repayment of the A1 and 2 interest.  There would be a

14   litigation trustee and a litigation to handle that.  It

15   would -- that litigation trustee would owe fiduciary duties

16   to the Class A1, A2, and B holders.

17            The settlement also includes releases.  The

18   releases include the Debtors, the Committee, and the Filo

19   Secured Parties, the litigation -- the litigation trust, I

20   should say, and certain related parties.  More on that in a

21   second.  And they would exchange mutual releases whenever

22   the trust was established, what is defined as the litigation

23   trust establishment date.

24            The settlement comes out as the result of a multi-

25   month mediation before Judge Isgur.  I would note at the

1  same time that this motion was filed, there is a proposed

2  Chapter 11 plan and a proposed disclosure statement that

3  I'll talk about in a minute.  And then as well as a motion

4  seeking conditional approval and solicitation procedures

5  related.

6          I would note that the targeted date for plan

7  confirmation requested there is July 8th.  So there is a

8  syncing of the dates between the litigation trust date,

9  transfer date, and the plan confirmation.

10          Numerous parties have objected to the relief

11  requested in the settlement motion.  The primary arguments

12  deal with what I would call the substance of the settlement.

13  It's not in the best interest of the estates, it doesn't

14  satisfy the 9019 standards, there are broad releases there.

15  At the hearing there was a timing component that was raised;

16  the Court shouldn't consider this motion and should delay

17  and consider the motion in conjunction with plan

18  confirmation.  So I'll call that kind of the timing issue.

19          And then the more substantive is that there is

20  allegations that this is a sub rosa plan, an impermissible

21  sub rosa Chapter 11 plan, the settlement itself is a sub

22  rosa plan.

23          The Court admitted exhibits on the Debtor's

24  witness and exhibit list for 4998 and that includes

25  declarations of John Castellano, the Debtor's chief

1   restructuring officer, which was in 4998, but is also ECF

2   4903 and the declaration of Will Transier, an independent

3   manager of the Debtors.  That declaration was included in

4   the exhibits at 4998 as well, but it's also identified in

5   the hearing at 4904.  I would note that Transier and

6   Castellano also gave live testimony.  Castellano gave a

7   supplemental direct in addition to his declaration and was

8   cross-examined.  Mr. Transier was examined on cross as well.

9        Before I kind of get into the analysis, I should

10  note that the Debtor's remaining assets based upon the

11  evidence in court, the Debtors have about $7 million in

12  cash.  There are some amounts that are escrowed on behalf of

13  third parties that don't constitute litigation trust assets.

14  There's a number of accounts receivables.  There are some

15  joint venture interests in certain clinics, and then there

16  are estate causes of action.  The Debtors claim that there

17  are significant causes of action that could bring in excess

18  of a multibillion dollar against certain commercial payors

19  in connection with accounts receivable against an insurance

20  policy for property damage, potential claims against Blue

21  Cross Blue Shield, there's a number of preference claims,

22  and then claims against current and former insiders,

23  including fraudulent conveyance, breach of fiduciary duties,

24  and other theories.

25        I want to note from the outset there was -- and I

1    understand that the Debtors raised a number of potential

2    actions and named a number of parties.  I take no position

3    one way or the other and nor do I find at this stage that

4    that there's litigation, there are potential causes of

5    actions against parties.  I've made no findings one way or

6    the other whether based on any evidence in front of me

7    whether any party has done any wrongdoing, and I want to be

8    really clear about that.  And I am including certain parties

9    here.  I'm seeing Ms. Jacobson's client (indiscernible).  I

10   make no findings.  I got it.  There could be some litigation

11   down the line.  There's some litigation pending.  Those are

12   issues for another day at another time.  And that's kind of

13   where we are.

14           I note that the Commonwealth of Massachusetts also

15   appeared and there was some potential issues raised and

16   potential litigation against them.  Again, my decision today

17   is not based upon me looking at intent, anyone who filed an

18   objection.  Parties in interest under the Bankruptcy Code

19   have a right to be heard on any matter.  The Bankruptcy

20   Congress gave parties the ability to raise and be heard.

21   And I thought the objections that were raised were valid

22   objections.  I found nothing improper about any objections

23   that were raised by any party.  But I got it, we are where

24   we are.

25           Let me turn to the factors.

  1            Bankruptcy Rule 9019  says that on a motion by the

  2     debtor and after notice and a hearing, the court may approve

  3     a compromise or a settlement.  That's what 9019 says.  The

  4     Fifth Circuit has held that a Bankruptcy Court may approve a

  5     settlement if the proposed settlement is fair, equitable,

  6     and in the best interest of the estate.  And that's In re

  7     Age Refining, Inc., 801 F.3d 530, 540 (5th Cir. 2015) case

  8     determining whether a settlement is fair and equitable.  And

  9     the Fifth Circuit applies a multi-tier test, the probability

 10     of success (indiscernible) litigating a claim subject to a

 11     settlement with due considerations for the uncertainty and

 12     facts in law, the complexity and likelihood and duration of

 13     any litigation or any intended (indiscernible).  And three,

 14     all other factors bearing on the wisdom of the compromise,

 15     including the best interest of creditors with proper

 16     deference to their reasonable views and to the extent in

 17     which the settlement is truly a product of arm's length

 18     bargaining and not of fraud or collusion.

 19            The Debtors bear the burden of establishing that

 20     the balance of these factors leads to a fair and equitable

 21     compromise.

 22            As for the first factor, when you kind of think

 23     about the probabilities here, Cajun Electric and there's

 24     plenty of other cases saying bankruptcy courts don't have to

 25     conduct mini trials to determine the probability of any

1  outcome, waived in a settlement.  Said a court must apprise

2  itself of relevant facts and law to make an informed and

3  intelligent decision.  Great judicial deference is given to

4  courts in -- and to the debtors in their exercise of their

5  business judgement.

6        And you look at cases like Aweco, 725 F.2d 293,

7  297 (5th Cir. 1984), approval of a settlement agreement is a

8  matter within the sound discretion of the bankruptcy court.

9        So the Court considered evidence and the testimony

10  and there were a number of evidence.  I took the night and

11  considered everything, carefully considered the evidence

12  before the Court and considered the objecting parties and

13  their concerns.  I've got a lot to say.  I just kind of need

14  to get it all out.  And what I say will fit in some places

15  and some other places.  There may be some overlap because

16  some of these issues overlap.

17        But where the Debtors have based themselves now is

18  that there is an expired several-hundred-million dollar

19  facility with lenders who have the ability to seek relief

20  from the stay and to foreclose on the assets that I've

21  identified.  No party disputes that.  That's why the Court

22  has to consider today this motion.

23        Considering this motion, as other parties have

24  asked me to, to another date 60 days from now, or I should

25  say a month-and-a-half from now, is realistically not

```
 1    possible.  And no one provided this Court any legal basis to
 2    adjourn for 40 days (indiscernible) that's been on notice.
 3    I would note I reviewed the final DIP order and I reviewed
 4    the rights that the FILO DIP lenders have under that order.
 5    An order has been there for a while.  You're talking a
 6    significant amount of time.  The order says what it says.
 7    And I think creditors have the right, secured creditors have
 8    the right to rely on court orders and that the court will
 9    grant the relief that is provided in those orders.  And I
10    read orders literally.  That order has been out there for a
11    while.  And the secured creditors has the right to seek the
12    right to lift the stay to foreclose, not for the Court to
13    then come at the eleventh hour and stay and decide something
14    60 days from now.
15           I would also note that the termination of cash
16    collateral -- probably terminated last night if not -- it
17    doesn't exist now.  So this case stops today completely, 100
18    percent, unless I rule on this motion.  It just does.  No
19    cash, the case can't continue.  I've got to consider this
20    motion today.  And I would note that it's on -- I do find
21    that there has been proper notice of the considerations of
22    the motion here.  I'm going to get into the merits of them.
23           But I am going to overrule the timing
24    consideration.  And I don't think bankruptcy courts should
25    be providing what I would call at best 105 relief to push
```

1    out hearings for a number of days.  I just have to rule up

2    or down on that.  But secured creditors have rights and

3    they've got to be able to rely on those orders.  Words

4    matter on those orders.  If people are going to lend

5    hundreds of millions of dollars, they're entitled to the

6    rights that they have under the order.  And courts have to

7    enforce them as written.

8         So let me just note I am going to grant the

9    settlement motion, and I'm going to tell you why.  The

10   settlement agreement, if you look at Castellano's

11   declaration at Paragraph 22, which is unrefuted, states that

12   the settlement agreement allows the Debtors to avoid

13   substantial litigation costs and risks associated with the

14   FILO secured parties seeking relief from the automatic stay,

15   to exercise remedies against their collateral, and

16   terminating consensual use of cash collateral.  And that if

17   the debtors were unsuccessful in that litigation, these

18   cases would convert to Chapter 7 and result in a very

19   material destruction for the Debtor's administrative and

20   unsecured creditors.

21        The unsecured creditors tell me in their arguments

22   and the evidence bore it out that without this settlement,

23   there's virtually no hope of any recover for unsecured

24   creditors.  It goes away.  There is none.  Because the

25   secured creditor can take and foreclose on all of the

1   assets.  And there's nothing in that final DIP order that

2   requires a secured -- FILO -- secured lenders to foreclose

3   on collateral, own the collateral, and then if they make

4   more money later as a result of foreclosing on the

5   collateral, that they've got to turn it over.  The only

6   option to keep the FILO secured lenders in -- there's a

7   waterfall treatment -- is in connection with the settlement

8   agreement.  It's the only thing that keeps them here.  It's

9   the only legal hook to keep the FILO secured lenders in this

10  case and to agree to allow them to get paid up to the amount

11  of their facility and to give a possibility for an unsecured

12  creditor to receive a dollar based upon the evidence before

13  me.  It is this settlement -- all the cash is gone.  All the

14  admin claim.  There is no runway.  It all stops today.  And

15  that weighs heavily on me.  That's what is unrefuted.  In

16  connection with this case.

17          Castellano's live testimony, he stated on direct

18  examination that if the FILO parties are successful, the

19  Debtors will have no liquidity and no assets left and it

20  would have a detrimental impact on unsecured creditors and

21  that the FILO securities would have title to all assets of

22  the estate, including cash.  It's unrefuted.

23          Castellano testified in his supplemental

24  declaration at ECF 4977, which is admitted as well,

25  Paragraphs 5 through 7, that the FILO secured parties will

1    not consent to a priming lien and that there's a substantial

2    risk that the estates lose ownership of the remaining estate

3    assets and that the most likely outcome of a sale or an

4    auction process is that the FILO secured parties will

5    purchase all or substantially all of the Debtor's assets

6    primarily or exclusively using a credit bid.  Mr. Price, who

7    represents the FILO secured parties, stood up in court and

8    confirmed just that.

9            Additionally, Castellano testified in his

10    declaration at 4903 at Paragraph 30 that entry into the

11    settlement agreement is necessary to provide adequate

12    protection to the FILO secured parties and to ensure the

13    continued consensual use of cash collateral, both of which

14    were necessary to avoid litigation with the FILO parties and

15    to avoid conversion.  That's where we are.

16            Thinking about the complexity and the attendant

17    expenses and inconvenience and delay, there's no question

18    that without the use of cash collateral, this case comes to

19    a screeching halt.  There's no question that any debtor with

20    $7 million in cash with no -- with someone who has a priming

21    lien, a secured lien, to try to get someone with a priming

22    lien to come in and -- that's a -- we just never get there.

23    You just never have the opportunity to come up with -- there

24    are no other alternatives.

25            And I would note for the record, and I sat there

1    and listened very carefully, there is no -- no one presented

2    a credible alternative to taking out the secured lender,

3    someone putting up new money.  There was no credible

4    evidence in front of me to even hint that that was a

5    possibility.

6             Castellano's declaration at 13, unrefuted.

7    Without the adequate protection provided for in the

8    settlement agreement, they could foreclose, litigating over

9    issues, the use of cash collateral and a motion to lift the

10   automatic stay before any attempt to confirm a Chapter 11

11   plan would deplete the Debtor's remaining resources and

12   leave insufficient funds to pursue an alternative

13   transaction to maximize value for the estate.

14            Castellano's supplemental declaration in Paragraph

15   8, upon conversion thinks that the trustee would obtain

16   materially less for the remaining assets.  That issue was

17   disputed by objecting parties.

18            And I'm going to talk about this in a minute.

19   Castellano also testified that he talked to numerous parties

20   to see if anyone was going to take up litigation.  And there

21   is a risk, a very real one, that a Chapter 7 trustee would -

22   - the case would convert and the Chapter 7 trustee has no

23   cash to do anything.  And she or he would have to speak to

24   parties to try to get information and try to pursue causes

25   of action which would be owned by the FILO secured parties.

1    And let's even say that she or he is successful about

2    winning and getting a cause of action that is not subject to

3    secured lenders' liens, which I don't see, Castellano also

4    says that no one is going to take it on a contingency.  And

5    that's unrefuted and no one showed up in court to contest

6    any of it.  So there's nothing for priority creditors.

7    There's nothing for unsecured creditors.

8         When you think about all other factors bearing on

9    the wisdom, best interest of creditors, the deference to

10   their reasonable views -- you know, you go back to this FILO

11   secured parties seeking to foreclose and their rights,

12   material value destructing for an admin priority and

13   unsecured creditors.  Castellano also explains in Paragraph

14   24 at ECF 4903 that the settlement provides for $21.5

15   million to the Debtor's estates after litigation trust

16   establishment date to fund the administration of the estate

17   and payments to administrative creditors and that the

18   settlement subordinates the retained FILO claims of $10

19   million to admin and priority to share recovery with general

20   unsecured creditors.

21        Castellano also testified that the global -- in a

22   supplemental declaration in Paragraph 10 that the global

23   settlement negotiated with the FILO parties and the

24   Creditors' Committee provides the only path to avoid these

25   risks and to enable the Debtors to repay admin claims and

1    priority creditors in full and to provide a meaningful

2    recovery to unsecured creditors.

3         Mr. Transier testified in his declaration that the

4    estate has valuable claims against insiders and third

5    parties and that the investigation subcommittee was

6    appointed by the board and instructed counsel to conduct an

7    investigation to identify any potential claims and that he

8    believes that there were hundreds of thousands of the

9    Debtor's financial records and communications between

10   insiders and third parties and meetings and board meetings

11   and that there were 14 interviews with directors, officers,

12   and employees and that the subcommittee reviewed findings

13   and determined that the Debtors have valuable estate claims

14   and causes of action.

15        Castellano testified that he thinks that's the

16   only remaining available asset and that it could be multi-

17   billion.  And he also testified that that's the only way to

18   repay admin and priority claims in full and provide a

19   meaningful recovery, and that the settlement provides the

20   time, the money, and the support for key stakeholders to

21   pursue these claims and to maximize recovery.

22        Transier was crossed on the fact that a

23   contingency billing process may or may not have been

24   proposed to Kobre & Kim, but he also testified that Kobre &

25   Kim was selected because of its experience trying some other

1    cases and saw their credentials.

2         And the Debtor's didn't sit on their hands when it

3    came to potential litigation, potential financing outside of

4    the settlement.  In fact, Castellano testified in his

5    declaration at 4903 that the Debtors contacted 19 other

6    third parties to gauge interest in providing a proposal for

7    litigation financing but ultimately the FILO secured

8    parties' proposal was the best litigation financing

9    alternative available to the Debtors and that it was based

10   on reasonable and market-based terms and actionable, and the

11   only proposal that provided comprehensive funding needed to

12   confirm a Chapter 11 plan, fund the estate, and effectively

13   pursue all the litigation assets.

14        The evidence also shows -- there is no refute --

15   that this was arm's length negotiations in mediation and not

16   the result of any fraud or collusion.  I don't think anyone

17   got anything they wanted, everything, a hundred percent in

18   connection with the settlement agreement.

19        When you look at Paragraph 23 -- Paragraph 25,

20   Transier, non-contested.

21        So you turn to the objections.  Let me start that

22   it's not in the best interest of creditors here -- I know

23   TRACO and others essentially argue that the settlement

24   agreement is not in the best interest of creditors by

25   exacerbating administrative insolvency issues.  And there's

1    a real admin problem, there's no question about it.  There's

2    a very large number out there, an incredibly big number, a

3    number of administrative claims.  And it's been

4    substantiated by the administrative claims bar date.  It has

5    been substantiated by Castellano's testimony and it may be

6    larger than the Debtors think at this point.  But Castellano

7    also testified that absent consent, there's no funding to

8    monetize the remaining assets and pursue a Chapter 11 plan.

9    You just don't get to monetize anything.  The number doesn't

10   get bigger.  There's no chance of getting anywhere.

11   Everything comes to a halt today in this court based on the

12   evidence.

13          Castellano explains in Paragraph 24, unrefuted

14   evidence, it avoids conversion to Chapter 7, which again,

15   it's unclear what a Chapter 7 trustee would have at all if

16   this case converted immediately.  And value-destructive.

17   Provides funding to try to get to a Chapter 11 plan to see

18   what creditors want.  Subordinates $10 million and also

19   allows the use of cash collateral.  You cannot overlook the

20   fact that there is a several-hundred-million dollar

21   financing that has come to term and it immediately stops the

22   use of cash collateral.

23          The evidence from the objecting parties suggest

24   that somehow the Court could continue as the only way, but

25   there is nothing that would stop the continued use of cash

1    collateral.  And without the consensual use of cash

2    collateral, there is no case.  What -- I'm going to convert

3    something to Chapter 7?

4            I would also note -- and I'll say this about

5    motions to convert -- the case has been out here for a

6    while.  Every motion to convert the case was filed shortly

7    before the hearing.  And I was asked to consider it.  But I

8    do think conversion is a consideration in a 9019, whether it

9    would be best or not.  But there will be a day to take up a

10   motion to convert the case where people can put on their

11   evidence.  I'm just talking about -- I am not required to

12   conduct a mini-trial on every issue.  There will be proper

13   notice on those and we'll take them up in due course.  But

14   the evidence shows that the only path available to avoid

15   these risks is to put them here.

16           The Commonwealth argued -- and I said this a

17   little earlier about it's premised upon a false threat of

18   foreclosure.  The documents say what they say.  I don't

19   think it's a false threat.  I think it is a very real

20   possibility.  And that would destroy value for every

21   unsecured creditor here today.  And that's what the Official

22   Committee of Unsecured Creditor -- and I would note the

23   Committee -- this is no -- at any point no committee that

24   has rolled over at any point in connection with this case.

25   They have been active and pushed hard on every point in this

```
 1   case.  And I want to note that for the record.  I make no

 2   findings about the Commonwealth, I make no -- but whether

 3   they did anything here.  I don't play around with threats.

 4   And this isn't a threat, it's just a statement in a -- it is

 5   an order of the Court that allows parties to exercise

 6   rights.  That's where we are.  But certainly the use of cash

 7   collateral terminates and there's nothing that this Court

 8   would do to extend that based upon the lack of adequate

 9   protection.

10          And I want to note the Committee and its

11   professionals.  I don't know what took place in the

12   mediation, I just know it took over a couple of months.  But

13   noting about the actions in front of them.  This case, the

14   admin claims are high.  And a lot of them are professional

15   fees.

16          There will be a time to take up professional fees.

17   The Bankruptcy Code guarantees that there is a hearing where

18   we can review and review professional fees and take them up

19   and parties have the right to object.  The Court will

20   consider them.

21          I also have to consider as part of the 9019 -- I

22   know Mr. Keach mentioned we don't need to think about the

23   past.  But I do think when you have to consider whether the

24   settlement and where we are and why the Committee is pushing

25   for it, the Committee, Mr. Castellano, Mr. Transier, the
```

1    Debtors, the FILO secured parties have been mediating for
2    months and have been showing up in a case that came with
3    really hard facts.  Right?  The -- go back to the MPT
4    parties and someone owning the land.  Held hearing -- you
5    know, live patients, people coming into this court saying
6    that if the Court didn't act or didn't prevent parties from
7    acting, that people would die by actions, decisions that
8    this Court made or decisions that this Court didn't make.
9    The act or failure to act in some instances would lead to
10   death.  Those are really hard facts to deal with.
11           And so at some level professionals who represent
12   the Debtor or who represent the Committee, you've got to do
13   everything.  You didn't create the facts that came into
14   this, but you had to do everything you could to a certain
15   extent to try to make sure that you did everything you
16   could.  If not, then folks can allege that you didn't do
17   enough and that's the reason that there's no cash.  That
18   leads to litigation and people questioning estate
19   professionals and saying you didn't do enough while you were
20   there.  That's Highland II, right?  Or Highland I.  I can't
21   keep track of all the Highlands.
22           So that's professionals have a duty and they are
23   really hard facts.  Selling assets, coming up with sales,
24   continuing.  But the number is really big.  And I'll talk
25   more about admin claims in a moment.

1          There's no question the Debtors don't have

2    liquidity.  So I overrule that it's not in the best interest

3    of the estate and the professionals or in the best interest

4    of other creditors.  That's because the admin claims could

5    get larger.  When you look at the remaining assets which

6    I've identified, there's nothing there on its own that you

7    can just sell and magically pay admin claims.  It just

8    doesn't work.

9          Let me talk about the sub rosa plan.  There's

10   arguments that this is a sub rosa plan.  And what is a sub

11   rosa plan?  The Latin phrase -- and Keach stole my thunder

12   yesterday -- the Latin phrase literally translated when used

13   as an adjective here, it means happening or done in secrecy.

14   Right?  So literally translated, it means a plan happening

15   in secret, right?  And that's obviously not what's happening

16   here.  We've had public hearing, there's been a motion with

17   plenty of notice, over 200 participants on the phone, 165

18   today.

19         But sub rosa plan has kind of developed its own

20   meaning in caselaw that really refers to a de facto plan,

21   one in which a Chapter 11 debtor constructs or does

22   something that amounts to a Chapter 11 plan of

23   reorganization, kind of restructuring debt in a way that

24   bypasses many of the Bankruptcy Code's fundamental

25   protections that are set forth in connection with a plan

1   confirmation.

2          A court can sometimes deem a sub rosa plan when

3   there's a settlement if the settlement essentially has the

4   effect of dictating the terms of a prospective Chapter 11

5   plan.  And you can hear people making the arguments that the

6   settlement dictates the terms of a Chapter 11 plan, picking

7   up on those Energy Future Holdings Delaware cases and the

8   Capmark cases.

9          There's a famous Fifth Circuit case involving

10  airline slots and airline script.  The Braniff case.  Harold

11  Abramson was still practicing law at the time, if you can

12  believe it, before he became a judge at the time.  Fifth

13  Circuit in Braniff determined -- and you can see caselaw has

14  developed here.  You see cases -- I think Babcock & Wilcox

15  kind of summarized Braniff well.  Judge Smith on the Fifth

16  Circuit wrote that Braniff stands merely for the proposition

17  that the provisions of a Section 363 permitting the trustee

18  to use seller lease and assets don't allow a debtor to gut a

19  bankruptcy estate before the reorganization or to change the

20  fundamental of the assets in a way that limits a future

21  reorganization plan, right?  You would file an order of

22  priority changing.  You know, are you doing something that

23  bypasses the priority scheme that is required in connection

24  with a Chapter 11 plan?  You can see hints of that as well

25  in cases like Jevic (indiscernible) structured dismissals.

1    And what you're saying is we're going to do it this way, but

2    we're going to do it this way but we're going to pay these

3    creditors first in this way, but you couldn't do it in a

4    Chapter 11 plan, but you're trying to do it outside of the

5    plan process.  Are you changing a fundamental priority,

6    protections like best interest of creditors and absolute

7    priority rules?  Are you trying to bypass it -- in other

8    words, really de facto and sub rosa, are you really kind of

9    secretly trying to just do an 11 without doing an 11 to

10    avoid the requirement that creditors get to vote on a plan?

11    And that's not really what's happening here.  Not at all.

12         First of all, the  Court find that it would have

13    the authority to establish a litigation trust outside of a

14    Chapter 11 plan process.  That could happen.  Assets can be

15    transferred to the trust, create a trust outside of the plan

16    process in connection with a settlement and why couldn't

17    they do it in connection with this settlement?  And again,

18    you've got to go back to where we find ourselves.  The

19    secured lender has a right to foreclose on all the property.

20    It has a super priority lien on all these assets.

21         In other words, we talked about the Class A and B,

22    A1, A2.  Helps in the settlement.  The secured creditor has

23    a right to foreclose on all of it.  And I said yesterday I

24    would lift the stay.  Of course I would.  It's been -- over

25    $300 million and no plan and no cash.  No use of cash

1    collateral.  What else is there to -- not a complicated

2    hearing if one were to hold a lift stay hearing.  There's

3    nothing here that would stop that secured creditor from

4    having the right.  And I think I have to enforce court

5    orders as written and to honor the deal that was struck in

6    connection with reaching a consensual use of cash

7    collateral.  It leads to harsh consequences but also allowed

8    hundreds of millions of dollars to be used in connection

9    with this Chapter 11 case.  Saved lives during the course of

10   the case.

11        So I think the settlement complies with the

12   Bankruptcy Code and doesn't dictate the terms of a plan.

13   There is another plan there, but it doesn't dictate the

14   terms of that plan, it doesn't dispose of claims against all

15   claims by all parties against the estate, it doesn't

16   restrict creditor votes, either.  And you look at Sections

17   1122, 1123, 1124, 1125, 1126 and 1129, they are important

18   sections of the Code that directly relate to plan

19   confirmation.  Right?  Look at 1123.  It says what has to be

20   in a plan, what must be in a plan and what may be allowed in

21   a plan.

22        I agree with the Capmark analysis, 438 B.R. 471,

23   513 (Bankr. D. Del. 2010).  And if you look at a settlement,

24   you're going to have to dispose of all claims against the

25   estate or restrict the creditor's right to vote.  And that

1    was adopted by the district court in the Energy Future

2    Holding case.

3          Here, unlike Braniff, which said here's how the --

4    we're going to get the proceeds in and then here's how we're

5    going to pay it and here's who it's going to pay and here's

6    exactly what's going to happen, right?  That's what the

7    court was against in Braniff.  Dictated the terms of any

8    plan.

9          Here we actually have a plan.  Could there be a

10   hypothetical settlement that dictated all the terms of the

11   plan?  I don't know.  But we don't have that here.  But

12   that's a hypothetical because there is actually a plan here.

13   Do they complement one another?  Yes, sure.  But that

14   doesn't mean it dictates the terms of the plan.

15         And there was some arguments made, well, could

16   someone file a plan that violates the settlement order, they

17   would file at the same time.  Who in the world would do

18   that?  That doesn't make sense.  Of course you reach the

19   settlement in a mediation and there's two separate documents

20   there.  And they both stand and fall on their own.

21         And that's an incredibly important point to me.

22   This settlement stands on its own.  Plan confirmation is an

23   entirely different endeavor in my -- that's the way it's set

24   up and that's the way I'm telling everyone I'm thinking

25   about it.  Make no mistake, there is no guarantee that

1    there's a Chapter 11 plan that could be confirmed.  It will

2    stand and fall on its own merits.

3           The settlement gives the Debtor money to pay --

4    the reference to payment of claims is really dictated under

5    the plan.  It's not dictated under the settlement agreement,

6    right?  But yeah, but the A1, the A2, the B, that still

7    keeps the priorities.  Quite frankly it's giving -- it's

8    really giving up some rights that the secured lender is

9    doing.  There's no path.

10          You know, and you look at cases like Richmond

11   Leasing, 762 F.2d 1303 (5th Cir. 1985), you look at Cajun

12   Electric Power Cooperative, 119 F.3d 349 (5th Cir. 1997).

13   And you don't dispose of all the assets and release -- it

14   doesn't alter creditor rights.  Just the priorities are

15   there.  And just because of where we find ourselves, I think

16   I view the settlement as a necessary first step towards

17   getting to a plan.  You just don't get there without it.

18   There is no path for the Debtors to propose a Chapter 11

19   plan or even negotiate with anyone else.  Everyone loses,

20   especially unsecured creditors.

21          Based on the evidence in support of the

22   settlement, we're talking basically no recovery.  And I mean

23   none.  And priority among admin claimants may be rendered

24   meaningless, too.  Potentially hundreds of millions of

25   dollars of potential litigation claims could go.  And that's

1    a real possibility.  Unsecured creditors would see nothing.

2           I'll talk about the releases.  I think the

3    releases are appropriately narrowly tailored with two

4    exceptions.  All claims by all parties are not being

5    released under the settlement.  The settlement provides for

6    mutual releases between the Committee, the FILO lenders, and

7    debtor-related parties.  There are no third-party releases.

8    There are no third-party releases.  There is no Purdue,

9    there are no third-party releases.

10           There was questioning about two individuals, Ann-

11   Marie Driscoll and Joseph Lombardo.  I make no findings

12   about them at all.  They were included as debtor-released

13   parties.  They were included, and then it was questioned.  I

14   just don't have any evidence in front of me to include them

15   as part of the settlement or why they were included in the

16   settlement.  They've got to be excluded.  Maybe they get

17   included in the plan.  I don't know.  That's another issue

18   for another day.  But I can't include them as part of the

19   settlement based upon the evidence before me.  I'm trying to

20   call it as fair as I can.  Including them is about this deal

21   and the evidence.  I say zero about them.

22           So based upon the Court's consideration of all the

23   relevant factors, I'm going to find that the settlement is

24   in the best interest of the estate.  Considering all

25   relevant factors under the Fifth Circuit caselaw, it is the

1     only path that provides any opportunity for any runway for

2     the estate to have an opportunity to provide any form of

3     meaningful recovery, even if the case -- if I find based

4     upon the evidence in front of me is to convert at a later

5     date.  Conversion today is not before me.  What would come

6     before me is a motion to lift the stay which I would have to

7     take up in short order and would likely lead to foreclosure

8     on all the assets.  That's where we are.  This provides

9     additional liquidity, provides runway.  I would note for the

10    record provides -- and again, I know there are some firms

11    that are listed.  I'd rather not say their name.  But they

12    are serious professionals.  I take that into consideration

13    as well.  So note that for the record.  I don't know where

14    money would come from, what alternatives would be there.  No

15    one proposed anything.

16          So I grant the motion.  I want the Debtors to

17    submit a proposed order.  I know that there were a bunch of

18    tweaks and revised languages and promises that were left out

19    and put in.  And get whatever is the right version with

20    everything in there that was promised on the record and

21    submit an order and I want to sign it, get this going.

22          I want to note as well and I find that the

23    Committee, its professionals, the Debtor and its

24    professionals, and I include the Transformation Committee

25    based on the evidence before me, Mr. Castellano and his

1    team, all acted in good faith in connection with the

2    mediation and the proposal of this settlement.  It was put

3    on notice to all parties, all members of the Committee who

4    voted to support this.  Find no evidence to put a motion

5    before the court based upon months of mediation, and they

6    put it out in good faith.

7              Now, I am approving it in the best interest of the

8    estate as complying with the Fifth Circuit caselaw with

9    limited exception for the releases.

10             I would note as well that it's not unusual in

11   connection with a large settlement that parties provide

12   mutual releases.  There are scores of cases, scores of cases

13   where parties enter into large agreements outside of a

14   Chapter 11 plan process and provide releases to each other.

15   And the FILO secured parties as well.  I find they acted in

16   good faith and its professionals in connection with this

17   process.  Obviously they are a part of the settlement

18   parties as well.  It's not uncommon.

19             So anyway, I am approving the settlement.  I don't

20   know, calls to Mr. Cohen, someone.  We will find the right

21   person.  You will Ms. Saldana know, and I will sign the

22   order.

23             I'm going to turn to conditional approval.  I'm

24   going to approve conditional approval of the disclosure

25   statement.  It is a -- the disclosure statement has -- its

1    over 500 pages.  The Debtors understand that they run the

2    risk by conditional approval that I could change my mind at

3    a later time and find that it didn't contain adequate

4    protection and the Debtors are willing to take that risk and

5    that will be conducted to a final hearing.

6                I note the Committee has asked for a letter to be

7    included, and it should.  I read the letter and it should be

8    included with the parties.

9                I would note that 1125 provides that a disclosure

10    statement must contain adequate information.  Adequate

11    information is determined as (indiscernible) information to

12    allow a holder to make an informed decision as to whether to

13    make an informed decision as to whether to vote to accept or

14    reject the plan.

15                The disclosure statement should go out.  We'll let

16    the vote of creditors -- I want to hear from voters as to

17    what they think about this plan, the admin expense and

18    whether they want it or not.  High threshold to meet.  If

19    it's going to work.  I want to hear from voters.  I want to

20    hear from unsecured creditors.  I want to hear from admin

21    parties.  I heard from a lot of them today, but there's

22    nothing in that disclosure statement that violates the

23    Bankruptcy Code on its face.  The plan is not patently

24    unconfirmable.

25                Certainly there are -- we got a preview of the

1    coming attraction, if you will.  And there were two big

2    issues.  Certainly feasibility is one, right?  Can the

3    Debtors actually pay all admin claims in full on the

4    effective date?  And then we'll talk about what that means.

5    But let's just start there.

6             I'm telling the Debtors now I'm concerned about

7    admin claims and the amount of the admin claims and the

8    Debtor's ability to do so.  The Debtors will not at plan

9    confirmation have the right to just tell me that they think

10   it's going to be worth billions of dollars in litigation and

11   leave it there.  They're going to have to put on at least a

12   prima facie case to some of these claims.  They're going to

13   have to articulate it.  They're going to have to identify.

14   That doesn't mean we're going to get into a mini trial, the

15   merits, and how much do you think you're going to make and

16   turning it into a discovery, but there's got to be more to

17   give me comfort and to give me a factual basis that some of

18   these investigations, that they were fruitful and that they

19   resulted in claims.

20            Now, there is a way to do this that has been done

21   plenty of times in other large cases.  I'm not -- you've got

22   to put some meat on the bone.  And it's not just going to --

23   we were at a conditional disclosure statement hearing.  I

24   don't need the legal -- but you've got to put something on

25   to tell me what you think you see and why you think

1   something is going to be worth, is there insurance that

2   parties can go after.

3          And I am making no findings about the other side,

4   either.  That's why we're not conducting a mini trial.  This

5   is not going to be -- it's way too much -- there's way too

6   much rattling of sabers for me on both sides, on everything.

7   Way too much on this side.  Let's just talk about what

8   claims are being reserved, what you think you're doing.  And

9   if you're going to say you think you can make a billion

10  dollars or a couple more, there's got to be some meat on the

11  bone to really provide that.  And there's a way to do this -

12  - talking about opening doors and showing -- I want

13  sufficient information to get me comfortable that you can

14  actually do this.

15         I want to know why you picked 2027.  I want to

16  know.  How long is this litigation going to last, right?

17  Where are you going to go and how do you get there?  What

18  else are you counting?  Are you counting personal injury

19  postpetition claims in connection with this and how are you

20  thinking about those?  And it's different.  I want clarity

21  when it comes there.  I don't know if you get there.

22         I'm going to take up conversion at the same time

23  as I do plan confirmation.  And whenever I make the decision

24  on that, I will make the call and the case will either

25  convert or I'll confirm.

```
 1              It stands on its own.  I should say the FILO

 2    secured party settlement agreement stands on its own.  It's

 3    supported by law.  So plan confirmation its own.  The Debtor

 4    will have to meet its burden on that.  I'm not rattling

 5    sabers here.  I'm just saying this is not -- just because

 6    you approve one doesn't mean you approve the other.  That's

 7    the whole purpose of it is that one doesn't dictate the

 8    terms of the others, right?  So we'll see where this goes.

 9              I want to hear from voters and voters will talk.

10    And again, I can hear briefing on the effective date.  And

11    it's been done in other cases.  And I read the cases Mr.

12    Keach referred me to, and I know that the Debtors are going

13    to cite cases like Sears and Pier One and other cases.  So

14    you go both ways.  And I think courts have to look at this

15    and make an informed decision about how it works.  And I've

16    read Premier, and they're right, it can go both ways.  But I

17    need to hear what the evidence is.  And I don't have --

18    yesterday wasn't the day for me to say, you know, on the

19    spot you can never do this.  Because it's been done by other

20    courts.  Other courts found it didn't work in those cases.

21    And I do think others are going to have to show up and tell

22    me why -- you know, and maybe analysis changes, maybe the

23    date goes further out, maybe the date comes closer in.  I

24    don't know.  I do think and I encourage the Debtors to

25    continue to work.  There are a number of matters that I
```

1    think could really clarify and streamline the admin process.

2    I know that they are continuing to work and I strongly

3    encourage them to continue to work with the Committee during

4    this time.  The July 8th period works as well.

5           I want to let the Debtors know that and I want the

6    associates to know that I did not pick July 8th.  It was

7    your partners who picked July 8th.  It was not me.  That's

8    what they asked for.  And we'll show up and we'll try and

9    we'll take this up.  But again, I know that there are

10   serious matters here.  And some real serious issues were

11   raised.

12          I am also going to ask the Debtors, you know, if

13   there are no surprises in terms of Mr. Castellano said they

14   were still kind of doing the reconciliation.  And I'm asking

15   the Committee if something big comes up that I need to know

16   about, I want to have a hearing.  I don't want to show up on

17   July 8th with a big surprise that the number is nowhere near

18   what we heard yesterday.  I want to know about it and I want

19   to make decisions.  I want to make real-time decisions.

20   Just because there's a hearing on the 8th doesn't mean we

21   need to have the hearing on the 8th.  But if something comes

22   up, I want to know.  I'm asking.  And if not, we'll take up

23   plan confirmation.  We'll take up conversion at the same

24   time.  And if we need to have a status conference about what

25   that looks like, I'm happy to do that.

1    There was a lot of talk about professional fees

2    being paid out at the end of the year.  I haven't approved

3    anything.  What I have approved today is a settlement

4    motion.  That's what I approved.  I haven't approved

5    anything else today.  Oh, I did approve conditional approval

6    of the disclosure statement, which gets you to send stuff

7    out and pick dates.  I have not approved any administrative

8    expense claims, I haven't done anything.

9    So everybody's rights are preserved on all issues

10   related to plan confirmation.  And I would note that what

11   was argued before me yesterday was largely plan confirmation

12   issues, right?  You know, best interest of creditors and --

13   best interest of creditors is an issue.  I'm assuming that -

14   - I don't know what the vote -- I've got to see the vote.

15   You've got to see the votes to then see if the best interest

16   of creditors kicks in, and then you've got to make a

17   determination as to which class.  And then we can make all

18   kind of arguments, parties can make all kinds of argument

19   about that and the Court will consider all those issues at

20   the appropriate time.

21   So we will take up exculpations, releases, all

22   other related issues that come with -- there were

23   classification issues that were raised, there was issues

24   about feasibility.  And, you know, the Debtors have the

25   burden.  They put on their case.  But again, I still want to

1    know if there are surprises before then.  You all let me

2    know and we'll schedule a hearing.

3         I did count there were about a hearing a week on

4    average here.  I'm not holding one on a Saturday anymore,

5    but we'll hold one.  That's unnecessary.  But we'll pick

6    this up.

7         The reason I'm saying it's -- io do agree with the

8    point that these cases need to come to a conclusion one way

9    or the other.  That's what I am stressing.  And I'm not

10   saying no one feels that way, I'm just expressing why I

11   think July 8 is a real date.  But now you're going to have a

12   chance to get there, get some liquidity, extend maturity so

13   we don't have to have an emergency hearing on Monday to lift

14   the automatic stay and have a fight about that.  Some

15   administrative creditors can continue to get paid, the

16   debtors can continue to work.  I've encouraged the Debtors

17   to work with certain parties.

18        I'll rule on the HAS.  I think my case manager is

19   going to reach out to parties to talk about scheduling and

20   getting on a schedule on additional discovery related to

21   that matter.  I'm sure there are other matters that we'll

22   take up before then.  We'll take them up one at a time based

23   upon the law and the facts.

24        Pardon me.  I'm just going to check my notes.  Can

25   you just give me two minutes?  I'm going to step off and

```
1    then I'll come back on and we'll see where we are.

2              (Recess)

3              THE COURT:  We're back on the record.  I have

4    covered all of my bases.

5              Mr. Cohen, I forgot to mention, get me an order

6    that works for the parties.

7              Mr. Cohen?

8              MR. COHEN:  We will, Your Honor.  For the record,

9    David Cohen, Weil Gotshal & Manges, for the Debtors.  We

10   actually will get you a revised settlement order as well as

11   a revised order approving conditional approval of the

12   disclosure statement.

13             Just one request, Your Honor, now that you've put

14   a target on my back.  Will do so (indiscernible) in terms of

15   the July 4th date, number one.

16             Number two, we do agree with the Court.  These are

17   very important issues that I'm just going to have to address

18   at confirmation.  And I would like the opportunity just to

19   speak to Mr. Price about potentially extending that date out

20   at least a few days just so we don't deliver your

21   confirmation briefs from the Sunday of July 4th weekend.

22   (indiscernible).

23             THE COURT:  Don't worry about me.  I'm good.  I'm

24   fine.  I'm ready to go.  I'll be ready.  Don't worry about

25   me one bit.  These are important issues.  This case -- no, I
```

```
1   knew what I was doing when I was approving it on the 8th.

2   I'm ready to go.  You all just be ready as well.

3              MR. COHEN:  Understood, Your Honor.

4              THE COURT:  Okay?  All right, folks.  Anything

5   else we need to talk about?  All right.

6              MR. COHEN:  (indiscernible).  Thank you, Your

7   Honor.

8              THE COURT:  Thank you very much.  All right.

9         (Proceedings adjourned at 4:11 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         CERTIFICATION

 2

 3     I certify that the foregoing is a correct transcript from

 4     the electronic sound recording of the proceedings in the

 5     above-entitled matter.

 6

 7

 8

 9

10     Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  June 3, 2025
```